1  **UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan**

**ANDREA ROSSI**, *et al.*,

      Plaintiffs,

v.

**THOMAS DARDEN**, *et al.*,

      Defendants.

_____/

**ORDER**

**THIS CAUSE** came before the Court upon Defendants, Thomas Darden; John T. Vaughn; Industrial Heat, LLC; IPH International B.V.; and Cherokee Investment Partners, LLC's (collectively, "Defendants[']") Motion to Dismiss ("Motion") [ECF No. 17], filed on June 2, 2016. Plaintiffs, Andrea Rossi and Leonardo Corporation (collectively, "Plaintiffs") filed their Memorandum of Law in Opposition . . . ("Response") [ECF No. 18], on June 17, 2016. Defendants filed their Reply . . . ("Reply") [ECF No. 19] on June 27, 2016. The Court has carefully reviewed the parties' written submissions, the record, and applicable law.

**I.  BACKGROUND**[1]

Plaintiff, Andrea Rossi ("Rossi"), invented a low-energy nuclear reactor, popularly known as the "Energy Catalyzer" or "E-Cat," which produces energy at a cost well below traditional energy sources. (*See* Compl. ¶ 1). Plaintiff, Leonardo Corporation ("Leonardo"), owns all of the intellectual property related to and underlying the E-Cat technology (hereinafter, "E-Cat IP"). (*See id.*). To protect the E-Cat IP, Leonardo and Rossi filed numerous patent and trademark applications in the United States and Europe, three of which were granted. (*See id.* ¶¶

---

[1] The factual allegations of the Complaint . . . ("Complaint") [ECF No. 1] are accepted as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

26–29).[2]

In early 2012, Defendants, Thomas Darden ("Darden"), John T. Vaughn ("Vaughn"), and Cherokee Investment Partners, LLC ("Cherokee") contacted Plaintiffs and expressed an interest in licensing the E-Cat IP in the United States. (*See id.* ¶ 34). Darden is the CEO of Cherokee, and Vaughn is a manager. (*See id.* ¶¶ 9–10). The parties met several times, and Darden, Vaughn, and Cherokee repeatedly stated: "Cherokee has billions of dollars at its disposal, and is willing to pay Rossi and Leonardo" to license the E-Cat IP. (*Id.* ¶ 38). They further assured Plaintiffs they would protect the E-Cat IP from dissemination "so as to maximize the value of the intellectual property around the world." (*Id.* ¶ 39). In reliance on such representations, Plaintiffs began licensing negotiations with Cherokee. (*See id.* ¶ 40).

On October 26, 2012, Rossi arrived at Cherokee's office to execute a License Agreement ("License Agreement") [ECF No. 1-2]. (*See id.*). At this time, Darden and Vaughn told Rossi they had formed a new business entity, Defendant, Industrial Heat, LLC ("IH"), a branch of Cherokee designed to serve as the holding company for the E-Cat license. (*See id.* ¶ 41).[3] Darden and Vaughn represented to Rossi that Cherokee entirely owned and funded IH. (*See id.* ¶ 43).

The License Agreement provided that in return for receiving the license, IH would pay Leonardo a total of $100,500,000.00 distributed over three payments as follows: (1) $1,500,000.00 upon execution of the License Agreement; (2) $10,000,000.00 following successful completion of a 24-hour test period (hereinafter, the "Validation Test") performed by an independent expert responsible for validation (hereinafter, "ERV"); and (3) $89,000,000.00

---

[2] On December 15, 2010, the European Patent Office published European Patent No. 2259998 (the "European Patent"). (*See* Compl. ¶ 27). On April 6, 2011, the Italian Patent and Trademark Office issued Italian Patent No. 0001387256 (the "Italian Patent"). (*See id.* ¶ 28). Finally, on August 25, 2015, the U.S. Patent and Trademark Office issued U.S. Patent No. 9,115,913B1 (the "U.S. Patent"). (*See id.* ¶ 29).

[3] Darden is President of IH, and Vaughn is Vice-President. (*See* Compl. ¶¶ 9–10).

2

after the successful completion of a 350-day test period (hereinafter, the "Guaranteed Performance Test") performed by the ERV, or another independent expert agreed upon by the parties.  (*See id.* ¶ 46).

The parties executed the License Agreement, and IH paid Leonardo the initial $1,500,000.00 payment.  (*See id.* ¶ 47).  The parties then agreed the Validation Test would occur on April 30, 2013 at Leonardo's facility in Ferrera, Italy.  (*See id.* ¶ 48).  On April 28, 2013, just prior to the Validation Test, IH informed Plaintiffs it desired to amend the License Agreement before IH would place the amount of the second payment ($10,000,000.00) into escrow.  (*See id.* ¶ 49).  IH's proposed amendment allowed IH to assign the License Agreement under certain circumstances, but without relieving IH of its obligations under the License Agreement.  (*See id.* ¶ 50; *see also* First Amendment to License Agreement ("First Amendment") [ECF No. 1-3]). Plaintiffs agreed to execute the First Amendment.  (*See* Compl. ¶ 50).  At this time, Darden, Vaughn, and IH also informed Plaintiffs IH had formed a new wholly owned subsidiary, Defendant, IPH International B.V. ("IPH"); and IPH was going to be the intellectual property holding entity for IH.  (*See id.* ¶ 51).

On May 1, 2013, the ERV performed the Validation Test of the E-Cat Unit in Ferrara, Italy, following the test protocol agreed upon by the parties.  (*See id.* ¶ 57).  Upon conclusion of the Validation Test, the ERV certified the E-Cat Unit satisfied each of the Validation requirements within the Validation Test period, and IH paid Leonardo the second payment of $10,000,000.00.  (*See id.* ¶ 58).

