## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

_____

| | | |
|---|---|---|
| ANDREA ROSSI and LEONARDO CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 1:16-cv-21199-CMA |
| THOMAS DARDEN; JOHN T. VAUGHN; INDUSTRIAL HEAT, LLC; IPH INTERNATIONAL B.V.; and CHEROKEE INVESTMENT PARTNERS, LLC, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| INDUSTRIAL HEAT, LLC and IPH INTERNATIONAL B.V., | ) ) ) | |
| Counter-Plaintiffs, | ) ) | |
| v. | ) ) | **THIRD AMENDED ANSWER, ADDITIONAL DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS** |
| ANDREA ROSSI and LEONARDO CORPORATION, | ) ) ) | |
| Counter-Defendants, | ) ) | |
| and | ) ) | |
| J.M. PRODUCTS, INC.; HENRY JOHNSON; FABIO PENON; UNITED STATES QUANTUM LEAP, LLC; FULVIO FABIANI; and JAMES A. BASS, | ) ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

## ANSWER AND ADDITIONAL DEFENSES

For their Answer and Additional Defenses to the complaint ("Complaint") of Plaintiffs Andrea Rossi ("Rossi") and Leonardo Corporation ("Leonardo") (collectively, "Plaintiffs"), Defendants Thomas Darden ("Darden"), John T. Vaughn ("Vaughn"), Industrial Heat, LLC ("Industrial Heat"), IPH International, B.V. ("IPH"), and Cherokee Investment Partners, LLC ("Cherokee") (collectively, "Defendants") state the following:

### NATURE OF ACTION

1.      Defendants deny that the energy catalyzer ("E-Cat") technology "generates a low energy nuclear reaction resulting in an exothermic release of energy" along the lines claimed by Plaintiffs – which is that a reactor using the E-Cat technology produces more than 50 times the energy it consumes.  Compl. ¶ 71.  Such claims are not scientifically verifiable or reproducible.  *See e.g.*, U.S. Patent and Trademark Office ("USPTO"), "Non-Final Rejection," dated January 11, 2016 as to Patent App. No. 12/736,193 (attached hereto as Exhibit 1); discussions of third party testing *infra*.  In addition, the procedures and mechanisms which Plaintiffs have used in their experiments and testing of the E-Cat technology are flawed and unreliable in many respects.  *See e.g. id.*; response to Paragraph 72 *infra*.  Lastly, the E-Cat technology has never been independently validated by a scientifically reliable methodology to produce the energy levels Plaintiffs now claim, and has failed to produce any commercially viable product.  Indeed, using the E-Cat technology Plaintiffs directly provided them, Industrial Heat and IPH have been unable to produce any measurable excess energy.  Defendants deny the remaining allegations in Paragraph 1.

2.      Defendants deny the allegations in Paragraph 2.

3.      Defendants deny the allegations in Paragraph 3.

4.      Defendants deny the allegations in Paragraph 4.

5.      Defendants deny the allegations in Paragraph 5.

6.      Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 6 as to Plaintiffs' reasons for bringing this action, and therefore deny them.  To the extent that Paragraph 6 alleges that Industrial Heat and IPH have infringed upon Plaintiffs' intellectual property, Defendants deny that allegation.

## PLAINTIFFS' ALLEGATIONS AS TO THE PARTIES

7.      Defendants admit the allegations in Paragraph 7.

8.      Defendants admit the allegations in Paragraph 8.  Defendants also admit that there was a separate corporation named Leonardo Corporation that was incorporated in New Hampshire.  Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Footnote 2 appended to Paragraph 8, and on that basis deny those remaining allegations.  For purposes herein, Defendants use "Leonardo," as Plaintiffs use "Leonardo" in the Complaint, as encompassing both the Florida corporation named Leonardo Corporation (which is the Plaintiff in this action) and the New Hampshire corporation named Leonardo Corporation. Defendants note, however, that during the time period relevant to the Complaint, the two companies existed as separate corporations, and the Leonardo Corporation that was a party to the License Agreement entered into on October 26, 2012 (the "License Agreement") was the New Hampshire corporation.

9.      Defendants admit the allegations in Paragraph 9.

10.      Defendants deny that Vaughn is a "Manager" at Cherokee, as "Manager" of a LLC is defined in 6 Delaware Code §§ 18-101(10), 18-401, and 18-402.  Defendants admit the remaining allegations in Paragraph 10.

11.     Defendants admit that Industrial Heat is a Delaware limited liability company. Defendants deny that the address listed in Paragraph 11 is the address of Industrial Heat's principal place of business.

12.     Defendants admit that IPH is a *Besloten vennootschap*, a Dutch private limited liability company.  Defendants deny that the address listed in Paragraph 12 is the address of IPH's principal place of business.

13.     Defendants admit the allegations in Paragraph 13.

### PLAINTIFFS' ALLEGATIONS AS TO JURISDICTION AND VENUE

14.     Paragraph 14 states legal conclusions to which no response is required. Defendants admit that this Court had subject matter jurisdiction at the time Plaintiffs filed the Complaint under 28 U.S.C. §§ 1331, 1332, and 1338(a).

15.     Paragraph 15 states legal conclusions to which no response is required.

16.     Paragraph 16 states legal conclusions to which no response is required. Defendants admit that diversity exists under 28 U.S.C. § 1332 because this case is between citizens of different States and in which citizens or subjects of a foreign state are additional parties.

17.     Paragraph 17 states legal conclusions to which no response is required. Defendants admit that Industrial Heat entered into a contract with a specific forum selection/choice of law provision.  Defendants deny the remaining allegations in Paragraph 17.

18.     Paragraph 18 states legal conclusions to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 18.

19.     Paragraph 19 states legal conclusions to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 19.

20.     In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 20.  In addition, Paragraph 20 states legal conclusions to which no response is required.  To the extent any response is required regarding Plaintiffs' allegations of patent infringement, Industrial Heat and IPH deny those allegations.

21.     Defendants deny the allegations in Paragraph 21.

22.     Defendants deny the allegations in Paragraph 22.

23.     Defendants deny the allegations in Paragraph 23.

24.     Paragraph 24 states legal conclusions to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 24.

25.     Paragraph 25 states legal conclusions to which no response is required.  Defendants admit that Leonardo's principal place of business is in this District.  Defendants further admit that a substantial part of the events giving rise to the claims alleged in the Complaint occurred in this District.  Defendants deny the remaining allegations in Paragraph 25.

**PLAINTIFFS' ALLEGATIONS AS TO PATENTS AT ISSUE IN THIS SUIT**

26.     Defendants admit that Plaintiffs filed numerous patent applications, provisional patent applications, and PCT applications, and at least one trademark application.  Defendants deny the remaining allegations in Paragraph 26.

27.     Defendants deny that the document referenced in Paragraph 27 was a "European Patent"; the document referenced in Paragraph 27 is simply a patent application filed with the European Patent Office.  Defendants admit that the European Patent Office published such application, which was Application No. EP 08873805.9 (the "European Patent Application"), on or about December 15, 2010 and that said application was entitled "Method and Apparatus for Carrying out Nickel and Hydrogen Exothermal Reaction."  Defendants deny that the European

Patent Office "duly and legally published" the European Patent Application.  Defendants further note that the European Patent Application parallels that U.S. patent application which was rejected by the USPTO as referenced in their response to Paragraph 1 *supra*; *see* Ex. 1.

28.     Defendants admit that on or about April 6, 2011, the Italian Patent and Trademark Office (*Ufficio italiano brevetti e marchi*) issued Italian Patent No. 0001387256 (the "Italian Patent") and that said patent was entitled "*Processo ed apparecchiatura per ottenere reazioni esotermiche, in particolare da nickel ed idrogeno*."  Defendants lack sufficient knowledge or information to admit or deny that the Italian Patent and Trademark Office "duly and legally issued" the Italian Patent.

29.     Defendants admit that on August 25, 2015, the USPTO issued U.S. Patent No. 9,115,913 B1 entitled "Fluid Heater" (the "U.S. Patent").  Defendants also admit that a copy of the U.S. Patent is attached to the Complaint as Exhibit A.  However, Defendants note that the U.S. Patent is not a patent for a catalyst that generates a low energy nuclear reaction or any other reaction resulting in an exothermic release of energy; such a catalyst is more appropriately described in Rossi's U.S. Patent application that was rejected by the USPTO as referenced in Defendants' response to Paragraph 1 *supra* (*see* Ex. 1).  Defendants lack sufficient knowledge or information to admit or deny that the U.S. Patent was "duly and legally issued," at least to the extent that such an allegation suggests that the patent is valid and enforceable.  More recently, and subsequent to the issuance of the U.S. Patent, the International Searching Authority issued a written opinion in connection with a related Patent Cooperation Treaty ("PCT") application determining that many claims in that PCT application lacked novelty or inventive step.  *See* International Searching Authority, "Written Opinion," dated October 19, 2015 as to PCT App. No. PCT/US2015/042353 (attached hereto as Exhibit 2).

30.     In light of the Court's dismissal of Counts II and VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 30.  In addition, Paragraph 30 states legal conclusions to which no response is required.  To the extent any response is required regarding Plaintiffs' allegations of patent infringement, Industrial Heat and IPH deny that they infringed the purported "European Patent," the "Italian Patent," or the "U.S. Patent."

## PLAINTIFFS' FACTUAL BACKGROUND ALLEGATIONS

31.     Defendants lack sufficient knowledge or information to admit or deny the allegations concerning the number of years Rossi has purportedly spent working, or the nature of the work Rossi has purportedly performed, on the E-Cat.  Defendants deny that the E-Cat produces energy substantially in excess of the amount of energy input into the reaction at a cost substantially below that of more traditional energy sources; *see* Ex. 1.[1]  Indeed, using the E-Cat technology Plaintiffs directly provided them, Industrial Heat and IPH have been unable to produce any measurable excess energy.

32.     Defendants lack sufficient knowledge to admit or deny that the design and construction of the E-Cat device, as well as the process by which it operates, constitute the intellectual property of Plaintiffs; *see* response to Paragraph 1 *supra*.  Defendants deny the remaining allegations in Paragraph 32.

33.     Defendants admit that Plaintiffs have filed a broad array of IP-related applications, including the European Patent Application, the patent applications corresponding to the U.S. Patent and the Italian Patent, and numerous provisional patent applications and PCT applications.  Defendants deny the remaining allegations in Paragraph 33.

34.     Defendants deny the allegations in Paragraph 34.

---

[1] As alleged in the Complaint, Plaintiffs claim that an E-Cat unit produces more than 50 times the energy it consumes.  Compl. ¶ 71.

35.     Defendants deny the allegations in Paragraph 35.

36.     Defendants deny the allegations in Paragraph 36.

37.     Defendants admit that Vaughn met with Rossi in Zurich, Switzerland to discuss licensing of the E-Cat IP.  For purposes of this Answer, Additional Defenses, Counterclaims, and Third-Party Claims, the "E-Cat IP" is defined as in the License Agreement, which states that the "E-Cat IP" consists of:

> patents, designs, trade secrets, technology, know-how (including all the knowledge necessary to produce thermal energy by means of apparatuses derived from the technology), products and business plans and all other intellectual property related directly or indirectly to energy production and conversion technologies and to the development, manufacture and sale of products using such technologies, including the Energy Catalyzer ("E-Cat") the catalyzer formula used to fuel the E-Cat, the "Hot-Cat" and the related energy production and conversion technologies.

License Agreement at page 1.  The E-Cat IP also "include[s] all documents, manuals, technical data, formulae, and other items and materials necessary or useful to enable the Company to (i) operate the 1 MW E-Cat Unit, (ii) make E-Cat Products, and (iii) exploit the E-Cat IP as contemplated by this Agreement."  *Id.* § 16.1.  Defendants deny the remaining allegations in Paragraph 37, including to the extent they claim that Cherokee was interested in or willing to pay for a license of the E-Cat IP.

38.     Defendants deny the allegations in Paragraph 38.

39.     Defendants deny the allegations in Paragraph 39, including all subparts.

40.     Defendants admit that Plaintiffs negotiated the terms of what would become the License Agreement.  Defendants also admit that the License Agreement was executed on October 26, 2012 by Plaintiffs.  Defendants further admit that Rossi traveled to Cherokee's office in North Carolina to execute the License Agreement.  Defendants deny the remaining

allegations in Paragraph 40, including any allegations that the License Agreement was "with Cherokee."  As the License Agreement states, it was with Industrial Heat.

41.    Defendants deny the allegations in Paragraph 41.

42.    Defendants lack sufficient knowledge or information to admit or deny the allegations as to Plaintiffs' knowledge of the timing of the formation of Industrial Heat. Defendants admit that Industrial Heat was formed on or about October 24, 2012.  Defendants deny the remaining allegations in Paragraph 42.

43.    Defendants deny the allegations in Paragraph 43, including all subparts.

44.    Defendants admit that an incomplete copy of the License Agreement is attached as Exhibit B to the Complaint.  Defendants also admit that Plaintiffs entered into the License Agreement with Industrial Heat and AmpEnergo, Inc. ("AEG") on October 26, 2012. Defendants state the License Agreement speaks for itself, and therefore deny any allegations in Paragraph 44 inconsistent therewith.  Defendants deny the remaining allegations in Paragraph 44.

45.    Defendants state that the License Agreement speaks for itself, and therefore deny any allegations in Paragraph 45 inconsistent therewith.

46.    Defendants state that the License Agreement speaks for itself, and therefore deny any allegations in Paragraph 46, including all subparts, inconsistent therewith.

