1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2                   MIAMI DIVISION
             CASE NO.  16-CV-21199-CMA/JJO
3

4    ANDREA ROSSI, *et al.*,

5                 Plaintiffs,

6         vs.

7                                    Miami, Florida
                                     December 20, 2016
8    THOMAS DARDEN, *et al.*,          Pages 1-43

9                 Defendants.
     _____

10                TRANSCRIPT OF DISCOVERY HEARING
11         BEFORE THE HONORABLE JOHN J. O'SULLIVAN
              UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   FOR THE PLAINTIFFS:
                    *Perlman, Bajandas, Yevoli & Albright, P.L.*
15                  BY:  BRIAN W. CHAIKEN, ESQ.
                    BY:  CHRISTOPHER PERRE, ESQ.
16                  283 Catalonia Avenue
                    Suite 200
17                  Miami,  Florida 33134

18   FOR THE DEFENDANTS:
                    *Jones Day*
19                  BY:  CHRISTOPHER R.J. PACE, ESQ.
                    BY:  CHRISTOPHER M. LOMAX, ESQ.
20                  600 Brickell Avenue
                    Brickell World Plaza
21                  Suite 3300
                    Miami, Florida 33131
22

     TRANSCRIBED BY:    DAWN M. SAVINO, RPR
23                      Official Court Stenographer
                        400 N. Miami Avenue, 10S03
24                      Miami, Florida  33128
                        Telephone:  305-523-5598
25

```
 1                        P-R-O-C-E-E-D-I-N-G-S

 2            COURTROOM DEPUTY:  All rise.

 3            THE COURT:  Afternoon.  We're here today in the case of

 4   Rossi versus Darden, Case number 16-civil-21199.

 5            Could I have appearances for the Plaintiff first?

 6            MR. CHAIKEN:  Yes.  Good afternoon, Your Honor.  Brian

 7   Chaiken, C-H-A-I-K-E-N and Christopher Perre, P-E-R-R-E, on

 8   behalf of Plaintiffs.

 9            I also have Dr. Rossi who is here with us today.  Dr.

10   Rossi asked me to tell you that he is wearing a piece on his

11   head for health reasons, and instead of wearing a hat, which

12   really didn't help the cause, he has a piece.  So that explains

13   his appearance.

14            THE COURT:  That's fine.  I wouldn't have even known

15   that.  Okay.  Thank you.  You can be seated unless you're

16   addressing the court.

17            Who is here for the Defendant?

18            MR. PACE:  Good afternoon, Your Honor.  Chris Pace and

19   Chris Lomax are here for Industrial Heat.

20            THE COURT:  Okay.  All right.

21            I got -- the Defendant's filed an objection to the

22   Plaintiff's notice of hearing.  That's inappropriate, so I'm

23   striking that.  In the future, if you have an objection to it,

24   when you come here, you can tell me all about it, but you're not

25   supposed to be filing anything before that.  The notice only
```

1    indicated in there what the issues were that were going to be

2    addressed and not argument.  The idea of having these hearings

3    is not to have argument ahead of time because it puts you in

4    some kind of advantage.

5           All right.  Let me hear from the Plaintiff.

6           MR. CHAIKEN:  Well Your Honor, we have two issues.  One

7    substance and one form.  I guess we'll deal with form first.  I

8    guess that's the bigger picture issue.

9           Plaintiffs -- excuse me.  Defendants have been

10   providing us with documents responsive to our request pursuant

11   to the previous order that you had issued in this case.  They

12   have produced over 65,000 documents, over 138,000 pages worth of

13   materials as well as a 3.2 terabyte hard drive.  And we've gone

14   back and forth with opposing counsel, and our biggest issue that

15   hasn't been unresolved as of yet is trying to get Defendants to

16   identify which documents are responsive to which requests.

17          THE COURT:  Okay.  What do you say about?

18          MR. CHAIKEN:  And if I can just really briefly go into

19   that.

20          Their claim in the case is that the documents were

21   produced in the ordinary course of business and the way they're

22   normally held, pursuant to Federal Rule.  We shared with them

23   yesterday some of the comments or feedback we received from our

24   vendor who is trying to help us decipher what we received, and I

25   had sent him an e-mail and I'll just quote one thing that I had

1      sent them, which I think sums up the entire thing.  And our

2      provider told us that based on the volume, format and file types

3      produced, video, audio, database files, et cetera, it will take

4      an extreme amount of time, cost and resources to fully evaluate

5      the production.  More so, given the complete lack of

6      transparency Defendant has shown with this production.  There

7      are hundreds, if not thousands, of hours of audio and video, an

8      assumption based on the file size that has been produced.  This

9      format, more so with no understanding of what the files are

10     responsive to, create undue burden on the Plaintiffs and may

11     result in unnecessary expense for them to attempt to decipher

12     the content of the production.  Furthermore, based on

13     Plaintiff's sampling of the production, it is also believed that

14     select video and audio files are not even responsive to

15     discovery.  This heightens our concern about the Defendants

16     simply performing a data dump.

17             Now I've got examples of documents, Your Honor.

18             THE COURT:  What did they say about that?

19             MR. CHAIKEN:  They haven't responded to that.  Or they

20     claim that our requests were so broad that they were just being

21     responsive.

22             THE COURT:  So did they respond to that or not?

23             MR. CHAIKEN:  Their response was our requests were so

24     overly broad that their responses were within the scope of our

25     requests.

1          THE COURT:  Okay.

2          MR. CHAIKEN:  Now, they've also said that they're not

3    going to identify, you know, which documents are responsive to

4    which requests, which I think would resolve most of our

5    problems.

6          THE COURT:  Okay.  What do you say about that,

7    Mr. Pace?

8          MR. PACE:  A few things.  One Your Honor -- and let me

9    provide this before I provide it to you.  One, Your Honor, is

10   that this e-mail came over yesterday.  And as opposed to when it

11   should have come over, had time for the parties to talk about

12   it.  Can I hand the court one piece of paper?

13         THE COURT:  Yeah.  Well, did you talk about the e-mail?

14         MR. PACE:  I'll address --

15         THE COURT:  Hand it to me.

16         MR. PACE:  Actually I don't know if we (inaudible).

17   Sorry.  Let me get back to the microphone.

18         We did talk about it and we talked about trying to, you

19   know, resolve the matter or look into the matter.  But let me --

20   let's talk about the video and this production.  I've given you

21   an example, because this is the 3.2 terabyte hard drive.  We

22   have things -- these things are broken down into files, so this

23   is just an example.  If you go into it and you look at the file,

24   one of them is filed Italy.  You click on Italy, you come up

25   with these breakdowns by year.  You click on the year and you

1    come up in these subfolders, analysis, data, images, video.  So

2    they're all put together.

3         Plaintiffs, on the other hand, when they produced a

4    very, very small number of videos, just gave us the videos

5    without any indication.  Some of them are of somebody's

6    apartment.  We actually were able to open a couple of them.

