```
                       UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
                             MIAMI DIVISION
                       CASE NO.  16-CV-21199-CMA/JJO


        ANDREA ROSSI, et al.,

                        Plaintiffs,

                 vs.

                                           Miami, Florida
                                           January 5, 2017
        THOMAS DARDEN, et al.,             Pages 1-39

                        Defendants.
        _____

                       TRANSCRIPT OF DISCOVERY HEARING
                  BEFORE THE HONORABLE JOHN J. O'SULLIVAN
                     UNITED STATES MAGISTRATE JUDGE


        APPEARANCES:

        FOR THE PLAINTIFFS:
                            Perlman, Bajandas, Yevoli & Albright, P.L.
                            BY:  BRIAN W. CHAIKEN, ESQ.
                            283 Catalonia Avenue
                            Suite 200
                            Miami,  Florida 33134

        FOR THE DEFENDANTS:
                            Jones Day
                            BY:  CHRISTOPHER R.J. PACE, ESQ.
                            BY:  CHRISTOPHER M. LOMAX, ESQ.
                            BY:  ERIKA HANDELSON, ESQ.
                            600 Brickell Avenue
                            Brickell World Plaza
                            Suite 3300
                            Miami, Florida 33131

        FOR THIRD PARTY DEFENDANT HENRY JOHNSON
        And J.M. PRODUCTS, INC.:

                            Aran, Correa & Guarch, P.A.
                            BY:  FRANCISCO J. LEON de la BARRA, ESQ.
                            255 University Drive
                            Coral Gables, Florida 33134
```

1   **FOR THIRD PART DEFENDANT FULVIO FABIANI**
    **And UNITED STATES QUANTUM LEAP, LLC:**

2
                        **BY:  RODOLFO NUNEZ, ESQ.**
3                       255 University Drive
                        Coral Gables, Florida 33134
4
    **TRANSCRIBED BY:    DAWN M. SAVINO, RPR**
5                       **Official Court Stenographer**
                        **400 N. Miami Avenue, 10S03**
6                       **Miami, Florida  33128**
                        **Telephone:  305-523-5598**
7   _____

8                   **P-R-O-C-E-E-D-I-N-G-S**

9           COURTROOM DEPUTY:  All rise.

10          THE COURT:  We're here today in the case of Andrea

11  Rossi and others versus Thomas Darden, as well as I think this

12  relates to a third party defendant, J.M. Products and others,

13  case number 16-civil-21199.

14          Could I have appearances for the Plaintiff first.

15          MR. CHAIKEN:  Good afternoon, Your Honor.  Brian

16  Chaiken on behalf of Plaintiffs.

17          THE COURT:  Thanks.

18          And for Thomas Darden and the Defendants?

19          MR. PACE:  Good afternoon, Your Honor.  Chris Pace,

20  Chris Lomax and Erika Handelson on behalf of Defendants.

21          THE COURT:  Thanks.  And for the Third Party

22  Defendants?

23          MR. LEON:  Francisco Leon on behalf of J.M. Products,

24  Henry Johnson and James Bass.

25          MR. NUNEZ:  And Your Honor, Rudy Nunez on behalf of

1    Fulvio Fabiani and United States Quantum Leap, LLC.

2            THE COURT:  Okay.  Good.  All right.  I think this was

3    filed by the Defendants, right?

4            MR. PACE:  It was, Your Honor.

5            THE COURT:  You can be seated unless you're addressing

6    the court.

7            What's the issue?

8            MR. PACE:  If I can, Your Honor, let me -- if I can

9    just set an agenda because there are four issues and I just want

10   to make sure -- I think we can cover all of them very easily in

11   a half an hour.

12           THE COURT:  Good.

13           MR. PACE:  One is the end date of discovery.  At what

14   point do they no longer have to continue to produce documents.

15   One is the start date, so two dates, you know, sandwiching.

16   There's one scope issue as to J.M. Products, Johnson and Bass,

17   and then there's a document production timing issue as to Third

18   Party Defendants Fabiani and USQL.

19           So if I can just kind of take them in that order and if

20   Your Honor wants everybody else to chime in, they certainly can.

21           THE COURT:  Okay.

22           MR. PACE:  There's a common objection as to end date.

23   All the Third Party Defendants want to stop producing documents

24   after February of 2016 because that is when the testing, the --

25   what they've alleged -- what the Plaintiffs have alleged is the

1    guaranteed performance testing finished was in February of 2016.

2         THE COURT:  Tell me who are these Third Party

3    Defendants?  How are they related to this thing?

4         MR. PACE:  The alleged customer to which power was

5    being provided is J.M. Products.

6         THE COURT:  Okay.

7         MR. PACE:  Henry Johnson is the president of that

8    company.

9         THE COURT:  Right.

10         MR. PACE:  James Bass is the alleged director of

11    engineering of the company.

12         THE COURT:  Okay.

13         MR. PACE:  Fabio -- Fulvio Fabiani was working with

14    Mr. Rossi, was like his assistant or his person handling the

15    electrical parts and his company is US Quantum Leap.

16         THE COURT:  Okay.

17         MR. PACE:  Now --

18         THE COURT:  So what kind of records are you getting

19    from them?

20         MR. PACE:  We haven't gotten anything yet from Fabiani

21    and USQL and that's an issue for today.  From Johnson, Bass and

22    J.M. Products, or at least Johnson and Bass, we've gotten some

23    documents.  In fact, one of the things, you know --

24         THE COURT:  I guess what I really mean is what kind of

25    records are you trying to get from them?

1          MR. PACE:  Well, we're trying to get -- if I can

2     explain the problems with these date limitations.

3          THE COURT:  All right.

4          MR. PACE:  Our position is that the company, J.M.

5     Products was essentially -- was a scam.  It was a sham company

6     that wasn't really operating.  We were fooled into -- they said

7     "hey, we've got this customer in Florida, let us bring our plant

8     from North Carolina down to Florida so we can provide services

9     for this real customer".  Turns out there is no real customer.

