**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**ANDREA ROSSI,** et al.,       )
                             )
        Plaintiffs,       )
v.                            )         No. 16-cv-21199-CMA (JJO)
                             )
**THOMAS DARDEN,** et al.,     )
                             )
        Defendants.     )
_____)

**DEFENDANTS'/COUNTER-PLAINTIFFS' MEMORANDUM OF LAW REGARDING
COMMUNICATIONS WITH DEEP RIVER VENTURES THAT ARE PROTECTED BY
THE ATTORNEY-CLIENT PRIVILEGE
AND WORK PRODUCT DOCTRINE**

Pursuant to the Court's instructions at the February 9, 2017 discovery hearing, Defendants/Counter-Plaintiffs respectfully submit this memorandum of law contending that email communications involving Deep River Ventures, LLC ("DRV"), an independent contractor engaged by Industrial Heat to serve as an intellectual property ("IP") consultant, are protected by the attorney-client privilege and the work product doctrine.

At the hearing, the Court requested briefing on two particular issues. *First*, whether attorney-client communications are covered by the privilege if they involve so-called "business" advice versus legal advice in cases involving patents. *Second*, whether the inclusion of DRV on attorney-client privileged communications waived the privilege as to Industrial Heat. On the second issue, the Court provided counsel with two illustrative emails, one which it believes is protected by the attorney-client privilege and one which it believes contains strictly business-related communications, and directed that documents similar to the second illustrative email be produced on or before February 16, 2017.

Per the Court's instructions, undersigned counsel has diligently conducted a review of the emails and determined that it is appropriate to continue to assert the attorney-client privilege and/or the work product doctrine with respect to many of them (and accordingly to withhold them from production).  As explained below, because cases involving patents almost inevitably involve technical data and business-related analyses, courts have rejected the business-versus-legal distinction in cases involving patents and applied the privilege liberally. Moreover, the question of waiver is inapposite here.  Patent counsel was retained to *jointly* represent Industrial Heat and DRV; because both entities were in fact clients, the attorney-client privilege protects DRV's communications with counsel as a matter of first principles.

## BACKGROUND

Industrial Heat and its affiliates are involved in developing and investing in "low energy nuclear reaction" ("LENR") technologies intended to provide clean, reliable, efficient, and safe sources of energy.  Defendants and their affiliates continue to work on such technologies, often in conjunction with inventors who initially discovered or developed different forms or applications of them.

In October of 2012, Industrial Heat entered into negotiations with Plaintiffs Andrea Rossi and Leonardo Corporation in order to, among other things, use Mr. Rossi's intellectual property known as "Energy Catalyzer" or "E-Cat" technology within specific geographic territories.  *See* Counterclaims and Third-Party Claims at ¶¶ 1-2, 32-36.

Consistent with its mission to invest in and develop LENR technologies, Industrial Heat thereafter engaged two law firms to serve as its legal counsel in intellectual property matters: Myers Bigel and NK Patent Law.  *See* Exh. A (attaching engagement letters).  The engagement letters for both firms specified that counsel was retained to *jointly* represent Industrial Heat *and*

DRV, an entity that specializes in helping companies identify, create, develop and protect inventions for use in the development of new products, services, markets and intellectual portfolios.  *Id.; see also*  http://deepriverventures.com.  DRV had begun providing consulting services for Industrial Heat in May of 2013.  The law firms were jointly engaged by Industrial Heat and DRV in August 2013 and February 2014, respectively.  *See* Exh. A.

In May of 2015, Industrial Heat entered into a "Consulting, Confidentiality, Noncompetition and Inventions Agreement" ("Consulting Agreement") with DRV.  Under the terms of the Consulting Agreement, DRV agrees to perform the following Scope of Work:

> maintaining relationships with inventors and others in the field commonly known as low energy nuclear reactions (the "Field"), identifying investment and strategic partnership opportunities in the Field, staying abreast of all new developments in the Field and routinely reporting such developments to Company management, assisting with overall business, intellectual property and commercialization strategy, and providing assistance in other capacities as requested by the Company .
> . . .

Consulting Agreement (attached as Exh. B) at § A.

The Consulting Agreement defines "Developments" as "any invention, discovery, idea, process, technique, know-how and data, improvement, technology, algorithms, trade secret, design, graphic, work of authorship, source, HTML and other code, computer program, audio, video or other files or content . . . that relates to the Field . . . ."  *Id.* at § P.  With respect to such intellectual property, DRV agrees in pertinent part:

> to perform . . . all acts deemed necessary or desirable by the Company to permit and assist it . . . in obtaining, maintaining, defending and enforcing patents, patent rights, copyrights, trademark rights, trade secret rights or any other rights in connection with such Developments . . . .  *Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings.*  Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents, as Consultant's agents and attorney-in-fact to act for and on its behalf and instead of it, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth in this subsection [], including . . . the perfection of

assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such Developments and improvements thereto with the same legal force and effect as if executed by Consultant.

*Id.* at § Q.4 (emphasis added).

At the February 7, 2017 discovery hearing before this Court, counsel for Plaintiffs represented that "it is our understanding, through hearing testimony from Industrial Heat VP, that Deep River Ventures was retained for the purposes of helping them with their IP strategy. And perhaps acquiring additional IP related to the technology at issue and finding investors related to that." Feb. 7, 2017 Transcript at 22 (attached as Exh. C). Counsel also conceded that "some intellectual property related services may require DRV, or its contractors to review patents and other documents in order to render DRV services . . . ." *Id.* at 23. He went on to assert, however, that "we're at a loss to able to understand how" any "communications solely between" counsel and DRV are privileged. *Id.* As explained below, the explanation is simple: DRV is itself the client for purposes of the attorney-client privilege.

## DISCUSSION

I.    **Patent Counsel Was Expressly Retained to Provide Joint Representation to Industrial Heat and DRV, So the Attorney-Client Privilege Directly Applies to Communications with DRV.**

First, as a threshold matter, it is important to clarify that DRV *was itself a client* jointly represented by Myers Bigel and NK Patent Law, along with Industrial Heat. In particular, the attorney retention letters expressly state that both Industrial Heat and DRV are the clients of Myers Bigel and NK Patent Law, respectively, and that the representation is joint and dual. *See* Exh. A. The attorney-client privilege thus covers DRV's communications with counsel directly, and waiver is beside the point.

## II.    The Inclusion of "Business" Information in Attorney-Client Communications Involving Intellectual Property Does Not Negate the Attorney-Client Privilege.

Second, the law does *not* negate application of the attorney-client privilege to particular communications with Industrial Heat and/or DRV simply because they appear technical or "business-like" in nature.  Rather, in all circumstances, the attorney-client privilege must be construed with its purpose in mind, "which is to encourage clients to communicate freely and open[ly] with their attorneys by removing the fear that their discussions will be subject to disclosure." *Automed Techs., Inc. v. Knapp Logistics & Automation, Inc.*, 382 F. Supp. 2d 1372, 1374 (N.D. Ga. 2005) (citing *United States v. Suarez*, 820 F.2d 1158 (11th Cir. 1987)); *see also Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981) (stating that the privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice").

