# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

| | |
|---|---|
| ANDREA ROSSI and LEONARDO CORPORATION, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) CASE NO. 1:16-cv-21199-CMA<br>) |
| THOMAS DARDEN; JOHN T. VAUGHN, INDUSTRIAL HEAT, LLC; IPH INTERNATIONAL B.V.; and CHEROKEE INVESTMENT PARTNERS, LLC, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |
| INDUSTRIAL HEAT, LLC and IPH INTERNATIONAL B.V., | )<br>) |
| Counter-Plaintiffs, | ) |
| v. | ) **DEFENDANTS' MOTION FOR SANCTIONS BASED ON** |
| ANDREA ROSSI and LEONARDO CORPORATION, | ) **PLAINTIFFS' AND THIRD PARTY**<br>) **DEFENDANTS FABIANI, UNITED**<br>) **STATES QUANTUM LEAP AND** |
| Counter-Defendants, | ) **J.M. PRODUCTS INC.'S**<br>) **SPOLIATION OF EVIDENCE** |
| and | ) |
| J.M. PRODUCTS, INC.; HENRY JOHNSON; UNITED STATES QUANTUM LEAP, LLC; FULVIO FABIANI; and JAMES BASS | )<br>)<br>)<br>) |
| Third-Party Defendants. | )<br>) |

Defendants Thomas Darden, John T. Vaughn, Industrial Heat ("IH"), LLC, IPH International B.V. ("IPH") and Cherokee Investment Partners, LLC hereby move for sanctions to dismiss Plaintiffs' claims against them on the ground that Plaintiffs in bad faith destroyed critical evidence, specifically (1) piping that transported heated fluid from the "1MW Plant" operated by Leonardo Corporation ("Leonardo") at a warehouse in Doral (the "Doral Warehouse") to a container walled off on the other side of the Doral Warehouse and allegedly owned by J.M. Products, Inc. ("JMP"), (2) a purported heat exchanger to dissipate the heat from the steam allegedly produced by the 1MW plant and to convert that steam back into water, and (3) email communications between Andrea Rossi ("Rossi"), on behalf of Leonardo, to the person who was allegedly monitoring and measuring the 1MW Plant operations (Fabio Penon).  Defendants also move for sanctions against Third-Party Defendants Fulvio Fabiani and United States Quantum Leap ("USQL") because Fabiani – the owner and sole member of USQL – also destroyed his email communications with Penon, Rossi, and others relating to the operation of the 1MW Plant at the Doral Warehouse as well as data collected during the operation of the Plant.  Finally, Defendants move for sanctions against JMP, which now admits that it was being run by Rossi (though this was concealed from Defendants) and which allowed Rossi to destroy both the piping and heat exchanger referenced above.

Defendants request that the Court impose such sanctions pursuant to its "inherent power to manage its affairs and to achieve the orderly and expeditious disposition of cases," as well as to insure the integrity of the judicial process.  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).  To the extent required to provide them full relief, Defendants also request that the Court impose sanctions if needed pursuant to Federal Rule of Civil Procedure 37.

**INTRODUCTION AND RELEVANT FACTS**

At the core of Plaintiffs' claims against Defendants is that for nearly a year (from February 2015 to February 2016), Plaintiffs allegedly operated the 1MW Plant at the Doral Warehouse to convert water into steam, which was then transported to the JMP side of the Doral Warehouse. The energy represented by this steam, Plaintiffs contend, regularly exceeded one megawatt ("1 MW") and was "substantially greater than fifty (50) times" the energy used by the 1MW Plant to convert water into steam. Compl. ¶ 71 & Ex. B at 21; *see also id*. ¶ 73; D.E. 128 Ex. 1.[1] Based on this, Plaintiffs claim to have achieved "guaranteed performance" under the License Agreement and hence be owed $89 million from IH and/or IPH pursuant to the License Agreement. Compl. ¶¶ 71-74.

