# Exhibit 2

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3           CASE NO. 1:16-cv-21199-CMA/O'Sullivan
 4
 5
      ANDREA ROSSI and LEONARDO    )
 6    CORPORATION,                 )
                                   )
 7                                 )
      Plaintiffs,                  )
 8                                 )
                                   )
 9    v.                           )
                                   )
10    THOMAS DARDEN; JOHN T.       )
      VAUGHN; INDUSTRIAL HEAT,     )
11    LLC; IPH INTERNATIONAL,      )
      B.V. and CHEROKEE            )
12    INVESTMENT PARTNERS, LLC,    )
                                   )
13    Defendants.                  )
14
15
16              C O N F I D E N T I A L
17
18    Video Deposition of THOMAS BARKER DAMERON, III
19                (Taken by the Plaintiffs)
20                 Raleigh, North Carolina
21               Thursday, December 1, 2016
22
23
24
25    Reported by:    Marisa Munoz-Vourakis -
                      RMR, CRR and Notary Public
```

Veritext Legal Solutions
800-726-7007                                    305-376-8800

Page 78

1  BY MR. ANNESSER:
2  Q.  And your answer?
3  A.  No.
4  MR. ANNESSER:  We'll take a break.
5  THE VIDEOGRAPHER:  We're off the
6  record at 10:56.
7  (Recess.)
8  THE VIDEOGRAPHER:  Video number two,
9  we're on the record at 11:13.
10  BY MR. ANNESSER:
11  Q.  Sir, before we left on our short break, we
12  were talking about three perceived flaws in the test
13  setup for the guaranteed performance test in Doral,
14  Florida, correct?  Do you recall that?
15  A.  Yes.
16  Q.  I think we covered the first two, but the
17  third was that there were no traplines in place, is
18  that correct?
19  A.  Correct, yes.
20  Q.  Okay.  And how do you know there were no
21  traplines in place?
22  A.  In my visit, about February 24, that was an
23  observation I made.  There may have been another
24  picture of that area that came from somewhere else, but
25  I do not recall.

Page 79

1  Q.  And had there been a trapline in place, is
2  it possible that it could have been something you just
3  didn't see?
4  A.  It was -- when I laid the unit out and had
5  it kind of setup, before we kind of packed it up and
6  sent it, it was not where I had put it.
7  Q.  I'm sorry, I didn't follow.  Say that
8  again, please?
9  A.  The unit was -- when it was constructed, it
10  had pipes on the outside of it that had to be taken off
11  for shipping.  And so that's where those traplines and
12  some of that extra stuff was, extra piping, places for
13  instruments were located.  And that was not there when
14  I observed it in Florida.
15  Q.  Did you say anything at the time you didn't
16  see it?
17  A.  I did not.
18  Q.  Now, you had mentioned with all three of
19  these perceived problems with the test, that you didn't
20  have the opportunity to mention it to Andrea Rossi or
21  to Mr. Penon.  But you were there February 24,
22  thereabouts, with Dr. Rossi.  Was Mr. Penon there as
23  well?
24  A.  I think not, I'm pretty sure --
25  Q.  Have you ever met Mr. Penon?

Page 80

1  A.  Yeah, I met him in the trip to Italy, but
2  as I recall, that's the only time I met him.
3  Q.  Are there any other errors that you see in
4  the test that tell you automatically that hey, this is
5  not proper, this is not correct?
6  MR. PACE:  Objection, form.
7  BY MR. ANNESSER:
8  Q.  Other than the three we've discussed?
9  A.  There may be others.  Those are the main
10  ones that come to mind.
11  Q.  And do you perceive those to be big
12  problems or little problems?
13  A.  Big problems.
14  Q.  Now, you knew what this test was in Miami,
15  correct?  You knew that it was the guaranteed
16  performance test pursuant to the contract?
17  MR. PACE:  Objection to form.
18  BY MR. ANNESSER:
19  Q.  I remind you, sir, you're under oath.
20  MR. PACE:  Objection to form.
21  A.  What was the question?
22  Q.  You knew, sir, that the guaranteed
23  performance test, the test in Doral, Florida, was the
24  test pursuant to the contract?
25  MR. PACE:  Objection to form.

Page 81

1  BY MR. ANNESSER:
2  Q.  Is that correct?
3  A.  No, I'm not -- I wasn't sure exactly --
4  there was some question about selling steam to a client
5  at one point.  There were -- the answer, the things you
6  mentioned earlier about what was the test and when did
7  the test start, so there's confusion in my mind about
8  even when I was there, was that the guaranteed test?
9  If that's what it was, I'm not sure what was when.
10  Q.  Sir, you knew that the guaranteed
11  performance test was to take place in Doral, the 350
12  out of 400 day test, you know what I'm talking about,
13  correct?
14  MR. PACE:  Objection to form.
15  A.  I -- the whole what was a test was in some
16  question to me.  It may have been known by other
17  people.  I, I think I can say pretty -- that there was
18  going to be a test, and it was likely to be in Florida
19  or at this location.
20  Q.  And you knew that Mr. Penon was the ERV for
21  that test, as he had been for the validation test,
22  correct?
23  A.  No, there seemed to have been some question
24  about was he qualified, was he agreed upon and so on.
25  That was not part of what I was -- that's not part of

Page 198

1  Q. Sir, looking at Exhibit 12, Mr. Penon
2  submitted a report that the operation of the plant had
3  begun, and that report was as of -- that was the first
4  report on May 28, 2015.
5  A. Okay. Got you.
6  Q. Did you review that report?
7  A. I did see that report, yes.
8  Q. In writing to any person.
9      Did you tell them that you thought that the
10 results of that report were incorrect?
