# Exhibit 3

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION
 3             CASE NO. 1:16-cv-21199-CMA
 4
      ANDREA ROSSI, et al.,
 5
                      Plaintiffs,
 6
          v.
 7
      THOMAS DARDEN, et al.,
 8
                      Defendants.
 9   - - - - - - - - - - - - - - - - - - -x
     INDUSTRIAL HEAT, LLC, et al.,
10
                      Counter-Plaintiffs,
11
          v.
12
      ANDREA ROSSI, et al.,
13
                      Counter-Defendants.
14
          and
15
      J.M. PRODUCTS, et al.,
16
                      Third-Party Defendants.
17   - - - - - - - - - - - - - - - - - - -x
18                    600 Brickell Avenue, Suite 3300
                      Miami, Florida
19                    Friday, February 24, 2016
                      10:17 a.m.- 7:56 p.m.
20
                   CONFIDENTIAL TRANSCRIPT
21         PORTIONS OF TRANSCRIPT HIGHLY CONFIDENTIAL
                    ATTORNEYS' EYES ONLY
22
           VIDEO DEPOSITION OF LEONARDO CORPORATION
23                 THROUGH ANDREA ROSSI
24         Taken before Edward Varkonyi, Registered
     Merit Reporter and Notary Public for the State of
25   Florida at Large, pursuant to Notice of Taking
     Deposition filed in the above cause.
```

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 14

1     A.  It happens also to me to forget to turn
2 off the telephone.
3     Q.  I believe I have some documents here.  I
4 am not sure whether I used -- I think I might have
5 shown you this one the last time, but I might not.
6         (The document referred to was thereupon
7 marked Deposition Exhibit 2 for Identification, a
8 copy of which is attached hereto.)
9         THE WITNESS:  Thank you.
10 BY MR. PACE:
11    Q.  Let me hand you what I marked as Exhibit
12 Number 2.  In fact, we did -- we did look at this
13 exhibit last week.  It was I think towards the end of
14 the time during the deposition.
15    Q.  A few questions I wanted to ask because I
16 want to understand this.  I had a chance to kind of
17 look at it a little bit better.  First of all what I
18 marked here as Exhibit 2, these are -- these are your
19 handwritten notes, correct?
20    A.  Yes, it is correct.
21    Q.  These are notes that would be taken, if I
22 look on the left-hand column, for example, in the
23 first page, that's the date, correct?
24        There is a date in February on this first
25 page starting from the 23rd going to the 28th; is

Page 15

1 that correct?
2     A.  It is correct.
3     Q.  The second entry is a recording of the
4 temperature taken at 5 p.m. from the steam -- from
5 the output -- I'm sorry, let me take a step back.
6 Just define some terms.
7         I think we used these same terms last
8 week.  I just want to make sure that there is no
9 confusion.
10        At the Doral location I will refer to the
11 E-Cat plant as probably just the E-Cat plant because
12 I know there is individual units within there called
13 the E-Cat units or reactors, correct?
14    A.  Correct.
15    Q.  Okay.  And what I will probably refer to
16 as the J.M. Products side is the side where the
17 output from the plant, from the E-Cat plant was being
18 sent.
19        Is that okay?
20    A.  Okay.
21    Q.  All right.  So there is -- there is
22 between the E-Cat plant and the J.M. Products side,
23 there is a -- or there was a pipe, correct, that
24 would take the output from the E-Cat plant and send
25 it over to the J.M. Products side of the warehouse,

Page 16

1 correct?
2         MR. ANNESSER:  Object to form.
3         THE WITNESS:  Can you repeat?
4 BY MR. PACE:
5     Q.  Yes.  At the Doral warehouse there was a
6 pipe that carried the output from the E-Cat plant
7 over to the J.M. Products side of the Doral
8 warehouse, correct?
9     A.  Correct.
10    Q.  All right.  What we have here on Exhibit
11 2, column -- the second column here is a reading of a
12 thermocouple that was on that output pipe; is that
13 correct?
14    A.  It is correct.
15    Q.  Now, is this -- where would you get this
16 information?
17        Can you read it directly from the
18 thermocouple or do you have to read it from a
19 separate computer?
20    A.  No, I read it by means of a manual
21 thermometer that was property -- was left there by
22 Engineer Penon, the ERV, what we define the expert
23 responsible of validation in the agreement, and he
24 gave me the task to read -- every day we agreed upon
25 to make the reading along my shift of work on the

Page 17

1 plant.
2         My shift of work was from say about
3 between 5 and 6 p.m. and between 10 and 11 a.m. of
4 the next day.  And so I have taken these lectures.
5     Q.  So this is -- so you're not reading the
6 temperature of a thermocouple, you are actually
7 putting a manual thermometer, so to speak, on the
8 pipe?
9         MR. ANNESSER:  Object to form,
10 mischaracterization.
11        THE WITNESS:  Can you repeat?
12 BY MR. PACE:
13    Q.  I can, because I might have
14 misunderstood.
15        When you get this temperature data, let's
16 take the first column here or the first line here
17 which is we got 23 for February 23.  We have --
18    A.  Yes.
19    Q.  We have 5 p.m. Yes, 5 p.m. which is the
20 time that you are doing this reading.  Then we have
21 103.
22        Is the 103, are you getting that -- is
23 that information that is being taken out of the
24 thermocouple that is on the pipe or is it information
25 that is being obtained separately by using some

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 34

1 taking every day of the temperature for the output
2 pipe from the E-Cat plant, correct?
3 　　　MR. ANNESSER:  Object to form.
4 　　　THE WITNESS:  Correct.
5 BY MR. PACE:
6 　　Q.  As well as our -- as well as the last
7 column that your recollection reflects somehow a
8 water level connected to the E-Cat plant?
9 　　　MR. ANNESSER:  Object to form.
10 　　　THE WITNESS:  Correct.
11 BY MR. PACE:
12 　　Q.  And just if you can kind of take a look
13 over the entirety of the page, I am just going to
14 tell you there is a lot of -- most of these
15 temperatures are all between 103.7 and 103.6.
16 　　A.  Uh-huh.
17 　　Q.  Is the device you were using, did it read
18 only one digit or did it read more than one digit and
19 you rounded to the closest -- I'm sorry, that was a
20 terrible question.  Let me ask it again.
21 　　　Did the device that you were using to
22 read the temperature, did it show only four digits,
23 such as 103.7, or would it reflect more than four
24 digits but you would round it off so if it said
25 103.68 you would write it as 103.7?

Page 35

1 　　　MR. ANNESSER:  Object to form.
2 　　　THE WITNESS:  The instrument that I used
3 showed exactly the four digit, the 100s and the
4 one decimal.
5 　　　If you are asking if it also indicated
6 the hundredth,, the answer is no.
7 BY MR. PACE:
8 　　Q.  That's exactly what I was asking.  Again,
9 to take a day out of here, October 12.
10 　　A.  Yeah.
11 　　Q.  The first manual reading you took shows a
12 temperature is at 103.7, correct?
13 　　A.  Correct.
14 　　Q.  This is for the output pipe going over to
15 Leonardo -- going over to the J.M. Products side of
16 the warehouse, correct?
17 　　A.  Yes, it is correct.
18 　　Q.  The next reading you took for that day
19 was 103.6, correct?
20 　　A.  Correct.
21 　　Q.  All right.  And the last is 103.7,
22 correct?
23 　　A.  Correct.
24 　　Q.  All right.  Dr. Rossi, can I ask you to
25 turn to the top of -- it's page 9295.  I believe it

Page 36

1 reflects the entries -- the manual entries for
2 December.
3 　　A.  Yes.
4 　　Q.  If you look at the December 2nd, the last
5 column has a 30 percent and then I have to be honest
6 with you, I have a hard time figuring out what is
7 written after that.  It looks like the word "Rich" is
8 in there.
9 　　　MR. ANNESSER:  Was there a question?
10 BY MR. PACE:
11 　　Q.  Can you tell me -- I'm sorry.  Can you
12 read that?
13 　　A.  I'm trying to recall.  "CU Rich J.M."
14 　　　MR. ANNESSER:  His question is can you
15 　　read that.
16 　　　THE WITNESS:  I can read, but I -- yes, I
17 　　can read it.
18 BY MR. PACE:
19 　　Q.  Let's start with that because I actually
20 even have a hard time reading it.  What does it say
21 after 30 percent there?
22 　　A.  Should be -- should be the letter, but
23 what I do not remember because -- if I wrote this,
24 this was for me.
25 　　　These notations were for me, not for

Page 37

1 Penon.  You know, at the moment I put down something
2 to remember something.
3 　　Q.  Okay.
4 　　A.  And I don't remember what that was.
5 　　Q.  I just want to write down some of these
6 days we were just looking at.  I am going to mark the
7 next exhibit as Exhibit 3.
