# Exhibit 6

```
                                                          Page 1

 1                   UNITED STATES DISTRICT COURT
                              for the
 2                   Southern District of Florida
 3                 Civil Action No. 1:16-cv-21199-CMA
 4      ANDREA ROSSI and LEONARDO
        CORPORATION,
 5
                          Plaintiff,
 6      vs.
 7      THOMAS DARDEN; JOHN T. VAUGHN;
        INDUSTRIAL HEAT, LLC; et al.,
 8
                          Defendant.
 9      _____/
10                                    600 Brickell Avenue
                                      Miami, Florida
11                                    February 27, 2017
                                      10:00 a.m.
12
13
14                      VIDEO DEPOSITION OF
15                  KAU-FUI VINCENT WONG, PH.D.
16
17          Taken before SUZANNE VITALE, R.P.R., F.P.R.
18      and Notary Public for the State of Florida at Large,
19      pursuant to Notice of Taking Deposition filed in the
20      above cause.
21
22
23
24
25
```

Page 70

1  a few things just to make sure we've got them clear.
2  We made a couple of references already this morning
3  to COP.
4     That's a reference to coefficient of
5  performance, correct?
6     A.  Yes.
7     Q.  You made a reference already today to
8  seeing pipes at the Doral location.
9     You made at least one reference to that,
10  so I just want to understand.
11     When you were actually at the Doral
12  location, what pipes or piping did you see?
13     A.  I think I'm still basing it on Dr. Rossi's
14  statement that there was a heat exchanger there and
15  there were pipes leading to the heat exchanger room.
16     Q.  So you didn't see any pipes that -- when
17  you were there, you didn't see any pipes that were
18  part of a heat exchanger, for example?
19     A.  I wasn't looking out for them.  I just --
20  no.
21     Q.  Did you see any pipes running from the
22  E-Cat unit or plant to any other location?
23     A.  No.  I didn't look out for them.
24     Q.  I understand.  I thought you made, and I
25  may be wrong, I thought you made a reference to

Page 71

1  seeing pipes at the warehouse and I may be mistaken.
2     It sounds, from what you're telling me
3  right now, that you certainly didn't see any heat
4  exchanger pipes.  You didn't see any pipes running
5  from the E-Cat plant to some other unit, so if you
6  happened to see any piping when you were there, it
7  was simply incidental.  I'm sure there's water pipes
8  there that run to the sink.  I'm sure that there are
9  other pipes, those would be the only other pipes you
10  saw?
11     A.  Yes.
12     Q.  Let's take our break now and come back
13  right when you're finished with lunch.  We can go
14  off the record.
15     THE VIDEOGRAPHER:  We're going off the
16  record.  The time off the video monitor is
17  12:16 p.m.
18     (Lunch recess taken.)
19
20     THE VIDEOGRAPHER:  We're back on the
21  record.  This marks the beginning of Media Unit
22  Number 2.  The time on the video monitor is
23  1:36 p.m.
24  BY MR. PACE:
25     Q.  Those are the books that you cited in your

Page 72

1  expert report.  It looks like there's two additional
2  ones there.  I see statistical engineering.
3     A.  These are -- these are the two thermo
4  books.  The second one is not the latest.  It's the
5  sixth edition.  I think I sold all of my ninth
6  edition.
7     These are other engineering books within
8  the last two or three years.  And this just came in
9  the mail.  This is two of my journal papers from the
10  ASME.  This is how the journals come up.
11     Q.  Okay.  And just, again, because we've got
12  a court reporter and a videographer here.  The
13  bottom book on that stack is a book published by the
14  ASME called --
15     A.  Journal of Energy Resources Technology.
16     Q.  Journal of Energy Resources Technology.
17     The next two books on the bottom of that
18  stack are your two textbooks, Thermodynamics for
19  Engineers, and Thermodynamics for Engineers II.
20     A.  Yes.
21     Q.  And, then, let me just see those -- I'm
22  not going to mark them as exhibits -- no, not those,
23  the other two.  I can just -- I can probably read
24  them a little faster into the record.
25     And then the other two books you have with

Page 73

1  you are -- you are the author for "Sustainable
2  Engineering" is the title, published by Momentum
3  Press.
4     And the second one that you're also the
5  author on, also by Momentum Press, and that title is
6  "Climate Change."
7     These are both newer books and consistent
8  with what you had testified to this morning that
9  your work now has focused more on
10  environmental-related engineering?
11     A.  Has always been in energy and environment.
12     Q.  Energy and environment.  I appreciate
13  that.
14     A.  They did a newer focus.  I had the
15  contracts.  I just submitted the two final
16  manuscripts on nutrition and health by Momentum
17  Press.  Some manuscripts are coming out in 2017.
18     Q.  We talked about the things that you did to
19  prepare for your - to prepare your report.  I want
20  to talk just --
21     A.  Oh, maybe just a little bit clarification.
22     Q.  Uh-huh.
23     A.  These principally are republication of my
24  journal papers which you requested, not all of them,
25  but republication of many.

