# Exhibit 8

CONFIDENTIAL TRANSCRIPT

```
                                                    Page 1

 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                   MIAMI DIVISION
 3              CASE NO. 1:16-cv-21199-CMA
 4
        ANDREA ROSSI, et al.,
 5
                    Plaintiffs,
 6
            v.
 7
        THOMAS DARDEN, et al.,
 8
                    Defendants.
 9      - - - - - - - - - - - - - - - - - - -x
        INDUSTRIAL HEAT, LLC, et al.,
10
                    Counter-Plaintiffs,
11
            v.
12
        ANDREA ROSSI, et al.,
13
                    Counter-Defendants.
14
            and
15
        J.M. PRODUCTS, et al.,
16
                    Third-Party Defendants.
17      - - - - - - - - - - - - - - - - - - -x
18                    600 Brickell Avenue, Suite 3300
                      Miami, Florida
19                    Wednesday, March 1, 2017
                      10:14 a.m.- 5:46 p.m.
20
                   CONFIDENTIAL TRANSCRIPT
21         PORTIONS OF TRANSCRIPT HIGHLY CONFIDENTIAL
                    ATTORNEYS' EYES ONLY
22
           VIDEO DEPOSITION OF J.M. PRODUCTS, INC.
23                 THROUGH ANDREA ROSSI
24         Taken before Edward Varkonyi, Registered
        Merit Reporter and Notary Public for the State of
25      Florida at Large, pursuant to Notice of Taking
        Deposition filed in the above cause.
```

CONFIDENTIAL TRANSCRIPT

Page 6

1        THE WITNESS: I do.
2        DIRECT EXAMINATION
3    BY MR. PACE:
4        Q.   Dr. Rossi, can you state your full name.
5        A.   Andrea Rossi.
6        Q.   And what's your present work address?
7        A.   1331 Lincoln Road, Miami Beach, Florida
8    33139.
9        Q.   Is that also your resident address?
10       A.   Yes.
11       Q.   Is it the same unit within the building
12   where you work and you reside?
13       A.   Yes.
14       Q.   Do you have -- you're here testifying
15   today as the representative of J.M. Products,
16   correct?
17       A.   Correct.
18       Q.   Do you have any formal title or position
19   within J.M. Products?
20       A.   Yes, I am the so to speak director, with
21   a small D.  So I am the scientific and technical
22   director of the plant that I have designed and
23   invented and -- but I do not have corporate tasks.
24       Q.   So let me ask my question again.  Do you
25   have any formal title within J.M. Products?

Page 7

1        Your answer is no, correct?
2        A.   I do not know what you mean by formal.
3        Q.   Fair enough.  Let me ask you, do you have
4    any title -- do you hold any position as an officer
5    or director of J.M. Products?
6        A.   When you mean director, what do you
7    mean?
8        Q.   Do you know what a director of a
9    corporation in the United States is?
10       A.   No.
11       Q.   Okay.  Do you know what a board of
12   directors for a corporation in the United States?
13       A.   Yes, I know what is a board of directors.
14       Q.   In this context, a director, I am
15   referring to a member of a board of directors.
16       So as to J.M. Products, are you a
17   corporate officer of J.M. Products?
18       A.   No.
19       Q.   Are you a member of the board of
20   directors of J.M. Products?
21       A.   No.
22       Q.   Okay.  When you just described yourself
23   as a director, small D, of J.M. Products, has anyone
24   ever given you that title?
25       A.   I gave it -- you know, I gave it to

Page 8

1    myself because discussing with the president,
2    attorney Johnson, we can see that I can be qualified
3    that way because I directed the plant.
4        For example, I am the person most
5    qualified to answer to the question put in your paper
6    upon which I am here now.
7        Q.   I understand.  And that's because you
8    control -- you control all aspects of J.M. Products,
9    correct?
10       MR. ARAN:  Objection to form.
11       THE WITNESS:  Sorry, I must ask you as
12   the other times to be so kind to speak a little
13   bit slow.  I understand perfectly English.
14   BY MR. PACE:
15       Q.   I will.  No, I sometimes ask --
16       A.   Just if you go fast I --
17       Q.   Fair enough.
18       A.   I don't get it.
19       Q.   You control all aspects of J.M. Products,
20   correct?
21       MR. ARAN:  Objection to form.
22       MR. CHAIKEN:  Object to form.
23       THE WITNESS:  Your -- your question is
24   correct in the measure of technical tasks.
25   BY MR. PACE:

Page 9

1        Q.   How about financial tasks, doesn't all
2    money -- isn't all the money that J.M. Products uses
3    to pay for any expenses it has come from either you
4    or Leonardo Corporation?
5        A.   But that was on the base of a contract
6    that -- of an agreement that there was between J.M.
7    and Leonardo Corporation and this agreement foresaw
8    that Leonardo Corporation was going to pay all the
9    bills and expenses for the day by day activity of
10   J.M. as a compensation for products that Leonardo
11   Corporation was going to buy from J.M.
12       Q.   So my question again, because you didn't
13   answer it.  You started with a but response.
14       All of the money for any expenses paid by
15   J.M. Products came from either you or Leonardo
16   Corporation; yes or no?
17       A.   I don't know if all the money paid by
18   J.M. came from Leonardo Corporation of me.
19       Q.   So let's go -- let's talk a little bit
20   about what you did to prepare to be the corporate
21   representative J.M. Products today because that's an
22   answer you should have, you should have prepared for,
23   so let's talk about this.
24       To prepare today to speak as the
25   corporate representative of J.M. Products with whom --

CONFIDENTIAL TRANSCRIPT

Page 14

1    Q.  If you will answer my question first.
2  What other documents -- you said reviewed your
3  technical documents.
4    A.  Yes.
5    Q.  What other documents did you review to
6  prepare?
7    A.  I was answering.  Another document that I
8  have gone through together with my attorney and the
9  attorney Johnson has been the one that you had in
10  your hands a few seconds ago.
11    Q.  Okay.  And what else?
12    A.  I don't remember else.
13    Q.  Well, you said you reviewed documents
14  relating to technical work that you performed.
15    A.  Yes, also.
16    Q.  Did you review any documents relating to
17  the financial records of J.M. Products?
18    A.  Can you kindly repeat the last?
19    Q.  Did you review any documents relating to
20  the financial operations of J.M. Products?
21    A.  What do you mean exactly by financial
22  operations?
23    Q.  Did you review the bank accounts of J.M.
24  Products?
25    A.  No.

Page 15

1    Q.  Did you review the bills of J.M.
2  Products?
3    A.  No.
4    Q.  Did you review the invoices of J.M.
5  Products?
6    A.  No.
7    Q.  Did you make any effort to determine how
8  J.M. Products has paid for expenses in the past?
9    A.  You know, for what concerns the expenses
10  that J.M. made related to the activity in Doral, I
11  know them perfectly because I did them as Leonardo
12  Corporation based on the agreement that there was
13  between J.M. and Leonardo Corporation.
14    Q.  That Leonardo --
15    A.  I reviewed those -- I reviewed those
16  documents, yes.
17    Q.  So I think some of this stemmed from you
18  providing a slightly different answer a little while
19  ago.
20        I asked -- well, maybe not.  Maybe I
21  shouldn't say this.  Are there any expenses that J.M.
22  Products has had in the past two years that are not
23  related to the Doral warehouse?
24        MR. ARAN:  Objection to form.
25        THE WITNESS:  Just one second.  I take

Page 16

1  the occasion also now, because I must repeat it,
2  because it's another -- that I have a problem, I
3  cannot swallow and so now and again you will see
4  me to cough in that --
5  BY MR. PACE:
6    Q.  Cup.
7    A.  This glass.  This is not lack of
8  respect.  I am sorry, I have to sometime cough inside
9  there because I cannot swallow.  I delayed my surgery
10  to be able to make this depositions because after
11  that surgery I will be several weeks without having
12  the possibility to talk.
13        So please excuse me, sometime you will
14  see me make this very bad gesture, but it's
15  necessary.  I'm sorry.  I am sorry.  Can you kindly
16  repeat your question?
17    Q.  Are you -- as the corporate
18  representative of J.M. Products are you aware of any
19  other source of funds that J.M. Products has had to
20  pay for its expenses, other than you and/or -- you,
21  Andrea Rossi and/or Leonardo Corporation?
22        MR. ARAN:  Objection to form.
23        THE WITNESS:  I have understood your
24  question.  I am aware only of the expenses that
25  J.M. made related to the activity in Doral.

