# Exhibit 9

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2
3          CASE NO. 1:16-cv-21199-CMA/O'SULLIVAN
4
    ANDREA ROSSI, ET AL.,
5
               Plaintiffs,
6
    vs.
7
    THOMAS DARDEN, ET AL.,
8
               Defendants.
9    _____/
10                        Casa de Campo
                          Resort & Villas
11                        La Romana, D.R.
                          Wednesday, February 22, 2017
12                        9:06 a.m. - 7:42 p.m.
13
14
              VIDEOTAPED DEPOSITION OF FABIO PENON
15
16
17
18
19
20
21         Taken on behalf of the Plaintiffs before
22   Diana Santos, Shorthand Reporter and Notary Public
23   in and for the State of Florida at Large, pursuant
24   to Notice of Taking Deposition filed in the above
25   cause.

Page 106

1  consistency of the data.
2      Q    Would that machine or that device record
3  any changes made to the data?
4      A    Yes.
5          MR. PACE:  Objection to the question, but
6  go ahead.
7          THE WITNESS:  Definitely, yes.
8  BY MR. ANNESSER:
9      Q    Looking at the fifth column, tank water
10  T-max.  How was that measured?
11      A    With the temperature sensor.
12      Q    Where?
13          THE INTERPRETER:  Where?
14  BY MR. ANNESSER:
15      Q    Where was the sensor located?
16      A    Indicated in the diagram, if I remember
17  well, in the reference to --
18      Q    Are you referencing Exhibit 9?
19      A    Yes, Exhibit 9.  No, it is not.
20          MR. PACE:  You are covering up the mic.
21  BY MR. ANNESSER:
22      Q    Let me ask you, sir, not to waste time on
23  that.
24          How was that data recorded?
25      A    With the same principle, the analogical

Page 107

1  signal reached to a certain -- that realized the
2  conversion, digital analogical to reverse to
3  download to my computer.
4      Q    Did you have a computer at the Doral
5  facility?
6      A    It was that one which had to be -- to
7  gather all data.
8      Q    Was that data transmitted to you in Italy?
9      A    These are the data that I said them to
10  transfer regularly to Italy.
11      Q    Did anyone have access to your computer at
12  the Doral facility?  Let me finish.  Was it password
13  protected?
14          MR. PACE:  Objection to the question.
15          MR. ANNESSER:  Let me restate.
16  BY MR. ANNESSER:
17      Q    Your computer at the Doral facility, was
18  it password protected?
19      A    Yes, it was protected if I don't -- if I
20  remember well by a password technology.
21      Q    Did anyone at the Doral facility have
22  access that they can alter the data recorded in that
23  computer?
24          MR. PACE:  Objection to the question.
25          Objection to the question.

Page 108

1          THE WITNESS:  Not that I can imagine.
2  BY MR. ANNESSER:
3      Q    How often would you monitor the tank water
4  temperature from Italy?  How often would you
5  monitor...?
6      A    Each two months they were transmitted to
7  me and every two months, approximately, I was
8  checking this data.
9      Q    How were they transmitted to you?
10      A    E-mail.
11      Q    Who would send it to you via e-mail?
12      A    Fabiani.
13      Q    Did he also receive the temperature data
14  to his computer?
15      A    Can you repeat it?
16      Q    Did Mr. Fabiani also receive the
17  temperature data to his computer?
18      A    No.  I think Fabiani had his own system of
19  recovering this data.
20      Q    Okay.  Okay.  Column six, "effective
21  flowed water".  How was that measured?
22      A    Through the measure of the water power.
23      Q    Was that the flowmeter?
24      A    The flow meter, yes.
25      Q    How did you retrieve the data from the

Page 109

1  flowmeter?
2      A    Datas were read every night by Dr. Rossi
3  and Rossi had to report them in the -- in the log --
4  in the logbook and every night it was transmitted in
5  this data.
6      Q    Did you have any way to verify the data
7  that Dr. Rossi was providing you?
8      A    The correctness of the data?
9      Q    Yes.
10      A    When I visited to the Doral plant one of
11  the controls that I wanted to make is the
12  reconciliation between the data transmitted by Rossi
13  and the data relieved in the -- in the meter.
14      Q    So you would reconcile the data provided
15  by Dr. Rossi with the change from your last visit,
16  the change in water flow?
17      A    With the relevant data in the opportunity
18  of my business.
19      Q    Sir, some people have said that it is
20  impossible to have the same amount of water flow
21  every -- multiple days in a row.  I'm sorry.  Can
22  you explain why -- why the measurements are all to
23  the -- to the thousandth, I believe they are
24  thousand kilogram per day?
25      A    Can you repeat?

