# Exhibit 12

# JONES DAY

600 BRICKELL AVENUE • BRICKELL WORLD PLAZA • SUITE 3300 • MIAMI, FLORIDA 33131
TELEPHONE: +1.305.714.9700 • FACSIMILE: +1.305.714.9799

December 4, 2015

<u>Via E-Mail and UPS</u>
Silver Law Group
87889 Overseas Highway
P.O. Box 710
Islamorada, Florida 33036

Mr. Annesser:

    We represent IPH International B.V. ("IPH"), to which Industrial Heat, LLC ("IH") assigned the License Agreement ("Agreement") by and among Leonardo Corporation ("Leonardo"), Andrea Rossi, Ampenergo, Inc. and IH. We are writing in response to your letter of November 20, 2015, as well as Leonardo's letter of August 3, 2015 (the "Leonardo Letter"). In the event you do not have the Leonardo Letter, a copy is attached hereto.

**Your November 20 Letter**

    Your letter makes four allegations, none of which demonstrate that IPH or IH is in breach of the License Agreement.

    1.    You claim that IH is in breach of the Agreement because it has not paid half of the expenses of Engineer Fabio Penon for the work he has performed as the ERV for the Guaranteed Performance process, pursuant to Section 5 of the Agreement. Neither IPH nor IH "engaged" Mr. Penon to serve as the ERV for the Guaranteed Performance process, which is a requirement under Section 5. Such an engagement would need to be negotiated and would need to involve very specific written instructions on what an ERV would have to do in the Guaranteed Performance process. Also, the language you quote in your letter addressing the costs for the ERV comes from Section 4 of the Agreement and deals with the Validation process under Section 4, not the Guaranteed Performance process under Section 5.

    As your clients are aware, IPH or IH has paid for a number of expenses on behalf of Leonardo or Dr. Rossi that they are not required to pay under the Agreement, such as certain legal bills, repair bills and operational expenses of Leonardo or Dr. Rossi. Those expenses have totaled in the hundreds of thousands of dollars (if not well over a million dollars when factoring in costs associated with the rebuild of the 1MW unit). In that same vein, and even though IPH is not required to do so under the Agreement, IPH will pay the amount reflected in the invoices attached to your letter within the next 10 days. To be clear, however, IPH does not agree that Mr. Penon is or can be the ERV for Guaranteed Performance. Also, IPH and IH continue to

reserve their rights to be reimbursed for expenses they have paid on behalf of Leonardo or Dr. Rossi.

On the subject of Guaranteed Performance under the Agreement, Section 5 clearly states that Guaranteed Performance was to occur during the "400 day period commencing on the date immediately following delivery of the Plant to the Company." The delivery occurred years ago, and hence the 400 day period has long since lapsed. The project on which Leonardo is currently working cannot be the Guaranteed Performance process set forth in the Agreement. Indeed, this is further confirmed by Leonardo asking IPH to pay for expenses relating to repairs, adjustments or alterations of the 1MW unit in Florida – such expenses clearly would have been the sole responsibility of Leonardo and Dr. Rossi in connection with any Guaranteed Performance process under Section 5. Nevertheless, IPH is willing, and would like, to meet with Dr. Rossi and others at Leonardo to discuss (among other things) (a) the current project on which they are working, (b) Leonardo assisting IPH to replicate the reported results from the Validation period, and (c) the potential for an appropriate written modification of the Agreement so that the parties can move forward cooperatively to develop and support the E-Cat IP.

2.  You state that IH has misrepresented to the U.S. Patent and Trademark Office ("PTO") that Mr. Dameron is a co-inventor of part of the E-Cat IP. We assume by this that you are referring to the PCT International Application No. PCT/US2015/016897: *Energy-Producing Reaction Devices, Systems and Related Methods* (the "PCT Application"). But there are multiple claims identified in the PCT Application, including claims directed to a reaction device with a spiral groove and helically-disposed resistive wires in the groove. The PCT Application was required to list all inventors, including co-inventors, as to any one (or more) of the claims. Because the claims in the PCT Application include claims involving Mr. Dameron's inventive work on the reaction device, Mr. Dameron was correctly listed therein as a co-inventor.[1]

