# EXHIBIT 15

CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF FLORIDA
 3         CASE NO. 1:16-cv-21199-CMA/O'Sullivan
 4
 5
    ANDREA ROSSI and LEONARDO    )
 6  CORPORATION,                 )
                                 )
 7                               )
    Plaintiffs,                  )
 8                               )
                                 )
 9  v.                           )
                                 )
10  THOMAS DARDEN; JOHN T.       )
    VAUGHN; INDUSTRIAL HEAT,     )
11  LLC; IPH INTERNATIONAL,      )
    B.V. and CHEROKEE            )
12  INVESTMENT PARTNERS, LLC,    )
                                 )
13  Defendants.                  )
14
15
16             C O N F I D E N T I A L
17
18     Video Deposition of THOMAS BARKER DAMERON, III
19                (Taken by the Plaintiffs)
20                 Raleigh, North Carolina
21               Thursday, December 1, 2016
22
23
24
25  Reported by:    Marisa Munoz-Vourakis -
                    RMR, CRR and Notary Public
```

Veritext Legal Solutions
800-726-7007                                          305-376-8800

Page 198

1  Q.  Sir, looking at Exhibit 12, Mr. Penon
2  submitted a report that the operation of the plant had
3  begun, and that report was as of -- that was the first
4  report on May 28, 2015.
5  A.  Okay.  Got you.
6  Q.  Did you review that report?
7  A.  I did see that report, yes.
8  Q.  In writing to any person.
9      Did you tell them that you thought that the
10 results of that report were incorrect?
11 A.  Not that I recall.
12 Q.  Did you see any other reports from Engineer
13 Penon regarding the operation of the E-CAT plant in
14 Doral, Florida, between February 2015 and February
15 2016?
16 A.  My recollection is I saw this report.  I
17 may have seen another report sometime between this
18 report and the end of the test, but I think I've seen
19 one at the end of the test.
20 Q.  And with those reports, did you ever send
21 an email to anybody, whether it be Engineer Penon,
22 Dr. Rossi, Mr. Vaughn, Mr. Darden, indicating that you
23 disagreed with those reports?
24 A.  Not that I recall.
25 Q.  Sir, did you ever prepare a design

Page 199

1  schematic for the layout of the plant and how it should
2  be at the Doral facility, in your opinion?
3  A.  Yes.
4  Q.  Did you ever share that with Dr. Rossi?
5  A.  I thought that I did.  I don't guarantee
6  it.
7  Q.  If it's not in the emails that are
8  produced, is it fair to state that it was not shared
9  with Dr. Rossi?
10 A.  No, because it may have been shown to him
11 in a hand sketch.
12 Q.  When would you have shown that to him?
13     MR. PACE:  Objection to the form of
14  the question.
15 A.  That would be very near the time it was
16 shipped, as that would have been when that was being
17 laid out.
18 Q.  Isn't it true, sir, that Dr. Rossi was in
19 fact in Miami prior to it being shipped?
20 A.  He was back and forth at various times.
21 Q.  Do you know whether the layout of the plant
22 was done in line with your design schematic?
23 A.  I think it was not.
24 Q.  How so?
25 A.  When I went down there and looked at it, it

Page 200

1  was not there, and I have heard from Barry West it was
2  rearranged, consciously rearranged.
3  Q.  What do you mean by consciously rearranged?
4  A.  Andrea changed the design -- layout of it
5  and put it in a different way.
6  Q.  And what was the difference?
7  A.  It didn't have a steam header in it.  It
8  didn't have the steam traps in it.  It didn't have the
9  drains in it.
10     MR. ANNESSER:  Sorry, gentlemen, I
11  can't hear.  Gentlemen, please.
12 Q.  So you said it did not have a steam header,
13 correct?
14 A.  Did not have --
15 Q.  I want to go through these again.  I want
16 to go through one by one to make sure I understand.
17 A.  The steam header that was made to go on the
18 unit was not on the unit.
19 Q.  What is the steam header?
20 A.  Steam header is a piece of pipe that comes
21 out, has taps in it for pressure and temperature,
22 thermal wells for temperature.  It had a place to
23 put -- it had a drip leg in it where you could get
24 condensate out, a place for a trap to drain that.  It
25 had a place to install two steam meters.  It had a way

Page 201

1  to connect it back together again and connect to the
2  pipe going to the JM Products.
3  Q.  And, sir, what was there in place of this
4  steam header?
5  A.  A line came out of the one megawatt unit
6  and turned and went straight to the JM Products.
7  Q.  Were there any temperature devices there,
8  temperature gauges?
9  A.  I don't -- there may be, I don't recall.
10 Q.  Pressure gauges?
11 A.  I don't think there were any pressure
12 gauges there.  There was a pressure gauge inside the
13 unit.
14 Q.  And when you were there on February 24,
15 2015, did you pull Andrea Rossi aside and say hey, this
16 isn't what we planned?
17 A.  No, I did not.
18 Q.  When you returned, did you tell Mr. Vaughn
19 or Mr. Darden that --
20 A.  Most likely, yes.
21 Q.  Did you ever tell Mr. Penon?
22 A.  No.
23 Q.  And you don't know sitting here today
24 whether Mr. Darden or Mr. Vaughn ever told Dr. Rossi or
25 Engineer Penon --

```
             VERITEXT LEGAL SOLUTIONS
       COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.