# COMPOSITE EXHIBIT 44

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                   MIAMI DIVISION
3            CASE NO. 1:16-cv-21199-CMA
4    ANDREA ROSSI and
     LEONARDO CORPORATION,
5
             Plaintiffs,
6    v.
7    THOMAS DARDEN; JOHN T. VAUGHN,
     INDUSTRIAL HEAT, LLC;
8    IPH INTERNATIONAL B.V.; and
     CHEROKEE INVESTMENT PARTNERS, LLC,
9
             Defendants.
10   _____/
11   INDUSTRIAL HEAT, LLC, and IPH
     INTERNATIONAL B.V.,
12
             Counter-Plaintiffs,
13   v.
14   ANDREA ROSSI and LEONARDO CORPORATION,
15           Counter-Defendants,
     and
16
     J.M. PRODUCTS, INC.; HENRY JOHNSON;
17   UNITED STATES QUANTUM LEAP, LLC;
     FULVIO FABIANI; and JAMES BASS,
18
             Third-Party Defendants.
19   _____/
20
21                   600 Brickell Avenue
                     Miami, Florida
22                   February 28, 2017
                     Tuesday, 7:45 A.M.
23
24
25

Page 2

1
2             V I D E O
        D E P O S I T I O N
3
            OF
4
5        FULVIO FABIANI
6
7    Taken on Behalf of the Defendants
     Pursuant to Notice of Taking Deposition
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1         A P P E A R A N C E S
2
3  On behalf of the Plaintiffs:
4  PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P L
       283 Catalonia Avenue, Suite 200
5      Coral Gables, FL 33134
    BY:   BRIAN CHAIKEN, ESQ
6       bchaiken@pbyalaw com
7  On behalf of the Defendants/Counter-Plaintiffs:
8  JONES DAY
       600 Brickell Avenue
9      Brickell World Plaza
       Suite 3300
10     Miami, FL 33131
    BY:  CHRISTOPHER R J PACE, ESQ  and
11     ERIKA HANDELSON, ESQ
       cpace@jonesday com
12     ehandelson@jonesday com
13
    On behalf of JM Products, Henry Johnson
14  and James Bass:
15  ARAN, CORREA & GUARCH, P A
       255 University Drive
16     Coral Gables, FL 33134-6732
    BY:  FRANCISCO LEON DE LA BARRA, ESQ
17     fleon@acg-law com
18  On behalf of United States Quantum Leap and Fulvio
    Fabiani:
19
    RODOLFO NUNEZ, P A
20     255 University Drive
       Coral Gables, Florida 33134
21  BY: RODOLFO NUNEZ, ESQ
       rnunez@acg-law com
22
23  Also Present:  Norma Merlano, Interpreter
                Todd Cohen, Videographer
24
25

Page 4

1              I N D E X
2  FULVIO FABIANI
3    Examination by Mr  Pace          8
4
5
6            E X H I B I T S
7
8  Deposition Exhibit 1            54
     5-20-13 email
9
     Deposition Exhibit 2            96
10   2-27-15 email
11 Deposition Exhibit 3            100
     13-page document
12
     Deposition Exhibit 4            125
13   3-6-15 email
14 Deposition Exhibit 5            126
     4-13-15 email
15
     Deposition Exhibit 6            128
16   5-13-15 email
17 Deposition Exhibit 7            134
     1-14-13 email
18
     Deposition Exhibit 8            135
19   6-19-15 email
20 Deposition Exhibit 9            140
     7-7-15 email
21
     Deposition Exhibit 10           141
22   2-23-16 email
23 Deposition Exhibit 11           142
     5-15-16 email
24
25

Page 5

1         THE VIDEOGRAPHER:  We are now on the video
2    record.  My name is Todd Cohen, representing
3    Veritext.  The date today is February 28th,
4    2017, and the time on the video record is
5    7:45 a m.
6         This deposition is being held at Jones
7    Day, located at 600 Brickell Avenue in Miami,
8    Florida.  The caption of the case is Andrea
9    Rossi and Leonardo Corporation, et cetera,
10   et al., versus Thomas Darden, John T. Vaughn,
11   Industrial Heat, LLC, et cetera, et al.
12        The case is being held in the United
13   States District Court, Southern District of
14   Florida, Miami Division.  The case number is
15   1:16-cv-21199-CMA.  The name of our witness
16   this morning is Fulvio Fabiani.
17        At this time may I please have counsel in
18   the room announce their appearances for our
19   court reporter.  Then Kelli Ann Willis, the
20   court reporter with Veritext, will then swear
21   the witness and we can begin.
22        MR. PACE:  Can I ask one quick question?
23   Is what you just said being recorded?
24        THE VIDEOGRAPHER:  Only by Kelli.
25        MR. PACE:  This is Chris Pace and Erika

2 (Pages 2 - 5)

Page 30

1  or the United States?
2      A.  I think so.
3      Q.  You collected documents for your counsel
4  in this case, correct?
5          MR. NUNEZ:  I'm going to object to form.
6          THE WITNESS:  Could you please explain a
7  little bit better what documents you are
8  talking about?
9  BY MR. PACE:
10     Q.  Did you receive discovery requests from
11 this litigation?
12         MR. NUNEZ:  Object to form.
13         MR. LEON DE LA BARRA:  Object to form.
14         THE WITNESS:  Please forgive me, but it is
15 not -- I'm not comprehending the question.  I'm
16 not.
17         MR. PACE:  I will do it again.
18 BY MR. PACE:
19     Q.  You were asked to collect certain
20 documents for this case.
21     A.  Yes.
22     Q.  And those were documents that you were
23 going to provide to the other parties in the case?
24     A.  I do not know who they were provided to.
25     Q.  You were asked to collect, for example,

Page 31

1  your emails with Andrea Rossi?
2          THE INTERPRETER:  Could you please repeat
3  your answer?
4          THE WITNESS:  The documentation that
5  was -- the complete documentation that is in
6  my -- that I have in my --
7          DR. ROSSI:  Possess.
8          MR. NUNEZ:  Possession.
9          THE INTERPRETER:  I'm sorry, I will get
10 the word.
11         THE WITNESS:  -- possession has been sent
12 to my attorney.
13 BY MR. PACE:
14     Q.  Did you search --
15     A.  I would like to finish.
16         Whatever I have not sent is not in my
17 possession any longer.
18     Q.  Did you search the documents you have
19 in the United States?
20     A.  No, in the US, no.
21         THE INTERPRETER:  It was cut.  The answer
22 was cut.  There was a technical difficulty.
23 Could you please repeat the answer?
24         THE WITNESS:  I'm also having --
25         THE INTERPRETER:  He's also having that

