# COMPOSITE EXHIBIT 48

CONFIDENTIAL

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF FLORIDA
 3         CASE NO. 1:16-cv-21199-CMA/O'Sullivan
 4
 5
      ANDREA ROSSI and LEONARDO    )
 6    CORPORATION,                 )
                                   )
 7                                 )
      Plaintiffs,                  )
 8                                 )
                                   )
 9    v.                           )
                                   )
10    THOMAS DARDEN; JOHN T.       )
      VAUGHN; INDUSTRIAL HEAT,     )
11    LLC; IPH INTERNATIONAL,      )
      B.V. and CHEROKEE            )
12    INVESTMENT PARTNERS, LLC,    )
                                   )
13    Defendants.                  )
14
15
16            C O N F I D E N T I A L
17
18    Video Deposition of THOMAS BARKER DAMERON, III
19               (Taken by the Plaintiffs)
20               Raleigh, North Carolina
21             Thursday, December 1, 2016
22
23
24
25    Reported by:   Marisa Munoz-Vourakis -
                     RMR, CRR and Notary Public
```

Veritext Legal Solutions
800-726-7007                                    305-376-8800

CONFIDENTIAL

Page 2

1  APPEARANCE OF COUNSEL:
2  For the Plaintiffs:
3      JOHN W. ANNESSER, ESQ.
4      BRIAN W. CHAIKEN, ESQ.
5      Perlman, Bajandas, Yevoli & Albright, P.L.
6      283 Catalonia Avenue, Suite 200
7      Coral Gables, FL 33134
8      305-377-0086
9      jannesser@pbyalaw.com
10     bchaiken@pbyalaw.com
11
12  For the Defendants:
13     CHRISTOPHER R.J. PACE, ESQ.
14     CHRISTOPHER LOMAX, ESQ.
15     Jones Day
16     Brickell World Plaza
17     600 Brickell Avenue, Suite 3300
18     Miami, FL 33131
19     305-714-9700
20     crjpace@jonesday.com
21     clomax@jonesday.com
22
23
24
25

Page 3

1  APPEARANCES (Continued)
2  For the Third-Party Defendants JM Products, Inc., Henry
   Johnson, Esq. and James Bass:
