## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | | |
|---|---|---|
| ANDREA ROSSI and LEONARDO CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 1:16-cv-21199-CMA |
| THOMAS DARDEN; JOHN T. VAUGHN; INDUSTRIAL HEAT, LLC; IPH INTERNATIONAL B.V.; and CHEROKEE INVESTMENT PARTNERS, LLC, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| INDUSTRIAL HEAT, LLC and IPH INTERNATIONAL B.V., | ) ) ) | **INDUSTRIAL HEAT, LLC AND IPH INTERNATIONAL B.V.'S REPLY TO THIRD-PARTY DEFENDANTS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Counter-Plaintiffs, | ) ) | |
| v. | ) ) | |
| ANDREA ROSSI and LEONARDO CORPORATION, | ) ) ) | |
| Counter-Defendants, | ) ) | |
| and | ) ) | |
| J.M. PRODUCTS, INC.; HENRY JOHNSON; UNITED STATES QUANTUM LEAP, LLC; FULVIO FABIANI; and JAMES A. BASS, | ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |
| | ) ) | |

# TABLE OF CONTENTS

**Page**

ARGUMENT .................................................................................................................. 1

I.    J.M. Products and Johnson's Opposition to Summary Judgment for IH on Count
      III of the AACT (Fraudulent Inducement) Is Meritless.................................................. 1

II.   Third-Party Defendants' Opposition to Summary Judgment for Counter-Plaintiffs
      on Count IV of the AACT (FDUTPA) Is Meritless. ..................................................... 5

      A.    Each Third-Party Defendant Engaged In Deceptive and Unfair Conduct. ........... 6

      B.    Each Third-Party Defendant's Deceptive and Unfair Conduct Was
            Material. ........................................................................................................ 9

      C.    Counter-Plaintiffs Suffered Actual Injury. ...................................................... 12

III.  Fabiani and USQL's Opposition to Partial Summary Judgment for IH on Count V
      of the AACT (Breach of Contract) Is Meritless............................................................ 13

      CONCLUSION........................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Bowen v. Fidelity Bank,*
 183 S.E. 266 (N.C. 1936) ........................................................................................... 15

*Butler v. Yusem,*
 44 So.3d 102 (Fla. 2010) ............................................................................................. 5

*Corporate Fin., Inc. v. Principal Life Ins. Co.,*
 461 F.Supp.2d 1274 (S.D. Fla. 2006) ......................................................................... 4

*Fitzpatrick v. General Mills, Inc.,*
 635 F.3d 1279 (11th Cir. 2011) ................................................................................. 12

*Friedman v. Am. Guardian Warranty Servs., Inc.,*
 837 So.2d 1165 (Fla. Dist. Ct. App. 2003) ................................................................ 1

*Galstaldi v. Sunvest Cmtys. USA, LLC,*
 637 F.Supp.2d 1045 (S.D. Fla. 2009) .................................................................. 11, 12

*Hauben v. Harmon,*
 605 F.2d 920 (5th Cir. 1979) ...................................................................................... 1

*Int'l Schools Servs. v. AAUG Ins. Co., Ltd.,*
 2012 WL 5635590 (S.D. Fla. Nov. 15, 2012) ........................................................... 14

*Johnson v. Davis,*
 480 So.2d 625 (Fla. 1985) ........................................................................................... 2

*KC Leisure, Inc. v. Haber,*
 972 So.2d 1069 (Fla. Dist. Ct. App. 2008) ............................................................... 13

*Kinnard v. Mecklenburg Fair, Ltd.,*
 266 S.E.2d 14 (N.C. Ct. App. 1980) .......................................................................... 15

*Meyer v. Holley,*
 537 U.S. 280 (2003) ..................................................................................................... 2

## <u>TABLE OF AUTHORITIES</u>

**Page**

*Miles v. Jones*,
  2010 WL 5574324 (S.D. Fla. Nov. 22, 2010)..........................................................................8

*Millis Const. Co. v. Fairfield Sapphire Valley*,
  358 S.E.2d 566 (N.C. Ct. App. 1987) ...................................................................14

*Nature's Prods., Inc. v. Natrol, Inc.*,
  990 F.Supp.2d 1307 (S.D. Fla. 2013) ...................................................................12

*Ramel v. Chasebook Const. Co., Inc.*,
  135 So.2d 876 (Fla. Dist. Ct. App. 1962) ........................................................1, 3

*Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*,
  581 F.Supp.2d 1215 (S.D. Fla. 2008) .............................................................12, 13

*Wilson v. Burch Farms, Inc.*,
  627 S.E.2d 249 (N.C. Ct. App. 2006) ...................................................................15

**STATUTES**

Fla. Stat. § 501.204(1).............................................................................................12

Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") ....................................... *passim*

Counter-Plaintiffs Industrial Heat, LLC ("IH") and IPH International, B.V. ("IPH") (collectively, "Counter-Plaintiffs") hereby file their reply to the Opposition of Third-Party Defendants Henry Johnson, J.M. Products, Inc. ("J.M. Products"), James Bass, Fulvio Fabiani, and United States Quantum Leap, LLC ("USQL") to Defendants' Motion for Summary Judgment ("Opposition" or "Opp.") [D.E. 203].

