# Composite Exhibit 1

CONFIDENTIAL TRANSCRIPT

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                   MIAMI DIVISION
 3            CASE NO. 1:16-cv-21199-CMA
 4
      ANDREA ROSSI, et al.,
 5
                     Plaintiffs,
 6
          v.
 7
      THOMAS DARDEN, et al.,
 8
                     Defendants.
 9    - - - - - - - - - - - - - - - - - - - -x
      INDUSTRIAL HEAT, LLC, et al.,
10
                     Counter-Plaintiffs,
11
          v.
12
      ANDREA ROSSI, et al.,
13
                     Counter-Defendants.
14
          and
15
      J.M. PRODUCTS, et al.,
16
                     Third-Party Defendants.
17    - - - - - - - - - - - - - - - - - - - -x
18                   600 Brickell Avenue, Suite 3300
                     Miami, Florida
19                   Wednesday, March 1, 2017
                     10:14 a.m.- 5:46 p.m.
20
                 CONFIDENTIAL TRANSCRIPT
21        PORTIONS OF TRANSCRIPT HIGHLY CONFIDENTIAL
                 ATTORNEYS' EYES ONLY
22
          VIDEO DEPOSITION OF J.M. PRODUCTS, INC.
23                THROUGH ANDREA ROSSI
24        Taken before Edward Varkonyi, Registered
      Merit Reporter and Notary Public for the State of
25    Florida at Large, pursuant to Notice of Taking
      Deposition filed in the above cause.
```

CONFIDENTIAL TRANSCRIPT

Page 2

1     APPEARANCES
2
3     BRIAN CHAIKEN, ESQ ,
      Perlman Bajandas Yevoli & Albright, P L
      283 Catalonia Avenue, Suite 200
4     Coral Gables, Florida 33134
      on behalf of the Plaintiff
5
6     CHRISTOPHER R J PACE, ESQ ,
      MICHAEL MAUGANS, ESQ ,
7     Jones Day
      600 Brickell Avenue, Suite 3300
8     Miami, Florida 33131
      on behalf of the Defendant
9
10    RODOLFO NUNEZ, ESQ ,
      Rodolfo Nunez, P A
11    255 University Drive
      Coral Gables, Florida 33134
12    on behalf of Defendants J M  Products,
      Johnson and Bass
13
14    FERNANDO ARAN, ESQ ,
      Aran Correa & Guarch, P A
15    255 University Drive
      Coral Gables, Florida 33134
16    on behalf of Defendant United States
      Quantum Leap and Fabiani
17
18
19    ALSO PRESENT: Chris Hernandez, Videographer
20
21
22
23
24
25

Page 3

1              I N D E X
2     Witness          Direct
3     ANDREA ROSSI        6
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              E X H I B I T S
2     Deposition              For Ident.
3     Exhibit 1   Notice of Deposition          63
4     Exhibit 2   Term Sheet               63
5     Exhibit 3   Industrial Gross Sublease        71
6     Exhibit 4   Color Photo            82
7     Exhibit 5   HJ00218               89
8     Exhibit 6   JM000014 to 16            96
9     Exhibit 7   ROSSI 00003876           104
10    Exhibit 8   Color Photo            114
11    Exhibit 9   Blank Sketch of Doral Location     117
12    Exhibit 10  Drawn on Sketch of Doral Location  117
13    Exhibit 11  Color Photo            120
14    Exhibit 12  Color Photo            120
15    Exhibit 13  Hand Drawn Drawing by Andrea Rossi  127
16    Exhibit 14  "Composite Exhibit A" by Wong     134
17    Exhibit 15  Drawn on Sketch of Doral Location   136
18    Exhibit 16  Color Photo            193
19    Exhibit 17  Rossi 00011387 to 11388      202
20    Exhibit 18  000464            202
21    Exhibit 19  JB000468             213
22    Exhibit 20  JB000473             224
23    Exhibit 21  Color Photo            231
24    Exhibit 22  JM000062 to 64           233
25

Page 5

1  Thereupon--
2          THE VIDEOGRAPHER:  We're on the record.
3  The date is March 1st, 2017.  The time is 10:14
4  a.m.
5          This is media unit one of the video
6  deposition of J.M. Products, Inc. in the matter
7  of Andrea Rossi, et al. versus Thomas Darden, et
8  al. At this time may counsel please state their
9  appearances for the record.
10         MR. PACE:  This is Chris Pace and Mike
11  Maugans from Jones Day on behalf of the
12  defendants.
13         MR. ARAN:  Fernando Aran of the law firm
14  of Aran, Correa & Guarch on behalf of third
15  party defendants J.M. Products, James Bass and
16  Henry Johnson.
17         MR. CHAIKEN:  Good morning.  Brian
18  Chaiken on behalf of plaintiffs.
19         MR. NUNEZ:  Rudy Nunez on behalf of third
20  party defendants Fulvio Fabiani and United
21  States Quantum Leap, LLC.
22  Thereupon--
23         LEONARDO ROSSI
24  was called as a witness by the Defendant and having
25  been first duly sworn responded as follows:

CONFIDENTIAL TRANSCRIPT

Page 6

1        THE WITNESS: I do.
2              DIRECT EXAMINATION
3 BY MR. PACE:
4      Q.  Dr. Rossi, can you state your full name.
5      A.  Andrea Rossi.
6      Q.  And what's your present work address?
7      A.  1331 Lincoln Road, Miami Beach, Florida
8 33139.
9      Q.  Is that also your resident address?
10     A.  Yes.
11     Q.  Is it the same unit within the building
12 where you work and you reside?
13     A.  Yes.
14     Q.  Do you have -- you're here testifying
15 today as the representative of J.M. Products,
16 correct?
17     A.  Correct.
18     Q.  Do you have any formal title or position
19 within J.M. Products?
20     A.  Yes, I am the so to speak director, with
21 a small D.  So I am the scientific and technical
22 director of the plant that I have designed and
23 invented and -- but I do not have corporate tasks.
24     Q.  So let me ask my question again.  Do you
25 have any formal title within J.M. Products?

Page 7

1       Your answer is no, correct?
2      A.  I do not know what you mean by formal.
3      Q.  Fair enough.  Let me ask you, do you have
4 any title -- do you hold any position as an officer
5 or director of J.M. Products?
6      A.  When you mean director, what do you
7 mean?
8      Q.  Do you know what a director of a
9 corporation in the United States is?
10     A.  No.
11     Q.  Okay.  Do you know what a board of
12 directors for a corporation in the United States?
13     A.  Yes, I know what is a board of directors.
14     Q.  In this context, a director, I am
15 referring to a member of a board of directors.
16       So as to J.M. Products, are you a
17 corporate officer of J.M. Products?
18     A.  No.
19     Q.  Are you a member of the board of
20 directors of J.M. Products?
21     A.  No.
22     Q.  Okay.  When you just described yourself
23 as a director, small D, of J.M. Products, has anyone
24 ever given you that title?
25     A.  I gave it -- you know, I gave it to

Page 8

1 myself because discussing with the president,
2 attorney Johnson, we can see that I can be qualified
3 that way because I directed the plant.
4       For example, I am the person most
5 qualified to answer to the question put in your paper
6 upon which I am here now.
7      Q.  I understand.  And that's because you
8 control -- you control all aspects of J.M. Products,
9 correct?
10       MR. ARAN:  Objection to form.
11       THE WITNESS:  Sorry, I must ask you as
12     the other times to be so kind to speak a little
13     bit slow.  I understand perfectly English.
14 BY MR. PACE:
15     Q.  I will.  No, I sometimes ask --
16     A.  Just if you go fast I --
17     Q.  Fair enough.
18     A.  I don't get it.
19     Q.  You control all aspects of J.M. Products,
20 correct?
21       MR. ARAN:  Objection to form.
22       MR. CHAIKEN:  Object to form.
23       THE WITNESS:  Your -- your question is
24     correct in the measure of technical tasks.
25 BY MR. PACE:

Page 9

1      Q.  How about financial tasks, doesn't all
2 money -- isn't all the money that J.M. Products uses
3 to pay for any expenses it has come from either you
4 or Leonardo Corporation?
5      A.  But that was on the base of a contract
6 that -- of an agreement that there was between J.M.
7 and Leonardo Corporation and this agreement foresaw
8 that Leonardo Corporation was going to pay all the
9 bills and expenses for the day by day activity of
10 J.M. as a compensation for products that Leonardo
11 Corporation was going to buy from J.M.
12     Q.  So my question again, because you didn't
13 answer it.  You started with a but response.
14       All of the money for any expenses paid by
15 J.M. Products came from either you or Leonardo
16 Corporation; yes or no?
17     A.  I don't know if all the money paid by
18 J.M. came from Leonardo Corporation of me.
19     Q.  So let's go -- let's talk a little bit
20 about what you did to prepare to be the corporate
21 representative J.M. Products today because that's an
22 answer you should have, you should have prepared for,
23 so let's talk about this.
24       To prepare today to speak as the
25 corporate representative of J.M. Products with whom --

3 (Pages 6 - 9)

CONFIDENTIAL TRANSCRIPT

Page 14

1      Q.  If you will answer my question first.
2 What other documents -- you said reviewed your
3 technical documents.
4      A.  Yes.
5      Q.  What other documents did you review to
6 prepare?
7      A.  I was answering.  Another document that I
8 have gone through together with my attorney and the
9 attorney Johnson has been the one that you had in
10 your hands a few seconds ago.
11      Q.  Okay.  And what else?
12      A.  I don't remember else.
13      Q.  Well, you said you reviewed documents
14 relating to technical work that you performed.
15      A.  Yes, also.
16      Q.  Did you review any documents relating to
17 the financial records of J.M. Products?
18      A.  Can you kindly repeat the last?
19      Q.  Did you review any documents relating to
20 the financial operations of J.M. Products?
21      A.  What do you mean exactly by financial
22 operations?
23      Q.  Did you review the bank accounts of J.M.
24 Products?
25      A.  No.

Page 15

1      Q.  Did you review the bills of J.M.
2 Products?
3      A.  No.
4      Q.  Did you review the invoices of J.M.
5 Products?
6      A.  No.
7      Q.  Did you make any effort to determine how
8 J.M. Products has paid for expenses in the past?
9      A.  You know, for what concerns the expenses
10 that J.M. made related to the activity in Doral, I
11 know them perfectly because I did them as Leonardo
12 Corporation based on the agreement that there was
13 between J.M. and Leonardo Corporation.
14      Q.  That Leonardo --
15      A.  I reviewed those -- I reviewed those
16 documents, yes.
17      Q.  So I think some of this stemmed from you
18 providing a slightly different answer a little while
19 ago.
20         I asked -- well, maybe not.  Maybe I
21 shouldn't say this.  Are there any expenses that J.M.
22 Products has had in the past two years that are not
23 related to the Doral warehouse?
24         MR. ARAN:  Objection to form.
25         THE WITNESS:  Just one second.  I take

Page 16

1 the occasion also now, because I must repeat it,
2 because it's another -- that I have a problem, I
3 cannot swallow and so now and again you will see
4 me to cough in that --
5 BY MR. PACE:
6      Q.  Cup.
7      A.  This glass.  This is not lack of
8 respect.  I am sorry, I have to sometime cough inside
9 there because I cannot swallow.  I delayed my surgery
10 to be able to make this depositions because after
11 that surgery I will be several weeks without having
12 the possibility to talk.
13         So please excuse me, sometime you will
14 see me make this very bad gesture, but it's
15 necessary.  I'm sorry.  I am sorry.  Can you kindly
16 repeat your question?
17      Q.  Are you -- as the corporate
18 representative of J.M. Products are you aware of any
19 other source of funds that J.M. Products has had to
20 pay for its expenses, other than you and/or -- you,
21 Andrea Rossi and/or Leonardo Corporation?
22         MR. ARAN:  Objection to form.
23         THE WITNESS:  I have understood your
24 question.  I am aware only of the expenses that
25 J.M. made related to the activity in Doral.

Page 17

1         I am not aware of other expenses that
2      J.M. could have had.
3 BY MR. PACE:
4      Q.  As to -- but you haven't answered my
5 question, so let me ask my question again.
6         As to those expenses of which you are
7 aware, did either Andrea Rossi and/or Leonardo
8 Corporation pay for all those expenses?  It's a yes
9 or no answer.
10      A.  Yes.
11      Q.  All right.  We're going to go back here
12 just for a second, which is as to J.M. Products then
13 you, Andrea Rossi, controlled all technical and
14 product development activities of J.M. Products, to
15 the extent they existed, correct?
16      A.  Correct.
17      Q.  Either Andrea Rossi or Leonardo
18 Corporation provided all of the funds for any
19 expenses relating to the Doral location, correct?
20         MR. ARAN:  Objection to form.
21 BY MR. PACE:
22      Q.  Isn't that what you just answered?
23      A.  No, I have understood your question.  I
24 have just to focus the memory because I want to be
25 sure that what I answer is precise because there

5 (Pages 14 - 17)

CONFIDENTIAL TRANSCRIPT

Page 18

1 could have been -- in the top of the plant there
2 could have been expenses not made by Leonardo or me
3 at the very beginning.
4     And -- but what -- as far as I recall,
5 all the day by day expenses have been paid by
6 Leonardo Corporation. Not by me as Andrea Rossi, by
7 Leonardo Corporation.
8     Q. And then -- since you are here testifying
9 as the corporate representative of J.M. Products your
10 testimony is you're not aware of any other expenses
11 that J.M. Products incurred in connection with the
12 Doral location, correct?
13     A. Not that I am aware of.
14     Q. All right. So all expenses of J.M.
15 Products were being paid -- as they relate to the
16 Doral location were being paid by Leonardo
17 Corporation, correct?
18     MR. ARAN: Objection to form.
19     THE WITNESS: All the expenses I am aware
20 of.
21 BY MR. PACE:
22     Q. You are aware of as the corporate
23 representative of J.M. Products and who also spoke
24 with Henry Johnson, the president of J.M. Products,
25 correct?

Page 19

1     MR. ARAN: Objection to form.
2     THE WITNESS: Again, I was the scientific
3 and technological director, so I spoke with
4 Henry Johnson for what concerns all the
5 expenses.
6     When I spoke with Henry Johnson, when we
7 spoke about expenses, we spoke only about the
8 expenses I was aware of, which are the expenses
9 I explained before, the day by day expenses, you
10 know, the employee, the consultant, the bill of
11 FPL, et cetera, et cetera, et cetera and
12 invoices that came for some technological issue
13 or technical issue.
14     And -- but again, I am not aware of and I
15 do not know if there have been or not other
16 expenses independent from this activity.
17 BY MR. PACE:
18     Q. So you learned nothing from
19 discussions -- your discussions with Henry Johnson
20 about any expenses you didn't already know about?
21     A. Can you repeat?
22     Q. You told us you spoke with Henry Johnson
23 about expenses of Leonardo.
24     A. Yes.
25     Q. I'm sorry, expenses of J.M. Products.

Page 20

1     A. Yes, yes.
2     Q. Sounds though what you just said is he
3 didn't make -- he didn't inform you of any expenses
4 you weren't otherwise already aware of?
5     A. He had no reason to do that because --
6     Q. Because?
7     A. Because I did not ask. It was not -- I
8 was interested to the activity -- to the scientific
9 and technological activity of J.M.
10     Q. So as the corporate representative of
11 J.M. Products sitting here today, however, your
12 testimony is you are not aware of a single expense
13 incurred by J.M. Products that wasn't paid for or
14 reimbursed by either Andrea Rossi or Leonardo
15 Corporation, correct?
16     A. You are asking me if I am -- I am
17 repeating your question to be sure I have understood
18 it because I want to answer properly.
19     You have asked me, if I understood, if I
20 am aware of other expenses, apart the ones Leonardo
21 Corporation has paid for. Is this the question?
22     Q. Leonardo Corporation or Andrea Rossi.
23     A. Yeah, okay.
24     Q. I just want to make sure you understood
25 the question.

Page 21

1     A. The answer is yes.
2     Q. You are aware of other expenses incurred
3 by J.M. Products?
4     A. No.
5     Q. You're not answering my question. Let me
6 try it again.
7     A. Yes.
8     Q. As the corporate representative of J.M.
9 Products do you know of any expenses incurred by J.M.
10 Products, other than the expenses that were paid for
11 by either Leonardo Corporation or Andrea Rossi?
12     A. No.
13     Q. All right. How many times has Henry
14 Johnson been to the Doral -- I'm sorry, let me define
15 something here.
16     If I refer to the Doral warehouse --
17 what's the address of J.M. Products? What's the
18 address of J.M. Products?
19     A. 7861 Northwest 46th Street, Doral,
20 Florida 33166.
21     Q. If I refer to that as either the Doral
22 warehouse or the Doral location, are you comfortable
23 with that?
24     A. Yes.
25     Q. Okay. How many times has Henry Johnson

6 (Pages 18 - 21)

CONFIDENTIAL TRANSCRIPT

Page 22

1  been to the Doral warehouse?
