# Composite Exhibit 2

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                                        )
    ANDREA ROSSI and LEONARDO             )
 3  CORPORATION,                          )
                                          )
 4        Plaintiffs,                     )
                                          )
 5  VS.                                   )
                                          ) No. 1:16-cv-2119-CMA
 6  THOMAS DARDEN; JOHN T. VAUGHN;        )
    INDUSTRIAL HEAT, LLC; IPH             )
 7  INTERNATIONAL B.V.; and               )
    CHEROKEE INVESTMENT PARTNERS,         )
 8  LLC,                                  )
                                          )
 9        Defendants.                     )
    INDUSTRIAL HEAT, LLC and IPH          )
10  INTERNATIONAL B.V.,                   )
                                          )
11        Counter-Plaintiffs,             )
                                          )
12     Vs.                                )
                                          )
13  ANDREA ROSSI and LEONARDO             )
    CORPORATION,                          )
14                                        )
          Counter-Defendants,             )
15                                        )
       And                                )
16                                        )
    J.M. PRODUCTS, INC.; HENRY            )
17  JOHNSON; FABIO PENON; UNITED          )
    STATES QUANTUM LEAP, LLC;             )
18  FULVIO FABIANI; and JAMES             )
    BASS,                                 )
19                                        )
          Third-Party Defendants.    )
20

21              Videotaped Deposition of
                     THOMAS DARDEN
22              (Taken by Plaintiff)
    3509 North Haworth Drive, Suite 403, Raleigh, North Carolina
23
                     February 16, 2017
24              Reported in Stenotype By
                     Leslie Christian
25    Transcript produced by computer-aided transcription
```

02/16/2017 Thomas Darden

**Page 2**

```
1           A P P E A R A N C E S :
2   ON BEHALF OF PLAINTIFFS:
3       PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
        BRIAN CHAIKEN, ESQ.
4           JOHN W. ANNESSER, ESQ.
        283 Catalonia Avenue
5       Second Floor
        Coral Gables, Florida 33134
6       (305)337-0781
        bchaiken@pbyalaw.com
7       jannesser@pbyalaw.com
8   FOR THE DEFENDANTS:
9       MILLER FRIEL, PLLC
        BERNARD P. BELL, ESQ.
10      1200 New Hampshire Ave, NW
        Suite 800
11      Washington, D.C. 20036
        (202)760-3156
12      BellB@MillerFriel.com
13  ON BEHALF OF THIRD-PARTY DEFENDANTS
    J.M. PRODUCTS, INC., HENRY JOHNSON, and JAMES BASS:
14
        ARAN, CORREA & GUARCH, P.A.
15      FERNANDO S. ARAN, ESQ. (Via teleconference)
        225 University Drive
16      Coral Gables, Florida 33134-6732
        (305)665-3400
17      faran@acg-law.com
18  ON BEHALF OF THIRD-PARTY DEFENDANTS
    FULVIO, and UNITED STATES QUANTUM LEAP, LLC:
19
        RUDOLFO NUNEZ, P.A.
20      RUDOLFO NUNEZ, ESQ.
        255 University Drive
21      Coral Gables, Florida 33134-6732
        (305)665-3400
22      rnunez@acg-law.com
23  ALSO PRESENT:
24      MICHAEL KIRBY, CLVS
        DR. ANDREA ROSSI
25
```

**Page 3**

1 T A B L E   O F   C O N T E N T S
    EXAMINATIONS - ATTORNEY                              PAGE
2 Direct - Mr. Chaiken                          6
   Cross - Mr. Aran                            287
3 Recross - Mr. Nunez                          308
4 E X H I B I T S
   NO.                                         PAGE
5 Exhibit 1   IH Holdings Structure               9
   Exhibit 2   E-mail chain                    32
6 Exhibit 3   E-mail chain                     36
   Exhibit 4   High Temperature Catalyzer Test    37
7 Exhibit 5   E-mail chain                     49
   Exhibit 6   Industrial Heat, LLC document       58
8 Exhibit 7   E-mail chain                     61
   Exhibit 8   Industrial Heat, LLC document       65
9 Exhibit 9   E-mail chain                     70
   Exhibit 10  E-mail chain                    73
10 Exhibit 11  License Agreement                   81
   Exhibit 12  E-mail chain                    84
11 Exhibit 13  Amendment to License Agreement       94
   Exhibit 14  E-mail chain                   101
12 Exhibit 15  E-mail chain                   114
   Exhibit 16  Amendment to License Agreement      116
13 Exhibit 17  Myers Bigel letter             121
   Exhibit 18  E-mail                         131
14 Exhibit 19  Confidential Memorandum            133
   Exhibit 20  E-mail chain                   139
15 Exhibit 21  E-mail chain                   143
   Exhibit 22  Industrial Heat 18-Month Bus. Plan   144
16 Exhibit 23  E-mail chain                   148
   Exhibit 24  E-mail chain                   152
17 Exhibit 25  E-mail chain                   162
   Exhibit 26  E-mail chain                   167
18 Exhibit 27  E-mail                         181
   Exhibit 28  Term Sheet                     185
19 Exhibit 29  E-mail chain                   190
   Exhibit 30  E-mail chain                   203
20 Exhibit 31  E-mail chain                   204
   Exhibit 32  E-mail                         210
21 Exhibit 33  E-mail chain                   213
   Exhibit 34  E-mail                         216
22 Exhibit 35  E-mail                         217
   Exhibit 36  E-mail chain                   220
23 Exhibit 38  E-mail chain                   221
   Exhibit 38  Fourth Amended Answer             234
24 Exhibit 39  E-CAT Energy Plant in Miami         250
   Exhibit 40  E-mail chain                   258
25 Exhibit 41  E-mail chain                   261
   Exhibit 42  Feasibility Report              264

**Page 4**

1 Table of Contents (Continued):

   Exhibit 43  E-mail chain              268

2 Exhibit 44  E-mail chain              271

   Exhibit 45  E-mail chain             275

3 Exhibit 46  E-mail chain              276

   Exhibit 47  E-mail chain             278

4 Exhibit 48  Supplement to Defendant     288

```
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1           S T I P U L A T I O N S
2           I, Leslie Christian, being a court
3  reporter and a Notary Public in and for the state of
4  North Carolina, was appointed commissioner by consent
5  to record the deposition of THOMAS DARDEN, on
6  February 16, 2017 beginning at 9:08 a.m., at
7  CaseWorks, located at 3509 Haworth Drive, Suite 403,
8  Raleigh, North Carolina.
9           THE VIDEOGRAPHER:  We are on the
10 record at 9:08 a.m.  This is the videotaped deposition
11 of Thomas Darden in the matter of Andrea Rossi, et al.,
12 vs. Thomas Darden, et al.  This deposition is being
13 held in the offices of CaseWorks at 3509 Haworth Drive,
14 Suite 403 in Raleigh, North Carolina 27609, on February
15 16, 2017.
16          The court reporter is Leslie
17 Christian, the videographer is Michael Kirby, both with
18 CaseWorks.
19          Would counsel please introduce
20 themselves.
21          MR. CHAIKEN:  Yes, good morning.
22 Brian Chaiken on behalf of plaintiffs.  I may be joined
23 by Jonathan Annesser on the phone.
24          MR. BELL:  Bernard Bell for the
25 defendants including Mr. Darden.
```

02/16/2017 Thomas Darden

Page 98

1    Q.   Okay.  And it's because you think that that
2  test was not performed properly?
3    A.   I think it was --
4          MR. BELL:  Objection to form.
5          THE WITNESS:  I think the test was not
6  performed properly, but I think it was part of an
7  overall -- overall setup to fool us.
8  (BY MR. CHAIKEN)
9    Q.   Okay.  And does Industrial Heat contend
10 that it's also entitled to keep the license to the
11 E-CAT IP, sitting here today?
12         MR. BELL:  Objection to form.  You
13 know he's not here to testify as to Industrial Heat.
14         THE WITNESS:  I haven't --
15         MR. CHAIKEN:  That's okay.
16         THE WITNESS:  I haven't thought about
17 that in relation to the return of the initial capital.
18 I don't know about it legally.
19 (BY MR. CHAIKEN)
20   Q.   Do you think the E-CAT IP has any value?
21   A.   It's clear that it does not have the value
22 that we were told that it had or that we perceived it
23 had.  If you could easily replicate these reactors
24 using that IP then it would be extremely valuable.  It
25 clearly does not have that kind of value.  Whether

Page 99

1 anyone ever could produce any energy with this IP is
2 not clear.
3          It's hard to prove a negative.  It's sort
4 of hard to say this could not have any value
5 whatsoever.  It's hard to say.  But we -- we don't see
6 that this technology has value at all materially
7 relative to the kinds of numbers we were talking about
8 then.
9    Q.   Do you think it has any value -- based on
10 that and based on what you know sitting here today, do
11 you think it has any value whatsoever?
12   A.   We don't know.  It's an option on future
13 value.  Is it possible that someone in the future might
14 be able to do something with this IP.  We can't; Rossi
15 can't.  But is it possible that somebody might or that
16 occasionally at some point it might work.  We don't
17 know.
18         MR. CHAIKEN:  We can stop here.  Off
19 the record.
20         THE VIDEOGRAPHER:  We're off the
21 record at 11:14 a.m.
22         (Whereupon a break was taken.)
23         THE VIDEOGRAPHER:  We are back on the
24 record at 11:26 a.m.
25 (BY MR. CHAIKEN)

Page 100

1    Q.   Mr. Darden, I had asked you some questions
2  about the license agreement prior to taking a break.  I
3  believe one of the conditions in order for Leonardo to
4  earn that 10 million dollar payment was to transfer the
5  composition of the fuel he used as the catalyst to you.
6  Did that happen?
7    A.   It's not clear.  I mean, the requirement
8  was to transfer all of the information needed to build
9  a replicated technology and for Dr. Rossi to work with
10 us to build and successfully produce these machines,
11 have them work, be able to sell them.
12         And so he transferred information to me
13 about the fuel that he described as being the IP of the
14 company or the IP of the devices.  He also gave us some
15 drawings that showed some of the mechanism of some of
16 the plants that were being built at that point.  That
17 then evolved over time.
18         However, none of that ever worked.  We were
19 never able to build devices that successfully produced
20 energy.  So did he transfer some formulas or a formula
21 to me.  The answer is yes.  Was it the transfer of the
22 IP needed to build these devices, no.
23   Q.   That's your opinion though, right?  You
24 don't believe it was the fuel or the catalyst that was
25 required or it didn't work?

Page 101

1    A.   I don't know whether it was the fuel and
2  the catalyst that didn't work or the device that didn't
3  work or the whole thing doesn't work.  I don't know
4  which parts of it don't work, but something doesn't
5  work.
6          (Whereupon Exhibit 14 was marked for
7  identification as of this date.)
8    Q.   I'll show you what's been marked as
9  Exhibit 14.  Exhibit 14 has been bates stamped IH-81230
10 through 1234.  This is a series of e-mails from
11 September of 2013.
12   A.   Um-hm.
13   Q.   And the one I'm most concerned with is the
14 one on -- it starts on page 81231.  And it looks like a
15 forwarded e-mail from John Mazzarino to Joe Pike,
16 yourself and John Mazzarino.  And the paragraph I want
17 to refer to is on actually the third page, 81232.
