# Composite Exhibit 4

Page 1

```
UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF FLORIDA
          MIAMI DIVISION
   CASE NO. 1:16-cv-21199-CMA
```

ANDREA ROSSI, et al.,

    Plaintiffs,

 v.

THOMAS DARDEN, et al.,

    Defendants.
- - - - - - - - - - - - - - - - - - - - -x
INDUSTRIAL HEAT, LLC, et al.,

    Counter-Plaintiffs,

 v.

ANDREA ROSSI, et al.,

    Counter-Defendants.

 and

J.M. PRODUCTS, et al.,

    Third-Party Defendants.
- - - - - - - - - - - - - - - - - - - - -x

     600 Brickell Avenue, Suite 3300
     Miami, Florida
     Thursday, February 2, 2017
     11:17 a.m.- 6:06 p.m.

HIGHLY CONFIDENTIAL TRANSCRIPT
ATTORNEYS' EYES ONLY
VIDEO DEPOSITION OF JAMES BASS

Taken before Edward Varkonyi, Registered Merit Reporter and Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

Page 2

```
 1              APPEARANCES
 2
       BRIAN CHAIKEN, ESQ ,
 3     Perlman Bajandas Yevoli & Albright, P L
       283 Catalonia Avenue, Suite 200
 4     Coral Gables, Florida 33134
         on behalf of the Plaintiff
 5
 6     CHRISTOPHER R J PACE, ESQ ,
       MICHAEL MAUGANS, ESQ
 7     Jones Day
       600 Brickell Avenue, Suite 3300
 8     Miami, Florida 33131
         on behalf of the Defendant
 9
10     RODOLFO NUNEZ, ESQ ,
       Rodolfo Nunez, P A
11     255 University Drive
       Coral Gables, Florida 33134
12       on behalf of Defendants J M Products,
         Johnson and Bass
13
14     FERNANDO ARAN, ESQ ,
       Aran Correa & Guarch, P A
15     255 University Drive
       Coral Gables, Florida 33134
16       on behalf of Defendant United States
         Quantum Leap and Fabiani
17
18
19     ALSO PRESENT: Andrea Rossi
                Alex Montalvo, Videographer
20              Raphael Chaiken
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2     Witness         Direct
 3     JAMES BASS           7
 4
 5              E X H I B I T S
 6     Bass               For Ident.
 7     Exhibit  1  Color Photo              30
 8     Exhibit  2  Color Photo              33
 9     Exhibit  3  Color Photo              35
10     Exhibit  4  Color Photo              55
11     Exhibit  5  JB000377                 57
12     Exhibit  6  JB000380                 62
13     Exhibit  7  JB000368                 67
14     Exhibit  8  JB000365                 72
15     Exhibit  9  JB00036                  81
16     Exhibit 10  Color Photo              86
17     Exhibit 11  JB000355 to 356          92
18     Exhibit 12  Articles of Inc., Reactance Engineering  98
19     Exhibit 13  JB000347                102
20     Exhibit 14  JB000344                105
21     Exhibit 15  JB000341                108
22     Exhibit 16  JB000085                111
23     Exhibit 17  JB000335                113
24     Exhibit 18  JB000440 to 442         124
25     Exhibit 19  JB000215                128
```

Page 4

```
 1  Exhibit 20  JB000192 to 193           129
 2  Exhibit 21  JB000082 and attachments  137
 3  Exhibit 22  JB000336 to 337           137
 4  Exhibit 23  JB000073                  139
 5  Exhibit 24  JB0000068 to 69           141
 6  Exhibit 25  JB000326                  149
 7  Exhibit 26  JB000323                  155
 8  Exhibit 27  JB000096 to 97            160
 9  Exhibit 28  Color Photo Business Card 158
10  Exhibit 29  JB000385                  168
11  Exhibit 30  JB000086                  172
12  Exhibit 31  JB000360                  173
13  Exhibit 32  JB000349                  174
14  Exhibit 33  JB000010                  175
15  Exhibit 34  JB000206 to 207           177
16  Exhibit 35  JB000197 to 200           178
17  Exhibit 36  JB000138                  179
18  Exhibit 37  JB000107 to 108           182
19  Exhibit 38  JB000106                  183
20  Exhibit 39  JB000348                  185
21  Exhibit 40  Color Photo               188
22  Exhibit 41  Color Photo               188
23  Exhibit 42  Color Photo               190
24  Exhibit 43  Color Photo               191
25  Exhibit 44  Color Photo               192
```

