# Composite Exhibit 5

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
    ANDREA ROSSI and LEONARDO         )
 3  CORPORATION,                      )
                                      )
 4            Plaintiffs,             )
                                      )
 5      vs.                           ) No. 1:16-cv-2119-CMA
                                      )
 6  THOMAS DARDEN; JOHN T. VAUGHN;    )
    INDUSTRIAL HEAT, LLC; IPH         )
 7  INTERNATIONAL B.V.; and           )
    CHEROKEE INVESTMENT PARTNERS,     )
 8  LLC,                              )
                                      )
 9        Defendants.                 )
    INDUSTRIAL HEAT, LLC and IPH      )
10  INTERNATIONAL B.V.,               )
                                      )
11        Counter-Plaintiffs,         )
                                      )
12      vs.                           )
                                      )
13  ANDREA ROSSI and LEONARDO         )
    CORPORATION,                      )
14                                    )
          Counter-Defendants,         )
15                                    )
        and                           )
16                                    )
    J.M. PRODUCTS, INC.; HENRY        )
17  JOHNSON; FABIO PENON; UNITED      )
    STATES QUANTUM LEAP, LLC;         )
18  FULVIO FABIANI; and JAMES         )
    BASS,                             )
19                                    )
          Third-Party Defendants.     )
20

21               Videotaped Deposition of
                    JOHN THOMAS VAUGHN
22                 (Taken by Plaintiff)
    3509 North Haworth Drive, Suite 403, Raleigh, North Carolina
23                January 19, 2017, 9:04 a.m.

24               Reported in Stenotype By
              Margaret M. Kruse, CSR, RMR, CRR
25    Transcript produced by computer-aided transcription
```

01/19/2017 John Thomas Vaughn

Page 2

```
 1          APPEARANCES:
 2   ON BEHALF OF PLAINTIFFS:
 3          PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L., by
            MR. BRIAN CHAIKEN, and
 4          MR. JOHN W. ANNESSER
            283 Catalonia Avenue
 5          Second Floor
            Coral Gables, Florida  33134
 6          (305) 337-0781
            bchaiken@pbylaw.com
 7          jannesser@pbylaw.com
 8   ON BEHALF OF DEFENDANTS:
 9          MILLER FRIEL, by
            MR. BERNARD P. BELL
10          1200 New Hampshire Avenue, N.W.
            Suite 800
11          Washington, D.C.  20036
            (202) 459-9537
12          bellb@millerfriel.com
13   ON BEHALF OF THIRD-PARTY DEFENDANTS
     J.M. PRODUCTS, INC., HENRY JOHNSON, and JAMES BASS:
14
            ARAN, CORREA & GUARCH, P.A., by
15          MR. FERNANDO S. ARAN (via telephonic connection)
            225 University Drive
16          Coral Gables, Florida  33134-6732
            (305) 665-3400
17          faran@acg-law.com
18   ALSO PRESENT:
19          MR. MICHAEL KIRBY, CLVS
            DR. ANDREA ROSSI
20
21
22
23
24
25
```

Page 4

```
 1                    INDEX OF EXAMINATIONS
 2   WITNESS                                   EXAMINATION
 3
        JOHN THOMAS VAUGHN
 4      EXAMINATION BY MR. ANNESSER               6
        EXAMINATION BY MR. ARAN                 266
 5
 6                       EXHIBITS
 7   NUMBER                                  MARKED FOR ID
 8   Vaughn Deposition Exhibit
 9      Exhibit 1                                50
        Exhibit 2                                73
10      Exhibit 3                                89
        Exhibit 4                                91
11      Exhibit 5                               118
        Exhibit 6                               136
12      Exhibit 7                               146
        Exhibit 8                               152
13      Exhibit 9                               155
        Exhibit 10                              165
14      Exhibit 11                              173
        Exhibit 12                              191
15      Exhibit 13                              208
        Exhibit 14                              213
16      Exhibit 15                              217
        Exhibit 16                              220
17      Exhibit 17                              227
        Exhibit 18                              243
18      Exhibit 19                              249
19
20
21
22
23
24
25
```

Page 3

```
 1          VIDEOTAPED DEPOSITION of JOHN THOMAS VAUGHN, a
 2   witness called on behalf of Plaintiffs, before
 3   Margaret M. Kruse, Registered Merit Reporter, Certified
 4   Realtime Reporter, and Notary Public, in and for the State of
 5   North Carolina, at 3509 North Haworth Drive, Suite 403,
 6   Raleigh, North Carolina, on January 19, 2017, commencing at
 7   9:04 a.m.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          THE VIDEOGRAPHER:  We are on the record at
 2   9:04 a.m.
 3          This is the videotaped deposition of
 4   John T. Vaughn in the matter of Andrea Rossi and Leonardo
 5   Corporation vs. Thomas Darden, et al.  This deposition is
 6   being held in the offices of CaseWorks at 3509 Haworth
 7   Drive, Suite 403, Raleigh, North Carolina, 27609, on
 8   January 19, 2017.
 9          The court reporter is Margie Kruse, the
10   videographer is Michael Kirby, both with CaseWorks.
11          Would counsel please introduce themselves.
12          MR. ANNESSER:  My name is John Annesser.  I'm
13   here on behalf Dr. Rossi.  I have with me Mr. Chaiken, who
14   is also on behalf of Dr. Rossi and Leonardo Corporation.
15   And our client is here, Dr. Rossi.
16          MR. BELL:  Bernard Bell with the firm Miller
17   Friel for the defendants.
18          MR. ARAN:  Francisco Aran with Aran, Correa &
19   Guarch, on behalf of J.M. Products and Henry Johnson.
20          THE VIDEOGRAPHER:  Will the court reporter please
21   swear the witness.
22              (Witness administered an oath.)
23
24
25
```

01/19/2017 John Thomas Vaughn

Page 62

1  sorry.
2       (Record read.)
3          MR. BELL: Objection to form. Objection to the
4  form.
5  BY THE WITNESS:
6     A.   When we hired Joe in -- I believe it was in
7  either May or June -- I think it was June of '15, our goal
8  was to have, you know -- as you know, we were struggling to
9  replicate the technology and were being -- were
10 unsuccessful in doing so. So our goal was to get an
11 engineer that really was a qualified engineer -- and a
12 team, in fact, we hired more -- to look at this and to seek
13 to -- to do a more robust replication effort to see if --
14 you know, to see if we were just screwing it up.
15         Dr. Rossi led us to believe it was a simple
16 process that anybody could do it. We weren't having
17 success, and so we wanted to get more qualified people.
18 And that's -- that's what Joe was there to do.
19         He also tried to go down to Miami and assess the
20 setup there but was not allowed.
21 BY MR. ANNESSER:
22    Q.   We'll talk about that more in a little bit.
23         Taking a step back to the license agreement, now,
24 if I can ask you to turn to the second page of the license
25 agreement, Exhibit 1 in front of you, Section 3, price and

Page 63

1  payments. It states [as read]: The total price for the
2  grant of the license and the purchase of the plant is
3  $100,500,000.
4         Do you see that?
5     A.   I see that.
6     Q.   And then it goes on to say [as read]: The
7  payment terms will be as follows.
8     A.   Uh-huh.
9     Q.   And is it your understanding that there were
10 three tiers of payments?
11    A.   Correct. And I apologize, I was just reviewing
12 it to make sure my recollection wasn't incorrect. But
13 correct.
14    Q.   And at the first payment of $1,500,000 was to be
15 made within two days of the signing of this agreement,
16 correct?
17    A.   That's what it says, yes.
18    Q.   And it states in here [as read]: In the event
19 the plant is not delivered or validation is not achieved
20 within the time period set forth in Section 4, the full
21 $1,500,000 will be refunded to the company within two
22 business days of its request.
23         Do you see that?
24    A.   I see that, yes.
25    Q.   Did Industrial Heat ever request that that money

Page 64

1  be returned?
2     A.   I don't know. I did -- I don't recall myself
3  requesting that and I don't believe that Tom did. The --
4  we had been provided a report that Dr. Rossi gave us when
5  -- by Levy and other Swedish professors that was very
6  compelling. And so anyway. . .
7     Q.   This just says if it's not delivered or achieves
8  the --
9     A.   Validation, yeah.
10    Q.   -- the validation, the money would be returned.
11 Is that what it says?
12    A.   It says [as read]: In the event the plant is not
13 delivered or validation is not achieved within the time
14 period set forth in Section 4, the full 1.5 million will be
15 refunded to the company within two business days of its
16 request.
17         MR. BELL: And his pending question is: Is that
18 what it says?
19         THE WITNESS: That's what it says, yes.
20         MR. BELL: His earlier question was: Did you
21 make a request or whatever. I don't want to rephrase the
22 question.
23         THE WITNESS: I did not make a request.
24 BY MR. ANNESSER:
25    Q.   Was validation achieved, sir?

Page 65

1     A.   Was validation achieved.
2         MR. BELL: On this paragraph you're looking at?
3         MR. ANNESSER: I'm asking him the question
4  broadly and we can focus in after that.
5  BY MR. ANNESSER:
6     Q.   Was validation achieved?
7     A.   How is validation defined here?
8     Q.   Well, we can look to paragraph 4 that's
9  referenced in the document.
10    A.   Yeah.
11    Q.   Validation of the plant.
12    A.   Uh-huh.
13    Q.   Before we review that, sir, I'm going to ask you:
14 To your understanding, was a validation test performed?
15         MR. BELL: Objection to form.
16 BY THE WITNESS:
17    A.   Are you referencing in this -- I'm trying to make
18 sure I understand you -- the test that Dr. Rossi did in I
19 believe it's the end of April and early May of 2013?
20 BY MR. ANNESSER:
21    Q.   That's what I believe it to be.
22    A.   That's what you believe it to be.
23    Q.   Do you believe that to be the validation test?
24         MR. BELL: Objection to form.
25

01/19/2017 John Thomas Vaughn

Page 102

1 integrity and not trying to obfuscate or disguise what he
2 was doing or not doing. So anyway, that's a little
3 background.
4     You asked who operated that. I don't know
5 exactly. But it appears to me based on this that it was
6 Dr. Rossi doing it there at our facility, probably with the
7 rest of us around or in and out and maybe T. Barker there,
8 I don't know.
9 Q.  Is it your position that Dr. Rossi manipulated
10 those tests?
11 A.  So the test, yes. And by those tests, I just
12 want to be clear, but I think you mean the test that he
13 would do in our facility over at Triangle Drive. And so
14 this is when we were -- we were eager to see the one
15 megawatt operate. He was coming out with lots of reasons
16 for delaying that and focusing on the Swedish test and
17 blah, blah, blah, and this, that and the other. And
18 running a -- you know, preparing for really the next test
19 to be done by Levy and the Swedes.
20     But, yes, looking back, you know -- and we didn't
21 confront him at the time about some of this stuff. For
22 example, when John Mazzarino and I went to -- I guess it
23 was Ferrara in November of 2012, Rossi was showing us an
24 experiment. And -- and he used the Boltzmann formula,
25 which at the end of that formula -- I didn't know or

Page 103

1 whether he was introducing it to me -- you multiply
2 everything by E, which stands for emissivity, which is tied
3 to a camera setting.
4     And later during this period of time, when he was
5 testing in our facility in Raleigh, he would not multiply
6 everything by E. Because at the time, at that time he had
7 E set to 1 on the camera so it didn't matter and later he
8 changed it so it would be like .5 or whatever.
9     And I asked him. I said, "Why aren't you
10 multiplying by E because that affects -- that would cut
11 your supposed output energy in half." He said, cut me off
12 and said, "oh, You don't know the science or that's not
13 right or whatever."
14     But anyway that's just one example where we --
15 Q.  Did you ask somebody else about that?
16 A.  I'm not sure. I don't recall. I may have -- I
17 may have just taken his word for it. I don't recall. I
18 may have mentioned it to T. Barker. I don't remember.
19 Q.  But it wasn't enough of a concern to you to
20 withhold information such as the tests were producing
21 significant excess energy as set forth in Exhibit 3?
22     MR. BELL: Withhold from the investors?
23 BY MR. ANNESSER:
24 Q.  Sir?
25 A.  Is that what you mean?

Page 104

1 Q.  Yes.
2 A.  In investor communication.
3     I'm trying to clarify this for you, but we
4 were -- in an evolving process where, you know,
5 initially we were positive and hopeful and over time -- and
6 this is borne out in our communications with all of our
7 investors -- we became much more skeptical. And you know,
8 that's -- that's borne out in the communications.
9 Q.  At what point in time did you tell Dr. Rossi you
10 did not believe his results?
11 A.  I'm sure during this period of time we challenged
12 him on results. Again, he was very kind of controlling
13 and, you know, oh, you don't know and this has to be done.
14 Demonstrative I should say.
15     So it wouldn't have mattered how much I said,
16 "You know, Dr. Rossi I don't think this is accurate or this
17 is correct." You don't know. Granted, I'm not an
18 engineer. I'm an economist -- I'm not an economist. I
19 have an economics degree.
20     So, you know, at what specific point in time did
21 I first say -- express to Dr. Rossi reservations about the
22 accuracy of his results, it would have been during that
23 time period, fall of '13.
24 Q.  Would you have done that in an email?
25 A.  I doubt I did it in an email, but I don't know.

Page 105

1 We can go back and look. Just because communications with
2 him were so -- so tenuous, I should say. And, you know,
3 before kind of confronting him via email, which often, as
4 you'll see the emails, he was very -- you couldn't tell
5 what he meant in his response because he would respond in
6 all caps, for example.
7     And so we were careful not to try to say things
8 that would totally alienate him or make him mad in email.
