# Composite Exhibit 6

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
     ANDREA ROSSI and LEONARDO        )
 3   CORPORATION,                     )
                                      )
 4            Plaintiffs,             )
                                      )
 5       VS.                          ) No. 1:16-cv-2119-CMA
                                      )
 6   THOMAS DARDEN; JOHN T. VAUGHN;   )
     INDUSTRIAL HEAT, LLC; IPH        )
 7   INTERNATIONAL B.V.; and          )
     CHEROKEE INVESTMENT PARTNERS,    )
 8   LLC,                             )
                                      )
 9            Defendants.             )
     INDUSTRIAL HEAT, LLC and IPH     )
10   INTERNATIONAL B.V.,              )
                                      )
11            Counter-Plaintiffs,    )
                                      )
12       vs.                          )
                                      )
13   ANDREA ROSSI and LEONARDO        )
     CORPORATION,                     )
14                                    )
              Counter-Defendants,     )
15       and                          )
                                      )
16   J.M. PRODUCTS, INC.; HENRY       )
     JOHNSON; FABIO PENON; UNITED     )
17   STATES QUANTUM LEAP, LLC;        )
     FULVIO FABIANI; and JAMES        )
18   BASS,                            )
                                      )
19       Third-Party Defendants.      )

20                    HIGHLY CONFIDENTIAL

21        Videotaped Deposition of JOSEPH ALAN MURRAY
                       (Taken by Plaintiff)
22                   Raleigh, North Carolina
                    Friday, February 17, 2017
23
                     Reported in Stenotype by
24                   Lauren M. McIntee, RPR
         Transcript produced by computer-aided transcription
25
```

02/17/2017 Joseph Alan Murray

---

**Page 2**

```
 1              APPEARANCES
 2  ON BEHALF OF THE PLAINTIFF:
          John M. Annesser
 3        Brian Chaiken
          Perlman, Bajandas, Yevoli & Albright, PL
 4        283 Catalonia Avenue, Suite 200
          Coral Gables, Florida 33134
 5        (305) 377-0086
          Jannesser@pbylaw.com
 6        Bchaiken@pbylaw.com
 7  ON BEHALF OF DEFENDANTS:
          Christopher Lomax
 8        Jones Day
          Brickell World Plaza
 9        600 Brickell Avenue, Suite 3300
          Miami, Florida 33131
10        (305) 714-9700
          clomax@jonesday.com
11
    ON BEHALF OF THIRD-PARTY DEFENDANTS J.M. PRODUCTS, INC.,
12  HENRY JOHNSON, and JAMES BASS:
          Francisco J. León de la Barra (Via telephone)
13        Aran, Correa & Guarch, P.A.
          225 University Drive
14        Coral Gables, Florida 33134
          (305) 665-3400
15        fleon@acg-law.com
16  ON BEHALF OF THIRD-PARTY DEFENDANTS FULVIO FABIANI, AND
    UNITED STATES QUANTUM LEAP, LLC:
17        Rudolfo Nuñez (Via telephone)
          Rudolfo Nuñez, P.A.
18        255 University Drive
          Coral Gables, Florida 33134
19        (305) 665-3400
          rnunez@acg-law.com
20
21  ALSO PRESENT:
22  MR. MICHAEL KIRBY, CLVS
    DR. ANDREA ROSSI
23
24
25
```

**Page 3**

```
 1       VIDEOTAPED DEPOSITION OF JOSEPH ALAN MURRAY, a
 2  witness called on behalf of Defendant, before Lauren M.
 3  McIntee, Registered Professional Reporter and Notary
 4  Public, in and for the State of North Carolina, at
 5  CaseWorks Court Reporting, 3509 Haworth Drive, Suite
 6  403, Raleigh, North Carolina, on Friday,
 7  February 17, 2017, commencing at 8:50 a.m.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1           INDEX OF EXAMINATIONS
 2  By Mr. Annesser. . . . . . . . . . . . . . . . Page 6
    By Mr. León. . . . . . . . . . . . . . . . . . Page 349
 3  By Mr. Nuñez. . . . . . . . . . . . . . . . . Page 350
 4
 5
             INDEX OF EXHIBITS
 6
 7       NUMBER                        MARKED
 8
 9       Exhibit 1                        78
10       Exhibit 2                        82
11       Exhibit 3                       100
12       Exhibit 4                       116
13       Exhibit 5                       124
14       Exhibit 6                       133
15       Exhibit 7                       143
16       Exhibit 8                       177
17       Exhibit 9                       217
18       Exhibit 10                      239
19       Exhibit 11                      243
20       Exhibit 12                      262
21       Exhibit 13                      262
22       Exhibit 14                      322
23       Exhibit 15                      334
24
25
```

**Page 5**

```
 1       THE VIDEOGRAPHER:  We're on the record at
 2  8:51 a.m.  This is the videotaped deposition of
 3  Joseph Murray in the matter of Andrea Rossi, et al,
 4  versus Thomas Darden, et al.  This deposition is
 5  being held in the offices of CaseWorks at 3509
 6  Haworth Drive, Suite 403, in Raleigh, North Carolina
 7  27609 on February 17, 2017.  The court reporter is
 8  Lauren McIntee.  The videographer is Michael Kirby,
 9  both with Caseworks.  Would counsel please introduce
10  themselves.
11       MR. ANNESSER:  John Annesser and Brian
12  Chaiken on behalf of the Plaintiffs.
13       MR. LOMAX:  I'm Christopher Lomax on behalf
14  of the Defendants.
15       THE VIDEOGRAPHER:  And would the court
16  reporter please swear in the witness.
17       MR. NUÑEZ:  Hello there.  This is Rudy
18  joining in.
19       MR. ANNESSER:  Thank you, Rudy.  We've
20  already begun.
21       MR. NUÑEZ:  Okay.
22       MR. ANNESSER:  Please place us on mute.
23       MR. NUÑEZ:  I thought it was 9:00 though,
24  right?
25       MR. ANNESSER:  Yes, but we, we decided to
```

02/17/2017 Joseph Alan Murray

Page 62

1  over and test it again?
2      A.  Well, because Mr. Darden was, wanted us to
3  drive to the end, that if there was even one percent
4  chance that that one measurement he did was correct,
5  then let's get to the bottom of it.  And there was a big
6  language barrier.  So what we did was we had him, after
7  we were able using all of his information, able to
8  reproduce it or not able to reproduce it, what we had
9  him do was we had him to come over and use one of his
10  reactors in our facility to see if there was something,
11  some nuance difference that we just weren't getting, and
12  then try to reproduce it.  But we were not able to get
13  it to work even with him there.
14      Q.  Would you say that it is essential to work
15  with the inventor in order to make sure that you're
16  getting absolutely everything to attempt to replicate
17  these tests?
18      A.  In my opinion, yes.  I mean if, these are
19  very nuanced and subtle areas.  And so if you don't have
20  access to, to these people, it's very difficult to
21  really understand all of the, the small nuance
22  differences.
23      Q.  Did you ever try to reproduce or test an
24  E-Cat device designed by Dr. Rossi?
25      A.  I did not.

Page 63

1      Q.  So you've never tested an E-Cat device?
2      A.  We created a device that was as close as
3  possible to the best of our ability without, without the
4  ability to communicate with Mr. Rossi.  We, we did the
5  best we could.  So we created some reactors that were
6  similar to some of the reactors that he had tested at
7  the Triangle Drive facility before I was part of
8  Industrial Heat, and we tested those systems.
9      Q.  Okay.  Now, you said a couple things there I
10  want to ask you about.  You said with no communication
11  with Dr. Rossi?
12      A.  Uh-huh.
13      Q.  Why didn't you have communication with
14  Dr. Rossi?
15      A.  Well, so when I came on board, so in June of
16  2000 -- let me get the year right -- 15, Industrial Heat
17  was, had just received their funding.  I don't know if
18  it was in April or May.  They had received funding, and
19  they were in negotiations for several other investments.
20  And so those were ongoing, and the lawyers, you know,
21  not to say anything bad about lawyers, but the lawyers
22  were doing their thing.  And so they were taking a long
23  time to kind of get to the point where we could really
24  engage and work with the various groups.
25          So in June of 2015 Tom Darden and John

Page 64

1  Mazzarino asked me to look at in detail what Mr. Rossi
2  was doing.  So I took all the information that, that
3  they could provide me, and it was insufficient
4  information incidentally.  There were, there were no
5  red-line drawings of the plant.  There were no details.
6  And on top of that, this is another kind of detail, Tom
7  Darden was the keeper of the trade secrets.  Nobody else
8  knew anything about the details of the fuel technology.
9          So what we did was we focussed on the heat
10  transfer and the coefficient of performance as they had
11  been defined so that we could figure out if we could
12  replicate it.  Because Tom and John insisted that if
13  there's even one percent chance he's right, they want to
14  move ahead and figure out how to do this.
15          So in 2000 -- June of 2015 I went through
16  everything I could find.  And, and there were some
17  commissioning reports I think they were from Mr. Penon.
18  And I was going through those, and there were a lot of
19  typos and errors, and so that was concerning.  And so I
20  developed a whole bunch of questions.  Like, for
21  example, in the commission report they had the flow rate
22  in the system was 36,000 -- let me think of the unit --
23  kilograms per day, day after day after day, which I
24  thought was suspicious, but in the body of the text he
25  had written 3,600.

Page 65

1          So I thought, oh, 3,600 would be a lot more
2  logical.  It was kind of consistent with what everybody
3  was describing as the coefficient of performance, those
4  types of things.  So I thought, okay, well, maybe
5  there's an error there.  Maybe it's just a simple typo.
6  I mean somebody could have transposed a number.  That's
7  not a big deal.  Things happen.
8          So we went through all of that.  And I was
9  looking at it.  I just couldn't figure it out because I
10  couldn't figure out where, in a thermodynamic sense
11  where the various sensors were.  Because you have to
12  have the pressure and the temperature and the volume or
13  mass flow rate of the condensate return, and you need
14  the pressure and the temperature and the volume or mass
15  flow rate of the steam to, to measure the system.
16      Q.  I'm going to stop you for just a minute.
17      A.  Okay.
18      Q.  We will get into that.  I'm going to give you
19  plenty of --
20      A.  Okay.
21      Q.  -- opportunity to tell me about it.
22      A.  Okay.
23      Q.  But I want to go back to the testing that you
24  did.
25      A.  Okay.

02/17/2017 Joseph Alan Murray

Page 66

1    Q.   Okay.  So the question again was why you had
2  no communication with Dr. Rossi.
3    A.   Right.  So that was where I was getting to.
4  So at the end of that analysis -- thanks for reminding
5  me because I'm out in the weeds.  At the end of that
6  analysis I just couldn't make heads or tails of what was
7  going on, so JT Vaughn and Tom Darden and John Mazzarino
8  said you need to go down and meet with Mr. Rossi,
9  understand what he's doing, look at the plant.  He said
10  if we don't have the documentation, at least you can
11  look at the plant and understand what's going on.  I
12  said fine, I'll go down and meet with Dr., with
13  Mr. Rossi.
14  So in July of 2015 we were going to fly down
15  and visit him.  And I don't know exactly what happened,
16  but JT had informed Mr. Rossi we were coming down and
17  he, he said I couldn't come to the building.  So that
18  kind of put up a big barrier.  So subsequently what
19  we did was we, I engaged with Barry West, and Barry West
20  was on leave or vacation.  I think it was in August time
21  frame.  He would, I think he would work five weeks and
22  take a week off or maybe work four and take two.  I
23  don't remember what the details were, but he was back up
24  in North Carolina, and I met with him to get some
25  details to try to figure out what was going on.

Page 67

1    Q.   Okay.  Now, going back for just a minute to
2  your testing.  Well, first of all, in that time period,
3  and I understand JT Vaughn sent an e-mail to Dr. Rossi
4  as you explained.  Did you ever send an e-mail to
5  Dr. Rossi?
6    A.   I don't believe I ever did, no.
7    Q.   Did you ever introduce yourself to Dr. Rossi?
8    A.   First time I met him was actually the day
9  that you and I were at the plant for the first time.
10    Q.   Okay.  Did you have any preconceived notions
11  about Dr. Rossi when you met him?
12    A.   Yeah.  I would say yes, I did.
13    Q.   And what were those notions?
14    A.   Mr. Darden, Tom Darden and John Mazzarino,
15  they engaged with me directly and said, look, you just
16  have to be aware that he's very deceptive, and you just
17  have to be careful with that.  And I said I'm only about
18  the data --
19    Q.   When did they tell you that?
20    A.   -- and so.  I think after the meeting was
21  canceled in July, that, about that time frame.
22    Q.   Did they tell you that meeting was
23  likely not going to go over well with Dr. Rossi?
24       MR. LOMAX:  Objection to the form of the
25  question.

Page 68

1    A.   I don't, what --
2    Q.   Did they ever tell you that, you know, just
3  them even suggesting that you come down is probably
4  going to upset Dr. Rossi?
