# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 16-21199-CIV-ALTONAGA/O'Sullivan

**ANDREA ROSSI**, *et al.*,

      Plaintiffs,

v.

**THOMAS DARDEN**, *et al.*,

      Defendants.

_____/

## ORDER

    **THIS CAUSE** came before the Court on Plaintiffs, Andrea Rossi and Leonardo Corporation's *Daubert*[1] Motion to Strike and Exclude Defendants' Experts ("Plaintiffs' Motion") [ECF No. 215][2]; and Defendants' Motion to Exclude the Opinions and Testimony of Dr. K. Wong ("Defendants' Motion") [ECF No. 197].[3]

    Plaintiffs seek to exclude the Expert Disclosure of Joseph A. Murray ("Murray Disclosure") [ECF No. 215-1] as well as the Expert Report of Rick A. Smith ("Smith Report") [ECF No. 215-2] and the Supplemental Expert Report of Rick A. Smith ("Supplemental Smith Report") [ECF No. 235-10]. Plaintiffs level challenges to these documents based on: (1) Defendants' purported failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B), and (2) the documents' alleged failure to satisfy *Daubert* and the Federal Rules of Evidence. (*See generally* Pls.' Mot.). For their part, Defendants challenge the Expert Disclosure of Dr. Kaufui

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[2] Defendants filed an Opposition ("Defendants' Opposition") [ECF No. 235], to which Plaintiffs filed a Reply ("Plaintiffs' Reply") [ECF No. 252].

[3] Plaintiffs filed a Response ("Plaintiffs' Response") [ECF No. 233], to which Defendants filed a Reply ("Defendants' Reply") [ECF No. 248].

V. Wong [ECF 197-1] under *Daubert* and the Federal Rules of Evidence. The Court has considered the parties' written submission, the record, and applicable law.

## II. BACKGROUND

A fuller factual background can be gleaned from the parties' pleadings and the Court's previous Orders. Relevant to some of the issues raised in the present briefing, the Scheduling Order [ECF No. 23] set the following discovery-related deadlines: the parties exchange written expert summaries or reports by January 30, 2017; the parties exchange rebuttal expert witness summaries or reports by February 13, 2017; the parties complete all discovery by February 27, 2017; and the parties file any pre-trial motions and *Daubert* motions by March 21, 2017.

In accordance with the first deadline, Defendants served the Murray Disclosure and Smith Report on January 30, 2017. Murray was deposed on February 17, 2017. (*See* Murray Dep. Tr. [ECF No. 215-3]). At the deposition, he referred to a written report he had prepared for Defendants' counsel, but which had not been served on Plaintiffs, stating he needed to rely on this report to answer some of Plaintiffs' questions. (*See* Pls.' Mot. 8 (citing Murray Dep. Tr. 224:10–22, 227:2–16)). Plaintiffs assert, and Defendants do not appear to dispute, the Murray Disclosure does not satisfy the requirements of written expert reports under Rule 26(a)(2)(B). (*See* Pls.' Mot. 9; Defs.' Opp'n 6–7 (arguing Rule 26(a)(2)(B) is not applicable and Defendants were only required to provide a summary)). Defendants did not provide the written report prepared by Murray. (*See* Pls.' Mot. 8). Plaintiffs do not relate what action, if any, was taken to obtain the report, whether in conference with Defendants or before Magistrate Judge John J. O'Sullivan.

In addition to the Murray Disclosure, on January 30, Defendants served Plaintiffs the Smith Report. It contains three opinions and indicates Smith had "not yet been able to inspect

the E-Cat site in Florida." (Smith Report 2, 22). At Smith's deposition on February 27, Smith revealed he had formed an additional, undisclosed opinion the "E-Cat never produced superheated steam." (Pls.' Mot. 10 (citing Smith Dep. Tr. [215-4] 126:2–9)). After the deposition, Smith visited the Doral facility on March 2, 2017 (*see* Supp. Smith Report 3), and on March 20, 2017, Defendants served the Supplemental Smith Report which contains six conclusions not previously disclosed in the original Smith Report or at the deposition. (*See id.* 28, 30).