In August 2013, the E-Cat Unit was delivered from Ferrara, Italy to IH at its facility in Raleigh, North Carolina, where preparations began for the final Guaranteed Performance Test. (*See id.* ¶ 59).  Due to IH's inability or failure to secure an adequate facility in which the Guaranteed Performance Test could be completed, and failure to obtain the requisite regulatory

approval to operate the E-Cat Unit, Plaintiffs were prevented from commencing the Guaranteed Performance Test as set forth in the License Agreement. (*See id.* ¶ 60). Because of these complications, Darden, Vaughn, IH, and IPH informed Plaintiffs the time for commencing the Guaranteed Performance Test would not begin to toll until an adequate testing facility was located, the requisite approvals obtained, and the E-Cat Unit delivered to the test location. (*See id.* ¶ 61).

In October 2013, IH, Rossi, and Leonardo executed a Second Amendment to License Agreement ("Second Amendment") [ECF No. 1-4], which eliminated the requirement the Guaranteed Performance Test period commence immediately upon delivery of the E-Cat Unit, and instead required the period to commence on a date agreed to in writing by the parties. (*See* Compl. ¶ 62). The Second Amendment stated: "This Amendment may be executed in counterparts, no one of which need contain the original signatures of all Parties, provided that one or more counterparts collectively shall contain the signatures of all Parties to this Amendment." (Second Amendment ¶ 3). The Second Amendment was signed by IH and Rossi; a third party, AmpEnergo, Inc. did not sign. (*See generally id.*).

Despite IH and IPH's continued failure to secure an adequate testing facility, Rossi took it upon himself to locate and secure a location to conduct the Guaranteed Performance Test, as well as obtain the requisite regulatory approvals for the operation of the E-Cat Unit. (*See* Compl. ¶ 63). On August 13, 2014, Plaintiffs located a customer in Miami, Florida, that agreed to allow its facility to be used for the Guaranteed Performance Test. (*See id.* ¶ 64). Accordingly, on January 28, 2015, the ERV prepared and submitted to the parties a proposed test protocol for the Guaranteed Performance Test. (*See id.* ¶ 65). After making several minor changes, Darden, on behalf of IH and/or IPH, agreed to the test protocol. (*See id.*). Thereafter, the Guaranteed Performance Test was commenced on February 19, 2015 under the supervision of the ERV. (*See*

*id.* ¶ 66).

During the Guaranteed Performance Test, IH, Darden, and Vaughn publicly claimed they had acquired Rossi's intellectual property.  (*See id.* ¶ 69).  Plaintiffs believe IH, Darden, and Vaughn raised substantial money from investors based on these public claims.  (*See id.* ¶¶ 69–70).  Around this time, Defendants also attempted to obtain both a European and a U.S. patent using the E-Cat IP; and, in the U.S. patent application, asserted one of their agents, Thomas Barker Dameron ("Dameron"), was a co-inventor of the E-Cat IP.  (*See id.* ¶ 86).

On February 15, 2016, the Guaranteed Performance Test successfully concluded.  (*See id.* ¶ 71).  The E-Cat Unit successfully operated for over 350 days out of a 400-day period at a level substantially greater than the level achieved during the Validation Test.  (*See id.*).  On March 29, 2016, the ERV published a final report, confirming the E-Cat Unit satisfied all the performance requirements imposed by the License Agreement, including the requirement the E-Cat Unit produce energy at least six times greater than the energy it consumed.  (*See id.* ¶ 72).

Pursuant to the License Agreement, on March 29, 2016, Leonardo demanded payment of the remaining $89,000,000.00; yet, Defendants refused to make this payment.  (*See id.* ¶ 74).  As a result, Plaintiffs filed suit against Defendants on April 5, 2016, bringing the following claims against IH and IPH: (1) breach of contract for non-payment ("Count I"); (2) breach of contract for exceeding the scope of the license ("Count II"); (3) unjust enrichment ("Count III"); and (4) patent infringement ("Count VIII").  (*See generally* Compl.).  Plaintiffs also bring the following claims against all Defendants: (1) misappropriation of trade secrets ("Count IV"); (2) civil conspiracy to misappropriate trade secrets ("Count V"); and (3) fraud and deceit ("Count VI").  (*See id.*).  Finally, Plaintiffs bring a claim of constructive and equitable fraud ("Count VII") against IH, IPH, Darden, and Vaughn.  (*See id.* ¶¶ 118–27).  Plaintiffs seek declaratory and injunctive relief, as well as monetary damages.  (*See generally id.*).  Defendants move to dismiss

all claims asserted against them.  (*See generally* Mot.).

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 578 S. Ct. 1702 (2012).

## III.  ANALYSIS

In their Motion, Defendants assert the Court should dismiss each of Plaintiffs' eight counts.  (*See generally* Mot.).  They further contend Plaintiffs improperly lump Defendants together in Counts IV–VII, attributing conduct to all Defendants when such conduct should be broken down by individual Defendant.  (*See id.* 20).  The Court addresses each argument in turn.

### A.  Count I: Breach of Contract for Non-Payment

Defendants argue they are not liable for breach of contract because Plaintiffs failed to

satisfy a condition precedent to the contract — that the Guaranteed Performance Test commence immediately upon delivery of the E-Cat Unit to Defendants' plant. (*See* Mot. 5–6). They assert the Second Amendment did not alter this requirement because the amendment was not signed by all the parties and is therefore invalid.[4] (*See id.* 6). Defendants contend the Second Amendment is also invalid because it refers to a "Six Cylinder Unit," not the E-Cat Unit, which was actually tested. (*Id.*). Plaintiffs insist Defendants' arguments are not proper at the motion-to-dismiss phase because these arguments contest factual issues, as opposed to questioning whether Plaintiffs have successfully alleged all elements of a breach-of-contract claim. (*See* Resp. 3). Furthermore, Plaintiffs contend the Second Amendment is valid because Rossi and IH both signed it, and Plaintiffs only seek to hold IH to its terms. (*See id.* 4). Finally, Plaintiffs assert Defendants' six-cylinder argument goes beyond the four corners of the Complaint and thus cannot be considered by the Court. (*See id.* 5).