47.    Defendants admit the allegations in Paragraph 47.

48.    Defendants lack sufficient knowledge or information to admit or deny that Leonardo owned the facility referenced in Paragraph 48.  Defendants admit the remaining allegations in Paragraph 48.

49.     Defendants deny the allegations in Paragraph 49.  As to Footnote 2 appended to Paragraph 49, Defendants state that the License Agreement speaks for itself, and therefore deny any allegations inconsistent therewith.

50.     Defendants state that the First Amendment to the License Agreement, entered on April 29, 2013 ("First Amendment"), speaks for itself, and therefore deny any allegations in Paragraph 50 inconsistent therewith.  Defendants admit that Plaintiffs executed the First Amendment on April 29, 2013.  Defendants further admit that a copy of the First Amendment is attached to the Complaint as Exhibit C.  Defendants deny the remaining allegations in Paragraph 50.

51.     Defendants deny the allegations in Paragraph 51.

52.     Defendants deny the allegations in Paragraph 52.

53.     Defendants deny the allegations in Paragraph 53.

54.     Defendants admit that Rossi and Leonardo consented to Industrial Heat's assignment of the License Agreement to IPH.  Defendants deny the remaining allegations in Paragraph 54.

55.     Defendants state that the First Amendment speaks for itself, and therefore deny any allegations in Paragraph 55 inconsistent therewith.

56.     Defendants admit that Plaintiffs selected Fabio Penon ("Penon") as the Expert Responsible for Validation ("ERV") in connection with the Validation test performed in Ferrara, Italy.  Defendants state that the License Agreement and First Amendment speak for themselves, and therefore deny any allegations in Paragraph 56 inconsistent therewith.  Defendants deny the remaining allegations in Paragraph 56.

57.     Defendants admit that from April 30 to May 1, 2013, Penon conducted measurements in connection with the Validation test of certain E-Cat reactors operated by Plaintiffs.  Defendants deny the remaining allegations in Paragraph 57.  The Validation test did not follow the Validation protocol as set forth in the License Agreement and the First Amendment (the "Validation Protocol").  For example, the Validation Protocol required 30 E-Cat reactors to be operated as a unit ("Unit A") for twenty-four consecutive hours.  However, only 18 E-Cat reactors were operated as Unit A during the testing period.  In addition, the Validation Protocol required the flow of heated fluid from the E-Cat reactors to be measured during the Validation test.  However,  these measurements were not taken during the Validation test.  Furthermore, the Validation Protocol required that twenty-four consecutive hours of testing be done on Unit A.  However, less than twenty-four consecutive hours of testing was done on Unit A.  There are various other examples of the Validation Protocol not being followed during the Validation test.

58.     Defendants admit that Penon produced a report following the testing of the E-Cat reactors which was done during the Validation test.  Defendants further admit that Industrial Heat paid the second payment of $10 million under the License Agreement and the First Amendment.  Defendants state that this payment was made to an escrow agent and was subject to the requirement that Plaintiffs transfer "all the E-Cat IP" to Industrial Heat and IPH.  *See* License Agreement § 3.2(b).  Defendants deny the remaining allegations in Paragraph 58.

59.     Defendants admit that in August 2013, the E-Cat Unit was delivered to Industrial Heat at its facility in North Carolina.  The "E-Cat Unit" is defined in the License Agreement as the "Plant" and is sometimes referred to as the "1 MW E-Cat Unit" or the "1 MW Plant."  The specifications of the E-Cat Unit/Plant are contained in Exhibit C to the License Agreement.

Defendants lack sufficient knowledge or information to admit or deny that the E-Cat Unit was delivered from Ferrara, Italy.  Defendants deny the remaining allegations in Paragraph 59.

60.     Defendants deny the allegations in Paragraph 60.

61.     Defendants deny the allegations in Paragraph 61.

62.     Defendants admit that Industrial Heat and Rossi executed the proposed Second Amendment to the License Agreement (the "Proposed Second Amendment"), which is dated "October __, 2013."  However, the Proposed Second Amendment was not executed by Leonardo, IPH, or AEG.  Defendants state that the Proposed Second Amendment speaks for itself, and therefore deny any allegations in Paragraph 62 inconsistent therewith.  Defendants admit that a copy of the Proposed Second Amendment is attached to the Complaint as Exhibit D. Defendants deny that the Proposed Second Amendment was valid to amend the License Agreement.  In any event, the Proposed Second Amendment addressed the testing of "a six cylinder Hot Cat unit" (the "Six Cylinder Unit"), not the E-Cat Unit that was the subject of the License Agreement and the First Amendment.  The Six Cylinder Unit in the Proposed Second Amendment is separate and distinct from the E-Cat Unit or Plant as referenced in the License Agreement, the First Amendment, and the Complaint.  Photographs accurately depicting the Six Cylinder Unit are attached hereto as Exhibit 3.  The Six Cylinder Unit remains in North Carolina.

63.     Defendants deny the allegations in Paragraph 63.

64.     Defendants deny that the "test" referenced in Paragraph 64 – meaning the operation of the Plant in Doral, Florida in 2015 and early 2016 – was the "Guaranteed Performance" to be performed under the License Agreement.  Defendants deny the allegations in Paragraph 64 as to Plaintiffs locating a customer in Miami, Florida who agreed to allow its facility to be used for a "Guaranteed Performance" test.  The company Plaintiffs "located" for

the test referenced in Paragraph 64 was a company closely affiliated with Plaintiffs (J.M. Products, Inc.) that had no actual use for the steam produced by the Plant, and thus was not a "customer" for the steam power to be produced by the Plant.  Defendants deny the remaining allegations in Paragraph 64.

65.     Defendants deny the allegations in Paragraph 65.

66.     Defendants deny that the test referenced in Paragraph 66 was the Guaranteed Performance to be performed under the License Agreement.  Defendants lack sufficient knowledge or information to admit or deny that Penon performed a thorough inspection of or installed his monitoring equipment on the Plant on February 19, 2015.  Defendants deny the remaining allegations in Paragraph 66.

67.     Defendants admit that Industrial Heat and/or IPH engaged Barry West and Fulvio Fabiani ("Fabiani") as independent contractors to assist Rossi in operation of the Plant in Florida and caused them to be paid for their services.  Defendants deny the remaining allegations in Paragraph 67.

68.     Defendants deny the allegations in Paragraph 68.

69.     In light of the Court's dismissal of Counts II and VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 69.  To the extent any response is required, Defendants deny the allegations in Paragraph 69.

70.     In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 70.  To the extent that any response is required, Defendants admit that Industrial Heat raised substantial sums of money from numerous investors, including entities affiliated with the Woodford Funds.  Defendants deny the remaining allegations in Paragraph 70.

71.     Defendants admit that the E-Cat Unit was operated in Florida during a period in 2015 and 2016.  As reflected in Rossi's internet blog postings at the time, that Unit was the Plant – *i.e.*, the 1 MW E-Cat – which is described in Exhibit C to the License Agreement.  An excerpt from Rossi's blog posting, as reprinted on e-catworld.com, is attached as Exhibit 4.  Defendants deny the remaining allegations in Paragraph 71.  Furthermore, Defendants note that there were many flaws in how the purported Guaranteed Performance test referenced in Paragraph 71 was performed.  Several, but by no means all, of those flaws were identified in a document provided to Penon on March 25, 2016.  A copy of this document is attached hereto as Exhibit 5.

72.     Defendants deny that the test referenced in Paragraph 72 was the Guaranteed Performance to be performed under the License Agreement.  Defendants admit that on March 29, 2016, Penon sent his final report regarding the operation of the Plant to Darden and Rossi.  Defendants state that this report speaks for itself, and therefore deny any allegations in Paragraph 72 inconsistent therewith.  Defendants deny that the Plant satisfied all of the performance requirements imposed by the License Agreement; *see* Ex. 5.  Defendants also deny Plaintiffs' allegations in Paragraph 72 regarding the amount of energy produced by the Plant during the testing period; *see* Ex. 1.  Defendants deny the remaining allegations in Paragraph 72.

73.     Defendants deny that the test referenced in Paragraph 73 was the Guaranteed Performance to be performed under the License Agreement.  Defendants state that Penon's report speaks for itself, and therefore deny any allegations in Paragraph 73 inconsistent therewith.  Defendants deny Plaintiffs' allegations in Paragraph 73 regarding the amount of energy produced by the Plant during the testing period; *see* Ex. 1.  Defendants deny the remaining allegations in Paragraph 73.

74.     Defendants admit that on March 29, 2016, Leonardo demanded payment of $89 million, and that such demand has been refused and the payment has not been made.  Defendants deny the remaining allegations in Paragraph 74.

75.     Defendants deny the allegations in Paragraph 75.

## COUNT I

76.     In response to Paragraph 76, Industrial Heat and IPH repeat and reallege their responses to Paragraphs 1-75 above as if fully restated herein.

77.     Industrial Heat and IPH state that the License Agreement speaks for itself, and therefore deny any allegations in Paragraph 77 inconsistent therewith.  Industrial Heat and IPH further deny that the Proposed Second Amendment attached to the Complaint as Exhibit D was valid to amend the License Agreement.

78.     Industrial Heat and IPH deny the allegations in Paragraph 78 to the extent that they are meant to allege that the Guaranteed Performance as defined by the License Agreement was successfully achieved.  Industrial Heat and IPH state that the assignment from Industrial Heat to IPH speaks for itself, and therefore deny any allegations in Paragraph 78 inconsistent therewith.

79.     Industrial Heat and IPH deny the allegations in Paragraph 79.

80.     Industrial Heat and IPH admit that they have not paid $89 million to Leonardo. Defendants deny the remaining allegations in Paragraph 80.

81.     Industrial Heat and IPH lack sufficient knowledge or information to admit or deny the allegations in Paragraph 81.

## COUNT II

82.     In light of the Court's dismissal of Count II of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 82.

83.     In light of the Court's dismissal of Count II of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 83.

84.     In light of the Court's dismissal of Count II of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 84.

85.     In light of the Court's dismissal of Count II of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 85.

86.     In light of the Court's dismissal of Count II of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 86.

87.     In light of the Court's dismissal of Count II of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 87.

## COUNT III

88.     In response to Paragraph 88, Industrial Heat and IPH repeat and reallege their responses to Paragraphs 1-2, 5, 7-16, 17(a-b), 17(d-f), 18-43, 48, 51, 57, 59, 61, 63-73, and 75 above as if fully restated herein.

89.     Paragraph 89 states legal conclusions to which no response is required.  To the extent any response is required, Industrial Heat and IPH deny the allegations in Paragraph 89.  In fact, assuming the License Agreement is valid, the "exclusive license to use the E-Cat IP and related technology" irrevocably belonged to Industrial Heat and/or IPH after the $10 million payment was made under the License Agreement, meaning Plaintiffs could not have conferred the "benefit" of that license on Industrial Heat or IPH subsequent to the $10 million payment.

Alternatively, if somehow (for reasons unstated in the Complaint) the License Agreement were not valid, the "exclusive license to use the E-Cat IP and related technology" would never have been transferred to Industrial Heat or IPH in the first instance, meaning it could not have been a "benefit" that Plaintiffs conferred on Industrial Heat or IPH.

90.     Paragraph 90 states legal conclusions to which no response is required.  To the extent any response is required, Industrial Heat and IPH deny the allegations in Paragraph 90.

91.     Paragraph 91 states legal conclusions to which no response is required.  To the extent any response is required, Industrial Heat and IPH deny the allegations in Paragraph 91.

92.     Paragraph 92 states legal conclusions to which no response is required.  To the extent any response is required, Industrial Heat and IPH deny the allegations in Paragraph 92.

**COUNT IV**

93.     In response to Paragraph 93, Defendants repeat and reallege their responses to Paragraphs 1-75 and 83-86 above as if fully restated herein.

94.     Defendants deny the allegations in Paragraph 94.

95.     Paragraph 95 states legal conclusions to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 95.  Defendants state that significant portions of the E-Cat IP have been disclosed publicly.  For example, Rossi has filed a number of publicly available patent applications, provisional patent applications, PCT applications, and applications in foreign countries disclosing the E-Cat IP.  A non-exhaustive list of such applications is attached hereto as Exhibit 6.  Furthermore, the E-Cat IP was disclosed to Industrial Heat and IPH pursuant to the License Agreement without any restriction on Industrial Heat or IPH's further disclosure of such.  In fact, the License Agreement permitted Industrial

Heat and IPH to sublicense the E-Cat IP to anyone they wanted on any terms they desired, without any confidentiality restrictions.  *See* License Agreement §§ 1 & 16.4.

96.     Paragraph 96 states legal conclusions to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 96.  The E-Cat IP is defined in the License Agreement.  *See* response to Paragraph 37 *supra*.  Defendants state that the License Agreement speaks for itself, and therefore deny any allegations in Paragraph 96 inconsistent therewith.

97.     Defendants deny the allegations in Paragraph 97.

98.     The Court has rejected all but one of Plaintiffs' theories of misappropriation of trade secrets as alleged in Paragraph 98 (*see* [D.E. 24]); as a result, no response to such allegations is required.  In addition, Paragraph 98 states legal conclusions to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 98, including all subparts.

99.     The Court has rejected Plaintiffs' theory of misappropriation of trade secrets as alleged in Paragraph 99 (*see* [D.E. 24]); therefore, no response to Paragraph 99 is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 99.

100.     Defendants deny the allegations in Paragraph 100.

101.     The Court has rejected Plaintiffs' theory of a "confidential and fiduciary relationship" as alleged in Paragraph 101 and has dismissed Count VII (*see* [D.E. 24]); therefore, no response to Paragraph 101 is required.  In addition, Paragraph 101 states legal conclusions to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 101.  There are no provisions in the License Agreement requiring Industrial Heat or IPH to keep the E-Cat IP confidential.  The only provision of the License

Agreement (Section 16.4) requiring a party to keep the E-Cat IP confidential applies to Plaintiffs and AEG alone.