7    There are a few seconds showing the inside of somebody's

8    apartment.  The reality of the process is that I don't know if

9    in here they're going to find a video.  I mean, our folks

10   reviewed them, they were the testing related videos.  I would

11   imagine none of them are of somebody's apartment or of a

12   birthday party.  But they may -- if they're a video that was

13   taken of the testing facility, they asked for everything we had

14   relating to the testing facility, we produced it.

15        So is there a lot of data there?  Yeah.  I mean, we

16   told the court the last time we were here there's a lot of data.

17   They asked for a lot of data.  We had a meet and confer about

18   them, they were saying they wanted to have receipts for pipes

19   and wires -- I'm sorry, I keep using pipes instead of wires. So

20   we got all of the testing data.  We organized it so that that

21   massive file is all organized in this fashion, which they didn't

22   do with the videos they produced which are also --

23        THE COURT:  So how -- I thought you said this is how

24   it's kept in the ordinary course of business.

25        MR. PACE:  Well actually, for this what we did is it

1    was in different places and we said get it together and put it

2    in an organized fashion so we could produce it this way.

3         THE COURT:  So why don't you tell them that the

4    terabyte is in response to your requests that you have all

5    videos of the plant or whatever it is you just said to me?

6         MR. PACE:  We've told them that.  They know what's in

7    the terabyte drive.  They know it's the testing data.  I don't

8    think he's saying to the contrary.

9         THE COURT:  Okay.  Do you have a problem with the

10   terabyte drive?

11        MR. CHAIKEN:  Yeah, I absolutely do, Your Honor.  I've

12   got a copy of two videos right here I could show you.

13        THE COURT:  I'm not watching a video.

14        MR. CHAIKEN:  What's on the terabyte.  They're 30

15   second videos.

16        THE COURT:  I'm not watching videos, you can tell me

17   what's on it.

18        MR. CHAIKEN:  The videos show a bunch of people in a

19   church.  That's the first video.  The second video shows people

20   riding on a train.

21        THE COURT:  Okay.  Why is that?

22        MR. PACE:  Your Honor, I'm not going to dispute that

23   there may be some videos in there that shouldn't be in there,

24   just like they gave us videos of an apartment, of somebody's

25   apartment.

1    THE COURT:  I mean, it's not like well, they didn't do

2    the right job so we're going to send them videos of our church.

3    MR. PACE:  We didn't, Your Honor.  There's a lot of

4    videos in here.  If somebody had a file that says videos of X,

5    they copied it over.  Now, maybe in that video of X, you know,

6    if you go into my work computer it's almost all work stuff.  I

7    will admit I have a couple pictures of my daughters in there.

8    If I kind of said here's the file folder of my work stuff and I

9    copy it when you're producing this large amount of data, then

10   you can have it.  If the issue is the videos, you know, we can

11   go back and look at the videos.  I mean, I'm not going to

12   dispute that there's something in there.  Like I said, I think

13   this is the reality of the production process given the amount

14   of stuff we were trying to produce.

15   THE COURT:  Okay.  So I don't understand, what does the

16   Plaintiff want them to do?

17   MR. CHAIKEN:  The Plaintiff wants them to identify

18   which documents are responsive to which requests.

19   THE COURT:  All right.  Well, he just told you the JPEG

20   is -- the JPEG is all videos?  I mean, the terabyte thing?

21   MR. PACE:  No, the terabyte drive has analysis, data,

22   images and videos.  But it all relates to the E-Cat testing or

23   is supposed to all relate to the E-Cat testing.  Out of 3.2

24   terabytes, I'm not going to say that there can't be mistakes in

25   there.

1           MR. CHAIKEN:  If that's the answer, I'm satisfied with

2      that answer, Your Honor.  These documents are --

3           THE COURT:  Okay.  You got the answer --

4           MR. CHAIKEN:  These documents are --

5           THE COURT:  So you got the answer for that.  We don't

6      need to talk about that anymore.

7           Now, what else do you want?

8           MR. CHAIKEN:  Okay.  We've got 65,000 documents which

9      and I have no idea -- and 138,000 pages, and I have no idea what

10     requests they're responsive to.

11          THE COURT:  Okay.  What do you say about that?

12          MR. PACE:  We're allowed to produce -- well, two

13     things.  One is we're allowed to produce things in the ordinary

14     course.  But second is --

15          THE COURT:  It's the way they're maintained in the

16     ordinary course of business.  Generally what that contemplates

17     is like the old days where you would go, show up at the person's

18     business and they'd say all of my invoices are in that filing

19     cabinet there.  Go ahead and look at it.  Or I guess if they're

20     on a computer, all my invoices are, you know, under such and

21     such.  Go ahead and look at it.

22          MR. PACE:  I agree, Your Honor.  And in the new world,

23     fortunately they kind of changed it and updated it a little

24     (inaudible), we didn't highlight the (inaudible) -- I'm sorry.

25     I keep getting away from the microphone.  I apologize for that.

1        I've got another case too, but I think this will make

2    the point.  What we have agreed to provide them, and I will

3    admit, I said this yesterday because I did not realize we hadn't

4    provided the file path -- I'm sorry, Your Honor.  I think it's

5    Page 8.  Six.  Wow, my eyesight is going.  Eight.  It's

6    highlighted, it should be.

7              THE COURT:  I see it.  Eight and nine here.

8              MR. PACE:  Yeah.  But there's two issues with

9    production on electronic documents.  And we did not give them

10   the file path originally because I thought that we had -- we

11   gave them the file name which is what they requested, but we're

12   providing them the file path.  When you provide the file path on

13   the electronic documents, it does tell you the way that they're

14   maintained.

15             THE COURT:  Okay.  Have you looked at the file path?

16             MR. PACE:  They have not because I haven't given it to

17   them.  It just came up yesterday and I told them we'll get it to

18   them by the end of the day.

19             THE COURT:  All right.  Will you be satisfied if he

20   gives you the file path?

21             MR. CHAIKEN:  I don't know, Your Honor.  I would have

22   to see it first.  We've received, as per your last order,

23   documents over the last month including just recently as Friday,

24   so we're still analyzing the documents.  We have provided the

25   documents to our service provider.  We provided Defendant's

1    counsel with a protocol for providing the metadata that we've

2    requested.  In fact, we provided it way up front.  We never

3    received any feedback, they just gave us the documents in the

4    form they decided to give them to us.  We've given them a new

5    protocol very recently, asked them to give us comments and

6    feedback, we've yet to receive any feedback.

7          THE COURT:  Okay.  When did you give them that?

8          MR. CHAIKEN:  I believe it was yesterday, Your Honor.

9          THE COURT:  I mean, why do you give them stuff

10    yesterday when we're here today?

11          MR. CHAIKEN:  Well, Your Honor --

12          THE COURT:  So that we can just make sure that nothing

13    is resolved and you can just throw it up in the air in front of

14    me and I'm supposed to figure out what to do with 650,000

15    documents?