10    And again, from their actual document production, I can hand you

11    a few e-mails that show that this is in fact the case, that --

12    so that scam didn't end on February 2016.  They continued it

13    afterwards.  In fact, Mr. Johnson sent a letter to me or -- I'm

14    sorry, to Industrial Heat saying -- in April of 2016 saying

15    "hey, we want this plant to be re-started", and we called their

16    bluff on it and said "okay, we'll re-start the plant", and then

17    they came back and said "oh no, you know, there's -- you know,

18    Rossi and Leonardo are saying there's a dispute between the

19    parties so we can't really go forward with opening the plant."

20          so the scam, the sham, did not end in February of 2016.

21    And our view is we should be able to get the documents up to

22    present, to the extent they're otherwise responsive.  I mean,

23    obviously we're asking for responsive topics.

24          THE COURT:  So this relates to J.M. or to both folks?

25          MR. PACE:  It relates to all the Third Party Defendants

1    because I believe they've all taken a uniform position on that.

2            THE COURT:  Explain to me about J.M. and Henry Johnson,

3    but not about and Fabio Penon.  Is he part of J.M.?

4            MR. PACE:  No, he's not.  So if I can, that would

5    certainly cover J.M. Products, Bass and Johnson.

6            As to Fabiani and US Quantum Leap, the same applies,

7    there was -- in fact, there was a meeting that Fabiani had with

8    --

9            THE COURT:  Just so I understand the alignment here.

10           MR. PACE:  I'm sorry.

11           THE COURT:  Fabio Penon, who is he associated with,

12   anybody?

13           MR. PACE:  He's not supposed to be associated with

14   anyone, but --

15           THE COURT:  Well, who is representing Fabio Penon?

16           MR. PACE:  No one.  He's not been served in the case.

17   He's in Italy.

18           THE COURT:  Oh, so I don't need to worry about him.

19           MR. PACE:  Yeah, you don't need to worry.

20           THE COURT:  Okay.  Well, forget about him.  We don't

21   need to talk about stuff I don't need.

22           MR. PACE:  Yeah.

23           THE COURT:  So then we have United States Quantum Leap

24   and Fabiani, right?

25           MR. PACE:  Correct.

1        THE COURT:  They're together.

2        MR. PACE:  Correct.

3        THE COURT:  Okay.  So tell me why you need records for

4    them through today.

5        MR. PACE:  So they -- for example, Fabiani met with Joe

6    Murray in March of 2016 to talk about after the February -- the

7    conclusion of the testing in February or the alleged testing in

8    February, Industrial Heat tried to have contact with Fabiani to

9    try to say what's going on here, what data do you have, what

10   information, because we've got an agreement with you and you

11   have to provide us all this information.  And he stonewalled

12   them for a number of months.  He apparently now lives in Russia,

13   which is a new development we just found out about, but he was

14   properly served in this case so we don't have to deal with that

15   issue right now.  But our view is, again, it doesn't stop in

16   February.  He continued to have e-mail communications and in our

17   view, continued to perpetuate the sham all the way until, you

18   know, the lawsuit was filed and then the communications ceased.

19        THE COURT:  When was the lawsuit filed?

20        MR. PACE:  Well, when our claims were filed against him

21   was July or September of 2016.  I can get the exact date if

22   that's, you know, significant to the court.

23        THE COURT:  That was when he brought the third party

24   lawsuits?

25        MR. PACE:  Correct.

1          THE COURT:  Is that when you want the records to?

2          MR. PACE:  Yeah.  I mean, if there are records that go

3     up through present, I think we would still be entitled to them.

4     If they're still having communications about J.M. Products for

5     example.

6          I mean, again, the examples I can give you, Your Honor,

7     are J.M. Products had some -- a tax preparer did some work for

8     J.M. Products, they get an invoice.  Rossi sends something back,

9     an invoice for a $1,050.  Rossi says "send me an invoice for a

10    $1,050 for nickel powder", and it's to pay the money that he has

11    -- that J.M. Products has to pay on these invoices is just a

12    sham.  There's other e-mails where he says, Rossi says, "I've

13    always paid whatever comes due for J.M. Products".

14         So, you know, there is no -- you know, we were pitched

15    that this was an independent company.  There was somehow a

16    separate company.  In fact, the documents we received thus far

17    show that it is in fact simply operated by Andrea Rossi, and

18    there's also e-mails where he controls the bank account, you

19    know, including minor overdraws.  He says "tell me, you know,

20    why is there a $300 or 337 overdraw".  So we think we're

21    entitled to all of those communications.

22         THE COURT:  Okay.  So what does J.M. Products say?

23         MR. LEON:  Well Your Honor, the allegations in the

24    complaint and the allegations in the counterclaims all end as of

25    February, the date that the test ended which was the middle of

1    February of 2016.  The allegations in their counterclaims even,

2    all the acts or inactions or omissions that they're claiming

3    were allegedly deceptive or allegedly -- alleged

4    misrepresentations all occurred well before March 1st of 2016.

5         For example, one of their main claims against J.M.

6    Products, Henry Johnson, is the fraud in the inducement claim.

7    They don't need any communications after even 2016 to be able to

8    prove whether or not representation was correct or incorrect and

9    whether or not they relied on that representation to enter into

10    the agreement.  So if you take that count aside, what's left is

11    that was for entering into the term sheet and then also

12    allegedly moving the plant to Florida.  That's one part of the

13    scheme they're alleging.

14         The second part of the scheme they're alleging is the

15    manipulation of data.  And in their own allegations, they don't

16    allege that any of the Third Party Defendants, J.M. Products,

17    Henry Johnson or James Bass, manipulated any of the data.

18    Instead, all they say you guys made misrepresentations that

19    induced us to bring the plant to Florida and you guys didn't, on

20    multiple occasions, call it two or three occasions, didn't allow

21    Industrial Heat access to the E-Cat plant, which J.M. Products

22    did not have access to per the term sheet.

23         So our position is that anything that occurs after

24    February of 2016 is not only irrelevant to the allegations in

25    the pleadings, but is also not necessary.  In essence, they're

1    going on a fishing expedition to try to get information or

2    communications or documents that don't pertain to the lawsuit,

3    that aren't necessary for the lawsuit.  It's overburdensome.

4            THE COURT:  How many records do you guys have?  They

5    say sounds like it's really not a real company.  You say it's

6    overburdensome.  Why is it overburdensome?