Courts have accordingly held that in cases involving patents, "an invention record constitutes a privileged communication, so long as it is provided to an attorney for the purpose of securing primarily legal opinion, or legal services, or assistance in a legal proceeding."  *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000) (internal quotation marks omitted) (discussed and cited with approval in *Automed Techs.*, 382 F. Supp. 2d at 1375).  Thus, the fact that patent attorneys routinely work with technical data does not undermine the privilege, unless "the attorney is merely serving as a conduit for factual information." *Burlington Indus., Inc. v. Rossville Yarn, Inc.*, No. CIV.A.495-CV-0401-H, 1997 WL 404319, at *2 (June 3, 1997); *cf. Automed Techs.*, 382 F. Supp. 2d at 1376 (finding that the privilege did not apply to an invention record where "there is nothing in it to suggest it . . . was a communication of information, confidential or not, for use by counsel"); *Osterneck v. E.T. Barwick Indus., Inc.*, 82 F.R.D. 81, 86 (N.D. Ga. 1979) (finding privilege inapplicable for strictly "technical work").

The Federal Circuit's opinion in *In re Spalding Sports Worldwide, Inc.* is instructive.  In that case, two inventors of a polyurethane basketball cover submitted the invention record to Spalding's corporate legal department in connection with the assignment of the patent to Spalding.  When Spalding later sued Wilson Sporting Goods Co. for patent infringement, Wilson sought production of the invention record, claiming it was not privileged because "there was no evidence that [Spalding's] patent committee 'acted as a lawyer' by rendering *legal* advice, as opposed to making *business* decisions."  *In re Spalding Sports Worldwide, Inc.*, 203 F.3d at 805 (emphasis in original).  In the alternative, Wilson argued that "the section that lists prior art should nevertheless be disclosed, because it does not ask for legal advice." *Id.*

The court disagreed, reasoning that the invention record was submitted "to Spalding's corporate *legal* department . . . for the purpose of making patentability determinations." *Id.* (emphasis in original) (internal quotation marks omitted).  The court also rejected Wilson's alternative request for a redacted version of the document containing prior art, concluding that "[i]t is enough that the overall tenor of the document indicates that it is a request for legal advice or services." *Id.* at 806.  The court explained:

> [T]o the extent that Spalding's invention record may contain technical information, or refer to prior art, the inclusion of such information does not render the document discoverable, because requests for legal advice on patentability or for legal services in preparing a patent application necessarily require the evaluation of technical information such as prior art. . .  If an attorney-client communication could be discovered if it obtained information known to others, then it would be the rare communication that would be protected and, in turn, it would be the rare client who would freely communicate to an attorney.

*Id.* (internal quotation marks omitted).

*In re Spalding Sports Worldwide* thus suggests that, in matters involving patents, the inevitable exchange of technical data with attorneys does not excise such communications from the scope of the attorney-client privilege.  The animating policy behind the privilege—the

encouragement of candid discussions to enable attorneys to offer informed legal advice—supports this conclusion.  So long as the "overall tenor" of the communication is legal in nature, the inclusion of business-related data does not render the attorney-client privilege inapplicable. *Id.*

Here, attorney-client emails involving DRV warrant the same pragmatic approach that the Federal Circuit modeled in *In re Spalding Sports Worldwide*.[1]  Indeed, per that court's reasoning., the email that this Court identified as illustrative of a business communication is itself covered by the privilege.  The email was sent by counsel to other lawyers and representatives of both client entities, Industrial Heat and DRV.  It summarized a meeting at which issues relating to prior art and potential intellectual property were discussed and strategized, among other things.  As explained in *In re Spalding Sports Worldwide*, "an attorney cannot evaluate patentability . . . without knowing the prior art and obtaining relevant technical information from the inventors."  *Id.*  As a consequence, particularly in cases involving patents, the law governing the attorney-client privilege does *not* hinge on whether a communication is "business-like" in nature but, rather, on whether it was exchanged "for the purpose of securing . . . legal services."  *Id.* at 805 (internal quotation marks omitted).  In this case, the emails were exchanged for the purpose of securing legal services relating to, *inter alia*, "obtaining, maintaining, defending and enforcing patents, patent rights, copyrights, trademark rights, trade secret rights [and] include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings."  Exh C at § Q.4.  These legal objectives cannot be achieved

---

[1]     Optimally, application of the privilege is determined on a document-by-document basis. For that reason, Defendants are not in a position to fully argue its privilege claims in this brief, and request and reserve the opportunity to supplement the brief with additional law and explanatory declaration(s) in the event that the dispute is narrowed to particular entries on the privilege log.  Defendants are prepared to produce representative emails for the Court's *in camera* review, as appropriate.

without attorney access to and dialogue about technical and business-related information. Thus, the privilege protects email communications between representatives of Industrial Heat, DRV and/or their patent attorneys in this case.

**III.    Even if the Attorney Retention Letters Did Not Designate DRV a Joint Client with Industrial Heat, DRV Is an Agent of Industrial Heat on Patent Issues, so Its Attorney-Client Communications Are Protected by the Privilege.**

As explained above, DRV is a dual client of Industrial Heat's patent counsel, so its attorney-client communications are privileged and waiver is irrelevant. But even if waiver were an issue, under Florida law it is clear that the inclusion of a third party in an attorney-client communication does not automatically effect a waiver. The attorney-client privilege *protects* communications to third parties "to whom disclosure is in furtherance of the rendition of legal services, or those reasonably necessary for the transmission of the communication." *Tyne v. Time Warner Entm't Co.*, 212 F.R.D. 596, 598-99 (M.D. Fla. 2002) (citing Fla. Stat. § 90.502(1)(c)).[2] This exception to third-party waiver encompasses communications with "agents and subordinates working under the direct supervision and control of the attorney." *Royal Bahamian Assoc., Inc. v. QBE, Ins. Co.*, No. 10-21511-CIV, 2010 WL 3637958, at *3 (S.D. Fla. Sept. 20, 2010).[3]

Relying heavily on *In re Beiter Co.*, 16 F.3d 929 (8th Cir. 1994), the court in *Farmaceutisk Laboratorium Ferring A/S v. Reid Rowell, Inc.*, 854 F. Supp. 1273, 1274 (N.D. Ga.

---

[2]    North Carolina law is in accord with Florida law on the attorney-client privilege. *See, e.g., Berens v. Berens*, 785 S.E.2d 733, 739 (N.C. 2016) (attorney-client communication still privileged where third party involved was "an agent of either party") (internal quotation marks and citation omitted).

[3]    In addition to the agency exception to third party waiver, "disclosure to . . . individuals who have a common legal interest does not constitute a waiver of privilege." *Tyne v. Time Warner Entm't Co.*, 212 F.R.D. 596, 600 (M.D. Fla. 2002).

1994), thus determined that "a third party" was "an agent . . . for purposes of conversations with . . . counsel[,] and that where such conversations were for the purposes of seeking legal advice, they are protected" in a case involving patents.[4]  In *In re Beiter Co.*, a contractor was retained by a real estate developer to provide guidance regarding commercial development in Minnesota. Although the contract "made clear that [the third party] was an independent contractor, and that he was expressly not an agent, employee or partner of [the company]," the contractor regularly met with the company's attorneys and received direct communications from them.  *Id.* at 933-34.[5]  The court nonetheless held that the contractor's conversations were privileged, reasoning that "when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors."  *Id.* at 937.  The company "was formed with a single objective" and the contractor was "intimately involved in the attempt to meet that objective," *id.* at 938; thus, the contractor was properly considered a company "insider" for purposes of the privilege, *id.* at 936.