## I. Plaintiffs Destroyed The Output Pipe From The 1MW Plant.

A system was set up to measure the energy input into and energy output from the 1MW Plant at the Doral Warehouse. Critical to this system was the measurement of the temperature of the heated fluid in the pipe that carried the fluid from the Plant to the JMP container (the "Output Pipe"). The License Agreement among Plaintiffs, IH and IPH required that this heated fluid carried by the Output Pipe be at least 100 degrees Celsius. Compl. Ex. B (License Agreement) § 5. Furthermore, a large amount of energy is required to convert water into steam (the heat of vaporization is 2258 Joules of energy per gram of water), so a Plant that turns water into steam at 100 degrees Celsius would have to produce many times more energy than one that only heats water to 99 degrees Celsius. Expert Report of Rick Smith at 9 [Ex. 1].[2] Also critical was a device or devices in the Output Pipe designed to capture any water carried through the pipe (such

---

[1] This, of course, would eviscerate the law of the conservation of energy and the related first law of thermodynamics, but that is not the subject of the instant motion.

[2] Each exhibit to this motion is designated by [Ex. #]. Deposition excerpts and deposition exhibits for the same deponent are combined into a single exhibit. Deposition exhibits are cited herein by the name of the deponent followed by "Dep."

as a steam trap and a condensate drip or trap line) – if the trap line is filled with water, what is traveling though the Output Pipe is not pure steam; if there is no water in the trap line, that would indicate that steam was traveling through the Output Pipe. Dameron Dep. 78:11-79:14; 200:6-201:6 [Ex. 2].

Plaintiffs claim to have ended their "guaranteed performance" test in February 2016. At that time, representatives of IH and IPH were present and they locked up the 1MW Plant. They did not and could not, however, take possession of the Output Pipe. Sometime soon thereafter, Plaintiffs removed the Output Pipe. In fact, they not only took down the Pipe, they disassembled it and elected to uses the Pipe for other purposes at the Doral Warehouse. Leonardo Dep. 272:22-273:8 [Ex. 3].

## II.     Plaintiffs Destroyed The Alleged Heat Exchanger

One megawatt (1 MW) of energy is a massive amount of energy – enough to power several hundred residential houses. *What is a Megawatt?*, https://www.nrc.gov/docs/-ML1209/ML120960701.pdf [Ex. 4]. No one disputes that if steam containing that much energy was circulated through the Doral Warehouse without a mechanism to discharge the heat from that steam outside the Warehouse, the Warehouse would be superheated and human beings would not be able to operate in the Warehouse. Expert Disclosure of Joseph Murray at 2 [Ex. 5]; Wong Dep. 146:20-149:19 [Ex. 6]. Plaintiffs attempt to overcome this fatal flaw by claiming that they built a "heat exchanger" that carried the steam transported from the 1MW plant to the JMP container out of the JMP container though a lengthy series of pipes to a second story room. In that room, Plaintiffs assert, fans pushed the heat released from the steam out a window and allowed the steam to cool back to water, which was then returned to the JMP container and ultimately back to the 1MW Plant. Rossi Dep. 238:3-239:8 [Ex. 7].

There are no photographs of this alleged heat exchanger.  Rossi Dep. 235:5-9; 238:3-240:6; Leonardo Dep. 269:18-271:21; JMP Dep. 114:14-117:12; 120:9-124:25 [Ex. 8].  There are no receipts for the equipment Plaintiffs allegedly used to build the heat exchanger (including for the piping, the fans or the wood housing in the second story room).  Leonardo Dep. 266:16-267:4; JMP Dep. 142:5-143:4; 144:20-145:23; 157:22-158:2.  There are no records for the temporary workers who allegedly assisted Plaintiffs in constructing this heat exchanger in 2015 or dismantling it in 2016.   Plaintiffs do not know the identity of any of these temporary workers.  Leonardo Dep. 265:1-266:15; 288:21-290:6; Rossi Dep. 235:10-236:17; 291:13-19; JMP Dep. 140:10-141:14; 153:13-23; 156:20-157:21.