11 A. Not that I recall.
12 Q. Did you see any other reports from Engineer
13 Penon regarding the operation of the E-CAT plant in
14 Doral, Florida, between February 2015 and February
15 2016?
16 A. My recollection is I saw this report. I
17 may have seen another report sometime between this
18 report and the end of the test, but I think I've seen
19 one at the end of the test.
20 Q. And with those reports, did you ever send
21 an email to anybody, whether it be Engineer Penon,
22 Dr. Rossi, Mr. Vaughn, Mr. Darden, indicating that you
23 disagreed with those reports?
24 A. Not that I recall.
25 Q. Sir, did you ever prepare a design

Page 199

1  schematic for the layout of the plant and how it should
2  be at the Doral facility, in your opinion?
3  A. Yes.
4  Q. Did you ever share that with Dr. Rossi?
5  A. I thought that I did. I don't guarantee
6  it.
7  Q. If it's not in the emails that are
8  produced, is it fair to state that it was not shared
9  with Dr. Rossi?
10 A. No, because it may have been shown to him
11 in a hand sketch.
12 Q. When would you have shown that to him?
13     MR. PACE: Objection to the form of
14  the question.
15 A. That would be very near the time it was
16 shipped, as that would have been when that was being
17 laid out.
18 Q. Isn't it true, sir, that Dr. Rossi was in
19 fact in Miami prior to it being shipped?
20 A. He was back and forth at various times.
21 Q. Do you know whether the layout of the plant
22 was done in line with your design schematic?
23 A. I think it was not.
24 Q. How so?
25 A. When I went down there and looked at it, it

Page 200

1  was not there, and I have heard from Barry West it was
2  rearranged, consciously rearranged.
3  Q. What do you mean by consciously rearranged?
4  A. Andrea changed the design -- layout of it
5  and put it in a different way.
6  Q. And what was the difference?
7  A. It didn't have a steam header in it. It
8  didn't have the steam traps in it. It didn't have the
9  drains in it.
10     MR. ANNESSER: Sorry, gentlemen, I
11  can't hear. Gentlemen, please.
12 Q. So you said it did not have a steam header,
13 correct?
14 A. Did not have --
15 Q. I want to go through these again. I want
16 to go through one by one to make sure I understand.
17 A. The steam header that was made to go on the
18 unit was not on the unit.
19 Q. What is the steam header?
20 A. Steam header is a piece of pipe that comes
21 out, has taps in it for pressure and temperature,
22 thermal wells for temperature. It had a place to
23 put -- it had a drip leg in it where you could get
24 condensate out, a place for a trap to drain that. It
25 had a place to install two steam meters. It had a way

Page 201

1  to connect it back together again and connect to the
2  pipe going to the JM Products.
3  Q. And, sir, what was there in place of this
4  steam header?
5  A. A line came out of the one megawatt unit
6  and turned and went straight to the JM Products.
7  Q. Were there any temperature devices there,
8  temperature gauges?
9  A. I don't -- there may be, I don't recall.
10 Q. Pressure gauges?
11 A. I don't think there were any pressure
12 gauges there. There was a pressure gauge inside the
13 unit.
14 Q. And when you were there on February 24,
15 2015, did you pull Andrea Rossi aside and say hey, this
16 isn't what we planned?
17 A. No, I did not.
18 Q. When you returned, did you tell Mr. Vaughn
19 or Mr. Darden that --
20 A. Most likely, yes.
21 Q. Did you ever tell Mr. Penon?
22 A. No.
23 Q. And you don't know sitting here today
24 whether Mr. Darden or Mr. Vaughn ever told Dr. Rossi or
25 Engineer Penon --

CONFIDENTIAL

Page 266

1   THE VIDEOGRAPHER:  We're off the
2   record at 5:50 p.m.
3       (Whereupon the deposition was
4   concluded at 5:50 p.m.)
5       (Signature reserved.)

Page 268

1            ERRATA PAGE
2                MMV
3
4   CASE NAME:  Rossi vs. Darden
5
6   WITNESS NAME:  THOMAS BARKER DAMERON, III
7   DATE:  December 1, 2016
8
9   PAGE   LINE   READS   SHOULD READ   REASON FOR CHANGE
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 267

1            SIGNATURE PAGE
2
3
4
5
6
7   _____
8      THOMAS BARKER DAMERON, III
9
10
11   SUBSCRIBED AND SWORN to before me this _____
12   day of_____, 2016.
13
14
15      _____
16         NOTARY PUBLIC
17
18   My Commission expires:_____

Page 269

1            C E R T I F I C A T E
2       I, Marisa Munoz-Vourakis, RMR, CRR and Notary Public,
3   the officer before whom the foregoing proceeding was
4   conducted, do hereby certify that the witness(es) whose
5   testimony appears in the foregoing proceeding were duly
6   sworn by me; that the testimony of said witness(es) were
7   taken by me to the best of my ability and thereafter
8   transcribed under my supervision; and that the foregoing
9   pages, inclusive, constitute a true and accurate
10  transcription of the testimony of the witness(es).
11      I do further certify that I am neither counsel for,
12  related to, nor employed by any of the parties to this
13  action in which this proceeding was conducted, and
14  further, that I am not a relative or employee of any
15  attorney or counsel employed by the parties thereof, nor
16  financially or otherwise interested in the outcome of the
17  action.
18  IN WITNESS WHEREOF, I have hereunto subscribed my name
19  this   of   , 2016.
20              MARISA MUNOZ-VOURAKIS
21  Notary #20032900127

68 (Pages 266 - 269)

Veritext Legal Solutions
800-726-7007                                    305-376-8800

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.