8 　　　(The document referred to was thereupon
9 marked Deposition Exhibit 3 for Identification, a
10 copy of which is attached hereto.)
11 BY MR. PACE:
12 　　Q.  So this I believe is information that you
13 were -- that Leonardo was recording.  If you can see
14 there in the first page -- I'm sorry, let me start
15 this over again.
16 　　　For Exhibit 3 on the first page it
17 references "logbook of the performance data."  Is
18 this a logbook maintained by Leonardo Corporation?
19 　　A.  This is much more than that.  This is the
20 logbook that I maintained for the ERV.  This logbook
21 was not for Leonardo Corporation because the ERV
22 asked me to send to him every day at approximately
23 the same time -- I don't remember if I have taken
24 these values at the -- at 5 p.m., surely not at 4
25 a.m., but either 10 a.m. or 5 p.m. I don't remember,

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 38

1 but it's easy to reconstruct, make a comparison and
2 this is the log -- logbook that Penon asked to me to
3 update every day.
4    Every day I sent to him by e-mail as an
5 attachment this logbook with the new line every day.
6 So for example, this logbook was an attachment. The
7 first day of work of the plant had a logbook with
8 only one line because --
9    Q.   The line there that says 20?
10    A.   The line that says 20.
11    Q.   Okay.
12    A.   On the 21st I sent it to him the same
13 e-mail, but with the second line and so on and so on
14 and so on until the end.
15    Q.   And what e-mail address did you use to
16 send that?
17    A.   Sorry?
18    Q.   What e-mail address did you use to send
19 that?
20    A.   The e-mail address that Dr. Penon gave to
21 me.
22    Q.   So that's what you sent it to.  What
23 e-mail did you send it from, which of your e-mail
24 addresses?
25    A.   This -- you know, this I don't remember.

Page 39

1 But usually I use ar.123@mail.com or could have been
2 libero -- eon333@libero.it.  One of these two should
3 be.
4    Q.   When we look at Exhibit 3, each line that
5 corresponds to a date, such as the line for February
6 20th or the line for February 21st, the line for
7 February 20th, that reflects data or information that
8 you actually record on February 20th?
9    A.   Can you repeat the question?  I'm sorry.
10    Q.   Sure.  The first line of data in here
11 under February is February -- there is a 2-0,
12 correct?
13    A.   It's the 20th of February.
14    Q.   The 20th of February.  Then it has
15 numbers for water flow --
16    A.   Yes.
17    Q.   -- water, steam and P, which is short for
18 pressure, correct?
19    A.   Correct.
20    Q.   Each of those numbers reflects
21 information that you collected on February 20th,
22 wrote down on February 20th and sent to Dr. Penon
23 either on February 20th or February 21st, correct?
24    A.   Correct.
25    Q.   We'll come back and talk about this more

Page 40

1 generally.
2    Just for a second here, we're going to
3 jump up to June, just to go through.  I am actually
4 not trying to compare this to Exhibit 2.  I am just
5 trying to use some of the same reference dates.  So
6 it's page 1393.
7    A.   Yes.
8    Q.   Okay.  So we have here -- when we were
9 talking about Exhibit 2, we were talking about this
10 kind of June 7th, 8th, 9th.
11    What this reflects here, I have got a
12 line that has under June on page 1393, there is a
13 line that has 7 colon.  This is information that you
14 collected on the 7th of June, correct?
15    A.   Uh-huh.
16    Q.   It shows that there is a flow meter
17 reading that you took on the 7th of June --
18    A.   Uh-huh.
19    Q.   -- there is a water temperature reading
20 you took on the 7th of June, there is a steam
21 temperature reading you took on the 7th of June --
22    A.   Uh-huh.
23    Q.   -- and there is a pressure reading you
24 took on the 7th of June?
25    A.   Yes.

Page 41

1    Q.   All right.  Next -- the next paragraph
2 there has an 8 that reflects information you
3 collected on June 8th, correct?
4    A.   Uh-huh.
5    Q.   Information that you recorded on June
6 8th, correct?
7    A.   Yes.
8    Q.   Information you transmitted to Dr. Penon
9 on either June 8th or June 9th of 2015, correct?
10    A.   Right.
11    MR. ANNESSER:  Object to form.
12 BY MR. PACE:
13    Q.   Line 9 is similar because it also -- this
14 reflects data you collected on June 9th, correct?
15    A.   Sorry, can you repeat the question?
16    Q.   Yes.  You see the paragraph that starts
17 with 9 colon, on this page Rossi 1393?  That
18 paragraph reflects data that you collected on June
19 9th, correct?
20    A.   Correct.
21    Q.   It has a water flow meter reading --
22    A.   Uh-huh.
23    Q.   -- a water temperature reading, a steam
24 temperature reading and a pressure reading, correct?
25    A.   Correct.

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 154

1 that question next.  So you're one step ahead of me.
2        My question right now was did you ever
3 actually look at the data that Fulvio Fabiani
4 collected to see whether it was consistent with the
5 data that you were collecting from the Penon
6 measuring equipment?
7        A.  No, because -- no, because Fabiani
8 collected those data in a language that for me -- in
9 a particular language, so -- and I was not interested
10 honestly because for me what counted was what I read
11 in the instruments of Penon and that was all.
12        But, honestly, I told to Fabiani many
13 times, I told -- I am -- I am finding this
14 temperature between 103 and 104, blah, blah, does
15 this make sense with what you are measuring with your
16 instrument, and he always said yes, we are in the
17 same -- we are in the same range.  At this level,
18 yes.
19        Q.  So you would -- you would discuss with
20 Fabiani the data he was collecting but you didn't
21 actually look at his underlying data?
22        A.  Yes, I did not discuss those data.  I
23 just now and again randomly for curiosity and also
24 for -- you know, for serious curiosity, not curiosity
25 just joking.

Page 155

1        For curiosity I asked him does this data
2 that does this -- because the only thing that we
3 could confront about was the temperature, because
4 he -- because I was just measuring -- I was reading
5 the flow meter and there was nothing to discuss.
6        That was a seal at the thing with numbers
7 around and you have to read it, so there is nothing
8 to discuss.  For the temperature there is the
9 situation is not just reading a running wheel, but
10 there are probes and so it is interesting to see if
11 the probes are coherent or not.
12        And I asked now and again and always --
13 it never happened that I said, are you between 103
14 and 104?  It never happened that he said no, I am in
15 completely different on mine.
16        Q.  The data that was collected from the
17 Penon measuring equipment, at least it was collected
18 electronically.  Do you recall where that was stored?
19        MR. ANNESSER:  Object to form.
20        THE WITNESS:  Excuse me, I did not
21 understand the question.
22 BY MR. PACE:
23        Q.  So thermocouples will generate data,
24 correct, that is stored electronically on a computer
25 somewhere or in a data log?  Do you recall how that

Page 156

1 data was being stored in connection with the Penon
2 measuring equipment?
3        MR. ANNESSER:  Object to form.
4        THE WITNESS:  I never knew a bit about
5 that stuff and I was absolutely not interested
6 to that.  It was not my turf.
7 BY MR. PACE:
8        Q.  And so Leonardo Corporation has no
9 information on how or where that data was stored for
10 Penon?
11        A.  Absolutely not.
12        Q.  If Dr. Penon testified that Fulvio
13 Fabiani would send him -- would access that data and
14 send it to him every couple of months, Leonardo
15 Corporation doesn't have any information that is
16 contrary to that?
17        MR. ANNESSER:  Object to form.
18        THE WITNESS:  Absolutely.  Sorry.  I have
19 no information about that.
20 BY MR. PACE:
21        Q.  Okay.
22        A.  The only thing I knew was there was a
23 computer of Penon that was storing that.  That's all
24 I know.
25        Q.  Did you ever see Fulvio Fabiani accessing

Page 157

1 that computer?
2        A.  Can you repeat?
3        Q.  Did you ever see Fulvio Fabiani using
4 that computer?
5        A.  Not that I can recall.
6        Q.  I think you testified to this earlier but
7 I want to make sure I've covered it, which is do you
8 recall any of the Penon measuring equipment ever
9 being replaced?
10        A.  Not that I can recall.  But I remember
11 now this morning we have read somewhere in an exhibit
12 of yours that the PCE 830 had stopped.
13        I don't remember if that was for some --
14 maybe was a blackout, no.  I don't remember.  But
15 this morning during the deposition we have read
16 something about the PCE 830.  I don't remember what
17 that was.
18        Q.  Okay.  And Leonardo Corporation doesn't
19 have any information on that?
20        A.  It was a blackout.  It was a blackout.
21 Now I remember.  It was a blackout and it was written
22 during the blackout out the PCE 830 is going out of
23 service.  That was it, yeah.
24        Q.  So Leonardo Corporation doesn't have any
25 information on any of the measuring equipment ever

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 174

1    plant, of course under my control.