19 (Pages 70 - 73)

Page 98

1    A.  Through the fans.  It's in my exhibit.
2    Q.  You saw the two holes?
3    A.  For the two fans.
4    Q.  Let's see if we can get to your exhibit
5  and you can tell me where it is.
6    A.  Yeah, this.  (Indicating.)
7    Q.  A-2.  So you're saying out of A-2 --
8    A.  The two bottom holes were occupied by the
9  two fans.
10   Q.  And let's clarify a little bit.
11       You called them "holes."  Those
12  are frames.
13   A.  Frames.
14   Q.  This is frames.  These are window panes,
15  correct?
16   A.  It's not panes.  When I was there, it was
17  empty.  There were two workmen by the site here.
18   Q.  Okay.  There was no glass in these?
19   A.  No.
20   Q.  There was no glass in any of these four?
21   A.  No.
22   Q.  I'm sorry.  Exhibit A-2 shows four squares
23  for a window, and you're saying there was no glass
24  in any of the four squares?  Okay.
25   A.  Yes.

Page 99

1    Q.  Going back to your report.  You've got 22
2  steel pipes, approximately 10 meters each, interior
3  dimension, .15-meter.
4       You have never seen those steel pipes,
5  correct?
6    A.  No.
7    Q.  Dr. Rossi told you about those steel
8  pipes, correct?
9    A.  Yes.
10   Q.  Has anyone else told you about those steel
11  pipes?
12   A.  I discuss with counsel.
13   Q.  Okay.  Other than counsel and Dr. Rossi,
14  has anyone else told you about those steel pipes?
15   A.  No.
16   Q.  Did you ask to see the steel pipes?
17   A.  No.
18   Q.  Do you know what happened to the steel
19  pipes?
20   A.  No.
21   Q.  Did you see any receipts for the purchase
22  of the steel pipes?
23   A.  No.
24   Q.  Other than what you've been told by
25  counsel or Dr. Rossi, do you have any evidence that

Page 100

1  those steel pipes existed?
2    A.  Oh.  As a nonprofessional but as a rather
3  aged human being, it looked to have like something
4  has been laying on that floor before.  You see some
5  marks or something on that concrete floor.
6    Q.  Looking at your Exhibit A-1.
7    A.  Yeah.  It would be this -- this -- it
8  would seem as though there was something lying on
9  top.
10   Q.  So other than what you learned from
11  Dr. Rossi or from counsel, the only evidence you
12  have as to the -- even the existence of these steel
13  pipes is looking at the floor in Exhibit A-1, it
14  appears that something at one point was on the
15  floor?
16   A.  Yes.
17   Q.  Okay.  Without knowing whether that was
18  steel pipes, wood, or what exactly was on that
19  floor?
20   A.  Certainly not an office desk.
21   Q.  Understood.  Something other than an
22  office desk.
23       Encasement, it says:  "Wood panel
24  insulated with rock wool shaped for thermal and
25  acoustic insulation."

Page 101

1       Did you ever see this encasement?
2    A.  No.
3    Q.  Dr. Rossi told you about this encasement,
4  correct?
5    A.  Yes.
6    Q.  Did you have any -- did anyone else tell
7  you about this encasement?
8    A.  No.
9    Q.  Did you ever see any receipts for the
10  encasement?
11   A.  No.
12   Q.  Did you ever see any design specs for
13  building the encasement?
14   A.  No.
15   Q.  Did you ask to see if there was design
16  specs for building the encasement?
17   A.  Design specs, no.  I did ask -- I did
18  discuss with Rossi about the design of the casing.
19   Q.  But I -- I'm asking if there's any -- did
20  you see any paper --
21   A.  No paper.
22   Q.  -- that demonstrates that this encasement
23  existed?
24   A.  No paper.
25   Q.  Did you have see any paper, any diagrams,