Page 17

1        I am not aware of other expenses that
2    J.M. could have had.
3  BY MR. PACE:
4    Q.  As to -- but you haven't answered my
5  question, so let me ask my question again.
6        As to those expenses of which you are
7  aware, did either Andrea Rossi and/or Leonardo
8  Corporation pay for all those expenses?  It's a yes
9  or no answer.
10    A.  Yes.
11    Q.  All right.  We're going to go back here
12  just for a second, which is as to J.M. Products then
13  you, Andrea Rossi, controlled all technical and
14  product development activities of J.M. Products, to
15  the extent they existed, correct?
16    A.  Correct.
17    Q.  Either Andrea Rossi or Leonardo
18  Corporation provided all of the funds for any
19  expenses relating to the Doral location, correct?
20        MR. ARAN:  Objection to form.
21  BY MR. PACE:
22    Q.  Isn't that what you just answered?
23    A.  No, I have understood your question.  I
24  have just to focus the memory because I want to be
25  sure that what I answer is precise because there

CONFIDENTIAL TRANSCRIPT

Page 22

1 been to the Doral warehouse?
2    A.  Wow.  Surely he has been there.  How many
3 times, as far as I can remember, I am not sure.  I
4 am -- you know, several times.  Maybe two, three,
5 something like that.  But honestly, I do not remember
6 enough well to answer.
7       For sure I have in my brain the image of
8 attorney Johnson inside the factory and in the
9 office.  I have this image in my mind, but I cannot
10 recollect how many times.
11   Q.  Understood.
12   A.  But not many.  Not many.
13   Q.  Not many.  So on a day-to-day basis you
14 are at the Doral warehouse, correct?
15   A.  Every day.
16   Q.  All right.  And any operations that are
17 occurring at the Doral warehouse on behalf of J.M.
18 Products, you are controlling?
19   A.  Absolutely.
20   Q.  And that has been so since J.M. Products
21 was formed, correct?
22   A.  It is correct.
23   Q.  All right.  So you, Andrea Rossi, control
24 all of the day-to-day activity of J.M. Products,
25 correct?

Page 23

1   A.  Correct.
2   Q.  You, Andrea Rossi, control Leonardo
3 Corporation, correct?
4   A.  Correct.
5   Q.  Leonardo Corporation pays all the
6 expenses of J.M. Products, correct?
7   A.  No.
8       MR. CHAIKEN:  Object to form.
9 BY MR. PACE:
10   Q.  What expenses does J.M. Products incur
11 that Leonardo does not pay?
12   A.  You are forgetting that I told you at the
13 beginning of this deposition that Leonardo paid the
14 expenses of J.M. as a compensation of the products --
15   Q.  But they are still paying it.  My
16 question was Leonardo pays for whatever reason -- you
17 can explain later the reason.
18       MR. ARAN:  Objection.  Let's not talk
19   over each other.
20 BY MR. PACE:
21   Q.  Fair enough, I am just asking a
22 question.  You can explain later why they paid it.
23   A.  Okay.
24   Q.  You can explain it in the trial.  You can
25 explain it at some other context.

Page 24

1   A.  Okay.
2   Q.  My question was -- let's see if you can
3 answer my question though.  Because I thought we went
4 through this already.
5       You, as the corporate representative of
6 J.M. Products, are here to say -- to testify that the
7 only expenses of which you are aware of J.M. Products
8 were paid by Leonardo Corporation, correct?
9   A.  If we limit our description of the facts
10 to the action of paying the bills, yes.
11   Q.  Yes, sir.  I am --
12   A.  If we confine, yes.
13   Q.  We will get into the explanation of why
14 they paid but I am just trying to establish that you,
15 Andrea Rossi, ran the day-to-day operations of J.M.
16 Products, correct?
17   A.  Yes, it is correct.
18   Q.  You, Andrea Rossi, controlled Leonardo
19 Corporation, correct?
20   A.  Correct.
21   Q.  Leonardo Corporation paid for all the
22 day-to-day expenses of which you are aware for J.M.
23 Products, correct?
24   A.  Correct.
25   Q.  So there is -- the building -- the Doral

Page 25

1 warehouse where J.M. Products is located, that was
2 found by you, correct?
3   A.  Correct.
4   Q.  It was leased by Leonardo, correct?
5   A.  Correct.
6   Q.  J.M. Products subleased whatever
7 section -- whatever portion they used from Leonardo,
8 correct?
9   A.  Correct.
10   Q.  J.M. Products leased or contracted for or
11 received from Leonardo an employee?
12   A.  Can you kindly repeat the question?
13   Q.  Sure.  Who is Reinaldo Breto?
14   A.  Was the janitor -- well, janitor and
15 guardian of -- he was an employee of J.M.
16   Q.  He was an employee of J.M.
17       He was lent to J.M. by Leonardo
18 Corporation, correct?
19   A.  Yes, it is correct.
20   Q.  And that was your decision to loan Breto
21 from Leonardo to J.M. Products?
22   A.  Correct.
23   Q.  Okay.  And Mr. Breto acted under your
24 direction?
25   A.  Correct.  And not only under my

7 (Pages 22 - 25)

CONFIDENTIAL TRANSCRIPT

Page 78

1 ceased all business operations that you, as the
2 corporate representative of J.M. Products are
3 aware -- let me start.  That was a horrible
4 question.
5        Sometime in 2016 J.M. Products stopped
6 its business operations at the Doral location?
7    A.  Yes.
8    Q.  I want to see if I can narrow it down
9 when.
10       It was before the lawsuit was filed at
11 the beginning of April of 2016, correct?
12    A.  Correct.
13    Q.  It was after you met with Tom Darden in
14 Miami, which was in January of 2016, correct?
15    A.  Yes.  You mean the meeting with the
16 attorneys?
17    Q.  Yes.
18    A.  After that.
19    Q.  I'm sorry, that's a good point.  You met
20 Tom Darden at a law office in Miami in January of
21 2016, correct?
22    A.  Yes.
23    Q.  Okay.  So it was after that meeting.
24 Fabio Penon was here in Miami and was at the Doral
25 warehouse on at least the 16th and 17th of February

Page 79

1 of 2016.
2        Was J.M. Products still operating at that
3 time at the Doral warehouse?
4    A.  Yes.
5    Q.  All right.  So now we have narrowed it
6 further.  So now we have gotten to sometime after
7 February 17 of 2016, but before the very beginning of
8 April of 2016 J.M. Products ceased its operations?
9    A.  Yes.
10    Q.  That was a decision that was made by you,
11 correct?
12    A.  No, that was a decision that has been
13 made by the owner of J.M..
14    Q.  And when you say the owner, do you mean
15 Di Giovanni?
16    A.  Yes.
17    Q.  Is this -- was this a decision that was
18 made -- I'm trying to remember here.
19       Was this made at a meeting that you had
20 with Henry Johnson and Di Giovanni?
21    A.  I don't recall exactly this.  I don't
22 recall exactly this.
23    Q.  Once the operations were -- once the
24 business operations of J.M. Products ended sometime
25 between mid February and the very, very beginning of

Page 80

1 April 2016, what happened to -- what happened, for
2 example, to Jim Bass?  Jim Bass then became an
3 employee or a consultant for Leonardo?
4    A.  Immediately after, yes, Jim Bass of
5 course has been dismissed from J.M., and I asked to
6 Jim Bass, because -- because he was very good, I
7 asked to Jim Bass to go ahead for Leonardo
8 Corporation in the study of the robotization system.
9    Q.  I apologize.  I was sipping water
10 literally when you gave the last answer.  Did you say
11 the robotic system?
12    A.  Yes, I asked to the -- to the company of
13 Jim Bass that was -- I don't recall the name now.
14       But I asked to continue to be a
15 consultant of Leonardo Corporation because it would
16 have been a pity to throw away a study that had been
17 started at that point that is a very interesting
18 technology related not to the one megawatt plant but
19 to the technology of J.M. that is in development.
20    Q.  The technology of J.M., is that then
21 something that Leonardo acquired or is that still --
22 whatever that technology is it's still owned by J.M.
23 Products?
24    A.  No, the technology is still owned by J.M.
25 Products.