28 (Pages 106 - 109)

Page 162

1    Q   If you go for me two paragraphs down do
2  you see the one starting with "following my
3  request"?  Do you see that paragraph?
4    A   Uh-huh.
5    Q   Am I understanding this correctly, that
6  you had discussed with Dr. Rossi and Dr. Rossi had
7  agreed to include a condensed steam collector at the
8  bottom of the -- at the bottom of the steam pipe?
9      MR. ANNESSER:  Object to the form.
10     THE WITNESS:  Okay.
11 BY MR. PACE:
12   Q   Do you recall having that conversation
13  with Dr. Rossi?
14   A   In this very moment I don't remember, but
15  I think having written that...
16   Q   You would not have written that in the
17  e-mail, if the conversation didn't occur; is that
18  correct?
19      THE INTERPRETER:  Correct.  Exactly what
20  he was saying.
21      MR. ANNESSER:  Object to the form.
22 BY MR. PACE:
23   Q   If we could just ask him the question.
24   A   He must apply.  He has to apply.
25   Q   I understand.  I am just -- if you wrote

Page 163

1  in the e-mail that you had made a request to
2  Dr. Rossi and Dr. Rossi had agreed with your request
3  to apply a condensed steam collector, you believe
4  your e-mail is accurate?
5    A   I did the request and Rossi accepted to
6  apply.
7    Q   The next paragraph says "during the visit
8  I will check the amount of the water present".  Is
9  that a reference to the condensed steam collector?
10   A   Can you quote again which sentence?
11   Q   Yes.  Dr. Penon, the very next paragraph
12  says "During my visit I will check the amount of the
13  water present."  Do you see that paragraph?  That's
14  a reference to checking the amount of water in the
15  condensed steam collector; correct?
16   A   The demand is if I verify the
17  installation, right, the question is?
18   Q   No.  My question is because it has visits
19  as plural, I'm understanding this to say that -- are
20  you saying that during your visits -- your later
21  visits to the Doral warehouse you would check the
22  amount of water in the condensed steam collector?
23      MR. ANNESSER:  Object to the form.
24      THE WITNESS:  Yes.  During my visits,
25  during my visits I intended to verify the

Page 164

1  steam -- the water present, if any.
2      MR. PACE:  Understood.
3  BY MR. PACE:
4    Q   If I can, we only have a couple of more
5  minutes in this tape, but let me see if I can ask
6  this:  If you can turn to the prior page, page 27.
7  Right above your typed name do you see --
8    A   On the top of the page?
9    Q   No, it is more towards the bottom.  Do you
10  see a paragraph that starts with "If we move away
11  from the exit point"?
12      THE INTERPRETER:  Yes.
13  BY MR. PACE:
14   Q   "If we move away from the exit point it is
15  possible the formation of small amounts of water
16  which will be collected in the collector."  Am I
17  understanding correctly, that's the same condensed
18  steam collector that you -- that we were just
19  talking about on the prior page?
20      MR. ANNESSER:  Object to the form.
21      THE WITNESS:  Yes.
22  BY MR. PACE:
23   Q   Are you aware of whether there was any
24  steam collect -- any such condensed steam collector
25  actually installed at the plant in Doral?