On a related note, while we do not know whether this was intended on your part, your letter might be read to suggest that any inventions relating to the E-Cat IP are the property of Leonardo and/or Dr. Rossi. The Agreement is clear, however, that "any and all inventions, discoveries, concepts, ideas, information and anything else that the Company, its sublicensees, or any of their affiliates makes or develops which relate to the E-Cat IP ... shall be and shall remain the property of the Company (or such sublicensee or affiliate if so agreed by the Company)." Agreement §13.4. Accordingly, it would be incorrect to claim that any inventions relating to the E-Cat IP are the property of Leonardo and/or Dr. Rossi.

3.  You assert that IH has applied for patents in jurisdictions not included within the Territory described in Agreement §2. We are not sure on what you are basing such an assertion other than the PCT Application. The PCT Application does not secure a patent in a jurisdiction outside the Territory. Rather, the PCT application process is a procedure allowed pursuant to the Patent Cooperation Treaty to establish a uniform priority date in potential foreign jurisdictions of the various treaty parties and to allow for preliminary measures to be undertaken on a multi-

---

[1] Co-inventors need not physically work together, they need not make equal contributions to the subject matter of the claims in a patent, and each co-inventor need not contribute to the subject matter of every claim in a patent. *See* 35 U.S.C. §116.

jurisdictional basis towards securing patents in the treaty parties' jurisdictions. To secure a patent in a particular foreign jurisdiction, however, one has to go through the "national phase" in the patent office of the foreign jurisdiction to seek and obtain a patent under the laws in force in the jurisdiction. Neither IPH nor IH has undertaken the national phase of seeking and obtaining a patent from a foreign patent office under the laws in force in a jurisdiction outside of the Territory.

Furthermore, to the extent that you imply in your letter that IPH/IH is in violation of the Agreement simply by submitting any application to the PTO, we direct you to Section 7.1 of the Agreement. That section makes clear that "[t]he Company, at its election and its expense, may participate in patent prosecution and maintenance ... to the extent it deems necessary or desirable."

4.     Finally, you contend that IH has "repeatedly represented to third parties that it has 'acquired Andrea Rossi's intellectual property.'" But you do not explain how this could amount to a breach of the Agreement, and the simple fact of the matter is that such statements cannot breach the Agreement in any fashion. You also do not explain how such statements misappropriate Dr. Rossi's intellectual property, and again the simple fact is that such statements do not amount to a misappropriation of property in any way.

We further note that your letter incorrectly states that IPH only licensed "the right to use" certain intellectual property. That is inconsistent with the broad language in the Agreement §§1.1 and 13.4. Moreover, section 3.2(b) provides that after Leonardo was paid $10 million (which occurred back in the Spring of 2013), "Leonardo and Rossi will immediately transfer ... to the Company all E-Cat IP," and Section 10 provides that "[u]pon the request of the Company, Leonardo and Rossi shall assign to the Company the Licensed Patents with respect to the Territory." IPH has more than a "right to use" certain intellectual property under the Agreement.

**The August 3 Leonardo Letter**

Turning to the Leonardo Letter, it makes several allegations that IPH/IH has breached the Agreement that are as unfounded as the allegations in your letter.

1.     The Leonardo Letter states that "only after the complete payment of the total price provided" in the Agreement, IPH/IH "will acquire only and exclusively the rights to be our Licensee to manufacture and sell the E-Cat products in the Territory." The Agreement, however, is clear that after Leonardo was paid $10 million in the Spring of 2013, "the License will commence and Leonardo and Rossi will immediately transfer ... to the Company all E-Cat IP." Agreement §3.2(b). This is further confirmed in Agreement §1.1, which states that the "License shall commence on the date provided in Section 3.2(b) below and shall remain in force" for the period stated in the Agreement (which is, in short, the duration of the Licensed Patents and perpetual as to all other E-Cat IP). The Agreement defines Licensed Patents and E-Cat IP in Section 16.1. IPH thus has had, among other things, the exclusive right "to manufacture and sell

JONES DAY

the E-Cat products in the Territory" for years now, as opposed to obtaining that right only at some unspecified future date.[2]

2.  The Leonardo Letter argues that the Agreement obligates IH to "absolute and total confidentiality" as to "data and acts that can become of its knowledge in relation to the Intellectual Property." But that is not what the Agreement states. Instead, it states that *"each of Leonardo, Rossi, and AEG agrees* to keep the E-Cat IP strictly confidential and not disclose any of the E-Cat IP to any other party," with certain stated exceptions in the Agreement. Agreement §16.4 (emphasis added). The obligation under the Agreement to maintain the confidentiality of the E-Cat IP is one that is placed on Dr. Rossi, Leonardo and AEG, not IPH or IH.