Page 32

1  problem, kind of chopped up.  He's getting
2  delayed.  Our voices is getting like in pieces
3  and delayed.  Maybe if you try to fix the
4  connection for a minute.
5          MR. PACE:  Move that closer to you.
6          THE WITNESS:  It is a connection problem.
7  In this moment, it is near to yellow.
8          MR. PACE:  Let's ask my question again.
9  BY MR. PACE:
10     Q.  He may have answered this, but did you
11 search your documents in the United States?
12     A.  Physically, no.
13     Q.  Did you search the documents you have in
14 Italy?
15     A.  Physically, no.
16     Q.  But you believe you have a physical copy
17 of an NDA with Leonardo Corporation either in the
18 United States or Italy?
19     A.  Perhaps.  I think so.  Perhaps.  I don't
20 have a certainty of it.
21     Q.  You were asked to collect your email
22 communications with various individuals, correct?
23     A.  Yes.  Yes.
24     Q.  You provided very few emails with, for
25 example, Dr. Rossi?

Page 33

1      A.  I provided everything that was in my
2  possession after the closing of the contract with
3  Industrial Heat.
4      Q.  Did you search for your email
5  communications with James Bass?
6      A.  Yes, I searched for them.
7      Q.  And did you search through your email
8  communications with Andrea Rossi?
9      A.  Yes, I searched for them.
10     Q.  If Andrea Rossi and James Bass produced
11 far more email communications with you, then is that
12 because you have deleted some of your email
13 communications with, for example, Dr. Rossi and
14 James Bass?
15     A.  In the contract, it was foreseen that I
16 was to delete everything that was in my power, in my
17 possession, once the term of the contract would end.
18 I was to delete.  I only saved the necessary
19 documents.  Once I obtained the final payment and
20 renewal of the contract, as it was promised by
21 Industrial Heat.
22         THE INTERPRETER:  There was a discrepancy
23 in the translation.  Would you like me to ask
24 the question again and try to get an answer?
25 May the interpreter ask him to divide the

9 (Pages 30 - 33)

Page 34

1 answer.
2     MR. PACE:  Let me do this.  Let me say it.
3 BY MR. PACE:
4     Q.   Mr. Fabiani, we need you to provide -- to
5 break your responses into shorter sentences.
6     A.   Okay.  It is only one block, because it is
7 divided by significance.
8         THE INTERPRETER:  (In Italian.)
9         THE WITNESS:  Once it is divided, it loses
10     its meaning.
11 BY MR. PACE:
12     Q.   You are claiming that you deleted emails
13 because you were required to by your contract with
14 Industrial Heat?
15     A.   My contract with Industrial Heat would
16 foresee -- okay.  It was foreseen that I had to give
17 my -- all of the documentation that was done by me.
18         THE INTERPRETER:  No.  The interpreter is
19     not understanding.  (In Italian.)
20         THE WITNESS:  I have to finish my answer.
21     And this --
22         THE INTERPRETER:  The interpreter is not
23     understanding.  (In Italian.)
24         DR. ROSSI:  Delivery.
25         THE INTERPRETER:  The delivery.

Page 35

1         THE WITNESS:  The delivery was effected to
2     the attorney that is present.  It was all --
3     afterwards, it was all deleted afterwards to
4     respect the agreement of the contract.
5 BY MR. PACE:
6     Q.   That is literally what he's saying.
7         Mr. Fabiani, I want to understand here,
8     there are emails that you have deleted that relate
9     to either the E-CAT or to Leonardo Corporation or to
10     Industrial Heat, correct?
11     A.   They were deleted, as it was required by
12 the contract.
13     Q.   And when did you delete those emails?
14     A.   The day after the contract expired.
15     Q.   And pursuant to that contract, did you
16 provide copies of that information to Industrial
17 Heat?
18         THE INTERPRETER:  Copies of the contract?
19     Sorry.
20         MR. PACE:  Let me say it again.
21         THE INTERPRETER:  (In Italian.)
22 BY MR. PACE:
23     Q.   Let me just -- no, no.
24         Before deleting those emails, did you
25 provide copies of them to Industrial Heat?

Page 36

1     A.   A copy of what?
2     Q.   The emails you just testified that you had
3 deleted after the expiration of the contract.
4     A.   It was not -- in the contract, it did not
5 ask for any emails to be sent.  No, it did not ask
6 for any copies of the emails.  Just of the data,
7 information, copies of the data.
8     Q.   Let me ask my question to you again.
9         You testified that you have deleted some
10 of these email communications with -- the email
11 communications that involve the E-CAT -- that
12 involve the E-CAT or Leonardo Corporation or
13 Industrial Heat?
14     A.   Yes.
15     Q.   And you have deleted those -- wait -- and
16 you have deleted those within the past year?
17         MR. NUNEZ:  Object to form.
18         THE WITNESS:  The day after the end of the
19     contract.
20 BY MR. PACE:
21     Q.   You deleted those emails within the past
22 year?
23         MR. NUNEZ:  Object to form.
24         THE WITNESS:  When you say this last year,
25     what year are you talking about?

Page 37

1 BY MR. PACE:
2     Q.   You deleted those emails within the last
3 12 months?
4         MR. NUNEZ:  Object to form.
5         THE WITNESS:  I would like to know which
6     year you're talking about.
7 BY MR. PACE:
8     Q.   The past 12 months, Mr. Fabiani.
9     A.   We are in February, so -- yes, I think
10 that is within the 12 months.  I think so.
11     Q.   Prior to deleting those emails, did you
12 send copies of them to anyone?
13     A.   I do not remember if I distributed copies
14 during work.
15     Q.   The question was probably not well done.
16         When you decided to delete some email --
17 when you decided to delete the emails that we have
18 been talking about, at or shortly before that time
19 did you forward those emails to anyone else?
20     A.   That I recall, no.  Before, it was normal.
21 During the period of time that the work was
22 developing, that was normal.
23         After the contract expired, whatever was
24 left was sent to my attorney.
25     Q.   And when you say your attorney, do you

Page 38

1 mean Rudy Nunez?

2   A.  Yes.

3   Q.  Dr. Penon testified the other day that you

4 sent to him a series of emails.  Did you send email

5 communications to Dr. Penon?

6   A.  During the development of my work for

7 Industrial Heat.

8   Q.  Did these emails include attachments of

9 data?

10     THE INTERPRETER:  One moment.  The

11 interpreter's microphone fell off.  We are

12 good.

13     THE VIDEOGRAPHER:  Thank you.

14     THE INTERPRETER:  I'm sorry.  What kind of

15 data?