3      FERNANDO S. ARAN, ESQ. (By Telephone)
4      Aran, Correa & Guarch, P.A.
5      255 University Drive
6      Coral Gables, FL 33134-6732
7      305-665-3400
8      faran@acg-law.com
9
   For the Third-Party Defendants Fulvio Fabiani and United
10 States Quantum Leap, LLC:
11     RUDOLFO NUNEZ, ESQ.(By Telephone)
12     Rudolfo Nunez, P.A
13     255 University Drive
14     Coral Gables, FL 33134-6732
15     305-665-3400
16     rnunez@acg-law.com
17 Also Present - DONALD GRAVES, Videographer
18     Video Deposition of THOMAS BARKER
19 DAMERON, III, taken by the Plaintiffs, at Regus
20 Business Center, 9121 Anson Way, Suite 200, Raleigh,
21 North Carolina, on the 1st day of December, 2016 at
22 9:06 a m., before Marisa Munoz-Vourakis, Registered
23 Merit Reporter, Certified Realtime Reporter and Notary
24 Public.
25

Page 4

1            I N D E X
2  Examination of:                    Page
3  THOMAS BARKER DAMERON, III
4      EXAMINATION By Mr. Annesser . . . . . . . 6
5      EXAMINATION By Mr. Aran  . . . . . . . 251
6      EXAMINATION By Mr. Nunez . . . . . . . . 253
7          PLAINTIFF EXHIBITS
8  EXHIBIT NUMBER       DESCRIPTION          PAGE
9  Exhibit 1   Bates stamped IH00079300        38
10 Exhibit 2   Bates stamped IH00079279        56
11 Exhibit 3   Calculations and charts         65
12 Exhibit 4   Bates stamped IH00043972        83
13 Exhibit 5   Bates stamp number IH00004838   107
14 Exhibit 6   Bates number IH00079467         121
15 Exhibit 7   Bates stamped IH00105497        125
16 Exhibit 8   IH number 00105542 Bates stamp  129
17 Exhibit 9   Bates number IH00102496         131
18 Exhibit 10  Bates number IH00079139         145
19 Exhibit 11  Bates number IH00091609         152
20 Exhibit 12  Bates number IH00127169         157
21 Exhibit 13  Bates number IH00006713         168
22 Exhibit 14  Bates number IH00005473         183
23 Exhibit 15  Bates stamp number IH00087790   222
24 Exhibit 16  Two-page chart                  230
25 Exhibit 17  Patent Application              244

Page 5

1           P R O C E E D I N G S
2      THE VIDEOGRAPHER:  We're on the record
3  at 9:06.  Today's date is December 1, 2016.
4      This is video number one of the
5  deposition of Thomas Barker Dameron, taken
6  in the matter of Andrea Rossi and Leonardo
7  Corporation, plaintiffs versus Thomas
8  Darden, et al., defendants.
9      This deposition is being held at 9121
10 Anson Way, Raleigh, North Carolina.
11     My name is Donald Graves.  The court
12 reporter is Marisa Munoz with Veritext.
13     Will counsel introduce themselves for
14 the record, please.
15     MR. ANNESSER:  John Annesser and Brian
16 Chaiken with Pearlman Bajandas on behalf of
17 Dr. Andrea Rossi.
18     MR. PACE:  Chris Pace and Chris
19 Lomax -- I'm sorry, Chris Pace and Chris
20 Lomax of Jones Day on behalf of the
21 defendants.
22     MR. ARAN:  Fernando Aran; Aran, Correa
23 & Guarch, P.A. on behalf of Bass and JM
24 Products and Mr. Johnson.
25     THE VIDEOGRAPHER:  Will the court

CONFIDENTIAL

Page 178

1  A.  I would have to reread the protocol at this
2  point.
3  Q.  Sir, if you did not believe that the
4  protocol would yield a reliable result at the time that
5  you reviewed it, would you have said something?
6  A.  Yes.
7  Q.  Would you have sent an email to Dr. Rossi,
8  Engineer Penon, Mr. Vaughn or Mr. Darden saying
9  gentlemen, this protocol does not yield a reliable
10 result?
11  A.  If I were to have a communication, it
12 probably would have been verbal to either Tom or J.T.
13  Q.  Do you know, sir, sitting here today,
14 whether anybody; Mr. Vaughn, Mr. Darden or any other
15 person on behalf of Industrial Heat, conveyed to either
16 Engineer Penon or Dr. Rossi that there was a perceived
17 deficiency in the protocol prior to the beginning of
18 the test?
19  A.  I don't know.
20  Q.  Are you aware of any such communications,
21 sir?
22  A.  I thought that's what I just answered.
23  Q.  And so you don't know whether you conveyed
24 that to Mr. Vaughn or Mr. Darden or any other person or
25 not?

Page 179

1  A.  I thought that was not the question.
2  Q.  No, this is a new question.
3       MR. PACE:  Objection to the form of
4   the question.
5       BY MR. ANNESSER:
6  Q.  Sitting here today, you don't know whether
7  you ever conveyed to Mr. Vaughn, Mr. Darden, Dr. Rossi
8  or Engineer Penon, or any other person for that matter,
9  that you perceived the test protocol that was being
10 formulated to be deficient in any manner?
11      MR. PACE:  Objection to the form of
12  the question.
13  A.  A test protocol is one thing.  The way it
14 is piped and operated is a different thing.  So when I
15 say the protocol, I'm also saying I don't recall
16 exactly what was in the protocol.  So knowing what I
17 know now, I don't know whether it was followed or not.
18  Q.  Sir, as the sole engineer at the company at
19 the time, you reviewed the protocol, correct, before
20 the test, and one of two things happened; you either
21 objected to the protocol or you did not.  Sitting here
22 today, do you know whether you objected to the protocol
23 or whether you did not?