## ARGUMENT

### I.   J.M. Products and Johnson's Opposition to Summary Judgment for IH on Count III of the AACT (Fraudulent Inducement) Is Meritless.

J.M. Products and Johnson's opposition to summary judgment in IH's favor as to Count III of Defendants' Fourth Amended Answer, Additional Defenses, Counterclaims, and Third-Party Claims ("AACT") is without merit. There is ample evidence in the record that Johnson was present when Andrea Rossi and Leonardo Corporation ("Leonardo") (collectively, "Plaintiffs") made representations that J.M. Products[1] was affiliated with Johnson Matthey, plc ("Johnson Matthey"), a well known U.K. specialty chemicals and precious metals company. Defs.' Statement of Material Facts ("Def. SOMF") [D.E. 207] ¶¶ 57, 62. There is also ample evidence that Johnson acquiesced with and did not dispute such representations when Plaintiffs made them, even though he had undertaken to make other disclosures about J.M. Products, and that he subsequently reinforced such representations. *Id.* ¶¶ 62, 65; *see also Hauben v. Harmon*, 605 F.2d 920, 924 (5th Cir. 1979) ("[A]n affirmative duty to disclose exists in Florida if . . . some trick or artifice has been employed to prevent an independent investigation by the representee.") (applying Florida law); *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So.2d 1165, 1165 (Fla. Dist. Ct. App. 2003) ("Where a party in an arm's-length transaction undertakes to disclose information, all material facts must be disclosed[.]"); *Ramel v. Chasebook Const. Co., Inc.*, 135 So.2d 876, 882 (Fla. Dist. Ct. App. 1962) ("[N]ondisclosure of a material fact may be deemed fraudulent

---

[1]   At the time, J.M. Products was known as J.M. Chemical Products, Inc. It later changed its name to J.M. Products. Def. SOMF ¶ 58.

where the other party does not have equal opportunity to become apprised of the fact.").[2]  Even if

Johnson were ignorant about the real Johnson Matthey (willfully or otherwise) at the time Rossi made

these representations, *see* Opp. at 14-15,[3] Johnson would still be liable for fraudulent inducement.

Johnson unquestionably knew that J.M. Products was owned by a U.S. trust he formed and over which

he was the trustee, and therefore by definition was not owned or affiliated with Johnson Matthey.  Def.

SOMF ¶ 67.

Matters are even worse for J.M. Products.  It does not deny that Rossi made false representations.

What it then ignores, however, is its direct testimony (through Rossi as its Rule 30(b)(6) witness) that

Rossi was J.M. Products' "scientific and technical director."  J.M. Products Dep. (excerpts of which are

attached hereto as Composite Ex. 1) 6:21-22; 19:2-3; *see also id.* 27:13-14 ("… I was the director of the

day by day operation of J.M."), 28:12-15 ("I was the director of all the scientific research and

development activity and experimental activity of J.M., so I was the director and I am responsible about

all the day by day operations …").  J.M. Products is responsible for the false statements made by its

"scientific and technical director."  *See Meyer v. Holley*, 537 U.S. 280, 286 (2003) ("It is well

established that traditional vicarious liability rules ordinarily make principals or employers vicariously

liable for acts of their agents or employees in the scope of their authority or employment. . . . [I]n the

absence of special circumstances it is the corporation . . . who is the principal or employer, and thus

subject to vicarious liability for torts committed by its employees or agents." (citations omitted)); *see*

---

[2]      Indeed, "where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentations is tenuous. Both proceed from the same motives and are attended with the same consequences; both are violative of the principles of fair dealing and good faith; both are calculated to produce the same result; and, in fact, both essentially have the same effect." *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985).

[3]      Johnson claims he did not know details as to "what Johnson Matthey was" when he met with IH in North Carolina in July 2014, Ex. 3 at 237:8-10, but he admitted that he knew by then that Johnson Matthey sold platinum sponge and that Rossi was claiming he was going to buy platinum sponge from Johnson Matthey on behalf of J.M. Products, *id*. 194:18-195:3.

*also Ramel*, 135 So.2d at 883 ("It is generally held that a corporation is vicariously liable for fraud and misrepresentation practiced by its directors or agents within the scope of their employment.").