2      A.  Wow.  Surely he has been there.  How many
3  times, as far as I can remember, I am not sure.  I
4  am -- you know, several times.  Maybe two, three,
5  something like that.  But honestly, I do not remember
6  enough well to answer.
7      For sure I have in my brain the image of
8  attorney Johnson inside the factory and in the
9  office.  I have this image in my mind, but I cannot
10  recollect how many times.
11     Q.  Understood.
12     A.  But not many.  Not many.
13     Q.  Not many.  So on a day-to-day basis you
14  are at the Doral warehouse, correct?
15     A.  Every day.
16     Q.  All right.  And any operations that are
17  occurring at the Doral warehouse on behalf of J.M.
18  Products, you are controlling?
19     A.  Absolutely.
20     Q.  And that has been so since J.M. Products
21  was formed, correct?
22     A.  It is correct.
23     Q.  All right.  So you, Andrea Rossi, control
24  all of the day-to-day activity of J.M. Products,
25  correct?

Page 23

1      A.  Correct.
2      Q.  You, Andrea Rossi, control Leonardo
3  Corporation, correct?
4      A.  Correct.
5      Q.  Leonardo Corporation pays all the
6  expenses of J.M. Products, correct?
7      A.  No.
8          MR. CHAIKEN:  Object to form.
9  BY MR. PACE:
10     Q.  What expenses does J.M. Products incur
11  that Leonardo does not pay?
12     A.  You are forgetting that I told you at the
13  beginning of this deposition that Leonardo paid the
14  expenses of J.M. as a compensation of the products --
15     Q.  But they are still paying it.  My
16  question was Leonardo pays for whatever reason -- you
17  can explain later the reason.
18          MR. ARAN:  Objection.  Let's not talk
19  over each other.
20  BY MR. PACE:
21     Q.  Fair enough, I am just asking a
22  question.  You can explain later why they paid it.
23     A.  Okay.
24     Q.  You can explain in the trial.  You can
25  explain it at some other context.

Page 24

1      A.  Okay.
2      Q.  My question was -- let's see if you can
3  answer my question though.  Because I thought we went
4  through this already.
5          You, as the corporate representative of
6  J.M. Products, are here to say -- to testify that the
7  only expenses of which you are aware of J.M. Products
8  were paid by Leonardo Corporation, correct?
9      A.  If we limit our description of the facts
10  to the action of paying the bills, yes.
11     Q.  Yes, sir.  I am --
12     A.  If we confine, yes.
13     Q.  We will get into the explanation of why
14  they paid but I am just trying to establish that you,
15  Andrea Rossi, ran the day-to-day operations of J.M.
16  Products, correct?
17     A.  Yes, it is correct.
18     Q.  You, Andrea Rossi, controlled Leonardo
19  Corporation, correct?
20     A.  Correct.
21     Q.  Leonardo Corporation paid for all the
22  day-to-day expenses of which you are aware for J.M.
23  Products, correct?
24     A.  Correct.
25     Q.  So there is -- the building -- the Doral

Page 25

1  warehouse where J.M. Products is located, that was
2  found by you, correct?
3      A.  Correct.
4      Q.  It was leased by Leonardo, correct?
5      A.  Correct.
6      Q.  J.M. Products subleased whatever
7  section -- whatever portion they used from Leonardo,
8  correct?
9      A.  Correct.
10     Q.  J.M. Products leased or contracted for or
11  received from Leonardo an employee?
12     A.  Can you kindly repeat the question?
13     Q.  Sure.  Who is Reinaldo Breto?
14     A.  Was the janitor -- well, janitor and
15  guardian of -- he was an employee of J.M.
16     Q.  He was an employee of J.M.
17         He was lent to J.M. by Leonardo
18  Corporation, correct?
19     A.  Yes, it is correct.
20     Q.  And that was your decision to loan Breto
21  from Leonardo to J.M. Products?
22     A.  Correct.
23     Q.  Okay.  And Mr. Breto acted under your
24  direction?
25     A.  Correct.  And not only under my

CONFIDENTIAL TRANSCRIPT

Page 26

1 direction.
2    Q.  Under who else's direction, Jim Bass?
3    A.  Yes.
4    Q.  And Jim Bass is an individual that you --
5 you made the decision to hire Jim Bass for J.M.
6 Products, correct?
7    A.  Yes, but -- yes.  Yes, yes.
8    Q.  You did not find Jim Bass initially,
9 correct?
10    A.  No, I did not.
11    Q.  So I am not suggesting you did but the
12 decision to hire Jim Bass was by you?
13    A.  Yes.
14    Q.  Back to my -- you resisted answering the
15 control question, so I am trying to understand why.
16    A.  I did not understand what you said.
17    Q.  Sure.  I asked you -- you were reluctant
18 to answer yes to the question that, you know, Andrea
19 Rossi controls -- controls J.M. Products.
20    A.  It is absolutely --
21         MR. ARAN:  Objection to form.  There is
22 no question pending.  There is no question
23 pending.
24         MR. PACE:  What are you instructing him
25 not to do then?

Page 27

1         MR. ARAN:  I am objecting to the form,
2    which is you are simply making statements that
3    are not questions.
4         I am objecting to the form and I am
5    suggesting there is no question pending for him
6    to answer.
7 BY MR. PACE:
8    Q.  You were responding.  I'm sorry.
9    A.  I'm sorry, attorney, but I totally
10 disagree with you.  I am not resisting the facts that
11 you are saying.
12         I always answered yes to every question
13 that you asked to me related to the fact that I was
14 the director of the day by day operation of J.M.
15    Q.  I know, but I was asking you a question
16 about control and that's where you resisted, so let
17 me ask it again.
18         Andrea Rossi controls all aspects of J.M.
19 Products, correct?
20         MR. ARAN:  Objection to form.
21         MR. CHAIKEN:  Object to form.
22         THE WITNESS:  No.
23 BY MR. PACE:
24    Q.  Andrea Rossi controls J.M. Products,
25 correct?

Page 28

1         MR. ARAN:  Objection to form.
2         MR. CHAIKEN:  Object to form.
3         THE WITNESS:  No.
4 BY MR. PACE:
5    Q.  Why is it that Andrea Rossi does not
6 control J.M. Products?
7    A.  Because to control J.M. Products mean to
8 have full control of J.M. Products.  As you -- as you
9 have heard from the beginning, I was not in the board
10 of directors.  I was not the president.  I was not
11 the CEO.
12         I was the director of all the scientific
13 research and development activity and experimental
14 activity of J.M., so I was the director and I am
15 responsible about all the day by day operations,
16 working operations that take -- that have taken act
17 inside the factory of J.M., not of all the actions or
18 deeds that are related to the -- to the activity that
19 is proper of a president or of a board of directors.
20    Q.  What other activities does J.M. Products
21 engage in, other than activities that you have
22 controlled?
23    A.  I don't know.
24    Q.  As the corporate representative of J.M.
25 Products here today you are not aware of any

Page 29

1 activities in which J.M. Products is engaged that has
2 not been controlled by Andrea Rossi?
3    A.  I am --
4         MR. ARAN:  Objection to form.  He's here
5    to testify about the matters set forth in your
6    designated deposition, which deals with J.M.'s
7    activities as they relate to this lawsuit and
8    the operations of J.M. as it relates to this
9    lawsuit and the operation of the E-Cat, et
10    cetera.  It does not deal with anything else
11    that J.M. may have or not have.
12         MR. PACE:  A, that's not true.  B, that's
13    kind of a coaching, speaking objection.  You can
14    make an objection, if it's a fair objection.
15         MR. ARAN:  I will not help you anymore
16    again.
17         MR. PACE:  No, no, I understand.
18         MR. ARAN:  I am trying to help you.
19 BY MR. PACE:
20    Q.  That's fine.  By the way, he's made the
21 objection.  I want to make sure it's clear on the
22 record, I am not disputing that, that the objection
23 is here.
24         Let me try to rephrase my question.
25 Well, I think your answer might go to a scope issue

8 (Pages 26 - 29)

CONFIDENTIAL TRANSCRIPT

Page 30

1 but my question is still, as the corporate
2 representative of J.M. Products you are not aware of
3 any activity in which J.M. Products has engaged that
4 you have not controlled; is that correct or not
5 correct?
6        MR. ARAN: Objection to form.
7 BY MR. PACE:
8    Q. Yes or no?
9        MR. CHAIKEN: Objection to form.
10       THE WITNESS: It is not correct. It is
11    not correct, it is confusing because I have
12    just -- attorney, I have just answered you, that
13    I am aware of the facts --
14 BY MR. PACE:
15    Q. Dr. Rossi, let me -- I am going to try to
16 break those into small questions and they may not go
17 anywhere but let me just try this.
18       I don't think every question is an
19 invitation for you to say something in addition.
20 Times there are, if you feel my question is unfair.
21 You asked me to clarify it, so I am going to
22 clarify.
23       You testified today about various
24 activities of J.M. Products that you have controlled,
25 such as the technical aspects and the day-to-day

Page 31

1 activities at the Doral location, correct?
2    A. This is correct.
3    Q. I am asking you as the corporate
4 representative of J.M. Products are you aware of any
5 other activities in which J.M. Products has engaged?
6       Do they have any other business
7 activities that you are -- that you are not -- that
8 you, Andrea Rossi, are not involved in? Do they have
9 any other financial activities in which you, Andrea
10 Rossi, is not involved in?
11       MR. CHAIKEN: Object to form.
12       THE WITNESS: I have not a hint about
13    everything that happened out of the factory of
14    J.M. in 7861 Northwest 46th Street, Doral,
15    Florida.
16 BY MR. PACE:
17    Q. So you're aware of no such activities?
18       MR. ARAN: Objection to form.
19       THE WITNESS: I am aware and I am
20    perfectly aware of all the activities that
21    happened inside the factory.
22 BY MR. PACE:
23    Q. And you are not aware of any activities
24 by J.M. Products outside that factory?
25    A. This is correct.

Page 32

1    Q. So to the best of your knowledge there
2 are no activities by J.M. Products outside the
3 factory?
4       MR. ARAN: Objection to form,
5    mischaracterization.
6       THE WITNESS: I am not able to answer
7    about things that I am not aware of.
8 BY MR. PACE:
9    Q. Fair enough, but I think I asked to the
10 best of your knowledge. Let me ask the question
11 again.
12    A. The best of my knowledge is I don't
13 know.
14    Q. To the best of your knowledge you are not
15 aware of any activities of J.M. Products other than
16 what occurs at the Doral warehouse?
17    A. Yes.
18    Q. All right.
19    A. Sorry but, you know, it's the English to
20 the best of your knowledge that had put me in
21 difficulty because I don't know the semantic limit of
22 that proposition. This is why I was --
23    Q. Understood. I understand. Some of these
24 things I am trying to find out, you can only answer
25 to the knowledge that you either have prior to

Page 33

1 preparing for the deposition or in connection with
2 preparing for the deposition.
3       But as a corporate representative of J.M.
4 Products if the question, in fact, falls within the
5 scope of the topics for which you are a corporate
6 representative, and that can be a debate between
7 counsel but if it does your answer, you know, is
8 controlling for the corporation.
9       If it doesn't, then it's just your
10 personal -- you know, what Andrea Rossi knows
11 personally.
12    A. Yeah.
13    Q. You would agree with me that as it
14 relates to Leonardo Corporation the only activities
15 of J.M. Products that are of significance to Leonardo
16 Corporation are the activities at the Doral
17 warehouse, correct?
18       MR. CHAIKEN: Object to form.
19       THE WITNESS: Can you kindly repeat?
20 BY MR. PACE:
21    Q. It's a long question. I will try again.
22 The only activities of J.M. Products that are
23 relevant to Leonardo Corporation are those activities
24 at the Doral warehouse, correct?
25    A. Yes, it is correct.

9 (Pages 30 - 33)

CONFIDENTIAL TRANSCRIPT

Page 34

1    Q.  And those activities you, Andrea Rossi,
2  had complete control over?
3    A.  Yes.
4    Q.  All right.  When did you inform
5  Industrial Heat that you had complete control over
6  the activities of J.M. Products?
7    A.  From the beginning.
8    Q.  From the beginning?
9    A.  From the beginning.  In June there is --
10  I am aware of an e-mail that I sent to Tom Darden and
11  J.T. Vaughn in June 2014, so -- when did not yet
12  exist the factory of Doral because the factory of
13  Doral has been rented, if I will recall, in September
14  for 2014.
15       So in June 2014 I sent an e-mail where I
16  clearly stated to J.T. Vaughn and Tom Darden that I
17  was going to direct the plant of J.M.  I informed
18  them perfectly that it was an experimental plant.  I
19  informed them -- they knew perfectly everything from
20  the beginning.
21    Q.  And this is -- this you say is in e-mail
22  communications that you had with Tom Darden and J.T.
23  Vaughn, correct?
24       MR. ARAN:  Object to form.
25       THE WITNESS:  Yes, this is the one that I

Page 35

1  recall now, yes.
2  BY MR. PACE:
3    Q.  Okay.
4    A.  But maybe there are others, but I
5  remember this perfectly.  I have short memory of this
6  because you have shown it to me in my first
7  deposition.
8    Q.  So it's a document that you -- an e-mail
9  that you saw in your first deposition?
10    A.  Yes.  So I remember that.  I am sure
11  there are others but sure, I think there are others.
12       I am perfectly sure that Tom Darden and
13  J.T. Vaughn knew everything to the perfection but I
14  have very fresh memory of this e-mail because you
15  have shown it to me.
16    Q.  And this e-mail --
17    A.  You have shown it to me.
18    Q.  And this e-mail, does it refer to J.M.
19  Products or does it refer to a customer?
20    A.  Kindly can you repeat?
21    Q.  The e-mail you are talking about, does it
22  refer to J.M. Products or does it refer to a
23  customer?
24    A.  I don't remember this particular, but I
25  was referring to the plant of the customer.

Page 36

1    Q.  And the customer --
2    A.  When I say in that e-mail -- sorry, I
3  have not finished.  I'm sorry, attorney.
4    Q.  No, fair.  Please finish.
5    A.  When I wrote in that e-mail I will direct
6  or be the director, I don't remember -- now I don't
7  remember by word, but when I say that I would have
8  directed the plant, I was referring to -- obviously
9  of the plant -- to the plant of the customer.
10    Q.  When you were talking about operating the
11  plant you were not referencing operating the 1MW
12  plant, correct?
13    A.  That would have been ridiculous because
14  the fact that I was the director of the 1MW plant of
15  Leonardo was known since 2012.
16       It is like I come down to my wife and say
17  dear, I have to inform you that I am your husband.
18  You know, that would have been ridiculous.
19    Q.  And so your reading -- obviously these
20  are e-mails so we have the e-mails, but your reading
21  of these e-mails is that they disclose that you are
22  going to be in control of the customer?
23    A.  Plant.
24    Q.  The customer's plant?
25    A.  (Nods head.)

Page 37

1    Q.  And the day-to-day activities of that
2  customer?
3    A.  Yes, sir.
4    Q.  All right.  And other than that
5  communication you believe there are other e-mail
6  communications where you made the same point by
7  referencing the plant of the customer?
8    A.  I am not sure, attorney.
9    Q.  Okay.
10    A.  But I believe so.  But also, if I may
11  complete the question, in the sense no one of
12  Industrial Heat has ever, until the beginning of the
13  litigation, no one of Industrial Heat has ever put in
14  discussion the thing.
15       So they never asked me who is the
16  directing the plant of J.M..  They visited -- they
17  visited many times the plant of Leonardo.  They have
18  been there and they have also spoken with the -- with
19  Jim Bass, but the only thing they were interested to
20  was to show the plant and to get the reference of Jim
21  Bass for their investors that were the British of
22  Woodford and the Chinese from China.  Please.
23    Q.  You are now getting way collateral.
24    A.  No, I am not going away.  I am just
25  saying that the only thing they were interested to

10 (Pages 34 - 37)

CONFIDENTIAL TRANSCRIPT

Page 38

1 was to get the funds from their investors. They
2 never asked to me who is directing the plant.
3 Q. Dr. Rossi, did you ever take them to the
4 other side of the Doral warehouse where J.M. Products
5 operated; yes or no?
6 A. No, because --
7 Q. Did you tell them -- did you ever tell
8 them that they could not access the other side of the
9 Doral warehouse where J.M. Products was located; yes
10 or no?
11 A. In pursuit of --
12 Q. I'm sorry?
13 A. Yes or no does not exist. I have to
14 explain. If you -- I am sure that you know perfectly
15 the term sheet between Industrial Heat and J.M.
16 Q. You drafted that.
17 A. In the term sheet was written very
18 clearly that Leonardo -- pardon. Industrial Heat
19 guys had not to enter in the area of J.M. and J.M.
20 guys had not the right to enter in Leonardo area.
21 Pardon, Industrial Heat area.
22 So it had been signed, signed and
23 accepted by both parties that are J.M. from one party
24 and Industrial Heat from the other that none of them
25 had to invade the area of the other.

Page 39

1 Q. And you --
2 A. The only guy that could go in both areas
3 was me because I was at the same time as Industrial
4 Heat knew perfectly, as I said before, I was the
5 consultant and technical director of J.M., as well as
6 the director of the plant of one megawatt.