18   A.   Um-hm.
19   Q.   And you're describing the IH investment in
20 -- or to Paul Lamacraft.
21   A.   Um-hm.
22   Q.   And you're talking about a two billion
23 dollar evaluation, and you describe that evaluation.
24 Do you see that?
25   A.   Um-hm.

02/16/2017 Thomas Darden

**Page 154**

1 Mr. Darden consulted in November of 2015.

2        MR. CHAIKEN: All right. Let me ask

3 -- I'm going to ask not about this e-mail but about

4 Mr. Zali.

5        MR. BELL: That's fair.

6 (BY MR. CHAIKEN)

7    Q.  Who is Zali?

8    A.  It's Jaffee actually. So his name is Zali

9 Jaffee. And he's an attorney in Israel, and he works

10 with a -- someone that I know who invested in some

11 energy plants that were in Europe and ended up hiring

12 Zali to represent him. And I'm an investor in that

13 transaction. That's how I came to know Zali.

14    Q.  And you're telling me that Industrial Heat

15 retained him for legal services?

16    A.  Yes, we did.

17    Q.  What type of legal services did you retain

18 him to do?

19    A.  We wanted advice about -- oh, international

20 fraud.

21    Q.  What type of international fraud?

22    A.  Whether we might be a victim of an

23 international fraud.

24    Q.  And what jurisdictions or what territories

25 was Mr. Zali licensed to practice law in?

**Page 155**

1    A.  I don't know.

2    Q.  Do you know if he was licensed to practice

3 law in the United States?

4    A.  I don't know.

5    Q.  Did you ask him that question?

6    A.  I don't remember.

7    Q.  Is there a retention agreement between

8 Industrial Heat and Mr. Zali?

9    A.  I don't know if he sent us an engagement

10 agreement or not. We definitely worked with him

11 regularly in this other transaction.

12    Q.  Did you ask for legal advice with respect

13 to the license agreement at issue in this case?

14    A.  Say it again.

15    Q.  Did you ask for him to provide you with

16 legal services with respect to the license agreement in

17 this case?

18    A.  Yes, we did.

19    Q.  What type of legal service did you ask him

20 to perform?

21        MR. BELL: I think that's privileged.

22        MR. CHAIKEN: I don't think this is a

23 privileged document.

24        MR. BELL: Well, I think we're back to

25 the point where under the -- under the protective order

**Page 156**

1 the remedy is to rip it up, throw away all your notes

2 and make a motion to compel. I'm happy to, you know,

3 add this to the list and put this in camera with the

4 judge if he wants to see it. I think this is an

5 appropriate procedure.

6        It's not really -- the way a

7 protective order works isn't that you scrutinize the

8 document and make your own determination whether it's

9 privileged.

10        MR. CHAIKEN: Well, we can agree to

11 disagree or not. Maybe -- can we go off the record for

12 a second.

13        THE VIDEOGRAPHER: We are off the

14 record at 1:35 p.m.

15        (Whereupon a break was taken.)

16        THE VIDEOGRAPHER: We are back on the

17 record at 1:46 p.m.

18        MR. CHAIKEN: We have made an attempt

19 to reach out to Judge O'Sullivan to see if we can get a

20 quick ruling on this document. While we wait to see if

21 we can get him on the line we're going to proceed with

22 the deposition.

23 (BY MR. CHAIKEN)

24    Q.  At some point in time, Mr. Darden, did

25 Industrial Heat agree to allow the one megawatt plant

**Page 157**

1 to be shipped to Florida?

2    A.  Yes.

3    Q.  And why did it do that?

4    A.  We felt like it would be beneficial for us

5 and it would be beneficial for Andrea if we could use

6 that as a way to see if the tech --

7        MR. CHAIKEN: Hello. Someone just

8 joined?

9        MR. ANNESSER: I just -- this is John

10 Annesser.

11        MR. CHAIKEN: Oh, hey, John.

12 (BY MR. CHAIKEN)

13    Q.  I'm sorry.

14    A.  We could use the -- the operation of the

15 unit as a way of seeing if, in fact, the technology

16 might work. In other words, we're still at a point of

17 not knowing which was true. Does it never work, can it

18 never work or has he simply concealed from us how to

19 make it work.

20        And so to see the technology operate would

21 be -- we were willing -- it was interesting enough to

22 us to see it operate -- if we could actually see it and

23 measure it -- that we were willing to let the plant go.

24 In addition, he could sell licenses off of it; he could

25 advocate for or promote the technology as he would.

02/16/2017 Thomas Darden

Page 158

1 That was beneficial to him.  He wanted to do it.  If it
2 were credibly instrumented and measured then we would
3 have found the results important to note.
4        Q.    Did you have discussions with Dr. Rossi
5 prior to agreeing to let it go to Florida?
6        A.    Sure.
7        Q.    And was there a discussion about doing a
8 six cylinder test or a one megawatt test in Florida?
9        A.    We would do either one.
10       Q.    And were there --
11       A.    We wanted to see any device operate,
12 preferably at our location, but if he would only do it
13 at his location, while we felt extorted by that, we
14 were willing to let that happen.
15       Q.    Did you ever put in writing, "Hey, we think
16 the tests should take place in North Carolina.  We
17 don't want to move it to Florida"?
18              MR. BELL:  Objection to form.
19              THE WITNESS:  I don't remember that.
20 I wouldn't be surprised if we did.
21 (BY MR. CHAIKEN)
22       Q.    Was the issue of having a customer be a
23 part of that test something raised by Industrial Heat
24 or was it raised by Dr. Rossi?
25              MR. BELL:  Objection to form.

Page 159

1              THE WITNESS:  We felt that having a
2 bona fide customer would be an additional way of being
3 able to measure energy output.  That if someone
4 credible were receiving the energy then that would be
5 one added way to ratify the power production.  So, as I
6 said earlier when we were talking about measurement,
7 the problem with measurement is if you have only one
8 way of doing it with a new device or something that's
9 not well characterized, it's hard to know what the
10 output is.
11              So what you want to do in a setting
12 like that is to set up as many different measurement
13 systems as you can.  Measure input, measure output.
14 Measure output lots of different ways.  And so having
15 someone honest receiving the energy, measuring the
16 energy, was a way to ratify or show how much was being
17 produced.  You wouldn't need it if you had really good
18 instruments.
19              In other words, an instrument in front
20 of a radiator or something would also work.  But absent
21 that, having a very credible customer would be
22 beneficial in terms of verification.
23 (BY MR. CHAIKEN)
24       Q.    So getting back to that, was it IH's or was
25 it your idea or was it Dr. Rossi's idea to have that

Page 160

1 customer?
2              MR. BELL:  Objection to form.
3              THE WITNESS:  I think it was Rossi's
4 idea.
5 (BY MR. CHAIKEN)
6        Q.    And do you know when he brought that up?
7        A.    He mentioned it from very early on that he
8 felt like a customer would make a difference.
9        Q.    Was there any other benefit other than the
10 ability to measure it that you saw to having a customer
11 be a part of the testing?
12       A.    Well, if the operation were where we were I
13 would say no.  We could measure the steam energy
14 output.  But if it was -- if we didn't have good access
15 to the machine then to have a credible customer
16 measuring how much was coming from it would have been a
17 benefit.
18       Q.    Was --
19       A.    So the only benefit to me was -- was -- the
20 only benefit I cared about was third-party
21 ratification.  And that was an indirect way of doing
22 that.  I guess if there were some famous customers
23 saying that they were using the steam and it was a
24 credible company and it worked great, that there could
25 be some advantage to that as well.

Page 161

1        Q.    And what kind of advantage would that be?
2        A.    Well, let's say we had a device, the device
3 worked, and the device had been in operation in a
4 plant of, you know, a credible entity.  That would be a
5 great testimonial.
6        Q.    Did you think that being able to tell that
7 to investors would help raise money for Industrial
8 Heat?
9        A.    It wouldn't have mattered.
10       Q.    Why not?
11       A.    Well, everything matters a little bit but,
12 I mean, if we had a successful device that was
13 well-characterized and honestly monitored and we knew
14 we had built it, the device we built operated, we could
15 replicate it, then raising money was a complete
16 non-issue.  We didn't need anything to sell investors.
17       Q.    So really at the end of the day it didn't
18 matter to you who the customer was, if any?
19              MR. BELL:  Objection to form.
20              THE WITNESS:  No, it depends.  If the
21 device were sufficiently instrumented, if you had
22 enough measurement, if you had an honest measurement
23 system set up and us having full access to it, us being
24 able to put on it whatever instruments we wanted, us
25 being able to get credible professionals -- you know.

02/16/2017 Thomas Darden

Pages 162..165

**Page 162**

1 Duke University.  I don't know.  Bureau Veritas --
2 people like that to come in and set up a system for
3 measurement, we would have said we're happy not having
4 a customer.  But absent that, a customer was sort of an
5 added way of ratifying the power.
6 (BY MR. CHAIKEN)
7    Q.  Putting aside the issue of the time of
8 performance, the license agreement itself didn't
9 provide that a customer was required for the guaranteed
10 performance test, did it?
11         MR. BELL:  Objection to form.
12         THE WITNESS:  I believe that that's
13 correct that it did not.
14 (BY MR. CHAIKEN)
15    Q.  Okay.  I'll show you what's been marked as
16 Exhibit 25.
17         (Whereupon Exhibit 25 was marked for
18 identification as of this date.)
19    Q.  Exhibit 25 is -- have been marked IH-7126
20 through 7127.  It's a series of e-mails dated July
21 10th, 2014 between you and Dr. Rossi.  Have you seen
22 these e-mails before?
23    A.  Um-hm, yes.
24    Q.  Specifically I'm going to point you to the
25 first e-mail from you to Dr. Rossi.  Paragraph ten of

**Page 163**

1 this e-mail -- and I guess these are terms pursuant to
2 an agreement that you were negotiating at the time; is
3 that correct?
4    A.  The moving of the plant down to Florida.
5    Q.  Right.
6    A.  Allowing the plant to go.
7    Q.  Right.  That's what's being negotiated in
8 these e-mails?
9    A.  Um-hm.
10    Q.  And paragraph ten states -- this is your
11 e-mail to Dr. Rossi -- "Attached to this contract is
12 the letter of the Healthcare Office of Miami allowing
13 the operation of the one megawatt plant."  Do you see
14 that?
15    A.  Yes.
16    Q.  Did you think that that was a requirement
17 to allow the plant to go to Florida?
18    A.  No.
19    Q.  Did you have a discussion with Dr. Rossi
20 about it?
21    A.  I don't remember talking to him about that.
22    Q.  Do you know why it was included in the --
23 in these negotiations?