Page 5

```
 1  Exhibit 45  Color Photo                194
 2  Exhibit 46  Color Photo                195
 3  Exhibit 47  Color Photo                197
 4  Exhibit 48  HJ000216                   207
 5  Exhibit 49  HJ000250 to 251            207
 6  Exhibit 50  HJ000214                   207
 7  Exhibit 51  Color Photo, J.M. Products Guidance  209
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1  Thereupon.
2       THE VIDEOGRAPHER: Good morning. We're
3  now on the video record. This is the videotape
4  deposition of James Bass in the matter of the
5  case Andrea Rossi versus Leonardo Corporation
6  versus Tom Darden, et al.
7       Today is Thursday, February 2nd of 2017
8  and the time is 11:17 a.m. Counsel, please
9  state your appearance for the record and after
10 this the court reporter will swear in the
11 witness.
12      MR. PACE: Thank you. Chris Pace and
13 Mike Maugans for the defendants. Jones Day for
14 the defendants.
15      MR. ARAN: Fernando Aran of the law firm
16 Aran, Correa & Guarch on behalf of the deponent,
17 James Bass, third party defendant J.M. Products
18 and third party defendant Henry Johnson.
19      MR. NUNEZ: Rudy Nunez on behalf of the
20 third party defendant Fulvio Fabiani and United
21 States Quantum Leap, LLC.
22      MR. CHAIKEN: Brian Chaiken on behalf of
23 the plaintiffs, Dr. Andrea Rossi, who is present
24 with me and Leonardo Corporation.
25 Thereupon--

Page 7

1           JAMES BASS
2  was called as a witness and having been first duly
3  sworn responded as follows:
4           THE WITNESS: I do.
5           DIRECT EXAMINATION
6  BY MR. PACE:
7    Q. Mr. Bass, can you state your full name
8  and your work and home address -- well, your full
9  name and your work address.
10   A. I have a question first.
11   Q. Sure.
12   A. Shouldn't you be using a ouija board?
13   Q. A ouija board?
14   A. You know what it's for? Communicate with
15 spirits.
16   Q. With spirits. Why do you think I should
17 be using a ouija board?
18   A. They said I was a ghost.
19   Q. So you think I should be using a ouija
20 board --
21   A. Yeah, maybe.
22   Q. -- you think that's how -- okay. I
23 understand your disposition.
24        So Mr. Bass, you are obviously not happy
25 to be here today, correct?

Page 8

1    A. That's correct.
2    Q. Mr. Bass, you're obviously angry,
3  correct?
4    A. Yes.
5    Q. All right. Let's start. Mr. Bass, can
6  you please state your full name for the record.
7    A. James Alan Bass.
8    Q. Mr. Bass, will you please state your work
9  address for the record.
10   A. 515 Northeast 8th Avenue, Deerfield
11 Beach, Florida. I'm a contractor.
12   Q. So Mr. Bass, what is your educational
13 background?
14   A. I have almost four years in the US Navy
15 with flight control and guidance systems technician
16 on aircraft.
17        I graduated Rutgers University with
18 electrical engineering with a specialty in closed
19 loop control systems. I graduated first in my class
20 summa cum laude. I'm a member of Tau Beta Pi and Eta
21 Kappa Nu, both engineering honor societies.
22   Q. Any formal education after Rutgers?
23   A. I have been to various classes and things
24 like networking. I have a Cisco certified network
25 associate. That's a training for routing systems

Page 9

1  from Cisco Corporation and about 42 years of
2  engineering experience.
3    Q. Apologies for the delay but I'm actually
4  a right-handed writer and I'm trying to do this
5  left-handed.
6         Let's talk for a second about the 42
7  years of engineering experience. What was your first
8  engineering-related job after you graduated from
9  Rutgers?
10   A. I went to work at a computer company that
11 did factory process control and I did hardware and
12 software integration.
13        We worked in nuclear plants. I designed
14 a special control system for the Westinghouse Hanford
15 nuclear reactor out in Idaho Falls, Idaho and many
16 other projects.
17   Q. Who is that employer? What was the name
18 of the employer?
19   A. My employer?
20   Q. Yes.
21   A. Modular Computer Systems.
22   Q. How long did you work for Modular
23 Computer Systems?
24   A. Ten years.
25   Q. What did you do after you ended working

3 (Pages 6 - 9)

Page 26

1  The time is 11:45.
2      (Thereupon a brief recess was taken,
3  after which the following proceedings were had.)
4      THE VIDEOGRAPHER: We're now back on the
5  record. The time is 11:50.
6  BY MR. PACE:
7  Q. Mr. Bass, when we took a break you had
8  said that you were doing or since the spring of 2016,
9  you have done --
10 A. What did you do to your arm?
11 Q. Tore a rotator cuff. Had to have surgery
12 on it and reattach it.
13 A. Not fun.
14 Q. No. When we took our break we were
15 talking about work you have done with Andrea Rossi
16 and Leonardo Corporation since the spring of 2016.
17      You talked about designing energy
18 provoking -- energy provoking system. Can you
19 explain to me what that is?
20 A. Well, the E-Cat needs energy to provoke
21 it into generating heat and we're coming up with
22 different methods, high voltage electricity, so I am
23 trying to design some different test systems at high
24 voltage.
25 Q. So this is for providing energy into the

Page 27

1  E-Cat reactors?
2  A. Yes.
3  Q. Were you doing any of this work when you
4  were working for J.M. Products and Andrea Rossi --
5  A. No.
6  Q. -- prior to the spring of 2016?
7  A. No.
8  Q. All right. What are platinum sponges?
9  A. It's a -- platinum sponge, if you think
10 it looks like a sponge, it doesn't. It's more like a
11 craggy-type stuff that they use to -- they eventually
12 wind up after cooking it to put in catalytic
13 converters. It's more like a powdery-type stuff, I
14 think.
15 Q. Have you ever done any work with platinum
16 sponges?
17 A. I didn't specifically do any work with
18 platinum sponge, but J.M. did.
19 Q. J.M. Products did work with platinum
20 sponges?
21 A. Yeah.
22 Q. But you didn't do any work with that?
23 A. I didn't handle it.
24 Q. Did you -- during your time you worked at
25 J.M. Products did you ever see any platinum sponges?

Page 28

1  A. No.
2  Q. Did you believe that J.M. Products did
3  work with platinum sponges --
4  A. Yes.
5  Q. -- at the Doral location?
6  A. Yes, because I know there was a pilot
7  amount that was purchased and installed inside the --
8  whatever you want to call it, the box, for heating.
9  Q. And what was done with that platinum
10 sponge after it was heated?
11 A. Supposedly it was removed. I wasn't -- I
12 wasn't present when it was removed.
13 Q. Were you present when it was placed in
14 there?
15 A. I assisted in putting tubes into the
16 piping but I didn't know what they were at the time.
17 Q. What is graphene?
18 A. Graphene is a carbon. It's a certain
19 form of carbon molecule that's extremely expensive,
20 very slippery, used in a number of things and if you
21 try and buy graphene you'll find out how gross
22 expensive it is.
23 Q. Have you ever done any work with
24 graphene?
25 A. We did. Again, the same deal. I didn't

Page 29

1  specifically. I just was aware of the cost of
2  graphene because of a product that I had heard about
3  a while prior to working for J.M.
4  Q. But when you were working for J.M.
5  Products you believe J.M. Products did work with
6  graphene?
7  A. They did. We bought -- I believe we
8  bought industrial diamonds and stuff and used the
9  industrial diamonds in the heating process to produce
10 graphene.
11 Q. Let me -- I am going to use a few
12 exhibits here that are just images taken over at the
13 Doral location. For purposes of this deposition I'm
14 happy to refer to the warehouse, building, however
15 you want to refer to it. I am talking about the
16 warehouse that is at 7861 Northwest 46th Street.
17     Is there a way you are comfortable
18 referring to it? Do you call it the warehouse, the
19 building?
20 A. Warehouse is fine.
21 Q. I'll call it the Doral warehouse, just so
22 I don't have to keep repeating the address for the
23 rest of the afternoon. I'm going to hand you what I
24 am going to mark here as Bass Exhibit 1.
25     (The document referred to was thereupon

Page 38

1 steam when it hits your filter?
2  A. Probably not. It's hard to say. No, it
3 was collecting water mostly. There is some mix in
4 there. I don't know.
5  Q. What is the purpose of the filter box?
6  A. To prevent impurities from going back
7 into the E-Cat.
8  Q. So you just testified that for Bass
9 Exhibit 2 this piping was intended to keep the water
10 or the steam or the fluid, whatever was in here warm,