9 Because we were patient and hopeful. We were wanting to
10 get to the truth. And challenging him in the email, as was
11 our perception at the time, wasn't the best way to go about
12 that.
13 Q.  Sir, your company had invested at that point in
14 time 11.5 million dollars --
15 A.  Right.
16 Q.  -- and paid that to Dr. Rossi.
17 A.  Right.
18 Q.  And you're telling me that you had doubts, but
19 you did not have someone qualified other than Dr. Rossi to
20 perform tests or evaluations for you or validations?
21 A.  Correct. Because we thought that it was simple
22 and easy and that anybody could replicate it.
23     As I mentioned, T. Barker, who has some -- has an
24 engineering degree, was involved. But more or less, he was
25 there to help Dr. Rossi and be nice to Dr. Rossi. And T.

01/19/2017 John Thomas Vaughn

Page 106

1  Barker also was doing some testing on his own which caused
2  us to have concerns and questions. But we were relying on
3  Dr. Rossi's credibility and his abilities.
4      Q.   And, in fact, you and Mr. Darden instructed
5  Mr. Dameron not to raise any concerns or issues with
6  Dr. Rossi; is that correct?
7      A.   Tom may have. I don't recall saying that. But
8  Tom may have.
9      Q.   So after making an $11.5 million investment and
10 you're having these concerns because it's more complicated
11 than you originally thought -- and that's around September
12 2013 -- did you ever approach Dr. Rossi and say, "We are
13 not able to replicate, what are we doing wrong?"
14     A.   Yes. Yes. There was a specific -- again, we
15 weren't confronting him all the time because he's a
16 volatile character or at least he was acting to be at the
17 time. And we didn't want to do anything to damage that
18 relationship without needing to do that.
19         But finally at some point during that time period
20 I explicitly remember sitting at a conference table -- a
21 kitchen table I should say. We had a very small kitchen at
22 this facility, sitting there with Tom and Andrea and Tom
23 very directly confronted him saying, "You know, We're not
24 able to replicate. Help us do that. Help us understand
25 that. We have to be able to replicate." This was an

Page 107

1  intense conversation -- lose somebody or gain somebody?
2         MR. BELL: Don't worry about it. Just keep
3  going.
4  BY THE WITNESS:
5      A.   And eventually part of this conversation was Tom
6  ended up just kind of ended up walking out of frustration
7  after indicating that to Rossi and he was going on about
8  that, this, that and the other. And then, you know, I was
9  left there with Dr. Rossi after Tom left. And I kind of
10 said, "Well, it is what it is, but we do have to have -- we
11 do have to have -- we have to be able to replicate."
12         But. . .
13 BY MR. ANNESSER:
14     Q.   And when was that?
15     A.   I don't remember the exact time. But it was
16 during the fall of '13, I believe, because it was before
17 Rossi went to Switzerland for his next set of tests that he
18 had been focusing on and it was while we were still out at
19 Triangle Drive. I don't remember the exact time.
20     Q.   Isn't it true, sir, that Industrial Heat was
21 actually also interested in the Lugano test more so than
22 the tests that you were carrying on yourselves?
23     A.   Hang on just one second, sir.
24         (Brief pause.)
25         Can you repeat that question?

Page 108

1  BY MR. ANNESSER:
2      Q.   Isn't it true that Industrial Heat and yourself
3  were more interested in the results of the Lugano test, the
4  independent test, as it was referred to, than you were of
5  your own test?
6      A.   We were very interested in the results of that
7  test. Again, we didn't have -- we clearly had reservations
8  or questions at the end of '13. We also -- while we
9  weren't sure about Rossi's methods and results, we also
10 weren't sure of our own and we questioned our abilities to
11 determine the state-the-art. And so we were very
12 interested in what they claimed or their assessment in
13 Lugano.
14         So that was -- I think it's fair to say that we
15 were very eager to hear their analysis.
16     Q.   And before the Lugano test, you said you were
17 still concerned about how the testing was carried out and
18 whether those results were verifiable and accurate?
19     A.   Correct.
20     Q.   Who carried out the Lugano test, to your
21 understanding?
22     A.   Rossi was there with Fulvio. And then Levy. I
23 think Faci was there. And then -- I get the Swedish guys
24 mixed up, but I think there were two of three of them
25 there, and they were all there to carry out the test.

Page 109

1      Q.   And the Swedish guys were members of the Swedish
2  Royal Academy to your understanding?
3      A.   I don't know that. I think one of them may have
4  been. I'm trying to recall. What I really recall was that
5  they were -- I think they were retired -- they may not have
6  been retired. They may have been in University of Uppsala.
7  Possibly one of them was a Swedish Royal Academy. I don't
8  -- I don't recall.
9      Q.   But if you represent to your investors that they
10 are members or some of them were members of the delegation
11 that nominates Nobel laureates, would that be true or
12 correct?
13     A.   That is what we were being told by Dr. Rossi.
14 And so we -- we thought he was telling the truth or we
15 thought he knew.
16         Very early on -- I'm just trying to remember when
17 this was -- but we were -- we didn't believe that the
18 guys -- maybe this was when he gave us the test results in
19 the end of April 2013, but we didn't
20 know if, in fact, Swedish professors -- we had seen that
21 Levy had previously written some stuff about this
22 technology, but we didn't -- we weren't sure whether or not
23 Swedish professors from Uppsala, a very reputable
24 university, were involved in assessing this technology.
25         And he had been saying that, you know, it was the

01/19/2017 John Thomas Vaughn

Page 126

1      (Recess 12:31 p.m. until 1:02 p.m.)
2      THE VIDEOGRAPHER:  We're back on the record at
3  1:02 p.m.
4  BY MR. ANNESSER:
5      Q.   Sir, I remind you that you are under oath still.
6      During the break that we took, did you discuss
7  the subject matter of your testimony with anyone?
8      **A.   I talked with my counsel, Bernie.**
9      Q.   Did you discuss the subject matter of your
10 testimony with him?
11     **A.   I don't think that I did.  I mean, I think we**
12 **talked mainly about -- sorry.**
13     MR. BELL:  Just answer him yes or no.
14 BY THE WITNESS:
15     **A.   Subject matter of my testimony --**
16 BY MR. ANNESSER:
17     Q.   Did you talk about any of the questions that I
18 asked or the answers that you've given?
19     **A.   I think we did.**
20     Q.   And what specifically was said about those
21 things?
22     MR. BELL:  I'm going to object and instruct him
23 not to answer on the grounds of attorney-client privilege.
24 BY MR. ANNESSER:
25     Q.   Sir, one thing that I'm having a difficult time

Page 127

1  with, in addition to those we've already discussed, is that
2  if I'm -- correct me if I'm wrong.  But between 2012 when
3  the license agreement was signed and about June 2015 when
4  Mr. Murray came on board, you were on -- you or the company
5  were unsuccessful in replicating any of the results or any
6  COP for the E-Cat; is that correct?
7      MR. BELL:  Objection, form.
8  BY THE WITNESS:
9      **A.   We conducted multiple tests.  And, you know,**
10 **looking back --**
11     Q.   Sir, I apologize to interrupt you.  I know I said
12 I wouldn't.  But if you could, if you could answer the
13 question, then if you need to explain it afterward, you can
14 do that.
15     **A.   Sure.**
16     Q.   So during the period between when the license
17 agreement was signed in 2012 and approximately June 2015
18 when Mr. Murray came on board, it's your testimony that
19 Industrial Heat and yourself were unable to replicate any
20 positive COP during that time period?
21     MR. BELL:  Objection to form.
22 BY MR. ANNESSER.
23     Q.   Is that correct?
24     **A.   At this time, correct.**
25     **You know, we -- we have a bunch of indeterminate**

Page 128

1  information from that period of time, and it just --
2  depending on, you know, as I mentioned, it's an evolving
3  process, our view of the technology.  But we realized that
4  we had to get much more sophisticated than we were
5  originally to assess accurately whether or not the
6  technology worked.
7      Q.   So sitting here today your position is not that
8  it didn't work, it's that you can't affirmatively state
9  with the information that you collected at the time that it
10 does?
11     MR. BELL:  Objection to form.
12 BY MR. ANNESSER:
13     Q.   Is that fair to -- is that a fair summary?
14     **A.   Sitting here today, it is my belief that the**
15 **technology does not work.**
16     Q.   Okay.  I did not ask you what your belief was.
17     **A.   I'm confused about -- the way you're phrasing the**
18 **question is confusing.  If you could -- I apologize, but if**
19 **you could restate.**
20     Q.   You've used the term "indeterminate."  That
21 generally means, at least I take it to mean and correct me
22 if I'm wrong, that you cannot determine whether the results
23 were correct or not?
24     **A.   I said we were getting a lot of indeterminate**
25 **information.  So if you go back and you review all of these**

Page 129

1  **tests, the -- every time there's some variable that's**
2  **not accounted for, you know, if you later go back and say**
3  **oh, what about this or what about that, it's an evolving**
4  **process of sophistication.**
5      **You're asking me -- if you're asking me today**
6  **sitting here today do I believe the technology works, I**
7  **would say I do not believe that it works.  If you're asking**
8  **me sitting here today, did we ever have any success in our**
9  **attempts to replicate Rossi's technology, I would say no.**
10     Q.   Okay.  So there was no success during that time
11 period whatsoever, but yet you did not hire anybody who you
12 deemed competent to perform those tests to come in and
13 assist you?
14     **A.   I believe we've covered this matter exhaustively.**
15 **So I'll try to answer this one more time and then maybe we**
16 **can come back to it.**
17     Q.   Again, I'm going to ask you to answer the
18 question and then you can explain.
19     **A.   Sorry.**
20     Q.   Did you hire anyone during that time period that
21 you deemed competent to perform those tests and assist you
22 in replicating the results?
23     **A.   We hired Joe Murray in I believe it was June of**
24 **2015.  Prior to that, clearly Boeing did some assessment**
25 **and we believe Boeing to be capable of determining whether**

01/19/2017 John Thomas Vaughn

Page 178

1    And often, as is the case, there's some variable
2  that's changed or there's some variable that wasn't
3  properly accounted for and further scrutiny you figure that
4  out.
5    Clearly, this was sent before that further
6  scrutiny had been done. I mean, I say that on a
7  preliminary basis.
8    Q.   Do you know what the actual COP was for this
9  test?
10    A.   I don't recall. This is -- you know, the
11  specific test 1:37 p.m. afternoon test. As I recall, the
12  test that I did with that device, which was, by the way,
13  very rudimentary -- again this is a very rudimentary device
14  design to give some indication of is it working, if it's
15  really working at very high levels and it's kind of simple
16  and obvious. Definitely wasn't designed to tell this level
17  of precision or accuracy, 1.1, 1.2, 1.3.
18    I think my average on these -- I have to go back
19  and pull it -- was like .87 or something. It's not
20  overwhelming, right. Meaning not more energy came out
21  than --
22    Q.   I didn't ask that, sir.
23    A.   Okay. You asked if I remember the exact COP --
24    MR. BELL:  There's no question pending.
25    MR. ANNESSER:  There had been.

Page 179

1
2  BY THE WITNESS:
3    A.   What was that, sir?
4  BY MR. ANNESSER:
5    Q.   You don't know what the actual COP of this test
6  was?
7    A.   It's available. I mean, I don't recall. And the
8  other thing that I want to highlight is the research world
9  is a world of seeking to affirm and replicate results. So
10  oftentimes when you do something and you think, wow,
11  there's an interesting result there, you could later go
12  back and figure out that you accounted for something
13  improperly or didn't account for something all together.
14    Or you could just totally -- you can move on and
15  not ever see that result again and not spend a lot of time
16  improving why you didn't -- why that result was wrong, but
17  more time on why you aren't able to replicate it.
18    So I don't remember -- you asked me if I remember
19  this specific refined COP number for 11/27/13 PPM test; I
20  don't remember.
21    Q.   But you believe that there is a specific number
22  out there?
23    A.   I think and I was just getting into, the question
24  would be did I dig and try to figure out -- did I or
25  somebody more qualified dig in and try to figure out where

Page 180

1  the error was or did we just seek to try to replicate that
2  without success. Both are telltales or both are indicative
3  of inaccurate results.
4    Q.   So we're in the middle of 2014 now. And around
5  this time, the option of putting the plant down in Miami
6  for the 350-test arises. How did that first come up?
7    A.   I don't recall.
8    Q.   Did -- whose idea was it to operate the plant
9  down in Miami?
10    A.   Andrea's.
11    Q.   And what did he tell you or what did he say to
12  you or otherwise?
13    A.   He -- he made it sound as if this was going to be
14  a commercial installation for a company called Johnson
15  Matthey PL -- I think it's PLC, I'm not sure, Johnson
16  Matthey out of the UK. It's a chemicals company.
17    And, in fact, I think they have previously
18  supplied materials to some LENR researchers. So it wasn't
19  totally -- it wasn't totally nonsensical that possibly he
20  was communicating with Johnson Matthey and possibly they
21  did want to do some sort of a pilot test with him. That's
22  the way it was couched.
23    Q.   Now you said he made it seem. Did he tell you
24  that it was Johnson Matthey that wanted to do the test?
25    A.   Yes.

Page 181

1    Q.   And when was that?
2    A.   I don't recall exactly. I mean you said -- you
3  contextualized this as summer of '14 with me. It's not
4  like he later introduced that. That was introduced with
5  the concept of moving it to Miami I guess around about that
6  time.
7    Q.   And what else did he tell you, other than Johnson
8  Matthey wanted to use the plant and that there would be a
9  commercial installation?