5       MR. LOMAX:  Objection to the form of the
6  question.
7    A.   I, I don't know.  I, I would have anticipated
8  that, based on their relationship as it was kind of
9  presented to me, that, you know, there would be some,
10  some reception actually at that time, because Mr. Darden
11  and others were taking other people down there to look
12  at the plant and talk to them, and so I thought I was
13  just going to be another person to visit.
14    Q.   Okay
15    A.   So.
16    Q.   Did they ever tell you he would be upset by
17  your visit, but, you know, to do it anyways?
18       MR. LOMAX:  Objection to the form of the
19  question.
20    A.   I don't recall, but they may have.  They may
21  have indicated that.  It may have been after though
22  that, once he actually said you can't come in.  I don't
23  remember the exact time line that all of that happened.
24    Q.   Now, just back for a second with Mr., and I'm
25  sorry, Dr. Mizuno.  So is it your belief that his

Page 69

1  testing protocol that was undertaken at his lab in Japan
2  was faulty?
3    A.   I believe that the test protocol that he
4  executed in Japan prior to us being able to go in and
5  inspect what he was doing did have errors and, and
6  problems, yes.
7    Q.   To your knowledge, did Industrial Heat invest
8  in Dr. Mizuno's technology?
9    A.   To my knowledge I believe, and I'm not deep
10  into this, my understanding is that we paid him kind of
11  a monthly stipend to, to support his research and
12  development activities.
13    Q.   To your knowledge, has Industrial Heat sued
14  him?
15    A.   I am not aware of that, no.
16    Q.   All right.  Now, sir, taking a large step
17  back from what we've been discussing.  When did you
18  first come into contact with Industrial Heat?
19    A.   When did I first come into contact with
20  Industrial Heat or with the personnel associated with
21  Industrial Heat?
22    Q.   Well, let's go ahead and say the personnel.
23    A.   Okay.  So I met Dewey Weaver --
24       THE VIDEOGRAPHER:  Mr. Murray.
25       THE WITNESS:  Oh, I'm sorry.  Sorry about

02/17/2017 Joseph Alan Murray

Pages 82..85

Page 82

1 medical benefits renew -- I use a HSA medical plan, and
2 they renew at the beginning of the year.  And so when I
3 left Ultra I was in the middle of a, kind of a plan
4 year.  And my daughter was sick.  She needed some
5 surgery, and I didn't want to mess with the insurance.
6 So I just said, look, let me just consult until the end
7 of the year, and then we'll convert to an employee at
8 the end of the year when the medical plans turn over.
9      Q.   Now, as a consultant were you given a title
10 within the company?
11      A.   Because the intention was for me to
12 transition to a full-time employee, yeah.  My title was
13 Vice President of Engineering.
14      Q.   So you were Vice President of Engineering
15 from day one?
16      A.   Kind of from the beginning, yeah.
17      Q.   I'm going to show you a document, sir, that
18 we'll mark as Exhibit 2.
19           (Whereupon, Exhibit 2 was marked for
20      identification.)
21      Q.   Have you seen this document before, sir?
22      A.   One second.  Let me see.  Yes, I actually
23 think I prepared this document.
24      Q.   Okay.  Now looking, sir, the, the date on the
25 front of this document appears to be January 2016?

Page 83

1      A.   Uh-huh.
2      Q.   Okay.  What I'd like you to turn to -- and
3 I'm sorry.  This document is a document with a bates
4 number IH00053931.  I'll ask you to turn to the sixth
5 page of the document with the bates number IH00053936.
6      A.   Uh-huh.
7      Q.   There is an organizational structure there?
8      A.   Uh-huh.
9      Q.   And it lists engineering, J Murray.  Is that
10 you?
11      A.   Yes.
12      Q.   Okay.  And it has categories in which I
13 believe you're responsible:  Development, integration
14 and tests, data management, project management, modeling
15 and simulation?
16      A.   Yes.
17      Q.   Okay.  What development did you do for the
18 company?
19      A.   We developed data acquisition systems and
20 replication reactor systems.  We developed calorimetry
21 systems.  We developed a wide range of test assets.  We
22 developed databases to archive and store all of the
23 information from every test that we did.  I don't know.
24 Just broad range of development activities.
25      Q.   Didn't those exist before?

Page 84

1      A.   No, not to, not to my knowledge.
2      Q.   Did they have any systems in place when you
3 joined them in May or June of 2015?
4      A.   This, this was for the new facility.  So
5 we -- I don't recall when they got the lease on the new
6 facility.  I think it was about August or maybe
7 September of 2015.  So what we were doing is setting up
8 this entire new organization in the new facility.  And
9 so these systems, I -- not that I'm aware of.  I don't
10 know what they really had at Triangle Drive.  I know
11 they did, they were doing some electrolytic system
12 testing at Triangle Drive at that time.  I had gone over
13 there one or two times, but I wasn't really too versed
14 in what they were doing.
15      Q.   Okay.  Integration and tests, what was that?
16      A.   So integration and tests is actually taking
17 the development assets, bringing them together and
18 executing test programs using those.  So the integration
19 is kind of a validation procedure for the infrastructure
20 that lives over top of, for example, a reactor or we had
21 chambers and other equipment.  So we were integrating
22 all that equipment together, and then we were testing it
23 and validating it to make sure that it was operating as
24 we had specified in the development phase.
25      Q.   So that wouldn't be the testing and

Page 85

1 evaluation of the underlying LENR technology?  And by
2 LENR do you understand what I mean?
3      A.   Yes, I do.
4      Q.   Low energy nuclear reaction?
5      A.   Uh-huh.  It would be, in fact, a combination
6 of testing of the equipment and infrastructure necessary
7 to test those reactors as well as the test of those
8 reactors --
9      Q.   Yeah.
10      A.   -- when it was appropriate and when we got to
11 that point.
12      Q.   Data management?
13      A.   So in my experience, many companies fail to
14 adequately archive and manage data.  So what we were
15 doing is we put a very robust plan in place to store and
16 archive the data and metadata associated with tests so
17 we could reproduce it.
18      Q.   Okay.  Project management?
19      A.   Over --
20      Q.   Is that anything other than the common term,
21 project management, overseeing all these projects?
22      A.   It's project management.
23      Q.   Modeling and simulation?
24      A.   Right.  So we, we attempted to model and
25 simulate as many of the systems as we could so we could

02/17/2017 Joseph Alan Murray

Page 114

1 what the model of the flow meter is. We need to know
2 the type. We need to know what flow meter is on the
3 condensate line, what flow meter is on the steam side.
4 We needed all that information.
5    Q.   Did you, did you look at the, the test plan?
6    A.   I did, yes.
7    Q.   Okay. And that didn't indicate anything to
8 you?
9    A.   At some point along the way after the fact
10 once, once I actually got my eyes on what they were
11 doing down in the plant in February of 2015 when we were
12 there on that, those two days and I saw what they were
13 doing, I went back and scoured through all the
14 documents. And there was a document where they had a
15 bullet line of what the flow meter was --
16    Q.   Okay.
17    A.   -- on the condensate line, but I had not seen
18 that before that.
19    Q.   So they had that though?
20    A.   There was a --
21    Q.   That was information that Industrial Heat
22 had?
23    A.   There was a document that had that, yes.
24    Q.   Okay. And you hadn't seen that before?
25    A.   I had not noticed it, no.

Page 115

1    Q.   Okay. But Industrial Heat had it. It wasn't
2 a secret. It wasn't --
3    A.   That's right.
4    Q.   Okay. Now, you're dealings with Mr. Fabiani,
5 did he ever tell you that he felt like he was between a
6 rock and a hard spot, you know, sitting there between
7 Industrial Heat and Dr. Rossi?
8    A.   Yes. Yes.
9    Q.   Okay. Do you have any reason to believe that
10 that wasn't the case?
11    A.   No. He described his relationship with
12 Mr. Rossi when he was at Jones Day with us. He
13 described his relationship as he, he was very close to
14 Mr. Rossi's wife. I don't recall her name. He, he
15 described it as she was kind of like a sister or a
16 mother to me, and that he felt like he was really in a
17 hard spot because he couldn't do anything without being
18 under the scrutiny of Mr. Rossi.
19    Q.   Did he ever tell you that Dr. Rossi was very
20 disappointed in him because he thinks that he is an IH
21 spy?
22    A.   I don't recall those exact words, no.
23    Q.   Okay. I'll show you a document that we'll
24 mark as Exhibit 4. It bears the bates number
25 IH00087145.

Page 116

1         (Whereupon, Exhibit 4 was marked for
2    identification.)
3         MR. LOMAX: Thank you.
4    Q.   Do you recall receiving this e-mail, sir,
5 which was sent by Mr. Fabiani to yourself on April 25,
6 2016?
7    A.   Yes.
8    Q.   And do you recall him telling you that he is,
9 I think the words he used is between the hammer and
10 anvil?
11    A.   I don't recall the specific e-mail, but yeah,
12 I mean this, this looks like almost the same as what he
13 described when we met before this at Jones Day.
14    Q.   And isn't it true, sir, that Industrial Heat
15 refused to pay him for his last invoice?
16         MR. LOMAX: Objection to the form of the
17    question.
18    A.   Okay. Mr. Fabiani committed to delivering to
19 us a final report that he was preparing. And so when we
20 met with him in, at Jones Day prior to this, he said the
21 next day he would produce two things; all of the data
22 that he had collected, and he would produce a final
23 report with all of the details of what he had done
24 during the one-year period. And, and we said as soon as
25 you do that, we'll release your final payment and we'll

Page 117

1 go from there. And the next day he said he would not
2 release that information, and then we began a dialogue
3 of continually not getting the information.
4    Q.   That, that information, I'm sorry, that final
5 payment was already past due, was it not?
6    A.   I have no idea.
7    Q.   Okay. Now, Mr. Fabiani sent reports on a
8 regular basis to Industrial Heat, did he not?
9         MR. LOMAX: Objection to the form of the
10    question.
11    A.   I am not --
12         MR. ANNESSER: What's the objection?
13         MR. LOMAX: It's leading.
14         MR. ANNESSER: He's an opposing party
15    witness, Chris.
16         MR. LOMAX: It's just my objection for the
17    record.
18         MR. ANNESSER: Okay. Thank you.
19 BY MR. ANNESSER:
20    Q.   Go ahead, sir.
21    A.   Can you repeat the question?
22    Q.   Yes. Isn't it true that Mr. Fabiani sent
23 regular updates and reports to Industrial Heat?
24    A.   I'm not sure. Those in my, in my best
25 judgment would probably have gone to JT Vaughn.

02/17/2017 Joseph Alan Murray

Page 118

1    Q.   Okay.  Were they ever shown to you?
2    A.   Not that I recall.
3    Q.   Would those have been helpful to you in your
4  replication efforts?
5    A.   I don't know what the content of the, the --
6    Q.   If --
7    A.   -- reports were.
8    Q.   If he sent reports regarding the amount of
9  power used or water flow, or anything for that matter?
10    A.   No, I don't believe those would be valuable
11  relative to the replication efforts.
12    Q.   But --
13    A.   It would have been useful information
14  relative to understanding what was happening in that
15  facility.
16    Q.   Did you ever ask JT Vaughn for anything that
17  they received?
18    A.   I don't recall.
19    Q.   Power usage reports from Mr. Fabiani?
20    A.   Actually, yeah, I recall at some point,
21  probably after the test was complete, getting a PDF file
22  with a spreadsheet.  I mean I have a vague recollection
23  of this, but subsequent to that, when we met at Jones
24  Day Mr. Fabiani provided us with a series of
25  spreadsheets and data that we actually analyzed.

Page 119

1    Q.   Okay.  Have those spreadsheets and data been
2  provided do you know in discovery?
3    A.   Yes, I believe they have.  I should say we
4  have provided them to Jones Day.  What they provide I,
5  don't know.
6    Q.   Okay.  So when Mr. Fabiani met with you, was
7  it with Jones Day or without Jones Day?
8    A.   With Jones Day.
9    Q.   Okay.  What was discussed at that meeting?
10    A.   He had, he had indicated that he had a lot of
11  data and that he would share that data with us.  So
12  initially we were just having small talk, you know.  He
13  kind of -- introduction.  We had never really formally
14  met in a, a less kind of stressful environment.  So we
15  chatted.  He kind of gave me a little bit of his
16  background.  I gave him a little bit of my background.
17  He was familiar with some of my defense background, and
18  I was familiar with some of the work that he had done in
19  Israel.
20         So we had small talk, and then we had a
21  discussion about what he had done and the data that he
22  would provide us, and he gave us a little bit of
23  information.  He gave us, several spreadsheets, and
24  then subsequently he made a commitment to give us
25  additional data that we, actually I don't know if we've

Page 120

1  received it now, but at that point we had not received
2  it.
3    Q.   So you haven't analyzed that now?
4    A.   I'm sorry?
5    Q.   You haven't analyzed the additional data that
6  he's given you?