The Wong Disclosure was served on Defendants on February 13, 2017, within a fortnight of the original expert disclosure deadline, and was meant to operate as a rebuttal report to the Murray Disclosure and Smith Report. (*See* Wong Disclosure 3). Discovery closed on February 27, and the parties filed their respective Motions by the dispositive motion deadline.

## III. ANALYSIS

### A. Failure to Comply with Rule 26 – The Murray Disclosure

Plaintiffs request the Murray Disclosure and the Smith Reports be excluded in their entirety because of Defendants' alleged discovery-related violations under Federal Rule of Civil Procedure 26. The Scheduling Order makes clear all discovery matters are referred to Judge O'Sullivan and no written discovery motions should be filed. The Court has previously denied two of Plaintiffs' discovery-related motions. (*See* Order [ECF No. 180]; Order [ECF No. 216]). Although the Court will not entertain those Rule 26 challenges related to the Smith Reports, the Court finds it prudent to address the challenges related to the Murray Disclosure.

Rule 26 governs duties to disclose and contains other general provisions regarding discovery. *See* FED. R. CIV. P. 26. Subsection (a)(2) of the Rule draws a distinction between witnesses who must provide a written report and those who do not. *Compare* FED. R. CIV. P.

26(a)(2)(B) *with id.* 26(a)(2)(C). "[I]f the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," a written expert report prepared and signed by the witness must accompany the expert disclosure. FED. R. CIV. P. 26(a)(2)(B) (alteration added). By contrast, if an expert is not required to submit a written report, the disclosure is "considerably less extensive." *Id.* 26 Advisory Committee's Notes (2010 Amendment). A movant seeking to strike expert disclosures bears the burden of showing a valid basis for doing so, but the party seeking to avoid producing an expert report bears the burden of demonstrating the report is not required. *See In re Denture Cream Products Liab. Litig.*, No. 09-2051-MD, 2012 WL 5199597, at *4 (S.D. Fla. Oct. 22, 2012) (citations omitted).

Joseph Murray, former Vice President of Engineering of Industrial Heat (*see* Defs.' Opp'n 6 (citation omitted)), seeks to offer opinions regarding: (1) the power sold by Florida Power & Light versus the power reportedly absorbed by the E-Cat during testing at the Doral facility; (2) the inverse relationship between the power input to the Plant and the coefficient of power;[4] and the results of (3) heat simulations and (4) water flow testing he conducted to recreate E-Cat testing conditions in the Doral testing facility (*see generally* Murray Disclosure).

Plaintiffs argue Murray should have submitted a written expert report under Rule 26(a)(2)(B) but failed to do so. (*See* Pls.' Mot. 7–10). According to Defendants, the Murray Disclosure was sufficient under Rule 26 because Murray is a "hybrid" witness who will provide both fact and opinion testimony based on his specialized knowledge. (*See* Defs.' Opp'n 7 n.4). Defendants argue hybrid witnesses need only submit disclosures to comply with Rule

---

[4] The term "coefficient of performance," as used by the parties, refers to the rate of energy produced by the Plant to energy consumed by the Plant. (*See* Defs.' Mot. 1; *see also* Fourth Amended Answer, Additional Defenses, Counterclaims, and Third-Party Claims ("Counterclaims") [ECF No. 132] ¶ 2).

26(a)(2)(C), and the Murray Disclosure was sufficient under this subsection. (*See id.* (citation omitted)).