"[A] contract not signed by all of the parties, but otherwise valid, may be upheld against a signing party, unless the nature or the wording of the contract indicates that his signature was conditioned upon all other parties signing the contract" *Skinner v. Haugseth*, 426 So. 2d 1127, 1131 (Fla. 2nd DCA 1983) (alteration added); *see also Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1228 (S.D. Fla. 2009) ("A contract may be binding on a party despite the absence of a party's signature. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties" (quoting *Gateway Cable T.V., Inc. v. Vikoa Constr. Corp.*, 253 So. 2d 461, 463 (Fla. 1st DCA 1971))); *Consol. Res. Healthcare Fund I, Ltd. v. Fenelus*, 853 So. 2d 500, 503 (Fla. 4th DCA 2003) (finding a party who had not signed the contract nonetheless

---

[4] Specifically, the Second Amendment contains signature lines for IH, Leonardo, Rossi, and AmpEnergo, but only IH and Rossi actually signed. (*See generally* Second Amendment). Defendants also argue IPH should have signed the Second Amendment because the amendment arose after IH assigned the License Agreement to IPH. (*See* Mot. 6).

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

assented to the contract through performance).

Construing the facts in the light most favorable to Plaintiffs, the Court finds the Second Amendment is valid despite the fact Leonardo, AmpEnergo, and IPH did not sign it. Importantly, Defendants' conduct before and after the signing parties executed the Second Amendment indicates Defendants' assent to the amendment's provisions. *See Gateway Cable T.V., Inc.,* 253 So. 2d at 463. First, when Defendants initially failed to locate a facility for the Guaranteed Performance Test upon the arrival of the E-Cat Unit, Darden, Vaughn, IH, and IPH informed Plaintiffs the time for commencing the Guaranteed Performance Test would not begin to toll until an adequate testing facility was located. (*See* Compl. ¶ 61).

Second, after the parties signed the Second Amendment, the ERV prepared and submitted a proposed test protocol for the Guaranteed Performance Test, which Darden, on behalf of IH and/or IPH, *edited and agreed to*. (*See id.* ¶ 65). The ERV then conducted the test in conformity with these protocols. (*See id.* ¶¶ 65–66). It appears clear Darden would not have agreed to the ERV's test protocol if he believed Plaintiffs had already breached the License Agreement by failing to commence the Guaranteed Performance Test immediately upon the E-Cat Unit's delivery. Furthermore, the Court is cognizant of the fact Darden created IH and then created IPH as a subsection thereof; thus, IPH's failure to sign the Second Amendment is of limited weight. Viewing these facts in their totality, the Complaint sufficiently alleges the Second Amendment is valid and enforceable despite the fact all parties had not signed it. *See Gateway Cable*, 253 So. 2d at 463 ("The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties.").

Regarding Defendants' "six-cylinder" argument, there is insufficient information in the record to determine whether the six-cylinder unit is simply another name for the E-Cat Unit. Accordingly, the Court will allow discovery to proceed on this matter before ruling. Thus, the

Court declines to dismiss Count I.

### B. Count II: Breach of Contract for Exceeding the Scope of the License

In Count II of the Complaint, Plaintiffs claim IH and/or IPH breached the License Agreement by: (1) stating they own the E-Cat IP; (2) attempting to obtain a European patent covering the E-Cat IP; (3) applying for a U.S. patent for the E-Cat IP and asserting Dameron was a co-inventor of the E-Cat IP. (*See* Compl. ¶ 86). Plaintiffs assert Defendants have exceeded the scope of paragraphs 1 and 2 of the License Agreement, which generally provide Plaintiffs grant Defendants the exclusive right to use or develop products derived from E-Cat IP. (*See* License Agreement 1–2; *see also* Resp. 5).

Defendants argue their actions are not specifically prohibited by the License Agreement; thus, these actions cannot constitute a "breach" of the Agreement. (*See* Reply 3 (quoting *Brown v. Capital One Bank (USA), N.A.*, 2015 WL 5584697, at *3 (S.D. Fla. Sept. 22, 2015) ("[T]o allege a material breach in accordance with the pleading standards required under the Federal Rules of Civil Procedure, the plaintiff must allege which provision of the contract has been breached." (alteration added)))). The Court agrees. A plain reading of the License Agreement reveals the agreement does not refer, even generally, to whether Plaintiffs can apply for a patent based on E-Cat IP or tell others they own E-Cat IP. (*See generally* License Agreement). Indeed, paragraphs 1 and 2 of the License Agreement, which Plaintiffs claim Defendants breached, only impose obligations upon Plaintiffs, not upon Defendants. (*See id.* 1–2 ("Leonardo and Rossi hereby grant to the Company the exclusive right and license under the Patents . . . . Leonardo will manufacture and sell and deliver to the Company a 1MW E-Cat Unit . . . . (alterations added)).

Rather, the allegations supporting Count II are better suited for a patent infringement claim than a breach-of-contract claim. *C.f. Bayer Healthcare LLC v. Gen-Probe Inc.*, No. CIVA

05-12084-RCL, 2006 WL 6499322, at *5–6 (D. Mass. July 26, 2006) (declining to dismiss breach-of-contract claim connected to the plaintiff's patent infringement claim where the contract specifically limited the rights of both parties to the "patent rights or other intellectual property rights of the other party for any use or application other than those expressly and specifically granted by the Agreement.").  Accordingly, dismissal of Count II is warranted.

### C.  Count III: Unjust Enrichment

Defendants assert Plaintiffs' unjust enrichment claim fails because an express contract — here, the License Agreement — exists concerning the same subject matter as Plaintiffs' unjust enrichment claim.  (*See* Mot. 9).  Florida courts have held "a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter."  *Persaud v. Bank of Am., N.A.*, No. 14-21819-CIV, 2014 WL 4260853, at *13 (S.D. Fla. Aug. 28, 2014) (quoting *1021018 Alberta Ltd. v. Netpaying, Inc.*, No. 8:10-CV-568-T-27MAP, 2011 WL 1103635, at *5 (M.D. Fla. Mar. 24, 2011)).  While causes of action may be pleaded in the alternative, *see* FED. R. CIV. P. 8(d)(2), a claim of unjust enrichment may only be pleaded in the alternative where one of the parties asserts the contract governing the dispute is invalid.  *See Persaud*, 2014 WL 4260853, at *13.