102.     Defendants deny the allegations in Paragraph 102.

103.     The Court has rejected all but one of Plaintiffs' theories of misappropriation of trade secrets as alleged in Paragraph 103 (*see* [D.E. 24]); therefore, no response to such allegations is required.  In addition, Paragraph 103 states legal conclusions to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 103, including all subparts.

104.     Defendants deny the allegations in Paragraph 104.  In fact, the License Agreement permitted Industrial Heat and IPH to sublicense the E-Cat IP to anyone they wanted on any terms they desired, without any confidentiality restrictions.  *See* License Agreement §§ 1 & 16.4.  In addition, Rossi has publicly disclosed significant portions of the E-Cat IP; *see* Ex. 6.

105.     Paragraph 105 states a legal conclusion to which no response is required.  To the extent any response is required, Defendants deny the allegations of Paragraph 105.

## COUNT V

106.     In light of the Court's dismissal of Count V of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 106.

107.     In light of the Court's dismissal of Count V of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 107.

108.     In light of the Court's dismissal of Count V of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 108.

109.     In light of the Court's dismissal of Count V of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 109.

110.     In light of the Court's dismissal of Count V of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 110.

### COUNT VI

111.     In response to Paragraph 111, Industrial Heat and IPH repeat and reallege their responses to Paragraphs 1-75, 83-86, 94-104, and 107-109 above as if fully restated herein.

112.     Defendants deny the allegations in Paragraph 112, including all subparts.

113.     Defendants deny the allegations in Paragraph 113, including all subparts.

114.     Defendants deny the allegations in Paragraph 114.

115.     Defendants deny the allegations in Paragraph 115, including all subparts.

116.     Defendants deny the allegations in Paragraph 116.

117.     Defendants deny the allegations in Paragraph 117.

### COUNT VII

118.     In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 118.

119.     In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 119.

120.     In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 120.

121.     In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 121.

122.     In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 122.

123.    In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 123.

124.    In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 124.

125.    In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 125.

126.    In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 126.

127.    In light of the Court's dismissal of Count VII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 127.

## COUNT VIII

128.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 128.

129.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 129.

130.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 130.

131.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 131.

132.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 132.

133.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 133.

134.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 134.

135.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 135.

136.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 136.

137.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 137.

138.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 138.

139.    In light of the Court's dismissal of Count VIII of the Complaint (*see* [D.E. 24]), no response from Defendants is required to Paragraph 139.

## PLAINTIFFS' PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to any relief on the Complaint.

## AFFIRMATIVE AND OTHER ADDITIONAL DEFENSES

Without conceding that they bear the burden of persuasion on any of the following defenses, Defendants assert the following separate affirmative and other additional defenses:

<u>First Defense</u>

1.    Plaintiff Leonardo lacks standing to bring any claims against Defendants because the assignment of the License Agreement from Leonardo Corporation, Inc., a New Hampshire corporation ("Leonardo New Hampshire"), to Plaintiff Leonardo was invalid.  As explained in Paragraph 8 *supra*, Leonardo New Hampshire is the party to the License Agreement.  Per the License Agreement and the First Amendment, Leonardo New Hampshire could not assign any

rights under the License Agreement to anyone else, either "voluntarily, involuntarily, by operation of law or otherwise."  *See* Counterclaims and Third-Party Claims ¶ 44 *infra*.  Rossi also lacks standing to bring the remaining breach of contract claim in the Complaint because the payment that is the basis of that claim (Count I) is due, if at all, to Leonardo New Hampshire, not Rossi.  *See* Answer ¶¶ 74, 80 *supra*.

<u>Second Defense</u>

2.      Plaintiffs' equitable claims are barred, in whole or in part, by the doctrines of estoppel, waiver and laches.  *See* Counterclaims and Third-Party Claims ¶¶ 1-11, 32-92, 100-148 *infra*.  Plaintiffs engaged in a scheme to deceive Defendants by, *inter alia*, improperly manipulating the Validation and Guaranteed Performance testing processes, fraudulently inducing Industrial Heat to enter the Term Sheet (defined *infra*), and engaging in the other conduct alleged in support of the fraudulent inducement and FDUTPA (defined below) claims pled *infra*.  *See id.* ¶¶ 50-57, 69-92, 134-148 *infra*.  Plaintiffs either never had, waived, or are estopped from asserting their fraudulent inducement claim by agreeing to the provisions in the License Agreement and the First Amendment.  *See* First Defense *supra*.  Plaintiffs either never had, waived, or are estopped from asserting their unjust enrichment claim because the License Agreement is valid.  Plaintiffs' unjust enrichment claim is also barred by laches because of their inexcusable delay in asserting any claim to the invalidity of the License Agreement, claiming instead that they were acting pursuant to the License Agreement.

<u>Third Defense</u>

3.      Plaintiffs' equitable claims are barred, in whole or in part, by reason of Plaintiffs' unclean hands.  Plaintiffs engaged in a scheme to deceive Defendants by, *inter alia*, improperly manipulating the Validation and Guaranteed Performance testing processes, fraudulently

inducing Industrial Heat to enter the Term Sheet, and engaging in the other conduct alleged in support of the fraudulent inducement and FDUTPA claims pled *infra*. *See* Counterclaims and Third-Party Claims ¶¶ 1-11, 50-57, 69-92, 134-148 *infra* & Answer ¶¶ 57, 64, 71 *supra*.

<u>Fourth Defense</u>

4.      Plaintiffs' claims are barred, in whole or in part, as a result of Plaintiffs' antecedent breaches of contract.  For example, Plaintiffs breached the License Agreement, prior to the breaches of contract alleged by Plaintiffs in the Complaint, by, *inter alia*, improperly disclosing the E-Cat IP and the terms of the License Agreement to unauthorized third parties, failing to assign certain patents and/or patent applications to IPH, failing to inform or consult with Industrial Heat and IPH on the existence of certain patent applications and failing to fully prosecute patent applications related to the E-Cat IP, failing to report and pay taxes on payments/revenue made under the License Agreement, and failing to keep the original Leonardo entity active.  *See* Counterclaims and Third-Party Claims ¶¶ 11, 39-46, 64-83, 93-133 *infra*.

<u>Fifth Defense</u>

5.      Plaintiffs' claims are barred, in whole or in part, as a result of Plaintiffs' unlawful actions, including their conduct in violation of the Florida Deceptive and Unfair Trade Practices Act.  This is reflected in the allegations in support of the claims pled against Plaintiffs *infra*, including the allegations in support of the FDUTPA claim pled *infra*.  *See id.* ¶¶ 140-148 *infra*.

<u>Sixth Defense</u>

6.      Plaintiffs' claims are barred, in whole or in part, as a result of Plaintiffs' fraudulent misrepresentations. Those fraudulent representations are pled *infra*.  *See id.* ¶¶ 1-11, 32-92, 134-148 *infra*.  As to the corporate entity or entities responsible for the acts of fraudulent misrepresentation referenced in the just-cited paragraphs, Defendants allege as follows:  With

one exception, the misrepresentations made by Rossi as pled in those paragraphs were in his capacity as both President of Leonardo Corporation (New Hampshire) and CEO of Leonardo Corporation (Florida), and Rossi did not purport to distinguish between when he was operating as President of Leonardo Corporation (New Hampshire) versus as CEO of Leonardo Corporation (Florida).[2]  Moreover, as alleged by Plaintiffs, Leonardo Corporation (New Hampshire) has been merged into Leonardo Corporation (Florida), which thereby would have assumed responsibility for the fraudulent misrepresentations of Leonardo Corporation (New Hampshire) and its President (acting in his capacity as President).  The fraudulent misrepresentations of Rossi for which Leonardo Corporation (Florida) is responsible thus are that (1) the E-Cat Unit/Plant could produce, and was producing, a very high coefficient of performance, (2) Italian law and the Ferrara Health Office required limitations on the Validation process to the extent represented by Rossi, (3) Leonardo and Rossi transferred all E-Cat IP to Industrial Heat and IPH, (4) J.M. Products, Inc. ("JMP"), f/k/a J.M. Chemical Products, Inc., operated a manufacturing process in Florida to produce chemical products and had a need for steam power in connection with that process, (5) Leonardo wanted to move the E-Cat Unit/Plant to Florida to provide steam power to "the real Customer" in Florida that had a need for steam power and to obtain government authorizations for producing additional E-Cat Units/Plants, (6) JMP was a confidential subsidiary of Johnson Matthey p.l.c., which was interested in using the E-Cat technology, and (7) JMP was conducting a secretive manufacturing process at the location in Doral, Florida where the E-Cat Unit/Plant was operated.  Leonardo Corporation (Florida) is also responsible, as a co-conspirator, for the fraudulent misrepresentations of the other participants in the common scheme to engage in unconscionable, unfair and deceptive acts against Industrial Heat and IPH, as alleged below.

---

[2]         The one exception was in connection with the License Agreement and related written instruments, which Rossi executed in his capacity as President of Leonardo Corporation (New Hampshire).

<u>Seventh Defense</u>

7.      Plaintiffs' claims are barred, in whole or in part, because any injury that Plaintiffs may have suffered was proximately caused or contributed to by the acts or omissions of Plaintiffs and/or third parties other than Defendants.  As reflected in Paragraphs 64, 71, 95, 101, 104 *supra*, Paragraphs 39-40, 69-76, 100-108 *infra*, and Ninth Defense *infra*, any purported "injury" to Plaintiffs relating to any alleged disclosure of the E-Cat IP or any "unjust enrichment"-type benefit allegedly conferred on Industrial Heat or IPH was a product of (1) their agreeing in the License Agreement to provide the E-Cat IP to Industrial Heat without any limitation on Industrial Heat's ability and right to disclose the E-Cat IP to anyone it chose, (2) their relinquishing in the License Agreement any claim to any prior or collateral agreement not reflected in the License Agreement and the written documents referenced therein, (3) their disclosures in patent applications and otherwise, and (4) their decision to conduct operations in Florida under the fraudulently induced Term Sheet and after the "Guaranteed Performance" period under the License Agreement expired.

<u>Eighth Defense</u>

8.      Plaintiffs' fraud claim is barred because of the merger and integration provision in the License Agreement (Section 16.8) as well as the ratification provision in the First Amendment (Section 2).  Per the License Agreement Section 16.8, that document and other written documents identified therein "contain the entire agreement among the parties" and "supersede[d] all prior agreements, written or oral."  Per the First Amendment Section 2, the parties acknowledged, "ratified[,] and confirmed" the License Agreement.

<u>Additional Defenses</u>

Defendants do not knowingly or intentionally waive any applicable affirmative or other defenses not stated above, and reserve the right to assert and rely on such other applicable affirmative or other defenses as may later become available or apparent.  Defendants further reserve the right to amend their answer and/or affirmative or other defenses accordingly and/or to delete defenses that they determine during the course of this litigation are not warranted or required.

## **COUNTERCLAIMS AND THIRD-PARTY CLAIMS**

Industrial Heat and IPH (collectively "Counter-Plaintiffs") bring this action against Leonardo; Rossi; J.M. Products, Inc. ("JMP"); Henry Johnson ("Johnson"); Penon; United States Quantum Leap, LLC ("USQL"); Fabiani; and James A. Bass  ("Bass").  In support, Counter-Plaintiffs allege as follows:

### **INTRODUCTION**

1.      Industrial Heat and its affiliates, including IPH, are involved in developing and investing in "low energy nuclear reaction" (or LENR) technologies that have the potential to provide clean, reliable, efficient, and safe sources of energy.  There are various forms of LENR technologies, including Electrolytic Cell Reactors ("ECR"), Gas Metal Matrix Reactors ("GMMR"), and Solid State Hydride Reactors ("SSHR").  Industrial Heat and its affiliates are working on the development of all such technologies, often in conjunction with inventors who initially discovered or developed different forms or applications of these technologies.

2.      Prior to 2012, Rossi claimed that he had developed an E-Cat device, which when used in connection with an E-Cat fuel/catalyzer formula ("E-Cat Fuel"), could produce well over six times the energy it consumed (which would equate to a coefficient of performance ("COP")

of 6.0).  Consistent with its guiding mission to develop and invest in LENR technologies, Industrial Heat entered into the License Agreement with Leonardo and Rossi in October 2012.

3.      Under the License Agreement, it was possible for Leonardo to earn three different payments.  The first was for the Plant, but was refundable to Industrial Heat or IPH if Leonardo and Rossi could not "validate" during a 24-hour test period that the Plant could produce at least six times the energy it consumed – a COP of 6.0 ("Validation").  License Agreement § 3.2(a). The second payment was for a license and transfer to Industrial Heat or IPH of all of the E-Cat IP, but only if Validation could be achieved.  *Id.* § 3.2(b).  The third payment was due if Leonardo and Rossi could demonstrate that the Plant could consistently operate at a COP of at least 4.0, if not at the COP level at which Validation was achieved, for 350 out of 400 days ("Guaranteed Performance").  *Id.* § 3.2(c).

4.      Industrial Heat made the first payment under the License Agreement to Leonardo – an amount deemed by the License Agreement to "include payment in full for the Plant" – in October 2012.  License Agreement § 3.2(a).  That payment was in the amount of $1.5 million. Leonardo and Rossi purported to achieve the 24-hour validation from April 30 to May 1, 2013,[3] claiming a COP in excess of 10.0, after which they purported to transfer all of the E-Cat IP to Industrial Heat and IPH in exchange for the second payment.  The second payment under the License Agreement – in the amount of $10 million to Leonardo – was made in June 2013.