16          MR. CHAIKEN:  Absolutely not, Your Honor.  In fact, we

17    gave them our ESI requests and our requests for metadata over a

18    month ago and again, they gave us documents in the form they

19    gave them to us.  They never said we're not going to give you

20    these fields or --

21          THE COURT:  Well, when you have your ESI conference,

22    you're supposed to discuss what form you're going to get the

23    documents in, you're supposed to agree that the documents will

24    be provided in some form and then you give them to him in that

25    form and he gives them to you in that form.

1          MR. CHAIKEN:  I would agree, Your Honor.

2          MR. PACE:  Your Honor, we produced them in the format

3     they requested and in the form they requested.  They didn't

4     request file path, but I'm saying I --

5          THE COURT:  Well, you got the file path -- hold on.

6     Give them the file path.  You have an expert who is working on

7     this thing too who is collecting all this stuff?

8          MR. PACE:  We have an e-discovery vendor, we do.

9          THE COURT:  Okay.  Good.  That person is to communicate

10    with his e-discovery vendor, his e-discovery person, and he's to

11    explain to him how he's to research these records so he can get

12    to what he wants.  Because this is not hide the ball.

13         MR. PACE:  Your Honor, it's not -- that first came up

14    yesterday.  Wait a second, Your Honor.  In fairness to us and

15    the amount of volume we produced, we produced the testing data

16    in an incredibly organized fashion.

17         THE COURT:  I don't want to hear a speech about what

18    you provided.  There's two ways to provide things, okay?

19         MR. PACE:  Fair enough.

20         THE COURT:  Maybe, and I suspect that this thing isn't

21    right because you guys aren't communicating well together,

22    that's why I'm telling you to get your experts together so they

23    can communicate with each other well.

24         But there's two ways of -- one thing is to give them a

25    lot of documents, but give them so much garbage that there's no

1   way they're ever going to find what is relevant to this case.

2   The other thing is to provide a lot of documents because they

3   asked for a lot of documents and they're all relevant and, you

4   know, that's fine.  But just saying well, we provided this and

5   we provided that, that means nothing to me.  I've got no idea.

6           I've had cases where they only provided ten documents

7   and people were happy, and I've had other cases where you got to

8   provide a million documents and that wasn't enough.  You have to

9   provide 1.5 million documents then.  So, you know, telling me

10  the number of documents means zero except for the fact that you

11  provided a lot of junk to them.

12          MR. PACE:  Well, what I was going to say, Your Honor,

13  was we gathered up the testing material and we organized it.

14  That's the big production.  We then produced, for example, the

15  communications back and forth.

16          THE COURT:  I don't understand.  What production is

17  that?

18          MR. PACE:  The terabyte hard drive.  The terabyte hard

19  drive.

20          THE COURT:  I don't want to hear what you provided, I

21  want to hear what the problems are.  I don't want to hear what

22  you did, I want to hear what you didn't do and why you didn't do

23  it.  I've heard that, I'm now ordering you to provide the path.

24  Or if you're voluntarily providing the path, you're to do that.

25  The part you're to provide your expert or someone who is

1    familiar with how these records are kept, how they can be
2    searched, and have them talk to his expert and don't come back
3    here again either of you until you've accomplished that.
4         And don't come back here again and tell me -- you guys
5    have been, you know, calling my law clerk about five times a
6    week going we need time, we need more time, and then you come in
7    here and go oh well, I just sent him all this stuff yesterday.
8    And he's not -- you know, that doesn't make sense.  Instead of
9    calling my law clerk asking for 30 minutes every 30 minutes, why
10   don't you instead call each other and talk to each other?
11        I mean look it, this is a big case.  You guys are good
12   lawyers.  You shouldn't need me for more than 30 minutes to
13   resolve an issue.  It should be an issue that comes to me and
14   say judge, you know, we think that this stuff is protected by
15   the work product privilege and they think there's not and I
16   think we need to have an argument on this or we think that this
17   stuff is hidden in a mountain in Colorado and we shouldn't have
18   to go get it, so we need a judge really to decide whether or
19   not, you know, it's proportional to the needs of the case.  Not,
20   you know, oh we gave them videos and we did this and we did
21   that.  This is garbage.  This is not what I'm here for.
22        So I suggest you guys start working on this stuff a
23   little better.  I don't know who is, you know, doing the
24   communicating between you, but if it's not you two and it's
25   someone else, they need to communicate.  And if they can't get

1   it accomplished, then you two get it accomplished before you

2   come and see me again.  I'm not here to resolve kindergarten

3   matters, and I'm serious about this.

4           All right.  What's the next issue?

5           MR. CHAIKEN:  Your Honor, as it relates to that same

6   point, which is we believe that they are responsible for

7   providing us which documents by Bates stamp number are

8   responsive to which.

9           THE COURT:  They're not if they give it to you in the

10  ordinary -- the way it's kept in the ordinary course of

11  business.

12          MR. CHAIKEN:  Right.

13          THE COURT:  Now you're telling me you can't figure out

14  head or tails.  He tells you that he's going to give you

15  whatever this trail is so that you can hopefully do that.

16          MR. CHAIKEN:  Right.  I've got some case law as well I

17  would like to present.

18          THE COURT:  Here's another thing.  You want to present

19  case law, he just did this too.  You present the case law to the

20  opposing party 48 hours before the hearing so that way he's not

21  reading it while you're arguing.

22          MR. CHAIKEN:  Yes, Your Honor.

23          THE COURT:  Okay.  What are you giving me case law on?

24          MR. CHAIKEN:  I'll get to a microphone.  This case

25  stands for the proposition that if a party claims the documents

1    were kept in the ordinary course of business, it bears the

2    burden of demonstrating that fact.  Even when a party produces

3    documents as they were kept in the ordinary course of business,

4    if the business recordkeeping system is so deficient as to

5    undermine usefulness of production, that party may not have met

6    its obligation under Rule 34.

7              THE COURT:  All right.  So why are you giving me this?

8    Didn't he just say he's going to be giving you something that

9    you're going to be able to search this?

10             MR. CHAIKEN:  And we will discuss that with our

11   provider.  In fact, I suggested that our two service providers

12   talk to each other and that was a suggestion that I made as of

13   yesterday.  I understand, Your Honor, we will do that.

14             Getting past that, then we can walk through just a few

15   of the additional objections that they've raised to our specific

16   requests.  If you don't have them in front of you, I can hand

17   you a copy Your Honor.

18             THE COURT:  Okay.  You can hand me a copy I guess.

19             MR. CHAIKEN:  Sure.

20             THE COURT:  They're probably attached to your motion,

21   aren't they?  Or no?

22             MR. CHAIKEN:  I hope so, but I've got the amended

23   responses (inaudible).

24             THE COURT:  They wouldn't be -- well, unless they were

25   attached to your -- but this is fine.