7            MR. LEON:  Henry Johnson is the attorney, has been, and

8    they've known this, has been and still is the attorney for Rossi

9    and Leonardo Corporation on various matters.  James Bass still

10   has communications with Rossi because he now works with Rossi

11   and Leonardo Corporation on things unrelated to the lawsuit.  At

12   a certain point in time, once the Third Party Defendants were

13   going to be brought in or it was felt that they were going to be

14   brought in, there was a joint defense agreement.  There's that

15   issue.  Rossi and Leonardo Corporation, they continued to

16   develop new technologies, there's an issue there because the

17   parties still maintain communications.  It's no secret that they

18   still communicate just on things that don't relate to the

19   lawsuit.  So it becomes a fishing expedition for them to get

20   potentially privileged information, potentially confidential

21   information when it's just not necessary.

22           THE COURT:  Okay.  What about the other folks?

23           MR. NUNEZ:  Yes, Your Honor, Rudy Nunez.

24           As Your Honor is well aware, the scope of discovery and

25   relevance of discovery depends on the claims, the defenses and

1   the proportionality.  In this case, as you heard from Mr. Pace,

2   my client, Fulvio Fabiani, was the assistant for Mr. Rossi who

3   is the big player, right?  As we've taken one deposition,

4   basically my client's counterpart for Industrial Heat, for the

5   Defendant, basically characterized himself as a worker elf.  And

6   I asked him "well, what about Mr. Fabiani?  What was he doing?

7   No, he's a worker elf too.  He was doing whatever Mr. Rossi told

8   him."  So in the big scheme of things, proportionality, my

9   client is a small player here.  My client is not in dispute on

10  the $100 million controversy between the Plaintiff and the

11  Defendant.  My client was paid $10,000 a month by Industrial

12  Heat to help Mr. Rossi.  His contract -- well, let me back up.

13          Now, let's look at the claims in the case.  We got one

14  claim is a breach of contract.  Well, that contract started

15  September of 2013.  That contract terminated when Mr. Fabiani

16  stopped working at the Doral facility at the end of February

17  2016.  My client then leaves the country, he is now working in

18  Russia doing some consulting work, he's a computer engineer

19  doing some consulting.  The burdensomeness is my client's, you

20  know, he's hard working, you know, 60, 70-hours-a-week-guy

21  working on several projects, and it's hard for him and it's

22  burdensome for him to be doing all the discovery in this broad

23  array of discovery that has been asked.

24          Mr. Pace's original discovery, which we objected to,

25  we're here on the objections, their time frame, they wanted to

1    start January of 2011.  Just to give Your Honor an idea of why

2    we're objecting.  They wanted to start this discovery time frame

3    January of 2011.  Mr. Darden, the main principle of Industrial

4    Heat, he doesn't even meet Mr. Rossi until 2012.  My client is

5    not involved with the Defendants until September of 2013.  So

6    our position is while we objected and maintained that the

7    documents should only be produced for the time at Doral, the

8    time that the facility was in Doral, and the main issues are

9    involved in the work in Doral, I can concede, and I tried to

10    concede, we conferred and tried to work things out, I can

11    concede okay, September 1, 2013, you entered into a contract

12    with my client, okay, you get communications, documents, et

13    cetera from that time.  Then February 2016, my client stops

14    working on this, he goes away, he's off this project.  Okay.  So

15    we think it should end there.

16          THE COURT:  I mean, why are we arguing -- if he's off

17    the project and he doesn't have anything, then we don't have to

18    worry about anything after February 2016 because he went to

19    Russia and he's doing something else.

20          MR. NUNEZ:  Well, he's off the project, he's off the

21    project, he's doing something else, but he hasn't stopped

22    working with Mr. Rossi.  And they continued some relationship

23    with regard to E-Cat, E-Cat development, it's my understanding,

24    and to the extent that those documents and any work that he's

25    done for Rossi after February 2016 are not relevant to this

1    case.

2           Again, if we look at the claims for the breach of

3    contract, their claims on breach for my client are that my

4    client did not give them -- and you heard this from Mr. Pace,

5    did not give them data and information for the time period that

6    the plant was working in Doral.  Again, ending February 2016.

7    That is their primary basis for the breach of contract.

8           With regard to the other claim that my client's

9    involved in is the FDUTPA claim.  So that claim is the

10   inducement to move the plant from North Carolina to Doral.  That

11   happens in 2014.  Okay.  A year or a year and a half after my

12   client's been working for Industrial Heat.  So the allegations

13   are moving the plant to Florida, this is the scheme, right, the

14   getting them to move the plant to Florida; manipulating the

15   data, failing to provide data which is also part of the breach

16   of contract, and finally, demanding payment.  And that's Rossi

17   demanding payment.  I guess -- my client also he feels that he's

18   owed one more month of payment, but those are their claims for

19   FDUTPA.

20          So now they wanted this huge expanded discovery time

21   frame that's frankly not relevant to their claims and to the

22   proportionality of my client.

23          THE COURT:  Are you talking about from February 2016 to

24   when -- when did you file your third party claim?  Have you

25   figured that out yet?

1          MR. PACE:  I think we actually originally filed it in

2     July, beginning of August, and we've amended it a couple of

3     times.  I'm actually looking at the amended version.  I'm sorry

4     about that.

5          THE COURT:  So they're talking, at most, ten months

6     through now, you know.  At the least it would be until when they

7     filed the lawsuit which would be July, which would be five

8     months.  So we're not talking about -- you know, he's talking

9     about going an extra six years.

10          MR. PACE:  If we can limit it, let's say --

11          THE COURT:  Let me tell you something.  You got a fraud

12     claim, you've got to prove some kind of, you know, fraud.

13     You've got to prove the guy's state of mind.  Sometimes state of

14     mind is determined by -- later on when you're sending an e-mail

15     that says "hey, you know, we did something bad to these people"

16     or you know:  Let's hide this or let's hide that".  And even

17     though it's occurring after the action, it still shows a state

18     of mind at the time that the actions were occurring.  I mean, I

19     would think on a contract claim, I don't know how -- a contract

20     claim is a contract claim.  But on the fraud allegations, it

21     seems like it is would be fair to go --

22          MR. NUNEZ:  Well, and to that point -- and again, with

23     regard to my client alone, he's not involved and he's not named

24     in the fraud claim.  He's only in the FDUTPA claim.

25          THE COURT:  Well, FDUTPA usually involves fraud,

1    doesn't it?