---

[4]     Other courts have similarly held that third party consultants in cases involving patents are covered by the privilege.  *See In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 832-83 (Bankr. S.D. Fla. 2016) (citing with approval *Rembrandt Techs., LP v. Harris Corp.*, No. 07C-09-059-JRS, 2009 WL 402332 (Del. Super. Ct. 2009), in which the court concluded that the "attorney-client privilege protected communications among a patent holder, his attorney, and a patent enforcement consultant," as well as *Walker Digital, LLC v. Google, Inc.*, No. 11-309-SLR, 2013 WL 9600775 (D. Del. 2013), in which the court identified a "'common legal interest' between client and patent monetization consultant").

[5]     Despite suggestions by Plaintiffs' counsel to the contrary, language in the Consulting Agreement that limits Industrial Heat's liability for acts of DRV by similarly addressing whether DRV is an "agent" of Industrial Heat has no bearing on application of the attorney-client privilege.  As indicated above, DRV is a direct and joint client of Industrial Heat's patent counsel, so waiver is irrelevant here.  Moreover, Plaintiffs offer no authority for the proposition that the term "agent" in a contract is dispositive of the issue of third party waiver under attorney-client privilege law.

For nearly four years, DRV has been intimately involved in Industrial Heat's identification, development and protection of intellectual property—which is the very reason for the company's founding in the first place. *See generally* Exh. B. The Consulting Agreement accordingly engages DRV to "identify[] investment and strategic partnership opportunities in the Field," and "assist[] with overall business, intellectual property and commercialization strategy . . . ." *Id.* at § A. It goes on to designate Industrial Heat as DRV's attorney-in-fact, and provides that DRV must perform "all acts deemed necessary or desirable by the Company to permit and assist it . . . in obtaining, maintaining, defending and enforcing patents," including by "assistance or cooperation in legal proceedings." *Id.* § Q.4.

One can scarcely imagine contractual language more sweeping in terms of tasking DRV with the objectives of Industrial Heat. DRV's enmeshment with Industrial Heat's IP mission is particularly stark in light of the decision to *jointly* hire patent counsel. There can be no question, therefore, that the representatives of Industrial Heat and DRV, as well as their lawyers, believed that their communications were privileged. *See In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 832 (Bankr. S.D. Fla. 2016) (observing that a "reasonable expectation of confidentiality" is an "essential element" of waiver analysis). It would be contrary to the very spirit of the attorney-client privilege to nonetheless strip such communications of the privilege by virtue of Plaintiffs' initiation of this lawsuit.

## IV.   The Work Product Doctrine Also Applies Here.

Finally, to the extent that the emails concern the instant litigation, they are covered by the work product doctrine, as well. Under Fed. R. Civ. P. 26(b)(3), "documents prepared in anticipation of litigation are not subject to discovery, unless there is a substantial need shown and the party seeking to discover the information cannot acquire it elsewhere without undue

hardship." *In re Int'l Oil Trading Co.*, 548 B.R. at 835.  Even assuming arguendo that Plaintiffs were able to demonstrate both substantial need and undue hardship, they cannot obtain discovery of "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  Fed. R. Civ. P. 26(b)(3).  Similar protections exist under Florida law.  *In re Int'l Oil Trading Co.*, 548 B.R. at 835 (citing Fla. R. Civ. P. 1.280(b)(4)) (observing that "opinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances") (internal quotation marks omitted).

Here, certain emails were withheld from production because they contain work product of counsel shared with Industrial Heat and DRV, and Plaintiffs have not made a showing of substantial need and undue hardship.  Under the non-extraordinary circumstances of this case, moreover, so-called core work product (counsel's mental impressions, conclusions, opinions, or legal theories) is categorically protected.

## CONCLUSION

For the foregoing reasons, Defendants/Counter-Plaintiffs respectfully request that the Court conclude that the DRV-related emails are protected by the attorney-client privilege and the work product doctrine.

11

Dated: February 16, 2017        Respectfully submitted,

*Christopher R.J. Pace*
Christopher R.J. Pace
cpace@jonesday.com
Florida Bar No. 721166
Christopher M. Lomax
clomax@jonesday.com
Florida Bar No. 56220
Erika S. Handelson
ehandelson@jonesday.com
Florida Bar No. 91133
Christina T. Mastrucci
cmastrucci@jonesday.com
Florida Bar No. 113013
Michael A. Maugans
mmaugans@jonesday.com
Florida Bar No. 107531
JONES DAY
600 Brickell World Plaza
Suite 3300
Miami, FL 33131
Tel: 305-714-9700
Fax: 305-714-9799

*Attorneys for Defendants/Counter-Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 16, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record.

*/s/ Michael A. Maugans*
Michael A. Maugans

# EXHIBIT A



**MYERS BIGEL SIBLEY & SAJOVEC, P.A.**
4140 Parklake Ave, Ste 600 I Raleigh, NC  27612
PO Box 37428 I Raleigh, NC 27627
P: 919.854.1400 I F: 919.854.1401
instructions@myersbigel.com
www.myersbigel.com

August 26, 2013

Industrial Heat
111 E. Hargett Street
Suite 300
Raleigh, NC 27601

Deep River Ventures, LLC
712 Latta Street
Raleigh, NC 27607

Re: *Joint Representation Agreement for Intellectual Property Matters Related to Production of Energy*

Gentlemen:

We thank Industrial Heat ("IH") and Deep River Ventures, LLC ("DRV") for selecting Myers Bigel Sibley & Sajovec, P.A. ("MBSS" or the "Firm") to jointly represent the interests of IH and DRV in connection with the above-referenced matter(s).  The North Carolina Rules of Professional Conduct ("Rules") advocate, and our Firm's policy requires, a conflict check and executed agreement prior to our engagement.

We are pleased to advise that our check of potential conflicts identified no present conflicts with the proposed representation.  Please note that additional conflict checks may be necessitated for new matters prior to any further engagement of our Firm.  While this Representation Agreement and conflicts check are specific to the above-referenced engagement, the attached Terms of Representation contemplate the conventional nature of Intellectual Property practice such that new matters quickly arise, and how the terms of our engagement may be extended to such new matters.

We ask that IH and DRV carefully review this Representation Agreement and the attached Terms of Representation, which together detail the specific terms, scope, and conditions of our representation.  Certain provisions regarding specific billing rates and a fee deposit are described below.

IH and DRV agree to be jointly represented by MBSS in connection with the captioned matters.  The parties agree that MBSS shall use its independent professional judgment in providing such representation.  IH agrees to pay MBSS directly for all such legal services and seek reimbursement from DRV for its share of such services as they deem appropriate.