Notwithstanding the foregoing, Plaintiffs insist that the heat exchanger existed.  What happened to it?  Plaintiffs claim that they took down the heat exchanger after completion of the "guaranteed performance" test.  Rossi Dep. 236:10-237:18; JMP Dep. 94:1-6.  Furthermore, just like with the Output Pipe, they claim that they not only took down the heat exchanger, but they disassembled it completely and put all of its components to new uses – they disassembled the piping, fans and wood housing, and used all of this equipment for something else.  Leonardo Dep. 273:24-274:5.

### III. Plaintiffs Destroyed Their Communications With Penon.

According to both Rossi and Penon, Rossi was communicating *daily* with Penon directly about the claimed "guaranteed performance" test that Plaintiffs were conducting and that Penon was to be measuring.  Penon Dep. 190:2-17 [Ex. 9]; Leonardo Dep. 37:5-39:24.  These communications were by email, and the emails purportedly were providing daily information to Penon about the operation of the 1MW Plant.  Leonardo Dep. 16:10-17:1; 37:5-39:24; Penon Dep. 108:20-109:5.

What specifically was in those daily emails? What data was attached to those daily emails? What else was communicated in those emails? The obvious way to determine this would be to review the emails, but that is not possible. And the reason is simple: Rossi, the CEO of Leonardo, destroyed the emails.

### IV.     Fabiani Destroyed His Emails With Penon And Others.

Rossi was not the only person who was communicating with and providing data to Penon. According to both Fabiani and Penon, Fabiani – the owner and sole member of USQL – also regularly sent emails to Penon that contained data on the performance of the 1MW Plant. Fabiani Dep. 38:3-40:14 [Ex. 10]; Penon Dep. 108:3-12. While both acknowledge the email communications, Penon and Fabiani disagreed as to the data contained in those emails. Penon testified that Fabiani sent data he accessed from Penon's computer at the Doral Warehouse, which contained the data from Penon's measuring equipment at the Warehouse. Penon Dep. 169:19-172:2. Fabiani, on the other hand, testified that he sent data to Penon from Fabiani's measuring equipment and that he could not access or tamper with Penon's data. Fabiani Dep. 38:3-39:10; 88:8-89:2.[3]

Once again, the obvious way to determine the content of those emails and their attachments would be to review them, but Fabiani – like Rossi – has destroyed his email communications with Penon. In fact, Fabiani/USQL has gone even further: Fabiani destroyed not just his emails with Penon but all of his email communications concerning the operation of the 1MW Plant other than the communications he had with Defendants. Fabiani Dep. 32:21-33:21; 35:7-40:16. Some of those communications have been obtained from other parties in this litigation, but that discovery could not obtain Fabiani's communications with non-parties (like

---

[3]     Rossi testified that neither he nor Leonardo has any information to contradict that Fabiani sent Penon data from Penon's own computer. Leonardo Dep. 155:23-156:19.

Penon) and, of course, is limited to what the other parties preserved. Fabiani also testified in his deposition that he was collecting temperature data not only from the Output Pipe, but also from the individual reactor units contained in the 1MW Plant. Like the Fabiani emails, however, Fabiani/USQL also destroyed this data. Fabiani Dep. 40:6-15; 46:10-47:19; 85:3-99:8.[4]

Fabiani was clear in his testimony that he undertook this intentional destruction of evidence sometime after March 31, 2016, when the Technical Consulting Agreement expired between USQL and IH (the "USQL Agreement" [Ex. 11]). Fabiani Dep. 35:7-14. At the earliest, therefore, the destruction occurred just days before Plaintiffs filed their lawsuit.