2 BY MR. PACE:
3        Q.   Can you tell me about when that is?  Are
4 we still in 2014 or are we beginning 2015?
5        A.   This is difficult to say.  You must
6 consider that if the plant has been, let me say just
7 one number that could be wrong.  Assume the plant
8 arrived the 1st of November.
9            Now we have from the 1st of November to
10 the 23rd of February, you know, inside the period
11 there was also Christmas, the Christmas holidays,
12 blah, blah, blah, so one month is gone in various
13 kinds of holidays.
14           So basically we had all November, half
15 December and half January to complete the -- because
16 much work had to be done yet.
17           At that point when we scheduled or when
18 we understood that more or less within ten days we
19 would have been completed, I phoned to the ERV and
20 said from the 15th of February we are ready, you can
21 come when you want.
22        Q.   And did you -- well, let me -- let me see
23 if I can -- I believe this is an exhibit we used in
24 your last deposition but let me mark as Exhibit
25 Number 9.

Page 175

1            (The document referred to was thereupon
2 marked Deposition Exhibit 9 for Identification, a
3 copy of which is attached hereto.)
4        THE WITNESS:  Thank you.  Okay.
5 BY MR. PACE:
6        Q.   Do you recall this -- there being an
7 e-mail exchange between you, Dr. Penon and Tom Darden
8 about how the test was going to operate in Doral?
9        A.   No, I don't remember but I take advice of
10 this now from you.  For sure it's genuine.
11       Q.   You're actually I think going to answer
12 my question then because my question was really going
13 to be do you know anything about what is being
14 discussed in this e-mail --
15       A.   I don't remember.
16       Q.   -- beyond what is written in the e-mail?
17       A.   Let me read the e-mail.  If I read the
18 e-mails maybe something comes up.  So they are in
19 reverse order of date.  The last is the first, is
20 that correct?
21       Q.   Yes, sir.
22       A.   Okay.  (Witness reading to himself.)
23       MR. ANNESSER:  If you read allowed he has
24 to take it down.
25       THE WITNESS:  I am sorry.

Page 176

1        MR. PACE:  He has to write mumble,
2 mumble, mumble.
3        THE WITNESS:  All right.  Well, now your
4 question is if -- your question was?
5 BY MR. PACE:
6        Q.   Do you recall this e-mail exchange about
7 questions about the test plan?
8        A.   Now that I have read it, I recall it.
9 And I -- it seems to me it confirms what I said
10 before basically.
11       Q.   If you look at page 19106.
12       A.   Yes, got it.
13       Q.   This actually is an e-mail from
14 Dr. Penon.
15       A.   Dear Mr. Darden, yeah.  From Fabio Penon,
16 yes.
17       Q.   And if you look at the last full
18 paragraph there it starts with:  "Following my
19 request."
20       A.   Following.
21       Q.   It says:  "Following my request a few
22 weeks ago --
23       A.   Yes.
24       Q.   -- before the plant start up Dr. Rossi has
25 to apply a condensed steam collector at the bottom of

Page 177

1 the steam pipe before the plant start up."
2        A.   Perfect.
3        Q.   Do you recall having that conversation
4 with Dr. Penon?
5        A.   I recall this perfectly.
6        Q.   And he is accurately summarizing the
7 conversation that he had with you, that you were
8 agreeing to apply a condensed steam collector?
9        A.   I recall perfectly.
10       Q.   All right.  I'm sorry, I understand you
11 recall the conversation perfectly.  I guess my next
12 question is is his summary of that conversation
13 accurate?
14       A.   No, this conversation is accurate.
15       Q.   So you had -- at the request of
16 Dr. Penon --
17       A.   Yes.
18       Q.   -- you had agreed to install a condensed
19 steam collector at the bottom of the steam plant?
20       A.   Sure.
21       Q.   I'm sorry, steam pipe.
22       A.   See here -- yes.  Condensed steam, yes,
23 exactly.
24       Q.   And then -- most of these e-mails are not
25 then -- that is the one e-mail where he was

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 178

1 describing a conversation with you, so I wanted to
2 ask about that.  There is also an e-mail in here from
3 you and it's on page 19104.
4      A.  Sorry, 19104?
5      Q.  Uh-huh.
6      A.  19104.  Here we go.  Yes.
7      Q.  So the paragraph I'm interested in, do
8 you see a sentence about halfway down it starts
9 with:  All those instruments for the measurement of
10 temperature -- I'm sorry.
11      A.  And of the steam, of the pressure of the
12 steam and of the temperature of the water and the
13 water tank inside the container connected with a
14 computer of Engineer Penon, that he brought here and
15 registers the data 24 hours per day, as well as with
16 the control system -- am I mumbling enough clearly
17 for you?  Obviously Penon will consider for his
18 calculations, blah, blah, blah.  I think now he is
19 embarking, et cetera.
20      Q.  Let me just -- I want to read one small
21 part of this and see if I can understand this
22 better.  It talks about data going to the computer of
23 Engineer Penon.
24      A.  Yes.
25      Q.  But then says, "as well as with the

Page 179

1 control system of ours."
2      A.  Sorry.
3      Q.  Then a little bit later or then right
4 after that you say:  "Obviously Penon will consider
5 for his calculations only the data registered by his
6 computer."
7      A.  Yes.
8      Q.  "But we can compare data that he will
9 find with the data that we will find."
10      So my question is, what is the data --
11 what are you referring to as the data we will find?
12      A.  With this we was the team.  In particular
13 these were the parallel measurements that Fabiani had
14 told me that had prepared under the direction of
15 Darden.
16      Q.  And you are saying here that you -- you
17 and someone else, you and Fabiani, because it says
18 we, we can compare the data that he will find with
19 the data that we will find?
20      A.  Yes.
21      MR. ANNESSER:  Object to form.
22 BY MR. PACE:
23      Q.  Do you recall ever comparing that data
24 with Fabiani, other than what you described earlier
25 today?

Page 180

1      MR. ANNESSER:  Object to the form.
2      THE WITNESS:  Other than what I described
3 before, no.
4 BY MR. PACE:
5      Q.  All right.  It says, data is collected
6 with -- data is collected in a computer of Engineer
7 Penon, as well as with the control system of ours.
8      Is that the control system that was
9 operated by Fulvio Fabiani?
10      A.  Yes, sir.
11      Q.  Where was the condensed steam collector
12 placed?
13      A.  It was placed -- I set it up, I remember,
14 together with Tom Darden and it was basically a
15 rubber pipe with a cup at the bottom that had to
16 collect -- there is -- okay.
17      Along the pipe, the steam pipe that
18 exited from the one megawatt plant to go to the J.M.
19 plant, we have put this cup, this plastic cup sealed
20 with the bottom of the steam pipe so that any
21 dripping of water was visible at any time and it was
22 put inside the insulation, but the insulation was
23 made in a way that it could be easy displaced to pull
24 down the rubber pipe, open the valve that was at its
25 end and see if water was going down.

Page 181

1      And I remember perfectly that Darden
2 together with me and Fabiani all -- quite all the
3 times that Darden came down, he wanted to see the
4 dripping of the water from, and we never have seen
5 any dripping of water.  And also the ERV.  Also the
6 ERV during his -- during his -- during the days in
7 which he came controlled the dripping.
8      Q.  So let me hand you what I will mark --
9      A.  Yes, exactly.
10      Q.  -- as Exhibit 10.
11      A.  Yes, very good.  Not that I can indicate
12 to you.  Not there.  You can see the dripping in --
13      MR. ANNESSER:  Dr. Rossi, let him hand
14 you the exhibit and let me get a copy too.
15      THE WITNESS:  Okay.  Okay.  Sorry, sorry,
16 sorry.  You have a photo that is precise,
17 because you already gave it to me the last
18 time.
19      MR. PACE:  That would be 10 and 11.
20      (The document referred to was thereupon
21 marked Deposition Exhibit 10 for Identification, a
22 copy of which is attached hereto.)
23      (The document referred to was thereupon
24 marked Deposition Exhibit 11 for Identification, a
25 copy of which is attached hereto.)

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 262

1     A.  No, through a bypass.  Yes, through a
2  bypass that -- yes, in any case, yes, the steam
3  arrived -- this is the steam that run inside these
4  pipes arrived from the Leonardo -- Leonardo's plant,
5  yes, sir.
6     Q.  So the cylinders you were just referring
7  to or the reactors, can we see where in the piping --
8  just where in the piping they would be here?  Can you
9  tell me which pipe they would be in?
10     A.  All the insulated pipes that you can see.
11     Q.  Okay.  So there is reactors on four
12  levels of pipes that show up --
13        MR. ANNESSER:  Object to form.
14        MR. LEON DE LA BARRA:  Join.
15        THE WITNESS:  When this photos has been
16     taken, yes.
17  BY MR. PACE:
18     Q.  Okay.  In those reactors were containers,
19  they might have graphene in them or they might have
20  platinum sponge in them?