Page 102

1  or drawings for how the steel pipes were supposedly
2  laid out in this heat exchanger?
3     A.  No diagrams.
4     Q.  Okay.  Any paper at all?
5     A.  No paper.
6     Q.  All right.  Airflow says:  "Two fans,
7  250,000 cubic meters per hour each."
8        MR. EVANS:  Object to form.
9  BY MR. PACE:
10    Q.  Looking at your report, question one is
11 did you see those two fans?
12    A.  No.
13    Q.  Did you ask to see the two fans?
14    A.  No.  I did ask about the design of the
15 heat exchanger and how the pipes were laid out.
16    Q.  And you asked that of Andrea Rossi?
17    A.  Right.
18    Q.  And he provided you the explanation?
19    A.  Verbally, yes.
20    Q.  Okay.  I understand.
21    A.  I had no reason to doubt that part of it.
22 If I believed that there was a heat exchanger there,
23 I believed the arrangement.
24    Q.  If you believe there was a heat exchanger,
25 you would have believed the arrangement for the heat

Page 103

1  exchanger.
2     A.  Because he say he made it himself.
3     Q.  How big would these fans be?
4     A.  What he said.  I --
5     Q.  Well, I'm sorry.  It tells me how much air
6  they can circulate.  I'm asking for the dimensions
7  of the -- the fans, if you know.
8     A.  This is a man's height, I think, so
9  three feet.
10    Q.  So let's describe this.  You're pointing
11 to Exhibit A-2.  You're saying that the entire
12 window is roughly --
13    A.  Three feet high -- six feet high.
14    Q.  Six feet high.  The window is six feet
15 high, so each pane would be three feet high
16 approximately?
17    A.  Three to three and a half.
18    Q.  Okay.  So, again, though, as I understand
19 how a heat exchanger works, these fans -- are the
20 fans up against the window?  Is that what you're
21 saying?
22    A.  It's part of the wall.  Yeah, it's part of
23 the wall.  There's no window.  These are holes in
24 the wall, and it was occupied by two fans down here.
25    Q.  These are holes in the wall --

Page 104

1     A.  External wall, actually.  Yeah.  Outside.
2  You can see the outside.
3     Q.  I don't understand that.
4        I'm going to mark for you -- we'll call
5  this Exhibit 5, I believe we're on.  There they are.
6  I want to make sure I don't cover it.
7        (Thereupon, the referred-to document was
8  marked by the court reporter for Identification as
9  Defendant's Exhibit 5.)
10 BY MR. PACE:
11    Q.  When you say that there are holes in the
12 wall, are you referring to any of these windows that
13 we're seeing here in front of 7861 -- in front of
14 the Doral warehouse?
15    A.  I'm not sure.  Was this taken recently?
16    Q.  No.  No.  It was taken a while ago.
17    A.  If I were forced to guess, parking lot is
18 here.  The holes are these, I think.
19    Q.  Are one of these windows --
20    A.  The second floor one.
21    Q.  So if we can identify this for the record.
22    A.  I think.
23    Q.  You're looking at Exhibit 5.  What you're
24 describing as the holes are on the left-hand side of
25 that exhibit.  If you're facing the exhibit, on the

Page 105

1  left-hand side, we can see some second-story window
2  there; is that correct?
3     A.  Yes.  It's because the other two are not
4  the same shape.  This is more squarish.
5     Q.  This is more square?
6     A.  Yes, but there was definitely no panes
7  when I was there.
8     Q.  Okay.  And this one -- and this one is
9  actually --
10    A.  But it was being worked on, because there
11 were two workmen waiting for me to take the photo.
12 I had to say, "Get out of the way."  I don't know
13 what they were working on.
14    Q.  You have -- you have no idea -- you don't
15 have any firsthand basis to know whether there
16 were -- whether there was glass in those windows
17 prior to February 10th of 2017, correct?
18    A.  Before and after those 20 minutes I was in
19 that room, I don't know what was happening.
20    Q.  And those 20 minutes were February 10th of
21 2017, correct?  I need a verbal response.
22    A.  Yes.
23    Q.  All right.
24    A.  And if there was a date, I confirmed that
25 I visited the plant in Doral.

27 (Pages 102 - 105)

Page 146

1  A. If it was there, it would be only one
2  part. This part I think is missing because I can
3  see the staircase.
4  Q. Okay.
5  A. And for some reason, I'm just reasoning
6  with my thoughts. For some reason, I felt I was
7  going from one room to another, from the reactor to
8  the other room where workmen were working, so I
9  think this one was probably still there, but not
10  this way.
11  Q. Let me explain because of the camera and
12  the court reporter.
13  The wall that has the white door in it you
14  think might still be there?
15  A. Separating -- the door may not be there,
16  but separating the reactor and whatever was there,
17  either empty or was there.
18  I kind of remember it as a separate room.
19  And the only reason would be because the wall - some
20  wall was there.
21  Q. And the wall -- but the wall that runs
22  towards the back --
23  A. There was a heat exchanger room.
24  Q. The short wall that runs towards the back
25  of that warehouse, you think that was not present?