Page 81

1    Q.  But Leonardo is furthering the
2 development of that technology?
3    A.  Yes, because not for J.M. Products but
4 for the European company we are in contact through
5 Di Giovanni, we're going to develop this business.
6    Q.  What is the European company?
7    A.  It is a company in theory.  This is an
8 initiative that has to be still made.
9    Q.  I'm sorry, I think I misunderstood.  A
10 company in its infancy, is that what you said?
11    A.  No, in theory, in the making.
12    Q.  Okay.  In theory, I'm sorry.
13    A.  In theory, yes.  Sorry, it's a Latin
14 expression.  I'm sorry for use.
15    Q.  So it's --
16    A.  Excuse me.
17    Q.  The European company hasn't been formed,
18 but what you are discussing with Di Giovanni is
19 forming that company in the future?
20    A.  Yes, sir.
21    Q.  All right.  Let me come back here to J.M.
22 Products.  After J.M. Products was -- after its
23 business operations were closed in Doral, which we
24 have established is sometime between late February
25 and the very beginning of April of 2016, the

21 (Pages 78 - 81)

CONFIDENTIAL TRANSCRIPT

Page 82

1 pipeline -- the pipes that were connecting the 1MW
2 plant on the Leonardo side of the warehouse to the
3 container, the kind of black box container on the
4 J.M. Products side of the warehouse, those pipes were
5 removed at some point, correct?
6     A.   Correct.
7     Q.   That was after the business of J.M.
8 Products closed?
9     A.   Yes.
10     Q.   That was shortly after the business of
11 J.M. Products closed?
12     A.   Yes.
13     Q.   That was at your direction?
14     A.   Yes.
15     Q.   And those -- this might help us for
16 clarity sake.  As you probably noticed through these
17 various depositions I sometimes like having
18 pictures.  They help make things a little more
19 clearer for me.
20     A.   Sure.
21     Q.   So I am going to mark here as Exhibit 4.
22         (The document referred to was thereupon
23 marked Deposition Exhibit 4 for Identification, a
24 copy of which is attached hereto.)
25 BY MR. PACE:

Page 83

1     Q.   Actually, you know what, I am going to
2 ask you a question about Exhibit 3, just so we get
3 that out of the way.  I just realized I didn't
4 actually --
5     A.   I have Exhibit 4 here.
6     Q.   Yeah.  I want to ask you -- I am going to
7 go back, only because I realized I didn't actually
8 get an answer to my question.  I just want to end it,
9 get the answer and then we can move on.
10     A.   Okay.
11     Q.   So at least for part of the second year
12 of this sublease that is Exhibit 3 --
13     A.   Yeah.
14     Q.   -- J.M. Products was operating at the
15 Doral location, correct?  At least from September
16 2015 until early 2016?
17     A.   Yes.  Independently from this lease
18 contract J.M. left the area very short time after the
19 closing of the plants, so automatically this expired.
20     Q.   I understand what you're saying.  I'm
21 just asking the question of you testified earlier
22 that there was no funds sent from J.M. Products to
23 Leonardo to pay for the first year's rent.
24     A.   Yes.
25     Q.   I just want to ask the question, there

Page 84

1 was also no funds sent from J.M. Products to Leonardo
2 to pay for the second year's rent?
3     A.   Correct.
4     Q.   I just wanted to close the loop.  Now we
5 can go to our new exhibit.
6         So Exhibit 4 shows -- too much paper.
7 Exhibit 4 shows the inside of the Doral warehouse,
8 correct?
9     A.   Yes, sir.
10     Q.   What we see there is a -- in silver what
11 we see there is a pipe wrapped in insulation,
12 correct?
13     A.   Yes.
14     Q.   That pipe was removed sometime after
15 February -- after the middle of February of 2016, but
16 before the beginning of April of 2016, correct?
17     A.   Yes.
18     Q.   All right.  And that pipe was removed at
19 your direction, correct?
20     A.   Yes.
21     Q.   And the pipe that was contained within
22 that insulation was then put to some other use by
23 you; is that correct?
24     A.   Yes.
25     Q.   And was the insulation discarded?

Page 85

1     A.   Yes.
2     Q.   Okay.  The -- what was the use that you
3 put the pipe to?
4     A.   That is related to a technology not
5 related to the technology of the litigation and it's
6 covered by industrial secret.
7     Q.   I'm sorry, the last one was industrial
8 secret?
9     A.   Secret, yes.
10     Q.   Let me ask you again.  I am not asking
11 for details on the underlying technology.  I am just
12 asking what did you do with the pipe?  You put it to
13 some other use?
14     A.   Yes.
15     Q.   What kind of use?  You don't have to give
16 me great details, but what kind of use?  Let me
17 rephrase.
18         Where is it now?  Where is the pipe now?
19     A.   Inside the plant.
20     Q.   All right.  And the pipe is now being
21 used in another device inside the plant?
22     A.   Yes, sir.
23     Q.   And this pipe being used in this other
24 device is carrying fluids through the device, without
25 getting into the details of what those fluids are?

22 (Pages 82 - 85)

CONFIDENTIAL TRANSCRIPT

Page 114

1    instruct him not to answer.
2  BY MR. PACE:
3      Q.   And Dr. Rossi, you are going to follow
4  that instruction?
5      A.   Yes.
6      Q.   I want to start off talking a little bit
7  about the heat exchanger we were discussing earlier
8  today.  I want to start by just laying a little bit
9  of groundwork.
10        (The document referred to was thereupon
11  marked Deposition Exhibit 8 for Identification, a
12  copy of which is attached hereto.)
13  BY MR. PACE:
14      Q.   I am handing you what is marked as
15  Deposition Exhibit 8.
16        Do you recognize Exhibit 8 as a picture
17  of the Doral warehouse taken from the Leonardo side
18  of that warehouse?
19      A.   Yes.
20      Q.   All right.  Can you tell just by looking
21  at the picture any time period when it was taken?
22      A.   After -- I can take that this has been
23  taken after the closing of the plants.
24      Q.   After the closing.  Now, you just said
25  plants.  So let's just make sure we're defining that

Page 115

1  correctly or we're on the same page.  Sorry, I
2  shouldn't say defining correctly.  That we're on the
3  same page.
4        Plants means -- ones of those plants is
5  the -- is the E-Cat plant by Leonardo, correct?
6      A.   Yes, it is correct.
7      Q.   And this picture that we have as Exhibit
8  8, that's reflected in the small piece of the red
9  container that we can see on the right-hand side of
10  the picture?
11      A.   Yes, it is correct.
12      Q.   All right.  And the other plant is the
13  J.M. Products plant and that we can see in this
14  picture is the -- top of the black box that we
15  see on the right-hand side of the picture; is that
16  correct?
17      A.   Yes, it is correct.
18      Q.   All right.  Between those two plants --
19  I'm sorry, I may sometimes call them containers
20  instead of plants.  Is that okay with you?
21      A.   No problem.
22      Q.   That's because both of these, the E-Cat
23  plant -- yeah, the E-Cat plant is in like a shipping
24  container; is that correct?
25      A.   Yes, the red shipping container.