Page 165

1    A   Another collector?
2    Q   Any collector?  Was there a steam -- was
3  there a condensed steam collector on the exit pipe
4  from the E-Cat heading over to the customer side?
5    A   In this moment I don't remember.
6    Q   All right.
7      MR. PACE:  Let's take a break, because
8  he's got to change the tape and I think you
9  have to hop to a phone call because it is
10  exactly 6:00 o'clock.
11      MR. LUKACS:  It is 5:00 o'clock in Miami
12  right now.
13      MR. PACE:  Oh, 6 o'clock.  I'm sorry.  I'm
14  sorry.
15      THE VIDEOGRAPHER:  Going off the record.
16  The same is 6 o'clock p.m.
17      (Thereupon, a recess was taken from 6:00
18  p.m. - 6:05 p.m., after which the following
19  proceedings were had:)
20      THE VIDEOGRAPHER:  All right.  We are now
21  back on the record.  The time is 6:05.  Media
22  number six.
23  BY MR. PACE:
24   Q   Dr. Penon, if I can keep you on the same
25  page that we were looking at for number -- we were

42 (Pages 162 - 165)

1 looking at page 27 of what I have marked as Exhibit
2 25. At the top of that page you see an e-mail from
3 Tom Darden. The very top, it starts with "Let's
4 make sure". Do you see "Let's make sure that there
5 is more than one way to measure the temperature in
6 that pipe." I want to use it really to transition
7 to page 26, because we have a response from
8 Dr. Rossi to the issue. If you look at his e-mail
9 there at the bottom. Do you see the paragraph that
10 starts with the -- several lines down. "The
11 temperature in the steam pipe, as you correctly
12 remember, is taken in two positions by means of two
13 thermocouples that have been brought in position
14 today by Engineer Penon." He also says, "Also the
15 temperature of the water in the tank inside the
16 container to feed the pumps is measured by two
17 thermocouples brought and installed under the
18 direction of Engineer Penon. And then he says, and
19 the pressure of the steam is measured with two
20 instruments brought by Engineer Penon."
21        Is -- did you bring two measuring devices,
22 whether for temperature or for pressure, and then
23 you used one and you had Fabio -- you allowed Rossi
24 or Fabiani to use the other?
25        MR. ANNESSER: Object to the form.

1        THE WITNESS: I brought two technical
2    probes. Yes, I brought two probes, technical
3    probes. One of those was going directly on the
4    document which was transforming from analogical
5    to digital and then it was stuck in his
6    computer.
7        The other one was to verify when I was
8    visiting the plant the consistency collected to
9    verify the thermometer connected with the
10    second -- with the second.
11        THE INTERPRETER: I got lost.
12        THE WITNESS: The second probe was
13    connected to the thermometer to verify the --
14    the relationship -- the correspondence of the
15    data from the relevance of the thermometer and
16    how much it was revealed by the first probe.
17        MR. PACE: Okay.
18 BY MR. PACE:
19    Q   Is the same applied for the pressure
20 probes?
21        MR. ANNESSER: Object to the form.
22        THE WITNESS: Can you repeat?
23        MR. PACE: Yes.
24 BY MR. PACE:
25    Q   Was there also the steam pressure measured

1 by two different instruments?
2    A   The steam pressure was measured by -- by
3 the probe, and as far as I can remember from the
4 manometer which had a symbol reading -- manual
5 reading.
6    Q   The manometer was read manually every day?
7        THE INTERPRETER: Yes.
8        THE WITNESS: He was checking the
9    manometer during my visits to verify the
10    consistency of the probe with the pressure.
11        MR. ANNESSER: Object to the form. Move
12    to strike.
13 BY MR. PACE:
14    Q   Were there two -- did you bring two
15 according to this e-mail it says, "Also the pressure
16 of the steam is measured with two instruments
17 brought by Engineer Penon." Is that accurate?
18    A   I don't remember at this very time.
19    Q   Okay. If you can go down for me a few
20 lines, there is -- let me just read it and then we
21 can talk about it.
22        "All those instruments for the measurement
23 of temperature of the steam, of the pressure of the
24 steam, and of temperature of the water in the water
25 tank inside the container are connected with the

1 computer of property of Engineer Penon." Do you see
2 where I'm reading in the document?
3    A   Yes. Yes, I see it.
4    Q   Sir, it follows that -- it says shortly
5 after "Obviously, Penon will consider for his
6 calculations only the data registered by the
7 computer."
8        MR. ANNESSER: Objection.
9        MR. PACE: -- "And we can compare the data
10    that he will find with the data that we will
11    find."
12        MR. ANNESSER: Object to the form.
13 BY MR. PACE:
14    Q   Do you see that?
15    A   I do not understand it. Can you repeat
16 it?
17        MR. PACE: Yes.
18 BY MR. PACE:
19    Q   Do you see the sentence in the e-mail that
20 starts with, "Obviously Penon will consider for his
21 calculations only the data registered by his
22 computer, but we can compare the data." You can
23 compare the data.
24        Is that -- did that occur during the
25 course of the test that you compared the data that