3.  The Leonardo Letter asserts that IH and its affiliates have an "absolute liability and obligation" under the Agreement "not to compete against Leonardo Corp." But the covenant not to compete provision in the Agreement currently prohibits *only Dr. Rossi, Leonardo, and any Affiliate of Dr. Rossi or Leonardo* from, among other things, participating in any business engaged in distributing or selling any E-Cat Products or related services, or "which is competitive with the E-Cat Products," unless such work is done for IPH, for a transferee of IPH, or with IPH's written consent. Agreement §13.3.

Not to be lost in the context of this response to your letter and the Leonardo Letter is the following: It is IPH's desire that the E-Cat IP prove to be fully successful. To that end, IPH believes that all parties will benefit from meeting in person to discuss where everyone stands on development of the E-Cat IP and the commercial use of the E-Cat IP. IPH representatives are willing to travel to Florida for such a meeting to make it easier on Dr. Rossi to participate. We look forward to hearing soon from you or Dr. Rossi as to whether he is open to participating in a meeting in Florida.

Respectfully,

Christopher R.J. Pace

Encl. Leonardo Letter

cc: Christopher M. Lomax

---

[2] In addition, the Leonardo Letter assumes that the "total price" under the Agreement has not been paid, but because Guaranteed Performance was not achieved within the time period provided in the Agreement, the "total price" has already been paid. Agreement §5, last sentence.

# LEONARDO CORPORATION

1331 LINCOLN ROAD, S.TE #601, MIAMI BEACH, FLORIDA 33139
web: www.leonardocorp1996.com; ph 786 453 2914 fax 786 453 2914 cell. 305 504 4067
email: info@leonardocorp1996.com

IPH International B.V.
111 Hargett Street, Ste 300
Raleigh, NC 27601

Miami Beach, August 03 2015

Industrial Heat
111 Hargett Street, S.te 300
Raleigh, NC 27601

Dear Sirs:

With reference to your communication by your email dated July 30th 2015, signed by your Manager Tom Darden, we are forced to invite you to respect the terms and conditions of the Licence Agreement made and entered into as of October 26th 2012 by and among Leonardo Corporation, Andrea Rossi, Ampenergo Inc. and Industrial Heat LLC.

In particular we want to point out what follows:
only after the complete payment of the total price provided by the License Agreement, Industrial Heat will acquire only and exclusively the rights to be our Licensee to manufacture and sell the E-Cat products in the Territory indicated in the Agreement; in any case you will not become the owners of the Intellectual Property.

The same Agreement demands to Industrial Heat not only an absolute and total confidentiality both about the License Agreement and about data and facts that can become of its knowledge in relation to the Intellectual Property, but also Industrial Heat is not allowed to work for a competitor of Leonardo Corp in the licensing or sale of products competing with the E-Cat Products; this obligation is valid also for the duration of two years after the period of effectiveness of this Agreement.

We remind you that your absolute liability and obligation both to the confidentiality and to not to compete against Leonardo Corp involves not only Industrial Heat, but also all its affiliates, employees, officers and directors.

For these reasons your behavior puts in evidence a significant breach of the License Agreement, because you declare to us that you have a program to build relationships with other researchers and companies "in this field", therefore our competitors.

In fact, we are really amazed to read in your email that Industrial Heat has invested in Brillouin, a competitor of Leonardo Corporation, against which our Dr Andrea Rossi has sent to you tens of pages of remarks against Brillouin's patents in competition with us.
I hope you now understand the "real" situation.

Dr Andrea Rossi
CEO of Leonardo Corporation