16 BY MR. PACE:

17   Q.  Data.  Attachments of data.

18   A.  Yes.

19   Q.  This included data that you took off of a

20 computer owned by Dr. Penon?

21     MR. NUNEZ:  Object to form.

22     MR. LEON DE LA BARRA:  Object to form.

23     THE WITNESS:  The answer is no.

24 BY MR. PACE:

25   Q.  Did Dr. Penon have a computer at the Doral

Page 39

1 location?

2   A.  Where precisely?

3   Q.  At the warehouse in Doral.

4   A.  Yes, in the studio where the plant was.

5   Q.  Did you -- is this -- did you have access

6 to that computer?

7   A.  What do you mean by access?

8   Q.  Were you able to access the data or

9 information on that computer?

10   A.  No.

11   Q.  What was the data that you sent -- you

12 would send by email to Dr. Penon?

13   A.  I did not understand the question.

14     THE INTERPRETER:  Maybe the interpreter

15 did not translate it correctly.

16     MR. PACE:  No problem.

17 BY MR. PACE:

18   Q.  What data would you send to Dr. Penon by

19 email?

20   A.  My summary of the --

21     DR. ROSSI:  Operation.

22     THE WITNESS:  -- operation of the --

23     DR. ROSSI:  Plant.

24     THE WITNESS:  -- the plant.  Okay.

25

Page 40

1     MR. PACE:  Let's do that again.

2     THE INTERPRETER:  I've got it now.

3 BY MR. PACE:

4   Q.  Mr. Fabiani, let me ask my question again

5 to allow for translation again.

6     What data would you send to Dr. Penon by

7 email?

8   A.  A summary of the operation of the plant.

9   Q.  How often would you send those emails to

10 Dr. Penon?

11   A.  Usually every two months.  Every two

12 months.

13   Q.  Have you saved those emails?

14   A.  No, absolutely not.

15   Q.  When did you delete those emails?

16   A.  The day after the contract expired.

17   Q.  And you did not -- before deleting those

18 emails, you did not send copies of those emails

19 either to Industrial Heat or to your counsel?

20     MR. NUNEZ:  Object to form.

21     THE WITNESS:  Before the expiration of the

22 contract --

23     THE INTERPRETER:  (In Italian.)

24     THE WITNESS:  Before -- had been sent

25 to --

Page 41

1     THE INTERPRETER:  (In Italian.)

2     MR. PACE:  He's translating for the

3 translator.  Mr. Fabiani, I know you understand

4 English, but you have to let her translate.

5     THE INTERPRETER:  It is reference to --

6 no, no.

7     MR. PACE:  Let's do this again.  Let me

8 ask my question again, and he can answer.

9     THE INTERPRETER:  (In Italian.)

10     THE WITNESS:  (In Italian.)

11     It is not correct, the translation.

12     MR. PACE:  That's why I'm asking.  I

13 realize you understand English, Mr. Fabiani.

14     THE WITNESS:  Thank you, thank you.

15 BY MR. PACE:

16   Q.  Prior to deleting your emails with

17 Dr. Penon, did you send those emails either to your

18 counsel or to -- or to Industrial Heat?

19   A.  Before the expiration of the contract --

20     THE INTERPRETER:  (In Italian.)  I'm

21 sorry.

22     DR. ROSSI:  I can help.

23     MR. PACE:  Let's take a break.

24     THE VIDEOGRAPHER:  Stand by to go off the

25 record.  Going off at 9:49.

11 (Pages 38 - 41)

Page 42

1    (Thereupon, a recess was taken, after
2  which the following proceedings were held:)
3    MR. PACE:  Back on the record.
4    THE VIDEOGRAPHER:  We are now back on the
5  video record.  The time back on is 9:55 a m.
6  BY MR. PACE:
7    Q.  Mr. Fabiani, before you deleted the emails
8  you sent to Dr. Penon, did you send those specific
9  emails to anyone else?
10    A.  I have to give a response a bit long, so I
11  have to divide it in several parts.
12    MR. NUNEZ:  Well, let him answer.
13  BY MR. PACE:
14    Q.  Can you answer yes or no first?
15    A.  Well, the answer of a yes or a no depends
16  on the time frame, the period of time.
17    Q.  All right.  Then let me -- I will narrow
18  it to make it easier.
19    A.  Correct.
20    Q.  Did you forward the emails that you sent
21  to Dr. Penon immediately before deleting them?
22    THE INTERPRETER:  Can you repeat the
23  question again because I'm hearing that that is
24  not correct.
25    THE WITNESS:  (In English.)  Sorry.  I

Page 43

1    don't understand the question.  It is not
2    complete.
3  BY MR. PACE:
4    Q.  Did you forward -- forwarding an email,
5  does that translate for something in Italian or are
6  you having a problem with that?  Let me use a
7  different word.
8    THE INTERPRETER:  It is to send.
9    DR. ROSSI:  To forward in Italian -- (in
10  Italian.)
11    THE INTERPRETER:  Okay.
12  BY MR. PACE:
13    Q.  Did you forward the emails you sent to
14  Dr. Penon to anyone else?
15    A.  I did not forward the emails to anyone.  I
16  sent the email to several --
17    DR. ROSSI:  I delivered.
18    THE INTERPRETER:  I delivered the emails.
19    DR. ROSSI:  The emails, the data.
20    MR. PACE:  The data.  The data.
21    THE INTERPRETER:  I delivered the emails
22  to -- (in Italian.)
23    MR. NUNEZ:  He gave the emails to various
24  people.  Not the emails, the data.
25    MR. PACE:  If everybody can stop.  What is

Page 44

1  the Italian word you're using for email?
2    THE INTERPRETER:  Email.
3    MR. PACE:  If he does not use the word
4  email --
5    THE INTERPRETER:  He's using email in
6  English.  Email.
7    MR. PACE:  What I think he was responding
8  in Italian is "the summary or the records."  He
9  did not use the word "email."  So your
10  translation should not use the word "email."
11  Let me try this again, to make sure I've got
12  it.
13  BY MR. PACE:
14    Q.  Mr. Fabiani, you are testifying that you
15  did not forward the Dr. Penon emails to anyone, but
16  you sent the same data you provided Dr. Penon to
17  others?
18    A.  Okay.  I did not understand it.  It is
19  quite complex because -- because the email of
20  Dr. Penon --
21    DR. ROSSI:  The email sent to Dr. Penon.
22    THE INTERPRETER:  The email sent to
23  Dr. Penon was not forwarded to anyone.
24    MR. PACE:  Understood.
25    THE WITNESS:  But the data that was