24  A.  I don't know.
25      MR. PACE:  Objection to the form of

Page 180

1  the question.
2  A.  Don't know.
3  Q.  So you do not know?
4  A.  No.
5  Q.  I understand there's two aspects; one is
6  what the protocol calls for and what was actually done,
7  correct?  Is that the distinguishment you're making?
8  A.  No, not at all.  There's the protocol and
9  the protocol assumes a type of piping.  So the type of
10 piping determines whether the protocol is right.
11      So it was -- it was not piped at the
12 time -- the protocol was written.  So you might agree
13 with the protocol, but if the piping has changed, you
14 don't agree with the protocol.
15  Q.  What piping are we talking about, sir?
16  A.  Steam water traps, drains.
17  Q.  Okay.  The piping between the plant and the
18 customer, correct?
19  A.  Piping within the plant, how you feed it
20 water, all kind -- many, many, there's many aspects of
21 that.
22  Q.  Didn't you construct the plant, sir?
23  A.  I did.
24  Q.  So you know what the inside, how it had
25 been piped, correct?

Page 181

1  A.  Correct.
2  Q.  So when reviewing this, you knew how it had
3  been piped?
4  A.  Right.
5  Q.  And the test protocol was appropriate for
6  that piping, correct?
7  A.  I would say so.
8  Q.  Now, you gave directions to JM and
9  Dr. Rossi as to the piping going to the JM site, is
10 that correct?
11  A.  No.
12      MR. PACE:  Objection to the form of
13  the question.  Go ahead.
14  A.  No, that was dictated later.
15  Q.  What do you mean dictated?
16  A.  It was already piped when we got there.
17  Q.  When who got there, sir?
18  A.  When the unit got there.  The wall was
19 already built.  The pipes were already there to feed.
20  Q.  Based on whose specifications?
21  A.  Don't know.  Not mine.
22      MR. PACE:  Are we at a breaking point?
23      MR. ANNESSER:  Yes.
24      MR. PACE:  Let's take a break.
25      THE VIDEOGRAPHER:  We're off the

Page 182

1 record at 3:14.
2 (Recess.)
3 THE VIDEOGRAPHER: This is video
4 number four, we're on the record at 3:32.
5 BY MR. ANNESSER:
6 Q. Sir, now you've seen the document that's
7 been marked as Exhibit 13, which is in front of you,
8 which is the document we have been previously
9 discussing. Having reviewed that document. Does that
10 refresh your recollection as to whether the test being
11 performed in Miami, Florida was in fact the guaranteed
12 performance test?
13 MR. PACE: Objection to the form of
14 the question.
15 A. It seems to be aimed that way.
16 Q. Would that be a yes or no, sir?
17 A. I was not involved in what was exactly
18 classified as the performance, the test performance
19 test, so --
20 Q. But that's what you understood it to be?
21 A. Yeah, I think I understood it to be.
22 Q. Now, prior to the beginning of this test,
23 Mr. Barry West went down to the facility, the JM
24 facility to scope it out, prepare for bringing the
25 plant down, is that correct?

Page 183

1 A. I'm not sure how much he went down before,
2 but he definitely was there to help set it up. I don't
3 remember his exact schedule, but it's something of that
4 nature.
5 Q. So from your understanding, Mr. West did
6 take part in the settlement of the plant?
7 A. Correct.
8 Q. What did that entail, if you know, the
9 setting up of the plant?
10 A. Let's see here, Barry is by trade is an
11 electrician. So it had to do with the electrical parts
12 of it. I can't tell you exactly what other tasks he
13 did. I believe there were some plumbing tasks that
14 were done. I don't think he was the only one down
15 there helping, so I don't know how that division of
16 work was carried out exactly.
17 Q. Sir, I'm going to show you a document,
18 which we'll mark as Plaintiff's Exhibit 14.