Furthermore, J.M. Products and Johnson ignore other evidence directly supporting IH's fraudulent inducement claim.  Tom Darden testified to a meeting with Johnson, the President of J.M. Products, in North Carolina where Johnson made a host of misrepresentations, including that: (a) he would be running the operations of J.M. Products, (b) J.M. Products would be using the steam produced by the 1 MW Plant operated by Leonardo in Florida to produce products, and (c) "they were going to move products from another plant into this plant" in Florida.  Darden Dep. (excerpts of which are attached hereto as Composite Ex. 2) 175:16, 176:4-9, 180:10-12, 181:7-17.  All of this was false: Johnson was never going to have any involvement in J.M. Products' operations.  Johnson Dep. (excerpts of which are attached hereto as Composite Ex. 3) 19:13-21:17, 22:24-23:8, 50:16-23, 53:7-11, 56:7-10, 198:9-21, 217:5-12.  J.M. Products also had no use for the steam power to be provided by the 1 MW Plant, and it had no products to produce; in fact, at the time of this meeting J.M. Products had no operations at all.  *Id.* at 31:19-25, 35:13-15, 90:25-91:3, 219:19-221:15, 222:3-24, 235:19-236:2.[4]  And it was all part of Rossi and Johnson's effort to lead IH to believe that a Johnson Matthey affiliated company would be operating the Florida facility where the 1 MW Plant would be placed.  Ex. 2 at 179:21-180:3.[5]

Finally, Johnson and J.M. Products downplay their false certification that J.M. Products was owned by a U.K. entity because, they claim, Johnson could not have known that IH would view the

---

[4]	This evidence directly disproves Johnson and J.M. Products' argument that "there is no record evidence that JM Products did not intend to use the steam produced by the Plant or that JM Products was not using the steam in a manufacturing process."  *See* Opp. at 15.

[5]	Darden further recalled both Rossi and Johnson representing that J.M. Products was affiliated with Johnson Matthey.  Ex. 2 at 186:9-18.

certification as evidence that J.M. Products was affiliated with Johnson Matthey.  But even were this so (which it is not), Johnson knew IH required the certification be executed (and in fact, corrected) before entering the Term Sheet, which is enough to establish that he knew it was an inducement to IH entering the Term Sheet.  *See* Def. SOMF Ex. 43 at Johnson Dep. Ex. 52.  And, of course, this argument by Johnson and J.M. Products does nothing to aid J.M. Products since the knowledge of its "scientific and technical director" Rossi – who clearly knew of IH's reliance – is also attributed to J.M. Products.  Early term sheet drafts reflected that one of the contracting parties was to be Johnson Matthey.  Def. SOMF ¶ 60.  Rossi insisted that this be removed because he claimed Johnson Matthey wanted to act through, and be camouflaged by, a U.S. company (J.M. Products).  *Id.* ¶ 64.  IH respected this demand, but then requested that J.M. Products at least provide information on its ownership.  In response, J.M. Products provided the blatantly false certification that it was "owned by an entity formed in the United Kingdom."  *Id.* ¶ 65.

The foregoing evidence clearly establishes that J.M. Products and Johnson, along with Plaintiffs, fraudulently induced IH to enter the Term Sheet.  Furthermore, J.M. Products and Johnson cannot escape liability by insisting that a fraudulent inducement claim cannot be based on misrepresentations not contained in the Term Sheet.  If the Term Sheet had a merger and integration clause as the License Agreement does, their claim would have merit, but the Term Sheet does not contain such a clause, so it does not preclude IH's claim.  *Corporate Fin., Inc. v. Principal Life Ins. Co.*, 461 F.Supp.2d 1274, 1291 (S.D. Fla. 2006).  Furthermore, J.M. Products and Johnson consciously ignore the recitals in the Term Sheet that do reflect various false representations Plaintiffs and they used to induce IH to sign the Term Sheet – namely, that J.M. Products "operates a production facility in Miami, FL" and that this facility "require[d] low temperature steam" for its production process.  Term Sheet (Def. SOMF Ex. 45) ¶ 2.  Both of these representations were patently false: At the time of entering the Term Sheet, J.M. Products

did not have any facility in Florida, let alone a production facility, and it had no production process at all, let alone a process that required "low temperature steam." Ex. 3 at 19:13-21:17, 22:24-23:8, 50:16-23, 53:7-11, 198:9-11, 224:20-226:10.

Finally, J.M. Products and Johnson's suggestion that IH must have justifiably relied on and conducted "due diligence" into their misrepresentations to have a claim is incorrect legally and factually. IH need not prove justifiable reliance or "due diligence" to succeed on their fraudulent inducement claim. *See Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010) ("Justifiable reliance is not a necessary element of fraudulent misrepresentation[.]"). In any event, the record is clear that IH did justifiably rely on the representations about J.M. Products when entering the Term Sheet, and that IH's attempt to conduct "due diligence" into J.M. Products' connection by seeking a meeting with Johnson Matthey was rebuffed by Rossi. *See* Section II.B. *infra*; Def. SOMF ¶¶ 61, 63.[6]

J.M. Products and Johnson cannot escape the deception they perpetrated on IH, and IH should be granted summary judgment as to them on Count III of the AACT.