7 Q. Again, so my question, let's ask again.
8 Let's see if you can answer it this time.
9 Did you tell them -- did you tell people
10 from Industrial Heat that they could not go to the
11 J.M. Products side of the warehouse? Why is that not
12 a yes or no answer?
13 MR. ARAN: Objection to form.
14 BY MR. PACE:
15 Q. Dr. Rossi --
16 A. I did not tell. The contract told it.
17 Q. So you are saying you never did. So your
18 testimony is -- your testimony is -- your sworn
19 testimony is you never told anyone --
20 A. No, my testimony is that I don't recall
21 that it has been necessary to tell to the guys of
22 Industrial Heat that they could not invade the area
23 of J.M., for the very simple fact that they were
24 perfectly aware of the agreement that they had signed
25 with J.M., where was written that J.M. guys could not

Page 40

1 invade the area of Industrial Heat and Industrial
2 Heat guys were not allowed to enter in the J.M.
3 area.
4 Q. So let's --
5 A. It was forbidden by contract. Excuse
6 me. If they have asked to me to allow them there,
7 that would mean that they asked to me to breach a
8 contract that they had signed.
9 This would mean that they tried to breach
10 a contract that they had with J.M..
11 Q. Right. We're going to be here all day,
12 Dr. Rossi, so we're going to have seven hours.
13 A. I am here for all the time you want.
14 Also more than seven hours if you want.
15 Q. That's great. Then we will take more
16 than seven hours.
17 MR. ARAN: No, you won't.
18 THE WITNESS: No problem.
19 BY MR. PACE:
20 Q. Let me ask the question again because
21 it's a simple question, you can keep trying to dance
22 around it, but I'm asking for a simple answer. Maybe
23 it never occurred, so let me ask again.
24 Did you, Andrea Rossi, ever tell anyone
25 from Industrial Heat that they could not enter the

Page 41

1 J.M. Products side of the Doral warehouse; yes or no?
2 A. Not that I can recall.
3 Q. Was that hard?
4 A. Sorry?
5 Q. Was that hard, to answer that question?
6 MR. CHAIKEN: Object to form.
7 THE WITNESS: No, it's not hard. I don't
8 recall.
9 BY MR. PACE:
10 Q. That's all I'm asking though.
11 A. Is this the answer?
12 Q. That was the question I asked. Now
13 you're answering the question I asked.
14 A. Okay.
15 Q. Okay. You can hold onto your speeches
16 for later on.
17 A. Perfect. But I just wanted --
18 MR. ARAN: Object.
19 THE WITNESS: I just wanted to clear if
20 should they have asked to enter --
21 BY MR. PACE:
22 Q. But you're saying they didn't.
23 A. -- in the J.M. contract, I say I don't
24 recall.
25 Q. Okay.

11 (Pages 38 - 41)

CONFIDENTIAL TRANSCRIPT

Page 42

1    A.  I don't say they didn't.  I say I don't
2  recall.
3    Q.  That's all I am asking for.  I am asking
4  for what you know, what you recall and your
5  recollection --
6    A.  I don't recall.
7    Q.  -- is that it never happened?
8    A.  Should they have made it they would have
9  asked to me to breach a contract that they had
10  signed.
11    Q.  I understand.  I understand what you
12  think the law is but I am just asking you for your
13  recollection.
14    A.  You're asking me --
15    Q.  Dr. Rossi --
16    A.  You are asking me if --
17    Q.  Dr. Rossi, let's go on to our next
18  question.
19    A.  Okay.
20    Q.  There is a question, I get an answer from
21  you, all right?
22        And your answer is to the best of your
23  recollection you don't believe you ever told anyone
24  from Industrial Heat that they could not access the
25  Doral -- the J.M. Products side of the Doral

Page 43

1  warehouse, correct?
2    A.  No.
3        MR. CHAIKEN:  Object to form.
4        MR. ARAN:  Object to form.
5        THE WITNESS:  I did not say that.  I say
6    I do not recall.
7  BY MR. PACE:
8    Q.  I'm sorry.  I said to the best of your
9  recollection.
10    A.  No, you said to the best of your
11  recollection you believe that.  I did not say so.  I
12  say as I am -- I say just I don't recall.  I do not
13  say I don't believe.
14        I say I don't recall.  You know English
15  better than me but some English I have learned.  To
16  recall is one thing and to believe is another thing.
17        And I also added that if they did, they
18  made an illegal action because they asked to breach a
19  contract.
20    Q.  Dr. Rossi, Andrea Rossi, you've said this
21  several times never in response to my question so
22  let's see if we can --
23    A.  No, I responded to your question.  I
24  don't recall.
25    Q.  Let's keep going here.

Page 44

1    A.  Okay.
2    Q.  Jim Bass, what title did you give to Jim
3  Bass in connection with J.M. Products?
4    A.  Consultant, scientific consultant.
5    Q.  Why did he represent himself as the
6  director of engineering for J.M. Products?
7    A.  Because he was for what concern -- for
8  what concerned the part related to the electronics
9  that we were developing there, he was the director.
10        So he was -- in the sense he was a
11  director.  Also, I must ask you that Tom Darden asked
12  me to present him as the director to his investors,
13  to have references from the director of the customer
14  that he was satisfied.  You know --
15    Q.  Let me stop you there.  I will break this
16  out.  We can get to the conversation.
17    A.  Okay.
18    Q.  Let's make sure I am clear for what you
19  said.
20    A.  Okay.
21    Q.  You're saying Tom Darden wanted someone
22  from J.M. Products to meet with potential investors,
23  correct?
24        I am just going to take this one little
25  chunk at a time.  Is that correct, somebody from J.M.

Page 45

1  Products?
2    A.  Someone that was not me.
3    Q.  We will keep going this with little
4  chunks and see if we can do it in little pieces
5  here.
6    A.  Very good.
7    Q.  You're telling me Tom Darden told you --
8    A.  Yeah.
9    Q.  -- that he wanted somebody from J.M.
10  Products, other than you, to meet with potential
11  investors, correct?
12    A.  Yes, it is correct.
13    Q.  And Tom Darden asked you that this person
14  be knowledgeable about the power or energy being
15  received by J.M. Products from Leonardo Corporation,
16  correct?
17        MR. CHAIKEN:  Object to form.
18  BY MR. PACE:
19    Q.  Do you want me to ask the question again?
20    A.  No, no, no I have understood perfectly
21  your question and it is correct.
22    Q.  Did Tom Darden tell you -- did Tom Darden
23  identify the particular person who should meet with
24  these investors?
25    A.  There was not another.

12 (Pages 42 - 45)

CONFIDENTIAL TRANSCRIPT

Page 54

1    A.  This is interesting because --
2    Q.  Wait, wait, wait.  What isn't
3 interesting, I think we all can agree, is you getting
4 collateral, so let's stick to this.
5    A.  Sorry, you are right.
6    Q.  There is four meetings and trust me, the
7 day will go much faster if you answer my questions
8 and --
9    A.  But I am not in a hurry.
10    Q.  When my questions are unfair you can
11 certainly go on.
12    A.  All right.
13    Q.  But sometimes like you get collateral to
14 me.
15    A.  I got all the time you want.
16    Q.  You got four meetings.  You said there is
17 four times investors came in.
18    A.  Yeah.
19    Q.  Let me ask incrementally.
20    A.  For meetings with the investors.
21    Q.  With the investors.  Did you meet with
22 Tom Darden --
23    A.  I am very sorry.
24    Q.  No problem.
25    A.  Yes.

Page 55

1    Q.  Did you meet with Tom Darden in advance
2 of each of those meetings with investors?
3    A.  In the first case, yes.
4    Q.  Okay.
5    A.  In the other case, I don't recall.
6    Q.  In terms of the conversation -- in terms
7 of the request by Tom Darden to have either Jim Bass
8 or at least somebody other than you to meet with the
9 investors, did you -- did he make that request in
10 connection with each of the four visits by investors
11 or did he just make the request the first time and
12 you understood that that should occur with each
13 investor meeting?
14    A.  No, he wanted -- he wanted -- I precisely
15 do not recall.
16    Q.  Okay.
17    A.  But he never told me I want not Jim Bass,
18 I want you.  So by default --
19    Q.  So you understood there is four times --
20 your testimony is that there is four times that
21 investors came to the Doral warehouse or potential
22 investors came to the Doral warehouse to see the 1MW
23 plant, correct?
24    A.  Kindly repeat your question.
25    Q.  Yes.  Your testimony is that there is

Page 56

1 four occasions when potential investors came to the
2 Doral warehouse to see the 1MW plant, correct?
3    A.  Yes, it is correct.
4    Q.  Your testimony is each time one of those
5 investor groups or potential investors groups came,
6 they met with Jim Bass?
7    A.  Yes, it is correct.
8    Q.  And each time Jim Bass told them that
9 J.M. Products was satisfied with the power or energy
10 they -- it was receiving from Leonardo Corporation,
11 correct?
12        MR. CHAIKEN:  Object to form.
13        MR. ARAN:  Object to form.
14        THE WITNESS:  This -- as far as I recall,
15 yes.
16 BY MR. PACE:
17    Q.  And your testimony is that that --
18    A.  Maybe -- I want to add this.  I am sure
19 of this for the first two times, first visit of the
20 British, second visit of -- second visit with the
21 Chinese.
22        I am not sure of this for the third visit
23 with the British again, but I think so.  But I am not
24 sure about the fourth visit with another Chinese
25 commission.  Maybe during this fourth visit with the

Page 57

1 Chinese commission Jim Bass was not there but I am
2 not sure of this.  I don't recall exactly.
3    Q.  So --
4    A.  The interesting is that the third visit
5 with the British happened in October and in October
6 they came with the commission of Woodford, October or
7 September, they came with the commission of the
8 British, of Woodford, with the two top manager of
9 Woodford and they commented extremely positively the
10 plant and I perfectly that the two officers of
11 Woodford with enthusiastic of the plant while --
12    Q.  And did they meet Jim --
13    A.  I'm not finished.
14    Q.  I am not asking about the details of the
15 meeting though.  Dr. Rossi, you're clearly getting
16 collateral on me.
17        All I was asking you -- I was asking very
18 focused little questions because I am just trying to
19 get my answers.  I may ask you about these other
20 subjects.  I probably will later on today.
21    A.  All right.
22    Q.  You know how a deposition works.  This is
23 your third deposition in what, two weeks; is that
24 correct?
25    A.  Yeah, more or less, yes.

15 (Pages 54 - 57)

CONFIDENTIAL TRANSCRIPT

Page 58

1  Q.  Okay.  So you're aware that --
2  A.  Yes.
3  Q.  -- to some extent there is questions I
4  want to ask, I want to get an answer to and then
5  there will be opportunities for you to get into other
6  subjects later on.  You understand that, correct?
7  A.  Yes, sure.
8  Q.  You understand there is a lot of subjects
9  we're going to get to cover today, correct?
10  A.  Absolutely.
11  Q.  So let me just -- I am just trying to
12  nail down this one particular point.
13  A.  Okay.
14  Q.  Your testimony is now, just so I am
15  clear, at least as to two --
16  A.  Go ahead.
17  Q.  -- there are four times investors visited
18  the Doral location, investors or potential inventors
19  to see the 1MW plant.
20  Your testimony is on at least two of
21  those occasions Jim Bass met with the group of
22  potential investors, correct?
23  A.  It is correct.
24  Q.  All right.  You are not sure if on the
25  other two occasions Jim Bass met with the group of

Page 59

1  potential investors?
2  A.  I am sure that he met them just for a
3  hello.
4  Q.  All right.
5  A.  Just for a hello, while in the first
6  two -- I am sure in the first two occasions Jim Bass
7  has sit at the head of the meeting rooms.  There is a
8  table like this, more or less.
9  Q.  Okay.
10  A.  And he was sit where I sit now and all
11  the other people was around and there has been a
12  meeting of at least half an hour in the first two
13  occasions, British and Chinese.
14  The other two, I don't remember if it has
15  been a meeting or just a hello.
16  Q.  I understand.  So Jim Bass was -- met --
17  so there is a meeting or hello.
18  As to each of the four groups of
19  investors or potential investors, Jim Bass was at
20  least present at the Doral warehouse?
21  A.  Yes.
22  Q.  As to two of those four occasions he may
23  simply have said hello, introduced himself as the
24  director of engineering to the group of potential
25  investors, correct?

Page 60

1  A.  I don't remember if he introduced himself
2  as the director of engineering or not, but he
3  introduced himself as saying hello, everything all
4  right just, you know, niceties and have a nice day.
5  I don't remember exactly but could be
6  that the second two meetings have seen Jim Bass in a
7  very -- in a very short spot.
8  Q.  Okay.
9  A.  While in the first two he was a long
10  movie.
11  Q.  He was making more of a presentation in
12  the first two meetings?
13  A.  Yeah.
14  Q.  Even in the second two meetings where you
15  are saying Jim Bass's interaction was more limited
16  with the groups of potential investors, even then he
17  would express that J.M. Products was satisfied with
18  the power or energy it was receiving from Leonardo
19  Corporation?
20  MR. CHAIKEN:  Object to form.
21  MR. ARAN:  Objection to form.
22  BY MR. PACE:
23  Q.  If you recall.
24  A.  I cannot recall, but exists a body
25  language and, you know, that -- the body language

Page 61

1  when he say hello to everybody was not the body
2  language of a nervous guy, so.
3  Q.  So you think by his body language he was
4  implying to the investors that J.M. Products was
5  happy with Leonardo Corporation?
6  A.  I think you are understanding what I say.
7  MR. CHAIKEN:  Object to form.
8  BY MR. PACE:
9  Q.  But on at least two occasions your
10  testimony is Jim Bass did meet with investors and had
11  a long meeting, approximately a hour meeting with
12  each of those groups of investors, correct?
13  A.  Yes.
14  Q.  And in those meetings he would more
15  clearly say or would clearly say that J.M. Products
16  was happy with or satisfied with the power or energy
17  it was receiving from Leonardo Corporation, correct?
18  A.  It is correct.
19  Q.  All right.  And in these meetings
20  would -- would Jim Bass identify your role in
21  connection with J.M. Products?
22  A.  Can you repeat the question?
23  Q.  Yes.  I am just trying to understand,
24  when Jim Bass is meeting with these group of
25  investors, these half hour meetings each time --

16 (Pages 58 - 61)

CONFIDENTIAL TRANSCRIPT

Page 62

1          MR. ARAN:  Objection to form.
2 BY MR. PACE:
3          Q.   -- and he's talking about the J.M. -- J.M.
4 Products being satisfied with the energy or power
5 it's receiving from Leonardo, would he discuss your
6 role in connection with either Leonardo or J.M.
7 Products?
8          MR. ARAN:  Objection to form.
9          THE WITNESS:  No.  No, it has not been
10 put on the table.  He just said he was
11 satisfied.  Basically that is what Tom Darden
12 asked for.
13          He just asked to me for to make Jim Bass
14 represent a good reference because he had to get
15 funds from those investors.  That's it.
16 BY MR. PACE:
17          Q.   Okay.  And to go back to your testimony
18 before, what Tom Darden said -- he either
19 specifically asked for Jim Bass or at the very least
20 he asked for someone from J.M. Products other than
21 you, correct?
22          A.   Correct.
23          MR. ARAN:  Object to form, asked and
24 answered.
25          (The document referred to was thereupon

Page 63

1 marked Deposition Exhibit 1 for Identification, a
2 copy of which is attached hereto.)
3 BY MR. PACE:
4          Q.   I am going to mark a couple of documents
5 here but we will just take them one at a time.  This
6 is -- I marked as Exhibit 1 the -- the deposition
7 notice for J.M. Products.
8          You have seen this notice before?
9          A.   Yes.
10          Q.   And you -- these are the topics upon
11 which you prepared yourself for testifying today?
12          A.   Yes.  Yes, sir.
13          Q.   All right.  We will come back to these in
14 a bit.  I wanted to have that marked as the first
15 exhibit and then I can go to my second exhibit, which
16 is going to be the term sheet.
17          (The document referred to was thereupon
18 marked Deposition Exhibit 2 for Identification, a
19 copy of which is attached hereto.)
20 BY MR. PACE:
21          Q.   This is marked as Exhibit 2.  You are
22 familiar with this document, what's marked as Exhibit
23 2, term sheet?
24          A.   Yes.
25          Q.   Who -- did anyone on behalf of J.M.

Page 64

1 Products negotiate this term sheet?
2          MR. CHAIKEN:  Object to form.
3          THE WITNESS:  I did.
4 BY MR. PACE:
5          Q.   You negotiated this on behalf of J.M.
6 Products?
7          A.   Yes, sir.
8          Q.   With whom did you negotiate the term
9 sheet?
10          A.   With Tom Darden.
11          Q.   All right.  Did you disclose to Tom
12 Darden that you were negotiating on behalf of J.M.
13 Products?
14          A.   Yes.
15          Q.   And when you negotiated with Tom Darden
16 over this term sheet, are these the e-mail
17 communications that we have seen that go back and
18 forth about the term sheet?