24         MR. BELL:  Objection to form.
25         THE WITNESS:  I did not include it in

**Page 164**

1 this.
2 (BY MR. CHAIKEN)
3    Q.  My question is do you know why it was?
4    A.  I don't know why.  But, to elaborate, I
5 think consistently we saw a pattern of trying to get
6 some type of certification, some type of stamp of
7 approval, something like that from some other entity as
8 a way of giving credibility to the technology.
9         It didn't matter to us, but I think it
10 mattered a lot to Andrea.  Meanwhile, in addition to
11 that, you know, given the sort of profile that Rossi
12 had out there -- has -- I think the possibility of --
13 you know, I think the more kind of external ways of
14 saying, you know, some big company, some government
15 entity, some certifier, some professors have looked at
16 this and said it's clear was something that he liked.
17 But that's me -- you know, I'm speculating about his
18 motivations.
19    Q.  Did it -- so as part of this the
20 negotiation included, you know, a customer to be using
21 the steam; is that correct?
22    A.  Yes.  I mean, it was something that he
23 represented was going to exist.  And as we were
24 thinking should we let this machine go --
25    Q.  Right.

**Page 165**

1    A.  -- you know, meanwhile, we thought we could
2 get paid a lot of money for it too.  So the whole thing
3 looked pretty good when it was Johnson Matthey.
4    Q.  And at this time June-July of 2014 was it
5 -- did it matter to you what that customer did with the
6 steam that was going to be produced?
7    A.  We wanted to be sure that they measured it
8 and that we could use them as a way of knowing how much
9 steam was produced.  So to have a third-party
10 sophisticated, you know, technical company that needed
11 steam and that could measure it was important to us.
12    Q.  Okay.  And did you include provisions in
13 the agreement which provided for the method and means
14 by which the third-party customer would, in fact,
15 measure that?
16    A.  No.  I think we would have been happy with
17 almost any way that a credible company would have
18 measured it.
19    Q.  Did you ask for any way?  Did you put some
20 writing where they said, "They're required to measure
21 it using any means possible"?
22    A.  I don't think so.
23    Q.  Why not?
24    A.  Well, they weren't going to pay us money
25 unless they were getting the steam.

02/16/2017 Thomas Darden

**Page 166**

1    Q.   Right.
2    A.   So obviously they were going to measure it.
3    Q.   Okay.  Was there a provision in that deal
4 which required them to provide you with -- with those
5 measurements?
6    A.   I don't know if there was a requirement
7 that they do so, but if they were going to pay for it
8 then we would have known from the fact that they were
9 paying for it that they were getting it.
10        MR. BELL:  You could always show him
11 the agreement.
12        MR. CHAIKEN:  I can't.
13 (BY MR. CHAIKEN)
14    Q.   I asked you a question about whether it
15 mattered to you what they did with the steam and you
16 gave me an answer.  I'm sorry if I'm asking you again.
17 But did it matter to you what they did with the steam?
18    A.   You mean what kind of -- are you asking
19 would it matter to me what type of product they were
20 producing with it?
21    Q.   Yeah, exactly.
22    A.   I think any product that Johnson Matthey
23 would have been producing we probably would have been
24 happy to have them producing with that steam, I
25 suspect.

**Page 167**

1        Q.   Let's assume that you weren't negotiating
2 -- well, let's assume you didn't know the name of the
3 customer.  Would you have needed to know the name of
4 the customer prior to agreeing to allow the test to go
5 forward in Florida?
6        MR. BELL:  Objection to form.
7        THE WITNESS:  I think that if we had
8 perceived it was a credible bona fide third-party
9 company we would have felt a lot of comfort from that.
10 Knowing who it was, we felt even more comfort from
11 that.  I think it's a -- our interest was in a whole
12 blend of different circumstances surrounding this.  So
13 any one attribute would we have compromised on?  Maybe
14 so in terms of letting it go, but everything mattered.
15        (Whereupon Exhibit 26 was marked for
16 identification as of this date.)
17 (BY MR. CHAIKEN)
18    Q.   I'll show you what's been marked as
19 Exhibit 26.  Exhibit 26 is an e-mail dated June 22nd,
20 2014, and it is bates stamped 117296 through 297.  And
21 the first e-mail which is on the second page -- it's an
22 e-mail chain.
23        First, on the second page Dr. Rossi writes
24 to you and several other people about a meeting on
25 June 17th talking about what happened in August.  And,

**Page 168**

1 in fact, his paragraph number two on that page states,
2 "Since August 2013 it has been impossible to
3 communicate to us the where to install and make
4 operative the plant."  Do you see that?
5    A.   Yes.
6    Q.   Do you disagree with his statement?
7    A.   Absolutely.
8    Q.   Do you think you had communicated where you
9 were going to make the plant operative at that time at
10 or around August 2013?
11    A.   We said straight away, right where it is.
12    Q.   Did you tell him in your response that you
13 disagreed with him?
14    A.   I don't know how we responded to this
15 but --
16    Q.   Well, your response is on the next page.
17    A.   Oh, I see.
18        MR. BELL:  Technically that's a draft
19 of the actual responses.
20        MR. CHAIKEN:  I think you're right,
21 Bernie.
22 (BY MR. CHAIKEN)
23    Q.   Did you, in fact, respond to Dr. Rossi's
24 e-mail?
25    A.   I don't remember, but I see a draft here or

**Page 169**

1 if this went then perhaps so.
2    Q.   Why did you think you needed to forward
3 this to your attorneys?
4    A.   Well, this e-mail --
5        MR. BELL:  Just -- I'm going to allow
6 him -- you can answer the question or allow -- I'll
7 instruct him not to answer the question.  Otherwise,
8 I'll instruct you not to disclose the substance of any
9 attorney-client communications coming back to you or
10 emanated from you.
11        THE WITNESS:  So this was an
12 outrageous e-mail, the one that he sent.  You know, it
13 said all kinds of things that were not true.  And we
14 were trying to figure out among ourselves -- and how do
15 we respond to this.  I mean, this is so ridiculous, but
16 does it matter, on the other hand.  Like, why do we
17 care about whether it says these things that are
18 ridiculous if they're not true then what difference
19 does it -- does it make a difference and what is our
20 goal.
21        Our goal is to see the plant operate,
22 to see if it might work.  And maybe we could credibly
23 instrument the plant.  So that was our primary goal.
24 Plus, it was beneficial for him.
25 (BY MR. CHAIKEN)

02/16/2017 Thomas Darden

Page 170

1    Q.  You state in your -- in this draft e-mail
2 at least. "Your e-mail refers to contract sections,
3 but I haven't read them since we signed. I will need
4 to get a copy of the document and read it." After you
5 received his e-mail on June 20th did you, in fact, get
6 a copy of the document and read it?
7    A.  I don't remember. On June 20th?
8    Q.  Yeah.
9    A.  I don't remember. You know, I'm sure that
10 -- I'm sure that at some point we began to read these
11 things. I think that -- I don't know when I first
12 began reading these sections.
13    Q.  As of June 22nd, 2014 had you previously
14 read the contract sections anytime between June 22nd,
15 2014 and October 26th, 2012?
16    A.  I would think that I probably had.
17    Q.  Were you in or around June of 2014 pushing
18 Dr. Rossi to start testing the one megawatt plant?
19    A.  We were -- around June of '14?
20    Q.  Yeah.
21    A.  We were always pushing to start testing
22 almost anything. We wanted to operate any machines
23 that he had built. If we had built a machine we wanted
24 to operate it and see it operate and see whether it
25 might work, whether he had transferred the technology

Page 171

1 to us.
2    Q.  Were those -- did you ever put those
3 requests in writing?
4    A.  I suspect that we did, but I don't
5 remember.
6    Q.  Is there a reason why you wouldn't have put
7 them in writing?
8    A.  Well, just because, you know, we're talking
9 by phone or -- excuse me -- in the other office. You
10 know, I saw him most days for a long period of time.
11    Q.  Now --
12    A.  I tend not to send e-mails to people who I
13 communicate with verbally so --
14    Q.  Did you have a meeting in Raleigh in July
15 of 2014 with Dr. Rossi and Henry Johnson?
16    A.  I know that we had a meeting in Raleigh
17 with -- when he brought Henry Johnson to a restaurant,
18 but I don't remember the date.
19    Q.  Who was present at that meeting?
20    A.  J.T. was there. I was there. Andrea
21 Johnson. I don't know who else was there from our
22 side. I can't remember.
23    Q.  And what was the purpose of that meeting?
24    A.  He was introducing us to the president of
25 the Johnson Matthey subsidiary.

Page 172

1    Q.  And did he say specifically that the
2 purpose of the meeting was to do that?
3    A.  The purpose -- yes.
4    Q.  Did he say that in writing or orally?
5    A.  I don't remember.
6    Q.  Did he ever tell you that he was working
7 with a Johnson Matthey subsidiary at any point in time?
8    A.  Yes.
9    Q.  When was that?
10    A.  He told us that that's who the customer
11 was.
12    Q.  And when did he tell you that?
13    A.  Several times. I mean, I don't remember
14 the specific dates but it was Johnson Matthey.
15    Q.  Did he tell you that --
16    A.  He told us he previously worked for Johnson
17 Matthey, that he had done business with them. He
18 repeatedly said that.
19    Q.  Did he tell you that orally or did he tell
20 you that in writing?
21    A.  I don't know if he said it in writing, but
22 I know he said it orally.
23    Q.  Okay. Did he tell you that he was
24 purchasing products from Johnson Matthey?
25    A.  He said that he had previously purchased

Page 173

1 products from Johnson Matthey. He said Johnson Matthey
2 was going to be operating the plant.
3    Q.  Okay. And who else was present when he
4 made those statements?
5    A.  I don't remember which conversation and who
6 was present at which conversation but --
7    Q.  Let's go to the --
8    A.  He said Johnson Matthey would -- after the
9 plant had operated for a brief period of time and they
10 were sure that it was working and everything was
11 effective, that Johnson Matthey wanted to announce that
12 they were the customer.
13    Q.  And let's go back to the meeting with Henry
14 Johnson. You said it was held in a restaurant in
15 Raleigh?
16    A.  Yes.
17    Q.  And there was J.T. Vaughn, yourself, Dr.
18 Rossi and Henry Johnson, right?
19    A.  Yes. I'm not sure if anybody else was
20 there.
21    Q.  And what was said at that meeting?
22    A.  It was a formalistic kind of a meeting to
23 introduce the customer and to talk about, you know, the
24 circumstances of bringing the plant down to Miami.
25 And, you know, we wanted to build a -- have some

02/16/2017 Thomas Darden

Pages 174..177

Page 174

1 communication with who was going to be using this thing
2 and try to get some feel for it.
3          You know, we just wanted to call Johnson
4 Matthey and talk to them.  We wanted to go meet with
5 Johnson Matthey.  You know, those were all our initial
6 -- I don't remember the chronology here so I say
7 "initial," but those were recommendations that we were
8 making.  And so I suspect that what happened is Andrea
9 said, "Well, I'll just bring the president of Johnson
10 Matthey, you know, to this subsidiary to meet with
11 you."