11 hot?
12  A. Uh-huh.
13  Q. Then that leads into your -- into this
14 filtration system here?
15  A. Uh-huh.
16  Q. If it was still steam coming in how would
17 it -- at what point would it be converted into water?
18  A. It's mostly converted into water or a mix
19 of water and steam inside the serpentine area.
20  Q. Okay. So why would you insulate the
21 serpentine area then? Don't you want the heat to
22 dissipate?
23  A. No, not particularly. You maintain the
24 efficiency of the closed loop system. That's another
25 closed loop system, by the way.

Page 39

1  Q. How do you turn steam into water without
2 the heat dissipating?
3  A. Remove energy.
4  Q. No, how does steam be converted back into
5 water? Does the temperature of the steam have to
6 lower?
7  A. No.
8  Q. The temperature of the steam can stay
9 above a hundred degrees Celsius?
10  A. Yes.
11  Q. How else does it convert into water?
12  A. You remove the energy from it.
13  Q. How do you remove the energy from it?
14  A. With an endothermic reaction.
15  Q. And what would that be?
16  A. Anything that takes in energy.
17  Q. Is there something within those
18 serpentine pipes that would take in energy?
19  A. Yes.
20  Q. What is that?
21  A. In the beginning it was -- sorry. The
22 catalytic stuff, platinum sponge.
23  Q. Platinum sponge. The platinum sponge
24 would be within the serpentine pipes?
25  A. Yes.

Page 40

1  Q. Did you put the platinum sponge into
2 those serpentine pipes?
3  A. I helped put pipes in there, that's all.
4 The pipes already had something charged in them.
5  Q. Did you see something charged in them
6 when you put the pipes? I am just trying to
7 understand.
8  A. No, I didn't see physically what was in
9 there.
10  Q. Let me take a step back, just so we're
11 clear. When we're looking at Exhibit 2 you helped
12 install these pipes, correct?
13  A. Yeah. Not the main serpentine. I did a
14 lot of stuff here, with the filter box.
15  Q. You are pointing to Exhibit 3?
16  A. Yes.
17  Q. But for Exhibit 2, did you --
18  A. Exhibit 2 was already there when I
19 started working for them.
20  Q. Do you think there was any -- were you
21 told by anyone that there was any platinum sponge
22 in --
23  A. I wasn't told anything about that at the
24 time.
25  Q. Okay. Let me start over. If you give me

Page 41

1 just a second to ask the question.
2    Do you believe today -- we will talk
3 about when you found out later on. Do you believe
4 today that in Exhibit 2 -- in these pipings in
5 Exhibit 2 that there was platinum sponge at some
6 point in the piping in Exhibit 2?
7  A. Yes.
8  Q. Okay. What's your basis for that belief?
9  A. Because I know that some of it was
10 purchased. I mean what would you do, throw it in the
11 street? That's what they talked about, that they
12 inserted the platinum sponge or we did, or it was a
13 group effort.
14    I didn't know it was in the pipes but
15 apparently some of it was already in there before
16 they were closed up.
17  Q. Okay. Who told you that there was
18 platinum sponge in the pipes before it was closed up?
19  A. Both Hank, Henry Johnson and Dr. Rossi
20 said eventually. I didn't know what was in there at
21 all at the time.
22  Q. When did they tell you that there was
23 platinum sponge in the piping?
24  A. I have no idea. Probably a month later.
25 I was the new guy in the block. I didn't know what

Page 42

1  was going on in there.
2      Q.  I understand.  When you say a month
3  later, are you saying in early 2015?
4      A.  Sometime in that area I found out it was
5  platinum sponge they were putting in there.
6      Q.  So you have never seen any platinum
7  sponge put in the pipe, but you were told by --
8      A.  Correct.
9      Q.  -- Mr. Johnson and Andrea Rossi that there
10 was platinum sponge in the pipe?
11     A.  Yes, they even bought some.  I saw the
12 bill.
13     Q.  You saw the invoice for --
14     A.  I saw the invoice for the platinum
15 sponge, so I figured that was good enough.
16     Q.  So you never really saw the platinum
17 sponge itself?
18     A.  No.
19     Q.  You saw an invoice for a platinum sponge?
20     A.  Uh-huh.
21     Q.  Do you know if that platinum sponge was,
22 in fact, purchased?
23     A.  Yes, I believe it was.  I saw the invoice
24 for the bill.
25     Q.  Let me rephrase.  Other than seeing an

Page 43

1  invoice, and the invoice was a request to buy the
2  platinum sponge?
3      A.  Huh?
4      Q.  It was an invoice for platinum sponge.
5  You recall it was over a million dollars worth of
6  platinum sponge was being purchased?
7      A.  No, I remember there was an initial
8  charge to test it.
9      Q.  Now, other than that document that you
10 saw, the invoice or the bill or whatever it was, so
11 I'm just asking, other than that did you ever see any
12 platinum sponge at the J.M. Products -- at the Doral
13 warehouse?
14     A.  Not particularly, no.
15     Q.  You qualified it some, so I just want to
16 understand.  Why do you say not particularly?
17     A.  There were a lot of things laying around
18 inside the plant.  It could have been.  There were
19 boxes and crates and everything.
20     Q.  I understand.  So you could have seen
21 platinum sponge and not known it was platinum sponge?
22     A.  I wouldn't have known it.
23     Q.  Understood.  But to your knowledge you
24 never saw platinum sponge but if it was there and --
25 you may have seen it and you wouldn't have known it

Page 44

1  was platinum sponge?
2      A.  That's correct.
3      Q.  Did you ever see any graphene at the J.M.
4  Products -- at the Doral warehouse?
5      A.  No.  Again, it's small stuff, but
6  whatever.
7      Q.  Graphene particles or objects are small?
8      A.  (Nods head.) Yes.
9      Q.  Turning to -- turning back to Bass
10 Exhibit 3, you say there is a filter box.
11         Is that the clear box we see here that
12 has kind of a red gauge on top of it?
13     A.  Yes.
14     Q.  All right.  This was to take out any
15 impurities in the water?
16     A.  Uh-huh.
17     Q.  And how was it -- did all the water that
18 came through the system run through that box?
19     A.  Only in the beginning of each test.
20     Q.  At the beginning, if you can help me
21 understand that.  What does that mean?
22     A.  When they first started the system if
23 they opened up the system, they would run it
24 initially through the box and then once they were
25 convinced -- it was up to Dr. Rossi when to divert it

Page 45

1  around the box.
2      Q.  So there is -- again, I'm not an engineer
3  so I apologize if I'm going to be asking some
4  questions poorly.
5          So when the system would be started up --
6  and when you say system, do you mean like the E-Cat
7  reactors?
8      A.  E-Cat, yes.
9      Q.  So when the E-Cat reactors would start
10 up, at least initially all of the water that was
11 flowing through this system would be redirected into
12 this box?
13     A.  Correct.
14     Q.  The filter box?
15     A.  Correct.
16     Q.  Then at some point a valve would be
17 turned so that the water no longer had to go into
18 this filter box?
19     A.  Yes.
20     Q.  And how much water can that filter box
21 hold?
22     A.  I don't know.  You can use your judgement
23 there.  I never particularly measured it.
24     Q.  Do you have a sense of how much water it
25 can hold?

12 (Pages 42 - 45)

Page 70

1 that?
2  A. Probably.
3  Q. All right.
4  A. I usually keep copies of stuff like
5 that.
6  Q. Your response to Andrea Rossi is to --
7 you're setting up time for a meeting. You say you
8 will not discuss what we're doing there. There,
9 meaning the Doral warehouse, correct?
10  A. Uh-huh.
11  Q. Then you said: Besides, you won't really
12 telling what you are doing there -- what we are doing
13 there.
14  A. Uh-huh.
15  Q. Is that a reference to what -- well, tell
16 me what you meant by that.
17  A. You're asking me to speculate. I don't
18 recall. Could have been both sides.
19  Q. Well, you wrote it, so that's why I am
20 asking you.
21  A. I wrote it two years ago.
22  Q. I understand. Can you tell me what you
23 meant?
24  A. No.
25  Q. All right.

Page 71

1  A. I might have meant what I knew about the
2 E-Cat, which was not very much at all or it might
3 have been the fact of what we were putting inside of
4 the serpentine pipes. I don't recall at the time.
5 That was two years ago.
6  Q. You didn't know what was being put in the
7 serpentine pipes?
8  A. No, I didn't at the time anyway, so it
9 didn't make much difference.