10    A.   That they wanted to purchase heat or steam; that
11  they would be doing a -- using it for some industrial
12  commercial process and that -- you know, that -- I'm trying
13  to remember all the contexts. Anyway, that they would be
14  setting up a subsidiary or just a company here do this in
15  conjunction with them in a low-profile way and that they
16  were using this installation to actually do something and
17  they were willing to purchase the heat.
18    Q.   You said that they were going to use it for some
19  commercial process. What commercial process did he tell
20  you they were using it for?
21    A.   I don't recall exactly. He didn't go into great
22  detail because he would always, you know, frame it in,
23  well, it's very confidential, we can't -- you know, we
24  can't talk about Johnson Matthey, what they're doing and
25  that sort of thing.

01/19/2017 John Thomas Vaughn

Page 182

1    So I don't recall the specific use of the energy
2  that they were -- that he proposed they were using before.
3    Q.   Do you believe that he told you a specific use?
4    A.   I don't recall.  I just don't remember.
5    Q.   Was it important to you what it was being used
6  for, what they were making?
7    A.   What was important to us is that really -- that
8  it was Johnson Matthey or an affiliate of Johnson Matthey,
9  a company that I believe -- I believe it was a public
10  company in the UK.  And so, you know, we thought, wow, this
11  is a chance to test the technology in a commercial setting
12  with a very reputable customer.  And regardless of whether
13  or not we want to sell them anything -- that was our
14  goal -- this should be a good opportunity for Dr. Rossi and
15  for us to -- to understand how the technology would perform
16  in an industrial setting.
17    Q.   So it didn't matter to you whether they were
18  making widgets or anything else?  What was important to you
19  was that it was Johnson Matthey?
20    A.   That it was Johnson Matthey and that they were --
21  they were accurate in their assessment of the energy that
22  they were using.  You know, we didn't care if they were
23  making nickel sponges or platinum sponges or whatever, so
24  long as it was Johnson Matthey and they were accurately
25  assessing the energy that they consumed.

Page 183

1    Q.   Why did it matter whether they were accurately
2  assessing the energy other than the amount that they agreed
3  to pay you for that energy?
4    A.   Because that's -- that's a check on whether or
5  not it's a -- how much energy is actually being produced.
6  They're saying we'll we're consuming X amount.  That's a
7  check.
8    Payment was unimportant.
9    Q.   So Dr. Rossi approached you and said that Johnson
10  Matthey wanted to use the device in Florida.  Were there
11  any other locations proposed for the 350-day test of the
12  device?
13    MR. BELL:  Objection to form.
14  BY THE WITNESS:
15    A.   Frequently --
16  BY MR. ANNESSER:
17    Q.   Let me -- I'm sorry.  You're counsel made a good
18  objection there, so let me break that up.
19    Other than Miami --
20    MR. BELL:  First time for everything.
21    THE WITNESS:  Look at that.
22  BY MR. ANNESSER:
23    Q.   First time.  You can pay him today.
24    Other than Miami, was any other location proposed
25  for the operation of the 350-day test?

Page 184

1    A.   We proposed early on that he could do it right
2  where the plant was delivered.  I mean, that's part of the
3  reason the plant was delivered to where it was delivered
4  to; otherwise why wouldn't it have just gone to Miami.  So
5  it was delivered to Raleigh because we fully anticipated
6  having the test there.
7    Andrea was very adamant about having a customer,
8  you got to have a customer that's only validated by the
9  market and blah, blah, blah.  That's what -- we wanted to
10  be accommodate I have to his desires to have his technology
11  validated by the market.  We wouldn't have a problem with
12  that, per se.  We just wanted to -- our goal was to
13  determine, again, whether or not the technology really
14  performed as advertised, real serious significant energy
15  output, real COP, and replicable.
16    So there a truck washing -- there is a
17  contracting firm and they often washed trucks with steam
18  right next to our building.  And -- so they needed a lot of
19  hot water or a lot of heat, and you know, however they wanted
20  to heat the steam, the water they were using.  And that was
21  one specific example of what was proposed.
22    I believe Tom made other proposals to accommodate
23  Andrea's desire to -- to want to have a commercial
24  validation of this.  But, anyway, that was -- that was one
25  of them.

Page 185

1    Q.   Did it have to have a customer to satisfy the
2  350-day test requirements?
3    A.   It did not.  And we didn't -- again, we were
4  trying to be accommodative and, you know, a good partner to
5  Andrea.  And he kept saying it was important to him.
6    And even though we didn't care, we weren't
7  against it.  I mean, it wasn't necessarily a negative
8  thing.  So we wanted to be accommodative to him on that
9  front because it doesn't necessarily preclude us, we didn't
10  think, from achieving our objectives.
11    Q.   Because you could measure it without a customer?
12  You could measure the output without having a customer
13  looked up to the other end of the line?
14    A.   Right.
15    Q.   Was West Virginia ever proposed?
16    A.   West Virginia?
17    Q.   Yes, sir.
18    A.   I don't recall.  You know, I'm trying to
19  remember.  I just don't recall.
20    Q.   Did you, sir, personally ever attempt to obtain
21  approval to operate the one-megawatt plant in North
22  Carolina?
23    A.   Did I ever personally attempt to?
24    Q.   Obtain approval from any government agencies or
25  state or federal?

01/19/2017 John Thomas Vaughn

Page 186

1    A.  I think we looked into this some.  We hired a
2  consultant to -- to provide an opinion about this, did we
3  need regulatory approval.  And our analysis was that we did
4  not because this type of device isn't presently regulated.
5  And so we were very cognizant of that or wanting to be
6  within compliance, if there are rules and regulations about
7  it.
8         Again, I think we hired a consultant to do an
9  analysis on this, and the feedback was you don't have to do
10  anything to operate this plant here and you're free to do
11  that.
12    Q.  Who was that consultant?
13    A.  I believe it was Steve Brown if I recall
14  correctly.  I'm not sure if there were others or not.  I
15  know that Tom also talked with people in government and in
16  the environmental sector of the government.
17    Q.  Did you ever get a letter from the North Carolina
18  Bureau of Radiology stating that they needed no
19  authorization or permit to run this device or anything else
20  that could be relied upon?
21    A.  We were talking -- so Tom was talking to at that
22  time the director of the EPA.  So I don't know what -- what
23  higher level information you need.  But he was fully aware
24  of what we were working on and didn't notify us of any
25  permits or approvals that we needed.  I don't know if that

Page 187

1  answers your question.
2    Q.  So you talked to the director of the EPA.  EPA is
3  federal, correct?
4    A.  I meant North Carolina EPA.  So maybe it's -- do
5  you know in North Carolina, I'm sorry -- John Skvarla.
6  That's my understanding, right.  First of all we hired a
7  consultant to do this, he says you're free to operate.
8  Secondly, Tom's communicating with various different
9  government stakeholders, including Skvarla, and they're not
10  telling them that he has to do anything from a regulatory
11  perspective.
12    Q.  Do you know if that is email communications or
13  verbal?
14    A.  I imagine it's verbal, but I don't know.
15    Q.  Did you ever obtain anything in writing stating
16  either you are authorized or you're not required to get
17  authorization from any government agency?
18    A.  Again, there's Steve Brown's analysis.  But the
19  law, as I understand it -- you're a lawyer, you may have a
20  different take on it -- is that if you're doing something
21  that aren't laws or rules or regulations that govern that
22  activity, you don't need a specific government letter.  You
23  know, it's -- you're free to operate until it's regulated.
24  After it becomes regulated, then you need the permits.
25  But. . .

Page 188

1         We did that analysis and that's the -- that's the
2  reason -- that's what we moved forward.
3    Q.  Would that Steve Brown communication have been
4  produced to us, if you know?
5    A.  I believe so.
6    Q.  Sir, in the beginning of this deposition, I asked
7  you about the background investigation you did on Rossi and
8  you said he had a checkered past, and you knew this in 2012
9  prior to entering into the license agreement; is that
10  correct?
11    A.  Correct.
12    Q.  What did you mean by "checkered past"?
13    A.  There were all sorts of claims about Andrea --
14  it's still out there today if you were to Google them --
15  positive and negative.  Positive, in that groups like Levy
16  and the Swedes were saying this technology is very
17  interesting or it's done XYZ.  Picardi would also be in the
18  positive camp.
19         You know others -- even others like NASA
20  scientists trying to drawing inconclusive results about
21  Rossi and leaving the door open for it to be a real
22  technology.
23         And in parallel to that, you had other reports
24  that, you know, Rossi's been to jail, Rossi's been involved
25  in all kinds of stuff.  You know, the details were never

Page 189

1  totally clear.  And we asked Rossi about this and he
2  described it as tax fraud, he had been accused of tax fraud
3  and that the guy -- and he even went on to say that the guy
4  who accused him later turned out to be corrupt or, you
5  know, was -- lost his position in government and -- and
6  that he had not complied with some sort of complicated tax
7  requirements.
8         And so it's not that he evaded the question of
9  whether or not he had ever served time in jail, I think he
10  was always up front about that, but he never -- looking
11  back now, I don't think he ever gave the full and complete
12  story, which I believe is out there, although it's a little
13  -- much more difficult to find and I don't know that it's
14  completely there.
15    Q.  And what do you believe the full and complete
16  story to be?
17    A.  I just don't know.  But I don't think it's what
18  he told us it was.
19    Q.  Now -- so you had been told or you had done
20  research that indicated that he may have been to jail, hat
21  he had been charged with tax fraud and you said other
22  things.  What are those other things, "involved in other
23  things"?
24    A.  Involved in other things, I think I was
25  referencing the tax fraud when I said that.

01/19/2017 John Thomas Vaughn

Page 190

1  Q.  Okay.

2  A.  Anyway.

3  Q.  And did he deny having been in jail for any

4  period of time?

5  A.  We didn't know exactly and I still know exactly

6  how much time he spent in jail.  He acknowledged spending

7  time in jail.  Like I said, he didn't -- but he had a story

8  prepared for why he went to jail and the reasons associated

9  with that, which, again, at the time, it was kind of

10  understandable.  He said, look, it's a complicated tax

11  regime here, I didn't do -- I didn't properly handle my

12  corporate taxes or something -- I don't remember the

13  details -- and, you know, I ended up in jail or something

14  like that.

15       I mean, it wasn't like he was evaded the fact

16  that he had been to jail.  It was just the reasons

17  associated with that I don't think we got the full story in

18  retrospect.

19  Q.  Do you have any facts or any information to

20  indicate that what he was telling you is not the full

21  story?  Is there something you've learned since?

22  A.  Yes.  I mean, there's -- if you -- if you spend

23  much more time researching there, it appears -- again, the

24  full story, I can't put it together -- but it appears

25  there's more to it than tax fraud.  It appears, whether or

Page 191

1  not this is accurate, it had to do with significant

2  environmental degradations and -- and pollution and things

3  like that.  But. . .

4  Q.  How much time did you spend looking into

5  Dr. Rossi in the beginning, in 2012?

6  A.  In 2012, I don't recall exactly, you know.  We

7  had a running timeline that we developed to try to recreate

8  key events or key points in the -- in Rossi's past or

9  history.  And these were positives and negatives and

10  neutral dots.  And I don't know.  That was an ongoing

11  process.  I'm not sure how much time that required.

12  Q.  Sir, going to the term sheet, do you know what I

13  mean when I reference "the term sheet"?

14  A.  I'm not sure.

15       Can I stand up real quick.

16       MR. ANNESSER:  Yes, sir.

17       (Whereupon, Vaughn Deposition Exhibit 12 was marked

18       for identification.)

19  BY MR. ANNESSER:

20  Q.  Sir, I'm going to show you a document that's

21  tabled as The Term Sheet, which we are marking as Exhibit

22  12.  I have it as 12.  Tell me if you need a moment to

23  review it.

24  A.  I would.

25  Q.  Have you seen this document before, sir?

Page 192

1  A.  Yes, sir.

2  Q.  Is that your signature on the top line of the

3  second page for Industrial Heat LLC?

4  A.  Yes, sir.

5  Q.  Now, the term sheet was an agreement between,

6  according to the top of this, Industrial Heat LLC, J.M.

7  Chemical Products, Inc., and Leonardo Corporation; is that

8  correct?

9  A.  That's correct.

10  Q.  Who is J.M. Chemical Products Inc.?

11  A.  Who is J.M. or what is?

12  Q.  Who?

13  A.  Now, it's -- it's known to be a company set up by

14  Henry Johnson and Andre Rossi that apparently is not at all

15  affiliated with Johnson Matthey.

16  Q.  Okay.  Now you say it's known to be set up by

17  Henry Johnson and Andre Rossi.  What do you base that on?

18  A.  I base that on materials you guys turned over in

19  discovery and that Johnson and Bass produced in discovery.

20  Q.  Specifically what?

21  A.  Exchanges where Rossi is dictating to Johnson or

22  Collett, I can't remember, prepare J.M. invoices such as

23  this with this letterhead, here's J.M. letterhead, et

24  cetera.  Exchanges like that.

25  Q.  Now, you knew that Dr. Rossi was consulting for

Page 193

1  J.M. as well, didn't you?  Dr. Rossi told you that?

2  A.  That he was consulting for J.M.?

3  Q.  Yes, sir.  He was doing consulting work for J.M.

4  He told you that, didn't he?

5  A.  Possibly.  I'm not sure.  I don't recall that.

6  Maybe he did.  I'm not sure.

7  Q.  So directions as to make payments or otherwise,

8  that doesn't indicate ownership, does it?