7    A.   I don't know if we've received it.
8    Q.   So you don't recall ever seeing monthly,
9  monthly spreadsheets?
10    A.   No.  I, I received monthly spreadsheets from
11  Mr. Fabiani when we met at Jones Day, and we analyzed
12  that data.  And at some point probably in the first, you
13  know, first part of 2016, maybe after the test,
14  somewhere thereabouts there were some spreadsheets that
15  were in PDF form that were shared with us.
16    Q.   And that meeting was in 2016 after the test
17  was --
18    A.   Completed, yeah.  I think it was in March.  I
19  would have to look back to see when I flew down to
20  Miami.
21    Q.   So you never received monthly spreadsheets --
22    A.   Before.
23    Q.   -- before that from anyone?
24    A.   Not that I'm aware of.
25    Q.   Did you receive --

Page 121

1    A.   Oh, there were the monthly or -- the reports
2  that Mr. Penon had submitted, I don't know if they were
3  monthly or quarterly.  And from time to time I would get
4  those updates, and we would look at those.  That's the
5  ones that I was describing as units were changing and
6  there were some, you know, things that we had to be
7  careful with.
8    Q.   So I know I asked you this before, but I need
9  you to refresh my recollection.  When is the first time
10  that you saw the test plan for the test being performed
11  by Mr. Penon?
12    A.   Probably, you know, it's hard to know which
13  one.  I saw a commissioning report.  That's what I
14  reviewed along with the, all of the information that was
15  available at that point in June of 2015.  The test plan,
16  kind of the precursor to that, I think it was kind of
17  incorporated in it, but it wasn't exactly the same.
18  These things, the reports kind of changed over time.
19    Q.   Okay.
20    A.   So I don't really know exactly when I saw the
21  test plan, but I know that after we went on the 15th and
22  16th and I saw the flow meter, I went back and scoured
23  through all the documents I could find, and then I found
24  a document that had a reference to a flow meter in it.
25    Q.   Okay.  And what was that document, if you

02/17/2017 Joseph Alan Murray

Page 126

1  been down there?
2      A.   I think he had when they were setting up the
3  plant, yes.
4      Q.   Did you ask him about his trip down there or
5  how things were set up?
6      A.   Yes.
7      Q.   And you still didn't know the configuration?
8      A.   No.
9      Q.   Did he ever try to come back down --
10     A.   I am not --
11     Q.   -- to your knowledge?
12     A.   -- aware. I am not aware.
13     Q.   So why would Dr. Rossi -- or why would he say
14  he'll start getting worked up now?
15          MR. LOMAX:  Object --
16     Q.   You said you, you said you took that to mean
17  that he didn't want you coming down?
18     A.   Yes.
19     Q.   Well, so you knew that before --
20     A.   No, no, no. He sent --
21     Q.   -- he even asked?
22     A.   I believe he sent this e-mail --
23     Q.   Two minutes after the original e-mail.
24     A.   -- after, he sent that e-mail to me saying,
25  well, he's going to start getting worked up now.

Page 127

1      Q.   He sent, no, he sent an e-mail --
2      A.   Yeah.
3      Q.   -- to Dr. Rossi, July 13, 2015, at 9:10 a.m.?
4      A.   Yes.
5      Q.   Two minutes later at 9:12 a.m. on July 13,
6  2015, he sent you an e-mail saying, "All right. He'll
7  start getting worked up now. Should be a fun trip."
8      A.   Uh-huh.
9      Q.   Did, did he tell you beforehand that he would
10  get worked up and oppose you coming?
11     A.   I think everybody thought that me, being an
12  engineer, coming down to inspect the plant was going to
13  cause Mr. Rossi some concern.
14     Q.   T. Barker Dameron is an engineer, isn't he?
15     A.   He is.
16     Q.   He was never refused access, was he?
17     A.   I am not aware.
18     Q.   T. Barker Dameron worked with Dr. Rossi for
19  some time?
20     A.   Uh-huh.
21     Q.   Are you aware of any problems with that?
22     A.   No, I'm not aware.
23     Q.   Okay.  Any reason to believe that Dr. Rossi
24  knew anything about you, Joe Murray?
25     A.   I don't know.  I, I believe that at some

Page 128

1  point Tom Darden indicated that he was hiring an
2  engineering team and that they were bringing, ramping up
3  Industrial Heat. I don't know if they shared that
4  information with Mr. Rossi though.
5      Q.   Okay.  Well, it certainly appears that JT
6  Vaughn knew that Dr. Rossi would get upset by that
7  suggestion.
8      A.   Of bringing somebody new in the plant?
9      Q.   Yeah.
10     A.   It appears that way, yes.
11     Q.   And Dr. Rossi didn't know you from Adam at
12  that point in time. And specifically at that point in
13  time isn't it true that you weren't even an employee of
14  Industrial Heat?
15     A.   No. I was --
16     Q.   You were a consultant?
17     A.   -- working as a consultant, that's correct.
18     Q.   Okay.  So at that point in time you knew as
19  of two minutes after they sent that e-mail, before
20  Dr. Rossi ever responded, that it was going to be a
21  problematic situation?
22     A.   According to what JT sent me, yes.
23     Q.   That was the intent of this original e-mail,
24  wasn't it?
25          MR. LOMAX:  Objection to the --

Page 129

1      Q.   To create a problem?
2          MR. LOMAX:  Objection to --
3      A.   Absolutely not.
4          MR. LOMAX:  Excuse me.  Objection to the form
5  of the question.
6          MR. ANNESSER:  What's the objection?
7          MR. LOMAX:  You asked him was the intent of
8  the e-mail to --
9          MR. ANNESSER:  If he knows.
10     Q.   Go ahead, sir.
11     A.   Absolutely not.  The intent was for me to go
12  down to the plant, inspect the plant, figure out what
13  was going on, and then try to understand the, the
14  content of the reports.
15     Q.   Now, it says, "I have booked a flight down
16  Tuesday afternoon."
17     A.   Uh-huh.
18     Q.   So you booked the flight. You, you guys
19  booked your flight before even telling Dr. Rossi, hey,
20  we'd like to bring Joe Murray down?
21     A.   Yeah. I think, I think that the, the
22  Industrial Heat people booked the flight, yes.
23     Q.   Okay.  To your knowledge, did anyone call and
24  say, hey, Andrea, we got this new guy, he's great, Joe
25  Murray, he's on board, he's our VP of Engineering, we'd

02/17/2017 Joseph Alan Murray

Page 130

1  like to bring him down, prior to this e-mail?
2  **A.   I have no idea.**
3  **Q.   Okay.  How did Dr. Rossi respond to this**
4  e-mail, Mr. Vaughn's original e-mail?
5  **A.   The trip was canceled.  I was not going to be**
6  **allowed into the facility.**
7  **Q.   How did Dr. Rossi respond?**
8  **A.   I, I don't recall.**
9  **Q.   Do you know if it was canceled because of**
10  Dr. Rossi?
11  **A.   It was canceled because I was not going to be**
12  **allowed into the facility.**
13  **Q.   By who?**
14  **A.   By Mr. Rossi.**
15  Q.   Did you ever speak with Mr. Rossi about that?
16  **A.   I did not.**
17  Q.   Did you ever reach out to him at any point
18  before or after that and say -- you know, by, by mid
19  July when that e-mail was sent, you had been working
20  May, June, so two and a half months with Industrial
21  Heat?
22  **A.   Uh-huh.**
23  Q.   As the head of engineering?  Or, I'm sorry,
24  the Vice President of Engineering?
25  **A.   Uh-huh.**

Page 131

1  Q.   And you never reached out to Dr. Rossi and
2  said, hey, nice to meet you, I'm really interested in
3  your work, we should talk?
4  **A.   No.**
5  Q.   Is there a reason?
6  **A.   There was no contact.  I wasn't provided**
7  **information.  I, I think at some point I said, hey,**
8  **should I send an e-mail, but.**
9  Q.   And what did they say?
10  **A.   As far as I know, I never did send an e-mail.**
11  Q.   Who did you ask that to?
12  **A.   I think John Mazzarino, Tom Darden, and JT**
13  **Vaughn.  I think.  Is my recollection.**
14  Q.   Are you aware that Mr. T. Barker Dameron had
15  been instructed not to confer with Dr. Rossi?
16  **A.   No, I was unaware of that.**
17  Q.   Were you ever given that instruction?
18  **A.   Not that I'm aware of.**
19  Q.   Okay.  So you were never told not to contact
20  Dr. Rossi?
21  **A.   Uh-huh.**
22  Q.   You just elected never to talk with him?
23  **A.   No.  We were working on multiple different**
24  **initias at the same time.  And so I was instructed to**
25  **analyze all the data we have; if we have the**

Page 132

1  **opportunity, go down, look at the plant, try to figure**
2  **out what's going on, and move forward.  The instruction**
3  **was if there is even one percent or a half a percent**
4  **chance that this works, we want to know so we can move**
5  **forward.**
6  Q.   Well, I absolutely understand you want to do
7  your, your investigation.  So after Dr. Rossi originally
8  said no to you coming to the plant, did you follow up at
9  all?  Did you say, hey, why don't I, you know, why don't
10  I give him a call?
11  **A.   No.**
12  Q.   You don't --
13  **A.   I was never introduced to him.**
14  Q.   Okay.  Is there a reason?  I mean --
15  **A.   Not that I'm aware of.**
16  Q.   Do you know of any reason why this Dr. Rossi
17  that you've never met would dislike you so much to say,
18  no, you can't come?
19  **A.   Not that I'm aware of.**
20  Q.   That didn't bother you at all?
21  **A.   We had numerous things moving at the same**
22  **time, lots of different activities.  So it was just one**
23  **of the things.**
24  Q.   Do you know of any attempts whatsoever after
25  that to have you come down?

Page 133

1  **A.   Not that I'm aware of, not until 2016.**
2  Q.   Now, after that you said -- how long after
3  that e-mail was sent did you meet with Mr. West?
4  **A.   I think in August is my recollection.**
5  Q.   So a month or so after?
6  **A.   Yeah.  Two to four weeks later, yes.**
7  Q.   Okay.  Was, was that meeting because an
8  attorney told you --
9  **A.   No.**
10  Q.   -- to have that meeting by any means?
11  **A.   I was trying to, you know, as part of the**
12  **effort of all of these different activities and hiring**
13  **people and getting the facility organized, I was trying**
14  **to get a handle on all the different projects.  And, and**
15  **it was suggested, hey, Barry's down there working, talk**
16  **to Barry and get, get whatever information you can from**
17  **Barry.  And so T. Barker and I -- Barry was back on one**
18  **of his leave.  And T. Barker and I went and had lunch**
19  **with him down at the beach.**
20  Q.   So that wasn't, that meeting wasn't in
21  preparation for litigation, was it?
22  **A.   Not that I'm aware of.**
23  Q.   I'm going to show you, sir, a document which
24  we'll mark as Exhibit 6.
25       (Whereupon, Exhibit 6 was marked for

02/17/2017 Joseph Alan Murray

Page 142

1  situation.
2      Q.   Did, did you ask him about the facts or
3  circumstances around that threat?
4      A.   Not really.
5      Q.   Problem I've got is we did speak with
6  Mr. West.  And as far as his relationship with
7  Mr. Fabiani, it was all flowers and sunshine.  So what
8  I'm trying to understand is why this would appear in
9  your report if Mr. West didn't indicate that to us.
10     A.   I just documented what he said.
11     Q.   So you have no independent knowledge of that?
12     A.   No.
13     Q.   And you have --
14     A.   Only what he said.
15     Q.   -- none of the facts or circumstances behind
16  that?
17     A.   No.
18     Q.   So based on your understanding, do you have
19  any reason to believe that Mr. Fabiani and Dr. Rossi
20  were colluding to skew the results of this test?
21     A.   No.
22     Q.   What about Dr. Rossi and Mr. Barry West?
23     A.   Not as far as I'm aware.
24     Q.   Now, sir, you started drafting a report to
25  undermine the testing protocol used by Dr. Penon, did

Page 143

1  you not?
2      A.   I never prepared any report to undermine
3  anything.  I prepared a report on a review of the
4  documents that I was provided.
5          (Whereupon, Exhibit 7 was marked for
6  identification.)
7      Q.   I show you, sir, a document marked as Exhibit
8  Number 7.  Have you seen this document before, sir?
9      A.   Not in this form.  It looks, it looks
10  familiar, but it doesn't seem like it's complete.
11     Q.   Did you prepare this document, sir?
12     A.   It appears to be part of a document that I
13  prepared.
14     Q.   Well, it says that it's an appendix.  Is
15  there a larger document?
16     A.   Well, this was after the test, so I would
17  imagine that there is more to this document, yes.