An expert report might not always be required of a hybrid witness providing both factual testimony and opinions based on scientific, technical, or specialized knowledge. *See Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *4 (M.D. Fla. Apr. 27, 2009) (quoting *Prieto v. Malgor*, 361 F.3d 1313, 1318 (11th Cir. 2004) (per curiam)) (other citation omitted). "The determinative factor is the witness's function in the suit." *Id.* Although employees frequently serve as fact witnesses, if their normal duties as employees involve giving expert testimony, they are required to provide an expert report under Rule 26(a)(2)(B). *See Prieto*, 361 F.3d at 1318 (stating a witness's status as an employee should not decide whether he is excepted from the requirements of Rule 26(a)(2)(B) because that practice "would create a category of expert trial witness for whom no written disclosure is required and should not be permitted." (internal quotation marks omitted) (quoting *Day v. Consolidated Rail Corp.*, No. 95-civ-968, 1996 WL 257654, at *2 (S.D.N.Y. May 15, 1996))). Similarly, experts "called solely or principally to offer expert testimony, whether or not they were employees," should submit a written expert report under Rule 26(a)(2)(B). *Id.* (internal quotation marks and citation omitted).

The Advisory Committee Notes on Rule 26 provide some guidance for determining who qualifies as a hybrid witness, citing treating physicians and healthcare professionals as common examples of hybrid witnesses exempt from proving a report. *See* FED. R. CIV. P. 26 Advisory Committee's Notes (1993 and 2010 Amendments). When physicians testify regarding opinions "formed and based upon observations made during the course of treatment" of a patient, the Rule 26(a)(2)(B) report is not necessary. *In re Denture Cream*, 2012 WL 5199597, at *4 (internal

quotation marks and citation omitted). Yet even treating physicians might be subject to section (2)(B) if they offer opinions that extend beyond their treatment of a patient or if they form opinions upon review of information provided by an attorney or in anticipation of litigation. *See id.* (citations omitted); *see also Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 1:11-CV-01094-JEC, 2013 WL 1189493, at \*12 (N.D. Ga. Mar. 21, 2013) ("If, however, the physician's opinion was based on facts gathered outside the course of treatment . . . or if the physician's testimony will involve the use of hypotheticals, then a full subsection B report will be required." (alteration added; citations omitted)).

Murray was Industrial Heat's Vice President of Engineering from May 2015 to October 2016. (*See* Defs.' Opp'n 6 (citation omitted)). He was listed as a potential fact witness in the initial disclosures exchanged by the parties. (*See id.* 7 n.4). He appeared as either sender or recipient of hundreds of email communications produced in discovery, some of which were used at his deposition. (*See id.*). Defendants argue these details show Murray is a hybrid witness with "some connection to the specific events underlying the case" (*id.* (internal quotation marks omitted) (quoting *Goodbys*, 2009 WL 1139575, \*4)), and make him "exempt from the robust reporting requirements . . . [of Rule] 26(a)(2)(B)" (*id.* (alterations added)).

While Murray certainly appears to have direct and personal knowledge of some of the facts in the case, the opinions offered in his Disclosure fall in the realm of expert opinions subject to Rule 26(a)(2)(B). Unlike a treating physician's observations in the course of treatment, Murray's opinions are not based on observations or perceptions he made while working "in the ordinary course" of his job functions as an employee of Industrial Heat. (Reply 6 (internal quotation marks omitted) (quoting Murray Dep. Tr. 344:12–17)). They are based on data analyses and testing he performed at the direction of counsel in the summer and fall of 2016

— several months after the case was filed. (*See id.* 5–6; *see also* Murray Dep. Tr. 209:16–210:3 (stating he was asked to review earlier collected data by counsel in August or September 2016); *see id.* 210:17–211:3 (stating he conducted a flow meter analysis beginning in the summer and into the fall of 2016)). Murray acknowledged he prepared a report in October 2016 on the testing he conducted (*see* Murray Dep. Tr. 224:16–22), and charged Industrial Heat $175 per hour to for his services as a witness (*see id.* 14:3–5).