Here, Defendants assert the Second Amendment, not the entire License Agreement, is invalid.  (*See generally* Mot.).  While the Court has concluded the Second Amendment is valid based on the current record and accepting Plaintiffs' statements as true, discovery may reveal facts indicating otherwise — *i.e.*, that the six-cylinder unit is distinct from the E-Cat Unit.  If, in fact, the Second Amendment is not valid, the License Agreement's meaning fundamentally changes.  In essence, Plaintiffs may not have a cause of action for breach-of-contract pursuant to the License Agreement if it is determined they did not fulfill conditions precedent to fulfillment of the contract.  Accordingly, dismissal of Plaintiffs' unjust enrichment claim is premature.  *See*

*Martorella v. Deutsche Bank Nat. Trust Co.*, 931 F. Supp. 2d 1218, 1228 (S.D. Fla. 2013) ("[I]t is not upon the allegation of the existence of a contract, but upon a showing that an express contract exists that the unjust enrichment count fails. . . .  Until an express contract is proven, a motion to dismiss a claim for unjust enrichment on these grounds is premature." (alterations added; internal citation omitted)).[5]

### D.  Count IV: Misappropriation of Trade Secrets

In Count IV, Plaintiffs claim Darden, Vaughn, IH, and IPH misappropriated their trade secrets by: (1) attempting to patent Plaintiffs' intellectual property as their own; (2) falsely stating one of their agents is a co-inventor of the E-Cat IP; (3) conveying Plaintiffs' intellectual property to third party competitors; and (4) failing to return Plaintiffs' trade secrets after IH and IPH breached the terms of the License Agreement.  (*See* Compl. ¶ 98).

Under the Florida Uniform Trade Secrets Act ("FUTSA"), to qualify as a trade secret, information the plaintiff seeks to protect must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy.  *See Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 264 F. Supp. 2d 1064, 1076 (S.D. Fla. 2003).  The following two acts constitute misappropriation of a trade secret: "(1) acquisition of another's trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret without consent by a person who used improper means to acquire the trade secret or knew that the trade secret was improperly acquired."  *Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147,

---

[5] Neither is the Court convinced by Defendants' argument Plaintiffs have not sufficiently alleged they conferred a benefit on IH and IPH.  (*See* Mot. 9 (citing *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1100 (Fla. 3d DCA 2014) ("The elements of a claim for unjust enrichment are: (1) plaintiff conferred a benefit on the defendant; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.")))  Plaintiffs conferred upon Defendants an exclusive right to use the E-Cat IP and related technology within a defined territory (*see generally* License Agreement); this is clearly a benefit.

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

1185 (S.D. Fla. 2008) (citing FLA. STAT. § 688.002), *aff'd in part sub nom. Sensormatic Elecs., LLC v. Kahle*, 367 F. App'x 143 (Fed. Cir. 2010).

Defendants assert Count IV should be dismissed because: (1) Plaintiffs permitted IH and IPH to disclose the E-Cat IP and did not protect its secrecy; (2) Defendants did not use improper means to obtain the E-Cat IP; and (3) the specific acts Plaintiffs allege do not constitute misappropriation.  (*See* Mot. 10–12).  The Court addresses each argument in turn.

    a.   *Protecting the Secrecy of the E-Cat IP*

First, Defendants argue Plaintiffs willingly disclosed the E-Cat IP to IH and IPH, and there is no provision in the License Agreement requiring Defendants to keep the E-Cat IP confidential or protect its secrecy.  (*See id.* 10–11).  Further, the License Agreement only imposes a duty of confidentiality on *Plaintiffs* regarding the intellectual property, not Defendants.  (*See* License Agreement § 16.4 ("[E]ach of Leonardo, Rossi, and AEG agrees to keep the E-Cat IP strictly confidential and not disclose any of the E-Cat IP to any other party . . . ." (alterations added)).

Plaintiffs allege they have "undertaken extensive steps to preserve and maintain the confidential and secret nature of the trade secrets, including the E-Cat IP, and to prevent the unauthorized disclosure of same," such as, "requiring individuals to whom the information is disclosed to sign confidentiality agreements and/or non-disclosure agreements."  (Compl. ¶ 104). The Complaint does not specify where or how Plaintiffs required individuals to sign these agreements, nor does the License Agreement.  However, at the motion-to-dismiss phase, the Court must construe allegations in the light most favorable to Plaintiffs.  *See United States ex rel. Ferrara v. Rosin*, No. 8:04-CV-349-T-30MAP, 2007 WL 2412848, at *1 (M.D. Fla. Aug. 21, 2007).  This is especially true since courts hesitate to decide factual inquiries, such as whether a party has taken reasonable steps to preserve its trade secrets, upon a motion to dismiss.  *See*

*Treco Intern. S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1287 (S.D. Fla. 2010).  Thus, the Court will not dismiss Count IV for Plaintiffs' asserted failure to protect the secrecy of the E-Cat IP.