5.      The long-term "Guaranteed Performance" demonstration under the License Agreement was to take place shortly after the 24-hour Validation.  More specifically, Leonardo was required to deliver the Plant to Industrial Heat within 30 days following Validation, and then the Guaranteed Performance demonstration was to take place over the "400 day period

---

[3]          Per the First Amendment, the 24-hour validation no longer needed to be of the Plant, but only of 30 E-Cat reactors combined into a "Unit A."

commencing on the date immediately following delivery of the Plant" to Industrial Heat.  *Id.* §§
3.2(a) & 3.2(c).  Guaranteed Performance required Leonardo and Rossi to operate the Plant "at
the same level (or better) at which Validation was achieved for a period of 350 days (even if not
consecutive) over a 400 day period."  *Id.* § 5.

6.      The testing Leonardo and Rossi now claim was the Guaranteed Performance did
not commence immediately following the delivery of the Plant to Industrial Heat.  In fact, that
testing ***began*** well over one year after the Guaranteed Performance period commenced under the
License Agreement – making it impossible for the Plant to achieve Guaranteed Performance
during the time period required by the License Agreement.

7.      Beyond the fact that Guaranteed Performance could not be achieved in the
required time period, Leonardo and Rossi knew that the Plant could not produce a COP of 10.0
or greater (or even a COP or 4.0 or greater) for 350 out of 400 days.  As a result, Leonardo and
Rossi manipulated the testing process by, among other things, 1) insisting that the Plant be
relocated to Miami, far away from Industrial Heat's offices, to provide steam to a purported
manufacturing "customer" that did not actually exist; 2) manipulating, along with Fabiani, the
operation of the Plant and the reports of the Plant's purported operations, to make it appear that
the Plant was producing a COP far greater than 10.0; and 3) enlisting Penon to produce a false
report stating that Guaranteed Performance was achieved.

8.      Eventually Counter-Plaintiffs discovered that the test that Leonardo and Rossi
were conducting, in conjunction with the supposed "customer" in Miami, was not a real test at all,
but a carefully scripted effort to deceive Counter-Plaintiffs into 1) providing Leonardo and Rossi
with credibility in their efforts to license and promote the E-Cat IP to others and/or obtain
investments from others in their business ventures, 2) making the third payment under the

License Agreement to Leonardo, 3) paying a multitude of expenses of Leonardo and Rossi including in connection with their operations in Florida, and 4) paying Penon and Fabiani for services not rendered and reimbursing them for unnecessary expenses.

9.     During the same time period, Counter-Plaintiffs continued their own efforts to replicate Rossi's purported results using the E-Cat IP that Leonardo and Rossi had provided them when they received the $10 million payment.  Using the E-Cat technology Leonardo and Rossi directly provided them, Counter-Plaintiffs were unable to replicate any of Leonardo and Rossi's claimed results or otherwise generate measurable excess energy.  This led Counter-Plaintiffs to realize that there were only three possible conclusions: 1) Leonardo and Rossi's claimed results, including the purported results from the Validation, were fabricated; 2) Leonardo and Rossi did not provide all of the E-Cat IP to Counter-Plaintiffs as was required under the License Agreement in exchange for the $10 million payment; or 3) both.

10.     Whether as a result of 1) fabricating the Validation test results so that it appeared that a COP greater than 6.0 was achieved when it was not, 2) not providing Counter-Plaintiffs with all the E-Cat IP, or 3) both, Leonardo and Rossi clearly breached the License Agreement.

11.     In addition to the foregoing breach, as well as Leonardo and Rossi's continuous efforts to deceive Counter-Plaintiffs, Leonardo and Rossi breached the License Agreement by, among other things: 1) improperly disclosing the E-Cat IP to unauthorized third parties, and improperly disclosing the terms of the License Agreement to unauthorized third parties without Counter-Plaintiffs' written permission, 2) failing to assign certain patents and/or patent applications to IPH, 3) failing to inform Counter-Plaintiffs of the existence of certain patent applications and failing to fully prosecute patent applications related to the E-Cat IP, 4) participating or having a financial interest in companies that would be Counter-Plaintiffs'

competitors, and 5) failing to keep the original Leonardo entity (a New Hampshire corporation) active.

## THE PARTIES

12.     Counter-Plaintiff Industrial Heat is a Delaware limited liability company having a principal place of business in North Carolina.

13.     Counter-Plaintiff IPH is a Netherlands private limited liability company having a principal place of business in the Netherlands.

14.     Counter-Defendant Rossi has a primary residence in Miami Beach, Florida and, upon information and belief, is a citizen of Italy.

15.     Counter-Defendant Leonardo is a Florida corporation having a principal place of business in Miami Beach, Florida.

16.     Third-Party Defendant JMP is a Florida corporation having a principal place of business in Doral, Florida.

17.     Third-Party Defendant Johnson is a citizen of Florida with a primary residence in Boca Raton, Florida.

18.     Third-Party Defendant Penon is a citizen of Italy with a primary residence in Abano Terme, Italy.

19.     Third-Party Defendant Fabiani is a citizen of Italy with a primary residence in Miami Beach, Florida.

20.     Third-Party Defendant USQL is a Florida limited liability company having a principal place of business in Miami Beach, Florida.  Fabiani is USQL's sole member.

21.     Third-Party Defendant Bass, upon information and belief, is a citizen of Florida with a primary residence in this judicial district.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1367.  The claims pled herein are related to the claims pled in the Complaint and arise out of the same case or controversy.

23.     Leonardo is subject to personal jurisdiction in this judicial district because it is a Florida corporation with a principal place of business in Miami Beach, Florida.

24.     Rossi is subject to personal jurisdiction in this judicial district because he is a Florida resident with a primary residence in Miami Beach, Florida.

25.     JMP is subject to personal jurisdiction in this judicial district because it is a Florida corporation with its principal place of business in Doral, Florida.

26.     Johnson is subject to personal jurisdiction in this judicial district because he is a Florida resident with a primary residence in Boca Raton, Florida

27.     Penon is subject to personal jurisdiction in this judicial district because he engaged in business in this judicial district from which the claim against him arises and committed tortious acts in this judicial district that are the basis of the claim against him.

28.     USQL is subject to personal jurisdiction in this judicial district because it is a Florida limited liability company with its principal place of business in Miami Beach, Florida.

29.     Fabiani is subject to personal jurisdiction in this judicial district because he is a Florida resident with a primary residence in Miami Beach, Florida.

30.     Bass is subject to personal jurisdiction in this judicial district because, upon information and belief, he is a Florida resident with a primary residence in this judicial district.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) & (c)(3) because Leonardo, Rossi, and Third-Party Defendants other than Penon reside in this

district, and Penon does not reside in the United States.  Venue is also proper in this judicial

district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions

giving rise to the claims asserted herein occurred in this judicial district.

**FACTUAL BACKGROUND**

***Thomas Darden's initial meeting with Rossi.***

32.     Industrial Heat was formed in October 2012 to support and invest in LENR

technologies.  If proven reliable and controllable, LENR technologies have the potential to

provide an energy resource that does not generate radioactive waste or emit other harmful

pollutants.  Since its inception, Industrial Heat has worked to identify and partner with promising

LENR inventors with an eye towards commercializing products that displace traditional fuel

sources in generating both heat and electricity without emitting radioactive waste.

33.     In June 2012, representatives from AEG introduced Darden to Rossi at Rossi's

apartment in Miami Beach, Florida.  In making the introduction, AEG explained that Rossi was

an inventor working on certain LENR technology.  At the time of the meeting, AEG held an

exclusive right to commercially market Leonardo and Rossi's E-Cat technologies in the

Americas.

34.     During the June 2012 meeting, Rossi told Darden that he had developed and was

continuing to develop a device (the E-Cat) that could produce energy at remarkably high levels

without generating the harmful byproducts normally associated with nuclear reactions.

35.     Thereafter, discussions continued among Rossi, Darden, and others regarding

opportunities to develop and commercialize the E-Cat technology.

***The License Agreement between Industrial Heat, Leonardo, Rossi, and AEG.***

36.     On or about October 26, 2012, Industrial Heat, Leonardo, Rossi, and AEG entered into the License Agreement.  An incomplete copy of the License Agreement is attached as Exhibit B to the Complaint.[4]

37.     The License Agreement was structured such that Leonardo could earn three payments from Industrial Heat – totaling over $100 million – if certain conditions were satisfied. *See* License Agreement § 3.2; response to Paragraph 3 *supra*.  In addition to the provisions of the License Agreement that gave Leonardo and Rossi an opportunity to earn the three payments, the License Agreement also imposes numerous obligations upon Leonardo and Rossi.  Some of those obligations are described further below.

38.     First, Section 3.2(b) requires that Validation be achieved as provided in Section 4 of the License Agreement.  Section 4, as amended by the First Amendment, states in relevant part:

> Retention by Leonardo of the $1,500,000 component of the purchase price and payment of the $10,000,000 described in Section 3.2(b) above are subject to successful Validation of the Plant. . . . The Validation will be made in the factory of Leonardo in Ferrara, Italy on April 30th and May 1, 2013 (unless otherwise agreed in writing by [Industrial Heat or IPH] and Leonardo).  Validation will be deemed successful and achieved when the expert responsible for validation ("ERV") certifies that the performance standards for the Plant set forth in Exhibit A to [the First Amendment] have been met.  To make this measurement the ERV will measure the flow of the heated fluid and the Delta T between the temperature of the fluid before and after the E-CAT reaction."

License Agreement § 4.

39.     Second, the License Agreement imposes confidentiality obligations on Leonardo and Rossi with respect to the terms of the License Agreement.  The License Agreement states: "While this Agreement is in effect and after this Agreement terminates, each party hereto and its

---

[4] Missing from the copy of the License Agreement attached to the Complaint as Exhibit B are 1) Exhibit B to the License Agreement (Rossi and Leonardo's license agreement with AEG) and 2) the first page of Exhibit C to the License Agreement.

Affiliates shall keep confidential, and shall not disclose, the terms of this Agreement to any other Person without the prior consent of each other Party hereto," with certain exceptions. *Id.* § 16.4.

40.     Third, the License Agreement imposes confidentiality obligations on Leonardo and Rossi with respect to the E-Cat IP.  The License Agreement states that "[d]uring the term of this Agreement, each of Leonardo, Rossi, and AEG agrees to keep the E-Cat IP strictly confidential and not disclose any of the E-Cat IP to any other party," also with certain exceptions. *Id.*  The License Agreement imposes no such confidentiality obligation on Counter-Plaintiffs.  In fact, Counter-Plaintiffs are allowed to disclose the E-Cat IP to anyone they want.

41.     Fourth, the License Agreement imposes very specific obligations upon Leonardo with respect to patent prosecution and maintenance.  In particular, the License Agreement requires that Leonardo, with respect to all Licensed Patents (as defined in the License Agreement): 1) prepare, file, and prosecute patent applications relating to the Licensed Patents; 2) maintain the Licensed Patents; 3) pay all fees and expenses associated with the just mentioned first two requirements; 4) keep Counter-Plaintiffs informed of the filing and progress of the prosecution of Licensed Patents and related patent applications; 5) consult with Counter-Plaintiffs concerning decisions that could affect the scope or enforcement of any issued claims or the potential abandonment of patent applications or patents relating to the Licensed Patents; and 6) notify Counter-Plaintiffs in writing of any additions, deletions, or changes in status of the Licensed Patents or patent applications related to the Licensed Patents. *See id.* § 7.1.  The License Agreement also imposes limitations on Leonardo's ability to abandon any patent application or patent that is a Licensed Patent. *See id.* § 7.2.

42.     Fifth, the License Agreement contains a "Covenant Not to Compete" provision that prohibits Leonardo, Rossi, or any of their affiliates from directly or indirectly owning,

- 34 -

managing, operating, joining, or having a financial interest in any other business or enterprise "(a) engaged in the design, development, manufacture, distribution, lease, rental or sale of any E-Cat Products, or provision of any services related thereto or (b) which is competitive with the E-Cat Products, unless Leonardo . . . shall have obtained the prior written consent of [Counter-Plaintiffs]." *Id.* § 13.3.

43.     Sixth, the License Agreement requires that Leonardo and Rossi "file all necessary documentation and returns with respect to any applicable sales, use, transfer, real property transfer, recording, gains, stock transfer and other similar taxes and fees pertaining to the respective revenues derived by the Parties in respect of the E-Cat IP (such as taxes and fees), including any interest or penalties thereon." *Id.* § 13.5.  The License Agreement also requires Leonardo and Rossi to keep the E-Cat IP "free and clear of any Liens." *Id.* §§ 12(a) & 12(e).

44.     Finally, the License Agreement, as amended by the First Amendment, prohibits Leonardo and Rossi from "assign[ing] or otherwise transfer[ring] any of [their] rights  . . . under this Agreement, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without [Counter-Plaintiffs'] prior written consent." *Id.* § 16.7; First Amendment § 1.C.

45.     As explained more fully herein, Leonardo and/or Rossi violated each of the aforementioned provisions of the License Agreement.

46.     Furthermore, Leonardo and Rossi made certain representations and warranties in the License Agreement.  For example, Leonardo and Rossi, "jointly and severally," represented that "[Leonardo was] duly organized, validly existing and in good standing as a corporation or other entity as represented herein under the laws and regulation of its jurisdiction of incorporation or organization" and that "it [had], and throughout the term of the License [would] retain, the full right, power and authority to enter into this Agreement and to perform its

obligations." License Agreement §§ 11(a) & 11(b). Furthermore, Leonardo and Rossi, jointly and severally, each represented that they "[had] and throughout the Term [would] retain the full, unconditional and irrevocable right, power and authority to License the E-Cat IP." *Id.* § 12(a). Leonardo and Rossi also represented that "each had filed all necessary tax returns" and "ha[d] paid all taxes." *Id.* § 12(j).