1          MR. CHAIKEN:  If you open up the interrogatory

2   responses, we can quickly go through the issues I have.

3          MR. PACE:  Your Honor, the interrogatory responses were

4   not noticed for today's hearing.

5          THE COURT:  Yeah, the two things you have on here are

6   requests for production on your notice of hearing.  Is that

7   right?  I mean, you're looking at me like --

8          MR. CHAIKEN:  Yeah.

9          THE COURT:  One is the first request for production and

10  one is the second request for production.

11         MR. CHAIKEN:  I guess we missed putting the -- the

12  amended response is the first set of interrogatories.

13         THE COURT:  What's the issue in the first set of

14  interrogatories?

15         MR. CHAIKEN:  There are two interrogatories that I

16  think require that you hear the issue.

17         THE COURT:  All right.  Tell me what they are.

18         MR. CHAIKEN:  Interrogatory Number 6 which is on page.

19         THE COURT:  This also tells me that you guys aren't

20  communicating because if you were communicating before you filed

21  this notice, you would have been talking about this

22  interrogatory.

23         MR. CHAIKEN:  No, we did actually, Your Honor.  We did

24  talk about these interrogatories yesterday.

25         THE COURT:  Again, yesterday.  From now on, here's what

1    you're supposed to do.  Before you file a notice, you're

2    supposed to discuss this stuff with each other and you're

3    supposed to try to resolve it.  Now, I know what happens a lot

4    of times is you try to resolve them, maybe you can't get it all

5    resolved, and then some lawyers, before they come in here go,

6    you know, I don't really want to go in front of Judge O'Sullivan

7    and show him how immature we are and how we can't practice law

8    and so you resolve it the night before.  I understand that

9    happens a lot, which I'm very happy when I get here and you say

10   well, we resolved two out of three of these issues.

11          But you don't start the night before trying to resolve

12   the issues that you're going to discuss with me the next day.

13          MR. CHAIKEN:  Your Honor, to be fair, we had started

14   discussing these issues well over a month ago.

15          Interrogatory Number 6.  We're requesting that they

16   provide us information with respect to their claim that

17   Mr. Penon, who is the expert in charge of validating the test,

18   anything that they stated as to why the protocol --

19          THE COURT:  Who did Mr. Penon work for?

20          MR. CHAIKEN:  Penon worked for the entity, Defendant

21   Industrial Heat, and he was selected by both parties and agreed

22   to by both parties as the evaluator for the validation test.

23          THE COURT:  Okay.  Okay.  Go ahead.

24          MR. CHAIKEN:  And so we've asked them to provide us,

25   you know, each and every reason why the agreed-upon protocol was

1    not followed.  And you can read through A through G.  And their

2    response was the test -- the protocol that you've identified is

3    incorrect.  The correct protocol is attached as Exhibit 1 to the

4    response, but they haven't responded to any of the items A

5    through G.  We've asked them to give us a response and they've

6    refused.

7              THE COURT:  Okay.  Well, they're saying that what you

8    attached as A was not the test protocol; am I correct?

9              MR. CHAIKEN:  That's correct.  And they attach what

10   they claim is the correct protocol.

11             THE COURT:  Okay.  Now what, you want them to do it for

12   the correct protocol?

13             MR. CHAIKEN:  That's correct.

14             THE COURT:  Okay.  Do you have a problem with that?

15             MR. PACE:  They can certainly serve an interrogatory on

16   that.  I don't have the interrogatories with me, it wasn't

17   noticed for the hearing.  These have not been being discussed

18   for the last few months.  This came up just yesterday,

19   production issues have been, that I admit.  But no, I mean, they

20   can serve an interrogatory on it and we can respond to it.

21             THE COURT:  I'm just -- here's what you're to do.

22   You're to substitute in Interrogatory Number 6, the correct

23   protocol is substituted for Exhibit A and you're to provide a

24   new response.  Either answer it -- either -- are you listening

25   to me?

1          MR. PACE:  I am.

2          THE COURT:  You either answer it or give me an

3     objection.  Whatever you want to do.  But we're not going to go

4     and start all over in the 30 day program and then you guys argue

5     over another 30 days and then come and see me in six months.

6          What's the next one?

7          MR. CHAIKEN:  Number 2 on Page 4.  We've asked them to

8     identify persons with knowledge regarding the subject matter of

9     the action and the basis and substance -- excuse me, nature and

10    substance of the knowledge they believe each person has.

11    They've identified persons, but not what knowledge they may

12    have.  It's important for us to understand what knowledge these

13    people may have so we can identify the appropriate witnesses to

14    be deposed, if necessary; or not to be deposed if they don't

15    have knowledge of anything that's really relevant.

16          THE COURT:  Okay.  What do you say about that?  You

17    gave a list of 31 people, the question was to provide what

18    knowledge they have.  That doesn't mean you have to write a

19    novel on each one of these, but you have to indicate who the

20    person is and what his position is.

21          MR. PACE:  Your Honor, this is not -- this is not

22    something that's been coming up recently.  Had they asked us

23    about it, we could have provided -- we will provide the

24    paragraph.  This still isn't the way it should be done.  I mean

25    --

1          THE COURT:  Well I know, but what should be done was

2     when you listed the people, you should have answered the

3     question.  Don't you think so?

4          MR. PACE:  Your Honor, I don't have -- I don't even

5     have it in front of me, so I'm sorry.

6          THE COURT:  Okay.  I mean, I don't see any objection

7     here.  Let's see what you say here.  Does he have an objection

8     to providing what knowledge they have?

9          MR. CHAIKEN:  They just simply said they may have

10    knowledge and information pertaining to the facts alleged in the

11    pleadings or underlying the subject matter of the action.

12         THE COURT:  Okay.  So you're to provide a one or two

13    sentence explanation of what this person has to do with this

14    case.  Okay?

15         MR. PACE:  We will, Your Honor.

16         THE COURT:  All right.  Does that take care of the

17    interrogatories?

18         MR. CHAIKEN:  That does, Your Honor.  Thank you.

19         THE COURT:  Okay.

20         MR. CHAIKEN:  Going to the requests for production.

21         THE COURT:  Which one?

22         MR. CHAIKEN:  Specifically Number 8 which is on page --

23    begins on Page 8.

24         THE COURT:  On Page 8?

25         MR. CHAIKEN:  Yep.  It's Request Number 8, we ask for

1   documents reflecting what the relationship and/or agreements

2   between Defendant IH and these individuals, and they've agreed

3   to provide us with that information for certain individuals but

4   not others.

5          THE COURT:  Okay.  Which ones don't they want to

6   provide?

7          MR. CHAIKEN:  They don't want to provide with respect

8   to Barry West, Joe Murray, T. Barker Dameron.

9          THE COURT:  Hold on.  Hold on.  Barry West, Joe Murray,

10  go ahead.