2         MR. NUNEZ:  But not in this case.  I think they've

3    argued strenuously that it's not based on fraud and they don't

4    have the heightened pleading requirements.

5         MR. PACE:  Deceptive and unfair practices, Judge.  Your

6    Honor, you have it right.  Their issue of whether 9B applies,

7    the judge has already ruled on.

8         THE COURT:  Under FDUTPA, you have to --

9         MR. PACE:  Whether you have to or not, you know, our

10   complaint complies and whether 9B applies or not -- but that's

11   not the issue.  The issue is the scheme that's pled, which I

12   think is what you're referring to is we actually don't plead a

13   fraud claim, we have a fraudulent inducement.  But that's

14   different.  But the FDUTPA claim is unfair and deceptive

15   practices and it covers the entire time period.

16        THE COURT:  The entire time period of what?

17        MR. PACE:  Well, it covers up to present.  I mean,

18   until the scheme -- I mean, the scheme has never fully been

19   revealed or resolved.

20        THE COURT:  But, I mean, where does it say that in your

21   pleading?

22        MR. PACE:  I think we say "up to present", and I guess

23   that's when the complaint was filed.  But, you know, our

24   position is that --

25        THE COURT:  They say you said until February 2016.

1          MR. PACE:  But that's the point, Your Honor.  I mean,

2     the scheme doesn't end -- again, if I can --

3          THE COURT:  Well, let's just clear this up first.  Did

4     you say until the complaint -- until your third party complaint

5     was filed or did you say until February 2016?

6          MR. PACE:  We never said until February 2016.  And if I

7     can explain.

8          THE COURT:  Okay.

9          MR. PACE:  For example, and I have a document here to

10    show you which is the correspondence they sent in April of 2016

11    when they say you have to re-open this plant and that was a

12    bluff by J.M. Products.  We need the power, and then when we

13    called their bluff, they said oh no, I guess we don't really

14    need you to re-open the plant.

15         THE COURT:  I know.  You already described that, but

16    generally discovery is limited to the claims that you brought.

17    Now, that's not saying that sometimes discovery isn't

18    appropriate for past the claims to prove the claim.  But if your

19    claim says until February 2016, that's different than if your

20    claim says to the date of the filing of the complaint or until

21    the date of the filing of the complaint and continuing, you

22    know, continuing on.  I don't know what your complaint says.

23         MR. NUNEZ:  Your Honor, if I may, if we look at their

24    complaint, and I only have one copy, I'm sorry, at Paragraph

25    142, the first part of the scheme was to manipulate the

1    Defendants in allowing the plant to be moved from North Carolina

2    to Florida.  And there's more in the photograph.  I'm just

3    summarizing.

4         Paragraph 143, the second part of the scheme was to

5    manipulate the operation of the plant and the measurements of

6    the plants operations.  All of that concluded February of 2016.

7    And --

8         THE COURT:  He says he has an e-mail that says in April

9    2016 you said let's start the plant back up.

10        MR. NUNEZ:  Well, that's not my clients.  Again, Your

11   Honor, my client is just the FDUTPA.  My client is not involved

12   with J.M. Products.  I'm just Fabiani and USQL, and I'm trying

13   -- because I think there should be a differentiation here

14   between my client, Rossi, J.M. Products, they're alleged to have

15   done different things.

16        And then in Paragraph 144 of the complaint, says the

17   final part of the scheme was to demand the money.  Rossi

18   demanded the money.  Okay.  And that happened shortly after

19   February 2016.

20        If anything, the limit should potentially be -- that's

21   straight from their complaint, the final part of the scheme is

22   demand, I think it's 80 million, $89 million.  It's a demand,

23   yeah, $89 million, it's the demand of the $89 million.  I think

24   that's probably early March or sometime in March.  And that's --

25        THE COURT:  Excuse me.  What's the docket entry for the

1    --

2         MR. NUNEZ:  This was docket entry -- I'm sorry, Your

3    Honor, 78.  And their FDUTPA claim starts on Paragraph 140.  And

4    I read to Your Honor from Paragraph 142, 43 and 44.

5         MR. LEON:  If I may, Your Honor, as I stated before,

6    their allegations as to James Bass, Henry Johnson and J.M.

7    Products don't go beyond February of 2016 because the actions or

8    inactions that they allege were deceptive or unfair all occurred

9    prior to that date.  They don't get an extension just because

10   communications were had after the fact.

11        THE COURT:  Well see, they do because if they're able

12   to show that you're communicating about the fraud that you

13   participated in before the fact.  What he gets is he gets

14   information regarding his claim.  So if tomorrow your client

15   types out an e-mail and says "boy, I really ripped off Andrea

16   Rossi and Leonardo Corporation" and sends it to his best friend

17   in California, he gets that because that relates to the

18   underlying claim.  Even though it was sent today, it still shows

19   the state of mind of what he was doing in 2015.

20        MR. LEON:  Correct, and I can agree with that.  But if

21   we limit the discovery they're entitled to, any and all

22   communications or any and all documents.  If what they want is

23   an admission or something of that nature, we can stipulate that

24   if there's something in the documents after the fact that is an

25   admission like Your Honor just stated, we will produce it.  But

1    they don't get to go on a fishing expedition and see any and all

2    communications and any and all documents when it's not relevant

3    to the case.

4            MR. PACE:  Your Honor, two things.  One is just in the

5    sense of we were ordered to produce all of our communications

6    with all the other parties.  That was the court's prior order in

7    connection with discovery served upon us.  We think it's

8    appropriate and up to present and what we had done.  We think

9    it's appropriate as to the other parties as well.

10           But the second thing is to say part of the issue here

11   is they're not supposed -- we were told that they were going to

12   be separate, that they were independent, that they were somehow,

13   you know, distinct.  So any of their communications, whenever

14   they're communicating about things like Leonardo paying or Rossi

15   making sure that the $150 is available in a checking account for

16   J.M. Products so it can pay some expense, that proves our claim.

17   So we're entitled, I think, to that information.

18           I also want to add, Paragraph 88 of our counterclaims

19   and third party claims, we specifically talk about the fact that

20   Fabiani says at the end of February that he was going to provide

21   us certain information, but in later e-mails, you know, we've

22   attached them as Exhibit 21, later e-mails he committed to

23   providing us certain raw data to us and never provided any of

24   it.  So we clearly are not limiting ourselves to February 2016.