**CONFIDENTIAL**

The parties hereto believe that their interests are sufficiently similar and so closely aligned that no significant risk or conflict of interest is expected, or can be foreseen, that would affect the ability of MBSS to act as counsel for all of the parties. The parties agree that they have been informed that in the event that MBSS provides advice or legal services that is acceptable to one but not all of them, a conflict could arise with respect to the joint representation. In the event that during the joint representation, if that conflict, or any other conflict of interest arises between the interests of IH and DRV, the parties hereto agree that MBSS shall, at IH's discretion and subject to MBSS' determination that such representation is proper under the North Carolina Rules of Professional Conduct, continue to represent IH, or withdraw from the representation of DRV, or both. DRV agrees that it has the absolute right to obtain or not to obtain separate counsel with respect to these matters, and the MBSS may use in its continued representation of IH any confidential or attorney-client information that it had previously received from any of the parties, and that such information may also be used by DRV and/or its separate counsel.

The parties hereto agree that MBSS may share any confidential and privileged attorney-client information it acquires in connection to the joint representation with the parties hereto without such information thereby losing its protection under the attorney-client privilege. However, MBSS is not authorized to disclose any such information to any other person or entity, except to the extent the disclosure is to any agent of the parties where disclosure would not result in the loss of the attorney-client privilege, or with written authorization of IH and/or DRV, as applicable.



If this Representation Agreement and Terms of Representation are satisfactory to IH and DRV, please sign the enclosed copy and return it to us. MBSS cannot and will not begin its joint engagement of IH and DRV until we have received the executed Representation Agreement and advance deposit.

**CONFIDENTIAL**

We look forward to working with IH and DRV on this and any other future intellectual property matters.

Sincerely,

████████████████

Myers Bigel Sibley & Sajovec, P.A.

**ACCEPTED AND AGREED BY:**
Industrial Heat

████████████████

Date: 9/17/13

**ACCEPTED AND AGREED BY:**
Deep River Ventures, LLC

████████████████

Date: 9/18/13

**CONFIDENTIAL**

## TERMS OF REPRESENTATION

We are pleased that IH and DRV have retained Myers Bigel Sibley & Sajovec, P.A. to jointly represent IH and DRV in intellectual property matters related to production of energy. The following information covers our Firm's fees, billing, collection policies, and other terms that will apply during our relationship.

**1.    Fees**



**2.    Expenses**

*Out-of-Pocket Expenses.* Expenses may be advanced by MBSS on behalf of IH and DRV, such as government fees, travel expenses (including meals, mileage at the then applicable rate, and lodging), postage and express mail expenses, or the costs of professional search services, on-line computer database services, drafting services, translations, and other goods and services procured external to MBSS specifically for the matter at hand. Included in this latter category are charges for expert witnesses, investigators, court reporters, and fees and expenses billed by other law firms (including foreign associates) when engaged by this law firm on behalf of IH and DRV. Depending on the particular circumstances, we may pay the provider/vendor ourselves on IH and DRV's behalf and invoice IH for reimbursement, or we may require that IH pay such charges directly to the provider/vendor. In the situation where we pay and invoice for reimbursement, we may include a nominal handling charge to cover our processing expense on IH and DRV's behalf and the float on the funds involved. When it is anticipated that the out-of-pocket expenses to be advanced on IH and DRV's behalf will be substantial (for example, for

**CONFIDENTIAL**

foreign filing of a patent application or for imaging services in connection with automated litigation support), we may request an advance expense deposit.

*Internal Charges.* In addition to the out-of-pocket expenses discussed above, we record as expenses specific internal support functions necessary for the performance on a particular matter. These expenses may include photocopies, facsimile transmissions, courier delivery, and these charges may vary from our direct costs. For the items to be charged, actual usage is recorded for each matter.

*Interest.* If an invoice has not been paid within thirty (30) days of issuance, we reserve the right to charge interest on the unpaid balance at a rate of one percent per month (12 percent annual rate).

*Delinquent Accounts.* If any invoice remains either partly or wholly unpaid ninety (90) days after issuance, our attorneys are prohibited by firm policy from performing additional work for IH and DRV until the account is brought current. In this situation, MBSS may terminate its joint representation of IH and DRV. Should it be necessary to bring collection action against IH for an overdue invoice, it is agreed that MBSS is entitled to attorneys' fees and all costs involved.

**3.    Staffing**

*Staffing.* IH and DRV will be advised concerning the attorneys who will be assigned to the matters covered by this agreement. Although we will attempt to maintain as much continuity as possible with regard to staffing, it may be necessary and/or desirable on occasion make staffing changes. If and when this is considered appropriate for IH and DRV's matter(s), we will make every effort to keep IH and DRV informed about who is working on IH and DRV's behalf, and we ask that IH and DRV advise us if IH and DRV have questions or concerns.

**4.    Billing**



**CONFIDENTIAL**

5.    **Ethics**

*Ethical Guidelines.* At all times the conduct of the attorneys in MBSS is guided by the Rules.

*Confidentiality.* Under the Rules, we are required to preserve the confidences and secrets of our clients. IH and DRV should regard our attorney-client relationship with IH and DRV as one that encourages mutual confidence and unrestrained communication that will facilitate our proper representation of IH and DRV.

*Identity of Client.* IH and DRV should be aware that, in instances in which we represent a corporation or similar legal entity, our client relationship is with the entity itself, not with its individual executives, shareholders, directors, partners, or persons in similar positions. In those cases, our professional obligations are owed to the entity. MBSS can represent individual executives, shareholders, partners, and other persons related to the entity in matters that do not conflict with the interests of the entity.

*Conflicts.* MBSS represents clients in many diverse technological fields, including in some instances clients involved in technological areas or industries. MBSS aspires to avoid conflicts of interest between clients wherever possible. MBSS will not, during the term of this engagement, represent any other client in the following instances: (i) in the assertion of any claim against IH and DRV, whether or not the claim relates to the subject matter of our representation of IH and DRV; (ii) in any matter in which confidential information we have received from IH and DRV will be implicated; or (iii) in any matter in which our representation of the other client will adversely affect or prejudice our effective representation of IH and DRV. Consistent with the Rules, MBSS will in its sole discretion identify and resolve conflict of interest questions, but will consult with IH and DRV in any matter the Firm deems such consultation necessary or advisable.

6.    **Scope of Representation**

*Intellectual Property Law.* Our Firm's practice is dedicated exclusively to intellectual property law, and we do not handle any matters outside this scope of practice. This generally includes patent, trademark, trade dress, and copyright related work, including prosecution, litigation, licensing, *inter partes* and *ex parte* reexamination, and opinion work. Any work beyond this scope must be specifically approved in advance in writing.

*Current and Future Scope of Engagement.* The nature of Intellectual Property practice is that it is conventional for new matters to arise quickly which may or may not be related to matters already being handled by MBSS. Consistent with the "Conflicts" provision above, MBSS will in its sole discretion identify and resolve conflict of interest questions including for any new matters not previously handled by MBSS, regardless of whether such new matters are or are not related to matters already being handled by MBSS. The originally executed Representation Agreement and this Terms of Representation incorporated therein may be extended to such new matters upon a written confirmation only by an attorney of MBSS. Such written confirmation may include, but is not limited to, electronic mail, facsimile, courier, or postal mail.