V.  **JMP's Direct Involvement In The Destruction Of Evidence.**

As noted above, the Output Pipe was connected both to the 1 MW Plant on the "Leonardo side" of the Doral Warehouse and to the container on the "JMP side" of the Doral Warehouse. Also, the alleged heat exchanger was solely on the JMP side of the Doral Warehouse – an area where Defendants were precluded from going during Plaintiffs' supposed "guaranteed performance" test. Leonardo Dep. 303:7-12; 319:16-320:12. Rossi, the CEO of Leonardo, was able to destroy the Output Pipe and heat exchanger evidence because, as Rossi admitted when testifying as JMP's Rule 30(b)(6) corporate representative, he was fully in charge of, and running, JMP, making all decisions for JMP at the Doral Warehouse. JMP Dep. 8:19-24; 17:11-16; 22:16-23:1. Hence, when Rossi was destroying the Output Pipe and claimed heat exchanger evidence, he was doing so on behalf of both Leonardo and JMP.

---

[4]  Fabiani also has destroyed, or at least has refused to produce, the full spreadsheet he maintained of other data he collected on the operation of the 1MW Plant. Fabiani has produced one tab from this spreadsheet covering the entire "guaranteed performance" time period, albeit in PDF format, (Fabiani Dep. Ex. 3), and Rossi produced what appears to be an earlier version of this spreadsheet with 13 additional tabs (one for each month from February 2015 to February 2016). Rossi_00001075 [Ex. 16] (representative pages from two months only because of spreadsheet's length). The tabs for the months of August 2015 to February 2016, however, do not contain the data populated in the tabs for the prior months. *Id*. Both Rossi and Fabiani testified that this spreadsheet was maintained by Fabiani. Rossi Dep. 259:11-260:23; Fabiani Dep. 100:8-104:5.

## VI. Plaintiffs And Third Parties' Awareness They Were Destroying Evidence Needed For Litigation.

There can be no dispute that by December 2015, Plaintiffs and JMP at least reasonably anticipated (if not knew for certain) that litigation was likely over whether Plaintiffs' operation of the 1MW Plant at the Doral Warehouse could constitute "guaranteed performance" under the License Agreement. On December 4, 2015, IPH counsel sent a letter to Plaintiffs' counsel advising Plaintiffs, among other things, that what they were doing at the Doral Warehouse could not be the "guaranteed performance" test under the License Agreement. [Ex. 12]. A few days later, IH requested a visit to the Doral Warehouse to inspect the 1MW Plant. *See* Johnson Dep. Ex. 40 [Ex. 13]. That same day, JMP told IH (a) that Plaintiffs' counsel insisted that IH not be permitted to access the Doral Warehouse and (b) further than Plaintiffs believed IH had breached the License Agreement. *See* Johnson Dep. Ex. 41. Several days later, Plaintiffs' counsel sent a letter expressly accusing "IH and/or IPH" of "anticipatory repudiation of the License Agreement." [Ex. 14].

As to Fabiani and USQL, Fabiani testified that he did not destroy his emails and data relating to the operation of the 1MW Plant at the Doral Warehouse, including his emails with Penon, until after the USQL Agreement with IH ended March 31, 2016. Fabiani Dep. 32:21-33:21; 35:11-14; 38:3-40:16. Earlier in March, however, Fabiani had met with IH personnel in Miami, admitted that he expected litigation between Plaintiffs and IH, and promised to send all of the data that he had to IH shortly, as required by the USQL agreement with IH. *See* Declaration of John T. Vaughn ¶¶ 5-8 [Ex. 15]. This, of course, proved to be a lie – Fabiani did not send all of his data to IH, but instead destroyed relevant emails and data, and thereafter fled to Russia (where he remains today). Fabiani Dep. 32:21-33:21; 35:7-40:16

**ARGUMENT**

"'Spoliation' is the intentional destruction, mutilation, alteration, or concealment of evidence." *Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010). "Federal law governs the imposition of sanctions for spoliation of evidence in a diversity action." *Id.* In the Eleventh Circuit, sanctions may include dismissal of the case, exclusion of expert testimony, or "instructing the jury that spoliation of evidence raises a presumption against the spoliator." *Id.* (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005)).