21        MR. ANNESSER:  Object to form.
22        THE WITNESS:  There was only -- there was
23     only a couple of them with the platinum sponge
24     and --
25  BY MR. PACE:

Page 263

1     Q.  How many of them with graphene?
2        MR. ANNESSER:  Object to form.
3        MR. LEON DE LA BARRA:  Join in that
4     objection.
5        THE WITNESS:  Around 30.
6  BY MR. PACE:
7     Q.  And you removed -- you removed and
8  checked at least the platinum sponge containers but
9  for the cylinders that had the graphene in them, is
10  it the same situation, which is every so often you
11  had to pull them out of this tubing and check them?
12     A.  Yes.
13     Q.  All right.  And to do that did anyone
14  ever assist you in checking the cylinders?
15     A.  No.
16     Q.  Was anyone ever in the container with you
17  when you checked the cylinders?
18        MR. ANNESSER:  Object to form.
19        MR. LEON DE LA BARRA:  Object to form.
20        THE WITNESS:  No.
21  BY MR. PACE:
22     Q.  How did you turn off the steam coming
23  over to J.M. Products so you could check the
24  cylinders?
25        MR. ANNESSER:  Object to form.

Page 264

1        MR. LEON DE LA BARRA:  Object to form.
2        THE WITNESS:  Can you repeat the
3     question?
4  BY MR. PACE:
5     Q.  Sure.  You couldn't physically go in
6  there and remove the cylinders while what you have --
7  you are saying is 103 or 100 degree Celsius steam
8  coming through those pipes, you can't reach in there
9  and take a cylinder out of it and then put it back
10  in, can you?
11     A.  Yes.
12     Q.  The steam -- so --
13     A.  No, the steam was bypassed.
14     Q.  Bypassed how?
15     A.  It was bypassed.  We had a bypass.
16     Q.  There was a bypass located up where the
17  steam was coming into the container?
18     A.  Yes.  The bypass was located in -- just
19  behind the wall there was a bypass.
20     Q.  Behind -- if we look at Exhibit 12 --
21     A.  Yes.
22     Q.  -- behind the gray wall?
23     A.  Yes, behind this we had a bypass and the
24  bypass allowed the steam in part or in total to the
25  plant or all the steam out from the plant.

Page 265

1     Q.  So the steam would be bypassed, it would
2  either just be released into the warehouse or it
3  would be circled back into the --
4        MR. LEON DE LA BARRA:  Object to form.
5        MR. ANNESSER:  Object to form.
6        THE WITNESS:  No, it could not be
7     released in the warehouse.  The steam was sent
8     to the heat exchanger that we had, that I
9     explained to you the last time when I -- in my
10     former deposition.
11        So we had a bypass there that could
12     either allow part or total -- on total the steam
13     because I did not know how much -- how much
14     steam it could be necessary in the various
15     phases so we had a bypass that --
16  BY MR. PACE:
17     Q.  Who?
18     A.  Sorry.
19     Q.  Who built the bypass?
20     A.  We did it, because the bypass is made by
21  pipes with a butterfly.
22     Q.  But who is we?
23     A.  I, with the help of contractors.
24     Q.  And are they the same contractors who
25  built the heat exchanger?

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 266

```
1       A.  You know, there was not the same
2  contractors because sometime we had some contractor
3  that -- that we call it from outside, but in that
4  industrial area mainly in that period every day
5  arrived guys with trucks that were ambulant --
6  ambulant workshops, you know, with welders, et
7  cetera.
8       And they knocked at the door saying you
9  need help, et cetera, et cetera and I use it many,
10 many times those guys because they are very well
11 skilled, very good and I -- and also the advantage is
12 they were not curious.  They just wanted to work.  So
13 under -- I myself, I work with them and we made this
14 piping system.  I bought pipes and we made all the
15 connections.
16      Q.  And pipes as well as fans, correct?  You
17 had fans for your heat exchanger?
18      A.  Yes.
19      Q.  You had to have the heat exchangers
20 themselves, correct?
21      A.  Yes.
22      Q.  Who paid for that?
23      A.  Leonardo Corporation.
24      Q.  Leonardo Corporation?
25      A.  Yes.
```

Page 267

```
1       Q.  Are there records reflecting those
2  purchases by Leonardo Corporation?
3       MR. ANNESSER:  Object to the form.
4       THE WITNESS:  I suppose so, yes.
5  BY MR. PACE:
6       Q.  So there is records you assume that
7  reflect purchasing heat exchangers?
8       A.  No, the heat exchangers are pipes.  I
9  bought pipes.
10      Q.  How about the fans, are there records
11 reflecting the fans?
12      A.  Yes.
13      Q.  Because those would have to be pretty big
14 fans that were done, correct?
15      A.  I had two fans with a total capacity
16 of -- within the fan of the heat exchanger.
17      Q.  The fans for the heat exchanger, those
18 would be pretty bag fans?
19      A.  They had the capacity necessary to move
20 the air that had to be moved.
21      Q.  And did you testify before that the way
22 of getting the heat out was through the second story
23 office?
24      A.  No, it was not an office.
25      MR. ANNESSER:  Object to form.
```

Page 268

```
1  BY MR. PACE:
2       Q.  Office.  Second story space?
3       A.  Now it's becoming an office.  Then was
4  a -- basically was a pretty big -- pretty big, I
5  would say workshop that we had in the second level.
6       Q.  You said we had.  We had being that
7  second level?
8       A.  We is --
9       Q.  Is there no distinction really in this
10 context between Leonardo and J.M. Products --
11      MR. LEON DE LA BARRA:  Object to form.
12 BY MR. PACE:
13      Q.  -- just space you worked?
14      MR. ANNESSER:  Object to form.
15      THE WITNESS:  No, no.  When I say we is
16 because I worked with the contractors with, you
17 know, when I -- I was not alone there.  So when
18 I say we, it's because it was -- there was not
19 only me.  I was with contractors, et cetera.
20      And Jim Bass also sometimes for other
21 things, et cetera, et cetera.  So I say we for
22 my -- it is my custom to say we and not I.
23 BY MR. PACE:
24      Q.  And up in this second story your
25 testimony I think was that to get the heat out you --
```

Page 269

```
1  you or somebody knocked out the window on the second
2  story?
3       A.  Yes, the second floor we had big windows
4  and we had to remove it completely one.  Now we have
5  reset everything because we're making offices there.
6       Q.  So Leonardo paid for the piping --
7       A.  Yes.
8       Q.  -- that was used for the heat exchanger?
9  Leonardo paid for the workers that did the work?
10      A.  Yes.
11      MR. ANNESSER:  Object to the form.
12 BY MR. PACE:
13      Q.  Leonardo paid for the fans that were used
14 for the heat exchanger system?
15      MR. ANNESSER:  Object to form.
16      THE WITNESS:  Yes.
17 BY MR. PACE:
18      Q.  And this heat exchanger, the bypass, I am
19 just trying to understand.  We have both a bypass --
20 I'm sorry.
21      Is it your testimony -- is the testimony
22 that the piping for this heat exchanger ran along the
23 side of the wall where the -- essentially this wall
24 here that we see in Exhibit 12, but just on the J.M.
25 Products side?
```

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 270

1    A.  Yes.
2    Q.   Did it go straight up and then straight
3  over to the --
4    A.   It's impossible --
5    Q.  -- loft?
6    A.  -- to answer this way because there was a
7  design and the bypass was run along the -- if we look
8  at this wall from the side of Leonardo, if we look
9  from here on, this run through the right -- yeah.
10   Q.   So if we're looking at Exhibit 10 now?
11   A.   Yeah, this run along the -- this run down
12  and then along the right side of the plant of J.M.,
13  with the transmissions to the bypass.  To the bypass
14  that was on the flank and also -- and also there was
15  the frontal connection for the inlet of the steam.
16   Q.   So by this picture that you have there
17  that is Exhibit 10, is this after the heat exchanger
18  was removed from the warehouse or before?
19   A.   I cannot -- I cannot say from this
20  photos.  It could be -- no, this photo has been made
21  before.
22   Q.   Before the heat exchanger was put into
23  place?
24   A.   No.
25      MR. ANNESSER:  Object to the form.

Page 271

1      THE WITNESS:  No, this photo has been
2    made before it has been dismantled.  This photo
3    has been made -- this photo has been made when
4    the heat exchanger was in operation.
5  BY MR. PACE:
6    Q.   So the heat exchanger was in operation
7  when that photo was made.  You recognize that photo
8  having been made when?
9      MR. ANNESSER:  Object to form.
10      THE WITNESS:  I don't know, you did it.
11  BY MR. PACE:
12   Q.   How do you know the heat exchanger was in
13  place then?  That's what I don't understand.
14   A.   Because we had the plant in operation
15  because when the plant stopped to be in operation all
16  this piping has been removed.