Page 147

1  A. Yes.
2  Q. Do you have an opinion -- if there was no
3  heat exchanger in this warehouse and the E-Cat unit
4  container was producing the amount of heated fluid
5  or steam that you were told it was producing, would
6  you agree then that the warehouse would have gotten
7  unbearably hot?
8  I'm saying assume no heat exchanger at
9  all.
10  A. It was probably used to heat some
11  industrial process.
12  Q. Let's assume that the testimony is that
13  there wasn't anything else that was absorbing the
14  heat, so it was -- if there's not a heat exchanger,
15  it was being discharged into the warehouse.
16  My question for you is only, your opinion
17  is if the heat exchanger existed, it would be able
18  to move that heat out of the warehouse?
19  A. Yes.
20  Q. My question to you is, if the heat
21  exchanger didn't exist, wouldn't that warehouse have
22  become unbearably hot?
23  MR. EVANS: Object to the form.
24  THE WITNESS: The reactor reacts,
25  generates heat, even though it's insulated.

Page 148

1  Dr. Rossi did tell me it was 1,500 degrees
2  centigrade inside, at least in one spot. But
3  the control room, I believe, is where -- the
4  one that was padlocked was there, human beings
5  would sit, including Dr. Rossi, to take data,
6  is probably air conditioned.
7  That reactor room would be the hottest.
8  BY MR. PACE:
9  Q. The reactor room would be the hottest and
10  then it would go out to the rest of the warehouse?
11  A. Whoever would be in the reactor room would
12  be dead first, if it's not in the control room.
13  Q. Sorry. Say that for me again.
14  A. Somebody in the reactor would be suffering
15  first and I assume it's Dr. Rossi in the beginning.
16  If it is the control room -- I believe it's the
17  control room where all the computers are would be
18  feeling, very, very uncomfortable.
19  Q. Let's exclude the control room. I'm just
20  asking for the warehouse, the whole warehouse.
21  If there is 1 megawatt hour per hour of
22  steam that's being produced in this warehouse and
23  there is not a -- the heat exchanger that Dr. Rossi
24  told you about, wouldn't that warehouse have become
25  unbearably hot?

Page 149

1  A. I'm a little wary about opining because I
2  know Murray opined on that and calculated marble and
3  everything.
4  Q. You're getting a little bit to my point.
5  I'm trying to understand.
6  When you take issue with Joe Murray's
7  opinion, it sounds to me like the only issue you're
8  really taking with Joe Murray's opinion is you're
9  saying there was a heat exchanger and that he's not
10  accounting for the heat exchanger?
11  I need a verbal response.
12  A. Yes.
13  Q. You're, otherwise, not taking issue with
14  Joe Murray's opinion because you haven't evaluated
15  his opinion.
16  Solely the issue of does a heat exchanger
17  exist or not exist, correct?
18  MR. EVANS: Object to form.
19  THE WITNESS: Correct.
20  BY MR. PACE:
21  Q. And your sole evidence that a heat
22  exchanger existed, you've never seen it, you didn't
23  have no documents that reflect it, you've never seen
24  any diagrams of how it was set up, it all comes
25  either from what's been orally communicated to you

Page 214

1  explained to you by Dr. Rossi, would it have
2  required a pump to get the heated fluid to circulate
3  through the system or no?
4     A.  It would probably require a pump to get it
5  back into the reactor.
6     Q.  A pump to get it back --
7     A.  The return pipe, the return pipe needs a
8  pump.
9     Q.  Understood.  And also the pump -- a pump
10 can also be used, though, to push the heated fluid
11 up in through the heat exchanger?
12    A.  Could.
13    Q.  Okay.  Would there be a limit on the flow
14 of the steam if there wasn't some form of pump?
15    A.  Would --
16    Q.  I may be getting myself confused about how
17 fast steam is moving.
18        Is it possible if steam is moving fast
19 enough, that it could have gone up through this heat
20 exchanger without having to have a pump?
21    A.  No, you need energy to get back into the
22 reactor.
23    Q.  That's all I was trying to understand, and
24 I marked it as Exhibit 13.  I don't have any further
25 questions.

Page 215

1        THE VIDEOGRAPHER:  We're going off the
2  record.  The time on the video monitor is
3  5:14 p.m.
4        (Concluded at 5:14 p.m.)