Page 116

1      Q.   And the J.M. Products plant is also in a
2  shipping container that is just wrapped in
3  insulation?
4      A.   Yes, sir.
5      Q.   So the black we see there is actually the
6  insulation?
7      A.   Yes, sir.
8      Q.   All right.  And between the two is a --
9  is a gray wall that looks like it's probably in the
10  range of, you know, six, seven feet high.  Is there a
11  name you are comfortable referring to that wall?
12      A.   Absolutely, okay.
13      Q.   As contrasting the large walls that go up
14  to the roof in this warehouse, what can we call this
15  small wall?  Can we call it a dividing wall?
16      A.   Very good.
17      Q.   Okay.  So there is a dividing wall
18  between the Leonardo container and the J.M. Products
19  container?
20      A.   It is correct.
21      Q.   And you said that this picture was --
22  what you can conclude from this picture in terms of
23  timing is it was taken after the operations of J.M.
24  Products had ended.
25        Why -- what about this picture shows that

Page 117

1  to you?
2      A.   Because there is not the steam pipe.
3  From this perspective we should necessarily see
4  between the red container that is in the right of
5  this photography and the black container that looms
6  up on the top of the dividing wall at the left of the
7  red ship container.  We should see the pipe of the
8  steam that brought -- that conveyed the steam
9  produced in the red container that is the E-Cat, to
10  the black container that is the J.M. plant.  Here is
11  not that pipe and obviously the plants were not in
12  operation.
13      Q.   I am going to mark here as actually
14  Exhibit 9 and 10, because we're going to have one --
15  I am going to start with 9, and 10 is going to be the
16  exact same version but I am going to let you draw on
17  10, which is why I am doing the difference, the
18  distinction.
19        (The document referred to was thereupon
20  marked Deposition Exhibit 9 for Identification, a
21  copy of which is attached hereto.)
22        (The document referred to was thereupon
23  marked Deposition Exhibit 10 for Identification, a
24  copy of which is attached hereto.)
25  BY MR. PACE:

30 (Pages 114 - 117)

CONFIDENTIAL TRANSCRIPT

Page 118

1    Q.  Handing you what's marked as Exhibit 9
2 and 10.  Actually, give one each to everybody because
3 I've got a couple of extra in case any get messed
4 up.
5       One of these I am going to ask, the
6 Exhibit 9, that we not draw on and then Exhibit 10 I
7 am going to let you draw on.  This is by no means to
8 scale.  I am not trying to claim it's to scale.
9    A.  Okay.
10    Q.  What I have tried to do is kind of create
11 a simple diagram that has -- it's almost like an
12 overview of the Doral warehouse.
13       It doesn't have everything in it but it's
14 meant to show that there is a portion of the Doral
15 warehouse that is for J.M. Products, that's the
16 square that is the upper right corner of this diagram
17 and then there is the area where Leonardo was
18 operating, which is the bottom part of the Exhibit
19 9.
20       I tried to draw in the little hallway we
21 see in Exhibit 8 that takes you back to the bathroom
22 in the back and then I put a box in here to represent
23 the J.M. Products plant.
24    A.  Okay.
25    Q.  Again, not drawn to scale, but is that

Page 119

1 position wise roughly correct?
2    A.  Yes, but I do not -- sorry, I miss the
3 difference between the Exhibit 9 and the Exhibit 10.
4    Q.  Absolutely none.
5    A.  They look absolutely the same.
6    Q.  They are the exact same.
7    A.  Okay.
8    Q.  The reason I gave you both of them is I
9 want you then to put Exhibit 9 to the side because
10 that way we know if you draw on Exhibit 10, we will
11 be able to show the difference --
12    A.  I understand.
13    Q.  -- here is what Dr. Rossi drew because
14 look at the difference between 9 and 10.  So let's
15 take 9 away from you so that you don't have an
16 incentive to draw on 9.  We will just put it under
17 the pile, but we're not taking it away.
18    A.  Okay.
19    Q.  I actually -- if we need additional ones
20 I actually have a few extra copies, we can create
21 additional exhibits.
22       I want to talk to you -- if you can keep
23 Exhibit 10 with you, I want to see if I can set
24 something up here.  I am going to give you pictures
25 you have seen before in a second.  I am going to mark

Page 120

1 here as Exhibit 11 and 12.
2       (The document referred to was thereupon
3 marked Deposition Exhibit 11 for Identification, a
4 copy of which is attached hereto.)
5       (The document referred to was thereupon
6 marked Deposition Exhibit 12 for Identification, a
7 copy of which is attached hereto.)
8 BY MR. PACE:
9    Q.  This is getting a little on the
10 interactive side.  This is Exhibit 11.
11    A.  Thank you.
12    Q.  This is Exhibit 12.  You have seen each
13 of these photographs before fairly recently?
14    A.  Yes, I have seen these photographies
15 during my -- I think my first deposition or the
16 second.  I don't remember exactly.  One of the two.
17    Q.  Right.  It might even have been both.  I
18 don't remember now either.
19    A.  Yeah.
20    Q.  These are pictures of the inside of what
21 you have identified as the J.M. Products plant or
22 container, correct?
23    A.  Yes, it is correct.
24    Q.  And if I understand it correctly, if we
25 put these pictures side by side, if you put Exhibit

Page 121

1 11 to your left and Exhibit 12 to your right, that
2 kind of -- that's the way they would appear in the
3 container, correct?
4       If you came into the container from the
5 door we see in Exhibit 11, you would see these pipes
6 in Exhibit 11 closest to that door, and then as you
7 kept looking down or walking down the container, you
8 would then see the equipment that is shown in Exhibit
9 12?
10    A.  No.
11    Q.  Can you explain to me how I got that
12 wrong?
13    A.  Here is a missing -- there is a gap.
14    Q.  There is a gap between them?
15    A.  Yes, between 11 and the 12 you should
16 need an 11-B because as you can really see, you can
17 easily see, they don't combine.
18    Q.  Right.  I'm sorry, I wasn't trying to say
19 that and you said that previously, so let me just do
20 this again.
21       Which is, if you came in the door that we
22 see on the left side of Exhibit 11 --
23    A.  Okay.  That's the entrance, okay.
24    Q.  The first thing you would see are these
25 pipes that are shown in Exhibit 11?

31 (Pages 118 - 121)

Veritext Legal Solutions
800-726-7007                                        305-376-8800

CONFIDENTIAL TRANSCRIPT

Page 122

1      A.   Yes, it is correct.
2      Q.   Then you would see some additional space
3  and additional equipment in between the picture in
4  Exhibit 11 and the picture in Exhibit 12?
5      A.   Correct.
6      Q.   And then on the far side of the container
7  you would see the equipment we see in Exhibit 12?
8      A.   Yes, it is correct.
9      Q.   Okay.  At the top of Exhibit 12 we see a
10 pipe that's got some blue and looks like silver tape
11 around it; is that correct?
12     A.   You mean this?
13     Q.   Yes, a tan colored pipe.
14     A.   Yes, it is correct.
15     Q.   That pipe is carrying the heated fluid
16 from the Leonardo plant over -- into the J.M.
17 Products plant, correct?
18     A.   Correct.
19     Q.   And that -- is that the same pipe as the
20 one we see on the top of Exhibit 11?  Recognizing
21 there is a gap between them.
22     A.   Yes, there is a gap between them and --
23 yes.  In any case, yes.
24     Q.   Okay.  And you're familiar with the
25 equipment that was in the J.M. Products container

Page 123

1  from your work for J.M. Products, correct?
2      A.   Yes.
3      Q.   Okay.  I'm just making sure that you're
4  knowledgeable about what we're looking at here.
5      A.   I am.
6      Q.   Okay.  So looking at Exhibit 11, the way
7  this system operated, the heated fluid coming from
8  Leonardo -- coming from the E-Cat container would
9  flow into these pipes, the first four pipes that we
10 see here on Exhibit 11, the top four pipes we see on
11 Exhibit 11?
12     A.   The insulated pipes, yes.
13     Q.   And I believe your testimony was very
14 clear that that's steam that's coming through those
15 pipes, correct?
16     A.   Yes, sir.
17     Q.   And so it remains steam as it's going
18 through these four pipes?
19     A.   Yes, sir.
20     Q.   And then between Exhibit 11 and Exhibit
21 12 there is a -- we will get into more detail on it
22 but there is a mechanism in place to carry the heated
23 fluid out of the container -- out of the J.M.
24 Products container to a heat exchanger; is that
25 correct?

Page 124

1      A.   Yes, there is a bypass.
2      Q.   There is a bypass, okay.
3      A.   Yes.
4      Q.   And then after the heated fluid goes into
5  the heat exchanger, it comes back as cooled fluid?
6      A.   The cold fluid, yes.
7      Q.   The cold fluid.  And it comes into the
8  pipe that we see on Exhibit 12, which is the -- it
9  looks like it's a pipe wrapped in white insulation
10 with some tan tape on it?
11     A.   Yes.
12     Q.   Okay.  And, I'm sorry, just to be clear,
13 it comes into this pipe somewhere on -- outside of
14 the image, but on the left-hand side of Exhibit 12?
15     A.   Can you repeat?
16     Q.   Yes.  When the -- when the cold fluid
17 comes back into the container after it has gone
18 through the heat exchanger, it would come into the
19 pipe that is wrapped in white insulation with tan
20 tape somewhere on the left-hand side of Exhibit 12,
21 or what's not seen on the left-hand side of Exhibit
22 12?
23     A.   Yes, it is -- yes, relatively cold.
24 Relatively respect the steam, because it was still
25 warm, but yes.