43 (Pages 166 - 169)

Page 170

1  you were -- that you were storing in your computer
2  with the data that was being collected by Rossi and
3  Fabiani?
4       MR. ANNESSER:  Object to the form.
5       THE WITNESS:  It happened in some visits
6  that we compared the data -- the data recovered
7  on the spot, at the very same time, with the
8  ones of Fabiani.
9  BY MR. PACE:
10      Q   And did you ever find any inconsistencies?
11      A   I was not really interested very frankly
12  in the data of Fabiani, because with the system of
13  comparison between different -- I was in a condition
14  of feeling sure about my collection of data.
15      Q   And that collection of data, you said
16  that -- they sent it to you every couple of weeks?
17      MR. ANNESSER:  Object to the form.
18      THE WITNESS:  No.  If you refer to the
19  data gathered in my computer at Doral I was
20  real -- I was requesting them to transfer the
21  data every two months.
22  BY MR. PACE:
23      Q   And how were they doing that?
24      A   They sent me the file with the entire data
25  of the period -- of the period in which I was

Page 171

1  interested.
2       Q   And who is the "they"?
3       THE INTERPRETER:  Sorry.
4  BY MR. PACE:
5       Q   Who would send you this data?
6       A   Fabiani.
7       Q   So Fulvio Fabiani would send you the data
8  from your computer every couple of months?
9       MR. ANNESSER:  Object to the form.
10      THE WITNESS:  According to my request.
11  BY MR. PACE:
12      Q   Okay.  So you made the request -- let me
13  rephrase it then.
14      Roughly every couple of months you made
15  the request for Fabiani to send you your data and
16  when you made such a request he would send it to
17  you?
18      MR. ANNESSER:  Object to the form.
19      THE WITNESS:  Correct.  He was sending the
20  data in the computer.
21  BY MR. PACE:
22      Q   So he had the ability to access your
23  computer to make at least a copy of the data to send
24  you?
25      MR. ANNESSER:  Object to the form.

Page 172

1       THE WITNESS:  He could access, but for
2  some limited tasks.
3  BY MR. PACE:
4       Q   And does that -- does that -- where is
5  that computer today?
6       A   I think it is in the container at the
7  Doral.
8       Q   So you -- you did not take that with you
9  when you returned to Italy in February of 2016?
10      A   No, because I had already all the data.
11      Q   When you -- when you took any of the data
12  from the computer that you had at Doral, would you
13  erase it from the computer?
14      THE INTERPRETER:  Excuse me?
15  BY MR. PACE:
16      Q   After you had reviewed the data that was
17  on the computer in Doral, would it get erased?
18  Would it get erased?
19      MR. ANNESSER:  Object to the form.
20      THE WITNESS:  I don't remember honestly.
21  I took them for sure, but I don't know if I
22  deleted it.
23  BY MR. PACE:
24      Q   So it may be on the computer that's in
25  Doral.  You don't know?

Page 173

1       A   It could be in the computer.
2       Q   Have you maintained a copy of this, this
3  data?
4       A   My personal data -- my personal data on my
5  computer.  No additional -- no other copies exist.
6       Q   But just so I understand.  These data --
7  these devices for collecting information are
8  collecting temperature and pressure readings on a
9  very regular basis, very consistent basis; correct?
10      MR. ANNESSER:  Object to the form.
11      THE WITNESS:  Correct, yes.
12  BY MR. PACE:
13      Q   And you testified that your report largely
14  uses average numbers for a day usually rounded up or
15  down?
16      MR. ANNESSER:  Object to the form.
17      THE WITNESS:  Can you repeat again?
18      MR. PACE:  Sure.
19  BY MR. PACE:
20      Q   You were looking with Mr. Annesser at some
21  of your reports and the annexes to the reports, and
22  you were talking about how those numbers -- you
23  don't report several hundred numbers for a given
24  day.  You report one number for a day.
25      A   The reports were related to 24 hours