Page 45

1    contained in that email --
2    DR. ROSSI:  Has been delivered.
3    THE INTERPRETER:  Has been delivered to
4  Dr. Rossi.  (In Italian.)
5    THE WITNESS:  Have been hand-delivered to
6  Dr. Rossi.
7    THE INTERPRETER:  (In Italian.)
8    The interpreter is not understanding the
9  names.  It is chopped up.
10  Could you please repeat the names?
11    THE WITNESS:  J.T. Bolgan.  Tom something.
12  BY MR. PACE:
13    Q.  Darden?
14    A.  Darden, during the time that they visited
15  the plant.
16    The day before the contract expired, I
17  went to -- I went to the officer or the firm of
18  Jones Day, and I hand-delivered to the engineer of
19  Industrial Heat.
20    DR. ROSSI:  A flash drive.
21    MR. NUNEZ:  A flash drive.
22    THE WITNESS:  A flash drive that contained
23  the same.
24    DR. ROSSI:  Reports.
25    THE INTERPRETER:  Reports.

12 (Pages 42 - 45)

Page 46

1        MR. PACE:  Data.
2        THE WITNESS:  Document.
3        After my contract was completed, I
4    proceeded -- I proceeded --
5        THE INTERPRETER:  (In Italian.)
6        THE WITNESS:  -- to the cancelation of all
7    of that, everything that did not have to do
8    with the renewing of the contract.
9    BY MR. PACE:
10       Q.   As to data that you sent to Dr. Penon, you
11   sent Dr. Penon temperature data?
12       A.   Yes.
13       Q.   You sent Dr. Penon electrical data?
14       A.   Yes.
15       Q.   Did you send Dr. Penon pressure data?
16       A.   Yes.
17       Q.   From where did you obtain the temperature
18   data?
19       THE INTERPRETER:  Temperature?
20       DR. ROSSI:  Correct.
21       THE WITNESS:  From my -- from my data,
22   from my part of the plan.
23       DR. ROSSI:  Control system.
24       THE WITNESS:  The control system.
25

Page 47

1    BY MR. PACE:
2        Q.   From where did you obtain the electrical
3    data?
4        A.   From the PC 800 --
5        DR. ROSSI:  PCE.
6        THE INTERPRETER:  PCE-830.
7        MR. PACE:  Dash 30.
8    BY MR. PACE:
9        Q.   And that is the electrical data that you
10   sent to Dr. Penon?
11       A.   Yes.
12       Q.   And then you sent -- from where did you
13   obtain the pressure data that you sent to Dr. Penon?
14       A.   From one of my pressure --
15       DR. ROSSI:  A probe, pressure probe in my
16   control system.
17       THE WITNESS:  My pressure.
18       THE INTERPRETER:  Pressure probe within my
19   control system.
20   BY MR. PACE:
21       Q.   Did you send water level information to
22   Dr. Penon?
23       THE INTERPRETER:  Water level data?
24       MR. PACE:  Yes.
25       THE WITNESS:  No.

Page 48

1    BY MR. PACE:
2        Q.   And your testimony is that the same data
3    you sent to Dr. Penon, you also turned over to an
4    engineer for Industrial Heat at the offices of Jones
5    Day?
6        A.   Yes.  Yes.
7        Q.   Your testimony is you turned this data
8    over in a flash drive?
9        A.   Yes.
10       Q.   Let's talk a little bit about the time you
11   were in the offices of Jones Day.  You met with J.T.
12   Vaughn and an engineer from Industrial Heat,
13   correct?
14       A.   Also with the presence of the attorney.
15       Q.   And the attorney who was present was
16   myself?
17       A.   Yes.
18       DR. ROSSI:  (In Italian.)
19       THE INTERPRETER:  (In Italian.)
20       THE WITNESS:  I do remember that, yes, I
21   do.
22   BY MR. PACE:
23       Q.   Mr. Fabiani, even though --
24       A.   I was at the Jones Day office two times.
25   Jones Day.

Page 49

1        Q.   Mr. Fabiani, for purposes of the
2    deposition, if you can wait for the Italian
3    translation before responding.  Otherwise, we are
4    talking over each other.
5        A.   Sorry.  I apologize.
6        Q.   During this meeting at Jones Day, you
7    spoke about -- about your interactions with James
8    Bass?
9        THE INTERPRETER:  Interactions.
10       MR. PACE:  That is a bad word.  Let me
11   start over.
12   BY MR. PACE:
13       Q.   At this meeting you spoke about your --
14   your --
15       MR. PACE:  Let me start this over.
16       THE INTERPRETER:  The interpreter would
17   like to know, "you" singular or "you" plural?
18   You or he spoke or they all spoke?
19       MR. PACE:  Give me a second.
20   BY MR. PACE:
21       Q.   At this meeting, you discussed your work
22   at the Doral location, correct?
23       A.   Which one of the two visits?
24       Q.   The first.
25       A.   Yes.

13 (Pages 46 - 49)

Page 82

1    Unit Number 2.  The time is 12:54 p.m.
2  BY MR. PACE:
3    Q.  Mr. Fabiani, you understand that you are
4  still under oath?
5    A.  Yes.
6    Q.  You testified earlier today that there was
7  a contract between US Quantum Leap and Industrial
8  Heat, correct?
9    A.  Yes.
10    Q.  That agreement was entered in the summer
11  or fall of 2013?
12    A.  More or less the fall of 2013, if I
13  recall.
14    Q.  When did that agreement end?
15    A.  It was a renewal --
16      THE INTERPRETER:  (In Italian.)
17      THE WITNESS:  I would have to look back at
18  the documents, but it was either March or
19  April, 2016.
20  BY MR. PACE:
21    Q.  During the time of this agreement,
22  Industrial Heat was paying US Quantum Leap for the
23  work you were doing?
24    A.  Yes.  Yes.
25    Q.  And were you also paid an amount for an

Page 83

1  apartment rental?
2    A.  Yes.  It was included in the contract.
3    Q.  And that was -- that was also money that
4  was paid by Industrial Heat?
5    A.  This what?
6    Q.  I'm sorry.  The amount that was being paid
7  for your apartment rental?
8    A.  Yes.
9    Q.  We spoke -- we were discussing earlier
10  today the 1-MW plant, correct?
11    A.  Yes.
12    Q.  What do you understand the 1-MW plant to
13  be?
14    A.  I'm not understanding the question.
15    Q.  What is the 1-MW plant?
16    A.  It is a container.  It contains more
17  groups of reactors.
18    Q.  How many groups of reactors?
19    A.  Six.  Six small ones and -- six done with
20  the small reactors and four done with the large
21  reactors.
22    Q.  Were the four groups of large reactors
23  sometimes called Big Frankies?
24    A.  Yes.
25    Q.  Was there any name for the six group of