19 (The document referred to was marked
20 Plaintiff's Exhibit Number 14 for
21 identification.)
22 Q. And really what I'd like to direct you to
23 is the last email on the first page.
24 MR. PACE: The carryover email Dear
25 Andrea?

Page 184

1 MR. ANNESSER: Yes.
2 Q. Sir, that appears to be an email from
3 Mr. David Perry to Fulvio Fabiani, Andrea Rossi, Barry
4 West and yourself, correct?
5 A. Yes.
6 Q. And it's regarding travel to Miami?
7 A. Yes.
8 Q. And this is an email, dated November 4,
9 2014?
10 A. Yes.
11 Q. And it states: I'm writing to inform you
12 that T. Barker's mother was in an automobile accident
13 this afternoon, and she is in the hospital. T. Barker
14 will not be traveling to Miami this week, but Barry
15 West will be there to study the plant and
16 specifications for delivery. Barry will arrive as
17 follows, and then provides his flight itinerary on
18 November 5, 2014.
19 Does that refresh your recollection as to
20 whether Mr. West came down prior to the delivery of the
21 plant?
22 A. Yes.
23 Q. Now, you had testified previously that the
24 piping for the JM had already been installed by the
25 time that you got there, is that correct?

Page 185

1 MR. PACE: Objection to the form of
2 the question.
3 A. Yes.
4 Q. Was that your testimony?
5 A. That's the truth.
6 Q. Do you know if it had been installed prior
7 to Barry's arrival?
8 A. I'm pretty sure it had been.
9 Q. Okay. And do you know if there was
10 anything wrong with the way it was setup?
11 A. Issues with the piping were just a couple
12 of -- one of them were we had to adjust for the
13 elevation of the condensate in one case, and the steam
14 pipe, I thought, was too small, but there was nothing
15 to be done at that point.
16 Q. Let's talk about the elevation for the
17 moment. In fact, per your instruction, JM changed the
18 location of their condensate pipe?
19 A. That --
20 MR. PACE: Let him finish the
21 question. Were you done?
22 MR. ANNESSER: Not quite yet.
23 Q. Changed the location of that pipe to
24 satisfy your concerns, is that correct?
25 MR. PACE: Objection. Objection to

Page 190

1  Q. And what effect do you believe that that
2  had on the measurements taken by the ERV?
3      MR. PACE: Objection to the form of
4   the question.
5  A. The effect of that pressure would have
6  greatly reduced the flow of steam that could go through
7  the pipe. So the effect is I don't know if it would
8  affect the measurement or not. It would affect the
9  flow.
10  Q. Okay. It would affect the flow of steam,
11  but you don't know that it would have affected the
12  measurements?
13  A. Correct.
14  Q. What measurements were taken on the steam
15  pipe?
16  A. Let's see here, I think there was, I'm not
17  exactly sure. I think there was a pressure gauge
18  somewhere in the system. I think I was shown a
19  pressure gauge inside the container up near the front,
20  and there were temperature sensors on all of the E-CAT
21  units. There were -- I don't recall the number or
22  placement of the temperature sensors on the steam
23  header leaving the plant. There may have been pressure
24  sensors on all of the E-CATs as well.
25  Q. Now, sir, you say you went and visited the

Page 191

1  plant on or about February 24, 2015?
2  A. That's correct.
3  Q. How long did you spend there?
4  A. It was a day trip.
5  Q. What was the purpose of your visit?
6  A. General looking around, see what was there.
7  Friendly visit, see how it was going. I hadn't seen
8  it.
9  Q. So at that point in time, you had reviewed
10  the test protocol, correct?
11  A. Yeah, would have.
12  Q. So you were aware of it?
13  A. Right.
14  Q. And you were also at that point in time, as
15  of February 2015, still the sole engineer at Industrial
16  Heat, correct?
17  A. I think that's correct.
18  Q. And so when you went down, is that when you
19  observed that the steam pipe, in your opinion, was too
20  small?