## II.    Third-Party Defendants' Opposition to Summary Judgment for Counter-Plaintiffs on Count IV of the AACT (FDUTPA) Is Meritless.

Third-Party Defendants' arguments against summary judgment in Counter-Plaintiffs' favor on Count IV of the AACT fall into three categories: (1) there is insufficient evidence that each Third-Party Defendant engaged in deceptive or unfair conduct; (2) each Third-Party Defendant's deceptive or unfair conduct was either irrelevant or unrelated to a contractual agreement involving Counter-Plaintiffs; and (3) Third-Party Defendants' deceptive or unfair conduct did not cause Counter-Plaintiffs to suffer damages. None of these arguments is meritorious.

---

[6]    J.M. Products and Johnson claim that IH did not care about the identity of the "customer" in Florida (Opp. at 16), but the undisputed evidence establishes that IH did care about having a bona fide customer with a legitimate need for the steam produced by the 1 MW Plant. *See* Section II.B. *infra*.

## A.   Each Third-Party Defendant Engaged In Deceptive and Unfair Conduct.

There is ample record evidence that each Third-Party Defendant was directly involved in the scheme identified in Count IV to deceive and manipulate Counter-Plaintiffs as to the operations and performance of the 1 MW Plant in Florida (including to have the 1 MW Plant moved to Florida), supporting summary judgment in favor of Counter-Plaintiffs.

First, as addressed in the preceding section, the evidence clearly demonstrates that Johnson and J.M. Products defrauded Counter-Plaintiffs into agreeing to relocate the 1 MW Plant to Florida. *See* Section I *supra*. These representations were made to induce IH to enter into the Term Sheet and allow the 1 MW Plant to be moved from its facilities in North Carolina (where it obviously could closely monitor any operation of, and any output from, the 1 MW Plant) to an alleged J.M. Products location in Florida, removed from IH's immediate oversight. Def. SOMF ¶¶ 69, 70.

Second, the evidence establishes that Johnson and J.M. Products created the intentionally false illusion that J.M. Products was a "real customer" of Leonardo using the steam produced by the 1 MW Plant in order to falsely substantiate the reliability and independence of the 1 MW Plant's operations and performance. Johnson and J.M. Products falsely represented J.M. Products as receiving, measuring, and being satisfied with the power it was purportedly receiving from the 1 MW Plant by sending monthly letters to IH stating the amount of power it was receiving and offering to pay for such power. *Id.* ¶ 74a.[7] And, contrary to Third-Party Defendants' assertion, Johnson and J.M. Products' description of J.M. Products as handling "Advanced Derivatives of Johnson Matthew Platinum Sponges" falsely portrays J.M. Products as being affiliated with Johnson Matthey, as even Johnson admitted. Ex. 3 at 171:4-172:18 (J.M. Products eventually stopped using this description because Rossi "didn't want to appear to

---

[7]     The Johnson/J.M. Products monthly letters on the power J.M. Products was allegedly receiving from the 1 MW Plant were drafted and the information contained therein provided by Rossi. Def. SOMF ¶ 78c.

be a subsidiary or an affiliate of Johnson Matthey"); *see also* Def. SOMF ¶ 74b & Ex. 41 at [IH-00011864] (Rossi tells Darden and Vaughn that "[y]ou will be allowed to say to your investors that Johnson Matthey is the *main supplier* of JMC and that the same buys from JMC all the production not bought by other Customers." (emphasis added)).  At no time did J.M. Products or Johnson disclose that, in reality, Plaintiffs entirely controlled and funded J.M. Products.  *Id.* ¶ 78.[8]

Third, for his part, Bass lied to IH about the J.M. Products operations in Florida, furthering the falsehood that J.M. Products was a real company engaged in a real manufacturing process using the steam provided by the 1 MW Plant.  Bass told Darden that the 1 MW Plant:

> … was producing lots of steam.  He said their utility bills have been reduced compared to what they were before because they weren't having to use so much electric energy and now they were using this energy. He said the form of the steam was great. You know, the temperature or whatever, the nature of it, and production was going well.

Ex. 2 at 228:17-24.  Bass also "represented to us [IH] that there was a manufacturing plant there and that it was operating nicely."  *Id.* 298:15-17; *see also id.* 301:16-21 ("He represented by saying that the plant was performing spectacularly or consistent with expectations in terms of output, the amount of steam they were getting.  He represented half of the equation that it was getting enough steam that it must have had that high COP."); *id.* 300:7-10, 300:23-301:3.[9]  All of this was false:  Bass knew nothing about the quality, or even quantity, of steam being produced by the 1 MW Plant,[10] knew J.M. Products was not

---

[8]     In fact, at its Rule 30(b)(6) deposition, J.M. Products' corporate representative (Rossi) testified that Rossi was J.M. Products' "scientific and technical director" and in complete control of all its operations at the Florida warehouse facility.  *See* Ex. 1 at 6:18-23, 22:16-23:4.