19          MR. CHAIKEN:  Object to form.
20          THE WITNESS:  Sorry, I did not understand
21 the question.
22 BY MR. PACE:
23          Q.   Sure.  How did you negotiate with Tom
24 Darden over the term sheet?  How did you
25 communicate?  Was it by e-mail or was it by --

Page 65

1          A.   By -- also by e-mail, sure.  By e-mail,
2 by personal discussions that we had in Raleigh
3 because in this period I was in Raleigh.
4          Q.   Okay.
5          A.   In this period I still was in Raleigh
6 regularly and by telephone, you know, we had many
7 conversations about this.
8          Q.   And who negotiated this term sheet on
9 behalf of Leonardo Corporation?
10          A.   Me.
11          Q.   All right.  So you were negotiating both
12 as -- for J.M. Products and for Leonardo Corporation?
13          A.   That is correct.
14          Q.   And at the time J.M. Products was called
15 J.M. Chemical Products, correct?
16          A.   Yes, it is correct.
17          Q.   Is that the name you came up with for the
18 company originally?
19          A.   No.  Originally, you know, I don't
20 remember.  Honestly, I don't remember who came up.
21          Q.   Is there anyone other than you who may
22 have come up with the name?
23          A.   Yes, could have been the -- could have
24 been Di Giovanni but honestly, I don't remember
25 that.  I was not -- I did not like the name anyway

17 (Pages 62 - 65)

CONFIDENTIAL TRANSCRIPT

Page 66

1 and lately has been changed into J.M. Products.
2     Q.  So is -- other than -- you made this a
3 first reference today to Di Giovanni.  That's
4 Francesco Di Giovanni?
5     A.  Yes.
6     Q.  And Francesco Di Giovanni is the
7 beneficiary of the trust that owns J.M. Products,
8 correct?
9     A.  Yes.
10     Q.  All right.  So your testimony is that you
11 believe -- well, your testimony is that either you or
12 Francesco Di Giovanni came up with the original name
13 for J.M. Products, that being J.M. Chemical Products?
14         MR. ARAN:  Objection, form.
15         THE WITNESS:  As far as I recall because,
16 you know, it is not -- it is not a thing that I
17 considered important, so it is an issue of three
18 years ago or something, so I don't -- I don't
19 remember exactly, but yes.  Anyway, I did not
20 like it and I changed it.
21 BY MR. PACE:
22     Q.  Why don't we complete that thought and
23 then we will do the -- we will come back to this,
24 which is at some point the company's name was changed
25 from J.M. Chemical Products to J.M. Products,

Page 67

1 correct?
2     A.  Yes, it is correct.
3     Q.  And that was at your direction, correct?
4     A.  Yes, it is correct.
5     Q.  All right.  Back to the term sheet.  Who
6 decided that J.M. Products would pay rent of $1,000
7 per day?  Who came up with that number?
8     A.  I agreed upon this with Di Giovanni and
9 he said that -- the agreement between me and
10 Di Giovanni has been this.  Leonardo will pay all the
11 day by day in change of the product that we will take
12 and I take the liability if the product is good or
13 not in the first period and you will -- and J.M. will
14 pay the thousand dollars per day to Industrial Heat.
15         I tried to make also the interest of
16 Industrial Heat because I was -- in those period you
17 must not forget that my relationship with Industrial
18 Heat was very good and --
19     Q.  So you in connection with Di Giovanni
20 came up with the number of $1,000 a day?
21     A.  No, the number of $1,000 has been --
22 partially correct, I'm sorry.  Partially correct
23 because I have been in contact -- I was in contact
24 with all the parties, that was Tom Darden -- Tom
25 Darden, J.T. Vaughn, John Mazzarino.

Page 68

1         These are the three I dealt with to the
2 setup of this term sheet regarding Industrial Heat.
3 So I agreed upon this sum from the side of Industrial
4 Heat with Tom Darden in first place, John Mazzarino
5 in second place and J.T. Vaughn in third place.
6     Q.  Did you negotiate with -- I'm a little
7 confused.
8         When the term sheet was first presented
9 to Industrial Heat, the term sheet was first prepared
10 by you or at your direction, correct?
11         MR. CHAIKEN:  Object to form.
12         THE WITNESS:  No.
13 BY MR. PACE:
14     Q.  Somebody from Industrial Heat first
15 prepared the term sheet?
16     A.  Neither.  We sit down at the table in
17 Raleigh, in the meeting room of the factory of
18 Raleigh and we came up with a draft where everybody
19 has
20 put -- in a brainstorm everybody has put down on the
21 table his ideas and we came up with a draft.
22     Q.  Who came up with the thousand dollars, if
23 you recall?  If you don't recall, you don't recall.
24     A.  Maybe the idea of the number was mine but
25 I am not sure of that.

Page 69

1     Q.  Okay.
2     A.  Maybe the idea of the number was mine
3 because I said this is a good sum for Industrial Heat
4 to make some money and is reasonable respect the work
5 that -- that had to be done.
6         But in any case, all this draft included
7 the one thousand per day has been decide together
8 around the table like this, with the three of
9 Industrial Heat and me.
10     Q.  So you negotiated this agreement, it
11 was -- your recollection is it was in a conference
12 room?
13     A.  Yes.
14     Q.  And in this meeting were you, Tom Darden,
15 John Mazzarino and J.T. Vaughn, correct?
16     A.  Correct.  At least --
17     Q.  Anyone else in the meeting?
18     A.  I don't recall.  I don't recall.  I don't
19 recall.  But I don't think so because this was a
20 decision that did not involve other kind of people
21 there, so I don't recall.
22     Q.  And so the terms -- eventually Henry
23 Johnson came up to Raleigh to sign this agreement on
24 behalf of J.M. Chemical Products, correct?
25         MR. CHAIKEN:  Object to form.

18 (Pages 66 - 69)

CONFIDENTIAL TRANSCRIPT

Page 70

1      THE WITNESS: No.
2 BY MR. PACE:
3      Q.   Did he not sign it in North Carolina?
4      A.   No.
5      Q.   He signed it back in Florida?
6      A.   Yes.
7      Q.   All right. There was a meeting in North
8 Carolina with Henry Johnson prior to the term sheet
9 being finalized; is that correct?
10     A.   Yes.
11     Q.   All right. Where were you when you
12 signed the agreement?
13     A.   This agreement, as I recall, attorney,
14 maybe I'm wrong, but as far as I can recall everybody
15 has signed it separately.
16          So there has not been a meeting in which
17 everybody signed. Once the term sheet has been
18 completed, this term sheet has made many back and
19 forth through the e-mail to correct things, et
20 cetera, et cetera.
21          Of course the attorney Johnson
22 participated to this ping-pong because he had -- he
23 also made reviewing, et cetera. Once we reached a
24 final text that was good for everybody, I don't
25 remember who sent copies.

Page 71

1          Maybe the first copy has been admitted,
2 but I am absolutely not sure, from Industrial Heat
3 that sent the final -- the final version to me and to
4 Johnson. We signed. I signed it by myself, Johnson
5 signed it by himself, Darden signed it by himself and
6 everybody -- and every of us retained a copy, with
7 all the three signature at last.
8      Q.   And what contribution did Henry Johnson
9 make to any terms of the term sheet?
10     A.   I don't recall.
11     Q.   Do you recall -- but you recall that he
12 made some changes or contributions to the term sheet?
13     A.   Yes, I recall that.
14     Q.   You just don't recall what they were?
15     A.   Yes, exactly.
16          (The document referred to was thereupon
17 marked Deposition Exhibit 3 for Identification, a
18 copy of which is attached hereto.)
19 BY MR. PACE:
20     Q.   I am going to mark as Exhibit 3 what's
21 called an industrial gross sublease.
22     A.   Can I ask five minutes of break to go to
23 the men's room?
24     Q.   Of course.
25          THE VIDEOGRAPHER: We're off the record.

Page 72

1      The time is 11:36 a.m.
2          (Thereupon a brief recess was taken,
3 after which the following proceedings were had.)
4          THE VIDEOGRAPHER: We're back on the
5 record. The time is 11:47 a.m.
6 BY MR. PACE:
7      Q.   Dr. Rossi, you have in front of you
8 what's been marked as Exhibit 3. This is a
9 subleasing agreement between Leonardo Corporation and
10 J.M. Products, correct?
11     A.   Correct.
12     Q.   Who negotiated this on behalf of Leonardo
13 Corporation?
14     A.   Me.
15     Q.   And who negotiated it on behalf of J.M.
16 Products?
17     A.   Me.
18     Q.   Okay. So essentially this is -- you
19 handled both sides of this agreement, correct?
20     A.   Yes, sir.
21     Q.   Okay. And it says here that there is a
22 base rent -- I'm sorry, I'm covering up my
23 microphone.
24          Paragraph 2(A) refers to a base rent of
25 $71,000 for the first year, correct?

Page 73

1      A.   Yes.
2      Q.   And then after that the base rent would
3 go up by three percent a year for the second and the
4 third year, correct?
5      A.   Correct.
6      Q.   And this base rent -- at least according
7 to this agreement, the base rent was money that was
8 going to be paid by J.M. Products to Leonardo
9 Corporation, correct?
10     A.   Correct.
11     Q.   Did J.M. Products ever make these lease
12 payments to Leonardo Corporation?
13     A.   Yes.
14     Q.   Did they make the payments using money
15 that was provided to J.M. Products from Leonardo
16 Corporation?
17     A.   No, they paid by compensation with their
18 products.
19     Q.   So the money for -- I understand the
20 phrase you want to use but let's talk about the
21 currency.
22          Was there a transfer of funds -- was
23 there ever a transfer of funds from J.M. Products to
24 Leonardo Corporation for any of the lease amounts
25 under this agreement?

19 (Pages 70 - 73)

CONFIDENTIAL TRANSCRIPT

Page 74

1    A.  No.
2    Q.  Okay.  So --
3    A.  For the reason I said before.
4    Q.  You explained --
5    A.  Yes.
6    Q.  -- the compensation --
7    A.  Yes.
8    Q.  -- the concept you were discussing.
9    A.  Yes.
10   Q.  But I just wanted to find out whether
11 there was actually a payment of money, transfer of
12 funds, and there was not.
13       My question was -- I asked it as the
14 first year, so let me just go through each of the
15 three years.
16       Was there ever any transfer of money from
17 J.M. Products to Leonardo Corporation for lease under
18 this agreement in the second year of the agreement?
19   A.  The second year of the agreement did not
20 exist.
21   Q.  Okay.  So this agreement -- when was this
22 agreement terminated?
23   A.  This agreement has been terminated when
24 the plants have been stopped in February 2016.
25   Q.  So the three year period would be from

Page 75

1 September 2014 to midnight August 31st, 2017.  So the
2 first year would have expired in September 2015,
3 correct?
4    A.  Yes.
5    Q.  Or August 31st, 2015, correct?
6    A.  Yes.
7    Q.  The next year would have expired August
8 31st, 2016, correct?
9    A.  Yes.
10   Q.  Prior to that second year expiring this
11 agreement was terminated?
12   A.  Yes.
13   Q.  All right.  But at least for part of that
14 second year of the lease term J.M. Products was
15 located at -- was located at the Doral warehouse,
16 correct?
17   A.  I don't remember exactly when J.M.
18 abandoned the plant, but few -- a few days -- I don't
19 remember exactly how many days.
20   Q.  Was it --
21   A.  But --
22   Q.  Was it in February or March of 2016
23 though?
24   A.  I don't recall exactly, but very briefly
25 after -- when it became clear that the litigation was

Page 76

1 not going to be resolved in matter of weeks and not
2 even in matter of months, J.M. decided to abandon the
3 plant.
4    Q.  So that's -- the litigation -- you filed
5 your lawsuit in the beginning of April of 2016.  Does
6 that ring a bell with you?
7    A.  Yes.
8    Q.  Does that sound accurate to you?
9    A.  Yes, it is accurate.
10   Q.  I think it was April 2nd of 2016 but I
11 don't have it in front of me.
12   A.  The deposit of the complaints.
13   Q.  Yes.  So your testimony is that J.M.
14 Products stopped -- stopped at least certain
15 operations sometime after the complaint was filed?
16   A.  No, before.
17   Q.  Before the complaint was filed.
18   A.  Because before -- as you well know,
19 before the complaint -- our complaints have been
20 filed the situation had deteriorated very much, well
21 before we met the first time in Miami with the
22 attorney of Industrial Heat, which was you, and my
23 attorney that was John Annesser in January -- 8 of
24 January, if I am not wrong.
25   Q.  It was in January of 2016?

Page 77

1    A.  I remember the 8th of January, yes,
2 because it's been an important date.
3    Q.  I am just trying to kind of go back to
4 something you were just saying, which is at some
5 point in 2016 J.M. Products stopped -- well, at some
6 point in 2016 J.M. Products stopped its business
7 operations?
8    A.  Yes.
9    Q.  Okay.
10   A.  In Doral.
11   Q.  In Doral.  And to the best of your -- and
12 you, as the corporate representative today for J.M.
13 Products, the only business activities you are aware
14 of for J.M. Products -- I want to make sure I'm using
15 the word you are comfortable with.
16       You are more comfortable with aware.  Let
17 me start over.  You, as the corporate representative
18 of J.M. Products, the only business activities of
19 J.M. Products that you are aware of were at the Doral
20 location?
21       MR. ARAN:  Objection to form.
22       THE WITNESS:  As well as I were aware of,
23 yes.
24 BY MR. PACE:
25   Q.  Okay.  So sometime in 2016 J.M. Products

20 (Pages 74 - 77)

CONFIDENTIAL TRANSCRIPT

Page 78

1 ceased all business operations that you, as the
2 corporate representative of J.M. Products are
3 aware -- let me start. That was a horrible
4 question.
5        Sometime in 2016 J.M. Products stopped
6 its business operations at the Doral location?
7    A. Yes.
8    Q. I want to see if I can narrow it down
9 when.
10       It was before the lawsuit was filed at
11 the beginning of April of 2016, correct?
12    A. Correct.
13    Q. It was after you met with Tom Darden in
14 Miami, which was in January of 2016, correct?
15    A. Yes. You mean the meeting with the
16 attorneys?
17    Q. Yes.
18    A. After that.
19    Q. I'm sorry, that's a good point. You met
20 Tom Darden at a law office in Miami in January of
21 2016, correct?
22    A. Yes.
23    Q. Okay. So it was after that meeting.
24 Fabio Penon was here in Miami and was at the Doral
25 warehouse on at least the 16th and 17th of February

Page 79

1 of 2016.
2        Was J.M. Products still operating at that
3 time at the Doral warehouse?
4    A. Yes.
5    Q. All right. So now we have narrowed it
6 further. So now we have gotten to sometime after
7 February 17 of 2016, but before the very beginning of
8 April of 2016 J.M. Products ceased its operations?
9    A. Yes.
10    Q. That was a decision that was made by you,
11 correct?
12    A. No, that was a decision that has been
13 made by the owner of J.M..
14    Q. And when you say the owner, do you mean
15 Di Giovanni?
16    A. Yes.
17    Q. Is this -- was this a decision that was
18 made -- I'm trying to remember here.
19       Was this made at a meeting that you had
20 with Henry Johnson and Di Giovanni?
21    A. I don't recall exactly this. I don't
22 recall exactly this.
23    Q. Once the operations were -- once the
24 business operations of J.M. Products ended sometime
25 between mid February and the very, very beginning of

Page 80

1 April 2016, what happened to -- what happened, for
2 example, to Jim Bass? Jim Bass then became an
3 employee or a consultant for Leonardo?
4    A. Immediately after, yes, Jim Bass of
5 course has been dismissed from J.M., and I asked to
6 Jim Bass, because -- because he was very good, I
7 asked to Jim Bass to go ahead for Leonardo
8 Corporation in the study of the robotization system.
9    Q. I apologize. I was sipping water
10 literally when you gave the last answer. Did you say
11 the robotic system?
12    A. Yes, I asked to the -- to the company of
13 Jim Bass that was -- I don't recall the name now.
14       But I asked to continue to be a
15 consultant of Leonardo Corporation because it would
16 have been a pity to throw away a study that had been
17 started at that point that is a very interesting
18 technology related not to the one megawatt plant but
19 to the technology of J.M. that is in development.
20    Q. The technology of J.M., is that then
21 something that Leonardo acquired or is that still --
22 whatever that technology is it's still owned by J.M.
23 Products?
24    A. No, the technology is still owned by J.M.
25 Products.

Page 81

1    Q. But Leonardo is furthering the
2 development of that technology?
3    A. Yes, because not for J.M. Products but
4 for the European company we are in contact through
5 Di Giovanni, we're going to develop this business.
6    Q. What is the European company?
7    A. It is a company in theory. This is an
8 initiative that has to be still made.
9    Q. I'm sorry, I think I misunderstood. A
10 company in its infancy, is that what you said?
11    A. No, in theory, in the making.
12    Q. Okay. In theory, I'm sorry.
13    A. In theory, yes. Sorry, it's a Latin
14 expression. I'm sorry for use.