12      Q.   And what happened at that meeting?
13      A.   We had lunch.  It was -- it was kind of
14 awkward.  It -- you know, it was -- he didn't seem like
15 a Johnson Matthey kind of guy.  Not that I know what
16 that is necessarily.  But, you know, somebody who's an
17 industrial facility operator kind of person.  I'm
18 trying to remember when it came up that we put two and
19 two together and figured out that he was Rossi's
20 lawyer.  And so that was weird.
21          Again, I'm kind of mixing together
22 different conversations and what we talked about at
23 which time.  But I do remember a conversation where we
24 were saying, you know, why would a lawyer be doing
25 this.  And either Rossi or Johnson was saying, "Well,

Page 175

1 you know, they needed to set up a subsidiary for this
2 purpose.  This is a special project.  They're going to
3 move some of their production from somewhere else in
4 Miami or somewhere nearby over there to produce -- to
5 run this plant, to produce in this plant."
6          They wanted it to be a separate subsidiary.
7 They didn't want their name on it.  They wanted it to
8 be, you know, registered by some attorney.  And so, you
9 know, here's an attorney.  Rossi knew this attorney.  I
10 don't know what the connection was to this attorney.
11 So he was going to do it.
12          But I remember saying, "So you're going --
13 you know, this is what you're going to do or you're
14 going to work with this or you're -- you know, so
15 you're going to run this operation" or something like
16 that.  He said, "Yeah, I'm going to run the operation."
17      Q.   Did they tell you what products they were
18 going to be producing?
19      A.   No, they wouldn't.
20      Q.   Did they tell you what they were going to
21 do with the steam?
22      A.   Hm?
23      Q.   Did they tell you how they were going to
24 measure the steam?
25      A.   Well, they said they were going to produce

Page 176

1 --
2          MR. BELL:  I just want to make sure
3 she gets your --
4          THE WITNESS:  Okay.  They didn't tell
5 us what products they were going to produce, and they
6 didn't tell us specifically what they were going to do
7 with the steam except to use it in producing their
8 products.  They said they were going to move products
9 from another plant into this plant.
10 (BY MR. CHAIKEN)
11      Q.   And did they tell you where that plant was
12 located?
13      A.   I recall that they said it was in or
14 somewhere around Miami, but I can't say that for sure.
15      Q.   And did you do any due diligence into Henry
16 Johnson at that time?
17      A.   Yes.  I mean, somewhere in there we figured
18 out this is a lawyer and, you know, we figured out this
19 was Rossi's lawyer.  So at some point we figured that
20 out.  That's why we were kind of surprised.
21      Q.   And --
22      A.   How this guy was going to go do this or
23 this guy is going to run this thing or -- it must be an
24 important operation.  He must really be a believer.  He
25 must really think this is going to be great.

Page 177

1      Q.   And did they tell you they were forming a
2 new company for the purposes of doing it?
3      A.   Yes.
4      Q.   And did they tell you who the officers and
5 directors of that company were going to be?
6      A.   I don't remember that.  Well, Henry
7 Johnson.
8      Q.   And they told you that they were going to
9 be opening up a new facility in --
10     A.   Yes.
11     Q.   Was there any reason why you were prevented
12 from calling Johnson and Matthey directly to confirm
13 any of this?
14     A.   Rossi made us promise we wouldn't do that.
15 He said, "Please don't do that.  Then they won't use
16 it.  They'll be scared.  They'll come cut as soon as
17 it's run for 90 days.  Everything is going great and
18 they'll come out.  You know, they'll be proud to be
19 associated with it at that point.  Right now they don't
20 want that to happen."
21          In fact, we knew people in England who knew
22 people at Johnson Matthey, and it would have been very
23 easy to simply -- you know, I was thinking, well, let
24 me call them up.  And he said, "No, no.  You can't do
25 that.  It'll -- you know, they'll get spooked or they

02/16/2017 Thomas Darden

Pages 178..181

Page 178

1 don't want any publicity until they know that
2 everything is working great."
3      Q.   Based on your prior due diligences into Dr.
4 Rossi and based on what you had learned about Henry
5 Johnson, didn't this all start to put red flags up and
6 say, hey, maybe this isn't legit?  We need to start
7 doing more due diligence?
8      A.   Well, our loss of confidence in the
9 technology and in Rossi was kind of a continuous slide.
10 So, you know, we tend to be hopeful and optimistic
11 people.  Being in the businesses that we're in you need
12 to be maybe a little bit slower to be suspicious than
13 we should be.  Certainly this was not -- it didn't feel
14 as good as it should have.
15      Q.   But here you are in June-July 2014.  You're
16 unable to replicate.  You had doubts at the start this
17 might be a fraud.  Dr. Rossi shows up with his attorney
18 as a so-called customer for Johnson Matthey.  And who
19 is Johnson Matthey, by the way?
20      A.   It's a large British, I think,
21 headquartered company that makes -- oh, products --
22 industrial supply products mostly for the medical or
23 high-tech industry.  Very sophisticated company.
24      Q.   Is it publicly traded?
25      A.   I'm 90 percent sure it is.  I'm not sure.

Page 179

1 I believe so.
2      Q.   So you've got all that going on, and you're
3 about to ship a piece of equipment they had paid $1.5
4 million for and you're not going to check to see if, in
5 fact, Johnson Matthey has anything to do with it?
6           MR. BELL:  Objection to form.
7 (BY MR. CHAIKEN)
8      Q.   I mean, I understand the thinking in that.
9           MR. BELL:  Objection to form.
10          THE WITNESS:  Are you saying that we
11 should have been worried about the value of the plant
12 and losing access to the value of this plant?  I mean,
13 we weren't getting value from the plant as it was so we
14 didn't care about that at that point.
15 (BY MR. CHAIKEN)
16      Q.   So it really wasn't -- this was, "Hey, we
17 just want to see it work.  We don't really care about
18 the logistics of it"?
19      A.   Well, we absolutely --
20          MR. BELL:  objection to form.
21          THE WITNESS:  So we absolutely
22 believed that someone associated with Johnson Matthey
23 was producing products on the other side of that wall.
24 (BY MR. CHAIKEN)
25      Q.   I'm sorry.  Say that one more time.

Page 180

1      A.   So we absolutely believed that somebody
2 associated with Johnson Matthey was producing something
3 on the other side of that wall.
4      Q.   But you didn't do any due diligence to
5 confirm that?
6           MR. BELL:  Objection to form.
7           THE WITNESS:  We talked to -- we
8 talked to a lawyer -- a licensed lawyer -- in Florida.
9 I mean, somebody who's presumably not a scam artist who
10 said, "I'm the president of this company.  We're going
11 to use this steam.  We're going to make products from
12 it."  I mean, sure, it wasn't comforting.  I wish that
13 it had been somebody who was coming that had a British
14 accent and worked for 20 years at Johnson Matthey.  I
15 would have felt much better.  But it also was credible
16 that a company like Johnson Matthey would have been
17 worried about being associated with this technology.
18 (BY MR. CHAIKEN)
19      Q.   But was it credible to think that Johnson
20 Matthey was going to be associated with Dr. Rossi's
21 personal attorney, and his personal attorney was going
22 to be the CEO of that subsidiary?
23      A.   Well, you could imagine --
24          MR. BELL:  Objection to form.
25          THE WITNESS:  I mean, if the goal of

Page 181

1 Johnson Matthey was to stay completely behind the
2 scenes or incognito relative to this, that would be a
3 good way to do it.
4 (BY MR. CHAIKEN)
5      Q.   Did you ask Henry Johnson what his
6 experience was in manufacturing?
7      A.   Yeah, we did.  We said, "Have you ever run
8 a plant or have you ever done anything like this."  He
9 said, "No.  It's a new thing for me."  We assumed that
10 the operational requirements of managing this operation
11 -- this facility, you know, for him would not call for
12 a lot of technical expertise.  And that was obvious.
13 We figured that there would be technical people running
14 this thing.
15      Q.   Isn't it true that Dr. Rossi told you that
16 he was going to be running this plant?
17      A.   No.
18      Q.   He never did?
19      A.   I don't remember that.
20          (Whereupon Exhibit 27 was marked for
21 identification as of this date.)
22      Q.   I'll show you what's been marked as
23 Exhibit 27.  Exhibit 27 has been bates stamped
24 IH-12026.  It's an e-mail from Andrea Rossi to you and
25 J.T. Vaughn and other persons dated June 10th, 2014.

02/16/2017 Thomas Darden

Pages 182..185

Page 182

1          It states, "I have completed the
2 organization of my plan to put the one megawatt in
3 operation. I confirm all I already said: We have a
4 customer who pays $1,000 a day to rent the one megawatt
5 plant, put it in his factory in Miami, produce
6 catalyzers that he sells; will direct the operation
7 of the plant for the first year, the contract will be
8 for three years, renewable." Did you ever have any
9 conversation with Dr. Rossi about that?
10     A.   I believe we generally did, but this is
11 consistent with what I just said. I think they're
12 questioning that he was not going to operate the
13 customer's facility.
14     Q.   You didn't take this sentence to mean that
15 he was going to direct the operation of the customer's
16 facility?
17     A.   Well, he's going to rent the one megawatt
18 plant, put it in the factory in Miami -- the factory in
19 Miami -- "produce catalyzers that he sells; I will
20 direct the operation of the plant" -- the one megawatt
21 plant in my mind -- "for the year." And then every day
22 or whenever, Rossi would report either to us or via the
23 blogs that he was working hard in the container -- I
24 mean, running the steam plant.
25     Q.   But couldn't have you read it a different

Page 183

1 way meaning he was going to be operating at the
2 customer's plants given the fact that he uses the --
3 the contract will be for three years renewable?
4 Doesn't that suggest to you that he's talking about the
5 customer's plant and not the one megawatt plant?
6     A.   No.
7          MR. BELL: Objection to form.
8 (BY MR. CHAIKEN)
9     Q.   Because why would you need a three-year
10 renewable contract for the one megawatt plant?
11     A.   Well --
12          MR. BELL: Objection to form.
13          THE WITNESS: Because we were --
14          MR. BELL: This is referencing the
15 contract. Why don't you show him the contract instead
16 of this. This is not the contract.
17          MR. CHAIKEN: Because I don't think he
18 was referring to a term sheet.
19 (BY MR. CHAIKEN)
20     Q.   So you can answer my question.
21     A.   Well, I remember that Rossi told us that
22 they would rent the plant for more than one year. And
23 so we actually thought we would be getting paid
24 whatever that is -- $265,000 a year for -- I thought it
25 was two years. Maybe it was three years. But that it

Page 184

1 was a longer term contract than that.
2          So I think this says that it was a -- it's
3 a renewable plant. The contract will be for three
4 years to run the steam plant. I mean, to buy steam
5 from us.
6     Q.   Did you ever have a conversation with him
7 after sending this e-mail regarding this e-mail?
8     A.   I don't remember.
9     Q.   So who negotiated the -- and you're
10 familiar with a document called the Term Sheet?
11     A.   Yes.
12     Q.   Who negotiated that term sheet with J.M.
13 Products?
14     A.   Rossi.
15     Q.   Who on the Industrial Heat side?
16     A.   I don't remember.
17     Q.   Who represented Leonardo in those
18 negotiations?