10  Q. Do you know whether J.M. Products has
11 ever sold a product?
12  A. No, I don't know.
13  Q. Have you ever seen a product being sold
14 from J.M.?
15  A. No.
16  Q. Have you ever seen a customer of J.M.
17 Products?
18  A. I think we had meetings with potential
19 people. I don't recall exactly.
20  Q. Who is we?
21  A. We. Who is we? Me, Dr. Rossi was in
22 there, I believe Industrial Heat was in there and we
23 discussed the potential uses of heat, of steam
24 energy, but that's all I recall. I don't recall the
25 guest list.

Page 72

1  Q. Well, I think you're talking to me about
2 the uses of the steam. I'm asking do you ever recall
3 whether J.M. Products met with any customers to buy
4 something that J.M. Products was producing, not that
5 Leonardo was producing?
6  A. No.
7  Q. Okay.
8  A. Could I take a quick bathroom break?
9  Q. Of course. Let's go off the record.
10      THE VIDEOGRAPHER: Going off the record,
11  the time is 12:47.
12      (Thereupon a brief recess was taken,
13 after which the following proceedings were had.)
14      THE VIDEOGRAPHER: We're now back on the
15  record. The time is 12:58, media number two.
16      (The document referred to was thereupon
17 marked Bass Exhibit 8 for Identification, a copy of
18 which is attached hereto.)
19 BY MR. PACE:
20  Q. Mr. Johnson, I'm marking what's another
21 document as Exhibit 8.
22      Again, with reference to our other
23 exhibits, here in this e-mail -- in one of these
24 e-mails on Exhibit 8 you say, I saw the heat strips
25 that are installed on the serpentine pipes -- on the

Page 73

1 serpentine pipe.
2      If you look at Exhibit 2, what are the
3 heat strips? Is that the insulation?
4  A. No, he had heat strips along some parts
5 of it that are covered up now.
6  Q. So in Exhibit 2 we can't see what the
7 heat strips are?
8  A. No, you can't.
9  Q. What's the function of a heat strip?
10  A. I don't recall, but probably to maintain
11 the heat when they had shut down the reactor. To
12 keep heating, to keep the pipes hot, because it was a
13 mandatory thing, as I recall, for the conversion and
14 the platinum sponge. That's all I recall.
15  Q. You recall that it was required that the
16 pipes stay heated for some purpose relating to the
17 platinum sponges?
18  A. Yes, that's what I recall. That's the
19 only reason to put them there and I think that was
20 the final -- that was the conclusion that I was
21 told. I don't remember the exact conversation.
22  Q. And who did you have that conversation
23 with?
24  A. Dr. Rossi.
25  Q. We talked previously on these serpentine

19 (Pages 70 - 73)

Page 94

1  A. Yes.
2  Q. Okay. And it's not going to go through
3 the exit pipe because it's not high enough to reach
4 where the exit pipe starts?
5  A. Yes, that was the concern.
6  Q. Why is that a concern?
7  A. In case we needed to get the filter
8 apart. In other words, you had water all over the
9 place.
10     The way -- if you see the clamps at the
11 end, that's the only way to change the filter, so you
12 would have spilled water. There actually is a
13 discharge pipe. You can't see it. I think it's in
14 the other corner. I specifically remember putting it
15 in.
16  Q. Okay. So --
17  A. It's a little faucet with a PVC tap on it
18 that allows all the water to drain out before you
19 take it apart.
20  Q. And that being the water up to the point
21 of the exit pipe --
22  A. Yes.
23  Q. -- because it's not going out the exit
24 pipe. It just sits there like still --
25  A. It doesn't matter while the system is

Page 95

1 running, understand, but when they had to take it
2 apart then it would have been a problem because there
3 is gallons of water in the bottom of that.
4  Q. So ultimately you did install --
5  A. Yes.
6  Q. -- the drain?
7  A. Yes.
8  Q. How many times was that drain used; do
9 you remember?
10  A. I have no idea.
11  Q. Did you ever use it?
12  A. No.
13  Q. When did you install it?
14  A. The drain?
15  Q. Yes.
16  A. Before the filter box was put in place.
17  Q. Okay. What did you understand,
18 Dr. Rossi's -- Andrea Rossi's response when he says:
19 "No, it is a dangerous source of spill. In case of
20 clog we take off the filter."
21  A. Where are we?
22  Q. I'm sorry. The first page of Exhibit
23 11. There at the bottom he says: "No, it is a
24 dangerous source of spill. In case of clog we take
25 off the filter."

Page 96

1  A. Let me see what he said before that, what
2 the question was.
3  Q. I don't think we have -- this is the way
4 it was produced to us in discovery. But it looked
5 like the preceding e-mail may have been --
6  A. There is something missing in that
7 because we definitely put the drain in there.
8  Q. Okay. So you don't think this is a
9 reference to your proposal to put a valve --
10  A. No.
11  Q. -- to drain the water?
12  A. No.
13  Q. Okay. You make a reference up here at
14 the top: "You are still the boss, so it's your
15 decision."
16     Was decisions -- decisions about what was
17 to go on -- what was to take place inside the
18 container on the J.M. Products side, those were all
19 made by Andrea Rossi?
20  A. Yeah, but he was being kind to me.
21  Q. I apologize.
22  A. Huh? About what?
23  Q. How -- I'm unclear.
24  A. He said, "you are still the boss."
25  Q. No, that's you. I'm sorry, that's your

Page 97

1 e-mail to Andrea Rossi.
2  A. Huh? Oh, yeah, it is. Okay.
3  Q. Okay.
4  A. I was confused.
5  Q. Sorry. So decisions about what equipment
6 was being used on the J.M. Products side of the Doral
7 warehouse, those were made by Andrea Rossi?
8  A. Uh-huh. Yes.
9  Q. Decisions about what type of filter box
10 or filtration system to put in, those had to be
11 approved by Andrea Rossi?
12  A. Yes.
13  Q. Did you ever -- when it came to any of
14 the operations on the J.M. Products side of the
15 warehouse, did you ever have to get approval from
16 Henry Johnson?
17  A. No.
18  Q. How many times have you met Henry
19 Johnson?
20  A. Many times.
21  Q. Were they all in connection with J.M.
22 Products?
23  A. Sometimes, yes.
24  Q. Did he form your corporation that you
25 created?

25 (Pages 94 - 97)

Page 98

1  A. It was formed before I ever became part
2  of it. I never was a direct part of J.M. though. I
3  was a contractor.
4      Q. All right.
5          (The document referred to was thereupon
6  marked Bass Exhibit 12 for Identification, a copy of
7  which is attached hereto.)
8  BY MR. PACE:
9      Q. I am going to hand you, Mr. Bass, what's
10 been marked as Exhibit 12.
11         Mr. Bass, this is a corporation that you
12 formed -- I'm sorry, these are the articles of
13 incorporation for a company that you formed in
14 September 2014, correct?
15     A. Yes.
16     Q. Who did the legal work for forming this
17 company, if anyone?
18     A. Nobody. Actually, my accountant helped
19 me do this, some of it.
20     Q. Who is your accountant?
21     A. Marshall Wexler. Does that matter?
22     Q. You formed this company right around the
23 same time that you -- we'll see some documents later
24 this afternoon, but would you be surprised to find
25 out that you had accepted the -- or you had been

Page 99

1  offered the employment or offered a contract to work
2  with J.M. Products or Andrea Rossi by September 1st
3  of 2014?
4      A. Would I be surprised?
5      Q. Yes.
6      A. No.
7      Q. Okay. So at that time period is also
8  when you formed Reactance Engineering?
9      A. Correct.
10     Q. Why did you form Reactance Engineering?
11     A. Because -- excuse me.
12     Q. Do you need some more water? We're going
13 to break in like two minutes.
14     A. I don't need anymore water right now.
15     Q. Let's finish this question.
16     A. I have had a cough for about a month
17 now.
18         I was working for another company at the
19 same time. The effort that I gathered I was going to
20 be doing was not going to be full-time at J.M. and
21 the other company wanted a contractor, a licensed --
22 they wanted to pay a company. They didn't want to
23 pay an employee.
24     Q. Understood.
25     A. They didn't want to give me a 1099. They

Page 100

1  wanted it as a contractor. That was Velocity
2  Aerospace. So based on that more than anything else
3  I formed my corporation, Reactance Engineering, and I
4  still have it.
5          MR. PACE: That answers that question.
6      Should we go ahead. We said we would take a
7      break at 1:30, 2, so let's go off the record.
8          THE VIDEOGRAPHER: Off the record, the
9      time is 1:31.
10         (Thereupon a brief recess was taken,