9  A.  It depends on -- it depends on the level of

10  involvement, I guess.  And maybe ownership is one question

11  but control is another.

12  Q.  Do you control Industrial Heat, sir?

13  A.  I'm the manager or the vice president at

14  Industrial Heat.

15  Q.  Do you control it?

16  A.  Industrial Heat is not controlled by me, no.

17  Q.  Who is it controlled by?

18  A.  Do you mean who makes executive decisions for

19  Industrial Heat or do you mean who owns -- you know, who

20  has voting control over Industrial Heat.

21  Q.  I'm asking you, sir, in the term you used,

22  control, as you referenced control as respect to J.M., who

23  controls in your mind Industrial Heat?

24  A.  Industrial Heat, I don't know that I understand

25  what you mean by control.  But it's clear to me that Andrea

Page 194

1  was directing J.M. Chemical Products with Johnson.
2  Q.   Who owns the stock in J.M. Chemical Products?
3  A.   I don't know.  Is there stock?
4  Q.   Could you answer that question?
5  A.   I don't know.
6      MR. BELL:  Don't ask him any questions.  He
7  doesn't have the answer.
8  BY MR. ANNESSER:
9  Q.   Now, you said you believed there was an
10 affiliation with Johnson Matthey.  Were you concerned at
11 all Johnson Matthey's name did not appear on this
12 whatsoever?
13 A.   You'll notice that it has J.M. Chemical Products,
14 Inc.  Again.  Andrea was leading us to believe that this was
15 an affiliate of Johnson Matthey and then they'd set up this
16 company specifically for this purpose.
17 Q.   For what purpose?
18 A.   To allow this technology, that plant, to be -- to
19 use in kind of a beta way, so to test whether or not it
20 worked for some of their needs, whatever the needs may be.
21 Q.   So you knew that there was no ongoing operation
22 or facility at the time that this was being set up
23 specifically for the purpose of running the E-Cat and using
24 the steam that was produced?
25 A.   I knew -- could you say that one more time.

Page 195

1  Q.   You knew at the time that J.M. Chemical Products
2  was a newly form entity, not a long-existing entity, it was
3  formed shortly before this agreement, you know that, right?
4  A.   I can't recall if we got into the specifics of
5  when J.M. Chemical Products was formed.  And I still don't
6  know when it was formed.  I'm sure it's out there.  I'm
7  sure you can look up the Secretary of State filing.
8      But what we believed is that it was formed
9  Johnson Matthey in the UK.
10 Q.   Okay.  I understand.  I understand that's your
11 belief.  But what I'm asking you is:  At the time, before
12 you entered into this agreement, was it your understanding
13 that J.M. chemical products, not Johnson Matthey, was a
14 newly formed company for the sole purpose of the -- of
15 working under the transaction contemplated in this term
16 sheet?
17 A.   I did not recall at the time -- you know, as I
18 said, my recollection is that it was an affiliate of the UK
19 company, Johnson Matthey.  I don't know when it was formed;
20 I'm not sure.
21 Q.   Do you know if J.M. Chemical Products had a
22 facility operating in Miami prior to entering into this
23 term sheet?
24 A.   I don't know.
25 Q.   If there had been a facility in Miami, would you

Page 196

1  have asked to see it?  Could you have asked to visit the
2  facility?
3  A.   Not necessarily.
4  Q.   Why not?
5  A.   Why would I have?
6  Q.   To see what they would use the E-Cat for I would
7  imagine.
8  A.   I previously told you we didn't care how they
9  were -- you know, what they were using it for.  We didn't
10 care if they were producing nickel, platinum, whatever.  It
11 didn't -- didn't make a difference to us.
12 Q.   Now -- I'm sorry.  We have to change the tape
13 again.  Take a five-minute break.
14     THE VIDEOGRAPHER:  We're off the record at 3:03
15 p.m.
16     (Recess at 3:03 p.m. until 3:11 p.m.)
17     THE VIDEOGRAPHER:  We're back on the record at
18 3:11 p.m.
19 BY MR. ANNESSER:
20 Q.   Sir, before the break, you had just finished
21 telling me that you were not concerned with what was being
22 done with the steam or what was being produced with the
23 steam, but you did indicate that it was important to you
24 that it was affiliated with Johnson Matthey; is that
25 correct?

Page 197

1  A.   That's correct.  We wanted to -- we were -- that
2  was a representation that was made and we thought that that
3  was a serious reason or a reason to do this in Miami.
4  Q.   Would you have done it in Miami if it were some
5  other company other than Johnson Matthey?
6  A.   I suppose if it were GE or something like that
7  and they wanted to do it in Miami.
8  Q.   If it was so important to you that it be Johnson
9  Matthey or a big name company, why did you agree to it
10 being done by a company called J.M. Chemical Products?
11 A.   First of all, it was important to us, but it was
12 more important to us that Dr. Rossi was advertising to us.
13 He made it seem like it was very important to him in his
14 commercialization efforts.
15     Secondly, like I said, we thought that
16 J.M. Chemical Products was an affiliate of Johnson Matthey.
17 Q.   And at what point did you decide that it was not?
18     MR. BELL:  Objection to form.
19 BY THE WITNESS:
20 A.   I don't recall exactly.
21 BY MR. ANNESSER:
22 Q.   Sitting here today, do you know whether it is or
23 not?
24 A.   Whether it is or not?
25 Q.   An affiliate of Johnson Matthey's.

01/19/2017 John Thomas Vaughn

Page 198

1   A.   I highly suspect that it is not.
2   Q.   Do you have any evidence or do you have any proof
3   that it is not?
4   A.   Besides everything you guys turned over in
5   discovery?  No.  I mean, I also don't have any proof that
6   it is.
7   Q.   Now, talking about proof that it is, did you ever
8   call Johnson Matthey and say, "Hey, guys, we're looking
9   forward to working with you"?
10   A.   Andrea didn't want us to do that.  And we said,
11   you know, can we meet with these guys.  I think we were
12   even going to meet them in the UK at some point.  And
13   Andrea said, "No, no, no.  This has got to be very
14   confidential.  You know, they don't want anybody to know."
15   So no, we did not.
16   Q.   So Dr. Rossi told you they didn't want anyone to
17   know what, they being Johnson Matthey?
18   A.   Correct, that they were setting up this facility
19   to do a testing of E-Cat one-megawatt facility in a unit in
20   Miami.
21   Q.   So why was it important to you that it was
22   Johnson Matthey if it wasn't going to be the name attached
23   to this facility?
24   A.   We didn't need the name.  I mean, we weren't
25   looking for PR points.  What we wanted to know was was it a

Page 199

1   credible entity saying yes, we used this amount of energy,
2   one-megawatt worth of energy on a, you know, continuous
3   basis.  To us that would have been pretty, you know,
4   impressive.
5   Q.   And you believe that J.M. Chemical Products was a
6   credible entity?
7   A.   No.
8   Q.   But that was who you contracted with?  You do
9   understand you did not contract with Johnson Matthey, you
10   contracted with a company here J.M. Chemical Products.
11   A.   We can beat this to death, John.  But the -- I
12   told you we thought that J.M. Chemical Products was an
13   affiliate of Johnson Matthey.  We later came to believe
14   that it was not.  It was just a company that Andrea had set
15   up for -- on intentions of deceiving us.
16   Q.   Now, you had testified -- you had testified
17   before, sir, that the 350-day test didn't require a
18   customer.
19   A.   Correct.
20   Q.   Did you do any due diligence into the claim that
21   this was Johnson Matthey or an affiliate of Johnson
22   Matthey?
23   A.   Again, clearly, as you noted, one would be
24   inclined to call Johnson Matthey and say, "Hey, we want to
25   confirm that this is your plant."  We weren't allowed to do

Page 200

1   that.  So it was very difficult for us to affirm whether or
2   not this was, in fact, Johnson Matthey.  We were relying on
3   Andrea's claim that it was.
4   Q.   When you say you weren't allowed to, what would
5   have happened if you'd picked up the phone and called?
6   A.   I'm not sure.  They probably would have said --
7   not have a clue what we're talking about.
8   Q.   And then what would you have done?
9   A.   I don't know.  Because we were talking about a
10   hypothetical situation.
11   Q.   If it was so important to you that it was Johnson
12   Matthey, what steps did you take to ensure that it was
13   other than Dr. Rossi saying that it was?
14   A.   Again, John, all the way back here, periodically
15   things that Rossi would say did turn out, in fact, to be
16   not entirely false.  So we were thinking, well, what if he
17   really is talking to Johnson Matthey, we'll respect that he
18   doesn't want us engaging them.
19   But, you know, what would have happened?  I don't
20   know what would have happened.  And -- if we had picked up
21   the phone and called him.  It wasn't -- it was important
22   for us that somebody -- a credible entity such as Johnson
23   and Matthey could say we're consuming X amount of energy on
24   a continuous basis and can validate that.
25   But it was a -- it was -- all of this was

Page 201

1   contrived and pulled together by Rossi.  So we were also
2   trying to accommodate him.
3   Q.   Did you ever request a letter from Johnson
4   Matthey or anything from Johnson Matthey to validate
5   Dr. Rossi's claim?
6   A.   I don't recall.
7   Q.   Now, as of the date this term sheet was signed,
8   was it your understanding that the plant was going to be
9   shipped to operate for J.M. Chemical Products and during
10   that period the 350-day test, as contemplated by the
11   license agreement, would be carried out?
12   A.   At the point this was signed?
13   Q.   Yes, sir.
14   A.   Can you state that again, the question again?
15   Q.   At the point that this was signed, which I will
16   represent to you was August 13, 2014 --
17   A.   Okay.
18   Q.   -- as stated on the last page, was it your
19   understanding that the plant would go down to Miami, both
20   to supply steam to J.M. Chemical Products as well as for
21   the 350-day test as contemplated by the license agreement?
22   A.   My understanding is that it would go down to
23   Miami.
24   Q.   At this point in time, did you believe that the
25   testing that would be done in Miami would not be the

01/19/2017 John Thomas Vaughn

Page 202

1   guaranteed performance test?
2   **A.   Would not the guaranteed performance test?**
3   Q.   Sir, we looked at a document from -- I'm sorry,
4   I'm trying to clarify.
5         We looked at a document from July 2014 where you
6   indicated that the guaranteed performance test would likely
7   start on September 1.  Do you recall that?
8   **A.   Right.  Right.**
9   Q.   And now this agreement comes up shortly after
10  that.
11  **A.   A year later?**
12  **A.   This is the same year.**
13  **A.   Oh, same year.**
14  **A.   A month or two later.**
15  **A.   Uh-huh.**
16  Q.   That the plant would go down and operate for a
17  two-year period in Miami.  And that was it your
18  understanding that the 350-day test, as contemplated by the
19  license agreement, would be carried out during its
20  operation in Miami?
21  **A.   I don't recall.**
22  Q.   Do you know if that was Dr. Rossi's
23  understanding?
24  **A.   I'm not sure what Dr. Rossi's understanding was.**
25  Q.   Did you ever meet with J.M.?

Page 203

1   **A.   I met with -- I believe so.  I believe so.**
2   Q.   And when was that?
3   **A.   I'm trying to recall.  It was two different times**
4   as I recall.  It might have been another time.  I'm not
5   sure.
6         But I don't remember when the first time was, but
7   I believe that Tom and I met Andrea and he was claiming to
8   be a representative of Johnson Matthey in Red Robin in
9   Brier Creek near Raleigh.  And it was Hank Johnson.  And
10  immediately I didn't connect the dots.  And I don't
11  remember if it was during the meeting or after the meeting
12  that we said is Hank Johnson or Henry Johnson -- we thought
13  we'd seen that name before.  In fact we had, it was his
14  attorney.
15        And I believe, if I recall correctly, at the time
16  he said, "Yeah, don't worry about it.  Johnson Matthey
17  wanted somebody to be the president that nobody would
18  know."  Couldn't talk back to Johnson Matthey, and so we
19  left that meeting thinking, odd, you know?  But maybe, who
20  knows.
21        And then the second meeting where I supposedly
22  met somebody from -- you know, a representative of --
23  Q.   I'm sorry.  I'm going to try to interrupt you for
24  a moment just so we can did one meeting at a time.
25  **A.   Okay.**

Page 204

1   Q.   During that first meeting, it was who?  Yourself,
2   Mr. Darden, Mr. Johnson and Mr. Rossi, Dr. Rossi?
3   **A.   I think that's right.**
4   Q.   Okay.  And what did Dr. Rossi tell you at that
5   time?
6   **A.   I think I just stated that, that he introduced**
7   Henry Johnson.  I don't remember if he said Henry Johnson
8   or Hank Johnson or Mr. Johnson.  And I don't remember the
9   title that he gave him.  I don't remember if he says this
10  is the president of J.M. -- whatever it's called --
11  Chemical Products or if he said -- you know, went on at
12  that point to elaborate that Johnson Matthey didn't want
13  anybody to know, so they used who Rossi had proposed, Henry
14  Johnson, to be the president of this affiliate or
15  subsidiary that they were forming to do this.
16  Q.   And what did Mr. Johnson tell you?
17  **A.   I don't remember exactly what he told us other**
18  than just kind of -- he was playing that part.  I don't
19  recall that he -- he reminded us that he was Rossi's
20  attorney, you know, from other affairs.  But I don't
21  remember specific things he said.
22  Q.   Did he tell you that he worked for Johnson
23  Matthey?
24  **A.   I'm -- it's difficult to recall so long ago.**
25  Q.   Can you recall any specific statements made by

Page 205

1   Mr. Johnson at that time?
2   **A.   Specific quotes?**
3   Q.   Any statements made.  I'm not asking necessarily
4   word for word.