18     Q.   Do you know why it hasn't been produced?
19     A.   I have no idea.
20     Q.   Who asked you to prepare this document?
21     A.   After the visit on the 20 -- I'm sorry, on
22  the 16th and 17th, Mr. Chris Pace of Jones Day asked
23  me --
24     Q.   16th and 17th of?
25     A.   I'm sorry.  Of February of 2016.

Page 144

1      Q.   Thank you.
2      A.   I have to be careful.
3          MR. LOMAX:  I'm going to instruct you not to
4  divulge conversations you had with counsel.
5          THE WITNESS:  Okay.
6      A.   I was instructed to write down all of my
7  notes and information about what I had observed.
8      Q.   Who instructed you?
9      A.   Counsel.
10     Q.   Counsel for Industrial Heat?
11     A.   Yes.
12     Q.   I'm sorry.  You were instructed to write down
13  your notes and everything that you had observed?
14     A.   Yes.
15     Q.   Is there a more complete report other than
16  this?
17     A.   I believe that, you know, based on what's in
18  here, there's lots of redactions and at least the front
19  matter is removed.  I'm still going through it, but
20  yeah, there's a lot of redaction.
21     Q.   Do you know why it would be redacted?
22         MR. LOMAX:  Objection to the form of the
23  question.
24     A.   Because I prepared it for Industrial Heat's
25  attorneys.

Page 145

1      Q.   Is it your understanding it would be used for
2  litigation?
3      A.   Probably.  If the litigation were to, to
4  happen.
5      Q.   Does any of this form the basis of your
6  opinions in this case?
7      A.   Yes.  These were my observations from what I
8  had seen on those days.
9      Q.   And do you reference these documents, or did
10  you refer to them in preparing your expert disclosure?
11     A.   I don't believe I did at all.
12     Q.   So you did this great body of work and never
13  referenced it?
14     A.   No, I don't think I did at all.  In fact, I
15  think this is the first time I've looked at it in at
16  least 10 or 11 months.
17     Q.   Okay.  Looking at -- I'm sorry.  For the
18  record, this is a document marked or bates stamped
19  IH00120031.  If you look at Page 4 of 39 of this
20  document.
21     A.   Oh, same one 4?
22     Q.   Yes, sir.
23     A.   Uh-huh.
24     Q.   On the first paragraph, second sentence in
25  you say, "As far as we can tell, none of the sensor data

02/17/2017 Joseph Alan Murray

Page 146

1 were logged digitally to an archive as required in the
2 FPTP."
3    A. Figure A2.
4    Q. I believe it refers to temperature and volume
5 flow rate of the return condensate and measurements of
6 the input powder.
7      THE VIDEOGRAPHER: Six minutes.
8    Q. Do you see that sentence, sir?
9    A. Yes.
10    Q. Okay. What is the FPTP?
11    A. It's the Fabio Penon test plan.
12    Q. Okay. Do you know, sitting here today,
13 whether any of the sensor data was logged digitally?
14    A. The test, the data that I was talking about
15 here was the volume flow meter on the volume condensate
16 return line and the pressure transducer. As far as I'm
17 aware, the information in the report was not logged
18 digitally. I know that the flow meter was not logged
19 digitally because Mr. Penon and Mr. Rossi, as we did the
20 exit interview that day, indicated that they had never
21 hooked up that interface.
22    Q. Does it have an interface that could read
23 digitally?
24    A. Yes.
25    Q. Okay. That particular flow meter?

Page 147

1    A. Yes.
2    Q. What about the input power? Is that logged
3 digitally?
4    A. That was logged to the power analyzer. So --
5    Q. So that was logged?
6    A. Yeah. It was not clear who logged it because
7 the data between Mr. Penon and Mr. Fabiani are virtually
8 identical. So it was not clear who was logging it or
9 how it was being logged since Mr. Fabiani was not there
10 continuously, how it was turned over. There, there's a
11 limit to how long you can log. Who was doing that, who
12 was resetting it, who was collecting that data was not
13 clear.
14    Q. Okay. Now, looking just below that,
15 Number 2, it says, "Temperature and pressure were
16 measured. Note that the temperature data logger and
17 sensor had expired calibrations."
18    A. Uh-huh.
19    Q. When did they expire?
20    A. They expired I believe, I would have to look
21 back at the pictures, but they expired in January or
22 February of 2016.
23    Q. So it was expired by less than a month?
24    A. About a month, yeah.
25    Q. How long are those calibrations good for?

Page 148

1    A. One year.
2    Q. Okay. So if it was a year-long test, by the
3 time it's hooked up on the plant, that's to be expected,
4 isn't it?
5    A. No, it's not.
6    Q. How do you --
7    A. When --
8    Q. How do you do a 400-day test with an
9 instrument that is calibrated every year without it
10 expiring unless you swap it out, send it off somewhere
11 for new calibration?
12    A. So when you design a plant like this, there
13 are really two things you do. For example, on a
14 temperature sensor you would put dual redundant
15 temperature sensors in a, a bung. There would be a bung
16 hole in the pipe. You would screw it in. You would put
17 the sensor into it, and you log both sensors. And then
18 when it's coming to an intermediate point in the test,
19 you can remove one of the sensors while the other
20 continues to log and you can take that sensor, have it
21 recalibrated and its logger recalibrated, and then you
22 put that system, you put that back in while both are
23 still --
24      (Conference call interruption.)
25    A. So you would, you would install dual. You

Page 149

1 would remove the one, have it calibrated while the other
2 one is operational, put that first one back in, remove
3 the second one and have it calibrated and then place it
4 back in the system. It's a standard technique for, for
5 systems, high availability systems.
6    Q. Okay. And that would be set forth in the
7 test plan generally?
8    A. Typically, it would be set forth in a test
9 plan.
10    Q. Okay.
11    A. And procedure. Actually, in the system
12 design.
13    Q. And in fact, that was one of your complaints
14 of Dr. Mizuno's work, was that he changed out some of
15 the equipment --
16    A. Absolutely.
17    Q. -- in the middle of the test?
18    A. Yeah.
19    Q. Okay. Now, you say, "Also, the volume flow
20 rate sensor was operated below the minimum operational
21 threshold of the device throughout the entire test
22 period."
23    A. Yes.
24    Q. Okay. We'll talk about that more later. I
25 will come back to it. I promise.

02/17/2017 Joseph Alan Murray

Page 190

1   A.  I have no idea what it was.
2   Q.  Or for --
3   A.  It was not on the facility.  It was not at
4  the facility.
5   Q.  Or for testing?
6   A.  I have no idea what their plan was.
7   Q.  Do you know if that equipment was ever
8  certified?
9   A.  What equipment?
10   Q.  The equipment used for this test, any of it.
11   A.  You know what, this week there were a bunch
12  of documents that came through, but they were all, some
13  of them were in Italian, so I didn't have a chance to
14  review them.
15   Q.  Okay.
16   A.  But just to continue here.  If we look at
17  this, the other sensors that are reported here in the
18  plant start-up are still different than the sensors that
19  are shown here in this list.  So we have a HT --
20  HSTC-TT-TI-24S.  That's there.  Okay.  That's a digital
21  thermometer.
22   Q.  Okay.
23   A.  From Omega.  And we have a TC-T-NPT-U-72-SMP,
24  which is the sensor, which is not identified here.
25   Q.  I believe it is.

Page 191

1   A.  I'm sorry.  Actually down below it is.  If
2  you look at the, the TU-T-NTP-U-72, that is over here on
3  the Omega steam pressure measurement.
4   Q.  Yeah.
5   A.  I'm sorry, steam temperature measurement.
6  And then we look for the Keller LEO 1 steam pressure.
7   Q.  Where do you see the Keller LEO 1?
8   A.  In the plant start-up.
9   Q.  Okay.
10   A.  That's the pressure sensor that Mr. Penon
11  indicated was used for making pressure measurements.
12   Q.  I'm sorry.
13   A.  I'm sorry.  Yeah, we're crossing documents
14  here, so.
15   MR. LOMAX:  It's probably better if you
16  reference the page.
17   A.  I'm sorry.  Let me reference the page.  So on
18  IH00011098, the digital, the third bullet down is
19  digital manometer Keller --
20   Q.  Okay.
21   A.  -- Type LEO 1 with a certificate.  And the
22  issue date, interesting enough, a full month after the
23  test started they added on another sensor, which is
24  fine.  There's a redundancy there.  So to your point,
25  that's a good thing.  The only problem is that it's not

Page 192

1  appropriate for this application.
2   Q.  The, the second one?
3   A.  The digital manometer, that's correct.
4   Q.  Okay.  But the first one was?
5   A.  Yeah.  We don't know where the -- this is the
6  device that, Dr. Penon indicated was used to capture the
7  pressure data for the system.  So I'm not saying that he
8  was lying or misleading me or anything else.  I'm just
9  saying that these sensors were not appropriately
10  selected.  They were not appropriately sized, that
11  collectively some of these sensors were not
12  appropriately selected or sized for this system.
13   Q.  Sir, and I understand that you take issue
14  with the test plan in this case.
15   A.  Yes.
16   Q.  I understand that and it certainly could have
17  been more robust, but this was no secret.  This is
18  information that --
19   A.  Absolutely.
20   Q.  -- Industrial Heat had?
21   A.  Absolutely.
22   Q.  Okay.
23   A.  I, I fault everybody.  I think it was poor
24  engineering and just overall an inappropriate way to do
25  it.

Page 193

1   Q.  We can agree on something.
2   A.  That's, that's for sure.
3   Q.  Fault everybody.  All right.  Do you feel
4  that Mr. Penon has hidden any information from you?
5   A.  No.
6   Q.  Okay.  Do you --
7   A.  I think he's been quite transparent.
8   Q.  Do you feel Mr. Fabiani has hidden any
9  information from you?
10   A.  Yes, I do.
11   Q.  What information?
12   A.  Well, he committed to providing us data that
13  he said he had encrypted and stored on a server in
14  Russia, and he committed to providing us with a final
15  report.  And so I feel that he was not being transparent
16  with us in providing us the information in a timely way.
17   Q.  Has he provided those now?
18   A.  I don't know.  I, I'm, really I'm not -- I
19  saw --
20   MR. LOMAX:  Objection to --
21   A.  I'm not sure what they provided.
22   MR. LOMAX:  -- to the extent it gets in to
23  communications with counsel.
24   Q.  You have never seen them?
25   A.  I have seen -- I have not reviewed the

02/17/2017 Joseph Alan Murray

Page 194

1  detailed data.  I have seen a couple of files.  I
2  haven't reviewed them, but I have never seen a final
3  report by Mr. Fabiani.
4      Q.   Was he engaged to do a final report?
5      A.   Yes.  And he said he was producing a final
6  report.  He had it almost complete.  He was doing a
7  final few things, and he was going to provide that to us
8  in about March of 2016.  I gotta get my years right.
9      Q.   In the work that you do, sir, when the new
10  client comes in, do you tell them how much the project
11  is going to cost?
12      A.   Uh-huh.
13      Q.   Do they pay you something before you begin
14  work?
15      A.   No.
16      Q.   They don't?
17      A.   No.
18      Q.   It's a bill as you go?
19      A.   Most of the work that I do is with Department
20  of Defense, and they have very rigorous accounting and
21  payments terms.
22      Q.   Okay.
23      A.   In almost every, in almost every aspect.
24      Q.   And you're pretty secure you're going to get
25  paid.  It's the government, right?

Page 195

1      A.   Yeah.
2      Q.   It may not be fast, but it's --
3      A.   Yeah.
4      Q.   -- going to come.
5      A.   Sometimes they're fast, yeah.  And I often
6  work for other companies, and most of the time the, the
7  payment terms are paid when paid or paid within a
8  certain number of days when paid.
9      Q.   Okay.  Have you ever worked for a customer or
10  a client that you did work for and then they didn't pay
11  you?
12      A.   Yes.
13      Q.   Okay.  Did you continue doing work for them?
14      A.   In some cases, yes.
15      Q.   And others no, right?
16      A.   In others no, yes.
17      Q.   Okay.  And that's because they hadn't paid
18  you?
19      A.   Yeah.  It depends on the circumstances.  It
20  depends on who it is and what the circumstances are
21  relative to the ultimate customer.
22      Q.   You can understand why somebody wouldn't want
23  to do more work for you if you hadn't paid, right?
24      A.   I would think that would be reasonable.
25      Q.   Now, Mr. Penon, you, you sent him a series of

Page 196

1  questions I guess or issues with the test data that you
2  observed; is that correct?
3      A.   Yes.
4      Q.   How did he respond to you?
5      A.   My recollection is that I sent that data to
6  him before the final report was issued.  And he did, I
7  don't believe he responded to my questions, but then he
8  issued the final report just some days later.  Maybe, I
9  don't know, maybe it was a week or two later.  I don't
10  recall exact dates.
11      Q.   Do you recall him telling anyone at
12  Industrial Heat or yourself that he has been available
13  to Industrial Heat and the Leonardo Corporation to
14  answer questions throughout the course of the test and
15  at the end of the validation; in fact, he answered your
16  questions and that the final report had concluded his
17  work?