These facts indicate Murray "functioned exactly as an expert witness normally does, providing a technical evaluation of evidence he had reviewed in preparation for trial." *Prieto*, 361 F.3d at 1319 (determining a police officer who did not have a connection to the case and was proffered as a hybrid witness and expert in use of force and police procedures was subject to Rule 26(a)(2)(B) disclosure requirements). Consequently, Defendants should have provided Plaintiffs with a written report by Murray under Rule 26(a)(2)(B), and so the Court considers the appropriate sanction for Defendants' violation.

Rule 37(c) states failure to provide information or identify a witness can be sanctioned by exclusion of the information or witness unless the failure was "substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "In addition to or instead of" exclusion, the Court may order payment of reasonable expenses, inform the jury of the violating party's failure, and "impose other appropriate sanctions." *Id.* 37 (a)(1)(A)–(C). Thus, the Court retains discretion to fashion an equitable remedy, "consonant with both the text and logic of Rule 37(c)(1)." *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 784 (6th Cir. 2003).

Plaintiffs argue exclusion of Murray's testimony is the only appropriate remedy for this Rule 26 violation, as the violation was not justified or harmless. (*See* Pls.' Mot. 10). Defendants served Plaintiffs with the Murray Disclosure on January 30, 2017, and provided

supplemental disclosure documents on February 16, 2017. (*See id.* 5). Murray was deposed on February 17, 2017 and testified he had prepared a report to reach his opinions. (*See id.* 5, 8). Plaintiffs asked Murray how he reached his opinions, what technology or methodology was used, and whether and how he had documented the analysis in a report. (*See generally* Murray Dep. Tr.).

Despite being aware of possible Rule 26 violations by the February 17 deposition, Plaintiffs do not appear to have made any effort to obtain a written report through conference with Defendants[5] or by bringing the matter to Magistrate Judge O'Sullivan.[6] Instead, they waited nearly five weeks to file their Motion and raise these issues for the first time. Had they timely raised the issue when they learned of it at deposition — and before the close of discovery on February 27 — they might have been able to obtain an expert report and conduct additional investigation or depositions. Plaintiffs may not delay in challenging a Rule 26 violation and then seek the most extreme of sanctions in a *Daubert* motion filed after the proper time for challenging discovery violations has expired. While the Court will not strike the Murray Disclosure, Defendants shall serve Plaintiffs a written expert report prepared by Murray.[7]

---

[5] Plaintiffs indicate they requested Murray's resume after receiving the Disclosure. (*See* Mot. 9).

[6] The Scheduling Order makes clear all discovery matters are referred to Magistrate Judge John J. O'Sullivan and no written discovery motions should be filed. The Court has denied two of Plaintiffs' previous discovery-related motions. (*See* Order [ECF No. 180]; Order [ECF No. 216]).

[7] Plaintiffs raise *Daubert*-based objections to the Murray Disclosure (*see* Mot. 11–19), but the Court declines to assess the methodology and contents of a four-page summary disclosure rather than a written report it has not seen and does not possess. The deadline for filing *Daubert* motions was March 21, 2017. (*See* Scheduling Order 2). If Plaintiffs find they have *Daubert*-based objections to the report, they may rely on "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to challenge the report at trial. *Daubert*, 509 U.S. at 596 (alteration added; citation omitted).

**B. *Daubert* and the Federal Rules of Evidence**

Federal Rule of Evidence 702 governs the admission of expert evidence. *See Daubert*, 509 U.S. at 588–89. Under Rule 702, "district courts must act as 'gatekeepers' which admit expert testimony only if it is reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). An expert may testify, if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

In assessing the admissibility of expert testimony, the Eleventh Circuit requires district courts to engage in a three-part inquiry to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The proponent of the expert testimony bears the burden of establishing, by a preponderance of evidence, the expert's qualification, reliability, and helpfulness. *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

With respect to the first requirement, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260–61. An expert's qualifications

may bear on the second requirement of reliability, but "they are by no means a guarantor of reliability." *Id.* at 1261 (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341–42 (11th Cir. 2003)).