####    b.   *Using Improper Means to Obtain the E-Cat IP*

Second, Defendants argue they did not use improper means to obtain the E-Cat IP; thus, Plaintiffs cannot sustain their misappropriation claim.  (*See* Mot. 11).  The FUTSA defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  FLA. STAT. § 688.002(1).  Plaintiffs allege, in their Complaint, Defendants "with the intent of stealing Rossi and Leonardo [sic] intellectual property, have systematically and deceptively taken measures to deprive Rossi and Leonardo of their control of their trade secrets."  (Compl. ¶ 97).  Plaintiffs further allege Defendants deceived them into entering into the License Agreement by making certain fraudulent misrepresentations in an attempt to misappropriate Plaintiffs' intellectual property.  (*See id.* ¶¶ 38–40).  The allegations of Defendants' misrepresentations are sufficient to satisfy the "improper means" factor.  *See CamMate Sys., Inc. v. Telescopic, LLC*, No. CV06-0831-PHX-JAT, 2008 WL 215830, at *3 (D. Ariz. Jan. 23, 2008) (finding sufficient evidence of improper means to preclude summary judgment where the counter-defendant fraudulently induced the counter-plaintiff to reveal its trade secrets by signing an agreement not to duplicate the trade secret "in any manner whatsoever.").

####    c.   *Specific Acts Alleged by Plaintiffs*

Finally, Defendants argue the specific acts alleged by Plaintiffs do not constitute misappropriation.  (*See* Mot. 11–12).  Specifically, Defendants assert attempting to patent technology related to the E-Cat IP; including Dameron as a co-inventor in a patent application; conveying the E-Cat IP to third-party competitors; failing to return the E-Cat IP to Plaintiffs after breaching the License Agreement; and creating foreign and domestic shell companies, do not

amount to misappropriation, particularly since the License Agreement allows Defendants to participate in patent prosecution and freely sublicense the E-Cat IP.  (*See id.* 11–13).

A party who uses improper means to acquire a trade secret and then "disclos[es] or use[s]" this trade secret without the owner's consent misappropriates the trade secret under the FUTSA.  *Sensormatic Elecs. Corp.*, 632 F. Supp. 2d at 1185 (alterations added); *see also* FLA. STAT. § 688.002.  The Court agrees with Defendants many of the specific acts alleged by Plaintiffs do not constitute disclosures or uses of E-Cat IP under the statute's meaning.  (*See* Mot. 11–12).  For example, it is difficult to believe creating foreign and domestic shell companies — even when those shell companies are allegedly complicit in a larger scheme — itself amounts to a disclosure or use of a trade secret.  Likewise, the mere act of listing Dameron as a co-inventor in a patent application cannot be said to constitute a disclosure or use of any trade secret.

Nevertheless, Plaintiffs' allegation that Defendants conveyed the E-Cat IP to "third party competitors" arguably states a claim for trade secret misappropriation, as at least this allegation involves a form of disclosure.  (Compl. ¶ 98).  Defendants argue this allegation cannot stand because the License Agreement did not prohibit them from revealing the E-Cat IP to other parties.  (*See* Mot. 12).  But, as previously noted, Plaintiffs allege they have "undertaken extensive steps to preserve and maintain the confidential and secret nature of the trade secrets, including the E-Cat IP, and to prevent the unauthorized disclosure of same," such as, "requiring individuals to whom the information is disclosed to sign confidentiality agreements and/or non-disclosure agreements."  (Compl. ¶ 104).  Taking these allegations as true, it is plausible Defendants' disclosure of the E-Cat IP to Plaintiffs' third-party competitors may have constituted trade secret misappropriation.  Accordingly, dismissal of Count IV is unwarranted at this time.

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

**E.  Count V: Civil Conspiracy**

In Count V, Plaintiffs allege Defendants conspired to misappropriate Plaintiffs' trade secrets, including, but not limited to the E-Cat IP.  (*See* Compl. ¶ 107).  Defendants argue the Court should dismiss Count V because: (1) the underlying claim — trade secret misappropriation — fails; and (2) the intra-corporate conspiracy doctrine bars Count V.  (*See* Mot. 13–14). Because Plaintiffs' trade secret misappropriation claim is sufficient, *see supra*, the Court solely addresses Defendants' second argument.

"The elements of civil conspiracy under Florida law consist of (1) a conspiracy between two or more parties; (2) to do an unlawful act, or to do a lawful act by unlawful means; (3) an overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result."  *Microsoft Corp. v. Big Boy Distribution LLC*, 589 F. Supp. 2d 1308, 1322 (S.D. Fla. 2008).  In a theory known as the intra-corporate conspiracy doctrine, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).  The logic behind this theory is that, "just as it is not legally possible for an individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself."  *Id.*

An exception to the intra-corporate conspiracy doctrine exists where the officer, director, or employee of the corporation has a personal stake in the illegal activities separate and distinct from that of the corporation.  *See Microsoft*, 589 F. Supp. 2d at 1323 (citing *Jewel Foliage Co. v. Uniflora Overseas Fla., Inc.*, 497 F. Supp. 513, 518 (M.D. Fla. 1980)).  Another exception to the doctrine manifests where separate legal entities are involved in the alleged conspiracy.  *See Solyom v. World Wide Child Care Corp.*, No. 14-80241-CIV, 2015 WL 6167411, at *2 (S.D. Fla. Oct. 15, 2015) (finding the intra-corporate conspiracy doctrine did not apply where the corporate

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

defendants were "separate legal entities, operating independently of each other"); *see also Regions Bank v. Kaplan*, No. 8:12-CV-1837-T-17MAP, 2014 WL 5088889, at *6 (M.D. Fla. Sept. 30, 2014). However, subsidiaries of parent corporations are not generally considered separate legal entities for the purpose of the intra-corporate conspiracy doctrine. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) (holding a parent corporation and its wholly owned subsidiary were not legally capable of conspiring with each other in a section 1 Sherman Act case).