### *The First Amendment to the License Agreement and assignment of Industrial Heat's rights to IPH.*

47.      On or about April 29, 2013, Leonardo, Rossi, AEG, and Industrial Heat executed the First Amendment, which is attached to the Complaint as Exhibit C.

48.      On that same date, Industrial Heat and IPH executed an Assignment and Assumption of License Agreement (the "Assignment and Assumption"), wherein Industrial Heat assigned its rights under the License Agreement to IPH. The Assignment and Assumption is attached hereto as Exhibit 7. On the same date that the Assignment and Assumption was executed, Leonardo and Rossi executed a certification that "the representations and warranties of Leonardo and Rossi contained in the License Agreement . . . [were] true and correct as of the date of [the] Certification, as if made on the date [t]hereof, and further, that such representations and warranties w[ould] remain true and correct" upon payment of the $10 million. *See* Ex. 8. Subsequently, Industrial Heat and IPH entered into an Amended and Restated Assignment and Assumption of License Agreement ("Amended Assignment and Assumption") in September 2014. The Amended Assignment and Assumption is attached hereto as Exhibit 27.

49.      At or about the time of the Validation testing, Industrial Heat tendered a payment of $10 million to a designated escrow agent. Pursuant to the License Agreement, the $10 million was not paid directly to Leonardo and Rossi because Leonardo and Rossi were required not only

to conduct the Validation testing, but also to provide all E-Cat IP to Industrial Heat in order to be entitled to the $10 million.

### *Testing the Plant in Italy, North Carolina, and Florida.*

#### *Validation testing in Italy.*

50.     Because Leonardo and Rossi knew that the Plant could not achieve Validation as defined in the License Agreement, they manipulated the Validation testing procedure to deceive Counter-Plaintiffs into making the second payment under the License Agreement.

51.     The Validation test was originally supposed to be performed on the Plant over the course of 24 hours.  However, in an effort to manipulate the Validation test, Rossi, on behalf of Leonardo, contacted Industrial Heat to report that Italian law required certain modifications to the Validation test.  On April 23, 2013, Rossi stated:

> This morning I had a meeting with the Health Office of the Province of Ferrara, which has to authorize the 24 hours test (it is unthinkable to make it without authorization, we could be stopped by the police upon a phone call due to the noise of the air escape of the condensers, because we must dissipate the energy not having any possible utilization for it). We found an acceptable solution. He explained to me that the Italian law "DPR ( Decreto del Presidente della Repubblica) # 551- Dec. 21 1999 requests an authorization for any plant that makes more than 35 kWh/h and this authorization takes at least 6 months. But we are advantaged, because LENR do not exist in the known technology, therefore when we say 35 kWh we say kWh consumed, because plants that produce more than the energy they consume "do not exist". Now, 35 x 6 = 210 kW[.] Therefore if we can consume up to 35 kWh/h without authorization, this implies that in out LENR case I can produce up to 210 kWh/h, which is a consistent amount of energy. I will steal something ( maybe the COP will be more) . . . .

Ex. 9.

52.     Upon information and belief, Rossi had no such meeting with the Ferrara Health Office, and Rossi's statement was false that Italian law would not allow for the 24-hour Validation process as set forth in the License Agreement without first obtaining a permit that would require "at least 6 months" to obtain.

53.     Unaware that Rossi had misrepresented his meeting with the Ferrara Health Office and Italian law, Industrial Heat agreed to amend the License Agreement so that Validation would require testing of only 30 reactors instead of the entire Plant.

54.     The modifications to the Validation Protocol were memorialized in Exhibit A to the First Amendment.  As modified, the Validation Protocol required that "[t]wo separate units ('Unit A' and 'Unit B'), each composed of a different set of 30 individual E-Cat reactors, [] be tested for a period of 24 hours."  First Amendment, Ex. A.  The modified Validation Protocol further states that "[f]or purposes concerning validation achievement, only the performance of Unit A will be considered."  *Id.*  The performance requirements for Unit A are as follows:

> Unit A will be required to consistently produce energy that is at least six times greater than the energy it consumes (that is, a coefficient of performance 'COP' of six or greater) and steam that is consistently 100 degrees Celsius or greater during the 24 hour test period.

*Id.*  The Validation Protocol also states that Unit A would be tested from 9:00 a.m. on April 30, 2013 through 9:00 a.m. an May 1, 2013.  *Id.*

55.     Later in April 2013, Rossi confirmed that the Validation test could be performed with 30 E-Cat reactors.  But just before the Validation test was commenced, Rossi claimed that even testing 30 E-Cat reactors was undoable due to restraints under Italian law, and explained that the test needed to be conducted with only 18 E-Cat reactors.  This claim by Rossi was false.

56.     Rossi further manipulated the Validation process by ensuring that his friend and colleague, Penon, served as the ERV for the Validation testing.  Industrial Heat requested that "one of the big testing companies" work alongside Penon in the measurement and validation of the test.  Rossi vehemently objected, insisting that having one of the big testing companies involved would "create big problems" for him.

57.     The Validation testing occurred from April 30 through May 1, 2013.  The testing

lasted for slightly less than the 24-hour period required by the Validation Protocol and included

only 18 E-Cat reactors.  On or about May 7, 2013, Penon issued his Evaluation Test Report on

the Validation test (the "Evaluation Report").  According to the Evaluation Report, the 18

individual E-Cat reactors tested over the course of the 23 1/2 hour period produced a COP of

10.85.

58.     When Industrial Heat representatives arrived at the Validation testing site, Rossi

provided them with a copy of a report (which he had received days earlier) by third parties who

tested two different E-Cat reactors.  That report, later published as "Indication of anomalous heat

energy production in a reactor device containing hydrogen loaded nickel powder," was prepared

by several Italian and Swedish scientists (Giuseppe Levi, Evelyn Foschi, Torbjorn Hartman, Bo

Hoistad, Roland Pettersson, Lars Tegner, and Hanno Essen) who hailed from some of Europe's

most prominent academic institutions (Royal Institute of Technology, Uppsala University and

Bologna University).  *See* Ex. 10 (the "Ferrara Report").  The Ferrara Report stated that one E-

Cat reactor produced a COP of 5.6, though the scientists noted that that COP might be overstated.

*Id*. at page 13.  The Ferrara Report also stated that the second E-Cat reactor produced a COP of

2.6 or 2.9.  *Id*. at page 24.[5]  These reported COP numbers, while less than what would have been

required for validation under the License Agreement, nevertheless reflected positive COP

findings by third parties from well known universities in Europe.[6]

59.     On or about April 30, 2013, coinciding with the Validation testing and consistent

with the License Agreement's requirements, Industrial Heat tendered a payment of $10 million

---

[5] The E-Cat reactors addressed in the Ferrara Report were different in design from the E-Cat reactors in the Plant.

[6] Since its publication, the Ferrara Report has been subject to criticism, but none of those criticisms was available at the time Rossi provided the report to the Industrial Heat representatives.

to a designated escrow agent.  Pursuant to the License Agreement, the payment of the $10 million was not made directly to Leonardo because, following any Validation testing, Leonardo and Rossi were also required to provide all E-Cat IP to Counter-Plaintiffs in order to be entitled to the $10 million payment.

### Rossi and Industrial Heat's inability to replicate Validation results in North Carolina.

60.     Following the Validation testing, a process was undertaken for Leonardo and Rossi to assemble for transfer to Counter-Plaintiffs all E-Cat IP.  On June 9, 2013, the escrow agent released the $10 million to Leonardo.  In exchange, Leonardo and Rossi purportedly transferred all E-Cat IP to Counter-Plaintiffs.  In fact, on the same day that the $10 million payment was released (June 9, 2013), Rossi met with Darden to provide him personally with the last piece of the E-Cat IP to be transferred – the formula for the E-Cat Fuel required to enable an E-Cat reactor to produce the high COP claimed by Leonardo and Rossi.

61.     Leonardo caused the Plant to be delivered to Industrial Heat's facility in North Carolina in August 2013.  This was later than the time required by the License Agreement, as amended by the First Amendment.  *See* License Agreement § 3.2(a); First Amendment § 1.A.

62.     Shortly after delivery, Industrial Heat hired several independent contractors to assist Rossi in connection with the development, modification, and testing of the Plant, of various E-Cat reactors, and of a prototype Six Cylinder Unit.

63.     Shortly after the Plant was delivered, Industrial Heat retained Fabiani, who had long worked with Rossi, as an independent contractor.  More specifically, on September 1, 2013, Industrial Heat entered into a Technical Consulting Agreement with USQL, through its sole member, Fabiani ("USQL Agreement").  The USQL Agreement is attached hereto as Exhibit 11. Industrial Heat engaged USQL and Fabiani – who joined the USQL Agreement in his individual

capacity – to "provide services related to the manufacture and development" of the Plant and related E-Cat IP.  USQL Agreement at 1.  The USQL Agreement required, among other things, that USQL and Fabiani:

> promptly disclose to Industrial Heat any and all improvements, inventions, developments, discoveries, innovations, systems, techniques, processes, formulas, programs and other things that may be of assistance to Industrial Heat or its affiliates, whether patentable or unpatentable, that (i) relate to the actual or demonstrably anticipated research or development by Industrial Heat or any of its affiliates, or (ii) result from any work performed by USQL for or at the request of Industrial Heat, or (iii) are developed on Industrial Heat's time or using the equipment, supplies or facilities or any Confidential Information or trade secret information of Industrial Heat, or any of its affiliates; and that are made or conceived by USQL . . . while engaged by Industrial Heat.

*Id.* § 7.

64.     Leonardo and Rossi were fully aware that, per the clear and express terms of the License Agreement, they were required to commence any "Guaranteed Performance" in 2013.  Nevertheless, Leonardo and Rossi made no efforts to commence such a test during 2013.  Instead, from approximately September 2013 through December 2013, Rossi was on site at Industrial Heat's facility in North Carolina working with Industrial Heat personnel in efforts both (a) to develop new versions of E-Cat reactors or new devices in which E-Cat reactors would operate and (b) to replicate the results of prior E-Cat testing as either claimed by Leonardo and Rossi or reported by Penon in connection with the Validation testing in Italy.

65.     Despite Rossi's presence and participation in the testing in North Carolina, the E-Cat testing in North Carolina was never able reliably or credibly to reproduce the COP of 10.85 as reported by Penon (or even reach the lowest COP threshold identified in the License Agreement, which was a COP of 4.0).

66.     At the time, Industrial Heat personnel were uncertain whether the lack of success was due to the failure of the E-Cat IP technology, or to efforts by Rossi to undermine the testing.

Industrial Heat was aware that Rossi had engaged in just such conduct in the past.  For example, Rossi and/or Leonardo had agreed to license the E-Cat IP to a company called Hydro Fusion in Europe.  *See* Ex. 12.  However, in order to be released from their obligation, Leonardo and Rossi purposely distorted the results of a testing of the E-Cat technology being performed for Hydro Fusion to dissuade Hydro Fusion from moving forward with the agreement:

> With this company Hydrofusion we [meaning Leonardo and Rossi] had agreed upon a draft to sell them IP, know how and manufacturing license for Europe but Germany, France and Italy.  By our law, if you send a proposal you are engaged to accept if the proposee accepts all the conditions of the proposal.   After receiving your last text at the end of August I decided to go ahead with you, *therefore I had to get rid of this engagement*.   The only way out was to invite them to a test, ask them to bring with them their consultant.   *I made the test abort*, maintaining the temperatures below the starting limit.   *Then I made up some discussions*, I said they made a wrong test, they escaped, I am free.
>
> We did not have damages of image, because, knowing what was on the road,  I had made before their test a disclaimer, saying that the Hot temperature E-Cat was just a prototype, still under test and validation and subject to modification, thing that I am repeating everywhere.  Now I am publishing that I am surprised of all this ado for nothing, since I already said that for the Hot Cat we needed more tests before saying it is a product ready for the market.  At this point we can organize with Cherokee a world strategy, since all the other licensees are just commercial: for example in Africa we will have just to pay a royalty to the local agent upon our sale price, but they all are very good and they can sell either energy or plants.  Nobody has rights upon the IP, know how, manufacturing and so on.
>
> Warmest Regards,
>
> Andrea

*See id.* (emphases added).  On the same day (September 10, 2012) but in a separate, earlier email, Rossi described his efforts at deceiving Hydro Fusion as a "masterpiece": "I got rid of the European big license I had to sign. I made a masterpiece making them go voluntarily . . . I will explain personally."[7]  *See* Ex. 13.

---

[7] Leonardo and Rossi's decision to "get rid of" their Hydro Fusion "engagement" was not of significance to Industrial Heat at the time because Industrial Heat was not negotiating for a license that would cover the same geographic territory as Hydro Fusion's license.

67.     After Rossi left North Carolina, Counter-Plaintiffs' personnel continued their work on developing new devices in which E-Cat reactors would operate and, using the E-Cat technology Leonardo and Rossi directly provided them, trying to replicate the results of prior E-Cat testing as either claimed by Leonardo and Rossi or reported by Penon.  Rossi would visit the North Carolina facility on occasion to provide his input and opinions as to the device designs (and design changes) and the testing methodologies and results.  None of the testing replicated (or came close to replicating) the high COP results previously claimed by Leonardo, Rossi, and Penon, or otherwise generated measurable excess energy.