11         MR. CHAIKEN:  T. Barker Dameron, Joe Pike.

12         THE COURT:  I got it.  Yeah.

13         MR. CHAIKEN:  Daniel Pike, Robert Godes and Woodford.

14         THE COURT:  Okay.  Do they indicate why they don't want

15  to provide it for them?

16         MR. CHAIKEN:  I'm not sure why they've excluded those

17  people, Your Honor.

18         THE COURT:  Okay.  How come you didn't want to provide

19  it regarding those people?

20         MR. PACE:  Well, we actually did on a separate document

21  request provide, I think, the Joe Murray employment agreement.

22  T. Barker employment agreement.  But otherwise what -- let me

23  get one objection out first because you've already struck the

24  objections so you said I should raise it here, which is our view

25  is we've already had a hearing on the objections, they're now

1    going back and re-raising -- we had an hour long hearing on it.

2            THE COURT:  On what?

3            MR. PACE:  On the objections.  That was the hearing we

4    had before you on October 28th.

5            THE COURT:  On this request for production?

6            MR. PACE:  On both these sets of requests for

7    productions, as well as on the interrogatories.  And their

8    position is there's things that they didn't get to in that

9    hearing, but we had an hour before you and now we're going back

10   to these things.

11           THE COURT:  Okay.  Why are we going back to something

12   that we argued about before?

13           MR. CHAIKEN:  Well, we didn't argue about this specific

14   request for production.  We ran out of time at the last hearing

15   and at the end of the last hearing, you said hey, take my

16   rulings into account, go back see if you can come to an

17   agreement.  If you can't, come back here.

18           THE COURT:  Okay.  What do you say about that?

19           MR. PACE:  Your Honor, all you said is if there's other

20   issues, you can come back.  I don't think it meant that they can

21   come back on the objections.  I understand --

22           THE COURT:  I would agree if I ruled on the objection.

23   But what he said sounds familiar to me, like something I would

24   say.  I don't have a particular memory of saying it, but it

25   seems like that's what I would say.  Now, if I already ruled on

1    this particular objection, I'm not ruling on it a second time.

2    I don't recall ruling on it the first time.

3         MR. PACE:  Well, some objections were handled in

4    groups.  So let me just say on this, there are requests in here,

5    and this -- you may recall this from the last hearing.  There

6    are requests in here that seek information relating to my

7    client's or -- yeah my client's investments in other

8    technologies.  And what we had argued last time, and I thought

9    we prevailed on last time, was the point of if it has some

10   connection to the E-Cat Technology, we were producing it.  I

11   mean, so in other words, if they sent something to somebody

12   reference the E-Cat Technology, we were going to produce it even

13   if -- doesn't matter who that person is.  But otherwise, getting

14   into our other inventors was inappropriate.

15        THE COURT:  Okay.

16        MR. PACE:  And that -- I believe that was a limitation

17   Your Honor recognized.  Same thing with getting into all these

18   different kinds of, you know, investment companies.  It's just

19   not relevant to the case.  The case is about Industrial Heat and

20   IPH.  There was a question about Cherokee, and I think we did

21   agree to give them anything about Cherokee because Cherokee is

22   the other party and the other party covered by the allegations.

23   They made allegations that the judge said didn't mean anything,

24   that they said oh, you formed subsidiaries or you formed other

25   companies.  And the judge's order on the motion to dismiss said

1    that's not a fraud.  Forming other companies doesn't create a

2    fraud.  So we've tried to narrow this thing down to agreements

3    with the parties in here, we included Ampenergo, because

4    Ampenergo has a relationship to the E-Cat Technology.

5            THE COURT:  Well, let's talk about the ones you didn't

6    provide.  Barry West.  Who's he?

7            MR. CHAIKEN:  Barry West was an independent contractor.

8    We've separately provided for Barry West and for Barry West, for

9    T. Barker and for Joe Murray.  We've provided their employment

10   agreement or independent contractor agreement.

11           THE COURT:  Barry West -- I'm sorry.  T. Barker and who

12   is the third one?

13           MR. PACE:  Dan Maroon and Joe Murray.

14           THE COURT:  Joe Murray and Dan Maroon?  Is that one of

15   the ones that's here?

16           MR. PACE:  Yes.  It's G, Your Honor.

17           THE COURT:  I see T. Barker is G.  You said Dan Maroon.

18   Who is Dan Maroon?  I mean, I don't see his name on here.

19           MR. CHAIKEN:  Dameron.

20           MR. PACE:  I'm --

21           THE COURT:  Okay.

22           MR. PACE:  I'm sorry.  I'm butchering it.  I'm sorry.

23           (Cross talk between the court and counsel)

24           THE COURT:  I got it.  Okay.  All right.

25           So the documents they provided for those, is that

1    sufficient or do you need for documents?

2         MR. CHAIKEN:  If those are the agreements between IH

3    and those individuals, we'll accept that.

4         THE COURT:  Okay.  All right.  So that leaves us with

5    Joseph pike, Daniel Pike, Robert Godes and Woodford Patient

6    Capital Trust, PLC if I'm not mistaken.

7         MR. CHAIKEN:  Correct.

8         THE COURT:  Okay.  So who is Joe Pike?

9         MR. PACE:  Joe Pike is an investor in IHHI, which is

10   the holding company of Industrial Heat.

11        THE COURT:  Okay.  Why is he -- why do you want his

12   documents?

13        MR. CHAIKEN:  He's listed.  I want any agreement

14   between him and IH.  He's someone they listed in response to

15   Interrogatory Number 2.  If he played some role or has some --

16   obviously someone who has knowledge of the facts of our case.

17   If he has an agreement with IH, we would like to know what that

18   agreement is.

19        THE COURT:  Okay.

20        MR. PACE:  If the agreement relates to Dr. Rossi or

21   Mr. Rossi, we would be producing it.  We produced e-mails with

22   Joe Pike.  I mean, we're not concealing the name Joe Pike, but I

23   don't think -- like his shareholder agreements, to the extent

24   that's what they're seeking, I don't think that that's

25   responsive or relevant to discovery.

1        THE COURT:  Okay.  What do you say about that?

2        MR. CHAIKEN:  Well, if he's a shareholder in IH or

3   anything having to do with our technology, then certainly we

4   would like to know what the basis of that investment was, what

5   he was told by the company.  If he was told by IH that hey, this

6   is the greatest technology ever and it works fantastically and

7   then he's turning around in this lawsuit saying this technology

8   is worthless and doesn't work, we would like to be able to point

9   out those contradictions.

10       MR. PACE:  Those documents would have been produced and

11  they know that because we produced the investor presentations.

12  Again, he's referencing Mr. Rossi's technology.  If it

13  referenced Mr. Rossi's technology, we've produced it.

14       MR. CHAIKEN:  Okay.  You know what, I'll accept that,

15  Your Honor.

16       THE COURT:  Okay.  Daniel Pike?  Is that the same

17  thing?  Is he related to Joseph Pike?

18       MR. CHAIKEN:  I believe so.  He's the son of Joe, so

19  same issue.  I agree.