25           And again, as Your Honor has said, it's not an extended

1    time period.  We're not talking about the end date should have

2    been February of 2013, and we're trying to get it up to present.

3    We're talking about a 10 month period.  If they had responded to

4    -- you know, at the time period and the document request had

5    come out, it would have been a few months ago.  So it would have

6    even been less, but there's no -- again, the scheme has not been

7    stopped.  In fact, what the folks are just here now telling you

8    is they're continuing to work on things relating to -- they're

9    supposedly continuing to work together.

10         MR. LEON:  On things unrelated, if I might just

11   clarify.

12         THE COURT:  All right.  I'm going to require that the

13   documents -- first of all, I look at this e-mail, the e-mail

14   that's referred to is May 16th, the furthest e-mail that is

15   attached to Exhibit 21 is May 16th, and that's from Joseph

16   Murray to Fulvio Fabiani.  So I'm going to require that the

17   documents be provided up to the filing of the first

18   counterclaim.  When was that?  Do you want to give me a date?

19         MR. PACE:  Your Honor, we'll include that in the order.

20         THE COURT:  Okay.

21         MR. PACE:  I apologize.  It's either the end of July or

22   beginning of August.

23         THE COURT:  I can have the clerk find it if you want,

24   but you know what day I'm talking about.

25         MR. PACE:  I absolutely do, Your Honor, and we will --

1          THE COURT:  Okay.

2          MR. PACE:  I don't think that's something we can fudge.

3          THE COURT:  Okay.  All right.  I find that it's

4     relevant to prove -- first of all, some of these e-mails in the

5     complaint and the claim, especially as to Fabiani who says he's

6     not involved in a fraud but only the FDUTPA claim, goes up

7     through May and I think it's fair to provide communications and

8     documents relating to communications up through the time of the

9     filing of the counterclaim and that it's likely to lead to

10    admissible evidence.

11         What's the next issue?

12         MR. NUNEZ:  Your Honor, I'm sorry.  Just for

13    clarification, so we dealt with the end date.

14         THE COURT:  Yeah.

15         MR. NUNEZ:  With regard to Fabiani, what about the

16    beginning date?  Our position is that it should be from the date

17    of the contract of September 1, 2013.  That was his first

18    involvement with Industrial Heat.

19         THE COURT:  By the way, your first answer in third

20    party claim was August 5, 2016.

21         MR. PACE:  August 5th.

22         THE COURT:  You then amended it the 11th and then, I

23    guess, amended it again.

24         The start date?  When do you want to start?

25         MR. NUNEZ:  The contract date which was September 1,

1    2013.

2          THE COURT:  That's the date the actual contract was

3    entered into?

4          MR. NUNEZ:  That's the date of the contract, Your

5    Honor, yes.

6          THE COURT:  I mean, before you have a contract, don't

7    you have conversations and communicaions and stuff?  So why

8    would you start that date?

9          MR. NUNEZ:  That's a good point, Your Honor.  I mean,

10   no doubt.  My thing then would be -- and I agree with Your

11   Honor, but it can't be what they want of January 2011.

12         THE COURT:  Okay.

13         MR. NUNEZ:  If there's a contract, I think the license

14   agreement is October 2012?  And that's a license agreement

15   between Rossi and them.  But my client, if he starts working for

16   Industrial Heat September 1st, I mean, what's a reasonable time

17   that they started?

18         THE COURT:  Well, when did he start working for Rossi?

19         MR. NUNEZ:  He's been working with Mr. Rossi, to my

20   understanding, for years.  For years and years.  It's a

21   long-term relationship which they knew about at the inception.

22   It wasn't something that wasn't disclosed or that they didn't

23   know about.

24         THE COURT:  Got it.  Got it.

25         MR. PACE:  Prior to 2011, we only went back 2011.

1    You'll admit that he was working with Mr. Rossi prior to 2011.

2         MR. NUNEZ:  I can't say -- I can't admit to a specific

3    date.  I don't think it should be --

4         MR. PACE:  I don't think he was.

5         THE COURT:  I understand.  Why do you think 2011 is a

6    fair date?

7         MR. PACE:  Because he's got information, the testing

8    began, the development of this E-Cat product started actually

9    even prior to 2011, but we started with January of 2011 to have

10   a clear number, a clear date.  It actually started somewhere in

11   2010, but it's a little vague as to when.  Mr. Fabiani was

12   involved with Mr. Rossi in that testing.  We were not.  I mean,

13   now it was -- some of the stuff that was told to us in

14   connection with entering into the license agreement in October

15   of 2012 from a burdensomeness perspective we don't think that

16   there's a substantial burden that's going to be associated with

17   it.  And again, he's kind of uniquely in a position, other than

18   Mr. Rossi, to be able to provide that information.  I don't know

19   how much stuff he has from back then.  If for some reason there

20   was -- and there's been discussions, and I understand, but

21   unless there's a massive amount of information, I think that the

22   2011 date is a relevant date.

23        THE COURT:  Okay.  What do you say, Mr. Nunez?

24        MR. NUNEZ:  Well Your Honor, my argument is not so much

25   of burdensomeness, it's again as to relevance.  Their complaint

1    -- and again, my client is not named as breach of the license

2    agreement all those claims, but my understanding and my reading

3    of the complaint they're not -- their dispute is not that the

4    E-Cat doesn't work.  Their dispute is the fraud and the FDUTPA

5    claims with regard to, again, moving the plant from North

6    Carolina to Florida.  Their claims are not "hey, this doesn't

7    work so we should be able to look at all -- you know, every

8    test, every data that they have with regard to this E-Cat to see

9    if it does indeed work", which is what I understand that they're

10   looking for.  That's just not relevant to their claims.  Their

11   claims are very specific about moving the plant from North

12   Carolina to Florida, manipulation of the data in Florida and the

13   demand for money.

14        So going back to "hey, does this thing work", that's

15   their due diligence that they needed to do in October of 2012

16   when they enter into the license agreement.  That has to do --

17   they did testing in North Carolina, this is a long-term project.

18   And I think my issue, Judge, is with the relevance and not

19   agreeing to this fishing expedition of "give me everything".