**CONFIDENTIAL**

*Insurance.* MBSS does not provide guidance on any insurance matters relating to IH and DRV's business. Any guidance that IH and DRV deem necessary regarding insurance matters relating to IH and DRV's business should be sought by IH and DRV. Moreover, MBSS does not refer clients to any third parties regarding insurance matters.

7.   **Termination and Modification of Representation**

*Termination of the Representation.* This joint representation may be terminated at any time by either IH and/or DRV or MBSS. Upon completion of the matter(s) at hand, or at earlier termination of the representation in accordance with the provisions of the agreement, the attorney-client relationship will terminate unless the representation is extended with mutual approval by MBSS and IH and DRV. Of course, matters discussed during the attorney-client relationship remain privileged and confidential if IH and DRV so desire. Termination shall not affect IH's obligation for payment of all fees for services rendered and expenses and charges incurred as of the date of termination, including the right of MBSS to apply any fee deposit to such remaining bill or obligation.

During the course of our representation, there may be time sensitive matters, including deadlines, that if not met, may result in abandonment of a patent application or patent, that will require instructions from IH and DRV and/or third party expenses. IH and DRV acknowledge that MBSS is not responsible for maintaining, paying or attending to any matter for which (i) IH and DRV do not provide a current correspondence email or physical address, (ii) IH and DRV do not provide timely instructions or (iii) for which IH and DRV fail to prepay, upon request by us, for actions that require a third party expense.

*Modification to the Agreement.* The Representation Agreement and attached Terms of Representation constitute the full agreement between MBSS and IH and DRV. This agreement may be modified only by a subsequent written addendum, signed by both MBSS and IH and DRV.

*Prior Representation by Member of Firm.* The Representation Agreement and attached Terms of Representation supersede any prior representation agreements with an attorney, or with a prior firm of an attorney, who is now a member of MBSS.

8.   **File Retention**

At the conclusion of representation, MBSS will return to IH and DRV any original documents for which a request in writing is made within thirty (30) days of such conclusion. Upon the conclusion of each separate matter, MBSS will close its active file for this matter, but will keep an inactive file containing a copy of all pertinent documents (not including prior art or legal research) for a minimum of six (6) years, as required by the Rules. At the end of such period, MBSS will in its sole discretion dispose of the contents of the inactive file, including any original documents, unless IH and DRV request possession of the file contents.

**CONFIDENTIAL**

9. **Resolution of Disputes**

Despite the best efforts to account in the Representation Agreement and this Terms of Representation for all reasonably foreseeable consequences and issues relevant to the Firm's engagement, both the Firm and IH and DRV recognize that differences of opinion may arise between them which cannot be amicably resolved. Should such differences of opinion arise which cannot be so resolved (even though no such situation is anticipated or likely), both the Firm and IH and DRV agree, individually and collectively, to forego litigation of those differences and instead to limit their remedies exclusively to compulsory and binding arbitration, under the provisions of the American Arbitration Association.

**CONFIDENTIAL**

**4917 Waters Edge Drive**
**Suite 275**
**Raleigh, NC 27606**
**P: 919-348-2194**
**F: 919-882-8195**




February 10, 2014

<u>**VIA EMAIL**</u>

Industrial Heat, Inc.
111 E Hargett St.
Raleigh, NC 27601

Re:   Engagement for Legal Services; Client File No. 438

Dear ▮▮▮▮

We are pleased that you have chosen NK Patent Law, PLLC to provide legal services relating to intellectual property matters for Industrial Heat, Inc.. NK Patent Law understands that the scope and nature of our engagement is limited to serving as legal counsel relating to intellectual property matters, specifically as it relates to patent matters, and this letter will clarify and confirm the basis upon which the firm will provide the legal services.

The attorney-client privilege is an important subject that we raise with our clients at the outset of a new representation. As a matter of professional responsibility, we are required to preserve the confidences of our clients. This professional obligation and the legal privilege accorded attorney-client communication exist to encourage candid and complete communication between client and attorney. The attorney-client privilege can be lost if our written or oral communications are shared inappropriately with others, including, under certain circumstances unauthorized persons of your organization. We should discuss in advance any intention of yours to include others in our confidential relationship.

We are unaware of any conflict with regard to the matters for which the firm's aid has been requested, with the exception of the dual representation of Deep River Ventures, LLC, and Industrial Heat, Inc., for which a dual representation agreement is being provided under separate cover. In the event that a conflict may arise where a matter may be adversely related to you, we will contact you immediately.



**CONFIDENTIAL**

My understanding is that invoices for projects completed on your behalf will be directed to your attention.  If this is not correct, please let me know.

Please acknowledge receipt of this letter and its acceptance by signing a copy of this letter at the place indicated below and returning it to me.

With best regards,

NK Patent Law, PLLC

By: ██████████████

Date: 2/11/2014

**CONFIDENTIAL**

## AGREEMENT TO DUAL REPRESENTATION

THIS DUAL REPRESENTATION AGREEMENT (the "Agreement") is made this _____ day of _2/11_ , 2014, among NK Patent Law, PLLC ("NK Patent Law"), Deep River Ventures, LLC ("DR") and Industrial Heat, Inc. ("IH").  DR and IH are collectively referred to herein as the "Parties".

THE PARTIES HEREBY ACKNOWLEDGE AND AGREE AS FOLLOWS:

1.      The Parties hereby acknowledge and agree that each of them have been advised by NK Patent Law that NK Patent Law shall be retained by both of the Parties to act on behalf of each of the Parties.

2.      The Parties further acknowledge that each have been advised by NK Patent Law that all information relevant to each of the parties that is received in connection with NK Patent Law's representation of the Parties cannot be treated as confidential between the Parties.  The Parties acknowledge that NK Patent Law will be required to disclose any and all relevant information received by or known to NK Patent Law from any source to both of the Parties.

3.      The Parties further acknowledge that, in accordance with the requirement of the rules of the laws of the governing jurisdiction, NK Patent Law has advised each of the Parties to seek and obtain independent legal representation.

4.      The Parties further acknowledge that NK Patent Law has advised each of the Parties that in the event of a material conflict between the Parties which cannot be resolved, NK Patent Law will advise each of the Parties and it may be necessary for NK Patent Law to discontinue acting for both of the Parties.

5.      DR (Deep River Ventures, LLC) has been assigned NK Patent Law Client No. 364 and IH (Industrial Heat, Inc.) has been assigned NK Patent Law Client No. 438.

**CONFIDENTIAL**

6.      DR and IH acknowledge that information that is irrelevant to NK Patent Law's representation of the other party will not be shared with that other party.  For the sake of clarity and for illustration purposes, it is understood that DR may engage NK Patent Law for matters entirely unrelated to the business goals and technology field of IH, and NK Patent Law will not share information learned as a result of representation of DR for those entirely unrelated matters with IH.

Industrial Heat, Inc.

*2/11/2014*

Date

Deep River Ventures, LLC

Date

Owner, NK Patent Law, PLLC

*2/10/2014*

Date

**CONFIDENTIAL**



# Schedule of Fees



**CONFIDENTIAL**



CONFIDENTIAL

# EXHIBIT B

**CONSULTING, CONFIDENTIALITY,
NONCOMPETITION AND INVENTIONS AGREEMENT**

THIS AGREEMENT is made and entered into as of the 10th day of May , 2015, by and between INDUSTRIAL HEAT, LLC, a Delaware limited liability company ("Company"), and DEEP RIVER VENTURES, LLC, a North Carolina limited liability company (the "Consultant").