A party has an obligation to retain relevant objects, data and documents, including emails, where litigation is reasonably anticipated. *Managed Care Sols., Inc. v. Essent Healthcare, Inc.,* 736 F. Supp. 2d 1317, 1324 (S.D. Fla. 2010) (finding that litigation should have been reasonably anticipated at the time "counsel for the defendant sent counsel for the plaintiff a letter outlining the defendant's position with respect to some of the provisions of the PSA which the Plaintiff claimed had been breached"); *see also Point Blank Sols., Inc. v. Toyobo Am., Inc.,* 09-61166-CIV, 2011 WL 1456029, at *11 (S.D. Fla. Apr. 5, 2011) ("the duty to preserve evidence arises when a party reasonably anticipates litigation. "); *Se. Mech. Services, Inc. v. Brody,* 8:08-CV-1151T30EAJ, 2009 WL 2242395, at *3 (M.D. Fla. July 24, 2009) ("SMS undoubtedly anticipated litigation when it sent TEI a demand letter on June 3, 2008.").

To warrant dismissal of claims in the Eleventh Circuit, the circumstances surrounding the missing evidence usually must "indicate bad faith, e.g., that [a party] tampered with the evidence." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). Bad faith can be established by showing that evidence once existed that could fairly be supposed to have been material to a claim or defense, a party engaged in an act causing the evidence to be lost, and the party did so at

a time it knew or should have known that it has a duty to preserve evidence. *Walter*, 2010 WL 2927962, at *2.[5]

A District Court "has broad discretion to impose sanctions derived from its inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases." *Simon Prop. Grp, Inc. v. Lauria,* 6:11-CV-01598-ORL-31, 2012 WL 6859404 (M.D. Fla. Dec. 13, 2012), report and recommendation adopted, 6:11-CV-1598-ORL-31, 2013 WL 152525 (M.D. Fla. Jan. 15, 2013)  Dismissal of a plaintiff's claims is warranted where the plaintiff knows the opposing party would want to examine the material evidence it destroyed. In *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944-45 (11th Cir. 2005), the Court found that dismissal of the plaintiff's claim was necessary in a case involving plaintiff's destruction of an automobile following an accident: "[P]laintiff should have known that the vehicle…needed to be preserved and examined as evidence central to his case. Plaintiff's failure to preserve the vehicle resulted in extreme prejudice to the defendant, and failure to respond to defendant's letter displayed a clear dereliction of duty." *Id*.  In *Lauria,* the Court entered a default against a party who had destroyed electronically stored information on a laptop computer, finding that these actions "are at least as flagrant as those of the Plaintiff in *Flury* . . ., in which the Eleventh Circuit imposed the ultimate sanction of dismissal." 2012 WL 6859404 at *9.

Numerous courts in this Circuit also have imposed the sanction of an adverse inference against a party that failed to preserve material evidence without a compelling justification. *See e.g., Austrum v. Fed. Cleaning Contractors, Inc.,* 149 F.Supp.3d 1343 (S.D. Fla. 2016); *Swofford v. Eslinger*, 671 F. Supp. 2d 1274 (M.D. Fla. 2009); *Southeastern Mechanical Servs., Inc. v.*

---

[5] Although dismissal of a case is typically reserved for cases where the circumstances indicate a party acted in bad faith, "even when conduct is less culpable, dismissal may be necessary if the prejudice to the [movant] is extraordinary, denying it the ability to defend its case. *Silvestri v. General Motors Corp.*, 271 F.3d 583, 592 (4th Cir. 2001).  The *Silvestri* Court held that dismissal was warranted there regardless of whether the spoliator's conduct was deliberate or negligent because the piece of evidence destroyed was central to the case. *Id*. at 593.