17   Q.   I understand.  I will actually come to
18  that in just a second.  Simply because the pipe is
19  there --
20   A.   I suspect that this photos have been made
21  the last day of the test.  I suspect.
22   Q.   You understand the last day of the test
23  the heat exchanger was still there?
24   A.   Of course.
25   Q.   Who removed that piping?

Page 272

1    A.  I did.
2    Q.   When did you remove that piping?
3    A.   After the end of the test.
4    Q.   Where is that piping now?
5    A.   We use it to make other things.  I
6  recovered all the pieces that were not -- no more
7  necessary to make other things and the heat
8  exchanger -- all the pipes of the heat exchanger have
9  been recovered to make other things and that space
10  now is becoming offices.
11   Q.   Let's see if I understand.  You are
12  looking there at Exhibit 10, there is a pipe there in
13  Exhibit 10 that we see that is the pipe you are
14  saying was carrying the output of the E-Cats over to
15  the J.M. Products side of the Doral warehouse,
16  correct?
17      MR. ANNESSER:  Object to the form.
18  BY MR. PACE:
19   Q.   That's what we see there?
20   A.   You should repeat speaking if possible a
21  little bit slower.
22   Q.   Sure, certainly will.  There in Exhibit
23  10 we see insulated pipe --
24   A.   Yeah.
25   Q.   -- that is carrying the output of the

Page 273

1  E-Cat plant over to the J.M. Products side of the
2  Doral warehouse, correct?
3    A.   Yes.
4    Q.   That has now been -- you removed that
5  pipe after -- sometime after February 16 of 2016,
6  correct?
7      MR. ANNESSER:  Object to form.
8      THE WITNESS:  Correct.
9  BY MR. PACE:
10   Q.   And you have repurposed that piping or
11  you now are using that piping for another purpose?
12      MR. ANNESSER:  Object to the form.
13      THE WITNESS:  It's correct.
14  BY MR. PACE:
15   Q.   And you didn't maintain the pipe, you
16  didn't maintain the insulation, it's been put to
17  another use?
18      MR. ANNESSER:  Object to form.
19      THE WITNESS:  (Nods head.)
20  BY MR. PACE:
21   Q.   The heat exchanger no longer exists at
22  the Doral location, correct?
23   A.   Correct.
24   Q.   The piping that was used for the heat
25  exchanger you have now put to another use, you didn't

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 274

1 maintain any of the piping for the heat exchanger?
2        MR. ANNESSER: Object to form.
3 BY MR. PACE:
4     Q.   Is that correct?
5     A.   Correct.
6     Q.   The -- I assume you replaced the window
7 on the J.M. Products side, Leonardo paid for that?
8        MR. ANNESSER: Object to form.
9        THE WITNESS: We have represented as it
10    was before we have installed the --
11 BY MR. PACE:
12    Q.   What's your testimony as to when that
13 window was put back in?  Was it February 16th or 17th
14 of 2016?
15    A.   Sorry, can you repeat the question?
16    Q.   Sure.  Your testimony is that the heat
17 exchanger was in place and functioning all the way
18 through at least February 16 of 2016, correct?
19    A.   Correct.
20    Q.   So up until February 16 of 2016 that
21 window in the second story was removed, correct?
22        MR. ANNESSER: Object to the form.
23        MR. LEON DE LA BARRA: Object to the
24    form.
25        THE WITNESS: Can you repeat the

Page 275

1    question?
2 BY MR. PACE:
3     Q.   I will.
4     A.   A little bit slower.
5     Q.   Sure.  You said that the heat exchanger
6 was pushing the heat out the window on the second
7 story --
8     A.   Yes.
9     Q.   -- on the J.M. Products side, correct?
10    A.   Yes, correct.
11    Q.   Once -- as long as the heat exchanger was
12 in place --
13    A.   Yes.
14    Q.   -- that window had to be removed, correct?
15    A.   Correct.
16    Q.   Otherwise that room would have turned
17 into an absolute furnace?
18        MR. LEON DE LA BARRA: Object to form.
19        THE WITNESS: Of course.
20 BY MR. PACE:
21    Q.   Of course, notwithstanding the form.  So
22 after you took -- after the plant was turned off and
23 you took the heat exchanger down, you could replace
24 the window on that second story, in that second story
25 room, correct?

Page 276

1        MR. ANNESSER: Object to form.
2        THE WITNESS: Correct.
3 BY MR. PACE:
4     Q.   So sometime after February 16 of 2016 is
5 when you replaced the window on the second story?
6     A.   No, the window as it was before has been
7 replaced not much time ago.  Not much time ago when I
8 decided to make offices.  Because --
9     Q.   And do you recall who you paid to put the
10 window back in?
11    A.   Yes.
12    Q.   Who was that?
13    A.   Was a contractor.
14    Q.   Do you recall --
15    A.   Together with -- together with me, yes.
16    Q.   When we talk about contractor, is this
17 again somebody who -- like a day laborer?
18    A.   Yes.
19    Q.   Somebody who you -- there is no records
20 of who this person is that Leonardo Corporation
21 maintains?
22    A.   Yes.
23    Q.   You are not aware of any records that
24 anyone maintains as to who this person is?
25    A.   No.

Page 277

1        MR. ANNESSER: Object to form.
2 BY MR. PACE:
3     Q.   And that person worked with you to
4 replace the window, correct?
5     A.   Yeah, yeah.
6     Q.   No one else was present at the time?
7        MR. ANNESSER: Object to form.
8        THE WITNESS: No.
9 BY MR. PACE:
10    Q.   And what happened to the fans?
11    A.   The fans are still there.
12    Q.   The fans are still in the warehouse?
13    A.   Yeah.
14    Q.   And what happened to the cylinders?
15    A.   The cylinders have been -- I have used
16 them for other things.  I have recovered them for
17 other things.  Can we cut five minutes?
18    Q.   Certainly.
19    A.   Only call my wife.
20    Q.   Please.  We will go off the record.
21    A.   Five minutes.
22        THE VIDEOGRAPHER: The time is 18:16.
23    Off the record.
24        (Thereupon a brief recess was taken,
25 after which the following proceedings were had.)

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 286

1 Trust -- I'm actually going to say -- I'm not asking
2 into.  I'm asking does the Platinum American Trust
3 make any payments to Leonardo?
4     A.  No.
5         MR. ANNESSER:  Object to form.
6 BY MR. PACE:
7     Q.  And Leonardo doesn't make any payments to
8 Platinum American Trust?
9     A.  No.
10    Q.  Are you aware that at some point in 2016
11 Leonardo was asked to transfer or assign the license
12 patents under the licensing agreement to Industrial
13 Heat or IPH?
14    A.  Can you kindly repeat --
15        MR. ANNESSER:  Object to form.
16        THE WITNESS: -- the question because it's
17    heavy.
18 BY MR. PACE:
19    Q.  I can.  It is.  I'll rephrase it.  I will
20 see if I can break it down a little bit.  That might
21 make it easier.
22    A.  Thank you.
23    Q.  Are you aware that under the license
24 agreement there is a provision that says upon the
25 request of either Industrial Heat or IPH, that

Page 287

1 Leonardo and Rossi shall assign to Industrial Heat or
2 IPH what are called the licensed patents; are you
3 familiar with that?
4         MR. ANNESSER:  Object to form.
5         THE WITNESS:  Yes.  Yes.
6 BY MR. PACE:
7     Q.  Are you aware that in 2016 IPH and
8 Industrial Heat requested that such an assignment
9 occur?
10        MR. ANNESSER:  Object to form.
11        THE WITNESS:  I don't recall exactly but
12    if you have any document about that.  I don't
13    recall exactly what happened in 2016 on this
14    matter.
15 BY MR. PACE:
16    Q.  Okay.
17    A.  So if -- if you have some document to
18 show me, I will be glad to take a look at it.
19    Q.  I think it's actually an attachment to
20 the complaint, but I don't have it here but I am
21 going to make the easier part to it which is whether
22 or not that was sent, Leonardo has -- Leonardo
23 Corporation or yourself individually have not
24 assigned any of your patents -- let me start that
25 over again.

Page 288

1         Leonardo Corporation has not assigned any
2 patents it owns to anyone else in the year 2016; is
3 that correct?
4     A.  Absolutely.
5     Q.  Dr. Andrea Rossi has not assigned any
6 patents he owns to anyone else in the year 2016?
7         MR. ANNESSER:  Object to form.
8         THE WITNESS:  Correct.
9 BY MR. PACE:
10    Q.  And would the answers be the same also
11 for the year of 2017?  In other words, Leonardo has
12 not made any such assignment in 2017, correct?
13    A.  Correct.
14        MR. ANNESSER:  Object to form.
15 BY MR. PACE:
16    Q.  And Dr. Rossi has not made any such
17 assignment in 2017?