Page 216

1            AFFIDAVIT
2
   STATE OF FLORIDA    )
3  COUNTY OF _____ )
4
       I, _____, being
5  first duly sworn, do hereby acknowledge that I did
   read a true and certified copy of my deposition
6  which was taken in the case of ANDREA ROSSI, taken
   on the 27th day of February, 2017, and the
7  corrections I desire to make are as indicated on the
   attached Errata Sheet.
8
             _____
                   (Deponent)
9
10       + + + + + + + + + + + + + + + + +
11             CERTIFICATE
12
13 STATE OF FLORIDA    )
   COUNTY OF _____ )
14
15
       Before me personally appeared
16 _____,
   to me well known / known to me to be the person
17 described in and who executed the foregoing
   instrument and acknowledged to and before me that he
18 executed the said instrument in the capacity and for
   the purpose therein expressed.
19
20     Witness my hand and official seal, this
   ____ day of _____, _____.
21
22
23           _____
                   (Notary Public)
24
   My Commission Expires:
25

Page 217

1            ERRATA SHEET
2  ANDREA ROSSI
   Deponent: KAU-FUI VINCENT WONG, PH.D
3  Date of : February 27th, 2017
   Job# 2552478
4
5  PAGE   LINE      REMARKS
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20
21        _____
22           Signature of Witness
   _____
23 (Notary Public)
24 Dated this _____ day of _____, _____.
   My Commission Expires: _____
25

55 (Pages 214 - 217)

Page 218

1   CERTIFICATE OF OATH
2
3   STATE OF FLORIDA   )
4   COUNTY OF BROWARD  )
5
6        I, the undersigned authority, certify
7   that KAU-FUI VINCENT WONG, PH.D personally
8   appeared before me and was duly sworn.
9        WITNESS my hand and official seal this
10  8th day of March, 2017.
11
12
13  *Suzanne Vitale*
    _____
14  SUZANNE VITALE, R.P.R., F.P.R.
    Notary Public, State of Florida
15  My Commission No. DD179981
    Expires: 5/24/2020

Page 219

1   CERTIFICATE
2
3   STATE OF FLORIDA   )
4   COUNTY OF DADE     )
5
6        I, SUZANNE VITALE, R.P.R., F.P.R. do
7   hereby certify that I was authorized to and did
8   stenographically report the foregoing deposition
9   of KAU-FUI VINCENT WONG, PH.D; that a review of
10  the transcript was requested; and that the
11  transcript is a true record of my stenographic
12  notes.
13       I FURTHER CERTIFY that I am not a
14  relative, employee, attorney, or counsel of any
15  of the parties, nor am I a relative or employee
16  of any of the parties' attorney or counsel
17  connected with the action, nor am I financially
18  interested in the action.
19       Dated this 8th day of March, 2017.
20
21
22  *Suzanne Vitale*
    _____
23  SUZANNE VITALE, R.P.R., F.P.R.
    My Commission No. DD179981
24  Expires: 5/24/2020
25

Page 220

1   VERITEXT FLORIDA, LLC
    Two South Biscayne Blvd., Suite 2250
2   MIAMI, FL 33131
    305-376-8800
3
4   KAU-FUI VINCENT WONG, PH.D c/o
    PERLMAN BAHANDAS YEVOLI & ALBRIGHT, P.L.
5   283 Catalonia Avenue, Suite 200
    Coral Gables, Florida 33134
6   ATTENTION: D. PORPOISE EVANS, ESQ.
7
8               March 9, 2017
9
    RE: ANDREA ROSSI
10  CASE NO.
    AVAILABLE FOR READING UNTIL: 30 days
11
    KAU-FUI VINCENT WONG, PH.D:
12
         This letter is to advise you that the
13  transcript of your deposition is available for
    reading and signing.
14
         PLEASE CALL THE ABOVE NUMBER TO MAKE AN
15  APPOINTMENT to come to the Veritext office
    closest to you to read and sign the transcript.
16  Our office hours are 8:30 a.m. to 4:30 p.m.,
    Monday through Friday.
17       In the event other arrangements are
    made, please send us a notarized list of any and
18  all corrections and/or changes, noting page and
    line numbers, and the reason for such changes,
19  so that we can furnish respective counsel with a
    copy.
20       If the reading and signing has not been
    completed prior to the above-referenced date, we
21  shall concluded that you have waived the reading
    and signing of the deposition transcript.
22       Your prompt attention to this matter is
    appreciated.
23
24       SUZANNE VITALE, R.P.R., F.P.R.
25

```
             VERITEXT LEGAL SOLUTIONS
       COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.