Page 125

1      Q.   Then it would flow through this pipe
2  that's covered in white insulation and tan tape out
3  through the -- what we see here on the right-hand
4  side of Exhibit 12?
5      A.   Uh-huh.
6      Q.   And that would then flow back to the
7  Leonardo side of the Doral warehouse?
8      A.   Yes.
9      Q.   Okay.  Just so I understand also, then I
10 want to talk about our diagram that's Exhibit 10.
11          Just so I understand, the heat -- the
12 bypass that you referenced, the bypass goes out
13 the -- how does the bypass carry the steam out from
14 the J.M. Products -- out from the J.M. Products
15 container?  Is there a device that pushes the steam
16 out or does it just flow naturally?
17     A.   I did not understand the question.
18     Q.   It was not a very good question by me.
19 You testified that between Exhibit 11 and Exhibit 12
20 there is a -- there is a bypass and that takes the
21 steam over to the heat exchanger, correct?
22     A.   Yes.
23     Q.   All right.  What does that bypass look
24 like?
25     A.   A bypass is -- is a sort of a Y.  So

32 (Pages 122 - 125)

CONFIDENTIAL TRANSCRIPT

Page 138

1 was an experiment. And so I put the things in a way
2 that I could have wheels in my hands.
3       The famous violin, I wanted to play any
4 cord, any possible cord to have any possible tuning.
5 So I could -- I could modulate the amount of steam
6 that I was sending inside this. Why these pipes are
7 insulated while, for example, this area was designed
8 to cool down in some particular cases?
9       When I put insulating means I need heat.
10 So why I needed heat here? Because inside here I had
11 the reactors. I needed the heat here. How much
12 heat, I did not know. I did not know. So basically
13 I have made so that I could regulate.
14     Q.  Can we be clear for the record, what you
15 were just talking about was Exhibit 11?
16     A.  Yes.
17     Q.  You are talking about the pipes we see in
18 Exhibit 11?
19     A.  Yes, sir.
20     Q.  Just doing it for the record.
21     A.  This one.
22     Q.  Understood.
23     A.  So regulating this bypass, because the
24 bypass as I -- which this kind of bypass is called --
25 in the jargon of this kind of technology it's called

Page 139

1 a butterfly. Why butterfly? Because it is like a
2 wing. It is like a wing.
3       When you turn the wing in one sense it
4 closes the pipe. You turn it 90 degrees in the
5 other -- you turn it clockwise, for example, it
6 becomes open. You turn it counterclockwise, it
7 becomes closed.
8       Being a wing, it call it butterfly. So
9 we had a butterfly here and butterfly here, so that
10 we could modulate the steam. Why we foresaw a
11 powerful heat exchanger at the end? Because I did
12 not know how much heat I was going to consume, but I
13 knew that I had to produce one megawatt power per
14 hour for the performance test, so at that point I
15 made that system. And foreseeing that the excess
16 heat were going to be dumped in the -- dump heat in
17 our jargon means to cool down without work, just to
18 cool down. And this is it.
19     Q.  And so the first bypass, what you have
20 labeled as BP-1 --
21     A.  Yeah.
22     Q.  -- it would take the heated fluid from the
23 pipe over to the exact same -- over to the same
24 piping that is -- that is bypassed -- that bypass 2
25 led into?

Page 140

1     A.  Yes.
2     Q.  Then from there they would run against
3 the far -- run against the wall to what I am calling
4 the back of the warehouse? I don't know if you call
5 it the back or the front of the warehouse. The part
6 of the warehouse where the second story was?
7     A.  Correct.
8     Q.  Okay.
9     A.  Sorry.
10     Q.  Who purchased the butterfly bypasses?
11     A.  No, we did it. We did it.
12     Q.  You created it yourself?
13     A.  Yes, because it is just -- please
14 remember that I have very big experience in making
15 this kind of stuff because I started when I was 22
16 years old to make incinerators with heat recovery,
17 manufacturing them in my factory. In fact, also
18 manufacturing using also my hands.
19       I had 20 years of experience in that
20 plant. A butterfly valve can be easily made with
21 very few money. It's just a pipe with a disk inside,
22 a shaft in the middle and outside a lever to maneuver
23 it counterclockwise or clockwise, and that is a
24 butterfly.
25     Q.  I understand.

Page 141

1     A.  If you buy a butterfly you spend $5,000.
2 If I make a butterfly for you it cost $100.
3     Q.  Understood. You may have been kind of
4 using the royal plural, but you said we made the
5 butterfly pass.
6     A.  Yes.
7     Q.  Did you make it or did you make it with
8 somebody else?
9     A.  I needed the help of some contractor.
10     Q.  Do you know the name of that contractor?
11     A.  No, I don't remember because as I told
12 you in a former deposition of mine I don't remember
13 it's the first or the second, I used -- there was --
14 there were always around contractors in that area.
15       Also because under my direction it's easy
16 because it's just a matter of cutting and welding,
17 so.
18     Q.  Would you do any of the cutting and
19 welding?
20     A.  No, I did not cutting and welding with my
21 hands specifically. I am able to but I did not.
22     Q.  Right. I didn't think so. So the
23 contractor was the person who did the cutting and
24 welding. And the equipment used for the cutting and
25 welding, was that equipment that the contractor

36 (Pages 138 - 141)

CONFIDENTIAL TRANSCRIPT

Page 142

1 brought with him or her?
2     A.   The welder, yes, because we do not have a
3 welder.  For the cutting we have -- we have the tools
4 necessary to cut.
5     Q.   Aside from the bypass was there any --
6 was there any diverter pump that was used in
7 connection with the heat exchanger?
8         Was there any pump in let's say in the
9 J.M. Products container to push the heated fluid out?
10    A.   We had a recirculator.
11    Q.   Yes, a recirculator.
12    A.   Which is a pump.
13    Q.   And who bought the recirculator?
14    A.   I bought it.  Leonardo bought it.
15    Q.   If I concentrate hard I can actually
16 write okay with my left hand now.
17        Where did you buy the recirculator?
18    A.   I don't remember.
19    Q.   Did you save any purchase receipts from
20 buying the recirculator?
21    A.   Can you repeat the question?
22    Q.   Did you save any receipts from buying the
23 recirculator?
24    A.   I don't take the accounting, so I am not
25 able to answer.  I did not take the accounting but

Page 143

1 yes, I should have it.
2     Q.   Okay.  In fact, when you say you should
3 have it, your accountant should have it?
4     A.   Yes.  Yes.
5     Q.   The heat exchanger on the J.M. Products
6 side, that was one that you designed?
7     A.   Can you kindly repeat?
8     Q.   Yes.  The heat exchanger that you have
9 been drawing in these diagrams there on Exhibit 10,
10 and it doesn't show all the heat exchanger --
11    A.   Here I design nothing.
12    Q.   That's what I was going to ask you.  The
13 heat exchanger has pipes that carry -- that carry the
14 heated fluid from let's just say in the case of when
15 you are using bypass number 2, out of the J.M.
16 Products container --
17    A.   Yes.
18    Q.   -- up to the second story --
19    A.   Yes.
20    Q.   -- of the Doral warehouse --
21    A.   Yes.
22    Q.   -- and then the cooled fluid --
23    A.   Yes.
24    Q.   -- relatively speaking comes back?
25    A.   Yes.