44 (Pages 170 - 173)

Page 190

1 BY MR. PACE:
2     Q   I believe you said that daily Dr. Rossi
3 sent you a measurement?
4         MR. ANNESSER:  Object to the form.
5         THE WITNESS:  Yes.
6 BY MR. PACE:
7     Q   How did he send that to you?
8     A   Compiling the log of the implant and there
9 was sending the log updated.
10    Q   But was it a daily e-mail you would get
11 from Dr. Rossi?
12    A   Correct.  Daily.
13    Q   Okay.  So you have over 350 -- at some
14 point you have almost -- let me start over again.
15    Were there roughly 350 or 360 of these
16 e-mails?
17    A   Approximately, yes.
18    Q   Okay.  And these e-mails, when it has the
19 flow meter data, it is the exact reading, he is
20 supposed to provide you the exact reading, not a
21 rounded off reading?
22    A   Yes.
23    Q   And then the other data that was being
24 sent to you when you would request from Fabio --
25 from Fulvio Fabiani, that would also be sent to you

Page 191

1 by e-mail?
2         MR. ANNESSER:  Object to the form.
3         THE WITNESS:  Correct.
4 BY MR. PACE:
5     Q   Now, I understand these -- I understand
6 this temperature data would record temperature every
7 few seconds.
8         MR. ANNESSER:  Object to the form.
9 BY MR. PACE:
10    Q   Is that correct?
11    A   There the frequency -- I don't remember
12 exactly, after the certain number of seconds there
13 was a new -- a new.
14    Q   Measurement?
15        THE INTERPRETER:  Output, measurement.
16 BY MR. PACE:
17    Q   And these are the large files that would
18 be sent by Fulvio Fabiani to you?
19        MR. ANNESSER:  Object to the form.
20        MR. LUKACS:  Okay.  Let me just stay on
21 the record for a moment.  We started at
22 9:00 o'clock this morning Dominican Republic
23 time.  It is now 6:58 here in the Dominican
24 Republic.  I have a 6:00 o'clock call Eastern
25 Standard Time that I am going to make right

Page 192

1 now.  We are off the record.
2         THE VIDEOGRAPHER:  Off the record.  The
3 time is 6:58.
4         (Thereupon, a recess was taken from 6:58
5 p.m. - 7:14 p.m., after which the following
6 proceedings were had:)
7         THE VIDEOGRAPHER:  We are now back on the
8 record.  The time is 7:14.
9 BY MR. PACE:
10    Q   Dr. Penon, I have been advised that I have
11 got 15 more minutes to ask you questions so I'm
12 going to try to -- to move a little quickly now, if
13 I can.
14    Can you look at Exhibit 18 for me?
15    A   Page number?
16    Q   Exhibit 18, the first two pages.  Do you
17 have 18 with you?
18        THE INTERPRETER:  Is it the big one?
19 BY MR. PACE:
20    Q   Did you find it?  If you could turn to the
21 second page of that exhibit.  This is the picture
22 of -- it says in reactors -- you see how it refers
23 to electrical measures and reactors BF1, BF2 and
24 BF3; correct?  BF1 -- do you know what BF is short
25 for or stands for?

Page 193

1     A   The grouping of -- E-Cat unit.  The
2 unit BF1 unit BF2 unit.
3     Q   So this is what they call the Big Frankie
4 units?
5     A   I did not go deeply into the matter.
6     Q   Is it true that there is also a BF4?
7     A   No, I don't know.
8     Q   So --
9     A   I do not know.
10    Q   So at the plant you do not recall there
11 being four units of this type, only three?
12        MR. ANNESSER:  Object to the form.
13        THE WITNESS:  These were -- we perform it
14 on these three units because they were working.
15    I ignore how many other units were not working.
16    It was not of my interest, so I didn't need it.
17 BY MR. PACE:
18    Q   So when you went there on this date
19 October 13th, if you look at the actual signature it
20 has October 13 at the very top if you look date
21 October 13, 2016.  Let me just be quick if I can.
22    There were three of these collections of
23 E-Cats working?
24        MR. ANNESSER:  Object to the form.
25        THE WITNESS:  We verified the function of