Page 84

1  the small reactors?
2    A.  No.  They were numbered alphabetically.
3    Q.  Do you recall that the 1-MW plant was sent
4  to Doral warehouse in late 2014?
5    A.  I was present when it was unloaded, but I
6  don't remember the exact date.
7    Q.  Do you remember that the 1-MW plant was
8  operated -- was run at the Doral warehouse in 2015
9  and early 2016?
10    A.  Did you say at the end of 2016?
11    Q.  No.  Let me ask my question again.
12      THE INTERPRETER:  Maybe it was a mistake
13  of the interpreter.
14      THE WITNESS:  No, no.  I did hear 2016.
15  BY MR. PACE:
16    Q.  Do you recall that the plant was operated
17  at the Doral warehouse -- was operated at the Doral
18  warehouse in 2015 and early 2016?
19    A.  Yes.
20    Q.  In connection with running the 1-MW plant
21  at the Doral warehouse, there were measurements
22  being taken in connection with running the plant,
23  correct?
24    A.  The question is very confusing.  Can you
25  reformulate it a little bit?

Page 85

1    Q.  I can.
2    A.  Thank you.
3    Q.  When the 1-MW plant was being operated in
4  Doral, were there measurements being taken of the
5  inputs into and the outputs from the plant?
6    A.  They were taken in more ways.
7    Q.  I wanted to ask you about those
8  measurements and how they were made.
9    A.  Okay.  I understood the question.
10      I need to give a long answer because it is
11  three different -- it is three systems.
12    Q.  Uh-huh.
13    A.  Okay.  The first part was the system that
14  would give data to me to be able to see and regulate
15  the functioning during the date -- throughout the
16  day.
17      The second system was the -- was the
18  system that would memorize the data that the
19  engineer -- the third system would be Engineer Penon
20  would come to verify his data and his certified
21  instrument -- instruments.  Instruments.
22      Okay.  Perfect.  There were occasions in
23  which during the visits of Industrial Heat, from
24  J.T. -- J.T. -- J.T. --
25    Q.  J.T. Vaughn?

22 (Pages 82 - 85)

Page 86

1    A.   -- J.T. Vaughn and Tom Darden, photographs
2  of the apparatus and the data.  And Barry West,
3  during the development of the test, of the tests,
4  took pictures of the electrical meter.  Meter.  And
5  the hydraulic meter.
6    Q.   The data collected from the first system,
7  how was that stored?
8        THE INTERPRETER:  I'm trying to think of
9  the word "stored."
10       MR. PACE:  Let me ask a different
11  question.
12  BY MR. PACE:
13   Q.   There were measuring devices that were
14  used for collecting the data for Engineer Penon,
15  correct?
16   A.   Of course.
17   Q.   And those measurement devices measured --
18  actually let me start again.  Let me start again.
19       What measurement devices were used in
20  Doral to collect data for Engineer Penon?
21   A.   Okay.  Engineer Penon had two systems at
22  his disposal.  The first system was an electronic
23  system that would permit the registering or
24  registration of data that was necessary to
25  understand if the system would function in a

Page 87

1  continuous cycle.
2        The second -- the second set of
3  instruments were certified instruments sent from
4  Penon -- sent by Penon and installed in the plant
5  once -- okay, to be able to do a measuring, a
6  certified measurement.
7    Q.   The data collected in the electronic
8  system for Engineer Penon, where was that data held
9  or stored?
10   A.   Okay.  The data for the certified
11  instrument was inside the certified instrument.
12  Okay.  The data, because there are two instruments,
13  the first one was the certified instruments.  The
14  second was the registered data from the electronic
15  control system inside of Penon's computer.
16   Q.   Then there was also a system that
17  collected data that you would use to operate the
18  plant?
19   A.   Yes.
20   Q.   What data did you collect for purposes of
21  operating the plant?
22   A.   Electrical, incoming temperature -- input
23  temperature, output temperature, pressure.
24   Q.   Anything else?
25   A.   No.

Page 88

1    Q.   Where is -- was that data that you just
2  described, was that stored in the computer
3  somewhere?
4    A.   It was stored in my server.  From this
5  data, I extracted the file that was delivered in the
6  attorney's office during my second meeting.
7  Attorney Pace, the attorney next to the interpreter.
8    Q.   You testified earlier today that you sent
9  data to Engineer Penon.  Was that -- was that data
10  from your system?
11   A.   Yes.  Yes.  I could not get into
12  Mr. Penon's --
13       MR. PACE:  Computer.
14       THE INTERPRETER:  I could not hear the
15  word.  Into the system?
16       THE WITNESS:  I could not enter into
17  Mr. Penon's system.
18  BY MR. PACE:
19   Q.   And so the system for the electronic
20  control, the measurement system of Engineer Penon
21  for the electronic controls, that data was stored in
22  a computer of Dr. Penon's?
23   A.   Yes.
24   Q.   And no one other than Dr. Penon accessed
25  that computer?

Page 89

1    A.   Yes.  We were only to see if it functioned
2  or did not.
3    Q.   Who is "we"?
4    A.   All of those that would enter the command.
5    Q.   Container?
6    A.   Container.  Okay.  It is a small container
7  where the office is inside.
8    Q.   How is the data kept for the certified
9  instruments?
10   A.   I could only speak for one of the
11  certified instruments.
12   Q.   Which one is that?
13   A.   PCE-130.  Oh, 830.
14   Q.   Where was the data for the PC-830 stored?
15   A.   Inside of the PCE-830.
16   Q.   Who installed the measurement equipment
17  for the system that you operated?
18   A.   Which instruments?  There are so many.
19   Q.   Let's go through each of them.
20       The instrument for measuring the
21  electrical power.
22       THE INTERPRETER:  Measuring?
23       MR. PACE:  Electrical power.
24       THE WITNESS:  For the PCE-830, yes, it was
25  installed, Barry West, under my direct

23 (Pages 86 - 89)