21  A. No. The steam pipe was too small based on
22  the earlier visit. I think that I -- however, that
23  information got to me when we were lowering the
24  condensate line, that I think we knew something
25  about -- Andrea maybe even told me, the size and the

Page 192

1  coupling types of the lines.
2  Q. And did you alert the ERV as to your
3  concerns?
4  A. No.
5      MR. PACE: Hold on, objection to the
6   form of the question.
7  A. No. My communications were through the
8  Industrial Heat people.
9  Q. And you don't know sitting here today
10  whether they did or did not alert the --
11  A. Correct.
12  Q. Did you observe any other problems with
13  either the placement of equipment, the type of
14  equipment being used by Engineer Penon or any other
15  problems with the measurements taken by the ERV for the
16  guaranteed performance test?
17      MR. PACE: Objection to form of the
18   question.
19  A. The measurement system was much different
20  than how it was designed to be. So there were meters
21  in places where I not expected there to be meters. And
22  piping was noticeably different than what we said as to
23  how it was laid out to be operated under my skin. So
24  it took me some time to figure out what that scheme had
25  been rearranged to be.

Page 193

1  Q. What piping are you referring to, sir?
2  A. I'm referring to the condensate return
3  system, supply water system, the drain system, the trap
4  system, steam header system. I think that's all.
5  Q. Okay. So specifically, the condensate we
6  discussed, you said that that was placed where you had
7  instructed them to the condensate line?
8  A. What might be called condensate return,
9  yes.
10  Q. We're talking about the same thing, that's
11  what we talked about before being located where you had
12  instructed?
13  A. Right.
14  Q. So that was as you had instructed?
15  A. Yes.
16  Q. Okay. The supply water line, what was the
17  problem with the supply water line?
18  A. The supply water line design was completely
19  abandoned, and it was actually the condensate return
20  tank was used as a supply tank in a different location.
21  Q. And did you believe that to be a problem
22  for the carrying out of the guaranteed performance
23  test?
24      MR. PACE: Objection to the form of
25   the question.

Page 194

1    A.    Did I think? It was a confusing thing. It
2  was not -- the whole -- the movement of the tank called
3  into question how you would meter the water going in
4  that I did not follow up on.
5    Q.    So there would be no emails in which you
6  discuss that or perhaps email Andrea and say hey,
7  it's --
8    A.    Discussions were not with generally Andrea.
9  It was -- no.
10   Q.    The drain system, what was wrong with the
11 drain system?
12   A.    There was a drain system in there that was
13 to come out and alarm. It's certain valves happen, if
14 you wanted to drain water, and it was -- I think it was
15 either not connected or stopped up, one or the other.
16 It was to come out to a device to measure, and that
17 device was not there.
18   Q.    Likewise, did you bring that to Dr. Rossi's
19 attention?
20   A.    No, same as usual.
21   Q.    So there will be no emails that discuss
22 those perceived deficiencies?
23   A.    Probably not.
24   Q.    And the steam header, is that the same
25 thing we've been talking about with in terms of the

Page 195

1  size of the pipe?
2    A.    It is the same system. It's further up --
3  further towards the plant.
4          So what we were talking about before was
5  the steam line as it is on the JM Product side, and the
6  steam header would be what is on the production side.
7  So they come together and meet someplace.
8    Q.    Why did it matter what happened on the JM
9  side with the steam line?
10   A.    Different type -- for several reasons. On
11 a very basic level, you didn't want to supply steam to
12 a device that didn't want steam. So there should have
13 been a way to divert a steam supply, if it needed to be
14 diverted for safety reasons.
15   Q.    Let me interrupt you for just a moment.
16         Does that affect the measurements being
17 taken by the ERV?
18         MR. PACE: Objection to the form of
19    the question.
20   A.    I would have to think about that one for a
21 minute, but it doesn't come to mind right off.
22   Q.    Okay. Continue your answer, sorry.
23   A.    Let's see, what is on the other side, what
24 type of load there? It matters what pressure that
25 system operates to how the one megawatt would operate.