[9]     This unrefuted testimony cannot be disregarded because it was not "communicated to [Darden] or IH in writing."  Opp. at 22.  Darden's testimony is clear that Bass made these statements to him in person, and Bass offers no explanation of why a writing repeating the statements would be required.

[10]     Bass also deceived IH by holding himself out as J.M. Products' "Director of Engineering."  Bass claims this was not false because Rossi bestowed this title on him.  Bass Dep. (excerpts of which are attached hereto as Composite Ex. 4) 157:2-10.  But Bass was hired as an independent contractor (not employee) of J.M. Products, was hired by Rossi, and worked under Rossi's direction.  Def. SOMF

operating a manufacturing facility (but simply had a container through which the 1 MW Plant's output was circulated), and had no basis to claim J.M. Products' utility bills were reduced because of the steam it was receiving from the 1 MW Plant (since J.M. Products had no prior operations before being set up as the fake customer to receive the output from the 1 MW Plant).  Ex. 4 at 27:15-28:16, 41:17-42:18, 71:1-15, 133:23-135:12, 136:12-19.[11]

Fourth, the evidence establishes that Fabiani and USQL deceived Counter-Plaintiffs as to the accuracy and success of the 1 MW Plant's operations and performance.  Specifically, there is substantial evidence that Fabiani and USQL (themselves and through Fabio Penon) provided false measurement data on the 1 MW Plant to Counter-Plaintiffs.  Def. SOMF ¶¶ 80-82.[12]  The power absorption data that Fabiani and Penon provided Counter-Plaintiffs (which were nearly identical to each other, *see id.* ¶ 81) materially conflicted with the data provided by Florida Power and Light ("FPL").  Indeed, during certain time periods, this data from Fabiani and Penon reflected that the 1 MW Plant used more power than FPL was providing to the entire warehouse facility where the 1 MW Plant was located.  *See id.*  Fabiani and USQL's  contention that all reasonable inferences as to the FPL data must be drawn in their favor is superficial – they have not pointed to any evidence supporting the reasonable inference that "any discrepancies were the result of instrument malfunction that should be attributed to the FPL meter" (Opp. at 27).  *See Miles v. Jones*, No. 08–20612–CIV, 2010 WL 5574324, at *7 (S.D. Fla. Nov. 22,

---

¶ 78a.  The title "Director of Engineering" for J.M. Products was clearly a sham that, if not literally false, was at least intended to deceive.

[11]     The record is clear that J.M. Products had no manufacturing process to use the steam allegedly produced by the 1 MW Plant,  Def. SOMF ¶ 77, and Third-Party Defendants raise no triable issue as to this fact.  This ample record evidence disproves Third-Party Defendants' double-negative argument that there is no evidence J.M. Products did not have a manufacturing process taking place.  *See* Opp. at 23.

[12]     Third-Party Defendants overlook that these paragraphs establish (supported by the record evidence cited therein) more than one proposition.  *See* Opp. at 26.  Specifically, these paragraphs establish two separate facts: (1) that Fabiani and USQL provided data to Counter-Plaintiffs (*see* Def. SOMF ¶ 80) and (2) that certain of this data was fabricated and/or manipulated (*see id.* ¶¶ 81-82).

2010) ("Although the Court is required to draw all reasonable inferences in favor of the party opposing summary judgment, *those inferences must be based on facts in the record*." (emphasis added)). Likewise, their contention that the discrepancies were immaterial because they only covered 17 days during "a test lasting almost 350 days" wholly ignores the relevant context here.  *See* Opp. at 28.  The supposed "Guaranteed Performance" test Plaintiffs were conducting with Fabiani and USQL was supposed to cover 350 days.  Even Plaintiffs do not dispute that they would not have reached the 350-day mark if 17 days of their test period were excluded or disregarded.

Fifth, the evidence establishes that Johnson, J.M. Products, Fabiani, and USQL prevented or blocked Counter-Plaintiffs from verifying the 1 MW Plant's operations and performance.  For example:

- Johnson and J.M. Products complied with and enforced Plaintiffs' refusal to grant IH personnel access to the Doral facility in at least December 2015, *see* Def. SOMF ¶ 87, so that IH and IPH could not assess the operation of the 1 MW Plant while the alleged "Guaranteed Performance" test was being conducted, *see id.* ¶ 88; and

- Following the completion of the purported "Guaranteed Performance" test, Fabiani and USQL refused to provide IH with data that they had collected during the purported test, despite IH's entitlement to, and repeated requests for, that data, *see id.* ¶¶ 97-98; instead, Fabiani and USQL intentionally destroyed their data and their emails relating to the 1 MW Plant's performance in Florida, *see id.* ¶ 104.