15    Q. So it's --
16    A. Excuse me.
17    Q. The European company hasn't been formed,
18 but what you are discussing with Di Giovanni is
19 forming that company in the future?
20    A. Yes, sir.
21    Q. All right. Let me come back here to J.M.
22 Products. After J.M. Products was -- after its
23 business operations were closed in Doral, which we
24 have established is sometime between late February
25 and the very beginning of April of 2016, the

21 (Pages 78 - 81)

CONFIDENTIAL TRANSCRIPT

Page 82

1  pipeline -- the pipes that were connecting the 1MW
2  plant on the Leonardo side of the warehouse to the
3  container, the kind of black box container on the
4  J.M. Products side of the warehouse, those pipes were
5  removed at some point, correct?
6      A.  Correct.
7      Q.  That was after the business of J.M.
8  Products closed?
9      A.  Yes.
10     Q.  That was shortly after the business of
11 J.M. Products closed?
12     A.  Yes.
13     Q.  That was at your direction?
14     A.  Yes.
15     Q.  And those -- this might help us for
16 clarity sake.  As you probably noticed through these
17 various depositions I sometimes like having
18 pictures.  They help make things a little more
19 clearer for me.
20     A.  Sure.
21     Q.  So I am going to mark here as Exhibit 4.
22         (The document referred to was thereupon
23 marked Deposition Exhibit 4 for Identification, a
24 copy of which is attached hereto.)
25 BY MR. PACE:

Page 83

1      Q.  Actually, you know what, I am going to
2  ask you a question about Exhibit 3, just so we get
3  that out of the way.  I just realized I didn't
4  actually --
5      A.  I have Exhibit 4 here.
6      Q.  Yeah.  I want to ask you -- I am going to
7  go back, only because I realized I didn't actually
8  get an answer to my question.  I just want to end it
9  get the answer and then we can move on.
10     A.  Okay.
11     Q.  So at least for part of the second year
12 of this sublease that is Exhibit 3 --
13     A.  Yeah.
14     Q.  -- J.M. Products was operating at the
15 Doral location, correct?  At least from September
16 2015 until early 2016?
17     A.  Yes.  Independently from this lease
18 contract J.M. left the area very short time after the
19 closing of the plants, so automatically this expired
20     Q.  I understand what you're saying.  I'm
21 just asking the question of you testified earlier
22 that there was no funds sent from J.M. Products to
23 Leonardo to pay for the first year's rent.
24     A.  Yes.
25     Q.  I just want to ask the question, there

Page 84

1  was also no funds sent from J.M. Products to Leonardo
2  to pay for the second year's rent?
3      A.  Correct.
4      Q.  I just wanted to close the loop.  Now we
5  can go to our new exhibit.
6         So Exhibit 4 shows -- too much paper.
7  Exhibit 4 shows the inside of the Doral warehouse,
8  correct?
9      A.  Yes, sir.
10     Q.  What we see there is a -- in silver what
11 we see there is a pipe wrapped in insulation,
12 correct?
13     A.  Yes.
14     Q.  That pipe was removed sometime after
15 February -- after the middle of February of 2016, but
16 before the beginning of April of 2016, correct?
17     A.  Yes.
18     Q.  All right.  And that pipe was removed at
19 your direction, correct?
20     A.  Yes.
21     Q.  And the pipe that was contained within
22 that insulation was then put to some other use by
23 you; is that correct?
24     A.  Yes.
25     Q.  And was the insulation discarded?

Page 85

1      A.  Yes.
2      Q.  Okay.  The -- what was the use that you
3  put the pipe to?
4      A.  That is related to a technology not
5  related to the technology of the litigation and it's
6  covered by industrial secret.
7      Q.  I'm sorry, the last one was industrial
8  secret?
9      A.  Secret, yes.
10     Q.  Let me ask you again.  I am not asking
11 for details on the underlying technology.  I am just
12 asking what did you do with the pipe?  You put it to
13 some other use?
14     A.  Yes.
15     Q.  What kind of use?  You don't have to give
16 me great details, but what kind of use?  Let me
17 rephrase.
18         Where is it now?  Where is the pipe now?
19     A.  Inside the plant.
20     Q.  All right.  And the pipe is now being
21 used in another device inside the plant?
22     A.  Yes, sir.
23     Q.  And this pipe being used in this other
24 device is carrying fluids through the device, without
25 getting into the details of what those fluids are?

22 (Pages 82 - 85)

CONFIDENTIAL TRANSCRIPT

Page 86

1    A.  Yeah.
2    Q.  Okay.  You can use a pipe to hold up a
3  table, correct?
4    A.  Sure.
5    Q.  So I am trying to understand.
6    A.  No, you are right.  Like this, like this.
7    Q.  Right, exactly.  Even this picture there
8  is a pipe --
9    A.  Sure.
10    Q.  -- that's shown as holding --
11    A.  As a pillar.  This is just a pillar.
12    Q.  What we see here is there is a gray or
13  metal-colored, surprisingly, pipe.
14    A.  Yes, exactly.
15    Q.  That is actually simply holding up the
16  pipe wrapped in insulation?
17    A.  Pillar.  Like a pillar.
18    Q.  Like a pillar?
19    A.  Yeah.
20    Q.  That's all I was trying to understand.
21    A.  Sure.
22    Q.  I just want to make sure our testimony
23  was clear on that because we're talking about
24  removing of pipes.  Now we've got a picture that it's
25  tied to.

Page 87

1      Reinaldo Breto, you testified earlier he
2  was a employee of Leonardo that was lent or
3  contracted out to J.M. Products, correct?
4    A.  I am sorry but I think that Reinaldo
5  Breto was an employee of J.M.
6    Q.  You think he was an employee of J.M.
7    A.  Yes, I remember.  Maybe I am wrong but as
8  I can recollect I remember that he was -- now he is
9  an employee of Leonardo, but at the times he was an
10  employee of -- of J.M..
11    Q.  Okay.  Well, this afternoon after lunch
12  we will bring in the actual Leonardo to J.M.
13  agreement, but it's just a matter of recollection.
14    A.  Sure.
15    Q.  But you are really getting, I think to my
16  added question, which is after J.M. Products closed
17  its business operations in Doral, Reinaldo Breto
18  became an employee of Leonardo Corporation?
19    A.  Yes.
20    Q.  And he remains an employee of Leonardo
21  Corporation until today?
22    A.  Yes.
23    Q.  And do you know where does -- at any
24  point in time did he -- was he actually living at the
25  Doral warehouse?

Page 88

1    A.  No, he was not living in the Doral -- I
2  asked him to -- we prepared for him a place where to
3  sleep in an office for guarding, to have somebody
4  always inside there because during the time I was
5  alone in the Leonardo -- mainly in the Leonardo
6  place, and I wanted to have somebody in the other
7  side just for security to call me, then to call the
8  police or somebody for security reasons.
9      And yes, for some time he slept there,
10  yes, but he was not -- it was not a stable
11  situation.
12    Q.  Do you know for how long he was residing
13  at the Doral location?
14    MR. CHAIKEN:  Object to form.
15    THE WITNESS:  He was not residing.  He
16  never resided.
17  BY MR. PACE:
18    Q.  I'm sorry, you're right.  I just used the
19  wrong word.
20      For how long was he staying at the Doral
21  location under the arrangement you talked about,
22  where there was a place for him to be able to spend
23  the night while you were at the Doral location?
24    A.  During the -- I don't recall exactly the
25  period -- I don't recall exactly the period but when

Page 89

1  we saw -- I was very suspicious about espionage,
2  about -- sometime we had people around that was
3  around to take photography, et cetera.
4      During periods in which I did not feel
5  very safe, I asked him to remain there.
6    Q.  I understand.  So it was not steady, it
7  wasn't that he was always at the J.M. Products side
8  of the Doral warehouse --
9    A.  Yes.
10    Q.  -- for a period of time, it was when you
11  would request?
12    A.  Yes.
13    Q.  But otherwise he was a full-time
14  janitor/handyman J.M. Products?
15    A.  It is correct.
16    Q.  All right.  If we have one extra copy,
17  they'll split.  This is a simple point.
18      (The document referred to was thereupon
19  marked Deposition Exhibit 5 for Identification, a
20  copy of which is attached hereto.)
21  BY MR. PACE:
22    Q.  Dr. Rossi, just so that our record is
23  clear I marked as Exhibit 5, because Mike here is
24  very good at finding documents.  This is why I am
25  better doing depositions with Mike than without him.

23 (Pages 86 - 89)

CONFIDENTIAL TRANSCRIPT

Page 90

1 This is a document that shows that
2 Leonardo Corporation lent Reinaldo Breto to J.M.
3 Products in the first instance, correct?
4 A. Correct.
5 Q. All right. And now -- so essentially now
6 that Reinaldo Breto is an employee of Leonardo
7 essentially --
8 A. Yes.
9 Q. -- simply this contract has been
10 cancelled?
11 A. I am not able to answer to this
12 question. You know, from this invoice I can
13 understand that Reinaldo -- Reinaldo was -- during
14 the period of this invoice should have been an
15 employee of Leonardo, not of J.M. Products.
16 As I said before, I don't recall exactly
17 if he was an employee of one or the other and so
18 probably -- sir, I am not able to answer. Because
19 this is an invoice where Leonardo invoices to J.M.
20 Products the services of Reinaldo Breto.
21 From this invoice I must only think that
22 in this period Reinaldo Breto was an employee of
23 Leonardo Corporation. This is all I can answer to
24 you, sir.
25 Q. Okay. And in terms of this period,

Page 91

1 you're confident --
2 A. I don't see a date. Sorry if I interrupt
3 you, but where is the date on this?
4 Q. I don't think there is a date to it. Is
5 that your signature at the bottom?
6 A. Yes, it is my signature.
7 Q. This is a document that you prepared or
8 had someone prepare for you?
9 A. I am not able to answer because I do not
10 remember this document. I am reading this now. For
11 sure it is authentic because this is my signature,
12 there is no doubt about that, but I do not remember
13 this.
14 And so I am not able to answer you if --
15 if this has been something that then has been
16 cancelled or not. I am not able to tell you.
17 Q. You're not aware of J.M. Products ever
18 sending funds to Leonardo Corporation in the amount
19 of $3,000 a month for Reinaldo Breto, correct?
20 A. I have to repeat what I said before,
21 this -- every expenses of the day by day, this
22 reenters in the day by day expenses was covered by
23 the compensation agreement between Leonardo and J.M.
24 So J.M. never transferred money. J.M.
25 paid in products by compensation.

Page 92

1 Q. But again, so we're clear though, there
2 wasn't any transfer of funds, either for Reinaldo
3 Breto or for any other purpose from J.M. Products to
4 Leonardo?
5 A. Sir, not that I can recall.
6 Q. So that makes it easier for this. The
7 other thing I would say is you are confident if you
8 signed this it would have been during a period when
9 J.M. Products was still conducting its business,
10 correct?
11 A. Yes.
12 Q. So this must be prior to whenever it
13 terminated its business in 2016?
14 A. Absolutely. Absolutely. Because after
15 when they terminated they had no reason at all to
16 have anybody working for them.
17 Q. Okay.
18 A. In Doral.
19 Q. I want to -- I want to discuss the heat
20 exchanger that you've testified about on the J.M.
21 Products side of the Doral location in more detail
22 actually later on today, but the only thing I want to
23 talk about now on that is was that -- that heat
24 exchanger that you have testified about, that you
25 have discussed with Dr. Wong, do you -- do you know

Page 93

1 the date when that was removed?
2 A. Immediately after the -- after the
3 closure, after the stop of the plants.
4 Q. So when -- when Fabio Penon was in Miami
5 in February of 2016 the heat exchanger was still in
6 place on the J.M. Products side of the Doral
7 warehouse, correct?
8 A. Yes, it is correct.
9 Q. So sometime after that but before --
10 well, let me ask you, by the time you filed your
11 lawsuit had the heat exchanger that you have
12 testified about and described to Dr. Wong, had that
13 been removed?
14 A. Sorry, attorney, it's pretty much
15 confusing.
16 Q. Okay. Let's do this. When I refer to
17 the heat exchanger I'm referring to the heat
18 exchanger that you testified about previously in this
19 case and that you described to Dr. Wong, okay?
20 A. Yes.
21 Q. As to that heat exchanger --
22 A. Yes.
23 Q. -- had that been removed from the Doral
24 location prior to your lawsuit being filed?
25 A. Yes.

24 (Pages 90 - 93)

CONFIDENTIAL TRANSCRIPT

Page 94

1    Q.   Okay.  So that also -- just like the
2  pipes -- the piping that we saw in Exhibit 4, that
3  heat exchanger also, that was removed sometime
4  between the middle of February 2016 and the beginning
5  of April 2016?
6    A.   It is correct.
7    Q.   All right.  And that also, according to
8  your testimony, involved a large amount of piping.
9    A.   Yes.
10   Q.   Where has all that piping gone?  We will
11 talk about the other aspects of it later but I'm just
12 trying to understand, is that piping -- let me just
13 ask the question.
14        Where did all that piping go?
15   A.   In another plant not connected with the
16 activity of the one megawatt plant, like the other
17 one I told before.
18   Q.   So there is another plant, there is
19 another location?  It's at a different location?
20   A.   It's another plant.  No, it is in the
21 same location, but it's -- it's another thing.
22   Q.   So let's see if we can get this -- we're
23 going to talk about this in a lot more detail in the
24 afternoon after lunch but I am just trying to
25 understand.

Page 95

1        The piping for the heat exchanger that
2  you testified about, it is now -- it's still at the
3  Doral warehouse?
4    A.   Yes.
5    Q.   All right.  But it's being used in some
6  new type of device?
7    A.   Yes.
8    Q.   And in connection with this device, is it
9  being used -- does it have fluids flowing through it?
10   A.   Yes.
11   Q.   And just to be clear for our purposes, we
12 have discussed this in other depositions, I know, but
13 I like each deposition to be clear.
14        Both a liquid and a gas is a fluid,
15 correct?
16   A.   Correct.
17   Q.   So if we talk about -- when we talk
18 about -- if we were talking about water, if you
19 described it as a heated fluid, that could be not
20 just hot water, that could be steam, correct?
21   A.   Correct.
22   Q.   Okay.  So I am not -- when I say that a
23 fluid is flowing through these pipes I am not asking
24 you whether it's steam or hot water or what it is,
25 it's some kind of fluid?

Page 96

1    A.   You know, in chemistry and in physics
2  everything that is not solid is a fluid.
3    Q.   Is a fluid.  I just wanted the record to
4  be clear that I am not -- when I refer to fluid, I am
5  not trying to get into a debate --
6    A.   Sure.
7    Q.   -- over whether we're talking about
8  something is in liquid form or gas form, it's a fluid
9  in any event.
10        (The document referred to was thereupon
11 marked Deposition Exhibit 6 for Identification, a
12 copy of which is attached hereto.)
13 BY MR. PACE:
14   Q.   I'm going to hand you Deposition Exhibit
15 6.
16   A.   Thank you.
17   Q.   You're welcome.  This is a -- this is the
18 meeting from the first board of directors and
19 shareholders for J.M. Products or, I'm sorry, for
20 J.M. Chemical Products, correct?
21   A.   I never saw this, so.  I think this is
22 the first time I see this document.
23   Q.   Okay.  If you look at the date on it --
24 well, let me ask.  So in preparing for your
25 deposition testimony today this is not a document you

Page 97

1  reviewed?
2    A.   No, this is not a document I reviewed.
3    Q.   Okay.  Assuming this is an authentic
4  document, it was produced by J.M. Products, date --
5  you see on the last page there is a date that is June
6  27, 2014, so that's right around the time that J.M.
7  Products was formed, correct?
8    A.   Okay.  Yes, if it is so.  Again, I am
9  seeing, attorney, this document for the first time in
10 my life.
11   Q.   I understand.  I am asking you about the
12 date.  I'm saying --
13   A.   I am reading dated June 27, 2014, yes.
14   Q.   Right.  And is that -- do you recall --
15   A.   Sorry.
16   Q.   I'm sorry.
17   A.   Sorry.
18   Q.   Do you recall that's around the time that
19 J.M. Products was -- J.M. Chemical Products was
20 created as a company?
21   A.   Makes sense.
22   Q.   Okay.  But you don't actually recall -- I
23 am not trying to put words in your mouth.  You don't
24 actually recall --
25   A.   No.

25 (Pages 94 - 97)

CONFIDENTIAL TRANSCRIPT

Page 102

1 you will be requested and I am, just tell that it's a
2 typo made by secretary and that's it. He told me
3 that eventually has been corrected.
4    Q. It's been corrected. So there should be
5 another document that should have been produced or
6 would have been produced that would have the
7 corrected information in it?
8    A. So the attorney Johnson told me.
9    Q. Understood. Right. You didn't actually
10 do the correction?
11    A. No.
12    Q. Either Henry Johnson or his assistant,
13 Colette made the correction?
14    A. I suppose so.
15    Q. By the way, just so I put it on the
16 record before I forget about it, Colette is Colette
17 Sauer, but it's spelled S-A-U-E-R, correct?
18    A. Yes, it is correct.
19    Q. We have got that done so later on today
20 when I refer to Colette Sauer it will be spelled
21 correctly in the record.