19     A.   I don't remember.
20     Q.   Do you know who represented J.M. Products
21 in those negotiations?
22     A.   No, I don't remember.
23     Q.   Do you know if it was Dr. Rossi who did?
24     A.   I don't know. I don't remember that.
25     Q.   Did your -- I say "your," did Industrial

Page 185

1 Heat's attorneys review the term sheet before it was
2 executed?
3     A.   I don't remember much about that term
4 sheet. Maybe if I looked at it I could get a feel for
5 it.
6     Q.   Your wish is granted. Here's the term
7 sheet.
8          (Whereupon Exhibit 28 was marked for
9 identification as of this date.)
10     Q.   Exhibit 28 has been marked, and that is the
11 term sheet. It's stamped IH-11496 through 11497. Does
12 this refresh your recollection as to whether or not
13 your attorneys -- IH's attorneys reviewed this prior to
14 it being executed?
15     A.   I don't remember whether they did or not.
16 I would assume that they did, but I don't know that
17 they did.
18     Q.   Does the word or name Johnson Matthey
19 appear anywhere in this contract?
20     A.   J.M.C. J.M. Chemical Products, Inc. And
21 then later, J.M.C.
22     Q.   But that doesn't say "Johnson Matthey,"
23 does it?
24     A.   Right. This was a separate subsidiary of
25 Johnson Matthey.

02/16/2017 Thomas Darden

Pages 186..189

Page 186

1    Q.  And --
2    A.  We were told.
3    Q.  Was that --
4    A.  And I believe, in fact -- I think we looked
5 at this.  I believe that there's a Johnson Matthey
6 Chemical Products, Inc.  I think that there actually is
7 a company called that.  So it was a logical name.
8 That's a recollection.
9    Q.  Did you -- do you have anything in writing
10 that you asked, whether it be J.M. Chemical Products,
11 Inc., or Dr. Rossi or Henry Johnson, where they stated
12 specifically, "We represent that J.M. Chemical
13 Products, Inc., is, in fact, the subsidiary of Johnson
14 Matthey"?
15    A.  I don't remember that specifically.  And
16 whether it was subsidiary or affiliate or part of the
17 group or some of the language, clearly they represented
18 that.
19    Q.  In writing?
20    A.  I don't know.  We would have to search.
21    Q.  If it wasn't produced in discovery in this
22 case would you agree that it doesn't exist?
23         MR. BELL:  In writing.
24         THE WITNESS:  So is there nothing --
25 is there nothing -- I don't know that there is nothing

Page 187

1 that has the name Johnson Matthey in it that -- that
2 was produced in discovery.
3 (BY MR. CHAIKEN)
4    Q.  Did you ever receive anything in writing
5 from Dr. Rossi where he said specifically that he was
6 purchasing products from Johnson Matthey?
7    A.  I don't remember that.
8    Q.  In the course of this case defendants have
9 produced over 65,000 pages of documents.  I haven't
10 seen one which says specifically anything to the effect
11 of J.M. Chemical Products, Inc., is a subsidiary or
12 affiliate of Johnson Matthey.  Is it your contention
13 that such a written document exists?
14    A.  I know -- I don't know whether such a
15 written document exists.
16    Q.  Okay.  If it did exist it would have been
17 produced, correct?
18    A.  I would assume that it would have.
19    Q.  Okay.  Now, you mentioned that pursuant to
20 this agreement, Industrial Heat would have been
21 entitled to $365,000 per year, correct?
22    A.  Yes.
23    Q.  Did Industrial Heat ever seek to collect
24 that money?
25    A.  After the plant got it -- no, we did not.

Page 188

1 After the plant got installed in Florida and we saw
2 that Rossi had removed all of the instrumentation and
3 the monitoring access that we had, and as we realized
4 that he was restricting access to it so it was not
5 going to be a fully transparent bona fide test, at that
6 point we became very suspicious.
7         We realized that it was -- something bad
8 was going on down there.  And we don't want to get
9 thrown in jail for participating in some kind of fraud
10 so we said we don't want to receive payment from them.
11    Q.  What measurement equipment did you --
12    A.  I don't know the details of it, but we had
13 put on access ports on places where instruments could
14 be put so that we could put our own instruments on it
15 and cut it all off.
16    Q.  Who -- who knows more about that than you?
17    A.  T. Barker knows about it.
18    Q.  Anybody else?
19    A.  Barry probably knows something about it.
20    Q.  Did you ever inform Dr. Rossi and said,
21 "Hey, why are you removing all this measuring
22 equipment"?
23    A.  We did talk about that.
24    Q.  You talked about it.  Did you ever send him
25 an e-mail and say, "Hey, why are you moving all this

Page 189

1 stuff"?
2    A.  I don't remember sending an e-mail.  I
3 remember talking directly about it.
4    Q.  Was there -- did you ever give an
5 instruction to -- whether it be T. Barker Dameron or
6 Berry West where you told him, "Hey, you know, dance
7 carefully around Dr. Rossi.  Don't say anything that
8 might upset him.  Don't tell him if you think something
9 is wrong with the plant"?  Anything of that -- anything
10 of that nature?
11    A.  Well, we definitely -- I definitely don't
12 remember saying don't tell if there's something wrong
13 with the plant.  I mean, I don't know the definition of
14 "wrong with the plant."  But they knew that they needed
15 to be careful in their communication with Rossi
16 generally because he was so volatile and he would get
17 very angry at them.  So if they -- if they asked
18 questions or if they tried to get information, you
19 know, they knew that Rossi was likely to get very
20 angry.
21    Q.  Let me ask it a different way.  Did you
22 ever give any instruction to T. Barker Dameron as to
23 what topics of conversation he should not have with Dr.
24 Rossi?
25    A.  I don't remember but could have.

02/16/2017 Thomas Darden

Page 190

1    Q.  What about Barry West?
2    A.  I don't remember but maybe.
3    Q.  Now, you would agree with me that this term
4 sheet provides for a test of the one megawatt plant,
5 right?
6            MR. BELL:  Objection to form.
7            THE WITNESS:  For selling steam from
8 the one megawatt plant.
9 (BY MR. CHAIKEN)
10   Q.  Got it.  For selling steam.
11           THE VIDEOGRAPHER:  You have seven
12 minutes left.
13           MR. CHAIKEN:  Okay.
14 (BY MR. CHAIKEN)
15   Q.  I'll show you what's been marked as
16 Exhibit 29.
17           (Whereupon Exhibit 29 was marked for
18 identification as of this date.)
19   Q.  Exhibit 29 has been bates stamped 80561
20 through 80567.  The very first e-mail at the top of the
21 page is an e-mail from you to Joe Pike and Daniel Pike.
22   A.  Um-hm.
23   Q.  Do you recall sending that e-mail?
24   A.  I don't -- I mean, it looks like I did.  I
25 don't recall specifically sending it.

Page 191

1    Q.  This exhibit is an e-mail chain
2 approximately March 23rd, 2015.
3    A.  Um-hm.
4    Q.  And you're responding to -- you're having
5 some conversations about what's going on in the plant.
6 In fact, this very first page you state on March 23rd
7 at 9:54 a.m., "I'm torn about calling it a commercial
8 customer or about representing the output at this time.
9 We only have Rossi's words so far."
10          And then at the top in response to an
11 e-mail from Joe Pike you state, "My lack of clarity is
12 just around 1) precisely how much.  We cannot
13 definitively represent this yet."  Referring to the
14 steam.  "And 2) what is the nature of the customer."
15 And then you state, "But these are picky nuances, not
16 related to the core issue."
17   A.  Yes.
18   Q.  The nature of the customer in March of 2015
19 was not a core issue, was it?
20          MR. BELL:  Objection to form.
21          THE WITNESS:  Well, the nature of the
22 customer and the measurement of the steam were core
23 issues for us in deciding how the technology worked.
24 They were not core issues around the question of
25 whether it was producing any steam for some kind of

Page 192

1 customer.  That's the distinction.
2 (BY MR. CHAIKEN)
3    Q.  Got it.
4    A.  They were important issues to us.
5    Q.  Maybe I didn't -- I'm sorry if I
6 misunderstood.  It seems to me that this e-mail states
7 the nature of the customer is not a core issue to you.
8 Am I wrong?  Maybe I just missed it.
9    A.  So I would have to read more of it.
10   Q.  Yeah.
11   A.  But I believe that he must have written
12 something to somebody in China saying Industrial Heat
13 is producing, you know, a megawatt of steam or lots of
14 steam for, you know, a great customer or something like
15 -- I don't know.
16          Let's say if he had said that, I would have
17 said, well, I don't know.  I don't know how much we're
18 producing.  We can't definitively represent this yet.
19 And I don't know the nature of the customer.  Now,
20 maybe they said something about the nature of the
21 customer that it's a big industrial company or it's a
22 -- you know, they're making wonderful products or -- I
23 don't know what it said.
24          But, you know, I was saying I don't want to
25 do anything dishonest.  I don't want to overrepresent

Page 193

1 anything, you know.  But, again, I would have to look
2 at the e-mail and see what it was exactly he said.
3    Q.  Do you want to take a look and do that?
4    A.  Yeah.  Let me take a look at it.  Where
5 does he refer to the customer?
6    Q.  Well, right in this e-mail right below
7 yours.
8    A.  I know but where -- I want to see what it
9 was that he said that I think I must have objected to.
10          MR. ANNESSER:  Pardon me.  What's the
11 number?  The bates number for Exhibit 29?
12          MR. CHAIKEN:  I'm sorry.  80561
13 through 80567.
14          MR. ANNESSER:  05612?
15          MR. CHAIKEN:  Through 80567.
16          MR. ANNESSER:  Thank you.
17          MR. CHAIKEN:  You're welcome.
18          THE WITNESS:  Maybe -- I don't know.
19 There's a sentence in here that says, "Since then we
20 have installed our first beta customer device."  A beta
21 device -- a beta customer is -- you know, that's a
22 customer that's really using a -- I'm trying to think
23 of an example.
24          A beta product is something that --
25 it's really kind of ready to go.  You know, it's -- and

02/16/2017 Thomas Darden

Pages 198..201

Page 198

1 "We've got to have an in-person meeting and talk about
2 this. It's really important." So I said I'm coming
3 down there. And so I flew down there and met him in a
4 restaurant. And actually he brought Madelana and her
5 mother. And I said, "Andrea, that unit was fueled
6 with a dummy as producing great energy. So unless
7 something else is going on here we've a got a serious
8 problem with measurement." No, no, it's impossible.
9 It can't be. You know, the charge got stolen. You
10 know, somebody came in and took it out.
11        And the way this was built, it was molded
12 into it. I mean, it was totally sealed up. So it was
13 not -- I don't know if you could pull it out and stick
14 something else in there. I said, "Look, I haven't
15 taken it apart, but I know which ones I have and that's
16 the only one that I don't have in my physical
17 possession so, therefore, it's in that unit and so
18 we've got a serious problem."