11 after which the following proceedings were had.)
12         THE VIDEOGRAPHER: Good afternoon. We're
13     now back on the record. The time is 2:49.
14 BY MR. PACE:
15     Q. Mr. Bass, let me remind you that you are
16 still under oath. Are you aware of that?
17     A. Uh-huh.
18     Q. I'm going to ask you a few questions. I
19 want you to answer just as to whether something
20 occurred. I do not want you to tell me the substance
21 of it.
22         During the break did you have a chance to
23 speak with your lawyer?
24     A. We went to lunch, yes.
25     Q. During your break did you speak with any

Page 101

1  of the other lawyers here or with Andrea Rossi?
2      A. Only pleasantries.
3      Q. I'm sorry, I don't want you to tell me
4  substance. I appreciate only pleasantries.
5          I want to avoid attorney-client privilege
6  so let me just ask you the questions. These
7  individuals know or Mr. -- at least Mr. Chaiken
8  knows why I'm asking the question. This is just
9  establishing a record and then we will move on.
10         Let your lawyer object to this and he may
11 instruct you not to answer. What did you discuss
12 with your lawyer during your break?
13     A. His girlfriend and marriage.
14     Q. All right.
15     A. My girlfriend.
16     Q. Did you discuss your testimony from this
17 morning?
18     A. No.
19     Q. Fantastic. Can I have the Exhibit 12
20 from you? I should have given you an Exhibit 12. I
21 am trying to figure out if it was -- it might be the
22 articles of incorporation.
23         MR. ARAN: 12 is electronic articles of
24     incorporation.
25         THE WITNESS: Yeah, this is my business.

Page 110

1 much energy was being transferred?
2    Q. Well, that was going to be my next
3 question, was did you have any --
4    A. No.
5    Q. -- measurement?
6    A. No, no method.
7    Q. Just so I ask the whole question.
8    A. That's what it seems like, you're going
9 in that direction.
10    Q. I am, but I am trying to go there
11 incrementally. Let me just ask.
12      Was there any method to measure the
13 amount of energy or power that was being provided by
14 Leonardo to the J.M. Products side of the Doral
15 warehouse?
16    A. No. No.
17    Q. We had looked at a picture this morning
18 that showed the hoses that were going into the system
19 so that water could be added into the system. I
20 believe that's Exhibit 4.
21      Do you know whether there was any
22 measurement of the water that was flowing through the
23 hoses into the system?
24    A. I don't know.
25      MR. ARAN: Objection to form.

Page 111

1      MR. CHAIKEN: Objection to form.
2      MR. NUNEZ: Object to the form.
3 BY MR. PACE:
4    Q. I will ask the question again, just so I
5 can cover any objection. Maybe not. Can you take a
6 look for me at Exhibit 4.
7    A. Yes.
8    Q. There -- we see hoses in Exhibit 4,
9 correct?
10    A. Yes.
11    Q. Am I correct that you testified this
12 morning that those are hoses for water to go into the
13 system?
14    A. As I recall, yes.
15    Q. My question is are you aware of any
16 measurement that was made of how much water was being
17 placed into this system through those hoses?
18    A. No.
19    Q. Are you aware of any measuring device
20 that existed to determine that?
21    A. No.
22      (The document referred to was thereupon
23 marked Bass Exhibit 16 for Identification, a copy of
24 which is attached hereto.)
25 BY MR. PACE:

Page 112

1    Q. I'm going to hand you what's been marked
2 as Exhibit 16. We're actually going back in time
3 now, back to January of 2015. Just a few questions
4 on this. Just take a second.
5      One is, does this refresh your
6 recollection as to whether Reinaldo lived there?
7    A. I told you sometimes he lived -- he slept
8 in the office so I don't know that he lived there
9 permanently.
10    Q. Okay.
11    A. He was an immigrant, so.
12    Q. There was a flow meter for the water that
13 was being provided by --
14    A. Yeah, everybody has one. Don't you have
15 one?
16    Q. I know. I'm just --
17    A. Yeah.
18    Q. -- getting clear here. Hold on. This is
19 the flow meter from Miami sewer?
20    A. Yeah.
21    Q. Miami-Dade sewer?
22    A. It was outside the building. I don't
23 think it's from the sewer though.
24    Q. Water. Just the water.
25    A. Thank you.

Page 113

1      (The document referred to was thereupon
2 marked Bass Exhibit 17 for Identification, a copy of
3 which is attached hereto.)
4 BY MR. PACE:
5    ==Q. Handing you what's marked as Exhibit 17.==
6 ==We have a few documents on this, though may be able==
7 ==to probably shortcut this after I talk to you about==
8 ==some of these.==
9      ==There were a couple of -- I see the==
10 ==Banana PI version. There was also something called==
11 ==the BeagleBone. Just generally can you tell me what==
12 ==was the work that you were doing with Fulvio Fabiani?==
13    ==A. This was pretty much the main reason I==
14 ==was hired, was -- where my engineering part came==
15 ==from, is to design the future robotic control system==
16 ==for the reactor and for whatever we use on the==
17 ==reactor.==
18      If you want to know what a Banana Pi is,
19 it's a little Linux based card that does -- it does
20 ethernet, it does -- has video controller on it. It
21 has keyboard controller on it. It has USB.
22      It's about that big and the target was to
23 be able to put in a more compact reactor and take
24 care of all the control things necessary and we went
25 through a selection process. Fulvio is a very, very

Page 114

1 cognizant engineer of control systems, so we went
2 through a selection process for the Banana Pi.
3      Sorry, the Raspberry Pi, which is really
4 the name of the processor based out of England. Then
5 when China came up with one called the Banana Pi,
6 then we finally settled on BeagleBone Black. If you
7 look it up on the Internet it's a reality.
8    Q.  I know. They are unusual names but they
9 all exist.
10    A.  Yes, and it's made by Texas Instruments
11 and it's a US product and has lots of documentation.
12      I wrote a lot of code and we were getting
13 ready for a design to actually implement that board.
14      MR. CHAIKEN: Just for the record, Chris,
15   we're going to designate that response as highly
16   confidential, attorneys' eyes only.
17      I guess we can do this after the fact as
18   it relates to all his testimony but I just want
19   to make sure the record is clear.
20 BY MR. PACE:
21    Q.  Fair enough. Having ultimately settled
22 on the BeagleBone, was that -- this is a system for
23 controlling what in connection with the E-Cats, the
24 amount of electricity that went into the E-Cats, the
25 amount of water that went into the E-Cats to be

Page 115

1 heated, everything?
2    A.  This was a control --
3      MR. CHAIKEN: Object to form. Sorry, you
4   can answer.
5      THE WITNESS: Huh?
6      MR. CHAIKEN: I objected to form. You
7   can answer.
8      THE WITNESS: It was a system. If I
9   could be coarse in the description, it has
10   gazuntas and had gazoutas, all right. It's the
11   way control processors work, is they have
12   monitored inputs that can be digital in, digital
13   out -- sorry, digital in or analog in and it can
14   control digital out.
15      In other words, it can read a sensor and
16   it can control a servo, move an arm, turn a
17   motor. That was the function of it and all
18   control processors are like that.
19      So whatever you put on the other end, it
20   doesn't make a difference, as to turning water
21   on and off, measuring temperature, diverting
22   turning a valve back and forth, that's what they
23   do.
24 BY MR. PACE:
25    Q.  Okay.

Page 116

1    A.  The center brain of it is flexible.
2    Q.  So what were these ones designed to do?
3 The ones that you were working on, what was going to
4 be on the other end, the digital out?
5    A.  I don't know. Fulvio just gave me the
6 description of what we had to start with, all right,
7 and how many points of digital in, how many points of
8 digital out, how much analog input and that was where
9 we were working along.
10      He said this is what we see that we're
11 going to need. So I can't tell you what the direct
12 output was and I can't even tell you what the direct
13 input is, but the inference is obviously was
14 measuring temperature, pressure, things like that.
15    Q.  You say the inference. Is that
16 because --
17    A.  The inference of a control system and
18 what it does.
19    Q.  I am saying are you -- is it your belief