5   **A.   Yeah.  I'll tell you what I recall, which is what**
6   I've stated initially, which is that we were -- and I don't
7   remember the sequence.  Right.
8         We were supposed to go meet Andrea and a
9   representative of Johnson Matthey.  So we showed up and
10  then it turned out to be Henry Johnson or Hank Johnson.
11  And I can't remember if it dawned on us right then and we
12  said, you know, "Have we met you before?  Have we seen your
13  name before?"  Or if was after the meeting when we said,
14  you know. isn't he your lawyer or haven't you interacted
15  with Hank Johnson before?  I think we've seen that name
16  somewhere.
17        And, you know, Rossi's explanation of that,
18  ultimately whether it was at that lunch or later, I don't
19  recall, was, yes, they needed -- they needed a
20  representative that wouldn't be tied back to Johnson
21  Matthey.  So he's a lawyer and they asked him to be
22  president of this company, this affiliate company they're
23  setting up.
24  Q.   And you knew all of this before the term sheet
25  was signed?

01/19/2017 John Thomas Vaughn

Page 206

1    A.   I believe we had met with him before the term
2  sheet was signed.
3    Q.   Okay.  Now you said there was a second meeting.
4    A.   Right.
5    Q.   Who was at the second meeting and when was it?
6    A.   Associated with the term sheet, we also had him
7  sign another document.  It's not here, but anyway.
8        The second meeting was, I believe, in February of
9  '15.  Was it '15?  I think that's right.  Where Tom Darden,
10  myself, Paul Lamacraft were going down to see the plant and
11  we met with Rossi and Bass there.  And I can't remember how
12  Bass was introduced.  His card -- I have his card
13  somewhere.  I can go check his title, engineering plant
14  manager.  I don't remember whether it were Johnson Matthey,
15  J.M. Chemical products.  But that's who we met with in that
16  meeting.
17    Q.   And what did he -- now, that was after the term
18  sheet was signed in the second meeting?
19    A.   Yeah.  I mean this term sheet was signed
20  August 13, 2014.  That meeting was I believe in February
21  2015.
22    Q.   Okay.  So you didn't rely on any statements by
23  Mr. Bass before entering into this term sheet?
24    A.   I don't recall if we did or did not.
25    Q.   Sitting here today, is it your position that

Page 207

1  Industrial Heat relied on you as the vice president of
2  Industrial Heat before signing this agreement, relied on a
3  statement by Mr. Bass prior to signing it?
4    A.   By Mr. Bass?
5    Q.   Yes.
6    A.   I don't recall.  I don't recall.  I don't recall
7  at what point Mr. Bass was introduced into the equation.
8    Q.   And was Mr. Johnson there the second time?
9    A.   He was not.
10    Q.   So how many times have you spoken with
11  Mr. Johnson?
12    A.   I don't recall -- for example, I don't recall if
13  I've talked with him on the telephone or if he's been on a
14  conference call that I've been on.  I'm trying to remember
15  if he was ever at the plant any other time or if I
16  literally only met him, besides that mediation, the one
17  other time in Red Robin.
18    Q.   Sir, within the term sheet that you have in front
19  of you, you would agree with me that there's no mention of
20  Johnson Matthey, correct?
21    A.   As designed by Rossi, correct.
22    Q.   As designed by Rossi.
23        Now, you signed this agreement, correct?
24    A.   I did.
25    Q.   That's what I asked you before.

Page 208

1    A.   I did.
2        (Whereupon, Vaughn Deposition Exhibit 13 was marked
3        for identification.)
4  BY MR. ANNESSER:
5    Q.   Sir, I'm going to show you another document,
6  which has been marked as Exhibit 13.  This is titled as
7  Compliance With OFAC.  Do you know what OFAC is, sir?
8    A.   I have two.  Do you want me to have both of them?
9    A.   I'll take that one back from you, thank you.
10        Do you know what OFAC is, sir?
11    A.   Office of Foreign Asset Control Department.
12        THE REPORTER:  Asset?
13        THE WITNESS:  Office of Foreign Asset Control.
14  BY MR. ANNESSER:
15    Q.   What was the purpose of this document, sir?
16    A.   The purpose of this document was, as I stated
17  here -- do you want to read it?  Shall we read it?
18    Q.   No.
19        I'm asking if you know the purpose, not what it
20  says.
21    A.   Right.  Well, maybe I should refresh myself on
22  it.  Okay.
23    Q.   Sir, down at the last paragraph, it says
24  [as read]:  JMC is owned by an entity formed in the United
25  Kingdom.

Page 209

1        Do you have any evidence or knowledge to prove
2  that is not true?
3    A.   I have no evidence or knowledge to prove that
4  that is true.
5    Q.   Do you have any evidence or knowledge to prove
6  that it is not true?
7    A.   I imagine there is.  These guys are going through
8  it.  But we'll see.
9    Q.   Do you have it, sir?  It's not what people are
10  going through or what you imagine.  I'm asking a yes-or-no
11  question.
12        Do you have evidence that J.M. is not owned by an
13  entity formed in the UK?
14    A.   You asked me a yes-or-no question pertaining to
15  matters that are -- you know, that you would have to review
16  a lot of information to know the answer to.  And I haven't
17  reviewed it all.
18        MR. BELL:  He's asking you as you sit here today.
19        THE WITNESS:  As I sit here today, I do not know
20  whether or not --
21  BY MR. ANNESSER:
22    Q.   Sir, my question -- and I want a yes-or-no answer
23  and then you can explain it if you feel it's necessary.
24        Do you have any evidence or knowledge that JMC is
25  not an entity formed in the United Kingdom?

01/19/2017 John Thomas Vaughn

Page 234

1 been agreed to?
2 **A.   I don't remember us telling him that we had**
3 **agreed to the test plan.**
4 Q.   Was it silence, just nobody said anything and
5 we'll see how it goes?
6 **A.   No.  You already asked Tom.  He was trading**
7 **emails with Penon.  And I just -- I'm not sure.**
8 Q.   You're vice president of the company.  You didn't
9 know whether the test plan had been agreed to or not?
10 **A.   I knew that Penon had set a test plan.  I knew**
11 **that there were questions about that test plan.  But. . .**
12 Q.   Wasn't this plan important, sir?
13 **A.   What was important, as I've said, is determining**
14 **definitively whether or not the technology works.  And to**
15 **the degree that this plan would enable that, it was**
16 **important.**
17 Q.   And you understood at the time that this emails
18 was exchanged and you were copied that success under this
19 test plan, if the E-Cat operated successfully, your company
20 could be obligated to pay $89 million?
21 **A.   I understood that -- that there was -- if he**
22 **performed, based on the credible test plan, and we could**
23 **prove that the technology had been transferred, meaning we**
24 **could replicate it, yes, then we would be obligated to pay**
25 **$89 million.**

Page 235

1 Q.   So as of the dates of these emails range -- as of
2 February 18 or February 19, you understood that this test
3 plan could result in the payment of $89 million.  This was
4 the test plan that you were trying to determine whether it
5 was reliable or not, that you had to determine and say,
6 yes, this is the plan we agreed to in order for this test
7 to take place, where at the end, if the plan has been
8 followed and the test successful, your company would have
9 to pay $89 million?
10 MR. BELL:  Objection to form.
11 BY THE WITNESS:
12 **A.   The -- could you -- I'm sorry.  I was distracted**
13 **with you guys.**
14 Q.   Were there any other -- let me go back.
15 Were there any other test plans being thrown
16 around and considered at the time for the 350-day test?
17 **A.   There may have been.  I'm not sure.**
18 Q.   Did you tell Dr. Rossi about any other test plans
19 or did you have any communications with Dr. Rossi?
20 **A.   I'm not sure.  I mean, as you can see, Tom was**
21 **emailing with Penon about this.**
22 Q.   So was it your understanding that this was the
23 test plan, in whatever final form it ended in, that would
24 determine the payment of $89 million?
25 **A.   This is a test plan they were putting forth.**

Page 236

1 Q.   Sir, I'm going to ask you yes or no, and then you
2 can explain.
3 **A.   Okay.**
4 Q.   Was this the test plan to your knowledge that
5 would result, the ultimate plan, that was created from this
6 discussion, that would result in either the payment or
7 nonpayment of $89 million to Dr. Rossi?
8 **A.   It's hard to say because there were emails going**
9 **back and -- I mean, you're not showing me a test plan.  I**
10 **mean, this is not a test plan.**
11 **I don't know is my answer.**
12 **Now, I will say that I'm sure there's some**
13 **document somewhere that outline a test plan that probably**
14 **they sent to us and probably that said, you know,**
15 **here's a test plan.  And whether or not that test plan is**
16 **perfect, I can't say.  I don't know.**
17 MR. ANNESSER:  We have to take a short break to
18 change the tape.
19 THE VIDEOGRAPHER:  We're off the record at 4:13
20 p.m.
21 (Recess at 4:13 p.m. until 4:22 p.m.)
22 THE VIDEOGRAPHER:  We are back on the record at
23 4:22 p.m.
24 BY MR. ANNESSER:
25 Q.   Sir, during the course of the test being carried

Page 237

1 out down in Doral, Florida, did you visit the plant at all?
2 **A.   I did.**
3 Q.   How many times?
4 **A.   I don't remember exactly.  Multiple occasions, a**
5 **handful of times.  I don't remember exactly.**
6 Q.   Were you there when the Chinese investors came to
7 visit?
8 **A.   No, sir.**
9 Q.   Do you know who I'm talking about when I say "the
10 Chinese investors"?
11 **A.   Not really.  It was a trip -- I mean, I know that**
12 **they took some Chinese -- Tom or Joe Pike or somebody.  I'm**
13 **not sure.  But I don't know who those guys were.**
14 Q.   Were you there when representatives of Woodford
15 came to the plant?
16 **A.   I was.**
17 Q.   How many occasions?
18 **A.   I think we visited twice.**
19 Q.   And what did you do during those tests -- I'm
20 sorry during those visits?
21 **A.   We just discussed one little bit ago when Paul**
22 **Lamacraft and Tom and I met with Bass and Andrea.**
23 **And the second one, I can't remember if it was**
24 **just me and Paul or Tom, me and Paul or there was another**
25 **guy Harry Rates, who may have been there.  I think this was**

01/19/2017 John Thomas Vaughn

Page 238

1  in August of 2015; is that right?  Yes.  Anyway, that was
2  the next time.
3       Did you ask what did we do there?
4   Q.   Yeah, what did you do?  Did you walk around the
5  E-Cat plant?  Did you look at the operation?
6   A.   We stopped in to -- to observe.
7   Q.   Okay.  And during your visits to the plant, did
8  you notice anything that was not normal to you?  Anything
9  that seemed out of place?
10  A.   Yes.  We could not go on the other side of this
11  wall to see fully how everything fit together and was
12  designed.
13  Q.   Where was this wall, sir?
14  A.   It was in the facility.
15  Q.   What did it -- I'm trying to figure out what
16  you're talking about.  Was this the wall -- was this the
17  wall between they E-Cat plant and the J.M. side?
18  A.   Correct.
19  Q.   Why couldn't you go on the other side of the
20  wall?
21  A.   We weren't allowed by Andrea.
22  Q.   What was it that you wanted to observe on the
23  other side of the wall?
24  A.   Originally, you know, when we started talking
25  this morning, as I explained to you how it's important to

Page 239

1  note from a diagram perspective what goes where, all --
2  following all heat flows.  Whether it be water, steam,
3  electricity, you need to have a very thorough and detailed
4  diagram.  And for that reason, you know, we needed to know
5  what's going on on the other side of the wall.  Otherwise
6  you can't -- you don't really know how something's operated
7  because you've only got partial information.  You don't
8  know what's going on over here.
9   Q.   Did you observe Dr. Penon's testing equipment?
10  A.   I suppose I probably did.  But I -- I don't know
11  that I would have known, like, what's Penon's, what's
12  Andrea's.
13  Q.   Did you ask?
14  A.   I don't recall if I did or did not.
15  Q.   To your recollection, nobody told you, no, we
16  won't tell you?
17  A.   We won't tell you what?
18  Q.   If you did ask, was it pointed out to you?
19      MR. BELL:  Objection, form.
20  BY THE WITNESS:
21  A.   I don't recall if I asked about a specific piece
22  of equipment.  Also, keep in mind, you know, I'm not an
23  engineer.  We tried to go down -- Joseph Murray and I tried
24  to go down in July of '15 and we were denied -- you were
25  there, John.  Joe finally was allowed in February of '16.

Page 240

1  And so Joe would have been the guy to much more competently
2  assess the system's performance than I would have been.
3   Q.   Okay.  So prior to Mr. Murray coming on board,
4  did you ask any other engineer to go down, other than
5  Mr. Dameron?
6   A.   I don't believe that we did.
7   Q.   And you said you believed it was around July when
8  you attempted to come down with Mr. Murray.  And why didn't
9  you?
10  A.   We were turned away by Andrea.
11  Q.   You were turned away.  Didn't -- did you go down
12  and he turned you away at the door or how was that?
13  A.   No.  Via email.  He told us emphatically that Joe
14  could not come in the plant.
15  Q.   For what reason?
16  A.   I don't remember his explicit reason.  But we
17  have the emails.  You could pull them up.
18      But I believe his reason was that he recognized
19  Joe as a sophisticated engineer.  And historically Andrea
20  has never wanted truly sophisticated engineers around what
21  he's doing because they have a better ability to spot how
22  he's manipulating things.