18          MR. LOMAX:  Objection to the form of the
19  question.
20      A.   It sounds familiar, yes.
21      Q.   Okay.  Do you know if he was engaged or
22  offered more money to answer additional questions that
23  you had?
24      A.   I have no idea.
25      Q.   Okay.  Sir, I'm going to kind of jump a big

Page 197

1  step back from where we've been at for a minute.
2      A.   Okay.
3      Q.   In the beginning of this deposition you
4  mentioned two publications that were part of your
5  masters program?
6      A.   Yes.
7      Q.   But you don't recall the names of those right
8  now?
9      A.   No, I don't.
10      Q.   Okay.  Have you published anything else
11  within the last 15 years?
12      A.   Yes.  There were publications associated with
13  my PhD research.  I have presented data which was
14  ultimately published to multiple NDIA, National Defense
15  Industry Association, conferences and proceedings on --
16  slow down?
17      Q.   I'm sorry.  You presented data to them, or
18  you formed a publication?  I --
19      A.   I --
20      Q.   What I'm looking for is any document that's
21  going to list you as the author.
22      A.   So I, I was requested to present to a
23  conference proceeding, and then subsequently they
24  produced those.  So they were NDIA presentations and
25  numerous technical reports and final reports for

02/17/2017 Joseph Alan Murray

Page 214

1  before I saw the final report after the information came
2  here.
3      Q.   Now, the reports you, you referred to
4  Exhibit --
5      A.   Exhibit --
6      Q.   -- Number 8?
7      A.   Yes.
8      Q.   Those reports had been provided to Industrial
9  Heat before.  He was just sending them to you again?
10     A.   May, may very well have been.
11     Q.   Okay.  Did you ever see them before that
12 time?
13     A.   I don't know which of these.  I've certainly
14 seen parts of these.  Yeah, I don't know if I've seen
15 them all.  I may have seen them all.  I may have only
16 seen a subset of them.
17     Q.   And I'm sorry, sir.  The date of that e-mail
18 was?
19     A.   The e-mail from Fabio Penon was
20 February 23rd.
21     Q.   When did you formulate an opinion as to the
22 accuracy of the Penon reports?
23     A.   I formulated an opinion about the accuracy of
24 the flow meter on the 16th or, I'm sorry, not the 16th.
25 The 17th of February, the second day of testing when we

Page 215

1  were at the airport.
2      Q.   You formed an opinion right there on the
3  spot?
4      A.   Yeah.  I looked, I, I was surprised by the
5  flow meter itself.  And so we took pictures of the flow
6  meter and its certification label.
7      Q.   Sure.
8      A.   And when we went to the airport, I looked it
9  up and I downloaded the, the data sheet from the
10 manufacturer.  And I looked at it, and it sure enough
11 said that the minimum flow rate was 1.6 meters cubed per
12 hour.  And I was, did the math, and I was like, you
13 know, all these measurements are below the minimum
14 operating flow rate of the meter.  So I was concerned at
15 that point and saying this is a problem.
16     Q.   Well, there's a difference between being
17 concerned and forming an opinion that the entire test
18 was bogus.  Would you agree?
19     A.   Yeah, I didn't say the entire test was bogus.
20 I was specifically talking about the the, the validity
21 of the flow meter.
22     Q.   Do you believe the entire test was bogus?
23     A.   How do you mean -- what does bogus mean?
24     Q.   I don't know.  Did you think the whole thing
25 was either fraudulent or so poorly done that it couldn't

Page 216

1  possibly give an accurate result?
2      A.   I think that the, the test, inclusive of
3  Industrial Heat and Leonardo Corporation, was so poorly
4  designed that you couldn't get an accurate result from
5  it, yes.
6      Q.   Okay.  Did you blame that on one side or
7  another?
8      A.   At that time I was probably frustrated and
9  concerned about Leonardo Corporation's position.  I was
10 very frustrated that we couldn't see the full system
11 when I was at the factory, but as I went through this, I
12 feel like all parties are complicit in this mess.  And
13 I've said that, too.
14     Q.   Because of the test plan?
15     A.   Because of the overall construction of the
16 system and how it was put together and how it was
17 instrumented and how it was operated, and the lack of my
18 ability to actually get in there and see things.
19     Q.   Okay.  Now, so as of March 2016 you had not
20 done the water flow analysis yet to see if there would
21 actually be a higher error rate with a decreased water
22 flow?
23     A.   Well, we did not do flow analysis to
24 determine a higher error rate or not.  What we did was
25 we looked at the flow meter from what happens when you

Page 217

1  operate it outside of a valid regime, right.  If you're
2  operating outside of the defined operating parameters,
3  then we just wanted to find out what would be happening.
4  Why would, why did we see the corrosion line inside the
5  flow meter?  Why did these things exist?  I'm trying to
6  understand what the test was telling us.
7      Q.   Okay.  And we'll get into that in a little
8  bit more detail, but at that time you had already
9  determined that the report was, Penon's report was
10 completely bogus?
11     A.   At which, which time?
12     Q.   March 29, 2016, prior to undertaking the
13 water flow meter analysis?
14     A.   Yeah.  I, well, I had res, I would say I had
15 strong reservations about the validity of the flow meter
16 data.
17     Q.   In fact, you called it bogus?
18     A.   Yeah, possibly.
19          (Whereupon, Exhibit 9 was marked for
20 identification.)
21     Q.   You did.  I'm going to show you a document
22 we'll mark as Exhibit 9, bates stamped IH00087309.  You
23 know what, this appears to be different than the one
24 that I've got here.  Hold on.  Let me take that back.
25     A.   Oh, I'm sorry.

02/17/2017 Joseph Alan Murray

Page 250

1 the data that was provided under subpoena.
2    Q.    So all of the input was done by Industrial
3 Heat employees?
4    A.    Yes.
5    Q.    So you've got both of those in, and how did
6 you compare them using these programs? Was there a
7 complex analysis, or was it just plotting these out into
8 a graph?
9    A.    So first, well, there was also a third piece
10 of data. That was the data provided by Fabio Penon. He
11 provided that data, in again in March/April time
12 frame he gave us files. I kind of described that
13 earlier.
14    Q.    Mr. Penon did?
15    A.    I'm sorry. Fulvio Fabiani provided us files.
16 And so we, we looked at that, that data. Fulvio
17 Fabiani's data actually had two measurements for each
18 day. He had a measurement at, I believe the numbers
19 were 10:30 a.m. and 10:30 p.m. Mr. Penon's data -- I
20 have to be careful, make sure these names are right --
21 Mr. Penon's data was actually only once per day. It was
22 at I believe 10:30 p.m. each day. And the data from
23 Florida Power and Light was each day at midnight.
24       So what we did is we went back and we
25 cross-referenced it and made comparisons on a daily

Page 251

1 basis and made, to make sure that we were comparing
2 apples to apples. And then we plotted the data and took
3 the differences between the various data sets and
4 checked the integrity between Penon and Fabiani's data
5 and then checked the comparisons against Florida Power
6 and Light.
7    Q.    Okay. So let's look at Exhibit A of
8 Exhibit 11, which you should have in front of you.
9    A.    Okay.
10    Q.    Is that, sir, the comparison that you did?
11    A.    This is part of the comparison, yes.
12    Q.    Okay. I only see two lines here, one green
13 and one red.
14    A.    Underneath it you can see a few points where
15 Mr. Fabiani -- I'm sorry. We gotta look at the colors
16 here. It's hard to see at this scale. Mr. Fabiani's
17 data diverges from Mr. Penon's data. You can see right
18 about here, and you can see down here. So there were
19 very little divergence between Mr. Fabiani and
20 Mr. Penon's data. In fact, I would, I would argue they
21 were the same exact data.
22    Q.    Okay. The same exact?
23    A.    Except for these points where they diverge.
24 Because Mr. Fabiani's data, as I said, had two data
25 points per day where Mr. Penon's data only had one.

Page 252

1    Q.    Okay.
2    A.    And so they --
3    Q.    So that would be consistent with the data
4 points or the data being measured being accurate,
5 correct?
6    A.    It would certainly be consistent with the
7 data being measured coming from the same device.
8    Q.    Any reason to believe that either one of them
9 have manipulated the results?
10    A.    No.
11    Q.    Okay. So the green line is FP&L?
12    A.    Yes.
13    Q.    All right.
14    A.    Florida Power and Light, yes.
15    Q.    And for the vast majority of this, the green
16 line is higher than the red line?
17    A.    That's correct.
18    Q.    So the amount of power supplied by FP&L
19 substantially exceeds the amount of power that was
20 recorded going into this device?
21    A.    Yes, yeah.
22    Q.    Is that odd to you?
23    A.    No. You would imagine that a facility like
24 this, the actual reactor system would absorb some power,
25 but you would imagine that there are also some, some

Page 253

1 lights and the fan in the bathroom. There were a few
2 air conditioners around there. There was an office in
3 the front that I imagine would have heat and air
4 conditioning. So you would expect that Florida Power
5 and Light numbers would be higher than the numbers that
6 Mr. Penon and Mr. Fabiani measured. That would be a
7 reasonable expectation.
8    Q.    Florida Power and Light's measurements, how
9 were those taken?
10    A.    They were taken with a smart meter located on
11 the, on the building.
12    Q.    What type of smart meter?
13    A.    The smart meter that's approved by the State
14 of Florida.
15    Q.    You know it's approved by the State of
16 Florida?
17    A.    Yes.
18    Q.    How?
19    A.    I looked at the Florida Public Works
20 Commission website to find out if these things were
21 approved and how they were approved. And they indicate
22 that for investor-owned utilities, that they have
23 approval and then they give you a link to Florida Power
24 and Light, and in Florida Power and Light's data they
25 give the full description of how they implemented these

02/17/2017 Joseph Alan Murray

Page 254

1  programs and what the options are for the programs.
2  Q.   When was the FP&L device last calibrated?
3  A.   I have no idea.
4  Q.   Do you know if it's been three years?
5  A.   No idea.
6  Q.   Four years?
7  A.   I have, still have no idea.
8  Q.   Okay.  So you, you have absolutely no
9  information with respect to whether their data is
10  accurate or not?
11  A.   What I know is that they provided it under
12  subpoena.  They may or may not be accurate.
13  Q.   Okay.  So you don't have any reason to
14  believe that we should rely on those results as opposed
15  to the results of Mr. Penon or Mr. Fabiani; is that
16  correct?
17  A.   I disagree with that.  I, I would say that we
18  have to at least look at this and understand why, why
19  would it be this way.  And so my view is that if, if a
20  company like Florida Power and Light provides data under
21  subpoena, there would be an expectation that they would
22  provide, would provide proper and accurate data, and
23  it's a reasonable way to check the facility.  We did
24  this, I did this kind of anticipating that Florida Power
25  and Light would always be higher than the measurements

Page 255

1  that were made here.
2  Q.   Okay.  And, and the vast majority of the time
3  here they are?
4  A.   Yes.
5  Q.   With very few exceptions, in fact.  And one
6  exception is between November and December 2015?
7  A.   Yes.
8  Q.   And during that period it, it appears that
9  the power usage drops by the FP&L measurements, right?
10  A.   The FP&L measurement drops, yes, below the
11  measurements provided by Mr. Penon and Mr. Fabiani.
12  Q.   Do you know why that would be?
13  A.   I have no idea.
14  Q.   Do you know if it's accurate?  Do you know
15  if, perhaps, there is a problem with the device, the
16  measuring device?
17  A.   I have no information other than the data
18  that was provided in the subpoena by Florida Power and
19  Light.
20  Q.   Okay.  So you have no reason to believe that
21  that information is more accurate than the measurements
22  taken by Penon and/or Fabiani, correct?
23  A.   No, other than the fact that it's a Florida
24  utility, and they are regulated.  I would think that --
25  Q.   Do regulated Florida utilities ever have

Page 256

1  device malfunctions?
2  A.   Oh, absolutely.  Absolutely.  In fact, I
3  believe in this facility they actually replaced a smart
4  meter at some point earlier in the year.
5  Q.   Why do you believe that?
6  A.   Because the registration number of the meter
7  in the subpoenaed data changed.
8  Q.   When was that?
9  A.   I don't recall.  It was earlier in the year.
10  I would say sometime maybe in the May or June time
11  frame.
12  Q.   Okay.  Do you know if it was hooked up
13  correctly when it was replaced?
14  A.   I do, I do not.
15  Q.   Okay.  So what you've got here is just a
16  comparison side by side of the two number sets.  Is
17  there anything scientific about that other than looking
18  at it?
19  A.   It's, it's very alarming to see a drop.  I
20  mean in general when you see this, you see a very, very
21  consistent amount of power being absorbed by the reactor
22  system.  And when the reactor system has a major drop
23  like here in the, let's say between July and August you
24  see a drop off, which I think corresponds to the data
25  that says, hey, we had some, some reactors go offline,

Page 257

1  you see that drop.  That makes sense.  And then sometime
2  in October they brought all of the units back online and
3  the power goes up.