For the second requirement, *Daubert* suggested a non-exhaustive list of several factors to consider in determining if a methodology is reliable under Rule 702: whether the methodology can and has been tested; whether the methodology has been subjected to peer review and publication; the known or potential rate of error and the existence and maintenance of standards controlling operation of the methodology; and whether the methodology has gained general acceptance in the scientific community. 509 U.S. at 593–94. The Supreme Court declined to set forth a "definitive checklist or test" for assessing reliability, *id.* at 593, and instead has emphasized "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). While the inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (alteration added). "Rather, the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix*, 609 F.3d 1183, 1194 (quoting *Joiner*, 522 U.S. at 146).

The third element of the *Daubert* inquiry — whether testimony assists the trier of fact — "goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Daubert*, 509 U.S. at 591 (quoting 3 J. WEINSTEIN & M. BURGER, WEINSTEIN'S EVIDENCE ¶ 702[02] 702–18 (1988); citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985) ("An additional consideration under Rule 702 — and another

aspect of relevancy — is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.")).

In assessing the validity of the expert's testimony, the district court may not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341. "The gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (alteration added). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (alteration added; citation omitted). The court's role is limited to analyzing if the evidence is unreliable and irrelevant "because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison*, 184 F.3d at 1312.

The Court first evaluates whether the Smith Report and Supplemental Smith Report satisfy *Daubert* and Rule 702, and then proceeds to assess whether the Wong Disclosure opinions satisfy the standard.

### 1. The Smith Report and Supplemental Smith Report

Smith, a principal engineer working at Applied Thermal Engineering, Inc., was retained by Defendants to opine on the E-Cat's validation process. (*See* Smith Report 2). He renders nine opinions on the subject, casting doubt on the accuracy and validity of the Penon Report[8] [ECF No. 197-3] and the overall testing, setup, and operation of the Plant. (*See* Smith Report 22; Supp. Smith Report 28). Plaintiffs attack Smith's qualifications, reliability, and helpfulness by arguing: (1) Smith is not an expert in nuclear processes; (2) his testimony is based on personal

---

[8] Fabio Penon was the elected expert responsible for validation. (*See* Complaint [ECF No. 1] ¶ 56). The Penon Report indicates the E-Cat had a coefficient of performance "often greater than sixty." (Defs.' Mot. 1 (citation omitted)).

experience rather than reliable methodologies; and (3) the testimony is irrelevant to the underlying facts of the case. (*See* Pls.' Mot. 18–24).

With regard to Smith's qualifications as an expert, Plaintiffs argue Smith may be qualified to testify about "certain boiler systems," but he is not an expert regarding nuclear engineering, nuclear boilers, and nuclear reactions. (Pls.' Mot. 19). Defendants explain the Smith Report is admissible because Smith offers opinions based on the determination the Plant is a type of boiler — inputting, as it allegedly does, only water and electricity and outputting only steam. (*See* Defs.' Opp'n 16). Further, Smith's resumé reveals extensive experience and academic training in thermal and mechanical engineering, licenses in engineering and "steam systems," and several representative projects. (*See* Smith Report Ex. A). Plaintiffs may challenge the characterization of the Plant as a boiler at trial (*see* Reply 11), but Smith's training and professional experience (*see* Smith Report Ex. A), indicate he is qualified to testify regarding the opinions in his Reports.

Turning to *Daubert*'s second prong, reliability, Plaintiffs attack the Reports by arguing Smith "relies exclusively on his own personal experience as the basis for his conclusion[s]." (Pls.' Mot. 19 (alteration added)). Defendants correctly note an expert may rely on his experience in the field but, in any event, Smith's methodology is based on more than mere personal experience. (*See* Defs.' Opp'n 16–17).