Here, the relevant Defendants include Cherokee, IH, IPH, Darden, and Vaughn. (*See generally* Compl.). Cherokee entirely owns and funds IH, one of its holding companies. (*See id.* ¶¶ 41–43). IPH is a wholly owned subsidiary and holding entity of IH. (*See id.* ¶ 51). Furthermore, Darden is the CEO of Cherokee and president of IH; and Vaughn is the manager of Cherokee and vice-president of IH. (*See id.* ¶¶ 9–10). Thus, while Cherokee, IH, and IPH may have separate corporate structures, it is clear they are either subsidiaries or wholly owned holding companies of each other. (*See id.* ¶¶ 41–51). As such, neither they, nor their individual employees — Darden and Vaughn — may be said to conspire with each other. *See Copperweld*, 467 U.S. at 770–71 ("[T]here can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor. . . . For similar reasons, the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . ." (alterations added)).[6]

---

[6] The intra-corporate conspiracy doctrine originated in federal antitrust law, and there is some debate regarding whether it applies in other types of actions. *See, e.g.*, *O.H. v. Oakland Unified Sch. Dist.*, No. C-99-5123 JCS, 2000 WL 33376299 at *8 (N.D. Cal. Apr. 17, 2000) (refusing to apply the intra-corporate conspiracy doctrine to a sexual harassment claim). The Court is satisfied the doctrine may apply in a case such as this, as both the Eleventh Circuit and federal district courts in Florida have applied the doctrine in several non-antitrust cases. *See Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767–70 (11th Cir. 2000) (holding the intra-corporate conspiracy doctrine barred the plaintiff's civil rights conspiracy claim); *see also Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, No. 6:14-CV-533-ORL-31, 2014 WL 3747667, at *4 (M.D. Fla. July 29, 2014) (applying the intra-corporate conspiracy doctrine to a tortious interference claim).

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

Plaintiffs argue the intra-corporate conspiracy doctrine should not apply because Darden and Vaughn had a "personal stake in the product of the conspiracy undertaken to make sure that they maintained control over the misappropriated trade secrets." (Resp. 13 (citing *Regions Bank*, 2014 WL 5088889, at *6)). Plaintiffs explain Darden, Vaughn, and Cherokee's creation of foreign and domestic shell companies evidences their personal stakes in misappropriating Plaintiffs' trade secrets. (*See id.*). This argument fails to persuade. The Complaint does not sufficiently plead facts indicating Darden and Vaughn had a personal stake in the illegal activities *separate and distinct* from those of the corporate Defendants. *See Fried v. Stiefel Labs., Inc.*, No. 11-CV-20853-KING, 2012 WL 4364300, at *8 (S.D. Fla. June 8, 2012) ("[Plaintiff's] Complaint must allege that [the] individual defendants have an interest separate and distinct from their corporate interest as employees of SLI. . . . The Complaint must contain accusations which are sufficient to put the Defendants on notice as to how the actions of individual Defendants were at odds with rather than on behalf of, the corporation, to the point where the individuals' interests can be said to be separable and distinct from the corporation's." (alterations added; internal citations omitted)). Accordingly, the intra-corporate conspiracy doctrine bars Count V as presently pled.

### F.  Count VI: Fraud and Deceit

In Count VI, Plaintiffs allege Defendants misrepresented material facts — such as that IH controlled and directly managed IPH; and IH and Cherokee had sufficient funds to pay Plaintiffs pursuant to the License Agreement — which Plaintiffs relied upon by entering into the License Agreement. (*See* Compl. ¶¶ 111–17; *see also* Resp. 14). Defendants argue this claim fails because: (1) the damages arising from the alleged fraud are not separate or distinguishable from the damages arising from the breach of contract; and (2) to the extent Plaintiffs are, in essence, claiming fraudulent inducement, such a claim is not actionable against entities not parties to the

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

License Agreement.  (*See* Reply 7–8).

Under Florida law, "[i]n an action for fraud and deceit, a plaintiff must allege with reasonable certainty that 1) the defendant made a representation on which the plaintiff was meant to act; 2) the defendant knew the representation was false; and 3) the plaintiff relied on the representation to his detriment." *Carl's Furniture, Inc. v. APJL Consulting, LLC*, No. 15-60023-CIV, 2015 WL 1467726, at *3 (S.D. Fla. Mar. 30, 2015) (alteration in original).  A plaintiff claiming fraud or any other tort against a party in contractual privity must allege an action beyond and independent of the breach of contract.  *See Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014 WL 2215770, at *4 (S.D. Fla. May 29, 2014).  Unlike fraud in performing a contract, fraudulent inducement to enter into a contract is generally "a tort independent from a breach of contract because it requires the plaintiff to prove facts separate and distinct from the facts necessary to prove the breach of contract" — *i.e.*, acts that occurred prior to entering into the contract.  *Id.* at *5.  For example, fraudulent inducement occurs where "one party's ability to negotiate and make informed decisions as to the contract is undermined by the other party's pre-contractual fraudulent behavior." *Bradley Factor, Inc. v. United States*, 86 F. Supp. 2d 1140, 1145 (M.D. Fla. 2000).

Reading the facts in the light most favorable to Plaintiffs, the Court finds Plaintiffs adequately plead a claim for fraudulent inducement.[7]  The facts Plaintiffs identify in support of their fraudulent inducement claim are separate from those supporting Defendants' alleged breach of contract.  Specifically, Plaintiffs allege Defendants made particular misrepresentations to them *prior to entering into the License Agreement*, which Defendants knew would induce them to enter, including that: (1) Cherokee has billions of dollars at its disposal, and is willing to pay Plaintiffs (*see* Compl. ¶ 38); and (2) if Cherokee were granted a license to the E-Cat IP, it would

---

[7] The Court also rejects Defendants' argument Count VI fails to satisfy the pleading standard of Federal Rule of Civil Procedure 9(b) for the reasons set forth *infra*.

protect the E-Cat IP from dissemination so as to maximize the value of the intellectual property around the world (*see id.* ¶ 39). Plaintiffs further allege Defendants misrepresented to them that: (1) Cherokee and IH are the same company; (2) Cherokee entirely owns and funds IH; and (3) Cherokee guaranteed Leonardo would be paid in accordance with the License Agreement. (*See id.* ¶ 43). These facts are separate from the primary facts supporting Plaintiffs' breach-of-contract claim — that Defendants failed to pay the $89,000,000.00 fee due and owing under the License Agreement. (*See generally id.*).