68.     In late 2013 and early 2014, Leonardo and Rossi made arrangements with the team of scientists who had published the Ferrara Report to conduct another test of a single E-Cat reactor (not an entire Plant or an entire Six Cylinder Unit) over a roughly one month time period in February and March 2014 in Lugano, Switzerland.  At the conclusion of the experiment, the scientists concluded in their report (the "Lugano Report") that the E-Cat reactor produced a COP of 3.2 and 3.6 across two different "runs" of the reactor (which is still less than the lowest COP number reflected in the License Agreement).  *See* Ex. 14.  This conclusion was subsequently criticized in a series of publications identifying flaws in the methodology the scientists employed which led to overstatement of their COP calculations.  These publications, however, did not surface until 2015.

### The Plant moves to Miami to service a fake "customer."

69.     In 2014, knowing that the high COP results that Leonardo, Rossi, and Penon had previously claimed could not be replicated by the various testing of E-Cat reactors in North Carolina (some done with the direct participation of Rossi) or even by the scientists in Lugano (though Rossi had significant control over their testing), Leonardo, Rossi, and others devised a

scheme to get the Plant removed from under Industrial Heat's control in North Carolina and to a

location in Florida where Leonardo, Rossi, and others could operate the Plant without careful

oversight and could control how any measurements of the Plant's performance were conducted.

70.     To that end, Leonardo and Rossi enlisted their attorney, Johnson, to create a

company that would pose as a "customer" in the Miami area that needed and would pay for

steam produced by the Plant.  Johnson registered the company, JMP, as a Florida corporation in

June 2014.  *See* Ex. 15.  JMP was originally incorporated as J.M. Chemical Products, Inc. in June

2014, but changed its name to J.M. Products, Inc. in September 2014.

71.     Thereafter, Leonardo and Rossi made their pitch to Counter-Plaintiffs as to why

they should allow Leonardo and Rossi to take the Plant down to Florida to operate it in Florida.

That pitch is best captured in their July 5, 2014 email to Counter-Plaintiffs (and others):

> Dear All:
>
> In the incoming meeting we will have next week, please allow me to encourage
> you to take a decision regarding where to put at work our 1 MW plant.  I really
> and strongly hope you will consider the solution I found, to rent it to JM, in its
> factory in Florida *where they will use it to process their chemical products*.
> Please think carefully before losing them.   *They are positive to us, but in
> September must start and they must know asap if they have to use our plant or
> provide otherwise*. This solution will:
>
> 1- allow to Industrial Heat to say to the Investors that they are getting 360,000
> dollars per year of rental, with a payback of a plant like this, whose construction
> cost is 200,000 $, in less than 6 month
>
> 2- allow to your Customer-Investors-Visitors to *hear from a real Customer* that he
> is making money with our plant
>
> 3- allow us to start in September the operation of the plant, with no further loss of
> time
>
> 4- allow us not to expose the know how, since the maintainence of the plant is
> made by us and the plant remains our property: a rental is not a sale

5- *allow us to make all the Authorities make all the measurements necessary to get the Authorizations for the next plants*

6- allow you to get orders to supply for rent thousands of plants

7- allow the plant work for 24 hours per day for 360 days per year, while if used as a room heater it could work only 4 months, not per 24 hours per day, with obvious loss of profit.

*Your proposal to put the plant in a factory owned by yourself at least until recently is dramatically less convincing.*

Let me do this and I will make a masterpiece ( half masterpiece has already been done *finding the Customer as a Chemical Industry* and getting the authorization from the Florida State Radiation Control Office).

Fulvio is completing the control system, made by 110 computers interconnected. Also that is a masterpiece.

Warmest Regards to all,
Andrea

*See* Ex. 16 (emphases added).

72.    Of note in Leonardo and Rossi's proposal is that there is no discussion of moving the Plant to Florida to try to achieve "Guaranteed Performance" under the License Agreement. Instead, Leonardo and Rossi enticed Counter-Plaintiffs to allow the Plant to be moved to Florida so that it could be used to provide power to "a real Customer" – a customer in the "Chemical Industry" that had a need for the steam power the Plant could produce "to process their chemical products."  *See id.*  This, Leonardo and Rossi claimed, would provide a real-world demonstration, or test, of the Plant as a viable means of providing power to commercial users.  *See id.*  It would also, Leonardo and Rossi claimed, allow for regulatory agencies, to the extent required, to conduct any tests or measurements they needed to authorize the use of future Plants for other commercial purposes (*i.e.*, "allow us to make all the Authorities make all the measurements necessary to get the Authorizations for the next plants").  *See id.*  Leonardo and Rossi further

pressured Counter-Plaintiffs to decide on this proposal quickly because this chemical industry customer "must know asap" if it could use the Plant to provide the steam power it needed or if it had to "provide otherwise." *See id.*

73.     Unbeknownst to Counter-Plaintiffs, everything material in the Leonardo and Rossi proposal was false – there was no customer in Florida who needed steam power for its chemical products processing, there was no intention for Leonardo and Rossi to operate the Plant to provide power to a real customer, and there was no intention for Leonardo and Rossi to seek authorizations from regulatory agencies to allow the Plant or subsequent E-Cat plants to be used for other commercial purposes.  Instead, the sole intention of Leonardo and Rossi all along was to find a way to get the Plant away from Counter-Plaintiffs and then to conduct a fatally flawed (and fatally late) run at demonstrating "Guaranteed Performance" so that they could falsely claim to be entitled to an additional $89 million payment under the License Agreement.

74.     Also in furtherance of this scheme, Rossi, both in his individual capacity and as the representative of Leonardo, and Johnson, both in his individual capacity and as the representative of JMP, traveled to North Carolina in August 2014 to meet with individuals from Industrial Heat.  During this meeting, Rossi and Johnson made a number of false representations to Industrial Heat, most notably that JMP (at the time called J.M. Chemical Products, Inc.) was a confidential subsidiary of Johnson Matthey p.l.c. ("Johnson Matthey"), and that Johnson Matthey was interested in using the E-Cat technology in connection with a confidential manufacturing process it wanted to operate in Florida.  In fact, in August 2014 Johnson on behalf of JMP even warranted in writing that JMP "[was] owned by an entity formed in the United Kingdom, and none of Leonardo, Dr. Andrea Rossi, Henry W. Johnson nor any of their respective subsidiaries, directors, officers, agents, employees, affiliates, significant others, or

relatives by blood or marriage [had] any ownership interest" in JMP.  *See* Compl. Ex. B. (last

page of Plaintiffs' Exhibit).  JMP, however, has never been a subsidiary of Johnson Matthey,

was not operating or planning to operate any manufacturing process in Florida, and was in fact

owned by persons whom Johnson represented in writing did not have any ownership interest in

JMP.

75.     Not knowing that the representations made by Leonardo, Rossi, JMP, and

Johnson about the customer in Florida and the operations to take place in Florida were false,

Industrial Heat entered into an agreement with JMP and Leonardo to deliver the Plant to JMP's

"production facility" in Miami, Florida.  The agreement was memorialized in a "Term Sheet"

executed by Industrial Heat, JMP, and Leonardo on August 13, 2014.  The Term Sheet is

attached hereto as Exhibit 17.

76.     Industrial Heat would not have entered into the Term Sheet agreement had it

known that JMP was not a real operating company, that JMP actually had no commercial use for

the steam power generated by the Plant, or that JMP was created solely as a ruse to induce

Industrial Heat to ship the Plant to Florida.

77.     JMP's role in the scheme magnified when JMP started sending falsified invoices

to Industrial Heat stating the amount of energy or steam JMP was purportedly receiving and

using from the Plant during a given month.  A selection of the invoices is attached hereto as

Exhibit 18.

78.     JMP's role further intensified when it, along with Leonardo, Rossi, Johnson and

Fabiani went so far as to have Bass pose as Director of Engineering for JMP.  Leonardo, Rossi,

JMP, Johnson and Fabiani enlisted Bass to pretend to be a JMP employee serving as its Director

of Engineering to make JMP appear to be a real manufacturing company that would need a

Director of Engineering and to create a person with whom they would allegedly interact on technical issues involving JMP's non-existent operations and operational needs.

79.    They even had Bass meet with Industrial Heat at JMP's Doral facility and express JMP's satisfaction with the steam power JMP was receiving from the Plant and using to run its manufacturing operations.  Attached as Exhibit 20 is a copy of the business card provided by Bass representing himself to be JMP's "Director of Engineering."  Bass also met with others, falsely claiming JMP was using steam from the Plant in a secretive manufacturing process.  All the while, JMP, Leonardo, Rossi, Johnson, Fabiani and Bass knew that there was no secretive manufacturing process taking place and JMP had no real use for the steam power.  JMP, Leonardo, Rossi, Johnson, Fabiani and Bass' unconscionable and deceptive practices are further evidence that the testing in Miami was nothing but a sham designed to create the illusions that the Plant performed at levels that could satisfy Guaranteed Performance and that the prior Validation testing was valid.

80.    In mid-2015, Industrial Heat hired Joseph Murray ("Murray") to serve as Vice President of Engineering, and empowered him to assemble a team of engineers and scientists to elevate the level of Industrial Heat's testing and evaluation of LENR technology.  Among other things, one of the projects undertaken by that team was rigorous testing of the E-Cat IP.  That testing demonstrated quite clearly that the results previously claimed by Leonardo, Rossi, and Penon simply could not be replicated using the E-Cat IP that Leonardo and Rossi had provided to Counter-Plaintiffs.

81.    Notwithstanding that Leonardo and Rossi allowed visitors to the facility in Doral where the Plant was located on a fairly regular basis, in July 2015, Rossi denied Murray access to the Plant without any reasonable justification.  *See* Ex. 19.  Had Murray – given his

established engineering background – been allowed to access the Plant in July 2015, he would have immediately recognized the deficiencies in the operations that were being conducted by Leonardo and Rossi.

82.     Indeed, when Murray eventually gained access to the Plant in February 2016 and examined the Plant, the methodology being used to operate the Plant, and the methodology being used to measure those operations, he immediately recognized that those methodologies were fatally flawed.  Some of the flaws that he was quickly able to identify are explained in Exhibit 5. Murray also recognized that the building in which the Plant was located had no method to ventilate the heat that would be produced by the Plant were it producing the amount of steam claimed by Rossi, Leonardo, and Penon such that persons would not have been able to work in the building if the Rossi/Leonardo/Penon claims were true.  This conflicted with the claims of individuals who had been in the building when the Plant was operating, all of whom claimed the temperature in the building was near or not much greater than the outside temperature. Photographs of the building ceiling from the inside are attached hereto as Exhibit 26.

83.     Leonardo, Rossi, JMP, Johnson, USQL, Fabiani, and Bass also restricted access to the JMP area at the Doral location, claiming that there was a secretive manufacturing process being conducted there, when in fact it was simply recycling steam from the Plant and sending it back to the Plant as water.

84.     Fabiani, USQL and Penon also played critical roles in the scheme to hide the fact that the Plant does not perform up to the standards set forth in the License Agreement.

85.     The USQL Agreement imposes an affirmative obligation upon USQL and Fabiani promptly to disclose information relating to their work on the Plant or the E-Cat IP.  *See* USQL Agreement § 7.  The USQL Agreement also makes clear that information obtained by USQL or

Fabiani during the course of their work under the USQL Agreement is the sole property of Industrial Heat. *Id*. § 6.

86. Despite the fact that Fabiani and USQL are required to "promptly disclose" an array of information related to their work on the Plant or the E-Cat IP, USQL and Fabiani have purposely only been providing very limited information to Industrial Heat. They have not been providing Industrial Heat with accurate, complete information on the Plant, knowing that such information would demonstrate that the Plant was not performing at levels claimed by Leonardo, Rossi and Penon.

87. Furthermore, Fabiani and USQL have refused and continue to refuse to provide records, "tests and results" and other information relating to their engagement under the USQL Agreement to Industrial Heat, even though they agreed that such information is the property of Industrial Heat. *Id*. § 6. They have so refused because they are aware that such information demonstrates that the Plant was not performing at levels claims by Leonardo, Rossi and Penon.

88. As just one example, in late February 2016, shortly after the conclusion of the purported Guaranteed Performance test, USQL and Fabiani committed to send certain data and a report by the end of March 2016 that would "bring to light all the flaws and functional deficiencies of the system" and identify "the plant stop periods (total or partial)." In later emails, USQL and Fabiani also committed to provide Industrial Heat with the raw data that USQL and Fabiani collected while working with the Plant in Doral, Florida. Despite repeated reminders, however, USQL and Fabiani have refused to provide either the report or the raw data to Industrial Heat. *See, e.g.*, Ex. 21.

89.     Leonardo, Rossi, JMP, Johnson, USQL and Fabiani are all interconnected in a number of ways.  As just one example, Johnson is currently listed as the President of both JMP and Leonardo.  He is also the incorporator of USQL and remains its registered agent.

90.     For his part, among other things, Penon primarily contributed to the scheme in a variety of ways relating to the purported measurement of the Plant's operations in Florida during the purported Guaranteed Performance test.[8]  To start, his initial plan and design for measuring the power coming into and out of the Plant was, as he well knew, fundamentally flawed – including using improper equipment to measure the flow of fluid into the Plant and no equipment to measure the flow of heated fluid out of the Plant.  Moreover, when the purported Guaranteed Performance test departed from Penon's plan and design almost immediately after the testing began – including that the number of reactors being operated was far less than the number of reactors specified in Penon's plan and design – Penon simply disregarded the massive deviation.  *See* Ex. 5.