20       THE COURT:  You agree to provide the same documents?

21       MR. PACE:  We provided them with Daniel Pike as well.

22  If it related to Mr. Rossi, we provided it.

23       THE COURT:  Okay.  Robert Godes?

24       MR. CHAIKEN:  Robert Godes is an inventor who works for

25  a company called Brillouin.  We believe Brillouin may have

1    received information regarding the E-Cat intellectual property.

2    Mr. Godes is the inventor and/or owner of Brillouin.  We would

3    like to know if there is any agreements between independent --

4    Industrial Heat and Brillouin and Mr. Godes that could impact

5    this case.

6              THE COURT:  Okay.

7              MR. PACE:  Your Honor, if it related to Mr. Rossi and

8    Mr. Rossi's technology, we've produced it.  They have no

9    connection with Brillouin.  But the fact of the matter is if

10   there is an e-mail or a document with Brillouin that references

11   anything about the Rossi technology, it has been --

12             THE COURT:  Were any payments made to Godes as a result

13   -- relating to that technology?

14             MR. PACE:  Relating to the Rossi technology, it's been

15   produced.

16             I do want to say one thing on the record because of

17   something that he said.  We don't agree with his

18   characterizations of Penon.  I don't think it's germane to the

19   hearing.

20             THE COURT:  Of who?

21             MR. PACE:  Penon.  The person he characterized as the

22   expert that was selected by both the parties and was on our

23   side.

24             THE COURT: Oh, okay.

25             MR. PACE:  I don't think Your Honor needs to resolve it

1    for this hearing.

2              THE COURT:  All right.  That leaves Woodford Patient

3    Capital Trust, PLC.

4              MR. CHAIKEN:  Yes.  And Woodford is referred to in

5    their response, there's allegedly an agreement with Woodford

6    Funds with respect to some funding.  We don't know why that

7    wouldn't be produced.

8              THE COURT:  Okay.  Why would that not be produced?

9              MR. PACE:  If it related to Mr. Rossi, if it references

10   Mr. Rossi or his technology, it has been produced.  And they

11   know that.  They know they've got a bunch of investor

12   presentations, they used them at depositions.

13             MR. CHAIKEN:  Presentations are one thing, agreements

14   are something else.

15             THE COURT:  Are there any agreements with him regarding

16   Mr. Rossi's technology?

17             MR. PACE:  No.  No.  Well, investment agreements.  And

18   we also I think actually maybe did produce one of those in any

19   event.  But still it's --

20             THE COURT:  Well, that would include if he's investing

21   in the company because of Mr. Rossi's technology then.

22             MR. PACE:  Well, our position would be Woodford was

23   investing in the company because of its kind of portfolio, but

24   if we did not produce the subscription agreement of Woodford, I

25   will produce it.  But I still think -- I'll go find out whether

1    we've produced that one.

2         THE COURT:  Okay.  Produce it if you have it.

3         MR. PACE:  But if there's any communications with

4    Woodford about Mr. Rossi or any documents sent to him back and

5    forth about Mr. Rossi or his technology, we've produced that

6    already.

7         THE COURT:  Okay.

8         MR. CHAIKEN:  Just to be clear, I would like to see the

9    copy of the agreement that's referenced in response to

10   Interrogatory Number 16.

11        THE COURT:  16 says -- well I don't see that being -- I

12   mean, I can't say.  I don't know what you're talking about

13   there.  Is there some agreement they provided pursuant to 16?

14        MR. CHAIKEN:  That's what I'm asking for.  I'm asking

15   to see a copy of it.  They referenced it.

16        THE COURT:  Where did they reference it?

17        MR. CHAIKEN:  Page 22, interrogatories.

18        THE COURT:  Oh, interrogatories.

19        MR. CHAIKEN:  Yes.

20        THE COURT:  Page 22.  Okay.  What do you say about

21   that?  They want to see the agreement with Westford Funds for an

22   additional $150 million in capital if the circumstances warrant

23   it.

24        MR. PACE:  I think -- wait, wait.  I may be looking at

25   the wrong one that he was referencing.  Yeah.  No, this is the

1   one that I'm saying, Your Honor, it's -- there's an option

2   provision for 150 million.  I believe we've produced it.  But

3   again --

4           THE COURT:  Okay.  If not, produce it.

5           MR. PACE:  I'll produce it.

6           MR. CHAIKEN:  Thank you, Your Honor.  That's it for

7   that one.  We can move on to Number 19 which is on Page 16.

8           THE COURT:  Okay.

9           MR. CHAIKEN:  Number 19, request Number 19 provides any

10  and all documents evidencing communications between you and any

11  other person or entity in which you mention, discuss or refer to

12  any deficiency or noncompliance with any testing procedure or

13  test plan in relation to the E-Cat.  And the response from

14  Defendants was they'll provide documents which discuss or refer

15  to any deficiency or noncompliance with the operation of the one

16  megawatt E-Cat plant and they've basically limited our request.

17          THE COURT:  Well, do you have something else other than

18  the one -- what did you say?  Megawatt E --

19          MR. CHAIKEN:  Megawatt E-Cat plant, right, exactly.  So

20  they're talking about the deficiency or noncompliance with the

21  operation of the plant.  We're asking for communications

22  regarding deficiencies or noncompliance with the testing

23  procedures or test plans, not merely the operations of one

24  plant.

25          THE COURT:  Okay.  What do you say about that?

1    MR. PACE:  It's been produced.  They could have raised

2 this with us, we would have told them.  We produced anything

3 that was covered by other requests where it was anything about

4 the E-Cat testing.

5    THE COURT:  Okay.  So amend your response to Number 19

6 to indicate it's been produced.

7    MR. PACE:  We will.

8    THE COURT:  What's the next one?

9    MR. CHAIKEN:  Let's see, Number 33 which is on Page 24.

10 We asked for any and all documents which support, pertain to or

11 evidence your statement that Leonardo has long since failed to

12 achieve guaranteed performance as described in the second

13 amendment.  I'm assuming Mr. Pace is going to tell me they've

14 produced them already.

15    MR. PACE:  I'm sorry, which one are we talking about?

16    MR. CHAIKEN:  Number 33 on Page 24.

17    THE COURT:  Evidence regarding your statement that

18 Leonardo has long since failed to achieve guaranteed performance

19 as described in the second amendment.

20    MR. PACE:  And we said we produced documents which

21 reflect, discuss or address whether or not they support

22 Industrial Heat's statement that Leonardo has long since failed

23 to achieve guaranteed performance as described in the second

24 amendment, and we've done that.

25    MR. CHAIKEN:  Right.

1          MR. PACE:  So, I mean, I think our objection was trying

2     to figure out -- and we raised this with them to figure out what

3     was meant to be covered by pertained.  It's not covered within

4     reflect, discuss or address.

5          MR. CHAIKEN:  Okay.

6          THE COURT:  So do I need to rule on that?

7          MR. CHAIKEN:  No, I think we're fine with that one.  I

8     apologize, Your Honor.