20        THE COURT:  Okay.  What's the relevance?

21        MR. PACE:  Two things.  Well, one is they just

22   identified.  But any of the testing, because we do dispute the

23   operation of the E-Cat.  What he's focusing on -- one issue that

24   arises here is we're entitled to get discovery, we think, as to

25   claims that are in the complaint against us, as well as in our

1   answer and counterclaims against the Plaintiffs as well as the

2   Third Party Defendants.  He keeps focusing on just "here's what

3   I think the allegations are against my client".  Our discovery

4   is not limited to that.  There is clearly a dispute here, does

5   this E-Cat technology work.  I don't think anyone can deny

6   that's a dispute in the lawsuit.  And I don't think Mr. Nunez is

7   going to deny that is a dispute in the lawsuit.  So this

8   discovery goes to that.

9        It does also go to the -- you know, again, whatever

10  information he had about the E-Cat and the E-Cat technology goes

11  to that issue as well as to the relationship between he and

12  Mr. Rossi in terms of their communications or dealings with

13  Industrial Heat.  But again, to me, the easiest way of resolving

14  is just to understand that we're entitled to discovery from him,

15  not just as to allegations.

16       THE COURT:  Yeah, I understand not just on the

17  allegations of the counterclaim, but also the allegations of the

18  complaint and your defenses of whatever.  So he says he's going

19  to -- that it is an issue of whether E-Cat works, and even

20  though your guy is not charged with that part of it, that it is

21  relevant to the other lawsuit.

22       MR. NUNEZ:  Your Honor, I would tell you from my

23  reading of it, I do dispute that.  I don't think that this

24  complaint is about that.  My reading of the complaint, it's not

25  about the claims between Rossi and Industrial Heat, it's not

1    about whether this thing works.  It's they had a license

2    agreement that certain, certain thresholds had to be met.

3    That's not the right word.

4            THE COURT:  Well, let me ask him:  Show me where in

5    your answer the issue arises.

6            MR. PACE:  It arises, I guess I would start, in our

7    introduction.  Let me see if I can find you the language.

8            THE COURT:  Are you looking at the second amended

9    answer?

10           MR. PACE:  I'm looking at the third amended.  I'm

11   sorry.  There's actually a third amended.  That's Number 78.

12           MR. NUNEZ:  And from what I've learned of the case,

13   Industrial Heat has even filed patents claiming that this

14   technology works.

15           MR. PACE:  So it's in a variety of places, but to make

16   it easier --

17           THE COURT:  The first paragraph says that "the

18   defendants deny that this thing generates a low energy nuclear

19   reaction resulting in release of energy along the lines claimed

20   by Plaintiff".  Isn't that what we're talking about?

21           MR. NUNEZ:  I'm sorry, first paragraph of the answer?

22           THE COURT:  Yeah.

23           MR. PACE:  It's the answer or the counterclaim.

24           THE COURT:  They say "the testing is flawed and

25   unreliable in many respects.  It's never been validated".

 1          MR. LEON:  Exactly, Your Honor.  The testing that

 2     occurred in Doral was flawed.

 3          THE COURT:  I find that it's relevant.  You go back to

 4     2011.

 5          All right.  What's the next issue?

 6          MR. PACE:  We have a start date issue with Johnson.

 7          THE COURT:  You said we're going to cover all this

 8     stuff in a half an hour, it's already been a half an hour.

 9          MR. PACE:  I apologize, Your Honor.  I thought some of

10     these issues would be a little bit quicker.

11          THE COURT:  What's the problem with the start date with

12     Johnson?  What do you want?

13          MR. LEON:  If I may, Your Honor, in our several meet

14     and confers, we've actually conceded that point and we've

15     actually produced documents that go before the date that we had

16     originally cut off.

17          THE COURT:  Okay.  So he says you got an agreement.

18          MR. PACE:  If there's no date limitation, we're fine.

19          THE COURT:  There's no issue there.

20          All right.  What's the next issue?

21          MR. PACE:  We have not yet gotten any documents

22     produced by Mr. Fabiani or USQL.

23          THE COURT:  All right.  Mr. Fabiani -- Mr. Nunez, when

24     is Mr. Fabiani going to produce these documents?

25          MR. NUNEZ:  Yes, Your Honor.  And we've conferred and

1    we tried to work this out.  Mr. Fabiani has transferred already

2    to me what I believe, and I'm not technology adept let's say,

3    I'm not the tech person and by the time I got it my, you know,

4    computer guy was out of town and I went on vacation.  So I've

5    had some timing issues.  But I couldn't deal with that, it's not

6    something I could deal with myself.

7              THE COURT:  Yeah, I understand.

8              MR. NUNEZ:  What I have right now is the testing data

9    that they're looking for which is probably responsive to two or

10   three of their requests.  I have it, and I basically need to get

11   with a professional to help me get it -- you know, get it to

12   them in a discoverable form.

13             THE COURT:  Right.

14             MR. NUNEZ:  I don't know -- we talked yesterday, I was

15   looking at it today, I don't know if it's something I can put

16   Bates stamps on.  I'm not sure how to get it to them for

17   purposes of this litigation.

18             THE COURT:  All right.

19             MR. NUNEZ:  And I suggested about another week for me

20   to get it to them.

21             THE COURT:  Okay.  How is that?  A week good?

22             MR. NUNEZ:  And I would ask a week from -- let's say a

23   week from tomorrow because I reached out to my client and he's

24   on vacation until the 9th, and I probably need his help.  So

25   let's say --

1   THE COURT:  A week from tomorrow?  How is that?

2   MR. PACE:  If we get everything a week from tomorrow

3   including the e-mails and everything else and in a proper

4   format, we're fine.  This is the issue that we've had.

5   THE COURT:  You guys got to talk to each other about

6   the format ahead of time so everybody knows, because I've had

7   cases where people spend hundreds of thousands of dollars

8   putting it in a format and, you know, part of under Rule 26

9   you're supposed to determine what the format is up front so

10   everybody knows.

11   MR. PACE:  And the format issue, I don't know if that's

12   really the problem.  The problem has been that we haven't gotten

13   the documents out of them and they've had some technical issues,

14   I understand that.  But, you know, the case is moving along and

15   discovery technically right now ends the end of February.