W I T N E S S E T H:

WHEREAS, Consultant has been providing services to the Company since May 1, 2013 and Consultant and the Company desire to confirm and continue the engagement of the Consultant on the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties agree as follows:

A.     SCOPE OF WORK.

Company hereby engages the Consultant to continue to provide the following services to the Company: maintaining relationships with inventors and others in the field commonly known as low energy nuclear reactions (the "Field"), identifying investment and strategic partnership opportunities in the Field, staying abreast of all new developments in the Field and routinely reporting such developments to Company management, assisting with overall business, intellectual property and commercialization strategy, and providing assistance in other capacities as requested by the Company (the "Work"), and the Consultant hereby accepts such engagement and agrees to continue to perform the Work, all under the terms and conditions set forth in this Agreement. The Consultant shall furnish all labor, materials, equipment and supervision, and all other services and items, that are necessary in order for the Work to be completed as provided herein; provided, however, that Consultant agrees that all Work will be performed primarily by ▮▮▮▮▮▮▮ and that Consultant will not permit any other personnel to perform the Work to whom Company may raise any reasonable objection. The Work shall be performed at locations specified by Company and as performance of the Work may require from time to time. In connection with the Work, the Consultant agrees to provide Company with such reports and presentations concerning the Work as Company may reasonably require; provided, however, that the form, style and content of such reports and presentations shall be determined by Consultant.

B.     PAYMENT.



C.     EXPENSES.

Industrial Heat shall reimburse Consultant for reasonable travel and other expenses Consultant incurs in connection with performing the Work. To obtain reimbursement, Consultant shall submit to Industrial Heat an invoice describing the Work performed and expenses incurred under this Agreement.

418064

**CONFIDENTIAL**

Industrial Heat shall provide any documentation requirements and any travel policy restrictions to Consultant in writing in advance, or be foreclosed from relying on such requirements and restrictions to deny reimbursement. Industrial Heat shall pay to Consultant invoiced amounts within thirty (30) days after the date of invoice.

D.      INDEPENDENT CONTRACTOR.

The Consultant is and shall remain an independent contractor in rendering services to Company pursuant to this Agreement. Consultant shall not be deemed an employee, partner, agent of or joint venturer with Company or any of its affiliates for any purpose, and neither the Consultant nor anyone acting on its behalf shall be authorized to enter into any contract or commitment on behalf of Company or any of its affiliates or otherwise bind Company or any of its affiliates in any way. This Agreement shall impose no obligation on Consultant or the Company to enter into any transaction, venture, or undertaking not specifically provided for in this Agreement. Consultant and its employees, agents or other personnel, if any, shall have no claim against Company or any of its affiliates hereunder or otherwise for employee benefits of any kind, including without limitation vacation pay or sick leave, health or disability benefits, unemployment insurance benefits, retirement benefits, or workers' compensation. Consultant shall be solely responsible for its own personal income or other taxes with respect to its compensation hereunder, and Company shall not be responsible for withholding taxes or any other amounts with respect to the Consultant's compensation.

E.      CONSULTANT REPRESENTATIONS AND COVENANTS.

Consultant agrees to perform the Work in a workmanlike and professional manner, promptly and with due diligence and care, and in accordance with all applicable laws, regulations and ordinances, utilizing qualified and suitable personnel, equipment and materials, as necessary. Consultant represents and warrants to Company that it possesses the expertise, capability, equipment and personnel necessary to perform the Work properly and that it has all licenses and permits, if any, that are required for the Work.

F.      NATURE OF ENGAGEMENT; CONFLICTS OF INTEREST.

It is understood that Consultant is engaged on a non-exclusive basis and that Consultant shall remain free to provide services to other parties during the term hereof, provided that such other services by Consultant do not unreasonably interfere with or impair Consultant's ability to provide services as contemplated hereunder on a timely basis and do not conflict with, and are not competitive in any way with, the activities of Company or its clients and do not violate Section M, N or O hereof. Consultant has informed Company of any potential conflict it has or anticipates may arise as of the date of this Agreement and shall inform Company of any potential conflict that may arise during Consultant's engagement by Company.

G.      INSURANCE.

Consultant shall procure such insurance coverages as Company may require or as are otherwise appropriate in connection with the operation of Consultant's business. All such coverages shall be maintained during the term of this Agreement at the Consultant's sole expense and with insurance companies acceptable to Company. All insurance policies required hereunder shall be in such form and shall contain such limits of liability and endorsements as may be satisfactory to Company. Upon request of Company at any time, certificates of insurance, or certified copies of policies acceptable to Company, shall be filed with Company to evidence the coverages required hereunder.

**CONFIDENTIAL**

accounting professionals who require the information to provide services to Consultant, or as required by law, or in connection with the performance of Consultant's duties on behalf of the Company.

L.    MAINTENANCE AND RETURN OF COMPANY MATERIALS

All Company Materials are and shall be the sole property of the Company.  Consultant agrees that during the Relevant Period, Consultant will not remove any Company Materials from the business premises of the Company or deliver any Company Materials to any person or entity outside the Company, except as Consultant is required to do in connection with performing its duties on behalf of the Company. Consultant further agrees that, immediately upon the termination of the Relevant Period for any reason, or during the Relevant Period if so requested by the Company, Consultant will return to the Company or its designee all Company Materials, apparatus, equipment and other physical property of the Company, or any reproduction of such property, excepting only Consultant's (i) personal copies of records relating to its compensation; and (ii) copy of this Agreement.

M.    NONSOLICITATION OF COMPANY EMPLOYEES

During the Relevant Period and for a period of eighteen (18) months thereafter, Consultant will not (i) encourage or solicit any employee or consultant of the Company to leave the Company for any reason; (ii) assist any other person or entity in such encouragement or solicitation; or (iii) hire or assist in hiring or retaining any such employee or consultant, for itself or for or on behalf of any other person or entity.  As part of this restriction, Consultant will not interview any such person or provide any input to any third party regarding any such person during the period in question.

N.    NONSOLICITATION OF CUSTOMERS AND VENDORS

During the Relevant Period and for a period of eighteen (18) months thereafter, Consultant will not directly or indirectly, for itself, or on behalf of any other person, firm or business entity, (a) solicit, divert or take away, or attempt to solicit, divert or take away, any Covered Customer of the Company or (b) disrupt or appropriate the relationship between the Company and any vendor to the Company.  For purposes of this Agreement, *"Covered Customer"* shall mean any customer of the Company or any prospective customer of the Company to whom the Company has made a specific proposal if Consultant was involved in such proposal or whose business or needs Consultant gained information about on behalf of the Company during the twelve (12) months immediately prior to the effective date of termination of the Relevant Period.