*Brody*, 657 F. Supp. 2d 1293 (M.D. Fla. 2009); *St. Cyr v. Flying J Inc.*, No. 3:06-cv-13-33TEM, 2007 WL 1716365 (M.D. Fla. June 12, 2007); *Morrison v. Veale*, No. 3:15-cv-1020-TFM, 2017 WL 372980, at *8 (M.D. Ala. Jan. 25, 2017);

      **I.**      **Plaintiffs, JMP, Fabiani And USQL Destroyed Material Evidence.**

There can be no question that the evidence Plaintiffs, JMP and Fabiani destroyed was clearly material. As noted above, whether the Output Pipe was carrying water, steam or some combination thereof is a critical issue. Plaintiffs contend it carried pure steam; Defendants contend it did not. And if the Output Pipe was not carrying pure steam, Plaintiffs clearly lose any entitlement to $89 million not only because the License Agreement required the 1MW Plant to produce "steam … consistently 100 degrees Celsius of higher," License Agreement § 5, but also because the estimated power output of the Plant would be dramatically lower (most of the claimed power comes from that last degree Celsius required to convert water into steam). Because Plaintiffs and JMP destroyed the Output Pipe, it could not be examined for signs of water flowing through the Pipe. Further, a condition to the testing of the 1MW Plant was that there be a trap line on the Output Pipe to capture any water flowing through the Pipe. Leonardo Dep. Ex. 9. Rossi testified that there was such a line on the Output Pipe (Leonardo Dep. 175:6-181:7), but there is no photograph of this line, the trap line installed by IH before the 1MW Plant was sent to Florida was removed (Dameron Dep. 78:11-79:14; 200:6-201:6), and of course the Output Pipe has now been intentionally destroyed.[6] And there is also testimony of Plaintiffs and JMP placing heating strips or cords on piping at the Doral Warehouse, which would render invalid the temperature measurements that purported to be of the contents of the pipe, not of the pipe itself. Rossi Dep. 231:13-232:7; JMP Dep. 245:14-246:25. Defendants cannot examine the

---

[6] Penon testified that he requested a condensate trap line be installed on the Output Pipe and Rossi agreed, but Penon does not recall ever seeing a trap line on the Output Pipe. Penon Dep. 162:5-163:6; 165:2-5.

Output Pipe to determine whether such heating strips/cords were placed on that Pipe because Plaintiffs and JMP destroyed the Pipe. *See* Leonardo Dep. 272:22-273:8; JMP Dep. 81:21-82:14; JMP Dep. 84:14-17.

The alleged heat exchanger is also clearly material. Both Plaintiffs and Defendants have offered expert witnesses on the issue of whether the Doral Warehouse would be extraordinarily hot, to the degree unsuitable for humans to be working inside the Warehouse. The only difference between their opinions on this issue is that Plaintiffs' expert assumed that the alleged heat exchanger described above existed at the Doral Warehouse even though he had never seen it, never seen photographs of it, and never seen any documentary evidence of it; all he could do was take Rossi's word on it. Wong Dep. 70:7-71:11; 99:1-23; 101:9-102:5. Absent such a heat exchanger, Plaintiffs' expert agreed with Defendants' experts that the Doral Warehouse would have been too hot for persons to work in there (and of course, any visitors to the Warehouse would have immediately noticed the extraordinary temperature). Wong Dep. 146:20-149:19; Expert Disclosure of Joseph Murray at 2. If such a heat exchanger ever existed (which is dubious), it exists no longer: Plaintiffs and JMP have openly admitted that they intentionally destroyed the claimed heat exchanger and converted all of its supposed parts to other uses. Rossi Dep. 236:10-17; Leonardo Dep. 271:22-272:10; JMP Dep. 94:1-17.

Both Rossi and Penon testified that they had daily email communications about the operation of the 1MW Plant during the supposed "guaranteed performance" test – i.e., the very test upon which Plaintiffs are relying to claim an entitlement to $89 million under the License Agreement. *See* Penon Dep. 190:2-17; Leonardo Dep. 37:5-39:24. What was said in all of those emails cannot be examined because Plaintiffs have destroyed the emails. Defendants cannot

ascertain what data was attached to or included in those emails, or how that data may have been changed over time, because Plaintiffs have destroyed the emails.