18    A.  Correct.
19        MR. ANNESSER:  Same objection.
20 BY MR. PACE:
21    Q.  For the temporary workers that you would
22 hire on different occasions at -- for work at the
23 Doral location, is there any identifying information
24 that you have as to any of those individuals?
25        MR. ANNESSER:  Object to form.

Page 289

1         THE WITNESS:  Can you repeat?
2 BY MR. PACE:
3     Q.  Yes.  There were a number of temporary
4 workers --
5     A.  Yes.
6     Q.  -- that were hired for work to be done at
7 the Doral warehouse, correct?
8     A.  Correct.
9     Q.  Do you have any identifying information
10 as to any of those individuals?
11        MR. ANNESSER:  Object to form.
12        THE WITNESS:  The information that I had,
13    for the ones of which I had information, I
14    already provided you with the discovery because
15    you asked -- you asked in some phase of this
16    litigation to be informed about all the supply,
17    blah, blah, et cetera, and I supplied.
18        So the ones of which I have the
19    possibility to have a track, I already have
20    informed you.
21 BY MR. PACE:
22    Q.  That's the information that you're aware
23 that your attorney put into a interrogatory response
24 and then you signed?
25    A.  Can you please speak slower?

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 290

1    Q.   I can.
2    A.   Thank you.
3    Q.   That's information that your attorney put
4  into -- put in writing and then you signed and swore
5  that that was accurate?
6    A.   Correct.
7         MR. ANNESSER:  Object to form.
8         THE WITNESS:  Correct.
9  BY MR. PACE:
10   Q.   We talked about this earlier today but I
11 don't think -- I am not quite sure if I really closed
12 the loop on this.
13        What alterations were made to the E-Cat
14 plant in Doral as compared to how it existed when it
15 was shipped from Raleigh to Doral?
16        MR. ANNESSER:  Object to form.
17 BY MR. PACE:
18   Q.   Do you want me to do that again?
19   A.   Yes.
20   Q.   At some point in November, December -- at
21 some point between October and December of 2014 the
22 E-Cat plant was shipped from Raleigh to Doral.
23        My question is after that occurred what
24 changes were made to the plant in Doral?
25   A.   Now I have understood perfectly.  Well,

Page 291

1  let me think.
2         As I said before, when the plant -- of
3  course we're talking of the one megawatt plant has
4  been delivered from Raleigh to Doral it was
5  incomplete.  It was not ready to go.
6         It was still incomplete and so Industrial
7  Heat sent to Doral not only the plant but also, if I
8  were recall, six workers, very good ones I must say,
9  very well skilled and they worked for two months to
10 complete everything, because it was very incomplete,
11 the plant.
12        And there was to make pipings,
13 connections, et cetera, et cetera.  So I would not
14 say -- if I remember well in your question was
15 contained the word altered, but nothing has been
16 altered.  It has been completed.
17   Q.   Okay.
18   A.   Like you receive a kit and you have to
19 complete it.  So which works did they do?  A lot
20 because they mounted the tank.  They mounted a lot of
21 pipings.  They made a lot of connections.
22   Q.   Can I ask it slightly differently?
23 Because this will help, just a word, which is what
24 you are saying is that these workers, they
25 reassembled the plant along with the piping that was

Page 292

1  shipped down from North Carolina?
2    A.   Yes, sir.
3    Q.   Because in North Carolina, for example,
4  the pipe that went from the plant over to the J.M.
5  Products side was put together in North Carolina, it
6  just had to be reconnected to the plant down in
7  Florida?
8    A.   No.
9         MR. ANNESSER:  Object to form.
10        THE WITNESS:  The plant that connected
11 the J.M. plant to the Leonardo plant was not of
12 our property.  Was of J.M.
13 BY MR. PACE:
14   Q.   Okay.
15   A.   But -- but many pipings have been
16 delivered from -- from Industrial Heat from Doral --
17 from Raleigh to Doral in Florida that have been
18 assembled because there are -- there is a kilometer
19 of pipings inside the plant.
20   Q.   That's what I meant.  So when you were
21 talking about these six workers though, what they
22 were doing is essentially reassembling the plant and
23 the related equipment, like the water tanks and the
24 tubing or the piping that was initially put together
25 in Raleigh?

Page 293

1         MR. ANNESSER:  Object to the form.
2         THE WITNESS:  Reassembling is the wrong
3    word.  To reassemble means first disassemble,
4    then reassemble.
5  BY MR. PACE:
6    Q.   Right.
7    A.   It is not so.  The plant has been
8  delivered at the state -- in the state it had arrived
9  to be in Raleigh.
10        Together with this there was another
11 truck full of a lot of components that -- parts that
12 had to be still connected, installed.
13   Q.   I think I may know where we're differing
14 here a little bit which is when you say the plant,
15 are you referring only to the container and not to,
16 for example, the -- there was another container right
17 next to it, right, that had all the electrical
18 equipment?
19   A.   Correct, the computer.
20   Q.   The computer and everything.  Those are
21 the things that had to be assembled when everybody
22 got down to Doral?
23        MR. ANNESSER:  Object to form.
24        THE WITNESS:  Same thing.  You are right,
25    the containers were two.  One, the bigger one

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 302

1 I just say I need this.
2     Q.  Right.
3     A.  Do it.
4     Q.  So you -- you directed or requested for
5 Jim Bass to work on a new control system that would
6 be used by J.M. Products?
7     A.  Correct.
8     Q.  And then you requested or directed that
9 Fulvio Fabiani assist Jim Bass in that project?
10     A.  Yes, because they are complimentary,
11 because where ends Fabiani begins Bass and vice
12 versa.  They together make a good couple, electronic.
13     Q.  I will let that side.
14     A.  Electronically speaking.
15     Q.  A good electronic couple.  And the work
16 that they did together was sometimes done -- was
17 sometimes done over at J.M. Products, correct?
18     A.  Can you explain the question?  I don't
19 get the English.
20     Q.  Sure.  They would meet together?
21     A.  Yes.
22     Q.  Jim Bass and Fulvio Fabiani --
23     A.  Yes.
24     Q.  -- on this product -- on this project?
25     A.  Yes.

Page 303

1     Q.  When they would do so would they meet
2 over at the offices that are on the J.M. Products
3 side of the warehouse?
4     MR. ANNESSER:  Object to form.
5     THE WITNESS:  Yes.
6 BY MR. PACE:
7     Q.  What you would have is you would have
8 Fulvio instead of going through that door that
9 directly connects Leonardo to J.M. Products, you
10 would have him walk around the building and walk in
11 the front door of J.M. Products, correct?
12     A.  Yes, it is correct.
13     Q.  There he would meet with Jim Bass?
14     A.  Yes.
15     Q.  And so that was so anyone else in the
16 warehouse, such as a Barry West, would not see Fulvio
17 crossing over from the Leonardo side of the warehouse
18 to the J.M. Products side of the warehouse?
19     MR. ANNESSER:  Object to form.
20     MR. LEON DE LA BARRA:  Object to form.
21     THE WITNESS:  Correct.  But attention, I
22 say correct and I hope so, but consider that I
23 was in the factory from 5, 6 in the afternoon to
24 10, 11 of the day after.  During the day I was
25 not there.  I assume that they respected the

Page 304

1     rule.
2 BY MR. PACE:
3     Q.  So the rule that you gave to Fulvio
4 Fabiani was don't walk right through the door --
5     A.  Exactly.
6     Q.  -- that goes from Leonardo to J.M.
7 Products, always walk around the building when you
8 are going to go to the J.M. Products?
9     MR. ANNESSER:  Object to form.
10     THE WITNESS:  Correct, and the same
11     symmetrical rule I gave to Jim Bass.  Jim Bass
12     was absolutely forbidden to enter in the area of
13     Leonardo, for any reason.
14 BY MR. PACE:
15     Q.  Right.  He would -- he was to stay on the
16 J.M. Products side?
17     A.  Yes.
18     Q.  Okay.
19     A.  Yes.  So the area that they had in common
20 was the office of Jim Bass that was separated because
21 when you -- as you will see when you will come there,
22 you will see that you enter in the office and there
23 are the offices.
24     Q.  Understood.
25     A.  Then there is a door, you enter through

Page 305

1 the door and you are in the J.M. area.
2     Q.  Did J.M. Products pay Fulvio Fabiani for
3 that work or was that -- was that pursuant to what he
4 was already being paid under his USQL contract?
5     MR. LEON DE LA BARRA:  Object to the
6     form.
7 BY MR. PACE:
8     Q.  Let me start that over again.  We have
9 gotten a little away from it.
10     This project you are talking about that
11 Fabiani worked on with Jim Bass, did J.M. Products
12 pay him for working on that project?
13     A.  No.
14     Q.  Is the only compensation he got for
15 working on that project the money he was making under
16 his USQL agreement with Industrial Heat?
17     MR. ANNESSER:  Object to the form.
18     MR. LEON DE LA BARRA:  Object to the
19     form.