Page 144

1     Q.   Who created that design?
2     A.   I did.
3     Q.   Okay.  And for that design you needed a
4 lot of pipe, correct?
5         MR. CHAIKEN:  Object to form.
6         THE WITNESS:  I don't know what you mean
7 by a lot.  I needed about 100 and something
8 meters of pipe.
9 BY MR. PACE:
10    Q.   Fair enough.  I was going to say over 100
11 meter of pipe?
12    A.   Over 100 meters of pipe.  A lot --
13    Q.   Relative concept, it depends on who you
14 are, right?
15    A.   100 meters is very small respect, you
16 know.
17    Q.   If you're building a skyscraper a hundred
18 meters is not very much.
19    A.   Correct.  Exactly.
20    Q.   So the heat exchanger that you designed
21 and built involved over a hundred meters worth of
22 pipe.
23        From where did you buy that hundred
24 meters worth of pipe?
25    A.   From Home Depot and from -- because there

Page 145

1 were two different kinds of pipes.  I bought them
2 from Home Depot and from a supplier I don't remember
3 the name of.  A supplier of steel pipes.  I don't
4 remember the name of him.
5         Was some -- it was a company in New
6 Jersey, if I were remember or something like that or
7 in Florida.  I don't remember, sir, but for sure I
8 have accounting of that.
9     Q.   And would that be accounting -- is that
10 J.M. -- were they bought -- was it bought by J.M.
11 Products or was it bought by Leonardo, the pipes?
12    A.   As far as I recall they have bought by
13 Leonardo along the compensation agreement that
14 Leonardo had with J.M.,.  But maybe, again, by
15 default it is Leonardo.
16        I don't remember particular situations
17 for which J.M. could have bought, but I think it was
18 Leonardo.
19    Q.   Okay.  And the --
20    A.   You know, when I prepared for this
21 deposition, attorney, I did not go to find for
22 distinction about this invoice, because for me it was
23 one bundle.
24    Q.   You didn't look for a distinction between
25 J.M. Products and Leonardo?

37 (Pages 142 - 145)

CONFIDENTIAL TRANSCRIPT

Page 150

1    Q.   I'm sorry, Dr. Rossi, you had -- you took
2  a look at some notes to identify the model of the
3  fans that were used in the heat exchanger you have
4  been testifying about.  What was the model?
5    A.   No, the manufacturer is Multifan.
6    Q.   I'm sorry?
7    A.   M-U -- Multifan, M-U-L-T-I-F-A-N.
8    Q.   Multifan?
9    A.   Multifan.
10    Q.   And I forget if I asked you this
11  already.  Where did you buy the fans?
12    A.   From Multifan.
13    Q.   Directly, you bought it directly from --
14  Multifan is the manufacturer?
15    A.   Yes.
16    Q.   And you bought them directly from the
17  manufacturer?
18    A.   Yes.
19    Q.   Is it safe to say you don't recall
20  whether you bought them on behalf of Leonardo or J.M.
21  Products?
22    A.   Most likely Leonardo, but could be -- I
23  think Leonardo.
24    Q.   And you believe that your -- your
25  accountant would have the records of the purchase of

Page 151

1  those fans?
2    A.   Yes.
3    Q.   And how many fans did you buy?
4    A.   Two.
5    Q.   Do you still have those fans?
6    A.   They have been modified.  They have been
7  modified because I had used them for another purpose
8  now.
9    Q.   Without getting into the detail, can you
10  explain to me what the other purpose is of the fans?
11        MR. ARAN:  Objection to the extent --
12  BY MR. PACE:
13    Q.   What's the purpose you are using the
14  fans?
15    A.   Can you repeat?
16    Q.   Sure.  You just said that you still have
17  the fans but you are -- they have been modified
18  because you are using them for another purpose,
19  correct?
20    A.   Yes.
21    Q.   Are the fans being used in connection
22  with the container, the J.M. Products container?
23    A.   Yes, but for a completely different
24  purpose because the kind of technology we have there
25  is a completely different thing.

Page 152

1    Q.   How have the fans been modified?
2    A.   Can you repeat?
3    Q.   How have the fans been modified?
4    A.   I deem this confidential information
5  because the modification of those fans reenters in
6  this new technology.
7        So if you are more specific and ask me
8  something.  How have been modified is too generic to
9  answer.  Because I should have to explain things that
10  I deem not information to give to my competitor
11  and -- but --
12    Q.   Were the fans modified by somebody on
13  behalf of J.M. Products or somebody on behalf of
14  Leonardo Corporation?
15    A.   Leonardo Corporation.
16    Q.   Who made -- who modified the fans?
17    A.   I did.
18    Q.   To modify the fans did you have to
19  disassemble them?
20    A.   Yes.
21    Q.   Do they still operate as fans?
22    A.   Fan is a very generic -- anything that
23  moves a fluid -- anyway, yes.  I would say yes.
24    Q.   Are they still used to move air?
25    A.   Yes.

Page 153

1    Q.   Do they operate inside the container, the
2  J.M. Products container?
3    A.   Yes.
4        MR. ARAN:  Objection to form.
5  BY MR. PACE:
6    Q.   This heat exchanger that you have been
7  testifying about, when was it put into place at the
8  Doral warehouse?
9    A.   Kindly can you repeat?  I was distracted.
10    Q.   Okay.
11    A.   I was thinking to something.  Sorry, it's
12  my fault.
13    Q.   I believe you have already testified that
14  this heat exchanger about which you are testifying
15  was removed sometime between mid February and very
16  early April of 2016, correct?
17    A.   Correct.
18    Q.   All right.  When was it installed?
19    A.   It has been installed before the
20  beginning of the test.
21    Q.   If the test that you are describing was
22  in late February of 2015 --
23    A.   Correct.
24    Q.   -- can you tell me was it installed by
25  January of 2015?  Was it installed in mid --

39 (Pages 150 - 153)

CONFIDENTIAL TRANSCRIPT

Page 154

1     A.  I would say the end.  Has been made at
2  the very end, so I would say half February.
3     Q.  The middle of February 2015?
4     A.  Yes, just -- we completed it just before
5  the start-up of the plant.  Has been the last thing
6  we made.
7     Q.  And when you say we made, it was you and
8  independent contractors, correct?
9     A.  Yes.  As I told you during I think my
10  first deposition, I never say I.  I always say we.
11        It is also -- it is because I have been
12  told when I was a child never say I because it's a
13  concentric, et cetera.  Always we because everything
14  is merit of everybody, so I have this attitude.  I
15  tend to say always we.
16     Q.  That's why I'm asking.  When you say we,
17  I want to make sure that you are not referring to
18  just yourself, that there is somebody else involved.
19     A.  Yes.
20     Q.  So in this case to install the heat
21  exchanger how many people were involved?
22     A.  I don't remember.  Maybe one, two
23  because -- I don't remember exactly.
24     Q.  How long did it take to install the heat
25  exchanger?

Page 155

1     A.  15 days.
2     Q.  Okay.  If it was completed before the
3  test -- before the end of February when the test you
4  have described began --
5     A.  Yes.
6     Q.  -- you must have begun work on it by the
7  early part of February?
8     A.  Maybe, yes.  I believe makes sense.
9     Q.  Okay.  So 15 days for the installation,
10  approximately.
11     A.  Yeah.
12     Q.  How much were you paying the workers, if
13  you recall?
14     A.  I don't remember.  I absolutely don't
15  remember.
16     Q.  Did you pay them --
17     A.  You know, usually they were paid by the
18  day cash because that's how things go there.  And --
19  so I have not recall of this.
20     Q.  It sounds like you would be paying
21  several hundred dollars a day though to these workers
22  or are they less expensive than that?
23     A.  Might be, yes.  I would say yes.
24     Q.  And there is -- there is an element of
25  this bypass -- I'm sorry.  There is an element of

Page 156

1  this heat exchanger that you've described that we
2  have not addressed yet, which is the -- these pipes
3  that go up to the second floor are laid out in kind
4  of a serpentine pattern on the second floor, a back
5  and forth pattern?
6     A.  Can you kindly rephrase?
7     Q.  Yes.
8     A.  Thank you.
9     Q.  For the heat exchanger that goes up --
10  the pipes that are on the second floor --
11     A.  Yes.
12     Q.  -- those are laid in kind of a serpentine
13  pattern, correct, a back and forth pattern?
14     A.  You know, the part of pipe that goes up
15  to the heat exchanger is just straight.
16     Q.  Right.  I am talking about the pipes that
17  are in the heat exchanger.
18     A.  That was confusing.  The pipe inside is a
19  serpentine, yes.
20     Q.  And those serpentine pipes were -- your
21  testimony has been that those serpentine pipes were
22  contained within a wooden -- some kind of wooden
23  enclosure?
24     A.  Yes, we made -- to make it very fast and
25  very cheap we made a wooden frame to sustain the