49 (Pages 190 - 193)

Page 206

1    MR. LUKACS:  9:00 o'clock this morning and
2  it is now 20 minutes until 8:00.
3    MR. PACE:  And it is now 20 minutes until
4  8:00 a.m.
5    MR. LUKACS:  8:00 p.m.
6    MR. PACE:  And at this point -- 8:00 p.m
7  you are calling it into the deposition.
8    MR. LUKACS:  Most respectfully, I might
9  add.
10    THE VIDEOGRAPHER:  All right.  Going off
11  the video record.  The time is 7:42 p.m. in the
12  Dominican Republic.
13    MR. LUKACS:  Reporter, thank you so much.
14  No waive.  We'll have an opportunity to read.
15    (Thereupon, the taking of the deposition
16  was concluded at 7:42 p.m.)
17
18
19
20
21
22
23
24
25

Page 207

1  RE: ANDREA ROSSI, ET AL. VS. THOMAS DARDEN, ET AL.
   DEPO OF: FABIO PENON
2  TAKEN: February 22, 2017
3
4    EXCEPT FOR ANY CORRECTIONS
     MADE ON THE ERRATA SHEET BY
5    ME, I CERTIFY THIS IS A TRUE
     AND ACCURATE TRANSCRIPT.
6    FURTHER DEPONENT SAYETH NOT.
7    _____
     FABIO PENON
8
   STATE OF FLORIDA   )
9                     ) SS:
   COUNTY OF MIAMI-DADE)
10
11    Sworn and subscribed to before me this
12  _____ day of _____, 2017.
13  PERSONALLY KNOWN _____ OR I.D._____
14  _____
     Notary Public in and for
15   the State of Florida at
     Large.
16
   My commission expires:
17
18
19
20
21
22
23
24
25

Page 208

1    ERRATA SHEET
2  RE: ANDREA ROSSI, ET AL. VS. THOMAS DARDEN, ET AL.
   DEPO OF: FABIO PENON
3  TAKEN: February 22, 2017
   JOB# 2547735
4  DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
5  Page #| Line #| Change       | Reason
6  _____|_____|_____|_____
7  _____|_____|_____|_____
8  _____|_____|_____|_____
9  _____|_____|_____|_____
10 _____|_____|_____|_____
11 _____|_____|_____|_____
12 _____|_____|_____|_____
13 _____|_____|_____|_____
14 _____|_____|_____|_____
15 _____|_____|_____|_____
16 _____|_____|_____|_____
17 _____|_____|_____|_____
18 _____|_____|_____|_____
19 _____|_____|_____|_____
20 _____|_____|_____|_____
21 State of Florida
   County of     )
22
   Under penalties of perjury, I declare that I have
23 read by deposition transcript, and it is true and
   correct subject to any changes in form or
24 substance entered here.
   _____ _____
25 Date       FABIO PENON

Page 209

1    CERTIFICATE OF OATH OF INTERPRETER
2
3  STATE OF FLORIDA   )
              ) SS:
4  COUNTY OF MIAMI-DADE)
5
6    I, DIANA SANTOS, Notary Public in and for
7  the State of Florida at Large, certify that the
8  Interpreter, UGO V. CHIARATO personally appeared
9  before me on February 22, 2017 and was duly sworn by
10 me.
11    WITNESS my hand and official seal this
12 22nd day of February, 2017.
13
14
15  _____
     DIANA SANTOS
16   DIANA SANTOS
     Notary Public, State of Florida
17   at Large
18 Notary #FF030013
19 My commission expires: 7/7/17
20
21
22
23
24
25

53 (Pages 206 - 209)

Page 210

1    CERTIFICATE OF OATH OF WITNESS
2
3  STATE OF FLORIDA    )
          ) SS:
4  COUNTY OF MIAMI-DADE)
5
6        I, DIANA SANTOS, Notary Public in and for
7  the State of Florida at Large, certify that the
8  witness, FABIO PENON, personally appeared before me
9  on February 22, 2017 and was duly sworn by me.
10       WITNESS my hand and official seal this
11  22nd day of February, 2017.
12
13
14         *Diana Santos*
           _____
15         DIANA SANTOS
           Notary Public, State of Florida
16         at Large
17  Notary #FF030013
18  My commission expires: 7/7/17
19
20
21
22
23
24
25