Page 98

1 to turn on the small reactors, but we found
2 installation defects that did not allow to be able
3 to work with the small reactors.
4     Q.  Was that insulation problem more than just
5 the problem with the temperature probes?
6     A.  Okay.  That insulation problem derived
7 from an error, an erred system of electrical
8 cabling.  This led to -- led to having current,
9 current, like electricity, on the metallic mats.
10 For this reason is why they burnt out.
11     Q.  And those small reactors burnt out in
12 early 2015?
13     A.  They were not turned on in 2015.  They
14 were turned on only for testing.
15     Q.  So the -- any output from the 1-MW plant
16 was from the four big Frankie units?
17     A.  Ninety-nine percent, yes.
18     Q.  What is the 1 percent wrong?
19     A.  Thank you.  Is okay.  The 1 percent is if
20 the -- 1 percent -- oh, from the startup, the
21 1 percent of the system, to then be able to turn off
22 all of the small reactors for a problem of short
23 circuit to the -- the -- the -- during the -- during
24 the turning on -- oh, during the functioning.
25     THE INTERPRETER:  I'm sorry.  The words

Page 99

1     were choppy.
2 BY MR. PACE:
3     Q.  The small reactors were operating for a
4 very short time when the plant was first turned on?
5     A.  Yes.  Yes.  In the documents that were
6 delivered in the Excel file, there are the comments
7 for each day.  And it is written when we had to turn
8 off the small reactors, the small reactors.
9     MR. PACE:  Why don't we take a short break
10 and we will get that spreadsheet out, too.
11     MR. NUNEZ:  Chris, before we -- before we
12 go off the record, I don't know if it needs to
13 be on the video record, I told you we were here
14 for the seven hours.  It is not seven hours of
15 questioning.  I mean, you could speak with me
16 if you need a little bit longer.  We're at 2:00
17 now.
18     MR. PACE:  Our position is under the rules
19 we are entitled to seven hours of questioning.
20 If you guys want to turn off the Skype and stop
21 the deposition, you can do so at your own risk.
22 That's up to you.
23     How much time are we at?
24     THE VIDEOGRAPHER:  I can tell you when we
25 go off.  Stand by to go off Media Unit

Page 100

1 Number 2.  Going off the record at 1:55 p.m.
2     (Thereupon, a recess was taken, after
3 which the following proceedings were held:)
4     THE VIDEOGRAPHER:  We are now back on the
5 video record.  This is the beginning of Media
6 Unit 3.  The time on the record is 2:24 p.m.
7 BY MR. PACE:
8     Q.  Mr. Fabiani, before we broke you made a
9 reference to a document that reflects when different
10 parts of the E-CAT -- the 1-MW plant was working or
11 was stopped.
12     I want to show you what I have marked here
13 as Exhibit 3.
14     (The referred-to document was marked by
15 the court reporter for Identification as
16 Deposition Exhibit 3.)
17 BY MR. PACE:
18     Q.  Just looking at this first page of the
19 exhibit, is this the -- and I will represent to you
20 that this was produced by your lawyer in discovery.
21 Does this -- is this the document you discussed?
22     A.  This part seems like it, yes.
23     MR. NUNEZ:  Let me just -- I'm sorry.  Not
24 so much -- Fulvio, one second.
25     Mr. Pace, just because you said this was

Page 101

1 produced by us, is there a reason it doesn't
2 have the Bates stamps on it?
3     MS. HANDELSON:  We didn't get Bates stamps
4 on any of our production.
5     MR. PACE:  This was 13 and 14.  I don't
6 think it had the Bates stamps on it.
7     MR. NUNEZ:  All right.  Go on.  I'm going
8 to look.  I'm pretty sure it did.
9     MR. PACE:  I want to say it is 13 or 14.
10 It is one or both.
11     MR. NUNEZ:  I think this one was 14.
12     THE INTERPRETER:  I'm sorry.  The
13 interpreter left her glasses right there.
14 Sorry, Counsel.  Sorry about that.
15 BY MR. PACE:
16     Q.  If we go to the -- if we go to the second
17 page.
18     MR. NUNEZ:  Just for the record, just
19 because you had made that reference, because
20 mine do have Bates stamp, it looks like a
21 different copy.
22     MR. PACE:  Did you look at 13?  I think
23 you produced the same thing.  Production 13 and
24 14.
25     MR. NUNEZ:  Right, because 13 -- just bear

26 (Pages 98 - 101)

1     MR. PACE:  Put the Italian version up.
2     (The referred-to document was marked by
3 the court reporter for Identification as
4 Deposition Exhibit 7.)
5     MR. PACE:  There is one, two, three.  I'm
6 going to give you one for you to look at.
7 BY MR. PACE:
8     Q.  Mr. Fabiani, I don't want to ask you a lot
9 of details about this document.  I just want to make
10 sure that I'm clear that the Giuseppe Levi that is
11 referenced in this email, that is the Professor Levi
12 from Bologna University?
13     A.  Yes, it is Giuseppe Levi.
14     Q.  And is this a -- the email address that
15 you are communicating with him -- let me start that
16 over.
17     This is an email communication that you
18 are having from him from his -- let's start over
19 again.
20     This is being sent from his personal
21 email, not his email at the University of Bologna,
22 correct?
23     MR. NUNEZ:  Object to form.
24     THE WITNESS:  I have no idea.  I do not
25 know all the email addresses.

1 BY MR. PACE:
2     Q.  Is this the email address that you usually
3 use to communicate with Professor Levi?
4     A.  By memory, I don't remember.
5     MR. PACE:  Can you scroll down to the
6 bottom of this page?  Just where his email
7 starts.  That's good enough there.
8 BY MR. PACE:
9     Q.  Mr. Fabiani, at the bottom of this page
10 there is also an email address for you.  Do you see
11 that?  Do you see that?
12     A.  Yes.  I read my name, yes.
13     Q.  Is that an email address that you still
14 use?
15     A.  No, absolutely not.
16     Q.  When did you stop using that email
17 address?
18     A.  A few years ago.
19     MR. PACE:  June 19, 2005.  2015.  Sorry.
20     THE INTERPRETER:  '15.
21     MR. PACE:  I'm sorry about that.
22     (The referred-to document was marked by
23 the court reporter for Identification as
24 Deposition Exhibit 8.)
25

1 BY MR. PACE:
2     Q.  This is an email that you sent to
3 Dr. Rossi, correct?  Correct?
4     A.  Yes, I think so.  I believe so.  Think,
5 believe.
6     MR. PACE:  Can you do me a favor?  Can you
7 go to the second picture?
8 BY MR. PACE:
9     Q.  Mr. Fabiani, can you tell me what we are
10 looking at in this image?
11     A.  Two containers.
12     Q.  Is this the E-CAT plant?
13     A.  I think so.
14     Q.  Do you know, these are -- these are
15 attached to an email that was dated June 19, June 19
16 of 2015.  Do you recall if these are pictures that
17 you took around that time period?
18     A.  I don't remember.
19     Q.  On the left side of this picture, we can
20 see a gray wall, correct?
21     A.  Yes.
22     Q.  What is on the other side of that gray
23 wall?
24     A.  I have no idea.
25     Q.  Have you ever been on the other side of