Page 196

1  So it would be important to know something about that
2  unit.
3    Q.    How does that affect the measurements by
4  the ERV?
5    A.    You could have, for instance, a vacuum on
6  the other side that would suck steam over that could
7  distort things.
8    Q.    What would it distort?
9    A.    I would have to think about that for a
10 minute. It would distort pressures inside the system.
11   Q.    But that would be reflected in the
12 pressures being measured on the E-CAT site?
13   A.    Should be, yeah.
14   Q.    So if in fact there was something creating
15 a difference in pressure on the JM side, that would be
16 reflected in the measurements taken on the E-CAT side,
17 correct?
18         MR. PACE: Objection to the form of
19    the question.
20   A.    The answer is only probably.
21   Q.    Why is it only probably?
22   A.    It depends on how each one is operated.
23 They could have been operated in a balance, for
24 instance, so --
25   Q.    If it was operated in a balance, meaning

Page 197

1  it's not a vacuum system, it's not a pressured system,
2  how would that affect the measurements taken by the
3  ERV?
4    A.    I'm not sure how it changes -- it just
5  changed the operation of the unit.
6    Q.    It changes the operation of the unit, but
7  it won't necessarily change the results of the test?
8         MR. PACE: Objection to the form of
9    the question?
10        BY MR. ANNESSER:
11   Q.    Is that correct?
12   A.    I would have to think about that a little
13 bit. That would not be a high concern for me, but I
14 would have to think about it.
15   Q.    Did you see a copy of Engineer Penon's
16 initial report? Actually, I think it may be -- it may
17 have been attached to one of those emails that we have
18 been discussing.
19        Did you review the additional report from
20 Engineer Penon?
21        MR. PACE: Objection to the form of
22    the question.
23   A.    I'm trying to remember which reports I saw.
24 Are you talking about a dir -- can you explain which
25 report this is in more depth?

Page 198

1  Q. Sir, looking at Exhibit 12, Mr. Penon
2 submitted a report that the operation of the plant had
3 begun, and that report was as of -- that was the first
4 report on May 28, 2015.
5  A. Okay. Got you.
6  Q. Did you review that report?
7  A. I did see that report, yes.
8  Q. In writing to any person.
9      Did you tell them that you thought that the
10 results of that report were incorrect?
11  A. Not that I recall.
12  Q. Did you see any other reports from Engineer
13 Penon regarding the operation of the E-CAT plant in
14 Doral, Florida, between February 2015 and February
15 2016?
16  A. My recollection is I saw this report. I
17 may have seen another report sometime between this
18 report and the end of the test, but I think I've seen
19 one at the end of the test.
20  Q. And with those reports, did you ever send
21 an email to anybody, whether it be Engineer Penon,
22 Dr. Rossi, Mr. Vaughn, Mr. Darden, indicating that you
23 disagreed with those reports?
24  A. Not that I recall.
25  Q. Sir, did you ever prepare a design

Page 199

1 schematic for the layout of the plant and how it should
2 be at the Doral facility, in your opinion?
3  A. Yes.
4  Q. Did you ever share that with Dr. Rossi?
5  A. I thought that I did. I don't guarantee
6 it.
7  Q. If it's not in the emails that are
8 produced, is it fair to state that it was not shared
9 with Dr. Rossi?
10  A. No, because it may have been shown to him
11 in a hand sketch.
12  Q. When would you have shown that to him?
13     MR. PACE: Objection to the form of
14   the question.
15  A. That would be very near the time it was
16 shipped, as that would have been when that was being
17 laid out.
18  Q. Isn't it true, sir, that Dr. Rossi was in
19 fact in Miami prior to it being shipped?
20  A. He was back and forth at various times.
21  Q. Do you know whether the layout of the plant
22 was done in line with your design schematic?
23  A. I think it was not.
24  Q. How so?
25  A. When I went down there and looked at it, it

Page 200

1 was not there, and I have heard from Barry West it was
2 rearranged, consciously rearranged.