All told, there is ample evidence of Third-Party Defendants' deceptive and unfair conduct.  Their claim to the contrary is disingenuous and no barrier to summary judgment.

### B. Each Third-Party Defendant's Deceptive and Unfair Conduct Was Material.

J.M. Products, Johnson, and Bass argue that their deceptive conduct should be forgiven because it was irrelevant to whether the 1 MW Plant was performing as Plaintiffs claimed in order to justify

- 9 -

Plaintiffs' subsequent demand to IH and IPH that they be paid $89 million under the License Agreement.[13]  They are wrong.  Rossi told IH that having a "real Customer" with a need for steam would be an independent check on how the 1 MW Plant was operating because the customer could confirm the level of steam the Plant was producing.  Def. SOMF ¶¶ 59, 76; *see also* AEG Dep. (an excerpt of which is attached hereto as Ex. 7) 215:8-23.  Darden and J.T. Vaughn agreed, not knowing that J.M. Products was a fake customer: "We felt that having a *bona fide* customer would be an additional way of being able to measure energy output.  That if someone credible was receiving the energy then that would be one added way to ratify the power production."  Ex. 2 at 159:1-5 (emphasis added), 159:21-22 ("[H]aving a very credible customer would be beneficial in terms of verification[.]"); Vaughn Dep. (excerpts of which are attached hereto as Composite Ex. 5) 182:24-183:5 (IH wanted to know that the customer would be "accurately assessing the energy that [it] consumed" because "that's a check on whether or not it's a – how much energy is actually being produced"); *see also* Ex. 2 at  300:7-10, 300:23-301:3, 301:16-21 (explaining how Bass' made-up claims about the power J.M. Products was receiving reinforced Plaintiffs' claims about the 1 MW Plant's performance).

J.M. Products, Johnson, and Bass maintained the ruse that J.M. Products was a legitimate company with an actual need for the steam allegedly being produced by the 1 MW Plant to deceive and manipulate IH and IPH into believing that the 1 MW Plant was, or at least might have been, working as claimed by Plaintiffs.  IH and IPH would have known to the contrary had they known J.M. Products was

---

[13]     Third-Party Defendants' reliance on the Court's Order on their Motion to Dismiss Counts III, IV, and V of the Third Amended Answer, Additional Defenses, Counterclaims, and Third-Party Claims [D.E. 120] (*see* Opp. at 23-24) is misplaced, as Counter-Plaintiffs subsequently filed the AACT that cured any deficiencies identified in the Court's Order.  [D.E. 124, 132].  The Court so held in its Order of February 1, 2017.  [D.E. 130].

a shell company with no manufacturing process or customers, solely under the control of Plaintiffs.[14]

(Third Party Defendants suggest that Darden testified he was suspicious of J.M. Products from the

beginning, and hence he should not have relied on anything associated with J.M. Products.  But what

Darden testified is that IH did not bill J.M. Products for the power Plaintiffs were allegedly providing

because IH was "suspicious" *of Plaintiffs* and did not want to participate "in some kind of fraud" by

billing J.M. Products for power not provided.  Ex. 2 at 187:23-188:10.  In other words, IH did not want

to defraud J.M. Products; it was not aware that J.M. Products was defrauding it.)[15]

Fabiani and USQL's position that their deceptive and unfair conduct was harmless likewise rings

hollow.  They provided IH and IPH with false data that was directly related to the performance of the 1

MW Plant in Florida.  Def. SOMF ¶¶ 80-82.  They destroyed other data that also directly related to the

performance of the 1 MW Plant in Florida, as well as related emails.  *See id.* ¶ 104.  Clearly depriving

IH and IPH of full and accurate data on the 1 MW Plant's operation perpetuated and enabled the

deception and manipulation of IH and IPH.

Further, to the extent Third-Party Defendants suggest that the role of each, viewed in isolation,

was not substantial in the larger picture or was minor compared to the roles of Plaintiffs, that suggestion

is without substance.  A FDUTPA claim does not require "show[ing] [that] [a] defendant was the

principal actor involved in the violative acts, or that [a] defendant initiated those acts."  *Galstaldi v.

Sunvest Cmtys. USA, LLC*, 637 F.Supp.2d 1045, 1056 (S.D. Fla. 2009).  "[I]t is sufficient to allege that a

party directly participated in a violation of the FDUTPA, even if that violation was initiated by another."

---

[14]    As noted above, Johnson and J.M. Products also blocked IH and IPH's access to the Doral
warehouse to prevent them from checking themselves on how the 1 MW Plant was operating.

[15]    Third-Party Defendants also claim that Counter-Plaintiffs never sought from J.M. Products or
Johnson records regarding the operation of the 1 MW Plant.  This is simply false.  *See* Def. SOMF Ex.
64 at Johnson Dep. Ex. 40 (Vaughn tells Rossi and Johnson that one of the purposes of scheduling a
visit to the Doral facility is "to obtain copies of records of the operation of the 1MW Plant").

*Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F.Supp.2d 1215, 1222 (S.D. Fla. 2008).

FDUPTA also does not require proof of actual reliance. *See Fitzpatrick v. General Mills, Inc.,* 635 F.3d

1279, 1282-83 (11th Cir. 2011).  Thus, that Third-Party Defendants may not have been as involved in

the scheme as Plaintiffs, or that their involvement amongst themselves may have varied, does not

diminish Counter-Plaintiff's FDUTPA claim against them.

Finally, Third-Party Defendants' emphasis that (a) Bass was not involved in negotiating the

License Agreement and (b) Bass, Fabiani, and USQL were not involved in negotiating the Term Sheet is

misplaced. *See* Opp. at 22, 26.  FDUTPA claims do not require and are not limited to contractual

relationships between parties. *See* Fla. Stat. § 501.204(1); *Nature's Prods., Inc. v. Natrol, Inc.*, 990

F.Supp.2d 1307, 1322 (S.D. Fla. 2013).  Thus, whether Third-Party Defendants' deceptive or unfair

conduct arises out of the License Agreement or the Term Sheet is irrelevant to establishing their liability

under FDUTPA.

### C.   Counter-Plaintiffs Suffered Actual Injury.

Lastly, Third-Party Defendants assert that Counter-Plaintiffs did not suffer actual injury relating

to their FDUTPA violations.  To the extent this is just a different way of arguing that Counter-Plaintiffs'

injuries flowed from the conduct of Plaintiffs, not the conduct of Third-Party Defendants, the response is

the same as above: Third-Party Defendants' deceptive and manipulative conduct misled Counter-

Plaintiffs as to the basis for moving the 1 MW Plant from North Carolina (where they could directly

oversee its performance) to Florida (where they could not) as well as to the performance of the 1 MW

Plant in Florida.  Counter-Plaintiffs need not prove reliance on particular deceptive acts by particular

Third-Party Defendants, *see Fitzpatrick*, 635 F.3d at 1282-83, and they need not prove that each or any

Third-Party Defendant was a principal actor in the scheme against IH, *see Galstaldi*, 637 F.Supp.2d at

1056.  They all clearly and directly participated in the scheme to deceive Counter-Plaintiffs, and

therefore are all liable for the injuries flowing from that scheme. *See Sundance Apts. I, Inc.*, 581

F.Supp.2d at 1222; *KC Leisure, Inc. v. Haber*, 972 So.2d 1069, 1074 (Fla. Dist. Ct. App. 2008).

As to the actual damages caused by this scheme and suffered by Counter-Plaintiffs, the damages

are extensive.  Counter-Plaintiffs incurred expenses on their own behalf – as well as reimbursed Third-

Party Defendants and Plaintiffs for their expenses – in connection with the 1 MW Plant's operations in

Florida that they would not have paid or incurred if they knew the truth.  Some of these expenses arose

in connection with transporting and setting up the 1 MW Plant in Florida. *See* Def. SOMF ¶ 89.  But in

addition, *during the period of the purported "Guaranteed Performance" test*, Counter-Plaintiffs also

paid for, among other things, (1) repairs and maintenance to the 1 MW Plant while in Florida; (2) new

equipment for the Doral warehouse facility; and (3) personnel to work at the warehouse and on

maintenance of the 1 MW Plant (such as Barry West and Fabiani). *See id.*  Furthermore, Counter-

Plaintiffs clearly incurred actual damages arising from this litigation, as Plaintiffs would have had no

basis to sue Counter-Plaintiffs if they had not been able to use J.M. Products and the 1 MW Plant's

relocation to Florida as a cover for conducting their purported Guaranteed Performance test and then

thereafter suing Counter-Plaintiffs.

**III.    Fabiani and USQL's Opposition to Partial Summary Judgment for IH on Count V of the AACT (Breach of Contract) Is Meritless.**

Fabiani and USQL's opposition to partial summary judgment in favor of IH as to Count V of the

AACT lacks merit.  They do not dispute that they breached the Technical Consulting Agreement (the

"USQL Agreement"), but merely argue that the breach was immaterial, that they have the defense of

prior breach by IH, and that IH suffered no damages.