22    A. It's the secretary of Johnson.
23    Q. I want to -- before we take a break for
24 lunch, I want to talk -- one of the deposition topics
25 for today, if you look at -- if you're looking at

Page 103

1 Exhibit 1 but I will read it to you. You can read
2 along with me if you like.
3    A. Exhibit 1, yes.
4    Q. Deposition topic 6 is --
5    A. Page?
6    Q. I'm sorry, page 2.
7    A. Page 2, yes.
8    Q. Deposition topic 6 is the relationship
9 between JMP and Johnson Matthey p.l.c. --
10    A. Yes.
11    Q. -- or its affiliates --
12    A. Yes.
13    Q. -- including, but not limited to any
14 products JMP purchased from or sold to Johnson
15 Matthey, any payments between JMP and Johnson Matthey
16 and any agreements between JMP and Johnson Matthey.
17       I think I can kind of cover this topic in
18 just a few minutes and if I'm wrong, we'll break for
19 lunch and finish afterwards.
20    A. No problem.
21    Q. J.M. Products never ultimately sold any
22 products to Johnson Matthey, correct?
23    A. J.M. Products was not supposed to sell
24 products to Johnson Matthey.
25    Q. Okay. And --

Page 104

1    A. Never. Never sold. The answer to your
2 question, correct.
3    Q. They never sold. And that's because they
4 were never intending to sell any products to Johnson
5 Matthey?
6    A. No, Johnson Matthey --
7       MR. CHAIKEN: Object to form.
8       THE WITNESS: Johnson Matthey in the long
9 discussions that I had with their top managers,
10 they said that they would have been open to --
11 also to buy our products, to buy back the
12 materials in case of we did not need them but --
13 but basically they were not supposed to buy
14 material from JMP.
15 BY MR. PACE:
16    Q. Some of this I'm going over things that
17 were covered in your prior deposition. I am just
18 trying to make sure I'm clear because I've got you
19 here as a representative of J.M. Products.
20    A. Okay.
21       (The document referred to was thereupon
22 marked Deposition Exhibit 7 for Identification, a
23 copy of which is attached hereto.)
24 BY MR. PACE:
25    Q. I am handing you what's marked as Exhibit

Page 105

1 7. I believe we covered this in your deposition on
2 behalf of Leonardo Corporation last Friday, so I
3 don't think I'm treading new ground.
4       You just said that you were talking with
5 high level people at Johnson Matthey.
6    A. Yes.
7    Q. And I believe last Friday you identified
8 those individuals as the people on this e-mail. This
9 is an e-mail that you had with Johnson Matthey with a
10 Dalton O'Brian and Alain Groborz, correct?
11    A. Yes, it is correct.
12    Q. Those are the two individuals at Johnson
13 Matthey with whom you were having your discussions?
14    A. Correct.
15    Q. All right. There has -- there has never
16 been a payment by Johnson Matthey to J.M. Products,
17 correct?
18    A. Correct.
19    Q. Has there ever been a payment by J.M.
20 Products to Johnson Matthey?
21    A. I don't recall if -- because I bought --
22 I bought a sample from them and -- for several
23 thousand dollars and I don't remember if I bought it
24 as Leonardo Corporation or if J.M. bought it. I
25 don't remember this.

27 (Pages 102 - 105)

CONFIDENTIAL TRANSCRIPT

Page 106

1     Q.  Okay.
2     A.  Maybe yes, maybe not.  I don't recall
3 exactly.  Because in any case, this reentered in the
4 day by day operation of the company.
5      So in any case, the money had to come
6 from Leonardo based on the agreement between Leonardo
7 and J.M..  So maybe that this has been made, because
8 they were in contact with J.M., as you can see from
9 this e-mail.
10      This e-mail has been signed Andrea Rossi,
11 J.M. Products Corporation, Doral, Florida, so they
12 knew that they were talking with J.M.
13     Q.  Right.
14     A.  And -- but I don't remember if I bought
15 that sample as Leonardo or as J.M., so I am not able
16 to answer your question.  Either one.
17     Q.  That's why I was asking you.
18     A.  Either one.
19     Q.  That's why I was asking the question.  I
20 was trying to understand whether J.M. Products bought
21 it or whether Leonardo bought it.
22     A.  I don't recall.
23     Q.  Because I don't think we have received
24 documents from either reflecting the actual purchase
25 so I was trying to figure out who should have the

Page 107

1 documents.
2     A.  And I can explain why.  Because I bought
3 from their American subsidiary.
4     Q.  In Tennessee?
5     A.  I don't remember if it is in Tennessee
6 but we bought -- since we bought -- it was a small
7 amount because it was just a sample and so they
8 directed me to their American subsidiary for this
9 small amount.  And I don't remember if it was
10 Tennessee or not.
11     Q.  So let's break that down.  Again, we can
12 take a break in a little bit.  I don't want to keep
13 you for lunch.
14     A.  I don't need it.
15     Q.  Unfortunately I think I do need lunch.
16      This e-mail is dated March 22nd and it
17 talks about an order or potential order of 10
18 kilograms of platinum sponge.
19      The first question is, your recollection
20 that there was an actual purchase of platinum sponge
21 from Johnson Matthey, that transaction occurred
22 subsequent to this e-mail?
23     A.  No.
24     Q.  Prior to this e-mail?
25     A.  Can you repeat the question?

Page 108

1     Q.  Yeah.  Maybe use of the word subsequent
2 was a bad one.  I think what you were just telling me
3 was sometime after this e-mail you, either on behalf
4 of Leonardo Corporation or on behalf of J.M.
5 Products, bought some platinum sponge from a Johnson
6 Matthey subsidiary in the United States; is that
7 correct?
8     A.  I bought from Johnson Matthey a sample of
9 a -- of a particular filter, from which I could take
10 off platinum sponges because they do not sell
11 platinum sponges in small quantities and I needed a
12 small quantity to make one experiment and so I bought
13 from -- I bought -- yes, indirectly I bought platinum
14 sponges, but directly what I bought was a particular
15 filter that I knew because I used it in Italy for
16 other things.  It's a catalyst.
17      It's a catalyst that contains platinum
18 sponges and I knew how to take off from that catalyst
19 the platinum sponge that I need to make the
20 experiment, to make an experiment.
21     Q.  Let me walk backwards, if I can.  First
22 of all, when you bought these filters, you bought
23 them from a Johnson Matthey subsidiary in the United
24 States?
25     A.  Yes.

Page 109

1     Q.  Second is you bought them sometime after
2 the date of this e-mail, which is March 22nd of 2015,
3 correct?
4     A.  Yes.
5     Q.  In response to this e-mail where you were
6 looking to buy ten kilograms of platinum sponge, did
7 Johnson Matthey inform you they weren't willing to
8 sell ten kilograms -- simply ten kilograms of
9 platinum sponge?
10     A.  They sent an offer.
11     Q.  You said that you needed a small amount
12 of platinum sponge for the experiment you wanted to
13 run.
14      What do you mean by a small amount?  Are
15 we talking a few grams?  Are we talking a kilogram?
16     A.  We're talking a few grams.
17     Q.  A few grams.  And you obtained those few
18 grams from the -- from removing them from filters you
19 bought from the Johnson Matthey subsidiary?
20     A.  Correct.
21     Q.  And you don't recall sitting here today
22 whether it was J.M. Products or Leonardo that bought
23 those filters?
24     A.  Correct.
25     Q.  When J.M. Products -- actually, before I

CONFIDENTIAL TRANSCRIPT

Page 110

1 get into that subject, let me just see if I can wrap
2 things up with Johnson Matthey.
3        So you received order -- orders or
4 proposed orders from Johnson Matthey for either J.M.
5 Products or Leonardo to buy platinum sponge, but
6 those orders were never completed, the platinum
7 sponge pursuant to those orders was never bought; is
8 that correct?
9      A.  You say order, but you mean offers.
10     Q.   Offer.  I'm sorry, I didn't know if there
11 was a phrase used for it.  Yes, so let me rephrase my
12 question.
13        You received offers or proposals --
14     A.  Yes.
15     Q.  -- from Johnson Matthey to sell to either
16 Leonardo Corporation or J.M. Products some quantity
17 of platinum sponge, correct?
18     A.  Correct.
19     Q.  Those proposals or offers were never
20 accepted by either J.M. Products or Leonardo,
21 correct?
22     A.  Correct.  In that case from J.M.
23 because -- yes, okay.  No.  The answer is correct.
24     Q.  All right.  Either J.M. Products or
25 Leonardo did obtain some platinum sponge from a

Page 111

1 Johnson Matthey subsidiary, but it obtained it by
2 purchasing filters from Johnson Matthey, the Johnson
3 Matthey subsidiary, correct?
4      A.  Yes, it is correct.
5      Q.  So that transaction is not reflected in
6 Exhibit 7?
7      A.  No, sir.
8      Q.  Okay.  But it occurred sometime after
9 Exhibit 7?
10     A.  Yes, sir.
11     Q.  All right.  Other than proposals --
12 proposals or offers from Johnson Matthey to buy --
13 I'm sorry, to sell platinum sponge and aside from the
14 transaction whereby either Leonardo or J.M. Products
15 bought filters from a Johnson Matthey subsidiary,
16 have there been -- are there any other agreements
17 or -- are there any other agreements between J.M.
18 Products and Johnson Matthey?
19     A.  No, sir.
20     Q.  Okay.  Have there been any other
21 potential agreements negotiated between J.M. Products
22 and Johnson Matthey?
23     A.  I don't understand the question.
24     Q.  It was a poor question.  Other than a
25 proposal or offer to sell platinum sponge by Johnson

Page 112

1 Matthey to J.M. Products, and other than the
2 transaction whereby certain filters were bought by
3 either J.M. Products or Leonardo from a Johnson
4 Matthey subsidiary, have -- are there any other
5 business transactions that were negotiated or
6 discussed between Johnson Matthey and J.M. Products?
7      A.  No.
8        MR. PACE:  Why don't we go off the
9 record.
10        THE VIDEOGRAPHER:  Sure.  Off the
11 record.  The time is 12:44 p.m.
12        (Thereupon a lunch recess was taken,
13 after which the following proceedings were had.)
14        THE VIDEOGRAPHER:  We're back on the
15 Record the time is 1:52 p.m.
16 BY MR. PACE:
17     Q.  Dr. Rossi, we have gone through this --
18 well, first of all you recognize you are still under
19 oath, correct?
20     A.  Yes.
21     Q.  We have gone through this exercise before
22 so I think you know the drill but I am going to ask
23 you a series of questions.
24        I'd ask kind of yes, no answers, give
25 your lawyer a chance to object and at some point your

Page 113

1 lawyer I suspect is going to instruct you not to
2 answer, so just -- we have done this before.
3        Which is at your -- during the break with
4 whom did you meet or discuss or have conversations?
5      A.  With my attorneys.
6      Q.  And those attorneys are?
7      A.  Attorney Aran.
8      Q.  Aran and attorney Chaiken?
9      A.  Yeah.
10     Q.  And just answering yes or no, did you
11 discuss at all your testimony from earlier today?
12     A.  Yes.
13     Q.  With both of the attorneys or with just
14 one or the other attorney?
15     A.  With both of my attorneys.
16     Q.  Okay.  Again, give your lawyer a chance
17 here.  But what did you discuss?
18        MR. ARAN:  Objection, privileged.
19        MR. CHAIKEN:  Instruction not to answer.
20        MR. ARAN:  And instruction not to answer.
21        THE VIDEOGRAPHER:  Counsel, microphone
22 please.
23        MR. PACE:  Hit it again, just so they
24 hear it on the record.
25        MR. ARAN:  Objection, privileged and

29 (Pages 110 - 113)

CONFIDENTIAL TRANSCRIPT

Page 150

```
 1      Q.  I'm sorry, Dr. Rossi, you had -- you took
 2  a look at some notes to identify the model of the
 3  fans that were used in the heat exchanger you have
 4  been testifying about.  What was the model?
 5      A.  No, the manufacturer is Multifan.
 6      Q.  I'm sorry?
 7      A.  M-U -- Multifan, M-U-L-T-I-F-A-N.
 8      Q.  Multifan?
 9      A.  Multifan.
10      Q.  And I forget if I asked you this
11  already.  Where did you buy the fans?
12      A.  From Multifan.
13      Q.  Directly, you bought it directly from --
14  Multifan is the manufacturer?
15      A.  Yes.
16      Q.  And you bought them directly from the
17  manufacturer?
18      A.  Yes.
19      Q.  Is it safe to say you don't recall
20  whether you bought them on behalf of Leonardo or J.M
21  Products?
22      A.  Most likely Leonardo, but could be -- I
23  think Leonardo.
24      Q.  And you believe that your -- your
25  accountant would have the records of the purchase of
```

Page 151

```
 1  those fans?
 2      A.  Yes.
 3      Q.  And how many fans did you buy?
 4      A.  Two.
 5      Q.  Do you still have those fans?
 6      A.  They have been modified.  They have been
 7  modified because I had used them for another purpose
 8  now.
 9      Q.  Without getting into the detail, can you
10  explain to me what the other purpose is of the fans?
11         MR. ARAN:  Objection to the extent --
12  BY MR. PACE:
13      Q.  What's the purpose you are using the
14  fans?
15      A.  Can you repeat?
16      Q.  Sure.  You just said that you still have
17  the fans but you are -- they have been modified
18  because you are using them for another purpose,
19  correct?
20      A.  Yes.
21      Q.  Are the fans being used in connection
22  with the container, the J.M. Products container?
23      A.  Yes, but for a completely different
24  purpose because the kind of technology we have there
25  is a completely different thing.
```

Page 152

```
 1      Q.  How have the fans been modified?
 2      A.  Can you repeat?
 3      Q.  How have the fans been modified?
 4      A.  I deem this confidential information
 5  because the modification of those fans reenters in
 6  this new technology.
 7             So if you are more specific and ask me
 8  something.  How have been modified is too generic to
 9  answer.  Because I should have to explain things that
10  I deem not information to give to my competitor
11  and -- but --
12      Q.  Were the fans modified by somebody on
13  behalf of J.M. Products or somebody on behalf of
14  Leonardo Corporation?
15      A.  Leonardo Corporation.
16      Q.  Who made -- who modified the fans?
17      A.  I did.
18      Q.  To modify the fans did you have to
19  disassemble them?
20      A.  Yes.
21      Q.  Do they still operate as fans?
22      A.  Fan is a very generic -- anything that
23  moves a fluid -- anyway, yes.  I would say yes.
24      Q.  Are they still used to move air?
25      A.  Yes.
```

Page 153

```
 1      Q.  Do they operate inside the container, the
 2  J.M. Products container?
 3      A.  Yes.
 4         MR. ARAN:  Objection to form.
 5  BY MR. PACE:
 6      Q.  This heat exchanger that you have been
 7  testifying about, when was it put into place at the
 8  Doral warehouse?
 9      A.  Kindly can you repeat?  I was distracted.
10      Q.  Okay.
11      A.  I was thinking to something.  Sorry, it's
12  my fault.
13      Q.  I believe you have already testified that
14  this heat exchanger about which you are testifying
15  was removed sometime between mid February and very
16  early April of 2016, correct?
17      A.  Correct.
18      Q.  All right.  When was it installed?
19      A.  It has been installed before the
20  beginning of the test.
21      Q.  If the test that you are describing was
22  in late February of 2015 --
23      A.  Correct.
24      Q.  -- can you tell me was it installed by
25  January of 2015?  Was it installed in mid --
```

CONFIDENTIAL TRANSCRIPT

Page 198

1  From the time that the E-Cat plant arrived in Doral
2  to present has J.M. Products or Leonardo paid money
3  to either Fulvio Fabiani directly or to US Quantum
4  Leap?
5      A.  J.M. for sure not.  About Leonardo
6  Corporation, honestly I do not remember.  I do not
7  remember.  Maybe -- maybe yes, maybe no, because I am
8  not able to collocate in time because Leonardo
9  Corporation has paid Fabiani, because Fabiani gave to
10 Leonardo Corporation much of consulting.
11     Now I am not able to tell you if the --
12 if the payments -- payments have been made to him
13 also after the -- after the Industrial Heat
14 connection.  Maybe yes.  I don't remember.
15     Maybe yes, because he continued to give
16 to Leonardo Corporation consulting for the -- for
17 example, for the robotization.  I am not -- I am
18 not -- I do not remember.  It is possible, but I do
19 not remember.
20     Q.  So no as to J.M. Products, possible as to
21 Leonardo?
22     A.  J.M. Products, surely not.
23     Q.  And just so we were clear, because I
24 think you may have covered a broader time period than
25 I intended.  The starting point I asked for was when

Page 199

1  the E-Cat plant arrived in Doral, which would have
2  been in late 2014.
3      A.  Yes.
4      Q.  Does that change your answer as to
5  Leonardo?  Are you still maybe, maybe not?
6      A.  (Nods head.)
7      Q.  Okay.  Just you had made a reference to
8  North Carolina.  That's why I was trying to
9  understand.