19        And so he agreed to come up to North
20 Carolina. And he and I together drilled it out. You
21 know, like, drilled into it to see if there was
22 anything in it. There was nothing in it. And he
23 stormed out and you, know, the Russians came and stole
24 the charge. I mean, you know, who knows. You know, "I
25 know it was charged. It had to have been charged. How

Page 199

1 could it not be charged."
2        And so that was just an example of instead
3 of saying, "Wait, a second. Oh, wow. We have an
4 instrumentation error here. We've got a problem. We
5 need to really bore into this and try to figure out,
6 you know, what's going on. What's wrong with the way
7 we're measuring." You know, it was just like, you
8 know, we're going to ignore that or kind of carry on
9 notwithstanding that or not use multiple ways of
10 measuring.
11        So that's an example. I think the tests
12 that were done with the professors were not thoroughly
13 really instrumented. As an example, the one in
14 Switzerland. There was a thermocouple in that device
15 so -- but they didn't give the information from the
16 thermocouple to the professors. So the professors were
17 only allowed to put a thermal camera on the device, not
18 to in addition put a -- run a thermocouple on it the
19 whole time.
20        If it had run a thermocouple the whole
21 time, you could have been comparing two things against
22 one another and saying, you know, gee, you know --
23 which is, do they match up. Does this kind of make
24 good logical sense. You know, why is that. You know,
25 why not put 25 thermocouples on it two different -- you

Page 200

1 know, multiple ways of measuring it.
2        Is it a search for truth or is it a goal to
3 sort of trick something or to find some way to -- it
4 looks like -- looked like it worked but maybe it didn't
5 really work. And so, you know, you look backwards and
6 you just see a pattern of this consistently. How about
7 running the -- you know, running the fraction of the
8 units and -- you know, running the fraction of the
9 units in the Ferrara test. You know, what's that
10 about. I mean, we thought it was all legitimate like,
11 okay, well, I guess there's some law that says you
12 can't -- you know, you can't run an energy device
13 larger than whatever the size was. But, you know, what
14 was that about. I mean, why -- why -- why do that.
15 It's just weird.
16     Q. Did you -- did you put any of these issues
17 in writing to Dr. Rossi saying, "Hey, you're hiding the
18 ball. You're not letting us measure with two different
19 devices"? Did you say anything like that in writing?
20     A. I don't remember our communication in
21 writing. We talked to him, you know, daily about
22 measurement, how to measure. He was extremely volatile
23 and extremely dismissive of anyone challenging anything
24 about measurement. Just like, no, you're wrong.
25 You're an idiot. And early on we believed him. We

Page 201

1 thought, okay, we're idiots. I mean, I guess we don't
2 really know about this stuff. It was really over time
3 as the accumulation of all these things we're thinking
4 -- you know, looking backwards in particular like this
5 was so outrageous. But we weren't catching it then.
6     Q. If there was such a plethora of data like
7 this or instances like this, why wasn't there a paper
8 trail made to say, "Hey, look, starting way back when,
9 you know, we asked for duplicate ways to measure these
10 tests and you've denied here; you denied it here; you
11 denied it here"? Why don't I see that in the documents
12 you've provided?
13     A. How would it help us?
14     Q. It would validate your claim.
15     A. Our claim for our ten million back?
16     Q. That, your claim against -- your claim
17 against or defending against his claim for the
18 $89 million.
19     A. So at that point we don't know. It depends
20 on which point it is. But at that point we don't know
21 that the technology never works. And some of these
22 tests were compelling. You get these professors who
23 are really smart guys coming in saying, "Wow, look at
24 this. This works." And we're thinking, "Well, damn,
25 maybe it does work."

02/16/2017 Thomas Darden

Page 226

1 Anything like that?

2       A.   The real motivation was to take the

3 technology to China.  They might have been interested

4 in or willing to invest in a U.S. company as well.  But

5 their primary motivation was to be the partners for

6 developing the technology in China.  And we said to

7 them, "We don't know if we have a technology that works

8 that we could use in China, but you're welcome to come

9 see it."

10      Q.   I'm going to show you what's been marked as

11 Exhibit 38.  Exhibit 38 is a copy of Industrial Heat's

12 -- it's a long-titled document so bear with me.

13 Supplemental -- Supplement to Defendant Industrial Heat

14 LLC's Amended Responses and Objections to Plaintiff

15 Andrea Rossi's Second Requests for Production -- that's

16 the wrong document.  I'm sorry.  They gave me the wrong

17 document.

18      A.   Do you want it back?

19      Q.   Yeah.  Let me have it back.  It's not what

20 I meant to hand you.  Sorry about that.

21          MR. BELL:  No worries.

22 (BY MR. CHAIKEN)

23      Q.   They're all the same.

24      A.   Hm?

25      Q.   I said they're all the same.  They're all

Page 227

1 wrong.

2          MR. BELL:  Are you looking for the one

3 that lists the visitors?

4          MR. CHAIKEN:  Yeah, exactly.  That's

5 okay.

6 (BY MR. CHAIKEN)

7      Q.   So you brought Woodford to the facility,

8 and you brought Chinese investors to the facility.  Do

9 you remember the timeframe?

10      A.   No, I don't remember the dates.  Sorry.

11      Q.   Did you --

12          MR. BELL:  Object to the form of the

13 question.

14 (BY MR. CHAIKEN)

15      Q.   Did you ask Dr. Rossi to speak to --

16 whether it be Woodford or the Chinese investors?

17      A.   I'm sure that would have assuming he was

18 there.  I mean, I'm sure he was there.  I assume he was

19 for any visits that we made, and I'm sure he would have

20 said, "Hey, tell them what's going on here."

21      Q.   And did you ask -- do you know who James

22 Bass is?

23      A.   Yes.

24      Q.   Who is James Bass?

25      A.   James Bass was the plant manager for the

Page 228

1 Johnson Matthey plant.  J.M. plant.

2      Q.   Did you ever speak with him?

3      A.   Yes.

4      Q.   And what did you speak with him about?

5      A.   We met him in his capacity as the operator

6 of the -- of the J.M. plant.

7      Q.   Okay.  I understand you met him in that

8 capacity, but what did you speak to him about?

9      A.   Oh, oh; I'm sorry.  We asked him how it was

10 going.  You know, how is production.  How is the energy

11 supply.  How do you feel about this.  Is it working

12 well.  It was a general conversation that, you know,

13 somebody might have with a plant manager, somebody

14 operating a plant, to try to get information about, you

15 know, was it a good customer supply relationship, how

16 were they feeling about it, was it operating

17 effectively.  He said it was producing lots of steam.

18          He said their utility bills have been

19 reduced compared to what they were before because they

20 weren't having to use so much electric energy and now

21 they were using this energy.  He said the form of the

22 steam was great.  You know, the temperature or

23 whatever, the nature of it, and production was going

24 well.

25      Q.   When did you have that conversation with

Page 229

1 him?

2      A.   I don't remember the dates.  And I believe

3 I met him on two separate occasions so I could be

4 blending two conversations together.  Although, I think

5 they were the same.  But it was in the conference room

6 at J.M. Products.

7      Q.   Do you know if it was February 2015?  After

8 that time?

9      A.   I don't remember.

10      Q.   Do you know if he was by himself or was he

11 with other people?

12      A.   Well, we had -- we had visitors so, I mean,

13 it was in a conference room with visitors.  So I don't

14 know -- I don't remember meeting him alone, for

15 example.

16      Q.   Do you know if Dr. Rossi was present when

17 that conversation took place?

18      A.   Yes, yes; he was there.

19      Q.   Did James Bass speak to any of the people

20 -- visitors that Industrial Heat brought?

21      A.   Well, they were there in the room.

22          MR. BELL:  I'm sorry.  I lost focus.

23 What was the question, please?

24          (Requested portion was read.)

25          THE WITNESS:  When I saw James Bass I

02/16/2017 Thomas Darden

Pages 246..249

Page 246

1    A.  I haven't seen the tax return, and I don't
2 have anything clearly documented that says he didn't
3 pay taxes except my recollection that he said that.
4    Q.  "He" being someone from Ampenergo?
5    A.  Well, Andrea.
6    Q.  Andrea told you directly that he didn't pay
7 his taxes?
8    A.  He said either he didn't pay the taxes or
9 he wasn't going to owe the taxes.  And I couldn't
10 figure out how that could be the case because it was a
11 U.S. company.
12    Q.  And how, in fact, has IH or IPH been harmed
13 as a result?
14    A.  Well, our credibility is, unfortunately,
15 tied to Rossi's credibility.  And so if Rossi has legal
16 problems or credibility problems associated with
17 compliance then it affects us.
18    Q.  But sitting here today you don't know if
19 that's true or not?
20    A.  I don't know if -- if it has been
21 manifested at this point.  I don't know.
22    Q.  And have you done anything to count -- to
23 compute what your actual damages are as a result of any
24 failure to pay taxes?
25    A.  I don't believe that any of us -- I have

Page 247

1 not, and I don't believe that others of us have made
2 such a computation.
3         MR. CHAIKEN:  Anybody just join the
4 call?
5         MR. ARAN:  Fernando here.  I'm still
6 here.  I'm not sure --
7         MR. CHAIKEN:  We're going to keep
8 going.  Somebody just join now?
9         MR. ANNESSER:  This is John.  I got
10 disconnected.
11         MR. CHAIKEN:  Okay.  Thanks for
12 announcing yourself.
13 (BY MR. CHAIKEN)
14    Q.  Back -- back to my questions.  I forgot to
15 ask Mr. Darden with respect to the third category,
16 "Failing to inform or consult with Industrial Heat and
17 IPH on the existence of certain patent applications."
18 How has -- or let me ask it this way.  Has IP -- IH or
19 IPH computed how it's -- what its actual damages are as
20 a result of that allegation?
21    A.  I don't believe that we've computed that.
22 We know how much money we've spent pursuing this
23 technology.  If it jeopardized that then certainly it
24 would be the value of the money that we spent.
25    Q.  Okay.  There's one last paragraph there.

Page 248

1 One last allegation.  It states, "Failing to keep the
2 original Leonardo entity active."  Have you made any
3 attempts to compute what your damages are as a result
4 of that failure?
5    A.  I don't believe so.  I'm not aware of that.
6    Q.  And in response to all of these allegations
7 contained in this fourth defense -- when I say "you" I
8 know I'm talking to Tom Darden, but you as an officer
9 or director of the company, do you know if IH or IPH
10 has computed damages for any of these items?
11    A.  I'm not aware that the companies have
12 computed damages for those other than knowing how much
13 money we spent on it and the possible jeopardy of that.
14    Q.  Okay.  Did you during the course of the
15 tests in 2015 that was taking place in Florida, did you
16 receive copies of reports from Fabio Penon?
17    A.  Yes, I did.
18    Q.  And did you review them?
19    A.  I did.
20    Q.  And did you send them to Joe Murray?
21    A.  I believe that I sent them around to people
22 inside Industrial Heat.  I assume I sent them to Joe.