20 that this was going to be used in connection with the
21 E-Cats?
22    A.  Yes.
23    Q.  All right. Was it ever put in use in
24 connection with the E-Cats?
25    A.  We didn't get that far.

Page 117

1    Q.  All right. Is this something you're
2 still working on connection with the E-Cats?
3    A.  Directly right now, no.
4    Q.  When did you stop working on that?
5    A.  When things fell apart with the whole
6 Industrial Heat deal.
7    Q.  Would that be roughly spring of 2016?
8    A.  Yes.
9    Q.  Is it possible that this system was going
10 to be used for something other than the E-Cat?
11    A.  Could have been, yes. Could have been
12 used on the other side of the steam side. It's a
13 general purpose. That's the whole idea of these
14 things.
15    Q.  That's all I was trying to understand
16 too.
17    A.  Yeah.
18    Q.  From your standpoint it was a general
19 purpose device and it didn't have to necessarily be
20 used with an E-Cat, they may have been working on
21 something else that it could be used for?
22    A.  That's correct.
23    Q.  And the main person working on this
24 was --
25    A.  Me.

Page 118

1   Q.  Was you with Fulvio Fabiani?
2   A.  Well, with his advice, actually, I guess
3 you could say, because he's done a lot of major
4 control systems.
5       He's designed the control system for the
6 big E-Cat.  He gave me concepts to deal with and
7 constraints and said this is what we're looking for
8 later on.
9   Q.  Okay.  You said that was the main reason
10 that you were hired?
11  A.  Pretty much, yeah.
12  Q.  Did Fulvio Fabiani work for J.M.
13 Products?
14  A.  No.
15  Q.  Any time you bought equipment or material
16 for this project, this main project you were working
17 on, would the cost have to be approved by either
18 Andrea Rossi or by Fabiani?
19  A.  Uh-huh.
20      MR. NUNEZ:  Object to form.
21 BY MR. PACE:
22  Q.  I want to come up with a shorthand for
23 this project that you were working on.
24      What can I call it that we can agree to
25 on a -- did you have a name for the project?  Was

Page 119

1 there a --
2   A.  BeagleBone.
3   Q.  Okay.
4   A.  We called it the BeagleBone.
5   Q.  BeagleBone project?
6   A.  Yeah, BeagleBone is fine.  I suggest you
7 look on the Internet and see what it does too.  You
8 will have a far better idea.
9   Q.  I actually did look at it just the other
10 day.
11  A.  Okay.
12  Q.  As well as the Raspberry, which is
13 actually spelled R-A-S-P-B-E-R-R-Y, right?  There is
14 a P that gets snuck in there, I think.
15  A.  Yeah, and the Pi is not something that
16 tastes good.
17  Q.  Right.
18  A.  It's the Greek letter Pi.
19  Q.  You had testified this morning, I
20 believe, that one of the other things you worked on
21 when you were working with J.M. Products and Andrea
22 Rossi was measuring temperature in piping.
23  A.  Piping?  Well, temperature, yeah,
24 measured temperature.
25  Q.  What projects -- what were you involved

Page 120

1 in with J.M. Products or Andrea Rossi for
2 measuring -- other than the BeagleBone project were
3 you involved with measuring temperatures for
4 anything?
5   A.  Occasional checking to see what was going
6 on on our side, looking at the flow meter and looking
7 at the temperature of the steam.
8   Q.  So there were temperature gauges on the
9 J.M. Products side?
10  A.  Yes.
11  Q.  Where were those located?
12  A.  They were outside of the chamber sitting
13 on a table.
14  Q.  And where would -- where were the
15 sensors, the temperature sensors attached?
16  A.  Obviously went through the wall and they
17 were tapped into the serpentine.
18  Q.  So if we can -- I know I keep sending you
19 back here.  If you can go back to Exhibit 2, the
20 temperature sensors are in this piping somewhere?
21  A.  Yeah, I think they are -- I think you
22 can't see them because I think they go up the other
23 end.
24      I didn't install the sensors in there.  I
25 only had access to the meters outside that measured

Page 121

1 that.
2   Q.  Did you keep track of that information?
3   A.  No, just -- it was just an observation to
4 look at it from time to time.
5   Q.  So if you can do me a favor and look at
6 Exhibit 4.  I don't know if you can see it from here
7 either, but I'm just going to see if that helps just
8 because it's a different angle.
9   A.  See what?
10  Q.  Where the temperature sensors go into the
11 piping.
12  A.  They are buried inside of the insulation
13 obviously to know what the temperature was.
14  Q.  I'm sorry, if you look at the top of that
15 picture.
16  A.  Yeah.
17  Q.  You see the little piece of metal there
18 that's attached to the wood?
19  A.  Yeah.
20  Q.  And there is a wire that comes in the top
21 of that?
22  A.  That is something to do I think with the
23 water -- the water system that was meant for
24 something and I don't recall.  I didn't put it in
25 there.  I never had anything to do with it.

Page 130

1  Q. Did he ever explain to you why this would
2  be needed for the J.M. Products side of the plant?
3  A. No.
4  Q. Do you know of any reason it would be
5  needed on the J.M. Products side of the plant?
6  A. I didn't know.
7  Q. I think you said there would be a
8  transformer for an extremely high voltage.
9  A. Yes.
10  Q. What would such a transformer be used for
11  typically or more commonly?
12  A. There is -- making arcs, sparks.
13  Q. I'm sorry, is there a --
14  A. Creating plasma.
15  Q. Can you -- is there a type of industry
16  where transformers using this extremely high voltage
17  would be used?
18  A. I'm not sure. I don't know.
19  Q. Okay.
20  A. But there could be.
21  Q. He says that: "This has priority upon
22  what you are doing for Fulvio."
23  A. Yes.
24  Q. Is that a reference to the BeagleBone
25  project?

Page 131

1  A. Yes.
2  Q. Were you ever able to find the
3  transformer that Andrea Rossi wanted?
4  A. No.
5  Q. Was he able to find it?
6  A. He said he solved the problem. I'm not
7  sure if that meant finding the transformer or solving
8  the problem another way.
9  Q. And he never explained to you what the
10  problem itself was?
11  A. That's correct.
12  Q. Were you ever involved in installing -- I
13  think I know the answer to this but I just want to
14  make sure I'm clear.
15  I assume you were never involved in
16  installing any transformers either on the Leonardo or
17  the J.M. Products side of the Doral warehouse, or am
18  I incorrect?
19  A. Certainly not on the Leonardo side. Any
20  transformers? Transformers, why are you asking that
21  question?
22  Q. Well, we're talking about transformers
23  here.
24  A. We put a transformer -- I'm trying to
25  remember what we did it for. Not for this particular

Page 132

1  project, only after. Now I remember now.
2  Q. Why was the transformer used? For what
3  purpose was the transformer used?
4  A. It's not relevant to this particular
5  discussion.
6  Q. Fair enough.
7  A. We imported a whole new concept into the
8  system.
9  Q. Into the system, meaning?
10  A. Into our side and I don't know how far we
11  can go with this. After -- after the test was done
12  the work got diverted, so.
13  Q. Well, first of all, you said brought a
14  whole new system into our side. What is our side,
15  the J.M. Products side?
16  A. The J.M. side.
17  Q. When was the new system brought in?
18  Without giving me the details of it when was the new
19  system brought into the J.M. Products side?
20  A. Rather than say new system we modified a
21  lot of stuff, moved things around, moved the power
22  feed around. So everything got diverted over to the
23  J.M. side, that's all.
24  Q. This is after February of 2016?
25  A. Yeah, sometime later.

Page 133

1  Q. All right.
2  A. I don't remember exactly when.
3  Q. Is the container still -- is that -- the
4  insulated black container on the J.M. Products side,
5  is that still there?
6  A. Yes.
7  Q. Has anything in there been changed?
8  A. Stuff has been added since then.
9  Q. Into that container?
10  A. Uh-huh.
11  Q. Has anything been removed from the
12  container?
13  A. I don't know that.
14  Q. At the time -- if we go back to early
15  2015, once you walked through that white door --
16  A. Why do you close your eyes when you're
17  talking to me?
18  Q. Because I'm trying to make sure I get the
19  question correct. I can see words when I close my
20  eyes. Does that help?
21  A. Okay.
22  Q. Some people can do that.
23  When you walked through the white door
24  into the J.M. Products side of the Doral warehouse --
25  A. Yeah.

34 (Pages 130 - 133)

Page 134