23  Q.   And tell me, sir, did you insist on Mr. Murray
24  coming down?  Did you say --
25  A.   I did.

Page 241

1   Q.   -- we absolutely have the right and you were
2  insisting on coming down?
3   A.   I don't remember the exact email exchange.  You
4  guys have it.  But, clearly, I said that Joseph Murray was
5  going to come with me and we were going to come assess the
6  plant and we were emphatically denied.
7   Q.   Do you know how many emails there were?  You told
8  him you were going to come down with Mr. Murray and he said
9  no.  What was your response to that?
10  A.   I don't remember.  We were -- he had rejected us.
11  It's like beating a dead horse.  He's not going to allow
12  it, so we said -- we just left it at that.
13  Q.   You didn't say anything more about it?
14  A.   I don't recall whether or not --
15  Q.   Did you try to bring him down again other than at
16  the end of the test?
17  A.   Other than in -- I don't recall.  I don't
18  remember.
19  Q.   Do you know who Joe P ke is?
20  A.   I do.
21  Q.   Is he an employee, officer or director of
22  Industrial Heat, IPH International or any of those related
23  companies?
24  A.   He is not.
25  Q.   Is he a representative of those companies in any

01/19/2017 John Thomas Vaughn

Page 242

1 capacity?

2    A.   No.  He's an investor.

3    Q.   Did you authorize or ask Dr. Rossi to allow him

4 to come to the plant with the Chinese investors?

5    A.   I don't believe I did.  Not to my recollection.

6    Q.   Do you know if Dr. Rossi was asked to allow the

7 Chinese investors to come?

8    A.   Presumably somebody communicated with me about

9 that.  Whether it was Tom or Joe Pike directly, I don't

10 recall.

11    Q.   At any time prior to Woodford making their

12 investment in Industrial Heat or its related entities, did

13 you tell them that you were not able to replicate any

14 measurable COP?

15    A.   Yeah.  I mean, I was -- first of all, Tom was

16 managing those communications prior to their investment.  I

17 mean, I wasn't -- as I said before, you know, you saw an

18 email exchange with Paul and Tom.  I wasn't there.  I

19 didn't go to the meetings.

20        But, for example, in -- in the data room, we

21 highlighted critiques of tests.  And we were saying to

22 Paul Lamacraft we just don't know.  We've -- we've not been

23 successful.  These experts have apparently.  I mean, these

24 are their reports.  Here are critiques of their reports.

25 We don't know which way this is going to go.

Page 243

1        You know, for all the time that had passed, we

2 were still waiting to see if -- if this technology was real

3 or not, and they were very aware of that.

4    Q.   Sir, you mentioned a data room.  Is that data

5 room still available?

6    A.   I believe it is.

7    Q.   Do you know if the contents of the data room have

8 been provided to my firm?

9    A.   They should have been.

10    Q.   Did you ever review the final test plan?

11    A.   Which one?

12    Q.   The final test plan prepared by Dr. Penon?

13    A.   I'm not sure.  If you show it to me, I'll be

14 happy to review it.

15        (Whereupon, Vaughn Deposition Exhibit 18 was marked

16        for identification.)

17 BY MR. ANNESSER:

18    Q.   I'll show you what we'll mark as Exhibit 18,

19 which is entitled E-Cat MW1 Energy Test Plant -- Energy

20 Plant in Miami Test Plan bearing the Bates number

21 IH-00104655.  Have you seen this before?

22    A.   I think that I have.

23    Q.   Did you ever tell Dr. Penon that you did not

24 agree with this test plan?

25    A.   We covered this already.

Page 244

1    Q.   You had asked me because you did not have the

2 test plan in front of you.  So now that you do, did you

3 ever tell Engineer Penon or Dr. Penon that you did not

4 agree with this test plan?

5    A.   I think I've already said all that I can say

6 about this.

7    Q.   It's a yes-or-no answer, sir.

8    A.   Not to my recollection.

9    Q.   Okay.  Now, looking at this test plan, can you

10 please identify the specific errors that were committed

11 during the course of the test that you believe rendered the

12 results invalid?

13    A.   The specific errors.

14    Q.   Do you believe that the test plan was followed or

15 do you have any evidence that it was not?

16    A.   I guess you got a couple questions there.

17    Q.   Let me break it up for you, I want to be very

18 simple.  Do you believe this test plan was followed?  It's

19 a yes-or-no question.

20    A.   I don't know.

21    Q.   Do you have any evidence that this test plan was

22 not followed or are you aware of any evidence that this

23 test plan was not followed?

24    A.   Yes.

25    Q.   And what is that?

Page 245

1    A.   And I'm just -- you know, I'm glancing at it here

2 because literally just looking at it.  So a list of

3 components is 115 E-Cat units.  I don't believe 115 E-Cat

4 units were operating.

5    Q.   Does this test plan require that all of the units

6 have to be operating all the time?

7    A.   I don't know.  We have to review it to see.

8        But back to your macro level question, one, I

9 don't know whether or not -- I should say I don't know the

10 specific critiques of this test plan, but a guy like Joseph

11 Murray would.

12    Q.   Okay.  I'm not asking you for critiques of the

13 plan.  I'm asking you:  Do you have any evidence -- and you

14 just said yes.  Do you have any evidence of any portion of

15 this test plan that was not followed?

16    A.   Well, it says list of components and this says

17 115 E-Cat units.

18    Q.   Okay.  Other than that, sir, is there anything

19 else?

20    A.   I'm not sure.  I haven't reviewed it all.

21        You know these are very specific.  But I haven't

22 -- I don't have off the top of my head the ability to

23 recollect or check, you know, was this type of water

24 temperature or measurement device used and were the

25 calibration certificates accurate and notarized and, you

01/19/2017 John Thomas Vaughn

Page 246

1  know, those sorts of -- I don't know.
2     Q.   So sitting here today, you do not know?
3     A.   I do not know?
4     Q.   Other than -- other than the number of smaller
5  E-Cats within this one-megawatt plant that were operating
6  at any time, you do not know of any other --
7     A.   I don't know if I know of any other.
8     Q.   You don't know what you don't know.
9     A.   That's right. I'm sorry.
10    Q.   Either you know or you don't. If you don't, the
11  answer is no.
12    A.   I'd have to go through and review all of this and
13  see if the backup detail exists or not.
14    Q.   Did you ever receive statements from J.M. as to
15  the amount of power that they received and requested that
16  you send them an invoice for that power?
17    A.   I did.
18    Q.   Did you ever send an invoice?
19    A.   Not to my recollection.
20    Q.   Why?
21    A.   Because we -- we could -- that was irrelevant to
22  us. And if, in fact, it were a fraud, we didn't want to
23  participate in that.
24    Q.   So you believed at the time it could be a fraud?
25    A.   We didn't know.

Page 247

1     Q.   Now, Industrial Heat paid two people to be there,
2  Mr. Fulvio -- I'm sorry, Fulvio Fabiani and Mr. Barry West.
3  They were there --
4     A.   At the request of Dr. Rossi. We were -- Rossi
5  should have been paying them. We were, again, being
6  generous and accommodative. We paid them.
7     Q.   So you're telling me that you knew this was the
8  350-day test and you didn't think it prudent to put anyone
9  else in that plant to monitor, figure out what's going on,
10  what is he doing that we're not doing?
11         MR. BELL: Objection to form.
12  BY THE WITNESS:
13    A.   Andrea would only allow Barry and Fulvio. And,
14  you know, those were the guys that he wanted.
15  BY MR. ANNESSER:
16    Q.   Did you request additional people come on?
17    A.   Yes. I told you I tried to take Joseph Murray
18  down there. And we also planned to have other of our staff
19  rotate -- excuse me, rotate in and out. So we talked
20  amongst our engineering and operational team to -- about
21  having people go down there and spend long periods of time
22  down there.
23    Q.   Okay. Prior to Joseph Murray coming on board in
24  the middle of 2015, who was your engineering team?
25    A.   As I told you previously, T. Barker Dameron and I

Page 248

1  believe that was the extent of it.
2     Q.   Was Mr. Dameron ever turned away?
3     A.   Not that I recall, and the reason for that is
4  that he's not a -- he was a friendly engineer that has --
5  you know, elderly engineer who was really assigned to be
6  helpful and assistive to Andre.
7     Q.   So you don't have an engineer team before
8  Mr. Murray, in that sense, other than an elderly engineer
9  that was there to assist Dr. Rossi?
10    A.   He was there -- T. Barker worked with us and
11  assisted Dr. Rossi, but we didn't have an engineering team
12  like we had later when Joe and others were hired and new to
13  the team.
14    Q.   What others, other than Joe, were hired for your
15  engineering team?
16    A.   What other engineers?
17    Q.   Between July 2015 and February 2016?
18    A.   Quite a few. I'm trying to remember. Some of
19  them had more scientific backgrounds than engineering
20  backgrounds, but they were all on the engineering team.
21    Q.   Did you ever ask if any of them could come down
22  to the plant?
23    A.   Oh, yeah. I mean, we didn't -- we didn't -- as I
24  said, we had talked about it internally. I don't recall if
25  we ever put that to Andrea after he slammed the door in our

Page 249

1  face with Joe. Our goal was to -- after Joe and I went
2  down to then have a -- kind of a -- get a feel for it, do a
3  thorough assessment, diagram, as I described, and then
4  begin having people rotate in and out. And I can't
5  remember if we ever sent anybody else down there. We can
6  check the records on that, though.
7     Q.   Sir, so it's your position today that you've
8  never been able to replicate the test, never been able to
9  replicate a measurable COP with any of Dr. Rossi's
10  technology, correct?
11         MR. BELL: Objection to form.
12  BY THE WITNESS:
13    A.   I don't believe we've been successful in
14  replicating Dr. Rossi's claim about technology.
15  BY MR. ANNESSER:
16    Q.   Are you aware that Industrial Heat filed a patent
17  application that was accompanied by a sworn statement as to
18  the accuracy of the information therein in which it
19  purports that there were, in fact, three successful
20  replications performed of Dr. Rossi's technology?
21         (Whereupon, Vaughn Deposition Exhibit 19 was marked
22         for identification.)
23  BY MR. ANNESSER:
24    Q.   I will show you what's been marked as Plaintiff's
25  Exhibit 19.

01/19/2017 John Thomas Vaughn

Page 254

1    Q.   Did you ever tell him that Industrial Heat was
2  fully funded by Cherokee?
3    A.   No.
4    Q.   By the Cherokee principals?
5    A.   I may have said that, but that's an entirely
6  different statement.  That means by individuals.
7    Q.   And that Cherokee would guarantee that Leonardo
8  would be paid in accordance with the license agreement?
9    A.   I never said that.
10   Q.   Now, Industrial Heat when it assigned the license
11  agreement to IPH or when it was preparing to, isn't it true
12  that you represented, along with Mr. Darden, that IPH
13  International B.V. was a wholly-owned subsidiary and that
14  IPH International B.V. would be the holding entity for
15  Industrial Heat?
16       MR. BELL:  Wholly-owned subsidiary of which?
17  BY MR. ANNESSER:
18   Q.   Of Industrial Heat and that it would be the
19  holding entity for Industrial Heat?
20   A.   The IP holding entity, is that what you mean?
21   Q.   Yes.
22   A.   At the time that was the case.
23   Q.   You also represented that IPH International B.V.
24  would remain a wholly-owned entity of Industrial Heat;
25  isn't that true?

Page 255

1    A.   I'm not sure about that.
2    Q.   You don't know?
3    A.   I don't -- that doesn't make sense to me, so I
4  don't recall saying that or making that representation.
5  But, as you said -- could you repeat, could you repeat what
6  you said.
7    Q.   Isn't it true, sir, that at that time you also
8  represented to Dr. Rossi that IPH International B.V. would
9  continue to be a wholly-owned subsidiary of Industrial
10  Heat?
11   A.   I do not recall representing that.
12   Q.   You don't know if you did or didn't?
13   A.   I don't recall representing that.  I mean, that
14  seems -- that doesn't seem to -- why would somebody say
15  that?  It doesn't to -- you're making statements about the
16  future that are. . .
17   Q.   Were there any communications, sir, between you
18  and either Fulvio Fabiabi and/or Mr. Barry West during the
19  course of the 350-day test being carried out in Doral?
20       MR. BELL:  Objection to form.
21  BY MR. ANNESSER:
22   Q.   By Dr. Penon?
23   A.   There was a lot in there.  Could you go back.
24  Were there --
25   Q.   Do you have communications with Mr. West between

Page 256

1  February 2015 and February 2016 regarding the operation of
2  the plant?
3    A.   I'm sure I asked Barry how things were going down
4  there.
5    Q.   Okay.  And he responded and gave you reports?
6    A.   Periodically he would check in.
7    Q.   What about Mr. Fulvio Fabiabi?
8    A.   I probably touched base with Fulvio less
9  frequently.  Periodically Fulvio would send us information,
10  I think, if I recall correctly.  But I'm not certain
11  exactly.
12   Q.   And what did you do with that information?
13   A.   I can't recall what it was, so I can't recall
14  what I did with it.
15   Q.   And you also received reports from the ERV,
16  correct?
17   A.   I do recall Penon sending some stuff.  I think he
18  sent that to Tom.  I can't remember if he sent it to me.
19   Q.   You know that industrial report received routine
20  reports?
21   A.   I believe Penon sent reports periodically to --
22  to Tom.