4  So all of the trends seem to be consistent
5  except for this period of time when, in about from
6  middle of November to the beginning of December where
7  you have a power level absorbed into the building lower
8  than the measured.  So that would give -- to me, there
9  are three potential explanations.  Number one, Florida
10  Power and Light could be wrong.  Number two, the
11  measurements made by Fabiani and Penon could be wrong.
12  And number four or -- I'm sorry, number three, the data
13  could have been manipulated.  On either part, on either
14  party.
15  Q.   Do you have any evidence that the data has
16  been manipulated --
17  A.   No, I don't.
18  Q.   -- by either one?
19  A.   Not by Florida Power and Light or by Fabiani
20  or Penon.
21  Q.   Okay.  So you have no evidence of
22  manipulation.  So what are you opining to specifically
23  here?
24  A.   Specifically, in this period it was, it was
25  determined by Mr. Penon that the measurements, the

02/17/2017 Joseph Alan Murray

Page 258

1   absorption of power was accurate and reflected what was
2   happening in the reactors.  But if, in fact, Florida
3   Power and Light indicates that their data is valid in
4   the data provided under subpoena, then it would be
5   impossible for them to absorb more power than Florida
6   Power and Light provided.
7      Q.   Now, you keep saying data provided under
8   subpoena, as if that makes it more accurate.  It's the
9   measuring equipment that makes it more accurate or not,
10  correct?
11     A.   Sure.
12     Q.   Not whether it was voluntarily provided or
13  under subpoena?
14     A.   Uh-huh.
15     Q.   Correct?
16     A.   Yeah.  My view is that if, if a, if a person
17  is providing data under subpoena, they're going to
18  probably provide the best possible data they have.  We
19  also know that Florida Power and Light has hourly
20  measurements for this facility, and we have not received
21  that data.
22     Q.   Okay.  But you don't know whether it was
23  measured correctly or not at that point in time.  All
24  you can tell based on this is that there is a
25  difference?

Page 259

1      A.   Yeah.  I don't know whether or not any of
2   these lines were measuring correctly at that time.
3      Q.   Okay.  So what I'm, what I'm trying to
4   determine, because you're, you're giving an opinion as
5   to this, is I can see this as well as you can.  I can
6   see this graph.
7      A.   Right.
8      Q.   I can see the, the lines where they drop
9   below the Penon number and, which would indicate that if
10  the FP&L measurements was right, it was supplying less
11  other than the power going into the unit.  Okay.  But
12  other than that, is there anything scientific that we
13  had to apply, any methodology to apply to, to create
14  this graph?
15     A.   This is just a summary graph.  And I think
16  there's, might be another plot in this --
17     Q.   There is.  And we'll --
18     A.   -- Exhibit B.
19     Q.   And we'll get to that one.
20     A.   Yeah, so there were a series of analyses that
21  I completed.  And we looked at the baseline power of the
22  building, and that gets to, more to the opinion.  This
23  is just the raw data comparison.  And if the raw data
24  showed that there was no period, then I think we could
25  have said it's potentially a reasonable expectation.

Page 260

1   But this is a problem, and these areas down here are a
2   problem.  What they're indicating is that nothing else
3   in the building is absorbing power, only the reactor,
4   and that's simply not realistic.
5      Q.   And as you said, there's one of three
6   options.  Either FP&L is wrong, Penon and Fabiani are
7   wrong, or there's manipulation on the data?
8      A.   On, on the part of some party, yes.
9      Q.   Okay.  So basically one or the other is
10  incorrect, and then the third option is that it was
11  intentionally incorrect?
12     A.   Right, by somebody.
13     Q.   By somebody?
14     A.   That's right.
15     Q.   Okay.  But you don't know which one is which?
16     A.   No.
17     Q.   Okay.  So your opinion is simply that this is
18  an area of concern where it drops below and the other
19  areas where it drops below slightly are --
20     A.   In the context of this one plot, yes.
21     Q.   Okay.  Now, the measurements taken by FP&L
22  were taken at what time?
23     A.   Midnight.
24     Q.   Midnight.  The measurements taken by Engineer
25  Penon were what time?

Page 261

1      A.   Well, he was only in the facility I believe
2   four times.  So I would imagine he only collected the
3   data.  He didn't actually take the measurements.  So
4   that's why I believe that Fabiani actually collected the
5   data in the logs and provided that to Mr. Penon.
6      Q.   That's your belief?
7      A.   It is my belief, yes.
8      Q.   Okay.  Do you know what data Mr. Penon
9   received directly?
10     A.   How would Mr. Penon receive data directly?
11     Q.   It's called the internet.
12     A.   Really?  No, I have no idea what data.  I
13  would be interested to see.  So he --
14     Q.   Do you know if he did?
15     A.   I do not.
16     Q.   Do you know if he had a computer on site?
17     A.   I believe that there were computers on site
18  that were collecting data from, from the instruments,
19  yes.
20     Q.   Okay.  Do you know if one of those was
21  Mr. Penon's, or Dr. Penon's I should say?
22     A.   I do not.
23     Q.   Okay.  Now, now you said that FP&L's data was
24  recorded at midnight?
25     A.   Yes.

02/17/2017 Joseph Alan Murray

Pages 278..281

Page 278

1    Q.   How long?
2    A.   Oh, I don't remember.  There were, I don't
3    know.  There was quite a bit of time that they provided
4    data for.
5    Q.   I don't, I don't have that either.
6    A.   Yeah.
7    Q.   Wouldn't you agree with me that during the
8    summer in Florida power usage is going to be
9    substantially higher than the winter time?
10   A.   Could be, yeah, but that would only make this
11   worse.  We try to draw a very conservative estimate.  So
12   if more and more power was going to more and more things
13   outside of that, that would only make it worse because
14   that line would draw up.  Because let's say you had an
15   air conditioner in the office space up front.  If you
16   were, had the air conditioner running, let's say 12
17   hours a day to keep the office space cool, then that
18   would actually increase the amount of power that was
19   going to --
20   Q.   Well, sir, sir, you've attributed, and I, you
21   know, for the most part the line of FP&L minus Penon or
22   FP&L minus Penon 3-day rolling average is above that
23   line with the exception of a few points of your average
24   power.
25   A.   Right.

Page 280

1    Q.   But your average applies -- I'm sorry.  I'm
2    looking at your baseline --
3    A.   Yeah.
4    Q.   -- power.
5    A.   So there are, I need to be careful.  There
6    are two things -- it's, it's actually energy per day.
7    There are two things being shown here.  There is a line,
8    a dotted line shown at zero, right, meaning that
9    anything below zero is, is indicative of the power
10   absorbed by the reactor being higher than the power
11   available from Florida Power and Light, and that's a
12   problem.  And why, and as I said, whether it's a problem
13   with Florida Power and Light or with Penon's
14   measurements or something else, we don't know at this
15   point.
16        Then the other line is, if you consider that
17   the building, which is the explanation in this previous
18   plot, the explanation for the difference between what
19   Penon and Fulvio Fabiani measured and what Florida Power
20   and Light said they delivered, that difference would be
21   the amount of power used outside of the reactors for
22   whatever purpose.
23   Q.   Okay.
24   A.   Office, whatever.  So that difference right
25   there is reflective of the nominal power absorbed in, in

Page 279

1    Q.   Or your baseline power as you defined it.
2    During the month of November to December 2015, what were
3    the temperatures outside?
4    A.   Oh, I don't know.  Florida, I'd guess
5    probably in the 70s or 80s maybe.
6    Q.   Did you look?
7    A.   Actually, in the simulation data we used the
8    NOAA published average temperatures to figure that out.
9    Q.   Simulation data, what simulation data?
10   A.   I'm sorry.  That 's a different part of
11   the --
12   Q.   We'll --
13   A.   -- what we'll talk about later.
14   Q.   Okay.  We'll get to that, but so you don't
15   know what the energy usage would have been at that time
16   for the building?  In any year for that matter?
17   A.   No.  What we would do is just to look at the
18   average of how much the building absorbed, but what we
19   should say is that anytime that the number is below
20   zero, it would indicate that there's an error somewhere
21   either with Florida Power and Light or with Mr. Penon's
22   data.
23   Q.   Based on your average, but your average --
24   A.   No, no, no.  Oh, I'm sorry, the 3-day
25   average, yes.

Page 281

1    the building.  But what we did was instead of using
2    that, because that's really difficult to say because we
3    don't know if, what was going on over in JM Products.
4    What we did is we just looked at the windows outside of
5    those periods of time to establish a very conservative
6    number and drew that very conservative number on this.
7    And so that's indicative of that number that I just
8    described.  Does that make sense?
9    Q.   To be honest, not really.
10   A.   Okay.
11   Q.   But I, I'm not going to ask you to do it
12   again.
13   A.   Okay.
14   Q.   The cumulative energy absorption, FP&L minus
15   Penon, what does that tell you?
16   A.   So what we're doing is for each one of these
17   data points --
18   Q.   I'm going to back you up for a second.  What
19   conclusion were you able to draw from --
20   A.   Again --
21   Q.   -- that graph?
22   A.   -- this was included in here.  The, the only
23   area of concern is actually right here where the
24   cumulative energy is actually decreasing in that period
25   of time.  So there's a slight decrease in the cumulative

02/17/2017 Joseph Alan Murray

Pages 282..285

Page 282

1  energy when you compare Florida Power and Light to
2  Penon, which indicates that one of those measurements is
3  clearly in error because you can't give energy back.
4      Q.   But you don't know which one?
5      A.   No, we don't.
6      Q.   So what does this, what does this tell you
7  other than there's an error in one of the measurements?
8      A.   What this tells us is anywhere that the value
9  is below zero is a, is an impossibility in the case
10 where the measurements are correct.  If the measurements
11 are incorrect, then that may be described by an error in
12 the data.
13     Q.   Okay.  So it says that there is an error in
14 the data, whether manipulated or --
15          (Conference call interruption.)
16     Q.   So sir, that just tells you that there's an
17 error, there's an error or inaccuracy in one of the data
18 sets, correct?
19     A.   Yes.
20     Q.   Okay.
21     A.   I think that's fair to say, yes.
22     Q.   So you've got two data sets that report one
23 thing consistently, fairly equivalent to each other, and
24 one data set that is different.  And of those three data
25 sets, at least one of them is incorrect?

Page 283

1      A.   I would agree with that, yes.
2      Q.   Okay.  But you don't know which one?
3      A.   No, not at this point.
4      Q.   And the investigation you've done doesn't
5  tell you whether it was Penon's or FP&L's or Fabiani's?
6      A.   Penon, FPL -- yes.
7      Q.   Okay.  How did you decide on what data to
8  review?
9      A.   In what context?  What are you --
10     Q.   In, in doing this analysis.
11     A.   Oh, in this?
12     Q.   Yes.
13     A.   I took the, the data from the final report.
14 I took the data that Fulvio Fabiani had provided us, and
15 then I took the data from the, the Florida Power and
16 Light subpoena.  That data were the only sources that I
17 was aware of for power absorption data.
18     Q.   Okay.  Who provided you that data?
19     A.   These three sources of data?  Well, I
20 received a copy of the final report from I, I believe I
21 may have even been on the distribution from Mr. Penon.
22 The data from Fulvio Fabiani was what he provided when
23 he met with us in Jones Day office.  And the Florida
24 Power and Light data was provided to me by counsel.
25     Q.   So ultimately based on the graphs that you

Page 284

1  did here, you came to the conclusion that the results
2  were at odds with the amount of power reported between
3  the three measuring entities, we'll call them?
4      A.   Yes.
5      Q.   But you make no opinion as to why they're at
6  odds?
7      A.   Not at this point.
8      Q.   Okay.  Your next opinion stated, sir, is
9  that, "Mr. Murray compared these numbers to the actual
10 power provided by FP&L to the Doral location and found
11 numerous inaccuracies" -- I'm sorry.  That's part of the
12 same one.
13     A.   Which, which, what's the --
14     Q.   Okay.
15     A.   -- document number on that one?
16     Q.   That is 11.
17     A.   Oh, it's this one.  I'm sorry.
18     Q.   Yes, your report.  I'm sorry.  The second
19 part was, "Mr. Murray also compared Penon and Fabiani's
20 data to the historical average amount of power data."
21 Is that what we were discussing?
22     A.   Yes.
23     Q.   That red line?
24     A.   Yes.
25     Q.   And what did that tell you?

Page 285

1      A.   That just said if we, if we had a
2  conservative estimate for the, the amount of absorption
3  into the building for other purposes besides the
4  reactor, that, in fact, there were many more days where
5  the measurements were below, but again it's the same
6  problem.  If Florida Power and Light's data was
7  inaccurate, then it's, it's, there are equal probability
8  of which source of data was incorrect.
9      Q.   Okay.  So it doesn't tell you one way or
10 another whether there's been manipulation or, or
11 otherwise with respect to any set of data?