Smith offers several opinions related to the conditions observed at the Doral facility and the testing results provided in the Penon Report. As Defendants indicate, Smith's analysis is based on his observations, his experience with boiler operation, and basic laws of thermodynamics and engineering, which he takes pains to explain at the beginning of his Report. (*See* Defs.' Opp'n 17; *see also* Smith Report 3–10). Smith stated at deposition the "whole body

of mechanical engineering work related to thermodynamics" would support the theories he applied in the case and on which he bases his conclusions. (Smith Dep. Tr. 153:15–19). Smith additionally references the American Society of Mechanical Engineers' performance test codes to determine the proper parameters for measuring steam flow from boilers, and by extension, the boilers' performance and efficiency (*see* Smith Report 14); he uses testable formulas to draw incremental inferences (*see* Supp. Smith Report 8, 18); and he compares the alleged operation of the E-Cat and its components to that of conventional models (*see, e.g.*, *id.* 21–24).

The Smith Report and Supplemental Report do not contain, as Plaintiffs contend, "unexplained assurance[s] that [Smith's] opinion rests upon accepted scientific methodology." (Pls.' Mot. 21 (alterations added; citation omitted)). To the contrary, Smith applied his knowledge of thermodynamic engineering principles to the information he obtained and conditions he observed at the facility. He explains why certain outcomes can be expected to bear out based on these principles and conditions. For instance, Smith concludes any steam flow numbers from the Penon Report are suspect (*see* Supp. Smith Report 28), based on a pressure difference analysis and a heat transfer analysis appearing earlier in the Supplemental Report (*see id.* 4–9), as well as on details gathered from his facility visit (*see id.* 7 (providing internal diameter of E-Cat outlet pipe and considering steam velocity under those conditions and ramifications)).

This is not a mere *ipse dixit* statement by the expert, and the Court is not being asked to simply "tak[e] the expert's word for it." *Battle v. Gold Kist, Inc.*, No. 3:06-CV-782-K-32TEM, 2008 WL 4097717, at *8 (M.D. Fla. Sept. 2, 2008) (alteration added; internal quotation marks omitted) (quoting FED. R. EVID. 702 Advisory Committee's Note (2000 Amendment)). Rather, Smith explains the starting points and inferences that support his conclusions. Plaintiffs may

attack the conclusions of the Smith Report and Supplemental Report, but they must do so through cross-examination and the presentation of contrary evidence at trial instead of exclusion of testimony for failing to satisfy *Daubert*. *See Daubert*, 509 U.S. at 596 (citation omitted).

Finally, with regard to *Daubert*'s third prong respecting relevance, Plaintiffs assert Defendants may not challenge the propriety of the testing protocol to validate the Plant's performance since the procedure was agreed upon by the parties. (*See* Pls.' Mot. 21–23). Plaintiffs therefore contend, the Smith Report's three conclusions — as to testing adequacy, the Penon Report's validity, and the E-Cat's non-production of energy claimed — are irrelevant. (*See id.*).

These arguments are without merit. The question of whether the Plant performed under the License (and whether the report of the expert-responsible-for-validation accurately reflected contract performance) are integral to the factual disputes for which the parties seek resolution. Both parties, for instance, assert breach of contract claims related to Guaranteed Performance — Plaintiffs say Guaranteed Performance was achieved and Defendants owe the final contract payment; Defendants dispute Guaranteed Performance was achieved and refused the demand for the final payment. (*See* Compl. ¶¶ 76–87; Counterclaims ¶¶ 92–98). Additionally, Defendants' claim under the Florida Deceptive and Unfair Trade Practices Act accuses Plaintiffs and Third-Party Defendants of deceiving Defendants by manipulating the operation of the Plant in order to suggest the Plant was performing to expectation, thereby securing the payments under the License Agreement. (*See* Counterclaims ¶ 142). The achievement or non-achievement of Guaranteed Performance and Validation is a central issue in this case, and the testing and operation of the Plant throughout the phases of testing, contemplated by the License Agreement, are likewise of central importance.

Accordingly, the Smith Reports' conclusions are relevant to the case, and as Smith uses a reliable method and is qualified to give the opinions, his Reports satisfy *Daubert*.