Because Defendants made representations materially separate from any fraud that may have occurred during performance of the contract, Plaintiffs allege a plausible fraudulent inducement claim. *See New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 907 (M.D. Fla. 2007) (finding the plaintiffs adequately pled a claim of fraudulent inducement rather than a claim for fraud in the performance of the contract, where the defendant fraudulently concealed the fact he was a competitor of the plaintiff before entering into the contract). Furthermore, Defendants do not persuade the Court Plaintiffs cannot sustain a fraudulent inducement claim because they do not plead *damages* separate and distinguishable from the damages alleged in connection with their breach-of-contract claim. (*See* Reply 8 (citing *Williams v. Peak Resorts Intern., Inc.*, 676 So. 2d 513 (Fla. 5th DCA 1996))). While Plaintiffs have not identified such separate damages at this stage, they have identified separate underlying facts, *see supra*. Furthermore, it is possible discovery will reveal separate damages for Plaintiffs' fraud claim. *See Huie v. Dent & Cook, P.A.*, 635 So. 2d 111, 113 (Fla. 2nd DCA 1994) ("[T]he damages available for breach of a contract do not always duplicate all of the damages available in an action for fraud." (alteration added)).

Neither is the Court persuaded by Defendants' argument Plaintiffs' fraudulent inducement claim is not actionable against those Defendants not parties to the License

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

Agreement. (*See* Reply 8). The cases cited by Defendants do not address situations, such as here, where several Defendants did not sign the contract, but nonetheless: (1) participated in fraudulently inducing Plaintiffs to sign the contract; and (2) owned or were otherwise substantially related to the Defendants who did sign the contract. (*See id.*). Due to the particular facts of the instant case, dismissal of the non-signing Defendants is not warranted. *See Greco v. Jones*, 38 F. Supp. 3d 790, 794 n.2 (N.D. Tex. 2014) ("[P]rivity of contract between a plaintiff and a defendant is not required to prove the intent to induce reliance element of a fraud claim . . . ." (alterations added)).

### G. Count VII: Constructive and Equitable Fraud

In Count VII, Plaintiffs allege Darden, Vaughn, and IH began supporting and investing in companies in direct competition with Plaintiffs, shortly after acquiring Plaintiffs' intellectual property. (*See* Compl. ¶ 123). Plaintiffs further allege these Defendants took improper advantage of their licensee relationship with Plaintiffs by deliberately disclosing Plaintiffs' intellectual property to the competitor entities. (*See id.* ¶¶ 124–25). Defendants argue Count VII should be dismissed for three reasons: (1) Plaintiffs have failed to allege any facts demonstrating Defendants owed Plaintiffs a fiduciary duty; (2) the allegations of fraud do not meet Rule 9(b)'s particularity requirements; and (3) Count VII simply re-characterizes Plaintiffs' breach-of-contract claim. (*See* Mot. 16–18). The Court finds the fiduciary duty reason dispositive and thus solely addresses this issue.

"Constructive fraud occurs when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken." *Tardif v. People for the Ethical Treatment of Animals*, No. 2:09-CV-537, 2010 WL 3860733, at *6 (M.D. Fla. Sept. 29, 2010) (quoting *Levy v. Levy,* 862 So.2d 48, 53 (Fla. 3d DCA 2003)). A confidential or fiduciary relationship exists where "confidence is reposed by one party and a trust is accepted by the other,

or where confidence has been acquired and abused." *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005) (quoting *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002)).   Thus, to state a claim for breach of a confidential or fiduciary relationship, "a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Id.* (quoting *Watkins v. NCNB Nat. Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. 3d DCA 1993)).   Business relationships are not ordinarily confidential relationships because where the parties are dealing at arm's length, there is no duty imposed on either party to protect or benefit the other.   *See id.*; *see also Linville v. Ginn Real Estate Co., LLC*, 697 F. Supp. 2d 1302, 1309 (M.D. Fla. 2010).

Here, it appears the parties were engaged in an ordinary business relationship and negotiated the License Agreement at arm's length.   (*See generally* Compl.).   Plaintiffs do not allege any facts indicating they were the weaker party in the transaction or that Defendants accepted an explicit or implicit duty to advise, counsel, or protect them.   (*See id.*).   The factual allegations do not show the parties entered into a confidential or fiduciary relationship to support a constructive or equitable fraud claim.   *See In re Sherwood Inv. Overseas Ltd., Inc.*, No. 6:10-AP-00158-KSJ, 2015 WL 4486470, at *16 (Bankr. M.D. Fla. July 22, 2015) ("A fiduciary relationship does not arise because one side of a business relationship depends on the other side. . . .   Rather, for a fiduciary obligation to arise, the purported fiduciary must accept the more demanding, fiduciary responsibilities requiring it to act in the best interest of the other party, not itself, which is the virtual opposite of the typical business relationship where parties act in their own best interest." (alteration added)).[8]   The absence of a fiduciary or confidential relationship compels dismissal of Count VII.

_____

[8] *Biodynamic Techs, Inc. v. Chattanooga Corp.*, cited by Plaintiffs, is distinguishable.   *See* 644 F. Supp. 607, 612 (S.D. Fla. 1986).   While the court there found the parties' contractual negotiations established a confidential relationship wherein the plaintiff disclosed secret information to the defendant, the case did

### H.  Count VIII: Patent Infringement

In Count VIII, Plaintiffs allege IH and IPH infringed Plaintiffs' patented inventions by applying for their own patents based on Plaintiffs' technology, and soliciting millions of dollars in investments predicated upon their claim they own Plaintiffs' intellectual property rights.  (*See* Compl. ¶¶ 130–34).   Defendants move to dismiss Count VIII, arguing the aforementioned activity does not constitute patent infringement within the proper meaning of 35 U.S.C. section 271.  (*See* Mot. 18–19).  The Court agrees.