91.     Penon further knowingly relied on flawed or fabricated data collections in his supposed evaluation of the Plant's performance.  For example, Leonardo and Rossi have admitted (on their internet blog postings) that there were days when portions of the Plant were not operating, but Penon in his final report does not report any material decrease in output of the Plant on those days.  Rather, he makes the (inexplicable) claim in his final report that on these days the Plant's performance either did not change or somehow even increased.

92.     In February 2016 at an in-person meeting with Penon, Murray identified a number of flaws in how Penon was conducting his measurements of the Plant.  Some of those flaws were also presented in writing to Penon on March 25, 2016.  *See id.*  Despite have full knowledge of

---

[8] Penon's participation in the scheme was not limited to this time period.  In connection with the Validation test, Penon backed Leonardo and Rossi's false contention that Italian law only allowed for the test to be conducted using 18 E-Cat reactors.  Penon also knowingly did not follow the Validation Protocol.  *See* response to Paragraph 57, *supra*.

the flaws, Penon nevertheless issued his false final report on March 28, 2016, claiming that guaranteed performance was achieved – and that the COPs achieved by the Plant were literally many multiples greater than ever claimed by anyone else (other than Leonardo and Rossi) who had ever tested an E-Cat reactor.  Not surprisingly, since the day he left Florida in February 2016, Penon has refused to discuss his measurements, his measurement plan and design, or his report with Counter-Plaintiffs (though he has requested that Counter-Plaintiffs pay him for his work).

**COUNT I: BREACH OF CONTRACT**
**(Validation and Disclosure of E-Cat IP)**
**(Industrial Heat and IPH against Leonardo and Rossi)**

93.     Counter-Plaintiffs reallege the allegations in Paragraphs 1 through 88 as if fully set forth herein.

94.     The License Agreement states: "On the date the Escrow Agent pays the $10,000,000 to Leonardo, the License will commence and Leonardo and Rossi will immediately transfer, and the Validation Agent (as defined in Schedule 3.2(b)) will deliver to the Company all E-Cat IP."  License Agreement § 3.2(b).

95.     The escrow agent released the $10 million payment to Leonardo and Rossi on June 9, 2013, at which point Leonardo and Rossi became obligated to transfer and deliver to Counter-Plaintiffs all E-Cat IP.

96.     Leonardo and Rossi purportedly transferred and delivered all E-Cat IP to Counter-Plaintiffs on June 9, 2013.  However, after numerous attempts, both with and without Rossi's involvement, Counter-Plaintiffs have been unable, using the transferred E-Cat IP, to replicate the results included in the Evaluation Report purportedly certifying that Validation was achieved from April 30 to May 1, 2013, or otherwise generate measureable excess energy.

97. Only one of three conclusions can be drawn from the foregoing facts: 1) Leonardo and Rossi did not transfer and deliver all E-Cat IP to Counter-Plaintiffs; 2) Validation was never achieved and Penon's reported COP calculations were false; or 3) both.

98. Each of these scenarios leads to only one conclusion: Leonardo and Rossi breached the terms of the License Agreement, either by not achieving Validation, not transferring or delivering all of the E-Cat IP to Counter-Plaintiffs, or both.

99. As a result of Leonardo and Rossi's breach, Counter-Plaintiffs have suffered and continue to suffer damages including, but not limited to: a) both the $1.5 million and $10 million payments made to Leonardo in connection with the License Agreement; b) other payments made to Leonardo or Rossi to reimburse them for unnecessary (in light of the conduct alleged herein) services, equipment, and expenses; and c) multi-million dollar payments made to a third party pursuant to the License Agreement, *see* License Agreement § 16.6.

### COUNT II: BREACH OF CONTRACT
### (Various Provisions in the License Agreement)
### (IPH against Leonardo and Rossi)

100. IPH realleges the allegations in Paragraphs 1 through 88 as if fully set forth herein.

### *Confidentiality*

101. The License Agreement imposed two distinct confidentiality obligations as it relates to Leonardo and Rossi. *See* License Agreement § 16.4.

102. The License Agreement provides that "[w]hile this Agreement is in effect and after this Agreement terminates, each party hereto and its Affiliates shall keep confidential, and shall not disclose, the terms of this Agreement to any other Person without the prior consent of each other Party hereto," except in two specific situations not relevant to Leonardo and Rossi's disclosures referenced below. *Id.*

103.    The License Agreement also provides that "[d]uring the term of this Agreement, each of Leonardo, Rossi, and AEG agrees to keep the E-Cat IP strictly confidential and not disclose any of the E-Cat IP to any other party," except in specific situations not relevant to Leonardo and Rossi's disclosures referenced below.  *Id.*

104.    Notwithstanding the clarity of the confidentiality provisions set forth above, Rossi, both individually and on behalf of Leonardo as its owner and sole operating officer, repeatedly violated the confidentiality provisions.

105.    Addressing solely the time period prior to the filing of their Complaint in April 2016, Leonardo and Rossi violated the first confidentiality provision by disclosing various specific terms of the Agreement:

     a.     Leonardo and Rossi disclosed that their agreement with Counter-Plaintiffs required a test of the Plant.

     b.     Leonardo and Rossi disclosed that their agreement with Counter-Plaintiffs required a test to be conducted over 400 days.

     c.     Leonardo and Rossi disclosed that their agreement with Counter-Plaintiffs required a test involving 350 days of operation of the E-Cat Plant.

     d.     Leonardo and Rossi disclosed that their agreement with Counter-Plaintiffs required a guaranteed performance, or "guarantees of performance" test.

106.    Making matters worse, Leonardo and Rossi thereafter filed their Complaint, with the License Agreement attached to it, in a public court record without any attempt to seal the Agreement.  Within an exceedingly short time, as Leonardo and Rossi knew would occur, the Agreement was replicated and made available to anyone in the world with access to the Internet. As a consequence of Leonardo and Rossi's public disclosure of the License Agreement, the confidentiality provision barring disclosure of the License Agreement's specific terms has been rendered a nullity.

107.    Addressing solely the time period prior to the filing of their Complaint in April

2016, Leonardo and Rossi violated the second confidentiality provision by disclosing various

information about the E-Cat IP:

    a.    Leonardo and Rossi, without any written waiver from IPH, provided samples of the E-Cat Fuel (purportedly from both before and after an E-Cat reactor was operated) to the scientists who prepared the Lugano Report, or authorized the scientists to obtain the samples.  The scientists analyzed the E-Cat Fuel samples and published the results of their analysis.  *See* Ex. 14.

    b.    Leonardo and Rossi, without any written waiver from IPH, disclosed specific information about the E-Cat Fuel to Norman Cook, a professor at Kansai University in Osaka, Japan.  Rossi and Cook thereafter published a paper detailing new information about the E-Cat Fuel sample not disclosed in the Lugano Report.  *See* Ex. 22.

    c.    Leonardo and Rossi, without any written waiver from IPH, have made public comments about the E-Cat Fuel sample on the Internet.

108.    None of the E-Cat Fuel sample disclosures referenced in the prior Paragraph was

protected by a non-disclosure agreement – as evidenced by the fact that the information obtained

from the disclosures is publicly available.  On information and belief, Leonardo and Rossi have

made additional E-Cat Fuel sample disclosures without IPH's consent and without the protection

of a non-disclosure agreement, including as recently as May 2016.

109.    Leonardo and Rossi's disclosure of the terms of the License Agreement harms

IPH.  For example, because the terms of the License Agreement have been made public, other

entities (including current counter-parties to agreements) can use the License Agreement's terms

in negotiations over similar agreements with IPH or its affiliates.

110.    Disclosure of the E-Cat IP also harmed IPH.  For example, Counter-Plaintiffs

have paid  $11.5 million to Leonardo and millions more to a third party per the License

Agreement for (among other things) control over any disclosure of the E-Cat IP.  Clearly any

value associated with the exclusive control over the disclosure of the E-Cat IP was diminished

with any disclosure of the E-Cat IP by Leonardo and Rossi without IPH's written waiver. Leonardo and Rossi disclosed that confidential information to third parties and, in some instances, made it available for large scale public consumption.  To the extent that the E-Cat IP has commercial value, IPH's ability to capture that value is substantially harmed by Leonardo and Rossi's improper disclosures.

### *Failure to Assign Licensed Patents*

111.    The License Agreement requires Leonardo and Rossi to assign the Licensed Patents, as defined in License Agreement § 16.1 and License Agreement Exhibit A, to Counter-Plaintiffs upon request: "Upon the request of the Company, Leonardo and Rossi shall assign to the Company the Licensed Patents with respect to the Territory[.]"  License Agreement § 10.

112.    On February 17, 2016, IPH, through its counsel, requested that Leonardo and Rossi "assign to IPH the Licensed Patents (as defined by the [License] Agreement) with respect to the Territory (as also defined in the [License] Agreement)."  IPH also provided Leonardo and Rossi an appropriate assignment form by which to assign the Licensed Patents.  The request and assignment form are attached hereto as Exhibit 23.

113.    Leonardo and Rossi refused to assign the Licensed Patents to IPH in violation of the express and unambiguous terms of the License Agreement.

114.    Leonardo and Rossi's failure to assign the Licensed Patents caused IPH to suffer damages in that it is unable to secure any value that might be derived from having control over the Licensed Patents.

### *Failure to Inform/Consult on Patent Applications*

115.    The License Agreement contains clear directives relating to informing and consulting with IPH regarding patent prosecution and maintenance of the E-Cat IP.  Section 7.1 of the License Agreement states:

> For each patent application and patent under the Licensed Patents, Leonardo shall:
>
> (a) prepare, file and prosecute such patent application;
> (b) maintain such patent;
> (c) pay all fees and expenses associated with its activities pursuant to Section 7.1(a) and (b) above;
> (d) keep the Company currently informed of the filing and progress in all material aspects of the prosecution of such patent application, and the issuance of patents from any such patent application;
> (e) consult with the Company concerning any decisions which could affect the scope or enforcement of any issued claims or the potential abandonment  of such patent application or patent; and
> (f) notify the Company in writing of any additions, deletions or changes in the status of such patent or patent application.

License Agreement § 7.1.

116.    Section 7.2 of the License Agreement states: "If Leonardo wishes to abandon any patent application or patent that is a Licensed Patent, it shall give the Company ninety (90) days prior written notice of the desired abandonment.  Leonardo shall not abandon any such Licensed Patent except upon the prior written consent of the Company."  *Id.* at § 7.2.

117.    After executing the License Agreement, Leonardo filed patent applications relating to the Licensed Patents without informing IPH.

118.    Leonardo also failed to keep IPH informed of the progress of the patent applications relating to the Licensed Patents.  Finally, Leonardo, without prior written consent from IPH, abandoned several patent applications.

119.    Leonardo and Rossi charged to IPH fees and expenses associated with preparing, filing, and prosecuting patent applications relating to the Licensed Patents, which fees and expenses IPH paid.

120.    As a result of the foregoing, IPH has been harmed, not only as a result of the fees and expenses they paid, but also the diminution in value of the E-Cat IP for which they paid millions of dollars as a result of Leonardo's improper handling of patent applications.

### *Covenant Not to Compete*

121.    The License Agreement contains a clear and defined non-compete provision:

> For as long as the Company or any of its subsidiaries is engaged in any business related to the E-Cat Products and . . . Leonardo, Rossi or any Affiliate are performing services for the Company or such transferee (whether as an employee, consultant or otherwise and specifically including the period of services required by Section 13.1) and for an additional period of two (2) years after the last of Leonardo, Rossi or such Affiliate shall have ceased to provide such services, none of Leonardo, Rossi or any of their Affiliates will (except as an officer, director, stockholder, employee, agent or consultant of the Company or such subsidiary or the Company) directly or indirectly own, manage, operate, join, or have a financial interest in, control or participate in the ownership, management, operation or control of, or be employed or engaged as an employee, agent or consultant,  or in any other individual  or representative capacity whatsoever, or use or permit their names to be used in connection with, or be otherwise connected in any manner with any business or enterprise (a) engaged in the design, development,  manufacture, distribution, lease, rental or sale of any E-Cat Products, or the provision of any services related thereto or (b) which is competitive with the E-Cat Products, unless Leonardo or such Affiliate shall have obtained the prior written consent of the Company or such subsidiary of the Company, as the case may be.

License Agreement § 13.3.

122.    Since at least the filing of their Complaint, and likely for months prior, Leonardo and Rossi have been open in broadcasting that they are engaged in designing and developing what are classified as "E-Cat Products" under the License Agreement.  They have also been open that they are doing so in combination with a company or companies unaffiliated with IPH.  *See*

*e.g.*, Ex. 24.  Leonardo and Rossi have even claimed that they have recently sold at least three E-Cat Units.  *See e.g.*, Ex. 25.

123.    IPH has not provided written consent to such conduct.

124.    As a result, the conduct – regardless of whether it will ever lead to the creation of a viable commercial product that can be sold, leased, or rented – is in direct conflict with the License Agreement.[9]

125.    Leonardo and Rossi's violations of the License Agreement's covenant not to compete have caused IPH to suffer harm, including the diminution in value of the E-Cat IP for which Counter-Plaintiffs paid millions of dollars.

### Failure to Pay Taxes

126.    Prior to Leonardo and Rossi entering the License Agreement, it was well known that Rossi had taxation issues with the Italian government, which even led to him facing criminal tax charges in Italy.

127.    As a result, the License Agreement has several carefully crafted provisions to ensure that Leonardo and Rossi would comply with their tax obligations as they relate to any payments from Counter-Plaintiffs.

128.    First, the License Agreement (Section 12(j)) required a representation from both Leonardo and Rossi that each has filed all necessary "tax returns or reports" and "has paid all taxes required by any jurisdiction or subdivision or agency thereof" prior to entering the License Agreement.  License Agreement § 12(j).