9          I think the last -- let's see.  The last one we have --

10    just look through my notes, Exhibit 52.  Request Number 52 which

11    is the last one.  Page 34.

12         THE COURT:  All right.

13         MR. CHAIKEN:  Any and all agreements between IH and

14    Penagril (ph).  Penagril was the broker who Plaintiffs used to

15    find purchasers of technology or licensers of technology.  We've

16    asked for all agreements.  They've limited it to simply the

17    agreements related to the E-Cat IP.  We think if there are other

18    types of compensation agreements between IH and Penagril, we

19    should be able to see it.

20         THE COURT:  Why?

21         MR. CHAIKEN:  It could influence bias in this case.

22    And Penagril hasn't -- although Penagril would be owed over $45

23    million under the contract, they haven't made any claim in this

24    case.  We think there's some other side deal going on and we

25    would like to see it.

```
 1              THE COURT:  All right.  What do you say to that?

 2              MR. PACE:  Your Honor, if there's anything related to

 3     the E-Cat, we would have produced it.  They are also a

 4     shareholder in IHHI and so agreement -- I mean, I think

 5     agreements could cover kind of shareholders.  But this says

 6     Industrial Heat.  Well again, look, I don't think it's relevant,

 7     but if we need to search for it, we can go ahead and search for

 8     it.  But again, my position is that would not cover anything in

 9     their capacity as a shareholder of IHHI.

10              THE COURT:  What do you say about that?

11              MR. CHAIKEN:  Well, I think that goes to the point.  If

12     they're a shareholder of IHHI, then they have an ulterior

13     interest here.  They're listed as a party that has knowledge of

14     the facts of this case.  We think there may be some bias.  We

15     would like to get into that.

16              MR. PACE:  By the way, they also have this.  Because

17     they have a production from AEG.  This is another reason why

18     this shouldn't be coming up.

19              THE COURT:  Who is AEG.

20              MR. PACE:  Ampenergo.  Sorry.

21              THE COURT:  Okay.

22              MR. PACE:  Ampenergo gets abbreviated as AEG.

23              THE COURT:  All right.

24              MR. PACE:  I apologize.  They have a document

25     production from AEG.  I think it includes some of the
```

1    shareholder stuff.  Even though we don't think it's really

2    relevant to the case, but again --

3             THE COURT:  All right.  I'm going to overrule your

4    objection and find that you have to respond in full to 52.

5    Because, I mean, I think my general rule is it has to relate to

6    the E-Cat, but I think in this instance, he's showing why it

7    would be relevant even if it doesn't relate to E-Cat itself.

8             All right.  What else do we need to talk about?

9             MR. CHAIKEN:  That's all I have, Your Honor.

10            THE COURT:  Okay.

11            MR. PACE:  Your Honor, can I just make sure so we're

12   not back here again?

13            THE COURT:  Yeah.

14            MR. PACE:  To be clear on the record, we're done with

15   their document requests, we're done with the interrogatories,

16   they've had their chance to --

17            (Cross talk between the court and counsel.

18            THE COURT:  I'll wait until the end until we're done

19   with that because today we didn't run out of time.  I think the

20   last time we did run out of time.

21            MR. PACE:  Fair enough.  I just don't want to come back

22   here.

23            THE COURT:  You still have an obligation, if you find

24   additional stuff that would be responsive to that, to produce

25   it.

1        MR. PACE:  I agree, and we may even have production

2   issues, Your Honor.  I'm not going to dispute that we're not

3   going to have something else.  I don't want to come back on

4   these objections.  I don't think this is the way the process is

5   supposed to work.  I'm getting kind of blasted a little bit here

6   and I understand the heat just flows in this direction, but I

7   didn't set this hearing for an hour, I didn't wait until

8   yesterday to raise some of these issues when it relates to

9   objections.  I know you don't want to hear about it, but I'm

10  just saying I don't want to have to come back here a third time.

11        THE COURT:  I just said that, that we're done with

12  these two.  But you have a duty to continue to supplement if

13  there's additional records that are provided.

14        MR. CHAIKEN:  Well Your Honor, then I would ask just

15  the issue of whether or not they've produced documents in the

16  ordinary course of business including the 100 --

17        THE COURT:  Yeah.  Well, that issue would not resolve

18  -- hopefully it's going to be resolved when your experts meet

19  and when he provides you this path way.  And if not, you can

20  come back to me on that.  Yeah.

21        MR. CHAIKEN:  Fair enough.  That's all I need, Your

22  Honor.

23        MR. PACE:  Can I move to one other issue?

24        THE COURT:  Yeah, sure.

25        MR. PACE:  Just because of scheduling concerns because

1       of the holidays.  We have -- and we've had multiple meet and

2       confers with the third party defendants, we have at least a

3       couple of issues as to each, neither of which will take more

4       than 30 minutes.  There's a schedule -- I mean we could -- we

5       tried to get in the schedule this week, they weren't available,

6       I understand it.  Next week I understand the court's off, so

7       that pushes us all the way into January.  And our discovery

8       cut-off, including experts, is the end of February.

9              THE COURT:  So I'm sorry, what did you want to set for

10      a hearing?

11             MR. PACE:  I'm trying to -- in all honesty, Your Honor,

12      I'm trying to figure out how to handle -- we've got some

13      discovery objections or some objections we want to resolve, but

14      just --

15             THE COURT:  Objections by them or by a third party?

16             MR. PACE:  No.  Third party.  I'm sorry, Your Honor.

17      We had some conversations, I don't -- maybe I should not be

18      doing this on the record, but I'm trying to figure out from a

19      scheduling standpoint when we should try to schedule this and

20      when we can try to schedule this thing.

21             THE COURT:  You have to tell me what it relates to.

22      It's objections by a third party to what?  A subpoena?

23             MR. PACE:  I'm sorry.  The party.  A third party

24      defendant.  They're a party in this case.

25             THE COURT:  Oh, they're a party in this case.

1          MR. PACE:  Yes.  And I'm not asking you to rule on

2     anything, I'm just trying to figure out --

3          THE COURT:  So it's JM Products or with Henry Johnson

4     or one of those folks?

5          MR. PACE:  Right.  It's with all of those folks.

6          THE COURT:  Okay.

7          MR. PACE:  And --

8          THE COURT:  So you want me to give you 30 minutes in

9     the beginning of January?

10         MR. PACE:  Well, I also want to be able to confer with

11    them first.  But I'm trying to figure out just from what Your

12    Honor just said -- I mean, I don't want to set a notice without

13    knowing what I'm going to do.

14         THE COURT:  Here's what I'm going to do.  I'm going to

15    give you a time in the beginning of January and then you're

16    going to let me know whether or not you need it or not.

17    Hopefully you're going to be able to resolve the issues with

18    them and if you can't, then you can use this time to set it down

19    for a hearing.  But I want you to have a real conversation with

20    them ahead of time.