16   THE COURT:  Yeah, well I wouldn't count on getting

17   anything more from Judge Altonaga.  I mean, sometimes she'll

18   continue stuff, but generally --

19   MR. PACE:  I understand.  I mean --

20   THE COURT:  -- she's very strict.

21   MR. PACE:  That's why I'm pushing.

22   THE COURT:  So by January 13th you're to provide the

23   documents.

24   MR. NUNEZ:  Your Honor, now I think I'm going to need a

25   little bit more time on the communications e-mails because I

1    haven't gotten those yet from my client.  He doesn't get back

2    until Monday, so the raw data, which is the largest part of my

3    production, that I'll have ready by next week.  I would ask for

4    one more week to get that, I'll try to get the other stuff a lot

5    quicker which should just be e-mails, tests, reports, things

6    like that.

7              MR. PACE:  But this is the problem, Your Honor.  It

8    just keeps getting extended.  They responded --

9              THE COURT:  When did you first do the request for

10   production?

11             MR. PACE:  November.  Oh, when did they respond?  In

12   November.  We did it in October.

13             THE COURT:  Okay.  You got to provide it all by next

14   Friday.  So tell your client, call him up in Russia and tell him

15   to start running his e-mails.  I mean, it shouldn't be that hard

16   for him to discover what e-mails he's got regarding Mr. Rossi or

17   whatever.

18             MR. PACE:  And Your Honor, we will be reasonable in

19   discussions with him.

20             (Cross talk between counsel)

21             MR. NUNEZ:  Yeah, yeah.  I -- and that's part of the

22   thing.  It's not just e-mails from Mr. Rossi, it's e-mails from

23   probably 30 -- I don't know about 30, but probably like 15 to 20

24   different individuals and corporations.

25             THE COURT:  Try to get it to him by the 13th.  If you

1    need a couple more days, then just work it out amongst

2    yourselves.

3            MR. NUNEZ:  Thank you, Your Honor.

4            THE COURT:  All right.  What's the next one?

5            MR. PACE:  The last issue, Your Honor, for today is the

6    -- we have a scope issue as it relates to Johnson, J.M. Products

7    and Bass that we just haven't been able to resolve, which is our

8    position has been documents don't need to -- as long as they

9    relate to any of the allegations either in the complaint against

10   us or in our answer and counterclaims or third party claims,

11   we're entitled to them.  So it doesn't have to relate directly

12   to the E-Cat.

13           Part of the issue -- like I said, some of the documents

14   they have produced in all honesty are documents that show that

15   there is a -- you know, that J.M. Products is actually just

16   being run by Rossi, but they haven't been willing -- they've

17   objected by saying they're actually narrowing the scope to

18   things like the term sheet or to the E-Cat or stuff like that.

19   And in our meet and confers, we just haven't been able to

20   resolve the issue.

21           But our position is, again, if it's responsive to the

22   complaint, we ought to be entitled to it and it shouldn't be

23   something that you say well, this doesn't -- for example, it

24   doesn't talk about the E-Cat.  Well, you know what, the e-mail

25   where Rossi is saying I -- you know, tell me what money you need

1    for J.M. Products I'll deposit it in the account so you can make

2    these payments, that may not relate to the E-Cat, it sure as

3    heck relates to our claims.

4              THE COURT:  Okay.  What do you say about that?

5              MR. LEON:  To be fair, Your Honor, in the meet and

6    confers that Chris and I have had, we did amend our objection.

7    We are not objecting to limit it to the E-Cat, but to the

8    pleadings.  So that would include the complaint, that would

9    include the answer to affirmative defenses and that would

10   include the counterclaims and third party claims.

11             THE COURT:  So that's what you just said you wanted,

12   isn't it?

13             MR. LEON:  All we're saying is we're not going to

14   produce documents that are not relevant to the pleadings.  Now,

15   to the extent that they're relevant to the pleadings, absolutely

16   it's fair game, and they have been produced.

17             MR. PACE:  Well, two things.  One is they had said they

18   were going to amend it and they haven't amended.  So if they are

19   going to commit to amend it --

20             MR. LEON:  That is correct.  He is correct.  We hadn't

21   filed, we decided just to wait for Your Honor's ruling on today.

22             THE COURT:  Okay.  They will amend it to indicate that.

23             MR. PACE:  If I can add one other thing though?

24             THE COURT:  Yeah.

25             MR. PACE:  Also on the request, we have asked --

1    because J.M. Products were supposed to be independent of a

2    variety of parties such as Fabiani, such as Rossi, et cetera,

3    we've asked for all communications with those people because if

4    they're having communications, you know, anything, "let's go out

5    to dinner; hey, our kids ought to be playing together", that

6    contradicts the "wait they were told this is a separate company

7    that was going to be operating independently".  So in terms of

8    -- I just want to make sure we're all clear too when we say

9    what's relevant, it is relevant that they're having

10   communications with these parties about other subjects.

11        Now Johnson, I would say, would be the exception

12   because there's times that items are going to go on a privilege

13   log and we don't have any problem with that because he's also a

14   lawyer.  But to the extent that Bass -- and, you know, again,

15   for example, Bass is another example.  He was supposed to be the

16   quote, unquote, director of engineering for J.M. Products.

17   Turns out from the discovery we've had thus far his dealings

18   have been with Rossi including asking Rossi -- I've got an

19   e-mail that shows when he asked Rossi "hey, there's a meeting

20   tomorrow, people are coming in, what should I tell them?"

21   Because I don't know -- because he doesn't know what's going on.

22        So that's my only issue is I think as long as the

23   responses is also viewed appropriately as to any furtherance of

24   the scheme.

25        THE COURT:  Okay.  What do you say about that?

1      MR. LEON:  I think -- Your Honor, I think we've been

2  pretty generous with the relevance factor.  I think we have

3  produced --

4      THE COURT:  I mean, do you interpret the relevance the

5  way he does?  I mean, you're getting the documents from him that

6  says this stuff?  So they must be giving it to you.

7      MR. LEON:  The only thing we object to in terms of

8  relevance is something that we disagree on which he just said is

9  whether or not they're meeting for dinner or whether or not, you

10  know -- "hey, how is Papito the fish doing" or "how is your cat

11  doing" things like that.  I'm not saying that those

12  communications exist.