O.    NONCOMPETITION

Consultant agrees that, during the Relevant Period and for a period of eighteen (18) months thereafter, Consultant will not, either directly or indirectly, on its own behalf or in the service or on behalf of others as a manager, supervisor, administrator, consultant, employee, director, officer or in any other capacity which involves any duties and responsibilities similar to those undertaken for the Company, (i) engage in any activity in or related to the Field for a Competing Business within the United States and within any other country or territory in which the Company does business or markets its Products or is actively planning to do so at the time of termination of Consultant's relationship with the Company or (ii) have any financial interest in or own any interest in (other than less than one percent of the outstanding shares of a corporation whose shares are publicly traded) any Competing Business.  For purposes of this Agreement, *"Competing Business"* means any business enterprise, entity or organization of whatever form engaged, either directly or indirectly, in any business or enterprise that competes against the Company, develops, markets, distributes or sells any intellectual property, technology, products or services which are competitive to the intellectual property, technology, products or services under

**CONFIDENTIAL**

development, developed, marketed, sold or distributed by the Company or its affiliated companies; or utilizes information or intellectual property that is the same or similar to, or provides the same or similar functionality as, the technology or products marketed, sold or distributed by the Company or its affiliated companies.

P.      DISCLOSURE OF DEVELOPMENTS TO THE COMPANY.

As used in this Agreement, "*Developments*" mean any invention, discovery, idea, process, technique, know-how and data, improvement, technology, algorithms, trade secret, design, graphic, work of authorship, source, HTML and other code, computer program, audio, video or other files or content, whether or not patentable or copyrightable, that relates to the Field or otherwise relates to the business of the Company. Consultant agrees to maintain adequate and current written records and promptly disclose in writing to the Company, all Developments, made, discovered, conceived, reduced to practice or developed by Consultant, either alone or jointly with others, during the Relevant Period.

Consultant will also disclose to the Company all Developments made, discovered, conceived, reduced to practice, or developed by it, either alone or jointly with others, within eighteen months following the end of the Relevant Period that resulted, in whole or in part, from Consultant's prior relationship with the Company. Such Developments, upon the request of the Company, shall be assigned to the Company in accordance with Section Q below. Consultant will not disclose Developments covered by this Section P to any person outside the Company unless Consultant is requested to do so by management personnel of the Company.

Q.      OWNERSHIP OF DEVELOPMENTS.

1.      Generally.

Consultant agrees that all Developments which Consultant makes, discovers, conceives, reduces to practice or develops (in whole or in part, either alone or jointly with others) during the Relevant Period shall be the sole property of the Company as described in this Section Q below.

2.      Works Made for Hire.

The Company shall be the sole owner of all patents, patent rights, copyrights, trade secret rights, trademark rights and all other intellectual property or other rights in connection with all Developments, subject to Consultant's rights in and to any Pre-Existing Developments (as defined below in Section Q(3)). Consultant further acknowledges and agrees that such Developments, including, without limitation, any computer programs, programming documentation and other works of authorship, are "works made for hire" for purposes of the Company's rights under copyright laws. Consultant hereby assigns to the Company any and all rights, title and interest Consultant may have or acquire in all such Developments.

3.      Pre-Existing Developments.

Consultant has attached hereto as Exhibit A a complete list of all Pre-Existing Developments to which Consultant claims ownership as of the date of this Agreement and that Consultant desires to specifically clarify are not subject to this Agreement, and Consultant acknowledges and agrees that such list is complete. If no such list is attached to this Agreement, Consultant represents that Consultant has no such Pre-Existing Developments at the time of signing this Agreement. For the purposes of this Agreement, "Pre-Existing Developments" means all Developments which were made by Consultant prior to the commencement of the Relevant Period, which belong solely or jointly with another to Consultant,

**CONFIDENTIAL**

within or outside the scope of the Work, and all intellectual property rights thereto, which are not assigned to the Company hereunder. In the event Consultant incorporates Pre-Existing Developments into any deliverables resulting from Consultant's performance of the Work, Consultant hereby grants to the Company a nonexclusive, worldwide, royalty-free, irrevocable, perpetual, transferable and sublicensable (direct and indirectly through multiple tiers) license to use, execute, reproduce, display, perform, distribute copies of, and prepare derivative works of such Pre-Existing Developments as incorporated in such deliverables and any derivative works thereof.

      4.    <u>Cooperation.</u>

Consultant agrees to perform, during and after the Relevant Period, all acts deemed necessary or desirable by the Company to permit and assist it, at the Company's expense, in further evidencing and perfecting the assignments made to the Company under this Agreement and in obtaining, maintaining, defending and enforcing patents, patent rights, copyrights, trademark rights, trade secret rights or any other rights in connection with such Developments and improvements thereto in any and all countries. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings. Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents, as Consultant's agents and attorney-in-fact to act for and on its behalf and instead of it, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth in this subsection 4, including, without limitation, the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such Developments and improvements thereto with the same legal force and effect as if executed by Consultant.

      5.    <u>Assignment or Waiver of Moral Rights</u>.

Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "**Moral Rights**"). To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, Consultant hereby waives such Moral Rights and consents to any action of the Company that would violate such Moral Rights in the absence of such consent.

R.    COMPANY AUTHORIZATION FOR PUBLICATION

Prior to Consultant submitting or disclosing for possible publication or dissemination outside the Company any material prepared by Consultant that incorporates information that concerns the Company's business or research concerning the Company's business, Consultant agrees to deliver a copy of such material to the Company. Within 30 days following such submission, the Company agrees to notify Consultant in writing whether the Company believes such material contains any Proprietary Information or Developments, and Consultant agrees to make such deletions and revisions as are reasonably requested by the Company to protect its Proprietary Information and Developments. Consultant further agrees to obtain the written consent of the Company prior to any review of such material by any person outside the Company.

S.    FORMER EMPLOYER INFORMATION

Consultant represents that its performance of all the terms of this Agreement and as an independent contractor of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by Consultant in confidence or in trust prior to

**CONFIDENTIAL**

Consultant's relationship with the Company, and Consultant will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employers or others. Consultant has not entered into and Consultant agrees it will not enter into any agreement, either written or oral, in conflict with this Agreement or in conflict with its obligations under this Agreement. Consultant further agrees to conform to the rules, regulations and policies of the Company, as in effect from time to time.

T.      PROVISIONS NECESSARY AND REASONABLE

Consultant acknowledges and agrees that (i) its relationship with the Company puts it in a position of trust and responsibility with access to Proprietary Information; (ii) the Proprietary Information, Developments and goodwill of the Company and the relationship between the Company and each of its employees, independent contractors, consultants and customers, are valuable assets of the Company; (iii) the Company's business is national and international in scope; (iv) the restrictions contained in this Agreement, including the time restrictions and the geographic and substantive provisions set forth in Sections M, N and O of this Agreement, are reasonable and necessary to protect the legitimate business interests of the Company and its affiliated companies and will not unreasonably impair or infringe upon Consultant's right to work or earn a living in the event its engagement by the Company ends; and (v) in the event of any breach of any of the covenants set forth herein, the Company could suffer substantial irreparable harm and may not have an adequate remedy at law for such breach. In recognition of the foregoing, Consultant agrees that in the event of any breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

U.      SEVERABILITY; INDEPENDENT OBLIGATIONS

If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law; provided, however, that if any of the provisions contained in this Agreement, or any part thereof, are held to be unenforceable by a court of competent jurisdiction because of the time period or geographic scope of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power, and is hereby authorized and directed to take the action necessary, to reduce the duration and/or geographic area of such provision and, in its reduced form, such provision shall be enforceable. Consultant also understands and agrees that its obligations as set forth in this Agreement shall be deemed independent of the Company's obligations to Consultant and shall be enforceable regardless of any breach or alleged breach by the Company in the performance of its obligations, it being hereby agreed that such claims, if any, as Consultant may have against the Company must be asserted in a separate action brought for that purpose.