Fabiani, too, had email communications with Penon about the claimed "guaranteed performance" test of the 1MW Plant, but he too has destroyed those emails. Penon Dep. 169:19-172:2; Fabiani Dep. 38: 3-39:10. Defendants can no longer examine what was said in those emails, nor can Defendants recover the data included in or attached to those emails. (As noted above, Penon and Fabiani disagreed as to what data was transmitted via these emails.) Making matters worse, Fabiani not only destroyed his emails with Penon, but he destroyed all of his email communications relating to the operation of the 1MW plant other than his email communications with IH (which he obviously knew IH was already retaining). Fabiani Dep. 32:21-33:21; 35:7-14; 38:3-40:16. He also destroyed at least some of the data he collected during the operation of the 1MW Plant. And he did all of this despite knowing that he had a contract with IH that expressly made these emails and data the property of IH, which had to be turned over to IH either on demand or after the conclusion of the Fabiani/USQL contract with IH. USQL Agreement § 5.

## II. Plaintiffs, JMP, Fabiani And USQL Intentionally Destroyed Evidence.

There is no question here whether Plaintiffs, JMP, Fabiani and USQL destroyed material evidence intentionally as opposed to accidentally. Each has openly admitted that he or it intentionally destroyed the evidence. Rossi, on behalf of Leonardo and JMP, intentionally removed the Output Pipe. Leonardo Dep. 272:22-273:8. Rossi, on behalf of Leonardo and JMP, testified that he intentionally removed all of the various parts of the alleged heat exchanger. Rossi Dep. 238:3-239:8. Making matters worse, Rossi repurposed all of this equipment to

ensure that any evidentiary value to the Output Pipe and the alleged heat exchanger was completely destroyed.  Leonardo Dep. 273:10-274:5.

The email destruction was also clearly intentional.  Fabiani, in fact, was quite clear that he systematically destroyed his emails relating to the claimed "guaranteed performance" test (other than his emails with IH) sometime in April 2016 or later (after the USQL Agreement expired).  He also destroyed other data as well, again because it related to the claimed guaranteed performance test.  Fabiani Dep. 35:7-37:24.

### III. The Destruction Occurred After Each Respective Party Knew That Litigation Was Reasonably Anticipated.

The last element is as easily satisfied as the first two.  Rossi, on behalf of Leonardo and JMP, destroyed the Output Pipe and the alleged heat exchanger sometime after the end of the purported "guaranteed performance" test in February 2016.  But even prior to that test being done, Leonardo, JMP and Rossi all knew that litigation was reasonably anticipated with at least IH and IPH because by December 2015 IPH had informed Plaintiffs that their operations at the Doral Warehouse could not constitute "guaranteed performance," Plaintiffs had already launched accusations at IH and IPH and threatened them with a claim of anticipatory contract breach, and JMP had confirmed in writing that it knew of the contract dispute and was siding with Plaintiffs to refuse to allow IH personnel access to the Doral Warehouse.  *See* Ex. 12; Johnson Dep. Exs. 40, 41.[7]  Plaintiffs, Fabiani and JMP had an obligation to retain these relevant emails and physical evidence as they could reasonably anticipate litigation at the time this evidence was destroyed.  *See Managed Care Sols., Inc.* 736 F. Supp. 2d at 1324.

Fabiani fares no better.  He was not a party to the communications in December 2015, but he did meet with IH employees in March 2016, at which time he admitted to knowing that

---

[7]   JMP was also informed in February 2016 that it was in breach of its Term Sheet agreement with IH.  *See* Johnson Dep. Ex. 42.

litigation was anticipated between Plaintiffs and IH/IPH.  He was even advised that he was a potential party to any such litigation.  *See* Vaughn Declaration ¶ 8.  Notwithstanding Fabiani's knowledge, he later undertook the intentional destruction of his email and data evidence as it relates to the very subject of the anticipated litigation (*i.e.*, the operations of the 1MW Plant at the Doral Warehouse).

### IV. The Appropriate Remedy Here Is Dismissal Of Plaintiffs' Claims And Judgment For IH and IPH On Their Claims Against Plaintiffs, JMP, Fabiani And USQL.