20     THE WITNESS:  Can you repeat the
21     question?
22 BY MR. PACE:
23     Q.  Yes.  Is the only money that Fabiani was
24 making for working on this project with Jim Bass the
25 payments he was getting from Industrial Heat under

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 318

1 removed?

2 　　　　MR. ANNESSER: Object to form.

3 　　　　MR. LEON DE LA BARRA: Join.

4 　　　　THE WITNESS: No, has been removed.

5 BY MR. PACE:

6 　　Q. Any other changes that have been made at

7 the warehouse?

8 　　　　MR. ANNESSER: Object to form.

9 　　　　THE WITNESS: For example, now we are

10 　　making offices where there was the heat

11 　　exchanger and we are -- I am -- I think that we

12 　　will prepare it to become a factory. Once

13 　　freed, et cetera, that will be a factory at that

14 　　the Doral location.

15 BY MR. PACE:

16 　　Q. How about any other changes on the

17 Leonardo side of the warehouse?

18 　　A. The Leonardo side has not been touched.

19 　　Q. Other than the piping being removed?

20 　　　　MR. ANNESSER: Hey, Chris, we're out of

21 　　time.

22 BY MR. PACE:

23 　　Q. Other than the piping being removed?

24 　　A. Other than the piping that has been

25 removed because it was property of J.M.

Page 319

1 　　　　MR. PACE: Understood. No further

2 　　questions. I think my time is up. I appreciate

3 　　it.

4 　　　　THE WITNESS: Thank you.

5 　　　　CROSS EXAMINATION

6 BY MR. ANNESSER:

7 　　Q. Okay. Just on the record I've got two

8 quick questions for you, just to clarify two things.

9 　　　　One is you were talking about the big

10 Frankies and I believe you said that they're properly

11 called the 250 unit and Mr. Pace asked is that

12 because they put out 250 kilowatts.

13 　　　　Are the big Frankie units capable of

14 putting out more than 250 kilowatts each?

15 　　A. Yes.

16 　　Q. And then the other thing I wanted to

17 clarify was Mr. Pace was asking you about Mr. Fabiani

18 having to walk out of the Leonardo side and around

19 the building to the J.M. side. I want to make sure I

20 understand correctly.

21 　　　　He asked you whether the purpose of

22 making him walk around was so Barry West would not

23 see you -- or, I'm sorry, would not see Mr. Fabiani

24 go through that door.

25 　　A. No, no was not this. Because I -- no, I

Page 320

1 did not understand this this way. I understood that

2 the question was that Fabiani had not to see the area

3 of J.M.

4 　　Q. Okay.

5 　　A. So I prohibited to Fabiani to go through

6 the door that separated J.M. from Leonardo because I

7 wanted not that Fabiani crossed the space of J.M.

8 　　　　This is why. So I forced -- I demanded

9 him to make the tour there because I wanted not that

10 Fabiani could see inside the area of J.M., as well as

11 I wanted that Jim Bass did not -- could not enter in

12 there in the area of Leonardo.

13 　　　　MR. ANNESSER: Okay. That's all the

14 questions I have. I think we're good.

15 　　　　MR. PACE: Could have been a one sentence

16 response if you put him together with your

17 translator.

18 　　　　MR. ANNESSER: We will read.

19 　　　　THE VIDEOGRAPHER: Time is 19:56.

20 Deposition adjourned. Off the record.

21 　　　　(Thereupon the taking of the deposition

22 was concluded.)

23

24

25

Page 321

1

2 　　　　　　　Deponent

3

4

5 　　　Sworn to and subscribed before me this

6

7 day of　　　　　2017.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

81 (Pages 318 - 321)

HIGHLY CONFIDENTIAL PORTIONS-ATTORNEYS' EYES ONLY

Page 322

1       CERTIFICATE OF OATH

2

3   STATE OF FLORIDA:

4           SS:

5   COUNTY OF DADE:

6

7

8       I, the undersigned authority, certify that

9   ANDREA ROSSI personally appeared before me and was

10   duly sworn.

11       WITNESS my hand and official seal this 6th

12   day of March 2017.

13

14

15       *Edward Varkonyi*

16   _____

17       Notary Public, State of Florida at

18   Large; my commission expires

19   February 26, 2019. Bonded through

20   Troy Fain Insurance, Inc.

21

22

23

24

25

Page 323

1   CERTIFICATE OF REGISTERED PROFESSIONAL REPORTER

2

3       I, EDWARD VARKONYI, and Registered
    Professional Reporter and a Notary Public for the

4   State of Florida at Large, do hereby certify that I
    reported the deposition of ANDREA ROSSI; that the

5   foregoing pages, numbered from 1 to 320, inclusive,
    constitute a true and correct transcription of my

6   shorthand report of the deposition by said witness on
    this date.

7       I further certify that I am not an
    attorney or counsel of any of the parties, nor a

8   relative or employee of any attorney or counsel
    connected with the action, nor financially interested

9   in the action.
        WITNESS my hand and official seal in the

10   City of Miami, County of Dade, State of Florida, this
    6th day of March 2017.

11

12

13

14

15       *Edward Varkonyi*

16   _____

17       Notary Public, State of Florida at

18   Large; my commission expires

19   February 26, 2019. Bonded through

20   Troy Fain Insurance, Inc.

21

22

23

24

25

Page 324

1       _____, 2017

2

3

4

5   JOHN W. ANNESSER, ESQ.,
    Perlman Bajandas Yevoli & Albright, P.L.

6   283 Catalonia Avenue, Suite 200
    Coral Gables, Florida 33134

7

    RE: Rossi v. Darden

8

    Dear Mr. Annesser,

9

    With reference to the deposition of Andrea Rossi

10   taken on February 24, 2017 in connection with the
    above-captioned case, please be advised that the

11   transcript of the deposition has been completed
    and is awaiting signature.

12

    Please arrange to have the deponent stop by our

13   office at Two South Biscayne Boulevard, Suite
    2250, Miami, Florida, for the purpose of reading

14   and signing the transcript.

15   If this is not taken care of, however, within the
    next 30 days, we shall conclude that the reading

16   and signing of the deposition has been waived and
    shall then process the original of the transcript

17   for filing with the Clerk of the Court by counsel
    without further notice.

18

    Sincerely,

19

20

    Edward Varkonyi,

21   Registered Merit Reporter

22

23

24

25

Page 325

1       ERRATA SHEET

2   RE   : Rossi v. Darden
    DEPO OF: Leonardo Corporation/Andrea Rossi

3   TAKEN : 2/24/16
    ASSG# : 2534814

4   DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

5   Page #   Line #   Change           Reason

6   _____   _____   _____   _____

7   _____   _____   _____   _____

8   _____   _____   _____   _____

9   _____   _____   _____   _____

10   _____   _____   _____   _____

11   _____   _____   _____   _____

12   _____   _____   _____   _____

13   _____   _____   _____   _____

14   _____   _____   _____   _____

15   _____   _____   _____   _____

16   _____   _____   _____   _____

17   _____   _____   _____   _____

18   _____   _____   _____   _____

19   _____   _____   _____   _____

20   _____   _____   _____   _____

21   State of Florida)
    County of   )

22

    Under penalties of perjury, I declare that I have

23   read my deposition transcript, and it is true and
    correct subject to any changes in form or substance

24   entered here.
    _____

25   Date       Signature

82 (Pages 322 - 325)

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**From:**      fabiopenon@iol.it
**Sent:**      Friday, February 20, 2015 5:07 AM
**To:**        tdarden@industrialheat.co; ar.123@mail.com
**Cc:**        jvaughn@industrialheat.co; tdameron@industrialheat.co
**Subject:**   R: Re: Tests plan

Dear Mr Darden,

the measurement instruments have been positioned as described by dr Rossi

I take this opportunity to thank dr. Rossi and his staff for their helpfulness and courtesy.

I note that, after the start up of the plant, my visits at the facility without notice will be possible to check the operation of the plant itself.

Sincerely

Fabio Penon

> ----Messaggio originale----
> Da: ar.123@mail.com
> Data: 19/02/2015 6.01
> A: "Tom Darden"<tdarden@industrialheat.co>
> Cc: <fabiopenon@iol.it>, <jvaughn@industrialheat.co>,
> <tdameron@industrialheat.co>
> Ogg: Re: Tests plan
>
> Thank you Tom: your congratulations are very important for us.
> Warmest Regards,
> Andrea.