Page 157

1  serpentine and frame and the box even wooden, with a
2  particular technique that I learned in my past to
3  also to eliminate the acoustic energy and that's it.
4     Q.  Who built the wooden box?
5     A.  Carpenters.  Carpenters that I got,
6  contractors.
7     Q.  Same answer, which is these are people
8  who you don't have the names of any?
9     A.  The same people.  The same people.
10     Q.  You don't know their names?
11     A.  No, I don't.
12     Q.  And you paid them in cash?
13     A.  Yes.  Mostly, not always.  Some of them
14  has been -- has made -- because some contractor that
15  work with me in all the plant made invoice and I paid
16  by invoice.
17        Now I don't remember if the ones that
18  worked in the second floor, if among them there was
19  somebody.  No, I don't think so.  The ones that came
20  to work there were just people that were there around
21  with their trucks and I paid them cash.
22     Q.  Okay.  Where did you buy the wood for
23  this enclosure box?
24     A.  There was -- there is a shop that's Home
25  Depot part and some wood also from -- from a wood

40 (Pages 154 - 157)

CONFIDENTIAL TRANSCRIPT

Page 158

1 seller that is not far from our factory.  I don't
2 remember the name of it.
3     Q.  If you look at exhibit -- what we have
4 here marked as Exhibit 14 and these are photographs
5 that Dr. Wong took and submitted with his expert
6 report.
7     A.  Okay, yes.
8     Q.  Exhibit A-1 --
9     A.  Yes.
10     Q.  -- is the second story of the Doral
11 warehouse, correct?
12     A.  Yes, it is correct.
13     Q.  This is a picture that was taken sometime
14 this past month of February 2017?
15     A.  This photo has been taken by Dr. Wong
16 when he visited our plant.
17     Q.  And that was in February of -- February
18 of this year, correct?
19     A.  Yes.
20     Q.  All right.  The serpentine pipes would be
21 laid on the floor, this kind of concrete floor we see
22 here?
23     A.  Yes.  Yes, upon a frame of wood, yes.
24     Q.  That was one of the things I was going to
25 ask.  So the pipes were on top of a wood frame,

Page 159

1 correct?
2     A.  Yes, we have put kind of lumbers, upon
3 the lumbers the pipe, the steam pipes.
4     Q.  And then --
5     A.  So the steam pipes were not in contact
6 with the floor.
7     Q.  Understood.  And then the wood would
8 also -- this was a box, so it would actually also
9 cover up the steam pipes, correct?
10     A.  Yes, not in contact with them through the
11 frame because there had to be some distance between
12 the wood cover and pipes, and the steam pipes.
13     Q.  So how tall was the box?
14     A.  The tall was -- I get the dimensions.
15 The dimensions should be in the report.
16     Q.  Actually, I don't have Wong's.  You
17 provided the dimensions to Dr. Wong?
18     A.  Yes, I provided the dimensions to
19 Dr. Wong and more or less you make about one meter of
20 it, more or less.  One meter is three feet.
21     Q.  And then the -- were the fans -- were the
22 fans inside the box?
23     A.  The fans were outside the box blowing air
24 inside the box at a rate such that we had very
25 consistent exchange of air inside the box, inside the

Page 160

1 box, not to allow the air to heat up too much.
2     Q.  And the -- so the fans are drawing air
3 from outside --
4     A.  Yes.
5     Q.  -- into the second story of the Doral
6 warehouse and then they are going over these pipes,
7 if I understand how the system works, because the
8 pipes are warm, that air is getting warmed up and it
9 has to be circulated back out of the second story?
10     A.  Right.
11     Q.  And it circulates back out of the second
12 story through the windows?
13     A.  Yes.
14     Q.  So if you look at Exhibit A-1, when we
15 look on -- we can see light coming through two
16 openings here.  Are those both windows or am I
17 looking somehow at doors?
18     A.  No, are both windows.
19     Q.  Was the air being pushed out of both
20 those windows or just one?
21     A.  No, just one.  The one with the two guys
22 there because we were substituting the -- we were
23 making substitution of -- of the glasses there.  The
24 second one has been the window that we used.
25     Q.  Okay.  So A-2, is that the -- is it your

Page 161

1 testimony that's the window that was used to push the
2 air out?
3     A.  I think so, yes.
4     Q.  Okay.  And just so I understand --
5     A.  I think so.  Sorry to interrupt.  I think
6 so because, you know, I am not -- I don't remember
7 exactly looking out of that window, if this is the
8 panorama.
9         In any case, yes, I think so.  Because
10 this window is equal to another -- there are three
11 windows basically.  Yes, three windows there are and
12 we used for this purpose the central one.
13     Q.  So just so I understand that too, if you
14 are walking into J.M. Products there is a window
15 right above the door for J.M. Products?
16     A.  Sorry, I do not understand what you are
17 saying.
18     Q.  Sure.  When you walk into the J.M.
19 Products building, the side of the Doral warehouse,
20 there is a window above the door that you come in,
21 correct?
22     A.  Correct.  And that is -- yes, correct.
23     Q.  And then there is two -- if you are
24 facing the building, to your left there is another
25 set of second story windows?

41 (Pages 158 - 161)

Veritext Legal Solutions
800-726-7007                                          305-376-8800

CONFIDENTIAL TRANSCRIPT

Page 242

1 together in different reactors inside the steam
2 line.
3    Q.  Okay.
4    A.  They were not alternative.  Alternative.
5    Q.  Okay, got it.  Got it.
6    A.  Okay.
7    Q.  The time period that -- we saw an e-mail
8 earlier today that was from, I think like March of --
9 March 22nd of 2015.
10      It's sometime after that that you -- that
11 J.M. Products went from working only on a product
12 involving platinum sponge to these other potential
13 products?
14    A.  Sir, I did not understand.
15    Q.  Fair enough.
16    A.  I am sorry.
17    Q.  I believe what you just testified was
18 that initially J.M. Products was just working on
19 producing a product that involved the platinum
20 sponge.
21    A.  Correct.
22    Q.  Eventually J.M. Products started working
23 on -- on different products that didn't necessarily
24 contain platinum sponge?
25    A.  Correct.

Page 243

1    Q.  Diversified the products it was trying to
2 develop?
3    A.  Correct.
4    Q.  I am just trying to -- I am trying to
5 identify that time period when J.M. Products,
6 according to your testimony, went from working only
7 with platinum sponge to the possibility of creating a
8 product that did not involve platinum sponge or did
9 not only involve platinum sponge, and I was using the
10 reference as the e-mail that was from late March of
11 2015 that you had with J.M. Products.
12      I don't know if that's -- that's helpful
13 to identify when you --
14    A.  You said J.M. Products or Johnson
15 Matthey?
16    Q.  Johnson Matthey.
17    A.  Okay.
18    Q.  So can you tell me --
19    A.  Yes, now I got it.
20    Q.  Can you give me some time frame, when did
21 J.M. Products go from working on a product that
22 involved platinum sponge to working on a product that
23 might have involved graphene?  Let's try it that
24 way.
25    A.  I have understood now the question

Page 244

1 perfectly.
2    Q.  Okay.
3    A.  Well, I would say I have not a precise
4 recollection of it.  I cannot be precise but I can
5 give you a ballpark distinction.
6      I started for sure with the platinum
7 sponges that I had brought with me from Italy.  They
8 were in-house already and they -- they -- and this
9 has been immediately.  So I started with them when
10 the plant has been started, so we're talking about
11 16, 17 February 2015, 2-0-1-5.
12      I would say that I have looked for
13 diversifications when I felt that the agreement with
14 Johnson Matthey was becoming shaky and so I would
15 place -- between the end of March -- and I don't
16 remember exactly when I bought graphite but I think
17 it has been end of March, beginning of April,
18 something like that.
19      After that date I could be wrong.  I
20 cannot be precise but the ballpark is this and after
21 that I continued.  Also I bought, as I told you this
22 morning, I bought some platinum sponge from Johnson
23 Matthey from another product that I bought from them
24 from their United States subsidiary.
25      So I -- I wanted to continue with all

Page 245

1 these materials because that was an experiment.
2 Again, I want to repeat that that was an experiment
3 and I wanted to try to test all the possible outputs
4 of that experiment.
5    Q.  And of those -- of those experiments
6 the -- the one product that -- that J.M. Products
7 ultimately did sell to Leonardo, that did not involve
8 platinum sponge; is that correct, or incorrect?
9    A.  You are correct.
10    Q.  In --
11    A.  Because the work with the platinum sponge
12 was not -- was not completed.  We did not have good
13 results and we had better results with the graphite.
14    Q.  There was some testimony previously, and
15 I might be using the wrong terms here.  I am trying
16 to remember the phrase you used.
17      I think you referred to them as heated --
18 heated -- heat cords or heat coils and somebody else
19 referred to them as heat strips.  Are you aware of
20 some kind of heating device used to keep pipes warm?
21 Is it called a heat -- what do you call it?  Did you
22 call it a heat cord?
23    A.  I did not call them.  They have been
24 cited probably from Jim Bass.
25    Q.  Well, he called them a heat strip.