Page 211

1     REPORTER'S DEPOSITION CERTIFICATE
2
3        I, DIANA SANTOS, certify that I was
4  authorized to and did stenographically report the
5  deposition of FABIO PENON, the witness herein on
6  February 22, 2017; that a review of the transcript
7  was requested; that the foregoing pages numbered
8  from 1 to 206 inclusive is a true and complete
9  record of my stenographic notes of the deposition by
10  said witness; and that this computer-assisted
11  transcript was prepared under my supervision.
12       I further certify that I am not a
13  relative, employee, attorney or counsel of any of
14  the parties, nor am I a relative or employee of any
15  of the parties' attorney or counsel connected with
16  the action.
17       DATED this 22nd day of February, 2017.
18
19
20
21         *Diana Santos*
           _____
22         DIANA SANTOS
23
24
25

Page 212

1         VERITEXT FLORIDA CO.
            ONE BISCAYNE TOWER
2        2 S. Biscayne Tower, Suite 2250
           Miami, Florida  33131
3            (305) 371-1884
4  March _____, 2017
5  FABIO PENON
    c/o JOHN CHARLES LUKACS, ESQUIRE
6  HINSHAW & CULBERTSON LLP
    2525 Ponce de Leon Boulevard
7  Coral Gables, Florida 33134
    Telephone: (305)358-7747
8  E-mail:jlukacs@hinshawlaw.com
9  RE: ANDREA ROSSI, ET AL. VS. THOMAS DARDEN, ET AL.
    DEPO OF: FABIO PENON
10  TAKEN  : February 22, 2017
    READ & SIGN BY:  April _____, 2017
11
   Dear FABIO PENON:
12
   This letter is to advise you that the transcript
13  of the deposition listed above is completed and
   is awaiting reading and signing.
14
   Please arrange to stop by our office in Suite 1020,
15  19 West Flagler Street, Miami, Florida to read and
   sign the transcript.  Our office hours are from
16  8:00 a.m. to 4:00 p.m. Monday through Friday.
   Depending on the length of the transcript, you
17  should allow yourself sufficient time.
18  If the reading and signing has not been completed
   prior to the referenced date, we shall conclude
19  that you have waived the reading and signing of the
   deposition transcript.
20
   Your prompt attention to this matter is appreciated.
21
   Sincerely,
22
23  DIANA SANTOS
24  cc: JOHN W. ANNESSER, ESQUIRE
      CHRISTOPHER R.J. PACE, ESQUIRE
25

Page 213

1         VERITEXT FLORIDA CO.
            ONE BISCAYNE TOWER
2        2 S. Biscayne Boulevard, Suite 2250
           Miami, Florida  33131
3            (305) 371-1884
4
   March _____, 2017
5
6  JOHN W. ANNESSER, ESQUIRE
    PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
7  283 Catalonia Avenue
    Suite 200
8  Coral Gables, Florida 33134
    Telephone: (305)377-0086
9  E-mail: jannesser@pbyalaw.com
10  RE: ANDREA ROSSI, ET AL. VS. THOMAS DARDEN, ET AL.
    DEPO OF: FABIO PENON
11  TAKEN  : February 22, 2017
    READ & SIGN BY:  April _____, 2017
12
13  Dear JOHN W. ANNESSER, ESQUIRE:
14  The original transcript of the deposition listed
   above was previously provided to your office. The
15  witness did not waive reading and signing and was
   duly notified to come in and read the transcript.
16
   _____ Attached to this letter you will find a copy
17  of the corrections made by the witness.
   PLEASE ATTACH THEM TO YOUR COPY OF THE
18  DEPOSITION SO IT WILL BE COMPLETE.
19  _____ The witness made no corrections to transcript.
20  _____ As of the above date, the witness has not come
   in to read and sign the transcript which has
21  been noted on the original transcript.
22  Sincerely,
23
    DIANA SANTOS
24
   cc: JOHN CHARLES LUCAKS, ESQUIRE
25    CHRISTOPHER R.J. PACE, ESQUIRE

54 (Pages 210 - 213)

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.