1 that gray wall?
2     A.  No.
3     Q.  Just above the gray wall we can see the
4 outline of a black box or the top of a black box or
5 a black container.
6     Do you see that?
7     A.  I see black.
8     Q.  Do you know what is in that -- have you
9 ever been inside of that black box?
10     A.  No, never been inside.
11     Q.  Next to the black box do you see a silver
12 pipe?  It is actually a pipe wrapped in insulation.
13     THE INTERPRETER:  I'm sorry.
14     MR. PACE:  A gray pipe.
15     THE INTERPRETER:  Your last question was,
16 do you see it?
17     THE WITNESS:  Yes.
18     THE INTERPRETER:  The answer is yes.
19 BY MR. PACE:
20     Q.  Was that the insulated pipe that was to
21 carry the heated fluid from the 1-MW plant over to
22 the J.M. side of the warehouse?
23     A.  Yes, I think that is it.
24     Q.  Do you recall when that pipe was put into
25 play -- when that pipe was installed?

35 (Pages 134 - 137)

Page 138

1    A.  I do not remember the date.
2    Q.  When was the pipe -- when was that
3  insulated pipe removed from its -- removed from the
4  location that it is in this picture?
5    A.  I don't know.
6    Q.  When was the last time you were in the
7  Doral warehouse?
8    A.  The last time, one or two days after the
9  plant was closed, yes, to take my material that had
10  been thrown outside.
11    Q.  What was that material?
12    A.  My computer, my acquisition system, my
13  electronic laboratory.
14    MR. PACE:  Equipment, laboratory.
15  BY MR. PACE:
16    Q.  When you -- do you recall whether that
17  insulated pipe was still at the Doral warehouse on
18  the last day you were there?
19    A.  No.  I did not go around looking around
20  the plant.  It was all closed.
21    Q.  Let's go to -- is this the third picture?
22  The third picture that was attached to the email, is
23  this a picture of the four Big Frankie units?
24    A.  It is not complete, but you can see four
25  Big Frankies.

Page 139

1    Q.  And the Big Frankie units are stacked on
2  top of each other in this picture?
3    A.  Yes, they are stacked.  But they are
4  distanced from each other.
5    MR. PACE:  Can you go to the last picture?
6  BY MR. PACE:
7    Q.  The last attached picture from this email,
8  can you tell me what we are looking at here?
9    A.  I think it could be the -- a small module.
10    Q.  A small module meaning a small E-CAT?
11    A.  Yes.  Yes, I am talking about the small
12  E-CAT.
13    Q.  Mr. Fabiani, were you ever involved in
14  fueling any of the E-CAT units?  Fueling.
15    MR. PACE:  Is that a bad word?  Let me
16    make a different question.
17  BY MR. PACE:
18    Q.  Mr. Fabiani, were you ever involved in
19  putting fuel into an E-CAT unit?
20    MR. PACE:  You can use the word "catalyst"
21    in Italian or "fuel" in Italian, but not
22    gasoline.  I'll try a different one.
23  BY MR. PACE:
24    Q.  Mr. Fabiani, were you ever involved in
25  putting any mixtures into the E-CAT units?

Page 140

1    A.  I understand.
2    No, never involved.
3    Excuse me.  It is 3:00 in the morning.  I
4  begin being very tired.
5    MR. NUNEZ:  Chris, how much longer do you
6    think you have?
7    MR. PACE:  I want to show him a couple of
8    documents.
9    THE INTERPRETER:  (In Italian.)
10    THE WITNESS:  Thank you, thank you.  I'm
11    not very lucid at 3:00 a.m.
12    MR. PACE:  This is 9?
13    (The referred-to document was marked by
14    the court reporter for Identification as
15    Deposition Exhibit 9.)
16  BY MR. PACE:
17    Q.  Mr. Fabiani, what you are looking at on
18  your screen now, this is an email that you wrote to
19  J.T. Vaughn; is that correct?
20    A.  Probably.
21    Q.  You do not recognize the email otherwise?
22    A.  Probably, yes, yes.
23    MR. PACE:  Can you go down to the bottom
24    of the first page of the agreement.  I want to
25    see if he recognizes his initials and his

Page 141

1    signature.
2  BY MR. PACE:
3    Q.  Mr. Fabiani, can you see either initials
4  or signatures in the bottom right-hand corner?
5    A.  Yes.
6    Q.  Are those your initials or signature?
7    A.  Yes.  It seems like mine.
8    MR. PACE:  Then why don't we go all the
9    way to just the first signature.
10  BY MR. PACE:
11    Q.  Mr. Fabiani, does this appear to be your
12  signature on this document, what we see there above
13  the name Fulvio Fabiani?
14    A.  Yes.  It seems like mine, yes.
15    MR. PACE:  Literally, one last document.
16  February 23, 2016.  This is Exhibit 10.
17    (The referred-to document was marked by
18    the court reporter for Identification as
19    Deposition Exhibit 10.)
20    MR. PACE:  Did I give you February 23rd?
21    MS. HANDELSON:  I have it up.
22  BY MR. PACE:
23    Q.  Mr. Fabiani, do you recognize this email?
24    A.  Yes.  It is properly mine, yes.
25    Q.  In this email, you are telling J.T. Vaughn

36 (Pages 138 - 141)

Page 142

1 about certain information that you are going to
2 provide him; is that correct?
3     A.  I read that we are trying to clarify the
4 interest in continuing to work together.
5     Q.  You say in this email that you are going
6 to send Mr. Vaughn an Excel file with electrical and
7 thermal data, correct?
8     A.  It is the file that I hand-delivered to
9 the engineer of Industrial Heat, in Attorney Pace's
10 office.
11     Q.  And then you say that you were going to
12 work on an official report; is that correct?
13     A.  It was not -- the official report was not
14 prepared because I was not paid.
15     Q.  So your position is you never prepared
16 your official report, correct?
17         MR. CHAIKEN:  Object to form.
18         THE WITNESS:  Never done.  There was no
19     final payment.  Nothing.
20         MR. PACE:  May 15th.
21         (The referred-to document was marked by
22     the court reporter for Identification as
23     Deposition Exhibit 11.)
24 BY MR. PACE:
25     Q.  Mr. Fabiani, I have marked for you here

Page 143

1 Exhibit 11.
2         Isn't it, in fact, the case that
3 Industrial Heat offered to make the final payment to
4 Quantum Leap if you would send the raw data and your
5 final report?
6     A.  The question?
7     Q.  Isn't that correct?
8     A.  This was -- this was a proposal done by
9 Murray, which I did not know.  It was done after the
10 closing of the contract.
11         THE INTERPRETER:  No.
12 BY MR. PACE:
13     Q.  Can you repeat your answer?
14     A.  This is a document done by a person that I
15 did not know, as far as being introduced to me.
16         THE INTERPRETER:  Going a little fast for
17     me, sorry.
18         THE WITNESS:  It was not contemplated in
19     my contract, to refer to this person as a
20     person that could ask me for data and
21     documents.
22 BY MR. PACE:
23     Q.  Mr. Fabiani, to whom did you hand over the
24 flash drive that you testified to earlier today?
25     A.  I took it to the office of the attorney.