3  Q. What do you mean by consciously rearranged?
4  A. Andrea changed the design -- layout of it
5 and put it in a different way.
6  Q. And what was the difference?
7  A. It didn't have a steam header in it. It
8 didn't have the steam traps in it. It didn't have the
9 drains in it.
10     MR. ANNESSER: Sorry, gentlemen, I
11   can't hear. Gentlemen, please.
12  Q. So you said it did not have a steam header,
13 correct?
14  A. Did not have --
15  Q. I want to go through these again. I want
16 to go through one by one to make sure I understand.
17  A. The steam header that was made to go on the
18 unit was not on the unit.
19  Q. What is the steam header?
20  A. Steam header is a piece of pipe that comes
21 out, has taps in it for pressure and temperature,
22 thermal wells for temperature. It had a place to
23 put -- it had a drip leg in it where you could get
24 condensate out, a place for a trap to drain that. It
25 had a place to install two steam meters. It had a way

Page 201

1 to connect it back together again and connect to the
2 pipe going to the JM Products.
3  Q. And, sir, what was there in place of this
4 steam header?
5  A. A line came out of the one megawatt unit
6 and turned and went straight to the JM Products.
7  Q. Were there any temperature devices there,
8 temperature gauges?
9  A. I don't -- there may be, I don't recall.
10  Q. Pressure gauges?
11  A. I don't think there were any pressure
12 gauges there. There was a pressure gauge inside the
13 unit.
14  Q. And when you were there on February 24,
15 2015, did you pull Andrea Rossi aside and say hey, this
16 isn't what we planned?
17  A. No, I did not.
18  Q. When you returned, did you tell Mr. Vaughn
19 or Mr. Darden that --
20  A. Most likely, yes.
21  Q. Did you ever tell Mr. Penon?
22  A. No.
23  Q. And you don't know sitting here today
24 whether Mr. Darden or Mr. Vaughn ever told Dr. Rossi or
25 Engineer Penon --

Page 202

1  A.  Correct.
2  Q.  -- that it was not done according to your
3  schematic?
4  A.  Correct.
5  Q.  In fact, you never raised any issue with
6  the setup of the plant to Dr. Rossi himself, is that
7  correct?
8  A.  Correct.
9  Q.  You never raised any issue with the setup
10 of the plant or testing equipment to Engineer Penon
11 either?
12 A.  Correct.
13 Q.  And at that time, you were still the sole
14 engineer?
15 A.  My communications were going through J.T.
16 and Tom.
17 Q.  And so if they didn't communicate that
18 information, it was not communicated, correct?
19     MR. PACE:  Objection to the form of
20   the question.
21 A.  I'm not sure what other paths are
22 available.  There may have been some, I don't know.
23 Q.  How often did you communicate with Barry
24 West throughout the guaranteed performance test between
25 February 2015 and February 2016?

Page 203

1      MR. PACE:  Objection to the form of
2    the question.
3  A.  I don't recall.  It was -- it was less than
4  weekly.
5  Q.  Would it be via email?
6  A.  Probably not.  Barry was not a big email
7  person.  It would have been by -- usually by telephone.
8  Q.  If you know, what percentage of the time
9  was Barry West at the facility?  Was he there five days
10 a week?  Seven days a week, if you know?  If you don't
11 know, that's fine.
12 A.  I think he was there full time.  So I'm not
13 sure what that means for overtime or days off.  But in
14 general, it was a full-time job.
15 Q.  And when you communicated with Mr. West,
16 what did you communicate about?
17 A.  Good question.  We communicated some about
18 what was going on at the plant.
19 Q.  What did he tell you?
20 A.  He told me -- the first thing he told me
21 was that Andrea had changed all the piping around, had
22 wanted it set up a different way and did that.
23 Q.  Hold on one second.  When you say the
24 piping, what piping?