Fabiani and USQL's first argument fails on at least two grounds.  To start, even if their USQL

Agreement breach were immaterial, IH can still sue for that breach under North Carolina law and

- 13 -

recover damages (though it might not be able to cancel the Agreement absent showing materiality).  *See*

*Millis Const. Co. v. Fairfield Sapphire Valley*, 358 S.E.2d 566, 570 (N.C. Ct. App. 1987).  Moreover,

Fabiani and USQL have no basis to miscast their breach as immaterial.  They claim that the intent of the

USQL Agreement was for Fabiani to assist Rossi.  But while that was at least one purpose of the

Agreement, it was not the *sole* purpose.  The USQL Agreement very clearly states that the information

Fabiania and USQL prepared, used or obtained relating to the work they were doing was the property of

IH and needed to be turned over to IH.  *See* Defs.' Summary Judgment Motion [D.E. 203] at 28-29

(quoting USQL Agreement [Def. SOMF Ex. 67] § 6).  This is a prominent provision in the Agreement,

and IH even required Fabiani to be bound personally to the provision.  Fabiani and USQL's blatant

breach of this provision cannot be cast aside as immaterial, especially since it involved information

directly addressing the performance of the 1 MW Plant.  *Id*. at 29.[16]

As to Fabiani and USQL's second argument, they are wrong that IH was required to address

their affirmative defense in Defendants' Summary Judgment Motion; rather, it is up to them to raise

such a defense first.  *See Int'l Schools Servs. v. AAUG Ins. Co., Ltd.*, No. 10-62115-CIV, 2012 WL

5635590, at *8 (S.D. Fla. Nov. 15, 2012).  In any event, IH *did* address that defense, providing the

record evidence showing that Fabiani and USQL breached the USQL Agreement first, and that even

after their breach, IH offered to pay USQL's final invoice if Fabiani and USQL would just comply with

the Agreement, but they refused.  *See* Defs.' Summary Judgment Motion at 30 n.10.  Fabiani and USQL,

on the other hand, offer no evidence to substantiate their affirmative defense (because there is none).

*See* Opp. at 30.

---

[16]    Fabiani and USQL also claim that IH's Joseph Murray testified that Fabiani "turned over the majority of all the data sought by the Counter-Plaintiffs."  This, however, simply was not Murray's testimony.  *See* Murray Dep. (excerpts of which are attached hereto as Composite Ex. 6) 366:14-367:7.

As to Fabiani and USQL's last argument, IH has clearly suffered damages. It paid Fabiani and USQL $10,500 per month from February 2015 through February 2016 and Fabiani's monthly rent of $1,370 during that time, but it did not receive from Fabiani and USQL a substantial benefit to which it was entitled under the Agreement – all of the information they collected about the operation of the 1 MW Plant that the Agreement made the property of IH. *See* Defs.' Summary Judgment Motion at 30 & Def. SOMF ¶¶ 102-103.[17] Furthermore, under North Carolina law, IH is still entitled to prevail on its breach of contract claim even if it can only recover nominal damages. *See Bowen v. Fidelity Bank*, 183 S.E. 266, 268 (N.C. 1936); *Kinnard v. Mecklenburg Fair, Ltd.*, 266 S.E.2d 14, 17-18 (N.C. Ct. App. 1980).

## CONCLUSION

For the foregoing reasons, Counter-Plaintiffs are entitled to summary judgment as to Third-Party Defendants on Counts III to V of the AACT.

---

[17]    Fabiani and USQL make the curious argument that because IPH reimbursed IH for some expenses IH paid relating to Fabiani and USQL, IH has no damages. But the testimony to which they point does not state that IPH reimbursed IH for all Fabiani and USQL expenses. There also is no basis under North Carolina law to apply a collateral sources rule to limit a party's breach of contract damages. *See Wilson v. Burch Farms, Inc.*, 627 S.E.2d 249, 257 (N.C. Ct. App. 2006).

Dated: April 12, 2017                    Respectfully submitted,


                                         */s/ Christopher R. J. Pace*
                                         Christopher R.J. Pace
                                         cpace@jonesday.com
                                         Florida Bar No. 721166
                                         Christopher M. Lomax
                                         clomax@jonesday.com
                                         Florida Bar No. 56220
                                         Erika S. Handelson
                                         Florida Bar No. 91133
                                         ehandelson@jonesday.com
                                         Michael A. Maugans
                                         Florida Bar No. 107531
                                         mmaugans@jonesday.com
                                         Christina T. Mastrucci
                                         Florida Bar No. 113013
                                         cmastrucci@jonesday.com
                                         JONES DAY
                                         600 Brickell Avenue
                                         Brickell World Plaza
                                         Suite 3300
                                         Miami, FL 33131
                                         Tel: 305-714-9700
                                         Fax: 305-714-9799


                                         Bernard P. Bell
                                         *Admitted pro hac vice*
                                         Miller Friel, PLLC
                                         1200 New Hampshire Avenue, NW
                                         Suite 800
                                         Washington, D.C. 20036
                                         Tel.: 202-760-3158
                                         Fax: 202-459-9537
                                         Email: bellb@millerfriel.com

                                         *Attorneys for Defendants/Counter-Plaintiffs*

- 16 -

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on April 12, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record.


/s/ *Christina T. Mastrucci*
Christina T. Mastrucci