10     A.  Let me give you some more.  Should it be
11 I would not be surprised, but because it is not
12 impossible.  But I don't specifically remember but it
13 is not impossible because he continued to give to me
14 consulting.
15     Q.  As to J.M. Products though, J.M. Products
16 has not made any payments to Fabiani or US Quantum
17 Leap and J.M. Products has not had any agreements
18 with Fabiani or US Quantum Leap?
19     MR. CHAIKEN:  Object to form.
20     MR. ARAN:  Object to form.
21 BY MR. PACE:
22     Q.  Let me start over again.  That was a long
23 question and these people are getting annoying.
24     MR. ARAN:  Two.
25     MR. PACE:  It was seven questions,

Page 200

1      actually.  You missed five of them.
2      MR. CHAIKEN:  That's true.
3  BY MR. PACE:
4      Q.  What you just testified is that J.M.
5  Products has not made any payments to Fabiani or US
6  Quantum Leap, correct?
7      A.  Yes.
8      Q.  Is it also true that J.M. Products has
9  not had any agreements with either Fabiani or US
10 Quantum Leap?
11     A.  It is true.  You know, sir, not that I am
12 aware of.  I don't know if behind me and without my
13 knowledge there has been some agreement.  I don't
14 think so.  I don't know and I don't think so.
15     Q.  One of the reasons I asked is you are
16 familiar with these -- with the work that was done
17 with the BeagleBone processor and the Banana Pro
18 processor, these documents we looked at before,
19 correct?
20     A.  Yes.
21     Q.  These are all --
22     A.  Familiar, it depends what you mean by
23 familiar.
24     Q.  Let me define that.  I'm not saying
25 you're familiar with the electronics behind it.

Page 201

1      A.  Exactly.
2      Q.  I am just saying you are aware that
3  Fulvio Fabiani and Jim Bass were working together on
4  a project that involved a control system?
5      MR. ARAN:  Objection.
6      THE WITNESS:  Yes, because I did direct
7      them to do it.
8  BY MR. PACE:
9      Q.  And my only -- the thing I was trying to
10 understand is, if I understood the earlier testimony,
11 at one point that was a project being done for J.M.
12 Products and then later became a project being done
13 for Leonardo.  Is that accurate or inaccurate?
14     A.  This is accurate.
15     Q.  Okay.  While that project was being done
16 for J.M. Products, J.M. Products was not paying
17 Fulvio Fabiani or US Quantum Leap for the work on
18 that project?
19     A.  No.
20     Q.  Okay.  That's what I was trying to
21 understand.  I think you referenced -- I'm sure you
22 have identified this in a prior exhibit, but since
23 you are here as a representative of J.M. Products,
24 let me make sure.
25     A.  Thank you.

51 (Pages 198 - 201)

CONFIDENTIAL TRANSCRIPT

Page 202

1      (The document referred to was thereupon
2 marked Deposition Exhibit 17 for Identification, a
3 copy of which is attached hereto.)
4 BY MR. PACE:
5      Q.  That is the -- that is the agreement you
6 have referenced before about the compensation
7 agreement between J.M. Products and Leonardo
8 Corporation, correct?
9      A.  Yes.
10      Q.  And this is signed by Henry Johnson for
11 J.M. Products and by you for Leonardo?
12      A.  Correct.
13      Q.  All right.  I just wanted to make sure we
14 got that kind of clear on the record, so that was
15 17.  Exhibit 17.
16      (The document referred to was thereupon
17 marked Deposition Exhibit 18 for Identification, a
18 copy of which is attached hereto.)
19 BY MR. PACE:
20      Q.  I have marked here as Exhibit 18.
21      A.  Yes, I know what is this.
22      Q.  In connection with -- in connection with
23 Industrial Heat entering the term sheet with J.M.
24 Products or J.M. Chemical Products, Industrial Heat
25 asked J.M. Chemical products to complete this form

Page 203

1 that is marked as Exhibit 18, correct?
2      A.  Yes.
3      Q.  And this was completed by Henry Johnson
4 as the president of J.M. Chemical products?
5      MR. ARAN:  Objection, form.
6      THE WITNESS:  I am reading that, yes.
7 BY MR. PACE:
8      Q.  Do you recognize that as Henry Johnson's
9 signature?
10      A.  Honest --
11      Q.  If you don't recognize it, you don't.
12      A.  Yeah, but I have no doubt -- I don't
13 recognize it because I am not familiar with his
14 signature.
15      Q.  Okay.
16      A.  But I am pretty sure that this has been
17 signed by him.
18      Q.  Okay.  And the J.M. Chemical Products is
19 what today is known as J.M. Products, correct?
20      A.  Yes, it is correct.
21      Q.  One statement in here is that JMC, which
22 is short for J.M. Chemical Products, is owned by an
23 entity formed in the United Kingdom.  That's not --
24 that's not, in fact, accurate, correct?
25      A.  No, it is not accurate.  May I explain?

Page 204

1      Q.  Yes.
2      A.  Okay.  From the beginning Di Giovanni
3 told us that he was going to make for this business a
4 partnership that would end up -- that would end up
5 with a UK entity and this remained -- and this
6 remained through various documents that follow it up
7 and at the end Di Giovanni did not -- did not make an
8 agreement with those people -- with those people and
9 remained this -- this thing that eventually turned
10 out not to have been made and it remained -- it
11 remained --
12      Q.  It remained?  Finish.
13      A.  It remained.
14      Q.  Owned by Platinum American Trust?
15      A.  American Trust, whose beneficiary is an
16 Italian.
17      So what was foreseen, also for me, also
18 from me, I had understood that the beneficiary would
19 become eventually a UK entity and that -- the
20 beneficiaries of Di Giovanni was provisional.
21      Q.  So at the time this was signed J.M.
22 Chemical products was owned by Platinum American
23 Trust, correct?
24      A.  At the time this has been -- what is the
25 time this has been signed, please?

Page 205

1      Q.  August -- the middle of August 2013 --
2 2014.  The middle of August 2014.
3      A.  So the Platinum Trust had already been
4 made, am I correct?
5      Q.  Correct.
6      A.  Yes.  So yes, when it has been signed
7 still there was the conviction from all that
8 Di Giovanni was going to eventually merge in a UK
9 entity.
10      Q.  So let me type out the date this was
11 signed.
12      So on the day this was signed J.M.
13 Chemical Products was owned by Platinum American
14 Trust, correct?
15      A.  Correct.
16      Q.  On the day this was signed the sole owner
17 of Platinum -- the sole beneficiary of Platinum
18 American Trust was Giovanni, correct?
19      A.  Correct.
20      Q.  And Giovanni was an Italian human being,
21 not a United Kingdom entity?
22      A.  Yes, it is correct.
23      Q.  Okay.
24      A.  But Di Giovanni --
25      Q.  Let me just --

52 (Pages 202 - 205)

CONFIDENTIAL TRANSCRIPT

Page 206

1    A.  Sorry.
2    Q.  Let me do this by steps.
3    A.  Sure.
4    Q.  But your testimony is what you understood
5  was that Di Giovanni was looking to transfer his
6  beneficial interest in the trust to a UK entity,
7  correct?
8    A.  Yes, it is correct.
9    Q.  And you say that -- and you have said
10 that there are documents that reflect that this
11 transaction was being contemplated, correct?
12        MR. CHAIKEN:  Object to form.
13        THE WITNESS:  I did not understand this.
14 BY MR. PACE:
15    Q.  I thought I heard you make a reference
16 that there are documents that reflect that
17 Di Giovanni was -- was contemplating selling his
18 beneficial ownership to a UK entity.
19        MR. CHAIKEN:  Object to form.
20        THE WITNESS:  No, sir, I did not say
21    that.
22 BY MR. PACE:
23    Q.  Okay.  I misunderstood.
24    A.  Di Giovanni told to us that --
25    Q.  He told that to you?

Page 207

1    A.  Di Giovanni told to me and to the
2  attorney Johnson this.
3    Q.  So that's all -- there is no documents
4  that reflect it, it's just oral communications?
5    A.  Not that I am aware of.
6    Q.  Understood.  And do you know the -- the
7  supposed entity, the UK entity to which Di Giovanni
8  was having some kind of communications?
9    A.  Can you kindly repeat?
10    Q.  Sure.  You have said that orally
11 Di Giovanni told you that he was having discussions
12 with selling his beneficial interest in J.M. Products
13 to a UK entity.
14    A.  No, he told me that he was going to make
15 a partnership with a UK entity.
16    Q.  Make a partnership.  Did he tell you the
17 UK entity?  Did he identify it for you?
18    A.  Sorry?
19    Q.  Did he identify the UK entity for you?
20    A.  No.
21    Q.  Did you ever ask him?
22    A.  No, it was not my business.
23    Q.  I'm sorry, I don't know if I've ever
24 asked this before.  How did you first meet
25 Di Giovanni?

Page 208

1    A.  You asked me before in the first
2  deposition.
3    Q.  I did.  The first one.  I am just getting
4  forgetful in my old age.
5    A.  No problem.  I knew him in Italy
6  initially when I was working, pretty much
7  notoriously, in the field to make fuel from waste and
8  that's how I knew him because he was in contact with
9  some fertilizer production company and he was
10 interested to that, et cetera and is borne from
11 that -- if you want a friendship, that's it.
12 Then he followed all -- all the follow-up of my
13 profession when he knew it.
14    Q.  So --
15    A.  Sorry.
16    Q.  So he was originally -- you originally
17 met him as a potential business partner?
18    A.  Yes, sir.
19    Q.  And --
20    A.  I would not say potential business
21 partner.  As a customer.  As a potential -- as a
22 person that could -- that had the necessary
23 acquaintances to allow us to make important plans.
24    Q.  Okay.  And then is the first -- is the
25 first transaction you have done with him J.M.

Page 209

1  Products?
2        MR. CHAIKEN:  Object to form.
3  BY MR. PACE:
4    Q.  Let me rephrase that.  You said that he
5  was a potential customer for this other business
6  which made me think he never became an actual
7  customer.
8        Have you done any transactions with
9  Di Giovanni prior to him becoming the beneficiary of
10 the Platinum American Trust, that in turn owned J.M.
11 Products?
12    A.  No.
13    Q.  There was testimony earlier in a prior
14 deposition, I think even your testimony, as well as
15 Jim Bass, that there was a -- on the J.M. Products
16 side of the Doral warehouse there was a flow meter.
17 Is that correct?
18    A.  Yes, it's correct.
19        THE VIDEOGRAPHER:  Counsel, your
20    microphone, please.
21 BY MR. PACE:
22    Q.  I'm sorry.  I'm sorry.  Let me do that
23 again.
24        There has been testimony previously that
25 on the J.M. Products side of the Doral warehouse

53 (Pages 206 - 209)

CONFIDENTIAL TRANSCRIPT

Page 230

1 BY MR. PACE:
2    Q.  Here we go.
3    A.  Go ahead.
4    Q.  You are jumping ahead of yourself.  Slow
5 down.
6    A.  Okay.
7    Q.  I am allowed to ask that question.
8    A.  All right.
9    Q.  You just like to get ahead of yourself
10 here.
11   A.  All right.
12   Q.  Ready?
13   A.  So what's the question?
14   Q.  Hold on.  It's coming.  Wait.
15   A.  Good.  I'm happy.
16   Q.  Slow down.  I am concerned about your
17 blood pressure.
18   A.  I'm still.  You can see.
19   Q.  Okay.
20   A.  Yes.
21   Q.  Ready?
22   A.  Sure.
23   Q.  Are you sure?
24   A.  Yeah.
25   Q.  Okay.  Is this payment made by -- I

Page 231

1 know.  Just making sure you calm yourself down here a
2 little bit.  It's a Wednesday.  High blood pressure,
3 I don't want you to have a heart attack on me.
4        Is this payment made on behalf of J.M.
5 Products?
6    A.  No.
7    Q.  Okay.
8    A.  This -- what do you mean, this one?
9    Q.  The thousand dollar a month payment to
10 remain loyal.
11   A.  Absolutely not.
12       MR. CHAIKEN:  Glad we were able to work
13   through that.
14       THE WITNESS:  Sorry?
15       MR. CHAIKEN:  I said I'm glad we were
16   able to work through that.
17 BY MR. PACE:
18   Q.  I think he saw this.
19       (The document referred to was thereupon
20 marked Deposition Exhibit 21 for Identification, a
21 copy of which is attached hereto.)
22 BY MR. PACE:
23   Q.  Dr. Rossi, I am going to mark as Exhibit
24 21 a picture of the outside of J.M. Products.  You
25 identified for us three -- that there were three sets

Page 232

1 of windows over the J.M. Products part of the Doral
2 warehouse, correct?
3    A.  Yes, sir.
4    Q.  And of those three sets of windows you
5 said it was the middle set of windows where the air
6 was being pushed out of the --
7    A.  Yes.
8    Q.  -- second story of the Doral warehouse?
9    A.  Yeah.
10   Q.  I am just trying to identify it here in
11 this picture.  That would be -- I'm going to give
12 you -- I'm going to let you play artist again.
13 Actually, do you have something a little stronger?
14 Can you circle on Exhibit 21 --
15   A.  Yes.  Sorry.
16   Q.  You know what, we're going to do it this
17 way.  Let's do that.  We can go right ahead, because
18 we will know what the marking is.  There is no
19 marking -- markers -- let me just start.
20       Other than the exhibit number on Exhibit
21 21 there is no other markings on Exhibit 21 right
22 now, correct?
23   A.  I did not understand the question.
24   Q.  I am just trying to make sure I've got a
25 clean record, which is as to Exhibit 21, other than

Page 233

1 the exhibit sticker on there, there is no other
2 markings on that document, it's just a picture?
3    A.  Yes.
4    Q.  Okay.  So the marking you are about to
5 make will be the only marking on that?
6    A.  Yes.
7    Q.  Can you do me a favor and circle the
8 window from which the heat was being exhausted from
9 the second floor.  All right.  Can you just put an AR
10 next to that, or however you initial something.
11       Perfect.  Has J.M. Products ever had a
12 customer -- I'm not asking about potential customer.
13 I am asking about an actual customer.
14       Has J.M. Products ever had a customer
15 other than Leonardo?
16   A.  No.
17   Q.  I'm going to mark as Exhibit 22.
18       (The document referred to was thereupon
19 marked Deposition Exhibit 22 for Identification, a
20 copy of which is attached hereto.)
21 BY MR. PACE:
22   Q.  This is what at least purports to be
23 another sale contract between J.M. Products and
24 another entity.
25   A.  What is your question, attorney?

59 (Pages 230 - 233)

CONFIDENTIAL TRANSCRIPT

Page 234

1    Q.  When you look at this agreement, is there
2 a -- do you know what happened with this agreement?
3 This looks like it's supposed to be an agreement with
4 a second purchaser, a customer but --
5    A.  Can I read it?
6    Q.  Yes.  The question is --
7    A.  Let me continue to read it because I am
8 trying to find a clue.  So far I am not -- sir, I do
9 not remember this document and I do not absolutely
10 remember and, by the way, here is also a very strange
11 thing, because I am reading here -- sorry, what's
12 your question about this?
13    Q.  What was the strange thing that you were
14 seeing in this document?
15    A.  The seller, which appears to be J.M.
16 Products Corporation, will invoice an amount equal to
17 US dollar per month starting from March 30, 2014.
18 Excuse me, but on March 30, 2014 J.M. did not exist.
19    Q.  I understand.  This is not a
20 document that --
21    A.  What the heck is this?
22    Q.  I know you don't believe me when I tell
23 you that other parties have produced documents but I
24 am going to represent to you that J.M. Products has
25 produced this document.  You may not believe me.  You

Page 235

1 may think it was done by somebody in the State of
2 Florida.
3    A.  I believe you.  I believe you because if
4 you gave me this is because somebody has gave it to
5 you.
6       I don't -- I absolutely don't recall this
7 document and the fact that J.M. starts selling
8 products on March 30, 2014 is a little bit bizarre.
9    Q.  Just as a reference to James Wolff would
10 be a little bit bizarre in that other document?
11    A.  I don't remember of this document, sir.
12    Q.  I understand.  I'm saying that could be a
13 typo, who knows how that occurred?
14    A.  Redacted, redacted, redacted, redacted,
15 redacted, no signatures, sir.
16    Q.  This is how we have it as well.
17    A.  What the heck is this?
18    Q.  You can look at somebody else at the
19 table than me.  We can deal with it afterwards.
20       MR. CHAIKEN:  Dr. Rossi, wait for a
21 question, please.
22 BY MR. PACE:
23    Q.  The question is --
24       MR. ARAN:  You are making a statement
25 without a question.

Page 236

1 BY MR. PACE:
2    Q.  Do you know who the buyer is for this
3 contract?
4    A.  No.  I never have seen this contract
5 before.
6    Q.  Okay.  And your testimony --
7    A.  And it makes no sense.
8    Q.  Right, I was going to say --
9       MR. ARAN:  There is no question.
10       MR. CHAIKEN:  Wait for the question.
11 BY MR. PACE:
12    Q.  Why does it makes no sense, because of
13 the date?