23    Q.  And did anybody ever respond to either
24 Penon or Dr. Rossi and say that they thought the
25 results were not valid?

Page 249

1    A.  I don't remember the specific conversations
2 that we had about that.
3    Q.  Well, I wasn't asking about a conversation.
4 I was asking about --
5    A.  I'm sorry.  I don't know.
6    Q.  Okay.
7    A.  I don't remember.
8    Q.  Is there a reason you wouldn't have said --
9 sent an e-mail or report and said, "Hey, look, these
10 are the problems with the report"?
11    A.  If it was so bad that we felt that it was
12 just completely unprofessional and not remediable, we
13 might have just said never mind.
14    Q.  Okay.  Did you end up paying Penon for his
15 time?
16    A.  We did end up paying Penon for his time.
17    Q.  And why did you?
18    A.  Well, we didn't know if we might have
19 agreed to pay Penon for his time, and so we didn't want
20 to not pay Penon if we had told him that we would.
21    Q.  Do you think he honored the contract -- the
22 agreement?
23    A.  No.
24    Q.  And how did he not honor it?
25    A.  I don't think he complied with the testing

02/16/2017 Thomas Darden

Pages 290..293

Page 290

1    Q.  Not before that one.
2    A.  I believe that I met him before that with
3 some Chinese visitors.
4    Q.  Okay.  And if we -- if we look at the
5 listing, I believe, only by reading the names, that
6 perhaps the first time that any one of the Chinese
7 defendants visited would have been March 27th, 2015?
8    A.  I see that.  Wait a second.  March 27th.  I
9 see that.
10   Q.  Would that refresh your recollection?
11   A.  Well, it would mean that I could not have
12 met him with the Chinese before the visit when we met
13 him with Paul Lamacraft.  So, yes, that would refresh
14 my recollection.  Are we saying the --
15   Q.  February 9th, 2015, would I be correct in
16 stating that the plant had not commenced operations
17 yet?  The testing phase yet?
18   A.  I don't remember the dates but let's say
19 that's the case.
20   Q.  So if that's the case, Mr. Bass at that
21 point in time could not have been making any
22 representations to you concerning the performance or
23 the power, if you will, being produced by the plant,
24 correct?
25   A.  I understand what you're saying.  If the

Page 291

1 plant was not running then he could not have been
2 representing that.
3    Q.  So now if you could take a second, I read
4 through the rest of the visit and in none of those
5 visits was it indicated that you, Mr. Vaughn or anyone
6 else met with Mr. Bass.
7    A.  I see that.
8    Q.  So that's -- based on your recollection
9 you're telling me that this is probably inaccurate then
10 that you met with him on more than that occasion?
11   A.  I remember him talking about the
12 performance of the plant.
13   Q.  Okay.  And if I could ask you when you met
14 and he talked about the performance of the plant, who
15 else was with him?
16   A.  Well, I'm not remembering the different
17 trips.  So I thought I met with him with some of the
18 Chinese visitors.  So I'm -- but I'm not remembering
19 the details of who was in the room at the time.
20   Q.  And could it be fair for me to state that
21 by the time those Chinese visitors went to the plant in
22 Doral the -- by then the plant was operational?
23   A.  I believe that's the case.  I believe
24 that's the case.
25   Q.  The plant was producing?

Page 292

1    A.  Yeah, I believe that's the case.  But let
2 me -- let me note something that in August there was
3 another visit when Paul Lamacraft came and so perhaps
4 we met with him at that point.  I don't know.  I don't
5 know whether it was the second trip with Paul Lamacraft
6 that we met with him again or whether it was one of the
7 Chinese trips.
8    Q.  But you do recall meeting with him when the
9 Chinese folks were at Doral?
10   A.  I don't want to make such a definitive
11 statement as that.  So I thought that I remembered
12 meeting with him with the Chinese visitors, but perhaps
13 I met him twice with Lamacraft.
14   Q.  Okay.  And if that were the case then we
15 would follow the dates here that would have been then
16 in August of 2015?
17   A.  That's when we apparently came with Paul
18 Lamacraft, yes.
19   Q.  And by then the test that was being
20 performed on the one megawatt plant was well underway,
21 correct?
22   A.  That would be correct.
23   Q.  Now, did Mr. Bass have an obligation to you
24 -- and by that I mean you or IH or IPH -- to present
25 you with reports of data concerning measurements of the

Page 293

1 COP of the one megawatt plant?
2    A.  I seem to recall that they did.
3    Q.  When you say "they," was it Mr. Bass that
4 was sending you a report?
5    A.  Well, Bass or J.M.  I have it in my mind.
6 I'm trying to remember something that -- where they had
7 committed to do that.  I can't remember, but I seem to
8 recall that.
9    Q.  Does the term sheet permit J.M. Products or
10 any of its employees to provide IH with any data at
11 all?
12   A.  Can we get it out and let me take a look at
13 it because this is -- I'm making these comments
14 from memory.
15   Q.  Could you please.
16   A.  Sure.  We're looking.
17       MR. BELL:  I'm putting in front of
18 Mr. Darden what was previously marked as Exhibit 28.
19       (Witness peruses document.)
20       THE WITNESS:  Well, I see here on the
21 second page 19, "J.M.C. will keep records of the
22 operation of the one megawatt plant as reasonably
23 requested by Leonardo or IH and will provide copies of
24 such records to Leonardo and IH upon request."
25 (BY MR. ARAN)

02/16/2017 Thomas Darden

Pages 294..297

Page 294

1    Q.   Okay.  Do you have any recollection of ever
2 having made such a request of J.M. Products?
3    A.   I don't remember doing that, but we would
4 like to see them.
5    Q.   Well, was a request made?
6    A.   I don't remember.  I'm sure that we said to
7 them, "How is it going.  How much are you getting.  How
8 is the output."
9    Q.   Okay.  But you did not make -- am I correct
10 in stating you did not make any formal request of J.M.
11 to keep track of any particular type of measurement,
12 correct?
13         MR. BELL:  Objection to form.
14         THE WITNESS:  Well, except via the
15 term sheet where we assumed that they were and the fact
16 that they were sending us bills.  Other than that, I'm
17 not aware of one.
18 (BY MR. ARAN)
19    Q.   So you're aware of them sending you an
20 invoice.  Let me backtrack.  What you're aware is that
21 they sent you a letter saying, "Please invoice me
22 because the one megawatt plant this month produced X
23 amount of COP"?
24    A.   I don't remember exactly what they
25 communicated but something like that.

Page 295

1    Q.   Okay.  And then did you ever send them the
2 invoice to collect on the supposed debt or payment?
3    A.   I believe that we never sent one.  I
4 believe that we made a decision early on that we were
5 worried about whether the -- the -- there was some type
6 of a fraud going on and we didn't want to be
7 participating in it, that it would be used to
8 communicate to the outside world.  But I don't remember
9 the timing of when we came to that conclusion.
10    Q.   And that would be specific -- do you recall
11 that it was Mr. Bass that did that or was that under
12 somebody else's signature?
13    A.   I don't remember.  I thought it may have
14 been from Henry Johnson.
15    Q.   Okay.  If I would tell you that it was
16 Henry Johnson do you have any reason to believe it was?
17    A.   No.  In fact, that was my -- that's what
18 kind of popped into my brain.
19    Q.   So my question is really precise.  Did
20 Mr. Bass communicate to you in writing -- and to "you"
21 I mean you or IH in writing -- any type of data
22 concerning performance of the one megawatt plant?
23    A.   I don't remember getting any writing from
24 him about that.
25    Q.   Now, what you do recall is being in Doral

Page 296

1 with other persons.  It could have been Mr. Lamacraft
2 or it could have been both him and another occasion,
3 both from China, and having a conversation generally
4 saying, "Hey, how is it going."  And he's saying,
5 "Yeah.  We're comfortable with the performance.  We're
6 comfortable with the power.  We're getting -- we're
7 comfortable with the steam" or receiving words to that
8 effect; am I correct?
9         MR. BELL:  Objection to form.
10         THE WITNESS:  It is correct that we --
11 that I remember a meeting where he said those things.
12 Things similar to that.
13 (BY MR. ARAN)
14    Q.   And I'm trying to characterize what I heard
15 before.  If you think that I didn't characterize your
16 testimony before please let me know how.
17    A.   I think you're --
18         MR. BELL:  Objection to form.
19 (BY MR. ARAN)
20    Q.   Okay.  So did I characterize it more or
21 less correctly?
22    A.   I believe so.
23    Q.   Okay.  And this is well after the plant has
24 been transferred to Doral and became operational?
25    A.   I believe so.

Page 297

1    Q.   Okay.  I'll try to be brief because I know
2 the other counsel needs to ask his questions.  If I
3 could direct you to the Fourth Amended Answer to the
4 Pleadings.  And that would be Exhibit 38.
5    A.   Yep, yep.
6    Q.   And then if you could find page 62.
7    A.   I have turned to 62.
8    Q.   Thank you.  I'm going to ask you to focus
9 on Count IV and initially paragraph 140.
10    A.   Yeah.
11    Q.   It indicates that, "As described in greater
12 detail above" -- meaning the other preceding paragraph
13 -- "Rossi, Leonardo, Johnson JMP, Fabiani, USQL, and
14 Bass were engaged in a common scheme," correct?
15    A.   Yes.
16    Q.   So under this Count IV, Industrial Heat and
17 IPH are suing Mr. Bass, correct?
18    A.   Correct.
19    Q.   Now, I'm going to ask you to direct your
20 attention now to paragraph 141.
21    A.   Yes.
22    Q.   And it indicates, "The first part of the
23 scheme was to manipulate Counter-Plaintiffs into
24 allowing the plant to be sent from the Industrial Heat
25 facilities in North Carolina to Florida," correct?

Page 298

1    A.  Yes.
2        Q.  What, if anything, did Mr. Bass do to
3  manipulate the plant being brought to Florida from
4  North Carolina?
5        A.  Well, if he was part of setting up a
6  fraudulent company, that was part of the scheme or the
7  deception to try to trick us into sending the machine
8  down there thinking that it was a credible entity, then
9  that would have been his role.
10       Q.  Well, what proof do you have that Mr. Bass
11  was involved in setting up this company or doing any of
12  the acts that you've just testified to?
13       A.  I believe that he helped in building the
14  heat radiator or heat transfer system on the other side
15  of the wall.  And I believe that he represented to us
16  that there was a manufacturing plant there and that it
17  was operating nicely.
18       Q.  But did that happen prior to you making the
19  decision to bring the plant to North Carolina?
20       A.  I don't know the chronology of when he came
21  to be involved.
22       Q.  But we do know that he -- you and him had
23  not met until after the decision had been made to bring
24  the plant to Florida?
25       A.  That is correct.

Page 299

1        Q.  So how then could he have been involved in
2  manipulating you to do so if he was not in the picture
3  at all?
4        A.  I don't know when he came to be part -- in
5  the picture.
6        Q.  So if he came to be part of the picture
7  after the decision had been made to transfer the plant
8  and the transfer had already been entered into, then
9  would I be correct in stating that he had no part in
10  that first part of the scheme?