```
 1   Q. -- other than the container --
 2   A. Yeah.
 3   Q. -- what do you see?
 4   A. Tables, boxes, stuff like that.
 5   Q. There is no manufacturing process going
 6 on on the other side of the wall?
 7   A. What do you mean by the other side? You
 8 mean back on the J.M. side or on --
 9   Q. Back on the J.M. Side. When you come in
10 the J.M. side -- if it helps, let's look at our
11 picture here.
12   A. What do you mean by manufacturing
13 process? Can you clarify that question?
14   Q. Sure. Let's look at a picture, Exhibit
15 1.
16       When you open up this white door and you
17 walk into the J.M. Products side of the warehouse --
18   A. Okay.
19   Q. -- before you get to the offices what is
20 there other than the container?
21   A. Pretty much the container and some tables
22 and some electrical stuff and some meters and things
23 like that.
24   Q. Are there -- are there any people working
25 on that side, in that space? I am not talking the
```

Page 135

```
 1 offices. I am talking the space between the
 2 container -- I'm sorry, the space between this white
 3 door and when you get to the office.
 4   A. Well, probably not at 2 o'clock in the
 5 morning but sometimes during the day.
 6   Q. Who would be working there during the
 7 day?
 8   A. I would, sometimes Andrea would be there,
 9 Dr. Rossi would be there.
10   Q. Anyone else?
11   A. Typically, no. I can't tell you that. I
12 wasn't there 24 hours a day.
13   Q. I understand. I am only asking for the
14 time that you were there. The times you were there,
15 is that where you would tend to work or would you
16 tend to work in the office?
17   A. In the beginning I spent most of my time
18 there and then in the office pretty much later on.
19   Q. How much time would Andrea Rossi spend
20 working in that area?
21   A. On and off. Never knew.
22   Q. All right.
23   A. Can't answer that question.
24   Q. Were there -- what work was being done in
25 that area?
```

Page 136