23   Q.   Did you ever represent to anyone that Industrial
24  Heat had acquired Rossi's intellectual property?
25   A.   I don't recall saying that.  And there's a --

Page 257

1  there's a clear distinction, right?  Did I say we had
2  licenses technology?  That's -- that's the more accurate
3  statement.  You know, to be even more specific, license it
4  in specific territories.  But I don't require -- I'm sorry,
5  I don't recall stating that we agreed his technology.  But
6  at some point, if I did that, it was a misstatement.  It
7  would have been better said we license this technology.
8    Q.   And, in fact, you raised over 50 million dollars
9  from investors predicated upon Dr. Rossi's technology; is
10  that correct?
11   A.   No.
12       MR. BELL:  Objection to form.
13       THE WITNESS:  That's not correct.  That's not
14  correct.  We raised 50 million dollars based on a portfolio
15  strategy in the LENR sector.  And part of that portfolio
16  was our license to Andrea's technology.  Andrea's was one
17  variable among many within a portfolio.
18  BY MR. ANNESSER:
19   Q.   Would you agree that it was the core?
20   A.   No.
21   Q.   If there were an email from Woodford stating that
22  they believed that Rossi's technology was the core and the
23  reason they invested 50 million dollars with your
24  company --
25   A.   There's not an email to that effect.  There's an

01/19/2017 John Thomas Vaughn

Pages 258..261

Page 258

1 which I believe you're referencing Paul Lamacraft says
2 something that it was a core element or something like
3 that. And pull the email, please. Let's review it.
4    Q.   I'm asking you if you've -- if you've got
5 information on an email, he said it was a core element?
6    A.   No. He said -- he referenced it as a core
7 element. He didn't say it was the core element. And we've
8 been very clear and I was very clear with Woodford -- well,
9 Lamacraft owned this. But they're investing in a strategy,
10 a portfolio-based approach to the LENR sector.
11       Rossi's technology could turn out to work and it
12 may not. We don't know. It's a variable among many in the
13 portfolio and that's what you're investing in.
14    Q.   Do you have any evidence, sir, to support the
15 claims by Industrial Heat and IPH international that
16 Dr. Rossi has not paid appropriate or taxes on the money
17 that he had received?
18    A.   I believe that Craig Casserino's accountant was
19 also Andrea's account and had reported to Craig that he
20 never paid?
21    Q.   Do you have any personal knowledge, sir?
22    A.   Sir, I'm telling you what I have. A conversation
23 with --
24    Q.   I'm asking -- I'm not asking who --
25       MR. BELL: He's distinguishing between what

Page 259

1 somebody told you and what you personally know yourself.
2       THE WITNESS: I have not personally reviewed
3 Andrea's taxes. Your mom may have, but I haven't.
4 BY MR. ANNESSER:
5    Q.   Interesting answer, sir.
6       Now, with respect to that, has Industrial Heat at
7 all been damaged by any payment or failure to pay taxes by
8 Dr. Rossi?
9    A.   It was a requirement of the license agreement
10 that he do so.
11    Q.   Okay. There were lots of requirement in the
12 license agreement.
13    A.   Sure.
14    Q.   So what I'm asking is have you been damaged?
15    A.   Sure. I live in the United States and he didn't
16 pay his taxes.
17    Q.   And that's the same way that Industrial Heat's
18 been damaged, correct?
19    A.   Industrial Heat is a company in the United
20 States. If the tax revenue in the United States decreases,
21 it affects the companies and the citizens within that
22 territory.
23    Q.   Did you ever tell Dr. Rossi that you wanted to
24 withhold taxes from that payment to assure that those would
25 be paid?

Page 260

1    A.   I don't recall.
2       MR. ANNESSER: Francisco.
3       MR. ARAN: How much time do we have left?
4       MR. ANNESSER: 28 minutes. I stole two of your
5 minutes.
6       MR. ARAN: I don't think I need more than 20
7 minutes, if you want to keep going, if you need to for a
8 little bit more.
9       MR. ANNESSER: All right. I'm going to take you
10 up on that for five minutes. Thought you were done with
11 me.
12 BY MR. ANNESSER:
13    Q.   Sir, in the counterclaim filed by Industrial
14 Heat, you accuse Dr. Rossi with manipulating along the
15 Fabiabi the operation of the plant and the reports of the
16 plant's purported operations.
17       Do you have any evidence that Dr. Rossi or
18 Mr. Fabiabi manipulated the operation?
19    A.   Again, I'm not a technical guy. So if you're
20 asking do I have specific evidence, such as them, you know,
21 using -- not using the amount of power they reported, for
22 example, I'm not sure. But our technical guys have looked
23 into all of this.
24    Q.   Okay. I don't want to ask you -- I'm not asking
25 you about what other people may or may not know. I'm

Page 261

1 asking you: Do you have specific knowledge or evidence of
2 Dr. Rossi or Mr. Fabiani manipulating the operation of the
3 plant?
4    A.   My knowledge is based on our engineering team's
5 analysis.
6    Q.   Okay. So independently you do not?
7    A.   Not other than what our engineering team has
8 provided, which, you know, I'm struggling now to recall
9 specifics about their analysis, but it's available.
10    Q.   Okay. You also alleged in the complaint,
11 Industrial Heat alleges -- and I want to know if you have
12 specific knowledge -- that Dr. Rossi did not ever meet with
13 the Ferrara health office and his statements regarding the
14 operation of the plant in Ferrara, Italy, for the
15 validation test were false.
16       Do you have any specific knowledge or evidence of
17 that?
18    A.   I believe that our legal team has looked into the
19 laws there and they're not consistent with what he had
20 claimed at the time.
21    Q.   Okay. But what I asked you is: Do you have any
22 evidence that there was no meeting with the Ferrara health
23 department or health office?
24    A.   Do I have positive evidence that a meeting didn't
25 take place?

01/19/2017 John Thomas Vaughn

Pages 262..265

Page 262

1   Q.   Yes.
2   A.   That's an interesting.
3   Q.   It is.
4        Do you have an answer?
5   A.   I do not.
6   Q.   You have no evidence sitting here today that he
7   did not have a meeting?  As far as you know, he may have,
8   he may not have?
9   A.   I don't know.
10  Q.   Now, you also claimed that Dr. Rossi and Leonardo
11  made no efforts to commence the guaranteed performance test
12  during 2013.  Did Industrial Heat make any efforts to do
13  so?
14  A.   Sure.
15  Q.   What did they do?
16  A.   We were trying to -- we were trying to work on
17  location.  You know, do you want to do it here, how do you
18  want to design it, do you want to -- he kept talking about
19  commercial customers, said he would pump the steam and the
20  hot water next door.  You know, we were actively -- and we
21  went so far as to, you know, order him another shipping
22  container.  He said he wanted a new container.
23       So we were working on all those things for him.
24  And we've got personnel to assist him.
25  Q.   And did you ever -- and that was to assist him in

Page 263

1   working on everything that you were doing there.  But what
2   did you do to commence the guaranteed performance test?
3   A.   All that I just said.  So we were -- we had
4   people that were working to assist him.
5   Q.   Did you ever tell him it has to be done this
6   year, let's get it going right now, get started?
7        MR. BELL:  John, please let him finish his
8   answer.
9        THE WITNESS:  Did we ever demand, hey, you've got
10  to get it going this year?
11  BY MR. ANNESSER:
12  Q.   Yes.
13  A.   I don't believe we did.  And as I've said before,
14  we were trying to be accommodative and he was a very
15  unpredictable character and we didn't want to piss him off
16  because we were trying to help him and get to the truth of
17  the matter.
18  Q.   Did you have a plant set up or a facility set up
19  in 2013 at which that testing could have taken place?
20  A.   We did.
21  Q.   Why wasn't it commenced?
22  A.   I don't know.  Andrea said it wasn't ready.  And
23  his focus was on the Swedish test.
24  Q.   As was Industrial Heat's, was it not.
25  A.   We were also interested in the Swedes test.

Page 264

1   Q.   You also state that J.M. Products started sending
2   falsified invoices to Industrial Heat.  Do you have any
3   evidence of that?
4   A.   I believe there is in discovery.
5   Q.   What is the evidence, sir?
6   A.   Where Andrea's tell them particularly what to
7   write on there.  And, you know, for all intents and
8   purposes, it appears that they were just fabricating these
9   invoices.
10  Q.   Do you have any evidence, sir, that they did not
11  receive the heat that was reported to Industrial Heat, the
12  heat or steam?
13       MR. BELL:  Objection to form.
14  BY THE WITNESS:
15  A.   That J.M. Chemical Products Inc. did not receive
16  it?
17  BY MR. ANNESSER:
18  Q.   That's correct.
19  A.   Based on pictures you guys have provided, there
20  appear to be some sort of rudimentary, what would you have,
21  like a radiator on that side.  So I guess whatever
22  temperature that water was when he pumped it over there,
23  that moved some energy.  Now, how much it was and all that,
24  I don't know.
25  Q.   And that was measured by the flow meter, right?

Page 265

1   A.   I don't know.  The key question is whether or not
2   that flow meter worked at all.
3   Q.   But you don't know whether or not it did or
4   didn't?
5   A.   I don't know.
6   Q.   Now, in the original version of the counterclaim,
7   Industrial Heat alleged that James Bass was a fictional
8   person, did not exist.  But you met with him, didn't you?
9   A.   I met with a person who introduced himself as
10  James Bass.
11  Q.   Uh-huh.  So why is it that in the complaint
12  alleged against Dr. Rossi and many others, you allege that
13  James Bass didn't exist?
14       MR. BELL:  Objection to form.
15  BY MR. ANNESSER:
16  Q.   Or that he was a fictional character?
17       MR. BELL:  Objection to form.
18  BY THE WITNESS:
19  A.   I didn't allege that.  It was alleged in the
20  thing.  But it -- it was because people believed at the
21  time that it was just a name with -- you know, the guy had
22  not been identified, meaning literally the name James Bass
23  go to a specific person or is it just a James Bass name
24  with a different person.  The person that I met, it turned
25  out his name actually was or is James Bass.

01/19/2017 John Thomas Vaughn

Page 266

```
1   BY MR. ANNESSER:
2   Q.   Do you review the complaint before it was filed?
3   A.   I believe I did.  Did I sign it?  I'm not sure.
4   Q.   So the allegation was incorrect?
5   A.   I did not say that.  That's what you said.
6        MR. ANNESSER:  Okay.  Francisco, he's all yours.
7        MR. ARAN:  Thank you, sir.
8               EXAMINATION
9   BY MR. ARAN:
10  Q.   Good afternoon.  I know it's been a long day.  I
11  will try to be quick.  I don't know if you can hear me all
12  right.  You can ask me to speak up.
13  A.   I can hear you just find.
14  Q.   During your testimony, you mentioned that you
15  tried to accommodate Mr. Rossi with respect to the
16  operation of the plant; is that correct?
17  A.   Pardon me, could you introduce yourself and
18  remind me who you represent.
19  Q.   Sure, my name is Francisco Aran from Aran, Correa
20  & Guarch.  I represent J.M. Products and Henry Johnson.
21  A.   Thank you.  Sorry about that, Fernando.
22  Q.   Nope, not at all.  Earlier in your mention you
23  mentioned you tried to accommodate Mr. Rossi as it related
24  to the operation of the plant; is that correct?
25  A.   Correct.
```

Page 267

```
1   Q.   Correct.  When was it first contemplated that the
2   plant be moved to Miami?  Do you know a time frame?
3   A.   I don't recall.  I'm trying to remember.  I'm
4   trying to remember when it was actually.  I don't recall
5   exactly, Fernando.  I'm sorry.
6   Q.   Francisco.
7   A.   I'm sorry, Francisco.  Sorry.  Sorry.
8   Q.   No worries.
9        Aside from having a customer down here, were
10  there any other considerations that were taken into account
11  when deciding whether or not to move the plant to Miami?
12  A.   Aside from having a customer down there, were
13  there other considerations that were taken into account?
14  Q.   Correct.
15  A.   It's a good question, Francisco, and I apologize.
16  I suppose there, but I'm just not sure.  What do you
17  mean by like "considerations," for example?
18  Q.   Was -- was the only thing you took into account
19  when you decided, hey, let's move the plant, you know,
20  let's go ahead and move the plant to Miami, was the only
21  thing you used to make that determination the fact that
22  there was a customer to provide the energy to or was there
23  something else that was brought up or mentioned that played
24  some form or role?
25  A.   Right.  As I mentioned previously, one of the big
```

Page 268

```
1   drivers for us that kind of got us over the hump being okay
2   with it going to Miami, was that purportedly an affiliate
3   of Johnson Matthey would be doing -- would be using the
4   energy there.
5        You know, other factors, I'm sure Andrea wanted
6   it close to where he has apartments.  So there may be other
7   considerations like that.  Fulvio was from that area too.
8   Q.   Got it.  And when were you first advised that the
9   customer in Miami was an affiliate of Johnson Matthey?
10  A.   That it was an affiliate?  I don't recall
11  exactly.  I'm sure that that's in emails somewhere, you
12  know, Andrea introducing this concept.
13  Q.   Can you give me a specific time frame?  Let's
14  start off with a year.  Was it in 2013?  Was it in 2014?
15  A.   Yeah, I'm guessing, Francisco, that it was in
16  2014.
17  Q.   And would it have been in the first quarter,
18  second quarter, third quarter, fourth quarter?
19  A.   I'm really -- I don't know.  I apologize.  I
20  can't recall and I'm not positive it was 2014.  It may have
21  been 2013.  And I apologize, Francisco.  I just don't
22  recall.
23  Q.   Okay.  Do you recall who made that
24  representation?