12     A.   No.
13     Q.   Your next opinion states that you "compared
14 the reported power input to the E-Cat plant reported by
15 Penon against the reported coefficient of power, COP,
16 reported by Penon as reflected in Exhibit C."  Let's
17 look at Exhibit C for a moment.  And in doing so,
18 "Mr. Murray will testify that there is no logical reason
19 why the COP should be changing inversely to the amount
20 of power inputted given the same E-Cat plant was used
21 throughout the guaranteed performance test."  I'm sorry,
22 what was the, the formula for COP calculation?
23     A.   It was I believe based on our reproduction of
24 the final report data, it was the energy out over the
25 energy in, or power out over power in on a per day

02/17/2017 Joseph Alan Murray

Page 310

1    Q.   Which --
2    A.   -- the flow is actually pretty amazing how
3    much flow there was in the room.  So because there was a
4    wall, there was a half wall, I don't know if you recall,
5    but there was a half wall.  And so you heat, you cause
6    this flow.  The flow comes up and collapses, and it
7    rolls back over.  So that was the basis of our
8    assumptions for our simulation, was that the vent was
9    open.  So air could go out the top, but the doors were
10   closed, like when we were there on that day in February.
11   Q.   So you didn't run a simulation with the doors
12   open?
13   A.   The doors weren't open when we were there.
14   Q.   But you do realize they open and did --
15   A.   Yeah.
16   Q.   Did you ask anyone there whether they were
17   open the majority of the time that it was running?
18   A.   No.  Because --
19   Q.   It was just --
20   A.   -- we were just looking at it, why,
21   specifically why was looking at why wasn't it hotter and
22   more uncomfortable in the building when we were there
23   when it was dissipating all this out.
24   Q.   Were there ventilation fans?
25   A.   I'm sorry?

Page 311

1    Q.   Ventilation or, I'm sorry.  Were there, were
2    there fans --
3    A.   Yeah.
4    Q.   -- to move air?
5    A.   There were two fans located kind of at the
6    aft end of the building, kind of the, the rollup door
7    side of the building.
8    Q.   Yeah.
9    A.   They were not operational when we were there
10   either.
11   Q.   Okay.  But did you work those into the
12   simulation?
13   A.   No, because they weren't in operation when we
14   were there.
15   Q.   Just for that short period while you were,
16   did you ask anyone whether those were normally in
17   operation --
18   A.   Yeah, actually we did.
19   Q.   -- during the --
20   A.   We asked Fulvio Fabiani if they were.
21   Q.   What did he say?
22   A.   He said from time to time they were on, yes.
23   Q.   Okay.  But how often is from time to time?
24   A.   You would have to ask Fulvio Fabiani.
25   Q.   What was the air transfer rate in that

Page 312

1    building?
2    A.   Meaning, what do you mean?
3    Q.   Like how often did the air circulate through?
4    A.   You mean vented outside and fresh air coming
5    in or?
6    Q.   Yeah, absolutely.
7    A.   We, I made an assumption about the building,
8    and so I have no idea.
9    Q.   What was the assumption you made?
10   A.   The assumption was that there was a vent at
11   the top and --
12   Q.   Just one?
13   A.   The, yes.  The, where the vent hole was
14   above, and that it was just heating of that room.
15   Q.   Okay.  If there was a second vent, would
16   that, would that change your calculations?
17   A.   Yeah.  It would change the heating, yes.
18   Q.   And if the doors were open, that would change
19   the calculations as well --
20   A.   Yes.
21   Q.   -- for your simulation?
22   A.   Yeah.  But they weren't there when I was
23   there.
24   Q.   What about if the fans were on?  Would that
25   change your calculations?

Page 313

1    A.   For some of the convection, yeah.  It would
2    actually change the calculation somewhat, yes.
3    Q.   How large were the bay doors?
4    A.   I would have to look in the simulation.  I
5    believe that they were approximately 10 feet wide and
6    about 14 feet high, but that was an approximation.
7    Q.   Okay.  What was the construction of the
8    building?
9    A.   Cement.  So there were concrete walls, and
10   there were concrete ceiling modules with a kind of beam
11   structure.
12   Q.   Do all types of concrete absorb the same
13   amount of energy, same amount of heat?
14        MR. LOMAX:  Objection to the form of the
15   question.
16   A.   No.  All concrete is not identical.
17   Q.   Okay.  So did you make any specific notation
18   as to the type of concrete?
19   A.   Yeah.  We used the average for concrete for
20   the material, and we also used the average temperature
21   for that region from NOAA, and we used the average wind
22   flow velocity on the outside of the building.
23   Q.   Were there any windows in the building?
24   A.   There were no windows in the back section
25   that I had access to.

02/17/2017 Joseph Alan Murray

Page 314

1    Q.   Okay.  What about the front section?
2    A.   There appeared to be some windows in the
3  office area.
4    Q.   In the office area, so downstairs?
5    A.   Well, there were some windows in the front,
6  and there may have been some windows up above as well.
7  I was never in the office area.
8    Q.   Do you know what was up on the second floor?
9    A.   Huh-uh.
10    Q.   Okay.  What about a heat exchanger?  Did you
11  see the heat exchanger?
12    A.   We were not given access to anything on the
13  other side of the wall.
14    Q.   Okay.  Now, if there was a heat exchanger
15  there, would that affect your calculations or
16  simulation?
17    A.   That's why we actually did a 10 percent waste
18  heat calculation, the 100-kilowatt calculation.  Because
19  if we just gave the benefit of the doubt that maybe
20  there was some mechanism that we were not privy to
21  dissipating most of that heat, you would still have
22  losses in the system and you would still have to get
23  that heat out.  So what we assumed, which actually was a
24  very generous assumption, was that in the case of the
25  100 kilowatt, that the, a 10 percent waste heat was

Page 315

1  actually a very modest number compared to the 1,000
2  kilowatt plant waste heat.
3    Q.   What temperature was the, the room at 100
4  kilowatts?
5    A.   So what I did was I drew section lines along
6  two locations.  I drew a line directly down the path
7  through the door that went from the front to the back,
8  and then I drew a line up above.  And on those lines I
9  showed the temperature at each one of the fine element
10  points.  And the temperature ranged from about 55
11  degrees Celsius up to about 68 degrees Celsius along
12  those two lines and in the section line.
13        There were other places where it was all the
14  way up at 100 degrees C, but I felt like, you know, that
15  was the area where most people were operating and
16  working, so that would be the area to be concerned with.
17    Q.   Do you know what the specifications of the
18  heat exchanger were?
19    A.   I was -- which heat exchanger?
20    Q.   The heat exchanger used at the facility.
21        MR. LOMAX:  Objection to the form of the
22  question.
23    A.   I don't, I don't have any information about a
24  heat exchanger in the facility.
25    Q.   Okay.  And so you didn't use any of that

Page 316

1  information in preparing your simulation?
2    A.   Well, it wasn't provided, yeah, so I don't
3  have that information.
4    Q.   Okay.  So you, you only performed a
5  simulation assuming one vent, closed doors --
6    A.   Uh-huh.
7    Q.   -- no heat exchanger?
8    A.   Well, I mean so here's the, we have to be
9  careful when we say no heat exchanger.  I assumed that
10  there must have been some mechanism to dissipate a good
11  amount of the heat because there was no, clearly there
12  was no work being done in the system because there was
13  no pressure, right.  The pressure was reported at zero
14  continuously throughout the test.  So there was no work
15  being completed.
16        So if you consider that, I said, well, let's
17  just give them the benefit of the doubt and say 90
18  percent of the heat they were able to get rid of in some
19  way.  Maybe that was your heat exchanger.  Maybe that
20  was something else, but there were still losses in the
21  system.  So the rest of that heat I said was, well,
22  let's try 10 percent, and then let's try 25 percent, and
23  let's try 50 percent, different levels of efficacy of a
24  heat exchanger, and then do the simulations and look at
25  it and see what the temperature was.

Page 317

1        So I was surprised to see that the
2  temperature in the simulation would reach as high as it
3  did even at 100 kilowatts, but then I reflected back on
4  the fact that it's Florida.  It's pretty darn hot.
5  There was no air conditioning in the building other than
6  the air conditioner for the small ISO container lab.
7  And furthermore, the -- sorry there -- the, so, I lost
8  my train of thought with that.
9    Q.   What exterior or, exterior air temperature
10  did you presume if you were --
11    A.   25 degrees Celsius.
12    Q.   Which is what Fahrenheit?
13    A.   I don't know.  You would have to do the
14  calculation.  Say about 80.  Approximately.
15    Q.   You don't know what the losses were on the
16  heat exchanger, do you?  You're just --
17        MR. LOMAX:  Objection.
18    A.   I've --
19    Q.   -- making an assumption?
20    A.   I, I've, I don't know.
21    Q.   Okay.
22    A.   I didn't know about any heat exchanger.
23    Q.   Okay.
24    A.   So for the fourth time, I'm not aware of any
25  heat exchanger.

02/17/2017 Joseph Alan Murray

Page 350

1 Products, Inc., Henry Johnson, and James Bass. I only
2 have a couple of questions for you. To start, did you
3 ever meet Mr. Henry Johnson?
4     **A.   I have not.**
5     Q.   You have not. Great. Have you ever spoken
6 with him on the phone or via e-mail?
7     **A.   I have not.**
8     Q.   Okay. Have you ever met Mr. James Bass?
9     **A.   I have not.**
10    Q.   You have not. Have you ever spoken with him
11 via telephone or e-mail?
12    **A.   I have not.**
13        **MR. LEÓN:   Okay. That's all the questions I**
14    **have. Go ahead, Rudy.**
15        **THE WITNESS:   That was easy. I like that.**
16        **MR. NUÑEZ:   All right.**
17            EXAMINATION
18 BY MR. NUÑEZ:
19    Q.   Good afternoon, Mr. Murray. My name is Rudy
20 Nuñez. We also met the other day at Dr. Rossi's
21 deposition. Can you hear me clearly through the
22 speakerphone?
23    **A.   Yes.**
24    Q.   All right. You let me know if you have any
25 problems or trouble hearing. Okay?

Page 351

1     **A.   Okay.**
2     Q.   All right. As you testified, you know,
3 several times today, you brought up Mr. Fabiani. I
4 represent Fulvio Fabiani and his company, an LLC by the
5 name of United States Quantum Leap. I certainly don't
6 have the time to go back through all that you've done
7 that I would want to, but I did want to, you know, touch
8 on a few points to kind of maybe clear up some questions
9 I had.
10        Let me ask you. When, when you first came on
11 board with Industrial Heat with regards to Dr. Rossi's
12 technology, E-Cat, and the plant, what were you told at
13 the start about Mr. Fabiani?
14    **A.   I was told that Fulvio Fabiani was a close**
15 **family friend of Mr. Rossi's wife. I, I believe her**
16 **name is Maddalena, and that she was, you know, a close,**
17 **almost like a mentor of his, and that Fulvio had worked**
18 **with, with Mr. Rossi in Italy and on other activities.**
19 **I also learned that he was a, an avid pinball machine**
20 **both repairman and developer.**
21    Q.   Anything else?
22    **A.   Other than he had developed some hardware**
23 **devices for the, the reactor system. And I don't, I**
24 **don't remember the exact nature of that. And that he**
25 **had spent a lot of time in, in Raleigh.**

Page 352

1     Q.   What were you told about his work
2 performance, if anything?
3     **A.   That he, you know, he showed up, but you**
4 **know, he was just kind of a participant in the data**
5 **collection and, at the plant. He was kind of like**
6 **Dr. -- or Mr. Rossi's kind of assistant, if you will, or**
7 **technical assistant, kind of helping him out in the**
8 **facility.**
9     Q.   Did anyone make any comments to you or talk
10 to you about any concerns they had with him?
11    **A.   I think there was, there was a, a modest**
12 **level of concern with how close he was with Mr. Rossi**
13 **relative to just, you know, the close relationship and**
14 **whether or not he would be fully -- fully disclose**
15 **everything to us, but I think the only thing that he**
16 **hasn't disclosed as far as I'm aware is the actual final**
17 **report and, and I think maybe he has produced some data.**
18 **I haven't looked at it though. So it was only a**
19 **question of if he would release all of the data.**
20    Q.   So to your understanding, the only thing he
21 didn't do was turn over that final report?
22    **A.   I believe that's, that's correct, yes.**
23    Q.   And I think the raw data too. I don't want
24 to, you know, I'm not trying to trip you up or anything.
25    **A.   Right, no, no, no. Yeah, I think the raw**

Page 353

1 **data, he indicated that there was raw data stored on a**
2 **server in Russia that was encrypted and he had to, he**
3 **put it there for safekeeping, and I believe that that**
4 **data has been released only maybe in the last few days.**
5 **I, I have not looked at it. I haven't seen it. I**
6 **haven't inspected it, but I believe that it has been**
7 **released in the last few days. But I have not seen a**
8 **final report, and I don't know anything about, you know,**
9 **if a final report was actually produced.**
10    Q.   All right. Now, getting back to, I was
11 asking you about conversations and concerns. And again
12 I don't want to put words in your mouth, but correct me
13 if I'm wrong that it seemed like you had heard that
14 there may be concerns about what he was, how honest he
15 was being with Industrial Heat. Is that a fair way to
16 phrase it?