### 2. The Wong Disclosure

Wong is a professor of mechanical and aerospace engineering at the University of Miami and was retained by Plaintiffs to opine on heat dissipation facilities designed and provided for the E-Cat, and to rebut the reports of Murray and Smith. (*See* Wong Disclosure 3). He provides four opinions on the subject: (1) the coefficient of performance is a suitable criterion to gauge the E-Cat's performance; (2) there are logical explanations for the inverse relationship between the power input into a device and its coefficient of performance; (3) it was possible for one megawatt of heat energy to be expelled without rendering the Doral facility an unsafe working environment; and (4) it was possible to expel one megawatt of heat energy from the Doral facility consistent with the Penon Report. (*See id.* 5). Defendants contend all four opinions should be excluded because they are speculative, unreliable, and based on sparse facts or faulty assumptions, and therefore are not helpful to a jury. (*See generally* Defs.' Mot.). The Court addresses the reliability of the methodology of each opinion.[9]

### a. First Opinion – The coefficient of performance is a suitable criterion to gauge E-Cat performance.

Defendants seek to exclude Wong's opinion the coefficient of performance is a valid criterion to assess the E-Cat's operation and performance. The Wong Disclosure contains no explanation or description of a methodology for reaching this conclusion. (*See* Wong Disclosure

---

[9] Defendants do not appear to challenge Wong's general qualifications; rather, they indicate even assuming his qualifications are sufficient, they would not guarantee the reliability and hence, admissibility, of his opinions. (*See* Defs.' Mot. 14). Additionally, Defendants do not appear to argue these opinions are irrelevant. The third element of the *Daubert* inquiry — whether testimony assists the trier of fact — goes to relevance. *See Daubert*, 509 U.S. at 591 (citation omitted). Defendants assert the testimony will not assist the trier of fact precisely because it is unreliable. (*See, e.g.*, Defs.' Mot. 13). The Court's analysis of the Wong Disclosure therefore focuses on the opinions' reliability under *Daubert*.

6 (discussing coefficient of performance)). Instead, discussion of the subject focuses on Wong's second conclusion regarding the inverse relationship between power input and coefficient of performance. (*See id.*). As Defendants emphasize, Wong testified he lacked knowledge about the E-Cat's underlying technology or how the E-Cat functions. (*See* Defs.' Mot. 7–8 (citations omitted)). Plaintiffs reference Wong's "in-depth review" of the Murray Disclosure, Smith Report, and Penon Report, as well as his interviews with Rossi and his inspection of the Plant (Pls.' Resp. 10); but this review is not accompanied by any explanation appearing in the Disclosure, allowing the Court to evaluate the reliability of the first opinion. As Plaintiffs have not met their burden of explaining the first opinion's methodology, much less establishing its reliability, the opinion does not satisfy *Daubert* and is properly excluded.

> **b. Second Opinion - There are logical explanations for the inverse relationship between the power input into a device and its coefficient of performance.**

The second opinion is contained in a single paragraph in the Wong Disclosure. Wong effectively explains the "basic equation" for the coefficient of performance — energy output is divided by energy input — and coefficient of performance increases as energy input decreases. (Wong Disclosure 6). Wong summarily states "the data collected by Dr. Penon is consistent" with the coefficient equation, but admitted at his deposition he had not reviewed all of the Penon Report's data, had not reviewed the entire Report before the deposition, and had not attempted to analyze whether Penon's numbers were accurate or consistent. (*See* Defs.' Mot. 10–12).

As Defendants recognize, the second opinion's methodology largely consists of identifying and comparing numbers, and then inputting these numbers into a simple division equation. (*See id.* 12). This basic arithmetic exercise is "not beyond the understanding of the average lay person" and therefore does not assist the trier of fact through application of an expert's specialized knowledge or technique. *LSQ Funding Grp., L.C. v. EDS Field Servs.*, 879

F. Supp. 2d 1320, 1336 (M.D. Fla. 2012) (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). Accordingly, Wong's second opinion is excluded under *Daubert*.