Section 271 provides: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  35 U.S.C. § 271(a).  In a recent opinion, the Federal Circuit concluded "[f]iling a patent application is generally not an infringement of a patent."  *Classen Immunotherapies, Inc. v. Elan Pharm., Inc.*, 786 F.3d 892, 898 (Fed. Cir. 2015) (alteration added).  The court reached this conclusion with the following analysis:

> [Filing a patent application] is not the making, using, offering to sell, selling, or importing of an invention. It is the act of approaching an agency of the government in order to obtain a limited privilege and to fulfill a public goal of making knowledge of an invention available to the public. It is not commercializing an invention, which requires introducing an invention into commerce, or making preparations to do so.

*Id.* at 898–99 (alteration added).

The foregoing analysis applies to the present case.  Defendants did not create, sell, or otherwise commercialize any products infringing Plaintiffs' patents, so as to qualify as "use" within the meaning of 35 U.S.C. section 271.   Instead, they simply approached several

---

not involve claims for either constructive fraud or breach of fiduciary duty.  *See generally id.*  Rather, the case only considered whether the parties had a confidential relationship for the purpose of the plaintiff's trade secret misappropriation, unfair competition, and account of profit claims.  *See id.* at 609.  The Court therefore finds *Biodynamic Technologies* of limited relevance to the present analysis.

administrative agencies, seeking to obtain intellectual property rights.  (*See generally* Compl.).

In the aftermath of *Classen*, such activity does not constitute "use."[9]  Furthermore, Defendants'

alleged statements claiming ownership of Plaintiffs' intellectual property and solicitation of

investments based on such ownership also do not constitute patent infringement.  *See Alphamed*

*Pharm. Corp. v. Arriva Pharm., Inc.*, 391 F. Supp. 2d 1148, 1158 (S.D. Fla. 2005) (finding the

plaintiff did not state a claim for declaratory relief for patent infringement where the defendant

had not even prepared to sell or manufacture an infringing product, but merely advertised it was

formulating such a product).  Accordingly, Count VIII is dismissed.

### I.   Grouping Defendants Together in Several Claims

Finally, Defendants argue Plaintiffs impermissibly lump Defendants together in Counts

IV–VII, attributing conduct to all Defendants when such conduct should be broken down by

Defendant.  (*See* Mot. 20).  For example, Plaintiffs allege Darden, Vaughn, IH, and Cherokee

made a series of specific misrepresentations to Plaintiffs, without specifying who made which

misrepresentations.  (*See* Compl. ¶ 112).  Plaintiffs fail to address this issue in their Response.

(*See generally* Resp.).  Nonetheless, the Court finds Defendants' argument unpersuasive.

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead "a short and plain

statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a).

"Under this rule, when a complaint alleges that multiple defendants are liable for multiple

claims, courts must determine whether the complaint gives adequate notice to each defendant."

---

[9] Plaintiffs concede *Classen* is the only published case addressing whether the filing of a patent
application constitutes infringement.  (*See* Resp. 17).  The Court is unpersuaded by Plaintiffs' attempt to
distinguish *Classen*.  First, while it is true the Federal Circuit only analyzed this issue in *dicta*, the
analysis is compelling and applies with equal force to the facts of this case.  The sole alternative source of
authority Plaintiffs point to is the definition of "use" in the Oxford English Dictionary.  (*See id.* 17–18).
The Court will not prioritize a dictionary definition over the Federal Circuit's expertise in this area of law.
*See Arlaine & Gina Rockey, Inc. v. Cordis Corp.*, No. 02-22555-CIV, 2004 WL 5504978, at *17, n.5
(S.D. Fla. Jan. 5, 2004) ("Decisions by the U.S. Court of Appeals for the Federal Circuit provide
controlling authority on the aspects of this case that are unique to patent law").

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

*Fifth Third Bank v. Barkauskas*, No. 2:12-CV-577-FTM-SPC, 2012 WL 5507831, at *1 (M.D. Fla. Nov. 14, 2012) (quoting *Pro Image Installers, Inc. v. Dillon*, No. 3:08cv273, 2009 WL 112953, at *1 (N.D. Fla. Jan.15, 2009)).  At times, a plaintiff's "grouping" of defendants in a complaint may require a more definite statement to comply with Rule 8(a).  *Id.*

Federal Rule of Civil Procedure 9(b), which applies to claims involving fraud or mistake, such as Counts VI and VII, holds Plaintiffs to a higher standard — there, "a party must state with particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b).  Rule 9(b) is satisfied if the complaint sets forth: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997)).

The Court notes Plaintiffs take pains to carefully allege each count only against the relevant Defendants, as opposed to alleging all counts against every Defendant.  (*Compare* Compl. ¶ 118 (alleging constructive and equitable fraud against IH, IPH, Darden, and Vaughn), *with id.* ¶ 128 (alleging patent infringement only against IH and IPH)).  While Defendants are grouped together for some allegations, Plaintiffs have done enough to satisfy the Rule 8(a) standard for their non-fraud claims and the Rule 9(b) standard for their fraud claims, particularly given the inter-related nature of the Defendants.[10]  *See U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007) (Rule 9(b) satisfied despite defining all defendants together, given day-to-day interrelationship between multiple defendants as related to

---

[10] By way of reminder, Darden is the President of IH and CEO of Cherokee; and Vaughn is the Vice-President of IH and a manager of Cherokee.  (*See* Compl. ¶¶ 9–10).

CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

allegations); *Associated Indus. Ins. Co. v. Advanced Mgmt. Servs., Inc.*, 2014 WL 1237685, at *7 (S.D. Fla. Mar. 26, 2014) (collective references to defendants and allegations of fraud did not violate Rule 9(b) where complaint alleged sufficient facts and enough specific allegations as to separate defendants).  Accordingly, the Court will not dismiss any claims on this basis.

### IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 17]** is **GRANTED in part** and **DENIED in part** as follows:

1.  Counts II, V, VII, and VIII are **DISMISSED without prejudice**.

2.  All other counts remain intact.

**DONE AND ORDERED** in Miami, Florida, this 19th day of July, 2016.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record