---

[9] The License Agreement also includes a "Right of First Offer" provision that requires Leonardo and Rossi to provide IPH with notice of their intent to license the E-Cat IP outside of the Territory covered by the License Agreement, and to give IPH an opportunity to purchase such license.  License Agreement § 13.2.  Upon information and belief, Leonardo and Rossi have breached this provision as well by licensing or offering to license the E-Cat IP outside of the Territory without first offering such license to IPH.

129.     Second, the License Agreement (Section 13.5) required each party to file all necessary documentation and returns as to any tax applicable to its or his "respective revenues derived . . . in respect of the E-Cat IP." *Id.* § 13.5.

130.     Third, the License Agreement (Section 12(a)) required Leonardo and Rossi to keep the E-Cat IP "free and clear of any Liens." *Id.* § 12(a); *see also id.* § 12(e).

131.     Fourth, IPH had Leonardo and Rossi provide it with a signed certificate certifying that all of their representations and warranties from the License Agreement, which included their representations as to compliance with their tax obligations, were true and correct as of the date of the certification (April 29, 2013) and would continue to be true after Leonardo was paid $10 million under the License Agreement. *See* Ex. 8.

132.     Notwithstanding the foregoing, on information and belief, Leonardo and Rossi have not paid their federal taxes on payments made to them from Counter-Plaintiffs, and have not filed all tax returns or reports relating to payments made to them from Counter-Plaintiffs.

133.     Leonardo and Rossi's failure to report and/or pay taxes on such payments is a prior breach of the License Agreement that serves as a defense to Plaintiffs' breach of contract claims against Industrial Heat and IPH.  Based on Leonardo and Rossi's representation that no tax lien has been imposed affecting Industrial Heat and/or IPH's assets or rights under the License Agreement, Industrial Heat and IPH do not assert this breach as a basis to recover damages from Leonardo and Rossi presently, but reserve the right to assert this claim in the event a federal tax lien is issued affecting Industrial Heat and/or IPH's assets or rights under the License Agreement.

### COUNT III: FRAUDULENT INDUCEMENT
#### (Term Sheet)
#### (Industrial Heat against Rossi, Leonardo, JMP, and Johnson)

134.    Industrial Heat realleges the allegations in Paragraphs 1 through 88 as if fully set forth herein.

135.    Rossi, Leonardo, JMP, and Johnson falsely represented to Industrial Heat that JMP was a manufacturing company with a real commercial use for the steam power generated by the Plant.

136.    In reality, JMP was not a manufacturing company, had no commercial use for the steam power generated by the Plant, and was created solely as a ruse to induce Industrial Heat to ship the Plant to Florida.

137.    Rossi, Leonardo, JMP, and Johnson made such false representations to induce Industrial Heat to enter into the Term Sheet so that Leonardo and Rossi could operate the Plant without Industrial Heat's direct supervision or oversight, thereby allowing them to manipulate the operation of the Plant, any measurement of the operation of the Plant, and any purported "Guaranteed Performance" testing of the Plant.

138.    Industrial Heat justifiably relied on such false representations in entering into the Term Sheet.  Industrial Heat would not have agreed to the Term Sheet but for such false representations.

139.    As a result of Rossi, Leonardo, JMP, and Johnson's fraudulent inducement, Industrial Heat has suffered and continues to suffer damages.  Among the damages are the following: the cost of transporting the Plant to Florida; the cost of operating the Plant in Florida; the cost of engaging and paying two independent contractors, one of whom was Fabiani; and a host of additional expenses charged to Industrial Heat in connection with the operation and maintenance of the Plant in Florida.

**COUNT IV: FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Industrial Heat and IPH against all Counter-Defendants and Third-Party Defendants)**

140.     Counter-Plaintiffs reallege the allegations in Paragraphs 1 through 135 as if fully set forth herein.

141.     As described in greater detail above, Rossi, Leonardo, Johnson, JMP, Penon, Fabiani, USQL, and Bass (the "FDUTPA Defendants") were all engaged in a common scheme against Counter-Plaintiffs.

142.     The first part of the scheme was to manipulate Counter-Plaintiffs into allowing the Plant to be sent from the Industrial Heat facility in North Carolina – where any work on, operation of, or testing of the Plant could be supervised and overseen by Counter-Plaintiffs – to Florida, where Leonardo, Rossi, USQL, Fabiani, and Penon could operate the Plant and purportedly conduct measurements of the Plant's operations away from the oversight and control of Counter-Plaintiffs.

143.     The second part of the scheme was to manipulate the operation of the Plant and the measurements of the Plant's operations to create the false and deceptive appearance and impression that the Plant was performing at astronomical levels, with COP measurements not only well in excess of anything achieved by any third party testing of the E-Cat technology, but in fact many multiples higher than anything achieved by any third party testing.  For example, notwithstanding flaws in their testing methodology that would have caused them to overstate their conclusions of the COP they were measuring from an E-Cat reactor, the Lugano scientists concluded that the E-Cat reactors they measured were producing a COP of 2.6, 2.9, 3.2, 3.6 or 5.6.  According to the manipulated and fabricated testing and measurements of the FDUTPA Defendants, they – through Leonardo, Rossi, and Penon – claimed that they were achieving COPs more than 10 times greater than the Lugano scientists, and in fact as high as 40+ times greater than the Lugano scientists.

144.     The final part of the scheme, of course, was for Leonardo and Rossi, based on the false and deceptive operations of the Plant in Florida, to claim to Counter-Plaintiffs that they were required to pay Leonardo and Rossi $89 million and, when Counter-Plaintiffs rightfully refused, to institute litigation against Counter-Plaintiffs.

145.     Another goal of the scheme was to obtain various payments from Counter-Plaintiffs for work that one or more of the FDUTPA Defendants was performing not to benefit Counter-Plaintiffs, but in fact with the goal of harming Counter-Plaintiffs.  Among these payments were service payments to USQL, Fabiani, and Penon; expense reimbursements to Leonardo, Rossi, USQL, Fabiani, and Penon (including for travel, apartment rentals, visa-related costs, repair work to the Plant, patent attorneys, and patent application fees); and payments for equipment (or the transportation of equipment) to be used – or purportedly to be used – by the FDUTPA Defendants.

146.     In furtherance of this scheme, the FDUTPA Defendants engaged in the unconscionable, unfair, and deceptive acts and practices described above, including:

a.     Deceiving Counter-Plaintiffs about JMP, the operations of JMP, the supposed role of Bass, and the reasons for JMP wanting to use the steam power that could be generated by the Plant.

b.     Deceiving Counter-Plaintiffs as to the reasons for wanting to move the Plant from North Carolina to Florida.

c.     Manipulating the operation of the Plant and the measurements of the Plant's operations to create the false impression and appearance that it was producing a COP far in excess of the COP it was in fact achieving.

d.     Providing false information to Counter-Plaintiffs as to the operation of the Plant and the measurements of the Plant's operations.

e.     Refusing to provide other information properly requested by Counter-Plaintiffs, and to which Counter-Plaintiffs were entitled pursuant to the License Agreement, the Term Sheet, the USQL Agreement, and/or the nature of the purportedly (but in fact, not) independent work being done by Penon.

f.      Preventing or blocking Counter-Plaintiffs from obtaining truthful information about the Plant's operations, the measurements of those operations, the role of JMP, the use by JMP of steam provided by the Plant, the role of Penon, or the bases for expenses or costs charged to Counter-Plaintiffs.

g.      Charging Counter-Plaintiffs for services, expenses, and equipment that were purportedly being used either for the benefit of, and to further the goals of, Counter-Plaintiffs when in fact no such services, expenses, or equipment were being used for Counter-Plaintiffs' benefit.

147.    The acts and practices alleged above, including in the prior paragraph, were unconscionable, unfair, and deceptive.  As such, they have been declared unlawful pursuant to Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

148.    As a result of the foregoing acts and practices declared unlawful under FDUTPA, Counter-Plaintiffs have suffered and continue to suffer actual damages, as described above.

## COUNT V: BREACH OF CONTRACT
### (Industrial Heat against Fabiani and USQL)

149.    Industrial Heat realleges the allegations in Paragraphs 1 through 88 as if fully set forth herein.

150.    Industrial Heat retained USQL and Fabiani to "provide services related to the manufacture and development" of products relating to the E-Cat IP.  *See* USQL Agreement, Page 1.  They were required to act in a manner in, and not opposed to, the best interests of Industrial Heat.  *See id*. § 3.

151.    The USQL Agreement makes clear that information obtained by USQL and Fabiani arising out of the services they agreed to provide to Industrial Heat is the property of Industrial Heat.  For example, the USQL Agreement states:

All Confidential Information, records, files, memoranda, reports, drawings, plans, designs, specifications, tests and results, recordings, documents and the like (together with all copies thereof), including any of the foregoing that are electronically maintained, relating to the business of Industrial Heat or the engagement of USQL [and Fabiani] pursuant to this Agreement that USQL [and Fabiani] shall use or prepare or come in contact with in the course of, or as a

- 64 -

result of, the engagement of USQL [and Fabiani] under this Agreement shall remain the sole property of Industrial Heat . . . .

*Id.* § 6.

152. The USQL Agreement also requires that USQL and Fabiani promptly disclose to Industrial Heat (among other things) developments and discoveries relating to the Plant or the E-Cat IP:

> USQL [and Fabiani] further agree[] that . . . [they] will promptly disclose to Industrial Heat any and all improvements, inventions, developments, discoveries, innovations, systems, techniques, processes, formulas, programs and other things that may be of assistance to Industrial Heat or its affiliates, whether patentable or unpatentable, that (i) relate to the actual or demonstrably anticipated research or development by Industrial Heat or any of its affiliates, or (ii) result from any work performed by USQL [and Fabiani] for or at the request of Industrial Heat, or (iii) are developed on Industrial Heat's time or using the equipment, supplies or facilities or any Confidential Information or trade secret information of Industrial Heat, or any of its affiliates; and that are made or conceived by USQL [and Fabiani], alone or with others, while engaged by Industrial Heat (collectively referred to herein as the "New Developments"). USQL [and Fabiani] agree that all New Developments shall be and remain the sole and exclusive property of Industrial Heat and that it shall upon the request of Industrial Heat, and without further compensation, but at the cost and expense of Industrial Heat, do all things reasonably necessary to [e]nsure Industrial Heat's or its affiliate's ownership of such New Developments.

*Id.* § 7.

153. USQL and Fabiani breached the USQL Agreement by failing to provide services to Industrial Heat relating to the manufacture and development of the Plant and the E-Cat IP. More specifically, USQL and Fabiani disregarded their contractual obligations to Industrial Heat in order to assist Leonardo and Rossi in their deceptive operations in Florida. Indeed, instead of working in "the best interests of Industrial Heat," as required by USQL Agreement § 3, Fabiani and USQL were – as Fabiani publicly admitted – working "under Rossi's orders," including assisting Rossi in actions directly against Industrial Heat's interests as alleged above.

154.    USQL and Fabiani also breached the USQL Agreement by failing to provide Industrial Heat with information relating to the scheme to manipulate the operation and testing of the Plant.  USQL and Fabiani had an affirmative obligation to inform Industrial Heat of the scheme to manipulate the Plant's operations and the testing.  Such information would constitute a "New Development" that USQL and Fabiani were required to disclose to Industrial Heat pursuant to the USQL Agreement.  USQL and Fabiani also refused to provide other information to Industrial Heat, as alleged above.  USQL and Fabiani intentionally withheld information from Industrial Heat relating to the scheme and, therefore, breached the USQL Agreement.

155.    USQL and Fabiani further breached the USQL Agreement by failing to provide Industrial Heat with information, including reports and data, relating to the operation of the Plant in Doral, Florida.  Industrial Heat made several demands for such information and USQL and Fabiani have repeatedly refused to provide Industrial Heat with the reports and data.  *See, e.g.*, Ex. 21.

156.    Industrial Heat and IPH have suffered harm as a result of USQL and Fabiani's breaches of the USQL agreement including USQL and Fabiani's failure to further the best interest of Industrial Heat, failure to provide Industrial Heat with information relating to the scheme pled herein, and failure to provide Industrial Heat with other information requested by Industrial Heat or that they were required to provide Industrial Heat.  These breaches have deprived Industrial Heat of the benefit of its bargain with USQL and Fabiani, led to Industrial Heat paying USQL and Fabiani for services not rendered, deprived Industrial Heat of property that is its property per the USQL Agreement, and prevented Industrial Heat from learning of the deceptive scheme as alleged above.

## COUNTER-PLAINTIFFS' PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiffs respectfully request that the Court enter judgment in their favor and against Counter-Defendants and Third Party Defendants as follows:

i.  For compensatory and expectation damages and/or restitution in an amount to be determined at trial;

ii.  For costs of suit and for attorneys' fees and costs;

iii.  For pre-judgment interest; and

iv.  For such other and further relief as this Court deems just and proper.

Dated: November 23, 2016.  Respectfully submitted,

*/s/ Christopher R. J. Pace*
Christopher R.J. Pace
cpace@jonesday.com
Florida Bar No. 721166
Christopher M. Lomax
clomax@jonesday.com
Florida Bar No. 56220
Christina T. Mastrucci
Florida Bar No. 113013
JONES DAY
600 Brickell Avenue
Brickell World Plaza
Suite 3300
Miami, FL 33131
Tel: 305-714-9700
Fax: 305-714-9799

*Attorneys for Defendants/Counter-Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 23, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record.


*/s/ Christopher R. J. Pace*
Christopher R.J. Pace