21         MR. PACE:  We have been, Your Honor.  And that's why

22    I'm saying, I hope we can resolve it, but just in case we can't.

23         THE COURT:  Right.  I'll give you a time and if for

24    some reason they say look it, you know, I'm at my great

25    grandmother's wedding that day, then come to me or call up and

1    say we can't do it, that way we have to do it another day.

2              MR. PACE:  If somebody is at their great grandmother's

3    wedding, I actually will personally come in here and tell you.

4    I'll probably withdraw the objection.

5              THE COURT:  There you go.  Hopefully they'll be at

6    their great grandmother's wedding.

7              How about Thursday, January 5th?  Is that good?  In the

8    afternoon?

9              MR. PACE:  That would be great, Your Honor.  Can we --

10   they're represented by two separate groups of lawyer.

11             THE COURT:  Hold on.  Hold on.  I just realized that

12   the preliminary injunction hearing is probably going to last all

13   day.  We can do it the afternoon of Tuesday, January the 3rd.

14   Or we can go to the next week if you want.  I mean, I don't know

15   what you guys -- if you guys are working, you know, Christmas

16   week or not.  Because that's the first day back after the

17   holiday, the 3rd.  Can't do it on that Thursday because I have a

18   preliminary injunction hearing.  I can do the 6th if you want at

19   2:00.  Oh, you're right.  Okay.  Yes, I do have time on either

20   the 5th or the 6th in the afternoon.

21             MR. PACE:  That's perfect.  We'll deal with the other

22   lawyers and --

23             THE COURT:  Which one you want me to hold for you?  You

24   pick one.

25             MR. PACE:  Just because I hate doing things on Friday

1   afternoon, can we take Thursday afternoon?

2           THE COURT:  Okay.  Thursday afternoon at 2:00.

3           MR. PACE:  2:00.  And then if we could --

4           THE COURT:  I mean, if you talk to them and they need

5   Friday, just call.  But if you don't call for a week, it could

6   be gone.  I'll hold that Thursday afternoon at 2:00 for you.

7           MR. PACE:  That's why I wanted to raise it here.  With

8   all the scheduling things going around, it's just been hard to

9   try to get something scheduled, so we wanted to try to lock

10  something in and then work backwards.

11          THE COURT:  All right.

12          MR. PACE:  But we have been negotiating with them and

13  trying to eliminate the issues.

14          THE COURT:  Good.  All right.  So if you need me --

15  Tori, put this on the calendar tentative 30 minutes for

16  Thursday, January 5th for Darden.  I don't know, I assume are

17  you guys going to be here or is that something --

18          MR. CHAIKEN:  I don't believe that's our issue.

19          THE COURT:  Okay.  Good.  All right.

20          Anything else?  Any other issues you want to discuss

21  today?  You're welcome to the -- it wasn't on this thing, if you

22  think it's going to help move the case forward and not sandbag

23  somebody.

24          MR. CHAIKEN:  No, Your Honor.  We appreciate your time.

25  Thank you very much.

```
1                    THE COURT:  Okay.

2                    MR. CHAIKEN:  Happy holidays.

3                    THE COURT:  Yeah, you guys have a great holiday.  See

4      you next year.

5                    MR. PACE:  Thank you, Your Honor.  Nothing else.

6                    THE COURT:  All right.  Thanks a lot.

7                    Oh yeah, when do you want to provide me with the order?

8                    MR. CHAIKEN:  48 hours from when we get the transcript?

9                    THE COURT:  How long does it take to get the

10     transcript, Cheri?

11                   COURTROOM DEPUTY:  It varies depending on what you're

12     willing to pay.

13                   THE COURT:  Yeah, if you want to pay a lot of money,

14     you can probably get it in an hour.

15                   COURTROOM DEPUTY:  Find out.

16                   MR. CHAIKEN:  Can we get it next week?

17                   THE COURT:  Are you working next week?

18                   MR. CHAIKEN:  I'm working next week, yes sir.

19                   THE COURT:  Okay.

20                   COURTROOM DEPUTY:  You'll have to speak to the court

21     reporters.  I'll give you the number.  They can tell you when

22     you can get it.

23                   THE COURT:  All right.  When are the amended responses

24     going to be provided and whatever order you've agreed to today?

25                   MR. PACE:  I'm trying to go back through my -- figure
```

```
1    out what we --

2          THE COURT:  I don't think there was anything that was

3    super extraordinary.

4          MR. PACE:  That's what I'm thinking.  I mean, look,

5    we'll get them done as fast as we can.  I'd say outer limit of

6    two weeks.  I don't think we need two weeks, but I just don't --

7    I'm looking at a little bit of scribble scratch here right now

8    to be perfectly honest with you so --

9          THE COURT:  Provide them as soon as possible, but in no

10   event later than January 3rd.

11         MR. PACE:  That's perfect, Your Honor.

12         THE COURT:  All right.  And when do you want to -- you

13   still haven't told me, you have to give me a date when you want

14   to provide the --

15         MR. CHAIKEN:  How about Thursday next week?

16         THE COURT:  That's fine.  If you want to put it off --

17   I'm not going to be here next Thursday, so if you want to put it

18   off to the 3rd, you're welcome to.  I mean, if you get it

19   earlier, you can send it early.

20         MR. PACE:  Can't we just set the date as Christmas and

21   just --

22         THE COURT:  Yeah, right.  That would be nice.  That's

23   when we should set this case for trial.

24         MR. PACE:  It will be our present to you.  We'll be

25   like here, happy holidays.
```

```
1              THE COURT:  Yeah, right.  All right.  So by, you know,

2      hopefully earlier.  But if not by January 3rd provide the order,

3      proposed order.  Yes.

4              MR. PACE:  It's just strange to have the same date that

5      the order would come in to you.

6              THE COURT:  The order is in effect right now.

7              MR. PACE:  Right.  That's fine.

8              THE COURT:  So it really doesn't matter.  The order is

9      in effect, the documents are due by then.

10              MR. PACE:  I wasn't thinking.  We'll have the

11      transcript well before then, so we'll be able to look at the

12      transcript that we haven't missed anything in our chicken

13      scratch.

14              THE COURT:  Okay.  All right.

15              Anything else I can help you all with?

16              MR. PACE:  No.  Happy holidays.

17              MR. CHAIKEN:  Thank you very much.

18              THE COURT:  All right.  Have a great holiday.

19              MR. CHAIKEN:  Thank you.

20              (PROCEEDINGS CONCLUDED)
                    C E R T I F I C A T E
21      I certify that the foregoing is a correct transcript from the
        record of proceedings in the above-entitled matter.
22
        12-22-2016              /s/ Dawn M. Savino
23      Date                    DAWN M. SAVINO, RPR

24

25
```

**PROCEEDINGS RECORDED BY DIGITAL AUDIO RECORDING**
**TRANSCRIPT PRODUCED BY COMPUTER**