13      THE COURT:  Yeah, yeah, yeah.

14      MR. LEON:  But as an example, those communications

15  aren't relevant.  To the extent that they show that these guys

16  were related, that they knew each other, Johnson was the

17  attorney for Rossi and Leonardo when they were negotiating the

18  license agreement.  They knew that Rossi and Johnson were

19  related.  They knew that Johnson was the president of J.M.

20  Products.  There's no --

21      THE COURT:  All right.  What do you say about that?

22      MR. PACE:  Your Honor, I'm happy -- I can produce a

23  document where they say that J.M. Products is a subsidiary of a

24  publicly traded British company and that Henry Johnson signed

25  and they know that.  So Johnson was supposedly kind of

1   technically in there as the CEO until the real person came in,

2   because this was all going to be done by a company called

3   Johnson Matthey, that it was supposedly a subsidiary of Johnson

4   Matthey.  In fact, I have documents.  If we want to talk about

5   documents, I brought an example.

6           THE COURT:  No.  I mean, I think what he's saying is by

7   showing that -- in other words, it would be true if the

8   allegation was Rossi said he never knew this guy Johnson, you

9   know, and he got him out of a phone book.

10          MR. LEON:  Correct.

11          THE COURT:  But he's known Johnson for years.  So the

12  fact that they went out to dinner together or their kids play

13  together, you know, seems like it's out there.

14          MR. PACE:  Your Honor, I will agree on that.  If I can,

15  there's other parties that that's more relevant to and in fact,

16  the way we've done our discovery -- and I apologize.  I gave you

17  a bad example.  We've done it with things like Penon.  Penon was

18  supposed to be an independent validator.  If there was any

19  communications with Penon, we should be getting those.  There's

20  a couple of European parties that we've identified.  I think

21  when it comes to Rossi and Johnson interactions, for example

22  we've largely focused on J.M. Products and issues related to

23  J.M. Products.

24          My only thing is just to say -- and again, we don't

25  have to decide this here as much as to make -- we may to the

1    extent we don't -- let me start over.  We have not been able, in

2    our meet and confer process, to come to a meeting of the minds,

3    I think, on what the scope of the discovery is.  I'm happy to --

4    given what has been said today, they will amend their responses

5    and we will deal with them in that context.  But again, I think

6    it's --

7              THE COURT:  Okay.  It's hard for me to rule on this,

8    but anyway, you're going to amend your thing.

9              I'm going to tell you what my thought is right now and

10   so it's that if it -- in other words, I agree with you on

11   Johnson because they have an ongoing relationship.  But the

12   allegation in the complaint is that they don't know this person,

13   this person is some third person who was brought in for -- you

14   know, to do independent testing or whatever it is, and there's

15   documents that show a relationship between the parties, then I

16   think that that's relevant to the allegations in the complaint.

17   So when you're going through the documents, keep that in mind.

18   If you have an issue with it, you know, and you can get a little

19   more focused on what we're talking about, you can come back.

20             MR. PACE:  We appreciate that, Your Honor.

21             MR. LEON:  Thank you, Your Honor.

22             THE COURT:  Okay.  All right.

23             Anything else I can help you out with?

24             MR. PACE:  Your Honor, only one other thing.  Just

25   because we've got counsel for Rossi and Leonardo here, we have

1    discovery disputes too.  I don't want to raise them today, but

2    if we could maybe try to see if we can find a date, just because

3    of the deadlines coming up, I think we need to get it resolved.

4    They have not produced documents to us yet either.  I think

5    they've committed to produce them on the 13th if I have the date

6    right.  But we've got some scope issues as well, and so if we

7    could --

8              THE COURT:  All right.  When are you talking about?

9    Like the 19th or -- I mean the week of the 13th so you can see

10   what you have?

11             MR. PACE:  I'm actually inclined to -- I mean, they've

12   been very clear as to what their limitations are that they're

13   imposing and where we have agreement.  I think we can do it

14   before the 13th.  I'm a little reluctant to wait too long to do

15   it.

16             THE COURT:  All right.  Do you want to do it next --

17   how about next Tuesday?  Is that good?

18             MR. CHAIKEN:  What time, Your Honor?

19             MR. PACE:  I could do in the morning or in the late

20   afternoon.  I have a client CEO coming in who is meeting with

21   the US Attorney's Office the next day, so the middle of the day

22   is kind of a tough one for me.

23             THE COURT:  What time do you want to do it in the

24   morning?

25             MR. PACE:  I'm sure Your Honor gets in earlier than I

1   do.  So whatever time.  I'm not a 7-a.m.-er, I can tell you

2   that.

3           THE COURT:  All right.  I'll put an hour aside at the

4   most, hopefully 30 minutes.  We'll do it at 10:00?  Is that

5   good?

6           MR. CHAIKEN:  That's fine, Your Honor.

7           THE COURT:  Does that give you enough time?

8           MR. PACE:  That will give me enough time to run back.

9   I appreciate it.  Thank you, Your Honor.

10           THE COURT:  All right.  Let us know if you're able to

11   resolve the issues.

12           MR. PACE:  We will.  We certainly will.

13           THE COURT:  Okay.  I mean, you've had enough hearings

14   with me you should know, be able to predict how I'm going to

15   rule and just agree so we don't have to keep meeting like this.

16   Okay?

17           Good seeing you guys.  Okay.  Have a good day.

18           MR. PACE:  We'll prepare the order and we will have it

19   to the court by -- we don't need a transcript for this, do we?

20   Can we get it to the court --

21           THE COURT:  Just give me a time.  All we want to do is

22   tickle it because the order is in effect right now.  If you need

23   a week, you can have a week.

24           MR. PACE:  Yeah, can we have -- we'll provide it to the

25   court by the end of the day on Thursday the 12th.  I just

1    struggled with the math there.

2              THE COURT:  There you go.  The 12th.  Okay?

3              MR. PACE:  Thank you, Your Honor.

4              THE COURT:  All right.  All right.

5              Anything else?  No?

6              MR. PACE:  No, Your Honor.

7              THE COURT:  Okay.  Thanks.  Have a good day.

8              (PROCEEDINGS CONCLUDED)
                        * * * * *

9                      C E R T I F I C A T E
10   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

11   January 9, 2017      _/s/ Dawn M. Savino
12   Date                 DAWN M. SAVINO, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25