V.      AUTHORIZATION TO NOTIFY NEW EMPLOYER

Consultant hereby authorizes the Company to notify Consultant's new employer, or any other party contracting with Consultant for the performance of services, about Consultant's rights and obligations under this Agreement following the termination of Consultant's engagement by the Company.

**CONFIDENTIAL**

W.    ENTIRE AGREEMENT

This Agreement sets forth the entire agreement and understanding between the Company and Consultant relating to the subject matter herein and merges all prior discussions between them including, but not limited to, any and all statements made by any officer, employee or representative of the Company regarding the subject matter hereof. Consultant understands and acknowledges that (i) Consultant has relied on its own judgment and investigation in entering into a relationship with the Company, and (ii) Consultant has not relied on any representation or inducement made by any officer, employee or representative of the Company. No modification of or amendment to this Agreement nor any waiver of any rights under this Agreement will be effective unless in a writing signed by the duly appointed President or Manager of the Company and Consultant. Consultant understands and agrees that any subsequent change or changes in its duties or compensation or any other change related to its engagement by the Company will not affect the validity or scope of this Agreement.

X.    EFFECTIVE DATE; BENEFICIARIES

This Agreement shall be effective as of the date first set forth above and shall be binding upon Consultant, █████████ and their heirs, executors, assigns and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns. This Agreement shall be enforceable by Industrial Heat, LLC and any of its affiliated companies, each of which shall be deemed a third party beneficiary of this Agreement.

Y.    CHOICE OF LAW

Consultant acknowledges that a substantial portion of the Company's business is based out of and directed from the State of North Carolina. Consultant also acknowledges that during the course of its relationship with the Company Consultant will have substantial contacts with the State of North Carolina.

The validity, interpretation and performance of this Agreement shall be governed by, and construed in accordance with, the internal laws of North Carolina, without giving effect to conflict of law principles. Consultant agrees that the venue for any action, demand, claim or counterclaim relating to the terms and provisions of this Agreement, or to their breach, shall be appropriate in the state or federal courts located in the State of North Carolina and that such courts shall have personal jurisdiction over the parties to this Agreement.

Z.    COUNTERPARTS; FACSIMILE SIGNATURE.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. Execution and delivery of this Agreement by facsimile signature shall have the same force and effect as execution and delivery by original signature.

[Signature page follows]

CONFIDENTIAL

EACH OF CONSULTANT AND DEWEY WEAVER HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON THEM AND THEY HAVE SIGNED THIS AGREEMENT VOLUNTARILY AND FREELY.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**INDUSTRIAL HEAT, LLC**

By: _____

Name: _____

Title: _____

**DEEP RIVER VENTURES, LLC**



## JOINDER

As an express condition precedent to execution of the foregoing Agreement by the Company, the undersigned, ▇▇▇▇▇▇▇ hereby joins in the foregoing Agreement for purposes of acknowledging and agreeing to be bound by the provisions thereof relating to confidentiality, materials, noncompetition, and developments to the same extent as the Consultant is bound by such provisions.  Further, the undersigned acknowledges that Consultant is an independent contractor for purposes of this Agreement and that neither Consultant nor the undersigned shall be deemed an employee of the Company or any of its affiliates companies for any purpose.



**CONFIDENTIAL**

**EXHIBIT A**

to

Consulting, Confidentiality, Noncompetition and Inventions Agreement

Between Industrial Heat, LLC

and

Deep River Ventures, LLC

Dated _____

1.     The following is a complete list of all Pre-Existing Developments relevant to the subject matter of Consultant's engagement by the Company that have been made, discovered, conceived, first reduced to practice or developed by Consultant or jointly with others prior to Consultant's relationship with the Company that Consultant desires to remove from the operation of the Consulting, Confidentiality, Noncompetition and Inventions Agreement:

___     No Pre-Existing Developments.

_X_     See below:  Any and all Pre-Existing Developments regarding:

___     Additional sheets attached.


2.     Consultant proposes to bring to its relationship with the Company the following materials and documents of a former employer or company:

___     No materials or documents

___     See below:


**DEEP RIVER VENTURES, LLC**

REDACTED

Pre-Existing Develops for Deep River Ventures, Redacted and associated companies:

REDACTED

# EXHIBIT C

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                         MIAMI DIVISION
 3
                  CASE NO.:  16-cv-21199-CMA
 4

 5

 6

 7   ANDREA ROSSI, et al.,        )
                                  )
 8              Plaintiffs,       )
     v.                           )
 9                                )
     THOMAS DARDEN, et al.,       )       February 7, 2017
10                                )
                Defendants.       )
11   _____/       Pages 1 - 55

12

13

14

15              DISCOVERY HEARING PROCEEDINGS

16      BEFORE THE HONORABLE JOHN J. O'SULLIVAN
                UNITED STATES MAGISTRATE JUDGE
17

18

19

20   APPEARANCES:

21
     On behalf of the Plaintiff:
22
                       PERLMAN BAJANDAS YEVOLI & ALBRIGHT, PL
23                     283 Catalonia Ave.
                       2nd Floor,
24                     Coral Gables, FL 33134
                       BY: BRIAN W. CHAIKEN, ESQ.
25                     BY:  JONATHAN ANNESSER, ESQ.
                       BY:  CHRISTOPHER PERRE, ESQ.
```

CONFIDENTIAL

22

1   communications or is entitled to privilege but --

2          THE COURT:  I don't see that person's name.  I only

3   see one Weaver on here.

4          MR. CHAIKEN:  REDACTED is on the first page, REDAC
                                                         TED
5   REDACTED

6          THE COURT:  Oh, I see it, yes.

7          MR. CHAIKEN:  And on the second page you'll find  REDA
                                                             CTED
8   REDACTED

9          THE COURT:  I see that.  So who is Deep River

10  Ventures?

11         MR. CHAIKEN:  I'm glad you asked, Your Honor.

12         Deep River Ventures is a consultant hired by

13  Industrial Heat or Cherokee or, you know, it is still unclear

14  because we've never received an executed version of an

15  agreement.  We've received drafts of the agreement.

16         Now, it is our understanding, through hearing

17  testimony from Industrial Heat VP, that Deep River Ventures was

18  retained for the purposes of helping them with their IP

19  strategy.  And perhaps acquiring additional IP related to the

20  technology at issue and finding investors related to that.

21         And we've also received through discovery things

22  showing that, in fact, what Deep River and REDACTED were

23  doing is anything but that as it relates to REDACTED And in

24  fact, what REDACTED was really doing was attempting to do a

25  character assassination of REDACTED on-line.

**CONFIDENTIAL**