The appropriate remedy is as clear as the spoliation.  Rossi, Leonardo, JMP, Fabiani and USQL not only intentionally destroyed evidence, but they intentionally destroyed evidence that goes to the very core of this litigation:  Dismissal is warranted both when a party intentionally destroys material evidence and when the evidence is central to a parties' case. *See Silvestri,* 271 F.3d at 593.  Furthermore, dismissal is the proper sanction in the instant matter because Plaintiffs' willful destruction of material evidence has prejudiced Defendants in their ability to defend and prosecute this suit.  *Id.* at 592.  Plaintiffs knew and should have known that the evidence they destroyed would need to be examined by Defendants as it was essential to the merits of the case *Flury*, 427 F.3d at 944-45.  Whether Plaintiffs, with the assistance of JMP, Fabiani and USQL, were able to operate a device (the 1MW Plant) for roughly one year that completely upends long-standing laws of physics (*see* note 1) by producing more energy (indeed, they claim tens of times more energy) than it consumed.  Plaintiffs claim this is what occurred and so are due $89 million.  Defendants know this is false, which is why they are not liable on any of Plaintiffs' claims and why IH and IPH have brought their claims against Plaintiffs and others, including JMP, Fabiani and USQL.  Plaintiffs, JMP, Fabiani and USQL have all engaged in intentional conduct to try to prevent Defendants from defeating Plaintiffs' claims and to prevent IH and IPH from proving their claims against Plaintiffs, JMP, Fabiani and USQL.  There is no conceivable

justification for their conduct, the sole purpose of which was to interfere and seek to affect the outcome of the instant litigation. Under these circumstances, no remedy short of entering judgment for Defendants on Plaintiffs' claims and entering judgment for IH and IPH on their claims against Plaintiffs, JMP, Fabiani and USQL (as specified below) would be adequate.

## CONCLUSION

Based on the foregoing arguments, the Court should dismiss all of Plaintiffs' claims with prejudice. The Court should also enter judgment in favor of IPH and IH (1) on their first breach-of-contract claim against Plaintiffs, (2) on their breach-of-contract claim against USQL and Fabiani, and (3) on their Florida Deceptive and Unfair Trade Practices Act claim against Plaintiffs, JMP, Fabiani and USQL. Alternatively, if the Court concludes that this appropriate relief should not be awarded, the Court should order that if there is any trial on any of the foregoing claims, the jury will be instructed that (a) examination of the Output Pipe – had it been preserved – would have demonstrated that the 1MW Plant was not producing steam as Plaintiffs claim, (b) the alleged heat exchanger that Rossi, Leonardo and JMP claim existed in fact did not exist, (c) Rossi and Fabiani's email communications with Penon would have demonstrated that Rossi, Leonardo and Fabiani were manipulating the claimed results of the "guaranteed performance" test, and (d) Rossi, Leonardo, JMP, Fabiani and USQL intentionally deceived IH and IPH about the operations of the 1MW Plant at the Doral Warehouse and the "guaranteed performance" test and obstructed IH and IPH's ability to learn the truth about those activities.

Dated:  March 22, 2017                    Respectfully submitted,


*/s/ Christopher R. J. Pace*
Christopher R.J. Pace
cpace@jonesday.com
Florida Bar No. 721166
Christopher M. Lomax
clomax@jonesday.com
Florida Bar No. 56220
Christina T. Mastrucci
Florida Bar No. 113013
Michael A. Maugans
Florida Bar No. 107531
JONES DAY
600 Brickell Avenue
Brickell World Plaza
Suite 3300
Miami, FL 33131
Tel: 305-714-9700
Fax: 305-714-9799

Bernard P. Bell
Miller Friel, PLLC
1200 New Hampshire Ave, NW, Ste. 800
Washington, DC 20036
Tel: 202-760-3158
Fax: 202-459-9537

*Attorneys for Defendants/Counter-Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 22, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record.

*/s/ Christopher R.J. Pace*
Christopher R.J. Pace