> p.s. I am in the plant ( it's midnight by the plant, how romantic!) and all is going on
> well.  Tomorrow Industrial heat will supply the first MW to JM.
>
>> **Sent:** Thursday, February 19, 2015 at 4:20 AM
>> **From:** "Tom Darden" <tdarden@industrialheat.co>
>> **To:** "Andrea Rossi" <ar.123@mail.com>
>> **Cc:** fabiopenon@iol.it, jvaughn@industrialheat.co, tdameron@industrialheat.co
>> **Subject:** Re: Tests plan
>>
>> Congrats on the startup!  This demonstration will have a great impact, beginning in about a
>> month when we have the visitor from overseas!
>>
>> Tom Darden
>> 919 522 4095 m
>>
>> **From:** Andrea Rossi
>> **Sent:** Wednesday, February 18, 2015 8:36 PM
>> **To:** Tom Darden
>> **Cc:** fabiopenon@iol.it; jvaughn@industrialheat.co; tdameron@industrialheat.co
>> **Subject:** Re: Tests plan



DEPOSITION
EXHIBIT
9
2/24/17 e

CONFIDENTIAL

IH-00019103

Hi Tom!

Ing. Penon is gone, the plant has been started, We are slowly increasing the temperature, will arrive at full regime tomorrow.

Fulvio and I are here in the plant right now.

So far so good.

Since Ing. Penon is now embarking on an airoplane and cannot answer to you, I can answer to your email on the base of the work made during his permanence here in the last three days.

The temperature in the steam pipe, as you correctly remember, is taken in two positions by means of two thermocouples that have been brought and  positioned today by Ing. Penon. Also the temperature of the water in the tank inside the container to feed the pumps is measured by two thermocouples brought and installed under the direction of Ing. Penon. Also the pressure of the steam is measured with two instruments brought by Ing. Penon.

All those instruments for the measurement of temperature of the steam, of the  pressure of the steam and of temperature of the water in the water tank inside the container are connected with the computer of property of Ing. Penon, that he brought here and registers the data 24 hours per day, as well as  with the control system of ours. Obviously Penon will consider for his calculations only the data registered by his computer, but we can compare the data that he will find with the data that we will find.

I think now he is embarking on the airoplane ( I left him at the airport at 7 p.m.), suppose he will be able to answer you tomorrow.

He reads in copy this message of mine.

Warmest Regards to all,

Andrea


**Sent:** Thursday, February 19, 2015 at 2:03 AM
**From:** "Tom Darden" <tdarden@industrialheat.co>
**To:** ar.123@mail.com
**Cc:** ar.123@mail.com, jvaughn@industrialheat.co, tdameron@industrialheat.co
**Subject:** Re: Tests plan

Let's make sure there is more than one way to measure the temperature in that pipe. If I recall correctly there were two or more in Ferrara and there were multiple ones when it was piped in Raleigh.   Thanks.

Tom Darden
919 522 4095 m
────────────────────────────────────
**From:** fabiopenon@iol.it
**Sent:** Wednesday, February 18, 2015 4:59 PM
**To:** tdarden@industrialheat.co
**Reply To:** fabiopenon@iol.it
**Cc:** ar.123@mail.com; jvaughn@industrialheat.co; tdameron@industrialheat.co
**Subject:** R: Re: Tests plan
────────────────────────────────────


Dear Mr Darden,

Please find the following answers to your last email:

CONFIDENTIAL

1. In the scope of proposal by myself prepared at the request of Dr. Rossi for the safety certification of the E-Cat plant MW1 by Bureau Veritas, that I mention in the test protocol proposal PC 1503 ed. 0, is necessary the definition of the technical specification of the system.

The technical specification shows technical characteristics of the plant.

They will be defined according to the results that I will have found during and after the tests that I am performing as the ERV .

2. About the evidence that it is impossible to have a steam pipe that is partially filled with water and partially filled with 103 Celsius degrees  steam, I believe the best answer is that the probe is placed at the outlet of the steam at the bottom of the steam pipe section.

If in this part of the pipe the steam temperature is close to or more than 103 ° C, at room pressure, there is only superheated steam and the water  cannot be present at that point.

If we move away from the exit point, it is possible the formation of small amounts of water, which will be collected in the collector, but which, in my  opinion,  does  not  affect  the  calculation  of  the  multiple energy  produced inside the plant.

Sincerely

Fabio Penon

----Messaggio originale----
Da: tdarden@industrialheat.co
Data: 18/02/2015 18.07
A: <fabiopenon@iol.it>
Cc: <ar.123@mail.com>, <jvaughn@industrialheat.co>, <tdameron@industrialheat.co>
Ogg: Re: Tests plan

Thanks for the news about BV, I was not aware of that.   So, are you saying BV will be certifying the energy multiple of our plant?   That is excellent news, we definitely would like to do this.

Could you please draw a diagram (nothing formal, just by hand is fine) showing where the condensate pipe will be?

One more question: a critic could claim that there is water below the steam.   How do we prove it is impossible to have a steam pipe which is partially filled with flowing water, and partially filled with 103 degree steam?   One way would be to have multiple temperature probes into the steam pipe, so you measure the temperature at the top of the pipe and at the bottom.   This is a good idea just to add comfort and certainty to our claims of success. How many probes will there be?

CONFIDENTIAL

Thanks do very much for your important work. This evaluation will have the eyes of the world on it, once we release any information!

Tom Darden
919 522 4095 m

**From:** fabiopenon@iol.it
**Sent:** Wednesday, February 18, 2015 11:53 AM
**To:** tdarden@industrialheat.co
**Reply To:** fabiopenon@iol.it
**Cc:** ar.123@mail.com; jvaughn@industrialheat.co; tdameron@industrialheat.co
**Subject:** R: Re: Tests plan

Dear Mr Darden,

the 'water satured vapor' is a vapor, whose temperature equals the temperature of boiling at the pressure existing on it ( Mc Graw Hill, Dictionary of scientific & technical terms )

The wet vapor is a vapor containing liquid droplets

The dry water satured vapor is satured vapor without suspended particles of water

This is a condition extremely instable.

A slightest heat gain transforms it into a superheated vapor.

In the temperature and pressure internal, in which thermodynamic equilibrium can exist, a fixed satured vapor temperature corresponds to each pressure.

At a pressure of 760 mm Hg the saturated temperature is 100 °C

In the E-Cat MW1 - USA I will check that the steam pressure is near atmospheric pressure and the temperature of the steam is always significantly greater than 100 ° C at least equal to 103 ° C.

In this way I should be certain that the steam is superheated steam and then always without suspended particles of water.

Following my request a few weeks ago,before the plan start up dr Rossi has to apply a condensed steam collector at the bottom of the steam pipe, before the plant start up

During my visits I will check the amount of the water present

CONFIDENTIAL

Absolutely I agree that 'having a 100% unquestionable report will be the most important way to establish the credibility of this new energy source'.

In fact, Dr. Rossi has accepted my proposal for the certification of the technical features, such as multiple energy, the E-Cat MW1, by Bureau Veritas, certification body prestigious and well-know over the world.

We are already working on the definition of the technical specification of the plant.

Our goal is to begin the certification tests by end of the year

Sincerely

Fabio Penon
----Messaggio originale----
Da: tdarden@industrialheat.co
Data: 18/02/2015 6.11
A: <fabiopenon@iol.it>, <ar.123@mail.com>
Cc: <jvaughn@industrialheat.co>, "T Barker Dameron"<tdameron@industrialheat.co>
Ogg: Re: Tests plan

Dear Dr Penon:

Please let me know your plan for determining that the steam is 100% dry, and that there is no water in the pipe. For example, a sight tube, or a condensate collector coming off the bottom of the steam pipe. These are just suggestions--I am sure you can find the best way to do this.

We are excited to see the machine operate, and we believe that having a 100% unquestionable report will be the most important way to establish the credibility of this new energy source. If we can show the world after the test that our results are completely beyond dispute, this will define Dr Rossi as the most important inventor of all time. Having a solid measurement system is the key to all this.

Tom Darden
919 522 4095 m

**From:** fabiopenon@iol.it
**Sent:** Tuesday, February 10, 2015 3:18 PM
**To:** ar.123@mail.com; tdarden@industrialheat.co
**Reply To:** fabiopenon@iol.it
**Subject:** Tests plan

Dear Sirs,

in the Annex you may find the report 'E-Cat MW1 Energy Plant in Miami: Tests plan', concluding the first module ( see proposal E-Cat MW1 Energy Plant in Miami: evaluation of the energy multiple' ) I am at your disposal for any clarifications.

Sincerely

CONFIDENTIAL

IH-00019107

Fabio Penon

CONFIDENTIAL

IH-00019108