CONFIDENTIAL TRANSCRIPT

Page 246

1    A.   Somebody called it heat strip, et
2 cetera.
3    Q.   What would you call it?
4    A.   Well, they can also -- the technical name
5 is heating cables.
6    Q.   Heating cables.
7    A.   And they are -- or heaters.
8    Q.   There were heating cables installed in
9 the -- in the container at the J.M. Products side,
10 correct?
11    A.   Yes, it is correct.
12    Q.   They were installed in those insulated
13 pipes that we saw back in Exhibit 11?
14    A.   Yes, it is correct.
15    Q.   When were those -- when were the heating
16 cables installed?
17    A.   From the beginning.
18    Q.   And were they there through the end,
19 through the --
20    A.   Yes, yes.
21    Q.   Let me ask the question again.
22    A.   Through the end of the test.
23    Q.   Through the end always ends up being
24 unclear, right?
25    A.   Yes, of course.

Page 247

1    Q.   Were they there until you removed those
2 pipes from the J.M. Products container?
3    A.   Correct.
4    Q.   All right.  Are those -- those heating
5 cables, were those purchased by J.M. Products or by
6 Leonardo, if you know?
7    A.   I think Leonardo.
8    Q.   And I have asked similar question to what
9 I asked before, as the other devices.  If there are
10 any records of that purchase they would be with your
11 accountant?
12    A.   Yes.
13    Q.   Do you recall where you bought them?
14    A.   Yes or no.
15    Q.   Did you just say yes or no?
16    A.   Yes or no, because -- because -- no, I
17 was thinking to a company but I am not sure, so I
18 just delayed to the accountant.
19        But maybe -- maybe I bought them from a
20 company whose name was Extreme or something like
21 that, but I am not sure.  In any case, surely --
22 surely this is accounted for.
23    Q.   Extreme --
24    A.   Because this was not -- this was not a
25 flying -- a freelance contractor.  This was a

Page 248

1 company.
2    Q.   When you said Extreme, could that have
3 been Extreme Plumbing?
4    A.   No.  No, no.  No, no, no, it was not a
5 plumber.  Has nothing to do with plumbers this.
6 These are heaters.
7        MR. PACE:  Why don't we -- I think we're
8    pretty close to the end.  Why don't we take a
9    break and give me about five minutes to try to
10    figure out -- let's make it ten.  Give me ten
11    minutes to figure out any closing questions and
12    we'll be done.
13        THE WITNESS:  Okay.
14        THE VIDEOGRAPHER:  We're off the record.
15    The time is 5:24 p.m.
16        (Thereupon a brief recess was taken,
17 after which the following proceedings were had.)
18        THE VIDEOGRAPHER:  We're back on the
19    record.  The time is 5:38 p.m.
20 BY MR. PACE:
21    Q.   Dr. Rossi, I just had a handful of kind
22 of wrap-up questions.
23        From February 2015 to February 2016 J.M.
24 Products made no use of the heated fluid provided by
25 Leonardo, other than whatever use was made within

Page 249

1 what we have been calling today the J.M. Products
2 container; is that correct?
3    A.   Yes, it is correct.
4        MR. ARAN:  Object to form.
5 BY MR. PACE:
6    Q.   You identified -- thus far you have
7 identified -- you referenced four groups of potential
8 investors who came to the Doral location.  You
9 referenced Tom Darden and J.T. Vaughn either together
10 or separately coming to the Doral location.
11        Are there any other -- were there any
12 other visitors -- I'm sorry, I am going to exclude
13 the temporary workers that either J.M. Products or
14 Leonardo would occasionally hire.
15        Were there any other individuals or
16 groups that visited the Doral warehouse?
17    A.   Yes.
18    Q.   Who?
19    A.   Ampenergo.  Ampenergo visited the plant
20 twice.  The first --
21    Q.   Go ahead.  Sorry.
22    A.   The first time in March or April '15 and
23 the second time September/October '15.
24    Q.   Anyone else?  Any other visits to the
25 Doral warehouse?

63 (Pages 246 - 249)

CONFIDENTIAL TRANSCRIPT

Page 254

1       CERTIFICATE OF OATH

2

3 STATE OF FLORIDA:

4           SS:

5 COUNTY OF  DADE:

6

7

8       I, the undersigned authority, certify that

9 ANDREA ROSSI personally appeared before me and was

10 duly sworn.

11       WITNESS my hand and official seal this 13th

12 day of March 2017.

13

14

15       *Edward Varkonyi*

16       _____

17       Notary Public, State of Florida at

18       Large; my commission expires

19       February 26, 2019. Bonded through

20       Troy Fain Insurance, Inc.

21

22

23

24

25

---

Page 255

1 CERTIFICATE OF REGISTERED PROFESSIONAL REPORTER

2

3       I, EDWARD VARKONYI, and Registered
Professional Reporter and a Notary Public for the

4 State of Florida at Large, do hereby certify that I
reported the deposition of ANDREA ROSSI; that the

5 foregoing pages, numbered from 1 to 253, inclusive,
constitute a true and correct transcription of my

6 shorthand report of the deposition by said witness on
this date.

7       I further certify that I am not an
attorney or counsel of any of the parties, nor a

8 relative or employee of any attorney or counsel
connected with the action, nor financially interested

9 in the action.
       WITNESS my hand and official seal in the

10 City of Miami, County of Dade, State of Florida, this
13th day of March 2017.

11

12

13

14

15       *Edward Varkonyi*

16       _____

17       Notary Public, State of Florida at

18       Large; my commission expires

19       February 26, 2019.  Bonded through

20       Troy Fain Insurance, Inc.

21

22

23

24

25

---

Page 256

1       March 13, 2017

2

3

4

5       FERNANDO ARAN, ESQ.,
       Aran Correa & Guarch, P.A.
       255 University Drive

6       Coral Gables, Florida 33134

7       RE: Rossi v. Darden

8       Dear Mr. Aran,

9       With reference to the deposition of Andrea Rossi
       taken on March 1, 2017 in connection with the

10      above-captioned case, please be advised that the
       transcript of the deposition has been completed

11      and is awaiting signature.

12      Please arrange to have the deponent stop by our
       office at Two South Biscayne Boulevard, Suite

13      2250, Miami, Florida, for the purpose of reading
       and signing the transcript.

14
       If this is not taken care of, however, within the

15      next 30 days, we shall conclude that the reading
       and signing of the deposition has been waived and

16      shall then process the original of the transcript
       for filing with the Clerk of the Court by counsel

17      without further notice.

18      Sincerely,

19

20      Edward Varkonyi,
       Registered Merit Reporter

21

22

23

24

25

---

Page 257

1       ERRATA SHEET

2 RE   : Rossi v. Darden
       DEPO OF: Andrea Rossi

3 TAKEN : 3/1/17
       ASSG# : 2553727

4   DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

5 Page #   Line #  Change                Reason

6 _____  _____  _____  _____

7 _____  _____  _____  _____

8 _____  _____  _____  _____

9 _____  _____  _____  _____

10 _____  _____  _____  _____

11 _____  _____  _____  _____

12 _____  _____  _____  _____

13 _____  _____  _____  _____

14 _____  _____  _____  _____

15 _____  _____  _____  _____

16 _____  _____  _____  _____

17 _____  _____  _____  _____

18 _____  _____  _____  _____

19 _____  _____  _____  _____

20 _____  _____  _____  _____

21 State of Florida)
       County of     )

22
       Under penalties of perjury, I declare that I have

23      read my deposition transcript, and it is true and
       correct subject to any changes in form or substance

24      entered here.
       _____

25 Date          Signature

65 (Pages 254 - 257)

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.