Page 144

1     Q.  And gave it to whom?
2     A.  And I proposed it to J.T. Vaughn, who told
3 me to hand-deliver it in the hands of that person.
4     Q.  Who was that person?
5     A.  Mr. Murray.
6     Q.  The person on this email?
7     A.  It could be that one.
8     Q.  Mr. Fabiani, you communicated with J.T.
9 Vaughn and Mr. Murray in English, correct?
10     A.  Yes, thanks to the translator.
11     Q.  You would communicate with Barry West in
12 English?
13     A.  Yes, thanks to the translator.
14     Q.  You would communicate with Jim Bass in
15 English, correct?
16     A.  Yes, thanks to the translator.
17     Q.  You would communicate with Henry Johnson
18 in English, correct?
19         MR. NUNEZ:  Object to form.
20         DR. ROSSI:  Object to form.
21         MR. NUNEZ:  Object to form.
22         MR. PACE:  I heard Dr. Rossi actually
23     insert an object to form.
24         MR. NUNEZ:  He can't do that.
25         THE WITNESS:  Could you please repeat the

Page 145

1 question?
2         MR. PACE:  Yes.
3 BY MR. PACE:
4     Q.  You communicated with Henry Johnson in
5 English, correct?
6         MR. NUNEZ:  Object to form.
7         THE WITNESS:  I have no idea who Henry
8     Johnson is.
9         I'm here.
10         MR. PACE:  No further questions.
11         MR. NUNEZ:  Thank you, Mr. Fabiani.
12     You've been great.  Thank you for these extra
13     three hours and more.
14         THE WITNESS:  Thank you to the translator
15     that put up with me.
16         THE INTERPRETER:  You put up with me.
17         THE WITNESS:  And thank you to Attorney
18     Pace.
19         MR. PACE:  Goodnight.
20         THE VIDEOGRAPHER:  5:21 p.m.  Going off
21     the video record.
22         (Thereupon, the taking of the deposition
23     was concluded at 5:21 p.m.)
24
25

37 (Pages 142 - 145)

Page 146

```
1              AFFIDAVIT
2  STATE OF FLORIDA      )
   COUNTY OF             )
3
4      I,              , being first
5  duly sworn, do hereby acknowledge that I did
   read a true and certified copy of my deposition
6  which was taken in the case of ROSSI V  DARDEN,
   taken on the 28th day of February, 2017, and
7  the corrections I desire to make are as
   indicated on the attached Errata Sheet
8
9              CERTIFICATE
10
11 STATE OF FLORIDA      )
   COUNTY OF             )
12
13
     Before me personally appeared
14
   to me well known / known to me to be the
15 person described in and who executed the
   foregoing instrument and acknowledged to and
16 before me that he executed the said instrument
   in the capacity and for the purpose therein
17 expressed
18
19     Witness my hand and official seal, this
       _____ day of _____, _____
20
21
22     _____
                (Notary Public)
23
24 MY Commission Expires:
25
```

Page 148

```
1              CERTIFICATE OF OATH
2  STATE OF FLORIDA  )
3  COUNTY OF MIAMI-DADE )
4
       I, the undersigned authority, certify
5  that FULVIO FABIANI personally appeared before me
   and was duly sworn
6      WITNESS my hand and official seal this
   13th day of February, 2016
7
8
9      _____, RPR, CRR
       KELLI ANN WILLIS, RPR, CRR
10     Notary Public, State of Florida
       My Commission No  FF911443
11     Expires: 2/16/20
   + + + + + + + + + + + + + + + + +
12             CERTIFICATE
13 STATE OF  FLORIDA )
14 COUNTY OF MIAMI-DADE  )
15     I, KELLI ANN WILLIS, Registered
   Professional Reporter and Certified Realtime
16 Reporter do hereby certify that    I was
   authorized to and did stenographically   report
17 the foregoing deposition of  2017;  That a review
   of the transcript  was requested; and that the
18 transcript is a true record of my stenographic
   notes
19     I FURTHER CERTIFY that I am not a
   relative, employee, attorney, or counsel of any
20 of the parties, nor am I a relative or employee
   of any of the parties' attorney or counsel
21 connected with the action, nor am I financially
   interested in the action
22     Dated this 13th day of February, 2016
23
24
25     _____, RPR, CRR
```

Page 147

```
1              ERRATA SHEET
2  PAGE  LINE    REMARKS
3      _____
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     Signature of Witness
       _____
23 (Notary Public)
24 Dated this _____ day of _____, _____.
25 MY Commission Expires: _____
```

Page 149

```
1
2  _____, 2017
3  Fulvio Fabiani
   c/o Rodolfo Nunez, Esq
4  255 Alahambra Circle
   Coral Gables, Florida 33134
5
   RE:  Rossi v  Darden
6  DEPO OF:  Fulvio Fabiani
   TAKEN:   2-28-17
7  NUMBER OF PAGES:   150
8  AVAILABLE FOR READING UNTIL:  30 days
9  Dear Sir:
10 This letter is to advise you that the transcript of
   your deposition is available for reading and
11 signing
12 PLEASE CALL 305 376-8800 TO MAKE AN APPOINTMENT to
   come to the Veritext office to read and sign the
13 transcript  Our office hours are 9:00 a m  to 5:00
   p m , Monday through Friday
14
   In the event other arrangements are made, please
15 send us a notarized list of any and all corrections
   and/or changes, noting page and line numbers, and
16 the reason for such changes, so that we can furnish
   respective counsel with a copy
17
   If the reading and signing has not been completed
18 prior to the above-referenced date, we shall
   conclude that you have waived the reading and
19 signing of the deposition transcript
20 Your prompt attention to this matter is appreciated
21 Sincerely,
22
23 Kelli Ann Willis, RPR, CRR
   cc:  All counsel of record
24
25
```

38 (Pages 146 - 149)

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.