25 A.  Steam header piping.

Page 204

1  Q.  The piping outside of the box?
2  A.  Outside of the unit.  He told me --
3  Q.  This is the piping that you saw when you
4  were down there on February 24, 2015?
5  A.  Right, or it wasn't there, right.
6  Apparently there was some plumbing issues he's told me
7  about.  He's told me about replacing thermocouples.
8  He's told me about fishing.  He's told me about dealing
9  with Fulvio.
10 Q.  Did he ever tell you anything about the COP
11 that they were registering?
12 A.  He may, he may have, but I don't recall.
13 From Barry that would have been what I would have -- I
14 call this hearsay evidence, I'm not sure Barry would
15 know what it was, unless they told him.  So I would
16 have dismissed that number.
17 Q.  Sir, when you reviewed the results that
18 periodically came out from Engineer Penon for the ones
19 that you saw, what were the COPs being recorded on
20 average?
21 A.  First of all --
22     MR. PACE:  Objection to the form of
23   the question.
24 A.  -- I don't think that they regularly came
25 out.  I think that that's not a true -- not the truth.

Page 205

1  Q.  How many reports did you see, sir?
2  A.  Like I said before, I think I saw this one
3  we referred to, maybe another one in between and some
4  at the end.  So possibly three reports out of maybe 12.
5  Q.  And do you recall even the range of COPs
6  that were being --
7  A.  I think they were very --
8      MR. PACE:  That were being, and he
9    didn't get a chance to finish his question.
10   Hold on a second.
11     BY MR. ANNESSER:
12 Q.  That were being reported by Engineer Penon?
13     MR. PACE:  Objection to the form of
14   the question.
15 A.  As I recall, they were very high, and I
16 forget the -- two numbers come to mind.  I don't
17 remember which one it was.
18     MR. ANNESSER:  Chris, what was your
19   objection?
20     MR. PACE:  I think that you had said
21   being --
22     MR. ANNESSER:  I asked him does he
23   recall what the COPs --
24     MR. PACE:  That's right.  So the
25   document speaks for itself.  It's written in

CONFIDENTIAL

Page 266

1  THE VIDEOGRAPHER: We're off the
2  record at 5:50 p.m.
3      (Whereupon the deposition was
4  concluded at 5:50 p.m.)
5      (Signature reserved.)

Page 267

1          SIGNATURE PAGE
7  _____
8     THOMAS BARKER DAMERON, III
11 SUBSCRIBED AND SWORN to before me this _____
12 day of_____, 2016.
15     _____
16        NOTARY PUBLIC
18 My Commission expires:_____

Page 268

1          ERRATA PAGE
2              MMV
4  CASE NAME: Rossi vs. Darden
6  WITNESS NAME: THOMAS BARKER DAMERON, III
7  DATE: December 1, 2016
9  PAGE  LINE  READS  SHOULD READ  REASON FOR CHANGE
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 269

1          C E R T I F I C A T E
2      I, Marisa Munoz-Vourakis, RMR, CRR and Notary Public,
3  the officer before whom the foregoing proceeding was
4  conducted, do hereby certify that the witness(es) whose
5  testimony appears in the foregoing proceeding were duly
6  sworn by me; that the testimony of said witness(es) were
7  taken by me to the best of my ability and thereafter
8  transcribed under my supervision; and that the foregoing
9  pages, inclusive, constitute a true and accurate
10 transcription of the testimony of the witness(es).
11     I do further certify that I am neither counsel for,
12 related to, nor employed by any of the parties to this
13 action in which this proceeding was conducted, and
14 further, that I am not a relative or employee of any
15 attorney or counsel employed by the parties thereof, nor
16 financially or otherwise interested in the outcome of the
17 action.
18 IN WITNESS WHEREOF, I have hereunto subscribed my name
19 this   of    , 2016.
20         MARISA MUNOZ-VOURAKIS
21 Notary #20032900127

68 (Pages 266 - 269)

Veritext Legal Solutions
800-726-7007                                    305-376-8800

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.