14    A.  Sure.  March 30, 2014, J.M. did not
15 exist.
16    Q.  Is there anything else that makes it make
17 no sense?
18    A.  Again, gram 1,500 of, redacted.  Name
19 redacted, mailing address redacted, phone redacted,
20 e-mail redacted, signature redacted.  But it is
21 highly confidential.  Looks like a clownery.
22    Q.  Dr. Rossi, for once you and I actually
23 seem to be pretty close to being in agreement.
24    A.  Yeah.
25    Q.  It's not a highly confidential document.

Page 237

1    A.  I don't know what this is.
2    Q.  You don't know.  Fair enough.  We can
3 find out from J.M. Products directly.
4       Notwithstanding seeing this document was
5 one of the reasons I wanted to show and see if it
6 refreshes your recollection.
7    A.  Looks like maybe it's some draft.
8       MR. CHAIKEN:  Dr. Rossi, there is no
9    question pending.
10       THE WITNESS:  You're right.  I am sorry.
11 BY MR. PACE:
12    Q.  Notwithstanding seeing this Exhibit 22,
13 your testimony remains the same, that the only actual
14 customer of J.M. Products was Leonardo Corporation?
15    A.  Yes.
16    Q.  Okay.  I believe I've asked this in a
17 prior deposition.  I don't think I've asked it today
18 and testifying here as a corporate representative of
19 J.M. Products, let me just ask.
20       Other than -- other than -- other than
21 Platinum American Trust owning the shares of J.M.
22 Products, are you aware of any agreements or payments
23 between Platinum American Trust and J.M. Products?
24    A.  No, not that I am aware of.
25    Q.  Other than whatever Platinum American

60 (Pages 234 - 237)

CONFIDENTIAL TRANSCRIPT

Page 238

1 Trust paid for the shares of J.M. Products, are you
2 aware of any payments between J.M. Products and
3 Platinum American Trust?
4        MR. ARAN:  Objection, form.
5        THE WITNESS:  Can you repeat the
6 question?
7 BY MR. PACE:
8    Q.  It was a long question.  Let me simplify
9 it.  Are you aware of any payments between Platinum
10 American Trust and J.M. Products either going from
11 J.M. Products to Platinum American Trust or going
12 from Platinum American Trust to J.M. Products, are
13 you aware of any payments?
14    A.  Understood.  Understood.  No, I am not
15 aware of.
16    Q.  Let me ask about Francesco Di Giovanni,
17 same type of questions.  Are you aware of any
18 agreement between J.M. Products and Francesco
19 Di Giovanni?
20    A.  Agreement?
21    Q.  Yes.
22    A.  Francesco Di Giovanni -- J.M. Products
23 and Francesco Di Giovanni was practically the
24 beneficiary of the trust that owned J.M.
25    Q.  Let me rephrase it.

Page 239

1    A.  So this is --
2    Q.  Other than the trust agreement.
3    A.  Okay.
4    Q.  So one agreement was the trust
5 agreement.
6    A.  This is the only one I am aware of.
7    Q.  Let me ask my question again though.
8 Other than the trust -- the Platinum American Trust
9 trust agreement, are you aware of any agreements
10 between J.M. Products and Francesco Di Giovanni?
11    A.  Not that I am aware of.
12    Q.  Are you aware of any payments between
13 J.M. Products and Francesco Di Giovanni?
14    A.  No, I am not aware of.
15    Q.  As the corporate representative of J.M.
16 Products are you aware of any documents that record
17 or reflect readings from the thermometer that was
18 operated on the J.M. Products side of the Doral
19 warehouse in 2015?
20    A.  Can you kindly repeat the question?
21    Q.  Let me break us --
22    A.  I think I have understood but I'm not
23 sure.
24    Q.  I'm going to ask you a series of
25 questions as the representative of J.M. Products.

Page 240

1    A.  Yes, okay.
2    Q.  In each case it's going to be about
3 whether documents exist reflecting certain
4 measurements from the different measuring devices on
5 the J.M. Products side.  I believe I know the answer,
6 you have told me your response individually, I have
7 heard this from other people that I have deposed but
8 I want to have a clean record for J.M. Products.
9    A.  Yes.
10    Q.  So on the J.M. Products side of the Doral
11 warehouse during the time period from February 2015
12 to February 2016 there was a flow meter, correct?
13    A.  Yes, sir.
14    Q.  Is there any document that reflects or
15 identifies the readings that anyone made off of that
16 flow meter during that time period?
17    A.  Now the question is clear.  No, there is
18 not because basically -- no, there is not.
19    Q.  Because I want to go through all these
20 before I have to keep repeating the question.
21        I want to ask the same question as to the
22 thermometer on the J.M. Products side of the Doral
23 location.  During that time period, February '15 to
24 February 2016, are there any documents that reflect
25 or identify the readings off of that thermometer?

Page 241

1    A.  No.
2    Q.  All right.  I feel like I'm forgetting
3 one.  Were there -- I'll ask you.  Were there any
4 other measuring devices in operation on the J.M.
5 Products side of the Doral warehouse from February
6 2015 to February 2016?
7    A.  No.
8    Q.  All right.  Without getting into the
9 details of what other substance was involved, I am
10 going to refer just for a second here.  I am going to
11 refer to the -- whatever product J.M. Products was
12 working on that involved platinum sponge, and I
13 understand there is a product that involved graphene
14 and then a third product that involved -- somehow
15 involved nickel.
16        I want to ask for just a time period --
17 some time period questions.  Was J.M. Products
18 working on -- first on a product that involved
19 platinum sponge, then a product that involved nickel,
20 then a product that involved graphene?
21        Was it one after the other or were they
22 all going on at the same time?
23    A.  I have understood.  Initially we worked
24 only with platinum sponges, initially.  Eventually I
25 added the other matters and they have been treated

61 (Pages 238 - 241)

CONFIDENTIAL TRANSCRIPT

Page 246

1    A.  Somebody called it heat strip, et
2  cetera.
3    Q.  What would you call it?
4    A.  Well, they can also -- the technical name
5  is heating cables.
6    Q.  Heating cables.
7    A.  And they are -- or heaters.
8    Q.  There were heating cables installed in
9  the -- in the container at the J.M. Products side,
10  correct?
11    A.  Yes, it is correct.
12    Q.  They were installed in those insulated
13  pipes that we saw back in Exhibit 11?
14    A.  Yes, it is correct.
15    Q.  When were those -- when were the heating
16  cables installed?
17    A.  From the beginning.
18    Q.  And were they there through the end,
19  through the --
20    A.  Yes, yes.
21    Q.  Let me ask the question again.
22    A.  Through the end of the test.
23    Q.  Through the end always ends up being
24  unclear, right?
25    A.  Yes, of course.

Page 247

1    Q.  Were they there until you removed those
2  pipes from the J.M. Products container?
3    A.  Correct.
4    Q.  All right.  Are those -- those heating
5  cables, were those purchased by J.M. Products or by
6  Leonardo, if you know?
7    A.  I think Leonardo.
8    Q.  And I have asked similar question to what
9  I asked before, as the other devices.  If there are
10  any records of that purchase they would be with your
11  accountant?
12    A.  Yes.
13    Q.  Do you recall where you bought them?
14    A.  Yes or no.
15    Q.  Did you just say yes or no?
16    A.  Yes or no, because -- because -- no, I
17  was thinking to a company but I am not sure, so I
18  just delayed to the accountant.
19        But maybe -- maybe I bought them from a
20  company whose name was Extreme or something like
21  that, but I am not sure.  In any case, surely --
22  surely this is accounted for.
23    Q.  Extreme --
24    A.  Because this was not -- this was not a
25  flying -- a freelance contractor.  This was a

Page 248

1  company.
2    Q.  When you said Extreme, could that have
3  been Extreme Plumbing?
4    A.  No.  No, no.  No, no, no, it was not a
5  plumber.  Has nothing to do with plumbers this.
6  These are heaters.
7        MR. PACE:  Why don't we -- I think we're
8  pretty close to the end.  Why don't we take a
9  break and give me about five minutes to try to
10  figure out -- let's make it ten.  Give me ten
11  minutes to figure out any closing questions and
12  we'll be done.
13        THE WITNESS:  Okay.
14        THE VIDEOGRAPHER:  We're off the record.
15  The time is 5:22 p.m.
16        (Thereupon a brief recess was taken,
17  after which the following proceedings were had.)
18        THE VIDEOGRAPHER:  We're back on the
19  record.  The time is 5:38 p.m.
20  BY MR. PACE:
21    Q.  Dr. Rossi, I just had a handful of kind
22  of wrap-up questions.
23        From February 2015 to February 2016 J.M.
24  Products made no use of the heated fluid provided by
25  Leonardo, other than whatever use was made within

Page 249

1  what we have been calling today the J.M. Products
2  container; is that correct?
3    A.  Yes, it is correct.
4        MR. ARAN:  Object to form.
5  BY MR. PACE:
6    Q.  You identified -- thus far you have
7  identified -- you referenced four groups of potential
8  investors who came to the Doral location.  You
9  referenced Tom Darden and J.T. Vaughn either together
10  or separately coming to the Doral location.
11        Are there any other -- were there any
12  other visitors -- I'm sorry, I am going to exclude
13  the temporary workers that either J.M. Products or
14  Leonardo would occasionally hire.
15        Were there any other individuals or
16  groups that visited the Doral warehouse?
17    A.  Yes.
18    Q.  Who?
19    A.  Ampenergo.  Ampenergo visited the plant
20  twice.  The first --
21    Q.  Go ahead.  Sorry.
22    A.  The first time in March or April '15 and
23  the second time September/October '15.
24    Q.  Anyone else?  Any other visits to the
25  Doral warehouse?

CONFIDENTIAL TRANSCRIPT

Page 250

1    A.  Not that I recall.
2       Q.  All right.  And then just to be clear,
3  when -- in connection with both visits by AEG did
4  they ever go on the J.M. Products side of the
5  warehouse?
6       A.  Can you kindly repeat?  Was confusing the
7  first time.
8       Q.  So there is two visits by somebody --
9  somebody -- let me restart this.  There is two visits
10  to the Doral warehouse by people from AEG, correct?
11     A.  Yes, it is correct.
12     Q.  Okay.  In connection with either of those
13  visits did anyone from AEG go over to the J.M.
14  Products side of the Doral warehouse?
15     A.  No, absolutely.
16     Q.  Did any of those individuals from AEG
17  meet with Jim Bass?
18     A.  No, not that I can recall.
19     Q.  With whom did these individuals from AEG
20  meet, other than yourself?
21     A.  Fabiani and Jim Bass, because they
22  entered in the plant during the time -- I am not sure
23  that -- yeah, yeah, yeah, Fabiani and Jim Bass.  Yes,
24  yes, yes, both.
25     Q.  All right.  The AEG people met both

Page 251

1  Fabiani and Jim Bass?
2       A.  Yes.
3       Q.  Okay.  On both occasions or on at least
4  one occasion?
5       A.  This is a good question.  I don't
6  recall.  I don't recall.  I think that -- no, I don't
7  recall, attorney.
8       Q.  Okay.
9       A.  I don't recall exactly.
10     Q.  I may have asked this, but just -- just
11  in case I did not, we talked about -- I'm going back
12  to the heat exchanger that you testified about
13  installing on the J.M. Products side of the Doral
14  warehouse.
15        Do there exist any -- are you aware of
16  whether there exists any photographs of that heat
17  exchanger?
18     A.  No.
19     Q.  Do there exist any diagrams of the heat
20  exchanger?
21     A.  What do you mean by diagram?
22     Q.  A drawing of the heat exchanger, maybe
23  either before it was put in place or after.
24     A.  Yeah, I made sketches for me because, you
25  know -- I made sketches for me but then I scratch

Page 252

1  them once, because it was not a product.  It was
2  just --
3       Q.  Let me see if I can get that defined
4  because you said you scratched them.  Does that mean
5  you threw them away, the sketches?
6       A.  Yes.  I did not conserve them, so I --
7       Q.  Are there any -- any -- any records of
8  testing done on the heat exchanger?
9       A.  What do you mean by testing?
10     Q.  To see if it worked.
11     A.  Oh, yeah, sure.  Of course.
12     Q.  Are there any records of it?  Are there
13  any documents reflecting testing that you did on the
14  heat exchanger?
15     A.  You know, I was -- no, because I was
16  working for myself in that moment and I had nothing
17  to produce to anybody.  And again, as for what
18  concerns the sketches, for sure I have taken numbers
19  for me while the temperature was going on, was
20  raising, I observed the behavior of the temperature
21  of the piping with my infrared thermometer and for
22  sure I have taken notes, et cetera, but I did not
23  conserve them.  Because once I have reached the
24  performance I needed, for me was stable.
25        MR. PACE:  No further questions.

Page 253

1        MR. ARAN:  I don't have any questions.
2        MR. CHAIKEN:  Read.
3        MR. ARAN:  We -- what's the policy with
4  him?
5        MR. CHAIKEN:  Read.
6        MR. ARAN:  Read.
7        MR. PACE:  Yes.
8        THE VIDEOGRAPHER:  Off the record.  The
9  time is 5:46 p.m.
10        (Thereupon the taking of the deposition
11  was concluded.)
12
13             Deponent
14
15
16     Sworn to and subscribed before me this
17
18  day of        2017.
19
20
21
22
23
24
25

64 (Pages 250 - 253)

CONFIDENTIAL TRANSCRIPT

Page 254

1          CERTIFICATE OF OATH

2

3   STATE OF FLORIDA:

4           SS:

5   COUNTY OF DADE:

6

7

8          I, the undersigned authority, certify that

9   ANDREA ROSSI personally appeared before me and was

10  duly sworn.

11         WITNESS my hand and official seal this 13th

12  day of March 2017.

13

14

15         _Edward Varkonyi_

16         _____

17         Notary Public, State of Florida at

18         Large; my commission expires

19         February 26, 2019. Bonded through

20         Troy Fain Insurance, Inc.

21

22

23

24

25

---

Page 256

1                    March 13, 2017

2

3

4

          FERNANDO ARAN, ESQ.,
5          Aran Correa & Guarch, P.A.
           255 University Drive
6          Coral Gables, Florida 33134
7   RE: Rossi v. Darden
8   Dear Mr. Aran,
9   With reference to the deposition of Andrea Rossi
    taken on March 1, 2017 in connection with the
10  above-captioned case, please be advised that the
    transcript of the deposition has been completed
11  and is awaiting signature.
12  Please arrange to have the deponent stop by our
    office at Two South Biscayne Boulevard, Suite
13  2250, Miami, Florida, for the purpose of reading
    and signing the transcript.
14
    If this is not taken care of, however, within the
15  next 30 days, we shall conclude that the reading
    and signing of the deposition has been waived and
16  shall then process the original of the transcript
    for filing with the Clerk of the Court by counsel
17  without further notice.
18  Sincerely,
19
20  Edward Varkonyi,
    Registered Merit Reporter
21
22
23
24
25

---

Page 255

1   CERTIFICATE OF REGISTERED PROFESSIONAL REPORTER

2

3          I, EDWARD VARKONYI, and Registered
    Professional Reporter and a Notary Public for the
4   State of Florida at Large, do hereby certify that I
    reported the deposition of ANDREA ROSSI; that the
5   foregoing pages, numbered from 1 to 253, inclusive,
    constitute a true and correct transcription of my
6   shorthand report of the deposition by said witness on
    this date.
7          I further certify that I am not an
    attorney or counsel of any of the parties, nor a
8   relative or employee of any attorney or counsel
    connected with the action, nor financially interested
9   in the action.
           WITNESS my hand and official seal in the
10  City of Miami, County of Dade, State of Florida, this
    13th day of March 2017.

11

12

13

14

15         _Edward Varkonyi_

16

17         Notary Public, State of Florida at

18         Large; my commission expires

19         February 26, 2019. Bonded through

20         Troy Fain Insurance, Inc.

21

22

23

24

25

---

Page 257

1              ERRATA SHEET

2   RE   : Rossi v Darden
    DEPO OF: Andrea Rossi
3   TAKEN : 3/1/17
    ASSG# : 2553727
4   DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
5   Page #   Line #  Change           Reason
6   _____  _____  _____  _____
7   _____  _____  _____  _____
8   _____  _____  _____  _____
9   _____  _____  _____  _____
10  _____  _____  _____  _____
11  _____  _____  _____  _____
12  _____  _____  _____  _____
13  _____  _____  _____  _____
14  _____  _____  _____  _____
15  _____  _____  _____  _____
16  _____  _____  _____  _____
17  _____  _____  _____  _____
18  _____  _____  _____  _____
19  _____  _____  _____  _____
20  _____  _____  _____  _____
21  State of Florida)
    County of   )
22
    Under penalties of perjury, I declare that I have
23  read my deposition transcript, and it is true and
    correct subject to any changes in form or substance
24  entered here
    _____   _____
25  Date        Signature

65 (Pages 254 - 257)

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.