11       A.  If he came to work there or got involved
12  after we had already made the decision to send the
13  plant to Florida what you said sounds reasonable.
14       Q.  Okay.  So that's a "yes"?  He would have
15  had no part in the scheme?  Now, let me read to you
16  what the second part of the scheme was.
17           "The second part of the scheme was to
18  manipulate the operation of the plant and the
19  measurement of the plant's operations to create the
20  false and deceptive appearance and impression that the
21  plant was performing at astronomical levels, with COP
22  measurements not only well in excess of anything
23  achieved by any third party testing of the E-CAT
24  technology, but in fact many multiples higher than
25  anything achieved by any third-party testing."  Let me

Page 300

1  ask you this.  What proof do you have that Mr. Bass
2  provided to you any COP measurements?
3        A.  Well, he was the plant manager.  According
4  to him, he was the plant manager who was operating the
5  plant that was receiving the steam.  And the plant was
6  putting out -- was supposed to have been putting out
7  one megawatt of steam.  I don't know if he specifically
8  confirmed that he was getting one megawatt of steam,
9  but he said that he was -- had dramatically reduced his
10  power bill and it was operating well.
11           So he was part of a scheme to make us
12  believe that there was somebody on the other side of
13  the wall manufacturing products and -- and getting a
14  megawatt worth of steam.
15       Q.  But what is alleged to be the second part
16  of the scheme is misrepresenting the output or the
17  measurement of the output of the one megawatt plant.
18           So what evidence do you have of Mr. Bass
19  submitting any information to you indicating that the
20  COP of the one megawatt plant was well in excess at an
21  astronomical level of any of these other adjectives
22  that are used to describe it?
23       A.  Well, the COP was a function of how much
24  electricity the facility used versus the production of
25  steam from the plant.  So if the steam -- if the plant

Page 301

1  produced a megawatt worth of steam, then it had a high
2  COP.  And so he was the manager of the plant that
3  reported to us that they received a megawatt of steam.
4        Q.  Did Mr. Bass ever report to you that the
5  J.M.C. side of plant received one megawatt of steam?
6        A.  I don't remember whether he said they
7  received a megawatt of steam.  He told us that he was
8  getting the steam that they needed for their facility.
9  It was a one megawatt plant.  And we get an invoice
10  from his company saying that they got a megawatt worth
11  of steam.  They proposed that we send them an invoice.
12       Q.  Right.  Mr. Bass himself did not make that
13  representation to you, did he?  Did he represent to you
14  COP measurements well in excess of anything achieved by
15  any third-party testing?
16       A.  He represented by saying that the plant was
17  performing spectacularly or consistent with
18  expectations in terms of output, the amount of steam
19  they were getting.  He represented half of the equation
20  that it was getting enough steam that it must have had
21  that high COP.
22       Q.  Okay.  Now, did he report anything to you
23  concerning measurements taken of the one megawatt
24  plant?  He did not, though, did he?
25       A.  He said that they were getting all the

02/16/2017 Thomas Darden

Page 302

1 steam and they were buying one megawatt of steam.

2    Q.  Again, a casual conversation?

3         MR. BELL:  Objection to form.

4         THE WITNESS:  He was sitting at the

5 head of the table as a representative of J.M. Products

6 there to report to us on how things were going.

7 (BY MR. ARAN)

8    Q.  Okay.  But did he measure and report to you

9 the measurement of COP of the one megawatt plant?

10   A.  No.

11        MR. BELL:  Objection to form.

12        THE WITNESS:  He did not report the

13 COP.  He reported to us that he was getting the steam.

14 (BY MR. ARAN)

15   Q.  Correct.  So the second part of the scheme

16 -- okay -- is reporting false and deceptive impressions

17 of the plant by the plant performing at astronomical

18 levels.  Mr. Bass never represented to you that the one

19 megawatt plant was performing at astronomical levels,

20 did he?

21   A.  Yes.  He did represent that it was

22 performing at astronomical levels because one megawatt

23 of steam coming from that small plant would have been

24 astronomical.  In fact, it would have heated up the

25 whole building to such a point that people couldn't

Page 303

1 have existed inside the building.

2    Q.  Did he ever say he was receiving one

3 megawatt of steam?

4    A.  He said that he was receiving all the steam

5 -- he said the plant was performing consistent with

6 their expectations and it was a one megawatt plant.

7    Q.  Well, that doesn't mean that he was

8 receiving anything in particular, does it?  Does it

9 mean that he was receiving one megawatt plant?  Do you

10 know how much power he needed to run the other side of

11 the plant?

12   A.  That was the other side of the equation.

13 In other words, I'm saying that he gave -- he gave us

14 half of the information that would lead us to believe

15 that it had that COP because he was buying a megawatt

16 worth of steam from us and he said he was getting all

17 the steam he was supposed to be buying.

18        He didn't say, "Gee, unfortunately, the

19 plant is only putting out 50 kilowatts of steam" or

20 some amount less than one megawatt.  He said, "Yeah.

21 Everything is going great.  We're getting the steam and

22 our utility bills are reduced."

23   Q.  So that's the statement he made?  "We're

24 receiving the steam and our electricity bills are

25 reduced"?

Page 304

1    A.  I'm speaking in sort of a -- I'm speaking

2 colloquially or I'm speaking -- I'm paraphrasing a

3 conversation.  So this is the kind of conversation that

4 manufacturing people would have with one another.  If

5 you said to somebody, "How is your business operating?

6 You know, how is your production"?  If somebody said,

7 "Things are great.  We're operating at capacity.  We're

8 getting what we need.  We're -- you know, the plant is

9 running well" -- if someone were asking you that and

10 they were your suppliers selling you one megawatt worth

11 of energy and you were only getting 100 kilowatts of

12 energy, then you would be saying, "We're only getting

13 100 -- you know, everything is great except we're only

14 getting 100 kilowatts of energy so it's not

15 looking so good."

16   Q.  But you never asked and he never did tell

17 you how much he was receiving.  So he never represented

18 to you or IH any particular measurement of COP.

19        MR. BELL:  Objection to form.  I mean,

20 at some point you can't ask the same -- you can't ask

21 the same question -- you can't ask the same question

22 for an hour.

23        MR. ARAN:  Okay.  Well, maybe I could

24 but I won't.

25        MR. BELL:  True.

Page 305

1 (BY MR. ARAN)

2    Q.  Now, based on this claim under the Florida

3 Deceptive and Unfair Trade Practices Act, do you know

4 what damages monetarily -- what amount, the quantum of

5 damages suffered by IH or IPH as a result of the

6 actions under this count?

7    A.  I'm not aware of that number.

8    Q.  And do you know if it has been calculated?

9    A.  I don't know if someone else has calculated

10 it or not.

11   Q.  Okay.  At last I'll ask you to refer to

12 paragraph 144, page 63.

13   A.  Um-hm, yes.

14   Q.  It indicates that based on the scheme

15 various payments were made.  And that among these

16 payments were -- and it lists payments to Fabiani,

17 Penon, USQL.  Do you see that?

18   A.  Yes, I see that.

19   Q.  Travel, equipment, etc.

20   A.  Yes, yes, yes.

21   Q.  Are these the types of damages that were

22 suffered as a result of the conduct indicated in this

23 particular count?

24   A.  I don't know.  I would have to think about

25 it but, you know, we spent a lot of money working on

02/16/2017 Thomas Darden

Pages 330..333

---

**Page 330**

1 CERTIFICATE OF REPORTER

2 STATE OF NORTH CAROLINA   )

3 COUNTY OF WAKE   )

4

5      I, Leslie Christian, the officer before whom

6 the foregoing videotaped deposition was taken, do

7 hereby certify that the witness whose testimony appears

8 in the foregoing videotaped deposition was duly sworn

9 by me; that the testimony of said witness was taken by

10 me to the best of my ability and thereafter reduced to

11 typewriting under my direction; that I am neither

12 counsel for, related to, nor employed by any of the

13 parties to the action in which this videotaped

14 deposition was taken, and further that I am not a

15 relative or employee of any attorney or counsel

16 employed by the parties thereto, nor financially or

17 otherwise interested in the outcome of the action.

18      This the 28th day of February, 2017.

19

20 _____

21      LESLIE CHRISTIAN

22      Notary Public in and for

23      County of Wake

24      State of North Carolina

25      Notary Public No. 201221300088

---

**Page 331**

1          WITNESS'S CERTIFICATE

2

3      I, Thomas Darden, MD, do hereby certify

4 that I have read and understand the foregoing

5 transcript and believe it to be a true, accurate, and

6 complete transcript of my testimony, subject to

7 the attached list of changes, if any.

8

9                Thomas Darden, MD

10

11      This deposition was signed in my presence by

12 _____, on the _____ day of

13 _____, 2017.

14

15

16              Notary Public

17

18 My commission expires:

19

20

21

22

23

24

25

---

**Page 332**

1 CaseWorks, Inc.

  811 Ninth Street, Suite 260     (Page 1 of 2)

2 Durham, North Carolina 27705

3       E R R A T A   S H E E T

4 Re: Andrea Rossi, et al. vs. Thomas Darden, et al.

5 Deposition of: Thomas Darden, MD

6       Please read this transcript with care, and if

  you find any corrections or changes you wish made, list

7 them by page and line number below.   DO NOT WRITE IN

  THE TRANSCRIPT ITSELF.  Return the

8 Certificate and Errata Sheet to this office after

  it is signed.  We would appreciate your prompt

9 attention to this matter.

      To assist you in making any such corrections,

10 please use the form below.  If supplemental or

  additional pages are necessary, please furnish same and

11 attach them to the errata sheet.

12 Page _____ Line _____ should

13 read:_____

14 Page _____ Line _____ should

15 read:_____

16 Page _____ Line _____ should

17 read:_____

18 Page _____ Line _____ should

19 read:_____

20 Page _____ Line _____ should

21 read:_____

22 Page _____ Line _____ should

23 read:_____

24 Page _____ Line _____ should

25 read:_____

---

**Page 333**

1 Page _____ Line _____ should     (Page 2 of 2)

2 read:_____

3 Page _____ Line _____ should

4 read:_____

5 Page _____ Line _____ should

6 read:_____

7 Page _____ Line _____ should

8 read:_____

9 Page _____ Line _____ should

10 read:_____

11 Page _____ Line _____ should

12 read:_____

13 Page _____ Line _____ should

14 read:_____

15 Page _____ Line _____ should

16 read:_____

17 Page _____ Line _____ should

18 read:_____

19 Page _____ Line _____ should

20 read:_____

21 Page _____ Line _____ should

22 read:_____

23 Page _____ Line _____ should

24 read:_____

25

---