```
 1   A. Energy conversion.
 2   Q. The actual conversion of energy in the
 3 area?
 4   A. Not in the area. Inside the box.
 5   Q. But I'm sorry, my question was poor.
 6 Other than inside the box.
 7       So outside the box but past this gray
 8 wall on the J.M. Products side of the warehouse, was
 9 there anything being built or manufactured?
10   A. What do you mean by being built or
11 manufactured?
12   Q. I am trying to understand was there
13 anything that J.M. Products was doing other than
14 whatever was going on inside that container?
15   A. No.
16   Q. Okay. And is that -- was that consistent
17 during the time period that you were working with
18 J.M. Products?
19   A. I would say so, yeah.
20   Q. All right. And your testimony is
21 obviously limited only to the times that you were
22 there, you can't tell me what was occurring --
23   A. Obviously.
24   Q. -- when you were not there?
25   A. Yes.
```

Page 137

```
 1       (The document referred to was thereupon
 2 marked Bass Exhibit 21 for Identification, a copy of
 3 which is attached hereto.)
 4 BY MR. PACE:
 5   Q. Mr. Bass, I am handing you what's been
 6 marked as Exhibit 21.
 7   A. Yeah.
 8   Q. Is this a -- an early e-mail involving
 9 the -- what eventually became the BeagleBone project?
10   A. Yes.
11   Q. And this is the primary work that you
12 were doing while you were working with J.M. Products?
13   A. Uh-huh. Yes. Yes.
14       (The document referred to was thereupon
15 marked Bass Exhibit 22 for Identification, a copy of
16 which is attached hereto.)
17 BY MR. PACE:
18   Q. I'll hand you what's marked as Exhibit
19 22. I take it -- Exhibit 22 reflects at least from
20 your e-mail that there is information that you needed
21 from Fabiani in order to continue your work on the
22 project that you were not getting from Mr. Fabiani.
23 Am I reading that first e-mail correctly?
24   A. Yes.
25   Q. His response -- I'm trying to see how you
```

Veritext Legal Solutions
800-726-7007                                      305-376-8800

Page 154

1  you have probably have said that you measured -- that
2  J.M. Products measures the energy input?
3       MR. ARAN: Objection to form.
4       THE WITNESS: You're asking -- that's
5    conjecture. You asked for conjecture, would I
6    have said that. I don't know, no.
7  BY MR. PACE:
8    Q. Well, you just told me if you were asked
9  about -- you just said --
10    A. I might -- I probably would have but I
11 don't remember being asked.
12    Q. Fair enough. Fair enough. I was asking
13 whether your recollection is that you were
14 following -- you followed whatever instruction or
15 guidance Andrea Rossi provided?
16    A. Of course, he was directly -- directly or
17 indirectly my boss, however you want to look at that.
18    Q. Why would you say -- wasn't he directly
19 your boss?
20    A. After a fashion, I more reported to J.M.
21 but took technical direction from him.
22    Q. When did you report to J.M. Products?
23    A. Effectively I was being paid by J.M.
24    Q. Okay.
25    A. All right. So it's --

Page 155

1    Q. We will go through some of those e-mails
2  in a minute.
3    A. There is a dashed line there.
4    Q. Fair.
5    A. There is nothing secret about it.
6       (The document referred to was thereupon
7  marked Bass Exhibit 26 for Identification, a copy of
8  which is attached hereto.)
9  BY MR. PACE:
10    Q. Showing you what's marked as Exhibit 26.
11 This is the same root e-mail from you but an
12 additional response from Andrea Rossi.
13       Separate from these e-mails did Andrea
14 Rossi tell you that the people who attended these
15 meetings, either Industrial Heat or the Chinese
16 investors, essentially it was none of their business
17 what J.M. Products did with the power that it
18 received?
19    A. I'm sorry, one more time the question,
20 the exact question.
21    Q. Sure. Separate from this e-mail --
22    A. Yeah.
23    Q. -- would -- or did Andrea Rossi tell you
24 that, either in connection with the people coming for
25 the first or the second meeting?

Page 156

1    A. You said separate from the e-mail?
2    Q. Yes.
3    A. In other words, did he tell me some other
4  time?
5    Q. Yes, that's all I am asking.
6    A. Obviously that's -- that's the best I've
7  got right now. He obviously told me at least once.
8  Might have told me again.
9    Q. So he's telling you -- at least in this
10 e-mail he's telling you --
11    A. Yes.
12    Q. -- if somebody from Industrial Heat or
13 somebody from this group of Chinese investors asked
14 you about J.M., your response should be that it's not
15 their business what J.M. does with the power?
16    A. Yes. That's -- the best answer is yes.
17    Q. Then my only question is aside from these
18 couple of e-mails we looked at, you don't recall
19 additional conversations with Andrea Rossi along
20 those lines?
21    A. No, I do not. There could be, but I
22 don't recall.
23    Q. And to the best of your recollection, to
24 the extent that that was the direction or guidance
25 you were given from Andrea Rossi, you followed it?

Page 157

1    A. Yes.
2    Q. What do you recall in terms of how you
3  explained your role at J.M. Products either to -- to
4  Industrial Heat during that meeting?
5    A. I was in charge of engineering projects
6  around J.M.. I was called director of engineering.
7    Q. And who gave you the title of director of
8  engineering?
9    A. I think Dr. Rossi said that would be a
10 good title because of what I was going to be doing.
11    Q. Because what you were going to be doing?
12    A. Yeah.
13    Q. When did he give you the title?
14    A. I don't recall. Probably when we decided
15 that I was going to go work with him, probably.
16    Q. Were you ever an employee of J.M.
17 Products?
18    A. No.
19    Q. You were a contractor for J.M. Products?
20    A. Always.
21    Q. Were there any other engineers who
22 were -- who worked for or were contractors for J.M.
23 Products?
24    A. No, I don't think so.
25    Q. I'm going to take these things a little

Page 158

1 bit out of order because I already marked something.
2          (The document referred to was thereupon
3 marked Bass Exhibit 28 for Identification, a copy of
4 which is attached hereto.)
5 BY MR. PACE:
6     Q.  Handing you what's marked as Exhibit 28.
7 Who created this business card?
8     A.  I did.
9     Q.  You did.  The image in the business card
10 is a plant in Japan; is that correct?
11    A.  I don't know.  I just got it off the
12 Internet.
13    Q.  Why did you create this business card?
14    A.  I had to have some business card to show
15 people.  That's what you usually do when you have
16 business meetings, I'd have something, so.
17    Q.  Well, how many people did you show this
18 card to?  How many people did you dole out this card
19 to?
20    A.  Probably during the meetings, that's what
21 I recall.
22    Q.  So twice?
23    A.  Yeah.  Yeah.  There were two meetings --
24 there were two times we met, that's what I remember.
25    Q.  So you had these business cards prepared

Page 159

1 for the purpose of two meetings?
2     A.  I think so, yeah.  Yeah, for whatever,
3 from there on out.  I still have some.  Do you want
4 one?
5     Q.  I'm asking if you ever used them again.
6 Did you ever give them out to anyone else?
7     A.  Besides people that were involved?  My
8 girlfriend maybe.  I don't know.
9     Q.  So aside from giving them -- aside from
10 giving one of these cards to your girlfriend and
11 aside from Andrea Rossi and Fulvio Fabiani, the only
12 people you may have given these cards to are people
13 who attended either the meeting for Industrial Heat
14 or the meeting that involved the Chinese investors?
15    A.  Probably, yes.  I don't recall giving
16 them to anybody else.  I didn't have a need to give
17 them to anybody else.
18    Q.  How many cards did you have made?
19    A.  20.  They come in sheets.
20    Q.  Okay.  And the phone number on there is
21 what phone number?
22    A.  That's the office in Doral.
23    Q.  If messages were left at that phone
24 number would they be provided to you?
25    A.  Yes.

Page 160

1     Q.  By whom?
2     A.  By the phone company.
3     Q.  Would you check the messages on that
4 phone number?
5     A.  Yes, when I was in there or Dr. Rossi
6 would check them, either one.  The phone -- it was a
7 common phone between the two offices.
8     Q.  Two offices meaning between your office
9 and Andrea Rossi's office?
10    A.  Yes.
11    Q.  Did you ever represent yourself to be the
12 director of engineering of J.M. Products to anyone
13 else, to the best of your recollection?
14    A.  I don't remember.
15         (The document referred to was thereupon
16 marked Bass Exhibit 27 for Identification, a copy of
17 which is attached hereto.)
18 BY MR. PACE:
19    Q.  Now I'm going to go back to Exhibit 27.
20 You have now what's been marked as Exhibit 27.
21         This e-mail discusses a third meeting
22 that was being set up for February 16, 2016 in Doral,
23 Florida.  Do you recall that -- do you recall such a
24 meeting being set up?
25    A.  No, I don't.  If you prompt me on who was

Page 161

1 there I would probably remember.
2     Q.  Well, I'm not sure the meeting occurred
3 so that's what I was going to ask you.  Do you recall
4 if a meeting actually occurred or not?
5     A.  I don't remember meeting anybody this
6 last year.
7     Q.  You ask here with your communications
8 with Andrea Rossi: "When we met with some people
9 last year, I don't remember who it was, one of them
10 asked me how does Johnson Matthey heat their platinum
11 in other plants.  At that time I didn't know you were
12 cooking platinum sponge, and I didn't know what
13 process they were using in other US operations, so I
14 was very uncomfortable answering."
15         Is J.M. Products a affiliate or
16 subsidiary of Johnson Matthey?
17    A.  No, not really.  No.  Well, by affiliate,
18 there was supposed to be the exchange of platinum
19 sponge and then a return back of the cooked platinum
20 sponge.  That's the way I understood it.
21    Q.  And you understood that from whom?
22    A.  From working around the people, working
23 around Dr. Rossi, Hank, Hank Johnson.
24    Q.  So Hank Johnson told you they were buying
25 platinum sponge --

Veritext Legal Solutions
800-726-7007                                      305-376-8800

Page 210

1  Q. Handing you what's been marked as Bass
2 Exhibit 51. Do you recognize this document, the
3 document that's in this photograph?
4  A. It's on the board in J.M.'s side.
5  Q. Is that your signature at the bottom of
6 each page?
7  A. Yeah.
8  Q. Did you prepare this document?
9  A. No.
10  Q. Who prepared this document?
11  A. I don't know. I think that's a standard
12 form that they might have gotten.
13  Q. Who asked you to sign this document?
14  A. Probably Dr. Rossi.
15  Q. Do you know roughly when you signed the
16 document?
17  A. No.
18  Q. Was this always up at the warehouse or
19 was this something put up in 2016 at the warehouse?
20  A. Don't know. I think there is certain
21 regulations when you have a business going you have
22 to have signs up and Equal Opportunity Employer stuff
23 and things like that.
24  Q. Understood. Assuming just -- for present
25 purposes if you assume this is not legally required

Page 211

1 to be posted, do you know -- this letter or these
2 guidelines are not legally required to be posted.
3  A. Do I know that?
4  Q. No, I'm saying if you just assume for a
5 second they're not. Assume for a second they are not
6 legally required to be posted, do you know why this
7 was posted? Did anyone ever give you an explanation
8 of why they needed you to sign this?
9  A. No, I don't recall when I -- I don't
10 recall when I did it or why we -- I don't know.
11  Q. You don't recall why you did it?
12  A. Yeah.
13  Q. And you don't recall asking anybody why
14 you were being asked to sign it?
15  A. No, I do not. That's correct.
16  MR. ARAN: Objection to form.
17  MR. PACE: No further questions.
18  MR. CHAIKEN: I have no questions.
19  MR. NUNEZ: No questions.
20  MR. ARAN: I have no questions. You have
21 the right to read the transcript of the
22 deposition once it's been transcribed and if you
23 find something that you believe is inaccurate,
24 you don't get to change the transcript but you
25 get to make a note of that.

Page 212

1  THE WITNESS: Okay.
2  MR. ARAN: Or you can waive that and not
3 do it. Do you want to read or do you want to
4 waive?
5  THE WITNESS: Are you going to read it?
6  MR. ARAN: I'm going to read it at some
7 point in time. The question is do you want to
8 read it before it becomes final? If you do the
9 court reporter will tell you it's available, you
10 then make arrangements with him to read it.
11 If you find anything that you thought was
12 wrong, taken down wrong, you make the
13 correction.
14  THE WITNESS: What is your recommendation
15 on that?
16  MR. ARAN: I usually recommend that the
17 witness waive.
18  THE WITNESS: Okay, I'll waive then.
19  THE VIDEOGRAPHER: Let's go off the video
20 record. The time is 6:06 p m.
21 (Reading and subscribing waived.)
22 (Thereupon the taking of the deposition
23 was concluded.)
24  - - -
25

Page 213

CERTIFICATE OF OATH

STATE OF FLORIDA:
   SS:
COUNTY OF DADE:

I, the undersigned authority, certify
that JAMES BASS personally appeared before me and was
duly sworn.

WITNESS my hand and official seal this
10th day of February 2017.

*Edward Varhayi*

Notary Public, State of Florida at
Large; my commission expires
February 26, 2019. Bonded through
Troy Fain Insurance, Inc.

Page 214

1  CERTIFICATE OF REGISTERED PROFESSIONAL REPORTER
2
3      I, EDWARD VARKONYI, Registered Professional Reporter and a Notary Public for the
4  State of Florida at Large, do hereby certify that I reported the deposition of JAMES BASS; that the
5  reading and subscribing of the deposition were waived by the witness and counsel for the respective
6  parties; that the foregoing pages, numbered from 1 to 212, inclusive, constitute a true and correct
7  transcription of my shorthand report of the deposition by said witness on this date.
8      I further certify that I am not an attorney or counsel of any of the parties, nor a
9  relative or employee of any attorney or counsel connected with the action, nor financially interested
10 in the action.
       WITNESS my hand and official seal in the
11 City of Miami, County of Dade, State of Florida, this 10th day of February 2017.
12
13
14
15
16
17  *Edward Varkonyi* (signature)
18  _____
19  Notary Public, State of Florida at
20  Large; my commission expires
21  February 26, 2019. Bonded through
22  Troy Fain Insurance, Inc.
23
24
25

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.