25  A.   Which representation again?
```

Page 269

```
1   Q.   That there was a customer in Miami that had a use
2   for the steam that was affiliated with Johnson Matthey?
3   A.   Fundamentally, you know, that was the
4   representation that Andrea was making to us.
5        MR. BELL:  You doing okay?
6        THE WITNESS:  Uh-huh.
7   BY MR. ARAN:
8   Q.   If I recall correctly, you stated earlier that
9   you met with Mr. Henry Johnson one time as it relates to
10  J.M. Chemical Products; is that right?
11  A.   Yeah.  I stated earlier, Francisco, that I didn't
12  recall if I met with him more than one time, but I do
13  remember one specific time.
14  Q.   And at that meeting in that one specific time
15  what was your understanding of Mr. Johnson's involvement
16  generally?
17  A.   He was introduced as a representative of Johnson
18  Matthey.  And I think I covered this some previously.  I
19  don't remember if it was made clear to us during the
20  meeting that like -- during the meeting we remembered Henry
21  Johnson, Hank Johnson, was also the name of Rossi's lawyer.
22  But I do recall that some point we remembered that.
23       And Rossi had said, you know, look, they -- they
24  needed a representative that couldn't be obviously attached
25  to Johnson Matthey and so please do it.  I don't recall
```

01/19/2017 John Thomas Vaughn

Page 270

1 when exactly that happened.
2 Q. Okay. Do you recall any conversations you had
3 with Mr. Johnson at this meeting that you're referring to?
4 A. I don't recall the substance of those -- of the
5 communications of that lunch. I apologize. But he was
6 introduced as, you know, a Johnson Matthey representative.
7 Q. Okay. Thank you. He didn't introduce him in
8 that manner, right?
9 MR. BELL: Objection to form.
10 THE WITNESS: I don't really recall, Francisco.
11 BY MR. ARAN:
12 Q. Let me rephrase. Did he intro -- how did
13 Mr. Johnson introduce himself or did he introduce himself
14 to you or was he introduced to you?
15 A. I'm struggling to recall, Francisco, if he
16 introduced himself or if he was introduced and I just don't
17 recall.
18 Q. And you don't recall anything substantively that
19 Mr. Johnson spoke about or said in that meeting?
20 A. I don't. Again, Francisco, this is a long time
21 ago. But the reason for the meeting is because Tom and I
22 wanted to meet a representative of Johnson Matthey who
23 could speak to the efficacy of what Andrea had been
24 describing.
25 Q. Okay. Was Mr. Rossi -- was Mr. Johnson present

Page 271

1 during the entire meeting?
2 A. It was a -- it was lunch meeting. So I can't
3 remember if Tom and I rode with Andrea or if we met him
4 there. But we met him for lunch and then we had lunch
5 together.
6 Q. Got it.
7 Okay. You stated earlier that you did not
8 contact Johnson Matthey to confirm any involvement they
9 might have with J.M. Chemical Products, correct?
10 A. Correct. We did not contact Johnson Matthey. I
11 did not. And that was because Andrea had said, you know,
12 Henry Johnson is the representative of Johnson Matthey and,
13 you know, you can't contact them, they want this to be
14 super confidential, you guys aren't to -- that will make
15 them nervous if you guys contact them or, you know, mess
16 things up.
17 Q. Given the circumstances and the amount of money
18 involved, would you agree with me that it would have
19 prudent to confirm one way or another that Johnson Matthey
20 was not affiliated with J.M. Chemical Products?
21 A. Say that one more time, Francisco.
22 Q. Given the circumstances and the amount of money
23 involved, would you agree with me that it would have been
24 prudent to confirm in one way another that Johnson Matthey
25 was, in fact, affiliated with J.M. Chemical Products?

Page 272

1 A. You know, in hindsight, again a lot of this is in
2 hindsight kind of Monday morning quarterbacking, what would
3 you do differently today than you did at the time. Should
4 we have spent more time and effort on that specific topic,
5 possibly so. But our main concern, again, was that it was
6 a bona fide customer and that, you know, we were going to
7 have a path to determine whether or not the technology
8 worked.
9 So it's -- and we were also trying to be
10 accommodative to Andrea, so we didn't want to mess up
11 things that he had been working on that were important with
12 him.
13 Q. Got it. I don't mean to play Monday morning
14 quarterback. But I just mean a scenario where you are
15 potentially investing up to 150 million dollars in a
16 venture, would it be normal to do a level of due diligence
17 that, you know, would require you or compel you to do
18 looking into the parent company of the company you're about
19 to go into business with?
20 MR. BELL: Objection to form.
21 THE WITNESS: We weren't about to go into
22 business with Johnson Matthey.
23 BY MR. ARAN:
24 Q. No. But that would -- that would be the parent
25 company, right. It was represented that it was an

Page 273

1 affiliate. So would it not be normal to conduct some form
2 of due diligence?
3 MR. BELL: Objection to form.
4 BY THE WITNESS:
5 A. Yeah, Francisco, we -- I described to you kind of
6 some of the process that went through and, you know, the --
7 whether or not Andrea was due additional payments did not
8 depend on whether or not Johnson Matthey was the customer.
9 So you can see how we would have wanted to spend
10 some time on this issue because it was important to us.
11 But you can also see how it wasn't the top priority in our
12 list.
13 BY MR. ARAN:
14 Q. But the top priority on your list would be to
15 make sure that the plant operated as -- as intended,
16 correct?
17 MR. BELL: Objection to form.
18 BY THE WITNESS:
19 A. As I've said all along, our top priority has been
20 to determine the state of the technology and determine
21 whether or not it works as advertised.
22 Q. I'll move on.
23 Do you recall negotiating any of the terms in the
24 term sheet?
25 A. I don't recall specifics.

01/19/2017 John Thomas Vaughn

Page 274

1   Q.   What's marked as Exhibit 12, I believe.
2   A.   Yeah, I can pull up the term sheet here.  I don't
3   recall the term sheet.  Andrea drafted it, I believe.  But
4   go ahead, Francisco.  What's your question?
5   Q.   Simply, did you -- did you make any changes to
6   the term sheet before it was signed?
7   A.   I think there was a little bit of back and forth.
8   I don't recall particularly on what points.  I think there
9   was some.
10   Q.   Okay.  So there was at least some back and forth
11   as to the term sheet before it was signed, correct?
12   A.   I think that's correct, Francisco.  You guys will
13   have to check the documents on this.
14   Q.   Did you request at any point that the term sheet
15   include some language that Johnson Matthey was affiliated
16   with J.M. Chemical Products?
17   A.   I think Andrea had said that Johnson Matthey
18   didn't want its name on anything and he had been
19   representing that J.M. Chemical Products, Inc., was an
20   affiliate of Johnson Matthey.
21   Q.   Right.  You mentioned that, you know, Rossi had
22   stated that he didn't want you guys reaching out because it
23   was supposed to be confidential.  But in an agreement that
24   can be confidential, would that not be a way that you could
25   confirm or back up the statement that Johnson Matthey was,

Page 275

1   in fact, affiliated with J.M. Chemical Products?
2   A.   One of the things that we did was -- you know, I
3   believe Henry Johnson -- he was a lawyer by the way.  He's
4   a lawyer, and he signed a representation that didn't
5   specify Johnson Matthey, but it did -- it alluded to a UK
6   company or said a UK company.
7   Again, Andrea didn't want Johnson Matthey
8   explicitly in there.
9   THE VIDEOGRAPHER:  Counsel, you have about five
10   1/2 minutes to cutoff.
11   MR. ANNESSER:  Francisco, you got five 1/2
12   minutes to cutoff.
13   MR. ARAN:  Okay.  Thank you.
14   BY MR. ARAN:
15   Q.   But did you guys specify that the important part
16   for you was, in fact, it was a company like Johnson Matthey
17   or I think you used other company GE, General Electric.  So
18   would you not to have wanted something specific in writing?
19   A.   That would be ideal, of course.  Andrea was very
20   adamant that that was not possible.  But that, you know,
21   his -- Henry Johnson, who's a lawyer, was happy to
22   represent that it was owned by a company in the UK and that
23   had no affiliation with Rossi or Johnson or their
24   relatives, et cetera.
25   Q.   Right.  But he did not, in fact, represent that

Page 276

1   it was affiliated with Johnson Matthey, correct?
2   A.   He did not because, as I said, Andrea did not
3   want that.
4   Q.   Okay.  So at this point you're answering to the
5   term sheet, Industrial Heat is potentially entering into an
6   agreement to move the plant to Florida, and if the plant --
7   you know, it's important to you for the sake of, you know,
8   backing up the facts, so to speak, that a company I ke
9   Johnson Matthey report to you guys or a subsidiary of a
10   company like Johnson Matthey report to you guys the amount
11   of energy being received because you deemed that to be a
12   credible source, correct?
13   MR. BELL:  Objection to form.
14   (Interruption.)
15   BY THE WITNESS:
16   A.   Francisco, could you run the question by me one
17   more time.  Sorry.
18   BY MR. ARAN:
19   Q.   Yeah.  So at this point in time, you guys are
20   getting ready to enter into the term sheet and move the
21   plant to Florida because you felt, you know, it would be
22   important, it would be -- I forget the word you used -- but
23   you would feel comfortable with a company like Johnson
24   Matthey confirming the amount of energy that was used by
25   the plant, correct?

Page 277

1   A.   I said previously, yeah, that would be a
2   comforting check on what Rossi was reporting if a -- if a
3   sophisticated company was also saying, you know, we've been
4   supplied with one megawatt of energy.  Because then you can
5   check the -- the power going into the facility and what
6   they're claiming to have been supplied.  And if it's
7   credible party, that's at least a check.  It's not, you
8   know, clearly not everything you need, but it's an
9   interesting data point.
10   Q.   Right.  It's a check.
11   But, needless to say, you did not think it was so
12   important that it needed to be included in the term sheet?
13   A.   The -- as I said --
14   MR. BELL:  Objection, asked and answered.
15   BY THE WITNESS:
16   A.   I believe -- I believe we have covered this.
17   And, Francisco, I think I'll just say what I'm going to say
18   about that.  If you want to move on to another question,
19   feel free to.
20   BY MR. ARAN:
21   Q.   That's all right.  I'll move on.  I know I have a
22   minute left.
23   Do you recall when the OFAC compliance sheet was
24   provided to you?
25   A.   Provided to me?

01/19/2017 John Thomas Vaughn

Page 278

1    Q.   Yes, or to Industrial Heat?
2    A.   I don't recall.  It's somewhere here in my stack
3  of documents.  I could look that up if you want me to.
4    Q.   Well, the sheet itself, the OFAC itself is not
5  dated or signed, so that wouldn't help you.
6    A.   The OFAC document is not dated or signed; is that
7  what you're saying?
8    Q.   It's not.  That wouldn't help you.
9         But do you know -- sitting here today, you don't
10  remember when you received the OFAC sheet?
11    A.   The exact date, I don't recall.  I'm trying to
12  pull up --
13    Q.   Do you recall --
14    A.   Go ahead, Francisco.  I'm sorry.
15    Q.   Do you recall if it was provided to you before
16  the term sheet was signed?
17    A.   I don't recall.
18         MR. ARAN:  Okay.  I'm not sure how I am on time,
19  but I'll cut it off there.
20         THE VIDEOGRAPHER:  This concludes the videotaped
21  deposition of John T. Vaughn.
22         MR. BELL:  We've marked or you've marked Exhibits
23  2, 3, 4, 9, 10, 14 and 16 which are attorneys' eyes only.
24  So I know we have additional opportunity to designate
25  things as confidential under the protective order, but

Page 279

1  those -- obviously those exhibits themselves and the
2  testimony about those we deem to be, you know, not suitable
3  for public file, among the other provisions of the order.
4  Thank you.
5         THE VIDEOGRAPHER:  This concludes the videotaped
6  deposition of John T. Vaughn.  We are off the record at
7  5:24 p.m.
8         THE REPORTER:  Reserving.  Read and sign.
9         (DEPOSITION CONCLUDED at 5:24 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 280

1  STATE OF NORTH CAROLINA
2  COUNTY OF W A K E
3              CERTIFICATE
4      I, Margaret M. Kruse, Registered Merit Reporter,
5  Certified Realtime Reporter and a Notary Public in and for the
6  State of North Carolina duly commissioned and authorized to
7  administer oaths and to take and certify depositions, do
8  hereby certify that on January 19, 2017, JOHN T. VAUGH, being
9  by me personally duly sworn to tell the truth, thereupon
10  testified as above set forth as found in the preceding pages,
11  this examination being reported by me verbatim and then
12  reduced to typewritten form under my direct supervision; that
13  the foregoing is a true and correct transcript of said
14  proceedings; that I am neither kin nor counsel to any of the
15  parties to this action; that I am not interested in the
16  outcome of this case; that I am not in the employ of any of
17  the parties to this action.
18         IN WITNESS WHEREOF, I have hereto set my hand, this
19  the 23rd day of January, 2017.
20
21
22                        Margaret M. Kruse, RMR, CRR
23
24  Notary Public #201632100246
25

Page 281

1              WITNESS'S CERTIFICATE
2
3      I, JOHN THOMAS VAUGHN, do hereby certify
4  that I have read and understand the foregoing
5  transcript and believe it to be a true, accurate, and
6  complete transcript of my testimony, subject to
7  the attached list of changes, if any.
8
9                        JOHN THOMAS VAUGHN
10
11      This deposition was signed in my presence by
12  _____, on the _____ day of
13  _____, 2017.
14
15
16                        Notary Public
17
18  My commission expires:
19
20
21
22
23
24
25