17    **A.   I would say that the concern was about his**
18 **allegiance and his close relationship with Mr. Rossi**
19 **rather than -- that's how I would characterize it.**
20    Q.   Okay. And do you think, was that something
21 that was knew over time or would they knew that from the
22 beginning?
23    **A.   I --**
24    Q.   I should say -- let me strike that.
25        Was that a new concern or a concern that they

02/17/2017 Joseph Alan Murray

Page 362

1    THE WITNESS: Chris, you weren't there, were
2  you?
3    A.   No.  I think it was --
4    MR. LOMAX: I guess I, I can't answer, but.
5    A.   Yeah, I'm sorry.  I'm sorry.  Yeah, I
6  believe, to the best of my recollection it was just the
7  three of us.
8    Q.   Were, were any, was anything offered to
9  Mr. Fabiani for him to turn over the remaining report
10  and data that he ended up claiming was due?
11    A.   Well, Mr. Fabiani actually offered up, he
12  said, look, I'm writing this final report and I have all
13  this data.  And I don't mean the specific details, but
14  he said we sampled data for specific things, I don't
15  know if it was every 10 seconds or 5 seconds, throughout
16  the entire test period using his system.
17    And he said he was completing a final report
18  for Industrial Heat.  And we said, great.  And I believe
19  that there was even a discussion of potentially trying
20  to have him help with other aspects, but I don't recall
21  the, the details of that.  My, really I was interested
22  in the data and interested in the final report to find
23  out what was going on, because I had hadn't seen any
24  details of how all this stuff was collected and pulled
25  together.

Page 363

1    Q.   Was there any offer made to Mr. Fabiani for
2  an extension of continuing to do work for Industrial
3  Heat?
4    A.   I think --
5    MR. LOMAX: Objection.
6    A.   Okay.  I, I think there was, but I can't
7  recall specifically.
8    MR. ANNESSER: One and a half minutes, Rudy.
9    Q.   And what were you told about the purpose of
10  that meeting with Mr. Fabiani?
11    MR. LOMAX: Objection to the extent it's
12  about communications with counsel.  Otherwise you
13  can answer.
14    A.   Okay.  I was --
15    Q.   What was that?
16    A.   I'm sorry.
17    MR. LOMAX: Could you hear me Rudy?
18    MR. NUÑEZ: Yeah.
19    Q.   I was going to say I don't want to hear what
20  the attorneys told you.  I want to hear what Mr. Vaughn
21  or Mr. Darden told you or Mr. Dameron, whoever else was
22  there.
23    A.   Yeah, well, it was just JT and I.  What was
24  your question?  The purpose of the meeting?
25    Q.   Well, yeah.  Let me clear that up.  You know,

Page 364

1  what were you told either before or, you know, at the
2  meeting by the Industrial Heat people of the purpose of
3  that meeting with Mr. Fabiani?
4    A.   This is my recollection going back to that
5  time, but my recollection was that Fulvio had this data.
6  We had requested data.  And so we were going to meet
7  with him to find out how we get a copy of the data and
8  then pay him the final payment that was offer -- you
9  know, that was due him.  And so we actually went down
10  there with the intention of, of doing that.
11    And so, and I, I don't recall if on the first
12  day he didn't have the data and then he went and he got
13  the data, some of the data, the spreadsheets on the next
14  day.  And then he said he would deliver the final report
15  and some of the other, the, the final report and the raw
16  data, you know, within the next few days.  And we said,
17  great, and then we'll just pay you for the final, you
18  know, payment due.
19    Q.   And who set up that meeting?  Who, who
20  scheduled it or, do you know?
21    A.   I suspect JT Vaughn, but I, I don't, I don't
22  recall.
23    Q.   And I think your testimony was at that
24  meeting that Mr. Fabiani came with spreadsheets and
25  documents to turn over?

Page 365

1    A.   Well, the, the next day.  He came back with
2  just spreadsheets.  Sorry.
3    MR. LOMAX: Rudy, do you have one more
4  question?  The time is up, but I, you know --
5    MR. NUÑEZ: Well, here's the thing, guys.  I
6  mean I'm not there, but I marked my watch when the
7  court reporter said 31 minutes.  I think John had
8  one question.  Francisco made two questions.  I
9  still have, I mean by my calculation, I've got like
10  7 minutes left.  You know, time does not work
11  differently down here, and I marked it when the
12  court reporter said 31 minutes.  So I'm not sure how
13  I've lost these 8 minutes because John did not take
14  up 8 minutes asking questions.
15    MR. LOMAX: Well, the court reporter --
16    MR. NUÑEZ: We can go back to the video or we
17  can go back to something.  I got a couple more
18  questions left.  I don't think I have 10 minutes,
19  but I marked my watch when the court reporter said
20  31 minutes.
21    MR. LOMAX: Well, you know, Rudy, this is
22  Chris.  I would, I would be willing to extend 5, 5
23  more minutes.  The court reporter is telling us that
24  the time is up.
25    THE WITNESS: So let's go.  If you have a

02/17/2017 Joseph Alan Murray

Page 366

1    couple more questions, go ahead, Rudy, quickly.
2          MR. NUÑEZ:  Yeah.  I don't have that much, so
3    I appreciate it, Mr. Murray.
4    BY MR. NUÑEZ:
5       Q.   And I'll move on from the meeting at Jones
6    Day.  Let's go to the -- and I think it's in your expert
7    report.  You've been asked a lot about it.  I'm not
8    trying to retread all this stuff, but I do want to
9    confirm a couple things just to clear up with my
10   questions.
11         There were -- and correct me if I'm wrong.
12   Mr. Fabiani provided what I would call, and you correct
13   me, electric power consumption numbers; is that correct?
14      A.   He provided us with, I think it was a
15   spreadsheet for each month or maybe it was one
16   spreadsheet that had numerous tabs.  I don't recall
17   which.  And it had the time stamp for twice a day,
18   cumulative energy in those 12-hour periods.  And he
19   provided us with a, a log that kind of showed dates and
20   events when things were turned on and the power went off
21   and this and that and different events, so what I would
22   describe as a log of events.
23         And I think those were the two major items
24   that he had provided to us on the second day, and then
25   he was going to wait and provide us with the final

Page 368

1       Q.   Okay.  So that was 14 out of, I think it was
2    350 or almost a year, correct?
3       A.   I believe the number in the final report was
4    total of 357 days, and then Mr. Penon deducted 5 or 6
5    days.  I don't remember the exact number.  And so there
6    was a cumulative number of maybe 352 days of, of
7    operational days.
8       Q.   And for lack of a better word, I think there
9    were discrepancies between Fabiani's numbers versus the
10   FP&L's numbers.  Do you have any reason to believe that
11   that is a result of Mr. Fabiani manipulating the data
12   that he was putting into his spreadsheets?
13      A.   At this point, I have no evidence of that
14   whatsoever.
15      Q.   And do you anticipate any kind of work in the
16   future between now and trial where you would come to a
17   different conclusion?
18      A.   I can't say at this point because I think
19   that there's a lot of data that's just becoming
20   available.  For example, I think the raw data from
21   Mr. Fabiani just became available, and I have not looked
22   at that at all.
23      Q.   Okay.  Let me ask you, and this will --
24         MR. LOMAX:  And Rudy --
25      Q.   I'm close to the end here.

Page 367

1    report and the other data a few days later.  He also
2    said that he had taken data from the flow meter from
3    time to time, and he had logged it into a spreadsheet on
4    the desktop of his computer, but his computer was locked
5    up and he couldn't get to it, and he was going to
6    provide that data to us as well, but he didn't produce
7    that data either.
8       Q.   Okay.  And now my question relates -- I think
9    you made an analysis that his power consumption numbers
10   for the plant don't match the readings from Florida
11   Power and Light; is that correct?
12      A.   No, which just incidentally we would not
13   anticipate that they match.  We would anticipate that
14   the building would absorb more power than just the
15   reactor because there was other, there were other
16   electrical devices in the building.  The primary concern
17   is where the value goes negative, where the building is
18   actually absorbing less, less energy per day than the,
19   than reported by Mr. Fabiani and Mr. Penon.
20      Q.   Okay.  And how many times did that happen?
21      A.   How many times?  There was a 14-day period.
22   I think cumulative number of days where it was below
23   zero was 14 days, and that's just pure absolute
24   negative.  And, you know, and that's just assuming that
25   nothing else in the building absorbed power.

Page 369

1          MR. LOMAX:  This is Chris and --
2       Q.   Do you have any evidence --
3          MR. LOMAX:  -- time is up.
4       Q.   -- in your investigation and your work for
5    Industrial Heat that Mr. Fabiani manipulated improperly
6    any data?
7       A.   At this point, no, I do not.
8          MR. LOMAX:  And, Rudy, this is Chris.  That's
9    the time.
10         MR. NUÑEZ:  All right.  And, yep, that's
11   going to match up with my time.  And I will say
12   thank you, Mr. Murray.  Thank you, everyone.  Have a
13   good weekend.
14         THE WITNESS:  Okay.  No problem.  Thank you,
15   guys.
16         THE VIDEOGRAPHER:  This concludes the
17   videotaped deposition of Joseph Murray.  We are off
18   the record at 5:20 p.m.
19   (Stenotype record continued off the video record.)
20         MR. ANNESSER:  Just as a formality, sir, you
21   have the right to read or waive, which means you can
22   read the deposition before it's finalized, or you
23   can waive that right.
24         THE WITNESS:  I would like to read it.
25         MR. ANNESSER:  Okay.

02/17/2017 Joseph Alan Murray

Page 370

```
 1      MR. LOMAX:  And Defendants are going to
 2  designate Mr. Murray's testimony at this time as
 3  highly confidential due to a lot of the information
 4  that was provided here today.
 5      (DEPOSITION CONCLUDED AT 5:20 P.M.)
 6          (SIGNATURE RESERVED)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 371

```
 1  STATE OF NORTH CAROLINA
    COUNTY OF WAKE:
 2
 3          REPORTER'S CERTIFICATE
 4      I, LAUREN McINTEE, RPR, a Notary Public in
 5  and for the State of North Carolina, do hereby certify
 6  that there came before me on Friday, the 17th day of
 7  February, 2017, the person hereinbefore named, who was
 8  by me duly sworn to testify to the truth and nothing but
 9  the truth of his knowledge concerning the matters in
10  controversy in this cause; that the witness was
11  thereupon examined under oath, the examination reduced
12  to typewriting under my direction, and the deposition is
13  a true record of the testimony given by the witness.
14      I further certify that I am neither attorney
15  or counsel for, nor related to or employed by, any
16  attorney or counsel employed by the parties hereto or
17  financially interested in the action.
18      IN WITNESS WHEREOF, I have hereto set my
19  hand, this the 20th day of February, 2017.
20
21
22
    LAUREN McINTEE, RPR, Notary Public
23  Notary Number:  201616000044
24
25
```

Page 372

```
 1          WITNESS'S CERTIFICATE
 2
 3      I, JOSEPH ALAN MURRAY, do hereby certify
 4  that I have read and understand the foregoing
 5  transcript and believe it to be a true, accurate, and
 6  complete transcript of my testimony, subject to
 7  the attached list of changes, if any.
 8
 9                  JOSEPH ALAN MURRAY
10
11      This deposition was signed in my presence by
12  _____, on the _____ day of
13  _____, 2017.
14
15
16                  Notary Public
17
18  My commission expires:
19
20
21
22
23
24
25
```

Page 373

```
 1  CaseWorks, Inc.
    811 Ninth Street, Suite 260        (Page 1 of 2)
 2  Durham, North Carolina 27705
 3      E R R A T A   S H E E T
 4  Re: Andrea Rossi, et al. vs. Thomas Darden, et al.
    Deposition of: JOSEPH ALAN MURRAY
 5
 6      Please read this transcript with care, and if
    you find any corrections or changes you wish made, list
 7  them by page and line number below.  DO NOT WRITE IN
    THE TRANSCRIPT ITSELF.  Return the
 8  Certificate and Errata Sheet after
    it is signed.  We would appreciate your prompt
 9  attention to this matter.
10      To assist you in making any such corrections,
    please use the form below.  If supplemental or
    additional pages are necessary, please furnish same and
11  attach them to the errata sheet.
12  Page _____ Line _____ should
13  read:_____
14  Page _____ Line _____ should
15  read:_____
16  Page _____ Line _____ should
17  read:_____
18  Page _____ Line _____ should
19  read:_____
20  Page _____ Line _____ should
21  read:_____
22  Page _____ Line _____ should
23  read:_____
24  Page _____ Line _____ should
25  read:_____
```