> **c. Third and Fourth Opinions – Under the conditions described at the Doral facility, it was possible to expel one MW of heat energy, including by use of a heat exchanger, without rendering the Doral facility an unsafe working environment, consistent with the Penon Report.**

Defendants' main objection to Wong's third and fourth opinions relating to heat dissipation stems from the fact the opinions are based exclusively on information regarding a heat exchanger provided by Rossi or Plaintiffs' counsel. (*See* Defs.' Mot. 13–14). Because Wong's assumptions are based on "self-serving statements" by a party to the litigation, Defendants contend they are unreliable and inadmissible. (*Id.* 20 (citation omitted)). Plaintiffs point out Wong is not opining on the factual existence of a heat exchanger at the Doral facility; rather, he is offering a carefully circumscribed opinion that "*if* the heat exchanger existed as described (and as testified to), it *could have* dissipated enough heat to make the working conditions at the Doral Facility suitable." (Pls.' Resp. 12 (emphases in original)).

Rule 702 requires expert opinions to be based on "sufficient facts or data." FED. R. EVID. 702. These opinions should not parrot a litigating party's testimony without independent review or analysis. *See Stinson Air Center, LLC v. XL Specialty Ins. Co.*, No. SA-03-CA-61-FB, 2005 WL 5979096, at *3 (W.D. Tex. July 8, 2005).

Wong presumably received the "exact specifications of the heat exchanger, including the composition, length, interior diameter, total surface area, encasement[,] and air flow" from Rossi. (Pls.' Resp. 12 (alteration added) (citing Wong Report 4–5)). He used this data, together with his own first-hand observation of facility conditions, including ceiling air vents and ventilation fans (*see id.* 5–6), to provide the values for formulas for heat transfer and cooling (*see id.* 7–8).

Based on application of these formulas, and "assuming the existence of the heat exchanger with the [described] specifications," Wong concludes it was possible to dissipate one megawatt of heat from the Doral facility. (*Id.* 9 (alteration added)). Contrary to Defendants' position, Wong's opinion does not "just restate[] an interested party's testimony" (Defs.' Reply 6 (alteration added; citation omitted)); rather, Wong provides a conditional opinion based on the assumption an interested party's testimony is true.

While Defendants argue this makes Wong's opinion speculative, the Wong Disclosure uses testable formulas and allows for Defendants to challenge its conclusions at trial. Indeed, as Defendants point out, if the testimony regarding the heat exchanger turns out to be untrue, and Wong's assumptions therefore faulty, Wong has conceded the Doral facility working conditions would be unsafe. (*See* Defs.' Mot. 15–16 (quoting Wong Dep. Tr. [ECF No. 197-2] 147:20–149:19)).

Defendants fault the Wong Disclosure for relying on evidence that is not credible (*see* Defs.' Reply 7), but credibility is generally an issue for the jury and can be addressed by Defendants on cross-examination, *see Deramus v. Saia Motor Freight Line, LLC*, No. 2:08-CV-23-MEF, 2009 WL 1664084, at *1 (M.D. Ala. June 15, 2009) (denying *Daubert* motion since failure of a physician to rely on credible evidence in making pain management assessments can be addressed in cross-examination); *Whatley v. Merit Distribution Servs.*, 166 F. Supp. 2d 1350, 1354 (S.D. Ala. 2001) ("[C]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (alteration added; internal quotation marks omitted) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000))). The weighing of the parties' conflicting evidence regarding a heat

exchanger is a matter for the jury, and Defendant's Motion is denied with respect to Wong's third and fourth conclusions.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Motion **[ECF No. 215]** is **GRANTED in part** and **DENIED in part**.

   Defendants shall serve a written expert report for Joseph A. Murray by **May 31, 2017**.

2. Defendants' Motion **[ECF No. 197]** is **GRANTED in part** and **DENIED in part**.

**DONE AND ORDERED** in Miami, Florida this 17th day of May, 2017.

_____

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record