## II. Defendants' Witnesses

1. Cassarino, Craig (Ampenergo, Inc.)
2. Childress, Jamie (The Boeing Company)
3. Fabiani, Fulvio
4. Rossi, Andrea (JM Products)
5. Rossi, Andrea (Leonardo, Corp.)

Defendants' designations and all corresponding counter-designations, rebuttal designations and objections.

Provided by Defendants.

## DEFENDANTS' DEPOSITION DESIGNATIONS AND OBJECTIONS FOR USE AT TRIAL

### Index to Objections:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| A | Authenticity | EPA | Excluded Pursuant to Agreement | LC | Legal Conclusion | ME | Misstates Evidence |
| AA | Asked and Answered | EPO. | Excluded Pursuant to Court Order | LPN | Lack of Personal Knowledge | MT | Mischaracterizes Testimony |
| Amb. | Ambiguous | F | Foundation | NP | Non-Responsive | NR | Non-Responsive |
| Arg. | Argumentative | H | Hearsay | P | Predicate | S | Speculation |
| C | Compound | I | Inadmissible | Priv. | Privileged | UP | Unduly Prejudicial |
| COT | Counsel is Testifying | IC | Improper Characterization | R | Relevance | V | Vague |
| Cum. | Cum. | IMP | Improper Counter | LC | Legal Conclusion | W | Exhibit Withdrawn |
| EOT | Expert Opinion Testimony | L | Leading | M | Misleading | | *Please note: brackets indicate partial objections to enhance readability for the Court.* |

### I. Witness: Cassarino, Craig (Corporate Rep. for Ampenergo Inc.)

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 9:5-9:16 | 15:19-16:9 R; | 23:5-10 | | | **Defendants' Objections to Plaintiffs:** | **Defendants' Rebuttals to Plaintiffs:** | | | |
| 11:13-12:3 | 16:20-17:3 R; | 34:20-35:1 | | | | | | | |
| 15:11-17:3 | 23:14-24:12 R; | 35:6-12 | | | 23:5-10 IMP | 35:2-5 | | | |
| 23:14-24:12 | 32:20-34:11 R; | 37:10-13 | | | 34:20-35:1 IMP | 37:14-18 | | | |
| 24:22-25:8 | 42:14- 43:13 | 37:19-38:3 | | | 35:6-12 IMP | 38:4-10 | | | |
| 29:14-29:23 | H; | 38:11-13 | | | 37:10-13 IMP | 38:14-23 | | | |
| 32:20-34:11 | 53:6-18 R; | 43:14-16 | | | 37:19-38:3 IMP | 49:5-8 | | | |
| 42:14-43:13 | 57:13-23 H; | 47:1-11 | | | 38:11-13 IMP | 63:16-64:8 | | | |
| 53:6-53:18 | 60:1-61:6 R, H; | 47:15-48:13 | | | 47:1-11 IMP | 75:8-76:1 | | | |
| 57:13-57:23 | 87:8-12 R, LC; | 57:13-60:20 | | | 47:15-48:13 IMP | 81:21-23 | | | |
| 60:1-61:6 | 97:3-7 EOT; | 61:4-16 | | | 58:10-59:23 IMP | 86:15-19 | | | |
| 69:5-70:22 | 102:18-20 H, | 61:17-63:9 | | | 61:17-63:15 IMP | 105:10-106:1 | | | |
| 76:16-77:3 | EOT; | 63:10-15 | | | 65:3-10 IMP | 112:8-20 | | | |
| 77:22-79:22 | 103:14-17 H; | 64:9-21 | | | 66:14-68:1 IMP | 118:12-18 | | | |
| 87:2-89:9 | 104:4-105:7 R; | 65:3-10 | | | 70:23-71:2 IMP | 128:13-18 | | | |
| 94:22-95:10 | 107:1-14 H, S; | 66:14-68:1 | | | 73:2-17 IMP | 129:19-130:7 | | | |
| 95:21-97:14 | 112:21-114:4 | 70:23-71:2 | | | 75:1-7 IMP, C | | | | |
| 98:6-98:13 | H, R; | 73:2-17 | | | 79:23-80:21 IMP | | | | |
| 98:17-100:18 | 122:4-123:6 R, | 75:1-7 | | | 82:7-11 IMP; | | | | |
| 102:13-102:20 | EOT; | 79:23-80:16 | | | | | | | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 103:14-103:17 | 123:14-124:11 R; | 80:17-21 | | | 82:13-83:7 IMP; | | | | |
| 104:4-105:7 | 131:22-133:2 A, R; | 82:7-11 | | | 86:10-13 IMP; | | | | |
| 106:9-107:14 | 145:16-146:7 A; | 82:13-83:7 | | | 97:15-98:4 IMP; | | | | |
| 112:21-114:4 | 148:6-16 H, R; | 86:10-13 | | | 105:8-9 IMP; | | | | |
| 119:6-119:19 | 180:22-183:15 R, S; | 87:12-89:9 | | | 108:16-109:12 IMP; | | | | |
| 122:4-123:6 | 183:20-185:12 R, S; | 97:15-98:4 | | | 111:1-22 IC, IMP; | | | | |
| 123:14-124:11 | 186:11-15 A, H, R; | 105:8-9 | | | 111:23-112:7 IMP; | | | | |
| 131:22-133:2 | 187:8-13 A, H, R; | 108:16-109:12 | | | 116:8-117:9 IMP; | | | | |
| 145:16-146:7 | 195:11-198:14 A, R; | 111:1-22 | | | 120:12-121:5 IMP, F; | | | | |
| 148:6-148:16 | 202:9-12 R, P; | 111:23-112:7 | | | 127:17-22 IMP, F; | | | | |
| 155:14-155:22 | 202:17-203:1 R; | 116:8-117:9 | | | 128:19-21 IMP, F; | | | | |
| 162:20-163:7 | 208:13-209:20 P, S, R; | 120:12-121:5 | | | 129:4-18 IMP, F, R, H; | | | | |
| 164:12-164:20 | 210:6-14 A, P, R; | 127:17-22 | | | 130:8-16 IMP, H; | | | | |
| 165:6-166:1 | 210:23-212:12 A, R, S; | 128:19-21 | | | 155:23-156:10 IMP, R; | | | | |
| 169:20-171:9 | 212:13-213:3 A, P, R; | 129:4-18 | | | 168:3-6  IMP; | | | | |
| 178:7-178:22 | 213:4-214:8 A, P, R; | 130:8-16 | | | 194:19-195:10 IMP, R; | | | | |
| 180:22-183:15 | 214:10-14 P, A, R; | 146:8-19 | | | 229:15-230:15 IMP; | | | | |
| 183:20-185:12 | 214:16-215:4 A, H, R, P; | 155:23-156:10 | | | 235:21-236:20 IMP | | | | |
| 186:11-186:15 | 215:6-20 H P, S; | 161:6-13 | | | | | | | |
| 187:8-187:13 | 215:20 R, S; | 166:22-167:11 | | | | | | | |
| 195:11-198:14 | 215:22-23 R, S; | 168:3-6 | | | | | | | |
| 198:20-199:5 | 216:11-217:8 R; | 194:19-195:10 | | | | | | | |
| 202:9-202:12 | 218:16-23 H, | 202:14-16 | | | | | | | |
| 202:17-203:1 | | 214:9 | | | | | | | |
| 208:13-209:20 | | 214:15 | | | | | | | |
| 210:6-210:14 | | 215:5 | | | | | | | |
| 210:23-214:8 | | 215:21 | | | | | | | |
| 214:10-214:14 | | 216:10 | | | | | | | |
| 214:16-215:4 | | 221:17 | | | | | | | |
| 215:6-215:20 | | 221:18-222:11 | | | | | | | |
| 215:22-216:9 | | 229:15-230:15 | | | | | | | |
| 216:11-217:8 | | 235:21-236:20 | | | | | | | |
| 218:12-220:3 | | | | | | | | | |
| 220:11-220:15 | | | | | | | | | |
| 220:19-221:16 | | | | | | | | | |
| 221:18-222:2 | | | | | | | | | |
| 223:21-224:5 | | | | | | | | | |
| 225:16-227:19 | | | | | | | | | |
| 241:13-242:2 | | | | | | | | | |
| 245:1-245:13 | | | | | | | | | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| | R;<br>220:11-15 A, H, P;<br>220:19-23 A, H, P;<br>221:1-12 H, S, P;<br>221:13-16 A, H, P, S;<br>221:18-222:2 A, H, P, S;<br>223:21-224:5 R;<br>225:16-226:23 H, R;<br>227:1-19 A, H, R;<br>241:18-242:2 P | | | | | | | | |

**Page 1**

PAGES:   1-245
EXHIBITS:  1-30
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:16-CV-21199-CMA/O'Sullivan

_____
ANDREA ROSSI, et al.,          )
        Plaintiffs,         )
            vs.             )
THOMAS DARDEN, et al.,          )
        Defendants.        )
_____)

VIDEOTAPED DEPOSITION OF AMPENERGO, INC.
BY CRAIG J. CASSARINO

This deposition, held pursuant to the
Federal Rules of Civil Procedure, Rule 30(b)(6),
at Nixon Peabody, LLP, 900 Elm Street, Manchester,
New Hampshire, on Thursday, February 23, 2017,
commencing at 9:00 a.m.

DUFFY & McKENNA COURT REPORTERS
P.O. Box 1658
Dover, NH  03821-1658
(603) 743-4949
1-800-600-1000

**Page 2**

1   APPEARANCES:
2
3       PEARLMAN, BAJANDAS, YEVOLI
4       & ALBRIGHT, P.L.
5       BY:  Brian Chaiken, Esq.
6       283 Catalonia Avenue, Suite 200
7       Coral Gables, FL  33134
8       305 377-0086
9       Bchaiken@pbyalaw.com
10      For the Plaintiffs
11
12      MILLER FRIEL PLLC
13      BY:  Bernard P. Bell, Esq.
14      1200 New Hampshire Ave., NW
15      Suite 800
16      Washington, DC  20036
17      202 760-3158
18      BellB@millerfriel.com
19      For the Defendants
20
21
22
23

**Page 3**

1   APPEARANCES:  (CONT'D)
2
3       NIXON PEABODY LLP
4       BY:  Andrew L. Share, Esq.
5       900 Elm Street
6       Manchester, NH  03101
7       603 628-4053
8       Ashare@nixonpeabody.com
9       For AmpEnergy and the Deponent
10
11      (Via Telephone)
12      ARAN CORREA & GUARCH, P.A.
13      BY:  Fernando S. Aran, Esq.
14          -and-
15      Francisco J. Leon de la Barra, Esq.
16      255 University Drive
17      Coral Gables, FL  33134
18      305 665-3400
19      Fleon@acg-law.com
20      Faran@acg-law.com
21      For Third-Party Defendants
22      JM Products, Johnson, and Bass
23

**Page 4**

1   APPEARANCES:  (CONT'D)
2
3       RODOLFO NUNEZ, P.A.
4       BY:  Rodolfo Nunez, Esq.
5       255 University Drive
6       Coral Gables, FL  33143
7       305 443-2440
8       Rnunez@ag-law.com
9       For Third-Party Defendant Fabiani
10      and USQL
11
12   ALSO PRESENT:
13
14      David Waldman, Videographer
15
16
17
18
19
20
21
22
23

1  (Pages 1 to 4)

Page 5

I N D E X

TESTIMONY OF:                          PAGE

CRAIG J. CASSARINO

(By Mr. Chaiken)            9, 234
(By Mr. Bell)              161
(By MR. Leon de la Barra)       228
(By Mr. Share)             238

Page 7

Exhibit 20    AE 005.01-005.011       145
Exhibit 21    AE 355          151
Exhibit 22    IH 112628-629       156
Exhibit 23    IH-0028414-421       178
Exhibit 24    IH 00083161-164       186
Exhibit 25    IH 00093886-890       192
Exhibit 26    AE 1-4          203
Exhibit 27    IH 00131061-62       206
Exhibit 28    AE 000345.001-002       212
Exhibit 29    JB 00010-232       217
Exhibit 30    multipage document, US Army   222
              Corps of Engineers,
              September, 2014

Page 6

E X H I B I T S

EXHIBIT        DESCRIPTION          PAGE

Exhibit 1    Amended Agreed Notice of      12
             Taking Videotaped Deposition
Exhibit 2    AE 422.001-422.002      30
Exhibit 3    AE 538          35
Exhibit 4    IH 21529-21533       42
Exhibit 5    IH 129182          43
Exhibit 6    IH 104053-104058       47
Exhibit 7    IH 132033-051       51
Exhibit 8    IH 104013-018       54
Exhibit 9    AE 340          66
Exhibit 10    AE 437.001-437.008       69
Exhibit 11    AE 436          73
Exhibit 12    AE 255.001-255.002       76
Exhibit 13    AE 295.001-295.003       78
Exhibit 14    AE 303          84
Exhibit 15    IH 124079-081       87
Exhibit 16    AE 304.001-304.002       98
Exhibit 17    IH 90966-967       104
Exhibit 18    IH 127256-258       117
Exhibit 19    AE 6-32          123

Page 8

1      VIDEOGRAPHER:  Today is February 23rd,
2  2017.  The time is 9 o'clock a.m.  The location is
3  Nixon Peabody LLP, in Manchester, New Hampshire.
4  My name is David Waldman, legal video specialist.
5  The Case No. is 1:16-CV-21199-CMA/O'Sullivan,
6  filed in the US District Court, Southern District
7  of Florida.  Case is Andrea Rossi, et al. versus
8  Thomas Darden, et al.  The deponent is Craig
9  Cassarino.  The video deposition was requested by
10  Brian W. Chaiken, Esquire.
11      Counsel and all present will please
12  identify themselves for the record, and the
13  stenographic court reporter, Jodi Ohnemus, will
14  swear in the witness.
15      MR. CHAIKEN:  Good morning, Brian
16  Chaiken, on behalf of Plaintiffs.
17      MR. BELL:  Bernard Bell, for Defendants.
18      MR. SHARE:  Good morning.  Andrew Share
19  counsel for AmpEnergo.
20      MR. CASSARINO:  Craig Cassarino.
21      COURT REPORTER:  On the phone?
22      MR. ARAN:  Hello.  Yes.  From the phone:
23  Fernando Aran, on behalf of third-party Defendant,

2  (Pages 5 to 8)

Page 9

1    JM Products, Inc., Henry Johnson, and James Bass.
2         MR. NUNEZ:  Rudy Nunez, on behalf of
3    Fulvio Fabiani and United States Quantum Leap,
4    LLC.
5         CRAIG J. CASSARINO, having
6         first been duly sworn, was
7         examined and testified as
8         follows
9    BY MR. CHAIKEN:
10   Q.   Good morning.
11   A.   Good morning.
12   Q.   My name is Brian Chaiken, and I'm an attorney for
13   the Plaintiffs in this case.
14        Could you please state your name and
15   spell your last name for the record.
16   A.   Yes.  Craig Cassarino, C-a-s-s-a-r-i-n-o.
17   Q.   And where do you live, Mr. Cassarino?
18   A.   I live at 30 Green Road, Amherst, New Hampshire.
19   Q.   Approximately how long have you lived there?
20   A.   Five and a half years.
21   Q.   Okay.  And I think you mentioned before we got on
22   the record that you had never been deposed before;
23   is that true?

Page 10

1    A.   That's true.
2    Q.   Okay.  There's a few ground rules I'm going to
3    give you for the deposition.
4    A.   Okay.
5    Q.   I need you to give an audio response to my
6    questions.  Although there's a videographer taking
7    a video of you, the court reporter can't take down
8    a shake of your head or a nod or -- although she
9    probably could take an uh-uh or an uh-huh --
10   A.   Yeah.
11   Q.   -- but you need to give an audible response, if
12   possible.
13   A.   Yes.
14   Q.   If you don't understand any of my questions, I'd
15   ask you to tell me that and say, you know, Please
16   rephrase your question; otherwise, I'm going to
17   assume you understood my question.
18   A.   Okay.
19   Q.   You may anticipate where I'm going with some of my
20   questions, but the court reporter can't take down
21   if both of us are talking at the same time.
22   A.   Right.
23   Q.   So I would ask that you give me a chance to

Page 11

1    complete my question before you begin your answer,
2    and I'll give you a chance to complete your answer
3    before I begin my next question.
4    A.   Right.
5    Q.   If at any time you need to take a break, please
6    feel free to ask and say, I need to take a break.
7         If there's a question pending, I would
8    just ask you to answer the question that's pending
9    before we take a break.
10   A.   Yes.
11   Q.   Fair enough?
12   A.   Fair enough.
13   Q.   Okay.  Have you been designated as the corporate
14   representative of AmpEnergo, Inc. for purpose --
15   A.   Yes, I am.
16   Q.   -- for purposes of this deposition?
17   A.   Yes.
18   Q.   See?  You already broke my rule.  You've already
19   started talking past my question.
20        Let me finish it first.
21        Who designated you as the corporate
22   representative for AmpEnergo?
23   A.   All the people at AmpEnergo.

Page 12

1    Q.   And who are all the people at AmpEnergo?
2    A.   Robert Gentile, Rick Nociti, Ron Engleman, and
3    Karl Norwood.
4    Q.   And are you all shareholders?
5    A.   Yes, we are.
6    Q.   Are you equal shareholders?
7    A.   No.
8    Q.   What -- what's the differences?
9    A.   Robert Gentile, Karl Norwood, and I have equal
10   shares, and Rick Nociti and Ron Engleman have a
11   lower percentage.
12   Q.   Okay.  I'm going to show you what's been marked as
13   Exhibit No. 1 for your deposition.  It's a copy of
14   the Amended Agreed Notice of Taking Videotaped
15   Deposition.
16        (Exhibit 1, Amended Agreed Notice of
17        Taking Videotaped Deposition.)
18        MR. SHARE:  And just for the record, I
19   want to note that we were not served a copy of
20   this until 10 minutes ago.
21        MR. CHAIKEN:  Okay.
22        MR. SHARE:  But we don't object to the
23   video-recording of the deposition.

3 (Pages 9 to 12)

Page 13

1    MR. CHAIKEN:  Appreciate that.
2  Q.  I'd ask you to review page 9 and 10.
3       And, Mr. Cassarino, had you previously
4  been provided with a -- not an amended agreed
5  notice, but a previous version of this that was --
6  A.  Yes.
7  Q.  -- simply a notice?
8  A.  Yes.
9  Q.  And had you had an opportunity to review the areas
10  of inquiry in that previous notice?
11  A.  Yes.
12  Q.  And I believe they're the same, and your -- your
13  counsel has -- and I have talked about it prior to
14  getting on the record, but I believe the topics
15  are all the same in this amended notice that were
16  in the previous notice.
17  A.  Okay.
18  Q.  Are you prepared to discuss all the areas that are
19  listed in this amended notice today?
20  A.  Yes.
21  Q.  Okay.  And did you do anything to prepare for
22  today's deposition?
23  A.  Yes.

Page 14

1  Q.  What did you do?
2  A.  I met with our attorney to go through the list of
3  questions.
4  Q.  Fair enough.  And I don't want you to tell me what
5  conversations you had with counsel.
6       Did you speak to anybody else about
7  today's deposition?
8  A.  Yes, my other partners.
9  Q.  And what did you talk about?
10  A.  Just going through the same questions and whether
11  any -- they had any insight or not.
12  Q.  Okay.  Did you review any documents?
13  A.  Yes, we did.
14  Q.  Which documents did you review?
15  A.  The legal documents.
16  Q.  Okay.  And when you say "the legal documents,"
17  what do you mean by that?
18  A.  The license agreements.
19  Q.  Okay.  Anything other than that?
20  A.  Well, we went through all of the emails and all of
21  that for review to give to you.
22  Q.  Okay.  And when did you do that?
23  A.  A month ago, maybe a month and a half ago.  I'm --

Page 15

1       I'm not sure exactly when.
2  Q.  Okay.  Did you review the complaint filed in this
3  case?
4  A.  Yes.
5  Q.  Have you reviewed the answer or any -- any of the
6  versions of the answers and defenses and
7  counterclaims filed by the --
8  A.  No, it's --
9  Q.  -- by the Defendants?
10  A.  It's just too complicated for me.
11  Q.  Okay.  AmpEnergo often goes by the initials AEG;
12  is that true?
13  A.  Yes.
14  Q.  So if I use the word "AEG," would you recognize
15  that as meaning AmpEnergo?
16  A.  I would.
17  Q.  Okay.  I may use that to shorten up --
18  A.  Okay.
19  Q.  -- my -- my questions.
20       Who founded AEG?
21  A.  Bob Gentile, Karl Norwood, myself and Rick Nociti.
22  Q.  And when was it founded?
23  A.  I believe it was -- I can't recall the exact date,

[R]

Page 16

1  but it was right after, probably, 2010.
2  Q.  Okay.  And -- and what was the purpose?
3  A.  To -- to license the agreement from Andrea Rossi.
4       COURT REPORTER:  I didn't get the end of
5  it.
6  A.  Yeah, to review -- I mean, to license the
7  technology from Leonardo and from Andrea Rossi.
8  Q.  Okay.
9  A.  It was set just for that purpose.
10  Q.  All right.  And you mentioned the names of the
11  various parties -- or excuse me -- the various
12  owners of AEG.
13       Did you have defined roles at AEG, or
14  were you all doing the same thing?
15  A.  Basically, you know, I took the lead in most of
16  the conversations.
17  Q.  Okay.
18  A.  You know, but it was no -- no -- nobody had any
19  more important role than anybody else.
20  Q.  Okay.  Does AEG -- or has -- since its founding,
21  has AEG had any other businesses other than its
22  dealings with Dr. Andrea Rossi and the Defendants
23  in this case?

[R]

4 (Pages 13 to 16)

**Veritext Florida Reporting Co.**

Page 17

1   A.   No.
2   Q.   It doesn't have any other businesses?
3   A.   No.
4   Q.   How were you first introduced to Doctor Rossi?
5   A.   How was I?
6   Q.   Yeah.
7   A.   1996, at Tufts University, common friend of ours
8        said that he had an inventor at Tufts, and he
9        wanted to introduce me to him, because he didn't
10       quite understand what the technology was; and he
11       called me.
12  Q.   And did you meet Doctor Rossi at that time?
13  A.   I did.
14  Q.   And what did you learn about Doctor Rossi at that
15       time?
16  A.   Well, that he had a technology I was familiar
17       with -- pyrolysis, and he was demonstrating it.
18  Q.   And what is that technology?
19  A.   Pyrolysis is air-starved conversion of this --
20       this was particular tires and -- with heating it
21       and starving air, you separate different
22       components that's contained within the rubber
23       tire.

Page 18

1   Q.   Okay.  After you had that -- was that the initial
2        conversation you had about that technology?
3   A.   Yeah.
4   Q.   And what -- when is the next time you met with
5        Doctor Rossi or saw Doctor Rossi after that?
6   A.   I'm not sure exactly, but we connected, and I
7        introduced him to a person I knew in New
8        Hampshire.
9   Q.   Okay.  And why did you do that?
10  A.   Because he -- his technology was something they
11       probably would be interested in.
12  Q.   And what was the name of that company?
13  A.   Bio Development.
14  Q.   And did that company start working with Doctor
15       Rossi?
16  A.   Yes.
17  Q.   In what context?
18  A.   Just trying to develop a business relationship.
19  Q.   Okay.  And did they develop a business
20       relationship?
21  A.   For a little while.
22  Q.   Okay.  Did the other members of AEG eventually
23       meet Doctor Rossi?

Page 19

1   A.   Yes.
2   Q.   Did --
3   A.   Bob Gentile was the first.
4   Q.   And did Bob Gentile work for that company in New
5        Hampshire?
6   A.   No.
7   Q.   What was the circumstances in which he met --
8   A.   I -- I was friends with Bob, and he and I were
9        working on different technologies; and he was past
10       Assistant Secretary of Energy, and we were
11       interested in some of the technology that Doctor
12       Rossi did.
13  Q.   Is that the same technology you mentioned
14       earlier --
15  A.   No.
16  Q.   -- or different?
17  A.   No -- well, a variety of them.
18  Q.   Can you describe for me what -- what technology
19       you were interested in.
20  A.   It was the pyrolysis -- that was one.
21            And, then -- and I -- again, I don't
22       recall exactly, but it was something to do with
23       converting waste through paper and -- various --

Page 20

1        sort of -- materials -- biomass materials.
2   Q.   And did Doctor Rossi end up working with Robert
3        Gentile?
4   A.   We did.  We actually formed a company together,
5        the three of us.
6   Q.   What was that company?
7   A.   That was Leonardo Technology -- I don't know if
8        it's Leonardo Research & Development, or just
9        Leonardo.  I'm not sure.
10  Q.   Does the phrase "LTI" mean anything to you?
11  A.   Yeah.  LTI is -- is the company that Bob and I
12       started --
13  Q.   Okay.
14  A.   -- separate -- completely separate company.
15  Q.   Got it.
16            But the company that you started with
17       Doctor Rossi was Leonardo R&D, or something like
18       that?
19  A.   Yes.  Yeah.
20  Q.   Do you know if that company's still in existence?
21  A.   It isn't.
22  Q.   Okay.
23  A.   Well, Leonardo Research & Development is just a

**Veritext Florida Reporting Co.**

800-726-7007                                                   305-376-8800

## Page 21

1    company that exists, but it doesn't do anything.
2  Q.  Okay.  What about Ronald Engleman?  Did you ever
3    introduce Doctor Rossi to Ronald Engleman?
4  A.  Yes.
5  Q.  When was that?
6  A.  After we formed AmpEnergo we -- we brought Ronald
7    into the company.
8  Q.  For what reason?
9  A.  He was a partner of ours -- a friend of ours, and
10   he was an engineer.
11       Bob and I are not engineers.
12 Q.  Got it.  So you were hoping that his background
13   would be useful for helping --
14 A.  To evaluate the technology.
15       The same with Rick Nociti.
16 Q.  Yeah.  All right.
17       What about Karl Norwood?
18 A.  Karl is a friend and partner and had known Doctor
19   Rossi from the beginning too.
20 Q.  How had Karl Norwood known Doctor Rossi?
21 A.  I introduced Karl.
22 Q.  Approximately the same time frame -- '96-'97?
23 A.  Yeah.  Yeah.

## Page 22

1  Q.  And what was Karl Norwood's background?
2  A.  He's a real estate developer.
3  Q.  Now, did you ever -- I guess you did.  You formed
4    a business together.
5        What was the nature of the business that
6    you formed with Doctor Rossi?
7  A.  To evaluate -- look at different technologies.
8  Q.  Had you ever worked with Doctor Rossi in Italy?
9  A.  After, but not -- not before.
10 Q.  Okay.  So when you say "after," what do you mean?
11 A.  After -- after we formed the company.
12 Q.  Got it.
13       "The company," being AEG, or the company
14   being --
15 A.  Either the -- Leonardo Research & Development
16   or --
17 Q.  Got it.
18       What did you do -- what was the nature
19   of the work --
20 A.  We -- we started to look at thermoelectrics --
21 Q.  Okay.
22 A.  -- with Doctor Rossi.
23 Q.  And did that lead to any business?

## Page 23

1  A.  We -- no.  We -- well, we -- Doctor Rossi --
2    proof -- proof of concept, and that was really
3    what we -- I had no idea what thermoelectrics was.
4  Q.  Got it.
5        How did you find it was to work with
6    Doctor Rossi?                                    [IMP]
7  A.  We had a good relationship.
8  Q.  Did you ever find him to be difficult to work
9    with?
10 A.  No.  He's strong-minded.
11 Q.  Did you ever find him to be deceitful or
12   dishonest?
13 A.  No.
14 Q.  What led to the -- to the formation of AEG?      [R]
15       How did -- how did those conversations
16   go?
17 A.  We -- after we had met with Doctor Rossi to
18   discuss about a licensing agreement, because of
19   the -- we just wanted to put a separate company
20   together just specifically for the purpose of
21   licensing and to keep everything -- 'cause we were
22   also working for, you know, other -- other
23   parties.

## Page 24

1  Q.  Okay.  Was that a conversation that Doctor Rossi
2    started?  I mean, did he come to and say, I
3    have a technology; I need your help?
4  A.  Yes.
5  Q.  I don't want to put words into your mouth.  I
6    mean, is that --
7  A.  Yes, he did.  He --
8  Q.  -- how it happened?
9  A.  Yes.  He was excited about the technology that he
10   was developing and approached us because of our
11   past relationship and asked us if he -- we could
12   help him here in the US.
13 Q.  Did your group have experiencing -- experience in
14   helping get new technologies partnered up with --
15   whether it be funding partners or commercial
16   partners -- for the use of that technology?
17 A.  Well, we were LTI at that time, 'cause that was
18   where Bob and I and Ron -- we had formed that
19   Leonardo Technologies, Inc.  That's part of what
20   we did was evaluate technologies for Department of
21   Energy.
22 Q.  When did Doctor Rossi approach you with his
23   technology that -- that you formed AEG for,

6 (Pages 21 to 24)

Page 25

1    approximately?
2   A.  2008.
3   Q.  And at that time what did he tell you about his
4    technology?
5   A.  That he had a hot water heater, 'cause that was
6    simple.
7   Q.  Right.
8   A.  And that was what he explained.
9   Q.  Did he eventually show you the technology?
10   A.  He -- Bob Gentile and Rick Nociti went to Italy to
11    look at the technology.
12   Q.  And did you have a conversation with them when
13    they came back?
14   A.  Yes.
15   Q.  And what did they say?
16   A.  They thought it was very interesting, but, you
17    know, didn't quite understand -- I mean,
18    understand the technology.
19        I think Rick had a better sense, but...
20   Q.  I'm going to -- I'm going to call the technology
21    the E-Cat technology.
22        Have you heard that term before?
23   A.  Yes, I have.

Page 26

1   Q.  What does that term mean to you?
2   A.  The technology that Andrea Rossi was working on.
3   Q.  Okay. And it had something to do with -- well,
4    what is your understanding of what the technology
5    was?
6   A.  My understanding, in laymen's terms, is converting
7    one element to another, and in that process of
8    that conversion, giving off excess heat.
9   Q.  Okay. Now, prior to -- whether it be forming AEG
10    or entering your agreement with Doctor Rossi, did
11    AEG perform due diligence on the technology?
12   A.  Well, it was a little outside of our scope of
13    expertise.
14   Q.  Right.
15   A.  And what we had discussed was, you know, having
16    other people evaluate it.
17   Q.  And did you do that?
18   A.  We did.
19   Q.  And who were those people?
20   A.  We had Mike Melich --
21   Q.  Can you spell that.
22   A.  M-e-l-i-c-h.
23        -- and a guy, Anthony Cugini.

Page 27

1   Q.  Spell that one, too.
2   A.  C-u-g-i-n-i.
3   Q.  And were they engineers?
4   A.  No -- well, Mike is a -- I don't know if he is a
5    physicist, but he had been looking at low energy
6    nuclear reaction for -- he's one that had a little
7    more expertise than any of us.
8   Q.  Okay. And did they do an analysis or review of
9    the technology?
10   A.  Well, we did one demonstration where they reviewed
11    it and observed -- for -- I'm trying to find
12    the -- observed the outputs.
13   Q.  Got it. And what was their feedback to you?
14   A.  That they couldn't explain what was going on.
15   Q.  Okay. And you mentioned low energy nuclear
16    reaction.
17        And that -- that's a phrase -- is it an
18    acronym, "LENR"? Have you heard that before?
19   A.  Yes.
20   Q.  What was your understanding of the field of LENR
21    at that time?
22   A.  Zero.
23   Q.  Have you -- did you do any research into that

Page 28

1    field?
2   A.  Only through having conversations and listening to
3    Doctor Rossi and Googling, you know -- I mean --
4    just as much as we could.
5   Q.  Did you gain just a very high-level understanding
6    of what it was?
7   A.  30,000 foot level; yes.
8   Q.  What -- good.
9        What was your 30,000-foot-level
10    understanding of it?
11   A.  That after Pons' and Fleischmann's experience,
12    that most people felt it was science that wouldn't
13    work.
14   Q.  Right. Did Doctor Rossi, prior to you -- prior to
15    you entering into an agreement with him -- provide
16    a -- or do a test for your group in Bedford, New
17    Hampshire?
18   A.  Yes.
19   Q.  Were you present for that?
20   A.  Yes.
21   Q.  Who else was present for that?
22   A.  Karl Norwood, Bob Gentile, Rick Nociti.
23   Q.  And what were the results of that test?

7 (Pages 25 to 28)

Page 29

1    A.   And -- and I think Mike came later -- I mean,
2         after it was started.
3    Q.   Got it.
4              Do you know what the results of that
5         test were?
6    A.   It -- the results were there looked like there was
7         something going on.
8    Q.   Okay.  Did you think that that test was a scam
9         or -- or was -- was not real?
10   A.   No.
11   Q.   Did you think at any time that Doctor Rossi was
12        defrauding you or your group?
13   A.   No.
14   Q.   Approximately when in time did you reach an
15        agreement with Doctor Rossi regarding licensing
16        his technology?
17   A.   It was a process.  He's a hard negotiator.  And we
18        spent time with our attorney, Bill Blake -- or I
19        did a lot of it -- and -- putting in with Andrea
20        and his attorney a framework for a license
21        agreement.
22   Q.   And did you eventually reach an agreement?
23   A.   We did.

Page 30

1    Q.   At some point in time -- and I'll get into the
2         agreement in a little bit, but at some point in
3         time did you ask Doctor Rossi to participate in
4         tests with the Department of Energy or the
5         Department of Defense?
6    A.   We -- we explored that.
7    Q.   And did -- did you pitch it --
8    A.   They couldn't come to an agreement.
9    Q.   When you say "we" couldn't come to an agreement...
10   A.   They, Doctor Rossi and the Department of Defense.
11   Q.   Okay.  Did you have conversations with anyone from
12        the Department of Energy, Department of Defense?
13   A.   No.  It wasn't really the Department of Defense.
14        It was the Navy research labs.
15   Q.   Got it.
16             I'm going to show you what's been marked
17        as Exhibit No. 2.
18             MR. CHAIKEN:  Exhibit No. 2 has been
19        Bates stamped AE 422.001 through 422.002.
20             (Exhibit 2, AE 422.001-422.002.)
21   Q.   And it's a series of emails -- actually, two
22        emails:  The first one is from you, I believe, to
23        J.T. Vaughan of Cherokee, dated February 19th,

Page 31

1         2013.
2              Is that your email on the page,
3         "CTCassarino@LTI --"
4    A.   Yes.
5    Q.   "-- global.com"?
6    A.   Yup.
7    Q.   Do you recall this email?
8    A.   No.
9    Q.   Take a minute and just review yours.  It starts
10        "Good morning, J.T."
11             And when you're done, let me know.
12   A.   (Witness reviews document.)
13   Q.   Do you recall being -- do you recall sending three
14        reports to J.T. Vaughan in 2013?
15   A.   I don't recall.
16   Q.   Do you recall what these reports were regarding?
17   A.   Well, it -- it -- what I'm looking at here, one
18        says "thermoelectric."  That could have been the
19        first proof of concept one that we had.
20             The other -- and, again, these would
21        have been the thermoelectrics.
22   Q.   Okay.  But you do recall going to the Department
23        of Energy and Department of Defense with this

Page 32

1         technology.
2    A.   It wasn't the E-Cat.
3    Q.   Oh, I'm sorry.
4    A.   It was not the E-Cat.
5    Q.   It was something else?
6    A.   It was the thermoelectrics.
7    Q.   Got it.
8              But were the applications for the E-Cats
9         to be used for thermoelectrics and things of that
10        nature?
11   A.   We were -- we were thinking that because the E-Cat
12        had excess heat, the thermoelectrics could capture
13        some of the excess heat and use the excess heat to
14        make more small power.  I mean, you know, that's
15        what thermoelectrics does, converts excess heat to
16        a delta T to make more power.
17             So we thought the E-Cat was producing
18        excess heat.  Maybe there's a blend for the
19        thermoelectrics.
20   Q.   Understood.  Going back to the agreement between
21        AEG and Doctor Rossi, did -- is it your
22        understanding that Doctor Rossi formed a company
23        also called Leonardo?

R

**Veritext Florida Reporting Co.**

Page 33

1   A.   Yeah.  There were -- I mean, that was confusing
2        for a lot of people.
3   Q.   But he did file -- he did incorporate a company
4        called Leonardo in New Hampshire; is that your
5        understanding?
6   A.   Yes.  Yes.  Yeah.
7   Q.   Okay.  And AEG entered into an agreement with
8        Leonardo?
9   A.   Yes.
10  Q.   And it was regarding the E-Cat technology?
11  A.   Yes.
12  Q.   What do you recall about the terms of that deal?
13  A.   That we would have the license agreement for the
14       Americas.
15  Q.   Okay.
16  A.   That, and I believe -- and I don't mean this
17       sarcastically -- but we, you know, all the points
18       are in the agreements that you have.  So, you
19       know, if you want to go through each one of those,
20       I mean, you know, it's...
21  Q.   I'm just talking high-level terms.
22  A.   Yeah.  It was -- it was to reach an agreement for
23       the -- to find an investor, 'cause we certainly

Page 34

1        didn't have the kind of capital -- to find an
2        investor and that we would participate, after
3        finding the investor, on a one-third
4        participation; and that there were requirements in
5        there, because we felt that it needed a
6        third-party evaluation through the investor.
7   Q.   What do you mean by that?
8   A.   That we didn't have the technical skills or the
9        know-how to evaluate the technology; and that if
10       we were to find an investor, that that was their
11       responsibility.
12  Q.   Understood.
13       Did Doctor Rossi and Leonardo honor that
14       agreement?
15  A.   Yes.
16       MR. BELL:  Objection to form.
17  Q.   At some point in time did AEG come in contact with
18       Tom Darden and Cherokee Fund?
19  A.   Yes.
20  Q.   And who made the introduction of Tom Darden to
21       AEG?
22  A.   Two people:  Rick Bauman and Jim Compton.
23  Q.   And how did they find you?

IMP

Page 35

1   A.   I'm not sure.
2   Q.   Do you know if they contacted Doctor Rossi
3        directly, and then Doctor Rossi introduced them to
4        you?
5   A.   I don't remember.
6   Q.   How did the initial conversation with Rick Bauman
7        and Jim Compton go?
8   A.   They asked if we would be interested in making an
9        introduction -- to an investor they had -- to
10       Doctor Rossi.
11  Q.   Okay.  And did that, in fact, happen?
12  A.   Yes, it did.
13  Q.   Do you know approximately when?
14  A.   You know, I don't recall the exact date we went to
15       Florida.
16  Q.   Does June 2012 sound about right?
17  A.   Sounds probably right.
18  Q.   I'm going to show you what's been marked as
19       Exhibit No. 3.
20       MR. CHAIKEN:  Exhibit No. 3 has been
21       Bates stamped AE 538, and it's two emails dated
22       June 25th, 2012.
23       (Exhibit 3, AE 538.)

IMP

Page 36

1   A.   (Witness reviews document.)  Yeah.  I remember;
2        yeah.
3   Q.   Did you travel to -- to Miami for this meeting?
4   A.   I did.
5   Q.   And you met Tom Darden at that time?
6   A.   I did.
7   Q.   Did you meet anybody else at that time?
8   A.   Rick Bauman and Jim Compton.
9   Q.   And was Doctor Rossi part of that meeting?
10  A.   Yes, he was.
11  Q.   And do you know exactly where it was held?
12  A.   It was held at his apartment in Miami.
13  Q.   "His" being Doctor Rossi's?
14  A.   Doctor Rossi's.
15  Q.   And just briefly if you could summarize what the
16       discussion was.
17  A.   It was an introduction.  They discussed what
18       Doctor Rossi was doing.  Doctor Rossi explained
19       what he was doing with the technology.
20       It was a get-to-know-each-other meeting.
21  Q.   And what -- based on your email, it sounded like
22       it went well.
23  A.   It did.

9  (Pages 33 to 36)

Page 37

1   Q.   And when you left the meeting, was your impression
2        that the parties were going to do business
3        together?
4   A.   That's what we were hoping.
5   Q.   Okay.  And after you left the meeting, what was
6        the next conversation you had regarding E-Cat and
7        E-Cat technology with Tom Darden?
8   A.   The next conversation, I'm -- I don't recall the
9        next conversation.
10  Q.   Okay.  At some point in time did -- whether it be
11       Tom Darden or someone from his group -- ever ask
12       you to help with their due diligence?
13  A.   No.
14  Q.   Did you play any role in negotiating the license
15       agreement between Tom Darden and his group and
16       Doctor Rossi?
17  A.   Did we participate in that?
18            No.
19  Q.   Other than the introduction with Rick Bauman and
20       Jim Compton, did AEG introduce Doctor Rossi to any
21       other potential investors or partners?
22  A.   Yes.
23  Q.   Who else?

Page 38

1   A.   John Preston, NASA.
2   Q.   Who's John Preston?
3   A.   He was an investor in Boston.
4   Q.   And --
5   A.   That was prior to Tom Darden.
6   Q.   And what happened with John Preston?
7   A.   They -- Doctor Rossi and John Preston couldn't
8        come to an agreement.
9   Q.   Okay.  So this was prior to June of 2012?
10  A.   I believe so.
11  Q.   What about NASA?  When did you introduce --
12  A.   That was part of -- John had a relationship with
13       them, and they were interested in the technology.
14  Q.   Okay.
15  A.   We -- we actually went and tried to find lots of
16       investors.
17  Q.   Other than John Preston and NASA, were there any
18       others that you can think of?
19  A.   Well, we had lots of meetings, I mean, with lots
20       of investors, but because of the way that the
21       agreement was structured and Doctor Rossi's
22       concern over somebody taking the technology, those
23       agreements could never come to fruition.

Page 39

1   Q.   Understood.
2            Did -- I think you said that you were
3        the lead person as it relates to AEG's --
4   A.   Well, only because I had a longer relationship
5        than anybody else with -- with Doctor Rossi.
6   Q.   Got it.
7   A.   And it was interesting to me.
8   Q.   What do you recall about the negotiations between
9        Tom Darden, his group, and Doctor Rossi, if
10       anything?
11  A.   Specifically, I'm not sure -- you mean what?
12            What...
13  Q.   Just what -- when it took place, how the
14       negotiations went, how they came to terms.
15  A.   It was -- we were not part of the negotiations
16       with Industrial Heat and Doctor Rossi.  We had our
17       own agreement that we were working on.
18            Everything seemed to work okay.
19  Q.   Did you ever review drafts of the license
20       agreement that was being discussed between Tom
21       Darden, his group, and Doctor Rossi?
22  A.   Yes, because we were part of the licensing.
23  Q.   Right.  And, in fact, AEG was a party to that

Page 40

1        agreement; were they not?
2   A.   Yes.
3   Q.   And were you the person from AEG who was giving
4        input to that, or was somebody else?
5   A.   Well, we all were.  I mean, we were all reviewing.
6   Q.   Did you find that agreement to be fair?
7            MR. BELL:  Objection to form.
8   A.   I -- I believe what we felt was that the agreement
9        that they had would move the -- move it forward.
10  Q.   Understood.  Is there a reason why AEG wanted to
11       be paid directly from Industrial Heat, as opposed
12       to from Doctor Rossi's company?
13            MR. BELL:  Objection to form.
14            THE WITNESS:  When you say "object," do
15       I -- do I have to --
16  Q.   You still have to answer the question.  I'm sorry.
17       You -- we should have explained that to you.
18            THE WITNESS:  Yeah.
19  Q.   Counsel may object to the form of my question.  He
20       may -- if he finds something objectionable about
21       it, but unless your attorney instructs you not to
22       answer the question --
23  A.   Oh, okay.

10 (Pages 37 to 40)

Page 41

1    Q.   -- then you can answer if you understand the
2    question.
3         MR. SHARE:  I may -- I may instruct you
4    -- I may instruct you to not answer something if
5    it's a privileged conversation.
6         THE WITNESS:  Okay.
7         MR. SHARE:  Otherwise, as we -- as
8    mentioned, if there's an objection, take a pause,
9    no instructions, you should assume to answer that.
10        THE WITNESS:  Okay.
11   A.   So could you repeat the question.
12   Q.   Yeah.  Is there a reason why AEG wanted to be paid
13   directly from Industrial Heat, as opposed to being
14   paid by Leonardo or Doctor Rossi?
15        MR. BELL:  Same objection.
16   A.   We wanted to make sure that we got our money up
17   front.
18   Q.   And you felt the only way to do that was to get
19   paid directly by Industrial Heat?
20   A.   Industrial Heat; yes.
21   Q.   I'm going to show you what's been marked as
22   Exhibit No. 4.
23        MR. CHAIKEN:  Exhibit 4 has been Bates

Page 42

1    stamped IH 21529 through 21533.
2         (Exhibit 4, IH 21529-21533.)
3    Q.   And the very first email on this exhibit is one
4    from Doctor Rossi to Tom Darden, and it cc's you
5    as well.
6    A.   (Witness reviews document.)
7    Q.   It just goes to the -- goes to the fact that AEG
8    wanted to be paid directly from Industrial Heat.
9    A.   Yes.
10   Q.   Did Industrial Heat or anyone from Tom Darden's
11   group have any issue with that -- with that
12   request?
13   A.   No.
14   Q.   Now, what were you told about Industrial Heat at
15   that time?
16   A.   Well, when we were first beginning, Industrial
17   Heat didn't exist.
18   Q.   Okay.
19   A.   It was -- it was Tom Darden/Cherokee that we
20   started to have conversations with.
21   Q.   And did they tell you they were planning on
22   opening up a new company --
23   A.   Yes.

Page 43

1    Q.   -- for purposes of this deal?
2    A.   Yes.
3    Q.   And what did they tell you about their -- their
4    corporate structure, if anything?
5    A.   That -- I -- I don't recall if they said anything.
6    Q.   Did you understand that Industrial Heat was going
7    to be an affiliate or subsidiary of the entities
8    that Tom Darden already owned?
9         MR. BELL:  Objection to form.
10   A.   I don't think so.  I think they -- we -- what we
11   understood was they were doing the same thing that
12   we do:  forming AmpEnergo and Industrial Heat to
13   keep things separate.
14   Q.   Did you have any specific conversations about
15   that?
16   A.   I might have.  I'm not -- I'm not sure.
17   Q.   I'm going to show you what's been marked as
18   Exhibit No. 5.
19        MR. CHAIKEN:  Exhibit No. 5 has been
20   Bates stamped IH 129182.
21        (Exhibit 5, IH 129182.)
22   Q.   And it is a draft term sheet.
23        Have you ever seen this before?

Page 44

1    A.   Yes.
2    Q.   Do you know who prepared this?
3    A.   I -- I don't recall who prepared this.  Must have
4    been our attorney.
5    Q.   Take -- just take a quick minute to review it.
6    A.   Okay.  (Witness reviews document.)  Maybe it's --
7    the -- Industrial Heat did this.
8    Q.   This document's not dated, but I'm trying -- I
9    believe I can get some context as to when it was
10   created, because the very first paragraph, under
11   No. 1, states "Under the existing agreement
12   between LC and AEG."
13        So obviously there -- that agreement
14   hadn't formed by the time this document was
15   drafted, I believe.
16   A.   Yeah.  (Witness reviews document.)
17   Q.   I believe that "LC" refers to Leonardo
18   Corporation?
19   A.   Yes.
20   Q.   Is it your understanding that the license
21   agreement between Leonardo Corporation and -- and
22   AEG was formed in 2010?
23        Does that sound right?

11 (Pages 41 to 44)

Page 45

1   A.  I am not sure of those dates.
2   Q.  Do the terms set forth in this term sheet reflect
3       what your understanding was -- was in -- during
4       the course of your negotiations with Tom Darden
5       and his group?
6           MR. BELL:  Objection to form.
7   A.  (Witness reviews document.)  Yes.
8   Q.  Did you ever have a discussion with Doctor Rossi
9       regarding AEG's intentions as it relates to Tom
10      Darden's group?
11  A.  More specific, please.
12  Q.  Yeah.  So specifically in paragraph 1 it states
13      that "AEG would receive board seats commensurate
14      with its equity share in new co."
15          Did you ever discuss with Doctor Rossi
16      that AEG was looking to take a board seat in
17      the -- in the company?
18  A.  I don't think we did.
19  Q.  Is there a reason you didn't?
20  A.  Because they told us we couldn't.
21  Q.  "They," being Tom Darden and his group?
22  A.  Yes.  Yeah.  We would not be able to have a board
23      seat.

Page 46

1   Q.  Ah.
2           So they said board seat's off the table?
3           MR. BELL:  Objection to form.
4   A.  Yes, because we were a minority shareholder.
5   Q.  Got it.
6           Paragraph 2 provides that AEG would
7       "provide assistance in the negotiation of research
8       and licensing agreements with commercial and
9       governmental -- government entities with which AEG
10      has a prior and ongoing relationship."
11          Was that something that was -- was that
12      something that AEG did after entering into its
13      deal with Tom Darden's group?
14  A.  Yes.
15  Q.  How did you do that?
16          What did you do?
17  A.  We had -- as I previously had stated -- had met a
18      lot of people along the way, and we just turned
19      over those contacts to them.  Again, the science
20      and that was beyond us, so we didn't have -- we
21      were mostly looking to help Industrial Heat find
22      or work with clients that had been approached --
23      that we had approached, or they had contacted us.

Page 47

1   Q.  Yeah.  At some point in time did AEG enter into a
2       Contribution Agreement with Industrial Heat?        **IMP**
3   A.  Yes, we did.
4   Q.  Do you know approximately when that was?
5   A.  No.  I -- it was during that whole period.  I'm
6       not sure exactly when.
7   Q.  And did AEG ever get equity in Industrial Heat?
8   A.  Yes.  We -- in -- in lieu of $500,000 payment, we
9       decided to take a 1 percent interest in Industrial
10      Heat.
11          So we left that on the table with them.
12  Q.  Got it.
13          I'm going to show you what's been marked
14      as Exhibit No. 6.
15          MR. CHAIKEN:  Exhibit 6 has been Bates       **IMP**
16      stamped IH 104053 through 104058.
17          (Exhibit 6, IH 104053-104058.)
18  Q.  It's a series of emails from April of 2015.
19  A.  (Witness reviews document.)
20  Q.  And I'm going to refer you to the third page of
21      this document.  It's an email from April Knight to
22      Andrew Share, dated April 14th, 2015.
23          Do you recall seeing these emails?

Page 48

1   A.  Yes.
2   Q.  And what -- what's the -- what's your
3       understanding of what was being discussed at this
4       time?
5   A.  They wanted us to put in extra money to bring the
6       share up to -- the way that they were raising
7       capital, the money that we put in would get
8       diluted; and in order to bring it up to that 1
9       percent, we had to put another $30,000 in.  And
10      that's, I believe, the core here; that we had
11      decided to do that.
12  Q.  Did you, in fact, do that?
13  A.  We did.
14  Q.  Did they also ask you to convert your shares in
15      Industrial Heat to the shares of another -- of a
16      different entity?
17  A.  Yeah.  And -- and this is -- I'm not a legal guy,
18      so shares and that, I left it up to our legal --
19      to our attorney to do that.  But that was part of
20      what --
21  Q.  Okay.  I don't want you to tell me the contents of
22      any communication you had with your counsel --
23  A.  Okay.

Page 49

1  Q.  -- but is it your understanding that you did, in
2      fact, swap out shares for Industrial Heat for
3      shares of another entity?
4  A.  Yes.
5  Q.  Now, were you told by Tom Darden or anyone from
6      Industrial Heat to keep the terms of that
7      transaction confidential from Doctor Rossi?
8  A.  No.
9  Q.  Well, if you could just go to the front page of
10     that document, in the very first -- I guess it's
11     the second email from Tom Darden to you, April
12     16th, 2015, he writes "Please remember also to
13     keep this confidential to within our shareholder
14     group, which does not include Andrea."
15 A.  I guess, then, it was.  You know, I just didn't
16     recall.  Didn't think that was...
17 Q.  And then you wrote right above "Thanks, Tom.
18     Thanks J.T.  You can be sure we will not say
19     anything to an anyone.  Craig."
20 A.  Okay.
21 Q.  So do you know why he wanted to keep that
22     confidential from Doctor Rossi?
23 A.  I -- I believe -- well, this is just my opinion:

Page 50

1      It was -- he was negotiating for other
2      stockholders.
3  Q.  "He" being Tom Darden?
4  A.  Tom.
5  Q.  You never had a conversation with Tom Darden as to
6      why he would want to keep things from Doctor
7      Rossi?
8  A.  I -- I don't recall.  I, you know...
9  Q.  What's the total amount of cash that AEG received
10     as a result of the Leonardo/Industrial Heat
11     contract?
12 A.  We were to receive one-third of the 15 million,
13     which was 5 million.  I don't know exactly how
14     much, exactly, but we were offered -- because they
15     couldn't raise the money initially, so they were
16     going to pay us an interest on that; I -- and I
17     believe it was 2 -- it was a half-a-million-dollar
18     interest on the money they owed us, and...
19         So the total amount was 500 and -- 5 --
20     $400,000 something plus the 50,000.
21 Q.  Okay.  Let me show you what's been marked as
22     Exhibit No. 7.
23         MR. CHAIKEN:  Exhibit 7 has been

Page 51

1      Bates stamped IH 132033 through 132051.
2          (Exhibit 7, IH 132033-051.)
3  Q.  This -- the first page of this exhibit is a letter
4      dated August 13th, 2013, regarding the
5      Contribution Agreement and payment of the first
6      tranche.  And there are two signatures on this
7      page.
8          Do you recognize these signatures?
9  A.  Yes.
10 Q.  And whose signatures are they?
11 A.  J. Vaughan -- J.T. Vaughan and Karl Norwood.
12 Q.  And the exhibits attached to this cover letter
13     are -- the first one is an "Amendment to
14     Contribution Agreement," and that's a two-page
15     document; and then the next one is, in fact, the
16     "Contribution Agreement," dated January 21st,
17     2013.
18         Do you recognize that?
19 A.  Yes.
20 Q.  Is that the Contribution Agreement that was
21     executed between AEG and Industrial Heat?
22 A.  Yes.
23 Q.  And is the first amendment what you just

Page 52

1      described -- the fact that there was a delay in
2      making that first payment to you, and so it was
3      amended to allow you to get an extra payment?
4  A.  Yes.
5  Q.  Now, after the license agreement between Leonardo
6      and Industrial Heat, did AEG have any further
7      obligations to Leonardo?
8  A.  Can you repeat that.
9  Q.  Yeah.  After the license agreement was entered
10     into between Leonardo -- Doctor Rossi's company --
11     and Industrial Heat, did AEG owe Leonardo any
12     additional obligations?
13 A.  No.
14 Q.  What about Industrial Heat?  Did -- did AEG owe
15     Industrial Heat any additional obligations?
16 A.  No.  I -- other than just verbal, We'll help each
17     other because we were all interested in, you know,
18     getting the technology advanced.
19 Q.  All right.  When did AEG first learn that
20     Industrial Heat intended to do a corporate
21     restructuring?
22 A.  I'm not sure exactly what those dates were.
23 Q.  Does --

13  (Pages 49 to 52)

Page 53

1    A.  It was probably shortly after the license, because
2         they were forming this new company.
3    Q.  Yeah.  I'm not talking about the formation of
4         Industrial Heat.
5    A.  Oh.
6    Q.  I'm talking about after the fact, around the time
7         when you were talking about swapping the shares of
8         Industrial Heat for shares of a different company.
9    A.  That was an ongoing conversation.  We had
10        conversations with J.T. Vaughan every two weeks,
11        where they would give us an update.  So that was
12        part of...
13   Q.  Was that a -- a phone conversation that you had --
14   A.  Yes, phone conversation.
15   Q.  -- every two days?
16             And when was that first started?
17   A.  Probably shortly after, you know, all the
18        agreements were in place.
19   Q.  Now, I think in the last exhibit the Contribution
20        Agreement was executed in January of 2013 --
21        January 21st?
22   A.  Yeah.  It -- it -- you know, I don't think it
23        happened right then, because there was still lots

Page 54

1         of negotiating going on.  I mean, them working
2         through their agreements, and we were sitting on
3         the sideline, really, for a while.
4    Q.  Got it.
5             I'm going to show you what's been marked
6         as Exhibit No. 8.
7             MR. CHAIKEN:  Exhibit No. 8 has been
8         Bates stamped IH 104013 through 104018.
9             (Exhibit 8, IH 104013-018.)
10   Q.  It's a series of emails from April of 2015.
11            Does that sound about the time in which
12        you were having conversations or -- or there were
13        communications about there being a restructuring
14        of the Industrial Heat companies?
15   A.  That's probably -- yeah.
16   Q.  Now, this -- the email on this page from Andrew
17        Share to April Knight cc's you.
18            I want to refer you to the second page
19        of that email.  It's Bates stamped at the bottom
20        104014.
21   A.  Yes.
22   Q.  Specifically I'd like to refer you to paragraph 4.
23   A.  Okay.  (Witness reviews document.)

Page 55

1    Q.  Paragraph 4 states -- I'm going to try to read
2         this slowly:  "As you know, the parties have
3         previously discussed the intent behind the
4         contribution agreement and any commercial
5         achievement that Rossi is able to generate, and it
6         has been raised that there could be some ambiguity
7         as to what triggers AmpEnergo has to future equity
8         in the appropriate company."
9             Did you have conversations with anyone
10        from Industrial Heat about an ambiguity into what
11        triggers AmpEnergo's future equity in the
12        appropriate company?
13   A.  Yeah.  And that was what I was saying.  When -- it
14        was -- had to do with stock swaps, and different
15        shares, and that's something that I still have a
16        hard time trying to understand.
17   Q.  So you think that this paragraph refers to simply
18        swapping out shares and not having anything to do
19        with what Rossi's able to achieve in his testing
20        of the technology.
21   A.  (Witness reviews document.)  That was No. 4, you
22        said?
23   Q.  Yeah, No. 4.

Page 56

1    A.  (Witness reviews document.)  Well, one of the
2         things that we had discussions with amp is -- I
3         mean, with Industrial Heat was performance and
4         reaching a certain COP, and that our agreement
5         with them was tied to that COP.
6    Q.  Right.  So --
7    A.  And we disagreed with that.
8    Q.  You disagreed with Industrial Heat --
9    A.  Yes.
10   Q.  -- as to --
11   A.  Yes.
12   Q.  -- your payment being tied to --
13   A.  It was ambiguous --
14   Q.  It's --
15   A.  -- on the percentages reached on the COP.
16   Q.  I see.
17            Did you ever have any discussions with
18        Industrial Heat wherein Industrial Heat's position
19        was the time for performance had past, and,
20        therefore, certain payments that may have been
21        achievable were no longer achievable?
22            MR. BELL:  Objection to form.
23   A.  I'm not sure if it was exactly that way.

14  (Pages 53 to 56)



Page 57

1  Q.  Well, explain to me what way you understood it to
2      be.
3  A.  It was tied to performance, and I knew that Doctor
4      Rossi and Industrial Heat were working on a
5      1-megawatt containerized version of the E-Cat, and
6      the delivery times -- we were told by Industrial
7      Heat is, Everything just seems to be moving
8      forward.
9          And so we just accepted their conclusion
10     -- 'cause they owned the technology -- that -- or
11     the license -- that they had been talking with
12     Andrea about timing.
13 Q.  Did they ever tell you -- and I'm talking about
14     the time frame of these emails, April of 2015 --
15     that they felt that Doctor Rossi had breached or
16     violated the license agreement?
17 A.  They were concerned that the timing was keep --
18     kept going on, but there was a lot of difficulty
19     in getting the container from Italy to North
20     Carolina.  They had to rework the container and
21     the 1 megawatt.  So I think they were concerned
22     about the timing on all of it, but that was not
23     our -- you know, we weren't involved in that.

**[H]** (marked at lines 13–23)

Page 58

1  Q.  But I'm going to be really specific in my question
2      now.
3  A.  Okay.
4  Q.  Did -- did anyone from Industrial Heat ever tell
5      you specifically, We think that Doctor Rossi has
6      violated the license agreement?
7          MR. BELL:  Objection to form.
8  A.  I don't recall.  I mean, I -- I just don't think
9      that was part of a discussion.
10 Q.  Did you ever have a discussion with Doctor Rossi
11     where you -- you expressed concerns about his
12     violating --
13 A.  No.
14 Q.  -- the license agreement?
15 A.  No.  I visited North Carolina on several occasions
16     to the lab and viewed what they were doing there,
17     and I assumed that everybody was working
18     cooperatively.
19 Q.  And what did you see when you were there?
20 A.  The 1-megawatt container, lots of E-Cats being
21     worked on, and group of people working with Doctor
22     Rossi and Industrial Heat together cooperatively.
23 Q.  Turning your attention back to Exhibit No. 8, that

**[IMP]** (marked at lines 10–23)

Page 59

1      same paragraph No. 4, the second -- the last
2      sentence in that paragraph states "Accordingly, we
3      would like to resolve any discrepancies on that
4      issue as part of the restructuring so that there
5      are not any misunderstandings about AmpEnergo's
6      future rights as it relates to the tests that
7      Rossi is currently conducting."
8          Did you resolve any discrepancies that
9      you had with Industrial Heat at that time?
10 A.  (Witness reviews document.)  I'm not sure
11     specifically what this refers to.
12 Q.  Okay.  Did you have any notes or anything that
13     described what was going on around April 2015?
14 A.  Is that -- I guess the question -- can I ask you a
15     question?
16 Q.  Sure.
17 A.  Is that prior to the 1 megawatt being shipped to
18     Florida?
19 Q.  No.  I think the 1 megawatt was already being
20     tested in Florida.
21 A.  Oh, it was.  Okay.  All right.
22          So the question -- can you re-ask the
23     question.

Page 60

1  Q.  Yeah.  I'm just reading what was written, and it
2      seems to me like there were some misunderstandings
3      or discrepancies between AEG and Industrial Heat
4      at the time.  And I guess maybe I should ask --
5      the first question is:  What discrepancies were
6      you aware of?  Or what misunderstandings were you
7      aware of at that time?
8  A.  Well, the COP, you know, and the performance
9      levels --
10 Q.  Okay.
11 A.  -- that they...
12          Basically we were listening to what
13     Industrial Heat told us.
14 Q.  Right.
15 A.  And we had visited Doctor Rossi once as a group
16     and saw what we saw.
17 Q.  Right.
18 A.  And they -- "they," being Industrial Heat -- we
19     assumed they had somebody there; that everything
20     was all right.
21 Q.  Are you --
22 A.  So the -- the discrepancy -- I -- I'm just not
23     sure what that -- you know, other than timing.

**[R, H]** (marked at lines 1–23)

15 (Pages 57 to 60)

Page 61

```
1    Q.  Okay.  When you say "other than timing --"
2    A.  Timing of when the -- the test started and when it
3    ended.
4    Q.  Did you have discussions with Industrial Heat
5    about the timing of the test?
6    A.  Probably.
7    Q.  But you don't remember anything specific.
8    A.  No.  I mean, this -- these were conversations that
9    we had ongoing with J.T. about the test, and they
10   had concerns.  They had concerns that they didn't
11   -- I'm trying to think of how this all...
12        I guess their concern was that they were
13   just letting Andrea go do what he was doing.
14   Q.  Did you have concerns, after hearing from
15   Industrial Heat, as to what was going on?
16   A.  We thought everything was good.
17   Q.  Okay.  Did you ever have a conversation with
18   Doctor Rossi in or around April of 2015, where
19   Doctor Rossi said, Hey, there are problems; there
20   are issues?
21   A.  Yeah, I think that -- I believe -- and, again, I'm
22   not quite sure of the date -- but we went down as
23   a team, because it was -- we had a meeting in
```

**IMP**

Page 62

```
1    Miami and went and viewed the 1 megawatt.
2    Q.  And Doctor Rossi was present during that meeting?
3    A.  Yes.
4    Q.  Were representatives of Industrial Heat present
5    during that meeting?
6    A.  No.
7    Q.  They were not?
8    A.  Well, I don't -- I don't know if they had somebody
9    working there or not.  That was -- I'm just not
10   sure.  I'm not sure if, you know, the person they
11   had hired to be working was there or not.
12   Q.  I see.
13        When you visited the plant in Miami,
14   the -- what was the purpose of -- of you making
15   that trip?
16   A.  We just -- we, you know, we had a vested interest
17   in -- in seeing that it worked; and -- and it was
18   the first time that all of AmpEnergo had a
19   opportunity to come together as a team to visit
20   the plant.
21   Q.  At the time of that visit, did Doctor Rossi
22   express to you or to anyone at AmpEnergo that he
23   felt there were problems or issues with his
```

Page 63

```
1    relationship with Industrial Heat?
2    A.  No.  He was -- he wanted to make sure
3    that this was working so that he would get his
4    payment.  I remember that.
5    Q.  Was it your understanding that, had that test been
6    successful -- or if the results of that test were
7    successful, that both Doctor Rossi and AmpEnergo
8    would be paid?
9    A.  We were hoping.
10   Q.  And what was the payment that was going to be the
11   result of that test?
12   A.  That Andrea would get his share of the remaining
13   monies due him, and that we would, depending on
14   the COP -- that was a discussion that was ongoing
15   --
16   Q.  Right.
17   A.  -- 'cause if it -- Industrial Heat had commented
18   to us, and that was a contention we had in the
19   language of the licensing agreement, that, if it
20   wasn't over 6 -- and, again, I think that is
21   what -- then we were not to participate -- or we
22   were not to get paid.
23        And we -- we were told a long -- you
```

Page 64

```
1    know, and, again, this was a little more
2    sophisticated than -- where we had -- that's why
3    we hired a good law firm to help us negotiate
4    through this, was to get a better understanding of
5    the drag-along, tag-along commitments that were
6    put in the license agreement that we felt that, if
7    he had reached 6, then we would -- we would get
8    paid.
9    Q.  So if he reached COP -- and what does "COP" stands
10   for?
11   A.  Coefficient of performance.
12   Q.  If he had COP of above 6, he would get paid
13   approximately $89 million, and AmpEnergo would get
14   paid approximately $45 million; is that your --
15   A.  Well, actually, we -- we'd get paid a little bit
16   more than that, because we were offered -- if we
17   took -- we had -- it was a 20 percent, I believe,
18   bump that they offered us in lieu of cash
19   originally.  So it was 54 million --
20   Q.  Got it.
21   A.  -- that we would get paid.
22   Q.  So if you took a piece of it in equity, you'd get
23   a higher number.
```

16 (Pages 61 to 64)

IMP

**Page 65**

1    A.  Yes.
2    Q.  Understood.
3        And as of April of 2015, you were
4    understanding -- your understanding was that the
5    payment was still achievable, based on the results
6    of the test?
7    A.  Well -- yeah.  I believe the test had just started
8    a little -- so, you know, it was only a month or
9    so.  So we wanted to see the -- the 1 megawatt as
10   a team, and -- yeah, it would -- yeah.
11   Q.  Now, getting back to the discussions with
12   Industrial Heat about the new entity they were --
13   they were forming, I believe, a holding company
14   for -- for the technology.
15       Is that your understanding?
16   A.  Yes.
17   Q.  And did they give AmpEnergo an opportunity to
18   invest in that holding company?
19   A.  Yes.  The -- the -- the idea was Industrial Heat
20   had the license agreement for Doctor Rossi.
21   Q.  Right.
22   A.  The holding company -- and I -- and, again, may --
23   this is the one that was formed in the UK?  Is

**Page 66**

1    that the one you're referring to?
2    Q.  I believe that's correct.
3    A.  That we did not want to -- we wanted to make sure
4    that our agreement put -- got put into the holding
5    company and not left -- you know, because if --
6    if, for some reason, the technology didn't work,
7    we were out of that 1 percent share that we had
8    within the company.
9    Q.  Right.  So you wanted to make sure that your
10   interests went up the -- up the chain?
11   A.  Up the chain; yes.
12   Q.  And, in fact, you did get that interest?
13   A.  We did; yes.
14   Q.  I show you what's marked as Exhibit No. 9.
15       MR. CHAIKEN:  Exhibit No. 9 has been
16   Bates stamped AE 340.
17       (Exhibit 9, AE 340.)
18   Q.  Do you recall seeing this proposed structure
19   before?
20   A.  Yes.  Yes.  Yeah.
21   Q.  Is this what Industrial Heat had presented to you
22   regarding their restructuring of their corporate
23   formation?

IMP

**Page 67**

1    A.  Yes.
2    Q.  Did -- do you know -- do you know when you
3    received this, approximately?
4    A.  I don't.
5    Q.  Were you told that Industrial Heat had been
6    investing in other LENR technologies --
7    A.  Yes.
8    Q.  -- around this time?
9    A.  Yeah.
10   Q.  Do you know what other technologies they told you
11   they were investing in?
12   A.  They didn't tell us.  They -- I knew from previous
13   conversations early on that Tom had had
14   conversations with William -- you know, I believe
15   there was a guy in Illinois, George Miley, that he
16   had invested in.
17       They -- they were going around looking
18   at various IPs to evaluate.
19       They told us that.
20   Q.  Did they ever tell you the status of any of those
21   technologies?
22   A.  No, only that some were promising.
23   Q.  Didn't go into any more detail than that?

**Page 68**

1    A.  No.
2    Q.  Did -- when you made that trip to the plant in
3    Florida to visit Doctor Rossi and see the
4    operations --
5    A.  Uh-huh.
6    Q.  -- did Doctor Rossi ever ask you about whether or
7    not you maintained your shares in Industrial Heat,
8    or if you changed them out?
9    A.  I think he did.
10   Q.  And what did you tell him?
11   A.  That we were -- that we did, I believe.  I mean, I
12   -- I can't imagine it wasn't...
13   Q.  You told him that you had swapped out shares for a
14   holding company?  Or did you tell him --
15   A.  No.  Maybe we didn't have that discussion; no.
16   Q.  You don't remember him asking that question?
17   A.  I don't remember that question being asked.
18       MR. CHAIKEN:  Want to go off the record.
19   Take a restroom break.
20       VIDEOGRAPHER:  Okay.  It is 10:15 a.m.
21   and we are going off the record.
22       (Recess was taken.)
23       VIDEOGRAPHER:  Okay.  It is 9:27 -- I'm

17 (Pages 65 to 68)

**Page 69**

1    sorry -- it is 10:27 a.m., and we are back on the
2    record.
3    Q.  Mr. Cassarino, I'm going to show you what's been
4    marked as Exhibit No. 10.
5           MR. CHAIKEN:  Exhibit No. 10 has been
6    Bates stamped AE 437.001 through 437.008, and it's
7    a copy of the first amendment to the license
8    agreement.
9           (Exhibit 10, AE 437.001-437.008.)
10   Q.  And my first question is going to be:  Have you
11   seen this before?
12   A.  Yes.
13   Q.  And do you know why a first amendment to the
14   license agreement was entered into?
15   A.  I'll have to -- I -- I'm -- there's so many legal
16   agreements.  I can't remember exactly.  So I just
17   need to look at this --
18   Q.  Go ahead.
19   A.  -- or maybe you can summarize it.
20   Q.  Well, my understanding was that this amended the
21   time for performance of what was called the
22   validation test under 3.2(a) of the agreement, and
23   it set the date and the location for the test.

**Page 70**

1           If you look at the very first page, "One
2    amendment," it kind of goes through the...
3    A.  (Witness reviews document.)  This is the one that
4    was done in Italy?
5    Q.  Yes.
6    A.  Okay.
7    Q.  Did you have any conversations with anyone from
8    Industrial Heat prior to this document being
9    executed?
10   A.  Yes.
11   Q.  And do you remember what those conversations were
12   about?
13   A.  Not totally, other than we were all going to go to
14   Italy to watch the performance.  I think Karl,
15   myself, and Ron Engleman went, and this, I guess
16   -- from what I remember -- set out the dates, the
17   times that that test would occur.
18   Q.  Right.  And this document's dated April 29th,
19   2013.
20           Do you know if this was executed in
21   Italy?
22   A.  It was executed in Italy.
23   Q.  And did you actually see the test being performed

**IMP**

**Page 71**

1    in Italy?
2    A.  I did.
3    Q.  And what was your impression at the time?
4           MR. BELL:  Objection to form.
5    A.  That everybody that was there was performing high
6    energy.  It was an intense 24 hours, or --
7    everybody was busy.  And being a nontechnical
8    person, I was an observer.
9    Q.  Got it.  Now, did this document, the first
10   amendment, impose any new obligations on AEG, as
11   far as you know?
12   A.  On AEG?
13   Q.  Yes.
14   A.  No, because I believe we had signed over -- we
15   were getting ready to sign over our agreements
16   and -- no.  This was just to be there to watch the
17   performance.
18   Q.  Did you think -- or was it your understanding that
19   AEG was a necessary party to this first amendment?
20           MR. BELL:  Objection to form.
21   A.  At the time I don't think we had any -- we were
22   there -- we were part of the -- the whole process,
23   so we just felt that this was part of what we

**Page 72**

1    needed to do.
2    Q.  Did anyone from the AE -- AEG group express any
3    concerns about executing this agreement -- this
4    amendment? -- excuse me.
5    A.  I don't believe so.
6    Q.  Do you know why the testing schedule was changed
7    from what was originally in the license agreement?
8    A.  Can you explain to me what those differences were.
9    Q.  I think the -- the timing of the tests --
10   A.  Oh.
11   Q.  -- was extended.
12   A.  The timing of the days, or the time of the 24-hour
13   test?
14   Q.  The time in which the test was to be performed.  I
15   think it was 100 -- it was supposed to be
16   performed within 120 days of execution of the
17   license agreement, and I believe this fell outside
18   of that.
19   A.  I don't -- I don't recall exactly why.  It just --
20   everybody was trying to move forward in setting
21   everything up.  Maybe that was the -- some
22   technical things.  I don't know.  I can't recall.
23   Q.  I show you what's been marked as Exhibit No. 11.

18 (Pages 69 to 72)

IMP

Page 73

```
1          (Exhibit 11, AE 436.)
2        MR. CHAIKEN:  Exhibit 11 is a series of
3   emails Bates stamped AE 436.  And it's dated --
4   the -- the main email on the page is dated May
5   8th, 2013.  It's from Ronald Engleman, Jr., to
6   several people, including yourself.
7        At the end of the email Ron writes "The
8   testing was deemed a success by all parties
9   present."
10       Was that your impression after the test
11  concluded?
12  A.  That's what -- yeah.  That's what everybody --
13  that was our impression because everybody wanted
14  to move ahead with it.  That was -- and, again,
15  from my point of view, I wasn't technical enough
16  to understand all of the thermal couples, you
17  know, the -- all of the technical side of this.
18  Q.  Now, what was your understanding as to the
19  significance of this test and its results as it
20  relates to AmpEnergo's receiving payment from
21  Industrial Heat?
22  A.  Well, if they were to move forward with this, we
23  would get paid.
```

Page 74

```
1   Q.  Okay.  And, in fact, they did move forward, and
2   you did get paid --
3   A.  Yes.
4   Q.  -- is that true?
5   A.  That's true.
6        MR. BELL:  Objection to form --
7   belatedly.
8   A.  But can I say something?
9        There -- it was -- that was a step
10  towards the payments.  This was --
11  Q.  I see.
12  A.  -- 'cause they were raising money.
13  Q.  Right.
14  A.  -- to put it together.  So that was --
15  Q.  At the time -- April/May 2013 -- did they have the
16  money to pay AmpEnergo?
17  A.  No.
18  Q.  How --
19  A.  They were raising the money.
20  Q.  How do you know that they didn't have it at that
21  time?
22  A.  Well, they said they didn't.
23  Q.  That's a good way.
```

IMP, C

Page 75

```
1        Did you ever have any discussions with
2   anyone from Industrial Heat after the test
3   concluded where they came back and told you, Hey,
4   we think that that test was somehow flawed, or the
5   protocol was improper, or we think the -- the data
6   from that test was wrongfully manipulated somehow?
7   A.  No.
8   Q.  Even after this lawsuit was filed, did they ever
9   come back and make those claims to you?
10  A.  About what?
11  Q.  About --
12  A.  That the first test was --
13  Q.  Was somehow flawed, or the protocol was incorrect,
14  or -- or there was an issue with it.
15  A.  Yes.
16  Q.  They did?
17  A.  Yeah.
18  Q.  When did they do that?
19  A.  We were called to Tom's office -- I guess probably
20  a year ago -- no, it was probably in August of
21  last year -- where they were -- this was after the
22  lawsuit had started --
23  Q.  Got it.
```

Page 76

```
1   A.  -- and insinuated that we were part of a fraud.
2   Q.  I'm going to get to that a bit later.
3   A.  And we -- to be -- you know, again, we put all of
4   our hope, because we actually -- we felt we had a
5   great relationship with Industrial Heat.  We
6   worked really good together.  We were always
7   communicating, and we trusted they were in the big
8   league in terms of financing.
9        This was outside my pay grade for sure;
10  and we assumed that all of this -- raising the
11  money and raising the capital and us getting
12  paid -- was because of what they felt they saw and
13  did.
14  Q.  Okay.  I show you what's been marked as Exhibit
15  No. 12.
16       MR. CHAIKEN:  Exhibit No. 12 has been
17  Bates stamped AE 255.001 through.002.
18       (Exhibit 12, AE 255.001-255.002.)
19  Q.  The top is an email from J.T. Vaughan to Karl
20  Norwood, yourself, Ronald Engleman, dated August
21  12, 2013, where they are showing a payment of, I
22  believe, $3,219,950 to AEG as of that date.
23       Do you recall receiving those funds --
```

19 (Pages 73 to 76)

## Page 77

1   A.  Yes.

2   Q.  -- on or around that time?

3   A.  Yes.  Yes.

4   Q.  Did Industrial Heat inform you sometime prior to

5      that that they had received funding that would

6      allow them to make payment to you?

7   A.  I don't -- I'm not sure they said that.  We

8      assumed they did if they were paying us.

9   Q.  Right.  Are you familiar with the parties -- when

10     I say "the parties," I'm talking about Leonardo

11     and Industrial Heat -- entering into or talking

12     about entering into a second amendment to the

13     license agreement?

14   A.  If the second amendment had to do with the

15     performance -- is that what...

16   Q.  Well, I think it had to do with the time of

17     performance, as well as equipment to be tested.

18   A.  I don't recall.

19   Q.  I show --

20   A.  I'm sure there was.

21   Q.  Let me show you what's been marked as Exhibit 13.

22        MR. CHAIKEN:  Exhibit 13 is -- has been

23     Bates stamped AE 295.001 through 295.003.

## Page 78

1        (Exhibit 13, AE 295.001-295.003.)

2   Q.  And it's a draft of a second amendment to the

3     license agreement.

4        Take a second to look it over and let me

5     know when you're done.

6   A.  (Witness reviews document.)  I -- I -- you know,

7     I'm a little confused as to the 6-cylinder unit.

8   Q.  You don't recall having conversations with either

9     Doctor Rossi or IH regarding a 6-cylinder unit?

10   A.  Well, the only -- my recollection was 6-cylinder

11     unit was something we spotted in -- oh, we saw in

12     Italy -- was tested -- or being tested.  The -- it

13     was a new kind of concept that Doctor Rossi had.

14     And I -- and I don't recall -- I thought, you

15     know, again, this is -- that the E-Cat, defining

16     which one -- the Hot Cat, E-Cat 6 cylinder was --

17     it's a little confusing for me as to which one.

18     I -- obviously, we've seen this.  We've --

19   Q.  Right.

20   A.  -- you know, did -- signed it and, you know, moved

21     ahead with it, but...

22   Q.  Is it -- is it your understanding that AEG

23     executed this document?

## Page 79

1   A.  I don't remember.  I don't remember.

2   Q.  Do you recall having a conversation with Doctor

3     Rossi where he said, I'd like you to sign the

4     second amendment, or, I'd like AmpEnergo to sign

5     the second amendment?

6   A.  Yes, I -- I do -- and -- and we did say we didn't

7     want to sign it.

8   Q.  Why?

9   A.  Because we felt that -- in negotiating with

10     Industrial Heat -- that, by signing this, we

11     wouldn't be party to that COP -- the 6 COP; and if

12     it was a percentage below that, we had no right to

13     any funds coming forward.

14   Q.  I see.

15        So is your view that you were going to

16     lose your -- your right to a payment of that

17     additional tranche by executing this document?

18   A.  Yes.

19   Q.  Did you express that to Doctor Rossi?

20   A.  Yes.

21   Q.  Was that verbal, or was that --

22   A.  It was -- it was verbal.

23   Q.  Okay.  Did you Say, Hey, If you change the terms  `IMP`

## Page 80

1     of this -- this amendment to incorporate --

2   A.  No.  I think we just -- we felt that it wasn't in

3     his best interest or our best interest to sign

4     this.

5   Q.  Why did you think it was not in Doctor Rossi's

6     best interest?

7   A.  Because we felt that he would not get the funds

8     that were due him if we -- if it was below -- it

9     was -- again, and -- and this is hard for me to

10     recall this -- but in the language of the

11     agreement, it was -- and we -- we had all kinds of

12     attorneys look at this -- it was -- sort of --

13     wishy-washy of how our payment -- it wasn't so

14     much Doctor Rossi; it was our payment -- how we

15     would get reimbursed the money that we were to

16     receive.

17   Q.  Okay.  Was it your understanding that, despite

18     AEG's not signing the second amendment, that

19     Industrial Heat and Leonardo were still working

20     towards a 350-day test?

21   A.  Yes.  Yeah.

22        MR. BELL:  Objection to form.

23   Q.  Did anyone from Industrial Heat say to you at any

20 (Pages 77 to 80)

Page 81

1  time in or around October of 2013 that the time
2  for performance of that 350-day test was to be
3  done immediately after that 1 megawatt was
4  delivered to North Carolina; and that, because the
5  test hadn't started up, there was no opportunity
6  for Doctor Rossi or AmpEnergo to -- to earn
7  additional payment under that provision?
8         MR. BELL:  Objection to form.
9  A.  I'm not sure I quite understand what -- let me --
10      sort of -- feed that back.
11 Q.  Sure.
12 A.  So you're saying that if that test had not started on X
13      day -- day one --
14 Q.  Right.
15 A.  -- under that 300 -- whatever the number was --
16      340 days -- or whatever that number was -- that
17      there would be a penalty for that?
18 Q.  I don't know if I would say a "penalty," but just
19      -- the time for performance had come and gone, and
20      because it wasn't performed --
21 A.  They were worried -- Industrial Heat was worried
22      that the timing -- it was taking a long time to
23      get this one-year test under -- underway.

Page 82

1         However, we were -- as I had mentioned
2  before, I had stopped at the lab several times,
3  and my -- my sense was that everybody was still
4  cooperating.
5  Q.  Okay.  Had -- had they put you -- well, strike
6  that.
7         Is it your understanding, through your
8  discussions with Doctor Rossi, that he still felt
9  that his -- he had the ability to earn an 80, $90
10      million payment if he performed a 350-day test?
11 A.  Yes.
12         MR. BELL:  Objection to form.
13 Q.  And you knew this because you had a discussion
14      with him about it?
15 A.  Yes.  I mean, that was why he was setting up to do
16      the test, I believe.  And we -- we assumed that
17      Industrial Heat and he had worked through those
18      agreements.
19 Q.  Now, you mentioned to me that Industrial Heat was
20      concerned about the fact that the 350-day test
21      hadn't started.
22 A.  Right.
23 Q.  Do you know why it hadn't started?

Page 83

1  A.  I don't think anybody had -- they -- they -- 1
2  megawatt -- and the 1 megawatt took a lot longer
3  to build than I think -- the unit that came from
4  Italy had some damage to it, I believe; and they
5  had to repair some of the units.  And so they were
6  working on -- at the lab in North Carolina -- new
7  units to install there.
8  Q.  And did Industrial Heat explain that that was the
9  reason why it was delayed in starting up, or was
10      there other reasons?
11 A.  No.  I -- I -- you know, being -- and this is my
12      assumption -- is that, in -- in the development of
13      technology, things always take longer than you
14      would hope they would.
15         So it -- to me, it was just technical
16      stuff that was being worked out between Industrial
17      Heat and -- and Andrea Rossi.
18 Q.  Do you know if there were any issues regarding
19      obtaining regulatory approvals to have a test of
20      the 1-megawatt E-Cat?
21 A.  You mean in Florida?
22 Q.  Whether it be in Florida, or North Carolina, or
23      anywhere in the United States.

Page 84

1  A.  Well, there were discussions, but that wasn't
2  anything that we were involved in.  So...
3  Q.  But you were aware of the discussions?
4  A.  Yeah.  We were told that they had looked into
5  issues, you know, but I -- I guess if -- from my
6  recollection, that -- that was what they were
7  doing, but I -- I don't know what...
8  Q.  Do you know -- do you know if any regulatory
9  approvals were required or obtained?
10 A.  I don't know.
11 Q.  I show you what's been marked as Exhibit 14.
12         MR. CHAIKEN:  Exhibit 14 has been Bates
13      stamped AE 303.
14 Q.  It's an email from Ron Engleman to Tom Darden,
15      cc'ing yourself, dated November 29th, 2013.  And I
16      believe the time frame is, this is shortly after
17      the parties had sent your second -- second
18      amendment to the license agreement.
19         (Exhibit 14, AE 303.)
20 Q.  Have you seen this email before?
21 A.  I'm sure I have; yes.
22 Q.  Do you recall having conversations with Ron
23      Engleman and Karl Norwood about --

IMP

IMP

Page 85

1    A.   Yes.  Yeah.  This was part of what I was
2         discussing about the percentages and our concern
3         for not getting payment.
4    Q.   Right.  Did Tom Darden or anyone from Industrial
5         Heat ever respond to this email, as far as you
6         know?
7    A.   I can't recall if they responded to this email or
8         not.
9    Q.   Do you recall having conversations with Tom
10        Darden, J.T. Vaughan, or anyone from Industrial
11        Heat about the contents of this email?
12   A.   Yeah.  We had -- we -- we did have discussions
13        with -- mostly with J.T.  He was -- sort of -- the
14        point person that we -- Tom was not -- we didn't
15        have a lot of conversations with Tom.
16             And this was a topic of conversation;
17        yes.
18   Q.   Now, specifically the -- the very first paragraph,
19        the very last sentence, it states "AEG felt that
20        if IH determined the technology was consistently
21        producing above unity during the 350-day test at a
22        COP that IH deemed appropriate and negotiated with
23        Rossi, then IH would move forward with fully

Page 86

1         licensing the E-Cat IP, and AEG would be entitled
2         to the second tranche equity."
3             Do you see that?
4    A.   Yes.
5    Q.   Did they -- did anyone from Industrial Heat ever
6         dispute that?
7    A.   I --
8    Q.   Meaning, did any -- let me rephrase it.
9    A.   Yeah.
10   Q.   Did anyone from Industrial Heat ever say, We don't
11        think that AEG could ever be entitled to the
12        second tranche of equity?
13   A.   No.  We assumed they would.
14   Q.   Okay.
15   A.   Yeah.  And you can see from that -- and I'm just
16        reading this -- that the other -- last paragraph
17        there, that we were always -- we -- we felt that
18        Industrial Heat and -- and us, we had a good
19        relationship, as did Industrial Heat and Andrea.
20        That was -- you know, it -- it got into the legal
21        stuff that, you know, we -- I -- you know,
22        personally, I don't have the stomach for it.  You
23        know, that's really -- it's about working

IMP

Page 87

1         collaboratively.
2    Q.   Did -- after this time frame, November of 2013,
3         did Industrial Heat or Doctor Rossi ever come back
4         to you and say, We don't think that that second
5         amendment was valid, because AmpEnergo didn't
6         execute it?
7    A.   Yeah.
8    Q.   And do you recall having conversations about it?
9    A.   I -- I'm sure we did.  I don't recall exactly
10        when/how, but we knew -- by not signing it -- that
11        that second amendment was not going to be valid.
12   Q.   All right.  I show you what's been marked as
13        Exhibit 15.
14             MR. CHAIKEN:  Exhibit 15 has been Bates
15        stamped IH 124079 through 124081.
16             (Exhibit 15, IH 124079-081.)
17   Q.   It's a series of emails from April of 2014 between
18        you and Doctor Rossi and others.
19             And the first email I'm going to point
20        you to is -- starts at the very bottom of the
21        first page.  It's dated April 30th, 2014.  It's
22        from you to Doctor Rossi.
23             And you write to him -- and you have to

R, LC

Page 88

1         turn the page to the second page to see the text
2         of the -- of the email.
3    A.   Oh.
4    Q.   And you write to him:  "Just trying to get some
5         idea of how things were going with the testing of
6         the blue box 1 megawatt.  J.T. had mentioned a
7         while ago that you were going to get it running
8         soon.  We are very interested as to how it is
9         going, because AmpEnergo's second tranche of funds
10        are tied to the 350-day test and COP.  As I
11        suspect, your payment is too."
12   A.   Yes, I --
13   Q.   I mean, if --
14   A.   I mean, I don't recall it, but, obviously, I -- I
15        wrote that.
16   Q.   What discussions were you having with Industrial
17        Heat about the 350-day test at this time?
18   A.   They -- my -- my sense of where Tom was in
19        conversations with he and J.T. was, they were
20        letting Andrea move ahead with it.  You know, we
21        were always -- not questioning, but we were
22        concerned that they weren't as involved in the
23        1-megawatt test as we would have been, you know.

22 (Pages 85 to 88)

Page 89

1   Q.   What -- what gave you those concerns?
2   A.   That -- that they were not -- J.T. -- J.T. or --
3        there was a guy, T. Barker...
4   Q.   T. Barker Dameron?
5   A.   Yeah.  Yeah.
6        You know, that they were all involved in
7   making this 1 megawatt with Andrea; and when it
8   went to Florida, they had not been as involved as
9   they were when it was in North Carolina.
10  Q.   Okay.  Now, Andrea Rossi responds to your email on
11       the next page, which is the first page of the
12       document.
13  A.   Okay.
14  Q.   And he writes to you:  "Dear Craig, we have to put
15       in operation the 1-megawatt plant that we are
16       ready to put in operation since when we delivered
17       it in August of 2013.  It has been delivered
18       perfectly ready to go, as it has been turned off
19       after the May test.  It has not been possible to
20       put it in operation for reasons independent from
21       us."
22        Did you ever have any conversations with
23   Doctor Rossi about why the -- the 1 megawatt

Page 90

1   hadn't been put into operation since August of
2   2013?
3   A.   Well, I -- as I'd mentioned before, getting it
4        here was -- was an issue.
5   Q.   Right.
6   A.   You know, I mean, just freight and delivery and
7        all of that.
8        And, yes, I remember having this.
9   Q.   And -- and he goes on to say -- after he writes
10       "for reasons independent from us," he writes
11       "location -- where to put it in operation,
12       authorizations, etcetera."  And we talked a little
13       bit about authorizations earlier.
14        Did you have conversations with Doctor
15   Rossi about authorizations that were required
16   for -- for running a test of the 1 megawatt?
17  A.   What -- you mean permitting?
18  Q.   Weather permitting, or just approval from a -- a
19       health organization, or anything else.
20  A.   We -- we probably -- I mean, Andrea and I went
21       back and forth about this stuff.  Again, we were
22       just assuming that Andrea and Industrial Heat --
23       because we were stepped -- we were actually one

Page 91

1   step removed from all of this --
2   Q.   Right.
3   A.   -- you know, so we were involved to the point,
4        because we had some second tranche coming, we
5        wanted this to be successful, but it was out of
6        our hands as to what was really going on.
7   Q.   You were having weekly meetings with industrial --
8        or biweekly meetings with Industrial Heat?
9   A.   Biweekly with -- with J.T. mostly.  But not every
10       week, I mean.  But, you know, we were -- you know,
11       we were always looking for technical updates, what
12       they were doing, and finance, you know.  So...
13  Q.   I know you said earlier that you recalled
14       Industrial Heat expressing concerns about why the
15       1-megawatt test hadn't started yet; and this email
16       -- kind of -- contradicts what you were being told
17       by Industrial Heat; does it not?
18        MR. BELL:  Objection to form.
19  A.   (Witness reviews document.)  Yeah.
20  Q.   Did you ever have a -- a conversation with
21       Industrial Heat about this email and what Doctor
22       Rossi was claiming in it?
23  A.   I don't think we had it -- and I can't recall

Page 92

1   about this specific email, but we -- I mean, we
2   were always looking to see a hope that everything
3   was moving forward.
4   Q.   And I get that.
5        But I'm just -- want to be specific to
6   this one, because your email up above on the same
7   page states -- and -- and this is dated right
8   after -- or the -- timewise is an hour after you
9   received Andrea's email.  You write to J.T.:
10   "Just as a follow-up to our conversation today,
11   still not sure what he is saying.  I can follow up
12   with another email.  What do you think."
13        So it looks like you had a conversation
14   with J.T. Vaughan about this email.
15        MR. BELL:  Objection to form.
16  A.   Well, I'm -- I'm not sure it was about this email.
17   It probably was.  But we were concerned about why
18   wasn't it moving forward.
19  Q.   All right.  Did you ever say to J.T. Vaughan, Hey,
20   Andrea doesn't think it's his fault that this
21   thing hasn't started yet.  He's saying that there
22   are other issues.  What do you say, J.T.?
23  A.   That was probably part of the conversation.  I

23  (Pages 89 to 92)

Page 93

```
 1        mean, we were -- we were concerned that, as this
 2        started to -- as an engineering company, we didn't
 3        feel that this was being engineered or put into --
 4        I -- I'm just trying to find the right way to
 5        express this.
 6             It's not the way we would have done
 7        this.
 8   Q.   I understand that, but I'm -- if you don't recall,
 9        that's a fine answer.  But do you recall asking
10        J.T. what he felt about Doctor Rossi's email --
11        this specific one; and do you recall what he
12        responded?
13   A.   I don't recall if -- we probably had the
14        conversation, but I'm not sure what he would have
15        answered.
16   Q.   Okay.  Did you ever call Doctor Rossi after you
17        received that email and say, Hey, what can I do to
18        help, you know, get this process moving along?
19   A.   Probably, you know, 'cause that was -- I was
20        communicating with both teams; and so, you know,
21        we would -- we would probably have had that
22        conversation, 'cause it was in everybody's
23        interest to move this forward.
```

Page 94

```
 1   Q.   Right.
 2             Is there a reason why Doctor Rossi
 3        wasn't included in the updates -- the biweekly
 4        updates you were getting from Industrial Heat?
 5   A.   Nothing specific; no.  No.
 6   Q.   Did you get a sense at any point in time that
 7        there was a lack of communication between
 8        Industrial Heat and --
 9   A.   Yes.
10   Q.   -- Doctor Rossi?
11   A.   Yes.
12   Q.   And when did you get that sense?
13   A.   I'm not sure when, but --
14   Q.   At least by the time of this email?
15   A.   Yes.
16   Q.   "This email," being the April 30, 2014?
17   A.   Yeah.  I -- we -- we were just -- we -- I guess
18        our -- it wasn't concern so much, because we -- we
19        are a third-party outside of all of this -- is
20        that, we really wanted to understand how the test
21        was going.
22   Q.   At some point in time is it your understanding
23        that -- whether it be Industrial Heat or Doctor
```

Page 95

```
 1        Rossi -- was looking to find a customer to use the
 2        -- the heat generated by the 1-megawatt E-Cat?
 3   A.   Yes.
 4   Q.   When did you first learn that?
 5   A.   Oh, I -- I think they were all looking from, you
 6        know, the -- the time it got delivered; and, then,
 7        I was on vacation in the Grand Canyon, and I got a
 8        call from Doctor Rossi saying that he had found a
 9        customer; and that I should tell Industrial Heat
10        that this customer should be looked at.
11             MR. CHAIKEN:  Okay.  I'm getting a
12        little note that we should take a break to change
13        a tape, and this is probably a good spot to take
14        that break.  So let's go off the record.  Stop
15        here.
16             VIDEOGRAPHER:  Okay.  It's 11:02, and we
17        are going off the record.
18             (Recess was taken.)
19             VIDEOGRAPHER:  It is 11:15 a.m., and we
20        are back on the record.
21   Q.   Mr. Cassarino, before we took that break, I was
22        asking questions about whether or not you were
23        aware of a -- of a customer -- whether or not
```

Page 96

```
 1        the parties had discussed getting a customer for
 2        purposes of the 350-day test.
 3             Did you have discussions with either
 4        Industrial Heat or Doctor Rossi regarding that?
 5   A.   Yes.
 6   Q.   What discussions did you have with Industrial Heat
 7        about it?
 8   A.   I -- we just asked him if they knew of the client
 9        in Florida.
10   Q.   And what did they say?
11   A.   They had not.
12   Q.   Okay.  Did they tell you they did some due
13        diligence on it?
14   A.   I don't believe that they did.  Maybe -- maybe
15        J.T. went for a visit there or something, but I
16        don't think -- when we -- before the -- I mean,
17        the -- the plant was in North Carolina; Andrea had
18        made contact in Miami with this company; and it
19        hadn't been shipped yet.
20             So that was -- Andrea had found the
21        client.
22   Q.   Now, prior to that, was it your understanding --
23        or was it AmpEnergo's understanding that a
```

24  (Pages 93 to 96)

Page 97

1  customer was required for purposes of the
2  contract?
3  A.  Not a customer required.  It was to run it for the
4  amount of -- I mean, you know, technically, it
5  would have been very difficult because of the --
6  the requirements for the water are -- you know,
7  where will you vent the heat, and all that.
8      So I think that was an issue that had
9  been, you know, a client was -- and, again, I --
10  I'm sorry -- I apologize.  But I'm not sure --
11  even in the contract or anything -- whether or not
12  there was -- there was a requirement.  It was
13  all -- it was really to run a test for one year.
14  I think that's what it was.
15  Q.  Did you ever have conversations with Industrial
16  Heat about what equipment was going to be used for
17  the test -- the 350-day test, whether it be a 6
18  cylinder or a 1 megawatt?
19  A.  We assumed it would be 1 megawatt.
20  Q.  I'm not asking about your assumption.  I'm asking
21  if you had any conversations.
22  A.  Well, I saw the 1 megawatt in -- in North Carolina
23  the day -- or two days before it was going to be

Page 98

1  shipped.  So, again, that was -- I'm not sure if
2  there was a discussion about it.  It was -- the
3  one megawatt was the one that was going to be
4  tested.
5  Q.  I show you what's marked as Exhibit 16.
6  MR. CHAIKEN:  Exhibit 16 has been Bates
7  stamped AE 304.001 through.002.
8      (Exhibit 16, AE 304.001-304.002.)
9  Q.  There is an email in -- in one-third of the way
10  down the page from Karl Norwood to Tom Darden and
11  cc'ing yourself and other people.  And it's, I
12  believe, forwarding an email that had been written
13  by Andrea Rossi.
14      You should take a minute to review that.
15  I'm going to ask you some questions about it.
16  A.  (Witness reviews document.)
17  Q.  So this -- kind of -- goes along with what you
18  said earlier before the break:  You had mentioned
19  that you received a call while you were in the
20  Grand Canyon?
21  A.  Right.
22  Q.  And what were you told on that call?
23      That was Doctor Rossi calling you?

Page 99

1  A.  Yeah.
2      That he found a client.  He'd given me
3  the name, which I -- at that time, I didn't
4  remember, 'cause I was, you know, just getting up
5  and having my coffee; that -- that he wanted us to
6  relay that to Industrial Heat; that he had found
7  a -- and he had mentioned payment of a thousand
8  dollars per day, which would reduce the cost of
9  the operation.
10  Q.  Did he tell you anything about who was operating
11  that plant, or what his role was going to be?
12  A.  That he would set -- set it up.
13  Q.  That he would work -- that he set up which, the
14  Industrial Heat --
15  A.  That Andrea would set up the 1 megawatt.
16  Q.  Did he tell you anything about his -- what he was
17  doing with the customer -- the potential customer
18  that he was using?
19  A.  That he was going to provide heat to them.
20  Q.  Okay.  Did he tell you anything else about them?
21  A.  Not -- well, he might have, but I don't remember.
22  Q.  Did he use the name "JM Chemicals" or "JM
23  Products"?

Page 100

1  A.  That's -- that's -- I recall that now.
2  Q.  Did he -- did he ever use the words "Johnson
3  Matthey"?
4  A.  I think they -- he did -- I think there was --
5  that was a European company, and that these were
6  an affiliate of that bigger company.
7  Q.  And Doctor Rossi said that to you?
8  A.  Yes.
9  Q.  Did he say he was purchasing products from Johnson
10  Matthey?
11  A.  I -- I don't recall.
12  Q.  Did he say he was going to sell products to
13  Johnson Matthey?
14  A.  No.  I think it was JM was the -- the company in
15  Florida that the contract was with.
16  Q.  And did he tell you what the nature of the
17  relationship was?
18  A.  That he was going to provide them heat.
19  Q.  Did he tell you who the president or owner of the
20  company was?
21  A.  He might have.  I -- you know...
22  Q.  Did he mention that it was his attorney?
23  A.  No, but J.T. Vaughan told us that.

25 (Pages 97 to 100)

Page 101

1   Q.   And when did he tell you that?
2   A.   A while after -- I mean, after they were -- and,
3        again, I don't know how -- what the sequence of
4        timing was, but that was part of the conversation
5        in one of our conversations.
6   Q.   Referring back to the -- the exhibit I just gave
7        you -- Exhibit 16 -- did you have conversations
8        with Karl Norwood or anyone else from AmpEnergo
9        about Andrea Rossi's plan?
10  A.   Yes.
11  Q.   And what was the conversation?
12  A.   Just that we were glad that it was going to get --
13       finally get some tests done on it.
14  Q.   Did you discuss it with Industrial Heat?
15  A.   We did, because it was getting shipped to them.
16       So --
17  Q.   Right.
18  A.   -- you know -- you know, again, this -- I
19       apologize.  I just can't recall all the details of
20       the conversations.
21  Q.   In the email from Tom Darden at the top of the
22       page to Karl Norwood and cc'ing you, he says that
23       "Thanks for reaching out.  He --" I believe he's

Page 102

1        referring to Doctor Rossi "-- sometimes sends such
2        emails documenting a meeting, but we didn't say
3        those things."
4             Did you have a conversation with Tom
5        Darden about things that Tom Darden didn't think
6        he had said that were represented by Doctor Rossi?
7   A.   I am not sure that we had -- we didn't have a lot
8        of conversations with Tom.  It was mostly J.T.
9   Q.   All right.
10  A.   Most of the conversations with Tom -- other than
11       when I went there, and, you know -- were more on
12       the contracts and stuff.
13  Q.   Now, prior to February of 2015, did Industrial
14       Heat ever express to you or anyone from AmpEnergo
15       that they thought that Doctor Rossi was
16       perpetrating a fraud on them, or was deceiving
17       them in any way?
18  A.   No.  I -- I do recall that they were not
19       successful in duplicating the, you know, the --
20       the IT -- the IP.
21  Q.   And when did they first tell you that?
22  A.   Well, I -- I visited with everybody there, and
23       that was --

**H, EOT**

Page 103

1   Q.   And did they explain to you what they thought the
2        problem was?
3   A.   Well, I think there was a lot -- I mean, when
4        the -- and, again, I -- this -- just bear with me,
5        from my recall -- but it had to do with something
6        swaging; with gases escaping.
7             When I was there, it was -- it was part
8        of the ceramics in the core and some of the wires
9        breaking.
10            So it was technical stuff that they
11       were -- and Andrea they and Industrial Heat
12       were trying to resolve that -- all those issues --
13       at T. Barker -- and the group they had there.
14  Q.   Did anyone from Industrial Heat ever tell you that
15       they had received -- they had run a test or an
16       experiment and had received a positive COP?
17  A.   No.
18  Q.   Going back to the issue of moving the -- the
19       1-megawatt plant to Florida, did AmpEnergo have
20       any issues or any concerns about the plant being
21       moved from North Carolina to Florida?
22  A.   No -- I mean, we didn't have a say in it.  So, you
23       know, it didn't really concern us.

**H**

Page 104

1             We were just glad that the test was
2        going to begin.
3   Q.   I show you what's been marked as Exhibit 17.
4             MR. CHAIKEN:  Exhibit 17's been Bates
5        stamped IH 90966.
6             (Exhibit 17, IH 90966-967.)
7   Q.   It's a series of emails between you and members of
8        IH from July of 2014.  And if you go -- the chain
9        starts on the second page, 90967.
10  A.   Yeah.
11  Q.   -- and goes all the way up.  And the first email
12       is from Andrea Rossi to you.  And he writes to
13       you:  "Can you answer my email confirming
14       AmpEnergo agrees upon my proposal."
15            And I believe he's referring to the
16       proposal of moving the -- the plant to -- the
17       1-megawatt plant to Doral in Florida.
18            And then you write to J.T. Vaughan and
19       John Mazzarino and Tom Darden "As you can see, he
20       wants me to answer.  Should we keep ignoring, or
21       what should we say?"
22            Is there a reason why you were ignoring
23       Andrea Rossi's requests in July of 2014?

**R**

26 (Pages 101 to 104)

Page 105

1    A.   Only that we thought if it could stay in North
2    Carolina, it would be a better option.
3    Q.   I thought you just said it didn't matter to you.
4    A.   Well, recalling this, I'm -- I guess I did have
5    that intent that we would rather have seen it
6    in -- their supervision, working together, rather
7    than it going off by itself.
8    Q.   And did you ever tell that to Doctor Rossi?
9    A.   I'm not sure.  I don't think so.
10   Q.   Is there a reason why you didn't?
11   A.   I -- 'cause I cherished his friendship, and I
12   didn't want to get him upset that we were trying
13   to keep it there for them to work together,
14   because -- two things:  One is, I understood
15   clearly that Andrea had a goal of getting this --
16   he's a very driven person, and sitting around
17   experimenting is not his style; that he wanted to
18   make something happen; and that that probably was
19   it.
20        The other -- the other part of this
21   is -- you know, again, not knowing what it takes
22   to put this thing together or what it took to
23   demonstrate a 1 megawatt, we would -- that's why

Page 106

1    we were hoping for the collaboration.
2    Q.   What were -- what were you hoping from the
3    Industrial Heat side of it?
4    A.   That they would continue to work with Andrea and
5    work together to accomplish the goal for the 360
6    or 300 -- whatever the test -- how-many day the
7    test was -- to work together to make sure
8    everybody was on the same page.
9    Q.   Did you ever get an understanding as to what the
10   customer in Miami was going to be doing with the
11   heat supplied by the 1-megawatt plant?
12   A.   You know, we understood it was a chemical plant,
13   and it was going to do something with the
14   chemicals.  But that was, you know, really the --
15   the gist of it.  It was going to dry chemicals or
16   do something on -- with it.
17   Q.   Did it matter to AmpEnergo what the customer did
18   with the heat?
19   A.   Did it matter to us --
20   Q.   Yeah.
21   A.   -- who the customer was?
22   Q.   Yeah.
23   A.   No.

Page 107

1    Q.   Did it matter to Industrial Heat?
2        MR. BELL:  Objection to form.
3    A.   I don't know.
4    Q.   Did they talk to you about it?
5    A.   They were concerned it was in Miami and not -- you
6    know, that was...
7    Q.   Other than the concern with the location, did --
8    did they tell you, one way or the other, that they
9    were concerned with either who the customer was or
10   what the customer was doing?
11   A.   Well, I think the -- J.T. did have a concern that
12   he had not met the customer, or they had met the
13   customer, and he was concerned about that part of
14   it.
15   Q.   Did you ever talk to Doctor Rossi about that
16   specifically?
17   A.   No.
18   Q.   Do you know if Industrial Heat did?
19   A.   Well, that -- that's -- I -- I assume they were
20   communicating, you know...
21   Q.   Did they tell you anything else about the
22   customer, the location, or what was going on in
23   Miami?  When I say --

Page 108

1    A.   They had concerns, 'cause they were not -- they
2    didn't see the process.  And, you know, and we
3    assumed that it was on the other side of the wall,
4    and we were -- you know, the only -- I was there
5    two times to see the 1 megawatt; and the second
6    time was when the ERV was performing -- I don't
7    know if it was the second or third independent,
8    you know, evaluation; and the first was when we
9    were there with a group from AmpEnergo.  And, you
10   know, the machine was running, and we just
11   assumed, again, that it was performing -- 'cause
12   we didn't know what was on the other side.  And --
13   and Industrial Heat had not -- I don't think we
14   ever visited the plant -- the JM -- the chemical
15   plant.
16   Q.   Did you review -- or were you shown -- a copy of
17   the test protocol --
18   A.   No.
19   Q.   -- for that test?
20   A.   What -- what we -- what we assumed and what Andrea
21   had said -- and we assumed -- that the test
22   protocol would be the same as it was done in
23   Italy.

**Page 109**

1  Q.  And you mentioned the word "ERV."
2      What is -- what is --
3  A.  Well, that's a good -- I can't remember.  It was
4      the evaluation -- it was an independent
5      evaluation.  I mean, the person that performed
6      the -- that acronym -- and I can't remember
7      exactly.
8  Q.  Expert responsible for validation?
9  A.  That's what it -- yes.  So that was the ERV.
10 Q.  Was it --
11 A.  And I believe it was the same person who did the
12     test in Italy.
13 Q.  Was it your understanding that was an independent
14     person?
15 A.  I assumed it was, because they had performed that
16     test in Italy.
17         I know -- and, again, this is recall --
18     but the independent -- the ERV person -- I think
19     his name was Penon -- was the same person; and he
20     had worked for a larger company originally; and
21     that was one of the companies, I believe, that
22     Industrial Heat wanted to have do the test.
23         So it seemed to us that he was an

**Page 110**

1      independent person.  I think he had a background
2      in nuclear something or other.  You know, he was
3      an engineer.  And because they performed the
4      test -- all of the people in Italy -- that we
5      assumed the -- maybe that was a bad assumption --
6      that the protocol was the same for the test in
7      Miami.  But we never saw -- there was never any
8      written protocol.
9  Q.  That you saw.
10 A.  That I saw.  We didn't see the results of any
11     test.  We didn't see any reports.  We haven't --
12     you know, we've been -- sort of -- that third
13     party.
14 Q.  Did you ever ask to see copies of protocols or
15     reports?
16 A.  Yeah.  I mean, we did, and, you know, because of
17     all the legal stuff that was starting to happen,
18     we were denied it.
19 Q.  Now, this is all after the fact?
20 A.  Yeah.
21 Q.  After --
22 A.  Yeah.
23 Q.  Got it.

**Page 111**

1      Do you know when the 350-day test began,
2  approximately?
3  A.  I --
4          MR. BELL:  Objection to form.
5  A.  I thought it started in February or March.
6  Q.  Of 2015?
7  A.  '15; yes.
8  Q.  And did you -- when I use the phrase "350-day
9      test," was that a common phrase --
10 A.  Well --
11 Q.   -- or a term you used?
12 A.   -- it was actually -- it was -- I believe, if I
13     recall now, there was time periods -- if it broke
14     down, that they could start it up again.  So it
15     was a period of time for one year, but I think
16     there was extra days in there that allowed it to
17     have breakdowns in -- if things happened.
18 Q.  Was there a -- was there a phrase or terminology
19     that you used to refer to that test?
20 A.  Maybe the Miami test.  I don't know.
21 Q.  Okay.
22 A.  Yeah.
23 Q.  Prior to that test starting, did Industrial Heat

**Page 112**

1      ever tell you, AmpEnergo, that, you know, We think
2      this test started too late.  It's not tied -- you
3      know, this test -- whatever the results are -- are
4      not tied to any payment obligations that
5      Industrial Heat has to either Leonardo or
6      AmpEnergo?
7  A.  No -- no.
8  Q.  Did you come to learn at any point in time that
9      that was their position?
10 A.  Can you repeat that.
11 Q.  Yeah.
12 A.  I mean -- yeah -- position on what?
13 Q.  As to whether or not the timing for the 350-day
14     test pursuant to the contract had expired.
15 A.  No, I -- we never heard anything about expiration.
16     They were concerned about it taking so
17     long.  I mean, I -- that was part of a discussion,
18     you know, not specifically to the 300 -- whatever
19     those days were -- but that it was taking so long
20     to get everything up and running.
21 Q.  Did Industrial Heat ever mention to you concerns
22     about the ERV, Fabio Penon?
23 A.  Yes.

28 (Pages 109 to 112)

Page 113

1    Q.   And what concerns did they express?
2    A.   That he was too close to Andrea.
3    Q.   And what did they tell you about that
4    relationship?
5    A.   Just that he was the same guy that performed it in
6    Italy, and that that was when they were
7    starting -- because they weren't able to reproduce
8    the formula.  They were concerned about his
9    ability to do the testing, because they were
10   concerned about their due diligence, I guess, in
11   Italy.
12   Q.   Did they ever tell you that they disagreed with
13   Penon as the ERV?
14   A.   Probably.
15   Q.   Do you know how they communicated that to you?
16   A.   It would have been a verbal conversation, I
17   believe, maybe a written, but I -- I know they
18   were -- they had said that they had not agreed to
19   Penon.
20   Q.   They had told you or AmpEnergo that they had not
21   agreed to Penon.
22   A.   Well, again, I -- I don't know if they said they
23   did not -- they were concerned.  I mean, that was

Page 114

1    always the language, I guess.  They were -- had a
2    big concern that, because of the way things were
3    starting to go, that he was the same guy that had
4    done it in Italy.
5    Q.   Is your -- is it your understanding that there was
6    an ERV required for the guaranteed performance
7    test, or the 350-day test?
8    A.   Yes.  Yes.
9    Q.   Do you -- do you know if the parties agreed on
10   someone to do that?
11   A.   I don't believe -- I don't know that they
12   agreed -- we weren't privy to any contractual
13   agreements or any written protocols for the ERV,
14   or -- or a contract for the ERV.
15   Q.   So you said earlier that you had showed up and the
16   ERV was present at the facility in Miami taking
17   measurements?
18   A.   No.  I -- I was not there when he did it.  I
19   showed up, and he had already done it.
20   Q.   I see.
21   A.   So I got there a day late.
22   Q.   But you knew he had been there.
23   A.   He had been there.

Page 115

1    Q.   And did you ever question Doctor Rossi and say,
2    Hey, I didn't -- is -- are you sure that he's --
3    A.   No, because I -- you know, I'm not a technical
4    guy.  And I -- you know, reading thermo -- you
5    know, all the stuff that's technical, I'm not sure
6    I would have been the right person.
7         What I wanted to do was to visit, see
8    the plant was running.  I mean, that's -- that was
9    about all I could do.
10   Q.   Right.  But you did understand, at least, that the
11   parties had to have someone independent act as the
12   ERV and provide a report at the end of the day in
13   order for the test to --
14   A.   Be success -- yeah, for a payment to be --
15   Q.   Right.  Exactly.
16   A.   -- done.
17   Q.   So was AmpEnergo concerned that there was, in
18   fact, an ERV agreed to for purposes of this test?
19        MR. SHARE:  Objection to form.
20        MR. BELL:  Join.
21   A.   Honestly, I -- can you repeat that again?
22   Q.   Yeah.
23        Did -- was AmpEnergo concerned that the

Page 116

1    parties had reached agreement -- or that there was
2    an agreement as to who the ERV was going to be?
3         MR. SHARE:  I'll just restate my
4    objection.
5         MR. BELL:  Same.  Join.
6    A.   I don't think we had a concern so much as we were
7    just wanting this to move forward.
8    Q.   Did you ever question either Industrial Heat or
9    Doctor Rossi as to who the ERV was going to be?
10   A.   We knew who it was going to be.
11   Q.   And who was it?
12   A.   It was Penon.
13   Q.   And how did you know it?
14   A.   Andrea told us.
15   Q.   And when did he tell you?
16   A.   I believe there was two -- and, again, I think
17   there were two or three times that he came to do
18   the testing:  Once I was in West Virginia on
19   business and he was showing up a couple of days --
20   and Andrea asked me to fly down there to -- to
21   view it, and he had mentioned it was Penon then;
22   and -- and I couldn't do it because I was in West
23   Virginia on business.

IMP

29 (Pages 113 to 116)

Page 117

1   And -- and, then, the second time -- and
2   I believe that was towards the end of -- probably
3   November -- or towards the end of the test, I --
4   he had -- he had done the last -- I think it was
5   the last one before the report, and I had -- was
6   in -- in Florida on business, and I -- because --
7   just because the flights and the way they were, I
8   couldn't get there, and he had already
9   accomplished -- he had already done all the tests;
10  and I was one day late, I believe.
11  Q.   I show you what's been marked as Exhibit 18.
12       MR. CHAIKEN:  Exhibit 18 has been Bates
13  stamped IH 127256 through 127258.
14       (Exhibit 18, IH 127256-258.)
15  Q.   It's a series of emails from May 18, 2015, and the
16  first one I'm going to refer you to is the one at
17  the very bottom of the page.  It's from Karl
18  Norwood to J.T. Vaughan, and cc's yourself and
19  other people.
20       Karl writes to J.T.:  "Just received a
21  call this morning from Andrea, requesting
22  attendance in Miami this Wednesday to witness the
23  certification of the three-month test results of

Page 118

1   the E-Cat."
2   I'm going to skip -- skip a few lines,
3   and I'm going to go down to the last sentence:
4   "I'm glad to go and think it is positive to
5   establish benchmarks of the testing as we proceed,
6   however, wanted to confirm with IH that this was
7   the part of the protocol of the year-long test."
8       Did Industrial Heat ever respond to Karl
9   on that email?
10  A.   I don't know if he responded to Karl, but I -- I
11  don't think so.  I don't think so.
12  Q.   Did you ever have discussions with Industrial Heat
13  confirming that they were aware of what was going
14  on, and they -- they had been part of the
15  protocol?
16  A.   Yes.
17  Q.   And what did they say?
18  A.   That they were concerned it was Penon.
19  Q.   Other than being concerned about Penon, what did
20  they -- did you have discussions about the actual
21  test protocol?
22  A.   Well -- no, not about the actual test protocol.
23  Q.   What did they -- I understand you -- you testified

Page 119

1   earlier about the concerns being that Penon was
2   too close to Rossi.
3       Was there other concerns other than that
4   relationship?
5   A.   Not that I recall.
6   Q.   Did anyone from Industrial Heat ever tell that you
7   it was their strategy when dealing with Doctor
8   Rossi to be intentionally vague about things like
9   whether or not they approved Penon as the ERV, and
10  whether or not they approved the protocol for the
11  test?
12  A.   Intentionally?
13  Q.   Yeah.
14  A.   No.
15  Q.   Unintentionally vague?
16  A.   No, I -- I -- you know, I'm going to say this --
17  and this is tongue-in-cheek -- but I -- my -- my
18  sense with Industrial Heat was that they were
19  letting Andrea do his thing.
20  Q.   Knowing full well that they may be responsible for
21  having to pay Leonardo -- just let me finish my
22  question -- they'd be responsible to pay Leonardo
23  $89 million and AmpEnergo $54 million?

Page 120

1   A.   Well, I don't know if, you know, that was part of
2   the process, but we hoped that they were
3   communicating.  I mean, that's really the --
4   bottom line with this is, we assumed -- and maybe
5   assumption is the wrong word -- that there were
6   concerns, but that -- and this is when, again,
7   they were not able to reproduce the catalyst or
8   the -- the process, and they were, you know, out
9   acquiring other technologies and comparing and --
10  and so we assumed that this was all going to be
11  okay.
12  Q.   Did you assume that they were monitoring what was
13  going on in the Miami facility?
14  A.   Well, they -- I understood they had somebody
15  there -- And I don't know who it was or
16  anything -- but that -- I know the -- the Italian
17  guy -- big Russian guy --
18  Q.   Fabiani?
19  A.   -- Fabiani was there, and I believe that he was
20  being paid by them originally.  I don't know
21  whether or not that was the person that was there
22  or not -- and, again, then I heard, Well, he's
23  close to Andrea too.  So...

IMP, F

30  (Pages 117 to 120)

Page 121

1  Q.  When you say Fabiani was being paid by them, you
2      mean by Industrial Heat?
3  A.  Yeah.  That's what I -- well, we understood they
4      brought him from Italy to North Carolina, and I
5      assume he went with them.
6  Q.  Did you have any internal communications at
7      AmpEnergo around this time -- May 2015 -- about
8      what was going on in the Miami facility?
9  A.  Yeah.  We were concerned that -- after a while --
10     that nobody was communicating.
11 Q.  And did you ever reach out to either Doctor Rossi
12     or Industrial Heat and say, Seems to us you guys
13     aren't talking.  What's going on?
14 A.  We probably had that conversation.
15 Q.  Did you have it with Industrial Heat?  Did you
16     have with Doctor Rossi?  Or both?
17 A.  Probably both.
18 Q.  And what was the response?
19 A.  Well, Andrea, you know, was, I'm just here
20     working.  He was in the container, you know, 24
21     hours a day and doing his work.  And Industrial
22     Heat -- J.T. had been there, and they had hired
23     some other guy -- and I can't remember his

Page 122

1      name -- to do evaluations of technology -- some
2      engineer; and, again, we were hoping that -- that
3      this was all moving forward.
4  Q.  When you visited the facility, was it hot in the
5      facility?
6  A.  It was hot in Florida -- coming from New
7      Hampshire.
8          So no, it wasn't that hot.  I mean,
9      they -- everybody was in the container, and it was
10     air conditioned, the -- the office.
11         So that was, you know...
12 Q.  The office where their computer --
13 A.  Where there -- yeah.  There were two containers:
14     One the 1 megawatt, and one the -- sort of --
15     control center, if you will.
16 Q.  Right.  And which one did you go into?
17 A.  Control center.
18 Q.  Did you ever go into the other one?
19 A.  Well, we viewed it.
20 Q.  But did you ever go in it?
21 A.  Yeah, we went in it.
22 Q.  Was it warm inside, or was it cool inside?
23 A.  It was -- I can't remember if it was hot, but it



R, EOT

Page 123

1      was noisy.  And I -- just as a point, you know --
2      and I don't know if this even has anything to do,
3      but there were four units instead of 100 -- or I
4      think there were originally 100 units, and, then,
5      it was down to two -- I mean, four 250.  Those are
6      the ones that we saw.
7  Q.  All right.  You mention that you had meetings with
8      Industrial Heat -- biweekly meetings.
9          Did someone from AmpEnergo keep notes at
10     those meetings?
11 A.  Well, we had -- we had conversations on the
12     telephone with J.T., and I believe Ron Engleman
13     kept notes.
14 Q.  I'm going to show you what's been marked as
15     Exhibit 19.
16     MR. CHAIKEN:  Exhibit 19 has been Bates
17     stamped AE 6 through AE 32.
18         (Exhibit 19, AE 6-32.)
19 Q.  And it looks to be a -- a series of handwritten
20     notes.  The first one is dated February 28th,
21     2013, and the last one of this set is dated
22     December 13th, 2013.
23         Have you ever seen this before?

R

Page 124

1  A.  I have not seen these; no.
2  Q.  Did you --
3  A.  Well, I -- you know, I think this was -- I might
4      have seen the uploaded versions that the attorneys
5      did send to you.
6  Q.  Right.
7  A.  That was -- I mean, I -- Ron kept all of the
8      notes, 'cause he's the only one that could read
9      his own writing.
10 Q.  You believe this is Ron Engleman's handwriting?
11 A.  Yeah, I do.
12 Q.  Now, in preparing for today's deposition, did you
13     review these notes?
14         Did you look at it?
15 A.  I did not; no.
16 Q.  You did not?
17 A.  No.
18 Q.  Were you present during the meetings in which
19     these notes were taken from?
20 A.  No.  We were all on separate telephones.
21 Q.  I see.  But this -- this was a -- normally a
22     conference call?
23 A.  Yes.

31 (Pages 121 to 124)

Page 125

1  Q.  You dialed in?
2  A.  Yeah.
3  Q.  Were you dialed in for most of the calls -- or the
4      majority of the calls?
5  A.  I think I missed a couple -- we all did on several
6      of them -- but most of them.
7  Q.  I'm going to walk you through some of these
8      notes --
9  A.  Yeah.
10 Q.  -- and see if you can remember anything about what
11     was happening at the time --
12 A.  Yeah.
13 Q.  -- given the date and -- and what was said on
14     the -- in the notes.
15         So on this very first page -- it's dated
16     February 28th, 2013.
17         There's a line almost halfway down, it
18     says "Cherokee's weakness -- not focusing."
19         Is this something that you discussed on
20     a phone call, or discussed with Ron?
21 A.  It was probably Ron's comment.
22 Q.  Got it.
23         On the next page -- it's dated March

Page 126

1      11th, 2013 -- at the -- almost at the very bottom
2      there's a name -- and it looks like an Italian
3      name -- it says "Piantelli"?
4  A.  Yeah.
5  Q.  And it says "Positive results, but not
6      reproducible."
7          Do you know what that -- what was that?
8  A.  Well, again, there was a whole bunch of Italian
9      inventors, and Piantelli was one of the folks that
10     had been in the LENR circle.
11 Q.  Got it.
12 A.  And I -- I guess he had had some results, but I'm
13     not sure anybody had -- was able to reproduce
14     those results.  I guess that's what that meant.
15 Q.  Got it.  The next page, dated May 31st, 2013,
16     there's a line in the middle of the page; it says
17     "Excited about Boeing."
18         Do you see that?
19 A.  Yup.
20 Q.  What was discussed with IH about Boeing?
21 A.  Boeing wanted to look at -- a little background --
22     again, you know.
23         So Andrea introduced me to Boeing.  And

Page 127

1      I -- Boeing was one of the people that we tried to
2      get as an investor.  And they just didn't work the
3      way that we wanted to work --
4  Q.  Yeah.
5  A.  -- so it didn't go there.
6          But because Boeing was one of the big
7      players in space and -- that we felt, you know, it
8      would be a player.
9          So anyway, I introduced -- I gave
10     Industrial Heat all of the people that I had been
11     in contact with, and one of those was Boeing.  And
12     Boeing wanted to -- came back and said they wanted
13     to work with Industrial Heat to look at -- see if
14     they could reproduce the technology --
15 Q.  Okay.
16 A.  -- not reproduce it, but demonstrate it.
17 Q.  Got it.  And do you know if Boeing worked with
18     Industrial Heat?
19 A.  Yes, they did.
20 Q.  And do you know if they included Doctor Rossi in
21     those conversations?
22 A.  They probably did not.
23 Q.  Do you know why they wouldn't?

IMP, F

Page 128

1  A.  I --
2          MR. SHARE:  Objection to form.
3  A.  I'm not sure, other than -- we're -- we're under
4      confidentiality with them, and that was one of the
5      reasons I didn't say anything to Doctor Rossi
6      about it is, they had told us that they didn't
7      want him to get nervous that they were working
8      with somebody else with his technology.
9  Q.  What did you think about it?
10 A.  What did I think about it?
11 Q.  Uh-huh.
12         MR. SHARE:  Objection to scope.
13 A.  Again, I -- I felt a little guilty that I wasn't
14     saying anything to Andrea, because if he just --
15     you know, not being in the loop, but I thought it
16     was to everybody's advantage to see if Boeing
17     could do this, because if Boeing did it, that
18     third-party evaluation would be a gold mine.
19 Q.  Do you think it would have been helpful to Boeing
20     if they were able to talk to the inventor himself?
21 A.  Yes, probably.
22 Q.  The next page is dated June 2013.  At the top of
23     the page, there's a line:  "Jim Travis,

IMP, F

32  (Pages 125 to 128)

**Page 129**

1    accountant."
2        Do you know who Jim Travis is?
3    A.  Do I --
4    Q.  Yeah.  Do you know who Jim Travis is?
5    A.  Oh, yes.
6    Q.  Who is he?
7    A.  He's -- he's my accountant.
8    Q.  Did you also refer him to Doctor Rossi?
9    A.  I did.
10   Q.  And did you have any discussions with Jim Travis
11   about Doctor Rossi's taxes?
12   A.  Yes, because Andrea had asked me to talk with Jim.
13   I got documents for Andrea from him, and, you
14   know, I -- sort of -- helped Jim and him
15   facilitate sometimes.
16   Q.  Did you ever -- did Jim Travis ever tell you that
17   either Leonardo or Doctor Rossi had failed to pay
18   their taxes?
19   A.  No.  I don't think Jim ever said that to me --
20   well, he knew -- I mean, there were two -- there
21   were several instances when -- and it was --
22   Andrea delivered receipts in a shoebox.  And, you
23   know, that was early on.  And they got that all

**Page 130**

1    squared away.
2        And the -- the monies that Andrea had
3    got -- received from Industrial Heat, that was
4    none of my business, and so -- and Jim, under
5    confidentiality, was really -- you know, said
6    that -- he just mentioned that Andrea had a trust,
7    and that they were working on that.
8    Q.  Did you ever tell anyone from Industrial Heat that
9    Jim Travis told you that Leonardo didn't pay its
10   taxes, or that Doctor Rossi hadn't paid his taxes?
11   A.  I might have said that to J.T. -- that I didn't
12   know that -- if he had paid his taxes or not.
13   Q.  So you told J.T. Vaughan that you were unaware as
14   to whether or not Doctor Rossi or Leonardo paid
15   their taxes?
16   A.  Right.
17   Q.  Did J.T. Vaughan specifically ask you that
18   question?
19   A.  He was asking about who the -- who the accountant
20   was, and he probably did ask if he paid -- I'm
21   sure he did.
22   Q.  Did he ask you for the contact information for Jim
23   Travis?

**Page 131**

1    A.  No.
2    Q.  The next page, which is still, I think, part of
3    the notes for the June 2013 meeting, it states at
4    the top "Tom and --" you're one past me.  At the
5    bottom it's --
6    A.  Okay.
7    Q.  Yeah.  There you go.
8        It says "Tom and T. Barker validate
9    IP/do we have expertise in-house to duplicate the
10   technology?"
11       Do you recall having conversations about
12   that?
13   A.  I'm not sure what that says, actually.  Validate
14   the IP.  "Do we have expertise in --"
15   Q.  "-- house."
16   A.  "-- in-house to duplicate..."
17       Who's saying that, Tom and T. Barker?
18   Q.  I don't know.  I'm asking you.
19   A.  Oh, I don't know.  I don't know who said that.
20   Q.  You don't remember conversations about that?
21   A.  No, I don't remember that.
22   Q.  The next page is dated June 25th, 2013 --
23   A.  Uh-huh.

**Page 132**

1    Q.  -- and the very last two sentence -- two lines of
2    the page say "Darden does not want to confront
3    Andrea, hydro fusion, etcetera, until they have
4    the secret sauce."
5        Do you know what that conversation was
6    about or what --
7    A.  Well, I -- I -- when -- when Andrea and Tom
8    started their relationship, we thought it was very
9    positive, and they had a good relationship; and
10   Tom did not want to confront Andrea on anything,
11   ever.  I mean, that was -- it was almost a -- you
12   know, it was always, Let him be over here doing
13   what he's doing, and we'll just -- so he -- and,
14   again, hydro fusion and -- yeah, I think they
15   were -- they were trying to -- and, again, I --
16   what time was this?  Before the contract was
17   signed?  I don't know.
18   Q.  This is June 25th, 2013.
19   A.  So had they agreed yet?
20   Q.  Yeah.  I believe the contract was from October
21   2012.
22   A.  Yeah.  And so I think what that -- and, again,
23   this is assumptions, 'cause I'm not writing this,

IMP, F, R, H

IMP, H

A, R

Page 133

1    so -- you know -- was that they didn't want to
2    upset Andrea until they could reproduce it.
3    Q.   And do you know what the -- what he was referring
4         to when he says "the secret sauce"?
5    A.   Yeah.  They just -- the magic in the LENR process.
6    Q.   Did you understand there was some formula for the
7         fuel that was going to charge --
8    A.   Well, we -- I didn't know what was -- I mean, we
9         never were privy to understanding what was making
10        it all work.  So, you know, we all -- we always --
11        tongue-in-cheek -- referred to it as the "secret
12        sauce."
13   Q.   Got it.
14   A.   (Witness reviews document.)  Ah.  That's...
15   Q.   Did you remember --
16   A.   No.  I just saw the bureau -- Veritas is the
17        company that -- that they had referred to earlier
18        that they thought would be a good company.
19   Q.   Got it.
20             I'm going to have you flip to page AE 14
21        at the bottom.  And there's -- it's dated July 16,
22        2013 at the top.
23   A.   Yup.

Page 134

1    Q.   And there is -- in the middle of the page -- some
2         lines.  One says "Next steps:  Run two parallel
3         tests."  And, then, the next one says "COP" -- it
4         looks like a greater than sign -- "11?" -- with a
5         question mark.
6              Do you know what that's about, or what
7         was discussed at that time?
8    A.   Oh, I think what they were looking at was putting
9         up side-by side tests:  one with a dummy, one that
10        didn't have any -- one with the "secret sauce,"
11        and running that in a parallel -- I mean, testing
12        them together to see the performance of -- of it.
13   Q.   All right.  So do you know if they ever did that?
14   A.   I don't know if they did that.
15   Q.   Do you know what "COP greater than 11" refers to?
16   A.   I -- you know, I think -- and, again, this is --
17        there's so much -- excuse me -- stuff here.  I
18        recall that when they were talking about patenting
19        something that they had talked about a COP of 11;
20        and that was in one of the patents or something.
21        But that -- that would be the only...
22   Q.   Is that in Doctor Rossi's patent or a patent
23        filed by Industrial Heat?

Page 135

1    A.   I think it was filed by both of them together.
2    Q.   Did you ever review any patents filed by either
3         Doctor Rossi or Industrial Heat?
4    A.   Yeah.  I glazed over...
5    Q.   Great fun reading; right?
6    A.   Yes.
7    Q.   I'm going to refer to you page 17, AE 17 -- at the
8         bottom there's a line -- kind of -- two-thirds
9         down the way -- and this is from July 18th, 2013
10        -- and there's a line that says "We are -- IH, we
11        are not their partners yet."
12             Did you have discussions internally
13        around that time about partnering up with
14        Industrial Heat?
15   A.   Well, I think -- not -- not in the sense of being
16        real strict partners, but being shareholders in
17        the company.
18   Q.   All right.  At the bottom of this page there's
19        some notes that say "Calculation:  Rossi versus T.
20        Barker" -- I can't -- oh, it looks like "-- 6
21        versus 1.3 times."
22             I'm not sure what that says or means.
23             Do you have any insight into that?

Page 136

1    A.   No.
2    Q.   Page AE 20 -- it's dated July 29th, 2013 at the
3         top.  There's some lines about -- near the top of
4         the page:  "Philosophy of experiments:  Rossi
5         doesn't like --" I don't know; I can't make out
6         that word, whether it says "-- investments," or
7         was there a -- was there a conversation on July
8         29th, 2013 about the philosophy of experiments,
9         that you recall?
10   A.   I don't -- I...
11             Bullshit.  That's the only thing that I
12        could -- no.
13             I'm -- no, I don't recall this.
14   Q.   Okay.
15   A.   I'll tell Ron to watch his language.
16   Q.   Going to go to -- turn to page AE 22.  There are
17        some notes on this page about COPs being
18        approximately equal to 7, approximately equal to
19        4.5.
20             Do you know what this is referring to?
21   A.   No, I don't.
22   Q.   Later on down on this page it says "Who is going
23        to validate?  Independent must validate minimum

34  (Pages 133 to 136)

1    performance."
2        Do you recall having discussions with
3    Industrial Heat --
4    A.   Yeah.  I mean, that was always an ongoing
5    discussion with us as to -- because of our payment
6    and the COP of 6.  So we wanted to make sure that
7    Industrial Heat was on the same page as Andrea
8    about the third-party evaluation.
9    Q.   Turn to page AE 24 dated September 27, 2013.
10   There are some notes about "IR cameras,
11   variables."
12       Did you ever have conversations with
13   Industrial Heat about equipment that was being
14   used for testing, and settings of equipment?
15   A.   Yes.
16   Q.   And what were those conversations?
17   A.   That they were -- the emissivity -- that word
18   there -- emissivity?
19   Q.   Emissivity.
20   A.   Yeah.  So -- and, again, just bear with me, but
21   that was always a concern when they were trying to
22   read the heat.  I believe that's what it was
23   about.  And they were using different kinds of

1    equipment.  And the concern was, was it the right
2    equipment.
3        That was always the question.
4    Q.   And do you know how that was resolved, if it ever
5    was?
6    A.   I don't know if it was resolved or not.
7    Q.   Did you ever talk to Doctor Rossi about it?
8    A.   Other than when I was there watching the -- the
9    testing going on, but not -- I mean, Andrea felt
10   it was the -- they had to do adjustments on the
11   cameras, I believe.  And whether or not the
12   adjustments were correct or not correct, who was
13   doing it -- again, beyond me.
14   Q.   Page 26, AE 26, it's dated October -- it's either
15   1st or 4th -- 2013.  There's a reference -- it
16   states "Reference to wrong lens.  Camera is
17   calculated properly."
18       Same conversation still being had at
19   this time?
20   A.   Yeah.  That would have been the same concerns that
21   everybody was having about the testing at the lab
22   and whether or not the equipment was calibrated to
23   the right numbers.

1    Q.   Turn to page 28, AE 28, and I believe it's dated
2    November 8th, 2013.  In the middle of the page --
3    actually, I'm going to go to the one that's dated
4    November 15, 2013.
5        Seems like there were a lot of -- a lot
6    of calls in November of 2013.
7        Is that your recollection?
8    A.   I assume that we did; yeah.
9    Q.   Is there a reason why you had more calls during
10   that time frame?
11   A.   Well, we were trying to get everything finalized
12   and trying to be -- I think there was a meeting in
13   Sweden or something, and J.T. went to that.  And
14   we were just trying to get our -- as much
15   information, 'cause we were -- again, we were
16   on -- kind of -- on the outside of what was going
17   on with them personally.
18   Q.   This -- the note for February -- excuse me -- for
19   November 15, 2013 says "Swedes early February.
20   May be a prior independent validation test before
21   the Swedes come."
22       Do you know what that was about?
23   A.   I think -- again, I don't -- I don't know if this

1    is the -- I think the -- some Swedish guys came to
2    the lab in North -- North Carolina; and I think
3    that was -- that -- that could be the reference.
4    Q.   Do you know who they were?
5    A.   I don't recall who they were.
6    Q.   Did you -- do you know the -- have you heard the
7    phrase "Swedish Academy of Sciences"?
8    A.   Yes.  Yeah.
9    Q.   Do you know if they were from that -- from there?
10   A.   Well, I know there were some people that were
11   doing tests -- or -- or looking at all of the
12   technology that Andrea had been working on, and I
13   believe one or two of the people that -- that were
14   evaluating this or looking at this were from that
15   -- that academy.
16   Q.   And do you know if they actually performed the
17   test in Sweden?
18   A.   I don't know.  I mean -- well, I -- yeah, I think
19   they did.  I think -- I think they went over and
20   set a test up there.
21   Q.   Do you know the results?
22   A.   Unless it's one of the documents that -- that was
23   evaluated -- you know, there were two or three

35  (Pages 137 to 140)

Page 141

```
 1      tests done by the Swedes, I think -- a couple
 2      anyway, and they did a report, and I think --
 3      yeah, I've seen those.
 4              And, again, I'm not sure -- you know, it
 5      all looked positive.  That's what -- again, from
 6      where Industrial Heat was moving, that's why we
 7      were hoping that they were all making good
 8      progress.
 9   Q.  The next page, AE 29, at the bottom of it states
10      "Start date/end date for 350 day tests -- no later
11      than."
12              Were you having conversations around
13      November 2013 about start date and end date for
14      the 350-day test?
15   A.  No.  I mean, I think we were -- you know, when --
16      when is it all going to happen?  Because we just
17      wanted it to happen.  And, you know, was there a
18      start date and an end date, and who was making
19      that decision.
20   Q.  The next page, AE 30, dated November 26, 2013,
21      middle of the page, "It has not been about I -- It
22      has not been about Rossi's engineering any good."
23              Were there questions about Doctor
```

Page 142

```
 1      Rossi's engineering at that time?
 2   A.  Well -- yeah.  I mean, you know, as an inventor
 3      and a scientist, knowing him all the years, that's
 4      what he did.  As an engineer, he -- you know, he
 5      knew what to do, but that was -- you know, there's
 6      engineers, and there's inventors.  And we always
 7      saw the engineering -- I mean, partly -- I can see
 8      where Ron, 'cause Ron's a hard engineer; that's
 9      what he does.  And so his -- you know, engineers
10      are always details, extreme details, and looking
11      at and observing there wasn't as much detail in
12      some of the engineering.
13   Q.  Was that ever discussed with Doctor Rossi?
14   A.  He -- it was probably discussed in -- in, you
15      know, a little wink and a nod sometimes, you know,
16      not from a -- that you're a bad engineer -- 'cause
17      we didn't want to offend anybody, but, you know,
18      some of the -- some of the things that we worked
19      with over those years were not as engineered, I
20      guess, as we at Leonardo Technology were used to.
21   Q.  The next page, AE 31, there's a line that states
22      "Invite a professor from local university (Duke,
23      UNC, NC state).  Rossi had suggested this in the
```

Page 143

```
 1      past."
 2              Had Doctor Rossi ever suggested bringing
 3      in outside professors to -- to review the
 4      technology?
 5   A.  Well, I -- I -- you know, just knowing Andrea, I'm
 6      not sure he wanted people to look inside for the
 7      secret sauce.
 8   Q.  Right.
 9   A.  But to look at the performance, yeah; it was
10      probably part of the discussion.
11   Q.  Last page, which is AE 32, dated December 13th,
12      2013, there's a line that says "He's difficult to
13      deal with.  He's a rascal" -- quotes, and --
14      parens/close parens -- "(J.T.)"
15              Did you ever -- were you ever part of a
16      conversation where J.T. made those statements
17      about Doctor Rossi?
18   A.  Oh, yeah.  He -- you know, J.T. was not used to
19      working with an inventor.  And so I think that was
20      part of the frustration on J.T.'s part; and, you
21      know, he's a young guy, and, you know, not an
22      engineer.  So...
23              I don't recall him saying this exactly.
```

Page 144

```
 1   Q.  Further on down the page it states "Hano Essen
 2      Swedish team."
 3              Was there a conversation about Hano
 4      Essen in December of 2013?
 5   A.  He might have been one of the people coming
 6      that -- that, you know -- that name sounds
 7      familiar.  And I believe, you know, he was part of
 8      that Swedish team.
 9   Q.  There's a line below that says "He's a bona fide
10      liar."
11              Is that referring to Hano Essen, or is
12      that referring to something he said?
13              Do you know what that context of that
14      line is?
15   A.  I have no idea.
16   Q.  Okay.  Done with that document.
17              MR. BELL:  Thinking about trying to plow
18      through to lunch?
19              MR. CHAIKEN:  Yeah.  Yeah.  Well, hoping
20      to plow through, be done with my direct, so you
21      can start it up whenever we're done.
22              THE WITNESS:  Can I take a nap?
23              MR. BELL:  Well, you can --
```

36  (Pages 141 to 144)

Page 145

1    THE WITNESS: I'm 72. Remember that,
2  guys.
3    MR. BELL: One of the instructions --
4    MR. SHARE: Want to break for lunch?
5    THE WITNESS: No. Let's -- let's plow
6  through this, and then we'll --
7    MR. BELL: We will take a lunch. And,
8  really, that's your call, not ours.
9    THE WITNESS: All right. No. We'll
10  plow through this, and then have lunch --
11    MR. CHAIKEN: I'm --
12    MR. BELL: I guess I shouldn't say that
13  but --
14    MR. CHAIKEN: I'm almost done. I'm
15  getting to the end.
16  Q.   I show you what's been marked as Exhibit 20.
17    MR. CHAIKEN: Exhibit 20 is a
18  continuation, I think, of the notes. It's been
19  Bates stamped AE 005.01 through AE 5.011.
20    (Exhibit 20, AE 005.01-005.011.)
21  Q.   Are these still Ron's handwritten notes --
22  A.   Yes.
23  Q.   -- as far as you know?

**[A]**

Page 146

1  A.   Yes.
2  Q.   The -- the first note is -- is from October 3rd,
3  2014, and the last one is August 7th, 2015, just
4  so --
5  A.   Yeah.
6  Q.   -- I can identify it properly.
7  A.   Yeah.
8  Q.   Was there a discussion in October of 2014 about
9  Woodford Capital or Woodford Fund?
10  A.   Yes.
11  Q.   And who is Woodford, as far as you know?
12  A.   Who?
13  Q.   Yeah.
14  A.   They were an English investment group.
15  Q.   And was there a discussion about them investing in
16  Industrial Heat?
17  A.   Yes.
18  Q.   And do you know if they did?
19  A.   I believe they did.
20  Q.   Was there a discussion about them buying out
21  Doctor Rossi?
22  A.   Buying him out?
23  Q.   Yeah. I'm looking at the very first page.

Page 147

1  There's a line which says "25 million, 50 million,
2  up to 200 million," and then parens, "(or more if
3  they need to buy out Rossi.)"
4  A.   I -- I don't recall about buying out.
5  Q.   The next page dated October 17th, 2014, there's a
6  line that says "Attorney Johnson, Rossi's lawyer
7  in Miami, real estate attorney, owner of entity in
8  Miami, may have connection to a chemical company
9  (not verified)."
10    Do you recall having conversations about
11  that in October of 2014?
12  A.   I believe that J.T. had mentioned that.
13  Q.   And we talked a little bit about that earlier --
14  A.   Yes.
15  Q.   -- as it relates to the customer in Miami?
16  A.   Right.
17  Q.   Do you know if he mentioned the name of any
18  chemical company as of October 2014?
19  A.   I -- you know, I just, again, assume it would be
20  the same JM Chemical, but I -- I don't remember on
21  these calls -- on these calls.
22  Q.   The next line says "Device sent to Boeing. Rossi
23  does not know."

Page 148

1  We talked a little bit about that
2  earlier; right?
3  A.   (Witness nods.)
4    COURT REPORTER: Right?
5  A.   Yes.
6  Q.   Next page I want to look at is page 5.005, dated
7  January 9th, 2015.
8    There's a line that says "Rossi removed
9  gauges to show water level. Said it wasn't part
10  of the original specs."
11    Do you recall having conversations with
12  Industrial Heat about that?
13  A.   I don't.
14  Q.   Do you recall having a conversation with Doctor
15  Rossi about that?
16  A.   No.
17  Q.   Do you recall having conversations about a Russian
18  scientist who claimed to have duplicated Doctor
19  Rossi's results?
20  A.   Yeah. I follow all the blogs, the E-Cat news, all
21  of -- you know -- and having conversations with
22  people -- there's a small circle of people that --
23  yeah, and everybody knew there was a -- began with

**[H, R]**

37  (Pages 145 to 148)

Page 149

1    a P -- Polovof [verbatim] or somebody that was
2    having some results after looking at Andrea's
3    IP -- or the -- the report, I guess, that came
4    out.
5  Q.  Was Industrial Heat's position that that wasn't
6    credible?
7  A.  Was or was not?
8  Q.  Was not.
9  A.  Yeah.  I don't recall that part of the
10    conversation.
11  Q.  Going to turn to page 58.008 at the bottom.  It's
12    dated April 20th, 2015.
13    Do you recall there being a $1 billion
14    valuation as it related to Doctor Rossi's
15    technology?
16    MR. BELL:  Objection to form.
17  A.  Well, I think -- again, these are assumptions, and
18    we were just trying to do back-of-the-napkin
19    evaluations, if, you know, the company that --
20    what's the...
21  Q.  Woodford?
22  A.  -- Woodworth [verbatim], or Slow Capital, or
23    whatever they -- their -- if they were buying a

Page 150

1    certain percentage of the stock for X amount of
2    dollars, we were concerned what our 1 percent
3    would be and what the evaluation would be -- and,
4    again, this is -- this is pure speculation on our
5    part, because what we came to -- or come to
6    understand is stock evaluation is, you know,
7    magical.  It's really, you know, something that --
8    I guess in the eyes of the beholder.
9    So I can see where -- you know, he's
10    making some assumptions here that we're -- if our
11    1 percent, you know, was worth -- what it was
12    worth.
13  Q.  Did you ever have conversations with Industrial
14    Heat about what the valuation of Doctor Rossi's
15    technology was?
16  A.  No, not -- not an evaluation of it; no.  I mean,
17    they always -- I mean, there wouldn't be -- what
18    we were hoping is they were raising money up to
19    move all this forward, because it was a good
20    venture; and, you know, we understood Woodruff was
21    in this for the long term, and that Industrial
22    Heat was in for the long term, and we -- we were
23    taking the ride with them.

Page 151

1  Q.  I'm done with that one.
2    I show you what's been marked Exhibit
3    21.
4    MR. CHAIKEN:  Exhibit 21 is Bates
5    stamped AE 355.
6    (Exhibit 21, AE 355.)
7  Q.  It's an email from Ron Engleman, dated Sunday,
8    April 24th, 2016, to Tom Darden at CCU and Karl
9    Norwood.
10    Was this email sent up after you had
11    your meetings with Industrial Heat in April of
12    2016?
13  A.  Yes.
14  Q.  So tell me what happened at that meeting.
15  A.  Is this the -- this is the meeting where we were
16    called down?
17  Q.  I think so.
18  A.  Yeah.
19  Q.  So let's talk about that.
20    Who called you down to North Carolina?
21  A.  J.T. -- to meet with Tom and him.  I believe this
22    was after the lawsuit had started.
23  Q.  And -- and what did he say the purpose of the

Page 152

1    meeting was going to be?
2  A.  He didn't say.
3  Q.  Okay.
4  A.  He just -- we -- we were called down.
5  Q.  Okay.
6  A.  So we -- we actually thought it was positive.
7    We -- we were going there to hopefully hear some
8    good news, you know, that things were being
9    resolved.
10    So Karl, Ron, and I went down.
11  Q.  Okay.  And where'd you meet?
12  A.  At Cherokee's office in Raleigh.
13  Q.  And do you know the address?
14  A.  I don't -- I don't remember the address.  It's
15    their main office.
16  Q.  Who was present at the meeting?
17  A.  Tom, J.T., a guy they hired -- the engineer -- to
18    evaluate.
19  Q.  Joe Murray?  Does that sound right?
20  A.  Joe Murray.
21  Q.  Anybody else?
22  A.  I think that was it.
23  Q.  Okay.

38 (Pages 149 to 152)

Page 153

1    A.  I think that was it.
2    Q.  And what was said at that time?
3    A.  What was said?
4    Q.  Yeah.
5    A.  It was very uncomfortable.  J.T. immediately
6        jumped on us.  And the first thing out of his
7        mouth was, "When did you know this was a fraud"?
8        And we were taken back by that completely, 'cause
9        we always felt we had been honest and transparent
10       and open with -- with everybody on both sides, and
11       to be accused of being part of something that we
12       felt was moving forward, you know, that -- that it
13       was -- it was very uncomfortable.
14   Q.  And --
15   A.  Lasted about an hour and a half.
16       Tom -- we -- we thought that we were
17       going to be put into part of the suit.  And it was
18       very emotional for us, because we had, as I said,
19       been extremely transparent from the beginning.  We
20       had no -- we had no insight to whether the
21       technology worked or it didn't.
22       And for it to be -- for us to be accused
23       of fraud was disheartening, to say the least,

Page 154

1        because we thought we had a good relationship with
2        Industrial Heat and with Andrea, and we had done
3        everything that are -- you can see I'm emotional
4        about this -- because we -- we had -- did
5        everything that we were asked to do, spent a lot
6        of time and money making things happen.  And Tom
7        said to me -- I -- I -- as you can see, I'm --
8        this is -- still a little emotional -- asked -- I
9        asked Tom if he -- if he was going to bring us
10       into the lawsuit, and he said that had yet to be
11       determined.
12       And I asked him if he was looking to get
13       his money back, and he said, "Well, if you were
14       honest, you'd give it back to us" -- not -- not
15       maybe in that -- but at -- you know, saying, you
16       know -- and we had lived up to our agreement.  We
17       had -- all we did was transfer a license.
18       So we -- and we were looking to
19       Industrial Heat to be the third-party evaluator to
20       see if this would all move forward.
21       So it was very uncomfortable -- the
22       meeting, and --
23   Q.  And did you offer to return any of the money that

Page 155

1        you had received from Industrial Heat?
2    A.  No.  We -- we're not going to.  It's -- it doesn't
3        even exist anymore.
4    Q.  Do you think that Doctor Rossi breached the
5        license agreement?
6        MR. BELL:  Objection to form.
7    A.  I -- I think that he did the -- what he thought he
8        was -- you know, whether the third-party
9        evaluation of the test was done.  And that is what
10       we were all hoping; that they would -- you know,
11       that the performance of the 1-Cat would meet the
12       requirements, and that that would all be moved
13       forward.
14   Q.  Do you understand that Doctor Rossi has sued
15       Industrial Heat and the other Defendants for
16       breach of contract and is demanding an $89 million
17       payment from them?
18   A.  I understand that.
19   Q.  Does AmpEnergo believe it's entitled to be paid
20       pursuant to its contract with Industrial Heat?
21   A.  If -- if, in fact, all of the performance levels
22       were met; yes.
23   Q.  Did you make that clear to anyone from Industrial

Page 156

1        Heat or Tom Darden?
2    A.  We were -- excuse me -- pissed off, and we didn't.
3    Q.  Do you have any intentions -- when I say "you," I
4        mean AmpEnergo.
5        Does AmpEnergo have any intentions of
6        suing Industrial Heat or any --
7    A.  We don't -- we don't have those resources.
8        MR. SHARE:  Object to form.
9    A.  And we don't have those resources.  We're just old
10       working boys.  That's all.
11       And -- okay.
12       MR. CHAIKEN:  This is my last exhibit,
13       Exhibit No. 22.  Exhibit 22 has been Bates stamped
14       IH 112628 through 2629.  It's some emails from
15       March of 2016.
16       (Exhibit 22, IH 112628-629.)
17   Q.  Do you know who Marianne Macy is?
18   A.  Yes, I do.
19   Q.  Who is she?
20   A.  She is married to Mike Melich.  She is a writer
21       and reporter.
22   Q.  And did she ask you to send her some -- some --
23       well, your email dated March 11, 2016 states that

IMP, R

39  (Pages 153 to 156)

Page 157

1  you will sent the pipe reactor to IH.
2      What -- what was going on with --
3  A.  That was -- that was -- it was an old piece of
4  pipe that was left over from one of the tests that
5  we did, and they had -- Industrial Heat had asked
6  for it; and after talking with Rick Nociti, there
7  was nothing -- I mean, so we decided not to do
8  anything with it.  Just throw it away.
9  Q.  And so you didn't send it to Industrial --
10 A.  No, we didn't send it to anybody.
11 Q.  At the bottom of -- of this first page there's an
12 email from Todd -- Todd N.
13     Who is Todd?
14 A.  Todd Norwood.  It's Karl Norwood's son.
15     He did the video of -- of the first test
16 we did at -- in Bedford.  So there was a video
17 that Nick -- I mean, Rick Nociti narrated.  And,
18 you know, I think -- yeah, that's what it was.  We
19 sent that video to -- you know, to him.
20 Q.  Was the video of -- of Doctor Rossi's initial
21 E-Cat test --
22 A.  Yeah.
23 Q.  -- that he performed for the AmpEnergo group?

Page 158

1  A.  Yes.
2  Q.  Got it.
3      Did you ever forward those on to
4  Industrial Heat?
5  A.  Yes.
6  Q.  Do you know when you did?
7  A.  I think probably early on, I mean -- because when
8  we had signed the agreements, they wanted all
9  kinds of information and any backup information
10 that we had -- the people that we had been working
11 with, and any kind of pictures and stuff.
12     So I sent all that stuff.
13     MR. CHAIKEN:  Okay.  I have no further
14 questions at this time.  I appreciate your time.
15 I think Counsel will probably have some questions,
16 and maybe counsel on the phone.
17     Do you want to take a break, or do you
18 want to go right into it?
19     MR. BELL:  I think it would be a great
20 idea to take a break.  Okay.  And I'll -- I'll be
21 guided by you, Mr. Cassarino, as to how long you
22 want.
23     THE WITNESS:  Well, I -- I would just as

Page 159

1  soon just take 20 minutes, you know, eat a little
2  bit and get -- keep this going, because I'm going
3  to get burnt out if I don't.  I'd rather just --
4      MR. BELL:  Well, that's what I'm afraid
5  of.
6      MR. SHARE:  He's making himself
7  available for the day, and you know, we expect
8  this will be wrapped up in the seven-hour
9  guideline?
10     MR. BELL:  Oh, yes.  No question about
11 that.  I just want -- and I -- whether you take 20
12 minutes or an hour, it's still going to be wrapped
13 up.
14     THE WITNESS:  Okay.
15     MR. BELL:  And I just want you to be as
16 fresh as you --
17     THE WITNESS:  Let's -- let's eat and
18 then -- take a half hour or something.
19     MR. BELL:  30 minutes?
20     THE WITNESS:  Yeah.
21     MR. BELL:  I'll be here.
22     MR. SHARE:  Leave the line open.
23     VIDEOGRAPHER:  Okay.  It's 12:37, and we

Page 160

1  are going off...
2      (Whereupon the deposition recessed at
3  12:39 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

40  (Pages 157 to 160)

Page 161

1          AFTERNOON SESSION: (1:14 PM)
2          VIDEOGRAPHER: The time is 1:14 p.m.,
3     and we are back on the record.
4                EXAMINATION
5     BY MR. BELL:
6     Q.   Good afternoon, Mr. Cassarino.
7     A.   Yes.
8     Q.   Earlier in the day I introduced myself. I'm
9     Bernard Bell, and I represent Mr. Darden, Mr.
10    Vaughan, and -- and the corporate entities that
11    have been sued in this case.
12         Do you understand that?
13    A.   Yes.
14    Q.   Does AEG still have physical possession of any
15    reactor fueled by Andrea Rossi?
16    A.   We have an old pipe.
17    Q.   Is -- other than that, do you have possession of
18    anything else that has been fueled by Andrea
19    Rossi?
20    A.   Yes. We have a reactor, the first one in the --
21    that was done in Bedford.
22    Q.   And where is that?
23    A.   It's in my house.

Page 162

1     Q.   And can you tell me, basically, the chain of
2     custody of that from the time that he --
3     A.   Yeah. I mean, I was --
4     Q.   Let me just finish the --
5     A.   Yeah, the --
6     Q.   Let me just finish the question.
7     A.   Yeah.
8     Q.   From the time that Andrea Rossi fueled it until
9     now, where has it been?
10    A.   It was in my brother-in-law's machine shop, and
11    then went from the machine shop to my basement.
12    Q.   Has anybody asked you for that, either in
13    connection with this litigation or otherwise?
14    A.   Not for that; no.
15    Q.   All right. And the -- you talked about the pipe.
16    What is the --
17    A.   It's just -- the reactor sits on a big black pipe.
18    It was part of the hot water that was going
19    through the reactor.
20    Q.   Okay. Now, you mentioned that you visited the
21    plant in Florida two times; is that correct?
22    A.   Yes.
23    Q.   Tell me the first time.

Page 163

1     A.   I believe that was in April with AmpEnergo: Bob
2     Gentile, Rick Nociti, Ron Engleman, Karl Norwood,
3     and myself.
4     Q.   And that was April 2015.
5     A.   Yes.
6     Q.   Was the -- was the unit operating at the time?
7     A.   Yes.
8     Q.   So describe for me, if you will, what you saw,
9     beginning with when you first approached from the
10    outside.
11    A.   The building was in, like, an industrial complex
12    with various units. We were let in the door.
13    There were two containers.
14         (Phone sounds.)
15    A.   One was the reactor container, and, then, the
16    other was the control center.
17         As you entered in, they were to the
18    right of the -- of the door.
19    Q.   Now, when you were on the street and you were
20    facing the building or in the parking lot --
21    I'm -- I'm not sure, you tell me -- but when you
22    were facing the building, what did you see?
23    A.   Just a -- a roll-up door.

Page 164

1          We -- we came in the back entrance to
2     the building. That's where we came in.
3     Q.   Okay.
4     A.   And there were just a set of, like, you know,
5     industrial roll-up doors -- half a dozen, maybe,
6     in a row in this building.
7     Q.   And is -- did you go in through one of the roll-up
8     doors?
9     A.   Yeah. We went in the -- it was actually just a
10    regular door that we went in. The -- the roll-up
11    door was open.
12    Q.   Okay. And you went in, and you had a meeting that
13    you -- you've discussed earlier you met in the
14    conference room, I believe --
15    A.   Yeah.
16    Q.   -- or the office where the controls were?
17    A.   Right.
18    Q.   And you also went in the container with the
19    1-megawatt unit?
20    A.   Yes.
21    Q.   Did you touch anything in there?
22    A.   No. We were told not to touch anything.
23    Q.   Who told you that?

Page 165

1    A.   Andrea.
2    Q.   Was Mr. Engleman with you?
3    A.   Yes, he was.
4    Q.   Did he ask to touch anything?
5    A.   No.
6    Q.   What did you observe inside the unit?
7    A.   Well, I think the first thing that we observed
8         was -- because we -- when -- when I saw the
9         container in Raleigh before it was shipped, there
10        were maybe a hundred units.  There were supposed
11        -- I think this was the same configuration that
12        was in Italy:  10 kilowatts each, which made up
13        the 1-megawatt unit.
14             What we first noticed -- was a surprise
15        to us -- there were four 250-kilowatt units in the
16        back part, which we didn't know existed.
17             So we were happy, 'cause they were --
18        seemed to be less complicated.  You know, rather
19        than hooking up 100 units, there were only four
20        units that were hooked up.  And the -- the rest of
21        the units -- this megawatt was two -- I mean --
22        was four 250-kilowatt units, and the others were
23        not running.  It was just the four 250 kilowatts.

Page 166

1         The rest of them were used for backup.
2    Q.   And when you say "250-kilowatt units," what do you
3         mean by that?
4    A.   Meaning they were in, like, big boxes.  You know,
5         the size of this maybe (indicating), you know, in
6         a square.  There were four of them.
7    Q.   When this -- you were pointing to the screen
8         behind you --
9    A.   Yeah.  There were -- they're square --
10   Q.   -- which is about -- just so -- because we're
11        getting words and not pictures --
12   A.   Right.  Okay.
13   Q.   -- I'm looking at something that's about 6 feet by
14        5 feet?
15   A.   Yeah.  I mean, they would have fit in the 40-foot
16        container in the back.  So I don't know how
17        long -- how wide that is, but they were probably 6
18        feet each by a couple of feet.  I -- I can't
19        remember exactly, but they were --
20   Q.   Sure.  I understand.
21   A.   -- box units, four of them.
22   Q.   When you say "250 kilowatts," what does that mean?
23   A.   That means that they're producing 250 kilowatts an

Page 167

1         hour of heat or -- or -- yeah, of heat.
2    Q.   They're capable of that, or they were actually
3         doing that?
4    A.   Well, we assumed they were doing that.
5    Q.   On what basis did you assume that?
6    A.   The instrumentation that we saw and the readout
7         that we -- again, I'm not the technical guy.  Rick
8         Nociti and Andrea -- I mean, Ron Engleman were --
9         we had a tour of that to show the water intakes,
10        the water outtakes, thermal couples showing the
11        heat; and I can't remember exactly what else.
12   Q.   Reminds me of another question I want to ask you,
13        which is -- you said a couple of things that
14        you're not in terms of your background, but what
15        is your background?
16   A.   My degree is in resource management and
17        conservation --
18   Q.   Okay.
19   A.   -- and I -- I was a partner in Leonardo
20        Technologies, and we helped run -- we were a
21        contractor for the Department of Energy at
22        Pittsburgh and Morgantown.  And so my background
23        was really managing different projects.

Page 168

1    Q.   Okay.
2    A.   That's what I do.
3    Q.   Do you have an engineering degree?                      IMP
4    A.   I don't.
5    Q.   Or any engineering certification?
6    A.   No, I don't.
7    Q.   Okay.  So when you -- going back to the visit to
8         the -- to the plant, you said you -- you looked at
9         the -- at meters and so forth.
10             Describe for me specifically what you
11        remember seeing.
12   A.   Basically, the same kind of equipment that we saw
13        before.  I mean, I -- we had run three or four
14        different tests at different times.  So there was
15        always thermal couples, flow meters of water
16        coming in; there was a computer in the control
17        room that ran it.
18             Those are the kinds of things that I
19        saw.
20   Q.   Was it your understanding that the thermal couples
21        were connected to the computer in some -- in some
22        fashion?
23   A.   Yes.

42 (Pages 165 to 168)

**Veritext Florida Reporting Co.**

Page 169

1   Q.   Where was the flow meter -- withdrawn.
2        What was the -- to your understanding,
3   what was the flow meter -- withdraw that too.
4   A.   It was the water intake --
5   Q.   How many -- how many flow meters do you recall
6   seeing?
7   A.   I don't recall.
8   Q.   Okay. Tell me what you recall about the flow
9   meters.
10  A.   They were pointed out to us that this was the flow
11  meter, and -- and I -- again, I was following my
12  engineering friends through this and listening.
13  Q.   And am I correct, based on your prior testimony,
14  that Mr. Engleman is -- sort of -- the -- the most
15  qualified engineer in the group?
16  A.   No. I think Rick Nociti probably -- he's a Ph.D.
17  chemical engineer, and he'd been involved in LENR
18  for quite some time. That's why we brought him
19  into AmpEnergo.
20  Q.   Did you observe steam?
21  A.   No.
22  Q.   Now, where was the customer -- what you understood
23  to be the customer -- in relation to where you

Page 170

1   were visiting?
2   A.   On the other side of the wall.
3   Q.   So describe the wall.
4   A.   The wall was like a -- any -- it was -- it was a
5   divider wall. I mean, it was part of the unit;
6   and the heat or the flow pipe went through that
7   area -- that wall. Just that it was a -- you
8   know, the -- I guess the manufacturing facility
9   was on the other side of this wall.
10  Q.   And -- and you understood the heat to be going
11  through the wall?
12  A.   Yes.
13  Q.   What did you observe in that respect?
14  A.   Just the pipe.
15  Q.   Do you recall more or less the diameter of the
16  pipe?
17  A.   I don't.
18  Q.   And you observed that it went through the wall to
19  the other side.
20  A.   Right.
21  Q.   Did you go to the other side?
22  A.   No, we didn't.
23  Q.   Did you ask to go to the other side?

Page 171

1   A.   No, we didn't.
2   Q.   Were you told that you could not go to the other
3   side?
4   A.   No, I don't think we were ever told. It was --
5   we -- we had -- it was a private company, and
6   so -- we were interested in the E-Cat, seeing the
7   E-Cat, not the client so much.
8   Q.   Did you see anybody from the client company?
9   A.   No.
10  Q.   Did you meet anybody? -- I should say.
11       Did you observe anybody?
12  A.   I didn't.
13  Q.   Did you observe anybody coming -- was there a door
14  in the wall that would allow passage from one side
15  to the other?
16  A.   I don't recall any.
17  Q.   And how long did you spend there, more or less, on
18  that visit?
19  A.   We probably spent three -- two or three hours.
20  Most of it was in the -- we did a tour of the --
21  of the E-Cat, the...
22       COURT REPORTER:  The what? I'm sorry.
23       THE WITNESS:  Pardon me?

Page 172

1        COURT REPORTER:  "...the E-Cat, the..."
2        I'm sorry. You said something else. I
3   didn't hear it.
4        "We did a tour of the E-Cat, the..."
5   A.   And -- and then we went into the control room and
6   sat there and had discussions.
7   Q.   What do you remember about the discussions?
8   A.   We were just curious how it was going, what the --
9   what the COP was for our interest; that he was --
10  Andrea was able to meet those. We were told that
11  it was above -- actually above the COP that was
12  needed for the third-party review.
13       I can remember distinctly one little
14  incident that Rick Nociti was -- very observant
15  person, and he mentioned to Andrea that there was
16  a -- some kind of an electronic device that was
17  laying on the table, and that anybody else that
18  knew what that device -- would be able to actually
19  know something about what was going on with the
20  E-Cat, the secret sauce or something. He -- he
21  mentioned that, in -- smiling about it.
22  Q.   Did you observe the outside of the building from
23  the -- from the side opposite where the roll-up

43 (Pages 169 to 172)

Page 173

```
 1     doors were?
 2  A.  You mean on the roof?
 3  Q.  Not on the roof, but on the other side of the
 4     building.
 5  A.  No.  No, we didn't.
 6  Q.  Did you observe the roof?
 7  A.  No, just as we were coming -- you know, coming in.
 8     That's why -- you know, it was -- it was a flat
 9     building.
10  Q.  What do you remember about the roof?
11  A.  Nothing.  I mean, that was just -- yeah, nothing.
12  Q.  Okay.  So that was the -- first visit in April
13     of 2015 --
14  A.  Yes.
15  Q.  -- and, then, you said there was a -- you visited
16     there a second time.
17  A.  Right.
18  Q.  When was that?
19  A.  I don't recall the exact date.  It was the -- I
20     think it was the second ERV test, probably --
21     whenever that test was.  And I -- honestly, I
22     don't remember the -- the day.  It was -- I was in
23     Florida, meeting with some people, and met with
```

Page 174

```
 1     Andrea one-on-one.
 2  Q.  Was the --
 3  A.  It was -- I think it was just after the -- it was
 4     after the second test for the ERV.
 5  Q.  The second time that Mr. Penon visited?
 6  A.  Yes.
 7  Q.  At -- the second time after the startup?
 8  A.  Yes, I believe so.
 9  Q.  Okay.
10  A.  It could have been the third time.  I don't --
11  Q.  Well, regardless of when the date was --
12  A.  Yeah.
13  Q.  -- tell me what you remember about the meeting,
14     please.
15  A.  I had a quick tour, nothing seemed any different
16     to me.  I had to sign a document, because they
17     weren't letting anybody in there.  It was just a
18     confidentiality --
19  Q.  What do you mean "they"?
20     Who -- who wasn't letting people in?
21  A.  The -- JM -- the -- the client.
22  Q.  You had to sign something to get into the
23     Industrial Heat side of the facility?
```

Page 175

```
 1  A.  Yeah.
 2  Q.  And it was your understanding that JM Products
 3     required you to sign that?
 4  A.  Yeah.
 5  Q.  Okay.  Where -- physically where was that?
 6  A.  The --
 7  Q.  In other words, you signed it some --
 8  A.  Oh, it was just a piece of paper.
 9  Q.  And did Mr. Rossi give that to you?
10  A.  Yes.
11  Q.  Was the -- was the 1 megawatt -- what we call the
12     1 megawatt or the E-Cat, was it operating?
13  A.  Yes.
14  Q.  Did you touch it at that time?
15  A.  No, I didn't -- I didn't touch anything.  I just
16     observed it again; the same kind of tour that I
17     had taken before.
18  Q.  Did you notice anything different from the first
19     visit?
20  A.  You know, no, not really.  I didn't see anything
21     that was different.
22  Q.  So it was still the four larger units?
23  A.  Yes.  Sure.
```

Page 176

```
 1  Q.  Did you have an understanding of who built the
 2     four larger units, as compared to the 100 smaller
 3     units?
 4  A.  That's a good question.
 5        No, we didn't -- I -- I assumed --
 6     again, that's an assumption -- that it was done in
 7     -- in North Carolina, because if it was starting
 8     to be operated in February to April of that
 9     period, then to build those, I think, would have
10     taken a longer time.  So it must have come in the
11     container.
12        That's what I -- we -- we assumed that.
13  Q.  Did you -- did you observe that the unit was
14     generating steam?
15  A.  We didn't -- I didn't see steam.
16  Q.  Is it your understanding that it's possible to
17     monitor or measure whether the unit's generating
18     steam, as opposed to water?
19  A.  Yes.
20  Q.  How -- how would you do that?
21  A.  With a meter of some sort.
22  Q.  And did you observe any such meter in the --
23  A.  I might have, but I'm not sure if it was a water
```

44  (Pages 173 to 176)

Page 177

1    meter or a steam meter.
2    Q.   Okay.  When was the last time you talked with
3    Andrea Rossi?
4    A.   The last time I talked with him?
5    Q.   Yeah, apart from today.
6    A.   Months ago.  I -- I don't recall.
7    Q.   Do you recall whether -- whether it was before
8    or --
9    A.   It was -- it was probably -- I don't -- I'm not
10   sure I actually had a conversation with him --
11   maybe once after my visit there, but...
12           After I -- we knew the suit was -- we
13   were -- I basically didn't communicate with him
14   anymore.
15   Q.   Why?
16   A.   Because I didn't want to get involved with
17   anything.  We -- we at AmpEnergo, we felt we were
18   in the middle, and we just didn't want to do that.
19           I did send Andrea a couple of emails --
20   personal ones -- about my son.  You know, that
21   was -- that was the only -- and I think a Merry
22   Christmas.
23   Q.   Did you ever hear back from him?

Page 178

1    A.   Thanking me for Merry Christmas, and -- and my
2    son; yes.
3    Q.   But just general things, like, personal --
4    A.   It was -- yes.  I -- I wanted to keep it more
5    personal than anything to do with business.
6    Q.   Understood.
7           Do you consider that AEG has a financial
8    interest in the outcome of this litigation?
9    A.   Yes.
10          MR. SHARE:  Objection to form.
11   Q.   What is your understanding?
12   A.   That if the -- it's successful, that the court is
13   proved, and that the COP is reached, and that --
14   all the requirements of the performance, then we
15   would be entitled to a second tranche of money.
16          MR. BELL:  I'm going to mark as the
17   exhibit next in order an agreement dated April
18   7th, 2011.
19          (Exhibit 23, IH-0028414-421.)
20   A.   (Witness reviews document.)
21   Q.   I just have a couple of questions, Mr. Cassarino.
22   A.   Yeah.
23   Q.   You've seen this before, I assume?

Page 179

1    A.   Yes, I have.
2    Q.   And in the "Goals and Objectives" there is --
3    which is --
4    A.   What page?
5    Q.   I'm sorry.  It's the third page of the document,
6    section 5.
7    A.   Yeah.
8    Q.   "Goals and Objections -- Goals and Objectives."
9    A.   Yeah.
10   Q.   There's a goal and objective to negotiate the
11   price of -- for a minimum of $150 million.
12          Do you see that?
13   A.   Yes.
14   Q.   Who set that?
15   A.   Andrea.
16   Q.   Do you know what it was based on?
17   A.   His -- I assume it was on his -- what he felt the
18   value of the -- of the technology was.
19   Q.   Okay.  And on the same page, above -- as the
20   carry-over in section 4, there's a phrase that
21   talks about Leonardo and AEG sharing with
22   potential customers -- I'm sorry.  I'm looking at
23   the wrong thing.  I apologize.

Page 180

1           Yeah.  In -- in section 3(a) on the
2    second page of the document --
3    Q.   3(a)?
4    A.   Uh-huh.
5    A.   Yes.
6    Q.   And this provides that the term of the agreement
7    is two years.  It begins to run on the date that,
8    quote, "Leonardo first provides AEG with the
9    necessary and essential test information."
10          Do you see that?
11   A.   Yeah.  Yeah.
12   Q.   What is that test information?
13   A.   (Witness reviews document.)  Oh, okay.
14          So that was -- Andrea was putting
15   together an agreement with a Greek organization to
16   test the 1-megawatt unit.  And we were to get the
17   information from that test, and then our -- it
18   would kick off -- because we didn't -- we didn't
19   know -- we didn't have any ability to know whether
20   it was working or not working.  So the test would
21   define that.
22   Q.   Now, earlier this morning I -- I believe that you
23   testified that you began to work with Andrea Rossi

R, S

45  (Pages 177 to 180)

Page 181

1  on -- on this E-Cat technology in 2008; is that
2  correct?
3  A.  Well, we -- we started talking about it; right.
4  Q.  When did you start marketing it?
5  A.  After this agreement (indicating).
6  Q.  And -- and what were you doing in between 2000 --
7  Talking with a lot of people about it to get --
8  kind of -- response and feedback about what
9  people -- how they saw low energy nuclear
10  reaction.
11  Q.  Between '08 and '11 --
12  A.  Yes.  Yeah.
13  Q.  -- you were doing that.
14  A.  Yeah.
15  Q.  And then you enter the agreement, and then you
16  begin to -- to market it?
17  A.  Yeah.
18  Q.  Were you --
19  A.  Well, we -- we were -- you know, I mean, we were
20  marketing by talking to different people about it;
21  yes.
22  Q.  And you -- you testified earlier this morning
23  about exploring things with the Naval Research

Page 182

1  Lab?
2  A.  Yes.
3  Q.  With whom specifically?
4  A.  That was with Mike Melich.
5  Q.  You also testified that you had lots of meetings
6  with lots of investors --
7  A.  Yeah.
8  Q.  -- more or less; correct?
9  And you -- you testified to the effect
10  that -- I'm paraphrasing here -- that, because of
11  the way the agreement was structured, and Andrea
12  Rossi's concern over -- over certain issues, it
13  could not come to fruition.
14  A.  Right.
15  Q.  Does that -- does that sound accurate?
16  A.  Yes.
17  Q.  What -- what do you mean by that?
18  A.  I meant that the way that Andrea -- because of
19  what he felt -- somebody might steal the
20  technology -- that the -- that he wanted $15
21  million up front, and nobody was willing to
22  negotiate that up-front money to have access to
23  the technology.

Page 183

1  Q.  And that includes Boeing?
2  A.  That included Boeing; yeah.
3  Boeing just -- they wouldn't put -- the
4  government and the Navy -- nobody does that kind
5  of business.
6  Q.  How many people -- potential people -- let me
7  phrase it this way:  Of the people that could
8  afford to pay $15 million, how many do you think
9  took a pass on this, more or less?
10  A.  Took a -- you mean just didn't want to do it?
11  Q.  Well, they didn't enter into the agreement with --
12  either you approached them, or they approached
13  you, and they -- they had the resources, but chose
14  not to -- chose not to move forward.
15  A.  Three or four, maybe.
16  Q.  Why was -- why was Mr. Darden different in that
17  respect?
18  MR. SHARE:  Objection to form.
19  Q.  I'll withdraw the question.
20  Why do you think, from your perspective,
21  Mr. Darden and -- and Industrial Heat were able to
22  negotiate successfully the license agreement with
23  Andrea Rossi in 2012?

R, S

Page 184

1  MR. SHARE:  Objection to form.
2  A.  I thought there was good chemistry; that they --
3  Andrea actually trusted Tom -- of all the people
4  that we -- I mean, the day that we were to fly
5  there, Andrea told me -- or two days prior to
6  that -- that he had about a 10 percent chance of
7  it moving forward.
8  And after we -- Tom and Rick Bauman and
9  Jim Compton and I -- visited with Andrea, they all
10  came out feeling good about it, feeling good about
11  the meeting.  And I think Tom took his time to get
12  to know Andrea, flew to Italy, met with Andrea and
13  his wife.
14  Nobody else had done that.
15  Q.  The --
16  A.  And -- and just -- not just from personalities,
17  but Tom had told us that he had been very
18  interested in low energy nuclear reaction; and
19  that this was something he wanted to move into
20  that area because of his concern for environmental
21  issues.
22  Q.  Did you understand that Mr. Darden was intending
23  to fund the initial payment himself?

46 (Pages 181 to 184)

Page 185

1   A.   No.  That was not what we were told.  He put up a
2        good share of it, but I think his partner
3        Mazzarino -- and there were other investors
4        putting up that first tranche of money -- he had
5        friends and other, I think -- you know, other
6        groups that he had that he had approached to raise
7        up that first tranche of money.
8   Q.   Did you understand that it was those investors --
9        Mr. Darden, Mr. Mazzarino -- were putting their
10       personal money or money from trusts that they
11       controlled?
12  A.   Yes.
13  Q.   Now, the agreement -- the 2011 agreement that you
14       had with -- between AEG and Mr. Rossi contemplates
15       a payment -- the goal and objective is a $150
16       million payment, which is then divided between the
17       two parties to the agreement --
18  A.   Right.
19  Q.   -- correct?
20  A.   Yes.
21  Q.   But the -- the license agreement with Industrial
22       Heat was structured in a different way; correct?
23       It was separate payments.

Page 186

1              Industrial Heat was to pay Andrea
2        Rossi --
3   A.   Yeah -- and pay us --
4   Q.   -- and then pay you separately?
5   A.   -- yes.  Yes.
6   Q.   Why was it done that way?
7   A.   We just thought that was good business.
8   Q.   Well, why?
9   A.   'Cause -- 'cause Tom had the money -- or
10       Industrial Heat had the money.
11            MR. BELL:  I'll have marked as an
12       exhibit next in order an email.
13            (Exhibit 24, IH 00083161-164.)
14            MR. BELL:  The top email is dated August
15       13, 2012, and stamped IH 00083161.
16  Q.   And I really have only one question on this
17       document, and it relates to the third page.
18  A.   (Witness reviews document.)
19  Q.   Have you had a chance to look at that, Mr.
20       Cassarino?
21  A.   Which -- which one?
22  Q.   I'm looking at the first comment that is in
23       italics:  "Rossi severed his relations with

**A, H, R**

Page 187

1        Defkalion, so he did not complete the Greek-based
2        installation.  The only other --"
3             COURT REPORTER:  I'm sorry.  You have to
4        speak up.  You're kind of soft.
5   A.   "-- ones are -- other independent tests are the
6        ones conducted by the military customer in Europe,
7        which AEG has not been able to verify."
8   Q.   So my question is, at the time of the -- the
9        transaction between Industrial Heat -- between and
10       among Industrial Heat, AEG, and Andrea Rossi, did
11       AEG have any independent verified tests of Rossi's
12       E-Cat technology?
13  A.   No.
14  Q.   Now, I'm going to ask you to take out the set of
15       handwritten notes that you looked at this morning
16       that's marked as Exhibit 19.
17  A.   Okay.  Which -- which one?
18  Q.   It's the -- the notes from 2013.
19  A.   Both sets?
20  Q.   No -- well, we'll get to the other one in a
21       minute.
22  A.   Okay.
23  Q.   But at first I just want to ask you some questions

**A, H, R**

Page 188

1        about 19.
2   A.   Yeah.
3   Q.   Okay.  First of all, on the third page of this
4        exhibit, which is dated 31 May, 2013 --
5   A.   Second page; yes.
6   Q.   Third page.  Thank you.
7   A.   Third page?
8   Q.   "Excited about Boeing"?
9   A.   (Witness reviews document.)  Yes.
10  Q.   Yeah.  Now, this morning you testified that,
11       Boeing "didn't work the way we wanted to work."
12            What did you mean by that?
13  A.   You mean on the first --
14  Q.   Yes.
15  A.   -- the first time?
16            That they could not get management to
17       pony up the $15 million that was required by
18       Andrea to develop the partnership.
19  Q.   Let me ask you to flip to the page in the notes
20       which is dated 29 July, 2013.  At the bottom it's
21       AE 20.
22  A.   (Witness reviews document.)  Yes.
23  Q.   There's reference in the middle of the page that

47  (Pages 185 to 188)

**Veritext Florida Reporting Co.**

Page 189

1    says, quote, "Plan B:  Validate IP/COP three-week
2    test."
3           Do you see that?
4    A.  (Witness nods.)
5    Q.  Does that have any meaning to you?
6    A.  (Witness reviews document.)  I think that was our
7        personal -- what -- what we had always contended;
8        that we didn't see a need for a 1-megawatt unit.
9        We just wanted to test one of the 10-kilowatt
10       units that were in there.
11   Q.  Why?
12   A.  Just to keep it simple; that we thought that
13       combining 100 units together with issues about
14       connections and all of that, and that all we'd --
15       anybody had ever told us, that all you've got to
16       do is show that you're getting COP above 1, and
17       you would change -- it would be a game-changer.
18           So what we were saying -- and I -- I
19       believe -- I am not sure -- that we -- we were
20       always saying, Gosh, you know, why do we have to
21       do a one-year test?  Why don't we just do a plan
22       B, three weeks of one unit, and -- just so that it
23       works.

Page 190

1    Q.  And did -- did you ever have a discussion with
2        either Mr. Darden or Mr. Vaughan about that
3        concept?
4    A.  Oh, yes.  Yes.
5    Q.  And -- and what was their reaction?
6    A.  I think they were in agreement.  I think that was
7        part of why they had asked Boeing to do a one-unit
8        test --
9    Q.  Uh-huh.
10   A.  -- was, Let's just prove it -- having a 1
11       megawatt, because the 1 megawatt was complicated,
12       just because -- and all the engineering
13       requirements that were entailed to get all of the
14       water and everything in sequence and all of that.
15   Q.  Okay.
16   A.  So what we were -- we just wanted to make sure
17       that the LENR was real; and that the easiest way
18       to do that would be just to do one unit.
19   Q.  Let me ask you to flip to the page that's dated 27
20       September, 2013, which is AE 24.
21           Are you with me?
22   A.  Yeah.
23   Q.  Really, I want to establish the date here is 27

Page 191

1    September, 2013, and I have a question on the next
2    page.
3    A.  Okay.
4    Q.  Now, is it your understanding that the validation
5        testing in Italy with Penon that resulted in the
6        10 or $15 million payment was in April/May of
7        2013?
8    A.  Yes.
9    Q.  So at -- by this time, that has already happened;
10       correct?
11   A.  Yes.
12   Q.  Now, there's a reference here -- can you -- can
13       you read the notes on AE 25.
14   A.  "ERV expert representation for validation.  Sweden
15       team?  Penon?"
16   Q.  With question marks after those.
17           What does that mean?
18   A.  I'm not sure what Ron meant by that.  I -- you
19       know, other than, Is it going to be the Swedish
20       team or Penon?
21   Q.  But it was -- it was not established that it would
22       be Penon; is that correct?
23           MR. CHAIKEN:  Object to form.

Page 192

1    A.  I don't -- I don't remember.
2           MR. BELL:  Mark this as exhibit next in
3        order, an email dated November 25, 2013, stamped
4        IH 00093886.
5           (Exhibit 25, IH 00093886-890.)
6        (Witness reviews document.)
7    Q.  This is an email that you wrote to Mr. Darden and
8        Mr. Vaughan; is that correct?
9    A.  Uh-huh -- yes.
10   Q.  Why at this time was AEG considering inviting the
11       collaboration to help Industrial Heat?
12   A.  Let me read this first.  (Witness reviews
13       document.)
14           Because we -- we felt that the -- the --
15       because Industrial Heat -- nobody at that time,
16       other than T. Barker, was not in a -- they weren't
17       technical.  They were money men.  I mean, that was
18       really the -- the key; that they were raising the
19       funds.
20           T. Barker was the only real technical
21       person they had available at this time.  We felt
22       that -- John Preston was one of the people.  He
23       had a company that was doing high -- high

48  (Pages 189 to 192)

Page 193

1  technology.  Tom -- I introduced Tom to him.
2       Boeing, obviously, had -- and that --
3  the more technical help we could give Industrial
4  Heat, the easier it would be to move all this
5  forward.
6  Q.  Okay.  And in -- in the email you write -- towards
7  the -- towards the end, about the sixth line from
8  the bottom of your email:  "I am not sure if this
9  is the right time, however, another set of
10  eyes and skills might speed this IP transfer
11  quicker and slow down your burn rate."
12       Do you see that?
13  A.  Uh-huh.
14  Q.  Now, in November of 2013, when you wrote this
15  email, did AEG believe that the IP transfer from
16  Rossi and Leonardo to Industrial Heat was not
17  complete?
18       MR. CHAIKEN:  Object to form.
19  A.  No.  We -- we felt it was -- I mean, that's why
20  they paid the money.  We felt that they tran --
21  everything had been transferred.  But what we were
22  understanding from J.T. is, they were not able to
23  reproduce it.  And because they only had a limited

Page 194

1  technical crew at the lab, that bringing in some
2  folks with technical abilities would help -- and
3  maybe IP transfer is the wrong word when I was
4  expressing -- it would be more of getting the --
5  getting the product up and running.
6  Q.  So when you use the phrase, you're -- you're using
7  it in the sense more of the ability to replicate
8  or to reproduce?
9  A.  Yes.  Yes.
10  Q.  In the --
11  A.  And, again -- and that goes back to what I said
12  earlier about when I visited their, you know,
13  there were -- things were, you know, people were
14  screwing caps on, rather than swaging them.  The
15  electric wires they were using on the ceramics
16  were different.  And so I -- I -- as even a
17  nonengineer, I could see they were all having
18  technical difficulties.
19  Q.  In the next sentence you write:  "I also
20  understand your sensitivity to/with A.R."
21       Do you see that?
22  A.  Yeah.  I -- and I don't think J.T. and A.R. had a
23  great relationship, just because of the

IMP, R

Page 195

1  communications.
2       You know, it was just he -- as I
3  explained earlier, he was a young guy.  He wasn't
4  that -- technology was not his -- he was a finance
5  guy.  And working with an inventor can be a little
6  difficult sometimes.
7       We were -- you know, again, all -- what
8  I was trying to do was to be a facilitator, to try
9  to help move all this along with the basic
10  knowledge base that I had.
11  Q.  I'm going to ask you to look back -- for the last
12  time -- at Exhibit 19, which is the handwritten
13  notes from 2013.
14  A.  Yeah.
15  Q.  And I'll ask you to turn to the page AE 30 that is
16  dated at the top 26 November, 2013.
17  A.  Yup.
18  Q.  And, again, is this -- this is Mr. Engleman's
19  handwriting?
20  A.  Yes.  Yes, it is.
21  Q.  All right.  In the -- this is separated into a few
22  blocks, and there's a block that begins "AEG's
23  position."

A, R

Page 196

1       Do you see that?
2  A.  Yes.
3  Q.  Can you read that, please.
4  A.  "AEG's position has always been the breakthrough
5  E-Cat IP technology consistency above unity.  Is
6  it replic --" and what's the word?
7  Q.  Replicable.
8  A.  "-- replicable, and is it transferable?  It has
9  not been --"
10  Q.  "And reproducible"?
11  A.  "And reproducible."
12  Q.  And then it continues "It has not been about --"
13  that was -- you -- you talked about that sentence
14  earlier today --
15  A.  Yeah.
16  Q.  -- correct?
17  A.  Yeah.
18  Q.  Now, I want you to keep that -- I want you to keep
19  that out, and also pull out again what -- what Mr.
20  Chaiken marked as Exhibit 14, which is November
21  29, '13 email, stamped AE 303.
22  A.  14?
23  Q.  Yes.

49 (Pages 193 to 196)

Page 197

```
 1   A.  (Witness reviews document.)  Yes.
 2   Q.  And -- and can you read for me the second sentence
 3   of the email "For AEG."
 4   A.  "We understand"?
 5   Q.  Ah.
 6   A.  Second paragraph or second sentence?
 7   Q.  No, second sentence.  "For AEG, the successful..."
 8   A.  Well, I've got -- Exhibit 14, and I don't see --
 9   Q.  Is it AE 303?
10       MR. SHARE:  (Indicating?)
11   A.  Oh, "For AEG --"
12   Q.  Yeah.
13   A.  It's the third, "For AEG, the successful
14   validation of E-Cap has not been about a specific
15   COP, about whether technology is consistently
16   operating above unity is replicable and
17   transferable."
18   Q.  Okay.  And in both the notes and email, what does
19   the word "replicable" mean to you?
20   A.  Means that somebody can replicate the technology.
21   Q.  And the word "transferable" is also used in both
22   documents.
23       What -- what does that mean in this
```

Page 198

```
 1   contexts?
 2   A.  That the IP was transferred to replicate.
 3       MR. CHAIKEN:  Object to form.
 4   Q.  And the -- also the word "reproducible" is used in
 5   both documents.
 6       What does that mean in this context?
 7       MR. CHAIKEN:  Object to form.
 8   A.  I don't know if it means any different than
 9   replicable, I guess.
10   Q.  In November of 2013, did AEG believe that
11   successful validation of Rossi's E-Cat IP required
12   that the technology be replicable, reproducible,
13   and transferable?
14   A.  Yes.
15       MR. SHARE:  Object to form.
16       MR. CHAIKEN:  Object to form.
17   Q.  Let me ask you to pull out what Mr. Chaiken marked
18   as AEG Exhibit 16, please.
19   A.  Yes.
20   Q.  Tell me what you recall about the conversation
21   that you had when you were at the Grand Canyon.
22   A.  It was brief.  Andrea asked that -- or -- or
23   mentioned that he had a client that he could host
```

Page 199

```
 1   the E-Cat to.  And, as I said before, he mentioned
 2   the name, which, then, I remember there was the
 3   JM, which I didn't remember.  But it was -- I was
 4   on vacation.  My family was getting going, and I
 5   cut him short.
 6   Q.  Okay.  Now, I want you to keep that document but
 7   also pull out what was marked as Exhibit 17, the
 8   next in order, which is a July 4, 2014.
 9   A.  Yeah.
10   Q.  Do you see that?
11   A.  17; yes.
12   Q.  Yeah.  The first is an email -- first -- the first
13   in order at the top of the document is a July 4,
14   email from you to Mr. Darden and others.
15   A.  Yes.
16   Q.  Now, on July -- the exhibit 17, the July 4 email,
17   it -- at that time there had been no agreement by
18   Industrial Heat to move the plant to Florida; is
19   that correct?
20   A.  Not that I recall.
21   Q.  So because of my poorly phrased question, I have
22   to ask it again.
23       But as of July 4, Industrial Heat had
```

Page 200

```
 1   not agreed to allow Rossi to move the machine to
 2   Florida; is that correct?
 3       MR. CHAIKEN:  Object to form.
 4       MR. LEON de la BARRA:  Join in the
 5   objection.
 6   A.  I'm not sure of the time sequence on this, but --
 7   so when I was at the Grand Canyon?  I don't
 8   remember.
 9   Q.  Well, in --
10   A.  Yeah.
11   Q.  -- 16 it says June 21.
12   A.  Okay.  So this had been after that conversation.
13   Q.  Right.
14   A.  I guess not.
15   Q.  Okay.  So -- now, when we look back at Exhibit
16   16 -- right -- in Andrea Rossi's email, which had
17   been sent at some point no later than June 21, he
18   says, in sum and substance, that Industrial Heat
19   had agreed to move the -- the facility; is that
20   correct?
21   A.  (Witness reviews document.)  Well, it says here --
22   I don't -- I didn't have that conversation with
23   Industrial Heat.
```

Page 201

1   Q.   No.  I understand.  But -- but my point is, Andrea
2        Rossi sent an email to all saying that it had been
3        agreed to move the plant; correct?
4   A.   Yes.
5   Q.   And -- and in the -- in the email from Mr. Darden,
6        Mr. Darden says "He --" meaning Mr. Rossi, "--
7        sometimes sends such emails documenting a meeting,
8        but we didn't say those things."
9            Do you see that?
10  A.   Yup.
11  Q.   So in this instance, as regards this particular
12       issue, who was telling the truth there?
13       MR. SHARE:  Objection to form.
14       MR. CHAIKEN:  Object to form.
15  A.   Well, I don't know who's telling the truth.  I
16       mean, that's how -- I don't know who's saying
17       what's truthful.
18           You know, what -- you know, it -- what I
19       see is, you know, Tom saying we are open-minded,
20       and we prefer to operate it here.  We had one --
21       we'll follow up with him, and that's -- kind of --
22       where I, you know, left off.
23  Q.   Uh-huh.

Page 202

1   A.   And -- and I will just make comment and is --
2        again, what we were trying to do was facilitate
3        and make things happen.  We were not part of any
4        agreements.
5            I think that's part of what I need to
6        emphasize here, is, that we could make
7        suggestions, have conversations, but that was a
8        decision between Industrial Heat and Andrea Rossi.
**R, P**  9   Q.   When Andrea Rossi told you that he had found a
10       client, did you believe that he was proposing an
11       arm's-length third party, or an entity that Rossi
12       himself directed and controlled?
13  A.   I --
14       MR. SHARE:  Object to the form.
15       MR. CHAIKEN:  I object to form.
16       MR. LEON de la BARRA:  Objection.
**R**  17   A.   It was -- it was client.  That's what we were
18       hoping.  I mean, it wasn't -- I don't have any
19       opinion.
20  Q.   At the time you don't remember having an opinion
21       as to whether it was somebody independent of Mr.
22       Rossi?
23  A.   Well, we -- we knew it was -- well, we thought it

Page 203

1        was independent of Mr. Rossi.
2            MR. BELL:  I'm going to have marked as
3        Exhibit next in order some handwritten notes dated
4        27 April, 2015, stamped AE 1.
5            (Exhibit 26, AE 1-4.)
6   A.   (Witness reviews document.)
7   Q.   Do you know what these are -- whose notes these
8        are?
9            I should start with that.
10  A.   It looks like we were -- this was -- we were at
11       the Sea View Hotel, so this is probably Ron's
12       notes.
13  Q.   And are they notes of a meeting with Mr. Rossi?
14  A.   Yes.  That was the meeting that we all were at
15       during that period.
16  Q.   Okay.  Can you do your best -- just because this
17       is our only shot -- to have a chance at
18       interpreting those.
19           Can you do your best to read them into
20       the record.
21  A.   It looks like -- can I read -- look at all of
22       them?
23  Q.   Sure.  Absolutely.

Page 204

1   A.   (Witness reviews document.)  Well, I guess the
2        easiest thing is just to go through each page?
3   Q.   Whatever is --
4   A.   Is that what you --
5   Q.   I think so.  Yeah.
6   A.   So it looks like what we were there -- what we --
7        four -- we saw those four 250-kilowatt units.
8   Q.   Okay.
9   A.   And the COP that we were seeing or that looked --
10       registered, because of the calculations that the
11       engineers were doing, it looked like the COP was
12       above 50.
13  Q.   The -- not your engineers, but -- but...
14  A.   No, our engineers.  I mean --
15  Q.   Well --
16  A.   -- Ron and -- that's why I think Ron wrote this
17       down --
18  Q.   Okay.
19  A.   -- is, we were there, and they were seeing stuff,
20       and we were talking with Andrea.  And it looked
21       like the information that we were being told and
22       the performance that -- or the equipment that we
23       were seeing, that the COP was above 50.

**Veritext Florida Reporting Co.**

800-726-7007                                                              305-376-8800

Page 205

1    So I can see Ron's, like, 4 times 250,
2  plus the 51, you know, I -- I assume that's
3  what that is.
4    No, maybe it isn't.  No, I -- again, 4
5  times the 250, plus 51 units, I guess, that's --
6  that were in the background -- the 10 kilowatts.
7  Q.  Okay.
8    MR. CHAIKEN:  Can I just clear this up?
9    Are these your notes?
10    THE WITNESS:  No, these aren't mine.  So
11  I have, really, no idea what he was putting in
12  here, you know.
13    MR. SHARE:  So I'll -- I mean, I'll
14  object to form.
15  Q.  All right.
16    MR. CHAIKEN:  Me too.
17    MR. BELL:  That's fine.
18    MR. SHARE:  If you want to enter it as
19  an exhibit...
20  Q.  You can put that aside.
21  A.  Okay.
22    MR. BELL:  Do you want to take a quick
23  break?

Page 206

1    THE WITNESS:  No, let's just keep going.
2    MR. BELL:  All right.  I'm going to mark
3  as the next exhibit an email -- first one is dated
4  June 12, 2015, stamped IH 131061.
5    (Exhibit 27, IH 00131061-62.)
6  A.  (Witness reviews document.)
7  Q.  And I'm really interested, Mr. Cassarino, in your
8  email dated June 3 to Mr. Vaughan at the bottom of
9  the page.
10    Do you see that?
11  A.  Yeah.
12  Q.  So you asked Mr. Vaughan whether he, meaning
13  Industrial Heat, was satisfied with Penon doing
14  the verification.
15  A.  Uh-huh.
16  Q.  Do you see that?
17    And in the last sentence you asked Mr.
18  Vaughan if he was going to accept the information
19  from Penon --
20  A.  Yeah.
21  Q.  -- is that correct?
22  A.  Yes.
23  Q.  And it says "except," but I take it you mean

Page 207

1  a-c-c-e-p-t --
2  A.  Yeah, I'm sure.
3  Q.  -- correct?
4  A.  Yeah.
5  Q.  Okay.  Now, let me ask you to pull out what was
6  marked this morning as Exhibit 20, which are the
7  handwritten notes that begin October of 2014.
8  A.  (Witness reviews document.)  Which -- which page?
9  Q.  And I'm asking you to look at the page that's
10  dated June 26, 2015.  It's AE 5.001.
11  A.  Okay.
12  Q.  Now, these -- you understand these to be notes of
13  a telephone conversation with J.T. Vaughan on June
14  26, 2015?
15  A.  On the Exhibit 20?
16  Q.  Yes.
17  A.  Yes.
18  Q.  Okay.  And in --
19  A.  It's actually October 14; right?
20  Q.  No.  I'm looking at AE -- the page that's AE
21  5.009, dated June 26 --
22  A.  Oh, 9.  Excuse me.  Excuse me.
23  Q.  Yeah.

Page 208

1  A.  (Witness reviews document.)  Yes.
2  Q.  So let me repeat the question again:  These are
3  notes of a telephone conversation between J.T.
4  Vaughan and -- at least Mr. Engleman at AEG -- on
5  June 26, 2015; correct?
6  A.  Yes.
7  Q.  Do you remember participating in this call
8  specifically?
9  A.  Let me just look.  I -- I'm -- we had a lot,
10  but...
11    (Witness reviews document.)  Yes, I see
12  that.
13  Q.  Okay.  So on June 3rd you had asked Mr. Vaughan by
14  email if Industrial Heat was satisfied with Penon
15  doing the verification, as we just saw; correct?
16  A.  Uh-huh.
17    COURT REPORTER:  Yes?
18  A.  Yes.
19  Q.  And on June 26, did Mr. Vaughan tell you that
20  Industrial Heat never agreed that Penon could do
21  the audit?
22  A.  That's what it says in the notes.
23  Q.  If you turn the page, did Mr. Vaughan tell you

P, R, S

52  (Pages 205 to 208)

Page 209

1    that a "real" -- underscore -- "real" audit must
2    be done?
3    A.   I guess he did.
4    Q.   And so in June of 2015, did AEG understand that
5    Industrial Heat did not agree to accept any report
6    by Penon?
7    A.   Well, that says here -- what -- we were confused
8    after this was why they didn't do anything to stop
9    the -- what was going on.
10        I mean, this was verbal, but we didn't
11   see any written or -- you know, these were
12   conversations that we had, and we were -- I mean,
13   we were confused, because I know J.T. --
14   (Phone sounds.)
15   A.   We knew that J.T. did not have confidence in
16   Penon; and that was part of this conversation.
17   Q.   So putting aside what was said or not said to Mr.
18   Rossi about that, you understood that Industrial
19   Heat did not agree to Penon.
20   A.   Yes.
21   Q.   All right.  Now, in the notes -- the handwritten
22   notes of the conversation, it goes on to say "IH
23   cannot replicate.  IH must --" underscore "-- must

Page 210

1    be able... replicate."
2         Do you see that?
3    A.   On which page?
4    Q.   AEG -- AE 5.010.  The next page.
5    A.   (Witness reviews document.)  Yes.
6    Q.   Uh-huh.  So in June of 2015 it was your
7    understanding that Industrial Heat did not believe
8    that it had been able to replicate the -- the
9    Rossi effect; is that correct?
10   A.   Yes.
11   Q.   Did AEG at that time understand that Industrial
12   Heat did not intend to pay Rossi or AEG if
13   Industrial Heat could not replicate?
14   A.   I -- that was always assumed.
15   Q.   Now, there's -- there's a notation in these notes
16   that says "What's behind the wall."
17        Do you see that?
18   A.   Whereabouts?
19   Q.   Just one line down -- two lines down from what we
20   just read.
21   A.   That's -- I guess that would have been J.T. making
22   comment.
23   Q.   Uh-huh.  And now -- and the next line says "If IH

[A, R, P]

[A, R, S]

Page 211

1    feels good about things, they may not push him on
2    the 1-megawatt test."
3         Do you see that?
4    A.   Uh-huh.
5    Q.   What does that mean to you?
6    A.   That if he's -- if they feel he was having
7    success, that -- I don't -- again, I --
8    conversations we always had with Tom and
9    Industrial Heat was, they were always feeling that
10   the 1 megawatt wasn't necessary either.  I think
11   Andrea felt that he wanted to show that he could
12   commercialize this, and that Industrial Heat felt
13   that, you know, if they -- if things were going
14   well, then -- then maybe that wasn't necessary to
15   do the big test.
16   Q.   And the last line there says "IH does not want to
17   piss him off."
18   A.   Yeah.
19   Q.   Do you see that?
20        What does that mean to you?
21   A.   It means that Tom always was trying to be
22   sensitive to Andrea and let him develop his -- the
23   project.  It was -- we always had this expression:

Page 212

1    It was, like, let -- you know, Andrea -- I mean,
2    Tom would always, like, give -- you know, Let
3    Andrea play in his sandbox.  Let him do what he
4    wants to do; be -- be himself and the inventor.
5    And Tom didn't want any conflict going on that
6    would upset Andrea so that Andrea would get
7    distracted from his mission of doing 1 megawatt or
8    for finding the...
9    Q.   Why do you think he did that?
10   A.   Why did Tom do that?  'Cause --
11        MR. SHARE:  Objection to form.
12   A.   -- I think he just wanted to make all this work.
13        MR. BELL:  I'm going to have marked as
14   the exhibit next in order an email dated June 29,
15   2015, stamped AE 345.001.
16        (Exhibit 28, AE 000345.001-002.)
17   A.   (Witness reviews document.)
18   Q.   Have you had a chance to review that?
19   A.   Doing that right now.  (Witness reviews document.)
20   Q.   Now, on June 29th you wrote an email to Andrea
21   Rossi; correct?
22   A.   Yes.
23   Q.   And in that email you asked him whether Industrial

[A, P, R]

53  (Pages 209 to 212)

Page 213

1  Heat had agreed to using Penon for the
2  certification for the test; is that right?
3  A.  Yes.
4  Q.  Now, you knew, based on the exhibits that we just
5  reviewed, that Industrial Heat did not agree to
6  using Penon for the certification.
7  So why did you ask Mr. Rossi that
8  question?
9  A.  'Cause we didn't get an answer from Industrial
10  Heat as to whether there was any agreement or not.
11  This was just a verbal conversation that I didn't
12  know whether or not Industrial Heat had
13  communicated with Andrea Rossi.
14  Q.  Well, those seem -- two separate things to me.
15  They -- they had clearly -- Industrial Heat had
16  clearly communicated it to you --
17  A.  Yes.
18  Q.  -- correct?
19  And you just told me that Mr. Darden
20  went out of his way not to -- not to aggravate Mr.
21  Rossi; correct?
22  A.  Yeah.  Yeah.
23  Q.  And you had a concern that they had not --

**[P, R, S]**

Page 214

1  Industrial Heat had not conveyed information to
2  Mr. Rossi --
3  A.  Yes.
4  Q.  -- is that -- is that fair?
5  A.  Yes.
6  Q.  Were you trying to influence Mr. Rossi to consider
7  a -- a different party to validate Mr. Rossi's
8  work in Florida?
9  MR. SHARE:  Objection to form.
10  A.  Well, I don't know if I was trying to convince him
11  to use someone -- I -- we just wanted to make sure
12  that a third-party evaluation was accepted by both
13  parties.
14  Q.  Why not be more direct with Mr. Rossi?
15  MR. SHARE:  Objection.  Form.
16  A.  I'm -- I can't answer that.  I'm not sure.
17  Q.  Well, in other words, J.T. Vaughan had told you
18  that Industrial Heat doesn't accept Penon;
19  correct?
20  A.  Uh-huh.
21  Q.  And you could have said to Mr. Rossi, Hey, I was
22  just talking to J.T. Vaughan on the phone.  They
23  don't accept Penon.

**[A, P, R]**

**[A, H, R, P]**

Page 215

1  A.  Well, I assumed that they had that conversation
2  with him.
3  Q.  Well, if they had that conversation, why -- why
4  would you send an email --
5  MR. SHARE:  Objection to form.
6  A.  I -- I just -- I suppose I should have had that
7  conversation with Andrea.
8  Q.  In the -- on the second page of the document in
9  your email, you look at the -- at the last sentence
10  of the first paragraph, "Do you --" Andrea Rossi
11  "-- have any certification or letter from the --"
12  quote/unquote "'-- client' and invoices for sale
13  of energy?"
14  Do you see that?
15  A.  Yes.
16  Q.  Why did you ask for that?
17  A.  Again, we wanted to make sure that everybody was
18  making -- living up to their ends of the
19  agreement.
20  Q.  What did that have to do with the agreement?
21  MR. SHARE:  Objection to form.
22  A.  That the invoices from the sale of energy would
23  show that they were producing energy.

**[H, S, P]**

**[R, S]**

Page 216

1  Q.  Okay.  Now, let me ask you to look at Mr. Rossi's
2  reply to your email.
3  Now, you had asked him a direct question
4  as to whether Industrial Heat agreed with Rossi
5  about Penon doing the certification, as we just
6  saw; correct?
7  A.  Yes.
8  Q.  And Mr. Rossi did not answer that -- did he -- in
9  his email?
10  MR. CHAIKEN:  Object to form.
11  A.  Yes, he did not.
12  Q.  Now, with -- what did he say with respect to your
13  request for certifications or letters from the,
14  quote, "client," close quote and invoices for sale
15  of energy?
16  A.  Did not have the documents.
17  (Witness reviews document.)  Did not
18  have the documents.
19  Q.  Related to the commercial agreement between
20  Industrial Heat and their customer?
21  A.  Yeah.
22  Q.  And he goes -- he goes on to say he spoke -- that
23  he, Rossi, spoke with the director of the factory

**[R]**

54  (Pages 213 to 216)



Page 217

1   and the customer, and they are very positive so
2   far; is that right?
3   A.   That's what it says.
4   Q.   What did you understand that to mean?
5   A.   That everything was going okay.
6   Q.   When -- on either of your two visits, did you meet
7   with a director of the factory and the customer?
8   A.   No.
9        THE WITNESS:  These are all screwed up
10  now.
11       COURT REPORTER:  That's all right.
12       MR. BELL:  Marking as the exhibit next
13  in order some documents.  The first one is dated
14  at the top June 1, 2015 and stamped JB 00010.
15       (Exhibit 29, JB 00010-232.)
16  A.   (Witness reviews document.)
17  Q.   So I want you to feel free to look through the
18  entire packet, but let me ask you just to look at
19  the page -- and this is -- kind of -- a mixture of
20  several different documents, but towards the back
21  end there's one stamped at the bottom "HJ 216";
22  it's dated March 3, 2015.
23  A.   H -- what?

Page 218

1   Q.   HJ.  I'm sorry.
2   Q.   HJ?
3   A.   Uh-huh.
4   A.   216?
5   Q.   Yeah.  I apologize, 'cause they're -- they're --
6   kind of -- all mixed up, but I could find it for
7   you if that will be quicker.
8   A.   (Witness reviews document.)  Yeah.  Well...
9   Q.   It looks like this (indicating).
10  A.   (Witness reviews document.)  I can't find it.
11  Q.   Let me --
12       MR. SHARE:  216?
13       MR. BELL:  Yes, March 3, 2015.
14       MR. SHARE:  (Reviews documents.)
15       THE WITNESS:  Thanks.
16  A.   Okay.

[H, R]

17  Q.   So that is a -- a letter from -- that's signed by
18  Henry W. Johnson to J.T. Vaughan.
19       Do you see that?
20  A.   Yes.
21  Q.   Is this the kind of thing that you were looking
22  for when you requested of Mr. Rossi to have
23  documents from the -- from the customer?

Page 219

1   A.   (Witness reviews document.)  Yeah, and a -- I
2   mean, I -- we were, you know, even simpler -- just
3   wanting electric billings, but --
4   Q.   Let me ask you to just flip the page to the
5   handwritten -- handwritten next page that is HJ
6   217.
7   A.   Yeah.
8   Q.   Do you recognize that handwriting?
9   A.   (Witness reviews document.)  Yes.
10  Q.   Whose handwriting is that?
11  A.   It looks like Andrea Rossi's.
12  Q.   So when you were asking Mr. Rossi in June of 2015
13  for documents relating to the client, did you
14  understand that the documents that were being sent
15  to J.T. Vaughan had actually been written by Mr.
16  Rossi?
17       MR. CHAIKEN:  Object to form.
18  A.   I don't know.
19  Q.   Would that have surprised you?
20  A.   Yes.
21  Q.   Why?
22  A.   'Cause I -- we were looking for -- from the
23  company.

Page 220

1   Q.   You were looking for -- from an independent
2   company?
3   A.   Yes.
4   Q.   Do you -- based on your understanding of the
5   relationship, do you think that Industrial Heat
6   was looking for the same thing?
7        MR. SHARE:  Objection to form.
8        MR. LEON de la BARRA:  Join.
9        MR. CHAIKEN:  Object to form.
10  A.   I would assume so.
11  Q.   Let me -- and, again, this is the last question I

[A, H, P]

12  have for you on the handwritten notes that are
13  Exhibit 20 -- are you with me?
14  A.   Yeah.
15  Q.   The last page, it's August 7, 2015, AE 5.011.
16       MR. SHARE:  I'm sorry.
17       Which document?
18       MR. BELL:  20.  This one (indicating).
19  A.   August 7th, 2015?

[A, H, P]

20  Q.   Yes, sir.
21  A.   Yes.
22  Q.   Are you with me?
23  A.   Yes.

55 (Pages 217 to 220)

Page 221

**H, P, S**

1  Q.  Are these notes of a conversation with J.T.
2  Vaughan on August 7th, 2015?
3  A.  These are Ron's notes.
4  Q.  And what do Ron's notes reflect that J.T. Vaughan
5  told AEG on August 7, 2015?
6  A.  (Witness reviews document.)  Trying to get things
7  done.
8  Q.  Well, let me -- let me ask you specifically:  Did
9  J.T. -- do these notes reflect that J.T. Vaughan
10  told AEG, in sum or in substance, that Industrial
11  Heat was trying to support Rossi's efforts?
12  A.  Yes.

**A, H, P, S**

13  Q.  Do they say that Industrial -- do they say that
14  J.T. Vaughan said that Industrial Heat's goal was
15  for Mr. Rossi to be successful?
16  A.  Yes.
17      MR. CHAIKEN:  Object to form.

**A, H, P, S**

18  Q.  And do they say that Industrial Heat does not have
19  what they need, and that they need more confidence
20  than the last time?
21  A.  That's what those notes say.
22  Q.  And does it say that Industrial Heat wants to
23  avoid a confrontation?

Page 222

1  A.  That's what the notes say.
2  Q.  Okay.
3  A.  (Witness reviews document.)  Ah.  And -- and I --
4  now -- it's the last -- the UK investing team was
5  coming to visit the plant.  And I think that was
6  part of the conversation that we had with
7  Industrial Heat; that they told us to be calm,
8  stay calm; that they -- the investor group was
9  coming; they didn't want any waves to happen; and
10  that they were trying to keep everybody happy for
11  the investor.
12      MR. BELL:  Can we take a short break.  I
13  have one more document, I think, I but want to
14  look over my notes.
15      THE WITNESS:  Sure.  I totally agree.
16      VIDEOGRAPHER:  We are -- it is 2:34, and
17  we are going off the record.
18      (Recess was taken.)
19      (Exhibit 30, multipage document,
20  US Army Corps of Engineers,
21  September, 2014.)
22      VIDEOGRAPHER:  The time is 2:43 p.m.,
23  and we are back on the record.

Page 223

1      MR. BELL:  The court reporter has marked
2  as exhibit next in order a voluminous document
3  dated September 20 -- September 2004, US Army
4  Corps of Engineers, and the title is "Application
5  of Thermoelectric Devices to Fuel Cell Power
6  Generation."
7  A.  Yes.
8  Q.  Are you familiar with this document?
9  A.  I am.
10  Q.  You'll be happy to know that I have no intention
11  of taking you very -- into very great deal.
12      I have some summary questions about the
13  project --
14  A.  Yes.
15  Q.  -- which I gleaned from just reading page 5 and 6.
16  A.  Okay.
17  Q.  I mean, I think they're summarized there --
18  A.  Yeah.
19  Q.  -- although I -- I'm sad to say I have read the
20  document.

**R**

21      Leonardo Technologies, Inc. was the --
22  was the company that you testified about earlier
23  this morning that you had formed to try and

Page 224

1  commercialize one of Andrea Rossi's earlier
2  technologies.
3  A.  No.  No.
4      We -- Leonardo Technologies, Inc. was
5  formed to do work for the Department of Energy.
6  Q.  And what was Mr. Rossi's role in this project?
7  A.  He had a project that we were interested in -- the
8  Department of Energy and the Department of -- DOD
9  was interested in thermoelectrics.
10  Q.  It had to do with converting waste to power?
11  A.  Heat -- waste heat to power.
12  Q.  Okay.  And did Rossi claim his devices could
13  produce 20 percent efficiencies converting waste
14  heat to power?
15  A.  That was the theoretical...
16  Q.  Claim?
17  A.  Claim.
18  Q.  And the current science at that point, as
19  reflected in this document, was along the lines of
20  4 percent efficiencies in that process; correct?
21  A.  Yes.
22  Q.  In 2000 were tests of this technology done at the
23  University of New Hampshire?

56 (Pages 221 to 224)

Page 225

1  A.   Yes, a demonstration of concept.
2  Q.   Were they small scale, with a duration of
3  approximately seven days?
4  A.   18 or 19 years ago.  I -- I guess that's probably
5  close.
6  Q.   Were they successful?
7  A.   We -- yes.
8  Q.   Did Leonardo Technologies, Inc. get a government
9  contract to build more and larger devices based on
10  that UNH test?
11  A.   Well, I don't know if it was based on that test.
12  They had -- the DOE had a real high interest in
13  thermoelectrics.  That proof of concept showed
14  that there was some potential with
15  thermoelectrics.

H, R

16  Q.   And -- and on the basis of that, was there -- was
17  a government contract issued to Leonardo
18  Technologies Inc.?
19  A.   Yes.
20  Q.   What was the value of that contract?
21  A.   We had two or three contracts with
22  thermoelectrics.  I -- I don't know the -- the
23  exact number.  I think it was $300,000, maybe.

Page 226

1  I really don't know.  I can't remember.
2  Q.   And this report reports on the results of that --
3  of that larger effort; correct?
4  A.   This report?
5  Q.   Yes.  What were the results of the --
6  A.   We were unable to do -- get to -- we were unable
7  to do the thermoelectrics we had thought about --
8  that we could do this.  And there was a big -- and
9  this was what I was learning as I was managing
10  these projects -- was that there's a difference
11  between concept and reality sometimes; that one of
12  the big things that we found out out of this
13  project (indicating) and a subsequent project that
14  we developed -- and the third project we were
15  successful -- was thermal expansion.  Nothing
16  was -- we hadn't thought about thermal expansion
17  in the concept for this development.
18  Q.   The -- the third thing you just mentioned that was
19  successful, did that involve Andrea Rossi?
20  A.   No, it did not.
21  Q.   Okay.  This project involved Andrea Rossi;
22  correct?
23  A.   Yes.

Page 227

A, H, R

1  Q.   This project involved building -- or at least
2  shipping 27 of the larger machines; right?
3  A.   No -- I mean, they -- they were looking at
4  producing thermoelectric units for applications
5  with the fuel cell -- and, again, this has been a
6  long, long time ago.
7          What -- what I recall is, again, the
8  thermal expansion quotient was never considered in
9  this application.
10  Q.   Well, the report says that 27 units were shipped,
11  of which 19 generated zero electricity.
12          Does that sound right?
13  A.   Could be.
14  Q.   And it says that the remaining eight generated
15  less than 1 watt, when 800 to 1,000 waters were
16  expected by the people who were paying for it.
17  A.   Right.
18  Q.   Does that sound right?
19  A.   Yes.
20  Q.   Okay.
21          MR. BELL:  No further questions.  Thank
22  you.
23          MR. CHAIKEN:  Francisco, are you there?

Page 228

1          MR. LEON de la BARRA:  Yes, sir, I'm
2  here.
3          EXAMINATION
4  BY MR. LEON de la BARRA:
5  Q.   Good afternoon.  My name is Francisco Leon de la
6  Barra.  I haven't had the pleasure.  I represent
7  JM Products, Inc., Henry Johnson, and James Bass.
8  And I'll try to be brief.  But I did pop in a
9  little late, so I might overlap with some of the
10  testimony from earlier today.  So please bear with
11  me.
12          MR. LEON de la BARRA:  I just want to
13  confirm that everyone over there can hear me all
14  right.
15          MR. CHAIKEN:  Yeah.  Thanks.
16          THE WITNESS:  Yes.
17  Q.   Earlier in your testimony, if I'm recalling
18  correctly, you stated that AEG wasn't interested
19  in the client that would be operating at the
20  facility, but solely interested in the E-Cat; is
21  that correct?
22  A.   Yeah.  We -- we -- well, we were interested in
23  having a client so that the E-Cat could perform.

57  (Pages 225 to 228)

Page 229

1    Q.   Okay.  Was it your understanding that a client was
2         necessary for the E-Cat to perform?
3              MR. BELL:  Objection to form.
4    A.   No.  Again, I'll repeat myself -- that I said this
5         morning -- is that what we were -- you know,
6         having a client that could accept the waste heat
7         or the energy seemed a productive way of running
8         the facility.
9              We couldn't figure out how you could run
10        a 1-megawatt unit -- because we saw this in
11        Italy -- we had to dump the water, and, you know,
12        it just didn't make sense to run the system
13        without having any end user.
14   Q.   Got it.

**IMP**

15        What was your understanding of who that
16        end user was going to be in -- you know, in
17        relation to the testing of the E-Cat?
18   A.   That it was a company in Florida, JM -- and I
19        apologize; I'm not sure what the -- what the -- JM
20        Products, or whatever the -- the company was --
21        that did use -- would use the heat -- the excess
22        heat to do something with paints or chemicals.
23   Q.   Got it.

Page 230

1         So it was always told to you that it was
2         going to be a company called JM Products, Inc. --
3    A.   Well, I --
4    Q.   -- as far as you know.
5    A.   Is that really -- I don't -- I don't know if it
6         was JM Products.  I think it was, yes.
7    Q.   Okay.  Was it ever -- did anyone ever tell you
8         that -- who the owner or the parent company of
9         this JM Products was, or would be?
10   A.   A parent company?
11        We -- we assumed that JM was its own
12        entity.
13   Q.   Okay.  So no one -- no one ever told you, Okay,
14        this company is associated with another company?
15   A.   I don't recall.
16   Q.   Okay.  Let me take a step back.
17        Before the plant ever moved to -- to
18        Florida, was it ever contemplated -- were you ever
19        advised of another entity that would be using what
20        you call the "waste steam" from the E-Cat?
21   A.   No.  I think they were looking for a facility in
22        North Carolina.  I know Tom had indicated there
23        was a brick company that they wanted to look at.

Page 231

1         I -- there were several companies, but it never
2         came to fruition.
3    Q.   Got it.
4         Now, take me back to a -- I believe
5         2015.  I believe you stated you did visit the --
6         the facility in Miami -- or Doral, better said --
7         two times --
8    A.   Yes.
9    Q.   -- in 2016?
10   A.   Yes.
11   Q.   In those -- in those meetings or those visits,
12        rather, what was the purpose of those visits?
13   A.   To visit the --
14   Q.   Well -- sorry.  Can I -- let me -- let me take
15        it -- on the first visit, which I believe was in
16        April of 2015; correct?
17   A.   Yes.
18   Q.   You stated that the purpose of that visit was
19        simply to observe the E-Cat; correct?
20   A.   Yes.
21   Q.   Okay.  Did you ever -- if I recall, you -- you
22        said you never met anyone from the -- the
23        customer -- the local customer that was using the

Page 232

1         steam?
2    A.   Correct.
3    Q.   All right.  Did you ever meet anyone from the
4         customer the second time around?
5    A.   No.
6    Q.   Does the name Henry Johnson mean anything to
7         you?
8    A.   No.
9    Q.   Does the name James Bass mean anything to you?
10   A.   What was the last name?
11   Q.   James Bass.
12   A.   No.
13   Q.   No, okay.
14        Were you ever told by anyone what --
15        strike that.
16        I think you alluded to this before, but
17        you said that you were told a customer would use
18        the steam.
19        Did you ever -- was -- did anyone ever
20        tell you how that customer was going to use the
21        steam?  In other words, what they were going to be
22        doing with the steam?
23   A.   Well, we -- we assumed it was a process for --

**Veritext Florida Reporting Co.**

800-726-7007                                                    305-376-8800

Page 233

1    again, I -- I -- you know, chemicals or paints or
2    something; that that heat would be used --
3    Q.   Okay.
4    A.   -- for that process.
5    Q.   Did you have any understanding -- and by "you," I
6    mean AEG; right?
7            Did AEG have any understanding of -- of,
8    you know, a specific brand or company whose
9    chemicals would be processed --
10   A.   No.
11   Q.   -- or who -- who would be supplied --
12   A.   No.
13   Q.   -- not supplied.  Rather, who the products that
14   were being processed would be sold to?
15   A.   No.
16   Q.   Oh.
17           MR. LEON de la BARRA:  I think -- yeah.
18   That's all I've got.  Short and sweet.
19           MR. CHAIKEN:  Thank you, Francisco.
20           I've got a few very quick followup
21   questions, based on what Mr. Bell had asked you
22   earlier.
23           FURTHER EXAMINATION

Page 234

1    BY MR. CHAIKEN:
2    Q.   You had asked -- answered some questions about
3    Exhibit 20 and Exhibit 27 -- about the ERV, and
4    there was a -- a meeting you had in, I believe,
5    June, where I believe there -- the notes reflected
6    that J.T. Vaughan said that they did not accept
7    Fabio Penon as the ERV.
8            Do you recall that --
9    A.   That was a --
10   Q.   -- line of questioning?
11   A.   -- phone conversation, I believe.
12   Q.   Right.
13   A.   That's the notes that Ron took.
14   Q.   And I think you said that there was -- the reason
15   why that Industrial Heat didn't want to upset
16   Doctor Rossi was because they were trying to close
17   on some funding; is that correct?
18           MR. BELL:  Object to form.
19   A.   I didn't -- no.  I -- I -- that was part of what
20   was going on in the big picture --
21   Q.   Right.
22   A.   -- but I know Tom didn't want to upset Andrea from
23   the beginning.  I mean, from -- day one.

Page 235

1    Q.   Do you think that the fact that they were trying
2    to close on some funding in -- in 2015 played a
3    role in how they communicated with Doctor Rossi
4    leading up to that funding?
5    A.   That would be an assumption.  I -- I don't know.
6    Q.   Did --
7    A.   You know, I -- one meeting that -- and I was not
8    on this call -- and we had this discussion the
9    other day; that I -- that Karl and Ron had with
10   J.T. that I was not involved with, and they were
11   in the money-raising phase, and we were asking if
12   there was anything we could do, and J.T. said no;
13   that everything was under control.
14           That was the only -- we knew that they
15   were out trying to raise money.  We were hoping
16   they would raise money.
17   Q.   All right.
18   A.   And we were offering any assistance that we could,
19   but we were told that they were in good shape.
20   So...
21   Q.   After you had the oral conversation with J.T.
22   Vaughan about the ERV, did you ever ask him, Hey,
23   why aren't you putting this in writing?

**IMP**

Page 236

1    A.   Well, we always wondered why -- first of all, for
2    us, why there wasn't a protocol.  I mean, you
3    know, that, from an engineering standpoint -- when
4    I'm surrounded by engineers -- the steps of the
5    protocol to get to that was a question we always
6    had, because we wanted to make sure that, in the
7    end, there was no -- that it wouldn't come to
8    this.
9    Q.   Do you -- do you know whether or not there was a
10   protocol?
11   A.   We never saw a protocol.
12   Q.   Did you ever ask for it?
13   A.   I'm sure we -- we've had -- we had conversations
14   with that -- about that.
15           What we -- and we thought the protocol
16   for the first test in Italy was really going to be
17   the protocol.  And so the process that they went
18   through in Italy, we assumed that that would be
19   the protocol set for this test or the -- the
20   following test.
21   Q.   Now, I asked a question -- and I'm not sure I got
22   a direct answer to this -- which was:  Did you
23   ever ask J.T. Vaughan, Why aren't you putting this

**Veritext Florida Reporting Co.**

800-726-7007                                                    305-376-8800

Page 237

1   stuff in writing?  If you object to Penon and
2   Penon is showing up at the plant, why didn't you
3   put something in writing saying, I don't agree
4   with Penon as the ERV?
5   A.  I'm sure we did.
6   Q.  And what was the response?
7   A.  I -- as I say, I'm sure we had that conversation,
8   'cause we were concerned that they weren't
9   communicating.
10  Q.  Right.
11  A.  So we wanted to make sure that there was a path
12      that would set those standards, protocol,
13      agreements, in place.
14  Q.  Well, what was -- what was Industrial Heat's
15      response to your question that, Why aren't you
16      putting your rejection of Penon in writing?  And
17      why aren't you making that clear to -- to Doctor
18      Rossi, who clearly thinks that he is the ERV;
19      right?
20          MR. BELL:  Objection to form.
21  A.  Yes.  Andrea thought that that was all right.  I'm
22      not sure why we didn't ask that question.
23  Q.  Did you -- so you -- you never got a response from

Page 238

1       IH as to why they weren't putting it in writing?
2           MR. BELL:  Objection to form.
3   A.  No, we never -- we never got a -- why they...
4   Q.  You think they should have, though; right?
5           MR. BELL:  Objection to form.
6           MR. SHARE:  Objection to form.
7   A.  Uhm.
8   Q.  I'll withdraw the question.
9           MR. CHAIKEN:  I have no further
10      questions.  Thank you for your time.
11          MR. BELL:  I'm done.  Thank you.
12          MR. SHARE:  I have some questions before
13      we wrap up.
14              EXAMINATION
15  BY MR. SHARE:
16  Q.  I want to -- I want to refer to --
17          MR. SHARE:  Well, for the folks on the
18      phone, my name's Andrew Share, I'm corporate
19      counsel to AmpEnergo.
20  Q.  I want to refer to Exhibit No. 8 that Attorney
21      Chaiken put into the record this morning.
22      Specifically this is an email from myself to April
23      Kite, who is -- or was at the time -- Industrial

Page 239

1   Heat's corporate counsel.  On the second page,
2   document No. IH-104014, the question was asked to
3   you by Attorney Chaiken earlier with respect to
4   this paragraph No. 4, which you can read, and I'll
5   paraphrase -- and that -- it's already been read
6   into the record -- asking about the parties'
7   intent behind the Contribution Agreement -- this
8   is a comment from me; and that the parties thought
9   that -- at least from AmpEnergo -- there was some
10  ambiguity as to what triggers AEG has to future
11  equity in the appropriate company.
12      At the time that question was asked, you
13  seemed to be struggling in trying to answer the
14  question, at the same time reading this email,
15  trying to remember what the context of it was.
16  A.  Right.
17  Q.  You know, time having passed, have you had further
18  thought to be able to think about exactly what the
19  ambiguity that was being referenced in this email
20  was?
21  A.  I -- I have a little bit of thought, but I'd like
22  to hear your...
23      MR. CHAIKEN:  You're putting your

Page 240

1   attorney on the spot.  Not a good idea.
2       THE WITNESS:  He's a smart guy.  So...
3       MR. CHAIKEN:  Okay.
4   Q.  Do you have -- do you recall at the time in which
5   this email was written there was a discussion
6   around a previous conversation that the parties
7   had had -- the parties being Industrial Heat and
8   AEG -- regarding the second amendment to the
9   license agreement, which is Exhibit 13, that
10  Attorney Chaiken had entered into the record?
11  A.  Yes.
12  Q.  The substance of the second amendment was for the
13  purposes of amending the milestones and criteria
14  through which Doctor Rossi would be paid, not
15  based -- amending --
16  A.  Not --
17  Q.  -- the requirement from no longer having to
18  achieve COP of 6 or greater, but providing the
19  opportunity to receive a reduced amount of
20  compensation if he received a COP of less than 6
21  but greater than 2.4?
22  A.  I recall that.
23  Q.  Do you -- did AEG and Industrial Heat reach an

Veritext Florida Reporting Co.

800-726-7007                                    305-376-8800

Page 241

1  agreement based upon compensation that would be
2  owed to AEG if Doctor Rossi achieved a COP of less
3  than 6 but greater than 2.4, that Industrial Heat
4  still thought proved that the technology had
5  value?
6      MR. BELL:  Objection to form.
7  A.  Yeah.  Yes.  They would have moved forward, and --
8  and we would not have been compensated.
9  Q.  Did AEG receive satisfactory -- did AEG and
10  Industrial Heat resolve the ambiguity that was
11  raised --
12  A.  No.
13  Q.  Referencing again Exhibit No. 13, second amendment
14  to the license agreement, you were asked by
15  Attorney Chaiken on whether or not AEG had signed
16  the second amendment, to which you responded
17  "Yes," and then further on said, "I don't know."
18      Have you had an opportunity to think
19  about and recall why AEG did not sign that second
20  amendment?
21  A.  Because we felt that we had not come to an
22  agreement; and that we felt that we should be
23  compensated; and that it was not in our best

P

Page 242

1  interest to sign that.
2      MR. SHARE:  That's it.
3      MR. BELL:  No further questions.  Thank
4  you very much for your time.
5      MR. CHAIKEN:  Okay.  Read or waive?
6      MR. SHARE:  What's that?
7      MR. CHAIKEN:  He wants to read it, or
8  waive his right to read it?
9      MR. SHARE:  No.  We're going to read it.
10      MR. CHAIKEN:  Okay.  Appreciate your
11  time.  Thank you.
12      VIDEOGRAPHER:  Okay.  Time is 3:03 p.m.,
13  and this concludes the deposition.
14      (Whereupon the deposition ended at
15  3:03 p.m.)
16
17
18
19
20
21
22
23

Page 243

1
2  ERRATA SHEET
3
4  I, Craig J. Cassarino, wish to document
5  the following corrections:
6
7  PAGE LINE
8
9  _____ _____  CHANGE: _____
   REASON: _____
10  _____ _____  CHANGE: _____
   REASON: _____
11  _____ _____  CHANGE: _____
   REASON: _____
12  _____ _____  CHANGE: _____
   REASON: _____
13  _____ _____  CHANGE: _____
   REASON: _____
14  _____ _____  CHANGE: _____
   REASON: _____
15  _____ _____  CHANGE: _____
   REASON: _____
16  _____ _____  CHANGE: _____
   REASON: _____
17  _____ _____  CHANGE: _____
   REASON: _____
18  _____ _____  CHANGE: _____
   REASON: _____
19  _____ _____  CHANGE: _____
   REASON: _____
20  _____ _____  CHANGE: _____
   REASON: _____
21  _____ _____  CHANGE: _____
   REASON: _____
22  _____ _____  CHANGE: _____
   REASON: _____
23  _____ _____  CHANGE: _____
   REASON: _____

Page 244

1      SUBSCRIPTION OF DEPONENT
2  State of _____
3  County of _____
4
5
6      I, Craig J. Cassarino, do hereby certify that
7  I have read the foregoing transcript of my
8  testimony and further certify that said transcript
9  (with/without) suggested corrections on the Errata
10  Sheet is a true and accurate record of said
11  testimony taken at the time and place designated.
12
13
14
15  _____
    Craig J. Cassarino
16
17  Date _____
18  Subscribed and sworn to
    Before me this _____
19  day of _____, 20___.
20
21
    _____
    Notary Public
22  State of New Hampshire
    Commission expires:
23  _____

**Veritext Florida Reporting Co.**

800-726-7007                                                    305-376-8800

Page 245

```
 1        C E R T I F I C A T E
 2
 3        I, Patricia Jodi Ohnemus, a Licensed
   Shorthand Reporter for the State of New Hampshire,
 4 do hereby certify that the foregoing is a true and
   accurate transcript of my stenographic notes of
 5 the proceeding taken at the place and on the date
   hereinbefore set forth to the best of my skill and
 6 ability under the conditions present at the time.
 7        I further certify that I am neither
   attorney or counsel for, nor related to or
 8 employed by any of the parties to the action in
   which this proceeding was taken, and further that
 9 I am not a relative or employee of any attorney or
   counsel employed in this case, nor am I
10 financially interested in this action.
11        The foregoing certification of this
   transcript does not apply to any reproduction of
12 the same by any means unless under the direct
   control and/or direction of the certifying
13 reporter.
14
15
16
17
18
19

20        _____
          Patricia Jodi Ohnemus
21        LCR #91, RMR, RPR, CRR
22
23
```

62 (Page 245)

## 2. Witness: Childress, Jamie (Corporate Rep. for Boeing)

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 1:11-13 | 31:11-13 L, P; | 10:21-25 | | | **Defendants' Objections to Plaintiffs:** | **Defendants' Rebuttals to Plaintiffs:** | | | |
| 7:9-12 | 32:17-24 R; | 17:14-18:24 | | | 22:1-14 H, FRE 1004; | 26:8-11 | | | |
| 10:3-6 | 34:1-3 R; | 19:19-20:3 | | | 33:8-10 R, FRE 403; | 52:12, 14 | | | |
| 11:14-18 | 34:7-12 R; | 20:6-10 | | | 33:22-25 R, FRE 403; | 93:25-94:23 | | | |
| 13:9-14 | 34:16-22 R; | 20:22-21:10 | | | 84:21-24 H; | | | | |
| 15:1-4 | 37:10-14 H, R; | 21:17-22:3 | | | 84:25-85:5 AA; | | | | |
| 15:15-21 | 37:16-20 H, R; | 22:5-14 | | | 85:21-25 AA; | | | | |
| 16:3-7 | 38:9-13 H, R; | 26:1-3 | | | 90:1-4 AA; | | | | |
| 18:25-19:4 | 39:10-41:6 | 26:12-25 | | | 99:5-Exhibit 8 R, IMP; | | | | |
| 22:15-23 | EOT, R; | 29:10-16 | | | 99:20-100:3 R, IMP; | | | | |
| 24:25-25:8 | 41:19-42:4 H, R; | 31:14 | | | 100:13-19 R, IMP; | | | | |
| 31:7-13 | 42:9-11 H, R; | 33:8-10 | | | 100:20-101:7 R, LPN, S, IMP; | | | | |
| 31:15-18 | 43:3-19 A, R; | 33:22-25 | | | 102:11-18 & Exhibit 9 R, H, IMP; | | | | |
| 32:17-24 | 43:24-44:2 A, | 34:4 | | | | | | | |
| 34:1-3 | EOT, R; | 34:6 | | | 103:3-2, 6-14 R, IMP; | | | | |
| 34:5 | 44:14-45:4 A, | 36:13-37:1 | | | 103-15-25 & Exhibit 10 R, IMP, H Exhibit; | | | | |
| 34:7-12 | EOT, R; | 37:15 | | | 104:1-13 R, IMP; | | | | |
| 34:16-22 | 45:12-15 L, | 45:5-11 | | | 104:22-105:1 R, IMP; | | | | |
| 37:10-14 | EOT, R; | 45:16 | | | 105:21-106:10 R, IMP; | | | | |
| 37:16-20 | 45:17-21 L, | 47:15 | | | 106:17-107:1 R, IMP; | | | | |
| 38:9-13 | EOT, R; | 48:18 | | | 107:24-108:17 R, IMP; | | | | |
| 39:10-41:6 | 46:13-25 A, | 52:13 | | | 110:10-13 AA; | | | | |
| 41:19-42:4 | EOT, H, R; | 56:7 | | | 113:9-13 AA; | | | | |
| 42:9-11 | 47:1-10 EOT, | 69:4 | | | 124:9-25 & Exhibit 14 R, IMP; | | | | |
| 43:3-19 | R; | 71:12 | | | | | | | |
| 43:24-44:2 | 47:11-14 L, | 72:11 | | | 125:19-126:14 R, IMP, S, LPN | | | | |
| 44:14-45:4 | EOT, R; | 75:14-18 | | | | | | | |
| 45:12-15 | 47:22-48:17 | 84:2-5 | | | | | | | |
| 45:17-21 | EOT, R; | 84:7-13 | | | | | | | |
| 46:13-47:14 | 48:19-21 P, | 84:21-85:5 | | | | | | | |
| 47:16-21 | EOT, R; | 85:21-25 | | | | | | | |
| 47:22-48:17 | 48:19-21 EOT, | 90:1-7 | | | | | | | |
| 48:19-21 | R; | 91:16-20 | | | | | | | |
| 48:23-50:22 | 51:17-52:8 | 92:5-22 | | | | | | | |
| 51:17-52:11 | EOT, R; | 96:6-21 | | | | | | | |
| 52:15-53:6 | 52:15-53:6 | 98:16-22 | | | | | | | |
| 54:9-10 | EOT, R; | 99:5 | | | | | | | |
| 55:6-12 | | 99:20-100:3 | | | | | | | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 56:1-6<br>57:12-58:21<br>58:23-59:21<br>68:25-69:3<br>69:5-12<br>70:5-71:9<br>72:8-10<br>72:12<br>96:23-97:7<br>97:9-22<br>136:17-25<br>137:2<br>137:4-6<br>137:8-14<br>137:15-138:1<br>139:24-140:25 | 54:9-10 H, R;<br>55:6-12 EOT, R;<br>56:1-6 EOT, R;<br>57:12-58:21 EOT, R;<br>58:23-59:21 EOT, R;<br>68:25-69:3 EOT, P, R;<br>69:5-12 EOT, P, R;<br>70:5-71:9 EOT, R;<br>72:8-10 EOT, R;<br>72:12 EOT, R;<br>96:23-97:7 H, R;<br>97:9-22 H, R;<br>136:17-25 EOT, R;<br>137:2 EOT, R;<br>137:4-6 EOT, R;<br>137:8-14 EOT, R; | 100:13-101:7<br>102:11-18<br>103:3-4<br>103:6-18<br>103:22-104:13<br>104:22-105:1<br>105:21-106:10<br>106:17-107:1<br>107:24-108:7<br>108:9-13<br>108:15-17<br>110:10-13<br>110:15-17<br>110:23-111:4<br>111:6-25<br>112:2<br>112:8-24<br>113:1-3<br>113:5<br>113:9-11<br>113:13<br>114:1<br>114:3<br>114:11-115:12<br>115:19-22<br>117:17-118:5<br>124:9-25<br>125:19-126:7<br>126:9-11<br>126:14<br>137:1<br>137:3<br>137:7 | | | | | | | |

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
--------------------------------------------------------
ANDREA ROSSI and LEONARDO         )
CORPORATION,                      )
         Plaintiffs,              )  CASE NO.
         vs.          )  1:16-CV-21199-CMA
THOMAS DARDEN; JOHN T. VAUGHN,    )
INDUSTRIAL HEAT, LLC; IPH         )
INTERNATIONAL V.B.; and           )
CHEROKEE INVESTMENT PARTNERS,     )
LLC,                              )
         Defendants.   )
--------------------------------)
AND RELATED CASE.          )
--------------------------------------------------------

CR30(b)(6) VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF THE BOEING COMPANY
BY JAMIE CHILDRESS
--------------------------------------------------------

11:03 a.m.
February 28, 2017
1201 Third Avenue, Suite 4900
Seattle, Washington
* * * HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY * * *
SENSITIVE - SUBJECT TO EXPORT CONTROL - U.S. Arms
Export Control Act, International Traffic In Arms
Regulations, Export Administration Act, U.S. Export
Administration Regulations.

Lauren G. Harty, RPR, CCR #2674, Court Reporter

Page 2

1            A P P E A R A N C E S
2
3  FOR PLAINTIFFS:  MR. JOHN ANNESSER
4            Perlman, Bajandas, Yevoli & Albright
5            283 Catalonia Avenue, Suite 200
6            Coral Gables, Florida 33134
7            305.377.0086
8            jannesser@pbyalaw.com
9
10  FOR DEFENDANTS:  MR. BERNARD P. BELL
11            Miller Friel
12            1200 New Hampshire Ave., NW, Ste. 800
13            Washington, DC 20036
14            202.760.3158
15            BellB@MillerFriel.com
16
17  FOR THE BOEING COMPANY and THE WITNESS:
18            MR. STEVE Y. KOH
19            Perkins Coie
20            1201 Third Avenue, Suite 4900
21            Seattle, Washington 98101-3099
22            206.359.3045
23            SKoh@perkinscoie.com
24
25  ALSO PRESENT:    MR. PATRICK NORTON, Videographer

Page 3

1          E X A M I N A T I O N   I N D E X
2   ATTORNEY                         PAGE
3   BY MR. BELL:                      10
4   BY MR. ANNASSER:                      75
5   BY MR. BELL:                      134
6          E X H I B I T   I N D E X
7   EX#          DESCRIPTION          PAGE
8   EXHIBIT 1  2/9/2017 "SUBPOENA TO TESTIFY AT A      10
9       DEPOSITION IN A CIVIL ACTION."
10   EXHIBIT 2  11/20/2014 email from Jamie Childress      41
11       to Tom Darden, JT Vaughn, T. Barker
12       Dameron, IH-00139330-1393331.
13   EXHIBIT 3  Pictures of Dummy Unit and Super      41
14       Q-Cat, IH-00139332.
15   EXHIBIT 4  "Dummy Test 10-19-14" Excel      54
16       spreadsheet test data summary.
17   EXHIBIT 5  "Dummy Test 11-19-14" Excel      61
18       spreadsheet test data summary.
19   EXHIBIT 46 (Tab 46 marked as Exhibit 6.)      77
20   EXHIBIT 6  4/13/2011 "PROPRIETARY INFORMATION      82
21       AGREEMENT PIA No. 2011-2011,"
22       IH-00082952-82956.
23   EXHIBIT 7  Email thread ending 3/13/2014 from JT      86
24       Vaughn to Jamie Childress,
25       IH-00092149-92152.

Page 4

1          E X H I B I T   I N D E X
2   EX#          DESCRIPTION          PAGE
3   EXHIBIT 8  11/22/2013 email from JT Vaughn to      99
4       Jamie Childress, BOE_000341.
5   EXHIBIT 9  12/3/2013 Industrial Heat "E-Cat HT      102
6       Test Outline Preliminary Draft Only
7       V1.0," IH-00093732-93747.
8   EXHIBIT 10  12/5/2013 email from Jamie Childress      103
9       to JT Vaughn, IH-00093731.
10   EXHIBIT 11  Email thread ending 11/21/2014 from      111
11       Tom Darden to Jamie Childress, JT
12       Vaughn, T. Barker Dameron,
13       IH-00105494-105495.
14   EXHIBIT 12  Email thread ending 11/21/2014 from      114
15       Jamie Childress to Tom Darden, JT
16       Vaughn, T. Barker Dameron,
17       IH-00105542-105544.
18   EXHIBIT 13  7/15/2015 email from T. Barker Dameron      119
19       to Jamie Childress, IH-00138640.
20   EXHIBIT 14  12/10/2014 email from Jamie Childress      122
21       to Leonard Quadracci, Brian Tillotson,
22       BOE_001557.
23   EXHIBIT 15  Email thread ending 1/8/2015 from      126
24       Jamie Childress to Leonard Quadracci,
25       Brian Tillotson, BOE_001551-1552.

1 (Pages 1 to 4)

Page 5

1          EXHIBIT INDEX
2    EX#      DESCRIPTION         PAGE
3    EXHIBIT 16 Email thread ending 4/24/2015 from    130
4         Jamie Childress to JT Vaughn,
5         IH-00139153-139162.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1          P R O C E E D I N G S
2         (Marked Deposition Exhibit No. 1.)
3         THE VIDEOGRAPHER:  Good morning.  We are on
4    the record at 11:03 a.m. on February 28th, 2017.
5         This is the video-recorded deposition of
6    Jamie Childress.  My name is Patrick Norton, here with
7    our court reporter, Lauren Harty.  We are here from
8    Veritext Legal Solutions at the request of counsel for
9    Defendant.
10         This deposition is being held at Perkins
11    Coie, Seattle, Washington.  The caption of this case
12    is Andrea Rossi, et al., versus Thomas Darden, et al.,
13    No. 1:16-cv-21199-CMA, in the United States District
14    Court, Southern District of Florida.
15         At this time will Counsel identify
16    themselves for the record.
17         MR. BELL:  Bernard Bell with the law firm
18    Miller Friel for the defendants.
19         MR. KOH:  Steve Koh, Perkins --
20         MR. ANNESSER:  John --
21         MR. KOH:  -- Coie --
22         Go ahead, John.
23         MR. ANNESSER:  I was going to say John
24    Annesser on behalf of the plaintiffs.
25         And just a point of clarification, I believe

Page 7

1    the videographer said that this was the deposition of
2    Jamie Childress, although I believe it was noticed as
3    the 30(b)(6) deposition of Boeing.
4         MR. KOH:  Steve Koh, Perkins Coie, on behalf
5    of The Boeing Company and the deponent, Mr. Childress.
6         THE VIDEOGRAPHER:  Thank you.
7         The witness will be sworn in, and Counsel
8    may begin the examination.
9    JAMIE CHILDRESS,        witness herein, having been
10              duly sworn by the Certified
11              Court Reporter, testified as
12              follows:
13         MR. KOH:  Bernie, if you don't mind -- this
14    is Steve Koh on behalf of Boeing -- I just wanted to
15    state for the record that The Boeing Company received
16    a subpoena, which has since been negotiated and
17    narrowed to a specific topic, which reads, "All tests,
18    experiments, or studies performed by Boeing related to
19    the E-Cat Technology," and this deposition is
20    therefore limited to that topic.  We will not permit
21    questions outside of that topic.
22         I also sent a note last night to counsel to
23    notify them that at least a couple of the exhibits I
24    believe, Bernie, that you intend to use Boeing has
25    identified as controlled by U.S. export law, and

Page 8

1    therefore, this deposition should be marked as,
2    "SENSITIVE - SUBJECT TO EXPORT CONTROL - U.S. Arms
3    Export Control Act, International Traffic In Arms
4    Regulations, Export Administration Act, U.S. Export
5    Administration Regulations."  I provided Bernie with
6    some labels that he can use to mark the exhibits that
7    I've identified as export controlled.
8         Further, all persons attending this
9    deposition are required to be U.S. citizens, and I
10    assume that that's the case, although if anybody is
11    not, they should say so.
12         And a proposal has been made to amend the
13    protective order to account for export control.
14    Boeing's position is that the transcript that flows
15    from this deposition will need to be handled in
16    accordance with those proposed amendments.
17         Finally, in my note to counsel last night I
18    requested that plaintiffs identify any documents that
19    they wish to present to the witness.  I did not
20    receive a response.  And so I would ask Mr. Annasser
21    whether he will permit the court reporter to provide
22    us with any exhibits that he intends to share with the
23    witness.
24         MR. ANNESSER:  Well -- I'll respond.  The
25    court reporter has our documents.  There's a number of

2  (Pages 5 to 8)

**Veritext Florida Reporting Co.**

Page 9

1  them. Not all of them will be used by me, and there
2  should be sufficient copies for counsel as well as the
3  deponent when the time comes.
4       MR. KOH: Okay. So I understand that
5  request is -- has been refused.
6       I don't have anything further.
7       MR. ANNESSER: No. Okay. No, I'm -- I'm
8  not refusing to provide you a copy. I -- I am,
9  though, stating that I'm not going to identify each
10  and every document before we begin this deposition
11  that I might possibly use. And, in fact, we -- we are
12  under certain restrictions ourselves pursuant to the
13  protective order in terms of what we can share or
14  provide you.
15       MR. KOH: Go ahead, Bernie.
16       MR. BELL: Okay. Now -- I've -- I've lost
17  track. Have you -- have you sworn the witness?
18       THE REPORTER: Yes.
19       MR. BELL: Okay.
20
21
22
23
24
25

Page 11

1       Q.  And in this subpoena the E-Cat technology is
2  defined on the -- the page before that to mean the --
3  in the definition number three. Are you with me on
4  that?
5       A.  Yep.
6       Q.  "...the" -- excuse me. It's defined to
7  mean, "...the energy catalyzer technology developed at
8  least in part by Andrea Rossi and/or Leonardo
9  Corporation."
10      Do you see that?
11      MR. ANNESSER: Object to --
12      A.  I do.
13      MR. ANNESSER: -- the form.
14      Q.  (By Mr. Bell) And this -- this subpoena is
15  directed to Boeing Corporation, and you're appearing
16  here -- here today in response to that; is that
17  correct?
18      A.  That's my understanding.
19      Q.  And you're prepared to testify on -- on that
20  subject as limited to the E-Cat technology?
21      A.  I am.
22      Q.  Have you ever been deposed before?
23      A.  I have.
24      Q.  On how many occasions?
25      A.  Once.

Page 10

1       E X A M I N A T I O N
2  BY MR. BELL:
3       Q.  Now, can you tell me whether you would
4  prefer to be addressed by Mr. Childress,
5  Dr. Childress? We'll get to that in a minute, but --
6       A.  Just -- Jamie is good.
7       Q.  Okay. Fair enough.
8       I have asked the court reporter to mark as
9  Exhibit No. 1 a copy of the subpoena, which you now
10  have in front of you. And as -- as counsel noted, we,
11  meaning the lawyers, had negotiated a restriction on
12  this -- this deposition to the topic which is numbered
13  three on the -- on the actual fourth page of this
14  exhibit, but it's the page that at the bottom is 1.
15      A.  So --
16      MR. KOH: One more.
17      THE WITNESS: Oh.
18      A.  Ah. Got it.
19      Q.  (By Mr. Bell) Are you with me?
20      A.  Yep.
21      Q.  So the -- the third topic is, "All tests,
22  experiments, or studies performed by Boeing related to
23  the E-Cat Technology."
24      Are you with me?
25      A.  Yes.

Page 12

1       Q.  Was that a business dispute relating to your
2  work at Boeing?
3       A.  It was related to my work at Boeing, yes.
4       Q.  Okay.
5       I don't -- I don't want to know the
6  substance of that. I -- I asked only to -- to assess
7  your familiarity with the -- with the way the
8  proceeding goes. Okay?
9       A.  Sure.
10      Q.  So I'm going to ask you some questions and,
11  as you see, the court reporter's here transcribing
12  your answers and the videographer is recording the --
13  the video.
14      A.  Uh-huh.
15      Q.  In order to have a clear record, I would ask
16  you to allow me to finish my question before you
17  answer, and I'll do my best to allow you to finish
18  your answer before I ask the next question. Fair
19  enough?
20      A.  Sounds good.
21      Q.  And if you don't understand a question that
22  I've asked or you need it to be clarified, please tell
23  me that. Okay? And --
24      A.  Will do.
25      Q.  -- if -- if you answer, I'm -- I'm going to

3 (Pages 9 to 12)

Page 13

1   assume that you've understood my question.  Okay?
2       A.  Understood.
3       Q.  If you need to take a break at any time and
4   for any reason, please just let me know and we can go
5   off the record.  The only thing I would ask is that
6   you not take a break while a question is pending.
7   Okay?
8       A.  Will do.
9       Q.  Now, with respect to the -- to the topic
10  that we identified, the -- the tests, experiments, or
11  studies performed on the E- -- by Boeing related to
12  the E-Cat technology, are -- are you the person who's
13  most knowledgeable about that within Boeing?
14      A.  I am.
15      Q.  And have you agreed to -- to testify here
16  about that subject --
17      A.  I --
18      Q.  -- on --
19      A.  -- have.
20      Q.  -- on behalf of Boeing?
21      A.  I have.
22      Q.  And tell me, without disclosing the -- the
23  substance of any communications you had with your
24  attorneys, what did you do in order to prepare for the
25  deposition today?

Page 14

1       A.  I reviewed the materials that were provided
2   me by the -- by my own counsel that apparently are
3   going to be -- have been -- already been shared with
4   you, and I reviewed to a limited extent my own notes
5   on some of the testing.
6       Q.  Did you speak with anyone other than Mr. Koh
7   about your deposition today?
8       A.  No.
9       Q.  Did you -- prior to Boeing being served with
10  the subpoena were you aware of litigation between
11  Andrea Rossi and my clients?
12      A.  I was, primarily due to the blogosphere,
13  since this was quite widely broadcast in the
14  blogosphere actually.
15      Q.  So I've learned.
16          Since the time that the -- so -- so there
17  came a time independent of the subpoena when you
18  learned that this litigation was pending, correct?
19      A.  Yeah.  I mean, not the specifics but --
20      Q.  Right.
21      A.  -- you know, the generalities in the
22  blogosphere, yes.
23      Q.  Have you talked to Andrea Rossi since that
24  time?
25      A.  I have not.

Page 15

1       Q.  Tell me, please, where you -- where you went
2   to college and what your degree is in.
3       A.  My degree is in aerospace engineering from
4   the University of Colorado.
5       Q.  And when -- when did you graduate from
6   Colorado?
7       A.  1982.
8       Q.  Did you pursue any postgraduate education?
9       A.  I have no postgraduate degree, but I have
10  quite a lot of postgraduate education.
11      Q.  What do you mean?
12      A.  You know, attending courses and, of course,
13  quite a lot of experience.
14      Q.  Yes.
15          And tell me about that.  So when you
16  graduated in Colorado in 1982 what was the first job
17  that you had?
18      A.  I worked for the Department of Defense.
19      Q.  What were you doing?
20      A.  I was a test engineer and a development
21  engineer at the U.S. Navy's Naval Air Warfare Center.
22      Q.  Where's that located?
23      A.  That was located at China Lake, California.
24      Q.  How long did you remain in that position?
25      A.  Five years.

Page 16

1       Q.  So until roughly 1987?
2       A.  Correct.
3       Q.  What was your next job?
4       A.  I came to work at Boeing.
5       Q.  And have you been continuously employed by
6   Boeing since 1987?
7       A.  That is correct.
8       Q.  Can you summarize for me your -- your job
9   titles during that period of time?
10      A.  Many.
11          Is that a sufficient summary?
12      Q.  Not really.
13      A.  Not really.  All right.
14          Let's see.  So I am currently an associate
15  technical fellow and -- so -- let's see.  Like I said,
16  many.  Integrated product -- product team leads, you
17  know, senior engineer, test leads, chief engineer, you
18  know.
19      Q.  Well, let -- let me come at it --
20      A.  A lot of --
21      Q.  -- a different way.
22          Yeah.
23      A.  A lot of stuff.
24      Q.  Let me -- let me come at it --
25      A.  Okay.

**Veritext Florida Reporting Co.**

800-726-7007                                                              305-376-8800

Page 17

```
 1        Q.   -- a different way.
 2        So when you -- when you -- when you were
 3   hired by Boeing in 1987 what --
 4        A.   Right.
 5        Q.   -- was your job at that time?
 6        A.   Primarily ballistic testing and development
 7   of fighter aircraft.
 8        Q.   And did you have a title?
 9        A.   Probably -- senior test engineer I'm -- I'm
10   guessing.  I mean, long ago.
11        Q.   And during -- so you worked for Boeing for
12   30 years.  Has it all been here in Seattle?
13        A.   True.
14        Q.   So from the point when you were hired as
15   senior test engineer -- just -- I -- I don't need
16   to -- to tie you down to, you know, months and years,
17   but can you walk me through the progression of your --
18   of your titles and responsibilities in a general way
19   since that time?
20        A.   So -- I mean, in terms of titles, I guess
21   I'm -- I'm not super certain on that.  I mean,
22   general -- you know, general engineering titles.
23   My -- when I first started working for Boeing I
24   primarily worked on fighter aircrafts doing testing
25   and development of testing as well as the development
```

Page 18

```
 1   of fighter aircraft themselves.
 2        And that progressed into research and
 3   development in all types of vehicles and all types of
 4   technologies.  So I have worked on everything from the
 5   F-22 fighter to the V-22 Osprey aircraft to spacecraft
 6   to ground vehicles to marine vehicles, both testing
 7   and development.  Advanced physics systems.  A very,
 8   very wide variety of things.
 9        Q.   And did you -- did you have a -- kind of a
10   specialty within that in terms of let's say propulsion
11   or some other engineering focus?
12        A.   So my original specialty when I came to
13   Boeing was a field of -- of study called
14   survivability.  Survivability is effectively the
15   ability of a system to enter the battlefield and
16   return more or less intact, so having survived.  And
17   that essentially gives you a very broad view of how
18   vehicles are constructed, because all systems are
19   considered.  So, you know -- so that was how my career
20   got launched.
21        And then once I had an understanding of --
22   essentially a broad understanding of more or less all
23   vehicle systems, it translated into then developing
24   those systems specifically and then were testing them.
25        Q.   Does the acronym LENR have meaning to you?
```

Page 19

```
 1        A.   Yes.
 2        Q.   Can you tell me what it means to you.
 3        A.   LENR in -- in the context of this stands for
 4   low-energy nuclear reactions.
 5        Q.   And do you recall when you became first
 6   familiar with that?
 7        A.   Quite a number of years ago.  Probably more
 8   than ten.  I --
 9        Q.   In what --
10        A.   -- don't have an exact number right here.
11        Q.   In -- in what context?
12        A.   In the context of low-energy nuclear
13   reactions.
14        Q.   Well, was it just personal curiosity?  Was
15   this something that you were doing as part of your
16   responsibilities at Boeing?
17        A.   Personal curiosity.
18        Q.   Okay.
19        Did there come a time during your job at
20   Boeing when you had -- when you took a professional
21   interest in LENR for Boeing?
22        A.   Yes.
23        Q.   When did that happen?
24        A.   You know, I don't have an exact date for
25   you, but say more than five years ago, so -- I guess I
```

Page 20

```
 1   don't have an exact date.
 2        Q.   More than five, less than ten?
 3        A.   Probably.  That sounds right.
 4        Q.   Do you recall what it was that -- that --
 5        MR. BELL:  Withdrawn.
 6        Q.   (By Mr. Bell)  Was there -- how did that come
 7   about within your job responsibility?  Was that
 8   something that you looked at yourself or was that
 9   something that -- that a supervisor or colleagues
10   tasked you with -- with understanding more about?
11        MR. KOH:  Just hold on for one moment.
12        I'm going to object to the question as
13   outside the scope of the deposition topic.  I
14   understand it's background, so I will permit the
15   witness to answer.
16        I would just caution you to not disclose any
17   proprietary information.  Keep it at a general level.
18   I understand this is for background leading up to the
19   topic at hand, but if you could keep your answer
20   brief.
21        THE WITNESS:  Yeah.
22        A.   So I would say my job is to research
23   advanced technologies for The Boeing Company, and
24   that's pretty broad.  And in this case my own personal
25   interests, you know, eventually coincided with
```

**Veritext Florida Reporting Co.**

800-726-7007                                                      305-376-8800



H, FRE 1004

Page 21

1  Boeing's potential use -- you know, the -- when the
2  technology reached the point where it was potentially
3  useful to Boeing it became sort of a -- more Boeing
4  related.
5      Q.  (By Mr. Bell)  So I -- I do appreciate and
6  agree with your counsel's suggestion that I don't want
7  to get into your proprietary business, but what was it
8  about the developments in the LNR -- LENR field that
9  caused them to reach a point where -- where you felt
10  they could be potentially useful to Boeing?
11      MR. ANNESSER:  Object as to form.
12      MR. KOH:  I have the same admonition for the
13  witness.  I'll allow this, but keep it at a general
14  level.  I -- if -- if it -- I think he's referring to,
15  for example, something you may have seen in the news
16  or read in papers.
17      A.  So -- I guess what I would say is that the
18  LENR field has interested me for a number of years,
19  and in the early days of the LENR field the power
20  levels involved were very small and, therefore, had no
21  credible utility to Boeing.  And in, you know, the
22  last number of years the power levels, you know,
23  reached -- the -- the -- the reported power levels,
24  more accurately, had -- had reached the point where
25  there was some potential utility.

Page 22

1      Q.  (By Mr. Bell)  Were there any specific
2  reports of power levels that you recall as -- as
3  sparking that interest?
4      MR. ANNESSER:  Object to form.
5      A.  Yes.  There are -- you know, there were a
6  number of them with different technologies, but the
7  reports involving Andrea Rossi were some of them
8  certainly.
9      Q.  (By Mr. Bell)  And -- and were there others
10  as well?
11      A.  There were.
12      Q.  Do you recall the others offhand?
13      A.  Yes.  There are a number of researchers
14  in -- in this field, so --
15      Q.  Why was that of interest to Boeing?
16      A.  Because almost all Boeing's products use
17  energy and almost all Boeing's products -- or a very
18  high percentage of Boeing's products, in any case, are
19  mobile.  And low-energy nuclear reactions, if they
20  could be proven to be a source of power, could be a
21  mobile source of power.  So, you know, if they --
22  potentially, if the technology were a proven
23  technology, it could be used to power Boeing products.
24      Q.  And within Boeing how did that -- how did
25  your responsibilities change to include -- I don't --

Page 23

1  I don't know how you want to characterize it --
2  oversight or responsibility for LENR evaluation?
3      MR. ANNESSER:  Object to form.
4      A.  So I guess I'm not entirely certain of
5  how -- what the question is.
6      Q.  (By Mr. Bell)  It wasn't my best, so I'll try
7  it again.
8      A.  Okay.
9      Q.  There -- there came a point in time --
10  you're sitting here today as the person who's the most
11  knowledgeable --
12      A.  Right.
13      Q.  -- in -- in your estimation, about LENR,
14  correct?
15      MR. KOH:  Well, just to be clear, I think he
16  testified he was the most knowledgeable with -- with
17  respect to the topic, which was the tests performed by
18  Boeing related to this E-Cat technology.
19      MR. BELL:  Agreed.  Agreed.
20      Q.  (By Mr. Bell)  And within Boeing you -- how
21  did you come into that role?  Did somebody direct you
22  to do that or is that something that you proposed
23  and -- and your proposal was accepted?
24      A.  That was something that I proposed.
25      Q.  Okay.

Page 24

1      And -- and I take it there's somebody that
2  has to sign off on that in terms of how you spend your
3  time?
4      A.  Of course.
5      Q.  And who -- and who is that by title?
6      A.  In this particular case it was a director, a
7  Boeing research and technology director.
8      Q.  Okay.
9      What are your general responsibilities as
10  regards evaluation, research, or development of -- of
11  LENR?  Just general.  I don't -- again, I don't want
12  to get into your proprietary business.
13      A.  So I have no responsibilities in general
14  of -- on LENR.
15      Q.  Okay.
16      How did it come to be that you -- well --
17      MR. BELL:  Strike that.
18      Q.  (By Mr. Bell)  Do you have the same position
19  now that you had in 2011?
20      A.  I do.
21      Q.  And -- and through the intervening years
22  have -- has your position remained constant?
23      A.  It -- it -- essentially, yes.
24      Q.  Okay.
25      Now, in -- in the context of LENR, if -- if

6  (Pages 21 to 24)

Page 25

1    I use the phrase excess heat, does that have meaning
2    to you?
3        A.   Of -- of course.
4        Q.   How -- and how do you understand that?  What
5    do you understand that to mean?
6        A.   So excess heat would mean that the LENR
7    device is itself creating heat from a -- an
8    LENR-related reaction.
9        Q.   Does the phrase over-unity have meaning to
10   you in that context?
11       A.   It does.
12       Q.   What meaning does it have?
13       A.   It means that the device is creating heat in
14   excess of the input power, so the input power being
15   1.0, and some number greater than 1.0 in -- in output
16   heat would indicate an over-unity operation.
17       Q.   And is excess heat by definition over-unity?
18           MR. ANNESSER:  Object to the form.
19       A.   So in context with the experiments that we
20   conducted I -- the answer would be yes.  So,
21   effectively, if we're inputting a known amount of
22   energy that is predominantly in -- in the form of
23   energy converted into heat, then excess heat would be
24   heat that we would not have expected to been generated
25   by our input power.

Page 27

1        Q.   When did you first become aware of Andrea
2    Rossi?
3        A.   So I don't have an exact date for you, but
4    sometime in, say, the last five to seven years I'll
5    say.  It's been a while actually.
6        Q.   How did you first become aware of him?
7            MR. KOH:  Can -- let me just object to the
8    question as outside the scope of the topic that we've
9    agreed to.  It actually relates to a topic that was
10   specifically excluded, which is communications between
11   Boeing and Mr. Rossi.  I appreciate that a little bit
12   of -- of this is background leading up to the test is
13   understandable and acceptable, but I would ask that we
14   move as quickly as possible to the test itself.
15           MR. BELL:  Can I have the question read
16   back?
17           THE REPORTER:  "Question:  How did you first
18   become aware of him?"
19       A.   So I first became aware of him due to
20   published reports on his ex -- his tests;
21   specifically, tests conducted in Europe.
22       Q.   (By Mr. Bell)  When did you first become
23   aware of my clients, Tom Darden or J.T. Vaughn?
24           MR. KOH:  Same objection.
25           You can answer this.

Page 26

1        Q.   (By Mr. Bell)  What is Boeing's capability to
2    test LENR technology to determine if it generates
3    excess heat?
4            MR. KOH:  Let me just object --
5            MR. ANNESSER:  Object to form.
6            MR. KOH:  And I'll object that it's outside
7    the scope of the topic.
8        A.   I guess maybe first you could,
9    Mr. Childress, describe whether there is something
10   beyond the test that you performed, a just "Yes" or
11   "No."
12       A.   No.
13       Q.   (By Mr. Bell)  I'm -- so I'm not sure what
14   you're answering, "No," to.
15       A.   So -- so -- let's say if I -- if I rephrase
16   the question, does Boeing have a generic LENR test
17   capability outside of the tests we're discussing here,
18   and the answer to that is no.
19       Q.   Okay.
20           Have you tested other LENR technologies --
21   and this is a "Yes" or "No" question.  Have you --
22   have you tested other technologies -- other LENR
23   technologies besides the E-Cat technology that we're
24   here to talk about?
25       A.   I have not.

Page 28

1        A.   And, again, I don't have an exact date.
2    I'll say in the three years ago time frame.  I -- I --
3    I guess I don't have an exact date.
4        Q.   (By Mr. Bell)  Okay.
5            Was it your understanding when you first
6    became aware or knew -- became aware of or knew
7    Mr. Darden or Mr. Vaughn that they through a corporate
8    entity had licensed Rossi's technology?
9            MR. KOH:  Same objection.
10           MR. ANNESSER:  Object to form.
11       A.   So, again, approximately that same time
12   frame, so whatever that time is, I'm -- again, I -- I
13   don't have an exact date.
14       Q.   (By Mr. Bell)  Sure.
15           So I'll represent to you that -- that --
16   that my client, Industrial Heat, entered into a
17   license agreement with Rossi and a corporate entity in
18   October of 2012.
19       A.   Okay.
20       Q.   Did you know Darden or Vaughn before October
21   of 2012?
22           MR. KOH:  Same objection.
23           You can answer.
24           THE WITNESS:  Okay.
25       A.   No, I did not.

7 (Pages 25 to 28)

Page 29

1    Q.  (By Mr. Bell)  Now, before Industrial Heat
2   licensed E-Cat technology, which I'll represent to you
3   occurred in October of 2012, did Boeing perform any
4   tests, experiments, or studies on Andrea Rossi's E-Cat
5   technology?
6    A.  No, I guess with the caveat that we read the
7   publicly-available reports.  If you consider that a
8   study, then -- so we -- but we conducted no
9   experiments nor analysis or research that was our own.
10    Q.  Before October of 2012, when I've
11   represented to you that Industrial Heat licensed E-Cat
12   technology from Rossi, did you discuss with Rossi or
13   representatives of Rossi the possibility of Boeing
14   testing, experimenting, or attempting to validate the
15   E-Cat technology?
16    A.  Yes.
17    Q.  Did -- did you approach -- did -- did Boeing
18   approach Rossi or did Rossi approach Boeing?
19    MR. KOH:  I'm going to object again that
20   this is outside the scope of the deposition topic, so,
21   to begin with, any testimony he's given in which I
22   make that objection is obviously not the testimony of
23   The Boeing Company.  It's only his own testimony
24   and -- I'm going to instruct the witness not to
25   answer, because I think that is directly the topic

Page 30

1   number one, which the parties had agreed would not be
2   part of this deposition.
3    Q.  (By Mr. Bell)  Now, Mr. Childress, I'm
4   mindful of your -- of your counsel's instruction.  I'm
5   going to ask you another question, and I think your
6   counsel might object again, but I'm going to ask it,
7   and we'll see what happens.
8    Did -- in -- before you knew anybody from
9   Industrial Heat, Mr. Darden or Mr. Vaughn, did Andrea
10   Rossi propose terms to Boeing for testing or
11   validation that Boeing could not accept?
12    MR. KOH:  I'll give the same --
13    MR. ANNESSER:  Object to form.
14    MR. KOH:  And I'll make the same objection
15   and instruction not to answer.  That question is not
16   on the topic of tests, experiments, or studies
17   performed by Boeing related to the E-Cat technology.
18    Q.  (By Mr. Bell)  Did there come a time when
19   Boeing agreed to test reactors provided by Industrial
20   Heat?
21    A.  There -- yes.
22    MR. ANNESSER:  Object to form.
23    MR. BELL:  What's the objection, John?
24   Maybe I can cure it.
25    MR. ANNESSER:  Well, I think -- I think

Page 31

1   you're -- you've got a compound question in the sense
2   that you're asking about agreeing to do a test, number
3   one, and then stating that they were prepared by
4   Industrial Heat, which I think the -- the documents in
5   this case indicate otherwise.  So I think the question
6   is misleading and compound.
7    Q.  (By Mr. Bell)  Did there come a time,
8   Mr. Childress, when Boeing agreed to test certain LENR
9   reactors?
10    A.  Yes.
11    Q.  Did you have an understanding that those
12   reactors were provided to Boeing by Industrial Heat?
13    A.  Yes.
14    MR. ANNESSER:  Object to form.
15    Q.  (By Mr. Bell)  What was the purpose of the
16   test, from your perspective?
17    A.  To determine if the reactor generated excess
18   heat.
19    Q.  Did you have an understanding what the
20   purpose of the test was from Industrial Heat's
21   perspective?
22    MR. ANNESSER:  Object to form.
23    MR. KOH:  I'll just object; calls for
24   speculation.
25    You -- you can --

Page 32

1    THE WITNESS:  Do I --
2    MR. KOH:  -- answer.
3    Q.  (By Mr. Bell)  I'm asking because --
4    THE WITNESS:  Yeah.
5    Q.  (By Mr. Bell)  -- if you --
6    A.  I --
7    Q.  -- if -- just to be clear, I'm asking you if
8   you formed an understanding --
9    A.  It was --
10    Q.  -- based on your dealings with them what
11   they -- what they were thinking.
12    A.  I think I got it.
13    MR. ANNESSER:  Same objection.
14    A.  So it was my understanding that they also
15   wanted to know if the unit -- LENR unit generated
16   excess heat.
17    Q.  (By Mr. Bell)  In -- in general terms, what
18   were the parameters or protocols for that test?
19    A.  So in that test Industrial Heat supplied us
20   with a reactor that was sealed, and the reactor was
21   effectively a -- a resistor, an electrical resistor,
22   that was filled with a proprietary material that, once
23   heated, that proprietary material would, in theory,
24   generate excess heat.
25    Q.  If it -- if it did generate excess heat when

8  (Pages 29 to 32)

Page 33

1   you were setting up the test, what did you plan to do
2   with the excess heat?
3          MR. ANNESSER: Object to form.
4      A.  Simply monitor its existence.
5      Q.  (By Mr. Bell) Did you -- did you provide for
6   a way to -- to measure it or --
7          MR. BELL: Strike that.
8      Q.  (By Mr. Bell) Did you provide for a way
9   to -- to take the excess heat out from inside of the
10  place where it was being tested?
11         MR. KOH: Let me just interject here that I
12  think the questions are now going to get into
13  information that is Boeing proprietary. I understand
14  that the protective order entered in this case allows
15  for the designation of the deposition or -- or
16  sections of it to be marked as "Highly Confidential -
17  Attorneys' Eyes Only," and I presume we'll have an
18  opportunity subsequently to -- to make those
19  designations, but for the record I'll say that I think
20  we're getting into subjects that are Boeing
21  proprietary.
22     Q.  (By Mr. Bell) Do you understand my question?
23     A.  I believe I do. And the answer would be we
24  simply allowed the heat to dissipate in the ambient
25  environment.

*R, FRE 403* (marked beside lines 8-10)
*R, FRE 403* (marked beside lines 22-25)

Page 34

1      Q.  In -- in the -- in the test that you
2   ultimately performed how much power was going in?
3      A.  Approximately one --
4          MR. ANNESSER: Object --
5      A.  -- kilowatt.
6          MR. ANNESSER: -- to form.
7      Q.  (By Mr. Bell) I'm sorry. I didn't catch it.
8      A.  Oh. Approximately one kilowatt of power was
9   used.
10     Q.  Did Industrial Heat tell you the formula for
11  the proprietary material that you described?
12     A.  They did not.
13     Q.  Did Industrial Heat permit Boeing to
14  disassemble the resistor?
15     A.  They did not.
16     Q.  Were there steps or measures that Boeing and
17  Industrial Heat agreed to in order to protect
18  Industrial Heat's intellectual property?
19     A.  Yes.
20     Q.  What were they?
21     A.  We had a proprietary information agreement,
22  which protected everyone's intellectual property.
23     Q.  In -- in what fashion did it protect
24  everyone's intellectual property?
25         MR. KOH: I'm just going to object that --

*R* (marked beside lines 1-6)
*R* (marked beside lines 7-12)
*R* (marked beside lines 16-22)

Page 35

1   for lack of foundation and also that it's beyond the
2   scope, but you can describe generally your
3   understanding.
4          THE WITNESS: Okay.
5      A.  So on a generic basis a proprietary
6   information agreement and -- and this one called for
7   the protection of the information generated and
8   exchanged in such a way that third parties would not
9   have access to the information and the information,
10  you know, is controlled.
11     Q.  (By Mr. Bell) Did Industrial Heat pay Boeing
12  for the work that Boeing did?
13     A.  They did not.
14     Q.  Why did Boeing do the work on a no-cost
15  basis?
16         MR. KOH: I'm going to give the same
17  objection that it's outside the scope, and the witness
18  can testify to his personal knowledge of this
19  information.
20     A.  Actually, pred -- predominantly expedience.
21     Q.  (By Mr. Bell) What do you mean by that?
22     A.  Well, for a large company like Boeing to do
23  some small piece of work takes a lot of legal
24  activity, et cetera. And, as strange as it sounds, it
25  was actually less expensive for Boeing simply to do

Page 36

1   it.
2      Q.  Did Industrial Heat ask to be paid for
3   system design data or anything else that they provided
4   to Boeing?
5          MR. KOH: Same objection.
6      A.  No.
7      Q.  (By Mr. Bell) Okay.
8          What was your understanding of why
9   Industrial Heat wanted Boeing to test the devices?
10         MR. ANNESSER: Object to form.
11     A.  Because their own capacity to conduct the
12  tests was not as good as ours.
13     Q.  (By Mr. Bell) Now, strictly with -- with
14  respect to the tests that you were conducting for
15  Industrial Heat, did you discuss those with Andrea
16  Rossi?
17     A.  No.
18     Q.  Did you discuss with Industrial Heat whether
19  to discuss the tests with Andrea Rossi?
20     A.  Yes.
21     Q.  What do you recall about that discussion?
22     A.  They did not want the test discussed with
23  Andrea Rossi.
24     Q.  Did they explain to you why they did not?
25     A.  Because they felt it would be a distraction

9 (Pages 33 to 36)

Page 37

1 to him as he was working on other projects for them.
2 Q. Do you recall with any greater specificity
3 what -- what projects he was working on that they --
4 that they were wanting to not distract him from?
5 MR. KOH: Just object; outside the scope of
6 the topic that's been agreed. I'll let this --
7 MR. BELL: I'll withdraw it.
8 MR. KOH: Okay.
9 MR. BELL: With -- question withdrawn.
10 Q. (By Mr. Bell) Did Industrial Heat tell you
11 at that time whether they themselves were able to
12 independently validate or replicate the E-Cat
13 technology?
14 A. I --
15 MR. ANNESSER: Object to form.
16 A. Let's see. I honestly don't know exactly
17 what tests they may have conducted. However, I do
18 recall that in my questioning of them as to whether
19 the E-Cat technology worked, they themselves did not
20 know.
21 Q. (By Mr. Bell) And how did they express that
22 to you?
23 A. In con --
24 MR. ANNESSER: Object to form.
25 A. In conversations? I mean, what --

Page 38

1 Q. (By Mr. Bell) Well --
2 A. -- what do you mean?
3 Q. What did they say to you?
4 A. Well, of course, we inquired as to whether,
5 you know -- other than the published data, of course,
6 whether they had been able to successfully validate
7 that the E-Cat technology produced excess heat.
8 Q. And what did they tell you?
9 A. And they said that they had no -- no test
10 data that, you know, was -- I -- how I would say
11 this? -- sort of was controlled and verifiable I --
12 guess. So, of course, they had test data, but it's
13 that controlled and verifiable piece that's difficult.
14 Q. When you --
15 MR. BELL: Strike that.
16 Q. (By Mr. Bell) Were you responsible for, at
17 least in part, establishing the methodology by which
18 Boeing was to test the technology?
19 A. Yes.
20 Q. And what steps did you take to address the
21 issue that you just described, that it be controlled
22 and -- and verifiable?
23 MR. KOH: As we get in --
24 MR. ANNESSER: Object to form.
25 MR. KOH: Bernie, as we get into the test

Page 39

1 details, rather than continuing to -- to make a point
2 about this being proprietary information, can we agree
3 that under the protective order we reserve the right
4 to designate portions of the testimony as protected?
5 MR. BELL: Yes. Stipulated.
6 MR. ANNESSER: Bernie, just for the record,
7 we're going to go ahead and designate this deposition
8 as "Highly Confidential - Attorneys' Eyes Only."
9 A. Please repeat the question.
10 THE REPORTER: "Question: And what steps
11 did you take to address the issue that you just
12 described, that it controlled and -- and
13 verifiable?"
14 A. So in previous testing that we had -- that
15 we had read about the critical lacking information was
16 that there was not a -- you know, two things. There
17 was not a controlled baseline wherein an independent
18 tester created essentially a replica of the -- of
19 the -- of the LENR device that had no LENR fuel in it.
20 And so in our tests we essentially said
21 okay. We have an LENR device, and we will create a
22 replica of that device using very known and ordinary
23 technology that we know has no -- is -- is incapable
24 of producing excess heat and -- so we will
25 effectively -- instead of worrying about trying to

Page 40

1 calculate all of the potential heat inputs and
2 outputs, we will simply compare our known device,
3 which we know does not include unknown or exotic
4 physics and is a very simple one, and simply compare
5 the performance of that device to the proposed LENR
6 device.
7 Q. (By Mr. Bell) You -- in the beginning of
8 your answer you started to say I think there were --
9 there were critical lacking information of -- of two
10 kinds. One was the controlled baseline. Was there a
11 second one or --
12 A. Let's see. So I guess the -- the -- the
13 second one was simply and as effectively part of that
14 experiment, which was that we were not going to worry
15 about calculating all of the potential inputs and
16 outputs, so our test was based upon, you know, two
17 premises; one, that in the case of building our
18 baseline device we controlled everything and,
19 therefore, knew all of the ingredients and exactly how
20 it was constructed. There were no mysteries in our
21 device.
22 And then the second piece to the test was to
23 conduct the exact same heating experiment, essentially
24 the exact same power-applied experiment, to both our
25 constructed device, which held no mysteries for us,

10 (Pages 37 to 40)

Page 41

1 and the provided LENR device and see if the provided
2 LENR device produced heat in excess of our device
3 under the exact same input condi -- characteristics.
4     Q.   Did you perform testing under those
5 circumstances?
6     A.   We did.
7     Q.   When did the testing occur?
8     A.   I'm sure -- there's an exhibit here with an
9 exact date I'm sure.  A couple of years ago.
10    Q.   Okay.
11         MR. BELL:  Why don't we stand off the record
12 for a minute.
13         THE VIDEOGRAPHER:  We're going off the
14 record at 11:55 a.m.
15         (Recess.)
16         (Marked Deposition Exhibit Nos. 2-5.)
17         THE VIDEOGRAPHER:  We're back on the record
18 at 12:06 p.m.
19    Q.   (By Mr. Bell)  Now, during the break,
20 Mr. Childress, I've had the court reporter mark as
21 Exhibit 2 a two-page document.  The cover -- the first
22 page is an email dated November 20, 2014, and it's
23 stamped at the bottom IH-00139330.
24         And I've also had the -- the reporter mark
25 as Exhibit No. 3 a one-page document, which has two --

Page 42

1 in -- in the version I'm -- I've marked it's two color
2 photographs, and it's stamped IH-00139332.  Both of
3 these documents have been marked as "Highly
4 Confidential - Attorneys' Eyes only."
5         Do you have those documents in front of you?
6     A.   I do.
7     Q.   Have you seen these documents before?
8     A.   I have.
9     Q.   And is Exhibit 2 an email that you sent to
10 Mr. Darden, Mr. Vaughn, and Mr. Dameron?
11    A.   It is.
12    Q.   Who is Leonard Quadracci?
13    A.   Leonard Quadracci is a manager at Boeing.
14    Q.   Does he work for you?
15    A.   No.
16    Q.   Do you work for him?
17    A.   In this particular instance, yes.
18    Q.   Okay.
19         But not gen -- not as a general matter, but
20 you -- you were working --
21         MR. BELL:  Strike that.
22    Q.   (By Mr. Bell)  In -- in -- in connection with
23 the -- with the events that are discussed here, both
24 you and Mr. Quadracci were working for Boeing; is that
25 correct?

Page 43

1     A.   Correct.
2     Q.   Okay.
3         And do you recognize what's been marked as
4 Exhibit 3?
5     A.   I do.
6     Q.   Did you prepare this?
7     A.   I did.
8     Q.   And did you prepare it in the -- in the
9 course of your business at Boeing?
10    A.   I did.
11    Q.   Now, do these documents, and -- and really I
12 suppose it's just Exhibit 2, but does this refresh
13 your recollection as to when Boeing performed the
14 tests that you're testifying about today?
15    A.   Yes, because it has a date on it.
16 November 20th, 2014.
17    Q.   And in this email you're reporting on
18 results, correct?
19    A.   Correct.
20    Q.   And -- so the -- the testing itself would
21 have occurred no later, obviously, than November 20,
22 2014, correct?
23    A.   Correct.
24    Q.   Did the tests that Boeing performed on the
25 E-Cat technology demonstrate that the active unit

Page 44

1 generated excess heat?
2     A.   It did not.
3     Q.   Did the tests that Boeing performed on the
4 E-Cat technology validate the technology?
5         MR. ANNESSER:  Object to form.
6         MR. KOH:  I'm going to object to the form as
7 well.
8         Go ahead.
9     A.   So I guess define your question a little
10 more accurately.  What -- what does that mean?
11    Q.   (By Mr. Bell)  Well --
12         MR. BELL:  I'm -- I'm going to withdraw the
13 question.  I'll come back to that.
14    Q.   (By Mr. Bell)  In Exhibit 2 in your email to
15 the Industrial Heat folks you -- you wrote in the
16 first sentence, "Len and I fired up the Super Q-Cat."
17         Do you -- do you see that?
18    A.   Yes.
19    Q.   What is the Super Q-Cat?
20    A.   The Super Q-Cat was the presumed LENR device
21 that was sent to us by Industrial Heat.
22    Q.   And in Exhibit 3 you have two -- the -- the
23 two photographs.  One is labeled, "Dummy Unit," and
24 the other is, "Super Q-Cat," correct?
25    A.   Correct.

11 (Pages 41 to 44)



Page 45

1     Q.   And the Super Q-Cat that's referred to in
2   Exhibit 3 is the same as that referred to in
3   Exhibit 2, correct?
4     A.   That is correct.
5     Q.   Now, the -- the email, Exhibit 2, references
6   an attachment, a jpeg attachment.  Was 3 attached to
7   2?
8     A.   I -- since I don't have the actual email in
9   front of me, I can't say with certainty, but that --
10   that's plausible.
11     Q.   Okay.
12     The -- and in Exhibit 3 the -- there's a
13   photo for "Dummy Unit."  Is that the unit that you
14   were describing before that was -- that had been
15   controlled by you for all variables?
16     MR. ANNESSER:  Object to form.
17     A.   Correct.  In this test the dummy unit was a
18   Boeing-constructed unit that was constructed in the
19   same manner as the Super Q-Cat, at least as -- as to
20   our understanding of the manner of the Super Q-Cat's
21   construction.
22     Q.   (By Mr. Bell)  Thank you for cleaning up a
23   brutal question, but I -- I understand.
24     The -- when you were testifying before about
25   the measures that you undertook to control and -- and

Page 46

1   verify the dummy unit was what you were describing in
2   that testimony?
3     MR. ANNESSER:  Object --
4     A.   Cor --
5     MR. ANNESSER:  -- to form.
6     A.   Correct.  The dummy unit was a -- our
7   replica LENR device that contained no -- no fuel, if
8   you will, so it was simply a resistor built to the
9   same resistor specifications as the resistor, as it
10   was explained to us, was built into the Super Q-Cat.
11     Q.   (By Mr. Bell)  Explained to you by whom?
12     A.   Industrial Heat.
13     Q.   In -- going back to Exhibit 2 now, you say,
14   "...unfortunately, it," meaning the Super Q-Cat, "it
15   didn't" gener -- "didn't show any excess heat."
16     What did you mean by that?
17     A.   That the Super Q-Cat did not achieve a
18   higher temperature for a given input power than our
19   dummy -- our dummy unit.
20     Q.   And in -- you go on to write in Exhibit 2,
21   "In fact, it turned out our dummy unit was slightly
22   more efficient."
23     Do you see that?
24     A.   Yes, I do see that.
25     Q.   What did you mean by that?

Page 47

1     A.   So for a given power input our dummy unit
2   actually got hotter than the -- the Super Q-Cat
3   device.
4     Q.   So further down in Exhibit 2 you say,
5   "Based on that, I'd say we got a bad unit"?
6     What did you mean by that?
7     A.   Well, I meant that the Super Q-Cat did not
8   produce excess heat, and since we were expecting
9   excess heat, then we have to assume that the unit had
10   a -- a failure of one sort or another.
11     Q.   When you said that -- when you wrote this in
12   Exhibit 2 that you got a bad unit, was that based on
13   the assumption that the technology actually worked?
14     A.   It was based on --
15     MR. ANNESSER:  Objection to form.
16     -- the tech --
17     So, yes, it was based on -- if the
18   technology worked and was capable of producing excess
19   heat, this unit did not produce any excess heat.
20   Therefore, either, A, the technology was -- itself was
21   faulty or the unit was faulty.
22     Q.   (By Mr. Bell)  Looking at Exhibit 3, you have
23   the same five measurements there listed in both
24   pictures.  Can you explain what those are one by one?
25     A.   Sure.

Page 48

1     The first measurement is the IR camera max
2   spot temperature, which is the infrared camera maximum
3   spot temperature as per a -- a little cursor that you
4   can move on -- in the infrared image, so we can within
5   the infrared image itself move the cursor around
6   within the image and find on an individual pixel basis
7   the -- the -- effectively the temperature as reported
8   by the camera, which is not exactly the same as the
9   actual temperature but the temperature as reported by
10   the infrared image.  And so -- and we were reporting
11   that for both the dummy unit and the Super Q-Cat.
12     In the case of the dummy unit, the infrared
13   camera max spot temperature was 796 degrees Celsius.
14   In the case of the Super Cat, Q-Cat, it was 799
15   degrees Celsius.
16     Q.   Was there any significance to you in -- in
17   the difference of 3 degrees there?
18     MR. ANNESSER:  Object to the form.
19     A.   No.  That -- that's -- you know, relative to
20   the fidelity of this test, they're -- that's
21   essentially the same.
22     Q.   (By Mr. Bell)  Okay.
23     And -- and the next component is surface
24   thermocouple max temp.  What does that refer to?
25     A.   So we had several thermocouples on each

12  (Pages 45 to 48)

Page 49

1  device, and in this particular case it was referring,
2  and it -- it's not referenced in here, but it would
3  have been referring to the thermocouple that would
4  have been the most common between the two, which in
5  this particular case would have been thermocouple
6  number five, so TC 5.
7       And so those thermocouples were slightly --
8  I -- I guess I would say slightly embedded in each of
9  the units.  So in this particular case we drilled very
10  small surface holes into each of the units and put,
11  with spring force on them, thermocouples so that the
12  thermocouples would stay in contact into each of those
13  small holes and -- so they were measuring, you know,
14  effectively at one location the -- the temperature
15  slightly below the surface.  So we're calling it
16  surface temperature, but it's about, say, 60,000ths of
17  an inch below the surface actually.
18       Q.   The surface of what?
19       A.   The surface of either the dummy unit or the
20  Super Q-Cat, depending on which unit we were testing.
21       Q.   Of the reactor unit itself?
22       A.   Yes, of the reactor unit itself.
23       Q.   Okay.
24       A.   More acc -- more accurately, the outside
25  shell of the reactor.

**R**

Page 50

1       Q.   Okay.
2       And in -- the next component there is
3  embedded thermocouple temperature.  What does that
4  refer to?
5       A.   So in the case of the dummy unit we
6  actually -- because, of course, we controlled the
7  manufacture of that unit, we actually cast into the
8  ceramic outer shell of that unit a thermocouple that
9  was actually essentially inside the unit and
10  approximately I'll say somewhere between .1 and
11  .15 inches beneath the surface.
12       And -- so in that particular case, the
13  embedded thermocouple temperature, so if I go back and
14  read these, the -- the surface thermocouple maximum
15  temperature in the case of the dummy unit was
16  600 degrees C.  The surface thermocouple maximum
17  temperature in the case of the Super Q-Cat was 7 --
18  607 degrees C.  And the embedded thermocouple
19  temperature in the case of the dummy unit was 706
20  degrees C.  And there is no embedded thermocouple
21  temperature in the case of the Super Q-Cat because we
22  didn't manufacture that.
23       Q.   Why did you embed a thermocouple in the
24  dummy unit?
25       A.   Well, because an embedded thermocouple gives

Page 51

1  you, of course, the most accurate temperature because
2  it's not exposed to the ambient air.  And that also
3  gave us a -- sanity check on our thermocouple
4  measurements because the thermocouple would be, of
5  course, highly accurate and, two, it would give us an
6  understanding of how the thermal gradient through the
7  thickness of the reactor worked.
8       So a -- the thermocouple on the surface we
9  would expect to be cooler than the embedded
10  thermocouple, and if for whatever reason that proved
11  to not be true, that would make us suspect our
12  thermocouple data.
13       Q.   So the embedded thermocouple was effectively
14  a check on the surface or vice --
15       A.   Correct.
16       Q.   -- versa.  Okay.
17       In -- the next entry here is camera
18  emissivity.  What does that refer to?
19       A.   So in the case of infrared measurements you
20  program into the camera the -- the emissivity of the
21  target that you wish to measure, and the emissivity of
22  something is a -- a value that tells you how much
23  infrared energy you would get off of an object for a
24  given actual physical temperature.  So the -- so
25  effectively you multiply the -- the -- you know,

**R, EOT**

Page 52

1  the -- the photon emissions, if you will, by the
2  emissivity.
3       So in the particular case of -- of these
4  tests, we claimed that we did not know the theoretical
5  emissivity of our targets.  We simply assumed that
6  they were both similar, and so instead of programming
7  in a presumed emissivity of our target we simply put
8  the emissivity to 1.
9       Q.   Why is camera emissivity important to
10  understanding whether the unit's generating excess
11  heat or not?
12       A.   Well, because the camera -- the --
13       MR. ANNESSER:  Object to form.
14       I'm sorry.
15       A.   So the -- if you're using an infrared camera
16  to measure temperature, then the -- the temperature
17  that the -- you know, the -- the output temperature is
18  a function of the actual photon energy coming into the
19  camera multiplied by the emissivity.
20       So it -- let's say if the camera were to
21  tell you that something is 700 degrees Fahrenheit, for
22  instance, and you had it set to an em -- emissivity of
23  1, if you changed the emissivity in the camera setting
24  to an emissivity of .8, it's now going to give -- tell
25  you a different temperature, right?

**R, EOT**

13 (Pages 49 to 52)

Page 53

1    So in this particular case the -- the most
2  important parameter is not whether we set the
3  emissivity to 1 or whether we set the emissivity to .8
4  or whatever.  The most important parameter is that the
5  emissivity of the camera was set in both cases to the
6  same value.
7    Q.  (By Mr. Bell)  Okay.
8    And -- and the fifth and final component
9  there is power in, and can you explain what that
10 means.
11   A.  So power in is electrical power, and in this
12 case it is three-phase 60 hertz electrical power.  And
13 in the case of the dummy unit we had -- were inputting
14 990 watts of electrical power in order to get the
15 temperatures that we've already discussed.  And in the
16 case of the Super Q-Cat we were inputting 1,145 watts
17 into the Super Q-Cat to get the temperatures that
18 we've already discussed.
19   Q.  So for the dummy unit you put in 990 watts
20 of power and got a measurement on the surface
21 thermocouple of 618 degrees Celsius.
22   A.  Correct.
23   Q.  And for the Super Q-Cat you put in 1145
24 watts, correct?
25   A.  Correct.

Page 54

1    Q.  And -- on the surface thermocouple to get a
2  reading of 607 Celsius, correct?
3    A.  Correct.
4    Q.  So it's that discrepancy between input and
5  maximum temperature observed that in Exhibit 2 you're
6  referring to as being slightly more efficient.
7    A.  Correct.
8    Q.  Okay.
9    Now, I'm going to have the court reporter
10 hand to you what has been marked as Exhibit 4.
11   MR. KOH:  Bernie, do you have an objection
12 if I mark each page of the exhibit with the export
13 control sticker?
14   MR. BELL:  I do not.
15   MR. KOH:  Okay.  I think that's the better
16 practice.
17   MR. BELL:  Yes.
18   And, John, this is -- and, for the record,
19 Exhibit 4 was produced under the Bates stamp
20 IH-00139285 as "Highly Confidential - Attorneys' Eyes
21 Only."
22   The version that we are marking here at the
23 deposition is a two-page printout of an Excel
24 spreadsheet.  I believe it's an Excel spreadsheet.  It
25 does not have the Bates control numbers because it was

Page 55

1  produced natively.
2    MR. ANNESSER:  Thank you for that.
3    Q.  (By Mr. Bell)  Do you have Exhibit 4 in front
4  of you?
5    A.  I do.
6    Q.  Is this a document that you prepared?
7    A.  It is.
8    Q.  Can you tell me what it is, please.
9    A.  It is a summary of the -- of the test data
10 on both the dummy test article and the -- the Super
11 Q-Cat, which in this particular case we are labeling
12 as Q-Tech.
13   Q.  So -- and, if you could, just starting from
14 the left-hand column, it's "Data Point," and it has
15 entries, "3," "5," "6," and so forth.  Do you see
16 that?
17   A.  Yep.
18   Q.  What does that refer to?
19   A.  So in terms of the data point, probably
20 that's just the Excel spreadsheet number, so I don't
21 think -- I think that probably has no -- no real
22 bearing.
23   The total power is the sum total power in
24 RMS watts from -- summed of all three phases of the
25 input 60 hertz power.

Page 56

1    Q.  And does the -- is the way this is arrayed,
2  the -- the first entries going from the top, pertain
3  to the dummy unit and then the entries below that
4  pertain to the Q -- what -- what you're calling here
5  the Q-Tech?
6    A.  That's correct.
7    MR. ANNESSER:  Object to form.
8    Q.  (By Mr. Bell)  And what is the next column,
9  "Tc#8 Embedded Temperature"?
10   A.  That would be the -- in the case of the
11 dummy test, that would be exactly that; thermocouple
12 number eight, which is the thermocouple that we cast
13 into the dummy reactor.  So that is -- would be below
14 the surface.
15   Q.  Okay.
16   So if we look at the -- at the -- at the row
17 that is across data point 15 -- right?
18   A.  Yep.
19   Q.  -- and -- and -- and look back at Exhibit 3,
20 the -- the total power in from Exhibit 4 in -- in that
21 row is 992; that corresponds to 990 in Exhibit 3?
22   A.  Yes.
23   Q.  And the thermocouple number eight embedded
24 temperature of 706 corresponds to the 706 degree in --
25 in Exhibit 3?

R, EOT

R, EOT

H, R

14  (Pages 53 to 56)

Page 57

1    A.   Correct.
2    Q.   And the 796 is the IR camera max spot
3  temperature --
4    A.   Correct.
5    --  that corresponds between 4 and 3?
6    A.   Correct.
7    Q.   And then the -- the last column there,
8  "618," is the surface thermocouple max temp?
9    A.   Correct, which would have been TC number
10  five.
11   Q.   Okay.
12       Now, where are the corresponding numbers for
13  the Q-Tech or Q-Cat in Exhibit 4?
14   A.   So the corresponding numbers on power would
15  be also under the column labeled total power in watts.
16   Q.   Okay.
17   A.   And then in the case -- so now we've got --
18  then the first column to the right of the image would
19  be the infrared camera maximum spot temperature in --
20  in Fahrenheit.  Then the column to the right of that
21  would be the -- the corresponding thermocouple number
22  five, which is in substantially the same place as the
23  thermocouple TC number five on the dummy unit and was,
24  in fact, the exact same thermocouple.  So -- so that
25  was the exact same thermocouple and in substantially

**R, EOT**

Page 58

1  the same location.
2       And then the next column over, "Q-Tech IR,"
3  is -- "C," is the -- is simply the infrared
4  temperature translated into degrees Celsius.
5    Q.   When you said it -- it was the same
6  thermocouple between the two units, what do you mean?
7    A.   I mean it was physically the same
8  thermocouple.  We didn't put a new thermocouple there.
9  There's -- so in -- when these tests were conducted
10  the test setup was identical.  We simply swapped out
11  the dummy for the Q-Tech and used all the same
12  thermocouples and everything, with the exception, of
13  course, of the TC number eight, which is -- it's
14  embedded.  We can't reuse that.
15   Q.   Why did you do it that way?
16   A.   To make it as consistent as possible.
17   Q.   So -- and -- and -- I'm going to possibly
18  reveal my ignorance, but so that the calibra -- there
19  would be no calibration difference between the two
20  or --
21   A.   Correct.
22   Q.   Okay.
23       Now, on Exhibit 4, the right-hand side of
24  the first page there is a -- a graph.  What does that
25  show?

**R, EOT**

Page 59

1    A.   That shows a series of plots for our -- both
2  the dummy unit and the -- the Super Q-Cat; i.e., the
3  Q-Tech, which we're labeling Q-Tech.  So -- so every
4  place you see Q-Tech reads Super Q-Cat and vice versa,
5  right?
6       So --
7    Q.   And that -- that was -- to be clear, that
8  was the unit that was provided to you by Industrial
9  Heat.
10   A.   That's correct.
11   Q.   Okay.
12   A.   That's correct.
13       So this plot shows the power input on the X
14  axis in -- in watts and the temperature in degrees
15  Celsius on -- on the Y axis.  And there are four
16  things plotted; the thermal value for TC number five
17  in degrees Celsius, the thermal value for the infrared
18  camera max spot temperature in degrees C, the -- for
19  the dummy unit and the Q-Tech unit.  So both those
20  parameters are plotted for both the dummy unit and the
21  Q-Tech, and the Q-Tech/Super Q-Cat.
22   Q.   And what is the significance of the red --
23  the red line at approximately -- I don't know -- a
24  thousand watts input?
25   A.   So that was -- one, it -- it provides a --

Page 60

1  you know, a clear line that you can use to examine the
2  relative temperatures, but also, that was the wattage
3  that we were given to understand would have very
4  clearly shown excess heat, would have actually shown
5  it prior to that, well prior to that.  So we wanted to
6  show that we had significantly exceeded the wattage
7  that, according to Industrial Heat, we should have
8  seen some excess heat in -- in the -- in the system.
9    Q.   And what was that based on, the -- the --
10  was that --
11       MR. BELL:  Withdrawn.
12   Q.   (By Mr. Bell)  The -- where you put the red
13  line, was that based on information that was provided
14  to you by Industrial Heat or inde -- or -- or -- or
15  information that you independently gathered from other
16  sources or both?
17   A.   That was based upon information provided by
18  Industrial Heat, but -- so I'll -- I'll -- you know,
19  if -- if there was other speculation, I can't -- don't
20  recall actually.
21   Q.   Okay.
22       And on the -- on the second page of
23  Exhibit 4 there's another chart.  What does that show?
24   A.   That shows essentially the same information,
25  only including embedded TC number eight for the dummy

15  (Pages 57 to 60)

Page 61

```
 1   unit.
 2       Q.   And you -- which you couldn't plot on -- on
 3   the other graph because the -- the other unit didn't
 4   have the embedded --
 5       A.   Right.  Essentially, just additional in --
 6   in -- information.  And we didn't include it in the
 7   first graph just because it would have been a little
 8   bit more confusing since the Q-Cat/ -- or the Super
 9   Q-Cat/Q-Tech would not have had that information, so
10   we put it on a separate graph just to not confuse this
11   graph.
12       Q.   Okay.
13           Let me ask you now to look at what has been
14   marked as Exhibit 5, which is a -- this is a -- a
15   four-page printout of some spreadsheets.  It was
16   produced as Industrial Heat 00138988 in native form.
17   It's "Highly Confidential - Attorneys' Eyes Only."
18           Do you have Exhibit 5 in front of you,
19   Mr. Childress?
20       A.   I do.
21       Q.   Now, the first two pages of Exhibit 5 are
22   the same as Exhibit 4, correct?
23       A.   Close.  The first page graph actually
24   includes -- you know, combines the -- TC number eight
25   into the -- into the original graph.  So it is --
```

Page 62

```
 1   the -- the graph is effectively the graph in Exhibit
 2   No. 4 plus the TC number eight data in addition.
 3       Q.   TC 8 being the embedded thermocouple in the
 4   dummy unit.
 5       A.   Correct.
 6       Q.   Okay.
 7           Now, what -- what are pages three and four
 8   of Exhibit 5?
 9       A.   So pages three and four are the data from a
10   set of tests we conducted on some additional reactors
11   that Boeing built, again unfueled, so they're
12   essentially similar to our dummy unit.  They are --
13   they are just additional dummy units.  And we built
14   these in coordination with Industrial Heat to help
15   Industrial Heat conduct their own tests.
16       Q.   And what are -- what are you measuring here?
17           MR. BELL:  Withdrawn.
18       Q.   (By Mr. Bell)  First of all, did you prepare
19   the -- the pages that are three and four on Exhibit 5?
20       A.   I did.
21       Q.   And you prepared those in the normal course
22   of your business at Boeing.
23       A.   Correct.
24       Q.   Okay.
25           And what do they report?
```

Page 63

```
 1       A.   They report the -- a test that was conducted
 2   on these two units.  And in this particular test both
 3   reactors, which are unfueled and constructed
 4   essentially the same or very similarly, in any case,
 5   to the dummy reactor that we used in the Super Q-Cat
 6   test.  And this test was conducted to show a slightly
 7   different test arrangement and to create a baseline
 8   test measurement for these two particular reactors.
 9       Q.   What was slightly different about the test
10   arrangement?
11       A.   So in this test both reactors are tested
12   simultaneously with the exact same current, so unlike
13   the previous test, where we had tested the dummy
14   reactor on -- on -- on one day -- in -- in that
15   particular case November 19th, 2014, and then the
16   following day tested the Super Q-Cat, so on
17   November 20th -- in this particular test we said,
18   well, for future testing there for Industrial Heat --
19   and -- and, again, the point of this test was to
20   create a verifiable test setup should Industrial Heat
21   send us back another reactor.  So this was in
22   preparation for some future test.
23           And -- so prior to -- you know, prior to
24   that test we wanted to have a -- a baseline test of
25   these reactors prior to them ever receiving fuel so
```

Page 64

```
 1   that we would know very accurately what the capability
 2   of these reactors was prior to any fueling.
 3           So in this particular test both reactors are
 4   subjected to the exact same current, so in the
 5   photograph you can see that the two reactors are
 6   actually wired together in the center of the
 7   photograph, so the current passes through reactor Q-1,
 8   passes out of reactor Q-1, and then into Q-2.  And in
 9   this way we can be certain that both reactors see
10   exactly the same amount of power.  And we also have
11   off-board from this, of course, other
12   characterizations of the reactors.
13           And then the data that you see here is --
14   and in this particular case there were both embedded
15   thermocouples as well as surface thermocouples.  And
16   so we have various thermocouples so, you know, we have
17   the -- the total power in, which -- which, of course,
18   would be the power supplied to both reactors.
19           Then the second column, which is powering
20   divided by two, is essentially the power received by
21   either individual reactor -- right? -- because
22   essentially now each reactor is absorbing power
23   independently of each other, but it's the same total
24   power.
25           And then Q-1, TC-1, would be the temperature
```

16  (Pages 61 to 64)

Page 65

1  in degrees Celsius at that location, at the location
2  of TC 1, thermocouple one on the Q-1 reactor, and then
3  Q-1 TC number two would be the temperature at the
4  location of the thermocouple number two.
5      And then in the case of Q-2, so essentially
6  now the power's going into the -- into reactor number
7  2, so, again, we have Q-2 TC number one, Q-2 TC number
8  2.
9      And then -- and then the -- the IR cam box
10 max temperature is essentially the max temperature
11 seen on -- on either of them.  So, in other words,
12 we're recording, okay, so in this -- this particular
13 case the infrared measurement, since that's a spot
14 measurement, is -- could have been on either Q-1 or
15 Q-2 and --
16     But what you have to keep in mind there is
17 that we record the infrared images, and the infrared
18 images can be interrogated at some future time, right?
19 So essentially the infrared images are exactly that,
20 a -- an interrogatable dataset themselves, and at any
21 future time we can interrogate that image and know
22 what the temperature is in any particular spot, right?
23     So in this particular case I'm simply
24 listing the -- the maximum temperature we saw in
25 either two.  And then -- but at -- but because that

Page 66

1  data was recorded, at some future time -- right? -- we
2  could find out the temperature at any location.
3      Q.  Because the camera's capturing the whole
4  unit.
5      A.  Exactly.
6      Q.  Okay.
7      Was there any significance to -- to the --
8  to the differences between Q-1 and Q-2 or are those
9  differences only -- would those differences only be
10 important in -- in comparison to the fueled reactors?
11     A.  Right.  The a -- your assessment is
12 essentially correct, that the importance here was that
13 we establish a baseline, so collect data from both Q-1
14 and Q-2.  And, as you can see from the plot, they were
15 very similar, although not identical, and --
16     But the main thing was to record this data
17 prior to them being fueled, and then at some future
18 time the -- the assumption was that they would come
19 back fueled, and then we would be able to see, okay,
20 was there a change relative to the initial -- this
21 initial baseline run.
22     So this initial baseline run was essentially
23 establishing, A, this is what these do when they're
24 not fueled.  The plan was to send them to Industrial
25 Heat, have Industrial Heat fuel them, conduct their

Page 67

1  own tests, see if, you know, they after being fueled
2  produced excess heat, and then if they did, send them
3  back to us and -- using this data we could
4  determine if there was some change.
5      Q.  So the -- the plan was to send these
6  devices, Q-1 and Q-2, to Industrial Heat for them to
7  fuel or was the plan to -- for Industrial Heat to send
8  fuel to you to run in Q-1 and Q-2?
9      A.  No.  The --
10         MR. ANNESSER:  Object --
11     A.  -- effect --
12         MR. ANNESSER:  -- to form.
13     A.  Okay.  So -- so the plan was we actually
14 sent only one of these units back to Industrial
15 Heat -- so we kept one, which, again, would re --
16 remain as a baseline.  And I can't remember if we sent
17 them Q-1 or we sent them Q-2.  We sent them one or the
18 other.  -- for Industrial Heat to fuel and then, you
19 know -- but also with instructions that based upon
20 this, only send it back to us if they have conducted
21 tests themselves that indicate there's a reason for us
22 to test it again.
23     Q.  (By Mr. Bell)  Why did you have that
24 instruction or understanding?
25     A.  Because time is -- is money at Boeing, as --

Page 68

1  as it is everywhere, and so we had already conducted a
2  test which showed that, you know, there was no excess
3  heat from the first unit, so we did not want to spend
4  additional time testing something that they themselves
5  had not tested.
6      So, you know, we wanted to verify something
7  that they already knew the answer, not try and
8  discover the answer, right?  I mean, you know,
9  we're -- we were not interested in testing units
10 that -- that they hadn't already shown to work, right?
11     Q.  And did that ever that happen?  Did --
12     A.  It did not.
13     Q.  Okay.
14     Are you -- are you familiar with testing
15 that was performed in Lugano, Switzerland, in 2014
16 that related to E-Cat technology?
17         MR. KOH:  I'm going to object to the
18 question as outside of the scope of the topic, which
19 is all tests, experiments, or studies performed by
20 Boeing.  I'll instruct the witness not to answer.
21         MR. BELL:  Well, I -- I think I --
22         MR. KOH:  Oh.  Is this --
23         MR. BELL:  I think I can connect it up, but
24 let me go about it a better way.
25     Q.  (By Mr. Bell)  Did Boeing perform a study or

R, EOT, P

17 (Pages 65 to 68)

Page 69

1 analysis relating to the E-Cat technology and
2 pertaining specifically to the Lugano testing that
3 occurred in 2014?
4       MR. ANNESSER:  Object to form.
5    A.   So -- so I guess what I would say is we read
6 the reports and considered what we thought was good
7 science about them and what we thought was bad science
8 about them.  I'm not sure I would classify it as a
9 study, not -- at least not by Boeing standards, but we
10 did examine the publicly-available data and -- and
11 think about, you know, what that data might -- might
12 mean to Boeing.
13    Q.   (By Mr. Bell)  What did you consider to be
14 good, picking up on your answer?
15       MR. KOH:  I'm going to give the same
16 objection.  This --
17       MR. ANNESSER:  Object to form.
18       MR. KOH:  -- witness is not here to provide
19 expert testimony, to opine on the technology
20 generally.  He's here to testify as to the tests
21 performed by Boeing.
22       To the extent there was a study of the study
23 that was performed by Boeing for which there were
24 findings made, you can share those, but if -- if not,
25 I think you should not answer the question.

Page 70

1    A.   So, again, I would say, you know, we were
2 not involved in that test.  We were aware of it.  We
3 read the test report.  We, you know, found some parts,
4 you know, good and some parts bad.
5    Q.   (By Mr. Bell)  And I'm -- I'm asking you to
6 identify what you found to be good and what you found
7 to be bad.
8    A.   So I -- I guess, you know, the -- some of
9 the good parts were that they did a long duration
10 test, so that was of interest.  They did have a
11 credible infrared collection capability, so those
12 parts were good.
13       What struck us as inadequate was that they
14 did not back up their infrared collection data with
15 thermocouples, so essentially no independent data
16 in -- you know, relative to the -- to the -- to the
17 infrared data.  And also the fact that there was no
18 baseline reference, so there was no unfueled baseline
19 reference.
20    Q.   No unfueled baseline reference of the sort
21 that you testified that you performed when you had the
22 reactors in Seattle?
23    A.   Correct.
24    Q.   Did you draw any conclusions with respect to
25 the emissivity settings and calculations that were

Page 71

1 reported in that study?
2    A.   So, you know, I guess what I would say is
3 that in that study because they did not back up their
4 infrared data with thermocouples, their data relied
5 exclusively on a presumed emissivity and their
6 infrared collection of the -- of the infrared photons
7 being given off by the unit.
8    Q.   And you consider that to be a weakness?
9    A.   Yes.
10       MR. ANNESSER:  Ob --
11    Q.   (By Mr. Bell)  Did you --
12       MR. ANNESSER:  Object to form.
13    Q.   (By Mr. Bell)  Did you draw any conclusions
14 with respect to custody of the charge and custody of
15 the -- of the ash after the test?
16       MR. ANNESSER:  Object to form.
17    A.   You know, I -- I -- I don't really have an
18 opinion on that one.
19    Q.   (By Mr. Bell)  Did you draw any conclusions
20 with respect to the independence of the test?
21       MR. ANNESSER:  Object to form.
22    A.   The test struck me as a -- you know, a
23 relatively independent group, so I guess I would -- I
24 certainly had no reason to believe that the testers
25 were not independent.

Page 72

1    Q.   (By Mr. Bell)  Has Boeing ever performed
2 tests, experiments, or studies relating to the E-Cat
3 technology and gotten a positive result, meaning
4 over-unity or excess heat, as we've described those
5 terms earlier?
6       MR. ANNESSER:  Object to form.
7       MR. BELL:  Withdrawn.
8    Q.   Has Boeing ever tested the
9 E-Cat technology and gotten a positive result, meaning
10 over-unity or excess heat?
11       MR. ANNESSER:  Object to form.
12    A.   No.
13    Q.   (By Mr. Bell)  Has Boeing performed any
14 tests, experiments, or studies relating to the E-Cat
15 technology that we haven't already discussed today?
16    A.   So run that one by me -- by me again to --
17 to make sure I get it.  So -- so, you know, Boeing has
18 been interested in this and -- so it depends on what
19 you consider -- classify as a study.
20       MR. KOH:  I -- let me just interject here,
21 Mr. Childress.  E-Cat technology, as was described
22 earlier, is de -- defined in the subpoena as the
23 technology developed, at least in part, by Andrea
24 Rossi and/or Leonardo Corporation.
25       So I think the question is besides the tests

18  (Pages 69 to 72)

Page 73

1  that were already described in your testimony were
2  there any other tests or experiments related to this
3  E-Cat technology.
4      Q.  (By Mr. Bell)  I -- I agree with that, but
5  let me try -- let me try and do it my way so that it's --
6  so that I -- at least in my mind it'll be clear.
7      A.  Okay.
8      Q.  Okay?
9      A.  Sure.
10     Q.  So we've -- you've testified this morning
11 and -- and this afternoon, I suppose, about testing
12 that you performed as -- as reported in Exhibits 1 --
13 Exhibits 2, 3, 4, and 5 that we've talked about,
14 correct?
15     A.  Yep.
16     Q.  So apart from -- from those tests, has
17 Boeing performed any other tests, experiments, or
18 studies relating to the E-Cat technology developed, at
19 least in part, by Andrea Rossi that we haven't already
20 discussed?
21     A.  Well, I guess I would say -- and, again,
22 it -- it depends on what you classify as something
23 con -- consisting of a study.  Have we reviewed the
24 a -- publicly-available literature, yes.  Have we --
25 let's say in the case of making these units that we've

Page 74

1  already discussed did we, you know, have to tinker
2  around a little bit so that we could successfully make
3  them, and yes.  Right?
4      But in terms of actually testing a -- you
5  know, an active device or doing some analysis on how
6  to construct an active device or analyze its theory,
7  et cetera, the answer would be no.
8      MR. BELL:  Okay.  Let's just take a short
9  break, and I think I'm -- I'm about done, but I just
10 want to make sure by reviewing my notes.
11     MR. KOH:  Sure.
12     MR. BELL:  Okay?
13     THE VIDEOGRAPHER:  We're going off the
14 record at 12:59 p.m.
15     (Recess.)
16     THE VIDEOGRAPHER:  This is the beginning of
17 Media No. 2 in the deposition of Boeing 30(b)(6) Jamie
18 Childress.  We're back on the record at 1:01 p.m.
19     MR. BELL:  I have no further questions at
20 this time, reserving my right to -- to follow on
21 whatever Mr. Annesser does.
22     MR. ANNESSER:  Okay.
23     MR. KOH:  And, Mr. Annesser, this is --
24     MR. ANNESSER:  All --
25     MR. KOH:  -- Steve --

Page 75

1      MR. ANNESSER:  -- right.
2          E X A M I N A T I O N
3  BY MR. ANNASSER:
4      Q.  Good --
5      MR. KOH:  This is Steve Koh.  Sorry to --
6  sorry to interrupt you.  This is Steve Koh.
7      I just wanted to ask if you had a sense of
8  how much time you're going to need?
9      MR. ANNESSER:  I'm looking at probably an
10 hour I would guess --
11     MR. KOH:  Okay.  Thank you.
12     MR. ANNESSER:  -- just roughly.  I'll --
13 I'll try to make it quick, though.
14     Q.  (By Mr. Annesser)  Okay.  Sir, as I said in
15 the beginning of this, my name is John Annesser.  I
16 represent the plaintiffs, Leonardo Corporation and
17 Andrea Rossi, in this matter.  Thank you for appearing
18 today, and I will try to make this as brief as I can.
19     One of the things that was asked of you was
20 your initial contacts with Industrial Heat.  Do you
21 know how you initially came into contact with them?
22     A.  I do.
23     Q.  Okay.
24     And how was that?
25     A.  So an associate of Andrea's, a -- a group of

Page 76

1  people that Andrea worked with, and I can't think of
2  their corporate name now, but the primary person I
3  dealt with is a gentleman named Craig Cassarino, and
4  so -- and I met Craig through Andrea, so Andrea gave
5  me Craig's name to contact when we had our early
6  discussions with Andrea.
7      Q.  Okay.
8      Now, you had known Dr. Rossi before that
9  point, correct?
10     A.  Yes.  That's true.
11     Q.  Okay.
12     And, in fact, you had entered into an
13 agreement, a proprietary information agreement, with
14 Dr. Rossi on or about April 13th, 2011?
15     MR. KOH:  I'm going to object to the
16 question as outside the scope of the deposition topic
17 in the subpoena.  A little bit of background, just as
18 I allowed with -- for Bernie, is fine, but I think
19 this is a topic that is outside -- clearly outside the
20 scope, and I'll instruct the witness not to answer it.
21     MR. ANNESSER:  You're -- okay.  You're
22 instructing the witness not to answer.  You do --
23 you -- sir, are you aware that the federal rules
24 require that although it may be outside of the scope
25 of the 30(b)(6) deposition notice, that we are

Page 77

1    still -- we are still entitled to inquire and it just
2    may or may not be binding upon the company itself?
3        So I believe he has an obligation and the
4    responsibility to answer.  The question is whether
5    it's binding on the company.  That we can sort out at
6    another time.
7        MR. KOH:  The instruction stands.  We're
8    here responding to a subpoena that is on a particular
9    topic.
10       MR. ANNESSER:  Okay.  Are you particular
11   seek -- particularly seeking a protective order?  In
12   which case, I will expect that you'll move the Court
13   in a timely manner for that protective order.
14   Otherwise, I'll insist upon an answer in this
15   deposition.
16       MR. KOH:  And the instruction stands.  You
17   can bring an action here in Seattle.
18       MR. ANNESSER:  Oh, no, the Court down here
19   has jurisdiction over its subpoena, sir.
20       MR. KOH:  You can move on, please.
21       MR. ANNESSER:  Madam Court Reporter, if I
22   could ask you to hand the witness the exhibit numbered
23   46.
24       THE REPORTER:  Just a moment.  I've kept
25   everything sealed.

Page 78

1        (Discussion off the record.)
2        MR. KOH:  Mr. Annasser, the court reporter
3    has handed me a folder marked Tab 46.  We're going to
4    take a break and review it.
5        Go off the record?
6        MR. ANNESSER:  What -- I'm sorry?  Excuse
7    me?
8        MR. KOH:  We're --
9        MR. ANNESSER:  No.  We're --
10       MR. KOH:  -- take --
11       MR. ANNESSER:  I don't --
12       MR. KOH:  There's no question pending.
13       MR. ANNESSER:  I'm sorry?
14       MR. KOH:  There's no question pending.
15   We're going to take a break to review it.
16       MR. ANNESSER:  In -- in fact, there was a
17   question pending, but you can take a break to review
18   it.
19       MR. KOH:  I think the record will reflect
20   that there wasn't, but in any event, we'll go off the
21   record, and we'll let you know when we're back.
22       MR. ANNESSER:  Sure.  Thank you.
23       THE VIDEOGRAPHER:  We're going off the
24   record at 1:06 p.m.
25       (Recess.)

Page 79

1        THE VIDEOGRAPHER:  We're back on the record
2    at 1:14 p.m.
3        MR. KOH:  This is Steve Koh.  I have been
4    handed a folder by the court reporter marked Tab 46.
5    It is an agreement dated April 13, 2011.
6        We are here -- The Boeing Company is here at
7    this deposition pursuant to a subpoena issued by the
8    defendant limited to a single topic.  This document
9    does not appear to be related to that topic, and
10   therefore, we decline to answer questions about it.
11       I am handing it back to the -- to the court
12   reporter.
13       MR. ANNESSER:  Okay.
14       Madam Court Reporter, we're going to mark
15   this as Exhibit 6.
16       And, Mr. Koh, I'd please refer you to the
17   case of King v. Pratt & Whitney, 161 F.R.D. 475 and
18   476, Southern District of Florida, 1995, in which the
19   Court stated that, "In sum, this Court concludes that
20   a Rule 30(b)(6) cannot be used to limit what is asked
21   of the designated witness at a deposition.  Rather,
22   the rule simply defines the corporation's obligations
23   regarding whom they are obligated to produce for such
24   a deposition and what that witness is obligated to be
25   able to answer."

Page 80

1        The rule, sir, in the Southern District of
2    Florida is that I am entitled to inquire of the
3    witness irrespective of any lack of indication on a
4    30(b)(6) notice.
5        MR. KOH:  Okay.  Thank you for that.
6        MR. ANNESSER:  And this is my -- this --
7    this, sir, is my good faith attempt to meet and confer
8    with you to try to resolve this issue before
9    requesting the Court to compel, and if we need to
10   compel and need to seek a continuance of this
11   deposition, we will do that.
12       MR. KOH:  Thank you for the information.
13   Obviously I don't have Westlaw here in front of me.
14   If I -- if we're going to have a true meet and confer,
15   I would need to review the authorities and get back to
16   you and have a discussion about it.
17       I'll just simply note without having looked
18   at the authority this is not your subpoena.  This --
19   we are here responding to a subpoena that lists a
20   particular topic, and your examination by definition
21   is limited to responding to whatever is relevant to
22   that topic.
23       MR. ANNESSER:  Okay.
24       And, in fact, Mr. -- Mr. Bell had inquired
25   into the familiarity of Boeing Company and your

Page 81

1    particular witness with Dr. Rossi, and so I am
2    following up on that.
3            MR. KOH:  Yeah.  And I -- I -- I then
4    instructed the witness not to answer beyond the --
5    the -- the background question of whether he was aware
6    of him prior to this time.
7            You can ask whatever questions you like.  If
8    they are outside of the topic, I'll -- I'll give the
9    instruction.  If -- and if not, he'll be free to
10   answer.
11           MR. ANNESSER:  Okay.
12           And -- and, again, I'll repeat my question,
13   are you moving for a protective order, sir?
14           MR. KOH:  I am at this moment not moving for
15   a protective order.  I'm sitting in a deposition.
16           MR. ANNESSER:  Okay.  That's -- that's fine.
17   That -- that's fine.  If you're not seeking a
18   protective order and you're instructing the witness
19   not to answer, I will move on.
20           MR. KOH:  Yeah.  Well, if we need to do so,
21   then obviously I can only do -- be in one place at one
22   time, and we would have to do it after you break.
23           MR. ANNESSER:  Okay.
24           Madam Court Reporter, if you could hand
25   Exhibit 6 to the witness.

Page 82

1       Q.  (By Mr. Annesser)  Sir, have you seen this
2    document before?
3            THE REPORTER:  Stand by.
4            MR. BELL:  Isn't that the one -- is this the
5    one -- we're talking about the same thing?
6            MR. KOH:  Oh.  I don't know.  Let me take a
7    look.
8            (Marked Deposition Exhibit No. 6.)
9            MR. KOH:  Yeah.
10           It's the same document that was in folder
11   46.  I'll instruct the witness not to answer.
12      Q.  (By Mr. Annesser)  Sir, do you understand
13   that your attorney has instructed you not to answer?
14   Notwithstanding, the choice is yours.  Are you
15   choosing to follow your attorney's instruction?
16      A.  I am following my attorney's instruction.
17      Q.  Okay.  Fair enough.
18           Sir, you had had conversations, had you not,
19   with Dr. Rossi regarding the E-Cat technology prior to
20   your contact with Industrial Heat?  Is that correct?
21      A.  That is true.
22      Q.  Okay.
23           And did you convey that to Industrial Heat
24   when you first had contact with them?
25      A.  I did.

Page 83

1       Q.  And what is it that you told Industrial Heat
2    regarding your prior relationship or prior knowledge
3    of Dr. Rossi?
4       A.  Simply that we had talked previously, that
5    we had met previously, and that we had reviewed the
6    publicly-available data.
7       Q.  Okay.
8            Did you ever inform them of continued
9    conversations between you and Dr. Rossi?
10      A.  I did.
11           MR. KOH:  Object to the form.
12           THE WITNESS:  Oh.
13           MR. KOH:  Go ahead.
14      Q.  (By Mr. Annesser)  Sir, you can answer.
15      A.  Yes, I did.
16      Q.  And -- and what did you tell them about your
17   continued conversations?
18      A.  Simply generalities.
19      Q.  Okay.
20           Now, you had testified, sir, that --
21   Mr. Bell I believe asked you whether you'd ever spoken
22   with Dr. Rossi and I believe regarding the testing
23   that you were doing for Industrial Heat, and I believe
24   your testimony was that you had not.  Is that correct?
25      A.  I'm sorry.  Re -- repeat the question?

Page 84

1       Q.  That -- yes.
2            I believe you had testified, and please
3    correct me if I'm wrong, that you had not discussed
4    any of the testing that Boeing was doing with respect
5    to Industrial Heat with Dr. Rossi.
6            MR. BELL:  Objection to form.
7       A.  To -- that is true.
8       Q.  (By Mr. Annesser)  And I -- and I believe you
9    were asked why you had not spoken with Dr. Rossi.  Or
10   perhaps I'm -- I'm mistaken.  Why is it that you did
11   not speak with Dr. Rossi regarding that testing?
12      A.  Because Industrial Heat did not want
13   Dr. Rossi distracted from his other projects.
14      Q.  Do you know why that would be?
15           MR. KOH:  Objection; calls for speculation.
16      A.  Yeah.  I agree.  I --
17      Q.  (By Mr. Annesser)  You can --
18      A.  I --
19      Q.  -- answer if you know.
20      A.  I honestly don't know.
21      Q.  Now, did you ever -- or -- I'm sorry.  Did
22   you have communications with Dr. Rossi regarding his
23   desire to obtain a jet engine to use for testing?
24      A.  I did.
25      Q.  And during those conversations did you ever

[H]

[AA]

21  (Pages 81 to 84)

Page 85

1  tell Dr. Rossi that you were working with Industrial
2  Heat?
3      A.  I did not.
4      Q.  Why did you not even tell him that you were
5  working with Industrial Heat?
6          MR. KOH:  I'm going to object to this as
7  outside the scope of the topic, unless you can explain
8  to us how this relates to tests, experiments, or
9  studies performed by Boeing related to the E-Cat
10 technology.
11         MR. ANNESSER:  Well, they -- I want to know
12 what was told to who and when about these tests.
13         MR. KOH:  Well -- oh, about the tests.
14         MR. ANNESSER:  Well, no.  I'm -- I'm asking
15 if Dr. Rossi -- why Dr. Rossi would not have even
16 been told that they were working together, and if his
17 testimony is that he was told, then -- then I'd like
18 to know that.  If not, I'd like to know why.
19         MR. KOH:  I'll permit this question.
20         THE WITNESS:  Okay.
21         A.  So the answer to that is I did not tell
22 Dr. Rossi at the request of Industrial Heat, very
23 straightforward, and I -- and the -- Industrial Heat's
24 exact reasons I don't know.  I was requested not to,
25 and so I didn't.

Page 86

1      Q.  (By Mr. Annesser)  Did you ever forward on
2  any of your communication with Dr. Rossi to Industrial
3  Heat during that time period?
4      A.  I informed them of -- that the -- that we
5  were talking and then that -- and the general subject,
6  and I don't know if I actually forwarded anything or
7  not.  I -- I can't -- don't recall.  Conceivably.
8      Q.  Okay.
9          MR. ANNESSER:  Madam Court Reporter, if I
10 can ask you to hand the witness -- well, mark it as
11 Exhibit No. 7 and hand the witness the document
12 contained in folder number 49.
13         (Marked Deposition Exhibit No. 7.)
14         THE REPORTER:  It's marked.
15         MR. ANNESSER:  Thank you.
16         MR. KOH:  So, for the record, I'm -- the
17 witness has in front of him Exhibit 7.  I have a copy.
18 And there's only one extra copy, so Bernie does not
19 have one, but it's Bates --
20         MR. ANNESSER:  Bernie --
21         MR. KOH:  -- number --
22         MR. ANNESSER:  -- do you need a --
23         MR. KOH:  I --
24         MR. ANNESSER:  Bernie, do you need a moment
25 to review it?

Page 87

1          MR. BELL:  Oh, sure.  Thank you.
2          MR. ANNESSER:  While you review it, Bernie,
3  just for the record, this is -- this document is Bates
4  stamped number IH-00092149.
5          MR. BELL:  Thank you.
6          MR. KOH:  Go ahead and take a look at it.
7  Review it.
8      A.  Okay.  Yes.  I -- I see what this is.  All
9  right.
10     Q.  (By Mr. Annesser)  Okay.
11         Have you seen this email chain before, sir?
12     A.  So apparently, and I didn't recall having
13 sent this specifically to J.T., but it is obviously
14 a -- a note that I forwarded to J.T. regarding testing
15 a jet engine.  So yes.
16     Q.  Okay.
17         Now, is it your recollection, sir, that
18 Dr. Rossi had desired to test the combustion in a jet
19 engine?
20     A.  Right.  Yes.  Andrea was interested in
21 testing a jet engine version of his E-Cat technology.
22     Q.  Okay.
23         I'm looking, sir, to the -- the second email
24 on the page, which is actually a -- probably the
25 second paragraph.  It appears to be from you on

Page 88

1  March 13th, 2014, and it says, "JT, FYI.  As we
2  discussed, my preliminary investigation into this
3  indicates it would be very challenging for Boeing to
4  send Andrea a turbine and even more difficult to deal
5  with it once he got one."
6          What did you mean by that?
7      A.  That turbine technology is very complicated,
8  and so putting -- changing the combustion chamber of
9  a -- a turbine engine is -- would be incredibly
10 difficult to do, so I basically could not conceive of
11 how you could do this.
12     Q.  Okay.
13         Now, you -- you state -- you follow up with
14 that stating, "I will investigate further...," and get
15 back to him within the next week.
16         What did you tell Dr. Rossi when you got
17 back to him?
18     A.  Well, if my memory serves me correctly, and
19 you probably have some exact answer, but if my memory
20 serves me correctly, I, you know, told him that this
21 would be difficult.
22     Q.  Okay.
23         Did you wind up doing any type of testing or
24 did Dr. Rossi propose any other type of testing of his
25 device with The Boeing Company?

22  (Pages 85 to 88)

AA

## Page 89

1    MR. KOH:  I'm going to object to the form.
2  You're excluding the testing that's been
3  discussed?
4    MR. ANNESSER:  I'm sorry?
5    MR. KOH:  Are you excluding the testing that
6  was already discussed this morning?
7    MR. ANNESSER:  Well, what -- and
8  specifically, sir, I'm asking whether he discussed any
9  other testing with Dr. Rossi --
10    MR. KOH:  Got it.
11    MR. ANNESSER:  -- of Dr. Rossi's devices.
12    A.  So I -- I guess I'm -- I'm still lost.
13  So -- so I have discussed -- we discussed with
14  Dr. Rossi his -- the publicly-available testing
15  information.  And the -- with reference to the -- this
16  turbine engine idea, we never tested anything there.
17  And we also never tested any devices -- any of Rossi's
18  devices other than the one we discussed here, the
19  Super Q-Cat.
20    Q.  (By Mr. Annesser)  Okay.
21    A.  So I --
22    Q.  But that wasn't -- that wasn't tested with
23  Dr. Rossi's knowledge, correct?
24    MR. KOH:  Objection; calls for speculation.
25    Q.  (By Mr. Annesser)  Okay.

## Page 90

1    Sir, you -- you didn't make Dr. Rossi aware
2  of the test of the Super Q-Cat, did you?
3    A.  True.  I did not make him aware of the test
4  of the Super Q-Cat.
5    Q.  Are you aware -- are you aware of anyone who
6  did make Dr. Rossi aware of that test?
7    A.  Not specifically, no.
8    Q.  Okay.
9    Now, you said you discussed with Dr. Rossi
10  the public test information.  Do you recall
11  specifically what you discussed?
12    A.  So we would have discussed, you know, there
13  was a number of -- of tests over the years, starting
14  with testing in Italy and -- et cetera.  So I -- you
15  know, I guess I don't have a specific laundry list for
16  you, but there's probably at least three or four
17  publicly-available reports.
18    Q.  Okay.
19    Now, when -- when you first be -- came into
20  contact with Industrial Heat and you began -- you
21  began discussing the E-Cat technology, what did you
22  understand the original assignment to be?
23    A.  To test very specifically a -- the Super
24  Q-Cat to find out if -- you know, if it were -- was
25  generating excess heat, and if so, how much.

## Page 91

1    Q.  And that was the -- the scope of the test,
2  the -- that was it?  Or was there something additional
3  that you were asked to do?
4    MR. BELL:  Objection to form.
5    A.  That was the scope of the test.  No -- no --
6  nothing else.
7    Q.  (By Mr. Annesser)  Now, I think you had
8  testified before that there was a test that was
9  performed on or around November 20th, 2014?
10  Actually -- and let me just clarify.  I believe you
11  testified that there was a test of a dummy E-Cat on
12  November 19th and the test of the Super Q-Cat on
13  November 20th; is that correct?
14    A.  That's correct.
15    Q.  Okay.
16    Other than November 20th, did Boeing Company
17  ever test a fueled reactor, a fueled E-Cat reactor?
18    A.  No.
19    Q.  So that was the sole and only test.
20    A.  Correct.
21    Q.  Okay.
22    Now, the Super Q-Cat that was tested, do you
23  know who constructed it?
24    A.  Well, that would require some speculation on
25  my part, but I was told that it was constructed by

## Page 92

1  Industrial Heat with the cooperation of Andrea Rossi.
2    Q.  So you believe Dr. Rossi assisted them in
3  constructing that device?
4    A.  That was my understanding, yes.
5    Q.  Now, to -- to carry out this test on
6  November 19th and 20th -- again, the test of the dummy
7  reactor and the test of the Super Q-Cat -- I believe
8  you testified that you had constructed the dummy
9  reactor yourself.
10    A.  That's true.
11    Q.  Is that correct?
12    A.  That's true.
13    Yes, that's --
14    Q.  How --
15    A.  -- correct.
16    Q.  -- did you know how to build the dummy
17  reactor?
18    A.  So Industrial Heat gave us instructions on
19  building a dummy reactor.
20    Q.  In -- in what form, sir?
21    A.  Written instructions and verbal
22  conversations.
23    Q.  Okay.
24    The written instructions, do you know who
25  prepared those?

23  (Pages 89 to 92)

Page 93

1    A.   I'm speculating here, but my -- most of my
2  conversations about, you know, details of construction
3  were with T. Barker Dameron, so I'm going to say the
4  preponderance of the information would have come from
5  T. Barker Dameron.
6    Q.   Okay.
7         So those weren't provided by Dr. Rossi
8  himself.
9    A.   That's true.
10   Q.   Did -- were you ever provided a copy of
11 Dr. Rossi's patent or any of his patent applications?
12   A.   I'm -- I may have seen them over the course
13 of a number of years in this, but I -- I don't
14 require -- recall being provided a copy, no.
15   Q.   What -- what are these -- the -- the E-Cats
16 that were constructed by Boeing, what are they
17 constructed out of, what material?
18   A.   So I guess I wouldn't call them E-Cats.  I
19 would call them a dummy reactor.
20   Q.   Okay.
21   A.   And their construction is an alumina tube, a
22 hollow alumina tube wrapped in -- with a resistance
23 heating wire and then that entire assembly cast in
24 ceramic shell.
25   Q.   Now, how confident are you that the

Page 94

1  construction of the reactor, the dummy reactor that
2  was done by Boeing, how confident are you that it was
3  identical to the Q-Cat reactor?  Or Super Q-Cat.
4  Sorry.
5    A.   Well, I -- since we did not disassemble the
6  Super Q-Cat, I cannot know exactly its construction,
7  but we followed Industrial Heat's instructions on
8  creating our dummy heater pretty accurately, and so
9  that was done, you know, with quite a lot of care.
10        And in terms of what we could see, so you
11 can visually see that the core of the Super Q-Cat is
12 also an alumina -- hollow alumina tube, so that is
13 easily verified even without disassembling it.
14        And very clearly resistance wires are
15 leading into the shell outside of the alumina tube, so
16 that's relatively easily verified.  The exact details
17 of the resistance wires may be somewhat different on
18 the inside.
19        And then the fact that there was an outer
20 ceramic shell is also easily verified.
21        So I would say is -- are they -- was our
22 dummy identical, it's impossible to know, but it is
23 substantially similar certainly.
24   Q.   Do you know or would you have any way of
25 knowing whether when the reactor that was provided to

Page 95

1  you, the Super Q-Cat, when it was constructed, whether
2  they followed the same construction procedures that
3  they provided to The Boeing Company.
4    A.   As far as I know, we were following the same
5  construction procedures as they had used to create the
6  original Super Q-Cat.
7    Q.   Now, were you present when they created the
8  original Super Q-Cat?
9    A.   No, I was not.
10   Q.   Okay.
11        So you don't know whether Industrial Heat
12 followed those procedures --
13   A.   That's --
14   Q.   -- correct?
15   A.   That's true.  I was -- I was told that they
16 did, but that doesn't make that true.
17   Q.   Okay.
18        Did Industrial Heat ever provide you any of
19 their internal test data from their testing?
20   A.   Not in any sort of written form, no, I
21 don't -- I don't believe so.
22   Q.   I -- I'm sorry.  I didn't hear your answer.
23 Not in what?
24   A.   Not in any sort of written form, no, I -- I
25 don't believe they did, no.

Page 96

1    Q.   Okay.
2         Did they ever tell you that they achieved a
3  positive COP?  And -- and before I ask that -- I'm
4  sorry --
5         MR. ANNESSER:  I'll strike that question.
6    Q.   (By Mr. Annesser) -- do you know what a COP
7  is?
8    A.   I do.  Coefficient of performance.  I'm
9  assuming that's what you mean.
10   Q.   Yes.
11        And -- and what is a coefficient of
12 performance?
13   A.   So a COP, or coefficient of performance, of
14 one would mean that the energy out of the object
15 equaled the energy into the object.  A COP of two
16 would mean that the energy coming out of the object
17 was twice as much as the incoming energy.
18   Q.   Okay.
19        Is that -- is that appropriate terminology
20 for the type of testing that you were doing, COP?
21   A.   Yes.
22   Q.   Okay.
23        Now, did -- did Industrial Heat ever tell
24 you or inform you in any manner that they had achieved
25 a positive COP or at least that they believed that

H, R

24  (Pages 93 to 96)

Page 97

1  they had?
2       A.  So, actually, I don't believe that they ever
3  did, no.  I think that they in our conversations
4  always prefaced any discussion of COP as being that
5  certain test data may indicate a -- various COPs, but
6  they themselves did not know whether the devices
7  worked or did not work.
8       Q.  Okay.
9           So let me ask it this way.  Did they ever
10 tell you that they had data that indicated that there
11 may be a positive COP?
12      A.  Well, I guess I would have to say I don't
13 think they did.  I mean, when topics of that would
14 come up they would pretty generally point to other
15 independent test data; you know, the existing
16 published test data.
17          And when we would ask them, well, you know,
18 have you guys validated the independent test data
19 and -- and do you have your own data effectively that
20 says that there is a positive COP, and I -- I -- if
21 I -- my memory is correct, they always said no, they
22 had no independent data of their own.
23      Q.  Okay.
24          Now, sir, among the -- the information that
25 was provided to Boeing, was Boeing provided a copy of

Page 98

1  the license agreement between Dr. Rossi and Industrial
2  Heat?
3       A.  You know, I don't know.  Conceivably.  You
4  know, contractual obligations is not my area.
5       Q.  Okay.
6           So you don't know if you saw one or not?
7       A.  Correct.
8       Q.  Okay.
9           Now -- and -- and remind me, sir, when did
10 you first begin talking with Industrial Heat regarding
11 doing any type of testing?
12      A.  You know, I don't recall an exact date, but
13 probably something in the neighborhood of at least six
14 months prior to these tests.
15      Q.  Okay.
16          Now, when -- when you were preparing to do
17 these tests did you develop a test plan or test
18 protocol?
19      A.  We did.
20      Q.  And did you share that test plan or test
21 protocol with Industrial Heat?
22      A.  We did.
23      Q.  Okay.
24          MR. ANNESSER:  Madam Court Reporter, if we
25 can mark as next numbered exhibit -- I believe it's 8,

Page 99

1  if I'm not mistaken -- a document in folder 16, but
2  first please hand it to Mr. Bell so that he can review
3  it.
4           THE REPORTER:  Stand by.
5               (Marked Deposition Exhibit No. 8.)
6           MR. BELL:  Thank you.
7           John, have these documents been provided to
8  Industrial Heat?
9           MR. ANNESSER:  I believe they have.  They've
10 got the Bates stamp number BOE 000341.
11          MR. BELL:  Right, which indicates that they
12 were produced by Boeing I think, my interpretation of
13 that.
14          MR. ANNESSER:  I -- I can verify -- I
15 believe they -- they have been, but I can check into
16 that.  I don't have that in front of me at the moment.
17          MR. BELL:  Okay.
18          MR. KOH:  Okay.  The witness has Exhibit 8.
19          MR. ANNESSER:  Okay.
20      Q.  (By Mr. Annesser)  Sir, looking at this
21 email, it appears it was an email sent to you on
22 November 22nd, 2013, by J.T. Vaughn?  Do you recall
23 receiving this email?
24      A.  You know, I don't recall this specific email
25 but, you know, we would have discussions with the

Page 100

1  Industrial Heat people about, you know, both the
2  publicly-available testing as well as our own testing,
3  so that's not -- doesn't strike me as odd.
4       Q.  Okay.
5           My -- my question's going to be a general
6  one.  Have you read this email that you have in front
7  of you now?
8       A.  Yep.  It's a very short email fortunately,
9  so yes.  No -- no problem.
10          What -- what -- what are you -- is your --
11      Q.  Okay.
12      A.  -- question?
13      Q.  The -- the second paragraph, it states,
14 "If your experts want to provide any further input/
15 critiques and the camera settings, set-up,
16 measurements data collection or COP calculations,
17 based on the test performed by the Swedish and Italian
18 committee, I welcome their input or observations via
19 email."
20          Had Boeing provided any input or critiques
21 as to the testing protocol used in the test performed
22 by the Swedish or Italian committee?
23      A.  You know, I don't know that we did anything
24 sort of formal there.  We may have mentioned in
25 discussions with Industrial Heat what we considered to



Page 101

1  be, you know, issues, but I don't know that we
2  provided, as I say, some kind of formal document.  I
3  mean -- so yeah.  I -- I'm --
4      Q.  Well, is --
5      A.  That's about all I've got on --
6      Q.  Okay.
7      A.  -- that one.
8      Q.  Is this --
9          I'm sorry.
10         Is --
11     A.  Yeah.
12     Q.  -- this email indicative of the types of
13  conversations that you had with Industrial Heat?
14         MR. BELL:  Objection to form.
15         MR. KOH:  Same.
16     A.  Well, I guess I would say we discussed in
17  general -- again, just like I already said -- both the
18  existing data from the open source testing as well as
19  our own planned test, so -- so -- I mean, that -- that
20  can be pretty broad actually.
21     Q.  (By Mr. Annesser)  Okay.
22         Okay.  But specifically, sir, did Boeing
23  discuss with Industrial Heat the propriety of camera
24  settings, COP, data collection, et cetera, being used
25  to test the E-Cat device?

Page 102

1          MR. BELL:  Objection to form.
2      A.  So, quite honestly, the -- relative to our
3  own testing, so -- so in -- in our own case the
4  emissivity setting the camera is effectively
5  irrelevant, so I don't know that we had a, you know,
6  particular, you know -- so did we have concerns about
7  the emissivity settings on the Lugano cameras, no.
8  Did we have concerns about their reliance on only
9  infrared data, and the answer is yes.
10     Q.  (By Mr. Annesser)  Okay.
11         MR. ANNESSER:  Okay.  Madam Court Reporter,
12  if I can please ask you to mark as Exhibit 9 the
13  document in folder 53.
14         (Marked Deposition Exhibit No. 9.)
15         MR. KOH:  The witness has Exhibit 9 in front
16  of him.
17         It's a long document, so take a moment to
18  look at it.
19         MR. ANNESSER:  Yes.
20     Q.  (By Mr. Annesser)  Sir, just tell me when
21  you've had a chance to look at it and are ready.  And
22  just so you know, my questions about this will be
23  very -- very broad, not directed to any particular
24  portion I believe.
25     A.  Okay.  Yep, I -- I -- sure.  Fairly generic.

**R, H, IMP (INCLUDING EXHIBIT 9)**

Page 103

1  So great.  Go -- go for it.
2      Q.  Okay.
3          Sir, do you know who prepared this document?   **R, IMP**
4      A.  I do not.
5      Q.  Okay.
6          Do you know if that was prepared by Boeing   **R, IMP**
7  or Industrial Heat?
8      A.  It was not prepared by Boeing I don't
9  believe, so -- I mean, this looks like it's a test
10  plan for the Lugano test.  So I'm going to say -- it
11  was definitely not prepared by Boeing, so I -- I
12  don't -- have no idea who prepared this.  It wasn't
13  me.
14     Q.  Okay.
15         MR. ANNESSER:  Madam -- Madam Court          **R, IMP; AS TO EXHIBIT H, R, IMP**
16  Reporter, can I ask you to please label as Exhibit 10
17  and hand the witness the document in folder 52.
18         (Marked Deposition Exhibit No. 10.)
19         MR. KOH:  The witness has Exhibit 10 in
20  front of him.
21         MR. ANNESSER:  Okay.
22         For the record, Exhibit 10 is a document
23  Bates stamped number IH-00093731.
24     Q.  (By Mr. Annesser)  Sir -- and I'm going to
25  ask you to take a moment to read this document, and

Page 104

1  let me know when you're ready.                         **R, IMP**
2      A.  Okay.
3          So it looks like it's the email forwarding
4  me the -- either this document or some similar
5  document.
6      Q.  Sir, the document that I'm looking at with
7  Bates number 00093731 appears to be an email from
8  yourself to J.T. Vaughn --
9      A.  Oh, okay.
10     Q.  -- in which it says, "JT, Attached you will
11  find the preliminary test outline that I put together
12  for your upcoming test.  I hope it proves useful."
13     A.  Okay.  And which is --
14     Q.  I'm looking at Exhibit --
15     A.  Which is --
16     Q.  Sorry.
17     A.  Well -- okay.  So -- so --
18         MR. KOH:  Just wait for a question.
19         THE WITNESS:  Okay.
20     A.  Shoot.  Fire away.
21     Q.  (By Mr. Annesser)  Okay.
22         Looking at Exhibit 9, which bears the Bates   **R, IMP**
23  stamp number IH-00093732, which I will represent to
24  you is the attachment that was attached to this email,
25  does this refresh your recollection as to who prepared

26 (Pages 101 to 104)

Page 105

1  the test plan?
2        MR. KOH:  And let me just say, obviously,
3  Mr. Childress, he's making a representation to you.
4  We don't know whether it's, in fact, the attachment to
5  that email or not.
6        A.  So I have no idea.
7        So this look to me like it's a test plan for
8  the Lugano test, which I did not participate in.
9        Q.  (By Mr. Bell)  Where -- where -- where, sir,
10  do you see Lugano?
11        A.  I'm -- I'm sorry?  Repeat the question?
12        Q.  Okay.
13        Sir, the -- the title of the email,
14  Exhibit 10, is "Preliminary test outline."
15        A.  Okay.
16        Q.  Okay?
17        A.  Right.
18        Q.  And it's got -- it's got an attachment to
19  this email, and this email was sent December 5th,
20  2013, from you to Mr. Vaughn.
21        A.  Okay.  Actually, you know what?  Now -- now
22  that I -- now that I see that train, I see exactly
23  what this is.
24        So this was a test plan that J.T. would have
25  sent me and then I commented on.  So actually -- so I

**R, IMP**

Page 106

1  didn't generate this test plan.  I commented on it.
2  So actually, if you see -- so let's look at page
3  three.
4        So my guess is that if we had the original
5  of this document, that in Section 3.0, "Test
6  Instrumentation," that the three bullets underneath
7  the -- the, "3.0," those would have been my feedback,
8  my suggestions.  Suggestion:  Microwave counter meter.
9  You know, suggestion:  Handheld gamma.  Suggestion:
10  Wide angle overview digital camera.
11        So these are --
12        Q.  Well, sir, you --
13        A.  -- these are simply --
14        Q.  In Exhibit --
15        A.  -- my suggestions.
16        Q.  Okay.
17        In -- in Exhibit 10 -- and -- and I
18  apologize.  I -- I don't mean to counter you on this
19  point, but I do stand a little confused.  On
20  Exhibit 10 you state, "My intention is for this to
21  simply be a starting point so you have a format,
22  et cetera.  I want this to be your test plan, not
23  mine, so please change it however you wish, so it
24  represents what you will really do."
25        That, sir, doesn't sound to me like a test

**R, IMP**

Page 107

1  plan that you were simply commenting on.
2        MR. KOH:  Let me just object; argumentative
3  and also incomplete.  The very next line says, "The
4  various suggestions (in red) are mine."  And I'll just
5  note for the record that Exhibit 11 -- or -- sorry --
6  9 was produced in black and white, so we don't -- we
7  don't actually see what may or not have been in red.
8  And, again, we're also relying --
9        MR. ANNESSER:  That's how --
10        MR. KOH:  We're also relying on the --
11        MR. ANNESSER:  That's how we received it.
12        MR. KOH:  Understood.
13        We're also relying on the -- on the
14  representation that, in fact, Exhibit 9 was the
15  attachment to Exhibit 10.
16        A.  So --
17        MR. ANNESSER:  All right.
18        A.  So I guess --
19        Q.  (By Mr. Annesser)  Sir, here is --
20        MR. KOH:  Just wait.
21        MR. ANNESSER:  Sorry?
22        MR. KOH:  Just wait.
23        Go ahead, John.
24        Q.  (By Mr. Annesser)  Sir, irrespective of who
25  prepared this test outline that you have -- your

**R, IMP**

Page 108

1  testimony is that you provided comment on and assisted
2  with, is it fair to state that you sent this test
3  outline with comments to J.T. Vaughn on or about
4  December 5th, 2013?
5        A.  So based on this email, I would say the
6  answer to that is -- is yes.  And that sounds
7  consistent with what, you know, we helped him with.
8        Q.  Okay.
9        Well -- so what -- what was the purpose of
10  sending him whether it be this draft of the outline
11  or -- or your comments on this outline?
12        A.  Well, to help them conduct a test that, you
13  know, was meaningful.
14        Q.  Okay.
15        To give them parameters for a meaningful
16  test.
17        A.  Correct.
18        Q.  Okay.
19        Do you know if they ever employed this test
20  outline that had been either proposed or at least
21  amended by you?
22        A.  So this looks like it, you know, was based
23  upon the Lugano testing, and I honestly don't know
24  what other details they may or may not have tested.
25  So if it wasn't publicly available, then I am not

27 (Pages 105 to 108)

**Veritext Florida Reporting Co.**

Page 109

1  aware of it.
2      Q.  Okay.
3          Now, kind of moving on ahead here, sir, how
4  many tests total were conducted by Boeing on the E-Cat
5  technology?
6      A.  Are you talking about actually fueled test
7  articles?
8      Q.  Well, no.  I'm asking in -- in total, fueled
9  or unfueled.
10     A.  So -- let's summarize them.  So we tested a
11 dummy unit.  Then the following day we tested a -- the
12 Super Q-Cat.  And then --
13     Q.  Okay.
14         And just for the record, sir, that -- that
15 was November 19th and November 20th?
16     A.  Correct.
17     Q.  Okay.  Sorry about that.
18     A.  And then some weeks later, so according to
19 these documents, on December 17th of 2014, we then
20 also tested the -- two additional dummy reactors, one
21 of which would have been sent to Industrial Heat for
22 them eventually to fuel, but we never -- so that would
23 have been the last test.
24         So effectively, so including dummy reactors,
25 we tested -- we had a test on the 19th.  That's the

Page 110

1  dummy reactor.  We had a test on the 20th.  That was
2  the Super Q-Cat.  Then we had a test on December 17th,
3  which would have been the Q-1/Q-2, also dummy
4  reactors.
5          And that would have been the end of it.  No
6  further testing.  At least not that --
7      Q.  Okay.
8      A.  -- I recall in any case.
9      Q.  I'm sorry.
10         So the -- the only fueled test, just to --
11 to recap again, was the Super Q-Cat tested on the
12 20th, correct?
13     A.  Correct.
14     Q.  Okay.
15         And -- and so would you have expected to see
16 a -- see excess heat out of any of the dummy reactors?
17     A.  No.
18     Q.  Okay.
19         You -- the only one that you expected could
20 produce excess heat potentially was the Super Q-Cat.
21     A.  Correct.
22     Q.  Okay.
23         Did you ever make a determination as to why
24 the Super Q-Cat did not -- well, why the testing did
25 not result in the production of excess heat?

**AA**

Page 111

1      A.  No.
2      Q.  Did anyone ever offer you an explanation, to
3  your recollection?
4      A.  No.
5      Q.  Okay.
6          I'm -- I'm going to ask you to pick up
7  Exhibit 2, which was marked by Mr. Bell, which is the
8  email sent from you to Mr. Darden, Mr. Vaughn, and
9  Mr. Dameron.
10     A.  Okay.
11     Q.  Got it?
12     A.  I do.
13     Q.  Okay.
14         This email was sent by you on November 20th,
15 2014, to Tom Darden and J.T. Vaughn and T. Barker
16 Dameron?
17     A.  Correct.
18     Q.  And that was advising them that there had
19 been no excess heat in the Super Q-Cat test?
20     A.  Correct.
21         MR. ANNESSER:  Madam Court Reporter, I'm
22 going to ask you to mark as Exhibit 11 the document in
23 folder number 56.  Please provide it to Mr. Bell first
24 so that he may review it.
25         (Marked Deposition Exhibit No. 11.)

Page 112

1          THE WITNESS:  Thank you.
2          MR. KOH:  The witness has Exhibit 11.
3          MR. ANNESSER:  Thank you.
4      Q.  (By Mr. Annesser)  Sir, tell me when you've
5  had a moment to read it.
6      A.  Okay.  I have read it.
7      Q.  Okay.
8          Does this refresh your recollection as to
9  any explanation that had been provided as to why the
10 E-Cat may not have worked?
11     A.  Yes.  It is indicating that they may have
12 had a slight difference in the fuel.
13     Q.  In fact, I believe in this email dated
14 November 21st, 2014, from Mr. Darden to yourself,
15 Mr. Vaughn, and Mr. Dameron, Mr. Darden states, "I was
16 hopeful, but also worried due to the change I made to
17 the fuel based on the material supply issue."
18         Was it your understanding, sir, that the
19 fuel was not the same as Dr. Rossi's fuel, based on
20 that comment?
21     A.  So I -- yeah.  So apparently, based on that
22 comment, I would say that, yes, that is not
23 necessarily exactly the same.  So yeah.  I -- I --
24 take the face -- comment at face value.
25     Q.  Okay.

28  (Pages 109 to 112)

Page 113

1        Now, did Industrial Heat ever make
2    arrangements to send back another unit properly
3    fueled?
4        MR. BELL:  Objection to form.
5    A.   They never sent us another unit, no.
6    Q.  (By Mr. Annesser)  Okay.
7        And let me ask that in a different way just
8    based on the objection.
9        Did Industrial Heat ever offer to either
10   send fuel that had not been changed by Mr. Darden for
11   the E-Cat?
12       MR. BELL:  Objection to --
13   A.   No.
14       MR. BELL:  -- form.
15       MR. ANNESSER:  Sir, I'm hoping that a
16   document has been delivered to the court reporter that
17   was sent over this afternoon.
18       Madam Court Reporter, did you receive an
19   additional document?
20       THE REPORTER:  Yes.
21       MR. ANNESSER:  Okay.
22       If we can please label that as Exhibit
23   No. 12.
24       MR. BELL:  Steve, may I look at 11?  Thank
25   you.

Page 114

1        (Marked Deposition Exhibit No. 12.)
2    MR. KOH:  Looks like there's an extra one.
3    The witness has Exhibit 12.
4        MR. ANNESSER:  Okay.  For the record, this
5    exhibit is IH-00105542.
6    Q.  (By Mr. Bell)  Sir, if you can take a look at
7    this email and tell me once you've had a moment to
8    read it.
9    A.   Yep.  Got it.
10   Q.   Okay.
11       Do you recognize this email dated
12   November 21st, 2014, at 11:04 a.m. from yourself to
13   Mr. Darden, Mr. Vaughn, and Mr. Dameron?
14   A.   Yeah.  I -- I mean, I -- I don't recall it
15   specifically, but it clearly is an email from myself,
16   yes.
17   Q.   Okay.
18       And in that email you state, "Tom, We need
19   to close the loop on this quickly.  The funding for
20   this effort expires on Monday December 15th.  Which
21   means we need to show a positive result by Friday
22   December 12th at the very latest.  Which is exactly 3
23   weeks from today.
24       What we need to make that happen is a unit
25   that meets the following criteria:

Page 115

1        1) The unit has" been -- "has the correct
2    fuel in it.
3        2) A preliminary test is conducted on the
4    unit at your shop, confirming that it works.
5        3) Ceramic or steel unit is unimportant.
6        What is the earliest date that we could get
7    a unit that ...meets that criteria?  Sooner is better.
8        Let me know what we can do to help you move
9    quickly."
10       Did you send that email, sir?
11   A.   Apparently I did.
12   Q.   Okay.
13       Was funding expiring on Monday, December 15?
14   A.   Yes.  That would be --
15   Q.   Did fund --
16   A.   -- essentially Boeing's internal funding
17   that would allow us to conduct these tests.
18   Q.   Okay.
19       And notwithstanding your email, did
20   Mr. Darden, Mr. Vaughn, or Mr. Dameron ever send you a
21   unit that met those three criteria?
22   A.   They did not.
23   Q.   Do you know why?
24   A.   I -- I -- I don't know.
25   Q.   Okay.

Page 116

1        Once funding runs out, does that mean you
2    can no longer work on the project?
3    A.   Well, it means that there's no explicit
4    budget to work on the project, so that doesn't prevent
5    me from let's say doing emailing or things on my own
6    time, but there effectively is no money to purchase
7    anything, no money to get any help from some
8    additional person.  So effectively in my job I'm
9    allowed to do things in my own time, et cetera, as
10   long as I don't incur some additional expense.
11       So in this particular case, conducting a --
12   you know, these tests take many hours and utilize
13   Boeing equipment, so I would have needed Boeing
14   funding to conduct another test but not necessarily
15   just to have conversations with them or do, you know,
16   some other small activity.
17   Q.   Would you agree, sir, that it would have
18   been prudent to contact Dr. Rossi regarding the E-Cat
19   technology to make a best effort to replicate the
20   positive results that others had seen?
21       MR. KOH:  I'm going to object to the form.
22   It's also outside the scope of the deposition topic.
23       MR. ANNESSER:  Okay.  Let me -- let me
24   strike that question.  I can ask it a different way.
25   Q.  (By Mr. Annesser)  Would it have been of

29  (Pages 113 to 116)

Page 117

1  assistance to you to be able to speak with Dr. Rossi
2  before performing your tests on the E-Cat technology?
3      A.  You know, I honestly don't know what the
4  answer to that is.  I mean, in this particular case we
5  were conducting a validation test for Industrial Heat,
6  and as part of that it needed to be a third-party
7  activity.  So involvement with the -- you know, Rossi
8  may or may not have been helpful.  So I -- I -- I
9  honestly don't know the answer to that.
10     Q.  Well, you -- I -- I understand you
11 represented that it was a third-party activity, but
12 you certainly had contact with Industrial Heat; did
13 you not?
14     MR. BELL:  Objection to form.
15     A.  Yes, but we were conducting the test for
16 Industrial Heat.
17     Q.  (By Mr. Annesser)  Did you continue working
18 with Industrial Heat after December 15th, 2014?
19     A.  Yes; I mean, in a very limited way.  So,
20 again, since budget would have ended in -- on
21 December 15th, my ability to do things with them would
22 have been quite limited, but that -- so as -- part of
23 my job is to explore technologies, so I am allowed to,
24 again, do things as long as it doesn't require
25 substantial large blocks of time and/or expensive

Page 118

1  Boeing equipment.
2      Q.  Okay.
3      Did you -- did you build any additional
4  E-Cat reactors for Industrial Heat?
5      A.  I -- I did.
6      Q.  Did that use Boeing funds?
7      A.  Actually, no.  Well, I mean, it -- it used
8  Boeing funds in the respect that the materials had
9  already been purchased before December 15th, but other
10 than that, no, it did not.
11     Q.  Well, how do you construct one of these
12 reactors?  How do you build them?
13     A.  So you take one of the alumina tubes, wrap
14 resistance wire around the alumina tube, and then cast
15 it in the ceramic shell.
16     Q.  Do you know if any of the reactors that you
17 constructed after December 15th, 2014, were ever
18 tested by Industrial Heat?
19     A.  If there were, I was not in -- I was not
20 informed of it.  At least not that I recall.
21     Q.  Well, you sent them these reactors that you
22 built for them, correct?
23     A.  That's true.
24     Q.  Sir, were you ever told of a test being
25 performed by Dr. Rossi called the guaranteed

Page 119

1  performance test?
2      MR. BELL:  Objection to form.
3      A.  So I'm not familiar with that name, but I
4  was aware that Dr. Rossi was building a large test
5  unit somewhere in Florida.
6      Q.  (By Mr. Annesser)  What were you told about
7  that large unit?
8      MR. BELL:  Objection to form.
9      A.  Actually, very little other than what --
10 what was, you know, sort of in the public sphere.
11     Q.  (By Mr. Annesser)  Okay.
12     MR. ANNESSER:  Before we get there I'd like
13 to mark as Exhibit No. -- I believe we're up to 13 --
14 the document contained in folder 60.  That's 6-0.
15     (Marked Deposition Exhibit No. 13.)
16     MR. KOH:  Thank you.
17     The witness has Exhibit 13.
18     A.  Okay.
19     Q.  (By Mr. Annesser)  Sir, this document bears
20 the Bates number IH-00138640.  It purports to be an
21 email dated July 15th, 2015, from T. Barker Dameron to
22 yourself.
23     Do you recall receiving this email, sir?
24     A.  You know, I don't recall this very specific
25 one, but T. Barker and I had running conversation on

Page 120

1  their own attempts to come up with a test apparatus,
2  and I was helping them with that, so I'm assuming this
3  involves that.
4      Q.  Okay.
5      Do you have any reason to believe you did
6  not receive this email?
7      A.  No.  I -- this is -- undoubtedly I received
8  it.
9      Q.  Okay.
10     Looking at the last paragraph in this email
11 it says, "There was an interesting temperature swing
12 around noon on the second day.  There was a floor fan
13 turned on at the other end of the test space for
14 several minutes.  The fan was about 50 feet away.
15     I will be glad to discuss."
16     Did you ever discuss that with Mr. Dameron?
17     A.  I honestly can't say for sure.  I mean,
18 T. Barker and I would discuss things periodically, so
19 quite possibly.
20     Q.  Now, this -- this email is approximately
21 seven months after Boeing's funding ran out.  Yet you
22 seem to continue to have an interest in this
23 technology.
24     A.  True.
25     Q.  Is that fair to state?

**Veritext Florida Reporting Co.**

Page 121

1    A.   Yes.  That -- that's true.
2    Q.   Do you continue to have an interest in this
3  technology?
4    A.   I do.
5    Q.   Do you have an opinion one way or another
6  whether Dr. Rossi's E-Cat technology works or not?
7        MR. KOH:  I'm going to --
8        MR. BELL:  Objection to form.
9        MR. KOH:  Same objection.
10   A.   Do I have an opinion.  Yes.  Of course,
11  everyone has opinions about everything.
12   Q.   (By Mr. Annesser)  Okay.
13       And what is your opinion, sir?
14       MR. KOH:  I give the same objection.  The
15  deposition topic is limited to tests performed by
16  Boeing.
17       Obviously, Mr. Childress, if you drew some
18  conclusions based on that testing, you are welcome to
19  share them with John, but you're not here offering,
20  you know, expert opinion or anything like that.
21       MR. BELL:  Objection to form.
22   Q.   (By Mr. Annesser)  Well, let me -- let me
23  rephrase.
24       Based on the testing done by Boeing, would
25  you consider that testing conclusive evidence that the

Page 122

1  E-Cat technology does not work?
2    A.   I would consider it conclusive testing --
3  conclusive evidence that the unit we tested does not
4  work.
5    Q.   So it would not be conclusive as to the
6  underlying technology; just simply as to that unit,
7  correct?
8    A.   Correct.  The unit we tested clearly did not
9  work.
10       MR. ANNESSER:  Okay.  Just one moment here.
11       Okay.  Madam Court Reporter, if you can
12  label as the next numbered exhibit, Exhibit No. 14 I
13  believe, the document in folder 42.
14       Excuse me.
15       (Marked Deposition Exhibit No. 14.)
16       MR. BELL:  I'm passing the document to
17  Mr. Koh, noting for the record that this is stamped
18  BOE 001557 and noting for the record that, John, your
19  office represented to us that you had not received
20  documents from Boeing, and obviously that is not true
21  as of the moment, and that you were obligated to share
22  those with us certainly before this deposition.  So
23  reserve the right to object to the admission of any of
24  this testimony with respect to documents that we were
25  not provided with.

Page 123

1        MR. ANNESSER:  Okay.  Mr. -- Mr. Bell, quite
2  frankly, the first time I've seen these documents was
3  this morning when I came in from Ohio, so I will
4  certainly track down when we received them and whether
5  they've been provided to you, and we can discuss those
6  later, but your objection is noted.
7        MR. KOH:  The witness has Exhibit 14.
8        For the record, John, the -- the exhibit
9  that's marked has highlighting on it, which I assume
10  is not part of the original document.
11       MR. ANNESSER:  No.  And why there would be
12  highlighting on it I can't tell you either.  There
13  should not have been, but please disregard the
14  highlighting.
15       THE WITNESS:  Okay.
16       MR. ANNESSER:  Actually, I'm look -- I'm
17  looking at my copy.  The copy that you have is a
18  single page or double page?
19       MR. KOH:  You know, it's -- it's double and
20  it's not consecutive.  The second page is --
21       MR. ANNESSER:  I'm seeing that -- yeah.
22  That's why I asked.  I'm seeing that on mine as well.
23       Please, if you would, just detach the second
24  page.  It is -- somehow the second document that got
25  attached thereto.

Page 124

1        MR. KOH:  Okay.  So --
2        MR. ANNESSER:  Exhibit 14 should be a
3  single-page document.
4        MR. KOH:  Yeah.  The witness has Exhibit 14,
5  which is a single page BOE 1557.
6        THE WITNESS:  Okay.
7        MR. ANNESSER:  And I apologize for that.
8  Thank you.
9    Q.   (By Mr. Annesser)  Sir, this document,
10  BOE 1557, which we've marked as Exhibit 14, appears to
11  be an email from you dated December 10th, 2014, to
12  Leonard Quadracci, Brian Tillotson --
13   A.   Tillotson.
14   Q.   -- I believe?
15   A.   Yep.
16   Q.   Is that -- Tillotson.
17   A.   Yeah.
18   Q.   Okay.
19       And -- and you appear to be describing the
20  one megawatt unit that was being sent to Florida or
21  that had been sent to Florida.
22   A.   Okay.
23   Q.   Does that refresh your recollection as to
24  what knowledge you had regarding the unit?
25   A.   Yep.

(Including
Exhibit 14)
R, IMP

31 (Pages 121 to 124)

Page 125

1    Q.  Okay.
2        Can you tell me any further what you were
3    told about why it was sent to Florida, what was going
4    on there?
5    A.  So I knew -- and, again, I think probably
6    most of this basic information was -- you know, I --
7    you know, just sort of general background information.
8    So -- let's see.  So I would say what I knew about the
9    system was its purpose was to have a -- some sort of
10   test.
11       So this was effectively the -- the -- the
12   test that Rossi was to conduct in order to validate
13   his technology and -- so it's a one megawatt system.
14   And so, according to this, it was about 107 reactors
15   and then, you know, whatever -- whatever information
16   is, that's -- my -- my guess is that's -- literally
17   everything you see there is everything I knew.
18   Q.  Okay.
19       Do you recall, sir, were you ever sent a
20   copy of the test plan for that test?
21   A.  Plausibly.  I -- yeah.  I -- conceivable.
22   I -- I honestly don't know.  You -- you tell me.  You
23   seem to know my email better than I do.
24   Q.  Well, that -- that's my job.
25       Sir, do you -- do you recall if you ever

Page 126

1    provided any comments on the test plan for the testing
2    of that one megawatt unit?
3    A.  Again, possibly.  You know, I know that, you
4    know, we would have sort of general discussions about
5    it but, I mean, nothing, you know -- I was never
6    involved in any of the testing, so I -- I don't know
7    the exact details.
8    Q.  Okay.
9        Well, let me put it this way.  Had
10   Industrial Heat asked you to review the test plan and
11   provide comment, would you have done so?
12       MR. BELL:  Objection to form.
13       MR. KOH:  Join.
14   A.  Undoubtedly, yes.
15   Q.  (By Mr. Annesser) Okay.
16       MR. ANNESSER:  Madam Court Reporter, if we
17   can mark as Exhibit 15 the document in folder 41.
18   Excuse me.
19       (Marked Deposition Exhibit No. 15.)
20       MR. KOH:  Thank you.
21       MR. BELL:  Same objection regarding the
22   Boeing production.
23       MR. ANNESSER:  Okay.
24       MR. KOH:  The witness has Exhibit 15.  It
25   also has some highlighting on it.

R, S, IMP, LPN

Page 127

1        MR. ANNESSER:  Okay.  And, again, I
2    apologize for that.  I'm not sure how that happened,
3    but please disregard the highlighting.
4        THE WITNESS:  Okay.
5    Q.  (By Mr. Annesser)  Sir, my first question
6    with respect to this document, which bears the Bates
7    stamp number BOE 1551, if you look at the earlier
8    emails, specifically the first one on the second page
9    of this document, the subject is "The Childress
10   Fellowship."
11   A.  Uh-huh.
12   Q.  What is that?
13   A.  That was my Christmas card --
14   Q.  The Child --
15   A.  -- from 2015.
16   Q.  Okay.
17       That was your Christmas card?
18   A.  Correct.
19   Q.  What -- what exactly was your Christmas
20   card?  Was it somehow in relation to the E-Cat
21   technology?
22   A.  No.
23   Q.  Okay.
24       Now, looking up at the top email, which
25   appears to be an email from you to Leonard and Brian

Page 128

1    Tillotson -- Tillotson?
2    A.  I'm --
3    A.  Tillotson.
4    Q.  -- sorry.  I'm -- I'm sure I -- I'm sure I
5    butchered it again.
6        -- dated January 8th, 2015, is this an email
7    you sent, sir?
8    A.  It -- apparently it is.
9    Q.  Okay.
10       I'm going to ask you to look in the second
11   paragraph in the fourth bullet point.  It says, "The
12   one megawatt reactor is down in Florida now and is
13   having final control hardware installed.  They hope it
14   will be operational in February, if for no other
15   reason than to get it off their books, since they
16   never wanted it anyway."
17       What were you told that -- that resulted in
18   that statement, that they never wanted it anyway?
19   A.  Well, what I was told was that they were not
20   interested in having a -- one megawatt of heat, so,
21   you know, their not whole having a reactor that
22   produces a megawatt of heat is -- wasn't -- what would
23   they do with it?  Which I have to agree with that.
24   What would you do with it?
25   Q.  Okay.

32  (Pages 125 to 128)

Page 129

1    And that's the only basis for that comment,
2  that -- that they didn't want a one megawatt plant?
3    A.  Right.  Yeah.  I mean, actually, if you
4  think about it rationally, it -- from a test
5  standpoint, something that generates a megawatt of
6  heat, it makes no sense whatsoever.  And we'd had that
7  conversation before; that building a test article that
8  generated a megawatt of heat was not -- not useful,
9  not valuable, not a good way to test things.
10   Q.  Did you ever convey that to Dr. Rossi?
11   A.  I don't believe I did, no.
12   Q.  Do you know whether the one megawatt reactor
13 was tested?
14   A.  You know, I gathered from just
15 conversations -- I never -- I don't believe I ever saw
16 any kind of final report or anything, but I gathered
17 from in the blogosphere and just general conversations
18 that, yes, there -- there was testing on it.  And
19 exactly what the results are I was -- I don't know the
20 details.
21   Q.  Did you ever inquire, to your recollection,
22 as to how the testing was going after -- after that
23 email that we've labeled as Exhibit 15?
24   A.  Yeah.  I mean, probably just because I would
25 have been curious.  You know, I -- again, I don't

Page 130

1  know -- wouldn't know the details of those inquiries,
2  but probably.
3    Q.  Okay.
4       MR. ANNESSER:  Madam Court Reporter, I'd
5  like to mark as Exhibit 16 --
6       MR. KOH:  You doing okay?
7       MR. ANNESSER:  -- the document in --
8       MR. KOH:  How you doing?
9       MR. ANNESSER:  -- folder 65.
10        (Marked Deposition Exhibit No. 16.)
11      MR. KOH:  The witness has Exhibit 16 in
12 front of him.  It's a lengthy document, so either the
13 witness should review it all or, John, you can direct
14 him to a particular part.
15      MR. ANNESSER:  Yeah.  Let me -- I don't want
16 to -- I don't want to spend too much time on it, so
17 we'll -- we'll just direct him to a particular part.
18 Actually, many of the documents are blank where images
19 had previously existed I imagine.
20   Q.  (By Mr. Annesser) Sir, looking at the
21 first page of Exhibit 16, which has Bates number
22 IH-00139153, I'm going to ask you to look at the -- I
23 believe it's the third email down.  It says, "On
24 Friday, April 24th, 2015...," Jamie Childress wrote.
25 Do you see that, sir?

Page 131

1    A.  I do.
2    Q.  Okay.
3       It says, "JT, Along the lines of other
4  activities, how is the one megawatt system coming?
5  Hopefully that is going well."
6       And I be -- and do you recall writing that
7  email?
8    A.  I don't recall specifically, but it sounds
9  like something I would re-inquire about, yes.
10   Q.  Any reason to believe you didn't write it?
11   A.  Nope.  Undoubtedly I did.
12   Q.  Okay.
13      Now, Mr. Vaughn responded to you, and he
14 states, "Hard to know at this point as we still have
15 not audited the data.  We are giving AR some space,
16 but sometime over the coming two to three months we
17 intend to do an intensive audit of the data."
18      So was it your understanding that as of
19 April 24th, 2015, Industrial Heat had not reviewed the
20 data that they had been provided?
21      MR. BELL:  Objection to form.
22   A.  So I -- you know, I -- I really can't
23 speculate.  And the email has to stand on its own.  I
24 have no additional information.
25   Q.  (By Mr. Annesser)  Well, I'm -- I'm asking

Page 132

1  you, sir, what did you understand that email to mean?
2  Could you tell based on that email whether the tests
3  were positive or negative?
4       MR. BELL:  Objection to form.
5    A.  Based on this, I have to assume that J.T.
6  doesn't know whether the results are positive or
7  negative.
8    Q.  (By Mr. Annesser) Okay.
9       Were you ever provided copies of Dr. Penon's
10 report on that test --
11      MR. BELL:  Object --
12   Q.  (By Mr. Annesser)  -- or any of his reports?
13      MR. BELL:  Objection to form.
14   A.  Not that I recall, so I -- I'm going to go
15 with no.  But since you know my Inbox better than I
16 do, maybe you have a -- maybe you have a different
17 answer.
18   Q.  (By Mr. Annesser) Were you ever asked to
19 review any of the reports from the testing of the one
20 megawatt unit, sir?
21      MR. BELL:  Objection to form.
22   A.  Again, not -- not that I recall.
23   Q.  (By Mr. Annesser) Okay.
24      MR. ANNESSER:  Sir, if you can give me just
25 a moment, I may be able to wrap it up here.  Give me

33  (Pages 129 to 132)

Page 133

1   just a moment. I'm going to put you on mute and then
2   get right back to you.
3        We'll go off the record for a moment.
4        THE VIDEOGRAPHER: We're going off the
5   record at 2:39 p.m.
6        (Discussion off the record.)
7        THE VIDEOGRAPHER: We're back on the record
8   at 2:42 p.m.
9        MR. ANNESSER: Okay.
10       Q. (By Mr. Annesser) Sir, I just have a couple
11  real quick questions.
12       Do you have any current agreement with
13  Industrial Heat to provide any services, whether
14  related to the E-Cat or anything else, at this time?
15       A. No. We're not actively doing anything. I
16  mean, the PIA that we had with them is probably still
17  in force. I'm -- I'm assuming that's true.
18       Q. Okay.
19       A. But no, we're not doing anything active.
20       Q. Okay.
21       And would that be true going back to, in
22  essence, the time of these emails, middle of 2015?
23       A. That -- that sounds right, yeah. We haven't
24  done anything with them in quite some time, not
25  since -- probably the last things that we did was try

Page 134

1   to help T. Barker, his capability to conduct tests at
2   their own shop, and that's -- that was the end of it.
3        Q. Okay.
4        MR. ANNESSER: Okay. That is all the
5   questions I have at this time.
6        Mr. -- Mr. Koh, I believe it's your turn, if
7   you wish.
8        MR. KOH: No questions.
9        MR. BELL: I just have -- just a few.
10       THE WITNESS: Fire away.
11       MR. BELL: Okay.
12       E X A M I N A T I O N
13  BY MR. BELL:
14       Q. Let me ask you, please, to look at what
15  Mr. Annasser had marked as Exhibit 15.
16       A. Okay.
17       Q. And in -- in that email there's reference to
18  a conversation that you had with Mr. Darden, correct?
19       A. Apparently, yes.
20       Q. And there's a reference in your email to an
21  unknown company.
22       A. Well, actually, looks like -- looks like
23  it's in reference to an e -- a conversation I had with
24  J.T., not -- not Darden --
25       Q. Okay.

Page 135

1        A. -- because it starts off, "I talked to JT
2   the other day. Here's the highlights."
3        So I'm assuming this is conversation with
4   J.T., not Darden.
5        Q. Oh.
6        Can I --
7        MR. KOH: Yeah.
8        Q. (By Mr. Bell) Let me make sure I'm
9   looking -- directing you at the right exhibit.
10       MR. KOH: Do you want 14 --
11       MR. BELL: No.
12       MR. KOH: -- as well?
13       Q. (By Mr. Bell) I'm looking at 14. I'm sorry.
14       A. Oh, okay.
15       Q. No wonder it didn't make sense.
16       A. All right.
17       Q. Okay. I apologize.
18       A. Okay.
19       Q. We're looking now at 14 --
20       A. Okay.
21       Q. -- and December 10, 2014. And it --
22       A. Yep.
23       Q. -- had -- you said you had a good discussion
24  with Darden.
25       A. Yeah.

Page 136

1        Q. Okay.
2        A. There you go.
3        Q. And in the third paragraph there's a
4   reference there to, "...another public company
5   (Unknown company.)"
6        Do you see that?
7        A. Right. Okay. Yep.
8        Q. What -- what do you -- what do you remember
9   about that discussion with Mr. Darden with respect to
10  that company?
11       A. You know, I don't know that that company
12  really came up much. I believe that I -- and so -- I
13  guess probably the only thing that I knew was that it
14  was something that Rossi had set up, and that's
15  about -- that's about all I knew.
16       Q. Okay.
17       You -- earlier in your testimony you
18  discussed the -- the value or utility of -- of -- of
19  testing a one megawatt unit. Do you recall that?
20       A. Yes.
21       Q. And without -- without unfairly para --
22  paraphrasing it or summarizing it, you -- you
23  testified that it was not, in your mind, useful or
24  valuable to do that. Is that fair?
25       A. Correct. Yes. That is --

R, EOT

**Veritext Florida Reporting Co.**

R, EOT



**Page 137**

1  MR. ANNESSER:  Object to --
2  A.  -- not useful.
3  MR. ANNESSER:  -- form.
4  Q.  (By Mr. Bell)  Why -- why is that?  Why is it
5  your opinion that it was not -- that it would not be
6  useful or valuable to test a one megawatt unit?
7  MR. ANNESSER:  Object to form.
8  A.  Because the larger the test article and the
9  more bits and pieces that it has, the more difficult
10  it is to understand the inputs and the outputs, and
11  especially in something like this, which was -- at
12  least it was my understanding is water cooled.  So --
13  I mean, it actually made no sense.  It makes no sense
14  at all really.
15  Q.  (By Mr. Bell)  Explain why.
16  A.  Because if you want to find out if something
17  works, you test something that you have a lot of
18  control over the details of the environment and the
19  testing and do it the way that we did; have, you know,
20  a control unit and an active unit, with a lot of
21  instrumentation on both, and a very detailed
22  understanding of what the knowns and unknowns are and
23  reduce the unknowns to an absolute minimum.
24  And something like a giant one megawatt
25  reactor with all kinds of -- of units in it, that --

**Page 138**

1  that -- that just makes no sense at all.
2  Q.  If it was -- if the -- if that apparatus
3  was, in fact, generating one megawatt, would that
4  present difficulties in measurement?
5  MR. ANNESSER:  Object to form.
6  MR. KOH:  I'm going to object as well as
7  calling for speculation and opinion.
8  MR. BELL:  Yeah.  I'll -- I'll withdraw
9  that.
10  I have no further questions.  Thank you.
11  MR. KOH:  I think we're done?
12  THE VIDEOGRAPHER:  This concludes --
13  MR. ANNESSER:  I believe we're done.
14  Once we go off the record, Mr. Bell, I have
15  a couple things for you.
16  THE VIDEOGRAPHER:  This concludes today's
17  testimony given by Boeing 30(b)(6) Jamie Childress.
18  The total number of media used was two and will be
19  retained by Veritext Legal Solutions.  We are off the
20  record at 2:48 p.m.
21  (Deposition recessed at 2:48 p.m.)
22  (Signature reserved.)
23
24
25

**Page 139**

1  S I G N A T U R E
2
3  I declare under penalty of perjury under the
4  laws of the State of Washington that I have read my
5  within deposition, and the same is true and accurate,
6  save and except for changes and/or corrections, if
7  any, as indicated by me on the CHANGE SHEET flyleaf
8  page hereof.
9  Signed in _____, Washington, this
10  _____ day of _____, 2017.
11
12
13  _____
14  JAMIE CHILDRESS
15  Taken:  February 28, 2017
16
17
18
19
20
21
22
23
24  Re: Rossi v. Darden, et al.
25  Cause No.:  1:16-cv-21199-CMA
   Lauren G. Harty, RPR, CCR #2674

**Page 140**

1  C E R T I F I C A T E
2  STATE OF WASHINGTON   )
3  COUNTY OF KING        ) ss.
                          )
4  I, the undersigned Washington Certified Court
5  Reporter, hereby certify that the foregoing deposition
6  upon oral examination of JAMIE CHILDRESS was taken
7  before me on February 28, 2017, and transcribed under
8  my direction;
9  That the witness was duly sworn by me pursuant
10  to RCW 5.28.010 to testify truthfully; that the
11  transcript of the deposition is a full, true, and
12  correct transcript to the best of my ability; that I
13  am neither attorney for nor a relative or employee of
14  any of the parties to the action or any attorney or
15  counsel employed by the parties hereto, nor am I
16  financially interested in its outcome;
17  I further certify that in accordance with
18  CR 30(e), the witness was given the opportunity to
19  examine, read, and sign the deposition within 30 days
20  upon its completion and submission, unless waiver of
21  signature was indicated in the record.
22  IN WITNESS WHEREOF, I have hereunto set my hand
23  this 6th day of March, 2017.
24
25  LAUREN G. HARTY, CCR #2674

35  (Pages 137 to 140)

## 3. Witness: Fabiani, Fulvio

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 6:25-7:4<br>7:24-8:10<br>11:22-12:22<br>13:23-14:1<br>26:22-28:1<br>30:19-30:21<br>32:21-33:21<br>34:12-34:17<br>35:1-35:4<br>35:6-35:14<br>35:24-38:9<br>38:17-39:10<br>40:4-40:16<br>46:10-47:25<br>48:2-48:14<br>49:21-50:7<br>59:10-60:3<br>74:20-75:8<br>82:6-82:19<br>82:21-84:6<br>84:16-84:19<br>85:3-85:6<br>86:13-86:16<br>87:7-88:17<br>88:19-89:7<br>90:14-91:21<br>93:8-94:20<br>96:13-99:8<br>100:8-100:22<br>102:17-109:3<br>109:17-110:14<br>111:11-113:8<br>113:24-114:3<br>114:11-119:4<br>120:5-121:21<br>122:5-123:2<br>123:5-124:1<br>124:7-125:1 | 11:22-12:22 R;<br>26:22-28:1 R;<br>32:21-33:21 R;<br>34:12-17 L, R;<br>35:1-4 R;<br>35:6-14 L, R, AA;<br>35:24-38:9 R;<br>40:13-16 R, AA;<br><br>82:6-19 agreement between USQL and IH in summer or fall of 2013, ended in either March or April 2016;<br><br>86:13-16 L<br>128:20-130:5 R | 44:14-17<br>44:18-20<br>44:22-23<br>44:25<br>45:5-6<br>45:13-19<br>45:22-23<br>75:10-76:5<br>85:7-86:5<br>86:19-87:6<br>89:8-90:1<br>95:18-96:12 | 11:22-12:22 R;<br>26:22-28:1 R;<br>102:17-103:4 R;<br>128:20-130:5 R;<br>130:14-131:2 R;<br>132:21-133:10 R | 86:17-87:6<br>89:8-90:13 | **Defendants' Objections to Plaintiffs:**<br>44:14-45:23 IC<br>75:10-76:5 IC<br>85:7-86:5 IC<br>89:8-90:1 IC<br>95:18-96-12 IC<br><br>**Defendants' Objections to Third Party Defendants:**<br>89:8-90:13 IMP | | | | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 128:12-128:16 | | | | | | | | | |
| 128:20-130:5 | | | | | | | | | |
| 130:14-131:2 | | | | | | | | | |
| 132:21-133:10 | | | | | | | | | |
| 135:22-138:13 | | | | | | | | | |
| 138:16-139:12 | | | | | | | | | |
| 140:13-141:14 | | | | | | | | | |
| 141:17-142:19 | | | | | | | | | |
| 142:25-144:16 | | | | | | | | | |
| 148:1-148:11 | | | | | | | | | |
| 148:12-148:25 | | | | | | | | | |

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:16-cv-21199-CMA

ANDREA ROSSI and
LEONARDO CORPORATION,

     Plaintiffs,

v.

THOMAS DARDEN; JOHN T. VAUGHN,
INDUSTRIAL HEAT, LLC;
IPH INTERNATIONAL B.V.; and
CHEROKEE INVESTMENT PARTNERS, LLC,

     Defendants.
_____/

INDUSTRIAL HEAT, LLC, and IPH
INTERNATIONAL B.V.,

     Counter-Plaintiffs,

v.

ANDREA ROSSI and LEONARDO CORPORATION,
     Counter-Defendants,
and

J.M. PRODUCTS, INC.; HENRY JOHNSON;
UNITED STATES QUANTUM LEAP, LLC;
FULVIO FABIANI; and JAMES BASS,

     Third-Party Defendants.
_____/

600 Brickell Avenue
Miami, Florida
February 28, 2017
Tuesday, 7:45 A.M.

## Page 2

```
 1
 2          V I D E O
 3       D E P O S I T I O N
 4
 5              OF
 6
 7       FULVIO FABIANI
 8
 9    Taken on Behalf of the Defendants
10    Pursuant to Notice of Taking Deposition
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

## Page 3

```
 1              A P P E A R A N C E S
 2
 3    On behalf of the Plaintiffs:
 4    PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
 5       283 Catalonia Avenue, Suite 200
 6       Coral Gables, FL 33134
 7    BY:  BRIAN CHAIKEN, ESQ.
 8       bchaiken@pbyalaw.com
 9    On behalf of the Defendants/Counter-Plaintiffs:
10    JONES DAY
11       600 Brickell Avenue
12       Brickell World Plaza
13       Suite 3300
14       Miami, FL 33131
15    BY:  CHRISTOPHER R.J. PACE, ESQ. and
16       ERIKA HANDELSON, ESQ.
17       cpace@jonesday.com
18       ehandelson@jonesday.com
19
20       On behalf of JM Products, Henry Johnson
21    and James Bass:
22    ARAN, CORREA & GUARCH, P.A.
23       255 University Drive
24       Coral Gables, FL 33134-6732
25    BY:  FRANCISCO LEON DE LA BARRA, ESQ.
26       fleon@acg-law.com
27    On behalf of United States Quantum Leap and Fulvio
28    Fabiani:
29
30    RODOLFO NUNEZ, P.A.
31       255 University Drive
32       Coral Gables, Florida 33134
33    BY:  RODOLFO NUNEZ, ESQ.
34       rnunez@acg-law.com
35
36    Also Present:  Norma Merlano, Interpreter
37                   Todd Cohen, Videographer
38
39
```

## Page 4

```
 1              I N D E X
 2    FULVIO FABIANI
 3       Examination by Mr. Pace ............  8
 4
 5
 6           E X H I B I T S
 7
 8    Deposition Exhibit 1 ........................  54
 9       5-20-13 email
10
11    Deposition Exhibit 2 ........................  96
12       2-27-15 email
13    Deposition Exhibit 3 ........................ 100
14       13-page document
15
16    Deposition Exhibit 4 ........................ 125
17       3-6-15 email
18    Deposition Exhibit 5 ........................ 126
19       4-13-15 email
20
21    Deposition Exhibit 6 ........................ 128
22       5-13-15 email
23    Deposition Exhibit 7 ........................ 134
24       1-14-13 email
25
26    Deposition Exhibit 8 ........................ 135
27       6-19-15 email
28    Deposition Exhibit 9 ........................ 140
29       7-7-15 email
30
31    Deposition Exhibit 10 ....................... 141
32       2-23-16 email
33    Deposition Exhibit 11 ....................... 142
34       5-15-16 email
35
36
```

Page 5

1    THE VIDEOGRAPHER:  We are now on the video
2    record.  My name is Todd Cohen, representing
3    Veritext.  The date today is February 28th,
4    2017, and the time on the video record is
5    7:45 a.m.
6        This deposition is being held at Jones
7    Day, located at 600 Brickell Avenue in Miami,
8    Florida.  The caption of the case is Andrea
9    Rossi and Leonardo Corporation, et cetera,
10   et al., versus Thomas Darden, John T. Vaughn,
11   Industrial Heat, LLC, et cetera, et al.
12       The case is being held in the United
13   States District Court, Southern District of
14   Florida, Miami Division.  The case number is
15   1:16-cv-21199-CMA.  The name of our witness
16   this morning is Fulvio Fabiani.
17       At this time may I please have counsel in
18   the room announce their appearances for our
19   court reporter.  Then Kelli Ann Willis, the
20   court reporter with Veritext, will then swear
21   the witness and we can begin.
22       MR. PACE:  Can I ask one quick question?
23   Is what you just said being recorded?
24       THE VIDEOGRAPHER:  Only by Kelli.
25       MR. PACE:  This is Chris Pace and Erika

Page 6

1    Handelson of Jones Day on behalf of the
2    Defendants.
3        Before everybody else introduces
4    themselves, just to make clear for the record,
5    the video is only capturing the responses by
6    the witness.  The court reporter is catching
7    the questions and objections of the counsel, as
8    well as the statements of the witness, and if
9    everyone can just be particularly careful and
10   conscious of when they are making objections
11   that they recognize that the court reporter has
12   to hear them and we don't have amplified sound
13   in this room.
14       MR. NUNEZ:  Rudy Nunez on behalf of
15   Mr. Fabiani and United States Quantum Leap,
16   LLC.
17       MR. CHAIKEN:  Good morning.  Brian Chaiken
18   on behalf of Plaintiffs.
19       MR. LEON DE LA BARRA:  Good morning.
20   Francisco Leon de la Barra on behalf of
21   third-party defendants, JM Products, Inc.;
22   Henry Johnson and James A. Bass.
23       (Thereupon, Norma Merlano was duly sworn
24   to act as interpreter.)
25   Thereupon:

Page 7

1        FULVIO FABIANI
2    a witness named in the notice heretofore filed,
3    being of lawful age and having been first duly
4    sworn, testified on his oath as follows:
5        E X A M I N A T I O N
6    BY MR. PACE:
7    Q.  Let me start, before I even begin the
8    deposition, two points.  It is also for everyone in
9    the room.
10       To assist in the translation, I'm going to
11   try to keep my questions short, or at least -- or at
12   least pause between my questions to allow for
13   translation.
14       Mr. Fabiani, I would request that you also
15   occasionally pause in your responses.
16   A.  Very well.
17   Q.  There are likely to be some technical
18   terms used today.  To the extent that there is not
19   an obvious Italian translation, the translator may
20   use the English word.  And if you don't understand
21   the technical term in English, please let the
22   interpreter know.
23   A.  Very well.
24   Q.  Mr. Fabiani, can you state your full name
25   for the record?

Page 8

1    A.  Fulvio Fabiani.
2    Q.  Mr. Fabiani, what is your current address?
3    A.  36 Parka Mova in Russia.
4    Q.  Mr. Fabiani, please spell out your
5    address.
6    A.  P-A-R-K-A.
7        DR. ROSSI:  Mova, M-O-V-A.
8        THE INTERPRETER:  That's what I was
9    thinking.  M-O-V-A.  P-A-R-K-A, M-O-V-A,
10   Slovenia.
11       MR. PACE:  The next time I say spell it, I
12   mean use letters.
13   BY MR. PACE:
14   Q.  Mr. Fabiani, have you been deposed before?
15   A.  In what country, sir?
16   Q.  In any country.
17   A.  Yes.
18   Q.  When?
19   A.  From '98 to 2002.
20   Q.  In what cases?
21   A.  When I served as a technician in court in
22   Rome.
23   Q.  What was your job?
24   A.  Adviser to the --
25       DR. ROSSI:  To the judge.

Page 9

1     THE WITNESS:  To the judge.
2     MR. PACE:  Wait, wait, wait.  Let's be
3  clear.  Stop.
4     We need to get this on the record, and you
5  can translate for this witness.  I understand
6  that you cannot -- you cannot ask -- you cannot
7  ask translations from Dr. Rossi.  Dr. Rossi
8  cannot provide you translations.  There should
9  be no communications between --
10     DR. ROSSI:  Sorry.
11     MR. PACE:  That's fine.  That's fine.  To
12  be clear -- no, no, I understand.  You're just
13  trying to help.  Let's make sure we're clear
14  about that going forward.  At a break, if
15  there's some phrase that you're not sure of the
16  interpretation, we can --
17     THE INTERPRETER:  We will put it on the
18  record.
19     MR. PACE:  Yes.  That's all I'm asking.
20  Otherwise, it's going to become very confusing.
21     MR. NUNEZ:  If I can add something.  There
22  may be a time where Dr. Rossi, who is fluent in
23  Italian, notices or has a dispute with the
24  translation offered by the translator.  So we
25  do want to get on the record in case there is

Page 10

1  some confusion as to the translation of a
2  particular word.
3     THE INTERPRETER:  If the interpreter is
4  not sure, but what he says, like an adviser,
5  and the interpreter needs it, maybe like an
6  expert witness.  I'm not sure of the technical
7  for the Judge.
8     MR. PACE:  I think as long as it's a
9  literal translation, I can ask clarifying
10  questions.
11     So let's go back to presenting the
12  questions to the witness.
13  BY MR. PACE:
14     Q.   What work were you performing for the
15  Italian court system?
16     A.   Technical adviser.
17     Q.   Technical adviser as to what?
18     A.   In the electronic and computer plant.
19     DR. ROSSI:  Information.
20     THE INTERPRETER:  Information.
21  BY MR. PACE:
22     Q.   In that job, did you testify under oath?
23     A.   Yes.
24     Q.   Have you testified under oath on any other
25  occasions?

Page 11

1     A.  Only in my work.
2     Q.  Do you mean only when you served as a
3  technical adviser to the court?
4     A.  Yes.
5     Q.  Do you understand that you are under oath
6  today as if you were testifying in court?
7     A.  Yes.
8     Q.  Any reason you cannot provide accurate
9  testimony today?
10     A.  No.  No.
11     Q.  If I ask an unclear question today, will
12  you please ask me to clarify the question?
13     A.  Yes.
14     Q.  If you do not understand one of my
15  questions, will you please let me know that you
16  don't understand the question?
17     A.  Yes.
18     Q.  In response to my questions, I need verbal
19  responses, so nodding your head is not sufficient.
20  Do you understand?
21     A.  Yes.
22  [R]  Q.  Mr. Fabiani, when did you leave the United
23  States?
24     A.  I do not remember exactly.
25     Q.  What is your best recollection of when you

THIRD PARTY: R

Page 12

1  left the United States of America?
2     A.  As far as I could recall, it was around
3  July of 2016.
4     Q.  Do you presently have any intention of
5  coming back to the United States?
6     A.  It does not depend on me.  It depends on
7  my work.
8     Q.  Mr. Fabiani, do you presently have any
9  intention to come back to the United States?
10     A.  In the short-term right now, no.
11     Q.  Mr. Fabiani, you own a company called
12  United States Quantum Leap?
13     A.  Yes.
14     Q.  The registered address for that company is
15  1331 Lincoln Road, correct?
16     A.  Not completely and not currently.
17     Q.  What is the current address for US Quantum
18  Leap?
19     A.  It is through the office of my accountant.
20     Q.  The business address of US Quantum Leap is
21  your accountant's address?
22     A.  Yes.
23     Q.  And that accountant is Diane Anniser?
24     A.  Yes.
25     Q.  And your statement is that US Quantum Leap

Page 13

1  provides some kind of business or services at the
2  office of Diane Anniser?
3       MR. NUNEZ:  Object to form.
4       THE INTERPRETER:  Could you repeat the
5  question?  I want to make sure that I translate
6  clearly.
7  BY MR. PACE:
8       Q.  Does US Quantum Leap perform any services
9  at the office of Diane Anniser?
10      A.  No.
11      Q.  Mr. Fabiani, you have not changed the
12  address of US Quantum Leap with the Florida
13  Secretary of State?
14      A.  That is not my job.
15      Q.  Who else works for US Quantum Leap?
16      A.  Excuse me.  Where?
17      Q.  I will ask my question again.
18          Who else works for US Quantum Leap?
19      A.  In the United States?
20      Q.  Anywhere.
21      A.  My attorney, my accountant, the engineers
22  that work for me throughout the world.
23      Q.  Who is the president of US Quantum Leap?
24      A.  I am.
25      Q.  Who is the owner of US Quantum Leap?

Page 14

1       A.  I am.
2       Q.  So isn't it your responsibility to
3  accurately report the location of US Quantum Leap?
4       A.  It is my responsibility, but it is not my
5  job.  My chore.
6       Q.  Mr. Fabiani, you own several other
7  corporations in the state of Florida, correct?
8       A.  Currently, no.
9       Q.  Do you own a company called Deaf's
10  Solution?
11      A.  Currently, no.
12      Q.  When did you sell that company?
13      A.  Last year.
14      Q.  When last year?
15      A.  I don't remember.
16      Q.  In what time of year?
17      A.  I don't remember.  I don't remember --
18  well, I think, if I recall correctly, it was around
19  the end of the year.
20      Q.  To whom did you sell the company?
21      A.  I'm sorry, but these are not matters
22  that -- these are private things.  They are not
23  relevant to this case.
24      Q.  Let me ask my question again.
25          To whom did you sell the company?

Page 15

1       A.  To an Italian.  Private, in Italy.
2       Q.  Was that Marco Deargia?
3       A.  Marco Deargia is the second partner.
4       Q.  So to whom --
5       A.  The president of the company.
6       Q.  What is the name of the individual to whom
7  you sold Deaf's Solution?
8       A.  I don't remember.
9       Q.  You just remember he or she was a resident
10  of Italy, correct?
11      MR. NUNEZ:  Object to form.
12      THE WITNESS:  Yes.
13  BY MR. PACE:
14      Q.  You know that you sold it at the end of
15  2016, correct?
16      A.  I think I'm remembering that that is
17  correct.
18      Q.  To whom did you sell your interest in
19  Deaf's Solution?
20      MR. NUNEZ:  Object to form.
21      MR. LEON DE LA BARRA:  Same objection.
22      THE WITNESS:  To a second partner who was
23  introduced to me by Marco Deargia.
24  BY MR. PACE:
25      Q.  Who is that second partner?

Page 16

1       A.  I don't remember.
2       Q.  Did you ever know the name of this second
3  partner?
4       A.  No.  I only met him that day when I did
5  the sale agreement.
6       Q.  So you sold Deaf's Solution to an
7  individual who you did not know?
8       A.  I met the person the day in which I sold
9  my percentage or my interest.
10      Q.  Did you meet this person in Italy?
11      A.  Yes.
12      Q.  For how much did you sell your interest in
13  Deaf's Solution?
14      MR. NUNEZ:  Object to form.
15      THE WITNESS:  Around 500 euros.
16  BY MR. PACE:
17      Q.  Why did you sell your interest in Deaf's
18  Solution?
19      A.  I was not interested any longer in the
20  objective of the company.
21      Q.  You have taken no action to remove
22  yourself as an officer of the company?
23      A.  I was -- I was not the president.  I was
24  not an officer of the company.
25      Q.  You were a manager of the company,

Page 17

1   correct?
2      A.   No.
3      Q.   Are you aware that you were listed as a
4   manager of the company with the Florida Secretary of
5   State?
6      A.   I don't remember.  I would have to verify
7   through the documents.
8      Q.   You also own a company called Miami
9   Cooling?
10     A.   Yes.
11     Q.   Where is Miami Cooling based?
12     A.   It doesn't exist any longer.  It has been
13  closed.
14     Q.   When did you close Miami Cooling?
15     A.   I did not close it.  The president did.
16     Q.   Who was the president of Miami Cooling?
17     A.   Nicola Sinisi.
18     Q.   Nicola Sinisi lives in Italy, correct?
19     A.   I don't know.  I imagine so.  I suppose he
20  does.
21     Q.   You entered a business with Mr. Sinisi
22  without knowing where he lives?
23     A.   I know where he lives, but I don't know
24  where his actual legal residence is.
25     Q.   So Mr. Sinisi lives in Italy, correct?

Page 18

1      A.   Yes, that is correct, he lives in Italy.
2   Yes.
3      Q.   And the business of Miami Cooling was
4   going to be performed in the United States, correct?
5      A.   The objective was to do business in Miami.
6      Q.   And objective could not be achieved once
7   you decided to leave for Russia?
8         MR. NUNEZ:  Object to form.
9         THE WITNESS:  I did not understand the
10  question.
11  BY MR. PACE:
12     Q.   You cannot operate a business after you
13  decided to leave -- you could not operate a business
14  in the United States after you decided to leave the
15  United States and move to Russia?
16        MR. NUNEZ:  Object to form.
17        THE WITNESS:  I repeat, I was not -- I was
18  not the director of the company.  It was -- it
19  was done to observe the American market for the
20  American -- for the air conditioning system.
21        Could you allow me one second?  I need to
22  go to the bathroom.
23        THE INTERPRETER:  The gentleman needs to
24  go to the bathroom.
25        MR. PACE:  Sure, we'll take a break.

Page 19

1         THE WITNESS:  Sorry, but I take pills for
2   blood pressure.
3         THE VIDEOGRAPHER:  Stand by.  Going off
4   the video record at 8:20 a.m.
5         (Thereupon, a recess was taken, after
6   which the following proceedings were held:)
7         THE VIDEOGRAPHER:  We are now back on the
8   video record.  The time on the video is
9   8:26 a.m.
10  BY MR. PACE:
11     Q.   Mr. Fabiani, if Miami Cooling was going to
12  do any business in the United States -- if Miami
13  Cooling was going to do any business in the United
14  States, would it be done by you?  By you?
15     A.   No.  Miami Cooling never functioned.  It
16  never opened.  Okay.  It was closed, but it didn't
17  have objective -- a market, a market here.  No
18  market, objective.
19     Q.   The only manager or owner of Miami Cooling
20  in the United States was you?
21        MR. NUNEZ:  Object to form.
22        THE WITNESS:  Owner, yes, but manager, no.
23  BY MR. PACE:
24     Q.   You are also the owner of a company called
25  Trading Tech?

Page 20

1      A.   Yes.
2      Q.   That is also a company that is based at
3   1331 Lincoln Road?
4         MR. NUNEZ:  Object to form.
5         THE WITNESS:  It is not registered any
6   longer, but -- because it's also in the process
7   of closing.  Okay.  It was -- the accountant
8   has been ordered to close the company.  It is
9   in the process of closing.
10  BY MR. PACE:
11     Q.   Who directed the accountant to close the
12  company?
13     A.   It was a mutual agreement of the partners.
14     Q.   And the partners are you and Francisco
15  Rimaldi?
16     A.   No.  Only us two.  Not also, but only us
17  two.
18     Q.   And when Trading Tech was operating, it
19  was operating out of the address at 1331 Lincoln
20  Road?
21        MR. NUNEZ:  Object to form.
22        THE WITNESS:  It never operated as a
23  business.  It was founded, but never operated
24  as a business.
25

Page 21

1    BY MR. PACE:
2       Q.  Why did you create Trading Tech, Miami
3    Cooling and Deaf's Solution all in March of 2016?
4          MR. NUNEZ:  Object to form.
5          THE WITNESS:  Coincidence.
6    BY MR. PACE:
7       Q.  I'm sorry, Mr. Fabiani, was your response
8    "coincidence"?
9       A.  Yes, it was a coincidence, because there
10   were three companies with three different functions
11   and different partners that had nothing in common,
12   only me as the person that prepared the projects, as
13   the adviser of the project.
14      Q.  And you were -- you were advising all of
15   these projects in March of 2016?
16      A.  Probably almost for sure.  There were
17   different initiations for each project, but it just
18   happened to be a coincidence that these people
19   arrived all at the same period of time.
20      Q.  But if all of these companies were formed
21   in March of 2016, you were working with or for these
22   companies in March of 2016?
23      A.  Sir, I usually work for more than one
24   project at a time, not just one.
25      Q.  Again, my question is:  In March of 2016,

Page 22

1    you were working with Miami Cooling, Trading Tech,
2    and Deaf's Solution?
3          MR. NUNEZ:  Object to form.
4          THE WITNESS:  Sir, to be a partner in a
5    company does not mean working with a company.
6    BY MR. PACE:
7       Q.  Right.  So you were, in March of 2016, you
8    were a partner in Trading Tech, Miami Cooling and
9    Deaf's Solution?
10      A.  Yes.  Partner, yes.
11      Q.  And the business plan for each of those
12   companies was to have some type of business in the
13   United States?
14         MR. NUNEZ:  Object to form.
15         THE WITNESS:  That is not -- that is not
16   my job, to decide what the company does.
17   BY MR. PACE:
18      Q.  I'm sorry.  As the owner of the company,
19   it is not your job to decide what the company does?
20         MR. NUNEZ:  Object to form.
21         THE WITNESS:  As far as I know, no, I am
22   the technical adviser.
23   BY MR. PACE:
24      Q.  Were you a technical adviser for companies
25   that were going to operate a business in the United

Page 23

1    States?
2          THE INTERPRETER:  I'm sorry.
3          MR. PACE:  Yes.
4          MR. NUNEZ:  Object to form.
5          THE INTERPRETER:  (In Italian.)
6          The interpreter is -- (In Italian.)
7          MR. ROSSI:  In Italian.
8          THE WITNESS:  The companies did not do any
9    work.  They did not function or work.
10         THE INTERPRETER:  (In Italian.)
11   BY MR. PACE:
12      Q.  After you became a partner in these three
13   companies in March of 2016, you left the United
14   States in July of 2016?
15      A.  Yes, because my sister passed away in
16   Italy.
17      Q.  Your sister passing away in Italy led you
18   to leave the United States and move to Russia?
19         MR. NUNEZ:  Object to form.
20         THE INTERPRETER:  Hello?
21         THE WITNESS:  Sorry, now I could hear you.
22   Can you please repeat the question?  I had lost
23   you.
24   BY MR. PACE:
25      Q.  Your sister passing away in Italy -- let

Page 24

1    me do this:  Did you testify earlier that you moved
2    to Russia in July of 2016?
3          MR. NUNEZ:  Object to form.
4          THE WITNESS:  No, sir.
5    BY MR. PACE:
6       Q.  When did you move to Russia?
7       A.  I left Italy in July of 2016.
8       Q.  Left Italy.  Left Italy for where?
9       A.  I left the United States to go to Italy
10   for my sister's funeral.
11      Q.  When did you move to Russia?
12      A.  I normally travel -- I usually travel
13   throughout Europe to Russia.  This is normal in my
14   work.
15      Q.  When did you move to Russia?
16      A.  I live now in Russia and I --
17         THE INTERPRETER:  (In Italian.)  Could you
18   please repeat the last part for the
19   interpreter?
20         THE WITNESS:  The last time that I
21   traveled, that I came to Russia, was two months
22   ago.
23   BY MR. PACE:
24      Q.  But you now live in Russia?
25      A.  At this moment, yes, but I don't just work

Page 25

1    in Russia, I work throughout Europe.
2        Q.   Where did you live two months ago?
3        A.   Slovenia.
4        Q.   How long did you live in Slovenia?
5        A.   Sir, I don't have exact dates.  I travel
6    throughout Europe: Spain, Italy, Germany, England,
7    and all of the -- okay, the Soviet Russian states,
8    Ukraine, and all of the different states in Russia.
9        Q.   Let me ask, when did you last live outside
10   either Russia or one of the former Soviet states?
11       A.   This current?  You mean this time?  Which
12   time now?  When you say --
13       Q.   You currently live in Russia, correct?
14       A.   This current one is the last one.  The
15   current.
16           MR. NUNEZ:  I think there's an issue with
17   the translation.
18           MR. PACE:  Everybody stop.
19           THE INTERPRETER:  You need to clarify.
20           MR. PACE:  Everyone stop.  Let's go off
21   the record.
22           THE VIDEOGRAPHER:  Stand by to go off the
23   video record.  Going off at 8:45 a.m.
24
25

Page 26

1            (Thereupon, a recess was taken, after
2    which the following proceedings were held:)
3            THE VIDEOGRAPHER:  We are back on the
4    video record.  The time is 9:08 a.m.
5    BY MR. PACE:
6        Q.   Mr. Fabiani, in light of the fact that we
7    are using a translator today, I would ask you to
8    pause in the middle of any long response.  That way,
9    the translator has a chance to translate what you
10   say.
11           DR. ROSSI:  I think he's not hearing us.
12           THE INTERPRETER:  Something is wrong.  Is
13   it okay if I repeat it?
14           MR. PACE:  Wait.
15           THE INTERPRETER:  He heard me.
16           THE WITNESS:  I did answer.  Certainly, I
17   will try, for sure.
18   BY MR. PACE:
19       Q.   We just had a technical pause there.
20   Mr. Fabiani, let me approach our last subject
21   differently.
22           When -- you left the United States in July
23   of -- in approximately July of 2016, correct?
24       A.   Yes.
25       Q.   Where did you reside -- next reside?

Page 27

1        A.   Italy.
2        Q.   For how long?
3        A.   I currently am a resident in Italy.  In
4    other words, my legal domicile is Italy.  My legal
5    residence is in Italy.
6        Q.   But you are now living in Russia?
7        A.   I live in Russia for work purposes.
8        Q.   Where did you live before you lived in
9    Russia?
10       A.   Italy.  Slovenia.  I did not have any
11   other residence before Russia.  Italy.  And
12   Slovenia.  And Slovenia.
13       Q.   And what is the work that you are
14   presently doing in Russia?
15       A.   Electronic informatic computer science.
16           THE INTERPRETER:  Computer science.  I
17   knew it was a word.
18   BY MR. PACE:
19       Q.   For whom are you doing this computer
20   science work?
21       A.   For several companies.
22       Q.   Which companies?
23       A.   For certain Russian and Slovenian
24   companies.
25       Q.   Which Russian and Slovenian companies?

Page 28

1        A.   I'm sorry, but it is covered by the NDA.
2        Q.   NDA, non-disclosure agreement.
3            You have a non-disclosure agreement with
4    each of these Russian and Slovenian companies?
5        A.   I do have an NDA for each one of my
6    contracts.
7        Q.   Do you have an NDA with Leonardo
8    Corporation?
9        A.   Yes.
10       Q.   Do you still have a copy of that NDA?
11       A.   Not at this moment.
12       Q.   When did you throw it away?
13       A.   I did not say that I threw it away.
14       Q.   You said you don't have it at this moment.
15   Where is it?
16       A.   I don't have it at this moment.  I think
17   it is together along with my documentation in Italy.
18       Q.   So you have documentation in Italy; is
19   that correct?
20       A.   I have documentation for each contract
21   that I agree to -- that I have and I make.
22           THE INTERPRETER:  It was a continuation to
23   the answer.
24           THE WITNESS:  Could you please repeat what
25   you translated, because I did not understand

THIRD PARTY: R    R

Page 29

```
 1    because you stopped.
 2         THE INTERPRETER:  This is him talking to
 3    the interpreter.
 4         The interpreter did not get a chance to
 5    translate his second portion.
 6    BY MR. PACE:
 7    Q.  Okay.  I will break the question down.
 8         You have documents in -- you have
 9    documents stored somewhere in Italy?
10    A.  I have documents in the United States.  I
11    have documents in Italy.  I have documents in
12    Slovenia.  And I have documents with me here in
13    Russia.
14    Q.  And you believe you have a copy of the NDA
15    with Leonardo Corporation along with your documents
16    in Italy?
17    A.  I think I have them either in Italy --
18         THE INTERPRETER:  Could you please repeat
19    your answer for the interpreter?
20         THE WITNESS:  I do not take to the
21    territory documents that is not of interest in
22    that territory.
23    BY MR. PACE:
24    Q.  Do you believe that you have a copy of
25    your NDA with Leonardo Corporation in either Italy
```

Page 30

```
 1    or the United States?
 2    A.  I think so.
 3    Q.  You collected documents for your counsel
 4    in this case, correct?
 5         MR. NUNEZ:  I'm going to object to form.
 6         THE WITNESS:  Could you please explain a
 7    little bit better what documents you are
 8    talking about?
 9    BY MR. PACE:
10    Q.  Did you receive discovery requests from
11    this litigation?
12         MR. NUNEZ:  Object to form.
13         MR. LEON DE LA BARRA:  Object to form.
14         THE WITNESS:  Please forgive me, but it is
15    not -- I'm not comprehending the question.  I'm
16    not.
17         MR. PACE:  I will do it again.
18    BY MR. PACE:
19    Q.  You were asked to collect certain
20    documents for this case.
21    A.  Yes.
22    Q.  And those were documents that you were
23    going to provide to the other parties in the case?
24    A.  I do not know who they were provided to.
25    Q.  You were asked to collect, for example,
```

Page 31

```
 1    your emails with Andrea Rossi?
 2         THE INTERPRETER:  Could you please repeat
 3    your answer?
 4         THE WITNESS:  The documentation that
 5    was -- the complete documentation that is in
 6    my -- that I have in my --
 7         DR. ROSSI:  Possess.
 8         MR. NUNEZ:  Possession.
 9         THE INTERPRETER:  I'm sorry, I will get
10    the word.
11         THE WITNESS:  -- possession has been sent
12    to my attorney.
13    BY MR. PACE:
14    Q.  Did you search --
15    A.  I would like to finish.
16         Whatever I have not sent is not in my
17    possession any longer.
18    Q.  Did you search the documents that you have
19    in the United States?
20    A.  No, in the US, no.
21         THE INTERPRETER:  It was cut.  The answer
22    was cut.  There was a technical difficulty.
23    Could you please repeat the answer?
24         THE WITNESS:  I'm also having --
25         THE INTERPRETER:  He's also having that
```

Page 32

```
 1    problem, kind of chopped up.  He's getting
 2    delayed.  Our voices is getting like in pieces
 3    and delayed.  Maybe if you try to fix the
 4    connection for a minute.
 5         MR. PACE:  Move that closer to you.
 6         THE WITNESS:  It is a connection problem.
 7    In this moment, it is near to yellow.
 8         MR. PACE:  Let's ask my question again.
 9    BY MR. PACE:
10    Q.  He may have answered this, but did you
11    search your documents in the United States?
12    A.  Physically, no.
13    Q.  Did you search the documents you have in
14    Italy?
15    A.  Physically, no.
16    Q.  But you believe you have a physical copy
17    of an NDA with Leonardo Corporation either in the
18    United States or Italy?
19    A.  Perhaps.  I think so.  Perhaps.  I don't
20    have a certainty of it.
21    Q.  You were asked to collect your email
22    communications with various individuals, correct?
23    A.  Yes.  Yes.
24    Q.  You provided very few emails with, for
25    example, Dr. Rossi?
```

R

Page 33

1    A.  I provided everything that was in my
2  possession after the closing of the contract with
3  Industrial Heat.
4    Q.  Did you search for your email
5  communications with James Bass?
6    A.  Yes, I searched for them.
7    Q.  And did you search through your email
8  communications with Andrea Rossi?
9    A.  Yes, I searched for them.
10    Q.  If Andrea Rossi and James Bass produced
11  far more email communications with you, then is that
12  because you have deleted some of your email
13  communications with, for example, Dr. Rossi and
14  James Bass?
15    A.  In the contract, it was foreseen that I
16  was to delete everything that was in my power, in my
17  possession, once the term of the contract would end.
18  I was to delete.  I only saved the necessary
19  documents.  Once I obtained the final payment and
20  renewal of the contract, as it was promised by
21  Industrial Heat.
22    THE INTERPRETER:  There was a discrepancy
23  in the translation.  Would you like me to ask
24  the question again and try to get an answer?
25  May the interpreter ask him to divide the

Page 34

1  answer.
2    MR. PACE:  Let me do this.  Let me say it.
3  BY MR. PACE:
4    Q.  Mr. Fabiani, we need you to provide -- to
5  break your responses into shorter sentences.
6    A.  Okay.  It is only one block, because it is
7  divided by significance.
8    THE INTERPRETER:  (In Italian.)
9    THE WITNESS:  Once it is divided, it loses
10  its meaning.
11  BY MR. PACE:
12    Q.  You are claiming that you deleted emails
13  because you were required to by your contract with
14  Industrial Heat?
15    A.  My contract with Industrial Heat would
16  foresee -- okay.  It was foreseen that I had to give
17  my -- all of the documentation that was done by me.
18    THE INTERPRETER:  No.  The interpreter is
19  not understanding.  (In Italian.)
20    THE WITNESS:  I have to finish my answer.
21  And this --
22    THE INTERPRETER:  The interpreter is not
23  understanding.  (In Italian.)
24    DR. ROSSI:  Delivery.
25    THE INTERPRETER:  The delivery.



Page 35

1    THE WITNESS:  The delivery was effected to
2  the attorney that is present.  It was all --
3  afterwards, it was all deleted afterwards to
4  respect the agreement of the contract.
5  BY MR. PACE:
6    Q.  That is literally what he's saying.
7    Mr. Fabiani, I want to understand here,
8  there are emails that you have deleted that relate
9  to either the E-CAT or to Leonardo Corporation or to
10  Industrial Heat, correct?
11    A.  They were deleted, as it was required by
12  the contract.
13    Q.  And when did you delete those emails?
14    A.  The day after the contract expired.
15    Q.  And pursuant to that contract, did you
16  provide copies of that information to Industrial
17  Heat?
18    THE INTERPRETER:  Copies of the contract?
19  Sorry.
20    MR. PACE:  Let me say it again.
21    THE INTERPRETER:  (In Italian.)
22  BY MR. PACE:
23    Q.  Let me just -- no, no.
24    Before deleting those emails, did you
25  provide copies of them to Industrial Heat?

Page 36

1    A.  A copy of what?
2    Q.  The emails you just testified that you had
3  deleted after the expiration of the contract.
4    A.  It was not -- in the contract, it did not
5  ask for any emails to be sent.  No, it did not ask
6  for any copies of the emails.  Just of the data,
7  information, copies of the data.
8    Q.  Let me ask my question to you again.
9    You testified that you have deleted some
10  of these email communications with -- the email
11  communications that involve the E-CAT -- that
12  involve the E-CAT or Leonardo Corporation or
13  Industrial Heat?
14    A.  Yes.
15    Q.  And you have deleted those -- wait -- and
16  you have deleted those within the past year?
17    MR. NUNEZ:  Object to form.
18    THE WITNESS:  The day after the end of the
19  contract.
20  BY MR. PACE:
21    Q.  You deleted those emails within the past
22  year?
23    MR. NUNEZ:  Object to form.
24    THE WITNESS:  When you say this last year,
25  what year are you talking about?

Page 37

```
 1   BY MR. PACE:
 2      Q.  You deleted those emails within the last
 3   12 months?
 4         MR. NUNEZ:  Object to form.
 5         THE WITNESS:  I would like to know which
 6   year you're talking about.
 7   BY MR. PACE:
 8      Q.  The past 12 months, Mr. Fabiani.
 9      A.  We are in February, so -- yes, I think
10   that that is within the 12 months.  I think so.
11      Q.  Prior to deleting those emails, did you
12   send copies of them to anyone?
13      A.  I do not remember if I distributed copies
14   during work.
15      Q.  The question was probably not well done.
16      When you decided to delete some email --
17   when you decided to delete the emails that we have
18   been talking about, at or shortly before that time
19   did you forward those emails to anyone else?
20      A.  That I recall, no.  Before, it was normal.
21   During the period of time that the work was
22   developing, that was normal.
23      After the contract expired, whatever was
24   left was sent to my attorney.
25      Q.  And when you say your attorney, do you
```

Page 38

```
 1   mean Rudy Nunez?
 2      A.  Yes.
 3      Q.  Dr. Penon testified the other day that you
 4   sent to him a series of emails.  Did you send email
 5   communications to Dr. Penon?
 6      A.  During the development of my work for
 7   Industrial Heat.
 8      Q.  Did these emails include attachments of
 9   data?
10         THE INTERPRETER:  One moment.  The
11   interpreter's microphone fell off.  We are
12   good.
13         THE VIDEOGRAPHER:  Thank you.
14         THE INTERPRETER:  I'm sorry.  What kind of
15   data?
16   BY MR. PACE:
17      Q.  Data.  Attachments of data.
18      A.  Yes.
19      Q.  This included data that you took off of a
20   computer owned by Dr. Penon?
21         MR. NUNEZ:  Object to form.
22         MR. LEON DE LA BARRA:  Object to form.
23         THE WITNESS:  The answer is no.
24   BY MR. PACE:
25      Q.  Did Dr. Penon have a computer at the Doral
```

Page 39

```
 1   location?
 2      A.  Where precisely?
 3      Q.  At the warehouse in Doral.
 4      A.  Yes, in the studio where the plant was.
 5      Q.  Did you -- is this -- did you have access
 6   to that computer?
 7      A.  What do you mean by access?
 8      Q.  Were you able to access the data or
 9   information on that computer?
10      A.  No.
11      Q.  What was the data that you sent -- you
12   would send by email to Dr. Penon?
13      A.  I did not understand the question.
14         THE INTERPRETER:  Maybe the interpreter
15   did not translate it correctly.
16         MR. PACE:  No problem.
17   BY MR. PACE:
18      Q.  What data would you send to Dr. Penon by
19   email?
20      A.  My summary of the --
21         DR. ROSSI:  Operation.
22         THE WITNESS:  -- operation of the --
23         DR. ROSSI:  Plant.
24         THE WITNESS:  -- the plant.  Okay.
25
```

Page 40

```
 1         MR. PACE:  Let's do that again.
 2         THE INTERPRETER:  I've got it now.
 3   BY MR. PACE:
 4      Q.  Mr. Fabiani, let me ask my question again
 5   to allow for translation again.
 6      What data would you send to Dr. Penon by
 7   email?
 8      A.  A summary of the operation of the plant.
 9      Q.  How often would you send those emails to
10   Dr. Penon?
11      A.  Usually every two months.  Every two
12   months.
13      Q.  Have you saved those emails?          R, AA
14      A.  No, absolutely not.
15      Q.  When did you delete those emails?
16      A.  The day after the contract expired.
17      Q.  And you did not -- before deleting those
18   emails, you did not send copies of those emails
19   either to Industrial Heat or to your counsel?
20         MR. NUNEZ:  Object to form.
21         THE WITNESS:  Before the expiration of the
22   contract --
23         THE INTERPRETER:  (In Italian.)
24         THE WITNESS:  Before -- had been sent
25   to --
```

Page 41

```
1         THE INTERPRETER:  (In Italian.)
2         MR. PACE:  He's translating for the
3   translator.  Mr. Fabiani, I know you understand
4   English, but you have to let her translate.
5         THE INTERPRETER:  It is reference to --
6   no, no.
7         MR. PACE:  Let's do this again.  Let me
8   ask my question again, and he can answer.
9         THE INTERPRETER:  (In Italian.)
10        THE WITNESS:  (In Italian.)
11        It is not correct, the translation.
12        MR. PACE:  That's why I'm asking.  I
13   realize you understand English, Mr. Fabiani.
14        THE WITNESS:  Thank you, thank you.
15   BY MR. PACE:
16        Q.  Prior to deleting your emails with
17   Dr. Penon, did you send those emails either to your
18   counsel or to -- to Industrial Heat?
19        A.  Before the expiration of the contract --
20        THE INTERPRETER:  (In Italian.)  I'm
21   sorry.
22        DR. ROSSI:  I can help.
23        MR. PACE:  Let's take a break.
24        THE VIDEOGRAPHER:  Stand by to go off the
25   record.  Going off at 9:49.
```

Page 42

```
1         (Thereupon, a recess was taken, after
2   which the following proceedings were held:)
3         MR. PACE:  Back on the record.
4         THE VIDEOGRAPHER:  We are now back on the
5   video record.  The time back on is 9:55 a.m.
6   BY MR. PACE:
7         Q.  Mr. Fabiani, before you deleted the emails
8   you sent to Dr. Penon, did you send those specific
9   emails to anyone else?
10        A.  I have to give a response a bit long, so I
11   have to divide it in several parts.
12        MR. NUNEZ:  Well, let him answer.
13   BY MR. PACE:
14        Q.  Can you answer yes or no first?
15        A.  Well, the answer of a yes or a no depends
16   on the time frame, the period of time.
17        Q.  All right.  Then let me -- I will narrow
18   it to make it easier.
19        A.  Correct.
20        Q.  Did you forward the emails that you sent
21   to Dr. Penon immediately before deleting them?
22        THE INTERPRETER:  Can you repeat the
23   question again because I'm hearing that this is
24   not correct.
25        THE WITNESS:  (In English.) Sorry.  I
```

Page 43

```
1         don't understand the question.  It is not
2   complete.
3   BY MR. PACE:
4         Q.  Did you forward -- forwarding an email,
5   does that translate for something in Italian or are
6   you having a problem with that?  Let me use a
7   different word.
8         THE INTERPRETER:  It is to send.
9         DR. ROSSI:  To forward in Italian -- (in
10   Italian.)
11        THE INTERPRETER:  Okay.
12   BY MR. PACE:
13        Q.  Did you forward the emails you sent to
14   Dr. Penon to anyone else?
15        A.  I did not forward the emails to anyone.  I
16   sent the email to several --
17        DR. ROSSI:  I delivered.
18        THE INTERPRETER:  I delivered the emails.
19        DR. ROSSI:  The emails, the data.
20        MR. PACE:  The data.  The data.
21        THE INTERPRETER:  I delivered the emails
22   to -- (in Italian.)
23        MR. NUNEZ:  He gave the emails to various
24   people.  Not the emails, the data.
25        MR. PACE:  If everybody can stop.  What is
```

Page 44

```
1         the Italian word you're using for email?
2         THE INTERPRETER:  Email.
3         MR. PACE:  If he does not use the word
4   email --
5         THE INTERPRETER:  He's using email in
6   English.  Email.
7         MR. PACE:  What I think he was responding
8   in Italian is "the summary or the records."  He
9   did not use the word "email."  So your
10   translation should not use the word "email."
11   Let me try this again, to make sure I've got
12   it.
13   BY MR. PACE:
14        Q.  Mr. Fabiani, you are testifying that you
15   did not forward the Dr. Penon emails to anyone, but
16   you sent the same data you provided Dr. Penon to
17   others?
18        A.  Okay.  I did not understand it.  It is
19   quite complex because -- because the email of
20   Dr. Penon --
21        DR. ROSSI:  The email sent to Dr. Penon.
22        THE INTERPRETER:  The email sent to
23   Dr. Penon was not forwarded to anyone.
24        MR. PACE:  Understood.
25        THE WITNESS:  But the data that was
```

IC

Page 45

1  contained in that email --
2      DR. ROSSI:  Has been delivered.
3      THE INTERPRETER:  Has been delivered to
4  Dr. Rossi.  (In Italian.)
5      THE WITNESS:  Have been hand-delivered to
6  Dr. Rossi.
7      THE INTERPRETER:  (In Italian.)
8      The interpreter is not understanding the
9  names.  It is chopped up.
10     Could you please repeat the names?
11     THE WITNESS:  J.T. Bolgan.  Tom something.
12 BY MR. PACE:
13     Q.  Darden?
14     A.  Darden, during the time that they visited
15 the plant.
16     The day before the contract expired, I
17 went to -- I went to the officer or the firm of
18 Jones Day, and I hand-delivered to the engineer of
19 Industrial Heat.
20     DR. ROSSI:  A flash drive.
21     MR. NUNEZ:  A flash drive.
22     THE WITNESS:  A flash drive that contained
23 the same.
24     DR. ROSSI:  Reports.
25     THE INTERPRETER:  Reports.

Page 46

1      MR. PACE:  Data.
2      THE WITNESS:  Document.
3      After my contract was completed, I
4  proceeded -- I proceeded --
5      THE INTERPRETER:  (In Italian.)
6      THE WITNESS:  -- to the cancelation of all
7  of that, everything that did not have to do
8  with the renewing of the contract.
9  BY MR. PACE:
10     Q.  As to data that you sent to Dr. Penon, you
11 sent Dr. Penon temperature data?
12     A.  Yes.
13     Q.  You sent Dr. Penon electrical data?
14     A.  Yes.
15     Q.  Did you send Dr. Penon pressure data?
16     A.  Yes.
17     Q.  From where did you obtain the temperature
18 data?
19     THE INTERPRETER:  Temperature?
20     DR. ROSSI:  Correct.
21     THE WITNESS:  From my -- from my data,
22 from my part of the plan.
23     DR. ROSSI:  Control system.
24     THE INTERPRETER:  The control system.
25

Page 47

1  BY MR. PACE:
2      Q.  From where did you obtain the electrical
3  data?
4      A.  From the PC 800 --
5      DR. ROSSI:  PCE.
6      THE INTERPRETER:  PCE-830.
7      MR. PACE:  Dash 30.
8  BY MR. PACE:
9      Q.  And that is the electrical data that you
10 sent to Dr. Penon?
11     A.  Yes.
12     Q.  And then you sent -- from where did you
13 obtain the pressure data that you sent to Dr. Penon?
14     A.  From one of my pressure --
15     DR. ROSSI:  A probe, pressure probe in my
16 control system.
17     THE WITNESS:  My pressure.
18     THE INTERPRETER:  Pressure probe within my
19 control system.
20 BY MR. PACE:
21     Q.  Did you send water level information to
22 Dr. Penon?
23     THE INTERPRETER:  Water level data?
24     MR. PACE:  Yes.
25     THE WITNESS:  No.

Page 48

1  BY MR. PACE:
2      Q.  And your testimony is that the same data
3  you sent to Dr. Penon, you also turned over to an
4  engineer for Industrial Heat at the offices of Jones
5  Day?
6      A.  Yes.  Yes.
7      Q.  Your testimony is you turned this data
8  over in a flash drive?
9      A.  Yes.
10     Q.  Let's talk a little bit about the time you
11 were in the offices of Jones Day.  You met with J.T.
12 Vaughn and an engineer from Industrial Heat,
13 correct?
14     A.  Also with the presence of the attorney.
15     Q.  And the attorney who was present was
16 myself?
17     A.  Yes.
18     DR. ROSSI:  (In Italian.)
19     THE INTERPRETER:  (In Italian.)
20     THE WITNESS:  I do remember that, yes, I
21 do.
22 BY MR. PACE:
23     Q.  Mr. Fabiani, even though --
24     A.  I was at the Jones Day office two times.
25 Jones Day.

Page 49

1      Q.  Mr. Fabiani, for purposes of the
2   deposition, if you can wait for the Italian
3   translation before responding.  Otherwise, we are
4   talking over each other.
5      A.  Sorry.  I apologize.
6      Q.  During this meeting at Jones Day, you
7   spoke about -- about your interactions with James
8   Bass?
9          THE INTERPRETER: Interactions.
10         MR. PACE:  That is a bad word.  Let me
11   start over.
12   BY MR. PACE:
13      Q.  At this meeting you spoke about your --
14   your --
15         MR. PACE:  Let me start this over.
16         THE INTERPRETER:  The interpreter would
17   like to know, "you" singular or "you" plural?
18   You or he spoke or they all spoke?
19         MR. PACE:  Give me a second.
20   BY MR. PACE:
21      Q.  At this meeting, you discussed your work
22   at the Doral location, correct?
23      A.  Which one of the two visits?
24      Q.  The first.
25      A.  Yes.

Page 50

1      Q.  And if I refer to the Doral warehouse, do
2   you understand that is the warehouse where you were
3   working with Dr. Rossi?
4      A.  Yes.  I only know that one, the Doral.
5      Q.  During this meeting, you explained that
6   you had only met with James Bass a few times?
7      A.  Yes.
8      Q.  At this meeting, you explained that the
9   only times you spoke with James Bass were to
10   discuss -- were to discuss the power needs of JM
11   Products?
12         THE INTERPRETER:  Power needs?
13   BY MR. PACE:
14      Q.  To discuss the amount of power or energy
15   that was needed by JM Products.
16         MR. NUNEZ: Object to form.
17         THE WITNESS:  For everything that had to
18   do with the E-CAT, we would only talk about the
19   necessary power at the JM company.
20         DR. ROSSI:  Company.
21   BY MR. PACE:
22      Q.  And you explained at this meeting that
23   Dr. Rossi also did not meet often with JM Products?
24         MR. NUNEZ:  Object to form.
25         MR. LEON DE LA BARRA:  Object to form.

Page 51

1          THE WITNESS:  It is not comprehensible,
2   the question.  I can't understand it.
3   BY MR. PACE:
4      Q.  I'm going to go back through this again.
5          We are talking about your first meeting
6   with J.T. Vaughn and the engineer from Industrial
7   Heat at the offices of Jones Day, okay?
8      A.  Yes.
9      Q.  At that meeting, you explained that you
10   spoke with James Bass only a few times, correct?
11      A.  A few times, normally in one year, one or
12   two times a month.  In the last period of time, it
13   could have even been three times a month.
14      Q.  Mr. Fabiani, I'm asking you what you said
15   at this meeting at Jones Day.  You said that you
16   rarely spoke with James Bass, correct?
17         MR. NUNEZ:  Object to form.
18         MR. LEON DE LA BARRA:  Object to form.
19         THE WITNESS:  Yes.  Five minutes a week is
20   rarely.
21   BY MR. PACE:
22      Q.  You stated at this meeting that you would
23   only speak to James Bass about the energy needs of
24   JM Products.
25         MR. NUNEZ:  Object to form.

Page 52

1          MR. LEON DE LA BARRA:  Join.
2          THE WITNESS:  For everything that had to
3   do with the CAT --
4          MR. NUNEZ:  E-CAT.
5          THE WITNESS:  -- E-CAT, I would talk only
6   about the production of energy.
7   BY MR. PACE:
8      Q.  I don't understand your limitation.
9          What else -- I'm going to have to come
10   back to this.  He's obviously talking past.  Let me
11   just come up with a -- I'll come back to that in a
12   second.
13         At this meeting with Industrial Heat at
14   the offices of Jones Day, you also said that
15   Dr. Rossi rarely met with anyone from JM Products,
16   correct?
17         THE INTERPRETER:  Met?
18         MR. PACE:  Rarely met with anyone from JM
19   Products, correct?
20         MR. LEON DE LA BARRA:  Object to form.
21         MR. NUNEZ:  Same objection.
22         THE WITNESS:  As far as I recall, I did
23   not say that.
24   BY MR. PACE:
25      Q.  And you said that Dr. Rossi limited the

Page 53

1  interactions between --
2      THE INTERPRETER:  Interactions?
3  BY MR. PACE:
4      Q.  Limited the dealings between --
5      THE INTERPRETER:  Hold on.  I'm just
6  reading.  The dealings between Leonardo
7  Corporation and JM Products.
8      I'm sorry.  I need the whole question.
9  BY MR. PACE:
10      Q.  You also said that Dr. Rossi insisted on
11  limiting the dealings between --
12      DR. ROSSI:  I'm sorry.
13      THE INTERPRETER:  Dealings.
14      MR. PACE:  Let me use a different word.
15  Let me try this over again and use a different
16  word.
17  BY MR. PACE:
18      Q.  At this meeting, you also said that
19  Dr. Rossi wanted to limit the involvement between
20  Leonardo Corporation -- that is not translating
21  either.
22      MR. PACE:  All right.  We need to take a
23  break.
24      DR. ROSSI:  If you want, I can help.
25      MR. PACE:  You may need to take a break,

Page 54

1  too.
2      THE VIDEOGRAPHER:  Stand by to go off the
3  video.  Going off at 10:21 a.m.
4      (Thereupon, a recess was taken, after
5  which the following proceedings were held:)
6      THE VIDEOGRAPHER:  We are now back on the
7  video record.  The time is 10:40 a.m.
8  BY MR. PACE:
9      Q.  Mr. Fabiani, I wanted to show you an
10  exhibit.  I'm going to mark it as Exhibit 1.
11      (The referred-to document was marked by
12      the court reporter for Identification as
13      Deposition Exhibit 1.)
14  BY MR. PACE:
15      Q.  We are going to use the computer to go
16  through the pages for you.  Can you see the
17  document?
18      A.  Yes.
19      MR. PACE:  Do you want to go to page 2?
20  And scroll down that.  Slowly.
21      Let's go to page 3 and then I will ask a
22  question.  If you can go back up to page 1 now.
23  BY MR. PACE:
24      Q.  Mr. Fabiani, do you recognize this as an
25  email that you sent to J.T. Vaughn -- I'm sorry, let

Page 55

1  me say it again.  I apologize.
2      Q.  Do you recognize this email that you sent
3  to J.T. Vaughn?
4      A.  It could be.
5      Q.  And do you recognize the CV attached to
6  the email?
7      A.  It could be my curriculum, but I don't
8  remember.
9      DR. ROSSI:  CV.
10      THE WITNESS:  Because it is from 2013.
11  BY MR. PACE:
12      Q.  Do you recognize this CV as a document you
13  prepared?
14      A.  I don't remember the curriculum from 2013.
15  It could be mine.
16      Q.  Do you have any reason -- do you have any
17  reason to have sent a CV to J.T. Vaughn that was not
18  yours?
19      A.  Me?  No.
20      Q.  So is your only uncertainty about this
21  document, about the CV attached here as Exhibit 1 --
22      THE INTERPRETER:  I'm sorry.
23  BY MR. PACE:
24      Q.  Is your only uncertainty as to the CV
25  shown here the date of when it was prepared?

Page 56

1      Let me try this again.  Let me try it
2  again.
3      Do you recognize the CV that you are being
4  shown as part of Exhibit 1?
5      A.  I couldn't say because I have not read it
6  all.
7      MR. PACE:  Do you want to scroll through
8  it?  Good.
9      THE WITNESS:  Too fast.  Please.  Too much
10  fast.
11      THE INTERPRETER:  He said too much fast,
12  please.
13      THE WITNESS:  Okay.  Stop.
14  BY MR. PACE:
15      Q.  Mr. Fabiani, will you let us know when you
16  want us to go to the next page?
17      A.  Absolutely, yes.
18      DR. ROSSI:  He says he's reading.
19      THE INTERPRETER:  Right now, he said.
20      DR. ROSSI:  Yes, before he said.
21      MR. PACE:  Before he said, okay.
22      Do you want to scroll down to the next
23  page, please?
24      THE WITNESS:  I no say jump the page.
25      DR. ROSSI:  My mistake.  I am the culprit.

Page 57

1    MR. PACE:  Mr. Fabiani, Dr. Rossi thought
2  you said move to the next page.
3    DR. ROSSI:  I'm very sorry.
4    MR. PACE:  It's fine.  You were trying.
5    THE WITNESS:  Okay.  Next page.  You can.
6  Stop.
7    I see that my image is covering.  Okay.
8  Never mind.  Thanks.
9    There is something that just doesn't --
10  could you please go lower, please?  Go down?
11  Stop.
12    You can still go down some more.
13    MR. PACE:  Just go down to the bottom of
14  this page and stop there.  It's okay like that
15  for now.  That's fine.
16    THE WITNESS:  Could you still go down some
17  more?
18    MR. PACE:  Actually, stop there.
19  BY MR. PACE:
20    Q.  Mr. Fabiani, as to at least these first
21  two pages, do you recognize those as being at least
22  the first two pages of your CV?
23    A.  Yes.  They are some of the activities that
24  I have performed in my -- that are in my
25  curriculum -- in my risumi.

Page 58

1    Q.  Uh-huh.  And are these first two pages
2  that you have reviewed here accurate?
3    A.  They are correct, but not precise, because
4  this is a summary.
5    Q.  Okay.  In terms of -- well, let me narrow
6  it down.
7    Let me ask you if we can go up to the page
8  that starts with the experience or where the
9  experience begins.  I think it is the -- right
10  there.
11    MR. PACE:  Can you scroll down just a
12  little bit?  That's perfect.
13  BY MR. PACE:
14    Q.  I want to ask about your description for
15  Leonardo Corporation.  And, remember, this was a
16  document that was prepared back in 2013, at the time
17  you had been working for Leonardo Corporation for
18  about a year?
19    A.  I started when -- okay.  I started working
20  from June 2012 to the first months of 2014.  I don't
21  remember if it was in the beginning of the summer.
22    DR. ROSSI:  Correct.
23    THE WITNESS:  Please forgive me, I don't
24  remember perfectly.
25    THE INTERPRETER:  (In Italian.)

Page 59

1    THE WITNESS:  There are some errors,
2  though, in this risumi.  It seems something
3  that was taken from the Internet, because I do
4  not send a risumi with grammar errors.
5  BY MR. PACE:
6    Q.  In 2012 or 2013, were you the technical
7  director at Leonardo Corporation?
8    A.  Yes, the engineer.  Rossi asked me to be
9  the technical consultant.
10    Q.  In 2012 and in 2013, were you the head of
11  research and development for Leonardo Corporation?
12    THE INTERPRETER:  Were you the head of --
13  I'm sorry.
14  BY MR. PACE:
15    Q.  Were you the head of research and
16  development at Leonardo Corporation?
17    THE INTERPRETER:  Research and -- I'm
18  sorry.
19    MR. PACE:  Development.
20    THE WITNESS:  That is correct, research
21  and development.
22    THE INTERPRETER:  Please repeat again for
23  the interpreter.
24    THE WITNESS:  I will make it short.  I
25  will make it short.

Page 60

1    I was the head of the research and
2  development of the electrical part and the
3  electronic part.
4  BY MR. PACE:
5    Q.  Electronics.
6    For how long did you work for Leonardo
7  Corporation?
8    A.  From mid-2012 to mid-2013, not
9  exclusively.
10    MR. PACE:  Can you scroll up?
11  BY MR. PACE:
12    Q.  Is this education section of your CV
13  accurate?
14    DR. ROSSI:  More or less.
15    THE WITNESS:  More or less, yes.
16  BY MR. PACE:
17    Q.  Can you tell me the less part?  Where is
18  it not accurate?
19    A.  It is not complete, not accurate, but not
20  complete.  All of the part that talks about the
21  military.
22    DR. ROSSI:  Specialization.
23    THE WITNESS:  Specialization.
24  BY MR. PACE:
25    Q.  It is accurate or not accurate?

Page 61

1    A.  It is only short.  It is -- it is not
2  possible to add the explanation.
3    Q.  During the time that you were working for
4  Leonardo Corporation, were you involved in a test or
5  experiment done in Ferrara, Italy?
6    A.  There was -- there was more than one
7  experiment performed in Ferrara.  If you tell me
8  which one you're talking about.
9    Q.  Were you involved in a test or experiment
10  that was done in April or May of 2013?
11    A.  When you refer to things that are long
12  time away, it is a little bit -- it is easier if you
13  tell me --
14    THE INTERPRETER:  (In Italian.)
15    THE WITNESS:  You think that I was present
16  with.
17  BY MR. PACE:
18    Q.  Are you familiar with a test or experiment
19  that was referred to as a -- I'm sorry.  Let me
20  start over again.
21    Have you ever seen the license agreement
22  between Leonardo Corporation and Industrial Heat,
23  among others?
24    THE INTERPRETER:  License.
25    MR. PACE:  License agreement.

Page 62

1    THE WITNESS:  No, no.  From Leonardo
2  Corporation to Industrial Heat, no.
3  BY MR. PACE:
4    Q.  I assume, also, that you have never seen
5  the first amendment to the licensing -- the license
6  agreement between Leonardo Corporation and
7  Industrial Heat?
8    DR. ROSSI:  (In Italian.)
9    THE WITNESS:  No.
10  BY MR. PACE:
11    Q.  Are you familiar --
12    A.  Could you please turn on the lights
13  because I only see darkness.
14    MS. HANDELSON:  He should see our screen.
15    THE INTERPRETER:  The documents.
16    MR. PACE:  Are you not seeing the
17  document?
18    THE WITNESS:  Yes, but right now we are
19  not talking about the document.
20    MR. PACE:  He wants to go back to the
21  screen.  The darkness is actually because of
22  the light here.  But we will deal with that.
23    THE WITNESS:  Okay.  Okay.  That is fine.
24  Thank you.  It was dark at first.  Now I can
25  see.

Page 63

1  BY MR. PACE:
2    Q.  Are you familiar with a test that was done
3  in 2013 that was referred to as a validation test?
4    A.  I did so many tests.  If you would tell me
5  with whom you think I was present with or with whom
6  I did it, then I could tell you yes or no.
7    Q.  J.T. Vaughn would also have been present?
8    A.  Oh, yes, I do remember this with J.T.
9  Vaughn.
10    Q.  Was that a test done in Ferrara, Italy?
11    A.  Yes.
12    Q.  What was your -- well, what do you recall
13  that test being?
14    A.  I don't understand the question.  In what
15  sense?
16    Q.  What was the test or experiment that was
17  done in Ferrara, Italy, when you were present along
18  with J.T. Vaughn?
19    DR. ROSSI:  It was about the startup of
20  the groups --
21    THE WITNESS:  It was about the startup of
22  the groups of reactors.
23  BY MR. PACE:
24    Q.  What was your role in connection with that
25  test or experiment?

Page 64

1    DR. ROSSI:  Verify.
2    THE INTERPRETER:  Nutrition system --
3    MR. PACE:  Mutual.
4    DR. ROSSI:  No, the control system.
5    THE WITNESS:  The control system.  Because
6  I had --
7    DR. ROSSI:  Supplied.
8    THE WITNESS:  -- supplied to Rossi and
9  EFA.
10    DR. ROSSI:  EFA, E-F-A.
11  BY MR. PACE:
12    Q.  Your role in connection with this test was
13  to operate the control system?
14    DR. ROSSI:  Control.
15    THE WITNESS:  The control of --
16    THE INTERPRETER:  What was the word?
17    MR. PACE:  Electrical.
18    DR. ROSSI:  Control of the supply of
19  electricity.
20    THE WITNESS:  Power supply.
21    DR. ROSSI:  Power supply.
22    THE WITNESS:  This is vocabulary that I
23  know very well in English because we use it in
24  Italy.
25

Page 65

1   BY MR. PACE:
2       Q.   During this testing in Ferrara, Italy, did
3   you have any discussions with J.T. Vaughn?
4       A.   I don't remember.  I think so.
5       Q.   Do you remember the substance of those
6   conversations?
7       A.   Probably about the description of the
8   power supply plant.
9       Q.   Power supply.
10          How did you learn -- when did you learn
11  about this test that was going to be conducted in
12  Ferrara, Italy, if you recall?
13      A.   I received -- I don't remember the date.
14  I received a telephone call.
15      Q.   From whom?
16      A.   From the EFA administrator.
17      Q.   Who was the EFA administrator?
18      A.   When I was present, Dr. Vascoch (ph).
19  Female.  I'm finishing.
20          And she told me that it was necessary to
21  create the plant that I had projected, the power
22  supply plant.
23      Q.   I think I'm asking maybe a slightly
24  different question.
25          Just as to the test that was conducted,

Page 66

1   the test or experiment that was conducted in
2   Ferrara, Italy, when you were there with J.T.
3   Vaughn, when did you find out that you needed to be
4   in Italy for that test or experiment?
5       A.   I don't remember the date.
6       Q.   All right.  Do you remember whether it was
7   far in advance or shortly in advance?
8       A.   If I would say anything, perhaps I would
9   be mistaken.  I really don't remember.  I remember
10  that we had 15 days for the research of the group.
11      Q.   I think he's talking about the reactors.
12      A.   For the power supply group.
13      Q.   You had 15 days to do what?
14      A.   No.  Okay.  There were 15 days that were
15  used to do the research for the power supply group.
16      Q.   Did anyone describe to you the test or
17  experiment that was being conducted in Ferrara,
18  Italy?
19      A.   From Dr. Rossi, I had a basic explanation.
20      Q.   What do you recall about the explanation
21  that he provided you?
22      A.   He asked me to perform a --
23      DR. ROSSI:  To make a.
24      THE INTERPRETER:  -- to make --
25      DR. ROSSI:  Proportional control.

Page 67

1       MR. NUNEZ:  Proportionate control.
2       DR. ROSSI:  Proportional control.
3       MR. NUNEZ:  Proportional control.
4       THE WITNESS:  -- proportional control of
5   the power supply.
6   BY MR. PACE:
7       Q.   Dr. Rossi asked you to make a proportional
8   control of the power supply?
9       DR. ROSSI:  (In Italian.)
10      THE WITNESS:  Yes.
11  BY MR. PACE:
12      Q.   And what is a proportional control of the
13  power supply?
14      A.   It is a system that allows to endure --
15  I'm sorry.
16      DR. ROSSI:  To make the dosage.
17      THE INTERPRETER:  To make the dosage.
18      THE WITNESS:  Okay.  To make the dosage,
19  which allows --
20      DR. ROSSI:  The power that is.
21      THE INTERPRETER:  The power that is.
22      DR. ROSSI:  Supplied.
23      MR. PACE:  Can we take a break?  We have
24  to change the tape.
25      THE VIDEOGRAPHER:  Stand by to go off.

Page 68

1       THE WITNESS:  Okay.  I have to have
2   dinner.  When do you foresee that you are going
3   to take your lunch break?
4       THE VIDEOGRAPHER:  Stand by to go off
5   Media Unit 1.  Going off at 11:15 a.m.
6       (Thereupon, a recess was taken, after
7   which the following proceedings were held:)
8       THE VIDEOGRAPHER:  We are now back on the
9   video record.  This is the start of Video Media
10  Unit 2.  The time on the record is 11:22 a.m.
11  BY MR. PACE:
12      Q.   Mr. Fabiani, when we went off the record a
13  couple of minutes ago we were talking about a
14  testing done in Ferrara, Italy, and I believe you
15  were describing that you provided the controls for
16  the power supply for that test?
17      A.   Yes.
18      Q.   That test --
19      A.   I provided the project, along with the
20  laborers.
21      DR. ROSSI:  The workers.
22      THE WITNESS:  The workers, workers.
23      DR. ROSSI:  It was installed.
24      THE WITNESS:  It was installed by the
25  workers.

Page 69

1  BY MR. PACE:
2      Q.  And who were those workers?
3      A.  Workers from EFA.
4      Q.  And this power supply was for -- for E-CAT
5  units?
6      A.  The E-CAT system is divided in groups.
7  Each group has a different --
8      DR. ROSSI:  Supply.
9      THE WITNESS:  -- supply.  And for each
10  group -- and for each group, they could provide
11  the --
12      DR. ROSSI:  A different supply of power.
13      THE WITNESS:  -- a different power supply.
14  Power supply.
15  BY MR. PACE:
16      Q.  Just limiting you to the test that was
17  done in Ferrara, Italy, where J.T. Vaughn was
18  present, how many groups of E-CAT units were tested,
19  if you recall?
20      A.  The system was composed of six inferior
21  groups and four superior groups.  They were tested,
22  four inferior groups were tested, and I don't
23  remember if two or three superior ones.
24      Q.  Who told you which groups to test?
25      MR. NUNEZ:  Object to form.

Page 70

1      THE INTERPRETER:  You said the groups.
2      MR. NUNEZ:  And object to form.
3      MR. PACE:  Yes.
4      THE WITNESS:  Dr. Rossi would ask me which
5  groups.
6  BY MR. PACE:
7      Q.  Do you know why some groups were selected
8  as opposed to others?
9      A.  No.  That was -- that was a discussion
10  between Dr. Rossi and Tom Darden.
11      Q.  Tom Darden.
12      THE INTERPRETER:  Sorry.
13      MR. PACE:  His pronunciation of it is a
14  little unique.
15  BY MR. PACE:
16      Q.  Did you participate in the discussion
17  between Andrea Rossi and Tom Darden?
18      A.  No.  I only discussed the technical data
19  with the Industrial Heat engineer named T. Barker.
20      Q.  T. Barker.
21      Just so the record is clear, did you
22  participate in the conversation between Andrea Rossi
23  and Tom Darden, yes or no?
24      A.  There were two types of conversations.
25  The first one was the choosing of the groups, in

Page 71

1  which I did not participate.
2      The second was the verification of the
3  power data --
4      DR. ROSSI:  Power data.
5      THE WITNESS:  -- in which Tom Darden and
6  Dr. Rossi would come to verify to me the power.
7      DR. ROSSI:  The power supply.
8      THE WITNESS:  Supply.
9  BY MR. PACE:
10      Q.  This was -- you are talking about --
11      A.  They would not ask me.  They would come to
12  me for me to explain to them the instrument.
13      DR. ROSSI:  Instrumentation.
14      THE INTERPRETER:  The what?
15      DR. ROSSI:  Instrumentation.
16      THE WITNESS:  Instrumentation.
17  BY MR. PACE:
18      Q.  Did this occur -- did the discussions that
19  you had with Tom Darden and Andrea Rossi together
20  occur after the test or experiment was run?
21      A.  No.
22      Q.  You may have described this already:  What
23  discussion did you have during this testing with
24  J.T. Vaughn?
25      A.  J.T. Vaughn is not a technician.  He

Page 72

1  wanted to have me try to explain to him how the
2  supply system was created.
3      Q.  Did you have any other discussions with
4  J.T. Vaughn during the testing?
5      A.  Yes.
6      Q.  About what?
7      A.  Food.
8      THE INTERPRETER:  It is dish.
9  BY MR. PACE:
10      Q.  Anything else?
11      A.  About life in Italy and if I was
12  interested in going to the United States to work
13  with him.
14      Q.  Prior to the test beginning, did you have
15  any discussions with Tom Darden?
16      A.  I don't remember.  I think that he asked
17  for some kind of a technical document.
18      Q.  Prior to the test starting in Ferrara,
19  Italy, did you have any discussions with J.T.
20  Vaughn?
21      A.  I don't remember, but I don't think so.
22      Q.  Prior to the test starting, did you
23  have -- did you have any discussions with T. Barker?
24      A.  I don't recall having seen him before the
25  test.

Page 73

1    Q.  After the test in Ferrara, Italy, did
2  there come a time when you moved to North Carolina?
3    A.  When?
4    Q.  The first question is:  Did you at some
5  point live in North Carolina?
6    A.  Yes.  When it was written in the contract.
7    THE INTERPRETER:  Oh, when the contract
8  was signed.
9  BY MR. PACE:
10   Q.  So your recollection is that you moved to
11 North Carolina around the same time that USQL signed
12 its first agreement with Industrial Heat?
13   A.  Yes, more or less during the same period
14 of time.
15   (A discussion was held off the record,
16 after which the following proceedings were
17 held:)
18 BY MR. PACE:
19   Q.  For how long were you living in North
20 Carolina?
21   A.  Until the transfer to the plant in Miami.
22   Q.  And by the plant, are you referring to the
23 E-CAT plant?
24   A.  Yes.  The name of the plant was --
25   DR. ROSSI:  Megawatt.

Page 74

1    MR. PACE:  One mega plant, 1-MW plant.
2  BY MR. PACE:
3    Q.  Mr. Fabiani, you worked in North Carolina
4  until the E-CAT plant was sent from North Carolina
5  to Florida?
6    A.  Not exactly.
7    Q.  What is more exact?
8    A.  That I worked not only for the plant, but
9  also in other experiments that were asked of me from
10 Rossi and Darden, to satisfy the curiosity of the
11 clients that wanted to see the --
12   DR. ROSSI:  Reactor working.  The reactor
13 working.
14   THE WITNESS:  -- the reactor working,
15 functioning.
16 BY MR. PACE:
17   Q.  Let me ask my question again there.  I'm
18 asking about time periods, not the substance of the
19 work that you did.
20   Is it your testimony that you moved to
21 North Carolina around the time that US Quantum Leap
22 first entered into an agreement with Industrial
23 Heat, correct?
24   A.  More or less during the same time frame.
25   And then you left North Carolina around

Page 75

1  the same time that the E-CAT plant was shipped from
2  North Carolina to Florida?
3    THE INTERPRETER:  During the same period
4  of time?
5    MR. PACE:  That the E-CAT plant was sent
6  from North Carolina to Florida.
7    THE WITNESS:  More or less during the same
8  period of time.
9  BY MR. PACE:
10   Q.  Okay.  During that time in North Carolina,
11 one of the things you worked on was making changes
12 to the 1-MW plant?
13   A.  No.  The majority of my time was spent in
14 refining the technology to build reactors.
15   Q.  Were you working on the -- let me stop.
16   When you say "reactors," do you mean E-CAT
17 units?
18   A.  There are several types of E-CAT units.
19   Q.  Are all the types of -- well, when you
20 refer to a reactor, what are you referring to?
21   A.  The reactors could be the E-CAT standard.
22 The E-CAT at high temperature.
23   THE INTERPRETER:  (In Italian.)
24   THE WITNESS:  Okay.  And the E-CAT at a
25 high power.

IC

Page 76

1    I was in charge of, according to what
2  Rossi -- according to what Rossi asked of me,
3  and together with the engineer, T. Barker, in
4  the refining of the technology for the E-CAT --
5  the temperature E-CAT and high-powered E-CAT.
6  BY MR. PACE:
7    Q.  Well, let me go back to my question,
8  though.  I'm just asking you a question about
9  terminology.
10   When you refer to a reactor, is that an
11 E-CAT unit?
12   A.  Yes.
13   Q.  Would you prefer that I refer to them as
14 E-CAT units or as reactors?
15   A.  Okay.  The reactor --
16   THE INTERPRETER:  (In Italian.)
17   THE WITNESS:  Distinguish high power and
18 high temperature.  Okay.  The E-CAT, the base
19 is called model.
20   DR. ROSSI:  Module.
21   THE INTERPRETER:  Module.  M-O-D-I-A --
22   DR. ROSSI:  M-O-D-U-L-E.
23   THE INTERPRETER:  Oh, module.  I'm sorry.
24   MR. PACE:  I want to try to close up the
25 loop here.

Page 77

1  BY MR. PACE:
2      Q.  Mr. Fabiani, what -- can you just describe
3  for me the work that you did while you were living
4  in North Carolina?
5      A.  Yes.  We projected new types of reactors.
6  We performed the prototypes with the collaboration
7  of Industrial Heat, with the cooperation of
8  Industrial Heat.
9      DR. ROSSI:  With the collaborators.
10     THE WITNESS:  Advisers.  Workers,
11     advisers.
12  BY MR. PACE:
13     Q.  I'm sorry.  You worked on new types of
14  reactors when you were in North Carolina?
15     A.  On the evolution of reactors by Rossi.
16     Q.  These reactors were -- some of these
17  reactors were housed in a container, correct?
18     A.  The majority of the reactors were in a
19  cylinder form, the majority of them.
20     Q.  You're familiar with something that was
21  described as a 1-MW plant?
22     A.  Yes.
23     MR. PACE:  And for this purpose, I don't
24     think you should translate 1-MW.  I think you
25     should literally say 1-MW.  That's what

Page 78

1  everybody referred to it as.
2      THE INTERPRETER:  In English.  Don't say
3      it in Italian.
4      MR. PACE:  Yes.
5  BY MR. PACE:
6      Q.  That plant was designed to have cooler
7  fluid coming into it and warmer fluid coming out of
8  it?
9      MR. PACE:  Wait, wait.  I have to stop
10     you.  Fluid is not liquid.  Fluid.  Fluid is
11     either a liquid or a gas, and for this purpose,
12     unfortunately, it actually makes a difference.
13     Is there a word "fluid" in Italian?
14     DR. ROSSI:  (In Italian.)
15     MR. PACE:  Sorry.  There is a debate over
16     sometimes whether we are dealing with water or
17     steam.  Let's just use the word "fluid."  Let
18     me start my question over.
19     THE INTERPRETER:  (In Italian.)
20  BY MR. PACE:
21     Q.  The 1-MW plant was designed to heat water,
22  correct?
23     A.  Yes, this is the base.
24     Q.  Did you do any work on that 1-MW plant
25  other than the power system for plant?

Page 79

1      THE INTERPRETER:  Apart from the?
2      MR. PACE:  The power supply of the plant.
3      THE INTERPRETER:  (In Italian.)
4      DR. ROSSI:  I have been exploited.
5      THE WITNESS:  I have been exploited by
6  Rossi for a small --
7      DR. ROSSI:  Maintenance.
8      THE WITNESS:  -- maintenance --
9      DR. ROSSI:  Work.
10     THE WITNESS:  -- work from the -- whether
11     from the hydraulic part and the electrical
12     part.
13  BY MR. PACE:
14     Q.  But, Mr. Fabiani, we are about to take --
15  first of all, we are about to take a break here in
16  just a couple of minutes.
17     A.  Yes, because I need to eat.
18     Q.  Until we take our break, I'm just going to
19  be asking you about your time in North Carolina.
20     A.  I am here for you.
21     Q.  So do you understand that limitation?
22     A.  Yes, just my time in North Carolina.
23     Q.  So just in that time period, what work did
24  you do on the 1-MW plant?
25     A.  My job as a project --

Page 80

1      MR. PACE:  Manager.
2      THE INTERPRETER:  Project manager?  (In
3      Italian.)
4      THE WITNESS:  I discussed and coordinated
5      the -- of installation --
6      THE INTERPRETER:  That part I got.
7      DR. ROSSI:  The power supply system.
8      THE WITNESS:  -- of the power supply
9      system.
10     DR. ROSSI:  And control systems.
11     THE WITNESS:  -- and control.
12     DR. ROSSI:  Systems.
13     MR. PACE:  Folks, we need to stop this.
14     We can't have this.  This is not the way this
15     can work.  Dr. Rossi, you understand?  I know,
16     I understand, but it causes a problem for the
17     record.  Right now we've got you on the record,
18     Dr. Rossi, testifying or providing information.
19     So just please talk to your lawyer.  Please
20     talk to your lawyer.  I don't want this to
21     become any more difficult than it is.  Stop.
22     You, as well.
23     Let's go ahead and take your break and you
24     can go to dinner right now, Mr. Fabiani.
25     THE WITNESS:  Can I not finish my answer.

Page 81

```
1        MR. PACE:  Yes, you may.  I apologize.
2        THE WITNESS:  It served to transform from
3    the European electrical power to the American
4    power.  So it was necessary to re-project all
5    of the power systems, power supply.  Thank you.
6        MR. PACE:  Let's go off the record.
7        THE VIDEOGRAPHER:  Going off Media Unit
8    Number 2.  Going off the record at 11:56.
9    Stand by to go off at 11:56 a.m.  We are off.
10       MR. NUNEZ:  Before we go off the record,
11   just so we talked about this a little,
12   Mr. Fabiani believes he's got to go till 12:00
13   his time.
14       MR. PACE:  That can be his belief, and we
15   decide in court.
16       MR. NUNEZ:  Okay.
17       MR. PACE:  You know that's not the
18   right -- I don't think that Judge O'Sullivan
19   thought that it was 12:00 Russian time.  If
20   that's the position you want to take, we will
21   deal with it in court.
22       MR. NUNEZ:  We will deal with that.
23   You can put this on pause.
24       THE INTERPRETER:  He can leave.
25       THE VIDEOGRAPHER:  We are still on Media
```

Page 82

```
1    Unit Number 2.  The time is 12:54 p.m.
2    BY MR. PACE:
3        Q.  Mr. Fabiani, you understand that you are
4    still under oath?
5        A.  Yes.
6        Q.  You testified earlier today that there was
7    a contract between US Quantum Leap and Industrial
8    Heat, correct?
9        A.  Yes.
10       Q.  That agreement was entered in the summer
11   or fall of 2013?
12       A.  More or less the fall of 2013, if I
13   recall.
14       Q.  When did that agreement end?
15       A.  It was a renewal --
16       THE INTERPRETER:  (In Italian.)
17       THE WITNESS:  I would have to look back at
18   the documents, but it was either March or
19   April, 2016.
20   BY MR. PACE:
21       Q.  During the time of this agreement,
22   Industrial Heat was paying US Quantum Leap for the
23   work you were doing?
24       A.  Yes.  Yes.
25       Q.  And were you also paid an amount for an
```

> **Agreement between USQL and IH in summer or fall 2013; ended in either March or April 2016.**

Page 83

```
1    apartment rental?
2        A.  Yes.  It was included in the contract.
3        Q.  And that was -- that was also money that
4    was paid by Industrial Heat?
5        A.  This what?
6        Q.  I'm sorry.  The amount that was being paid
7    for your apartment rental?
8        A.  Yes.
9        Q.  We spoke -- we were discussing earlier
10   today the 1-MW plant, correct?
11       A.  Yes.
12       Q.  What do you understand the 1-MW plant to
13   be?
14       A.  I'm not understanding the question.
15       Q.  What is the 1-MW plant?
16       A.  It is a container.  It contains more
17   groups of reactors.
18       Q.  How many groups of reactors?
19       A.  Six.  Six small ones and -- six done with
20   the small reactors and four done with the large
21   reactors.
22       Q.  Were the four groups of large reactors
23   sometimes called Big Frankies?
24       A.  Yes.
25       Q.  Was there any name for the six group of
```

Page 84

```
1    the small reactors?
2        A.  No.  They were numbered alphabetically.
3        Q.  Do you recall that the 1-MW plant was sent
4    to Doral warehouse in late 2014?
5        A.  I was present when it was unloaded, but I
6    don't remember the exact date.
7        Q.  Do you remember that the 1-MW plant was
8    operated -- was run at the Doral warehouse in 2015
9    and early 2016?
10       A.  Did you say at the end of 2016?
11       Q.  No.  Let me ask my question again.
12       THE INTERPRETER:  Maybe it was a mistake
13   of the interpreter.
14       THE WITNESS:  No, no.  I did hear 2016.
15   BY MR. PACE:
16       Q.  Do you recall that the plant was operated
17   at the Doral warehouse -- was operated at the Doral
18   warehouse in 2015 and early 2016?
19       A.  Yes.
20       Q.  In connection with running the 1-MW plant
21   at the Doral warehouse, there were measurements
22   being taken in connection with running the plant,
23   correct?
24       A.  The question is very confusing.  Can you
25   reformulate it a little bit?
```



**Page 85**

1   Q.  I can.
2   A.  Thank you.
3   Q.  When the 1-MW plant was being operated in
4   Doral, were there measurements being taken of the
5   inputs into and the outputs from the plant?
6   A.  They were taken in more ways.
7   Q.  I wanted to ask you about those
8   measurements and how they were made.
9   A.  Okay.  I understood the question.
10   I need to give a long answer because it is
11   three different -- it is three systems.
12   Q.  Uh-huh.
13   A.  Okay.  The first part was the system that
14   would give data to me to be able to see and regulate
15   the functioning during the date -- throughout the
16   day.
17   The second system was the -- was the
18   system that would memorize the data that the
19   engineer -- the third system would be Engineer Penon
20   would come to verify his data and his certified
21   instrument -- instruments.  Instruments.
22   Okay.  Perfect.  There were occasions in
23   which during the visits of Industrial Heat, from
24   J.T. -- J.T. -- J.T. --
25   Q.  J.T. Vaughn?

**Page 86**

1   A.  -- J.T. Vaughn and Tom Darden, photographs
2   of the apparatus and the data.  And Barry West,
3   during the development of the test, of the tests,
4   took pictures of the electrical meter.  Meter.  And
5   the hydraulic meter.
6   Q.  The data collected from the first system,
7   how was that stored?
8   THE INTERPRETER:  I'm trying to think of
9   the word "stored."
10   MR. PACE:  Let me ask a different
11   question.
12   BY MR. PACE:
13   Q.  There were measuring devices that were
14   used for collecting the data for Engineer Penon,
15   correct?
16   A.  Of course.
17   Q.  And those measurement devices measured --
18   actually let me start again.  Let me start again.
19   What measurement devices were used in
20   Doral to collect data for Engineer Penon?
21   A.  Okay.  Engineer Penon had two systems at
22   his disposal.  The first system was an electronic
23   system that would permit the registering or
24   registration of data that was necessary to
25   understand if the system would function in a

**Page 87**

1   continuous cycle.
2   The second -- the second set of
3   instruments were certified instruments sent from
4   Penon -- sent by Penon and installed in the plant
5   once -- okay, to be able to do a measuring, a
6   certified measurement.
7   Q.  The data collected in the electronic
8   system for Engineer Penon, where was that data held
9   or stored?
10   A.  Okay.  The data for the certified
11   instrument was inside the certified instrument.
12   Okay.  The data, because there are two instruments,
13   the first one was the certified instruments.  The
14   second was the registered data from the electronic
15   control system inside of Penon's computer.
16   Q.  Then there was also a system that
17   collected data that you would use to operate the
18   plant?
19   A.  Yes.
20   Q.  What data did you collect for purposes of
21   operating the plant?
22   A.  Electrical, incoming temperature -- input
23   temperature, output temperature, pressure.
24   Q.  Anything else?
25   A.  No.

**Page 88**

1   Q.  Where is -- was that data that you just
2   described, was that stored in the computer
3   somewhere?
4   A.  It was stored in my server.  From this
5   data, I extracted the file that was delivered in the
6   attorney's office during my second meeting.
7   Attorney Pace, the attorney next to the interpreter.
8   Q.  You testified earlier today that you sent
9   data to Engineer Penon.  Was that -- was that data
10   from your system?
11   A.  Yes.  Yes.  I could not get into
12   Mr. Penon's --
13   MR. PACE:  Computer.
14   THE INTERPRETER:  I could not hear the
15   word.  Into the system?
16   THE WITNESS:  I could not enter into
17   Mr. Penon's system.
18   BY MR. PACE:
19   Q.  And so the system for the electronic
20   control, the measurement system of Engineer Penon
21   for the electronic controls, that data was stored in
22   a computer of Dr. Penon's?
23   A.  Yes.
24   Q.  And no one other than Dr. Penon accessed
25   that computer?

**Page 89**

1    A.  Yes.  We were only to see if it functioned
2  or did not.
3    Q.  Who is "we"?
4    A.  All of those that would enter the command.
5    Q.  Container?
6    A.  Container.  Okay.  It is a small container
7  where the office is inside.
8    Q.  How is the data kept for the certified
9  instruments?
10    A.  I could only speak for one of the
11  certified instruments.
12    Q.  Which one is that?
13    A.  PCE-130.  Oh, 830.
14    Q.  Where was the data for the PC-830 stored?
15    A.  Inside of the PCE-830.
16    Q.  Who installed the measurement equipment
17  for the system that you operated?
18    A.  Which instruments?  There are so many.
19    Q.  Let's go through each of them.
20      The instrument for measuring the
21  electrical power.
22      THE INTERPRETER:  Measuring?
23      MR. PACE:  Electrical power.
24      THE WITNESS:  For the PCE-830, yes, it was
25  installed, Barry West, under my direct

**AS TO THIRD PARTY: IMP**  **IC**

**Page 90**

1  supervision.
2  BY MR. PACE:
3    Q.  I think we may have gotten our questions
4  crossed there a little bit.
5      I'm asking about the measurement equipment
6  that you used, not that Dr. -- not that Engineer
7  Penon used, for measuring electrical usage.
8    A.  For the amount of the measured
9  electricity -- power, one instrument alone was used.
10  I only had access only to the data, read data.
11    Q.  On the screen?
12    A.  On the screen, while Penon had the
13  possibility of unload the data and verify it.
14    Q.  So both you and Dr. Penon -- I'm sorry.
15  Let me start this over again.
16      Both you and Engineer Penon were using the
17  same device for measuring the electrical usage?
18    A.  In two different ways, yes.
19    Q.  Would you, for the way that you received
20  the data, did you have to do that manually, write it
21  down?
22    A.  Yes.
23    Q.  For the input temperature data that you
24  used for operating the system at the Doral
25  warehouse, what device did you use to measure that?

**Page 91**

1    A.  Okay.  Thermal waves.  Thermal waves.
2  Thermal probes.
3      THE INTERPRETER:  Sorry.  Probes.
4      THE WITNESS:  They were identical to the
5  ones that were used by Engineer Penon.
6  BY MR. PACE:
7    Q.  Mr. Fabiani, you understand that the term
8  thermal -- the English term "thermal couple"?
9    A.  Thermal couple.
10    Q.  For these purposes, why don't we both use
11  the term "thermal couple"?
12    A.  Thermal couple, yes.
13    Q.  So the -- you were measuring the input
14  temperature using the same type of thermal couple as
15  Engineer Penon?
16    A.  Yes, the same type.
17    Q.  But it was -- but it was a different
18  thermal couple?
19    A.  Yes.  Yes.  Positioned at 10 centimeters
20  of distance, perhaps even 16.  I don't remember
21  exactly.
22    Q.  Who installed both of those thermal
23  couples?
24      MR. NUNEZ:  Objection to form.
25      THE WITNESS:  The hydraulic worker

**Page 92**

1  directed by Rossi, by Dr. Rossi, and I did the
2  connection to the reading system.
3  BY MR. PACE:
4    Q.  You did the connection between the thermal
5  couple and the control panel?
6    A.  It is not exactly like that.
7      THE INTERPRETER:  I need to have that
8  repeated.
9      THE WITNESS:  Okay.  The thermal couple
10  was connected with a conversion.
11      MR. PACE:  Converter.
12      THE WITNESS:  A conversion board, board.
13  It is like an electronic board.  And it would
14  transmit the data to the computer that he was
15  assigned.
16      To be able to distinguish the two plants,
17  a board, a board was created for Penon's
18  thermal couple.  And another separate board was
19  installed for my thermal couple, to not risk --
20      THE INTERPRETER:  I'm not understanding
21  the word.
22      THE WITNESS:  To tie.
23      MR. PACE:  Ask him if he can explain it
24  again.
25      THE WITNESS:  To have the data pass

Page 93

1    through the same lines.
2        DR. ROSSI:  No, no.
3        THE WITNESS:  To avoid the data to go
4    through the same lines.
5        THE INTERPRETER:  I didn't hear "to
6    avoid."
7    BY MR. PACE:
8        Q.  Let me ask, for the output -- for the
9    measurements of the output temperature, thermal
10   couples were also used?
11       A.  Yes.
12       Q.  How many thermal couples?
13       A.  From my plant, one thermal couple for each
14   reactor.  And one output thermal couple for the
15   superior level of the tubal -- pipe.
16       THE INTERPRETER:  That's what I thought,
17   pipe.
18       THE WITNESS:  And one output thermal
19   couple for an inferior pipe level.
20   BY MR. PACE:
21       Q.  And then how many thermal couples were
22   used for Engineer Penon?
23       A.  Two thermal couples for the output of the
24   whole plant.  And two thermal couples for the input
25   of the plant.

Page 94

1        Q.  And what equipment was used to measure the
2    pressure for the outflow from the plant?
3        MR. PACE:  The outflow of the plant.
4        MR. NUNEZ:  Not output.
5        MR. PACE:  The output of the plant.
6        THE WITNESS:  I do understand outflow.  It
7    is one of the engineering terms.  For the
8    pressure, we had two instruments.  The first
9    one was an instrument manometer.  The second
10   one --
11       THE INTERPRETER:  A wire?  Cable?
12       THE WITNESS:  Wave.
13       MR. PACE:  Let him explain it again.
14       THE WITNESS:  A pressure probe, a pressure
15   probe for Engineer Penon and a pressure probe
16   for my system of --
17   BY MR. PACE:
18       Q.  Control?
19       A.  For my system of data, memorizing data,
20   memorizing.  Data memorizing.  Perfect.
21       Q.  And who installed the pressure-measuring
22   devices?
23       A.  The installation was done from the
24   hydraulic -- from the hydraulic worker of Dr. Rossi,
25   in front of my verification, and at the arrival of

Page 95

1    Engineer Penon, Engineer Penon verified the
2    installation of all of the Rossi's.
3        Q.  Do you know the name of the hydraulic
4    worker?
5        A.  Rossi used more contracts -- no.
6        THE INTERPRETER:  The interpreter is not
7    understanding what that word means.
8        THE WITNESS:  We had several hydraulic
9    workers that worked in the plant.  I don't
10   recall the names.
11   BY MR. PACE:
12       Q.  Were any of the -- were any of these --
13   did any of these measuring devices have to be
14   replaced in 2015 or early 2016?
15       THE INTERPRETER:  The hydraulic?
16       MR. PACE:  Let me start the question over.
17   BY MR. PACE:
18       Q.  Did any of these measuring devices have to
19   be replaced in 2015?                                   [IC]
20       THE INTERPRETER:  (In Italian.)
21       THE WITNESS:  (In Italian.)
22       THE INTERPRETER:  Two thousand?
23       MR. PACE:  '15.
24       THE WITNESS:  During the work of the
25   plant, we had -- we had hydraulic losses, and

Page 96

1    it was necessary to disconnect and connect
2    again, at the necessary time, some of the
3    probes.  This would happen normally during the
4    maintenance of the plant, with the presence and
5    the collaboration of Barry West.
6    BY MR. PACE:
7        Q.  And this would include the probes of
8    Engineer Penon?
9        A.  No.  Only my probes.  Engineer Penon's
10   probes were always attached.  In case of loss,
11   silicone was placed to avoid the loss.  But thermal
12   silicone.
13       MR. PACE:  I'm going to mark as -- I think
14   we are only on Exhibit 2.  I'm marking as
15   Exhibit 2 a February 27th, 2015 email.
16       (The referred-to document was marked by
17   the court reporter for Identification as
18   Deposition Exhibit 2.)
19   BY MR. PACE:
20       Q.  Mr. Fabiani, was there -- early in 2015
21   was there a problem with the temperature probes?
22       A.  February 27th?
23       Q.  February 27, 2015.
24       A.  Could you go down a little bit?  Yes, I
25   recall this incident very well.

Page 97

1    Q.   These probes were burning out because they
2  were grounded probes?
3    A.   Yes.  Yes, I understand the question.
4  These probes that burnt were not connected to the
5  area of the small reactors, where an error in
6  insulation -- where an error in installation
7  occurred.
8       These were probes that were not -- that
9  were not involved in the -- in the memorization of
10  the data, because it was chosen to exclude that part
11  of the plant because it was done wrongfully.  And it
12  doesn't have anything to do with --
13       THE INTERPRETER:  No.  I'm not
14  understanding.
15       THE WITNESS:  Oh, okay.  It does form part
16  of the -- the utilized probes that were used
17  for the test for one year.  For one year.
18  BY MR. PACE:
19    Q.   These probes were connected to the smaller
20  reactors?
21    A.   Yes.
22    Q.   And during 2015, how often were the
23  smaller reactors operating?
24    A.   In 2015, okay.  It was -- there was a --
25  a -- it was -- we tried -- yes, we tried -- we tried

Page 98

1  to turn on the small reactors, but we found
2  installation defects that did not allow to be able
3  to work with the small reactors.
4    Q.   Was that insulation problem more than just
5  the problem with the temperature probes?
6    A.   Okay.  That insulation problem derived
7  from an error, an erred system of electrical
8  cabling.  This led to -- led to having current,
9  current, like electricity, on the metallic mats.
10  For this reason is why they burnt out.
11    Q.   And those small reactors burnt out in
12  early 2015?
13    A.   They were not turned on in 2015.  They
14  were turned on only for testing.
15    Q.   So the -- any output from the 1-MW plant
16  was from the four big Frankie units?
17    A.   Ninety-nine percent, yes.
18    Q.   What is the 1 percent wrong?
19    A.   Thank you.  Is okay.  The 1 percent is if
20  the -- 1 percent -- oh, from the startup, the
21  1 percent of the system, to then be able to turn off
22  all of the small reactors for a problem of short
23  circuit to the -- the -- during the -- during
24  the turning on -- oh, during the functioning.
25       THE INTERPRETER:  I'm sorry.  The words

Page 99

1  were choppy.
2  BY MR. PACE:
3    Q.   The small reactors were operating for a
4  very short time when the plant was first turned on?
5    A.   Yes.  Yes.  In the documents that were
6  delivered in the Excel file, there are the comments
7  for each day.  And it is written when we had to turn
8  off the small reactors, the small reactors.
9       MR. PACE:  Why don't we take a short break
10  and we will get that spreadsheet out, too.
11       MR. NUNEZ:  Chris, before we -- before we
12  go off the record, I don't know if it needs to
13  be on the video record, I told you we were here
14  for the seven hours.  It is not seven hours of
15  questioning.  I mean, you could speak with me
16  if you need a little bit longer.  We're at 2:00
17  now.
18       MR. PACE:  Our position is under the rules
19  we are entitled to seven hours of questioning.
20  If you guys want to turn off the Skype and stop
21  the deposition, you can do so at your own risk.
22  That's up to you.
23       How much time are we at?
24       THE VIDEOGRAPHER:  I can tell you when we
25  go off.  Stand by to go off Media Unit

Page 100

1  Number 2.  Going off the record at 1:55 p.m.
2       (Thereupon, a recess was taken, after
3  which the following proceedings were held:)
4       THE VIDEOGRAPHER:  We are now back on the
5  video record.  This is the beginning of Media
6  Unit 3.  The time on the record is 2:24 p.m.
7  BY MR. PACE:
8    Q.   Mr. Fabiani, before we broke you made a
9  reference to a document that reflects when different
10  parts of the E-CAT -- the 1-MW plant was working or
11  was stopped.
12       I want to show you what I have marked here
13  as Exhibit 3.
14       (The referred-to document was marked by
15  the court reporter for Identification as
16  Deposition Exhibit 3.)
17  BY MR. PACE:
18    Q.   Just looking at this first page of the
19  exhibit, is this the -- and I will represent to you
20  that this was produced by your lawyer in discovery.
21  Does this -- is this the document you discussed?
22    A.   This part seems like it, yes.
23       MR. NUNEZ:  Let me just -- I'm sorry.  Not
24  so much -- Fulvio, one second.
25       Mr. Pace, just because you said this was

Page 101

1    produced by us, is there a reason it doesn't
2    have the Bates stamps on it?
3         MS. HANDELSON:  We didn't get Bates stamps
4    on any of our production.
5         MR. PACE:  This was 13 and 14.  I don't
6    think it had the Bates stamps on it.
7         MR. NUNEZ:  All right.  Go on.  I'm going
8    to look.  I'm pretty sure it did.
9         MR. PACE:  I want to say it is 13 or 14.
10   It is one or both.
11        MR. NUNEZ:  I think this one was 14.
12        THE INTERPRETER:  I'm sorry.  The
13   interpreter left her glasses right there.
14   Sorry, Counsel.  Sorry about that.
15   BY MR. PACE:
16   Q.  If we go to the -- if we go to the second
17   page.
18        MR. NUNEZ:  Just for the record, just
19   because you had made that reference, because
20   mine do have Bates stamp, it looks like a
21   different copy.
22        MR. PACE:  Did you look at 13?  I think
23   you produced the same thing.  Production 13 and
24   14.
25        MR. NUNEZ:  Right, because 13 -- just bear

Page 102

1    with me.  So 13, 13 is the big document, which
2    is, I believe, this same information, just not
3    in the Excel spreadsheet.  Unless it has
4    something else.
5         THE INTERPRETER:  (In Italian.)
6         THE WITNESS:  Could you please say what
7    the translation is?
8         MR. NUNEZ:  Everything we produced is
9    Bates stamped.  You can look at my same
10   document.
11        MR. PACE:  Fair enough.
12        MR. NUNEZ:  It looks like my same number
13   14.
14        MR. PACE:  I might have gotten this from
15   another collection.
16   BY MR. PACE:
17   Q.  Let me go forward with my questioning.  If
18   I can ask you to turn to the second page of the
19   document, under March 3 of 2015, does that entry
20   reflect that there was a power supply failure for 30
21   minutes?
22        THE INTERPRETER:  I have to think of a way
23   to say this.
24        MR. PACE:  (In Italian.)
25        THE INTERPRETER:  That would be nice, if I

THIRD
PARTY:
R

Page 103

1    can see it.
2         THE WITNESS:  Would you please repeat the
3    question from the beginning?
4    BY MR. PACE:
5    Q.  What is the event that is reflected for
6    March 3rd of 2015?
7    A.  Could you make the lettering bigger?
8    Because I cannot see it well.
9         MS. HANDELSON:  Bigger?
10        THE WITNESS:  A little bit more.  Just a
11   little bit more.  Okay, perfect.  No.  Other
12   side.
13        MR. PACE:  If you can go further.
14        THE WITNESS:  Okay.  So what is the
15   question?
16   BY MR. PACE:
17   Q.  What is the event that occurred on March
18   3rd?
19   A.  Okay.  There was a failure of the power
20   for 30 minutes.  The plant was stopped for 30
21   minutes.  The lack of power, I don't know, because
22   probably it happened in the middle of the night.
23   From the -- from the time 2230 on the 3rd of March
24   until 1030 of the 4th of March.  So there was a lack
25   of power, and the system was stopped for around 30

Page 104

1    minutes.
2    Q.  What does it mean for the system to be
3    stopped?
4    A.  That for 30 minutes there was no power
5    going in.
6    Q.  Was there any water going into the system?
7    A.  You shouldn't be asking me.  I was not
8    present there in the middle of the night, nor am I
9    in charge of what has to do with the water.
10   Q.  How do you know that the failure was only
11   for 30 minutes?
12        THE INTERPRETER:  Could you repeat for the
13   interpreter?  Your voice is going away.
14        THE WITNESS:  Okay.  In the recording of
15   the data, I found a void of 30 minutes.
16   BY MR. PACE:
17   Q.  That 30-minute void in the data, did that
18   apply to all of the -- all of the devices that were
19   being measured?
20   A.  No, it doesn't work that way.
21   Q.  How does it work?
22   A.  The system could continue working, but I
23   could not have a data for 30 minutes or the data
24   could be corrupted, corrupted and then reconstructed
25   by the system.  It is not -- it is not -- it is

Page 105

```
 1   impossible to know that beforehand if you are not
 2   present there in the event.
 3       Q.  I'm still a little bit confused here.
 4       What data was not collected during this
 5   30-minute window?
 6       A.  Okay.  My acquiring system, my system
 7   would create a transformation from the base data to
 8   the work data of the Excel.  Elaboratable.
 9       THE INTERPRETER:  I'm not sure.
10       THE WITNESS:  Workable, workable data from
11   Excel.  Therefore, I did not find the data on
12   Excel, and I concluded that there was a lack of
13   power for 30 minutes.
14   BY MR. PACE:
15       Q.  Was that the entire plant or power just
16   for a particular reactor?
17       A.  No.  This memorizing of the data is for
18   the complete plant.
19       Q.  And that would -- that would cover the
20   data you had for not just electrical usage, but also
21   temperature and pressure data?
22       THE INTERPRETER:  I really can't
23   understand the question.  Can you repeat it?
24       MR. PACE:  I can.
25
```

Page 107

```
 1   That is how we understand it.  But I do not
 2   remember.
 3       Q.  Do you remember any time when the 1-MW
 4   plant was shut down completely for any reason?
 5       A.  I remember several episodes, but I don't
 6   remember when or how many.
 7       Q.  For this power failure on April 7th, did
 8   it only affect your control system and measuring
 9   equipment?
10       A.  I cannot know that because I did not have
11   the control of the nautus (ph) system.
12       Q.  Let's go back to March 9th.
13       March 9th references it stopped for four
14   hours, correct?
15       A.  I don't remember.  But, yes, it is written
16   here that one module was stopped for four hours,
17   from 10:30 in the morning to 2230.  Probably a
18   maintenance.
19       Q.  Is there a reference there that it was
20   stopped because of leaks?
21       A.  It could be a hydraulic loss or an
22   electrical loss, but it is not written.  It is not
23   written, and I don't remember.
24       Q.  Okay.  There is a -- can you tell from
25   what you wrote here the module that was stopped was
```

Page 106

```
 1   BY MR. PACE:
 2       Q.  Was this power outage a network power
 3   outage?
 4       THE INTERPRETER:  What was it?
 5       MR. PACE:  A network power outage.
 6       THE WITNESS:  I don't know.  I was not
 7   present.
 8   BY MR. PACE:
 9       Q.  Did your -- did your system capture any
10   data for that 30-minute period?
11       A.  I don't know because this data was
12   transformed data.
13       Q.  Let's go forward to April 7th.  We are
14   going to move forward to April 7th.
15       What event occurred on April 7th?
16       A.  From what is written, lack of electrical
17   power.
18       Q.  For three hours?
19       A.  I think so.
20       Q.  Do you remember this event?
21       A.  I'm not able to remember everything.  If
22   this is written.
23       Q.  I'm sorry.  I don't think you completed
24   your thought.  If this is written?
25       A.  If this is written, this is what happened.
```

Page 108

```
 1   called Big Frankie No. 4?
 2       A.  It is probable.  I'm not sure.  But it is
 3   probable.
 4       Usually I write it better, but here the
 5   notes were quite fast.
 6       Q.  If we turn to March 17th, that identifies
 7   the module being stopped for two hours, correct?
 8       A.  Yes.
 9       Q.  That would be one of the Big Frankie units
10   was stopped for a two-hour time period?
11       A.  Yes, correct, that's what it means.
12       Q.  What would happen when one of the Big
13   Frankie groups of reactors was stopped?
14       A.  Normally, the other three would be on,
15   would remain on, remain turned on.  One module --
16   okay.  One module stops to avoid that during the
17   maintenance there would be the possibility of
18   getting electricity, power.
19       Q.  So when a Big Frankie is turned off, the
20   flow of electricity is turned off into that Big
21   Frankie?
22       A.  When a module is off, the electricity is
23   suspended in that module.
24       Q.  Is the water flowing into that module also
25   suspended?
```

Page 109

```
1       A.  That is not correct, because if the loss
2   was hydraulic, the flow would be necessary.  The
3   flow, if it were electrical.
4       THE INTERPRETER:  I'm not sure about the
5   words, I'm sorry.
6       MR. PACE:  I think we are having a breakup
7   here.  Ask him if he can repeat that answer one
8   more time.
9       THE WITNESS:  When a module is stopped, if
10  the loss is hydraulic, it is necessary to empty
11  the modules.
12      DR. ROSSI:  I cannot.
13      THE INTERPRETER:  I'm not sure about the
14  word.
15      DR. ROSSI:  I cannot.
16  BY MR. PACE:
17      Q.  If the problem is hydraulic with the
18  reactor or module, you have to stop the water
19  flowing into that reactor?
20      A.  That was not my job, to stop the water
21  that would -- I would only stop the electrical part.
22      Q.  When you stopped the electrical from
23  flowing into one module, did you increase the
24  electrical power flowing into the other module?
25      THE INTERPRETER:  What flowing?
```

Page 110

```
1       MR. PACE:  The electrical energy flowing.
2       THE WITNESS:  That was a decision of
3   Rossi, not mine.
4   BY MR. PACE:
5       Q.  But would Dr. Rossi be able to change the
6   amount of the electricity flowing into the other
7   modules or --
8       THE INTERPRETER:  Energy?
9       MR. PACE:  Electricity.
10  BY MR. PACE:
11      Q.  -- or would he have to ask you to do that?
12      A.  It was my job, and I would do it.  In the
13  case of a night emergency, if Rossi would have a
14  problem, he would call me.
15      Q.  How would you make that judgment -- how
16  would you adjust the electrical power that was
17  flowing into the modules that were still operating?
18      A.  Okay.  The power supply system was
19  composed of --
20      THE INTERPRETER:  The interpreter is not
21  sure how to translate that.
22      MR. PACE:  Do you need to take a break?
23      THE WITNESS:  I'm going to say it a
24  little --
25      THE INTERPRETER:  I'm not --
```

Page 111

```
1       MR. PACE:  Can we take a short break off
2   the record?
3       THE VIDEOGRAPHER:  Going off Media Unit 3.
4   Going off the record at 2:54 p.m.
5       (Thereupon, a recess was taken, after
6   which the following proceedings were held:)
7       THE VIDEOGRAPHER:  We are now back on
8   Media Unit Number 3.  The time back on the
9   record is 2:58 p.m.
10  BY MR. PACE:
11      Q.  Mr. Fabiani, can you explain to me,
12  though, slowly, how you would adjust the power to
13  the Big Frankies that were still working when one
14  Big Frankie was turned off?
15      A.  The system had two overlapping control
16  systems.  One contained in the control -- control
17  panel.
18      Q.  Panel.  Sorry.
19      A.  It would either turn on, complete turn on
20  or turn off a Big Frankie.  Only one.
21      The second system would allow the
22  regulation from zero to 100 percent power for each
23  Big Frankie.
24      Do you need any other explanation?
25      Q.  How much would you turn up the power for
```

Page 112

```
1   the other Big Frankies when one Big Frankie was
2   turned off?
3       MR. NUNEZ:  Object to form.
4       MR. LEON DE LA BARRA:  Object to form.
5       THE WITNESS:  It was not my choice.  That
6   was something that Mr. Rossi would decide.
7   BY MR. PACE:
8       Q.  Would it be the same every time one of the
9   Big Frankies was turned off?
10      MR. NUNEZ:  Object to form.
11      THE WITNESS:  I don't remember, but I
12  don't think so.
13  BY MR. PACE:
14      Q.  Can you go to May 15th?
15      Mr. Fabiani, what event occurred on May
16  15th, as reflected in your notes?
17      A.  From what is written, from what is
18  written, a stop on the No. 1 module for hydraulic
19  maintenance.
20      Q.  Is the No. 1 module also Big Frankie
21  No. 1?
22      A.  Yes.  In this case, yes, it is evident.
23      Q.  And what does it mean to do hydraulic
24  maintenance on a Big Frankie unit?
25      A.  A hydraulic loss has been eliminated.
```

Page 113

1    Q.   How is that -- well, who would do that --
2  who would eliminate that hydraulic loss?
3    A.   Normally, it would be the hydraulic --
4  hydraulic workers that are Lambert.
5    Q.   Lambert.
6    A.   Lambert.
7    Q.   And who is Lambert?
8    A.   Plumbers.
9    Q.   Plumbers?
10     THE INTERPRETER:  Hydraulic workers means
11  plumbers.  The interpreter got it now.
12     THE WITNESS:  Or Barry West.
13  BY MR. PACE:
14    Q.   What plumbers -- what plumbers worked at
15  the Doral warehouse?
16    A.   Rossi had several plumbers.  They would be
17  called when there was a need to intervene.  I don't
18  know.
19    Q.   Do you know any of their names or their
20  company names?
21    A.   I remember somebody named Mike.  But
22  90 percent -- but 90 percent of the interventions
23  were done by Barry West, and me as a help.
24    Q.   When a module was stopped for hydraulic
25  maintenance, would the water flow into the module

Page 114

1  also be stopped?
2    A.   That is not true.  It depends on the type
3  of intervention.  That was not my job.
4    Q.   But you said you assisted Barry West on
5  occasion in working on some of the modules?
6     THE INTERPRETER:  I'm sorry, what is --
7     MR. PACE:  West.
8     THE WITNESS:  It was Rossi's choice, not
9  mine.
10  BY MR. PACE:
11    Q.   I might be asking my question poorly.
12     Was there ever a time when you worked on
13  the plumbing for the 1-MW plant when the water into
14  the plant or any part of it was turned off?
15     THE INTERPRETER:  No, the question isn't
16  clear.
17  BY MR. PACE:
18    Q.   The times that you assisted Barry West
19  with plumbing issues for one of the Big Frankies,
20  would the water be flowing through the Big Frankie?
21    A.   In some cases, yes; in some cases, no.
22    Q.   Can you tell me why in some cases it would
23  be flowing and not in others?
24    A.   No, absolutely not.  I really don't
25  remember, so...

Page 115

1     MR. PACE:  Can we scroll down to -- let's
2  scroll down to May 29th of 2015.
3  BY MR. PACE:
4    Q.   What happened on May 29th of 2015,
5  according to your notes?
6    A.   I don't remember.  But I will read.  I'm
7  reading.
8    Q.   Can you see that, as well, down there?
9    A.   Yes.  Okay.  So module Big Frankie 3
10  stopped for substitution -- di gomma (phonetic)
11  means a piece of rubber.  It is a tube, like a
12  rubber piece or pipe, a rubber pipe.  Like this.
13  Around 10 centimeters.
14    Q.   Who would replace -- why would such a pipe
15  have to be replaced, if you know?
16    A.   It is written there, programmed
17  maintenance.  Probably because -- probably because
18  the rubber tube or pipe, it had a more brief
19  duration.
20    Q.   Who would replace the rubber pipe?
21    A.   Rossi's plumber, Barry West.  If I were
22  present, I would help.
23    Q.   How long did such maintenance usually
24  take?
25    A.   It does not have a set amount of time.

Page 116

1    Q.   During the time that maintenance was being
2  performed on one of the Big Frankies, would the
3  electricity being fed into the Big Frankie stop?
4    A.   Always.
5    Q.   But the water going into that Big Frankie
6  might or might not be stopped, correct?
7    A.   Exactly.
8    Q.   And the electricity flowing into the other
9  Big Frankies might -- might be increased?
10    A.   It depended on Rossi's choice.
11    Q.   And that is -- let me rephrase my
12  question.
13     The electrical power going into the other
14  Big Frankies might or might not be increased,
15  depending on what Dr. Rossi wanted to do?
16    A.   It could have been increased, but it was
17  Rossi's choice.
18    Q.   What does it -- what happens when you
19  reboot a Big Frankie?  I'm sorry.  Let me stop
20  before you do that.
21     How do you reboot a Big Frankie?
22     MR. PACE:  I think this is the word for
23  reboot:  R-I-A-V-V-I-O.
24     I'm sorry, can you scroll down to June 1st
25  for me?  If you look on the screen on June 1st,

Page 117

1    you see R-I-A-V-V-I-O.  I think that's Italian
2    for reboot.
3  BY MR. PACE:
4        Q.  How do you reboot a Big Frankie?
5        A.  To avoid the overheating, the heating, the
6    overheating for the electrical heaters, it was
7    necessary to do --
8        Q.  I think he's saying a ramp-up.
9        A.  -- a ramp-up of output power -- input
10   power.  And Rossi would decide the times and the
11   modalities.
12       Q.  So whenever you wanted to reboot a Big
13   Frankie, how -- roughly how long would it take?
14   Approximately how long would it take?
15       THE INTERPRETER:  I'm not sure.  The
16   interpreter is --
17       THE WITNESS:  It depends.
18       MR. PACE:  No, I'm going to go on to
19   the --
20   BY MR. PACE:
21       Q.  Can you explain that to me differently?
22       A.  Okay.  I will explain the concept to you.
23       The times of overheating were necessary --
24   okay.  It was necessary so it would not overheat,
25   and the time would be decided by Rossi, according to

Page 118

1    his needs.
2        Q.  I understand that, but I'm asking, is
3    there an average amount of time it would take to
4    reboot a Big Frankie?
5        A.  It depends on many factors.  It does not
6    depend on -- it depends if it was already hot -- it
7    depends on many factors.  It could be an hour, it
8    could be five hours.  It is not possible to give an
9    exact.  Or eight hours.  It depends on the condition
10   of the reactor.
11       Q.  What occurred on June 8th, according to
12   your spreadsheet?
13       A.  I'm sorry.  I can't see the picture.  It
14   is the answer that I did not hear.  It was short.
15   It arrived brief, briefly.
16       Q.  What happened on June 8th with the 1-MW,
17   according to your chart?
18       A.  I don't remember.  I will read.  I don't
19   remember the -- I don't recall the episode, but I'm
20   reading that at 10:30, there was an electrical stop
21   during the hydraulic maintenance, with a reboot
22   around 12:00.
23       Q.  Is this limited to one Big Frankie or is
24   this the entire plant?
25       A.  I don't remember.  I don't remember this.

Page 119

1        Q.  If you move down to June 11th, that does
2    say there was a complete -- or, yeah, a complete
3    reboot of the system, correct?
4        A.  Yes.
5        Q.  What is involved in a system reboot?
6        A.  The calibration of the electrical power
7    function of the --
8        THE INTERPRETER:  I don't know that the
9    interpreter is going to last much longer.  I'm
10   sorry.  A little burnt.  I need a break.
11       MR. PACE:  Can we get this answer out and
12   then we can take a break?  Let's see if we can
13   focus in on this answer.
14       THE WITNESS:  The electrical recalibration
15   is done for the thermal power.
16       MR. PACE:  Let's go ahead and take a
17   break.
18       MR. NUNEZ:  Do a short break.  We are at
19   1:00 in the morning.  It is 1:00 a.m.
20       THE INTERPRETER:  I understand.
21       MR. NUNEZ:  I understand.  She's tired.
22       THE VIDEOGRAPHER:  Going off the record at
23   3:26 p.m.
24       (Thereupon, a recess was taken, after
25   which the following proceedings were held:)

Page 120

1        THE VIDEOGRAPHER:  We are now back on the
2    video record.  It is still Media Unit 3.  The
3    time is 3:40 p.m.
4  BY MR. PACE:
5        Q.  Mr. Fabiani, how would all of the --
6    sorry -- how is a system reboot done?
7        A.  A verification of the temperature is done,
8    but it is not -- that is not my job.  Rossi would
9    decide what was the percentage of the output.
10       Q.  But when there was a system reboot, would
11   the entire plant be shut off for any period?
12       A.  No.  When we are talking about the reboot
13   of the system, we are only talking about the reboot
14   of the control system.  In this document, there are
15   only my notes, not everybody's notes.
16       Q.  Understood.
17       Can we go all the way down to August 11th?
18       For the entry you have on this document
19   for August 11th, does this indicate that Big Frankie
20   1, 2 and 3 were operating at 40 percent?
21       A.  August 11th?
22       Q.  Yes.
23       A.  Not of the Big Frankie.  A 40 percent of
24   the control system -- power supply.
25       Q.  So the Big Frankie 1, 2 and 3 were

Page 121

1   receiving 40 percent of the power?
2        A.  Of the maximum available power, yes.
3        Q.  And on August 11th, Big Frankie 4 was
4   receiving 30 percent of the maximum available power?
5        THE INTERPRETER:  I'm sorry, received?
6        MR. PACE:  Thirty percent.
7        THE WITNESS:  Yes.
8   BY MR. PACE:
9        Q.  If you go up to August 8th, Big Frankie 4
10  was stopped on that day?
11       A.  I am reading.  Excuse me.  Yes.  Big
12  Frankie 4 was stopped.
13       Q.  Was it stopped because of a wiring
14  problem?
15       THE INTERPRETER:  Wiring.  Wiring.
16       THE WITNESS:  A cabling problem, yes, a
17  wiring problem.  That's what is written there.
18  BY MR. PACE
19       Q.  Do you recall what the cabling problem
20  was?
21       A.  No, I don't remember.
22       Q.  Can you go all the way down to December
23  2nd?  We are almost done with this document.  You
24  will be the most relieved.  Down to December 2nd.
25       MS. HANDELSON:  Yes.

Page 122

1        (A discussion was held off the record,
2   after which the following proceedings were
3   held:)
4   BY MR. PACE:
5        Q.  On December 2nd, your spreadsheet shows
6   that there was a decrease in power at the request of
7   the client; is that correct?
8        A.  As far as I remember, I don't remember.
9   But it is written there, so I think so.
10       Q.  Who is the client?
11       A.  The client is JM, and this was ordered by
12  Rossi.
13       Q.  So the -- so the client never asked you to
14  decrease the power by --
15       A.  When the client would ask me, I would
16  refer to Rossi, and Rossi would decide.
17       Q.  And my question is:  How did you learn
18  that the client made a request to reduce the power?
19       A.  Through Rossi.  Through Rossi.  Jim Bass.
20  With Jim Bass.  In this specific case, I don't
21  remember.  I think Rossi.  I think Rossi.
22       THE INTERPRETER:  The interpreter did not
23  hear a big piece of the first sentence.
24       THE WITNESS:  I can repeat.
25       Since I can read that it is written here

Page 123

1        that it was a decrease 700 kilowatts, this is
2   surely an order through Rossi, on his behalf.
3   BY MR. PACE:
4        Q.  The last one on this document --
5        MR. PACE:  Can you go to December 21st?
6   BY MR. PACE:
7        Q.  Your notes for December 24th -- I'm sorry,
8   for December 21st referred to a verification or
9   inspection of hydraulics and electrical; is that
10  correct?
11       A.  Let me read what is written.
12       Q.  Do your notes reflect that that took 12
13  hours?
14       A.  Yes.  Yes.  This process lasted 12 hours.
15       Q.  Who would have been involved in that
16  process?
17       A.  I don't remember.  Probably Rossi's
18  plumber or Barry.  I don't remember.  The electrical
19  part is written.
20       THE INTERPRETER:  I think the interpreter
21  missed some words.  The sounds are not coming
22  in.  I think there are some words missing.
23       THE WITNESS:  For the electrical part, I
24  was present.
25       THE INTERPRETER:  That was the word that

Page 124

1        did not come out.  Thank you.
2   BY MR. PACE:
3        Q.  Are you familiar with a company called
4   J.M. Products?
5        A.  Yes.  Do you hear me?  Yes.  Sorry.  The
6   communication arrived late.  Yes.
7        Q.  What is the business of J.M. Products?
8        MR. LEON DE LA BARRA:  Object to form.
9        THE WITNESS:  I have no idea.  I have no
10  idea.
11  BY MR. PACE:
12       Q.  Do you know what J.M. Products did with
13  any power provided to it by Leonardo Corporation?
14       MR. LEON DE LA BARRA:  Object to form.
15       MR. CHAIKEN:  Object to form.
16       THE WITNESS:  I don't know.  I don't know.
17  BY MR. PACE:
18       Q.  Who is Jim Bass?
19       A.  The engineer for J.M.
20       Q.  You worked with Jim Bass on a project,
21  correct?
22       A.  No.  Worked, no.
23       Q.  You did not work with Jim Bass on a
24  project involving a control -- a control board?
25       A.  We discussed and we listened to

Page 125

1  suggestions, but I did not work.
2      MR. PACE:  Can you give him the March 6,
3  2016 email?
4      THE INTERPRETER:  The interpreter would
5  like to point out it is coming in very sloppy
6  and slow.
7      MR. PACE:  I'm going to mark Exhibit 4.
8      (The referred-to document was marked by
9  the court reporter for Identification as
10  Deposition Exhibit 4.)
11 BY MR. PACE:
12     Q.  This is a email communication you had with
13 Jim Bass, correct?
14     A.  Yes.
15     Q.  This is about your control board project?
16     A.  No.  This is the project for my pinball
17 board.
18     Q.  Pinball.  Mr. Fabiani, we are having you
19 break up a little bit.  Usually you are in full
20 screen.  It is a little easier.
21     You were saying that document was about a
22 pinball project?
23     A.  That is something that I sent free, for
24 free, because Jim Bass had asked me for a scheme
25 board.

Page 126

1      Q.  Schematic?
2      A.  Scheme board.
3      Q.  Schematic.
4      A.  Robotics, and that schematic that was --
5  the same schematic that I designed for the pinball
6  was -- it could be used also for the robotics.
7      Q.  I'm going to show you what has been marked
8  as Exhibit 5.
9      (The referred-to document was marked by
10  the court reporter for Identification as
11  Deposition Exhibit 5.)
12 BY MR. PACE:
13     Q.  Can you take a moment to look at
14 Exhibit 5?
15     A.  Can you go down?
16     (A discussion was held off the record,
17  after which the following proceedings were
18  held:)
19     THE WITNESS:  Yes, I want to see on top.
20 Go back.  Other side.
21     Okay.  The question?
22 BY MR. PACE:
23     Q.  Does this also involve a pinball system?
24     A.  Yes.  The Banana Pie and the Beagle Bone
25 are two schematics that are used, and they are two

Page 127

1  boards that are used in my pinball board.  And Jim
2  Bass -- and Jim Bass wants suggestions as to which
3  one is the better one.
4      Q.  Was Jim Bass designing a pinball control
5  system?
6      MR. LEON DE LA BARRA:  Object to form.
7      THE WITNESS:  That I know of, no.  A
8  design system for the rebooting.
9      DR. ROSSI:  No.
10     THE INTERPRETER:  (In Italian.)
11     THE WITNESS:  Oh, for the robotics.  For
12 the robotics.
13 BY MR. PACE:
14     Q.  And for whom was this robotics system?
15     MR. LEON DE LA BARRA:  Object to form.
16     THE INTERPRETER:  The interpreter is not
17 getting a complete --
18     THE WITNESS:  Can you hear me?  Can you
19 hear me?
20     THE INTERPRETER:  He's really breaking up
21 really badly.  Now that I have the sugar in me.
22     THE WITNESS:  Now I could hear well.
23     THE INTERPRETER:  But the interpreter
24 could not get a whole sentence.  We will try
25 again.

Page 128

1  BY MR. PACE:
2      Q.  Let me try.
3      Why was Jim Bass working on a robotics
4  system?
5      MR. LEON DE LA BARRA:  Object to form.
6      THE WITNESS:  You would have to ask Jim
7  Bass.
8  BY MR. PACE:
9      Q.  Did he ever tell you?
10     A.  No.  I don't know.  I don't remember.  But
11 I don't think so.
12     Q.  I'm going to show you what has been marked
13 as Exhibit 6.
14     (The referred-to document was marked by
15  the court reporter for Identification as
16  Deposition Exhibit 6.)
17     THE INTERPRETER:  I'm sorry, what date?
18     MR. PACE:  That was for her.
19 BY MR. PACE:
20     Q.  Now, Mr. Fabiani, this top email is you    R   THIRD
21 instructing Jim Bass that he cannot buy something      PARTY:
22 unless you accept it first, correct?                   R
23     A.  Yes.
24     Q.  Doesn't this involve the control board
25 project?

Page 129

```
1       A.  No.
2       Q.  What does this involve?
3       A.  This continues being Jim Bass' project.
4       Q.  Why does Jim Bass need your approval
5   before buying something for his project?
6       A.  Very simple.  Jim Bass will not --
7       THE INTERPRETER:  The interpreter did not
8   hear well.  I'm asking him to repeat the
9   answer.
10      THE WITNESS:  Jim Bass would tell me to
11  tell Rossi that I would suggest this board,
12  this board.
13  BY MR. PACE:
14      Q.  Was Jim Bass working -- was the project
15  on -- let me start over again.
16      Was the project on which Jim Bass was
17  working, was that a project for Dr. Rossi?
18      MR. NUNEZ:  Object to form.
19      MR. LEON DE LA BARRA:  Join.
20      THE WITNESS:  As far as I know, as far as
21  I know, I think so.  But I do not have the
22  certainty.
23  BY MR. PACE:
24      Q.  Mr. Fabiani, when you met with Jim Bass,
25  where would you meet him?
```

Page 130

```
1       MR. LEON DE LA BARRA:  Object to form.
2       DR. ROSSI:  No.
3       MR. CHAIKEN:  Object to form.
4       THE WITNESS:  In the offices of J.M.
5       THE INTERPRETER:  J.M.  Thank you.
6   BY MR. PACE:
7       Q.  Mr. Fabiani, when you refer to J.M., you
8   are referring to J.M. Products?
9       A.  I don't know.  I don't know.
10      THE INTERPRETER:  It is very bad.
11      THE WITNESS:  I do not know if they are
12  the same company.
13  BY MR. PACE:
14      Q.  Where were the offices of J.M.?
15      A.  For me to go to the J.M. office, I would
16  do an eternal --
17      Q.  External.  He would walk around the
18  building.
19      A.  Okay.  Now I see you well.
20      THE INTERPRETER:  Could you repeat,
21  please?
22      THE WITNESS:  I will repeat.
23      Okay.  The J.M. at Doral, I would go
24  out -- yes, I hear you, could you hear me?  I
25  would go outside and go around the building.
```

THIRD PARTY: R

Page 131

```
1       And I would enter into the office area, where
2   Jim Bass would see me.
3   BY MR. PACE:
4       Q.  Who else had an office in that office
5   area?
6       A.  I didn't go into the other rooms.  There
7   were other rooms, and then there was a meeting room.
8   So I don't know.
9       Q.  Did Dr. Rossi have an office over there?
10      A.  I know that Dr. Rossi worked for J.M.
11      Q.  Do you know who owned J.M.?
12      A.  No.  My -- never got information.
13      Q.  Mr. Fabiani, who else did you work on
14  pinball projects in 2015?
15      MR. CHAIKEN:  Object to form.
16      THE WITNESS:  Sorry.  Can you repeat?
17      MR. PACE:  I will do it.
18      THE WITNESS:  Can you repeat?  Could you
19  repeat the question?  Thank you.
20  BY MR. PACE:
21      Q.  Mr. Fabiani, with whom else did you work
22  on pinball projects in 2015?
23      MR. CHAIKEN:  Object to form.
24      MR. LEON DE LA BARRA:  Join.
25      THE WITNESS:  Do you want the number or
```

Page 132

```
1   the names?
2   BY MR. PACE:
3       Q.  The names.
4       A.  Okay.  John Popadiuk.  Popadiuk.
5       Q.  Can you spell that?
6       A.  Yes, madam.
7       THE INTERPRETER:  (In Italian.)
8       THE WITNESS:  He is known worldwide as a
9   person that does pinball projects.
10      THE INTERPRETER:  The second name, please,
11  for the interpreter.
12      THE INTERPRETER:  Roberto Cozzo.  Rossi.
13      THE INTERPRETER:  (In Italian.)
14      THE WITNESS:  Guiseppe Levi.
15      There is another three programmers, but I
16  don't remember their last names.  The
17  designer's name was -- is Piero Ruggeri.  Piero
18  Ruggeri.
19      These are the names that I remember.
20  BY MR. PACE:
21      Q.  Did US Quantum Leap make any payments to
22  Giuseppe Levy?
23      A.  Yes.
24      Q.  How much has US Quantum Leap paid Giuseppe
25  Levy?
```

THIRD PARTY: R

Page 133

1     A.  At this moment, I don't remember.
2     Q.  Let me ask one last question.
3         The Giuseppe Levi you're referring to is a
4  professor at the University of Bologna?
5     A.  Yes.
6     Q.  He was involved in --
7     A.  He is a big pinball fan, fanatic.
8     Q.  And Professor Levi was also involved in
9  doing some testing on the E-CAT, correct?
10    A.  Yes, when we met.  That is when we met.
11        THE INTERPRETER:  It is a very bad
12  connection.
13        MR. PACE:  Let's go ahead and take a
14  break.
15        THE VIDEOGRAPHER:  Stand by to go off
16  Media Unit 3.  The time is 4:25.
17        (Thereupon, a recess was taken, after
18  which the following proceedings were held:)
19        THE VIDEOGRAPHER:  We are now back on the
20  video record.  This is the beginning of Media
21  Unit 4.  The time back on the record is
22  4:46 p.m.
23        MR. PACE:  Am I on 7?  Rudy, can you tell
24  me?
25        MR. NUNEZ:  Yes.

Page 134

1         MR. PACE:  Put the Italian version up.
2         (The referred-to document was marked by
3  the court reporter for Identification as
4  Deposition Exhibit 7.)
5         MR. PACE:  There is one, two, three.  I'm
6  going to give you one for you to look at.
7  BY MR. PACE:
8     Q.  Mr. Fabiani, I don't want to ask you a lot
9  of details about this document.  I just want to make
10 sure that I'm clear that the Giuseppe Levi that is
11 referenced in this email, that is the Professor Levi
12 from Bologna University?
13    A.  Yes, it is Giuseppe Levi.
14    Q.  And is this a -- the email address that
15 you are communicating with him -- let me start that
16 over.
17        This is an email communication that you
18 are having from him from his -- let's start over
19 again.
20        This is being sent from his personal
21 email, not his email at the University of Bologna,
22 correct?
23        MR. NUNEZ:  Object to form.
24        THE WITNESS:  I have no idea.  I do not
25 know all the email addresses.

Page 135

1  BY MR. PACE:
2     Q.  Is this the email address that you usually
3  use to communicate with Professor Levi?
4     A.  By memory, I don't remember.
5         MR. PACE:  Can you scroll down to the
6  bottom of this page?  Just where his email
7  starts.  That's good enough there.
8  BY MR. PACE:
9     Q.  Mr. Fabiani, at the bottom of this page
10 there is also an email address for you.  Do you see
11 that?  Do you see that?
12    A.  Yes.  I read my name, yes.
13    Q.  Is that an email address that you still
14 use?
15    A.  No, absolutely not.
16    Q.  When did you stop using that email
17 address?
18    A.  A few years ago.
19        MR. PACE:  June 19, 2005.  2015.  Sorry.
20        THE INTERPRETER:  '15.
21        MR. PACE:  I'm sorry about that.
22        (The referred-to document was marked by
23 the court reporter for Identification as
24 Deposition Exhibit 8.)
25

Page 136

1  BY MR. PACE:
2     Q.  This is an email that you sent to
3  Dr. Rossi, correct?  Correct?
4     A.  Yes, I think so.  I believe so.  Think,
5  believe.
6         MR. PACE:  Can you do me a favor?  Can you
7  go to the second picture?
8  BY MR. PACE:
9     Q.  Mr. Fabiani, can you tell me what we are
10 looking at in this image?
11    A.  Two containers.
12    Q.  Is this the E-CAT plant?
13    A.  I think so.
14    Q.  Do you know, these are -- these are
15 attached to an email that was dated June 19, June 19
16 of 2015.  Do you recall if these are pictures that
17 you took around that time period?
18    A.  I don't remember.
19    Q.  On the left side of this picture, we can
20 see a gray wall, correct?
21    A.  Yes.
22    Q.  What is on the other side of that gray
23 wall?
24    A.  I have no idea.
25    Q.  Have you ever been on the other side of

## Page 137

1　that gray wall?
2　　　A.　No.
3　　　Q.　Just above the gray wall we can see the
4　outline of a black box or the top of a black box or
5　a black container.
6　　　　Do you see that?
7　　　A.　I see black.
8　　　Q.　Do you know what is in that -- have you
9　ever been inside of that black box?
10　　　A.　No, never been inside.
11　　　Q.　Next to the black box do you see a silver
12　pipe?  It is actually a pipe wrapped in insulation.
13　　　　THE INTERPRETER:  I'm sorry.
14　　　　MR. PACE:  A gray pipe.
15　　　　THE INTERPRETER:  Your last question was,
16　do you see it?
17　　　　THE WITNESS:  Yes.
18　　　　THE INTERPRETER:  The answer is yes.
19　BY MR. PACE:
20　　　Q.　Was that the insulated pipe that was to
21　carry the heated fluid from the 1-MW plant over to
22　the J.M. side of the warehouse?
23　　　A.　Yes, I think that is it.
24　　　Q.　Do you recall when that pipe was put into
25　play -- when that pipe was installed?

## Page 138

1　　　A.　I do not remember the date.
2　　　Q.　When was the pipe -- when was that
3　insulated pipe removed from its -- removed from the
4　location that it is in this picture?
5　　　A.　I don't know.
6　　　Q.　When was the last time you were in the
7　Doral warehouse?
8　　　A.　The last time, one or two days after the
9　plant was closed, yes, to take my material that had
10　been thrown outside.
11　　　Q.　What was that material?
12　　　A.　My computer, my acquisition system, my
13　electronic laboratory.
14　　　　MR. PACE:  Equipment, laboratory.
15　BY MR. PACE:
16　　　Q.　When you -- do you recall whether that
17　insulated pipe was still at the Doral warehouse on
18　the last day you were there?
19　　　A.　No.  I did not go around looking around
20　the plant.  It was all closed.
21　　　Q.　Let's go to -- is this the third picture?
22　The third picture that was attached to the email, is
23　this a picture of the four Big Frankie units?
24　　　A.　It is not complete, but you can see four
25　Big Frankies.

## Page 139

1　　　Q.　And the Big Frankie units are stacked on
2　top of each other in this picture?
3　　　A.　Yes, they are stacked.  But they are
4　distanced from each other.
5　　　　MR. PACE:  Can you go to the last picture?
6　BY MR. PACE:
7　　　Q.　The last attached picture from this email,
8　can you tell me what we are looking at here?
9　　　A.　I think it could be the -- a small module.
10　　　Q.　A small module meaning a small E-CAT?
11　　　A.　Yes.  Yes, I am talking about the small
12　E-CAT.
13　　　Q.　Mr. Fabiani, were you ever involved in
14　fueling any of the E-CAT units?  Fueling.
15　　　　MR. PACE:  Is that a bad word?  Let me
16　make a different question.
17　BY MR. PACE:
18　　　Q.　Mr. Fabiani, were you ever involved in
19　putting fuel into an E-CAT unit?
20　　　　MR. PACE:  You can use the word "catalyst"
21　in Italian or "fuel" in Italian, but not
22　gasoline.  I'll try a different one.
23　BY MR. PACE:
24　　　Q.　Mr. Fabiani, were you ever involved in
25　putting any mixtures into the E-CAT units?

## Page 140

1　　　A.　I understand.
2　　　　No, never involved.
3　　　　Excuse me.  It is 3:00 in the morning.  I
4　begin being very tired.
5　　　　MR. NUNEZ:  Chris, how much longer do you
6　think you have?
7　　　　MR. PACE:  I want to show him a couple of
8　documents.
9　　　　THE INTERPRETER:  (In Italian.)
10　　　　THE WITNESS:  Thank you, thank you.  I'm
11　not very lucid at 3:00 a.m.
12　　　　MR. PACE:  This is 9?
13　　　　(The referred-to document was marked by
14　the court reporter for Identification as
15　Deposition Exhibit 9.)
16　BY MR. PACE:
17　　　Q.　Mr. Fabiani, what you are looking at on
18　your screen now, this is an email that you wrote to
19　J.T. Vaughn; is that correct?
20　　　A.　Probably.
21　　　Q.　You do not recognize the email otherwise?
22　　　A.　Probably, yes, yes.
23　　　　MR. PACE:  Can you go down to the bottom
24　of the first page of the agreement.  I want to
25　see if he recognizes his initials and his

1  signature.
2  BY MR. PACE:
3      Q.  Mr. Fabiani, can you see either initials
4  or signatures in the bottom right-hand corner?
5      A.  Yes.
6      Q.  Are those your initials or signature?
7      A.  Yes, it seems like mine.
8      MR. PACE:  Then why don't we go all the
9  way to just the first signature.
10  BY MR. PACE:
11      Q.  Mr. Fabiani, does this appear to be your
12  signature on this document, what we see there above
13  the name Fulvio Fabiani?
14      A.  Yes.  It seems like mine, yes.
15      MR. PACE:  Literally, one last document.
16  February 23, 2016.  This is Exhibit 10.
17      (The referred-to document was marked by
18  the court reporter for Identification as
19  Deposition Exhibit 10.)
20      MR. PACE:  Did I give you February 23rd?
21      MS. HANDELSON:  I have it up.
22  BY MR. PACE:
23      Q.  Mr. Fabiani, do you recognize this email?
24      A.  Yes.  It is properly mine, yes.
25      Q.  In this email, you are telling J.T. Vaughn

1  about certain information that you are going to
2  provide him; is that correct?
3      A.  I read that we are trying to clarify the
4  interest in continuing to work together.
5      Q.  You say in this email that you are going
6  to send Mr. Vaughn an Excel file with electrical and
7  thermal data, correct?
8      A.  It is the file that I hand-delivered to
9  the engineer of Industrial Heat, in Attorney Pace's
10  office.
11      Q.  And then you say that you were going to
12  work on an official report; is that correct?
13      A.  It was not -- the official report was not
14  prepared because I was not paid.
15      Q.  So your position is you never prepared
16  your official report, correct?
17      MR. CHAIKEN:  Object to form.
18      THE WITNESS:  Never done.  There was no
19  final payment.  Nothing.
20      MR. PACE:  May 15th.
21      (The referred-to document was marked by
22  the court reporter for Identification as
23  Deposition Exhibit 11.)
24  BY MR. PACE:
25      Q.  Mr. Fabiani, I have marked for you here

1  Exhibit 11.
2      Isn't it, in fact, the case that
3  Industrial Heat offered to make the final payment to
4  Quantum Leap if you would send the raw data and your
5  final report?
6      A.  The question?
7      Q.  Isn't that correct?
8      A.  This was -- this was a proposal done by
9  Murray, which I did not know.  It was done after the
10  closing of the contract.
11      THE INTERPRETER:  No.
12  BY MR. PACE:
13      Q.  Can you repeat your answer?
14      A.  This is a document done by a person that I
15  did not know, as far as being introduced to me.
16      THE INTERPRETER:  Going a little fast for
17  me, sorry.
18      THE WITNESS:  It was not contemplated in
19  my contract, to refer to this person as a
20  person that could ask me for data and
21  documents.
22  BY MR. PACE:
23      Q.  Mr. Fabiani, to whom did you hand over the
24  flash drive that you testified to earlier today?
25      A.  I took it to the office of the attorney.

1      Q.  And gave it to whom?
2      A.  And I proposed it to J.T. Vaughn, who told
3  me to hand-deliver it in the hands of that person.
4      Q.  Who was that person?
5      A.  Mr. Murray.
6      Q.  The person on this email?
7      A.  It could be that one.
8      Q.  Mr. Fabiani, you communicated with J.T.
9  Vaughn and Mr. Murray in English, correct?
10      A.  Yes, thanks to the translator.
11      Q.  You would communicate with Barry West in
12  English?
13      A.  Yes, thanks to the translator.
14      Q.  You would communicate with Jim Bass in
15  English, correct?
16      A.  Yes, thanks to the translator.
17      Q.  You would communicate with Henry Johnson
18  in English, correct?
19      MR. NUNEZ:  Object to form.
20      DR. ROSSI:  Object to form.
21      MR. NUNEZ:  Object to form.
22      MR. PACE:  I heard Dr. Rossi actually
23  insert an object to form.
24      MR. NUNEZ:  He can't do that.
25      THE WITNESS:  Could you please repeat the

Page 145

1    question?
2        MR. PACE:  Yes.
3    BY MR. PACE:
4        Q.   You communicated with Henry Johnson in
5    English, correct?
6        MR. NUNEZ:  Object to form.
7        THE WITNESS:  I have no idea who Henry
8    Johnson is.
9        I'm here.
10       MR. PACE:  No further questions.
11       MR. NUNEZ:  Thank you, Mr. Fabiani.
12   You've been great.  Thank you for these extra
13   three hours and more.
14       THE WITNESS:  Thank you to the translator
15   that put up with me.
16       THE INTERPRETER:  You put up with me.
17       THE WITNESS:  And thank you to Attorney
18   Pace.
19       MR. PACE:  Goodnight.
20       THE VIDEOGRAPHER:  5:21 p.m.  Going off
21   the video record.
22       (Thereupon, the taking of the deposition
23   was concluded at 5:21 p.m.)
24
25

Page 146

1              AFFIDAVIT
2    STATE OF FLORIDA      )
3    COUNTY OF        )
4
5        I,              , being first
6    duly sworn, do hereby acknowledge that I did
7    read a true and certified copy of my deposition
8    which was taken in the case of ROSSI V. DARDEN,
9    taken on the 28th day of February, 2017, and
10   the corrections I desire to make are as
11   indicated on the attached Errata Sheet.
12
13            CERTIFICATE
14
15   STATE OF FLORIDA      )
16   COUNTY OF        )
17
18       Before me personally appeared
19   _____,
20   to me well known / known to me to be the
21   person described in and who executed the
22   foregoing instrument and acknowledged to and
23   before me that he executed the said instrument
24   in the capacity and for the purpose therein
25   expressed.
26
27       Witness my hand and official seal, this
28   _____ day of _____, _____.
29
30
31           _____
32               (Notary Public)
33
34   MY COMMISSION Expires:

Page 147

1              ERRATA SHEET
2    PAGE  LINE     REMARKS
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21       _____
22          Signature of Witness
23       _____
24   (Notary Public)
25   Dated this _____ day of _____, _____.
26   MY Commission Expires: _____

Page 148

1            CERTIFICATE OF OATH
2    STATE OF FLORIDA   )
3    COUNTY OF MIAMI-DADE  )
4
5        I, the undersigned authority, certify
6    that FULVIO FABIANI personally appeared before me
7    and was duly sworn.
8        WITNESS my hand and official seal this
9    13th day of February, 2016.
10
11
12         <%Signature%>
13       KELLI ANN WILLIS, RPR, CRR
14       Notary Public, State of Florida
15       My Commission No. FF911443
16       Expires: 2/16/20
17   +++++++++++++++++++++
18            CERTIFICATE
19   STATE OF  FLORIDA  )
20   COUNTY OF MIAMI-DADE  )
21       I, KELLI ANN WILLIS, Registered
22   Professional Reporter and Certified Realtime
23   Reporter do hereby certify that  I was
24   authorized to and did stenographically   report
25   the foregoing deposition of   2017; That a review
26   of the transcript  was requested; and that the
27   transcript is a true record of my stenographic
28   notes.
29       I FURTHER CERTIFY that I am not a
30   relative, employee, attorney, or counsel of any
31   of the parties, nor am I a relative or employee
32   of any of the parties' attorney or counsel
33   connected with the action, nor am I financially
34   interested in the action.
35       Dated this 13th day of February, 2016.
36
37
38         <%Signature%>
39       KELLI ANN WILLIS, RPR, CRR

Page 149

```
 1
 2   March, 14 2017
 3   Fulvio Fabiani
 4   c/o Rodolfo Nunez, Esq.
 5   255 Alahambra Circle
 6   Coral Gables, Florida 33134
 7
 8   RE:  Rossi v. Darden
 9   DEPO OF:  Fulvio Fabiani
10   TAKEN:   2-28-17
11   NUMBER OF PAGES:  150
12   AVAILABLE FOR READING UNTIL:  30 days
13   Dear Sir:
14   This letter is to advise you that the transcript of
15   your deposition is available for reading and
16   signing.
17   PLEASE CALL 305 376-8800 TO MAKE AN APPOINTMENT to
18   come to the Veritext office to read and sign the
19   transcript.  Our office hours are 9:00 a.m. to 5:00
20   p.m., Monday through Friday.
21
22       In the event other arrangements are made, please
23   send us a notarized list of any and all corrections
24   and/or changes, noting page and line numbers, and
25   the reason for such changes, so that we can furnish
26   respective counsel with a copy.
27
28       If the reading and signing has not been completed
29   prior to the above-referenced date, we shall
30   conclude that you have waived the reading and
31   signing of the deposition transcript.
32   Your prompt attention to this matter is appreciated.
33   Sincerely,
34
35   Kelli Ann Willis, RPR, CRR
36   cc:  All counsel of record
37
38
```

Page 150

```
 1
 2   March, 14 2017
 3
 4   Christopher Pace, Esq.
 5   Jones Day
 6   600 Brickell Avenue
 7   Suite3300
 8   Miami, Florida  33131
 9   RE:  Rossi v. Darden
10   DEPO OF:   Fulvio Fabiani
11   TAKEN:  February 28, 2016
12   NUMBER OF PAGES:  150
13   AVAILABLE FOR READING UNTIL:  30 days
14   Dear Counsel:
15   The original transcript of the deposition listed
16   above is enclosed for your file.  The witness did
17   not waive reading and signing and has been sent a
18   letter notifying them to come in to read and sign
19   their deposition transcript.
20   The witness will be provided a copy of their
21   deposition for reading in our office should they
22   come in to review the transcript, and we will
23   forward to you any corrections made by the witness
24   at that time, along with an original signature page
25       to be attached to the original transcript.
26
27   Sincerely,
28
29   Kelli Ann Willis, RPR, CRR
30
31
32
33
34
```

## 4. Witness: Rossi, Andrea (Corporate Rep. for JM Products)

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 5:22-6:1<br>6:14-23<br>7:11-8:6<br>8:19-9:11<br>16:17-17:2<br>17:6-18:20<br>20:10-23:4<br>24:13-26:13<br>27:24-28:23<br>32:14-17<br>40:24-41:2<br>44:2-45:25<br>49:1-14<br>55:25-56:3<br>59:18-61:6<br>61:9-18<br>63:25-64:10<br>65:8-16<br>66:22-67:18<br>72:7-20<br>72:24-74:1<br>74:21-24<br>78:5-79:9<br>79:23-80:8<br>81:21-82:14<br>83:20-85:1<br>87:1-10<br>90:1-24<br>91:17-92:5<br>92:19-93:8<br>93:21-94:21<br>108:1-109:20<br>110:3-111:4<br>111:11-19<br>111:24-112:7<br>120:20-121:17<br>122:24-124:11<br>125:1-8 | 8:19 -24 Amb.;<br>16:17-17:2 R;<br>17:6-19 R;<br>18:14-20 AA, P, R;<br>22:16-23:4 R;<br>24:13-26:13 R;<br>27:24-28:23 R;<br>32:14-17 R;<br>32:14-17 R, H;<br>59:18-61:6 H;<br>61:9-18 H;<br>72:24-74:1 R;<br>74:21-24 R;<br>81:21-82:14 R;<br>83:20-85:1 R;<br>87:1-10 R;<br>90:1-24 R;<br>91:17-92:5 R;<br>110:3-13 R;<br>111:11-19 R;<br>111:24-112:7 R;<br>144:23-145:8 R;<br>152:12-20 R;<br>154:20-155:23 R;<br>157:22-158:2 R;<br>168:15-24 R, S, Arg.;<br>178:11-15 R;<br>181:4-20 R;<br>201:2-19 R;<br>233:22-235:8 R;<br>236:2-7 R; | 7:8-10<br>8:11-13<br>8:15-18<br>15:25-16:16<br>18:22-25<br>19:2-16<br>27:8-19<br>27:22<br>31:23-32:13<br>32:18-22<br>34:3-35:17<br>36:1-37:22<br>40:24-42:2<br>42:17-43:2<br>43:5-6<br>46:1-11<br>51:7-15<br>61:7<br>64:11-14<br>65:17-66:9<br>68:6-10<br>68:12<br>68:14-21<br>79:10-22<br>80:9-19<br>95:1–07<br>203:21-204:20<br>207:6-22<br>249:4 | 8:19-24 A;<br>17:17-18:20 AA;<br>21:25-22:12 R;<br>22:23-23:1 AA;<br>23:2-4 R, Fact not in dispute;<br>24:13-24 AA;<br>27:24-28:19 Arg., MT;<br>59:22-60:7 S, H;<br>60:14-61:6 S, H;<br>61:9-18 H, M;<br>72:24-74:1 R;<br>74:21-24 R;<br>110:3-12 – Confusing;<br>111:11-19 R;<br>111:24-112:7 R | 80:14-19<br>85:10-86:1<br>203:21-204:20<br>207:6-22 | **Defendants' Objections to Plaintiffs:**<br>8:11-13 IMP<br>8:15-18 IMP<br>15:25-16:16 IMP<br>18:22-19:16 IMP<br>27:8-19 IMP<br>27:22 IMP<br>32:18-22 IMP<br>34:3-35:17 IMP<br>36:1-37:22 IMP<br>41:3-42:2 IMP<br>42:17-43:6 IMP<br>46:-1-11 IMP<br>51:7-15 IMP<br>65:17-66:9 IMP<br>68:6-21 IMP<br>79:10-22 IMP<br>95:1-7 IMP<br>203:21-204:20 IMP<br>207:6-22 IMP<br><br>**Defendants' Objections to Third Party Defendants:**<br>80:14-19 IMP<br>85:10-86:1 IMP<br>203:21-204:20 IMP<br>207:6-22 IMP | **Defendants' Rebuttals to Plaintiffs:**<br>19:17-20:9<br>26:14-27:6<br>32:23-33:11<br>33:21-34:2<br>35:18-25<br>42:3-6<br>50:16-51:6<br>66:10-20<br>206:4-207:5<br><br>**Defendants' Rebuttals to Third Party Defendants:**<br>80:20-81:8<br>85:2-9<br>202:22-203:20<br>206:4-207:5 | 19:17-20:9 IMP, Arg., R;<br>26:14-27:6 IMP, Arg., R;<br>32:23-33:11 IMP, Arg., R;<br>35:18-25 IMP, R;<br>42:3-6 AA, Arg., Cum.;<br>50:16-51:6 Confusing, Unintelligble;<br>66:10-20 R, MT;<br>206:4-8 AA, Cum.;<br>206:9-22 M, Confusing, MT;<br>206:23-207:2 AA;<br>207:3-5 R | 80:20-81:8 R;<br>85:2-9 Cum.;<br>203:3-6 M, Confusing;<br>203:7-20 R;<br>206:4-8 AA, Cum.;<br>206:9-22 M, Confusing, MT;<br>206:23-207:2 AA;<br>207:3-5 R | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 125:19-22<br>128:16-23<br>129:14-130:8<br>130:17-131:4<br>131:25-132:11<br>134:10-25<br>136:11-137:5<br>142:5-14<br>142:17-18<br>143:12-144:8<br>144:23-145:8<br>147:9-21<br>148:2-149:3<br>151:3-8<br>151:21-25<br>152:12-20<br>153:13-154:6<br>154:20-155:23<br>156:9-157:11<br>157<br>157:22-158:2<br>160:2-161:12<br>161:18-162:7<br>163:24-164:2<br>164:8-15<br>167:20-23<br>168:13-24<br>178:11-15<br>181:4-20<br>186:14-22<br>188:1-17<br>189:17-25<br>192:14-193:10<br>194:2-195:13<br>200:4-14<br>201:2-19<br>205:12-22<br>232:24-233:16<br>233:22-235:8<br>236:2-7<br>236:12-21 | 236:12-21 R;<br>237:12-15 R;<br>239:7-14 R | | | | | | | | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 237:12-15<br>237:20-24<br>238:8-15<br>239:7-14<br>240:10-241:7<br>245:14-247:7<br>248:23-249:3<br>251:10-252:24<br>254:1-256:1 | | | | | | | | | |

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:16-cv-21199-CMA

ANDREA ROSSI, et al.,

    Plaintiffs,

    v.

THOMAS DARDEN, et al.,

    Defendants.
- - - - - - - - - - - - - - - - - - -x
INDUSTRIAL HEAT, LLC, et al.,

    Counter-Plaintiffs,

    v.

ANDREA ROSSI, et al.,

    Counter-Defendants.

    and

J.M. PRODUCTS, et al.,

    Third-Party Defendants.
- - - - - - - - - - - - - - - - - - -x
    600 Brickell Avenue, Suite 3300
    Miami, Florida
    Wednesday, March 1, 2017
    10:14 a.m.- 5:46 p.m.

CONFIDENTIAL TRANSCRIPT
PORTIONS OF TRANSCRIPT HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF J.M. PRODUCTS, INC.
THROUGH ANDREA ROSSI
Taken before Edward Varkonyi, Registered
Merit Reporter and Notary Public for the State of
Florida at Large, pursuant to Notice of Taking

Page 2

1    APPEARANCES
2
3    BRIAN CHAIKEN, ESQ.,
    Perlman Bajandas Yevoli & Albright, P.L.
    283 Catalonia Avenue, Suite 200
4    Coral Gables, Florida 33134
    on behalf of the Plaintiff.
5
6    CHRISTOPHER R.J. PACE, ESQ.,
    MICHAEL MAUGANS, ESQ.,
7    Jones Day
    600 Brickell Avenue, Suite 3300
8    Miami, Florida 33131
    on behalf of the Defendant.
9
10    RODOLFO NUNEZ, ESQ.,
    Rodolfo Nunez, P.A.
11    255 University Drive
    Coral Gables, Florida 33134
12    on behalf of Defendants J.M. Products,
    Johnson and Bass
13
14    FERNANDO ARAN, ESQ.,
    Aran Correa & Guarch, P.A.
15    255 University Drive
    Coral Gables, Florida 33134
16    on behalf of Defendant United States
    Quantum Leap and Fabiani
17
18
19    ALSO PRESENT: Chris Hernandez, Videographer
20
21
22
23
24
25

Page 3

1          I N D E X
2    Witness        Direct
3    ANDREA ROSSI    6
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          E X H I B I T S
2    Deposition        For Ident.
3    Exhibit 1  Notice of Deposition    63
4    Exhibit 2  Term Sheet    63
5    Exhibit 3  Industrial Gross Sublease    71
6    Exhibit 4  Color Photo    82
7    Exhibit 5  HJ00218    89
8    Exhibit 6  JM000014 to 16    96
9    Exhibit 7  ROSSI 00003876    104
10    Exhibit 8  Color Photo    114
11    Exhibit 9  Blank Sketch of Doral Location    117
12    Exhibit 10  Drawn on Sketch of Doral Location    117
13    Exhibit 11  Color Photo    120
14    Exhibit 12  Color Photo    120
15    Exhibit 13  Hand Drawn Drawing by Andrea Rossi    127
16    Exhibit 14  "Composite Exhibit A" by Wong    134
17    Exhibit 15  Drawn on Sketch of Doral Location    136
18    Exhibit 16  Color Photo    193
19    Exhibit 17  Rossi 00011387 to 11388    202
20    Exhibit 18  000464    202
21    Exhibit 19  JB000468    213
22    Exhibit 20  JB000473    224
23    Exhibit 21  Color Photo    231
24    Exhibit 22  JM000062 to 64    233
25

**Veritext Florida Reporting Co.**

Page 5

1  Thereupon--
2       THE VIDEOGRAPHER:  We're on the record.
3  The date is March 1st, 2017.  The time is 10:14
4  a.m.
5       This is media unit one of the video
6  deposition of J.M. Products, Inc. in the matter
7  of Andrea Rossi, et al. versus Thomas Darden, et
8  al. At this time may counsel please state their
9  appearances for the record.
10       MR. PACE:  This is Chris Pace and Mike
11  Maugans from Jones Day on behalf of the
12  defendants.
13       MR. ARAN:  Fernando Aran of the law firm
14  of Aran, Correa & Guarch on behalf of third
15  party defendants J.M. Products, James Bass and
16  Henry Johnson.
17       MR. CHAIKEN:  Good morning.  Brian
18  Chaiken on behalf of plaintiffs.
19       MR. NUNEZ:  Rudy Nunez on behalf of third
20  party defendants Fulvio Fabiani and United
21  States Quantum Leap, LLC.
22  Thereupon--
23            LEONARDO ROSSI
24  was called as a witness by the Defendant and having
25  been first duly sworn responded as follows:

Page 6

1            THE WITNESS: I do.
2          DIRECT EXAMINATION
3  BY MR. PACE:
4       Q.  Dr. Rossi, can you state your full name.
5       A.  Andrea Rossi.
6       Q.  And what's your present work address?
7       A.  1331 Lincoln Road, Miami Beach, Florida
8  33139.
9       Q.  Is that also your resident address?
10       A.  Yes.
11       Q.  Is it the same unit within the building
12  where you work and you reside?
13       A.  Yes.
14       Q.  Do you have -- you're here testifying
15  today as the representative of J.M. Products,
16  correct?
17       A.  Correct.
18       Q.  Do you have any formal title or position
19  within J.M. Products?
20       A.  Yes, I am the so to speak director, with
21  a small D.  So I am the scientific and technical
22  director of the plant that I have designed and
23  invented and -- but I do not have corporate tasks.
24       Q.  So let me ask my question again.  Do you
25  have any formal title within J.M. Products?

Page 7

1       Your answer is no, correct?
2       A.  I do not know what you mean by formal.
3       Q.  Fair enough.  Let me ask you, do you have
4  any title -- do you hold any position as an officer
5  or director of J.M. Products?
6       A.  When you mean director, what do you
7  mean?
8       Q.  Do you know what a director of a
9  corporation in the United States is?
10       A.  No.
11       Q.  Okay.  Do you know what a board of
12  directors for a corporation in the United States?
13       A.  Yes, I know what is a board of directors.
14       Q.  In this context, a director, are you
15  referring to a member of a board of directors.
16       So as to J.M. Products, are you a
17  corporate officer of J.M. Products?
18       A.  No.
19       Q.  Are you a member of the board of
20  directors of J.M. Products?
21       A.  No.
22       Q.  Okay.  When you just described yourself
23  as a director, small D, of J.M. Products, has anyone
24  ever given you that title?
25       A.  I gave it -- you know, I gave it to

Page 8

1  myself because discussing with the president,
2  attorney Johnson, we can see that I can be qualified
3  that way because I directed the plant.
4       For example, I am the person most
5  qualified to answer to the question put in your paper
6  upon which I am here now.
7       Q.  I understand.  And that's because you
8  control -- you control all aspects of J.M. Products,
9  correct?
10       MR. ARAN:  Objection to form.
11       THE WITNESS:  Sorry, I must ask you as
12  the other times to be so kind to speak a little     IMP
13  bit slow.  I understand perfectly English.
14  BY MR. PACE:
15       Q.  I will.  No, I sometimes ask --           IMP
16       A.  Just if you go fast I --
17       Q.  Fair enough.
18       A.  I don't get it.
19       Q.  You control all aspects of J.M. Products,   Amb
20  correct?
21       MR. ARAN:  Objection to form.                 Third Party:
22       MR. CHAIKEN:  Object to form.                 A
23       THE WITNESS:  Your -- your question is
24  correct in the measure of technical tasks.
25  BY MR. PACE:

2 (Pages 5 to 8)

Page 9

1    Q.  How about financial tasks, doesn't all
2    money -- isn't all the money that J.M. Products uses
3    to pay for any expenses it has come from either you
4    or Leonardo Corporation?
5    A.  But that was on the base of a contract
6    that -- of an agreement that there was between J.M.
7    and Leonardo Corporation and this agreement foresaw
8    that Leonardo Corporation was going to pay all the
9    bills and expenses for the day by day activity of
10   J.M. as a compensation for products that Leonardo
11   Corporation was going to buy from J.M.
12   Q.  So my question again, because you didn't
13   answer it.  You started with a but response.
14       All of the money for any expenses paid by
15   J.M. Products came from either you or Leonardo
16   Corporation; yes or no?
17   A.  I don't know if all the money paid by
18   J.M. came from Leonardo Corporation of me.
19   Q.  So let's go -- let's talk a little bit
20   about what you did to prepare to be the corporate
21   representative J.M. Products today because that's an
22   answer you should have, you should have prepared for,
23   so let's talk about this.
24       To prepare today to speak as the
25   corporate representative of J.M. Products with whom

Page 10

1    did you speak?
2    A.  With attorney Johnson.
3    Q.  With whom else?
4    A.  My attorney.
5    Q.  All right.  How long did you speak with
6    attorney Johnson?
7    A.  Several hours.
8    Q.  When was that?
9    A.  That was several days ago.  Several days
10   ago in the office of my attorney.
11   Q.  Okay.
12   A.  At the presence of my attorney.
13   Q.  And you spoke with him as the -- he --
14   you spoke with Henry Johnson as the president of J.M.
15   Products, correct?
16   A.  Correct.
17   Q.  And what more specifically did you
18   discuss with Henry Johnson?
19   A.  Everything I discussed with him has been
20   discussed also together with my attorney, so I think
21   that --
22   Q.  Well, but you were conducting -- you were
23   interviewing Henry Johnson to prepare for your
24   deposition testimony today, correct?
25       MR. CHAIKEN:  Object to form.

Page 11

1        MR. ARAN:  Object to form.  To the extent
2    that any conversations were had with attorneys,
3    none of the conversations with the attorneys
4    should be divulged because they are
5    attorney-client privileged.
6        MR. PACE:  You can take that position if
7    you want, but he spoke with Henry Johnson.  It's
8    like interviewing a witness.  It's like a
9    30(b) -- well, look, if you are going to
10   instruct him not to answer, you will instruct
11   him not to answer and we'll take it with the
12   court.
13       We will make a clear record and then that
14   way we can go forward.  Let's do it this way.
15   Dr. Rossi --
16       MR. ARAN:  The areas of inquiry are
17   okay.  The areas of inquiry.  The sum and
18   substance of conversations will not be.
19       MR. PACE:  We will create a clean record
20   here and then we can deal with it later because
21   you can instruct him not to answer.
22   BY MR. PACE:
23   Q.  Dr. Rossi, when you met with Henry
24   Johnson to prepare for today's deposition what did
25   you discuss -- give a chance for your lawyer to step

Page 12

1    in here, but what did you discuss with Henry Johnson?
2        MR. ARAN:  Objection to form.  To the
3    extent it's attorney-client privileged we will
4    instruct him not to answer.  Attorney-client
5    privilege to the extent I'm the attorney for
6    J.M. Products, J.M. Products' deposition is
7    being taken.
8        The determination is made that the person
9    with most knowledge to answer the questions that
10   are specific to this request would be Mr. Rossi
11   or Dr. Rossi.  So Dr. Rossi is being prepared by
12   J.M. Products and being educated, to the extent
13   he needs to be educated, by J.M. Products and
14   those conversations took place in the presence
15   of counsel and with counsel's participation, to
16   the extent that it would be necessary.
17       MR. PACE:  Are you going to instruct --
18       MR. ARAN:  Therefore, I would instruct
19   him not to answer the question conversations.
20   If you want to determine the areas that he may
21   have been discussing, so you know how he
22   prepared for the deposition, then that would be
23   okay.
24       MR. PACE:  I understand.  So you are
25   instructing the witness not to answer?

3 (Pages 9 to 12)

**Veritext Florida Reporting Co.**

Page 13

1    MR. ARAN:  Not to answer any
2  communications that involve the preparation for
3  the deposition that took place with counsel.
4  BY MR. PACE:
5    Q.  Okay.  Are you going to follow your
6  counsel's instruction?
7    A.  Yes, sir.
8    Q.  How long did you meet with Henry Johnson?
9    A.  Several hours.  Maybe half day.
10    Q.  Okay.  What documents did you review to
11  prepare to testify today?
12    A.  Let me think about that because -- you
13  know, all the documents related to my activity that
14  was the activity of the scientific and technological
15  director of the company during the experiments that
16  we made in the factory of Doral.
17    Q.  What else did you review to prepare for
18  today's deposition?
19    A.  I did not understand the question.  I am
20  sorry.
21    Q.  What else did you review to prepare for
22  today's deposition?
23    A.  I would say mainly this because this
24  is -- but also we have gone -- exactly.  I have gone
25  through that document that you have in your --

Page 14

1    Q.  If you will answer my question first.
2  What other documents -- you said reviewed your
3  technical documents.
4    A.  Yes.
5    Q.  What other documents did you review to
6  prepare?
7    A.  I was answering.  Another document that I
8  have gone through together with my attorney and the
9  attorney Johnson has been the one that you had in
10  your hands a few seconds ago.
11    Q.  Okay.  And what else?
12    A.  I don't remember else.
13    Q.  Well, you said you reviewed documents
14  relating to technical work that you performed.
15    A.  Yes, also.
16    Q.  Did you review any documents relating to
17  the financial records of J.M. Products?
18    A.  Can you kindly repeat the last?
19    Q.  Did you review any documents relating to
20  the financial operations of J.M. Products?
21    A.  What do you mean exactly by financial
22  operations?
23    Q.  Did you review the bank accounts of J.M.
24  Products?
25    A.  No.

Page 15

1    Q.  Did you review the bills of J.M.
2  Products?
3    A.  No.
4    Q.  Did you review the invoices of J.M.
5  Products?
6    A.  No.
7    Q.  Did you make any effort to determine how
8  J.M. Products has paid for expenses in the past?
9    A.  You know, for what concerns the expenses
10  that J.M. made related to the activity in Doral, I
11  know them perfectly because I did them as Leonardo
12  Corporation based on the agreement that there was
13  between J.M. and Leonardo Corporation.
14    Q.  That Leonardo --
15    A.  I reviewed those -- I reviewed those
16  documents, yes.
17    Q.  So I think some of this stemmed from you
18  providing a slightly different answer a little while
19  ago.
20    I asked -- well, maybe not.  Maybe I
21  shouldn't say this.  Are there any expenses that J.M.
22  Products has had in the past two years that are not
23  related to the Doral warehouse?
24    MR. ARAN:  Objection to form.
25    THE WITNESS:  Just one second.  I take

**IMP**

Page 16

1  the occasion also now, because I must repeat it,
2  because it's another -- that I have a problem, I
3  cannot swallow and so now and again you will see
4  me to cough in that --
5  BY MR. PACE:
6    Q.  Cup.
7    A.  This glass.  This is not lack of
8  respect.  I am sorry, I have to sometime cough inside
9  there because I cannot swallow.  I delayed my surgery
10  to be able to make this depositions because after
11  that surgery I will be several weeks without having
12  the possibility to talk.
13    So please excuse me, sometime you will
14  see me make this very bad gesture, but it's
15  necessary.  I'm sorry.  I am sorry.  Can you kindly
16  repeat your question?
17    Q.  Are you -- as the corporate
18  representative of J.M. Products are you aware of any
19  other source of funds that J.M. Products has had to
20  pay for its expenses, other than you and/or -- you,
21  Andrea Rossi and/or Leonardo Corporation?
22    MR. ARAN:  Objection to form.
23    THE WITNESS:  I have understood your
24  question.  I am aware only of the expenses that
25  J.M. made related to the activity in Doral.

**R**

4 (Pages 13 to 16)



**Page 17**

1  I am not aware of other expenses that
2  J.M. could have had.
3  BY MR. PACE:
4  Q.  As to -- but you haven't answered my
5  question, so let me ask my question again.
6  As to those expenses of which you are
7  aware, did either Andrea Rossi and/or Leonardo
8  Corporation pay for all those expenses?  It's a yes
9  or no answer.
10  A.  Yes.
11  Q.  All right.  We're going to go back here
12  just for a second, which is as to J.M. Products then
13  you, Andrea Rossi, controlled all technical and
14  product development activities of J.M. Products, to
15  the extent they existed, correct?
16  A.  Correct.
17  Q.  Either Andrea Rossi or Leonardo
18  Corporation provided all of the funds for any
19  expenses relating to the Doral location, correct?
20  MR. ARAN:  Objection to form.
21  BY MR. PACE:
22  Q.  Isn't that what you just answered?
23  A.  No, I have understood your question.  I
24  have just to focus the memory because I want to be
25  sure that what I answer is precise because there

**Page 18**

1  could have been -- in the top of the plant there
2  could have been expenses not made by Leonardo or me
3  at the very beginning.
4  And -- but what -- as far as I recall,
5  all the day by day expenses have been paid by
6  Leonardo Corporation.  Not by me as Andrea Rossi, by
7  Leonardo Corporation.
8  Q.  And then -- since you are here testifying
9  as the corporate representative of J.M. Products your
10  testimony is you're not aware of any other expenses
11  that J.M. Products incurred in connection with the
12  Doral location, correct?
13  A.  Not that I am aware of.
14  Q.  All right.  So all expenses of J.M.
15  Products were being paid -- as they relate to the
16  Doral location were being paid by Leonardo
17  Corporation, correct?
18  MR. ARAN:  Objection to form.
19  THE WITNESS:  All the expenses I am aware
20  of.
21  BY MR. PACE:
22  Q.  You are aware of as the corporate
23  representative of J.M. Products and who also spoke
24  with Henry Johnson, the president of J.M. Products,
25  correct?

**Page 19**

1  MR. ARAN:  Objection to form.
2  THE WITNESS:  Again, I was the scientific
3  and technological director, so I spoke with
4  Henry Johnson for what concerns all the
5  expenses.
6  When I spoke with Henry Johnson, when we
7  spoke about expenses, we spoke only about the
8  expenses I was aware of, which are the expenses
9  I explained before, the day by day expenses, you
10  know, the employee, the consultant, the bill of
11  FPL, et cetera, et cetera, et cetera and
12  invoices that came for some technological issue
13  or technical issue.
14  And -- but again, I am not aware of and I
15  do not know if there have been or not other
16  expenses independent from this activity.
17  BY MR. PACE:
18  Q.  So you learned nothing from
19  discussions -- your discussions with Henry Johnson
20  about any expenses you didn't already know about?
21  Q.  Can you repeat?
22  Q.  You told us you spoke with Henry Johnson
23  about expenses of Leonardo.
24  A.  Yes.
25  Q.  I'm sorry, expenses of J.M. Products.

**Page 20**

1  A.  Yes, yes.
2  Q.  Sounds though what you just said is he
3  didn't make -- he didn't inform you of any expenses
4  you weren't otherwise already aware of?
5  A.  He had no reason to do that because --
6  Q.  Because?
7  A.  Because I did not ask.  It was not -- I
8  was interested to the activity -- to the scientific
9  and technological activity of J.M.
10  Q.  So as the corporate representative of
11  J.M. Products sitting here today, however, your
12  testimony is you are not aware of a single expense
13  incurred by J.M. Products that wasn't paid for or
14  reimbursed by either Andrea Rossi or Leonardo
15  Corporation, correct?
16  A.  You are asking me if I am -- I am
17  repeating your question to be sure I have understood
18  it because I want to answer properly.
19  You have asked me, if I understood, if I
20  am aware of other expenses, apart the ones Leonardo
21  Corporation has paid for.  Is this the question?
22  Q.  Leonardo Corporation or Andrea Rossi.
23  A.  Yeah, okay.
24  Q.  I just want to make sure you understood
25  the question.

5  (Pages 17 to 20)

Page 21

1    A.  The answer is yes.
2    Q.  You are aware of other expenses incurred
3  by J.M. Products?
4    A.  No.
5    Q.  You're not answering my question.  Let me
6  try it again.
7    A.  Yes.
8    Q.  As the corporate representative of J.M.
9  Products do you know of any expenses incurred by J.M.
10  Products, other than the expenses that were paid for
11  by either Leonardo Corporation or Andrea Rossi?
12    A.  No.
13    Q.  All right.  How many times has Henry
14  Johnson been to the Doral -- I'm sorry, let me define
15  something here.
16        If I refer to the Doral warehouse --
17  what's the address of J.M. Products?  What's the
18  address of J.M. Products?
19    A.  7861 Northwest 46th Street, Doral,
20  Florida 33166.
21    Q.  If I refer to that as either the Doral
22  warehouse or the Doral location, are you comfortable
23  with that?
24    A.  Yes.
25    Q.  Okay.  How many times has Henry Johnson

Page 22

1  been to the Doral warehouse?
2    A.  Wow.  Surely he has been there.  How many
3  times, as far as I can remember, I am not sure.  I
4  am -- you know, several times.  Maybe two, three,
5  something like that.  But honestly, I do not remember
6  enough well to answer.
7        For sure I have in my brain the image of
8  attorney Johnson inside the factory and in the
9  office.  I have this image in my mind, but I cannot
10  recollect how many times.
11    Q.  Understood.
12    A.  But not many.  Not many.
13    Q.  Not many.  So on a day-to-day basis you
14  are at the Doral warehouse, correct?
15    A.  Every day.
16    Q.  All right.  And any operations that are
17  occurring at the Doral warehouse on behalf of J.M.
18  Products, you are controlling?
19    A.  Absolutely.
20    Q.  And that has been so since J.M. Products
21  was formed, correct?
22    A.  It is correct.
23    Q.  All right.  So you, Andrea Rossi, control
24  all of the day-to-day activity of J.M. Products,
25  correct?

Page 23

1    A.  Correct.
2    Q.  You, Andrea Rossi, control Leonardo
3  Corporation, correct?
4    A.  Correct.
5    Q.  Leonardo Corporation pays all the
6  expenses of J.M. Products, correct?
7    A.  No.
8        MR. CHAIKEN:  Object to form.
9  BY MR. PACE:
10    Q.  What expenses does J.M. Products incur
11  that Leonardo does not pay?
12    A.  You are forgetting that I told you at the
13  beginning of this deposition that Leonardo paid the
14  expenses of J.M. as a compensation of the products --
15    Q.  But they are still paying it.  My
16  question was Leonardo pays for whatever reason -- you
17  can explain later the reason.
18        MR. ARAN:  Objection.  Let's not talk
19  over each other.
20  BY MR. PACE:
21    Q.  Fair enough, I am just asking a
22  question.  You can explain later why they paid it.
23    A.  Okay.
24    Q.  You can explain it in the trial.  You can
25  explain it at some other context.

Page 24

1    A.  Okay.
2    Q.  My question was -- let's see if you can
3  answer my question though.  Because I thought we went
4  through this already.
5        You, as the corporate representative of
6  J.M. Products, are here to say -- to testify that the
7  only expenses of which you are aware of J.M. Products
8  were paid by Leonardo Corporation, correct?
9    A.  If we limit our description of the facts
10  to the action of paying the bills, yes.
11    Q.  Yes, sir.  I am --
12    A.  If we confine, yes.
13    Q.  We will get into the explanation of why
14  they paid but I am just trying to establish that you,
15  Andrea Rossi, ran the day-to-day operations of J.M.
16  Products, correct?
17    A.  Yes, it is correct.
18    Q.  You, Andrea Rossi, controlled Leonardo
19  Corporation, correct?
20    A.  Correct.
21    Q.  Leonardo Corporation paid for all the
22  day-to-day expenses of which you are aware for J.M.
23  Products, correct?
24    A.  Correct.
25    Q.  So there is -- the building -- the Doral

Third Party:
R

Third Party:
(22:23-23:1)
AA

R

Third Party:
(23:2-4)
R, Fact not
in dispute

R

Third Party:
(24:13-24)
AA



Page 25

1   warehouse where J.M. Products is located, that was
2   found by you, correct?
3       A.   Correct.
4       Q.   It was leased by Leonardo, correct?
5       A.   Correct.
6       Q.   J.M. Products subleased whatever
7   section -- whatever portion they used from Leonardo,
8   correct?
9       A.   Correct.
10      Q.   J.M. Products leased or contracted for or
11  received from Leonardo an employee?
12      A.   Can you kindly repeat the question?
13      Q.   Sure.  Who is Reinaldo Breto?
14      A.   Was the janitor -- well, janitor and
15  guardian of -- he was an employee of J.M.
16      Q.   He was an employee of J.M.
17           He was lent to J.M. by Leonardo
18  Corporation, correct?
19      A.   Yes, it is correct.
20      Q.   And that was your decision to loan Breto
21  from Leonardo to J.M. Products?
22      A.   Correct.
23      Q.   Okay.  And Mr. Breto acted under your
24  direction?
25      A.   Correct.  And not only under my

Page 26

1   direction.
2       Q.   Under who else's direction, Jim Bass?
3       A.   Yes.
4       Q.   And Jim Bass is an individual that you --
5   you made the decision to hire Jim Bass for J.M.
6   Products, correct?
7       A.   Yes, but -- yes.  Yes, yes.
8       Q.   You did not find Jim Bass initially,
9   correct?
10      A.   No, I did not.
11      Q.   So I am not suggesting you did but the
12  decision to hire Jim Bass was by you?
13      A.   Yes.
14      Q.   Back to my -- you resisted answering the
15  control question, so I am trying to understand why.
16      A.   I did not understand what you said.
17      Q.   Sure.  I asked you -- you were reluctant
18  to answer yes to the question that, you know, Andrea
19  Rossi controls -- controls J.M. Products.
20      A.   It is absolutely --
21           MR. ARAN:  Objection to form.  There is
22  no question pending.  There is no question
23  pending.
24           MR. PACE:  What are you instructing him
25  not to do then?

Page 27

1            MR. ARAN:  I am objecting to the form,
2   which is you are simply making statements that
3   are not questions.
4            I am objecting to the form and I am
5   suggesting there is no question pending for him
6   to answer.
7   BY MR. PACE:
8       Q.   You were responding.  I'm sorry.
9       A.   I'm sorry, attorney, but I totally
10  disagree with you.  I am not resisting the facts that
11  you are saying.
12           I always answered yes to every question
13  that you asked to me related to the fact that I was
14  the director of the day by day operation of J.M.
15      Q.   I know, but I was asking you a question
16  about control and that's where you resisted, so let
17  me ask it again.
18           Andrea Rossi controls all aspects of J.M.
19  Products, correct?
20           MR. ARAN:  Objection to form.
21           MR. CHAIKEN:  Object to form.
22           THE WITNESS:  No.
23  BY MR. PACE:
24      Q.   Andrea Rossi controls J.M. Products,
25  correct?

Page 28

1            MR. ARAN:  Objection to form.
2            MR. CHAIKEN:  Object to form.
3            THE WITNESS:  No.
4   BY MR. PACE:
5       Q.   Why is it that Andrea Rossi does not
6   control J.M. Products?
7       A.   Because to control J.M. Products mean to
8   have full control of J.M. Products.  As you -- as you
9   have heard from the beginning, I was not in the board
10  of directors.  I was not the president.  I was not
11  the CEO.
12           I was the director of all the scientific
13  research and development activity and experimental
14  activity of J.M., so I was the director and I am
15  responsible about all the day by day operations,
16  working operations that take -- that have taken act
17  inside the factory of J.M., not of all the actions or
18  deeds that are related to the -- to the activity that
19  is proper of a president or of a board of directors.
20      Q.   What other activities does J.M. Products
21  engage in, other than activities that you have
22  controlled?
23      A.   I don't know.
24      Q.   As the corporate representative of J.M.
25  Products here today you are not aware of any

IMP

IMP

R

Third Party: (27:24-28:19) Arg., MT

Arg., R, IMP 

7 (Pages 25 to 28)

**Veritext Florida Reporting Co.**

800-726-7007                                          305-376-8800

Page 29

1  activities in which J.M. Products is engaged that has
2  not been controlled by Andrea Rossi?
3      A.  I am --
4      MR. ARAN:  Objection to form.  He's here
5  to testify about the matters set forth in your
6  designated deposition, which deals with J.M.'s
7  activities as they relate to this lawsuit and
8  the operations of J.M. as it relates to this
9  lawsuit and the operation of the E-Cat, et
10 cetera.  It does not deal with anything else
11 that J.M. may have or not have.
12     MR. PACE:  A, that's not true.  B, that's
13 kind of a coaching, speaking objection.  You can
14 make an objection, if it's a fair objection.
15     MR. ARAN:  I will not help you anymore
16 again.
17     MR. PACE:  No, no, I understand.
18     MR. ARAN:  I am trying to help you.
19 BY MR. PACE:
20     Q.  That's fine.  By the way, he's made the
21 objection.  I want to make sure it's clear on the
22 record, I am not disputing that, that the objection
23 is here.
24     Let me try to rephrase my question.
25 Well, I think your answer might go to a scope issue

Page 30

1  but my question is still, as the corporate
2  representative of J.M. Products you are not aware of
3  any activity in which J.M. Products has engaged that
4  you have not controlled; is that correct or not
5  correct?
6      MR. ARAN:  Objection to form.
7  BY MR. PACE:
8      Q.  Yes or no?
9      MR. CHAIKEN:  Objection to form.
10     THE WITNESS:  It is not correct.  It is
11 not correct, it is confusing because I have
12 just -- attorney, I have just answered you, that
13 I am aware of the facts --
14 BY MR. PACE:
15     Q.  Dr. Rossi, let me -- I am going to try to
16 break those into small questions and they may not go
17 anywhere but let me just try this.
18     I don't think every question is an
19 invitation for you to say something in addition.
20 Times there are, if you feel my question is unfair.
21 You asked me to clarify it, so I am going to
22 clarify.
23     You testified today about various
24 activities of J.M. Products that you have controlled,
25 such as the technical aspects and the day-to-day

Page 31

1  activities at the Doral location, correct?
2      A.  This is correct.
3      Q.  I am asking you as the corporate
4  representative of J.M. Products are you aware of any
5  other activities in which J.M. Products has engaged?
6      Do they have any other business
7  activities that you are -- that you are not -- that
8  you, Andrea Rossi, are not involved in?  Do they have
9  any other financial activities in which you, Andrea
10 Rossi, is not involved in?
11     MR. CHAIKEN:  Object to form.
12     THE WITNESS:  I have not a hint about
13 everything that happened out of the factory of
14 J.M. in 7861 Northwest 46th Street, Doral,
15 Florida.
16 BY MR. PACE:
17     Q.  So you're aware of no such activities?
18     MR. ARAN:  Objection to form.
19     THE WITNESS:  I am aware and I am
20 perfectly aware of all the activities that
21 happened inside the factory.
22 BY MR. PACE:
23     Q.  And you are not aware of any activities
24 by J.M. Products outside that factory?
25     A.  This is correct.

Page 32

1      Q.  So to the best of your knowledge there
2  are no activities by J.M. Products outside the
3  factory?
4      MR. ARAN:  Objection to form,
5  mischaracterization.
6      THE WITNESS:  I am not able to answer
7  about things that I am not aware of.
8  BY MR. PACE:
9      Q.  Fair enough, but I think I asked to the
10 best of your knowledge.  Let me ask the question
11 again.
12     A.  The best of my knowledge is I don't
13 know.
14     Q.  To the best of your knowledge you are not
15 aware of any activities of J.M. Products other than
16 what occurs at the Doral warehouse?
17     A.  Yes.
18     Q.  All right.
19     A.  Sorry but, you know, it's the English to
20 the best of your knowledge that had put me in
21 difficulty because I don't know the semantic limit of
22 that proposition.  This is why I was --
23     Q.  Understood.  I understand.  Some of these
24 things I am trying to find out, you can only answer
25 to the knowledge that you either have prior to

H, R

IMP

Arg., R, IMP

8  (Pages 29 to 32)

Page 33

1  preparing for the deposition or in connection with
2  preparing for the deposition.
3       But as a corporate representative of J.M.
4  Products if the question, in fact, falls within the
5  scope of the topics for which you are a corporate
6  representative, and that can be a debate between
7  counsel but if it does your answer, you know, is
8  controlling for the corporation.
9       If it doesn't, then it's just your
10  personal -- you know, what Andrea Rossi knows
11  personally.
12       A.  Yeah.
13       Q.  You would agree with me that as it
14  relates to Leonardo Corporation the only activities
15  of J.M. Products that are of significance to Leonardo
16  Corporation are the activities at the Doral
17  warehouse, correct?
18       MR. CHAIKEN:  Object to form.
19       THE WITNESS:  Can you kindly repeat?
20  BY MR. PACE:
21       Q.  It's a long question.  I will try again.
22  The only activities of J.M. Products that are
23  relevant to Leonardo Corporation are those activities
24  at the Doral warehouse, correct?
25       A.  Yes, it is correct.

Page 34

1       Q.  And those activities you, Andrea Rossi,
2  had complete control over?
3       A.  Yes.
4       Q.  All right.  When did you inform
5  Industrial Heat that you had complete control over
6  the activities of J.M. Products?
7       A.  From the beginning.
8       Q.  From the beginning?
9       A.  From the beginning.  In June there is --
10  I am aware of an e-mail that I sent to Tom Darden and
11  J.T. Vaughn in June 2014, so -- when did not yet
12  exist the factory of Doral because the factory of
13  Doral has been rented, if I will recall, in September
14  for 2014.
15       So in June 2014 I sent an e-mail where I
16  clearly stated to J.T. Vaughn and Tom Darden that I
17  was going to direct the plant of J.M.  I informed
18  them perfectly that it was an experimental plant.  I
19  informed them -- they knew perfectly everything from
20  the beginning.
21       Q.  And this is -- this you say is in e-mail
22  communications that you had with Tom Darden and J.T.
23  Vaughn, correct?
24       MR. ARAN:  Object to form.
25       THE WITNESS:  Yes, this is the one that I

Page 35

1  recall now, yes.
2  BY MR. PACE:
3       Q.  Okay.
4       A.  But maybe there are others, but I
5  remember this perfectly.  I have short memory of this
6  because you have shown it to me in my first
7  deposition.
8       Q.  So it's a document that you -- an e-mail
9  that you saw in your first deposition?
10       A.  Yes.  So I remember that.  I am sure
11  there are others but sure, I think there are others.
12       I am perfectly sure that Tom Darden and
13  J.T. Vaughn knew everything to the perfection but I
14  have very fresh memory of this e-mail because you
15  have shown it to me.
16       Q.  And this e-mail --
17       A.  You have shown it to me.
18       Q.  And this e-mail, does it refer to J.M.     R, IMP
19  Products or does it refer to a customer?
20       A.  Kindly can you repeat?
21       Q.  The e-mail you are talking about, does it
22  refer to J.M. Products or does it refer to a
23  customer?
24       A.  I don't remember this particular, but I
25  was referring to the plant of the customer.

Page 36

1       Q.  And the customer --                        IMP
2       A.  When I say in that e-mail -- sorry, I
3  have not finished.  I'm sorry, attorney.
4       Q.  No, fair.  Please finish.
5       A.  When I wrote in that e-mail I will direct
6  or be the director, I don't remember -- now I don't
7  remember by word, but when I say that I would have
8  directed the plant, I was referring to -- obviously
9  of the plant -- to the plant of the customer.
10       Q.  When you were talking about operating the
11  plant you were not referencing operating the 1MW
12  plant, correct?
13       A.  That would have been ridiculous because
14  the fact that I was the director of the 1MW plant of
15  Leonardo was known since 2012.
16       It is like I come down to my wife and say
17  dear, I have to inform you that I am your husband.
18  You know, that would have been ridiculous.
19       Q.  And so your reading -- obviously these
20  are e-mails so we have the e-mails, but your reading
21  of these e-mails is that they disclose that you are
22  going to be in control of the customer?
23       A.  Plant.
24       Q.  The customer's plant?
25       A.  (Nods head.)

IMP

9 (Pages 33 to 36)

Page 37

1    Q.   And the day-to-day activities of that
2  customer?
3    A.   Yes, sir.
4    Q.   All right.  And other than that
5  communication you believe there are other e-mail
6  communications where you made the same point by
7  referencing the plant of the customer?
8    A.   I am not sure, attorney.
9    Q.   Okay.
10   A.   But I believe so.  But also, if I may
11 complete the question, in the sense no one of
12 Industrial Heat has ever, until the beginning of the
13 litigation, no one of Industrial Heat has ever put in
14 discussion the thing.
15       So they never asked me who is the
16 directing the plant of J.M..  They visited -- they
17 visited many times the plant of Leonardo.  They have
18 been there and they have also spoken with the -- with
19 Jim Bass, but the only thing they were interested to
20 was to show the plant and to get the reference of Jim
21 Bass for their investors that were the British of
22 Woodford and the Chinese from China.  Please.
23   Q.   You are now getting way collateral.
24   A.   No, I am not going away.  I am just
25 saying that the only thing they were interested to

Page 38

1  was to get the funds from their investors.  They
2  never asked to me who is directing the plant.
3    Q.   Dr. Rossi, did you ever take them to the
4  other side of the Doral warehouse where J.M. Products
5  operated; yes or no?
6    A.   No, because --
7    Q.   Did you tell them -- did you ever tell
8  them that they could not access the other side of the
9  Doral warehouse where J.M. Products was located; yes
10 or no?
11   A.   In pursuit of --
12   Q.   I'm sorry?
13   A.   Yes or no does not exist.  I have to
14 explain.  If you -- I am sure that you know perfectly
15 the term sheet between Industrial Heat and J.M.
16   Q.   You drafted that.
17   A.   In the term sheet was written very
18 clearly that Leonardo -- pardon.  Industrial Heat
19 guys had not to enter in the area of J.M. and J.M.
20 guys had not the right to enter in Leonardo area.
21 Pardon, Industrial Heat area.
22       So it had been stated, signed and
23 accepted by both parties that are J.M. from one party
24 and Industrial Heat from the other that none of them
25 had to invade the area of the other.

Page 39

1    Q.   And you --
2    A.   The only guy that could go in both areas
3  was me because I was at the same time as Industrial
4  Heat knew perfectly, as I said before, I was the
5  consultant and technical director of J.M., as well as
6  the director of the plant of one megawatt.
7    Q.   Again, so my question, let's ask again.
8  Let's see if you can answer it this time.
9        Did you tell them -- did you tell people
10 from Industrial Heat that they could not go to the
11 J.M. Products side of the warehouse?  Why is that not
12 a yes or no answer?
13       MR. ARAN:  Objection to form.
14 BY MR. PACE:
15   Q.   Dr. Rossi --
16   A.   I did not tell.  The contract told it.
17   Q.   So you are saying you never did.  So your
18 testimony is -- your testimony is -- your sworn
19 testimony is you never told anyone --
20   A.   No, my testimony is that I don't recall
21 that it has been necessary to tell to the guys of
22 Industrial Heat that they could not invade the area
23 of J.M., for the very simple fact that they were
24 perfectly aware of the agreement that they had signed
25 with J.M., where was written that J.M. guys could not

Page 40

1  invade the area of Industrial Heat and Industrial
2  Heat guys were not allowed to enter in the J.M.
3  area.
4    Q.   So let's --
5    A.   It was forbidden by contract.  Excuse
6  me.  If they have asked to me to allow them there,
7  that would mean that they asked to me to breach a
8  contract that they had signed.
9        This would mean that they tried to breach
10 a contract that they had with J.M..
11   Q.   Right.  We're going to be here all day,
12 Dr. Rossi, so we're going to have seven hours.
13   A.   I am here for all the time you want.
14 Also more than seven hours if you want.
15   Q.   That's great.  Then we will take more
16 than seven hours.
17       MR. ARAN:  No, you won't.
18       THE WITNESS:  No problem.
19 BY MR. PACE:
20   Q.   Let me ask the question again because
21 it's a simple question, you can keep trying to dance
22 around it, but I'm asking for a simple answer.  Maybe
23 it never occurred, so let me ask again.
24       Did you, Andrea Rossi, ever tell anyone
25 from Industrial Heat that they could not enter the

10 (Pages 37 to 40)

**Page 41**

IMP

1  J.M. Products side of the Doral warehouse; yes or no?
2      A.  Not that I can recall.
3      Q.  Was that hard?
4      A.  Sorry?
5      Q.  Was that hard, to answer that question?
6      MR. CHAIKEN:  Object to form.
7      THE WITNESS:  No, it's not hard.  I don't
8  recall.
9  BY MR. PACE:
10     Q.  That's all I'm asking though.
11     A.  Is this the answer?
12     Q.  That was the question I asked.  Now
13  you're answering the question I asked.
14     A.  Okay.
15     Q.  Okay.  You can hold onto your speeches
16  for later on.
17     A.  Perfect.  But I just wanted --
18     MR. ARAN:  Object.
19     THE WITNESS:  I just wanted to clear if
20  should they have asked to enter --
21  BY MR. PACE:
22     Q.  But you're saying they didn't.
23     A.  -- in the J.M. contract, I say I don't
24  recall.
25     Q.  Okay.

**Page 42**

AA, Arg., Cum.

1      A.  I don't say they didn't.  I say I don't
2  recall.
3      Q.  That's all I am asking for.  I am asking
4  for what you know, what you recall and your
5  recollection --
6      A.  I don't recall.
7      Q.  -- is that it never happened?
8      A.  Should they have made it they would have
9  asked to me to breach a contract that they had
10  signed.
11     Q.  I understand.  I understand what you
12  think the law is but I am just asking you for your
13  recollection.
14     A.  You're asking me --
15     Q.  Dr. Rossi --
16     A.  You are asking me if --

IMP

17     Q.  Dr. Rossi, let's go on to our next
18  question.
19     A.  Okay.
20     Q.  There is a question, I get an answer from
21  you, all right?
22         And your answer is to the best of your
23  recollection you don't believe you ever told anyone
24  from Industrial Heat that they could not access the
25  Doral -- the J.M. Products side of the Doral

**Page 43**

1  warehouse, correct?
2      A.  No.
3      MR. CHAIKEN:  Object to form.
4      MR. ARAN:  Object to form.
5      THE WITNESS:  I did not say that.  I say
6  I do not recall.
7  BY MR. PACE:
8      Q.  I'm sorry.  I said to the best of your
9  recollection.
10     A.  No, you said to the best of your
11  recollection you believe that.  I did not say so.  I
12  say as I am -- I say just I don't recall.  I do not
13  say I don't believe.
14         I say I don't recall.  You know English
15  better than me but some English I have learned.  To
16  recall is one thing and to believe is another thing.
17         And I also added that if they did, they
18  made an illegal action because they asked to breach a
19  contract.
20     Q.  Dr. Rossi, Andrea Rossi, you've said this
21  several times never in response to my question so
22  let's see if we can --
23     A.  No, I responded to your question.  I
24  don't recall.
25     Q.  Let's keep going here.

**Page 44**

1      A.  Okay.
2      Q.  Jim Bass, what title did you give to Jim
3  Bass in connection with J.M. Products?
4      A.  Consultant, scientific consultant.
5      Q.  Why did he represent himself as the
6  director of engineering for J.M. Products?
7      A.  Because he was for what concern -- for
8  what concerned the part related to the electronics
9  that we were developing there, he was the director.
10         So he was -- in the sense he was a
11  director.  Also, I must ask you that Tom Darden asked
12  me to present him as the director to his investors,
13  to have references from the director of the customer
14  that he was satisfied.  You know --
15     Q.  Let me stop you there.  I will break this
16  out.  We can get to the conversation.
17     A.  Okay.
18     Q.  Let's make sure I am clear for what you
19  said.
20     A.  Okay.
21     Q.  You're saying Tom Darden wanted someone
22  from J.M. Products to meet with potential investors,
23  correct?
24         I am just going to take this one little
25  chunk at a time.  Is that correct, somebody from J.M.

11 (Pages 41 to 44)

Page 45

1  Products?
2      A.  Someone that was not me.
3      Q.  We will keep going this with little
4  chunks and see if we can do it in little pieces
5  here.
6      A.  Very good.
7      Q.  You're telling me Tom Darden told you --
8      A.  Yeah.
9      Q.  -- that he wanted somebody from J.M.
10  Products, other than you, to meet with potential
11  investors, correct?
12      A.  Yes, it is correct.
13      Q.  And Tom Darden asked you that this person
14  be knowledgeable about the power or energy being
15  received by J.M. Products from Leonardo Corporation,
16  correct?
17      MR. CHAIKEN:  Object to form.
18  BY MR. PACE:
19      Q.  Do you want me to ask the question again?
20      A.  No, no, no I have understood perfectly
21  your question and it is correct.
22      Q.  Did Tom Darden tell you -- did Tom Darden
23  identify the particular person who should meet with
24  these investors?
25      A.  There was not another.

Page 46

**IMP**

1      Q.  Okay.  So he didn't --
2      A.  He knew perfectly there was -- you know,
3  that was not for the corporation.
4      Q.  I understand.
5      A.  That was J.M. corporation.
6      Q.  So your testimony is when Tom Darden
7  asked you to -- for this, he knew there was no other
8  person at J.M. Products other than you running the
9  day-to-day activities; that's your testimony?
10      MR. ARAN:  Objection to form.
11      THE WITNESS:  No.
12  BY MR. PACE:
13      Q.  I am just trying to understand when Tom
14  Darden asked for somebody to meet with the investors,
15  somebody from J.M. Products, had he already met Jim
16  Bass?
17      A.  Can you repeat the question?
18      Q.  Yes.  This conversation you claim
19  occurred between you and Tom Darden, where Tom Darden
20  is asking you to provide somebody from J.M. Products
21  to speak with investors.
22      A.  Yes.
23      Q.  All right.  At the time of that
24  conversation had Tom Darden already met Jim Bass?
25      A.  Tom Darden knew already about Jim Bass

Page 47

1  because I had informed him about Jim Bass and I do
2  not recall if he had already met him or not.
3      I think yes.  I think yes.  And I explain
4  you why.  Now I -- if I focus the memory, I am very
5  close to being convinced that yes, because the
6  first time that Tom Darden together with Jim Bass
7  came to visit the factory was not with the
8  investors.
9      They came several times.  I remember
10  perfectly J.T. Vaughn that came alone one time
11  without -- without -- and stayed in the Holiday Inn
12  Express close to the airport of Miami.  I have gone
13  to pick up him there.
14      Another time came Tom Darden with Jim
15  Bass.  All this -- all these times without the
16  investors.  It was preliminary to the investors and
17  they met Jim Bass in that occasion.  They met Jim
18  Bass.
19      Q.  J.T. -- they meaning J.T. Vaughn and Tom
20  Darden?
21      A.  Yes, sir, you are correct.
22      Q.  Met Jim Bass in --
23      A.  In the meeting room of the office of --
24  of Doral.
25      Q.  This is the Doral warehouse?

Page 48

1      A.  Yes, sir.
2      Q.  The offices at the Doral warehouse?
3      A.  There is no other place.
4      Q.  I just want to make sure we have a clear
5  record.
6      A.  Yes, there is no other place and there is
7  no other person than Jim Bass.  The other person was
8  the poor Reinaldo Breto that was the janitor and for
9  sure Darden wanted not to present to a janitor the
10  investors.
11      So when he asked to me to talk -- to
12  have -- we say the director.  It was obvious it was
13  Jim Bass and it was obvious that he knew perfectly
14  that -- at the time that he knew Jim Bass I was the
15  director of the plant because he knew that I was the
16  director from the plant since June -- at least June
17  2014.
18      Q.  From your e-mail back in June of 2014?
19      A.  Very good.  Very good.  I don't know if
20  there is some other, but yes.
21      So when Tom Darden asked me that wanted
22  to meet a representative of J.M. to show him to the
23  investors and have good references, obviously he knew
24  that it was Jim Bass because there is no other
25  person.  There was no other person.

Page 49

1    Q.   And your testimony is that Tom Darden --
2    however, that Tom Darden said it should be a
3    representative of J.M. Products other than you,
4    Andrea Rossi?
5    A.   Yes.  He said so, yes.
6    Q.   I want to make sure I understand.  I just
7    want to make sure I understand.
8    A.   Yes, you have understood perfectly.
9    Q.   Because you are saying -- you are
10   saying -- your testimony is Tom Darden knew that you
11   ran the day-to-day operations of J.M. Products --
12   A.   Yes.
13   Q.   -- correct?
14   A.   Yes.
15   Q.   And Tom -- but Tom Darden didn't want you
16   to appear as the representative of J.M. Products,
17   correct, to investors?
18   A.   He did not say so.  I can -- I cannot --
19   I want not to speculate.  I want not to interject
20   myself in the brain of Tom Darden.
21        All I can say are facts.  The facts are
22   when -- several days before the visit with his
23   investors and those visits have been --
24   Q.   I am not asking for the details of all
25   the visits.  You are clearly getting collateral.

Page 50

1    Let's see if you can focus on answering the
2    question.
3         The answer was you're now saying several
4    days before the visit with the investor, you were
5    going to say something I think as to why you believe
6    Tom Darden was not -- what conversation you had with
7    Tom Darden.
8    A.   No, I did not understand the English.
9         MR. ARAN:  I am going to object.
10        MR. PACE:  I asked the question --
11        MR. ARAN:  I'm going to object.  You're
12   continuing to interrupt him in the middle of an
13   answer.  Even if it's not responsive you need to
14   let him finish.  Thank you.
15   BY MR. PACE:
16   Q.   Okay.  We can disagree on that.  You were
17   talking about a conversation you had with Tom Darden,
18   so let's focus on where we were before.
19        I was saying -- I was asking you if Tom
20   Darden said that he wanted a representative other
21   than you to meet with the investors.  You said --
22   well, your testimony then was that he did not
23   specifically say I want somebody other than you and
24   then you were going to explain why in this meeting
25   you understood that's what Tom Darden was

Page 51

1    communicating to you.
2         So I am not asking you for how many
3    meetings occurred subsequently.  I'm asking you just
4    focus on this meeting with Tom Darden, when he was
5    saying I want a representative of J.M. Products to
6    meet with investors.
7         First question.  Did he expressly tell
8    you that that representative should not be Andrea
9    Rossi?
10   A.   Yes.
11   Q.   Okay.  And so -- and as a result the only
12   other person that Tom Darden had met in connection
13   with J.M. Products other than the handyman/janitor
14   was Jim Bass; that's your testimony, correct?
15   A.   It is correct.
16   Q.   All right.  And so you took from this
17   conversation that Tom Darden wanted Jim Bass to meet
18   with the investors as the representative of J.M.
19   Products, correct?
20   A.   No, I am not sure that is correct.  He
21   just wanted to have Jim Bass give a good reference of
22   the plant to the investors.  This is what I know.
23   Q.   Okay.
24   A.   Now you add the word representative that
25   I never used.  I did not even know, because in

IMP

Page 52

1    Italian rappresentante means a completely different
2    thing, so.
3    Q.   Did he -- in this meeting that you are
4    testifying about under oath that you had with Tom
5    Darden, did he specifically use the name Jim Bass, I
6    want Jim Bass to meet with investors?
7    A.   I don't recall.
8    Q.   Do you recall how he characterized -- you
9    weren't comfortable with the word representative, so
10   let me avoid the word representative.
11        I'm trying to figure out did he
12   specifically say Jim Bass or did he say I want an
13   officer of J.M. Products, I want the top dog at J.M.
14   Products?  What do you recall?
15        MR. ARAN:  Objection to form.
16        THE WITNESS:  Attorney, again, that was
17   not for another company, that was J.M., et
18   cetera.  Sorry.
19   BY MR. PACE:
20   Q.   I understand.
21   A.   Mr. Tom Darden knew perfectly that there
22   were two persons beside me.  One was Jim Bass, the
23   other was the janitor.
24   Q.   Right.
25   A.   When a guy tells me I want somebody, not

Confusing, Unintelligible

13  (Pages 49 to 52)

Page 53

1    you, that talks to give good reference to my
2    investors, you know, if you exclude me, remain only
3    Jim Bass or the janitor.
4         You know, I don't recall if he said Jim
5    Bass but even if he did not say Jim Bass, if I say
6    please use one hand of yours but not the right one,
7    but I don't see the left one -- I don't say the left
8    one, excuse me, but if it is not the right one, it is
9    the left one. Am I wrong?
10        Q.  So your testimony is -- your testimony is
11   that he either -- your testimony you're swearing to
12   about this meeting with Tom Darden --
13        A.  Yeah.
14        Q.  -- Tom Darden either asked specifically
15   for Jim Bass to meet with investors or at least asked
16   for someone other than you --
17        A.  Correct.
18        Q.  -- to meet with investors, correct?
19        A.  Yes, it is correct.
20        Q.  All right. That's all I'm trying to
21   establish, exactly what it was that you are
22   testifying occurred.
23        A.  Very good. This happened not only in one
24   visit, but in all the four visits of his investors.
25        Q.  Okay. Every time for this visit --

Page 54

1         A.  This is interesting because --
2         Q.  Wait, wait, wait. What isn't
3    interesting, I think we all can agree, is you getting
4    collateral, so let's stick to this.
5         A.  Sorry, you are right.
6         Q.  There is four meetings and trust me, the
7    day will go much faster if you answer my questions
8    and --
9         A.  But I am not in a hurry.
10        Q.  When my questions are unfair you can
11   certainly go on.
12        A.  All right.
13        Q.  But sometimes like you get collateral to
14   me.
15        A.  I got all the time you want.
16        Q.  You got four meetings. You said there is
17   four times investors came in.
18        A.  Yeah.
19        Q.  Let me ask incrementally.
20        For meetings with the investors.
21        Q.  With the investors. Did you meet with
22   Tom Darden --
23        A.  I am very sorry.
24        Q.  No problem.
25        A.  Yes.

Page 55

1         Q.  Did you meet with Tom Darden in advance
2    of each of those meetings with investors?
3         A.  In the first case, yes.
4         Q.  Okay.
5         A.  In the other case, I don't recall.
6         Q.  In terms of the conversation -- in terms
7    of the request by Tom Darden to have either Jim Bass
8    or at least somebody other than you to meet with the
9    investors, did you -- did he make that request in
10   connection with each of the four visits by investors
11   or did he just make the request the first time and
12   you understood that that should occur with each
13   investor meeting?
14        A.  No, he wanted -- he wanted -- I precisely
15   do not recall.
16        Q.  Okay.
17        A.  But he never told me I want not Jim Bass,
18   I want you. So by default --
19        Q.  So you understood there is four times --
20   your testimony is that there is four times that
21   investors came to the Doral warehouse or potential
22   investors came to the Doral warehouse to see the 1MW
23   plant, correct?
24        A.  Kindly repeat your question.
25        Q.  Yes. Your testimony is that there is

Page 56

1    four occasions when potential investors came to the
2    Doral warehouse to see the 1MW plant, correct?
3         A.  Yes, it is correct.
4         Q.  Your testimony is each time one of those
5    investor groups or potential investors groups came,
6    they met with Jim Bass?
7         A.  Yes, it is correct.
8         Q.  And each time Jim Bass told them that
9    J.M. Products was satisfied with the power or energy
10   they -- it was receiving from Leonardo Corporation,
11   correct?
12        MR. CHAIKEN: Object to form.
13        MR. ARAN: Object to form.
14        THE WITNESS: This -- as far as I recall,
15   yes.
16   BY MR. PACE:
17        Q.  And your testimony is that that --
18        A.  Maybe -- I want to add this. I am sure
19   of this for the first two times, first visit of the
20   British, second visit of -- second visit with the
21   Chinese.
22        I am not sure of this for the third visit
23   with the British again, but I think so. But I am not
24   sure about the fourth visit with another Chinese
25   commission. Maybe during this fourth visit with the

14  (Pages 53 to 56)

Page 57

1    Chinese commission Jim Bass was not there but I am
2    not sure of this.  I don't recall exactly.
3         Q.   So --
4         A.   The interesting is that the third visit
5    with the British happened in October and in October
6    they came with the commission of Woodford, October or
7    September, they came with the commission of the
8    British, of Woodford, with the two top manager of
9    Woodford and they commented extremely positively the
10   plant and I perfectly that the two officers of
11   Woodford with enthusiastic of the plant while --
12        Q.   And did they meet Jim --
13        A.   I'm not finished.
14        Q.   I am not asking about the details of the
15   meeting though.  Dr. Rossi, you're clearly getting
16   collateral on me.
17        All I was asking you -- I was asking very
18   focused little questions because I am just trying to
19   get my answers.  I may ask you about these other
20   subjects.  I probably will later on today.
21        A.   All right.
22        Q.   You know how a deposition works.  This is
23   your third deposition in what, two weeks; is that
24   correct?
25        A.   Yeah, more or less, yes.

Page 58

1         Q.   Okay.  So you're aware that --
2         A.   Yes.
3         Q.   -- to some extent there is questions I
4    want to ask, I want to get an answer to and then
5    there will be opportunities for you to get into other
6    subjects later on.  You understand that, correct?
7         A.   Yes, sure.
8         Q.   You understand there is a lot of subjects
9    we're going to get to cover today, correct?
10        A.   Absolutely.
11        Q.   So let me just -- I am just trying to
12   nail down this one particular point.
13        A.   Okay.
14        Q.   Your testimony is now, just so I am
15   clear, at least as to two --
16        A.   Go ahead.
17        Q.   -- there are four times investors visited
18   the Doral location, investors or potential inventors
19   to see the 1MW plant.
20        Your testimony is on at least two of
21   those occasions Jim Bass met with the group of
22   potential investors, correct?
23        A.   It is correct.
24        Q.   All right.  You are not sure if on the
25   other two occasions Jim Bass met with the group of

Page 59

1    potential investors?
2         A.   I am sure that he met them just for a
3    hello.
4         Q.   All right.
5         A.   Just for a hello, while in the first
6    two -- I am sure in the first two occasions Jim Bass
7    has sit at the head of the meeting rooms.  There is a
8    table like this, more or less.
9         Q.   Okay.
10        A.   And he was sit where I sit now and all
11   the other people was around and there has been a
12   meeting of at least half an hour in the first two
13   occasions, British and Chinese.
14        The other two, I don't remember if it has
15   been a meeting or just a hello.
16        Q.   I understand.  So Jim Bass was -- met --
17   so there is a meeting or hello.
18        As to each of the four groups of
19   investors or potential investors, Jim Bass was at
20   least present at the Doral warehouse?
21        A.   Yes.
22        Q.   As to two of those four occasions he may
23   simply have said hello, introduced himself as the
24   director of engineering to the group of potential
25   investors, correct?

*[margin note: H]*

*[margin note: Third Party: (59:22-60:7) H, S]*

Page 60

1         A.   I don't remember if he introduced himself
2    as the director of engineering or not, but he
3    introduced himself as saying hello, everything all
4    right just, you know, niceties and have a nice day.
5         I don't remember exactly but could be
6    that the second two meetings have seen Jim Bass in a
7    very -- in a very short spot.
8         Q.   Okay.
9         A.   While in the first two he was a long
10   movie.
11        Q.   He was making more of a presentation in
12   the first two meetings?
13        A.   Yeah.
14        Q.   Even in the second two meetings where you
15   are saying Jim Bass's interaction was more limited
16   with the groups of potential investors, even then he
17   would express that J.M. Products was satisfied with
18   the power or energy it was receiving from Leonardo
19   Corporation?
20        MR. CHAIKEN:  Object to form.
21        MR. ARAN:  Objection to form.
22   BY MR. PACE:
23        Q.   If you recall.
24        A.   I cannot recall, but exists a body
25   language and, you know, that -- the body language

*[margin note: Third Party: H, S]*

15 (Pages 57 to 60)

H

Third Party:
H, M

Page 61

1   when he say hello to everybody was not the body
2   language of a nervous guy, so.
3       Q.   So you think by his body language he was
4   implying to the investors that J.M. Products was
5   happy with Leonardo Corporation?
6       A.   I think you are understanding what I say.
7       MR. CHAIKEN:  Object to form.
8   BY MR. PACE:
9       Q.   But on at least two occasions your
10  testimony is Jim Bass did meet with investors and had
11  a long meeting, approximately a hour meeting with
12  each of those groups of investors, correct?
13      A.   Yes.
14      Q.   And in those meetings he would more
15  clearly say or would clearly say that J.M. Products
16  was happy with or satisfied with the power or energy
17  it was receiving from Leonardo Corporation, correct?
18      A.   It is correct.
19      Q.   All right.  And in these meetings
20  would -- would Jim Bass identify their role in
21  connection with J.M. Products?
22      A.   Can you repeat the question?
23      Q.   Yes.  I am just trying to understand,
24  when Jim Bass is meeting with these group of
25  investors, these half hour meetings each time --

Page 62

1       MR. ARAN:  Objection to form.
2   BY MR. PACE:
3       Q.   -- and he's talking about the J.M. -- J.M.
4   Products being satisfied with the energy or power
5   it's receiving from Leonardo, would he discuss your
6   role in connection with either Leonardo or J.M.
7   Products?
8       MR. ARAN:  Objection to form.
9       THE WITNESS:  No.  No, it has not been
10  put on the table.  He just said he was
11  satisfied.  Basically that is what Tom Darden
12  asked for.
13      He just asked to me for to make Jim Bass
14  represent a good reference because he had to get
15  funds from those investors.  That's it.
16  BY MR. PACE:
17      Q.   Okay.  And to go back to your testimony
18  before, what Tom Darden said -- he either
19  specifically asked for Jim Bass or at the very least
20  he asked for someone from J.M. Products other than
21  you, correct?
22      A.   Correct.
23      MR. ARAN:  Object to form, asked and
24  answered.
25      (The document referred to was thereupon

Page 63

1   marked Deposition Exhibit 1 for Identification, a
2   copy of which is attached hereto.)
3   BY MR. PACE:
4       Q.   I am going to mark a couple of documents
5   here but we will just take them one at a time.  This
6   is -- I marked as Exhibit 1 the -- deposition
7   notice for J.M. Products.
8       You have seen this notice before?
9       A.   Yes.
10      Q.   And you -- these are the topics upon
11  which you prepared yourself for testifying today?
12      A.   Yes.  Yes, sir.
13      Q.   All right.  We will come back to these in
14  a bit.  I wanted to have that marked as the first
15  exhibit and then I can go to my second exhibit, which
16  is going to be the term sheet.
17      (The document referred to was thereupon
18  marked Deposition Exhibit 2 for Identification, a
19  copy of which is attached hereto.)
20  BY MR. PACE:
21      Q.   This is marked as Exhibit 2.  You are
22  familiar with this document, what's marked as Exhibit
23  2, term sheet?
24      A.   Yes.
25      Q.   Who -- did anyone on behalf of J.M.

Page 64

1   Products negotiate this term sheet?
2       MR. CHAIKEN:  Object to form.
3       THE WITNESS:  I did.
4   BY MR. PACE:
5       Q.   You negotiated this on behalf of J.M.
6   Products?
7       A.   Yes, sir.
8       Q.   With whom did you negotiate the term
9   sheet?
10      A.   With Tom Darden.
11      Q.   All right.  Did you disclose to Tom
12  Darden that you were negotiating on behalf of J.M.
13  Products?
14      A.   Yes.
15      Q.   And when you negotiated with Tom Darden
16  over this term sheet, are these the e-mail
17  communications that we have seen that go back and
18  forth about the term sheet?
19      MR. CHAIKEN:  Object to form.
20      THE WITNESS:  Sorry, I did not understand
21  the question.
22  BY MR. PACE:
23      Q.   Sure.  How did you negotiate with Tom
24  Darden over the term sheet?  How did you
25  communicate?  Was it by e-mail or was it by --

16 (Pages 61 to 64)

Page 65

1    A.  By -- also by e-mail, sure.  By e-mail,
2  by personal discussions that we had in Raleigh
3  because in this period I was in Raleigh.
4    Q.  Okay.
5    A.  In this period I still was in Raleigh
6  regularly and by telephone, you know, we had many
7  conversations about this.
8    Q.  And who negotiated this term sheet on
9  behalf of Leonardo Corporation?
10   A.  Me.
11   Q.  All right.  So you were negotiating both
12 as -- for J.M. Products and for Leonardo Corporation?
13   A.  That is correct.
14   Q.  And at the time J.M. Products was called
15 J.M. Chemical Products, correct?
16   A.  Yes, it is correct.
17   Q.  Is that the name you came up with for the
18 company originally?
19   A.  No.  Originally, you know, I don't
20 remember.  Honestly, I don't remember who came up.
21   Q.  Is there anyone other than you who may
22 have come up with the name?
23   A.  Yes, could have been the -- could have
24 been Di Giovanni but honestly, I don't remember
25 that.  I was not -- I did not like the name anyway

Page 66

1  and lately has been changed into J.M. Products.
2    Q.  So is -- other than -- you made this a
3  first reference today to Di Giovanni.  That's
4  Francesco Di Giovanni?
5    A.  Yes.
6    Q.  And Francesco Di Giovanni is the
7  beneficiary of the trust that owns J.M. Products,
8  correct?
9    A.  Yes.
10   Q.  All right.  So your testimony is that you
11 believe -- well, your testimony is that either you or
12 Francesco Di Giovanni came up with the original name
13 for J.M. Products, that being J.M. Chemical Products?
14   MR. ARAN:  Objection, form.
15   THE WITNESS:  As far as I recall because,
16 you know, it is not -- it is not a thing that I
17 considered important, so it is an issue of three
18 years ago or something, so I don't -- I don't
19 remember exactly, but yes.  Anyway, I did not
20 like it and I changed it.
21 BY MR. PACE:
22   Q.  Why don't we complete that thought and
23 then we will do the -- we will come back to this,
24 which is at some point the company's name was changed
25 from J.M. Chemical Products to J.M. Products.

Page 67

1  correct?
2    A.  Yes, it is correct.
3    Q.  And that was at your direction, correct?
4    A.  Yes, it is correct.
5    Q.  All right.  Back to the term sheet.  Who
6  decided that J.M. Products would pay rent of $1,000
7  per day?  Who came up with that number?
8    A.  I agreed upon this with Di Giovanni and
9  he said that -- the agreement between me and
10 Di Giovanni has been this.  Leonardo will pay all the
11 day by day in change of the product that we will take
12 and I take the liability if the product is good or
13 not in the first period and you will -- and J.M. will
14 pay the thousand dollars per day to Industrial Heat.
15   I tried to make also the interest of
16 Industrial Heat because I was -- in those period you
17 must not forget that my relationship with Industrial
18 Heat was very good and --
19   Q.  So you in connection with Di Giovanni
20 came up with the number of $1,000 a day?
21   A.  No, the number of $1,000 has been --
22 partially correct, I'm sorry.  Partially correct
23 because I have been in contact -- I was in contact
24 with all the parties, that was Tom Darden -- Tom
25 Darden, J.T. Vaughn, John Mazzarino.

Page 68

1    These are the three I dealt with to the
2  setup of this term sheet regarding Industrial Heat.
3  So I agreed upon this sum from the side of Industrial
4  Heat with Tom Darden in first place, John Mazzarino
5  in second place and J.T. Vaughn in third place.
6    Q.  Did you negotiate with -- I'm a little
7  confused.
8    When the term sheet was first presented
9  to Industrial Heat, the term sheet was first prepared
10 by you or at your direction, correct?
11   MR. CHAIKEN:  Object to form.
12   THE WITNESS:  No.
13 BY MR. PACE:
14   Q.  Somebody from Industrial Heat first
15 prepared the term sheet?
16   A.  Neither.  We sit down at the table in
17 Raleigh, in the meeting room of the factory of
18 Raleigh and we came up with a draft where everybody
19 has
20 put -- in a brainstorm everybody has put down on the
21 table his ideas and we came up with a draft.
22   Q.  Who came up with the thousand dollars, if
23 you recall?  If you don't recall, you don't recall.
24   A.  Maybe the idea of the number was mine but
25 I am not sure of that.

17 (Pages 65 to 68)

IMP

R, MT

IMP

Page 69

1    Q.  Okay.
2    A.  Maybe the idea of the number was mine
3  because I said this is a good sum for Industrial Heat
4  to make some money and is reasonable respect the work
5  that -- that had to be done.
6        But in any case, all this draft included
7  the one thousand per day has been decide together
8  around the table like this, with the three of
9  Industrial Heat and me.
10    Q.  So you negotiated this agreement, it
11  was -- your recollection is it was in a conference
12  room?
13    A.  Yes.
14    Q.  And in this meeting were you, Tom Darden,
15  John Mazzarino and J.T. Vaughn, correct?
16    A.  Correct.  At least --
17    Q.  Anyone else in the meeting?
18    A.  I don't recall.  I don't recall.  I don't
19  recall.  But I don't think so because this was a
20  decision that did not involve other kind of people
21  there, so I don't recall.
22    Q.  And so the terms -- eventually Henry
23  Johnson came up to Raleigh to sign this agreement on
24  behalf of J.M. Chemical Products, correct?
25        MR. CHAIKEN:  Object to form.

Page 70

1        THE WITNESS:  No.
2  BY MR. PACE:
3    Q.  Did he not sign it in North Carolina?
4    A.  No.
5    Q.  He signed it back in Florida?
6    A.  Yes.
7    Q.  All right.  There was a meeting in North
8  Carolina with Henry Johnson prior to the term sheet
9  being finalized; is that correct?
10    A.  Yes.
11    Q.  All right.  Where were you when you
12  signed the agreement?
13    A.  This agreement, as I recall, attorney,
14  maybe I'm wrong, but as far as I can recall everybody
15  has signed it separately.
16        So there has not been a meeting in which
17  everybody signed.  Once the term sheet has been
18  completed, this term sheet has made many back and
19  forth through the e-mail to correct things, et
20  cetera, et cetera.
21        Of course the attorney Johnson
22  participated to this ping-pong because he had -- he
23  also made reviewing, et cetera.  Once we reached a
24  final text that was good for everybody, I don't
25  remember who sent copies.

Page 71

1        Maybe the first copy has been admitted,
2  but I am absolutely not sure, from Industrial Heat
3  that sent the final -- the final version to me and to
4  Johnson.  We signed.  I signed it by myself, Johnson
5  signed it by himself, Darden signed it by himself and
6  everybody -- and every of us retained a copy, with
7  all the three signature at last.
8    Q.  And what contribution did Henry Johnson
9  make to any terms of the term sheet?
10    A.  I don't recall.
11    Q.  Do you recall -- but you recall that he
12  made some changes or contributions to the term sheet?
13    A.  Yes, I recall that.
14    Q.  You just don't recall what they were?
15    A.  Yes, exactly.
16        (The document referred to was thereupon
17  marked Deposition Exhibit 3 for Identification, a
18  copy of which is attached hereto.)
19  BY MR. PACE:
20    Q.  I am going to mark as Exhibit 3 what's
21  called an industrial gross sublease.
22    A.  Can I ask five minutes of break to go to
23  the men's room?
24    Q.  Of course.
25        THE VIDEOGRAPHER:  We're off the record.

Page 72

1        The time is 11:36 a.m.
2        (Thereupon a brief recess was taken,
3  after which the following proceedings were had.)
4        THE VIDEOGRAPHER:  We're back on the
5  record.  The time is 11:47 a.m.
6  BY MR. PACE:
7    Q.  Dr. Rossi, you have in front of you
8  what's been marked as Exhibit 3.  This is a
9  subleasing agreement between Leonardo Corporation and
10  J.M. Products, correct?
11    A.  Correct.
12    Q.  Who negotiated this on behalf of Leonardo
13  Corporation?
14    A.  Me.
15    Q.  And who negotiated it on behalf of J.M.
16  Products?
17    A.  Me.
18    Q.  Okay.  So essentially this is -- you
19  handled both sides of this agreement, correct?
20    A.  Yes, sir.
21    Q.  Okay.  And it says here that there is a
22  base rent -- I'm sorry, I'm covering up my
23  microphone.
24        Paragraph 2(A) refers to a base rent of
25  $71,000 for the first year, correct?



R

Third Party:
R

18  (Pages 69 to 72)

Page 73

1    A.  Yes.
2        Q.  And then after that the base rent would
3    go up by three percent a year for the second and the
4    third year, correct?
5        A.  Correct.
6        Q.  And this base rent -- at least according
7    to this agreement, the base rent was money that was
8    going to be paid by J.M. Products to Leonardo
9    Corporation, correct?
10       A.  Correct.
11       Q.  Did J.M. Products ever make these lease
12   payments to Leonardo Corporation?
13       A.  Yes.
14       Q.  Did they make the payments using money
15   that was provided to J.M. Products from Leonardo
16   Corporation?
17       A.  No, they paid by compensation with their
18   products.
19       Q.  So the money for -- I understand the
20   phrase you want to use but let's talk about the
21   currency.
22           Was there a transfer of funds -- was
23   there ever a transfer of funds from J.M. Products to
24   Leonardo Corporation for any of the lease amounts
25   under this agreement?

Page 74

1    A.  No.
2    Q.  Okay.  So --
3    A.  For the reason I said before.
4    Q.  You explained --
5    A.  Yes.
6    Q.  -- the compensation --
7    A.  Yes.
8    Q.  -- the concept you were discussing.
9    A.  Yes.
10   Q.  But I just wanted to find out whether
11   there was actually a payment of money, transfer of
12   funds, and there was not.
13           My question was -- I asked it as the
14   first year, so let me just go through each of the
15   three years.
16           Was there ever any transfer of money from
17   J.M. Products to Leonardo Corporation for lease under
18   this agreement in the second year of the agreement?
19       A.  The second year of the agreement did not
20   exist.
21       Q.  Okay.  So this agreement -- when was this
22   agreement terminated?
23       A.  This agreement has been terminated when
24   the plants have been stopped in February 2016.
25       Q.  So the three year period would be from

Page 75

1    September 2014 to midnight August 31st, 2017.  So the
2    first year would have expired in September 2015,
3    correct?
4        A.  Yes.
5        Q.  Or August 31st, 2015, correct?
6        A.  Yes.
7        Q.  The next year would have expired August
8    31st, 2016, correct?
9        A.  Yes.
10       Q.  Prior to that second year expiring this
11   agreement was terminated?
12       A.  Yes.
13       Q.  All right.  But at least for part of that
14   second year of the lease term J.M. Products was
15   located at -- was located at the Doral warehouse,
16   correct?
17       A.  I don't remember exactly when J.M.
18   abandoned the plant, but few -- a few days -- I don't
19   remember exactly how many days.
20       Q.  Was it --
21       A.  But --
22       Q.  Was it in February or March of 2016
23   though?
24       A.  I don't recall exactly, but very briefly
25   after -- when it became clear that the litigation was

Page 76

1    not going to be resolved in matter of weeks and not
2    even in matter of months, J.M. decided to abandon the
3    plant.
4        Q.  So that's -- the litigation -- you filed
5    your lawsuit in the beginning of April of 2016.  Does
6    that ring a bell with you?
7        A.  Yes.
8        Q.  Does that sound accurate to you?
9        A.  Yes, it is accurate.
10       Q.  I think it was April 2nd of 2016 but I
11   don't have it in front of me.
12       A.  The deposit of the complaints.
13       Q.  Yes.  So your testimony is that J.M.
14   Products stopped -- stopped at least certain
15   operations sometime after the complaint was filed?
16       A.  No, before.
17       Q.  Before the complaint was filed.
18       A.  Because before -- as you well know,
19   before the complaint -- our complaints have been
20   filed the situation had deteriorated very much, well
21   before we met the first time in Miami with the
22   attorney of Industrial Heat, which was you, and my
23   attorney that was John Annesser in January -- 8 of
24   January, if I am not wrong.
25       Q.  It was in January of 2016?

Third Party: R

R

19 (Pages 73 to 76)

Page 77

1    A.  I remember the 8th of January, yes,
2  because it's been an important date.
3    Q.  I am just trying to kind of go back to
4  something you were just saying, which is at some
5  point in 2016 J.M. Products stopped -- well, at some
6  point in 2016 J.M. Products stopped its business
7  operations?
8    A.  Yes.
9    Q.  Okay.
10    A.  In Doral.
11    Q.  In Doral.  And to the best of your -- and
12  you, as the corporate representative today for J.M.
13  Products, the only business activities you are aware
14  of for J.M. Products -- I want to make sure I'm using
15  the word you are comfortable with.
16        You are more comfortable with aware.  Let
17  me start over.  You, as the corporate representative
18  of J.M. Products, the only business activities of
19  J.M. Products that you are aware of were at the Doral
20  location?
21        MR. ARAN:  Objection to form.
22        THE WITNESS:  As well as I were aware of,
23    yes.
24  BY MR. PACE:
25    Q.  Okay.  So sometime in 2016 J.M. Products

Page 78

1  ceased all business operations that you, as the
2  corporate representative of J.M. Products are
3  aware -- let me start.  That was a horrible
4  question.
5        Sometime in 2016 J.M. Products stopped
6  its business operations at the Doral location?
7    A.  Yes.
8    Q.  I want to see if I can narrow it down
9  when.
10        It was before the lawsuit was filed at
11  the beginning of April of 2016, correct?
12    A.  Correct.
13    Q.  It was after you met with Tom Darden in
14  Miami, which was in January of 2016, correct?
15    A.  Yes.  You mean the meeting with the
16  attorneys?
17    Q.  Yes.
18    A.  After that.
19    Q.  I'm sorry, that's a good point.  You met
20  Tom Darden at a law office in Miami in January of
21  2016, correct?
22    A.  Yes.
23    Q.  Okay.  So it was after that meeting.
24  Fabio Penon was here in Miami and was at the Doral
25  warehouse on at least the 16th and 17th of February

Page 79

1  of 2016.
2        Was J.M. Products still operating at that
3  time at the Doral warehouse?
4    A.  Yes.
5    Q.  All right.  So now we have narrowed it
6  further.  So now we have gotten to sometime after
7  February 17 of 2016, but before the very beginning of
8  April of 2016 J.M. Products ceased its operations?
9    A.  Yes.
10    Q.  That was a decision that was made by you,    IMP
11  correct?
12    A.  No, that was a decision that has been
13  made by the owner of J.M..
14    Q.  And when you say the owner, do you mean
15  Di Giovanni?
16    A.  Yes.
17    Q.  Is this -- was this a decision that was
18  made -- I'm trying to remember here.
19        Was this made at a meeting that you had
20  with Henry Johnson and Di Giovanni?
21    A.  I don't recall exactly this.  I don't
22  recall exactly this.
23    Q.  Once the operations were -- once the
24  business operations of J.M. Products ended sometime
25  between mid February and the very, very beginning of

Page 80

1  April 2016, what happened to -- what happened, for
2  example, to Jim Bass?  Jim Bass then became an
3  employee or a consultant for Leonardo?
4    A.  Immediately after, yes, Jim Bass of
5  course has been dismissed from J.M., and I asked to
6  Jim Bass, because -- because he was very good, I
7  asked to Jim Bass to go ahead for Leonardo
8  Corporation in the study of the robotization system.
9    Q.  I apologize.  I was sipping water
10  literally when you gave the last answer.  Did you say
11  the robotic system?
12    A.  Yes, I asked to the -- to the company of
13  Jim Bass that was -- I don't recall the name now.    IMP
14        But I asked to continue to be a
15  consultant of Leonardo Corporation because it would
16  have been a pity to throw away a study that had been
17  started at that point that is a very interesting
18  technology related not to the one megawatt plant but
19  to the technology of J.M. that is in development.
20    Q.  The technology of J.M., is that then    R
21  something that Leonardo acquired or is that still --
22  whatever that technology it's still owned by J.M.
23  Products?
24    A.  No, the technology is still owned by J.M.
25  Products.

20  (Pages 77 to 80)

Page 81

1    Q.   But Leonardo is furthering the
2    development of that technology?
3    A.   Yes, because not for J.M. Products but
4    for the European company we are in contact through
5    Di Giovanni, we're going to develop this business.
6    Q.   What is the European company?
7    A.   It is a company in theory.  This is an
8    initiative that has to be still made.
9    Q.   I'm sorry, I think I misunderstood.  A
10   company in its infancy, is that what you said?
11   A.   No, in theory, in the making.
12   Q.   Okay.  In theory, I'm sorry.
13   A.   In theory, yes.  Sorry, it's a Latin
14   expression.  I'm sorry for use.
15   Q.   So it's --
16   A.   Excuse me.
17   Q.   The European company hasn't been formed,
18   but what you are discussing with Di Giovanni is
19   forming that company in the future?
20   A.   Yes, sir.
21   Q.   All right.  Let me come back here to J.M.
22   Products.  After J.M. Products was -- after its
23   business operations were closed in Doral, which we
24   have established is sometime between late February
25   and the very beginning of April of 2016, the

Page 82

1    pipeline -- the pipes that were connecting the 1MW
2    plant on the Leonardo side of the warehouse to the
3    container, the kind of black box container on the
4    J.M. Products side of the warehouse, those pipes were
5    removed at some point, correct?
6    A.   Correct.
7    Q.   That was after the business of J.M.
8    Products closed?
9    A.   Yes.
10   Q.   That was shortly after the business of
11   J.M. Products closed?
12   A.   Yes.
13   Q.   That was at your direction?
14   A.   Yes.
15   Q.   And those -- this might help us for
16   clarity sake.  As you probably noticed through these
17   various depositions I sometimes like having
18   pictures.  They help make things a little more
19   clearer for me.
20   A.   Sure.
21   Q.   So I am going to mark here as Exhibit 4.
22       (The document referred to was thereupon
23   marked Deposition Exhibit 4 for Identification, a
24   copy of which is attached hereto.)
25   BY MR. PACE:

Page 83

1    Q.   Actually, you know what, I am going to
2    ask you a question about Exhibit 3, just so we get
3    that out of the way.  I just realized I didn't
4    actually --
5    A.   I have Exhibit 4 here.
6    Q.   Yeah.  I want to ask you -- I am going to
7    go back, only because I realized I didn't actually
8    get an answer to my question.  I just want to end it,
9    get the answer and then we can move on.
10   A.   Okay.
11   Q.   So at least for part of the second year
12   of this sublease that is Exhibit 3 --
13   A.   Yeah.
14   Q.   -- J.M. Products was operating at the
15   Doral location, correct?  At least from September
16   2015 until early 2016?
17   A.   Yes.  Independently from this lease
18   contract J.M. left the area very short time after the
19   closing of the plants, so automatically this expired.
20   Q.   I understand what you're saying.  I'm
21   just asking the question of you testified earlier
22   that there was no funds sent from J.M. Products to
23   Leonardo to pay for the first year's rent?
24   A.   Yes.
25   Q.   I just want to ask the question, there

Page 84

1    was also no funds sent from J.M. Products to Leonardo
2    to pay for the second year's rent?
3    A.   Correct.
4    Q.   I just wanted to close the loop.  Now we
5    can go to our new exhibit.
6        So Exhibit 4 shows -- too much paper.
7    Exhibit 4 shows the inside of the Doral warehouse,
8    correct?
9    A.   Yes, sir.
10   Q.   What we see there is a -- in silver what
11   we see there is a pipe wrapped in insulation,
12   correct?
13   A.   Yes.
14   Q.   That pipe was removed sometime after
15   February -- after the middle of February of 2016, but
16   before the beginning of April of 2016, correct?
17   A.   Yes.
18   Q.   All right.  And that pipe was removed at
19   your direction, correct?
20   A.   Yes.
21   Q.   And the pipe that was contained within
22   that insulation was then put to some other use by
23   you; is that correct?
24   A.   Yes.
25   Q.   And was the insulation discarded?

21 (Pages 81 to 84)

**Veritext Florida Reporting Co.**

Page 85

**Cum.**

1  A.  Yes.
2  Q.  Okay.  The -- what was the use that you
3  put the pipe to?
4  A.  That is related to a technology not
5  related to the technology of the litigation and it's
6  covered by industrial secret.
7  Q.  I'm sorry, the last one was industrial
8  secret?
9  A.  Secret, yes.

**IMP**

10  Q.  Let me ask you again.  I am not asking
11  for details on the underlying technology.  I am just
12  asking what did you do with the pipe?  You put it to
13  some other use?
14  A.  Yes.
15  Q.  What kind of use?  You don't have to give
16  me great details, but what kind of use?  Let me
17  rephrase.
18  Where is it now?  Where is the pipe now?
19  A.  Inside the plant.
20  Q.  All right.  And the pipe is now being
21  used in another device inside the plant?
22  A.  Yes, sir.
23  Q.  And this pipe being used in this other
24  device is carrying fluids through the device, without
25  getting into the details of what those fluids are?

Page 86

1  A.  Yeah.
2  Q.  Okay.  You can use a pipe to hold up a
3  table, correct?
4  A.  Sure.
5  Q.  So I am trying to understand.
6  A.  No, you are right.  Like this, like this.
7  Q.  Right, exactly.  Even this picture there
8  is a pipe --
9  A.  Sure.
10  Q.  -- that's shown as holding --
11  A.  As a pillar.  This is just a pillar.
12  Q.  What we see here is there is a gray or
13  metal-colored, surprisingly, pipe.
14  A.  Yes, exactly.
15  Q.  That is actually simply holding up the
16  pipe wrapped in insulation?
17  A.  Pillar.  Like a pillar.
18  Q.  Like a pillar?
19  A.  Yeah.
20  Q.  That's all I was trying to understand.
21  A.  Sure.
22  Q.  I just want to make sure our testimony
23  was clear on that because we're talking about
24  removing of pipes.  Now we've got a picture that's
25  tied to.

Page 87

**R**

1  Reinaldo Breto, you testified earlier he
2  was a employee of Leonardo that was lent or
3  contracted out to J.M. Products, correct?
4  A.  I am sorry but I think that Reinaldo
5  Breto was an employee of J.M.
6  Q.  You think he was an employee of J.M.
7  A.  Yes, I remember.  Maybe I am wrong but as
8  I can recollect I remember that he was -- now he is
9  an employee of Leonardo, but at the times he was an
10  employee of -- of J.M..
11  Q.  Okay.  Well, this afternoon after lunch
12  we will bring in the actual Leonardo to J.M.
13  agreement, but it's just a matter of recollection.
14  A.  Sure.
15  Q.  But you are really getting, I think to my
16  added question, which is after J.M. Products closed
17  its business operations in Doral, Reinaldo Breto
18  became an employee of Leonardo Corporation?
19  A.  Yes.
20  Q.  And he remains an employee of Leonardo
21  Corporation until today?
22  A.  Yes.
23  Q.  And do you know where does -- at any
24  point in time did he -- was he actually living at the
25  Doral warehouse?

Page 88

1  A.  No, he was not living in the Doral -- I
2  asked him to -- we prepared for him a place where to
3  sleep in an office for guarding, to have somebody
4  always inside there because during the time I was
5  alone in the Leonardo -- mainly in the Leonardo
6  place, and I wanted to have somebody in the other
7  side just for security to call me, then to call the
8  police or somebody for security reasons.
9  And yes, for some time he slept there,
10  yes, but he was not -- it was not a stable
11  situation.
12  Q.  Do you know for how long he was residing
13  at the Doral location?
14  MR. CHAIKEN:  Object to form.
15  THE WITNESS:  He was not residing.  He
16  never resided.
17  BY MR. PACE:
18  Q.  I'm sorry, you're right.  I just used the
19  wrong word.
20  For how long was he staying at the Doral
21  location under the arrangement you talked about,
22  where there was a place for him to be able to spend
23  the night while you were at the Doral location?
24  A.  During the -- I don't recall exactly the
25  period -- I don't recall exactly the period but when

22  (Pages 85 to 88)

Page 89

1  we saw -- I was very suspicious about espionage,
2  about -- sometime we had people around that was
3  around to take photography, et cetera.
4       During periods in which I did not feel
5  very safe, I asked him to remain there.
6       Q.  I understand.  So it was not steady, it
7  wasn't that he was always at the J.M. Products side
8  of the Doral warehouse --
9       A.  Yes.
10      Q.  -- for a period of time, it was when you
11  would request?
12      A.  Yes.
13      Q.  But otherwise he was a full-time
14  janitor/handyman for J.M. Products?
15      A.  It is correct.
16      Q.  All right.  If we have one extra copy,
17  they'll split.  This is a simple point.
18      (The document referred to was thereupon
19  marked Deposition Exhibit 5 for Identification, a
20  copy of which is attached hereto.)
21  BY MR. PACE:
22      Q.  Dr. Rossi, just so that our record is
23  clear I marked as Exhibit 5, because Mike here is
24  very good at finding documents.  This is why I am
25  better doing depositions with Mike than without him.

Page 90

1       This is a document that shows that
2  Leonardo Corporation lent Reinaldo Breto to J.M.
3  Products in the first instance, correct?
4       A.  Correct.
5       Q.  All right.  And now -- so essentially now
6  that Reinaldo Breto is an employee of Leonardo
7  essentially --
8       A.  Yes.
9       Q.  -- simply this contract has been
10  cancelled?
11      A.  I am not able to answer to this
12  question.  You know, from this invoice I can
13  understand that Reinaldo -- Reinaldo was -- during
14  the period of this invoice should have been an
15  employee of Leonardo, not of J.M. Products.
16      As I said before, I don't recall exactly
17  if he was an employee of one or the other and so
18  probably -- sir, I am not able to answer.  Because
19  this is an invoice where Leonardo invoices to J.M.
20  Products the services of Reinaldo Breto.
21      From this invoice I must only think that
22  in this period Reinaldo Breto was an employee of
23  Leonardo Corporation.  This is all I can answer to
24  you, sir.
25      Q.  Okay.  And in terms of this period,

Page 91

1  you're confident --
2       A.  I don't see a date.  Sorry if I interrupt
3  you, but where is the date on this?
4       Q.  I don't think there is a date to it.  Is
5  that your signature at the bottom?
6       A.  Yes, it is my signature.
7       Q.  This is a document that you prepared or
8  had someone prepare for you?
9       A.  I am not able to answer because I do not
10  remember this document.  I am reading this now.  For
11  sure it is authentic because this is my signature,
12  there is no doubt about that, but I do not remember
13  this.
14      And so I am not able to answer you if --
15  if this has been something that then has been
16  cancelled or not.  I am not able to tell you.
17      Q.  You're not aware of J.M. Products ever   R
18  sending funds to Leonardo Corporation in the amount
19  of $3,000 a month for Reinaldo Breto, correct?
20      A.  I have to repeat what I said before,
21  this -- every expenses of the day by day, this
22  reenters in the day by day expenses was covered by
23  the compensation agreement between Leonardo and J.M.
24  So J.M. never transferred money.  J.M.
25  paid in products by compensation.

Page 92

1       Q.  But again, so we're clear though, there
2  wasn't any transfer of funds, either for Reinaldo
3  Breto or for any other purpose from J.M. Products to
4  Leonardo?
5       A.  Sir, not that I can recall.
6       Q.  So that makes it easier for this.  The
7  other thing I would say is you are confident if you
8  signed this it would have been during a period when
9  J.M. Products was still conducting its business,
10  correct?
11      A.  Yes.
12      Q.  So this must be prior to whenever it
13  terminated its business in 2016?
14      A.  Absolutely.  Absolutely.  Because after
15  when they terminated they had no reason at all to
16  have anybody working for them.
17      Q.  Okay.
18      A.  In Doral.
19      Q.  I want to -- I want to discuss the heat
20  exchanger that you've testified about on the J.M.
21  Products side of the Doral location in more detail
22  actually later on today, but the only thing I want to
23  talk about now on that is that was that -- that heat
24  exchanger that you have testified about, that you
25  have discussed with Dr. Wong, do you -- do you know

23 (Pages 89 to 92)

Page 93

1  the date when that was removed?
2      A.  Immediately after the -- after the
3  closure, after the stop of the plants.
4      Q.  So when -- when Fabio Penon was in Miami
5  in February of 2016 the heat exchanger was still in
6  place on the J.M. Products side of the Doral
7  warehouse, correct?
8      A.  Yes, it is correct.
9      Q.  So sometime after that but before --
10  well, let me ask you, by the time you filed your
11  lawsuit had the heat exchanger that you have
12  testified about and described to Dr. Wong, had that
13  been removed?
14      A.  Sorry, attorney, it's pretty much
15  confusing.
16      Q.  Okay.  Let's do this.  When I refer to
17  the heat exchanger I'm referring to the heat
18  exchanger that you testified about previously in this
19  case and that you described to Dr. Wong, okay?
20      A.  Yes.
21      Q.  As to that heat exchanger --
22      A.  Yes.
23      Q.  -- had that been removed from the Doral
24  location prior to your lawsuit being filed?
25      A.  Yes.

Page 94

1      Q.  Okay.  So that also -- just like the
2  pipes -- the piping that we saw in Exhibit 4, that
3  heat exchanger also, that was removed sometime
4  between the middle of February 2016 and the beginning
5  of April 2016?
6      A.  It is correct.
7      Q.  All right.  And that also, according to
8  your testimony, involved a large amount of piping.
9      A.  Yes.
10      Q.  Where has all that piping gone?  We will
11  talk about the other aspects of it later but I'm just
12  trying to understand, is that piping -- let me just
13  ask the question.
14          Where did all that piping go?
15      A.  In another plant not connected with the
16  activity of the one megawatt plant, like the other
17  one I told before.
18      Q.  So there is another plant, there is
19  another location?  It's at a different location?
20      A.  It's another plant.  No, it is in the
21  same location, but it's -- it's another thing.
22      Q.  So let's see if we can get this -- we're
23  going to talk about this in a lot more detail in the
24  afternoon after lunch but I am just trying to
25  understand.

Page 95                                    IMP

1      The piping for the heat exchanger that
2  you testified about, it is now -- it's still at the
3  Doral warehouse?
4      A.  Yes.
5      Q.  All right.  But it's being used in some
6  new type of device?
7      A.  Yes.
8      Q.  And in connection with this device, is it
9  being used -- does it have fluids flowing through it?
10      A.  Yes.
11      Q.  And just to be clear for our purposes, we
12  have discussed this in other depositions, I know, but
13  I like each deposition to be clear.
14          Both a liquid and a gas is a fluid,
15  correct?
16      A.  Correct.
17      Q.  So if we talk about -- when we talk
18  about -- if we were talking about water, if you
19  described it as a heated fluid, that could be not
20  just hot water, that could be steam, correct?
21      A.  Correct.
22      Q.  Okay.  So I am not -- when I say that a
23  fluid is flowing through these pipes I am not asking
24  you whether it's steam or hot water or what it is,
25  it's some kind of fluid?

Page 96

1      A.  You know, in chemistry and in physics
2  everything that is not solid is a fluid.
3      Q.  Is a fluid.  I just wanted the record to
4  be clear that I am not -- when I refer to fluid, I am
5  not trying to get into a debate --
6      A.  Sure.
7      Q.  -- over whether we're talking about
8  something is in liquid form or gas form, it's a fluid
9  in any event.
10          (The document referred to was thereupon
11  marked Deposition Exhibit 6 for Identification, a
12  copy of which is attached hereto.)
13  BY MR. PACE:
14      Q.  I'm going to hand you Deposition Exhibit
15  6.
16      A.  Thank you.
17      Q.  You're welcome.  This is a -- this is the
18  meeting from the first board of directors and
19  shareholders for J.M. Products or, I'm sorry, for
20  J.M. Chemical Products, correct?
21      A.  I never saw this, so.  I think this is
22  the first time I see this document.
23      Q.  Okay.  If you look at the date on it --
24  well, let me ask.  So in preparing for your
25  deposition testimony today this is not a document you

24  (Pages 93 to 96)

Page 97

1  reviewed?
2      A.  No, this is not a document I reviewed.
3      Q.  Okay.  Assuming this is an authentic
4  document, it was produced by J.M. Products, date --
5  you see on the last page there is a date that is June
6  27, 2014, so that's right around the time that J.M.
7  Products was formed, correct?
8      A.  Okay.  Yes, if it is so.  Again, I am
9  seeing, attorney, this document for the first time in
10 my life.
11     Q.  I understand.  I am asking you about the
12 date.  I'm saying --
13     A.  I am reading dated June 27, 2014, yes.
14     Q.  Right.  And is that -- do you recall --
15     A.  Sorry.
16     Q.  I'm sorry.
17     A.  Sorry.
18     Q.  Do you recall that's around the time that
19 J.M. Products was -- J.M. Chemical Products was
20 created as a company?
21     A.  Makes sense.
22     Q.  Okay.  But you don't actually recall -- I
23 am not trying to put words in your mouth.  You don't
24 actually recall --
25     A.  No.

Page 98

1      Q.  -- what month in 2014 J.M. Products was
2  formed?
3      A.  No, sir.
4      Q.  Okay.  I will represent to you that it
5  had been formed as of -- at least as of this day, in
6  fact a little before.  Just to give you ease this is
7  not a trick here.  I am just trying to understand.
8  If you can look on page JM15.
9      A.  Yes.
10     Q.  It's the second page of this document.
11     A.  Yes.
12     Q.  Do you see paragraph 4?
13     A.  4?  Yes, I see it.
14     Q.  You may be familiar with this, you may
15 not.  Are you aware that when a corporation is formed
16 there is something called a -- you know, a subscriber
17 or somebody who originally forms the company?
18         Do you understand, when companies are
19 first --
20     A.  I am not expert of this kind of things.
21     Q.  So let me just explain this a second.
22 There are -- when a company is first formed it
23 doesn't yet have stock.  It's got to create its stock
24 and then it can issue its stock.
25     A.  Yes.

Page 99

1      Q.  You understand that stock is how
2  companies are owned, right?
3      A.  Yes, of course.
4      Q.  So this document identifies that the
5  assignment for the right to buy the capital stock of
6  J.M. Chemical Products was provided in favor of James
7  L. Wolff.  Who is James L. Wolff?
8      A.  Well, the first answer is I don't have a
9  clue of who the heck is James L. Wolff but I can
10 explain.
11         And I can explain because the attorney
12 Johnson when we met -- I think I can explain this --
13 told me that this is a typo basically because James
14 L. Wolff was another client absolutely not related to
15 this, of the attorney Johnson.
16     Q.  I see.
17     A.  -- that had made another company, I don't
18 know whatever, et cetera.
19         And he explained to me and to my attorney
20 the other day that he had made a typo here that
21 remained this name that erroneously his secretary had
22 put in this deed -- can be considered a deed, this in
23 English, this document.
24     Q.  In this document, yes.  It's not really a
25 deed, but it's a document.

Page 100

1      A.  In this document his secretary
2  erroneously has written James L. Wolff.  This mistake
3  remained.  I suppose that he eventually has corrected
4  this, but this is just a typo.
5      Q.  What's the name that should be there?
6      A.  I don't know.  I have no idea.  That
7  has -- I have no idea because, again, I have nothing
8  to do with all this kind of stuff related to who are
9  the owners, et cetera, et cetera, et cetera.  It's
10 not my stuff.
11     Q.  I understand.
12     A.  The attorney -- sorry.
13     Q.  Go ahead.
14     A.  I was only completing the answer for
15 you.
16         I can say what I know and what I know is
17 that the attorney Johnson told me several days ago
18 when we reunited with the attorneys to prepare this
19 deposition, explained to me it is possible that you
20 will be asked about who is this Wolff and just answer
21 that it is a typo.
22     Q.  But he didn't tell you what the correct
23 answer was?  In other words, he told you James L.
24 Wolff is -- somebody typed in the wrong name, it
25 shouldn't be James L. Wolff, it should be something

25  (Pages 97 to 100)

Page 101

1    else, he just didn't tell you the something else?
2        A.   No, I don't recall this.  I don't recall
3    this or maybe he told, but I was not focused.  I got
4    the typo but, you know, I am totally not interested
5    what is the name that is here.
6        Q.   But you understand from this document,
7    this is the document, since you get a chance to
8    discuss it with Mr. Johnson, this is a document that
9    reflects who has the right to own or who owns J.M.
10   Products or J.M. Chemical products, at least
11   originally?
12       A.   Yes, but it is not my business.
13       Q.   I understand but it was a topic for the
14   deposition.
15       A.   Yeah, but the topic resolve like this.
16   In fact, he told me to explain this is a typo.
17       Q.   Okay.  No, I understand that.
18       A.   If you want to know who is the
19   beneficiary of the trust, that you know.
20       Q.   We might be able to resolve this without
21   having to have any further depositions by just
22   talking with counsel for J.M. Products.
23       A.   For now I can tell you that this is a
24   typo.  That I do not know who the heck is Mr. James
25   L. Wolff and the attorney Johnson explained to me if

Page 102

1    you will be requested and I am, just tell that it's a
2    typo made by secretary and that's it.  He told me
3    that eventually has been corrected.
4        Q.   It's been corrected.  So there should be
5    another document that should have been produced or
6    would have been produced that would have the
7    corrected information in it?
8        A.   So the attorney Johnson told me.
9        Q.   Understood.  Right.  You didn't actually
10   do the correction?
11       A.   No.
12       Q.   Either Henry Johnson or his assistant,
13   Colette made the correction?
14       A.   I suppose so.
15       Q.   By the way, just so I put it on the
16   record before I forget about it, Colette is Colette
17   Sauer, but it's spelled S-A-U-E-R, correct?
18       A.   Yes, it is correct.
19       Q.   We have got that done so later on today
20   when I refer to Colette Sauer it will be spelled
21   correctly in the record.
22       A.   It's the secretary of Johnson.
23       Q.   I want to -- before we take a break for
24   lunch, I want to talk -- one of the deposition topics
25   for today, if you look at -- if you're looking at

Page 103

1    Exhibit 1 but I will read it to you.  You can read
2    along with me if you like.
3        A.   Exhibit 1, yes.
4        Q.   Deposition topic 6 is --
5        A.   Page?
6        Q.   I'm sorry, page 2.
7        A.   Page 2, yes.
8        Q.   Deposition topic 6 is the relationship
9    between JMP and Johnson Matthey p.l.c. --
10       A.   Yes.
11       Q.   -- or its affiliates --
12       A.   Yes.
13       Q.   -- including, but not limited to any
14   products JMP purchased from or sold to Johnson
15   Matthey, any payments between JMP and Johnson Matthey
16   and any agreements between JMP and Johnson Matthey.
17            I think I can kind of cover this topic in
18   just a few minutes and if I'm wrong, we'll break for
19   lunch and finish afterwards.
20       A.   No problem.
21       Q.   J.M. Products never ultimately sold any
22   products to Johnson Matthey, correct?
23       A.   J.M. Products was not supposed to sell
24   products to Johnson Matthey.
25       Q.   Okay.  And --

Page 104

1        A.   Never.  Never sold.  The answer to your
2    question, correct.
3        Q.   They never sold.  And that's because they
4    were never intending to sell any products to Johnson
5    Matthey?
6        A.   No, Johnson Matthey --
7            MR. CHAIKEN:  Object to form.
8            THE WITNESS:  Johnson Matthey in the long
9    discussions that I had with their top managers,
10   they said that they would have been open to --
11   also to buy our products, to buy back the raw
12   materials in case of we did not need them but --
13   but basically they were not supposed to buy
14   material from JMP.
15   BY MR. PACE:
16       Q.   Some of this I'm going over things that
17   were covered in your prior deposition.  I am just
18   trying to make sure I'm clear because I've got you
19   here as a representative of J.M. Products.
20       A.   Okay.
21           (The document referred to was thereupon
22   marked Deposition Exhibit 7 for Identification, a
23   copy of which is attached hereto.)
24   BY MR. PACE:
25       Q.   I am handing you what's marked as Exhibit

26  (Pages 101 to 104)

Page 105

1    7. I believe we covered this in your deposition on
2    behalf of Leonardo Corporation last Friday, so I
3    don't think I'm treading new ground.
4         You just said that you were talking with
5    high level people at Johnson Matthey.
6         A.   Yes.
7         Q.   And I believe last Friday you identified
8    those individuals as the people on this e-mail.  This
9    is an e-mail that you had with Johnson Matthey with a
10   Dalton O'Brian and Alain Groborz, correct?
11        A.   Yes, it is correct.
12        Q.   Those are the two individuals at Johnson
13   Matthey with whom you were having your discussions?
14        A.   Correct.
15        Q.   All right.  There has -- there has never
16   been a payment by Johnson Matthey to J.M. Products,
17   correct?
18        A.   Correct.
19        Q.   Has there ever been a payment by J.M.
20   Products to Johnson Matthey?
21        A.   I don't recall if -- because I bought --
22   I bought a sample from them and -- for several
23   thousand dollars and I don't remember if I bought it
24   as Leonardo Corporation or if J.M. bought it.  I
25   don't remember this.

Page 106

1         Q.   Okay.
2         A.   Maybe yes, maybe not.  I don't recall
3    exactly.  Because in any case, this reentered in the
4    day by day operation of the company.
5         So in any case, the money had to come
6    from Leonardo based on the agreement between Leonardo
7    and J.M..  So maybe that this has been made, because
8    they were in contact with J.M., as you can see from
9    this e-mail.
10        This e-mail has been signed Andrea Rossi,
11   J.M. Products Corporation, Doral, Florida, so they
12   knew that they were talking with J.M.
13        Q.   Right.
14        A.   And -- but I don't remember if I bought
15   that sample as Leonardo or as J.M., so I am not able
16   to answer your question.  Either one.
17        Q.   That's why I was asking you.
18        A.   Either one.
19        Q.   That's why I was asking the question.  I
20   was trying to understand whether J.M. Products bought
21   it or whether Leonardo bought it.
22        A.   I don't recall.
23        Q.   Because I don't think we have received
24   documents from either reflecting the actual purchase
25   so I was trying to figure out who should have the

Page 107

1    documents.
2         A.   And I can explain why.  Because I bought
3    from their American subsidiary.
4         Q.   In Tennessee?
5         A.   I don't remember if it is in Tennessee
6    but we bought -- since we bought -- it was a small
7    amount because it was just a sample and so they
8    directed me to their American subsidiary for this
9    small amount.  And I don't remember if it was
10   Tennessee or not.
11        Q.   So let's break that down.  Again, we can
12   take a break in a little bit.  I don't want to keep
13   you for lunch.
14        A.   I don't need it.
15        Q.   Unfortunately I think I do need lunch.
16        This e-mail is dated March 22nd and it
17   talks about an order or potential order of 10
18   kilograms of platinum sponge.
19        The first question is, your recollection
20   that there was an actual purchase of platinum sponge
21   from Johnson Matthey, that transaction occurred
22   subsequent to this e-mail?
23        A.   No.
24        Q.   Prior to this e-mail?
25        A.   Can you repeat the question?

Page 108

1         Q.   Yeah.  Maybe use of the word subsequent
2    was a bad one.  I think what you were just telling me
3    was sometime after this e-mail you, either on behalf
4    of Leonardo Corporation or on behalf of J.M.
5    Products, bought some platinum sponge from a Johnson
6    Matthey subsidiary in the United States; is that
7    correct?
8         A.   I bought from Johnson Matthey a sample of
9    a -- of a particular filter, from which I could take
10   off platinum sponges because they do not sell
11   platinum sponges in small quantities and I needed a
12   small quantity to make one experiment and so I bought
13   from -- I bought -- yes, indirectly I bought platinum
14   sponges, but directly what I bought was a particular
15   filter that I knew because I used it in Italy for
16   other things.  It's a catalyst.
17        It's a catalyst that contains platinum
18   sponges and I knew how to take off from that catalyst
19   the platinum sponge that I need to make the
20   experiment, to make an experiment.
21        Q.   Let me walk backwards, if I can.  First
22   of all, when you bought these filters, you bought
23   them from a Johnson Matthey subsidiary in the United
24   States?
25        A.   Yes.

                              27 (Pages 105 to 108)



Page 109

1    Q.   Second is you bought them sometime after
2  the date of this e-mail, which is March 22nd of 2015,
3  correct?
4    A.   Yes.
5    Q.   In response to this e-mail where you were
6  looking to buy ten kilograms of platinum sponge, did
7  Johnson Matthey inform you they weren't willing to
8  sell ten kilograms -- simply ten kilograms of
9  platinum sponge?
10    A.   They sent an offer.
11    Q.   You said that you needed a small amount
12  of platinum sponge for the experiment you wanted to
13  run.
14       What do you mean by a small amount?  Are
15  we talking a few grams?  Are we talking a kilogram?
16    A.   We're talking a few grams.
17    Q.   A few grams.  And you obtained those few
18  grams from the -- from removing them from filters you
19  bought from the Johnson Matthey subsidiary?
20    A.   Correct.
21    Q.   And you don't recall sitting here today
22  whether it was J.M. Products or Leonardo that bought
23  those filters?
24    A.   Correct.
25    Q.   When J.M. Products -- actually, before I

Page 110

1  get into that subject, let me just see if I can wrap
2  things up with Johnson Matthey.
3    Q.   So you received order -- orders or
4  proposed orders from Johnson Matthey for either J.M.
5  Products or Leonardo to buy platinum sponge, but
6  those orders were never completed, the platinum
7  sponge pursuant to those orders was never bought; is
8  that correct?
9    A.   You say order, but you mean offers.
10    Q.   Offer.  I'm sorry, I didn't know if there
11  was a phrase used for it.  Yes, so let me rephrase my
12  question.
13       You received offers or proposals --
14    A.   Yes.
15    Q.   -- from Johnson Matthey to sell to either
16  Leonardo Corporation or J.M. Products some quantity
17  of platinum sponge, correct?
18    A.   Correct.
19    Q.   Those proposals or offers were never
20  accepted by either J.M. Products or Leonardo,
21  correct?
22    A.   Correct.  In that case from J.M.
23  because -- yes, okay.  No.  The answer is correct.
24    Q.   All right.  Either J.M. Products or
25  Leonardo did obtain some platinum sponge from a

Page 111

1  Johnson Matthey subsidiary, but it obtained it by
2  purchasing filters from Johnson Matthey, the Johnson
3  Matthey subsidiary, correct?
4    A.   Yes, it is correct.
5    Q.   So that transaction is not reflected in
6  Exhibit 7?
7    A.   No, sir.
8    Q.   Okay.  But it occurred sometime after
9  Exhibit 7?
10    A.   Yes, sir.
11    Q.   All right.  Other than proposals --
12  proposals or offers from Johnson Matthey to buy --
13  I'm sorry, to sell platinum sponge and aside from the
14  transaction whereby either Leonardo or J.M. Products
15  bought filters from a Johnson Matthey subsidiary,
16  have there been -- are there any other agreements
17  or -- are there any other agreements between J.M.
18  Products and Johnson Matthey?
19    A.   No, sir.
20    Q.   Okay.  Have there been any other
21  potential agreements negotiated between J.M. Products
22  and Johnson Matthey?
23    A.   I don't understand the question.
24    Q.   It was a poor question.  Other than a
25  proposal or offer to sell platinum sponge by Johnson

Page 112

1  Matthey to J.M. Products, and other than the
2  transaction whereby certain filters were bought by
3  either J.M. Products or Leonardo from a Johnson
4  Matthey subsidiary, have -- are there any other
5  business transactions that were negotiated or
6  discussed between Johnson Matthey and J.M. Products?
7    A.   No.
8       MR. PACE:  Why don't we go off the
9  record.
10       THE VIDEOGRAPHER:  Sure.  Off the
11  record.  The time is 12:44 p.m.
12       (Thereupon a lunch recess was taken,
13  after which the following proceedings were had.)
14       THE VIDEOGRAPHER:  We're back on the.
15  Record the time is 1:52 p.m.
16  BY MR. PACE:
17    Q.   Dr. Rossi, we have gone through this --
18  well, first of all you recognize you are still under
19  oath, correct?
20    A.   Yes.
21    Q.   We have gone through this exercise before
22  so I think you know the drill but I am going to ask
23  you a series of questions.
24       I'd ask kind of yes, no answers, give
25  your lawyer a chance to object and at some point your

R

Third Party: R

3rd Party - R

R

R

Third Party:
(110:3-12)
Confusing

28  (Pages 109 to 112)

Page 113

1    lawyer I suspect is going to instruct you not to
2    answer, so just -- we have done this before.
3           Which is at your -- during the break with
4    whom did you meet or discuss or have conversations?
5       A.  With my attorneys.
6       Q.  And those attorneys are?
7       A.  Attorney Aran.
8       Q.  Aran and attorney Chaiken?
9       A.  Yeah.
10      Q.  And just answering yes or no, did you
11   discuss at all your testimony from earlier today?
12      A.  Yes.
13      Q.  With both of the attorneys or with just
14   one or the other attorney?
15      A.  With both of my attorneys.
16      Q.  Okay.  Again, give your lawyer a chance
17   here.  But what did you discuss?
18           MR. ARAN:  Objection, privileged.
19           MR. CHAIKEN:  Instruction not to answer.
20           MR. ARAN:  And instruction not to answer.
21           THE VIDEOGRAPHER:  Counsel, microphone,
22   please.
23           MR. PACE:  Hit it again, just so they
24   hear it on the record.
25           MR. ARAN:  Objection, privileged and

Page 114

1        instruct him not to answer.
2    BY MR. PACE:
3       Q.  And Dr. Rossi, you are going to follow
4    that instruction?
5       A.  Yes.
6       Q.  I want to start off talking a little bit
7    about the heat exchanger we were discussing earlier
8    today.  I want to start by just laying a little bit
9    of groundwork.
10          (The document referred to was thereupon
11   marked Deposition Exhibit 8 for Identification, a
12   copy of which is attached hereto.)
13   BY MR. PACE:
14      Q.  I am handing you what is marked as
15   Deposition Exhibit 8.
16          Do you recognize Exhibit 8 as a picture
17   of the Doral warehouse taken from the Leonardo side
18   of that warehouse?
19      A.  Yes.
20      Q.  All right.  Can you tell just by looking
21   at the picture any time period when it was taken?
22      A.  After -- I can take that this has been
23   taken after the closing of the plants.
24      Q.  After the closing.  Now, you just said
25   plants.  So let's just make sure we're defining that

Page 115

1    correctly or we're on the same page.  Sorry, I
2    shouldn't say defining correctly.  That we're on the
3    same page.
4           Plants means -- ones of those plants is
5    the -- is the E-Cat plant by Leonardo, correct?
6       A.  Yes, it is correct.
7       Q.  And this picture that we have as Exhibit
8    8, that's reflected in the small piece of the red
9    container that we can see on the right-hand side of
10   the picture?
11      A.  Yes, it is correct.
12      Q.  All right.  And the other plant is the
13   J.M. Products plant and that we can see in this
14   picture is the -- the top of the black box that we
15   see on the right-hand side of the picture; is that
16   correct?
17      A.  Yes, it is correct.
18      Q.  All right.  Between those two plants --
19   I'm sorry, I may sometimes call them containers
20   instead of plants.  Is that okay with you?
21      A.  No problem.
22      Q.  That's because both of these, the E-Cat
23   plant -- yeah, the E-Cat plant is in like a shipping
24   container; is that correct?
25      A.  Yes, the red shipping container.

Page 116

1       Q.  And the J.M. Products plant is also in a
2    shipping container that is just wrapped in
3    insulation?
4       A.  Yes, sir.
5       Q.  So the black we see there is actually the
6    insulation?
7       A.  Yes, sir.
8       Q.  All right.  And between the two is a --
9    is a gray wall that looks like it's probably in the
10   range of, you know, six, seven feet high.  Is there a
11   name you are comfortable referring to that wall?
12      A.  Absolutely, okay.
13      Q.  As contrasting the large walls that go up
14   to the roof in this warehouse, what can we call this
15   small wall?  Can we call it a dividing wall?
16      A.  Very good.
17      Q.  Okay.  So there is a dividing wall
18   between the Leonardo container and the J.M. Products
19   container?
20      A.  It is correct.
21      Q.  And you said that this picture was --
22   what you can conclude from this picture in terms of
23   timing is it was taken after the operations of J.M.
24   Products had ended.
25          Why -- what about this picture shows that

29  (Pages 113 to 116)

Page 117

1  to you?
2       A.  Because there is not the steam pipe.
3  From this perspective we should necessarily see
4  between the red container that is in the right of
5  this photography and the black container that looms
6  up on the top of the dividing wall at the left of the
7  red ship container.  We should see the pipe of the
8  steam that brought -- that conveyed the steam
9  produced in the red container that is the E-Cat, to
10 the black container that is the J.M. plant.  Here is
11 not that pipe and obviously the plants were not in
12 operation.
13      Q.  I am going to mark here as actually
14 Exhibit 9 and 10, because we're going to have one --
15 I am going to start with 9, and 10 is going to be the
16 exact same version but I am going to let you draw on
17 10, which is why I am doing the difference, the
18 distinction.
19          (The document referred to was thereupon
20 marked Deposition Exhibit 9 for Identification, a
21 copy of which is attached hereto.)
22          (The document referred to was thereupon
23 marked Deposition Exhibit 10 for Identification, a
24 copy of which is attached hereto.)
25 BY MR. PACE:

Page 118

1       Q.  Handing you what's marked as Exhibit 9
2  and 10.  Actually, give one each to everybody because
3  I've got a couple of extra in case any get messed
4  up.
5          One of these I am going to ask, the
6  Exhibit 9, that we not draw on and then Exhibit 10 I
7  am going to let you draw on.  This is by no means to
8  scale.  I am not trying to claim it's to scale.
9       A.  Okay.
10      Q.  What I have tried to do is kind of create
11 a simple diagram that has -- it's almost like an
12 overview of the Doral warehouse.
13          It doesn't have everything in it but it's
14 meant to show that there is a portion of the Doral
15 warehouse that is for J.M. Products, that's the
16 square that is the upper right corner of this diagram
17 and then there is the area where Leonardo was
18 operating, which is the bottom part of the Exhibit
19 9.
20          I tried to draw in the little hallway we
21 see in Exhibit 8 that takes you back to the bathroom
22 in the back and then I put a box in here to represent
23 the J.M. Products plant.
24      A.  Okay.
25      Q.  Again, not drawn to scale, but is that

Page 119

1  position wise roughly correct?
2       A.  Yes, but I do not -- sorry, I miss the
3  difference between the Exhibit 9 and the Exhibit 10.
4       Q.  Absolutely none.
5       A.  They look absolutely the same.
6       Q.  They are the exact same.
7       A.  Okay.
8       Q.  The reason I gave you both of them is I
9  want you then to put Exhibit 9 to the side because
10 that way we know if you draw on Exhibit 10, we will
11 be able to show the difference --
12      A.  I understand.
13      Q.  -- here is what Dr. Rossi drew because
14 look at the difference between 9 and 10.  So let's
15 take 9 away from you so that you don't have an
16 incentive to draw on 9.  We will just put it under
17 the pile, but we're not taking it away.
18      A.  Okay.
19      Q.  I actually -- if we need additional ones
20 I actually have a few extra copies, we can create
21 additional exhibits.
22          I want to talk to you -- if you can keep
23 Exhibit 10 with you, I want to see if I can set
24 something up here.  I am going to give you pictures
25 you have seen before in a second.  I am going to mark

Page 120

1  here as Exhibit 11 and 12.
2          (The document referred to was thereupon
3  marked Deposition Exhibit 11 for Identification, a
4  copy of which is attached hereto.)
5          (The document referred to was thereupon
6  marked Deposition Exhibit 12 for Identification, a
7  copy of which is attached hereto.)
8  BY MR. PACE:
9       Q.  This is getting a little on the
10 interactive side.  This is Exhibit 11.
11      A.  Thank you.
12      Q.  This is Exhibit 12.  You have seen each
13 of these photographs before fairly recently?
14      A.  Yes, I have seen these photographies
15 during my -- I think my first deposition or the
16 second.  I don't remember exactly.  One of the two.
17      Q.  Right.  It might even have been both.  I
18 don't remember now either.
19      A.  Yeah.
20      Q.  These are pictures of the inside of what
21 you have identified as the J.M. Products plant or
22 container, correct?
23      A.  Yes, it is correct.
24      Q.  And if I understand it correctly, if we
25 put these pictures side by side, if you put Exhibit

30  (Pages 117 to 120)

Page 121

1    11 to your left and Exhibit 12 to your right, that
2    kind of -- that's the way they would appear in the
3    container, correct?
4           If you came into the container from the
5    door we see in Exhibit 11, you would see these pipes
6    in Exhibit 11 closest to that door, and then as you
7    kept looking down or walking down the container, you
8    would then see the equipment that is shown in Exhibit
9    12?
10      A.  No.
11      Q.  Can you explain to me how I got that
12   wrong?
13      A.  Here is a missing -- there is a gap.
14      Q.  There is a gap between them?
15      A.  Yes, between 11 and the 12 you should
16   need an 11-B because as you can really see, you can
17   easily see, they don't combine.
18      Q.  Right. I'm sorry, I wasn't trying to say
19   that and you said that previously, so let me just do
20   this again.
21          Which is, if you came in the door that we
22   see on the left side of Exhibit 11 --
23      A.  Okay. That's the entrance, okay.
24      Q.  The first thing you would see are these
25   pipes that are shown in Exhibit 11?

Page 122

1    A.  Yes, it is correct.
2    Q.  Then you would see some additional space
3    and additional equipment in between the picture in
4    Exhibit 11 and the picture in Exhibit 12?
5    A.  Correct.
6    Q.  And then on the far side of the container
7    you would see the equipment we see in Exhibit 12?
8    A.  Yes, it is correct.
9    Q.  Okay. At the top of Exhibit 12 we see a
10   pipe that's got some blue and looks like silver tape
11   around it; is that correct?
12   A.  You mean this?
13   Q.  Yes, a tan colored pipe.
14   A.  Yes, it is correct.
15   Q.  That pipe is carrying the heated fluid
16   from the Leonardo plant over -- into the J.M.
17   Products plant, correct?
18   A.  Correct.
19   Q.  And that -- is that the same pipe as the
20   one we see on the top of Exhibit 11? Recognizing
21   there is a gap between them.
22   A.  Yes, there is a gap between them and --
23   yes. In any case, yes.
24   Q.  Okay. And you're familiar with the
25   equipment that was in the J.M. Products container

Page 123

1    from your work for J.M. Products, correct?
2    A.  Yes.
3    Q.  Okay. I'm just making sure that you're
4    knowledgeable about what we're looking at here.
5    A.  I am.
6    Q.  Okay. So looking at Exhibit 11, the way
7    this system operated, the heated fluid coming from
8    Leonardo -- coming from the E-Cat container would
9    flow into these pipes, the first four pipes that we
10   see here on Exhibit 11, the top four pipes we see on
11   Exhibit 11?
12   A.  The insulated pipes, yes.
13   Q.  And I believe your testimony was very
14   clear that that's steam that's coming through those
15   pipes, correct?
16   A.  Yes, sir.
17   Q.  And so it remains steam as it's going
18   through these four pipes?
19   A.  Yes, sir.
20   Q.  And then between Exhibit 11 and Exhibit
21   12 there is a -- we will get into more detail on it
22   but there is a mechanism in place to carry the heated
23   fluid out of the container -- out of the J.M.
24   Products container to a heat exchanger; is that
25   correct?

Page 124

1    A.  Yes, there is a bypass.
2    Q.  There is a bypass, okay.
3    A.  Yes.
4    Q.  And then after the heated fluid goes into
5    the heat exchanger, it comes back as cooled fluid?
6    A.  The cold fluid, yes.
7    Q.  The cold fluid. And it comes into the
8    pipe that we see on Exhibit 12, which is the -- it
9    looks like it's a pipe wrapped in white insulation
10   with some tan tape on it?
11   A.  Yes.
12   Q.  Okay. And, I'm sorry, just to be clear,
13   it comes into this pipe somewhere on -- outside of
14   the image, but on the left-hand side of Exhibit 12?
15   A.  Can you repeat?
16   Q.  Yes. When the -- when the cold fluid
17   comes back into the container after it has gone
18   through the heat exchanger, it would come into the
19   pipe that is wrapped in white insulation with tan
20   tape somewhere on the left-hand side of Exhibit 12,
21   or what's not seen on the left-hand side of Exhibit
22   12?
23   A.  Yes, it is -- yes, relatively cold.
24   Relatively respect the steam, because it was still
25   warm, but yes.

31  (Pages 121 to 124)

Page 125

1  Q.  Then it would flow through this pipe
2  that's covered in white insulation and tape out
3  through the -- what we see here on the right-hand
4  side of Exhibit 12?
5  A.  Uh-huh.
6  Q.  And that would then flow back to the
7  Leonardo side of the Doral warehouse?
8  A.  Yes.
9  Q.  Okay.  Just so I understand also, then I
10  want to talk about our diagram that's Exhibit 10.
11  Just so I understand, the heat -- the
12  bypass that you referenced, the bypass goes out
13  the -- how does the bypass carry the steam out from
14  the J.M. Products -- out from the J.M. Products
15  container?  Is there a device that pushes the steam
16  out or does it just flow naturally?
17  A.  I did not understand the question.
18  Q.  It was not a very good question by me.
19  You testified that between Exhibit 11 and Exhibit 12
20  there is a -- there is a bypass and that takes the
21  steam over to the heat exchanger, correct?
22  A.  Yes.
23  Q.  All right.  What does that bypass look
24  like?
25  A.  A bypass is -- is a sort of a Y.  So

Page 126

1  basically --
2  Q.  Before you write on something, just
3  because I see a little note on the top.  I just want
4  you to write on a clean page because we're going to
5  mark it as an exhibit.  I don't want to have your
6  lawyers notes or whatever might be up there.
7  A.  A bypass is basically something that
8  conducts -- if we have an arrival and then we want to
9  separate the flows, this is a bypass, sort of a Y,
10  and here you will have a -- we call it a valve -- let
11  me call it a valve.
12  Normally in this case it will be a disk,
13  with the possibility to go in this position, which is
14  open, or in this position, looking from the top.
15  When it is closed you will see a line.  When it is
16  open you will see a circumference.
17  The same here, the same here.  In this
18  case this is closed, so this must be open, so this
19  will be like that, okay.  So this will be in this
20  case like that and alternate here, and this is a
21  bypass.
22  Q.  Right.  So the bypass carries -- let's
23  just -- we will go ahead and mark that as Exhibit
24  12.
25  MR. ARAN:  13.

Page 127

1  MR. PACE:  13, sorry.
2  (The document referred to was thereupon
3  marked Deposition Exhibit 13 for Identification, a
4  copy of which is attached hereto.)
5  THE WITNESS:  This is 13?
6  MR. PACE:  Yes.
7  THE WITNESS:  So this has been notated by
8  you?
9  BY MR. PACE:
10  Q.  Pardon.
11  A.  It was a scratch.  Now you have upgraded
12  it.
13  Q.  Yes, I have upgraded it to a --
14  A.  So I am proud of that.  It is the first
15  time that a drawing made by me is upgraded.  Normally
16  they are despised.
17  Q.  They are downgraded and now they have
18  been upgraded.  And this is the bypass that would
19  take the heated fluid out of the JMP container and
20  allow the fluid to come back into the JMP container?
21  A.  You know, a bypass is a device that can
22  deviate a flow.  So basically here we had a series of
23  bypass that deviated the flow depending on our
24  necessities.
25  Q.  And when you say depending on -- you said

Page 128

1  a series of bypasses.
2  A.  Yes.
3  Q.  Is there -- you have identified -- are
4  all of those bypasses, would they all be contained in
5  the area that is not covered by Exhibit 12 or Exhibit
6  11, the area in between?
7  A.  We had another bypass outside the box.
8  Q.  So there is a -- so we have the bypass that
9  brings the heated fluid from Leonardo Corporation
10  over to -- the Leonardo container to the J.M.
11  Products container?
12  A.  Yeah.
13  Q.  One bypass existed on that tube before it
14  went into the J.M. Products container?
15  A.  Yes.
16  Q.  Okay.  Another bypass existed, when we're
17  looking at Exhibit 11 and 12, between the bottom
18  insulated pipe that is white insulation that we see
19  on Exhibit 11, and the white insulated pipe we see
20  coming from the left-hand side of Exhibit 12, in
21  between those two there was also a bypass?
22  A.  In between these two photographies there
23  is another bypass, yes.
24  Q.  Okay.  Now, if I can ask you to look --
25  looking at Exhibit 10, you are going to have a second

Veritext Florida Reporting Co.
800-726-7007                                                                 305-376-8800

Page 129

1   drawing that makes into that -- gets elevated to
2   court exhibit.
3         Can you identify for me -- you don't have
4   to draw on it if you don't want to.  I thought it
5   might be easier.  Where would the -- the heat
6   exchanger involves pipes that would carry the heated
7   fluid out of the J.M. Products container up to the
8   second floor of the Doral warehouse, correct?
9         A.  Can you please rephrase for me?
10        Q.  Yes.
11        A.  If possible cutting into phrases.
12        Q.  I will.
13        A.  Thank you.  Because I was confused.
14        Q.  The heat exchanger --
15        A.  Yes.
16        Q.  -- involved pipes that carried the heated
17   fluid out of the JMP container, correct?
18        A.  Correct.
19        Q.  And the pipes went up to the second floor
20   of the Doral warehouse, correct?
21        A.  Correct.
22        Q.  All right.  On that Exhibit 10 can you
23   show me where the pipes came out of the container,
24   approximately?  Again, this is not drawn to scale.
25        A.  In this position.

Page 130

1         Q.  Okay.  And would the pipe then go to the
2    wall?  Would they run up to the wall?
3         A.  Yes, the pipe run -- the pipe run -- yes,
4    through the wall and go on here until we arrived to
5    the end, to go up and go to the heat exchanger.
6         Q.  And the pipes were not actually in the
7    wall, they were against the wall; is that correct?
8         A.  Yes.
9         Q.  So if we look back here on our Exhibit 8,
10   the -- I know I'm bouncing around here a little bit.
11        A.  Where is Exhibit 8?
12        Q.  That's it, Exhibit 8.
13        A.  8, okay.
14        Q.  We can see on the right-hand side kind of
15   a grayish, looks like it's a concrete wall?
16        A.  It is a concrete wall, yes.
17        Q.  The pipes would run along that wall?
18        A.  Yes.
19        Q.  To the back of the -- I don't know if
20   it's back or the front of the warehouse.  To the
21   part of the warehouse where the second story unit
22   was?
23        A.  Yes.
24        Q.  And then they would run up the wall --
25        A.  Yes.

Page 131

1         Q.  -- to the second story?
2         A.  Yes.
3         Q.  And then over to the door?
4         A.  Yes.
5         Q.  All right.  So just -- if we can, in the
6    diagram you are looking at there, Exhibit 10, the --
7         A.  Exhibit 10, yes.
8         Q.  The door would be -- again, it's a second
9    story, so this doesn't show you second story.
10        A.  Yeah.  Let -- no, sorry.  I interrupted
11   you.  I am very sorry.
12        Q.  I am going to see if I can -- if we're on
13   the same page here.  This wall --
14        A.  Yes.
15        Q.  -- would be essentially this side of the
16   paper, correct?
17        A.  Yes, exactly.
18        Q.  This wall would be this side of the
19   paper?
20        A.  Yes, sir.
21        Q.  And I am not sure how that is going to
22   show up on video, so I will do my best.
23        A.  No, but I have understood perfectly what
24   you are saying.
25        Q.  Can you just draw a line or lines that

Page 132

1    would show the path of the pipes?
2         A.  Very approximately.
3         Q.  Yes, this is not drawn to scale.
4         A.  Around like this, arrived here, go up
5    here, in this position, now this is hidden and enter
6    inside to go to the heat exchanger.
7         Q.  Would the pipes go up -- did they go up
8    like right underneath the door and then enter?
9         A.  Yes.
10        Q.  Then they --
11        A.  Underneath the door, yes.  Yes, exactly.
12        Q.  I don't think I actually have a picture
13   of that.  I should have done one that was top to
14   bottom.  All right.
15             Let me see if I can kind of talk this
16   through so it's clear on the record.  I should have
17   brought something you can mark up.
18             On Exhibit 8 we can see --
19        A.  Exhibit 8.
20        Q.  8.
21        A.  Yes.
22        Q.  We can see on the far wall a door, a
23   second story door, correct?
24        A.  Correct.
25        Q.  That's -- the pipe that brought -- the

33  (Pages 129 to 132)

Page 133

1  pipe that brought up the heated fluid to the second
2  story came up from the first story right underneath
3  where that door is?
4      A.  Yes.
5      Q.  And then entered --
6      A.  Underneath means from the bottom.
7      Q.  Uh-huh.
8      A.  Yes, okay.
9      Q.  Yes.  And then entered the second story
10 through --
11     A.  From the low left corner of this door.
12     Q.  Low left corner.
13     A.  Low left corner looking at this photo.
14     Q.  Okay.  Got it.  Got it.
15     A.  If this is the door that entered
16 underneath here.
17     Q.  Okay.  And did it enter -- I think I
18 understood what you just said.  Let me make sure I am
19 clear, which is the piping -- the piping didn't enter
20 through the door, it actually came up the wall and
21 then entered underneath the door?
22     A.  I did not understand what you said.
23     Q.  The -- I'm going to mark this.  I'm
24 sorry, I'm throwing a bazillion exhibits at you.
25     A.  That's okay.

Page 134

1      Q.  This is from doctor -- this is a
2  composite exhibit, I guess we'll call it.  This is
3  exhibits that Dr. Wong included with his expert
4  report.
5      A.  Uh-huh.
6          (The document referred to was thereupon
7  marked Deposition Exhibit 14 for Identification, a
8  copy of which is attached hereto.)
9  BY MR. PACE:
10     Q.  I have marked it as Deposition Exhibit
11 14.
12     A.  Okay.
13     Q.  If you look at page A -- what is Wong
14 Exhibit A-3, so I think it's the -- probably the
15 fourth page of Exhibit 14.
16     A.  Okay.
17     Q.  We see a doorway there.
18     A.  Yes.
19     Q.  Would the pipe come -- when the pipe came
20 up to the second story for this heat exchanger, did
21 it come through this door or did it come underneath
22 the door?
23     A.  Comes after underneath the door.  You
24 know, under -- comes after the bottom corner of the
25 door.

Page 135

1      Q.  And on this one, as we're looking at it,
2  because we're looking at it from inside the room on
3  the second story --
4      A.  Yes.
5      Q.  -- on this image it would actually -- the
6  bottom right-hand corner of this image?  I'm sorry,
7  the bottom right-hand corner of the door because
8  we're looking at it from the other side?
9      A.  Yes.
10     Q.  All right.  And if I can -- again, I
11 apologize because I am making you go through --
12 juggle a lot of exhibits here, but if we can put that
13 one to the side for just a second, I want to go back
14 to my Exhibit 10, our drawing there.
15     A.  Exhibit 10, okay.
16     Q.  Yes.  When -- the pipes that you have
17 drawn for -- that you have drawn in there already,
18 that's -- that's the piping that would come from
19 the -- from the bypass that was inside the J.M.
20 Products container, correct?
21     A.  Yes, sir.
22     Q.  I am going to mark -- we'll just go ahead
23 and mark this, so we don't write over everything.  I
24 am going to mark this as Deposition Exhibit 15.
25         (The document referred to was thereupon

Page 136

1  marked Deposition Exhibit 15 for Identification, a
2  copy of which is attached hereto.)
3  BY MR. PACE:
4      Q.  Exact same as Deposition Exhibit 10 but
5  now I am going to ask you --
6      A.  Okay.  So 15, we put it here?
7      Q.  Yes, we'll put 10 to the side.
8      A.  Not to make confusion.
9      Q.  I know I'm making you juggle a lot.
10     A.  All right.
11     Q.  On Exhibit 15 can you show me where the
12 piping ran that was from the bypass on the heated
13 fluid pipe that came from Leonardo to J.M. Products,
14 when you wanted to operate the bypass?
15     A.  Here we had a bypass, in this position.
16     Q.  Okay.
17     A.  In this position.
18     Q.  You can mark an X or a star, whatever you
19 want.  Okay.
20     A.  In this position we had a bypass.  This
21 bypass conveyed -- could convey the steam either or
22 both in this direction, this direction that is the
23 pipe that we have seen entering in the plant in the
24 Exhibit Number 12.
25         And then we have another line that --

34  (Pages 133 to 136)

Page 137

1 another line, now it is in plant, so you see a
2 circle, otherwise you should see a pipe that made a
3 down -- down and go here and go here, making the line
4 of steam where the bypass from inside also conveyed.
5 So now --
6     Q.  I understand.
7     A.  -- if we complete this, we could make
8 here --
9     Q.  Actually --
10     A.  Sorry, sorry.
11     Q.  It's okay.
12     A.  I just was trying to help you.
13     Q.  No, no, I am trying to -- so keep it
14 separate.
15     A.  So we have bypass BP-1, BP-1, BP-2.
16     Q.  Got it.
17     A.  This arrives and this goes.  This way we
18 did could regulate -- we could make the choice,
19 convey as much steam as we needed here.  Because
20 please always consider that this plant was an
21 experiment, an experiment that I did not know if it
22 could have even worked when I started and this was
23 clear to everybody there.
24         It was clear to Di Giovanni and was clear
25 to Industrial Heat.  It was clear to everybody.  This

Page 138

1 was an experiment.  And so I put the things in a way
2 that I could have wheels in my hands.
3         The famous violin, I wanted to play any
4 cord, any possible cord to have any possible tuning.
5 So I could -- I could modulate the amount of steam
6 that I was sending inside this.  Why these pipes are
7 insulated while, for example, this area was designed
8 to cool down in some particular cases?
9         When I put insulating means I need heat.
10 So why I needed heat here?  Because inside here I had
11 the reactors.  I needed the heat here.  How much
12 heat, I did not know.  I did not know.  So basically
13 I have made so that I could regulate.
14     Q.  Can we be clear for the record, what you
15 were just talking about was Exhibit 11?
16     A.  Yes.
17     Q.  You are talking about the pipes we see in
18 Exhibit 11?
19     A.  Yes, sir.
20     Q.  Just doing it for the record.
21     A.  This one.
22     Q.  Understood.
23     A.  So regulating this bypass, because the
24 bypass as I -- which this kind of bypass is called --
25 in the jargon of this kind of technology it's called

Page 139

1 a butterfly.  Why butterfly?  Because it is like a
2 wing.  It is like a wing.
3         When you turn the wing in one sense it
4 closes the pipe.  You turn it 90 degrees in the
5 other -- you turn it clockwise, for example, it
6 becomes open.  You turn it counterclockwise, it
7 becomes closed.
8         Being a wing, it call it butterfly.  So
9 we had a butterfly here and butterfly here, so that
10 we could modulate the steam.  Why we foresaw a
11 powerful heat exchanger at the end?  Because I did
12 not know how much heat I was going to consume, but I
13 knew that I had to produce one megawatt power per
14 hour for the performance test, so at that point I
15 made that system.  And foreseeing that the excess
16 heat were going to be dumped in the -- dump heat in
17 our jargon means to cool down without work, just to
18 cool down.  And this is it.
19     Q.  And so the first bypass, what you have
20 labeled as BP-1 --
21     A.  Yeah.
22     Q.  -- it would take the heated fluid from the
23 pipe over to the exact same -- over to the same
24 piping that is -- that is bypassed -- that bypass 2
25 led into?

Page 140

1     A.  Yes.
2     Q.  Then from there they would run against
3 the far -- run against the wall to what I am calling
4 the back of the warehouse?  I don't know if you call
5 it the back or the front of the warehouse.  The part
6 of the warehouse where the second story was?
7     A.  Correct.
8     Q.  Okay.
9     A.  Sorry.
10     Q.  Who purchased the butterfly bypasses?
11     A.  No, we did it.  We did it.
12     Q.  You created it yourself?
13     A.  Yes, because it is just -- please
14 remember that I have very big experience in making
15 this kind of stuff because I started when I was 22
16 years old to make incinerators with heat recovery,
17 manufacturing them in my factory.  In fact, also
18 manufacturing using also my hands.
19         I had 20 years of experience in that
20 plant.  A butterfly valve can be easily made with
21 very few money.  It's just a pipe with a disk inside,
22 a shaft in the middle and outside a lever to maneuver
23 it counterclockwise or clockwise, and that is a
24 butterfly.
25     Q.  I understand.

35  (Pages 137 to 140)

Page 141

1   A.  If you buy a butterfly you spend $5,000.
2   If I make a butterfly for you it cost $100.
3   Q.  Understood.  You may have been kind of
4   using the royal plural, but you said we made the
5   butterfly pass.
6   A.  Yes.
7   Q.  Did you make it or did you make it with
8   somebody else?
9   A.  I needed the help of some contractor.
10   Q.  Do you know the name of that contractor?
11   A.  No, I don't remember because as I told
12   you in a former deposition of mine I don't remember
13   it's the first or the second, I used -- there was --
14   there were always around contractors in that area.
15   Also because under my direction it's easy
16   because it's just a matter of cutting and welding,
17   so.
18   Q.  Would you do any of the cutting and
19   welding?
20   A.  No, I did not cutting and welding with my
21   hands specifically.  I am able to but I did not.
22   Q.  Right.  I didn't think so.  So the
23   contractor was the person who did the cutting and
24   welding.  And the equipment used for the cutting and
25   welding, was that equipment that the contractor

Page 142

1   brought with him or her?
2   A.  The welder, yes, because we do not have a
3   welder.  For the cutting we have -- we have the tools
4   necessary to cut.
5   Q.  Aside from the bypass was there any --
6   was there any diverter pump that was used in
7   connection with the heat exchanger?
8   Was there any pump in let's say in the
9   J.M. Products container to push the heated fluid out?
10   A.  We had a recirculator.
11   A.  Yes, a recirculator.
12   A.  Which is a pump.
13   Q.  And who bought the recirculator?
14   A.  I bought it.  Leonardo bought it.
15   Q.  If I concentrate hard I can actually
16   write okay with my left hand now.
17   Where did you buy the recirculator?
18   A.  I don't remember.
19   Q.  Did you save any purchase receipts from
20   buying the recirculator?
21   A.  Can you repeat the question?
22   Q.  Did you save any receipts from buying the
23   recirculator?
24   A.  I don't take the accounting, so I am not
25   able to answer.  I did not take the accounting but

Page 143

1   yes, I should have it.
2   Q.  Okay.  In fact, when you say you should
3   have it, your accountant should have it?
4   A.  Yes.  Yes.
5   Q.  The heat exchanger on the J.M. Products
6   side, that was one that you designed?
7   A.  Can you kindly repeat?
8   A.  Yes.  The heat exchanger that you have
9   been drawing in these diagrams there on Exhibit 10,
10   and it doesn't show all the heat exchanger --
11   A.  Here I design nothing.
12   Q.  That's what I was going to ask you.  The
13   heat exchanger has pipes that carry -- that carry the
14   heated fluid from let's just say in the case of when
15   you are using bypass number 2, out of the J.M.
16   Products container --
17   A.  Yes.
18   Q.  -- up to the second story --
19   A.  Yes.
20   Q.  -- of the Doral warehouse --
21   A.  Yes.
22   Q.  -- and then the cooled fluid --
23   A.  Yes.
24   Q.  -- relatively speaking comes back?
25   A.  Yes.

Page 144

1   Q.  Who created that design?
2   A.  I did.
3   Q.  Okay.  And for that design you needed a
4   lot of pipe, correct?
5   MR. CHAIKEN:  Object to form.
6   THE WITNESS:  I don't know what you mean
7   by a lot.  I needed about 100 and something
8   meters of pipe.
9   BY MR. PACE:
10   Q.  Fair enough.  I was going to say over 100
11   meter of pipe?
12   A.  Over 100 meters of pipe.  A lot --
13   Q.  Relative concept, it depends on who you
14   are, right?
15   A.  100 meters is very small respect, you
16   know.
17   Q.  If you're building a skyscraper a hundred
18   meters is not very much.
19   A.  Correct.  Exactly.
20   Q.  So the heat exchanger that you designed
21   and built involved over a hundred meters worth of
22   pipe.
23   From where did you buy that hundred
24   meters worth of pipe?
25   A.  From Home Depot and from -- because there

R

36 (Pages 141 to 144)

Page 145

1   were two different kinds of pipes.  I bought them
2   from Home Depot and from a supplier I don't remember
3   the name of.  A supplier of steel pipes.  I don't
4   remember the name of him.
5         Was some -- it was a company in New
6   Jersey, if I were remember or something like that or
7   in Florida.  I don't remember, sir, but for sure I
8   have accounting of that.
9         Q.  And would that be accounting -- is that
10  J.M. -- were they bought -- was it bought by J.M.
11  Products or was it bought by Leonardo, the pipes?
12        A.  As far as I recall they have bought by
13  Leonardo along the compensation agreement that
14  Leonardo had with J.M.,.  But maybe, again, by
15  default it is Leonardo.
16        I don't remember particular situations
17  for which J.M. could have bought, but I think it was
18  Leonardo.
19        Q.  Okay.  And the --
20        A.  You know, when I prepared for this
21  deposition, attorney, I did not go to find for
22  distinction about this invoice, because for me it was
23  one bundle.
24        Q.  You didn't look for a distinction between
25  J.M. Products and Leonardo?

Page 146

1         A.  For what concerns who paid what, no,
2   because the compensation agreement, you know, by
3   default covered everything.
4         So what had not been paid -- what had not
5   been paid by J.M. automatically it was paid by
6   Leonardo and vice versa.
7         Q.  Just so I understand, Leonardo uses the
8   same accountant as J.M. Products, correct?
9         A.  Yes, it is correct.
10        Q.  So there is -- the parts for this heat
11  exchanger, there is a recirculator, there is over 100
12  meters of pipe.  Was it -- what inch pipe was it?
13        A.  Sorry?
14        Q.  What inch pipe was it?
15        A.  I do not understand the question.  Sorry.
16        Q.  What was the diameter of the pipe or the
17  type of pipe?
18        A.  The steam pipes were about -- the
19  diameter was 15 centimeters.  So 15 centimeters, it
20  is six inches.  (Speaking Italian) Yes, about six
21  inches the steam, and 16 inches.  And the water pipes
22  were of different -- depending on the position.
23        Q.  Let me -- I might have asked my question
24  poorly so let me try again or I am just not
25  understanding.

Page 147

1         The -- I'm asking about the pipes that
2   are outside of the J.M. Products container but they
3   are part of this heat exchanger.  The pipes that
4   carried the heated fluid were six inches in diameter?
5         A.  Please specify.  That carried the heated
6   fluid from where to where?
7         Q.  This is where I may be having a problem.
8         A.  Because the diameter changes.
9         Q.  How about the pipes that carried the
10  heated fluid out of the J.M. Products container to
11  the wall where the -- to the back wall and then up to
12  the second story, was that all the same diameter?
13        A.  Yes, six inches.
14        Q.  So those were -- that's six inch pipe?
15        A.  Yes, sir.
16        Q.  Now, once the -- those pipes connected --
17  that piping connected to pipes that were laid out on
18  the second floor, correct?
19        A.  Yes, yes.
20        Q.  What was the diameter of those pipes?
21        A.  Six inches.
22        Q.  Six inches.  The idea as the -- we'll get
23  to this in a second.  But as the heated fluid flows
24  through those pipes on the second story and there is
25  fans running, that it cools down, correct?

Page 148

1         A.  Can you repeat the question?
2         Q.  Yes.  So the heated fluid comes up to the
3   second story, it flows through pipes on the second
4   story, these six inch pipes you were just
5   describing.  Eventually it cools down, it
6   condenses, it cools down before it goes back to the
7   first floor, correct?
8         A.  Right.
9         Q.  The piping that is taking the cooled
10  fluid from the second story --
11        A.  Cooled fluid.
12        Q.  -- back down to the first story and back
13  down to the J.M. Products container, what's the
14  diameter of those pipes?
15        A.  That is the water pipes.
16        Q.  Yes.
17        A.  The water pipes had diameter maybe -- I
18  don't remember exactly, sir, but could be --
19  (Speaking Italian) could be between two and three
20  inches.  I don't remember if -- because there was --
21  there were tracks with two inches, tracks with three
22  inches and depends on the position, but more or less
23  this.
24        Q.  Okay.  The other -- another component for
25  this heat exchanger that you have described is that

37  (Pages 145 to 148)

Page 149

1  it has fans that were up on the second story,
2  correct?
3      A.  Yes.
4      Q.  Who purchased those fans?
5      A.  Leonardo Corporation.
6      Q.  From where?
7      A.  From -- from a company that makes fans.
8      Q.  Would there -- sorry.
9      A.  To give you the -- I can provide you the
10  names of the manufacturer or I can give it to you
11  now, if I can go to see my papers, as you refer.
12      Q.  You can look at your papers and I'm not
13  going to ask to otherwise see the papers.  Why don't
14  you take a look at it.  I am not going to claim
15  you have to mark that paper as an exhibit.  Look at
16  it, leave it there, come back.  Why don't we take a
17  real quick break.  People can grab some water, if
18  they want as well.
19          THE VIDEOGRAPHER:  We're off the record.
20  The time is 2:44 p.m.
21          (Thereupon a brief recess was taken,
22  after which the following proceedings were had.)
23          THE VIDEOGRAPHER:  We're back on the
24  record.  The time is 2:54 p.m.
25  BY MR. PACE:

Page 150

1      Q.  I'm sorry, Dr. Rossi, you had -- you took
2  a look at some notes to identify the model of the
3  fans that were used in the heat exchanger you have
4  been testifying about.  What was the model?
5      A.  No, the manufacturer is Multifan.
6      Q.  I'm sorry?
7      A.  M-U -- Multifan, M-U-L-T-I-F-A-N.
8      Q.  Multifan?
9      A.  Multifan.
10      Q.  And I forget if I asked you this
11  already.  Where did you buy the fans?
12      A.  From Multifan.
13      Q.  Directly, you bought it directly from --
14  Multifan is the manufacturer?
15      A.  Yes.
16      Q.  And you bought them directly from the
17  manufacturer?
18      A.  Yes.
19      Q.  Is it safe to say you don't recall
20  whether you bought them on behalf of Leonardo or J.M.
21  Products?
22      A.  Most likely Leonardo, but could be -- I
23  think Leonardo.
24      Q.  And you believe that your -- your
25  accountant would have the records of the purchase of

Page 151

1  those fans?
2      A.  Yes.
3      Q.  And how many fans did you buy?
4      A.  Two.
5      Q.  Do you still have those fans?
6      A.  They have been modified.  They have been
7  modified because I had used them for another purpose
8  now.
9      Q.  Without getting into the detail, can you
10  explain to me what the other purpose is of the fans?
11          MR. ARAN:  Objection to the extent --
12  BY MR. PACE:
13      Q.  What's the purpose you are using the
14  fans?
15      A.  Can you repeat?
16      Q.  Sure.  You just said that you still have
17  the fans but you are -- they have been modified
18  because you are using them for another purpose,
19  correct?
20      A.  Yes.
21      Q.  Are the fans being used in connection
22  with the container, the J.M. Products container?
23      A.  Yes, but for a completely different
24  purpose because the kind of technology we have there
25  is a completely different thing.

Page 152

1      Q.  How have the fans been modified?
2      A.  Can you repeat?
3      Q.  How have the fans been modified?
4      A.  I deem this confidential information
5  because the modification of those fans reenters in
6  this new technology.
7          So if you are more specific and ask me
8  something.  How have been modified is too generic to
9  answer.  Because I should have to explain things that
10  I deem not information to give to my competitor
11  and -- but --
12      Q.  Were the fans modified by somebody on
13  behalf of J.M. Products or somebody on behalf of
14  Leonardo Corporation?
15      A.  Leonardo Corporation.
16      Q.  Who made -- who modified the fans?
17      A.  I did.
18      Q.  To modify the fans did you have to
19  disassemble them?
20      A.  Yes.
21      Q.  Do they still operate as fans?
22      A.  Fan is a very generic -- anything that
23  moves a fluid -- anyway, yes.  I would say yes.
24      Q.  Are they still used to move air?
25      A.  Yes.

R

38  (Pages 149 to 152)

Page 153

1    Q.   Do they operate inside the container, the
2  J.M. Products container?
3    A.   Yes.
4        MR. ARAN:   Objection to form.
5  BY MR. PACE:
6    Q.   This heat exchanger that you have been
7  testifying about, when was it put into place at the
8  Doral warehouse?
9    A.   Kindly can you repeat?  I was distracted.
10    Q.   Okay.
11    A.   I was thinking to something.  Sorry, it's
12  my fault.
13    Q.   I believe you have already testified that
14  this heat exchanger about which you are testifying
15  was removed sometime between mid February and very
16  early April of 2016, correct?
17    A.   Correct.
18    Q.   All right.  When was it installed?
19    A.   It has been installed before the
20  beginning of the test.
21    Q.   If the test that you are describing was
22  in late February of 2015 --
23    A.   Correct.
24    Q.   -- can you tell me was it installed by
25  January of 2015?  Was it installed in mid --

Page 154

1    A.   I would say the end.  Has been made at
2  the very end, so I would say half February.
3    Q.   The middle of February 2015?
4    A.   Yes, just -- we completed it just before
5  the start-up of the plant.  Has been the last thing
6  we made.
7    Q.   And when you say we made, it was you and
8  independent contractors, correct?
9    A.   Yes.  As I told you during I think my
10  first deposition, I never say I.  I always say we.
11        It is also -- it is because I have been
12  told when I was a child never say I because it's a
13  concentric, et cetera.  Always we because everything
14  is merit of everybody, so I have this attitude.  I
15  tend to say always we.
16    Q.   That's why I'm asking.  When you say we,
17  I want to make sure that you are not referring to
18  just yourself, that there is somebody else involved.
19    A.   Yes.
20    Q.   So in this case to install the heat
21  exchanger how many people were involved?
22    A.   I don't remember.  Maybe one, two
23  because -- I don't remember exactly.
24    Q.   How long did it take to install the heat
25  exchanger?

R

Page 155

1    A.   15 days.
2    Q.   Okay.  If it was completed before the
3  test -- before the end of February when the test you
4  have described began --
5    A.   Yes.
6    Q.   -- you must have begun work on it by the
7  early part of February?
8    A.   Maybe, yes.  I believe makes sense.
9    Q.   Okay.  So 15 days for the installation,
10  approximately.
11    A.   Yeah.
12    Q.   How much were you paying the workers, if
13  you recall?
14    A.   I don't remember.  I absolutely don't
15  remember.
16    Q.   Did you pay them --
17    A.   You know, usually they were paid by the
18  day cash because that's how things go there.  And --
19  so I have not recall of this.
20    Q.   It sounds like you would be paying
21  several hundred dollars a day though to these workers
22  or are they less expensive than that?
23    A.   Might be, yes.  I would say yes.
24    Q.   And there is -- there is an element of
25  this bypass -- I'm sorry.  There is an element of

Page 156

1  this heat exchanger that you've described that we
2  have not addressed yet, which is the -- these pipes
3  that go up to the second floor are laid in kind
4  of a serpentine pattern on the second floor, a back
5  and forth pattern?
6    A.   Can you kindly rephrase?
7    Q.   Yes.
8    A.   Thank you.
9    Q.   For the heat exchanger that goes up --
10  the pipes that are on the second floor --
11    A.   Yes.
12    Q.   -- those are laid in kind of a serpentine
13  pattern, correct, a back and forth pattern?
14    A.   You know, the part of pipe that goes up
15  to the heat exchanger is just straight.
16    Q.   Right.  I am talking about the pipes that
17  are in the heat exchanger.
18    A.   That was confusing.  The pipe inside is a
19  serpentine, yes.
20    Q.   And those serpentine pipes were -- your
21  testimony has been that those serpentine pipes were
22  contained within a wooden -- some kind of wooden
23  enclosure?
24    A.   Yes, we made -- to make it very fast and
25  very cheap we made a wooden frame to sustain the

39  (Pages 153 to 156)

Page 157

1  serpentine and frame and the box even wooden, with a
2  particular technique that I learned in my past to
3  also to eliminate the acoustic energy and that's it.
4       Q.  Who built the wooden box?
5       A.  Carpenters.  Carpenters that I got,
6  contractors.
7       Q.  Same answer, which is these are people
8  who you don't have the names of any?
9       A.  The same people.  The same people.
10      Q.  You don't know their names?
11      A.  No, I don't.
12      Q.  And you paid them in cash?
13      A.  Yes.  Mostly, not always.  Some of them
14  has been -- has made -- because some contractor that
15  work with me in all the plant made invoice and I paid
16  by invoice.
17           Now I don't remember if the ones that
18  worked in the second floor, if among them there was
19  somebody.  No, I don't think so.  The ones that came
20  to work there were just people that were there around
21  with their trucks and I paid them cash.
22      Q.  Okay.  Where did you buy the wood for
23  this enclosure box?
24      A.  There was -- there is a shop that's Home
25  Depot part and some wood also from -- from a wood

Page 158

1  seller that is not far from our factory.  I don't
2  remember the name of it.
3       Q.  If you look at exhibit -- what we have
4  here marked as Exhibit 14 and these are photographs
5  that Dr. Wong took and submitted with his expert
6  report.
7       A.  Okay, yes.
8       Q.  Exhibit A-1 --
9       A.  Yes.
10      Q.  -- is the second story of the Doral
11  warehouse, correct?
12      A.  Yes, it is correct.
13      Q.  This is a picture that was taken sometime
14  this past month of February 2017?
15      A.  This photo has been taken by Dr. Wong
16  when he visited our plant.
17      Q.  And that was in February of -- February
18  of this year, correct?
19      A.  Yes.
20      Q.  All right.  The serpentine pipes would be
21  laid on the floor, this kind of concrete floor we see
22  here?
23      A.  Yes.  Yes, upon a frame of wood, yes.
24      Q.  That was one of the things I was going to
25  ask.  So the pipes were on top of a wood frame,

Page 159

1  correct?
2       A.  Yes, we have put kind of lumbers, upon
3  the lumbers the pipe, the steam pipes.
4       Q.  And then --
5       A.  So the steam pipes were not in contact
6  with the floor.
7       Q.  Understood.  And then the wood would
8  also -- this was a box, so it would actually also
9  cover up the steam pipes, correct?
10      A.  Yes, not in contact with them through the
11  frame because there had to be some distance between
12  the wood cover and pipes, and the steam pipes.
13      Q.  So how tall was the box?
14      A.  The tall was -- I get the dimensions.
15  The dimensions should be in the report.
16      Q.  Actually, I don't have Wong's.  You
17  provided the dimensions to Dr. Wong?
18      A.  Yes, I provided the dimensions to
19  Dr. Wong and more or less you make about one meter of
20  it, more or less.  One meter is three feet.
21      Q.  And then the -- were the fans -- were the
22  fans inside the box?
23      A.  The fans were outside the box blowing air
24  inside the box at a rate such that we had very
25  consistent exchange of air inside the box, inside the

Page 160

1  box, not to allow the air to heat up too much.
2       Q.  And the -- so the fans are drawing air
3  from outside --
4       A.  Yes.
5       Q.  -- into the second story of the Doral
6  warehouse and then they are going over these pipes,
7  if I understand how the system works, because the
8  pipes are warm, that air is getting warmed up and it
9  has to be circulated back out of the second story?
10      A.  Right.
11      Q.  And it circulates back out of the second
12  story through the windows?
13      A.  Yes.
14      Q.  So if you look at Exhibit A-1, when we
15  look on -- we can see light coming through two
16  openings here.  Are those both windows or am I
17  looking somehow at doors?
18      A.  No, are both windows.
19      Q.  Was the air being pushed out of both
20  those windows or just one?
21      A.  No, just one.  The one with the two guys
22  there because we were substituting the -- we were
23  making substitution of -- of the glasses there.  The
24  second one has been the window that we used.
25      Q.  Okay.  So A-2, is that the -- is it your

40  (Pages 157 to 160)

Page 161

1  testimony that's the window that was used to push the
2  air out?
3          A.  I think so, yes.
4          Q.  Okay.  And just so I understand --
5          A.  I think so.  Sorry to interrupt.  I think
6  so because, you know, I am not -- I don't remember
7  exactly looking out of that window, if this is the
8  panorama.
9              In any case, yes, I think so.  Because
10 this window is equal to another -- there are three
11 windows basically.  Yes, three windows there are and
12 we used for this purpose the central one.
13         Q.  So just so I understand that too, if you
14 are walking into J.M. Products there is a window
15 right above the door for J.M. Products?
16         A.  Sorry, I do not understand what you are
17 saying.
18         Q.  Sure.  When you walk into the J.M.
19 Products building, the side of the Doral warehouse,
20 there is a window above the door that you come in,
21 correct?
22         A.  Correct.  And that is -- yes, correct.
23         Q.  And then there is two -- if you are
24 facing the building, to your left there is another
25 set of second story windows?

Page 162

1          A.  Yeah.
2          Q.  And then if you keep going to your left
3  there is a third set of second story windows?
4          A.  Yes, correct.
5          Q.  And your testimony is it's that second
6  set of second story windows that was used?
7          A.  Yes, it is correct.
8          Q.  And the fan was -- the fans were pulling
9  air in through the bottom of that window and then the
10 air was being pushed out through the top of the
11 window?
12         A.  No.
13         Q.  Where were the fans?
14         A.  No, the fans were put at the opposite
15 side of box, pulling air inside the box, to allow the
16 air exit from the windows.
17         Q.  I see.  So the fans were -- the fans were
18 not in the windows, the fans were on the other side
19 of the box?
20         A.  Correct.
21         Q.  So was the door -- the door into that
22 second story, was that always kept open?
23         A.  Sorry, now I am not understanding your
24 English.
25         Q.  Sure.

Page 163

1          A.  The door has nothing to do with the
2  blowers and with the windows.
3          Q.  Was the --
4          A.  The door is in the opposite side but, you
5  know, this locale is pretty much big.  The door is at
6  the -- if you go inside -- this is the door.
7          Q.  I understand.  Uh-huh.
8          A.  Now I am inside.
9          Q.  Yes.
10         A.  At the left of the door there is the
11 wall -- the door is pretty close to the wall.
12         Q.  Uh-huh.
13         A.  At the right of the door there is a lot
14 of space.
15         Q.  I understand.
16         A.  There is a lot of space.  So the blower
17 were set in that space.  They blown the air inside
18 the box.  They blown about 50,000 cubic meters per
19 hour.  50,000 cubic meters per hour in the volume of
20 that box change it, with very high speed, the air
21 inside and the air exited from the window.
22             So it was just -- and the window, that's
23 it.  So the window was --
24         Q.  How was new air getting into the room?  I
25 am trying to understand.

Page 164

1          A.  The room was not tight.  The room had
2  this door open and --
3          Q.  That's what I was asking.  That's what I
4  was trying to understand.
5          A.  The room had this door open.  The local
6  was open.  We had vents also in the factory.  We
7  had --
8          Q.  You have answered my -- that's what I am
9  trying to understand.  I think my question was was
10 the door open or closed.  The door was normally open
11 so that air could come in also from like the
12 warehouse --
13         A.  Yes.
14         Q.  -- for the circulation?
15         A.  Yes.
16         Q.  Because the one window that is -- that
17 you are testifying has been removed, the glass was
18 removed so that the air could go --
19         A.  The glasses was removed.
20         Q.  The glass was removed.
21         A.  We could not remove the window because I
22 asked the permission to the landlord, because the
23 building is not of ours.  We were just renting it.
24             I asked the permission to eliminate the
25 window but making another secure, but they did not

41 (Pages 161 to 164)

Page 165

1   give us the permission to change the aesthetics so we
2   had to preserve the aesthetics.
3        Q.   Understood.
4        A.   So we left the same frame, et cetera.  So
5   from outside if you look toward the facade you did
6   not understand that we had made modifications there.
7        Q.   But through that window where the glass
8   was removed, there was a pretty amount -- by your
9   testimony there is a pretty good amount of air that
10  is going out of that window, correct?
11       A.   Yes, that's correct.
12       Q.   So there is not that much room for air to
13  be coming in from that window, it was mostly being
14  used to push air out?
15       A.   No, that window was to exhaust the air,
16  not to get the air.
17       Q.   So as that air is moving out, there is
18  other air has to move into the room?
19       A.   The air entered -- sorry.  Italian
20  typical error.  The air entered from all the air
21  inlet of the factory, that were many.
22       Q.   That's what I was trying to understand.
23  That's why I was asking you a question about the door
24  being open or closed.
25            If the door was closed it would have been

Page 166

1   harder for the air to enter from the rest of the
2   factory?
3        A.   No, the door was normally -- it had to be
4   normally open.  But also, you know, anyway, this room
5   in the second floor is not airtight.
6        Q.   Were the fans in the inside or outside of
7   the box?
8        A.   They were -- they were applied to the
9   side of the box.
10       Q.   Okay.
11       A.   In the opposite side of -- you think to a
12  box.
13       Q.   Before we start --
14       A.   This is my box.
15            MR. CHAIKEN:  That's correct, that one
16  too.
17            MR. PACE:  I'm thinking about it.
18            THE WITNESS:  This is the window, all
19  right.  This is the window.  And the fans were
20  here and here, right.
21  BY MR. PACE:
22       Q.   I am actually not going to mark that as
23  an exhibit because I think it's basic enough but I
24  understand what you're saying.
25       A.   Also because there are cookies and that

Page 167

1   would be a waste.
2            MR. CHAIKEN:  Got trademark issues
3   there.
4   BY MR. PACE:
5        Q.   I have limits.  I will make some of your
6   drawings exhibits but I not going to elevate a cookie
7   drawing.
8            Was there anything else in the second
9   floor, in the second floor room?
10       A.   No.
11       Q.   You have identified dates -- dates -- at
12  least approximate date for the exhibit that is Number
13  14.  I want you to go back, if you can, to -- and for
14  Exhibit 8.
15            Exhibit 8 you've told us is sometime
16  after the -- after the middle of February 2016.
17       A.   This is after -- this is after the
18  closing of the plant because there is not the pipe of
19  the steam.
20       Q.   So if you can look at Exhibits 11 --
21       A.   11.
22       Q.   Uh-huh.  And 12.
23       A.   Okay.
24       Q.   Can you tell me -- from looking at those
25  exhibits, can you give me an idea when those pictures

Page 168

1   were taken?
2            I guess I should start with did you take
3   those pictures?
4        A.   Do you want me to talk about that, are
5   you sure?  Because --
6        Q.   Did you take the pictures?
7        A.   I tell you when they have been taken but
8   you will not like it, attorney.  I advise you, you
9   will not be glad.
10       Q.   When were they taken?  There is a lot of
11  things that make me not glad nowadays.
12       A.   All right.
13       Q.   Let me ask, did you take these pictures?
14       A.   No.
15       Q.   When were the pictures taken?                    R, S, Arg.
16       A.   These pictures have been fraudulently
17  taken when -- fraudulently.
18       Q.   Fraudulently taken.
19       A.   Taken in the following occasion.
20       Q.   The following occasion.
21       A.   Just what a coincidence two or three days
22  before the end of the test so --
23       Q.   Mid February 2016?
24       A.   No, no, no.  Yes, February 2016.
25       Q.   Correct.

42 (Pages 165 to 168)

Page 169

1      A.  The test finished, let me assume the 17th
2   of February.  I am not sure but --
3      Q.  I think 16th, but okay.
4      A.  So four days before -- what a
5   coincidence, four day before, a guy that -- whose
6   name is Frederick Zoepfl, that for a very strange
7   coincidence works in 3D Phoenix that for another
8   strange coincidence --
9      Q.  I'm sorry, 3D?
10     A.  Phoenix, P-H-E-N-I-X.
11     Q.  Oh, Phoenix.
12     A.  Phoenix.
13     Q.  Sorry.
14     A.  Sorry.  Because it is Phoenix in Latin.
15   It's a famous Phoenix.
16         Which is another strange coincidence, the
17   company of engineer Murray, the well known senior,
18   senior, senior, senior engineer -- they say senior,
19   senior, senior in deposition, engineer of Industrial
20   Heat.
21         This Zoepfl made an extremely high energy
22   pressure on the health care office of Florida to come
23   immediately to stop the plant of Leonardo Corporation
24   in Doral because there were -- there was radioactive
25   reactions of course because we were emitting

Page 170

1   radioactive waves, et cetera, et cetera.
2         After this pressure of this Mr. Frederick
3   Zoepfl, all this is in the inventory -- no.  What is
4   this discovery.  All this is in the discovery, so I
5   am talking of documents that we have in the discovery
6   that we got, thanks to the documents that we got
7   during the discovery period.
8         So the health care office of Florida
9   pushed by Zoepfl came to us and came to us, without
10  obviously any pre-advice, also because Zoepfl wrote
11  to them you must go immediately because this plant
12  will close within four days.
13        So if you wanted to get Mr. Rossi with
14  the hands in the jam you must go immediately now and
15  see all the horrible things that he is doing.  They
16  came and we are talking of two days before the
17  arrival of the ERV to close the test.
18     Q.  Can I stop you for just one second?
19     A.  Yes.
20     Q.  They is the --
21     A.  The health care office.  The health care
22  office of the State of Florida.
23     Q.  Do you recall somebody named James
24  Stokes?
25     A.  James Stokes for sure.  James Stokes that

Page 171

1   you deposed, by the way.  James Stokes, and other two
2   guys with him that were of the financial office of
3   the State of Florida because Mr. Zoepfl had the
4   kindness to tell to the State of Florida that I not
5   only was dealing with radioactive materials, but also
6   that I was making a big commercial or financial
7   fraud, so they came also to see this enormous
8   financial fraud.
9         When they arrived they arrived with the
10  sole duty, they were allowed only control that I had
11  not radioactive material inside the factory I was the
12  director of and that I did not emit ionizing
13  radiations.  The ionizing radiations are the gamma
14  rays that are typically produced from radioactive
15  materials.
16        Now, we are not talking of LENR that can
17  also not have radioactive gamma rays, as the gamma
18  rays are thermalized, but we're talking of
19  radioactive material, so uranium, plutonium, this
20  kind of stuff.
21        Now, when they came I was not there
22  because they arrived around 11 a.m. on the 14th of
23  February.  If it was not the 14, was the 14 or the 13
24  but it was one or two days before the arrival of the
25  ERV to finish the one year performance test.

Page 172

1         When they arrived I was sleeping because,
2   you know, my turn of work is from 5 p.m. to 10:30
3   p.m. of the day after so during the night I had to
4   work and I slept during the morning.  I was
5   sleeping.
6         Fulvio Fabiani telephoned to me and say
7   Andrea, here we have the State of Florida that says
8   that they want to enter and make all the -- they say
9   we have radioactive materials here, that if I do not
10  let them in they call the police.
11        And I told him, no problem, let them come
12  and have fun, we do not have any radioactive
13  material, we never produced any kind of gamma rays
14  and let them come in and have fun.  So they entered
15  in the -- I was not there and they say -- but also
16  tell them I am arriving.  I had to make a shower to
17  dress.  I was in the bed.  I was sleeping.
18        And I -- where I live, which is 1331
19  Lincoln Road, blah, blah, is about 30 minutes of
20  driving from Doral, from the factory, so I needed 40,
21  60 minutes to arrive there.
22        So I said tell them that I am arriving in
23  one hour, but in the meantime let them in and let
24  them have all the fun they want, to make all their
25  measurements that they wanted to make.  I have

43  (Pages 169 to 172)

Page 173

1  nothing to hide, so let them go.  And tell them if
2  they want to talk with me, I will be there within one
3  hour.
4       Q.  So these pictures weren't taken by them?
5       A.  These pictures have been taken when they
6  entered in -- because after -- first of all, they
7  measured -- I have been told, because I was not
8  there.
9       I have been told from Fabiani, Barry West
10  that were there that first of all they controlled the
11  one megawatt plant.  They controlled the radiation.
12  They were equipped with very good instrumentation
13  because they are high -- highly -- highly -- highly
14  specialized in taking measurement of radiations and
15  they have seen that in the Leonardo area there were
16  absolutely no ionizing radiations, no presence of
17  radioactive material whatsoever and at that point
18  they asked to go inside the J.M. area.
19       Again Fabiani phoned to me and asked they
20  want to go to see also the plant of J.M. and I said
21  all right, let them go have fun.
22       Q.  So Fabiani brought them into the other
23  side?
24       A.  Fabiani accompanied at that point in
25  violation of the taxative order that I have given for

Page 174

1  Fabiani never to go inside J.M., but in that case I
2  was not there and I said yes, okay, call Reinaldo
3  there, ask him to open this door.
4       Q.  The container?
5       A.  This door.  No, this door because they
6  were here in Leonardo.
7       Q.  Got it.
8       A.  Through this door that was always closed,
9  locked from the inside, because so nobody could --
10  and Reinaldo opened the door and they entered in the
11  area and they wanted to go inside here.
12       Q.  Inside here, the black container?
13       A.  Yes, and I say please have fun.
14       Q.  Right.
15       A.  And we have taken off all the
16  cohibentation (phonetic) that is the front of the
17  container.
18       Q.  The insulation, the black insulation?
19       A.  Yes, exactly.
20       Q.  Mr. Breto had to remove the black
21  insulation?
22       A.  Yeah, insulation.
23       Q.  So somebody could access the container?
24       A.  Yes.  You know, this -- you see this is
25  the black face here.  The other end has the same

Page 175

1  black face because it's what you call insulation,
2  more cohibentation.
3       Q.  You are pointing to Exhibit 8?
4       A.  Yes.
5       Q.  That's the container in Exhibit 8.
6       A.  Basically they entered but they were
7  absolutely not authorized to take any photography
8  because they had to measure the radiations, not to
9  take photographs.
10       Q.  So did they take these pictures?
11       A.  They take -- yes, they have taken these
12  pictures and --
13       Q.  How did you get copies of them?
14       A.  Because you gave them to me.
15       Q.  No, you produced them in discovery.  Your
16  lawyers produced them in discovery.
17       A.  No, no, these photos have been produced
18  by you.  I bet with you $1,000 you will lose.  You
19  produced these, not me.
20       Q.  Andrea Rossi, I can show you that they
21  have been produced by your lawyers.
22       A.  Okay. If we have produced them it's
23  because we got them from you and you will have -- you
24  want to bet me $1,000?  You want to bet?  I will win.
25       Q.  It's probably not good for us to bet

Page 176

1  money, but I will bet you a thousand dollars.
2       A.  These photographies --
3       MR. CHAIKEN:  Put it on the record.
4  BY MR. PACE:
5       Q.  We got it on the record.
6       A.  Attorney, I swear.  I swear.
7       Q.  He's doing it.  I'm not doing it.
8       A.  I swear.  I swear.  I swear that these
9  photographies come from your --
10       Q.  From Industrial Heat?
11       A.  From Industrial Heat.
12       Q.  Or the people who were there on that day,
13  you're saying --
14       A.  These photographies come from Industrial
15  Heat.
16       Q.  Okay.
17       A.  And these photographies had not to be
18  made.  Has been made, not by Stokes because -- not by
19  Stokes.
20       I have been told from Fabiani that was
21  there that to take photographies, click, click,
22  click, were the other two guys that were together
23  with Stokes.
24       Q.  They took pictures?
25       A.  They took pictures.  And Fabiani told me

44  (Pages 173 to 176)

Page 177

1  they took pictures and I said all right, patience,
2  but in any case there are pictures in the office of
3  the health care office, they -- I suppose they will
4  have -- they will remain confidential, et cetera.
5      The first day -- attorney, the first day
6  when you came there together with the senior, senior,
7  senior engineer Joe Murray to make the last two days
8  of test, performance test, I think Murray told to my
9  attorney we have the photographies of inside the --
10 of inside the container and we know that inside the
11 container there is nothing.
12     My attorney came to me and said Andrea,
13 they said they had the photographies of inside and I
14 say how the heck they can -- so the only way they can
15 have these photographies is that -- obviously Zoepfl
16 had those photographies from the guys that he sent to
17 us and then gave them to Murray.  This is
18 speculation from me.
19     But honestly, I don't see any other
20 possibility through which they could have this
21 photographies.  This is why I asked you if you were
22 sure that I wanted to tell you.
23     Q.  No, I am happy.
24     A.  These photographies are --
25     Q.  Are you talking about Exhibit 8?

Page 178

1      A.  These photographies --
2      Q.  Dr. Rossi.
3      A.  I'm talking of exhibit --
4      Q.  Let's make sure the record is clear.
5      A.  -- 11 and 12.
6      Q.  You're kind of rambling on here a little
7  bit.
8      A.  These --
9      Q.  Exhibits 11 and 12?
10     A.  Yes.
11     Q.  Your testimony is -- hold on a second.
12 Your testimony is Exhibits 11 and 12 are pictures
13 that were taken by the people from the State of
14 Florida, the agents of the State of Florida?
15     A.  Yes.
16     Q.  And they were then provided to, you
17 believe, to Fred Zoepfl?
18     A.  Yes.
19     Q.  Who you believe then provided them to
20 Industrial Heat?
21     A.  Yes.
22     Q.  And you are convinced these are not
23 pictures that were taken by you or by somebody on
24 behalf of Leonardo Corporation?
25     A.  I swear on God that they are not.

Page 179

1      Q.  I understand.  And that your testimony is
2  that those pictures were not produced -- could not
3  have been produced by Leonardo Corporation?
4      A.  I am not saying this because maybe that
5  my attorney, John Annesser, had from you these
6  photographies, for you guys.  Not for you person, for
7  your guys.
8      Q.  I see.
9      A.  What I am swearing is that these photos
10 come from Industrial Heat.  Now, if they had been
11 produced in the litigation from you or from John
12 Annesser or from Brian Chaiken, I don't know, but
13 that is a technical issue related to the litigation.
14     But before the litigation these
15 photographies originated from the two guys that were
16 together with Stokes.  Stokes cannot be because he
17 had both hands engaged to make his measurements.  The
18 other two guys that had free hands were taking
19 photographies.
20     They made the photographies and the day
21 after these photographies were in possession of
22 Industrial Heat, as the senior, senior, senior
23 engineer Murray told to John Annesser.
24     Q.  And Dr. Rossi, you keep hitting Exhibit 8
25 there, but you're not trying to exclude Exhibit 8 in

Page 180

1  from theory, correct?
2      Your conspiracy theory doesn't involve
3  Exhibit 8, does it, right in front of you, Dr. Rossi?
4      A.  No.
5      Q.  How about let's stop --
6      A.  No, no.
7      Q.  How about this.  We will stop touching
8  that and we will make sure you limit yourself --
9      A.  I'm talking about exhibits --
10     Q.  Right there.  They have the numbers on
11 them.
12     A.  I'm talking about Exhibits 12, 11 and
13 there is another.  Three photos you have --
14     Q.  That has been provided to you?
15     A.  -- that was fraudulent.  No, this is all
16 good.  This is legitimate.
17     Q.  Dr. Rossi, stop.  You just said three.
18 Find me the third.  Come on.
19     A.  It has been produced.  Has been given to
20 you during a deposition of mine.
21     Q.  It was given to you.  So you are not
22 saying you saw it today?
23     A.  Not today.
24     Q.  You are saying there is a third one?
25     A.  No, sir.  No, sir.

45 (Pages 177 to 180)

**Veritext Florida Reporting Co.**

800-726-7007                                                      305-376-8800

Page 181

```
1        Q.  I will find the third one so I can put it
2    in front of you.
3        A.  Okay.
4        Q.  So your testimony is by looking at these
5    pictures though you can tell they were taken on the
6    day before or the day that -- wait, don't shake your
7    hand.
8        A.  One day or two.
9        Q.  They were taken the day that James Stokes
10   was at the JMP location, the J.M. Products location?
11       A.  This is correct and absolutely true.
12       Q.  And that's exactly the way that they
13   looked on that day?
14       A.  Exactly.  Yes, sure.  Of course.
15       Q.  And explain for me, there is -- you did
16   say that there is an area in between Exhibit 11 and
17   Exhibit 12, correct --
18       A.  Yes --
19       Q.  -- in that container?
20       A.  it is correct, sir.
21       Q.  How big is that bypass?
22       A.  The bypass was outside.
23       Q.  Well, but something -- wasn't there a
24   bypass inside that you said you could redirect the
25   heated fluid out of the container?
```

Page 182

```
1        A.  The bypass -- yes, sir.  The bypass was
2    in the side of the container behind the pipes.  You
3    know, let us now pretend that the bypass was here,
4    okay.
5            Let us pretend to make it easier.
6    Because between here and here there is a block that
7    is equal to this basically.  So you just imagine that
8    this -- after this frame -- after this wood frame we
9    had another section equal to this, okay.
10           MR. ARAN:  Pointing to the exhibit.
11   BY MR. PACE:
12       Q.  Understood.  Equal to the piping we see
13   here.  I understand.
14       A.  Just to show.  So imagine that between
15   this and this there is a block that is just the twin
16   of this.
17       Q.  Okay.
18       A.  So now let us pretend to make me easier
19   to explain to you.  Let us pretend that this is this,
20   okay, that now we are in the hidden block from --
21       Q.  Understood.
22       A.  -- your two photos.
23       Q.  Between Exhibits 11 and 12?
24       A.  Yes, because the guy did not make a good
25   job.  He could have made a better job.  Just that he
```

Page 183

```
1    made all this photo, had to photograph also this
2    part.  The senior, senior engineer should complain.
3    Now, assume this --
4        Q.  No, you're entertaining me.  Just explain
5    to me where the hole is.
6        A.  Here.
7        Q.  Or where the valve is.
8        A.  It's behind this.
9        Q.  How big would it be?
10       A.  Between this and the steel wall.
11       Q.  And how large would it be?
12       A.  It could be say --
13       Q.  It's got to carry --
14       A.  As much large as one pipe.  But -- some
15   more.  Could be say six inches --
16       Q.  Six inches in diameter?
17       A.  -- time ten inches, something like that.
18       Q.  So the bypass would be a six inch
19   diameter pipe?
20       A.  Six -- no, the pipe is smaller.
21       Q.  The pipe is smaller, okay.
22       A.  The pipe is smaller here.  It's not six
23   inches.  The pipe is not six inches.  If this is six
24   inches with the insulation.  The pipe inside here, if
25   I remember well, it's this basically.  It's this.
```

Page 184

```
1        Q.  Three inch pipe?
2        A.  I think it's three inch, yes.
3        Q.  So the bypass, it's a three inch pipe and
4    then --
5        A.  It's three, but in effect it's not
6    three.  It's six, because you must give space.  You
7    must leave a little bit of play.
8            So the opening, let me call it the window
9    of the bypass.  The clearance, clearance of the
10   bypass, could be six inches time ten inches.
11       Q.  But the pipe is a three inch pipe that is
12   then -- that the bypass is this valve -- is the
13   butterfly valve that you described before?
14       A.  Yes, and the butterfly was out.  So here
15   you have just the pipe that goes out, the pipe
16   that -- the bypass is out.
17       Q.  The Y part of the bypass takes it
18   outside?
19       A.  Yes.
20       Q.  And then there is next to it the pipe
21   that comes back in?
22       A.  Yes.
23       Q.  So there is two pipes.  So the whole
24   one --
25       A.  No, sir, wait a moment.  The pipe that
```

46 (Pages 181 to 184)

Page 185

1  comes in is the water that is another issue.  The
2  water enters from -- entered from a lower clearance.
3  You must not -- you must distinguish.
4      Q.  I understand.
5      A.  Here we're talking of the bypass that
6  can -- that can send the -- steam outside or that
7  can send the steam inside.  Then you have the
8  condensed water that reenters.
9      Q.  And the condensed water that reenters, I
10  think you already testified at least as to Exhibit
11  12, after it's already come back into the container,
12  it's coming through the white -- the pipe --
13      A.  Yes.
14      Q.  -- that is white with the tan tape on it?
15      A.  Yes.
16      Q.  Okay.  So it's coming in around the
17  middle point of the container?
18      A.  Yes.
19      Q.  So when these pipes are -- what you have
20  claimed, when these pipes are carrying steam through
21  them, then the -- the heated fluid exits the
22  container several feet off the ground where that
23  white pipe is?
24      A.  Sir, the heated -- the heated fluid
25  arrives from Leonardo, okay.

Page 186

1      Q.  Right.
2      A.  Let me just -- sorry, you did not
3  complete.  Sir, I am making the usual mistake.  Serve
4  the question, please, okay.
5      Q.  Let me -- we will do this again.
6      A.  Sorry, but --
7      Q.  No, no, it's fine.
8      A.  -- I was taken in the -- you know.
9      Q.  We're going to come back.
10      A.  When I get in the fire in the discussion.
11      Q.  We're going to come back to the
12  conspiracy theory in just a little bit.  Let me just
13  kind of go through here.
14          You testified earlier that from Exhibit
15  11 we see some pipes with insulation, that the heated
16  fluid -- you're saying there is steam.  Steam would
17  be traveling through the insulated pipes in Exhibit
18  11 and then exiting the container, so it could go up
19  to your heat exchanger, correct?
20          MR. ARAN:  Objection to form.
21          THE WITNESS:  Once the steam has made the
22  work here, here the steam works.
23  BY MR. PACE:
24      Q.  Once it's done that.
25      A.  This is why it is insulated, otherwise we

Page 187

1  have to leave it naked.
2      Q.  So once it has done that --
3      A.  After that since -- I repeat, that was an
4  experiment.
5      Q.  I understand.
6      A.  I did not know how much if the reaction
7  inside here would have eaten.  And so I said maybe I
8  will have excessive heat going out.
9      Q.  Right, so you needed a heat exchanger.
10      A.  At that point I have a bypass.  What does
11  the bypass?  Either --
12      Q.  Before you get into the bypass let me
13  just ask.  I am just trying to understand kind of
14  from a dimension standpoint.
15          You have pointed to the pipe that's got
16  the white insulation covering it, correct?
17      A.  Yes.
18      Q.  The bypass is at that level of a
19  container?
20      A.  Yes.
21      Q.  That's not the very top pipe, it's not
22  the very bottom pipe.  I am saying it's roughly the
23  middle.  I know it's not quite the middle but several
24  feet up off the ground.
25      A.  Yes.

Page 188

1      Q.  The heated fluid that came through that
2  white pipe would then go to your bypass and into your
3  heat exchanger?
4      A.  Yes, correct.  Correct.
5      Q.  Then when --
6      A.  Otherwise --
7      Q.  Dr. Rossi, if I can.  I know there is an
8  explanation.  I am just trying to get a clean record
9  here.
10      A.  Okay.
11      Q.  Then the cooled fluid that would come
12  back would come back into the container at around the
13  level of what we see in Exhibit 12, the white piping
14  in the middle?
15      A.  Yeah.
16      Q.  Correct?
17      A.  Correct.
18      Q.  Now, that white piping in the middle
19  looks to me to be about the same height, maybe it's
20  not and you'll tell me, as the white insulated pipe
21  on Exhibit 11; is that incorrect?
22      A.  Can you repeat the question?
23      Q.  Yes.  If you look at the white -- the
24  pipe covered in white insulation on Exhibit 12 --
25      A.  Yes.

47  (Pages 185 to 188)

Page 189

1    Q. -- and the pipe covered in white
2  insulation in Exhibit 11, they look to me to be at
3  about the same height within the box, so that would
4  mean the bypass would take the heat -- the heated
5  fluid out and would bring back the cooled fluid in at
6  around the same level of the box, but that might not
7  be accurate.
8         Let me try to explain this a different
9  way. If -- I'm not saying this is accurate. I am
10  just saying if the white insulated pipe you see in
11  Exhibit 11, let's just assume for these purposes that
12  that was four feet high.
13    A. Yes.
14    Q. It looks to me like the pipe in Exhibit
15  12 would have been the same four feet high, in other
16  words they would have been on the same level.
17         So since the white insulated pipe on
18  Exhibit 11 would have the heated fluid coming through
19  it and the white insulated pipe on Exhibit 12 would
20  have the cooled fluid coming through it, it seems to
21  me to suggest that your heat exchanger brought the
22  heated fluid out of the container and brought the
23  cooled fluid back into the container around the same
24  level. Is that accurate or not?
25    A. More or less, yes.

Page 190

1    Q. Okay. That's all I was trying to
2  understand from there.
3    A. Yes.
4    Q. So the opening in the container on the
5  side was big enough to have both the three inch or
6  six inch pipe?
7    A. No, because it is not -- no, because the
8  water reentered before, not at the same length of the
9  container.
10    Q. I see.
11    A. The opening -- the opening to allow the
12  steam out was in this -- in this area, between this
13  and this, you know, was in the blind side that the
14  friend of Industrial Heat forgot to photograph.
15         But -- sorry, I wanted to say --
16    Q. You can keep going. Your theory is your
17  theory. I'm okay with it.
18    A. It was fraudulent. But -- but the water
19  reentered in this side of the plant, okay. So they
20  were displaced.
21    Q. Okay.
22    A. They were not piled up.
23    Q. If you can do me a favor. We have got
24  Exhibit 10. I am going to actually give you a chance
25  to draw a little bit more.

Page 191

1    A. Exhibit 10.
2    Q. Right there, it's in your hand. It's in
3  your hand, Dr. Rossi. No, no, hand.
4    A. Here, sorry.
5    Q. So Exhibit 10, if you take your pen.
6    A. Yes.
7    Q. Do me a favor, draw -- on the line that
8  you put in there, put just a couple of arrows, so it
9  shows the direction that that line is flowing.
10    A. Can you repeat?
11    Q. Yes. You have drawn a line in there that
12  represents the heat exchanger, the pipe carrying the
13  heated fluid out of the container.
14    A. Yes.
15    Q. Draw some directional arrows so it shows
16  the direction the fluid is in that pipe. Okay.
17         Now, draw me the pipe that is bringing
18  the cooled fluid back and where it enters into the
19  container.
20    A. Could be interesting to have another
21  color of pen. Is that a red pen?
22    Q. No, but I can get you one.
23    A. If you give me another color it becomes
24  easier. Are you going to sell these drawings?
25    Q. I don't know. We'll make images of them

Page 192

1  and we'll see if we can sell them.
2    A. After this upgrading from scratch to
3  deposition exhibit they could become something to go
4  in auction in Sotheby's or something.
5    Q. Here we go. There is a red one.
6    A. So we have approximately -- this is a
7  scheme. It's not a design. We have the water.
8         As a matter of fact the hot should be red
9  and the cold should be --
10    Q. Yeah, but we're --
11    A. This is creative. This adds value under
12  a numismatic point of view. So the water reenters
13  and reenters in this position.
14    Q. Understood. So the red line reflects the
15  piping from your heat exchanger that came back into
16  the box?
17    A. The small pipe of water coming back and
18  this is the big pipe of steam coming up.
19    Q. And then if we're looking back at Exhibit
20  12 or, I'm sorry, Exhibit 11 --
21    A. Yes, in this area.
22    Q. -- would it come before this area or would
23  it come between the door and where the pipes start?
24    A. It becomes -- no, no, no, no. It was
25  annexed directly in the piping so it entered in this

48  (Pages 189 to 192)

Page 193

1   area.
2       Q.   Okay.  It enters right directly into the
3   piping from the side of the container?
4       A.   Yes.
5       Q.   So there was a hole in the container for
6   the pipe to flow out?
7       A.   Correct.
8       Q.   And there was a hole in the container for
9   another pipe to come back in?
10      A.   Yes.
11      Q.   All right.
12           MR. CHAIKEN:  Can we take a short break
13   at some point if you're done with this line of
14   questioning?
15           MR. PACE:  Sure.  Yeah, why don't we take
16   a break now.
17           MR. CHAIKEN:  Thank you.
18           THE VIDEOGRAPHER:  We're off the record.
19   The time is 3:47 p.m.
20           (Thereupon a brief recess was taken,
21   after which the following proceedings were had.)
22           THE VIDEOGRAPHER:  We're back on the
23   record.  The time is 4:00 p.m.
24           (The document referred to was thereupon
25   marked Deposition Exhibit 16 for Identification, a

Page 194

1   copy of which is attached hereto.)
2   BY MR. PACE:
3       Q.   Dr. Rossi, I am going to mark here as
4   Exhibit 16.  Is this the -- a picture of the section
5   between Exhibit 11 and 12?
6       A.   Yes.  This is a piece, yes.  Yes, this is
7   the piece.  Let me -- yes, this is a piece of it.
8       Q.   Does this appear to be part of the same
9   series then as Exhibit 11 and 12 and taken at the
10  same time?
11      A.   Yes, this is a piece of it.
12      Q.   And -- but just so I am clear, Exhibit 16
13  is -- does not show the bypass that is in the
14  container?
15      A.   No, the bypass -- you can't see the
16  bypass because it's behind the pipes.
17      Q.   So the bypass is behind the pipes --
18      A.   It's behind the pipes.
19      Q.   -- you wouldn't see it through this
20  picture?
21      A.   It is hidden.
22      Q.   It's hidden.  So the bypass isn't
23  reflected, you can't see the bypass in Exhibit 16
24  either?
25      A.   No, you cannot see it, no.

Page 195

1       Q.   And --
2       A.   This was the missing -- the missing one,
3   yes.
4       Q.   This is the missing one.  So the
5   continuation -- you can actually even tell it from
6   the little tape hanging down on Exhibit 12.  Exhibit
7   11 goes to Exhibit 16, goes to Exhibit 12 and in fact
8   you can tell if you look at the tape --
9       A.   Yes, yes.
10      Q.   -- on Exhibit 12 to the left-hand side is
11  hanging down there, it's the exact same type hanging
12  down on the right-hand side on Exhibit 16, correct?
13      A.   Yes.
14      Q.   All right.  I told you I would find the
15  picture for you.  And this is -- your theory all of
16  these pictures had to have been taken by one of the
17  officials from the Florida agencies that were at the
18  Doral warehouse sometime around but before February
19  16 and 17?
20      A.   Attorney, inside this container only and
21  exclusivity two person were authorized to go.  These
22  two persons were me and Jim Bass.
23           No other person was allowed inside here.
24  And I am 100 percent -- and the only other persons
25  that entered inside this container have been the

Page 196

1   three guys of the health care office on the day that
2   they made the well known visit to us that you know
3   very well because you have deposed Mr. Stokes.
4           Therefore -- also Fabiani did not enter
5   because I asked to Fabiani, "Did you enter in the
6   container?"  He said, "No, I stayed out," but because
7   I asked did you take photos, et cetera.
8           He said no, but the photos have been
9   taken by the two guys that were together with Stokes,
10  because Stokes was making the measurements and the
11  other -- of the two guys, one of the two guys, I must
12  say -- I have been told one of the other two guys is
13  going inside to take pictures.
14      Q.   And who told you that?
15      A.   Fabiani.
16      Q.   Fabiani?
17      A.   Fabiani because he was there.  He was
18  outside the -- he is the man that has lead the three
19  officers of the health care office inside the J.M.
20  area and then he conducted them to the head, where
21  there was the entrance that we can see in the Exhibit
22  11, the entrance.
23           So that if I remember well, they asked
24  the two worker to Reinaldo to take off the
25  cohibentation, the -- sorry, the insulation, to be

49 (Pages 193 to 196)

Page 197

1  more clear, and allow them in obviously to take the
2  measurements of the radiations, to control that
3  inside there was no -- because the theory of Zoepfl
4  is I had hidden some plutonium or uranium somewhere
5  in the circuit.
6      Q.  I'm sorry, you said plutonium or what?
7      A.  Uranium.
8      Q.  Uranium.
9      A.  Uranium.
10     Q.  Got it.
11     A.  Uranium or something radioactive to heat
12  up the water.
13     Q.  I don't think I've asked this already but
14  let me ask.
15     Fulvio Fabiani in 2000 and -- just during
16  the time period that the Doral plant was being
17  operated, let's say very late 2014 through early
18  2016, did either J.M. Products or Leonardo pay Fulvio
19  Fabiani or US Quantum Leap or was he only paid by
20  Industrial Heat?
21     A.  Can you kindly repeat your question,
22  sir?
23     Q.  I can.
24     A.  I did not get all the English.
25     Q.  Let me -- I probably made it too long.

Page 198

1  From the time that the E-Cat plant arrived in Doral
2  to present has J.M. Products or Leonardo paid money
3  to either Fulvio Fabiani directly or to US Quantum
4  Leap?
5      A.  J.M. for sure not.  About Leonardo
6  Corporation, honestly I do not remember.  I do not
7  remember.  Maybe -- maybe yes, maybe no, because I am
8  not able to collocate in time because Leonardo
9  Corporation has paid Fabiani, because Fabiani gave to
10  Leonardo Corporation much of consulting.
11     Now I am not able to tell you if the --
12  if the payments -- payments have been made to him
13  also after the -- after the Industrial Heat
14  connection.  Maybe yes.  I don't remember.
15     Maybe yes, because he continued to give
16  to Leonardo Corporation consulting for the -- for
17  example, for the robotization.  I am not -- I am
18  not -- I do not remember.  It is possible, but I do
19  not remember.
20     Q.  So no as to J.M. Products, possible as to
21  Leonardo?
22     A.  J.M. Products, surely not.
23     Q.  And just so we were clear, because I
24  think you may have covered a broader time period than
25  I intended.  The starting point I asked for was when

Page 199

1  the E-Cat plant arrived in Doral, which would have
2  been in late 2014.
3      A.  Yes.
4      Q.  Does that change your answer as to
5  Leonardo?  Are you still maybe, maybe not?
6      A.  (Nods head.)
7      Q.  Okay. Just you had made a reference to
8  North Carolina.  That's why I was trying to
9  understand.
10     A.  Let me give you some more.  Should it be
11  I would not be surprised, but because it is not
12  impossible.  But I don't specifically remember but it
13  is not impossible because he continued to give to me
14  consulting.
15     Q.  As to J.M. Products though, J.M. Products
16  has not made any payments to Fabiani or US Quantum
17  Leap and J.M. Products has not had any agreements
18  with Fabiani or US Quantum Leap?
19     MR. CHAIKEN:  Object to form.
20     MR. ARAN:  Object to form.
21  BY MR. PACE:
22     Q.  Let me start over again.  That was a long
23  question and these people are getting annoying.
24     MR. ARAN:  Two.
25     MR. PACE:  It was seven questions,

Page 200

1  actually.  You missed five of them.
2      MR. CHAIKEN:  That's true.
3  BY MR. PACE:
4      Q.  What you just testified is that J.M.
5  Products has not made any payments to Fabiani or US
6  Quantum Leap, correct?
7      A.  Yes.
8      Q.  Is it also true that J.M. Products has
9  not had any agreements with either Fabiani or US
10  Quantum Leap?
11     A.  It is true.  You know, sir, not that I am
12  aware of.  I don't know if behind me and without my
13  knowledge there has been some agreement.  I don't
14  think so.  I don't know and I don't think so.
15     Q.  One of the reasons I asked is you are
16  familiar with these -- with the work that was done
17  with the BeagleBone processor and the Banana Pro
18  processor, these documents we looked at before,
19  correct?
20     A.  Yes.
21     Q.  These are all --
22     A.  Familiar, it depends what you mean by
23  familiar.
24     Q.  Let me define that.  I'm not saying
25  you're familiar with the electronics behind it.

Page 201

1    A.  Exactly.

2    Q.  I am just saying you are aware that
3  Fulvio Fabiani and Jim Bass were working together on
4  a project that involved a control system?

5        MR. ARAN:  Objection.

6        THE WITNESS:  Yes, because I did direct
7  them to do it.

8  BY MR. PACE:

9    Q.  And my only -- the thing I was trying to
10  understand is, if I understood the earlier testimony,
11  at one point that was a project being done for J.M.
12  Products and then later became a project being done
13  for Leonardo.  Is that accurate or inaccurate?

14    A.  This is accurate.

15    Q.  Okay.  While that project was being done
16  for J.M. Products, J.M. Products was not paying
17  Fulvio Fabiani or US Quantum Leap for the work on
18  that project?

19    A.  No.

20    Q.  Okay.  That's what I was trying to
21  understand.  I think you referenced -- I'm sure you
22  have identified this in a prior exhibit, but since
23  we are here as a representative of J.M. Products,
24  let me make sure.

25    A.  Thank you.

Page 202

1        (The document referred to was thereupon
2  marked Deposition Exhibit 17 for Identification, a
3  copy of which is attached hereto.)

4  BY MR. PACE:

5    Q.  That is the -- that is the agreement you
6  have referenced before about the compensation
7  agreement between J.M. Products and Leonardo
8  Corporation, correct?

9    A.  Yes.

10    Q.  And this is signed by Henry Johnson for
11  J.M. Products and by you for Leonardo?

12    A.  Correct.

13    Q.  All right.  I just wanted to make sure we
14  got that kind of clear on the record, so that was
15  17.  Exhibit 17.

16        (The document referred to was thereupon
17  marked Deposition Exhibit 18 for Identification, a
18  copy of which is attached hereto.)

19  BY MR. PACE:

20    Q.  I have marked here as Exhibit 18.

21    A.  Yes, I know what is this.

22    Q.  In connection with -- in connection with
23  Industrial Heat entering the term sheet with J.M.
24  Products or J.M. Chemical Products, Industrial Heat
25  asked J.M. Chemical products to complete this form

Page 203

1  that is marked as Exhibit 18, correct?

2    A.  Yes.

3    Q.  And this was completed by Henry Johnson
4  as the president of J.M. Chemical products?

5        MR. ARAN:  Objection, form.

6        THE WITNESS:  I am reading that, yes.

7  BY MR. PACE:

8    Q.  Do you recognize that as Henry Johnson's
9  signature?

10    A.  Honest --

11    Q.  If you don't recognize it, you don't.

12    A.  Yeah, but I have no doubt -- I don't
13  recognize it because I am not familiar with his
14  signature.

15    Q.  Okay.

16    A.  But I am pretty sure that this has been
17  signed by him.

18    Q.  Okay.  And the J.M. Chemical Products is
19  what today is known as J.M. Products, correct?

20    A.  Yes, it is correct.

21    Q.  One statement in here is that JMC, which
22  is short for J.M. Chemical Products, is owned by an
23  entity formed in the United Kingdom.  That's not --
24  that's not, in fact, accurate, correct?

25    A.  No, it is not accurate.  May I explain?

Page 204

1    Q.  Yes.

2    A.  Okay.  From the beginning Di Giovanni
3  told us that he was going to make for this business a
4  partnership that would end up -- that would end up
5  with a UK entity and this remained -- and this
6  remained through various documents that follow it up
7  and at the end Di Giovanni did not -- did not make an
8  agreement with those people -- with those people and
9  remained this -- this thing that eventually turned
10  out not to have been made and it remained -- it
11  remained --

12    Q.  It remained?  Finish.

13    A.  It remained.

14    Q.  Owned by Platinum American Trust?

15    A.  American Trust, whose beneficiary is an
16  Italian.

17        So what was foreseen, also for me, also
18  from me, I had understood that the beneficiary would
19  become eventually a UK entity and that -- the
20  beneficiaries of Di Giovanni was provisional.

21    Q.  So at the time this was signed J.M.
22  Chemical products was owned by Platinum American
23  Trust, correct?

24    A.  At the time this has been -- what is the
25  time this has been signed, please?

51 (Pages 201 to 204)

**Veritext Florida Reporting Co.**



Page 205

Q. August -- the middle of August 2013 -- 2014. The middle of August 2014.
A. So the Platinum Trust had already been made, am I correct?
Q. Correct.
A. Yes. So yes, when it has been signed still there was the conviction from all that Di Giovanni was going to eventually merge in a UK entity.
Q. So let me type out the date this was signed.
So on the day this was signed J.M. Chemical Products was owned by Platinum American Trust, correct?
A. Correct.
Q. On the day this was signed the sole owner of Platinum -- the sole beneficiary of Platinum American Trust was Giovanni, correct?
A. Correct.
Q. And Giovanni was an Italian human being, not a United Kingdom entity?
A. Yes, it is correct.
Q. Okay.
A. But Di Giovanni --
Q. Let me just --

Page 206

A. Sorry.
Q. Let me do this by steps.
A. Sure.
Q. But your testimony is what you understood was that Di Giovanni was looking to transfer his beneficial interest in the trust to a UK entity, correct?
A. Yes, it is correct.
Q. And you say that -- and you have said that there are documents that reflect that this transaction was being contemplated, correct?
MR. CHAIKEN: Object to form.
THE WITNESS: I did not understand this.
BY MR. PACE:
Q. I thought I heard you make a reference that there are documents that reflect that Di Giovanni was -- was contemplating selling his beneficial ownership to a UK entity.
MR. CHAIKEN: Object to form.
THE WITNESS: No, sir, I did not say that.
BY MR. PACE:
Q. Okay. I misunderstood.
A. Di Giovanni told to us that --
Q. He told that to you?

Page 207

A. Di Giovanni told to me and to the attorney Johnson this.
Q. So that's all -- there is no documents that reflect it, it's just oral communications?
A. Not that I am aware of.
Q. Understood. And do you know the -- the supposed entity, the UK entity to which Di Giovanni was having some kind of communications?
A. Can you kindly repeat?
Q. Sure. You have said that orally Di Giovanni told you that he was having discussions with selling his beneficial interest in J.M. Products to a UK entity.
A. No, he told me that he was going to make a partnership with a UK entity.
Q. Make a partnership. Did he tell you the UK entity? Did he identify it for you?
A. Sorry?
Q. Did he identify the UK entity for you?
A. No.
Q. Did you ever ask him?
A. No, it was not my business.
Q. I'm sorry, I don't know if I've ever asked this before. How did you first meet Di Giovanni?

Page 208

A. You asked me before in the first deposition.
Q. I did. The first one. I am just getting forgetful in my old age.
A. No problem. I knew him in Italy initially when I was working, pretty much notoriously, in the field to make fuel from waste and that's how I knew him because he was in contact with some fertilizer production company and he was interested to that, et cetera and is borne from that -- if you want a friendship, and that's it. Then he followed all -- all the follow-up of my profession when he knew it.
Q. So --
A. Sorry.
Q. So he was originally -- you originally met him as a potential business partner?
A. Yes, sir.
Q. And --
A. I would not say potential business partner. As a customer. As a potential -- as a person that could -- that had the necessary acquaintances to allow us to make important plans.
Q. Okay. And then is the first -- is the first transaction you have done with him J.M.

Page 209

1 Products?
2     MR. CHAIKEN:  Object to form.
3 BY MR. PACE:
4     Q.  Let me rephrase that.  You said that he
5 was a potential customer for this other business
6 which made me think he never became an actual
7 customer.
8         Have you done any transactions with
9 Di Giovanni prior to him becoming the beneficiary of
10 the Platinum American Trust, that in turn owned J.M.
11 Products?
12     A.  No.
13     Q.  There was testimony earlier in a prior
14 deposition, I think even your testimony, as well as
15 Jim Bass, that there was a -- on the J.M. Products
16 side of the Doral warehouse there was a flow meter.
17 Is that correct?
18     A.  Yes, it's correct.
19         THE VIDEOGRAPHER:  Counsel, your
20 microphone, please.
21 BY MR. PACE:
22     Q.  I'm sorry.  I'm sorry.  Let me do that
23 again.
24         There has been testimony previously that
25 on the J.M. Products side of the Doral warehouse

Page 210

1 there was a flow meter on the pipe that took the
2 water from the J.M. Products container back to the
3 Leonardo side of the warehouse, correct?
4     A.  Yes, it is correct.
5     Q.  All right.  Do you know the model of that
6 flow meter?
7     A.  You know, it is an old flow meter.  I
8 have looked at it because you have put this fact in
9 the paper related to my deposition of today and there
10 is written M -- M Flow Meters is the manufacturer.
11 M, as in Mary, Flow Meter, followed by a series of
12 numbers.
13         And again, if you want I have these
14 numbers in the same papers from where I have got the
15 name Multifan before.  So if you want I can go in my
16 briefcase and out this.  Also because -- no.  Okay.
17 If you allow me I can bring it out from my
18 briefcase.
19     Q.  Sure.  We can even stay on the record if
20 you can do it quickly.
21     A.  Okay, I can do it quickly.
22     Q.  I won't ask you to mark that as an
23 exhibit.  Let me make your life easier.
24     A.  It's this.
25     Q.  Yeah, but I don't want to be -- those are

Page 211

1 your notes and you may have talked to your lawyers
2 about them.  You can read me --
3     A.  Model.
4     Q.  M Flow Meter number.
5     A.  Flow meter is --
6         THE VIDEOGRAPHER:  Doctor, if you can,
7 your microphone, please.
8         THE WITNESS:  I am so sorry.  I have
9 written this just in the behind of the paper for
10 which I am here today, so it's nothing secret.
11         So this is -- the flow meter is --
12 yeah -- M, as in Mary, B as in Bob.  M is the
13 name of the manufacturer.  That's all is written
14 in the display.
15         The model is B, as in Bob, 80 317.11 and
16 in a second line below A, as in apple, H as in
17 hotel, dash B Pu, P, capital P.  All the letters
18 I said up to now are capital letters.
19         Then P capital, u small, 16.  This is the
20 flow meter.
21 BY MR. PACE:
22     Q.  If you can do, A H-B PuP --
23     A.  No, let's restart from A.  A, as in
24 apple, H, as in hotel, minus B or dash B.  When I say
25 minus is the --

Page 212

1     Q.  Hyphen?
2     A.  Hyphen B, then capital P, small u, 16.
3     Q.  Okay.
4     A.  And this is the flow meter.  Do you want
5 already the thermometer that you are going for sure
6 to ask me?  Because you put here that you want to
7 know the flow meter, the thermometer, so I wrote
8 both.
9     Q.  Sure.
10     A.  The thermometer is Digital Thermometers,
11 is the manufacturer, K probe.  K, as in Kursaal.
12     Q.  K as in Curacao did you just say?
13     A.  Yes, K, Kursaal.
14     Q.  I would have said kangaroo, but okay.
15     A.  Kangaroo, all right.
16     Q.  K as in Curacao.
17     A.  Kursaal is a well known --
18     Q.  In Italian it might be spelled with a K.
19 In English it's spelled with a C.
20     A.  In Italian the K does not exist as a
21 matter of fact.  We do not use the K in our
22 alphabet.
23         So we say Kursaal because it's a well
24 known chain like Macy's, so we say Kursaal.
25     Q.  Digital K Probe?

53  (Pages 209 to 212)

Page 213

1      A.  K Probe, then model T, as in Ted, 210666
2  and that's it.
3          (The document referred to was thereupon
4  marked Deposition Exhibit 19 for Identification, a
5  copy of which is attached hereto.)
6  BY MR. PACE:
7      Q.  I want to show you what's been marked as
8  Exhibit 19.  This is an e-mail from Jim Bass.  Well,
9  the bottom is an e-mail from Jim Bass to you.  The
10  top is your response.
11          This is an e-mail exchange from May of
12  2016, correct?
13      A.  Yes.
14      Q.  And James Bass is identifying for you
15  that Reinaldo has made a large hole in the chamber
16  wall.  The chamber wall is the J.M. Products
17  container, correct?
18      A.  Yes.
19      Q.  And this is to vent the hot air from the
20  chamber.  Then he says -- he's talking about making
21  an opening on the other end of the chamber as well,
22  correct?
23      A.  Yes.
24      Q.  Do you know if that opening was made in
25  the other end of the chamber as well?

Page 214

1      A.  You know, we are talking of a technology
2  that is not connected with the E-Cat and -- and this
3  reenters in the technology that I consider
4  confidential.
5          So this is -- in fact, this e-mail is of
6  May 23, 2016, so we're completely out of the period
7  of collaboration with Industrial Heat.  This has
8  nothing to do with that.
9      Q.  I understand.  Let me ask my question
10  again though.
11      A.  Yes.
12      Q.  Because I don't think whether there is a
13  second hole in the container is a trade secret, so
14  let me ask again.
15      A.  No, no.
16      Q.  I asked you a narrow question, so if you
17  just answer my question we can make this easy.
18      A.  Yes.
19      Q.  This says -- this identifies that
20  Reinaldo has already made a large hole in the J.M.
21  Products container, correct?
22      A.  Yes.
23      Q.  All right.  Jim Bass is proposing that a
24  second opening be made in the J.M. Products
25  container, correct?

Page 215

1      A.  Yes.
2      Q.  That second opening was, in fact, made in
3  the J.M. Products container, correct?
4          MR. ARAN:  Objection to form.
5  BY MR. PACE:
6      Q.  Fair enough.
7      A.  No, it has not been made.
8      Q.  It has not been made?
9      A.  No, no, because he had not understood
10  what was the scope of all, so no.  No.
11      Q.  There is a -- then you have -- you
12  probably got into my next question because there is
13  also a reference in here to an exhaust fan.
14          Was the exhaust fan installed or not
15  installed?
16      A.  It has been installed, but sorry, but --
17      Q.  Is that the same fan that was used for
18  the heat exchanger that you have testified about?
19      A.  Yes.  Modified, yes.
20      Q.  Modified by you?
21      A.  Yes.
22      Q.  Was there ever a time when J.M. Products
23  had the need to buy -- let me start broadly, then we
24  can go more narrowly.
25          Was there ever a time when J.M. Products

Page 216

1  had a need to buy any -- any types of materials or
2  substances, whether it's platinum, gold, nickel, you
3  name it?  I'm just asking generally.  Elements.  I am
4  not sure what the right phrase is.
5          Was there ever a time when J.M. Products
6  had a need to purchase any of that?
7      A.  Yes.
8      Q.  So I think you have already testified
9  that J.M. Products was looking into purchasing
10  platinum sponge.
11      A.  Yes.
12      Q.  What else did J.M. Products look to or,
13  in fact, purchase?
14      A.  Graphite.
15      Q.  Graphite.
16      A.  Nickel.
17      Q.  Nickel.
18      A.  Basically this.
19      Q.  And for what purpose would J.M. Products
20  be using nickel?
21      A.  Because of the process involved in the
22  reactors of J.M.
23      Q.  The reactors of J.M.  These are the --
24  these are the cylinders that you placed in the -- in
25  the pipes that appear in Exhibit 11?

54  (Pages 213 to 216)

Page 217

1      A.  Yes, it is correct.
2      Q.  Those pipes contained -- at one point I
3  know you testified you put platinum sponge in those
4  pipes, the containers.  At least some of the
5  containers had platinum sponge.
6          Would those same containers -- what else
7  would go -- let me start this over.  In a container
8  that included nickel what else would be included?
9      A.  Can you repeat the question?  I did not
10  understand.
11      Q.  Yes, I can.  I am just asking on the J.M.
12  Products side.  You said J.M. Products had a need for
13  acquiring and using nickel, correct?
14      A.  Yes.
15      Q.  And you said that that nickel would be
16  used in these cylinders that were placed into the
17  pipes that are in the J.M. Products container.
18      A.  Yes.
19      Q.  What else would be in a cylinder that
20  contained nickel or would it just be nickel by
21  itself?
22          MR. CHAIKEN:  Object to form.
23          THE WITNESS:  This is proprietary because
24      this is part of the confidential part of the
25      technology of J.M.

Page 218

1  BY MR. PACE:
2      Q.  Well, I think under the protective order
3  I am still entitled to receive it.  We don't have any
4  lay -- we don't have any non-attorneys in the room so
5  what is the additional substance that was put in with
6  the nickel?
7          MR. CHAIKEN:  Object to the form.
8          MR. ARAN:  Object to the form.  To the
9      extent --
10          MR. PACE:  Perhaps I can --
11          MR. ARAN:  To the extent you believe it's
12      a trade secret, confidential, that you don't
13      want to make.
14          THE WITNESS:  Can you repeat, attorney?
15      I did not hear it.
16          MR. ARAN:  To the extent that you think
17      it is a trade secret and confidential information
18      that should not be revealed to your competitor
19      then so state and then we will make it part of
20      the confidentiality order that only allows it to
21      be to the lawyers, or if you're not comfortable
22      with that then don't answer.
23          THE WITNESS:  We have one problem here,
24      that Industrial Heat now at any fact is a
25      competitor of us.

Page 219

1          They have published everywhere that they
2  are working with 12 competitors of us, of which
3  they have bought they say the technology.  So at
4  this point, confidential or not, Industrial Heat
5  will have access to everything that I am saying
6  today through the attorney.
7          So, you know -- and so whatever I am
8  saying now goes to the ear of Tom Darden because
9  obviously --
10  BY MR. PACE:
11      Q.  Dr. Rossi, let's get back to the
12  deposition.  You can talk to your lawyer separately
13  and off the record.  By the way, you shouldn't really
14  be doing that on the record.
15          MR. ARAN:  I think he's talking to all of
16      us, not just to me.
17          MR. PACE:  Then move to strike and that's
18      really not responsive.
19          MR. ARAN:  He's explaining the reason he
20      said that.
21          MR. PACE:  Let's ask the question again.
22          MR. ARAN:  Move on.
23          MR. PACE:  First of all, we get the time
24      period -- no, you instruct him not to answer or
25      we can go off the record.

Page 220

1          MR. ARAN:  Listen, I was talking and you
2  were talking over me and that doesn't allow him
3  to take it.  I thought we had agreed that we
4  would allow each other to finish talking.
5          MR. PACE:  Are you done?  So all I am
6  going to say is I'm happy to go off the record
7  if you want to have a discussion about it, but
8  that wasn't responsive to my question at all.
9          I wasn't asking about what Tom Darden
10  would see.  I asked you a question of what was
11  used with the nickel.  So --
12          THE WITNESS:  I'm --
13          MR. PACE:  I move to strike all that, to
14      the extent you feel it's on the record.  To the
15      extent it was meant to be a discussion with your
16      attorney, I would say you should not do that on
17      the record.  You should do that at a break.
18          THE WITNESS:  Okay.
19  BY MR. PACE:
20      Q.  Just to be careful.  So back to my
21  question.  And we can designate it as highly
22  confidential.  Let me start with the time period.
23          At some point you were putting nickel
24  into cylinders that you were then putting into the
25  pipes that were in the J.M. Products container,

55  (Pages 217 to 220)

Page 221

1 correct?
2     A.  It is correct.
3     Q.  At what time period was that occurring?
4 Was that during 2015?  Was it during 2016?  When can
5 you tell me?
6     A.  Yes, this has been in 2015, during the
7 test.
8     Q.  Okay.  What other substance was included
9 in those cylinders?
10     MR. CHAIKEN:  Object to form.
11     THE WITNESS:  I would like to talk with
12     my attorneys to decide if I can answer to you or
13     not.  It is not your --
14 BY MR. PACE:
15     Q.  I understand.
16     A.  I am answering to Industrial Heat now,
17 not to attorney base.
18     Q.  I understand.  Can we go off the record.
19     THE VIDEOGRAPHER:  Off the record.  The
20     time is 4:38 p.m.
21     (Thereupon a brief recess was taken,
22 after which the following proceedings were had.)
23     THE VIDEOGRAPHER:  We're back on the
24     record.  The time is 4:48 p.m.
25     MR. PACE:  Can you do me a favor and just

Page 222

1     reread my last question.
2     (The question referred to was read by the
3     reporter as above recorded.)
4     THE WITNESS:  I am sorry, but I must say
5     that I consider this industrial secret.
6 BY MR. PACE:
7     Q.  I understand that.  Are you refusing to
8 answer the question?
9     A.  I'm sorry.  I say I'm sorry, but I -- I
10 consider this an industrial secret, considering that
11 Industrial Heat is a competitor of us.
12     Q.  And you know that there is a protective
13 order in this case; you are familiar with that,
14 correct?
15     A.  You know, it is --
16     Q.  Dr. Rossi, I am just asking you a yes or
17 no.  I just want to make sure that you are aware of a
18 protective order in this case, correct?
19     A.  I am aware of that but --
20     Q.  I'm not saying you have to view it as
21 controlling or not but let me just say you have had a
22 chance to read that protective order?
23     A.  Can you repeat?
24     Q.  Have you had a chance to read that
25 protective order?

Page 223

1     A.  Yes, but a protective order does not
2 protect me from the fact that it is obvious that you
3 being the attorney --
4     Q.  Dr. Rossi --
5     A.  -- that we --
6     Q.  Dr. Rossi, I am not going to let you give
7 a speech on the record.  You can refuse to answer and
8 we can deal with it separately, okay.  That's an
9 issue that we can bring with the judge.
10     So rather than waste your time and my
11 time, I wanted to make sure you were aware of the
12 protective order so that you weren't saying well, I
13 didn't realize there was a protective order.  You are
14 aware of that, nevertheless --
15     A.  I --
16     Q.  -- nevertheless my question that I have
17 asked, and you're simply going to refuse to answer,
18 is what did you include in the cylinders along with
19 nickel when you would place those cylinders in the
20 pipes in the J.M. Products container?
21     MR. CHAIKEN:  Object to form.
22     THE WITNESS:  I want not to answer this
23     question because Industrial Heat will have
24     access to my answer.
25 BY MR. PACE:

Page 224

1     Q.  Okay.
2     A.  And I will not give --
3     Q.  There you go.  Dr. Rossi, again, we don't
4 need the speech about why at this point.
5     A.  Okay.
6     Q.  It's simply a refusal.
7     A.  All right.
8     Q.  Just so I am clear on your answer,
9 because you said I want not to respond.
10     A.  Okay.
11     Q.  Let me make sure you're clear.  You will
12 not respond?
13     A.  I will not respond.
14     Q.  Again, we can deal with this with the
15 court separately.
16     A.  I'm sorry for that.
17     Q.  No, I understand that.  Again, I am not
18 getting into the further detail on the issue.
19     MR. ARAN:  And also for the record I am
20     going to object as to relevancy now that he's
21     already made his decision.
22     MR. PACE:  Fair enough.
23     (The document referred to was thereupon
24 marked Deposition Exhibit 20 for Identification, a
25 copy of which is attached hereto.)

56  (Pages 221 to 224)

Page 225

```
 1  BY MR. PACE:
 2     Q.  Dr. Rossi, I am going to hand you what's
 3  been marked as Exhibit 20.  This is an e-mail
 4  exchange between you and Jim Bass in June of 2016,
 5  correct?
 6     A.  You know, we are talking of June 17,
 7  2016.  Now, we are in a period that is five months
 8  after the end of the test and we are talking of
 9  things that have nothing to do with Industrial Heat,
10  nothing to do with this litigation.
11     Again, this information is completely out
12  of the field of application of the paper I am here to
13  discuss about, so I refuse to talk of this document.
14  Sorry, attorney.  June 17 --
15     Q.  Wait, Dr. Rossi.  Look at the -- on Jim
16  Bass's e-mail, his fourth paragraph down.  "As you
17  said, you will be paying me $1,000 a month to remain
18  loyal and to return to work when the litigation is
19  concluded."
20     You're telling me that has nothing to do
21  with this case?
22     A.  Let me read.
23     Q.  How about you read the document and then
24  you can give me a speech if you want to.  Is that
25  okay?  Is that fair?
```

Page 226

```
 1     A.  You are right.
 2     Q.  Okay.
 3     A.  Okay.
 4     Q.  I am trying to do that with you.
 5     A.  No, you are right.
 6     Q.  Just take a second.
 7     A.  I just started from the date June 17,
 8  2016.
 9     Q.  I understand but I can call the court
10  when you refuse to answer a question.  I am not going
11  to because I don't want to do it that way but how
12  about you at least look at the document before you
13  give a speech.
14     A.  Okay.
15     Q.  Take him off my Christmas card list.
16     A.  I confirm.  I confirm.  I confirm,
17  attorney.  This e-mail has nothing to do with the
18  litigation and have nothing to do with the reason why
19  I am here today to answer to your questions.
20     Because this -- the content of this
21  e-mail from the first word to the last word has
22  nothing to do with this litigation.
23     Q.  Is the reference to --
24     MR. ARAN:  Let me get my objection.
25     MR. PACE:  Please.
```

Page 227

```
 1     MR. ARAN:  He's here as a designee of
 2  J.M. in response to a 30(b)(6) deposition, which
 3  has areas of inquiries and the areas of
 4  inquiries have to do with J.M. and its operation
 5  of the plant and things related to the dispute.
 6     This is an e-mail that if you really
 7  wanted to use it you should have used it either
 8  in Mr. Rossi's personal deposition, which was
 9  taken recently, but he's not here, at least not
10  as a representative of J.M. Products, to testify
11  about his relationship with Jim Bass after the
12  J.M. Products plant was over.  It's way above.
13     We look at every single one of these
14  inquiries that you put on topics of discussion,
15  it has nothing to do with any of this.  We
16  prepared based on the 16 issues or 16 areas of
17  inquiry or topics that appear in your notice.
18     MR. PACE:  Fair enough.  Are you going to
19  instruct him not to answer questions?
20     MR. ARAN:  I am not going to instruct
21  him.  If he doesn't want to answer, this has
22  nothing to do with J.M. Products.
23     MR. PACE:  Well, I don't actually know
24  that yet so I am actually going to find out here
25  or you can refuse to answer.
```

Page 228

```
 1     THE WITNESS:  What does -- what has --
 2     MR. CHAIKEN:  There is no question
 3  pending.
 4     THE WITNESS:  I'm sorry.
 5     MR. CHAIKEN:  Let him ask the question.
 6  BY MR. PACE:
 7     Q.  Let me ask the question and then you can
 8  decide whether you are going to respond to it or
 9  not.
10     A.  Okay.
11     Q.  So the first question is the litigation
12  that is referenced in this document, that's your
13  current litigation with Industrial Heat, correct?
14     A.  Yes, correct.
15     Q.  Okay.  The payment here is to remain --
16  is $1,000 a month payment to Jim Bass, is that
17  correct, an ongoing thousand dollar a month payment?
18     A.  You know, again --
19     Q.  You can refuse to answer or not.
20     A.  -- that relationship --
21     Q.  If you don't want to answer the question
22  you don't have to.  I don't need a speech.  You can
23  either say yes or no.
24     A.  I refuse to answer because I am here as
25  the representative of J.M. and the relationship
```

57  (Pages 225 to 228)

Page 229

1    between Leonardo Corporation and Jim Bass as the
2    consultant of Leonardo Corporation and the conditions
3    of this relationship have nothing to do with the
4    reason I am here today.
5         Q.  So your testimony is though -- or is that
6    this payment -- well, I mean, Dr. Rossi, hold on a
7    second.
8         Payments being made on behalf of J.M.
9    Products are being made on occasions by you,
10   correct?  You make payments to Jim Bass?
11        A.  Sorry, sorry, I did not understand the
12   question.
13        Q.  Have you ever made a payment to Jim Bass
14   in the year 2015?  Did you ever make a payment to Jim
15   Bass in the year 2015?
16        A.  Yes, on behalf of J.M.
17        Q.  Aha.
18        A.  So what?
19        Q.  You can make payments on behalf of Jim
20   Bass or on behalf of J.M. Products in 2015.  I know
21   it's 2016, Dr. Rossi.
22        A.  Yes.
23        Q.  But I think --
24        A.  It's not on behalf of J.M.
25        MR. CHAIKEN:  Wait for the question.

Page 230

1    BY MR. PACE:
2         Q.  Here we go.
3         A.  Go ahead.
4         Q.  You are jumping ahead of yourself.  Slow
5    down.
6         A.  Okay.
7         Q.  I am allowed to ask that question.
8         A.  All right.
9         Q.  You just like to get ahead of yourself
10   here.
11        A.  All right.
12        Q.  Ready?
13        A.  So what's the question?
14        Q.  Hold on.  It's coming.  Wait.
15        A.  Good.  I'm happy.
16        Q.  Slow down.  I am concerned about your
17   blood pressure.
18        A.  I'm still.  You can see.
19        Q.  Okay.
20        A.  Yes.
21        Q.  Ready?
22        A.  Sure.
23        Q.  Are you sure?
24        A.  Yeah.
25        Q.  Okay.  Is this payment made by -- I

Page 231

1    know.  Just making sure you calm yourself down here a
2    little bit.  It's a Wednesday.  High blood pressure,
3    I don't want you to have a heart attack on me.
4         Is this payment made on behalf of J.M.
5    Products?
6         A.  No.
7         Q.  Okay.
8         A.  This -- what do you mean, this one?
9         Q.  The thousand dollar a month payment to
10   remain loyal.
11        A.  Absolutely not.
12        MR. CHAIKEN:  Glad we were able to work
13   through that.
14        THE WITNESS:  Sorry?
15        MR. CHAIKEN:  I said I'm glad we were
16   able to work through that.
17   BY MR. PACE:
18        Q.  I think he saw this.
19        (The document referred to was thereupon
20   marked Deposition Exhibit 21 for Identification, a
21   copy of which is attached hereto.)
22   BY MR. PACE:
23        Q.  Dr. Rossi, I am going to mark as Exhibit
24   21 a picture of the outside of J.M. Products.  You
25   identified for us three -- that there were three sets

Page 232

1    of windows over the J.M. Products part of the Doral
2    warehouse, correct?
3         A.  Yes, sir.
4         Q.  And of those three sets of windows you
5    said it was the middle set of windows where the air
6    was being pushed out of the --
7         A.  Yes.
8         Q.  -- second story of the Doral warehouse?
9         A.  Yeah.
10        Q.  I am just trying to identify it here in
11   this picture.  That would be -- I'm going to give
12   you -- I'm going to let you play artist again.
13   Actually, do you have something a little stronger?
14   Can you circle on Exhibit 21 --
15        A.  Yes.  Sorry.
16        Q.  You know what, we're going to do it this
17   way.  Let's do that.  We can go right ahead, because
18   we will know what the marking is.  There is no
19   marking -- markers -- let me just start.
20        Other than the exhibit number on Exhibit
21   21 there is no other markings on Exhibit 21 right
22   now, correct?
23        A.  I did not understand the question.
24        Q.  I am just trying to make sure I've got a
25   clean record, which is as to Exhibit 21, other than

58  (Pages 229 to 232)

Page 233

1    the exhibit sticker on there, there is no other
2    markings on that document, it's just a picture?
3          A.   Yes.
4          Q.   Okay.  So the marking you are about to
5    make will be the only marking on that?
6          A.   Yes.
7          Q.   Can you do me a favor and circle the
8    window from which the heat was being exhausted from
9    the second floor.  All right.  Can you just put an AR
10   next to that, or however you initial something.
11         Perfect.  Has J.M. Products ever had a
12   customer -- I'm not asking about potential customer.
13   I am asking about an actual customer.
14         Has J.M. Products ever had a customer
15   other than Leonardo?
16         A.   No.
17         Q.   I'm going to mark as Exhibit 22.
18              (The document referred to was thereupon
19   marked Deposition Exhibit 22 for Identification, a
20   copy of which is attached hereto.)
21   BY MR. PACE:
22         Q.   This is what at least purports to be
23   another sale contract between J.M. Products and
24   another entity.
25         A.   What is your question, attorney?

Page 234

1          Q.   When you look at this agreement, is there
2    a -- do you know what happened with this agreement?
3    This looks like it's supposed to be an agreement with
4    a second purchaser, a customer but --
5          A.   Can I read it?
6          Q.   Yes.  The question is --
7          A.   Let me continue to read it because I am
8    trying to find a clue.  So far I am not -- sir, I do
9    not remember this document and I do not absolutely
10   remember and, by the way, here is also a very strange
11   thing, because I am reading here -- sorry, what's
12   your question about this?
13         Q.   What was the strange thing that you were
14   seeing in this document?
15         A.   The seller, which appears to be J.M.
16   Products Corporation, will invoice an amount equal to
17   US dollar per month starting from March 30, 2014.
18   Excuse me, but on March 30, 2014 J.M. did not exist.
19         Q.   I understand.  This is not a
20   document that --
21         A.   What the heck is this?
22         Q.   I know you don't believe me when I tell
23   you that other parties have produced documents but I
24   am going to represent to you that J.M. Products has
25   produced this document.  You may not believe me.  You

Page 235

1    may think it was done by somebody in the State of
2    Florida.
3          A.   I believe you.  I believe you because if
4    you gave me this is because somebody has gave it to
5    you.
6          I don't -- I absolutely don't recall this
7    document and the fact that J.M. starts selling
8    products on March 30, 2014 is a little bit bizarre.
9          Q.   Just as a reference to James Wolff would
10   be a little bit bizarre in that other document?
11         A.   I don't remember of this document, sir.
12         Q.   I understand.  I'm saying that could be a
13   typo, who knows how that occurred?
14         A.   Redacted, redacted, redacted, redacted,
15   redacted, no signatures, sir.
16         Q.   This is how we have it as well.
17         A.   What the heck is this?
18         Q.   You can look at somebody else at the
19   table than me.  We can deal with it afterwards.
20         MR. CHAIKEN:  Dr. Rossi, wait for a
21   question, please.
22   BY MR. PACE:
23         Q.   The question is --
24         MR. ARAN:  You are making a statement
25   without a question.

Page 236

1    BY MR. PACE:
2          Q.   Do you know who the buyer is for this
3    contract?
4          A.   No.  I never have seen this contract
5    before.
6          Q.   Okay.  And your testimony --
7          A.   And it makes no sense.
8          Q.   Right, I was going to say --
9          MR. ARAN:  There is no question.
10         MR. CHAIKEN:  Wait for the question.
11   BY MR. PACE:
12         Q.   Why does it makes no sense, because of
13   the date?
14         A.   Sure.  March 30, 2014, J.M. did not
15   exist.
16         Q.   Is there anything else that makes it make
17   no sense?
18         A.   Again, gram 1,500 of, redacted.  Name
19   redacted, mailing address redacted, phone redacted,
20   e-mail redacted, signature redacted.  But it is
21   highly confidential.  Looks like a clownery.
22         Q.   Dr. Rossi, for once and I actually
23   seem to be pretty close to being in agreement.
24         A.   Yeah.
25         Q.   It's not a highly confidential document.

59  (Pages 233 to 236)

Page 237

```
 1       A.  I don't know what this is.
 2       Q.  You don't know.  Fair enough.  We can
 3   find out from J.M. Products directly.
 4           Notwithstanding seeing this document was
 5   one of the reasons I wanted to show and see if it
 6   refreshes your recollection.
 7       A.  Looks like maybe it's some draft.
 8       MR. CHAIKEN:  Dr. Rossi, there is no
 9   question pending.
10       THE WITNESS:  You're right.  I am sorry.
11   BY MR. PACE:
12       Q.  Notwithstanding seeing this Exhibit 22,
13   your testimony remains the same, that the only actual
14   customer of J.M. Products was Leonardo Corporation?
15       A.  Yes.
16       Q.  Okay.  I believe I've asked this in a
17   prior deposition.  I don't think I've asked it today
18   and testifying here as a corporate representative of
19   J.M. Products, let me just ask.
20           Other than -- other than -- other than
21   Platinum American Trust owning the shares of J.M.
22   Products, are you aware of any agreements or payments
23   between Platinum American Trust and J.M. Products?
24       A.  No, not that I am aware of.
25       Q.  Other than whatever Platinum American
```

Page 238

```
 1   Trust paid for the shares of J.M. Products, are you
 2   aware of any payments between J.M. Products and
 3   Platinum American Trust?
 4       MR. ARAN:  Objection, form.
 5       THE WITNESS:  Can you repeat the
 6   question?
 7   BY MR. PACE:
 8       Q.  It was a long question.  Let me simplify
 9   it.  Are you aware of any payments between Platinum
10   American Trust and J.M. Products either going from
11   J.M. Products to Platinum American Trust or going
12   from Platinum American Trust to J.M. Products, are
13   you aware of any payments?
14       A.  Understood.  Understood.  No, I am not
15   aware of.
16       Q.  Let me ask about Francesco Di Giovanni,
17   same type of questions.  Are you aware of any
18   agreement between J.M. Products and Francesco Di
19   Giovanni?
20       A.  Agreement?
21       Q.  Yes.
22       A.  Francesco Di Giovanni -- J.M. Products
23   and Francesco Di Giovanni was practically the
24   beneficiary of the trust that owned J.M.
25       Q.  Let me rephrase it.
```

Page 239

```
 1       A.  So this is --
 2       Q.  Other than the trust agreement.
 3       A.  Okay.
 4       Q.  So one agreement was the trust
 5   agreement.
 6       A.  This is the only one I am aware of.
 7       Q.  Let me ask my question again though.
 8   Other than the trust -- the Platinum American Trust
 9   trust agreement, are you aware of any agreements
10   between J.M. Products and Francesco Di Giovanni?
11       A.  Not that I am aware of.
12       Q.  Are you aware of any payments between
13   J.M. Products and Francesco Di Giovanni?
14       A.  No, I am not aware of.
15       Q.  As the corporate representative of J.M.
16   Products are you aware of any documents that record
17   or reflect readings from the thermometer that was
18   operated on the J.M. Products side of the Doral
19   warehouse in 2015?
20       Q.  Can you kindly repeat the question?
21       Q.  Let me break --
22       A.  I think I have understood but I'm not
23   sure.
24       Q.  I'm going to ask you a series of
25   questions as the representative of J.M. Products.
```

Page 240

```
 1       A.  Yes, okay.
 2       Q.  In each case it's going to be about
 3   whether documents exist reflecting certain
 4   measurements from the different measuring devices on
 5   the J.M. Products side.  I believe I know the answer,
 6   you have told me your response individually, I have
 7   heard this from other people that I have deposed but
 8   I want to have a clean record for J.M. Products.
 9       A.  Yes.
10       Q.  So on the J.M. Products side of the Doral
11   warehouse during the time period from February 2015
12   to February 2016 there was a flow meter, correct?
13       A.  Yes, sir.
14       Q.  Is there any document that reflects or
15   identifies the readings that anyone made off of that
16   flow meter during that time period?
17       A.  Now the question is clear.  No, there is
18   not because basically -- no, there is not.
19       Q.  Because I want to go through all these
20   before I have to keep repeating the question.
21           I want to ask the same question as to the
22   thermometer on the J.M. Products side of the Doral
23   location.  During that time period, February '15 to
24   February 2016, are there any documents that reflect
25   or identify the readings off of that thermometer?
```

60  (Pages 237 to 240)

Page 241

1    A.  No.
2    Q.  All right.  I feel like I'm forgetting
3  one.  Were there -- I'll ask you.  Were there any
4  other measuring devices in operation on the J.M.
5  Products side of the Doral warehouse from February
6  2015 to February 2016?
7    A.  No.
8    Q.  All right.  Without getting into the
9  details of what other substance was involved, I am
10 going to refer just for a second here.  I am going to
11 refer to the -- whatever product J.M. Products was
12 working on that involved platinum sponge, and I
13 understand there is a product that involved graphene
14 and then a third product that involved -- somehow
15 involved nickel.
16      I want to ask for just a time period --
17 some time period questions.  Was J.M. Products
18 working on -- first on a product that involved
19 platinum sponge, then a product that involved nickel,
20 then a product that involved graphene?
21      Was it one after the other or were they
22 all going on at the same time?
23    A.  I have understood.  Initially we worked
24 only with platinum sponges, initially.  Eventually I
25 added the other matters and they have been treated

Page 242

1  together in different reactors inside the steam
2  line.
3    Q.  Okay.
4    A.  They were not alternative.  Alternative.
5    Q.  Okay, got it.  Got it.
6    A.  Okay.
7    Q.  The time period that -- we saw an e-mail
8  earlier today that was from, I think like March of --
9  March 22nd of 2015.
10      It's sometime after that that you -- that
11 J.M. Products went from working only on a product
12 involving platinum sponge to these other potential
13 products?
14    A.  Sir, I did not understand.
15    Q.  Fair enough.
16    A.  I am sorry.
17    Q.  I believe what you just testified was
18 that initially J.M. Products was just working on
19 producing a product that involved the platinum
20 sponge.
21    A.  Correct.
22    Q.  Eventually J.M. Products started working
23 on -- on different products that didn't necessarily
24 contain platinum sponge?
25    A.  Correct.

Page 243

1    Q.  Diversified the products it was trying to
2  develop?
3    A.  Correct.
4    Q.  I am just trying to -- I am trying to
5  identify that time period when J.M. Products,
6  according to your testimony, went from working only
7  with platinum sponge to the possibility of creating a
8  product that did not involve platinum sponge or did
9  not only involve platinum sponge, and I was using the
10 reference as the e-mail that was from late March of
11 2015 that you had with J.M. Products.
12      I don't know if that's -- that's helpful
13 to identify when you --
14    A.  You said J.M. Products or Johnson
15 Matthey?
16    Q.  Johnson Matthey.
17    A.  Okay.
18    Q.  So can you tell me --
19    A.  Yes, now I got it.
20    Q.  Can you give me some time frame, when did
21 J.M. Products go from working on a product that
22 involved platinum sponge to working on a product that
23 might have involved graphene?  Let's try it that
24 way.
25    A.  I have understood now the question

Page 244

1  perfectly.
2    Q.  Okay.
3    A.  Well, I would say I have not a precise
4  recollection of it.  I cannot be precise but I can
5  give you a ballpark distinction.
6      I started for sure with the platinum
7  sponges that I had brought with me from Italy.  They
8  were in-house already and they -- they -- and this
9  has been immediately.  So I started with them when
10 the plant has been started, so we're talking of about
11 16, 17 February 2015, 2-0-1-5.
12      I would say that I have looked for
13 diversifications when I felt that the agreement with
14 Johnson Matthey was becoming shaky and so I would
15 place -- between the end of March -- and I don't
16 remember exactly when I bought graphite but I think
17 it has been end of March, beginning of April,
18 something like that.
19      After that date I could be wrong.  I
20 cannot be precise but the ballpark is this and after
21 that I continued.  Also I bought, as I told you this
22 morning, I bought some platinum sponge from Johnson
23 Matthey from another product that I bought from them
24 from their United States subsidiary.
25      So I -- I wanted to continue with all

61  (Pages 241 to 244)

Page 245

1   these materials because that was an experiment.
2   Again, I want to repeat that that was an experiment
3   and I wanted to try to test all the possible outputs
4   of that experiment.
5       Q.   And of those -- of those experiments
6   the -- the one product that -- that J.M. Products
7   ultimately did sell to Leonardo, that did not involve
8   platinum sponge; is that correct, or incorrect?
9       A.   You are correct.
10      Q.   In --
11      A.   Because the work with the platinum sponge
12  was not -- was not completed.  We did not have good
13  results and we had better results with the graphite.
14      Q.   There was some testimony previously, and
15  I might be using the wrong terms here.  I am trying
16  to remember the phrase you used.
17          I think you referred to them as heated --
18  heated -- heat cords or heat coils and somebody else
19  referred to them as heat strips.  Are you aware of
20  some kind of heating device used to keep pipes warm?
21  Is it called a heat -- what do you call it?  Did you
22  call it a heat cord?
23      A.   I did not call them.  They have been
24  cited probably from Jim Bass.
25      Q.   Well, he called them a heat strip.

Page 246

1       A.   Somebody called it heat strip, et
2   cetera.
3       Q.   What would you call it?
4       A.   Well, they can also -- the technical name
5   is heating cables.
6       Q.   Heating cables.
7       A.   And they are -- or heaters.
8       Q.   There were heating cables installed in
9   the -- in the container at the J.M. Products side,
10  correct?
11      A.   Yes, it is correct.
12      Q.   They were installed in those insulated
13  pipes that we saw back in Exhibit 11?
14      A.   Yes, it is correct.
15      Q.   When were those -- when were the heating
16  cables installed?
17      A.   From the beginning.
18      Q.   And were they there through the end,
19  through the --
20      A.   Yes, yes.
21      Q.   Let me ask the question again.
22      A.   Through the end of the test.
23      Q.   Through the end always ends up being
24  unclear, right?
25      A.   Yes, of course.

Page 247

1       Q.   Were they there until you removed those
2   pipes from the J.M. Products container?
3       A.   Correct.
4       Q.   All right.  Are those -- those heating
5   cables, were those purchased by J.M. Products or by
6   Leonardo, if you know?
7       A.   I think Leonardo.
8       Q.   And I have asked similar question to what
9   I asked before, as the other devices.  If there are
10  any records of that purchase they would be with your
11  accountant?
12      A.   Yes.
13      Q.   Do you recall where you bought them?
14      A.   Yes or no.
15      Q.   Did you just say yes or no?
16      A.   Yes or no, because -- because -- no, I
17  was thinking to a company but I am not sure, so I
18  just delayed to the accountant.
19          But maybe -- maybe I bought them from a
20  company whose name was Extreme or something like
21  that, but I am not sure.  In any case, surely --
22  surely this is accounted for.
23      Q.   Extreme --
24      A.   Because this was not -- this was not a
25  flying -- a freelance contractor.  This was a

Page 248

1   company.
2       Q.   When you said Extreme, could that have
3   been Extreme Plumbing?
4       A.   No.  No, no.  No, no, no, it was not a
5   plumber.  Has nothing to do with plumbers this.
6   These are heaters.
7           MR. PACE:  Why don't we -- I think we're
8   pretty close to the end.  Why don't we take a
9   break and give me about five minutes to try to
10  figure out -- let's make it ten.  Give me ten
11  minutes to figure out any closing questions and
12  we'll be done.
13          THE WITNESS:  Okay.
14          THE VIDEOGRAPHER:  We're off the record.
15  The time is 5:24 p.m.
16          (Thereupon a brief recess was taken,
17  after which the following proceedings were had.)
18          THE VIDEOGRAPHER:  We're back on the
19  record.  The time is 5:38 p.m.
20  BY MR. PACE:
21      Q.   Dr. Rossi, I just had a handful of kind
22  of wrap-up questions.
23          From February 2015 to February 2016 J.M.
24  Products made no use of the heated fluid provided by
25  Leonardo, other than whatever use was made within

62  (Pages 245 to 248)

Page 249

1  what we have been calling today the J.M. Products
2  container; is that correct?
3      A.  Yes, it is correct.
4      MR. ARAN:  Object to form.
5  BY MR. PACE:
6      Q.  You identified -- thus far you have
7  identified -- you referenced four groups of potential
8  investors who came to the Doral location.  You
9  referenced Tom Darden and J.T. Vaughn either together
10 or separately coming to the Doral location.
11     Are there any other -- were there any
12 other visitors -- I'm sorry, I am going to exclude
13 the temporary workers that either J.M. Products or
14 Leonardo would occasionally hire.
15     Were there any other individuals or
16 groups that visited the Doral warehouse?
17     A.  Yes.
18     Q.  Who?
19     A.  Ampenergo.  Ampenergo visited the plant
20 twice.  The first --
21     Q.  Go ahead.  Sorry.
22     A.  The first time in March or April '15 and
23 the second time September/October '15.
24     Q.  Anyone else?  Any other visits to the
25 Doral warehouse?

Page 250

1      A.  Not that I recall.
2      Q.  All right.  And then just to be clear,
3  when -- in connection with both visits by AEG did
4  they ever go on the J.M. Products side of the
5  warehouse?
6      A.  Can you kindly repeat?  Was confusing the
7  first time.
8      Q.  So there is two visits by somebody --
9  somebody -- let me restart this.  There is two visits
10 to the Doral warehouse by people from AEG, correct?
11     A.  Yes, it is correct.
12     Q.  Okay.  In connection with either of those
13 visits did anyone from AEG go over to the J.M.
14 Products side of the Doral warehouse?
15     A.  No, absolutely.
16     Q.  Did any of those individuals from AEG
17 meet with Jim Bass?
18     A.  No, not that I can recall.
19     Q.  With whom did these individuals from AEG
20 meet, other than yourself?
21     A.  Fabiani and Jim Bass, because they
22 entered in the plant during the time -- I am not sure
23 that -- yeah, yeah, yeah, Fabiani and Jim Bass.  Yes,
24 yes, yes, both.
25     Q.  All right.  The AEG people met both

Page 251

1  Fabiani and Jim Bass?
2      A.  Yes.
3      Q.  Okay.  On both occasions or on at least
4  one occasion?
5      A.  This is a good question.  I don't
6  recall.  I don't recall.  I think that -- that no, I don't
7  recall, attorney.
8      Q.  Okay.
9      A.  I don't recall exactly.
10     Q.  I may have asked this, but just -- just
11 in case I did not, we talked about -- I'm going back
12 to the heat exchanger that you testified about
13 installing on the J.M. Products side of the Doral
14 warehouse.
15     Do there exist any -- are you aware of
16 whether there exists any photographs of that heat
17 exchanger?
18     A.  No.
19     Q.  Do there exist any diagrams of the heat
20 exchanger?
21     A.  What do you mean by diagram?
22     Q.  A drawing of the heat exchanger, maybe
23 either before it was put in place or after.
24     A.  Yeah, I made sketches for me because, you
25 know -- I made sketches for me but then I scratch

Page 252

1  them once, because it was not a product.  It was
2  just --
3      Q.  Let me see if I can get that defined
4  because you said you scratched them.  Does that mean
5  you threw them away, the sketches?
6      A.  Yes.  I did not conserve them, so I --
7      Q.  Are there any -- any -- any records of
8  testing done on the heat exchanger?
9      A.  What do you mean by testing?
10     Q.  To see if it worked.
11     A.  Oh, yeah, sure.  Of course.
12     Q.  Are there any records of it?  Are there
13 any documents reflecting testing that you did on the
14 heat exchanger?
15     A.  You know, I was -- no, because I was
16 working for myself in that moment and I had nothing
17 to produce to anybody.  And again, as for what
18 concerns the sketches, for sure I have taken numbers
19 for me while the temperature was going on, was
20 raising, I observed the behavior of the temperature
21 of the piping with my infrared thermometer and for
22 sure I have taken notes, et cetera, but I did not
23 conserve them.  Because once I have reached the
24 performance I needed, for me was stable.
25     MR. PACE:  No further questions.

63  (Pages 249 to 252)

Page 253

```
1        MR. ARAN:  I don't have any questions.
2        MR. CHAIKEN:  Read.
3        MR. ARAN:  We -- what's the policy with
4    him?
5        MR. CHAIKEN:  Read.
6        MR. ARAN:  Read.
7        MR. PACE:  Yes.
8        THE VIDEOGRAPHER:  Off the record.  The
9    time is 5:46 p.m.
10       (Thereupon the taking of the deposition
11   was concluded.)
12
13              Deponent
14
15
16       Sworn to and subscribed before me this
17
18   day of        2017.
19
20
21
22
23
24
25
```

Page 255

```
1    CERTIFICATE OF REGISTERED PROFESSIONAL REPORTER
2
3         I, EDWARD VARKONYI, and Registered
4    Professional Reporter and a Notary Public for the
     State of Florida at Large, do hereby certify that I
5    reported the deposition of ANDREA ROSSI; that the
     foregoing pages, numbered from 1 to 253, inclusive,
6    constitute a true and correct transcription of my
     shorthand report of the deposition by said witness on
     this date.
7         I further certify that I am not an
8    attorney or counsel of any of the parties, nor a
     relative or employee of any attorney or counsel
9    connected with the action, nor financially interested
     in the action.
10        WITNESS my hand and official seal in the
     City of Miami, County of Dade, State of Florida, this
     13th day of March 2017.
11
12
13
14
15        <%signature%>
16        _____
17    Notary Public, State of Florida at
18    Large; my commission expires
19    February 26, 2019.  Bonded through
20    Troy Fain Insurance, Inc.
21
22
23
24
25
```

Page 254

```
1             CERTIFICATE OF OATH
2
3    STATE OF  FLORIDA:
4                     SS:
5    COUNTY OF   DADE:
6
7
8         I, the undersigned authority, certify that
9    ANDREA ROSSI personally appeared before me and was
10   duly sworn.
11        WITNESS my hand and official seal this 13th
12   day of March 2017.
13
14
15        <%signature%>
16        _____
17    Notary Public, State of Florida at
18    Large; my commission expires
19    February 26, 2019. Bonded through
20    Troy Fain Insurance, Inc.
21
22
23
24
25
```

Page 256

```
1         March 13, 2017
2
3
4
     FERNANDO ARAN, ESQ.,
5    Aran Correa & Guarch, P.A.
     255 University Drive
6    Coral Gables, Florida 33134
     RE: Rossi v. Darden
7
8    Dear Mr. Aran,
9    With reference to the deposition of Andrea Rossi
     taken on March 1, 2017 in connection with the
10   above-captioned case, please be advised that the
     transcript of the deposition has been completed
11   and is awaiting signature.
12   Please arrange to have the deponent stop by our
     office at Two South Biscayne Boulevard, Suite
13   2250, Miami, Florida, for the purpose of reading
     and signing the transcript.
14
     If this is not taken care of, however, within the
15   next 30 days, we shall conclude that the reading
     and signing of the deposition has been waived and
16   shall then process the original of the transcript
     for filing with the Clerk of the Court by counsel
17   without further notice.
18   Sincerely,
19
20   Edward Varkonyi,
     Registered Merit Reporter
21
22
23
24
25
```

64 (Pages 253 to 256)

Page 257

```
 1        ERRATA SHEET
 2   RE  : Rossi v. Darden
     DEPO OF: Andrea Rossi
 3   TAKEN : 3/1/17
     ASSG# : 2553727
 4      DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
 5   Page #   Line #  Change              Reason
 6   _____  _____  _____  _____
 7   _____  _____  _____  _____
 8   _____  _____  _____  _____
 9   _____  _____  _____  _____
10   _____  _____  _____  _____
11   _____  _____  _____  _____
12   _____  _____  _____  _____
13   _____  _____  _____  _____
14   _____  _____  _____  _____
15   _____  _____  _____  _____
16   _____  _____  _____  _____
17   _____  _____  _____  _____
18   _____  _____  _____  _____
19   _____  _____  _____  _____
20   _____  _____  _____  _____
21   State of Florida)
     County of    )
22
     Under penalties of perjury, I declare that I have
23   read my deposition transcript, and it is true and
     correct subject to any changes in form or substance
24   entered here.
     _____    _____
25   Date        Signature
```

**Veritext Florida Reporting Co.**

800-726-7007                                                      305-376-8800

## 5. Witness: Rossi, Andrea (Corporate Rep. for Leonardo Corp.)

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 6:8-12<br>7:9-11<br>7:20-8:1<br>15:10-20<br>16:5-9<br>16:10-17:4<br>18:10-25<br>19:7-21<br>21:17-25<br>22:24-23:7<br>27:25-28:10<br>28:20-29:16<br>30:24-31:21<br>33:16-34:16<br>35:8-23<br>37:16-38:14<br>41:16-43:18<br>43:19-45:14<br>45:18-46:15<br>46:19-47:14<br>48:5-21<br>57:19-58:13<br>59:4-14<br>60:9-62:14<br>62:18-63:3<br>63:22-64:19<br>64:25-65:10<br>68:10-69:15<br>70:2-23<br>72:7-73:5<br>73:23-74:1<br>77:13-24<br>81:11-19<br>82:2-13<br>82:15-15<br>82:20-20<br>83:12-19<br>84:7-85:5 | 27:25-28:10 R;<br>142:18-22 R;<br>145:9-18 R;<br>146:1-3 R;<br>148:21-24 R;<br>206:16-207:20 R;<br>232:1-4 R;<br>235:12-236:7 R;<br>238:1-16 R;<br>239:4-19 R;<br>239:22-240:1 R;<br>254:24-255:12 R;<br>263:7-20 R;<br>273:10-274:5 AA, R;<br>274:16-19 AA, R;<br>275:16-19 R;<br>275:21-276:2 R;<br>276:9-25 R;<br>277:3- 8 R;<br>286:23-287:5 R;<br>302:20-304:17 R;<br>311:19-312:13 R;<br>313:1-314:1 R;<br>314:17-315:8 R;<br>316:24-318:25 AA, R; | 6:13-24;<br>19:1-6;<br>59:15-18;<br>82:14;<br>118:22-119:22;<br>155:23-156:6;<br>156:8-157:5;<br>183:9-184:15;<br>201:18-25;<br>210:3-5;<br>212:12;<br>212:14;<br>220:20-24;<br>221:5-222:4;<br>222:5-223:16;<br>231:16;<br>238:17-18;<br>239:20;<br>265:4-5;<br>280:8-16;<br>288:19;<br>319:7-320:12; | | | **Defendants' Objections to Plaintiffs:**<br>6:13-24  IMP<br>118:22-119:22 IMP<br>155:23-157:5 IMP<br>201:18-25 IMP<br>210:3-5 IMP, R<br>212:12 IMP, R<br>212:14 IMP, R<br>220:20-223:16 IMP<br>231:16 IMP<br>239:20 IMP, R<br>238:17-18 IMP, R<br>280:8-16 IMP<br>288:19 IMP, R<br>319:7-320:12 IMP | **Defendants' Rebuttals to Plaintiffs:**<br>7:1-5 | | | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 87:4-10 | | | | | | | | | |
| 88:3-11 | | | | | | | | | |
| 88:22-89:5 | | | | | | | | | |
| 89:8-10 | | | | | | | | | |
| 89:14-90:18 | | | | | | | | | |
| 94:18-96:2 | | | | | | | | | |
| 97:3-23 | | | | | | | | | |
| 98:24-99:17 | | | | | | | | | |
| 100:11-16 | | | | | | | | | |
| 100:18-23 | | | | | | | | | |
| 101:5-15 | | | | | | | | | |
| 102:21-103:22 | | | | | | | | | |
| 105:2-5 | | | | | | | | | |
| 105:8-18 | | | | | | | | | |
| 107:13-25 | | | | | | | | | |
| 113:11-114:7 | | | | | | | | | |
| 115:6-19 | | | | | | | | | |
| 116:1-18 | | | | | | | | | |
| 117:1-118:21 | | | | | | | | | |
| 120:1-3 | | | | | | | | | |
| 122:4-15 | | | | | | | | | |
| 127:6-9 | | | | | | | | | |
| 128:16-22 | | | | | | | | | |
| 129:8-24 | | | | | | | | | |
| 130:1-16 | | | | | | | | | |
| 132:7-133:19 | | | | | | | | | |
| 134:24-135:4 | | | | | | | | | |
| 135:21-136:23 | | | | | | | | | |
| 138:19-139:11 | | | | | | | | | |
| 142:18-22 | | | | | | | | | |
| 145:9-18 | | | | | | | | | |
| 146:1-3 | | | | | | | | | |
| 146:10-147:11 | | | | | | | | | |
| 147:25-148:24 | | | | | | | | | |
| 149:3-12 | | | | | | | | | |
| 150:22-151:7 | | | | | | | | | |
| 151:20-152:13 | | | | | | | | | |
| 153:10-13 | | | | | | | | | |
| 154:2-18 | | | | | | | | | |
| 159:11-25 | | | | | | | | | |
| 160:1-9 | | | | | | | | | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 160:11-23 | | | | | | | | | |
| 160:24-162:16 | | | | | | | | | |
| 172:18-22 | | | | | | | | | |
| 176:6-177:23 | | | | | | | | | |
| 180:11-181:7 | | | | | | | | | |
| 182:14-19 | | | | | | | | | |
| 188:25-191:19 | | | | | | | | | |
| 193:10-14 | | | | | | | | | |
| 193:20-194:9 | | | | | | | | | |
| 195:3-196:2 | | | | | | | | | |
| 196:13-197:13 | | | | | | | | | |
| 198:23-201:4 | | | | | | | | | |
| 201:6-17 | | | | | | | | | |
| 206:16-207:20 | | | | | | | | | |
| 207:24-208:14 | | | | | | | | | |
| 209:1-210:2 | | | | | | | | | |
| 210:6-21 | | | | | | | | | |
| 210:22-212:11 | | | | | | | | | |
| 212:13-13 | | | | | | | | | |
| 212:15-19 | | | | | | | | | |
| 213:13-24 | | | | | | | | | |
| 215:24-217:12 | | | | | | | | | |
| 219:20-220:10 | | | | | | | | | |
| 220:16-19 | | | | | | | | | |
| 223:20-224:13 | | | | | | | | | |
| 224:19-225:13 | | | | | | | | | |
| 226:3-7 | | | | | | | | | |
| 227:11-19 | | | | | | | | | |
| 230:22-231:15 | | | | | | | | | |
| 231:18-232:4 | | | | | | | | | |
| 233:18-24 | | | | | | | | | |
| 235:1-3 | | | | | | | | | |
| 235:12-236:7 | | | | | | | | | |
| 238:1-16 | | | | | | | | | |
| 239:4-19 | | | | | | | | | |
| 239:22-240:1 | | | | | | | | | |
| 240:14-18 | | | | | | | | | |
| 240:23-241:5 | | | | | | | | | |
| 242:4-10 | | | | | | | | | |
| 242:18-243:2 | | | | | | | | | |
| 243:10-25 | | | | | | | | | |

| Defendants' Designations | Plaintiffs' Objections | Plaintiffs' Counter Designations | Third Party Objections | Third Party Counter Designations | Defendants' Objections | Defendants' Rebuttals | Plaintiffs' Objections | Third Party Objections | Court's Ruling |
|---|---|---|---|---|---|---|---|---|---|
| 244:9-21 | | | | | | | | | |
| 246:20-248:8 | | | | | | | | | |
| 254:24-255:12 | | | | | | | | | |
| 261:17-262:16 | | | | | | | | | |
| 263:7-20 | | | | | | | | | |
| 264:5-265:3 | | | | | | | | | |
| 265:6-15 | | | | | | | | | |
| 265:17-266:25 | | | | | | | | | |
| 271:22-272:10 | | | | | | | | | |
| 272:22-273:8 | | | | | | | | | |
| 273:10-274:5 | | | | | | | | | |
| 274:16-19 | | | | | | | | | |
| 275:5-19 | | | | | | | | | |
| 275:21-276:2 | | | | | | | | | |
| 276:9-25 | | | | | | | | | |
| 277:3-8 | | | | | | | | | |
| 277:10-17 | | | | | | | | | |
| 281:22-282:1 | | | | | | | | | |
| 283:8-17 | | | | | | | | | |
| 284:14-25 | | | | | | | | | |
| 286:23-287:5 | | | | | | | | | |
| 287:7-14 | | | | | | | | | |
| 288:1-8 | | | | | | | | | |
| 288:10-18 | | | | | | | | | |
| 290:20-292:12 | | | | | | | | | |
| 292:14-294:10 | | | | | | | | | |
| 296:8-297:19 | | | | | | | | | |
| 300:15-301:16 | | | | | | | | | |
| 302:4-12 | | | | | | | | | |
| 302:20-304:17 | | | | | | | | | |
| 305:10-13 | | | | | | | | | |
| 311:19-312:13 | | | | | | | | | |
| 313:1-314:1 | | | | | | | | | |
| 314:17-315:8 | | | | | | | | | |
| 316:24-318:25 | | | | | | | | | |
| 322:1-20 | | | | | | | | | |
| 232:1-20 | | | | | | | | | |

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:16-cv-21199-CMA

ANDREA ROSSI, et al.,

    Plaintiffs,

    v.

THOMAS DARDEN, et al.,

    Defendants.
- - - - - - - - - - - - - - - - - - -x
INDUSTRIAL HEAT, LLC, et al.,

    Counter-Plaintiffs,

    v.

ANDREA ROSSI, et al.,

    Counter-Defendants.

    and

J.M. PRODUCTS, et al.,

    Third-Party Defendants.
- - - - - - - - - - - - - - - - - - -x

600 Brickell Avenue, Suite 3300
Miami, Florida
Friday, February 24, 2016
10:17 a.m - 7:56 p.m.

CONFIDENTIAL TRANSCRIPT
PORTIONS OF TRANSCRIPT HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF LEONARDO CORPORATION
THROUGH ANDREA ROSSI
Taken before Edward Varkonyi, Registered
Merit Reporter and Notary Public for the State of
Florida at Large, pursuant to Notice of Taking

Page 2

APPEARANCES

JOHN W. ANNESSER, ESQ.,
Perlman Bajandas Yevoli & Albright, P.L.
283 Catalonia Avenue, Suite 200
Coral Gables, Florida 33134
on behalf of the Plaintiff.

CHRISTOPHER R.J. PACE, ESQ.,
Jones Day
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
on behalf of the Defendant.

RODOLFO NUNEZ, ESQ.,
Rodolfo Nunez, P.A.
255 University Drive
Coral Gables, Florida 33134
on behalf of Defendants J.M. Products,
Johnson and Bass

FRANCISCO J. LEON DE LA BARRA, ESQ.,
Aran Correa & Guarch, P.A.
255 University Drive
Coral Gables, Florida 33134
on behalf of Defendant United States
Quantum Leap and Fabiani

ALSO PRESENT: Jason Stapleton, Videographer

Page 3

             I N D E X

Witness     Direct    Cross

ANDREA ROSSI    6      319

Page 4

E X H I B I T S

| Deposition | | For Ident. |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 8 |
| Exhibit 2 | Rossi 00009285 to 9297 | 14 |
| Exhibit 3 | Rossi 00001387 to 1406 | 37 |
| Exhibit 4 | Color Photo | 73 |
| Exhibit 5 | Color Photo | 73 |
| Exhibit 6 | 9 page document in Italian | 125 |
| Exhibit 7 | IH-00016937, 5 pages | 134 |
| Exhibit 8 | IH-00007019 to 7023 | 164 |
| Exhibit 9 | IH-00019103 to 19108 | 175 |
| Exhibit 10 | Color Photo | 181 |
| Exhibit 11 | Color Photo | 181 |
| Exhibit 12 | Color Photo | 188 |
| Exhibit 13 | Order of Discovery | 192 |
| Exhibit 14 | Second Amendment to License Agreement | 193 |
| Exhibit 15 | IH-OOO91696 to 91697 | 194 |
| Exhibit 16 | Test Process (Page 7) 23 Apr 2013 | 202 |
| Exhibit 17 | Rossi 00003876 | 215 |
| Exhibit 18 | Rossi 00011387 to 11390 | 223 |
| Exhibit 19 | "Exhibit 25" | 228 |
| Exhibit 20 | IH-00019055 to 19056 | 240 |
| Exhibit 21 | Color Photo | 261 |

**Veritext Florida Reporting Co.**

Page 5

1    Thereupon--
2         THE VIDEOGRAPHER:  We're on the record.
3    This is media unit number one.  We're here
4    today, February 24, 2017, at approximately 10:17
5    for the video depo of Andrea Rossi in the case
6    styled Andrea Rossi and Leonardo Corporation
7    versus Thomas Darden, et al, case number
8    1:16-cv-21199-CMA.
9         The videographer is Jason Stapleton.  The
10   court reporter is Edward Varkonyi.  At this time
11   would counsel please state their appearances for
12   the record.
13        MR. PACE:  Can I make one correction
14   before I do that?  Did you say the deposition of
15   Andrea Rossi?
16        THE VIDEOGRAPHER:  I did.  I'm sorry.
17        MR. PACE:  It should be the deposition of
18   Leonardo Corporation.  The representative is Dr.
19   Andrea Rossi.
20        And for the defendants my name is Chris
21   Pace of Jones Day and I actually have one of the
22   defendants present here with me today, John T.
23   Vaughn.
24        MR. ANNESSER:  John Annesser on behalf of
25   the plaintiffs.

Page 6

1         MR. LEON DE LA BARRA:  Francisco Leon de
2    la Barra on behalf of third party defendants
3    J.M. Products, Inc., Henry Johnson and James
4    Bass.
5         MR. NUNEZ:  Rudy Nunez on behalf of
6    Fulvio Fabiani and United States Quantum Leap,
7    LLC.
8    Thereupon--
9              ANDREA ROSSI
10   was called as a witness by the Defendant and having
11   been first duly sworn responded as follows:
12        THE WITNESS:  I do.
13   Can I say preliminarily one thing?  To say that
14   I am sorry but I have delayed a surgery to the
15   throat that -- because I cannot swallow and so
16   during -- as happened in the former my
17   deposition sometime I will have to cough in this
18   glass.  It is not a lack of respect.
19        It's just a necessity because I am not
20   able to swallow and I delayed the surgery
21   because after that surgery I will not be able to
22   talk for several weeks, so to make possible
23   these depositions I had to delay to the 1st of
24   April this surgery.  I am sorry for that.
25        DIRECT EXAMINATION

Page 7

1    BY MR. PACE:
2         Q.  Understood.  And if at any time you need
3    to take a break for that purpose, it's certainly
4    fine.
5         A.  Thank you.
6         Q.  Dr. Rossi, we were together about a week
7    ago for your testimony, correct?
8         A.  Correct.
9         Q.  You understand that you're here today
10   testifying on behalf of Leonardo Corporation?
11        A.  I understand.
12        Q.  Okay.  There are likely going to be
13   questions today where there might be a distinction
14   between what Dr. Andrea Rossi knows and what Leonardo
15   Corporation knows.
16        For example, if I were to ask something
17   from your childhood, you would know that answer,
18   Leonardo Corporation not necessarily because it
19   didn't exist at the time.
20        I will try to be clear if ever I'm asking
21   you a question in your personal capacity, I will try
22   to be clear that I am asking you in that role,
23   otherwise you're testifying as the corporate
24   representative of Leonardo Corporation.
25        Is that okay?

Page 8

1         A.  Understood.
2         Q.  All right.  We have gone through the
3    rules of depositions last week but we also had a
4    little bit of an issue with I think, on both of our
5    sides, talking at the same time sometimes.
6         So to the extent that you have not
7    finished a response, please let me know and I shall
8    let you finish your response.  For purposes of my
9    questions there are times I may take a pause in the
10   middle of a question.
11        If you can just give me a second to make
12   sure the question is finished and then you can start
13   providing your answer.  Is that fine?
14        A.  I will do my best.
15        Q.  No one ever does it perfectly but you
16   just try to -- I think the best you can do is you try
17   to do the best you can.
18        (The document referred to was thereupon
19   marked Deposition Exhibit 1 for Identification, a
20   copy of which is attached hereto.)
21   BY MR. PACE:
22        Q.  Let me hand you what's been marked as
23   Leonardo Exhibit 1.  This is a 30(b)(6) -- the notice
24   for the 30(b)(6) topics for today.
25        Have you reviewed this previously?

IMP

2  (Pages 5 to 8)

Page 9

1    A.  Yes.
2    Q.  All right.  Without getting into the
3  substance of any conversations you have had with your
4  lawyers, I just want to understand in preparing for
5  today's deposition to testify as the corporate
6  representative of Leonardo did you -- other than
7  counsel is there anyone else you spoke to to prepare
8  yourself?
9    A.  No.
10    Q.  Okay.  I remember when you testified last
11  week, for example, issues relating to the merger
12  between Leonardo Corporation of New Hampshire and
13  Leonardo Corporation of Florida, you said would be --
14  information on that would be known by persons other
15  than yourself, correct?
16      MR. ANNESSER:  Object to form.
17      THE WITNESS:  Correct.
18  BY MR. PACE:
19    Q.  Okay.  And if you look here on page 2,
20  topic 12.  Topic 12 is -- sorry, let me let you get
21  your glasses on.
22      Do you see topic 12 there?
23    A.  Yes.
24    Q.  It's the merger of Leonardo Corporation
25  of New Hampshire and Leonardo Corporation of

Page 10

1  Florida.
2      Do you have any more information than you
3  had last week --
4      MR. ANNESSER:  Object to form.
5  BY MR. PACE:
6    Q.  -- about that transaction?
7      MR. ANNESSER:  Form.
8      THE WITNESS:  Honestly, no, because I --
9    because I suppose to have already answer to this
10    question so I did not deepen my knowledge about
11    that.
12  BY MR. PACE:
13    Q.  You recall from last week's deposition
14  that you deferred to -- you said that information
15  about this transaction would have to be obtained from
16  others such as your accountants.
17      MR. ANNESSER:  Object to form.
18  BY MR. PACE:
19    Q.  Do you recall that?
20    A.  My accountants -- I recall -- sorry.  I
21  recall my accountants and my attorney.
22    Q.  And you didn't talk to your accountants
23  or your attorneys about that transaction?
24      MR. ANNESSER:  Object to form.
25      THE WITNESS:  Honestly no, attorney,

Page 11

1  because I suppose that the issue was over.  But
2  no, I did not deepen this point, I'm sorry.
3  BY MR. PACE:
4    Q.  So let's -- let me just make sure because
5  I think this is going to apply cross the board, if I
6  understood what you were saying a moment ago, which
7  is you didn't speak to anyone -- in terms of
8  preparing for your deposition, other than your
9  counsel today, you didn't speak to any fact -- I'm
10  sorry.  You didn't speak to anyone else to prepare
11  for today's deposition?
12      MR. ANNESSER:  Object to form.
13      THE WITNESS:  It is correct.
14  BY MR. PACE:
15    Q.  All right.  For purposes of preparing for
16  today's deposition there is no document or set of
17  documents that you reviewed to prepare for today's
18  deposition?
19      MR. ANNESSER:  Object to form.
20      THE WITNESS:  Yes, with -- I did with my
21    attorney.
22  BY MR. PACE:
23    Q.  And this was after your last deposition,
24  sometime between your last deposition and today?
25    A.  Yes.

Page 12

1    Q.  All right.  Without telling me the
2  specifics of the documents, can you tell me how many
3  documents you reviewed to prepare for the deposition
4  today?
5    A.  It's difficult to say because I did not
6  count them, but I have gone together with my attorney
7  through the issues that --
8      MR. ANNESSER:  Dr. Rossi, I am going to
9    instruct you not to tell him the content of your
10    conversations with counsel but listen to his
11    question and answer his question.
12      THE WITNESS:  This stops me from going on
13    with this answer.
14  BY MR. PACE:
15    Q.  Okay.  I think what your counsel was
16  telling you though is you can give me an idea of the
17  volume of documents.
18      I am not asking you about what was in the
19  documents.  So I am just asking did you -- let me ask
20  you a different way.
21      To prepare for today's deposition to
22  testify as the corporate representative of Leonardo
23  how much time -- I don't want to get into the
24  substance, but how much time did you spend with your
25  counsel?

3 (Pages 9 to 12)

Page 13

```
 1        A.  I didn't chronograph it.  Any number I
 2  could say would be very much in the ballpark.
 3        Q.  Can you provide me a ballpark?
 4        A.  Ballpark, I could say three hours,
 5  something.  Maybe one, maybe five.  Something like
 6  that.
 7        Q.  That helps us some with the documents,
 8  correct, because --
 9        A.  Sorry?
10        Q.  That might help us a little bit in terms
11  of the amount of documents you reviewed because there
12  is only so many documents you are going to be
13  reviewing in three hours, let's say, correct?
14        MR. ANNESSER:  Object to form.
15        THE WITNESS:  Yes and no.  Because --
16  because maybe we pass some document that takes
17  few seconds because the issue there is faster to
18  be resolved or maybe a small page that takes
19  much time because there is an issue that is
20  important.
21        So any number I could say could be very
22  much -- very much in the ballpark.
23  BY MR. PACE:
24        Q.  My apologies.  That's my phone, just for
25  the record.
```

Page 14

```
 1        A.  It happens also to me to forget to turn
 2  off the telephone.
 3        Q.  I believe I have some documents here.  I
 4  am not sure whether I used -- I think I might have
 5  shown you this one the last time, but I might not.
 6        (The document referred to was thereupon
 7  marked Deposition Exhibit 2 for Identification, a
 8  copy of which is attached hereto.)
 9        THE WITNESS:  Thank you.
10  BY MR. PACE:
11        Q.  Let me hand you what I marked as Exhibit
12  Number 2.  In fact, we did -- we did look at this
13  exhibit last week.  It was I think towards the end of
14  the time during the deposition.
15        A few questions I wanted to ask because I
16  want to understand this.  I had a chance to kind of
17  look at it a little bit better.  First of all what I
18  marked here as Exhibit 2, these are -- these are your
19  handwritten notes, correct?
20        A.  Yes, it is correct.
21        Q.  These are notes that would be taken, if I
22  look on the left-hand column, for example, in the
23  first page, that's the date, correct?
24        There is a date in February on this first
25  page starting from the 23rd going to the 28th; is
```

Page 15

```
 1  that correct?
 2        A.  It is correct.
 3        Q.  The second entry is a recording of the
 4  temperature taken at 5 p.m. from the steam -- from
 5  the output -- I'm sorry, let me take a step back.
 6  Just define some terms.
 7        I think we used these same terms last
 8  week.  I just want to make sure that there is no
 9  confusion.
10        At the Doral location I will refer to the
11  E-Cat plant as probably just the E-Cat plant because
12  I know there is individual units within there called
13  the E-Cat units or reactors, correct?
14        A.  Correct.
15        Q.  Okay.  And what I will probably refer to
16  as the J.M. Products side is the side where the
17  output from the plant, from the E-Cat plant was being
18  sent.
19        Is that okay?
20        A.  Okay.
21        Q.  All right.  So there is -- there is
22  between the E-Cat plant and the J.M. Products side,
23  there is a -- or there was a pipe, correct, that
24  would take the output from the E-Cat plant and send
25  it over to the J.M. Products side of the warehouse,
```

Page 16

```
 1  correct?
 2        MR. ANNESSER:  Object to form.
 3        THE WITNESS:  Can you repeat?
 4  BY MR. PACE:
 5        Q.  Yes.  At the Doral warehouse there was a
 6  pipe that carried the output from the E-Cat plant
 7  over to the J.M. Products side of the Doral
 8  warehouse, correct?
 9        A.  Correct.
10        Q.  All right.  What we have here on Exhibit
11  2, column -- the second column here is a reading of a
12  thermocouple that was on that output pipe; is that
13  correct?
14        A.  It is correct.
15        Q.  Now, is this -- where would you get this
16  information?
17        Can you read it directly from the
18  thermocouple or do you have to read it from a
19  separate computer?
20        A.  No, I read it by means of a manual
21  thermometer that was property -- was left there by
22  Engineer Penon, the ERV, what we define the expert
23  responsible of validation in the agreement, and he
24  gave me the task to read -- every day we agreed upon
25  to make the reading along my shift of work on the
```

4 (Pages 13 to 16)

Page 17

```
 1    plant.
 2         My shift of work was from say about
 3    between 5 and 6 p.m. and between 10 and 11 a.m. of
 4    the next day.  And so I have taken these lectures.
 5         Q.  So this is -- so you're not reading the
 6    temperature of a thermocouple, you are actually
 7    putting a manual thermometer, so to speak, on the
 8    pipe?
 9         MR. ANNESSER:  Object to form,
10    mischaracterization.
11         THE WITNESS:  Can you repeat?
12    BY MR. PACE:
13         Q.  I can, because I might have
14    misunderstood.
15         When you get this temperature data, let's
16    take the first column here or the first line here
17    which is we got 23 for February 23.  We have --
18         A.  Yes.
19         Q.  We have 5 p.m. Yes, 5 p.m. which is the
20    time that you are doing this reading.  Then we have
21    103.
22         Is the 103, are you getting that -- is
23    that information that is being taken out of the
24    thermocouple that is on the pipe or is it information
25    that is being obtained separately by using some
```

Page 18

```
 1    separate measuring device?
 2         MR. ANNESSER:  Object to form.
 3         MR. LEON DE LA BARRA:  Join.
 4         THE WITNESS:  There were more
 5    thermocouples inserted in the steam output in
 6    different position.  Position, by the way, that
 7    had been agreed upon between -- also between the
 8    ERV, Engineer Penon and Mr. Tom Darden.
 9    BY MR. PACE:
10         Q.  You're saying Mr. Darden saw where the
11    thermocouples were placed on the pipe and approved
12    them?
13         A.  Yes,.
14         Q.  He saw the specific location?
15         A.  I saw Mr. Tom Darden talk with Engineer
16    Penon, Fabio Penon to -- and I remember that Tom
17    Darden said his opinions about the positions of the
18    thermocouples and the Engineer Penon complied.
19         Q.  This was a personal meeting that they
20    had?
21         A.  Yes.
22         Q.  Okay.
23         A.  That was -- I would not call it a
24    meeting.  They just were both there before the
25    start-up of the plant.
```

Page 19

```
 1         Q.  I understand.
 2         A.  In Doral and Mr. Tom Darden gave some
 3    recommendation that he had got from some consultant
 4    of him --
 5         Q.  So if I understand correctly --
 6         A.  -- T. Barker.
 7         Q.  -- so prior to you starting the plant in
 8    Doral, the E-Cat plant in Doral, Tom Darden and Fabio
 9    Penon met and discussed where to place the
10    thermocouples in the output pipe from the E-Cat?
11         MR. ANNESSER:  Object to form.
12         THE WITNESS:  This is what I recall.
13    BY MR. PACE:
14         Q.  Okay.  Okay.
15         A.  This is what I recall.  I have in my
16    brain this movie now.
17         Q.  Right.
18         A.  And this is what I recall.
19         Q.  A visualization of it?
20         A.  This is the visualization of what I
21    remember.
22         Q.  Excellent.
23         A.  By the way -- okay.
24         Q.  Let me go back to my question originally,
25    which is you are getting this measurement of 103 at 5
```

Page 20

```
 1    p.m. on February 23rd.
 2         A.  Yes.
 3         Q.  You said you used a manual device to do
 4    so.
 5         Did you connect -- is this a manual
 6    device you connect to the thermocouple to find the
 7    reading of the thermocouple or is it a manual device
 8    that you connect elsewhere?
 9         MR. ANNESSER:  Object to form.
10         THE WITNESS:  I have understood the
11    question.  The ERV --
12         MR. ANNESSER:  ERV.
13         THE WITNESS:  ERV, expert responsible for
14    validation is the acronym.
15    BY MR. PACE:
16         Q.  So the ERV?
17         A.  Had installed the thermocouples connected
18    with his instrumentation.  Among these thermocouples
19    there was one specific that was hanging -- that was
20    hanging from the steam pipe.
21         He had put, if I were remember, that
22    thermocouple in the lower part of the pipe at the
23    exit of the steam because it had the lower temperature
24    because in a pipe the temperature could be equal
25    across all the section of the pipe but could also
```

Page 21

1  have some difference in the sense that could be a
2  little bit warmer upside than downside.
3        Q.  Dr. Penon -- Dr. Rossi, I am just asking
4  though, back to my question.  It's a simple
5  question.
6        A.  Yes.
7        Q.  Let me try it again.
8        MR. ANNESSER:  Chris --
9        MR. PACE:  Okay.
10  BY MR. PACE:
11       Q.  When you -- all I'm asking, you said that
12  you manually -- that this -- let's focus here.
13       A.  I understand.
14       Q.  Let's focus here just for a second.
15  There is a temperature reading here.
16       A.  Yes.
17       Q.  You testified that you manually checked
18  this with a device that was provided by Dr. Penon.
19       All I am asking is are you taking this
20  information -- it's a yes or no question.  I will
21  make it yes or no.  Is that information something
22  that you are getting by connecting a device, a manual
23  device to a thermocouple?
24       MR. ANNESSER:  Object to form.
25       THE WITNESS:  Yes.

Page 22

1  BY MR. PACE:
2        Q.  All right.  And this is a thermocouple
3  that Dr. Penon provided?
4        A.  Yes.
5        Q.  This is a thermocouple that you testified
6  on behalf of Leonardo that Dr. Penon installed?
7        A.  Yes.
8        Q.  Okay.  And you -- and what was the
9  device -- if you recall, what was the device you used
10  to read the information from the thermocouple?
11       A.  Yes, it was -- if I -- I could be wrong
12  because it is not mine and Penon has taken it back
13  when.
14       It was an Omega.  Omega 3 was the name of
15  the instrument.  Omega is the manufacturer, 3 the
16  model, but attorney, I could be wrong.  This is what
17  I recall.
18       It was a red box electronic and it was
19  connected by -- the thermocouple had two ends.  One
20  end was the real thermocouple that was inserted in
21  the pipe of steam.  The other end was the plug to be
22  plugged to this instrument.  So you push the button
23  and you read the temperature.
24       Q.  Understood.  And so what we have here is,
25  again looking at Exhibit 2, at three different times

Page 23

1  during the day, 5 p.m., 4 a.m. and 10 a.m. you would
2  take -- you would use this device -- may have been
3  Omega 3, may not, but you used this device to
4  determine the temperature that was being shown on the
5  thermocouple that Dr. Penon had installed on the
6  output pipe?
7        A.  Correct.
8        Q.  Okay.  Now, if we go -- there is some --
9  well, let me keep going here.
10       Without getting into particular pages
11  yet, I will in a second, but do I understand
12  correctly that in the course of a day, let's say
13  again the 23rd, you would take -- the 5 o'clock
14  measurement you would take at 5 o'clock and you would
15  write it down on this piece of paper?
16       A.  It is correct.
17       Q.  Then at 4 a.m. you would go make a
18  measurement again and you would write it down here on
19  this piece of paper?
20       A.  Correct.
21       Q.  In other words, when I look at a line for
22  let's say the 26th of February --
23       A.  Yeah.  Sorry.
24       Q.  It's not that you wait until you've
25  collected all the information elsewhere and then you

Page 24

1  filled in line -- you filled in the line for the 26th
2  of February all at once.  You filled in each space --
3  let me try this again.  That was poorly done.
4        I just want to make sure that I've got
5  this because your handwriting is very consistent, so
6  you can't really tell from the handwriting but if I
7  am looking at February 26th, the reading at 103.2 --
8  the reading of 103.2, the first one there, that was
9  written on or about 5 p.m. on February 26th; is that
10  correct?
11       MR. ANNESSER:  Object to form.
12       THE WITNESS:  As I recall, this has been
13  written at the moment when I -- you know, maybe
14  also that sometime I scribbled the number
15  somewhere and then reported in the log.  I don't
16  recall.
17  BY MR. PACE:
18       Q.  But would you do that the same day or
19  shortly afterwards?
20       A.  Should be the same -- the same day.
21       Q.  Okay.
22       A.  Should be.
23       Q.  So in most instances though you recall --
24  you would actually have this piece of paper with you
25  or these pieces of paper and you would write down the

6  (Pages 21 to 24)

## Page 25

1 information --
2 A. Yes, it is correct.
3 Q. -- at that time?
4 A. Yes, it is correct.
5 Q. And again, all I am trying to establish
6 or make sure I understand is that when I look at the
7 row that represents February 26th --
8 A. 26th, yes.
9 Q. -- what I am getting here is the first
10 number is going to be the temperature reading that
11 you took somewhere around 5 p.m. on February 26th,
12 correct?
13 MR. LEON DE LA BARRA: Object to form.
14 THE WITNESS: Correct.
15 BY MR. PACE:
16 Q. And then the next line or the next
17 number, 103.2, is a temperature reading that you took
18 somewhere on or about 4 a.m. on February 26th?
19 MR. ANNESSER: Object to form.
20 MR. LEON DE LA BARRA: Join.
21 THE WITNESS: Yes, but it is not 103.2.
22 I don't see the .2. I see .6.
23 MR. ANNESSER: Chris, if I may.
24 BY MR. PACE:
25 Q. I apologize. You know what, I was

## Page 26

1 reading the 26 and 24. I'm sorry, what you have
2 there is 24. I thought that was a 26. I apologize.
3 Let me do that question again then. That was my
4 mistake.
5 When we look at the row for February
6 26th.
7 A. Okay.
8 Q. The first number is 103.7; is that
9 correct?
10 A. It is correct.
11 Q. 103.7 represents the temperature
12 measurement you took for the output pipe on or about
13 5 p.m. on February 26th?
14 A. Correct.
15 Q. All right. The next number is 103.6; is
16 that correct?
17 A. It is correct.
18 Q. And that represents the temperature
19 reading you took on or about 4 a.m. on February 26th
20 or February 27th?
21 A. Correct. Correct.
22 MR. ANNESSER: Object to form.
23 BY MR. PACE:
24 Q. So we do have some -- if you can turn to
25 page -- let's see. Actually, looks like the time

## Page 27

1 entry for June. The bottom corner says Rossi 9289?
2 A. Yes.
3 Q. Now, there is a fourth column here and
4 from the copy this is the way it was kind of produced
5 to us. It's very hard to read but I think that copy
6 says -- I think the fourth column the heading is
7 $H_2O$.
8 A. The last column you say?
9 Q. Yes, the last column.
10 A. Yes, it is water. Yes.
11 Q. Okay. Sometimes there is percentages in
12 this column and sometimes there is just an F.
13 Is this a measure of the amount of water
14 that was in the water tank that was part of the E-Cat
15 plant?
16 MR. ANNESSER: Object to form.
17 THE WITNESS: I don't remember exactly.
18 BY MR. PACE:
19 Q. Do you know if F was short for full?
20 A. Yes, F means normal.
21 Q. Okay. We have percentages in here too,
22 correct, some of them are 30 percent or 10 percent?
23 MR. ANNESSER: Object to the form.
24 BY MR. PACE:
25 Q. I'm sorry, negative 30 percent, negative

## Page 28

1 10 percent in that last column. Do you know what
2 that means or represents?
3 MR. ANNESSER: Object to form.
4 THE WITNESS: I -- you know, that could
5 be -- that could be a level. I don't remember
6 exactly what I meant with this because they were
7 my personal annotations.
8 These annotation did not go to the ERV.
9 I don't remember exactly if I meant a level or a
10 flow.
11 BY MR. PACE:
12 Q. Okay. These are -- so let's look at --
13 let's take a couple of days here.
14 A. Uh-huh.
15 Q. June. You see the entries there for June
16 8th and June 9th?
17 A. Okay.
18 Q. All right.
19 A. Uh-huh.
20 Q. Actually, let me ask you to look at June
21 7th, 8th and 9th.
22 A. Uh-huh.
23 Q. First thing is each of these rows of
24 information reflects data that you were collecting on
25 the day and time that is reflected in this document?

R

7 (Pages 25 to 28)

Page 29

1  In other words, when I look at this row for June 8th,
2  the first number of 103.4 is the number you collected
3  around 5 p.m. on June 8th using the device provided
4  by Dr. Penon, correct?
5      A.  Yes, it is correct.
6      Q.  So these are all contemporaneous
7  measurements that you were recording, correct?
8      A.  What do you mean contemporary?
9      Q.  I'm sorry, these are all measurements
10  that you were recording on that day that is reflected
11  here in the spreadsheet?
12      A.  Yes.
13      Q.  Then you were actually putting it into
14  this manual spreadsheet that same day?
15          MR. ANNESSER:  Object to form.
16          THE WITNESS:  Yes.
17  BY MR. PACE:
18      Q.  Okay.  So if we go to our third -- if we
19  go to the last column here for the 7th, 8th and 9th
20  of June.
21      A.  7th, 8th and 9th, okay.
22      Q.  I have -- I see an F.
23      A.  F and minus 30 percent.
24      Q.  F, F and a minus 30.
25          Does that help in terms of understanding

Page 30

1  what was going on?  Something has been reduced by 30
2  percent; is that what that signifies?
3      A.  Yes, could be the level of -- could be
4  the level of the water in the -- could be the level
5  of the water in the tank.
6      Q.  Okay.  Does it help you at all if you
7  move up a few days to around the 5th of June and you
8  can see a minus 30 percent and then it looks like R4,
9  then the sign of omega?
10      A.  Omega means resistance.  It's the Greek
11  symbol for resistance.  So that -- that the
12  reactor number 4 had some problem to the
13  resistances.  And this can have -- caused a variation
14  in the level of the tank.
15      Q.  Now, I had -- if you can turn the page to
16  9290.
17      A.  9290, yes.
18      Q.  I had another question here.  If you can
19  look at the 27th, 28th and 29th of July.
20      A.  27th, 28th, 29th of July, yes.
21          MR. ANNESSER:  What's the Bates number at
22      the bottom?
23  BY MR. PACE:
24      Q.  9290.  Again, just so the record is
25  clear, these are -- these reflect the actual

Page 31

1  temperature measurements that you are drawing on the
2  days written here on July 28 -- July 27, July 28,
3  July 29th, correct?
4          MR. ANNESSER:  Object to form.
5          THE WITNESS:  Can you repeat the
6      question?
7  BY MR. PACE:
8      Q.  Yes.  Again, I am just trying to make
9  sure I get a clear record here.
10      A.  Sure.
11      Q.  This page we're looking at has three
12  temperature readings for each of July 27, July 28 and
13  July 29, correct?
14      A.  Okay, correct.
15      Q.  And each of those temperature readings is
16  a temperature reading you took on that particular
17  day, correct?
18      A.  Correct.
19      Q.  And you took it from the thermocouple
20  installed by Dr. Penon, correct?
21      A.  Correct.
22      Q.  Now, if we go to our fourth column after
23  the temperature readings there is a fourth column of
24  water level.
25      A.  Yes.

Page 32

1      Q.  For the 27th of July we have an F?
2      A.  Yes.
3      Q.  For the 28th and 29th we have a minus 20
4  percent Omega 3, minus 35 percent Omega 3?
5      A.  Correct.
6          MR. ANNESSER:  Object to form.
7  BY MR. PACE:
8      Q.  But there is also for the 28th of July --
9      A.  B.O.
10      Q.  Right.  I wasn't sure what that meant.
11      A.  I don't remember, I am sorry, because
12  this is a note that I have put for me for something
13  that in this moment that I forgot.
14          It was related to something that I had to
15  make that day, but I don't remember.
16      Q.  Does it somehow relate to the water
17  level?
18      A.  I don't remember.
19          MR. ANNESSER:  Object to form.  I'm
20  sorry.
21          THE WITNESS:  I don't remember this B.O.,
22  what was for.
23  BY MR. PACE:
24      Q.  All right.
25      A.  I don't remember it.

8  (Pages 29 to 32)

Page 33

1    Q.  All right.
2    A.  But in that moment was something
3  important because if I put this but then, you know --
4    Q.  Because these are the notes you are
5  taking at the time that you are recording --
6    A.  Yes, sir.
7    Q.  -- this information?
8    MR. ANNESSER:  Object to form.
9    THE WITNESS:  I'm sorry.
10    MR. LEON DE LA BARRA:  Join.
11    MR. ANNESSER:  Please allow him to finish
12  his question so we don't mess up the court
13  reporter.
14    THE WITNESS:  Sorry.
15  BY MR. PACE:
16    Q.  So Dr. Rossi, if I can ask you to turn to
17  page 9293.
18    A.  Okay.
19    Q.  These are the temperature readings for
20  August of --
21    A.  No, it is October.
22    Q.  October, I apologize.  So these are the
23  readings for October of 2015, correct?
24    A.  Correct.
25    Q.  These are the manual readings you were

Page 34

1  taking every day of the temperature for the output
2  pipe from the E-Cat plant, correct?
3    MR. ANNESSER:  Object to form.
4    THE WITNESS:  Correct.
5  BY MR. PACE:
6    Q.  As well as our -- as well as the last
7  column that your recollection reflects somehow a
8  water level connected to the E-Cat plant?
9    MR. ANNESSER:  Object to form.
10    THE WITNESS:  Correct.
11  BY MR. PACE:
12    Q.  And just if you can kind of take a look
13  over the entirety of the page, I am just going to
14  tell you there is a lot of -- most of these
15  temperatures are all between 103.7 and 103.6.
16    A.  Uh-huh.
17    Q.  Is the device you were using, did it read
18  only one digit or did it read more than one digit and
19  you rounded to the closest -- I'm sorry, that was a
20  terrible question.  Let me ask it again.
21    Did the device that you were using to
22  read the temperature, did it show only four digits,
23  such as 103.7, or would it reflect more than four
24  digits but you would round it off so if it said
25  103.68 you would write it as 103.7?

Page 35

1    MR. ANNESSER:  Object to form.
2    THE WITNESS:  The instrument that I used
3  showed exactly the four digit, the 100s and the
4  one decimal.
5    If you are asking if it also indicated
6  the hundredth,, the answer is no.
7  BY MR. PACE:
8    Q.  That's exactly what I was asking.  Again,
9  to take a day out of here, October 12.
10    A.  Yeah.
11    Q.  The first manual reading you took shows a
12  temperature is at 103.7, correct?
13    A.  Correct.
14    Q.  This is for the output pipe going over to
15  Leonardo -- going over to the J.M. Products side of
16  the warehouse, correct?
17    A.  Yes, it is correct.
18    Q.  The next reading you took for that day
19  was 103.6, correct?
20    A.  Correct.
21    Q.  All right.  And the last is 103.7,
22  correct?
23    A.  Correct.
24    Q.  All right.  Dr. Rossi, can I ask you to
25  turn to the top of -- it's page 9295.  I believe it

Page 36

1  reflects the entries -- the manual entries for
2  December.
3    A.  Yes.
4    Q.  If you look at the December 2nd, the last
5  column has a 30 percent and then I have to be honest
6  with you, I have a hard time figuring out what is
7  written after that.  It looks like the word "Rich" is
8  in there.
9    MR. ANNESSER:  Was there a question?
10  BY MR. PACE:
11    Q.  Can you tell me -- I'm sorry.  Can you
12  read that?
13    A.  I'm trying to recall.  "CU Rich J.M."
14    MR. ANNESSER:  His question is can you
15  read that.
16    THE WITNESS:  I can read, but I -- yes, I
17  can read it.
18  BY MR. PACE:
19    Q.  Let's start with that because I actually
20  even have a hard time reading it.  What does it say
21  after 30 percent there?
22    A.  Should be -- should be the letter, but
23  what I do not remember because -- if I wrote this,
24  this was for me.
25    These notations were for me, not for

9  (Pages 33 to 36)

Page 37

1    Penon.  You know, at the moment I put down something
2    to remember something.
3        Q.   Okay:
4        A.   And I don't remember what that was.
5        Q.   I just want to write down some of these
6    days we were just looking at.  I am going to mark the
7    next exhibit as Exhibit 3.
8            (The document referred to was thereupon
9    marked Deposition Exhibit 3 for Identification, a
10   copy of which is attached hereto.)
11   BY MR. PACE:
12       Q.   So this I believe is information that you
13   were -- that Leonardo was recording.  If you can see
14   there in the first page -- I'm sorry, let me start
15   this over again.
16       For Exhibit 3 on the first page it
17   references "logbook of the performance data."  Is
18   this a logbook maintained by Leonardo Corporation?
19       A.   This is much more than that.  This is the
20   logbook that I maintained for the ERV.  This logbook
21   was not for Leonardo Corporation because the ERV
22   asked me to send to him every day at approximately
23   the same time -- I don't remember if I have taken
24   these values at the -- at 5 p.m., surely not at 4
25   a.m., but either 10 a.m. or 5 p.m. I don't remember,

Page 38

1    but it's easy to reconstruct, make a comparison and
2    this is the log -- logbook that Penon asked to me to
3    update every day.
4        Every day I sent to him by e-mail as an
5    attachment this logbook with the new line every day.
6    So for example, this logbook was an attachment.  The
7    first day of work of the plant had a logbook with
8    only one line because --
9        Q.   The line there that says 20?
10       A.   The line that says 20.
11       Q.   Okay.
12       A.   On the 21st I sent it to him the same
13   e-mail, but with the second line and so on and so on
14   and so on until the end.
15       Q.   And what e-mail address did you use to
16   send that?
17       A.   Sorry?
18       Q.   What e-mail address did you use to send
19   that?
20       A.   The e-mail address that Dr. Penon gave to
21   me.
22       Q.   So that's what you sent it to.  What
23   e-mail did you send it from, which of your e-mail
24   addresses?
25       A.   This -- you know, this I don't remember.

Page 39

1    But usually I use ar.123@mail.com or could have been
2    libero -- eon333@libero.it.  One of these two should
3    be.
4        Q.   When we look at Exhibit 3, each line that
5    corresponds to a date, such as the line for February
6    20th or the line for February 21st, the line for
7    February 20th, that reflects data or information that
8    you actually record on February 20th?
9        A.   Can you repeat the question?  I'm sorry.
10       Q.   Sure.  The first line of data in here
11   under February is February -- there is a 2-0,
12   correct?
13       A.   It's the 20th of February.
14       Q.   The 20th of February.  Then it has
15   numbers for water flow --
16       A.   Yes.
17       Q.   -- water, steam and P, which is short for
18   pressure, correct?
19       A.   Correct.
20       Q.   Each of those numbers reflects
21   information that you collected on February 20th,
22   wrote down on February 20th and sent to Dr. Penon
23   either on February 20th or February 21st, correct?
24       A.   Correct.
25       Q.   We'll come back and talk about this more

Page 40

1    generally.
2        Just for a second here, we're going to
3    jump up to June, just to go through.  I am actually
4    not trying to compare this to Exhibit 2.  I am just
5    trying to use some of the same reference dates.  So
6    it's page 1393.
7        A.   Yes.
8        Q.   Okay.  So we have here -- when we were
9    talking about Exhibit 2, we were talking about this
10   kind of June 7th, 8th, 9th.
11       What this reflects here, I have got a
12   line that has under June on page 1393, there is a
13   line that has 7 colon.  This is information that you
14   collected on the 7th of June, correct?
15       A.   Uh-huh.
16       Q.   It shows that there is a flow meter
17   reading that you took on the 7th of June --
18       A.   Uh-huh.
19       Q.   -- there is a water temperature reading
20   you took on the 7th of June, there is a steam
21   temperature reading you took on the 7th of June --
22       A.   Uh-huh.
23       Q.   -- and there is a pressure reading you
24   took on the 7th of June?
25       A.   Yes.

10 (Pages 37 to 40)

Page 41

```
 1        Q.  All right.  Next -- the next paragraph
 2   there has an 8 that reflects information you
 3   collected on June 8th, correct?
 4        A.  Uh-huh.
 5        Q.  Information that you recorded on June
 6   8th, correct?
 7        A.  Yes.
 8        Q.  Information you transmitted to Dr. Penon
 9   on either June 8th or June 9th of 2015, correct?
10        A.  Right.
11        MR. ANNESSER:  Object to form.
12   BY MR. PACE:
13        Q.  Line 9 is similar because it also -- this
14   reflects data you collected on June 9th, correct?
15        A.  Sorry, can you repeat the question?
16        Q.  Yes.  You see the paragraph that starts
17   with 9 colon, on this page Rossi 1393?  That
18   paragraph reflects data that you collected on June
19   9th, correct?
20        A.  Correct.
21        Q.  It has a water flow meter reading --
22        A.  Uh-huh.
23        Q.  -- a water temperature reading, a steam
24   temperature reading and a pressure reading, correct?
25        A.  Correct.
```

Page 42

```
 1        Q.  Now, one of the things it has here also
 2   making this line a little bit more unique, it says
 3   reduced to three quarters -- I'm sorry, reduced to
 4   3/4 maintenance.
 5        A.  Yes.
 6        Q.  That doesn't appear for June 7th or June
 7   8th, correct?
 8        MR. ANNESSER:  Object to form.
 9        THE WITNESS:  No, it does not appear.
10   BY MR. PACE:
11        Q.  What does that -- what does that mean,
12   reduced to 3/4s maintenance?
13        A.  Means that the -- the flow of water has
14   been reduced for -- for maintenance in one of the
15   four reactors.
16        Q.  Okay.  Does that mean that one of the --
17   would that be because -- I'm sorry, you said one of
18   the four reactors.
19        A.  Uh-huh.
20        Q.  To make sure we're on the same page here,
21   you mean this is one of the four what you were
22   calling last week the big Frankies?
23        A.  Yes, sir.
24        Q.  In the E-Cat plant -- I know we talked
25   about this last week but we're here for the
```

Page 43

```
 1   deposition of Leonardo Corporation.  I just want to
 2   make sure we're clear on this transcript.
 3        In the E-Cat plant there were a number of
 4   E-Cat units or E-Cat reactors, correct?
 5        A.  Correct.
 6        Q.  There were -- some of these E-Cat units
 7   were assembled into one of four larger collections
 8   which were called big Frankies --
 9        A.  Correct.
10        Q.  Correct?
11        MR. ANNESSER:  Object to form.
12   BY MR. PACE:
13        Q.  I believe you testified previously that's
14   because sometimes these boxes, they would move a
15   little bit and people made the joke they were like a
16   Frankenstein, correct?
17        MR. ANNESSER:  Object to form.
18        THE WITNESS:  Correct.
19   BY MR. PACE:
20        Q.  And I believe -- we can look at documents
21   to get the exact number but these big Frankies have
22   something in the neighborhood of 60 to 64 -- 60 to 65
23   E-Cat units total across the four; is that correct?
24        MR. ANNESSER:  Object to form.
25        THE WITNESS:  Correct.
```

Page 44

```
 1   BY MR. PACE:
 2        Q.  In addition inside the E-Cat plant there
 3   were another approximately 50 E-Cat units as well,
 4   correct?
 5        MR. ANNESSER:  Object to form.
 6        THE WITNESS:  Correct.
 7   BY MR. PACE:
 8        Q.  All right.  Those additional 50 E-Cat
 9   units were not producing power or steam during the
10   test that was being run in Doral; is that correct?
11        MR. ANNESSER:  Object to form.
12        THE WITNESS:  Sometime they have -- not
13   always.  Sometime they have been turned it on.
14   BY MR. PACE:
15        Q.  They were turned on?
16        A.  Sometime.  Sometime.  But we had problems
17   with those.
18        Q.  After -- do you recall whether those --
19   the E-Cat units other than the big Frankies were ever
20   operating in the E-Cat plant after April of 2015?
21        A.  Yes.  Now and again I tried to put them
22   at work but they had problems.  I put them at work
23   now and again trying to -- trying to make them work
24   but with problems because they were unbalanced
25   because they had to work -- they were not easy to be
```

11 (Pages 41 to 44)

Page 45

1    synchronized in the -- I would say in the orchestra.
2         They had to be synchronized and to be
3    synchronized it was necessary that there were not
4    disharmonies between the groups.  They were
5    subdivided in subgroups.
6         We had problems because I am -- my
7    sensation it will have to be analyzed, et cetera, et
8    cetera.  Probably some or many of them have been for
9    some reason improperly charged.  They had been
10   charged without my control from -- in the factory of
11   Industrial Heat.  They had very strange behavior.
12        But I have put them in operation now and
13   again, trying to recombine, trying to put them in
14   equilibrium.
15        Q.  Okay.  So let me ask you one question.  I
16   want to get back to the spreadsheet but I do want to
17   ask you one question about that.
18        The E-Cat units that were not part of the
19   big Frankies, those were -- those additional 50 units
20   roughly, those were not charged by you?
21        A.  52.
22        MR. ANNESSER:  Object to form.
23   BY MR. PACE:
24        Q.  52.  Those additional 52 units, those
25   were not charged by you?

Page 46

1        MR. ANNESSER:  Object to form.
2        THE WITNESS:  No, and I have to add
3    another thing, that the units had to be -- the
4    units had to be 54 or -- 54.
5        When the plant has been delivered from
6    Industrial Heat to the factory of Doral, because
7    all of the small E-Cats have been made -- remade
8    and charged from anew from Industrial Heat.
9    BY MR. PACE:
10        Q.  Okay.
11        A.  And I was not there.  I was there during
12   the period in which they have been remade by
13   Industrial Heat only for a week or two or very rarely
14   because my work at that point was to stay in Doral to
15   prepare the factory.
16        Q.  Were you there when they were charged or
17   no?
18        A.  Can you repeat?
19        Q.  Were you there when these additional
20   units were charged?
21        A.  No.
22        Q.  -- or fueled?
23        MR. ANNESSER:  Object to form.
24        THE WITNESS:  Some -- I want to be
25   precise.  I was there for maybe ten of them --

Page 47

1    BY MR. PACE:
2        Q.  Understood.
3        A.  -- together with Tom Darden because the
4    charge has been made from me and Tom Darden initially
5    because I had also to teach him and after that -- but
6    they were 54.
7        Q.  Do you know which of those ten -- out of
8    the 54 could you identify which of the ten were you
9    there for the fueling or would the answer be that you
10   don't know which of the ten are the ones that you
11   were there for fueling?
12        MR. ANNESSER:  Object to form.
13        THE WITNESS:  It's impossible because
14   they are equal.
15   BY MR. PACE:
16        Q.  So in other words, when you walk in and
17   look at the 52 or 54 E-Cat units you'd say you don't
18   know?
19        A.  Should I have known that a problem, I
20   could have identified them with a number or something
21   but I did not because I suppose that we should not
22   have problem.
23        Q.  Let me ask you then, when we go back to
24   this Exhibit 9, this is how I am wrapping this
25   together.  Reduced by 3/4s maintenance, obviously if

Page 48

1    all that's being --
2        MR. ANNESSER:  You said Exhibit 9?
3    BY MR. PACE:
4        Q.  I'm sorry, let me -- thank you.
5    Dr. Rossi, if you will turn back to Exhibit 3, page
6    1393.
7        The date entry for June 9th, when it says
8    reduced to 3/4s --
9        A.  Sorry.
10        Q.  No problem.  When it says reduced to
11   3/4s-maintenance, I am trying to understand, does
12   that indicate that one of the big Frankie units was
13   not -- was offline for maintenance?
14        MR. ANNESSER:  Object to form.
15        THE WITNESS:  Yes, it is correct.
16   BY MR. PACE:
17        Q.  That's why I was asking you about the
18   additional units because 3/4s -- four big Frankies,
19   3/4s would suggest one of the big Frankies was
20   offline?
21        A.  Yes.
22        Q.  All right.  So if I am looking here now
23   to get -- go back and get a little bit more
24   information here, let's look at June 8th.
25        On June 8 there is a water flow meter

12  (Pages 45 to 48)

Page 49

1 reading. That's a reading that you manually took by
2 looking at the water flow meter that was on the line
3 coming from the Leonardo -- coming from the J.M.
4 Products side of the Doral warehouse over towards the
5 E-Cat plant --
6         MR. ANNESSER: Object to form
7 BY MR. PACE:
8     Q. -- is that correct?
9     A. Yes, it is correct.
10    Q. All right.
11    A. When you say manually -- sorry, just to
12 be more precise. When you say manually, I want to be
13 sure of the translation. When you say manually, you
14 mean by eyes?
15    Q. Yes. I'm sorry.
16    A. Yes.
17    Q. So you would -- let me just clear that.
18    A. Because I just read. You know, the flow
19 meter was like this watch. What time is it? It is
20 11:20. That's what I did.
21    Q. That's what I am asking. You would look
22 at --
23    A. I have gone there, read the number, put
24 the number in paper and give the number to Penon.
25 That was the idea.

Page 50

1     Q. So you would -- you would physically go
2 up to the meter on June 8th, looked at the number and
3 wrote down the number?
4     A. Yes.
5     Q. You did the same thing on June 7th for
6 the water flow meter reading, the same thing on June
7 8th for the water flow meter reading, correct?
8     A. Correct.
9     Q. Okay. Then we have got a water
10 temperature reading that is -- it says water "T 40 80
11 C", so I understand --
12    A. Yes.
13    Q. -- the 80 C is the 80 Celsius -- not 80
14 Celsius; is that right?
15    A. Yes, it is.
16    Q. So what -- why is it 40 space 80?
17    A. Because the temperature was taken in
18 different points of the tank and the temperature
19 was -- so we had a minimum and a maximum temperature
20 point.
21        So basically 80 Celsius was at the inlet
22 and 40 Celsius was in the colder position or maybe
23 the reason -- I'm sorry.
24        THE COURT REPORTER: The what position,
25    cold air?

Page 51

1         MR. ANNESSER: Dr. Rossi, one second, our
2 court reporter didn't get. The colder.
3         THE WITNESS: Colder, more cold. And
4 or -- or -- or -- let me correct myself.
5         Because now that I read here, because
6 also steam 103, 104, this is not (Speaking
7 Italian). This is the minimum and the maximum
8 that I have measured during -- during that day.
9         Because otherwise it does not -- because,
10 you know, the difference is too much to be in
11 two points.
12 BY MR. PACE:
13    Q. Right.
14    A. So this is the minimum and the maximum of
15 the period considered.
16    Q. So on June 8th -- just focusing on June
17 8th here.
18    A. Yes.
19    Q. You took more than one -- I'm sorry, took
20 is the wrong word. Let me start again.
21        On June 8th you read a water temperature
22 device. We'll get to what that was in a second but
23 you read a water temperature device that reflected
24 temperatures somewhere between 40 -- I'm sorry.
25 Reflected temperatures between 40 and 80 degrees

Page 52

1 Celsius?
2     A. It is correct.
3     Q. This -- the water T, the water
4 temperature here, this is from the tank that was
5 providing water into the E-Cat plant, correct?
6         MR. ANNESSER: Object to form.
7         THE WITNESS: Correct.
8 BY MR. PACE:
9     Q. And what -- how did you obtain this
10 temperature information? Was there -- what kind of
11 device did you use?
12    A. Good question. The same manual Omega
13 something that I used for the steam because, as I
14 explained it to you before, there was a plug. There
15 was a thermocouple.
16        This is the passage of the steam. So the
17 thermocouple is like this. Then you have a cable and
18 the cable goes down and at the end of the cable you
19 have a plug. The instrument is like this telephone
20 that here hosts the plug.
21    Q. You put the plug in it and it shows you?
22    A. Sorry, I am stealing your telephone to
23 make it clear. And so I take the plug from --
24    Q. Can you call long distance on this
25 temperature?

13 (Pages 49 to 52)

Page 53

1     A.  Sorry, sir?
2     Q.  Nothing, sorry.  Go ahead.  I apologize.
3  A little humor.
4     A.  So the plug, put the plug here and read
5  the steam, for example, if it is the plug from
6  thermocouple of the steam.
7        Then unplug and go inside the container
8  of the -- where there was the tank of the water and
9  plug in the thermocouple inserted in the tank of the
10  water, I had the temperature of the water.
11     Q.  Understood.
12     A.  Thank you for your precious sample.
13     Q.  So again, looking at June 8th, you
14  measured on multiple occasions on June 8th the
15  temperature of the water that was in the tank for the
16  E-Cat plant, correct?
17     A.  Yes, it is correct.
18     Q.  And you measured multiple times on June
19  8th the temperature in the output pipe from the E-Cat
20  plant?  That's what you have here.
21     A.  Attention, no.  If you are talking of the
22  water, you are talking of the input.
23     Q.  Correct.  But then you have a steam
24  temperature.  The next thing is steam.
25     A.  The steam is the output, sure.

Page 54

1     Q.  That's the output pipe?
2     A.  Yes, sir.
3     Q.  Multiple times a day you are measuring
4  the temperature and then you are writing the range
5  that it covers.  Now, I am noticing here we don't
6  have any decimal points.
7     A.  Yes, because I rounded because it was not
8  significant.
9        Also because -- this is a good question
10  and it's a precious question because the information
11  is important.
12        There is an agreement between the ERV and
13  me to take the -- he told me I will take the most
14  conservative data, if you agree, and I agreed upon
15  this.
16        So this -- so basically when I -- when I
17  rounded 103, 104, he considered for the calculation
18  of the COP 103.
19     Q.  Understood.
20     A.  At that point to put the decimals was
21  absolutely irrelevant.
22     Q.  We then have a bar reading here, a
23  pressure reading?
24     A.  Yes, of course by the 4th as every
25  expert -- I have interrupted you is my usual.  I'm

Page 55

1  sorry, please complete your question.
2     Q.  Every day you would take a reading from
3  the manometer for pressure?
4     A.  Yes, sir.
5     Q.  I assume this is a different device you
6  had to use to read the manometer or could you
7  physically read it?  Was there a number you could see
8  on the manometer?
9     A.  Can you kindly repeat the question?
10     Q.  Sure.  When we were talking about the
11  temperature readings and connected something into the
12  thermocouples that Dr. Penon installed, you were
13  telling us you had a little red box, right, that you
14  would use to get the temperature readings both for
15  the water for the input -- the water input as well as
16  for the output pipe, correct?
17     A.  Yes.
18     Q.  When you wanted to get the pressure
19  reading you had to go to a manometer; is that
20  correct?
21     A.  It is correct, yes.
22     Q.  To read the manometer, is there a gauge
23  on that that you can read directly or did you have to
24  plug it into a device?
25     A.  Now it's clear.  No, it was a direct

Page 56

1  reading.  There was a small ladder, because the
2  manometer was high and pushing a button appeared the
3  value of the bar.
4        And now I add what I was going to say
5  before, when I interrupted you.  Obviously by default
6  as any expert of the art knows, when it is not
7  specified it is always intended relative pressure,
8  not absolute pressure.
9        Obviously the absolute pressure was one
10  plus some millibar.  The relative pressure some
11  millibar, so 0.0, because we had some millibar but
12  this is the relative pressure.
13     Q.  Meaning atmospheric?
14     A.  No, the atmospheric pressure -- if you
15  consider the atmospheric pressure that is the
16  absolute pressure, which is the pressure that you
17  have in the pipe plus the atmospheric pressure.  That
18  is the absolute pressure.
19        The relative pressure is named relative
20  because it is relative only to the difference between
21  the pressure produced in the system and the
22  atmospheric pressure.  But any expert of the art,
23  when writes P 0 bar, it is obvious by default that it
24  is the relative pressure, not the absolute, otherwise
25  to have a zero absolute you would have to make a

**Veritext Florida Reporting Co.**

800-726-7007                                    305-376-8800

Page 57

1  vacuum.
2      Q.  Understood.  Then for this manometer I
3  guess it really applies to all devices but I will
4  just ask the manometer for now.
5      A.  No, manometer is the correct definition.
6      Q.  What I was going to say is so every day
7  you would read this device --
8      A.  Yes.
9      Q.  -- the manometer?
10     A.  Yes.
11     Q.  You would not otherwise -- other than
12  simply pressing the button every day on the
13  manometer, you didn't make any other change to the
14  manometer on any given day?
15         MR. ANNESSER:  Object to form.
16         THE WITNESS:  I did not understand the
17     question, I'm sorry.
18  BY MR. PACE:
19     Q.  I am just trying to understand.  So
20  you're interacting with this manometer every day,
21  correct?
22     A.  Yes, sir.
23     Q.  So I am just trying to understand, all
24  you did on those days -- all you ever did to the
25  manometer was press the little button and read the

Page 58

1  information?
2      A.  Yes, sir.
3      Q.  You never had to make any repairs to the
4  manometer?
5      A.  No.
6      Q.  You never replaced the manometer?
7      A.  Not that I can recall.
8      Q.  Well, I'm asking what you would do as
9  opposed to somebody else.  Do you --
10     A.  Not that I can recall, attorney,
11  honestly.  Not that I can recall.  But, you know, in
12  that plant so many events happened and so many things
13  happened from then to now but not that I can recall.
14     Q.  Also here on June 8th you have "added 50
15  L," which I assume is liters, "distilled water"?
16     A.  Yeah.
17     Q.  That reflects water that was added to the
18  external tank --
19     A.  Yes.
20     Q.  -- for the E-Cat plant, correct?
21     A.  Yes, because --
22         MR. ANNESSER:  Object to form.
23  Dr. Rossi, please allow him to finish his
24  question before you answer.
25         THE WITNESS:  I am sorry.

Page 59

1  BY MR. PACE:
2      Q.  I actually had.  I think he also wants to
3  have a chance to object too.  Let me again.
4      The added 50 liter distilled water means
5  that's 50 liters of distilled water that was added to
6  what was being called the external tank to the E-Cat
7  plant, correct?
8      A.  It is correct.
9      Q.  Who added that?  Would that be you?
10  Would that be Fulvio Fabiani?  Would it vary?
11         MR. LEON DE LA BARRA:  Object to form.
12         THE WITNESS:  Normally it was me but I
13     cannot exclude that sometime also Barry did or
14     Fabiani did under my direction.
15  BY MR. PACE:
16     Q.  And just for the record to be clear Barry
17  is a reference to Barry West?
18     A.  Yes, sir.
19     Q.  So I am going to jump to our other days
20  here just briefly.  If you can go forward for me to
21  page 1396.  I'm sorry, 1397.
22     A.  Okay.
23     Q.  The top --
24     A.  August.
25     Q.  The top three paragraphs there are --

Page 60

1      A.  27, 28, 29.
2      Q.  Yeah.  Uh-huh.
3      A.  Okay.
4      Q.  These are -- these are dates in July of
5  2015, correct, July 27, 28, 29?
6      A.  I am sorry, attorney.  I was reading and
7  I did not hear your question.
8      Q.  No problem.
9      The first three paragraphs on this page,
10  1397, these are -- reflects dates -- data that you
11  collected on dates in July of 2015, correct, July 27,
12  28th and 29th?
13     A.  Yes, it is correct.
14     Q.  All right.  So if we look here at July
15  28th.
16     A.  28th, okay.
17     Q.  Just to see if I am understanding this
18  correctly, we have -- the first two lines are the
19  same kind of information we were seeing before, water
20  flow meter reading, water temperature, steam
21  temperature, pressure.
22      Then we have "N.B. Black out of the grid
23  from 5:30 a.m. through 7 a.m."
24      That means that the electrical power was
25  not being provided from 5:30 a.m. through 7 a.m. on

15 (Pages 57 to 60)

Page 61

1 the 28th of July; is that correct?
2      A.  It is correct.
3      Q.  So a reference there to the grid is a
4 reference to the power grid?
5      A.  Can you repeat?
6      Q.  Yes.  The reference there to grid is a
7 reference to the power grid?
8      A.  Yes, sir.
9      Q.  Okay.  Then it says:  "No influence on
10 the data of T and P."  That would be on the data of
11 temperature and pressure, correct?
12      A.  Yes, it is correct.
13      Q.  Then we have, "PCE 830 out of service
14 during the black out."
15          Was that the network power analyzer, if
16 you recall?
17          MR. ANNESSER:  Object to form.
18          THE WITNESS:  The PCE 830 was -- I prefer
19      to tell it with my words, so we are sure.  Was
20      the instrument of Dr. Penon to measure the
21      amount of electric energy that was consumed by
22      the plant.
23 BY MR. PACE:
24      Q.  Okay.  Then we have on the 29th, we have
25 the same first two lines, same information we have

Page 62

1 seen on a lot of other days.
2          Then we have:  "From 5 p.m. of yesterday
3 to 6 a.m. this morning one reactor was out of
4 service, therefore, the power has been reduced of
5 1/4th in the period."
6          Is this a reference -- when it says a
7 reference to power, is that the -- the amount of
8 electrical power that is going into the E-Cat plant
9 or the amount of power that's coming out of the E-Cat
10 plant, steam power coming out of the E-Cat plant?
11      A.  I don't remember.
12          MR. ANNESSER:  Object to form.
13          THE WITNESS:  I don't remember what I
14      intended to say.  Could be either way.
15 BY MR. PACE:
16      Q.  Well, so if we look -- here is what I am
17 trying to -- maybe the next one will help you.
18          If you look at July 30th, you see the
19 third line for that paragraph says:  "Power reduced
20 to 750 kilowatts to repair a reactor."
21      A.  So this is the power of the plant.
22      Q.  Okay.  That's what I was thinking.  So
23 for June --
24      A.  Yes.
25      Q.  The way to read this is for July 29th,

Page 63

1 the output power of the plant was reduced by a
2 quarter?
3      A.  Yes.
4          MR. ANNESSER:  Object to form.
5 BY MR. PACE:
6      Q.  That's because one of the -- when it says
7 one reactor, that really means one big Frankie,
8 correct?
9          MR. ANNESSER:  Object to form.
10          THE WITNESS:  Could be, yes.  Could be.
11      Now, precisely -- precisely, but should be, that
12      should be an explanation, yes.
13 BY MR. PACE:
14      Q.  Well, let me explore that a little bit.
15 If one reactor meant only one of the E-Cat units, you
16 wouldn't expect the power level to be reduced by a
17 full quarter, would you?
18          MR. ANNESSER:  Object to form.
19          THE WITNESS:  Can you repeat the
20      question?
21 BY MR. PACE:
22      Q.  I can.  When we look at the 29th --
23      A.  Yes.
24      Q.  -- it says one reactor was out.
25      A.  Uh-huh.

Page 64

1      Q.  Therefore the power was reduced by one
2 quarter.
3      A.  Yes, I think it was -- this should be the
4 power of the plant.
5      Q.  I understand that.  But also when it
6 references one reactor, that has to be one big
7 Frankie, correct?
8      A.  Yes.
9      Q.  All right.  That's what I was getting at,
10 the collection of E-Cat units.  Because if only one
11 E-Cat unit was down you wouldn't expect the plant's
12 capacity to drop by a quarter?
13      A.  Yes, of course.
14      Q.  Next, 31, July 31.  We have -- I think
15 this supports the big Frankie argument -- repaired
16 the reactor number 4, or N.4.
17          That means repaired the what was called
18 big Frankie number 4, correct?
19      A.  Yes, sir.
20          MR. ANNESSER:  Object to form.
21 BY MR. PACE:
22      Q.  You might have answered.  I just didn't
23 hear you over Mr. Annesser.  Is that correct?
24      A.  Sorry, can you repeat?
25      Q.  Yes.  For July 31st we have the third

16 (Pages 61 to 64)

Page 65

```
 1    line down in that paragraph says:  "Repair the
 2    reactor N.4., return to 100 percent power."
 3          That means that what was repaired was big
 4    Frankie number 4, correct?
 5          MR. ANNESSER:  Object to form.
 6          THE WITNESS:  As I can understand here,
 7    yes.
 8    BY MR. PACE:
 9          Q.  All right.  And these are your notes --
10          A.  Yes.
11          Q.  -- so you are really the best person to
12    interpret them, correct?
13          A.  Absolutely.  Absolutely.  But still --
14    but still these are notes that taken fresh at the
15    moment, you know, immediately I know what they are.
16    Right now at the distance of two years --
17          Q.  Right.
18          A.  -- have some spider net around in the
19    brain.
20          Q.  Even your own notes read several years
21    later you might not remember?
22          A.  Yeah.
23          MR. ANNESSER:  Object to form.
24    BY MR. PACE:
25          Q.  Let me -- I am just going to go to the
```

Page 66

```
 1    other dates we already talked about in connection
 2    with Exhibit Number 2.  If you can go to page 1402.
 3          MR. ANNESSER:  Chris, whenever
 4    convenient, I am going to ask you for just a
 5    short break, any time.
 6          MR. PACE:  Less than two minutes.
 7          MR. ANNESSER:  No problem.
 8          MR. PACE:  Probably more like a minute.
 9    BY MR. PACE:
10          Q.  If you can look --
11          A.  We can make a break also now.
12          MR. ANNESSER:  Let him --
13    BY MR. PACE:
14          Q.  Let me just finish this pretty quickly.
15    Unless somebody really needs a break I have like two
16    more minutes and then we can move on to something
17    more interesting than reading charts.
18          A.  Okay.
19          Q.  If you look at 140 -- page 1401, you can
20    see we're starting --
21          A.  1401.
22          Q.  You can see we are starting here in
23    October.
24          A.  October.
25          Q.  Towards the bottom.  Now turn to 1402.
```

Page 67

```
 1          A.  Okay.
 2          Q.  The paragraph that starts with 12, do you
 3    see that kind of middle, top middle of the page?
 4          A.  Number 12, 12 of October.
 5          Q.  Okay.  This is October 12th, correct?
 6          A.  Yes.
 7          Q.  And again, this is a date we looked at
 8    when we were looking at Exhibit 2.
 9          MR. ANNESSER:  Object to form.
10    BY MR. PACE:
11          Q.  We have got a -- the same thing.  Again,
12    just to make sure we got a clear record, this water
13    flow meter reading is a water flow meter reading you
14    took by looking at the water flow meter on October 12
15    and writing down the number that you saw on that flow
16    meter?
17          A.  Yes.
18          Q.  Okay.  The water T reading here is a
19    water temperature reading you took on that same day
20    or is the range of water temperature readings you
21    took on that day from the input tank for the E-Cat,
22    correct?
23          A.  Correct.
24          Q.  The steam T is the temperature readings
25    you took -- the range of temperature readings that
```

Page 68

```
 1    you took during the -- on October 12th for the
 2    pipe -- the output pipe from the E-Cat plant,
 3    correct?
 4          A.  Correct.
 5          Q.  And then the P 0.0 bar, 0.0 bar is the
 6    pressure reading that you would manually -- that you
 7    would obtain by looking at the manometer and seeing
 8    the relative pressure shown on that manometer?
 9          A.  (Nods head.)
10          Q.  Then the last one, we talked about
11    December 2nd, so if you go to page 1405.  You see
12    December 2 there?
13          It has water -- has a water flow meter
14    reading.  Then it says:  "Power reduced to 700 kW
15    upon request of J.M. Corporation from now on until
16    new order."
17          I don't want to get into -- we will talk
18    about J.M. Corporation later.  But the only question
19    I want to ask before we break is how does Leonardo
20    reduce the power output from the E-Cat plant?
21          Is that by reducing the amount of
22    electrical power that goes in?
23          MR. ANNESSER:  Object to form.
24          THE WITNESS:  Can you repeat the
25    question?
```

17 (Pages 65 to 68)

Page 69

1 BY MR. PACE:
2    Q.  Yes.  It says -- for December 2nd it has
3 power reduced to 700 kilowatts.
4    How would you reduce the power of the
5 E-Cat plant from producing let's say one megawatt of
6 power down to producing 700 kilowatts of power?  What
7 do you change in the plant to accomplish that?
8    A.  To make this I operate on the system of
9 the resistances and the flow of the water.
10    So basically our necessary operations is
11 necessary to make a modification in the connections
12 of the resistances inside the reactors and at the
13 same time to maintain approximately constant the
14 temperature at the output, the flow of water must be
15 reduced.
16    Q.  So you change -- when you say change --
17 well, there is a lot in there so why don't we take
18 our break and then I will come back to it, otherwise
19 I will go on for five more minutes.  Why don't we
20 take a break.
21    MR. ANNESSER:  If you need five more
22    minutes we can go five more minutes.
23 BY MR. PACE:
24    Q.  Let me just ask this.  We'll take a
25 break.  Let me ask this one question, if I can.  A

Page 70

1 few questions just following up.
2    When you said change the resistances,
3 does that mean changing the amount of electrical
4 power that is being provided to the E-Cat plant?
5    A.  No, it's more complicated, the issue.
6    Q.  Okay.  So how -- well, let me come back
7 to that.  Let me just ask about the water and then I
8 will come back to the resistances.
9    Changing the water flow to reduce the
10 power is just adding less water?
11    A.  No --
12    Q.  Using less --
13    A.  -- it's not adding less water but
14 regulating the flow of water because there was a
15 recirculator and the recirculator could have been
16 modulated and so we could make the water flow in a
17 major or minor amount.
18    Q.  My question was I think probably poorly
19 done then.
20    When I meant by reduced is reduce the
21 amount of water that was flowing through the E-Cat
22 plant?
23    A.  Correct.
24    Q.  Okay.  So you would -- I understand the
25 water side.  If you want to lower the power output of

Page 71

1 the E-Cat plant, you would reduce the amount of water
2 flowing through the E-Cat plant and then you would
3 make changes to the resistance.
4    So can you bring us into the break by
5 explaining to me a little bit more, what does that
6 mean to make changes to the resistance?
7    MR. ANNESSER:  Object to form.
8    THE WITNESS:  Well, maybe I have to talk
9 with my attorney about the limit of that.
10    MR. PACE:  Okay.  All right.  We will
11 take a break and we will come back and talk
12 about that.
13    THE WITNESS:  Thank you.
14    THE VIDEOGRAPHER:  Time is 11:46.  Off
15 the record.
16    (Thereupon a brief recess was taken,
17 after which the following proceedings were had.)
18    THE VIDEOGRAPHER:  Time is 12:04.  We're
19 back on the record.
20    MR. ANNESSER:  Chris, this portion of the
21 deposition we're going to declare as highly
22 confidential, attorneys' eyes only.
23    MR. PACE:  Okay.  I assume that's in
24 reference to the last topic that I'm starting on
25 again.

Page 72

1    MR. ANNESSER:  Correct.
2 BY MR. PACE:
3    Q.  Which is in order to reduce the power
4 level of the E-Cat plant, there is a change on the
5 electrical side, let's just say, and there is a
6 change on the water side.
7    I believe I understand the change on the
8 water side, which is reducing the flow of water going
9 through the plant.  Can you explain to me better what
10 changes are made on the electrical side to reduce the
11 power output of the E-Cat plant?
12    MR. ANNESSER:  Object to form.
13    THE WITNESS:  It's necessary to operate
14 on the resistances.
15 BY MR. PACE:
16    Q.  And what does it mean to operate on the
17 resistances?
18    A.  Change some connections.
19    Q.  What does that mean?
20    A.  Means -- what is it means?  Change some
21 connections and -- and also there is a system to
22 upgrade or downgrade in combination the power
23 consumed by the resistances.  The energy, pardon,
24 consumed by the resistances.
25    Q.  So when you are talking about changing

18 (Pages 69 to 72)

Page 73

1  the resistances though, are you saying a change would
2  have to be made to the big Frankies or would a change
3  have to be made to some control panel?
4        MR. ANNESSER: Object to form.
5        THE WITNESS: I can say -- what I can say
6  BY MR. PACE:
7     Q.  Okay.  If you give me just a moment
8  here.  This might be one of those areas where a
9  picture is worth a thousand words and it might not.
10 I am going to mark these as Exhibits 5 and 6.  Sorry,
11 I am going to mark these as Exhibits 4 and 5,
12 please.
13        (The document referred to was thereupon
14 marked Deposition Exhibit 4 for Identification, a
15 copy of which is attached hereto.)
16        (The document referred to was thereupon
17 marked Deposition Exhibit 5 for Identification, a
18 copy of which is attached hereto.)
19        MR. PACE: I'll make you guys share but I
20 will dig out your own copy at a break.  4 is the
21 first one, the authorized.
22 BY MR. PACE:
23    Q.  So Dr. Rossi, I have provided you two
24 exhibits here.  Both of these are different views
25 inside the E-Cat plant; is that correct?

Page 74

1     A.  Yes, it is correct.
2     Q.  Exhibit 4 -- Exhibit 4 is actually --
3  that's -- the reactors we can see closest to the
4  camera here, these are the four big Frankie units,
5  correct?
6     A.  Yes, it is correct.
7     Q.  And if we looked at Exhibit 5 and wanted
8  to identify the big Frankie units in Exhibit 5, we're
9  actually -- it's at the far end of the container that
10 is reflected in Exhibit 5, and we're seeing the
11 backside of the big Frankie units; is that correct?
12        MR. ANNESSER: Object to form.
13        THE WITNESS: I am sorry, can you kindly
14 repeat the question?
15 BY MR. PACE:
16    Q.  Yes, in the middle of Exhibit 5 --
17    A.  Yes.
18    Q.  -- is that essentially the backside of the
19 big Frankie units that we're seeing in Exhibit 4?
20        MR. ANNESSER: Object to form.
21        THE WITNESS: Yes, it is correct.
22 BY MR. PACE:
23    Q.  All right.  So you were just telling me
24 that you make a -- that you had to operate -- that
25 you had to make changes to the big Frankie units in

Page 75

1  order to lower the power output level of the one --
2  of the E-Cat plant.
3        Using either Exhibit 4 or Exhibit 5 can
4  you explain to me what kind of changes you had to
5  make to these E-Cat plants or to the individual E-Cat
6  units?
7        MR. ANNESSER: Object to form.
8        THE WITNESS: I can say -- what I can say
9  is that you see all those electronics.  Take,
10 for example, Exhibit 4, you see all those boxes,
11 plastic boxes.  Inside those plastic boxes there
12 are small computers.
13        You can see the same boxes also in the
14 Exhibit Number 5, that you correctly were -- you
15 correctly say that in the middle, between the
16 two left and right blocks of the small E-Cats,
17 you can see those three, four plastic boxes that
18 are the four brains of the big Frankies.
19        And also in the Exhibit 4 you can see all
20 the wirings and operating on these apparatuses
21 with the collaboration of the consultant of
22 Industrial Heat, the engineer Fulvio Fabiani,
23 and also with the collaboration of Barry West
24 was possible to react to the value situations
25 that we encountered.

Page 76

1  BY MR. PACE:
2     Q.  Fulvio Fabiani, you have known him for
3  how long?
4     A.  About -- yes, I knew Fulvio Fabiani in
5  2012.
6     Q.  2012.
7     A.  And -- yes, in 2012.  And I have been
8  very surprised, if you allow me an anecdote.
9     Q.  No.  There may be an opportunity later
10 with your counsel --
11    A.  Very good.
12    Q.  -- or even off the record.
13        MR. ANNESSER: Just answer his
14 questions.  That's what we're here for.
15 BY MR. PACE:
16    Q.  You were not going to answer -- you
17 weren't going to say something responsive to my
18 question.  I might give you the opportunity later on,
19 who knows.  I may ask a bad question later on, but
20 let's continue.
21        We're talking about -- would you actually
22 have to make a change to the E-Cat units themselves
23 other than the external wiring in order to reduce the
24 electrical -- in order to reduce -- in order to
25 change the resistance -- resistances for the E-Cats?

19 (Pages 73 to 76)

Page 77

```
1         A.  No.
2         MR. ANNESSER:  I am going to object to
3    form on that one.  I'm sorry.
4    BY MR. PACE:
5         Q.  Do you recall during the time that the
6    E-Cat plant was operating in Doral the number of
7    times that you intentionally reduced the power output
8    of the E-Cat units?
9         MR. ANNESSER:  Object to form.
10        MR. LEON DE LA BARRA:  Object to form.
11        THE WITNESS:  Can you kindly repeat?
12   BY MR. PACE:
13        Q.  Yes.  Can you -- do you recall how many
14   times -- during the time that the E-Cat plant was
15   operating at the Doral warehouse, do you recall how
16   many times you intentionally reduced the power output
17   of that plant?
18        MR. ANNESSER:  Object to form.
19        MR. LEON DE LA BARRA:  Object to form.
20        THE WITNESS:  I don't recall.
21   BY MR. PACE:
22        Q.  We certainly saw it was at least once,
23   correct, in December of 2015?
24        A.  Yes.  As far as I can recall, yes.
25        Q.  All right.  And you don't recall ever
```

Page 78

```
1    reducing it at any other time?
2         MR. ANNESSER:  Object to form.
3         THE WITNESS:  You know, if you show me
4    situations in which I would have, I can answer
5    now.  As a group though I am not able to answer
6    this question.
7    BY MR. PACE:
8         Q.  That's kind of my point, I guess.  Maybe
9    I should phrase it differently, which is I am
10   purposely talking about when you intentionally
11   reduced the power output of the plant as opposed to
12   it being reduced for some other reason.
13        So at least in terms of there were times
14   when the power output of the plant was reduced, but I
15   am only now talking about times when you
16   intentionally reduced the power output of the plant.
17   I am only aware of the one time in December, though
18   maybe there is others.
19        MR. ANNESSER:  Object to form.
20   BY MR. PACE:
21        Q.  So let me ask for -- the question is, do
22   you recall any other time during the operation of the
23   E-Cat plant in Doral, other than in December of 2015,
24   that you intentionally reduced the power output of
25   the E-Cat plant?
```

Page 79

```
1         MR. ANNESSER:  Object to form.
2         THE WITNESS:  To respond to this
3    questions I would have to go to my logbook.
4    BY MR. PACE:
5         Q.  Absent going to your logbook the answer
6    would be you don't recall any other time?
7         MR. ANNESSER:  Object to form.
8         THE WITNESS:  It is correct.
9    BY MR. PACE:
10        Q.  All right.  Even if there was another
11   time, the process for intentionally reducing the
12   power output of the E-Cat plant would have been the
13   same?
14        MR. ANNESSER:  Object to form.
15        THE WITNESS:  Again, I must ask you to
16   repeat the question.  I'm sorry.
17   BY MR. PACE:
18        Q.  Sure.  If there were another time when
19   you intentionally reduced the power output of the
20   E-Cat plant, you would have -- you would have
21   followed the same method you just described to us in
22   connection with the December reduction, correct?
23        A.  I think so, yes.
24        Q.  That's all I was trying to understand.
25   There is one method for intentionally reducing the
```

Page 80

```
1    power output of the E-Cat plant and that's the method
2    you were just describing?
3         MR. ANNESSER:  Object to form.
4         THE WITNESS:  It's like to say there is
5    only one method to make a cure with the car.
6    You can say -- answer yes, but the answer is not
7    correct.
8    BY MR. PACE:
9         Q.  I see what you're saying.  Let me
10   rephrase it.  There is only one approach to reducing
11   the power output of the plant.  How you execute on
12   that approach might change over time?
13        A.  Yeah.
14        Q.  Okay.  We were talking earlier today
15   about there being times when one or the other of the
16   big Frankie units was not operating for -- had some
17   kind of maintenance to it, correct?
18        A.  Yes.
19        Q.  All right.  So looking here at Exhibit 4,
20   explain to me, if you can, how -- how would the
21   maintenance be done on just one of the big Frankies
22   compared to the other three?
23        Is there a way of removing that big
24   Frankie entirely out of the E-Cat plant?
25        MR. ANNESSER:  Object to form.
```

Page 81

```
1          THE WITNESS:  Yes.
2  BY MR. PACE:
3          Q.  So is that what would happen when
4  maintenance had to be done on an E-Cat -- on a big
5  Frankie, that you would -- someone would pull the
6  entire big Frankie out of the container that housed
7  the E-Cat plant?
8          MR. ANNESSER:  Object to form.
9          THE WITNESS:  No, this does not happen
10  actually.
11  BY MR. PACE:
12          Q.  So if you can -- help me understand.
13  There is entries -- we talked about at your last
14  deposition, we talked about it now today at this
15  deposition of Leonardo Corporation that there are
16  times when one or the other of these big Frankie
17  units that we see in Exhibit 4 was -- required
18  maintenance, correct?
19          A.  It is correct.
20          Q.  When it required maintenance it's also
21  correct that the water would not continue to flow
22  through that big Frankie, correct?
23          MR. ANNESSER:  Object to form.
24          THE WITNESS:  Not necessarily.  Depends
25  on the issue.
```

Page 82

```
1  BY MR. PACE:
2          Q.  So water would still be pumped through a
3  big Frankie while repairs were being made to the big
4  Frankie?
5          A.  In certain cases it is possible.
6          Q.  Do you recall whether --
7          A.  In other cases, no.
8          Q.  So your recollection is during the
9  operation of the 1MW -- during the operation of the
10  E-Cat plant in Doral there were times when people
11  were making repairs to a big Frankie unit without
12  stopping the flow of water or electricity into that
13  unit, correct?
14          MR. ANNESSER:  Object to form.  Chris --
15          THE WITNESS:  Yeah --
16          MR. ANNESSER:  Go ahead and answer and
17  then.
18          MR. PACE:  Answer.
19          MR. ANNESSER:  Go ahead and answer.
20          THE WITNESS:  In some case it happened.
21          MR. PACE:  Okay.
22          MR. ANNESSER:  I just want a
23  clarification, when you ask about the operation
24  of the plant in Doral, are you talking about
25  during the purported test period or are we
```

Page 83

```
1  talking about at any time during the operation?
2          Because my understanding is there was
3  operation days before the test even started.
4          MR. PACE:  I'm not sure it makes a big
5  distinction but I am certainly willing to draw a
6  the distinction, if you remember the day.
7          MR. ANNESSER:  I don't know if it does or
8  doesn't.
9  BY MR. PACE:
10          Q.  Fair enough.  Let me ask.  Do you -- let
11  me close out the last thing we were talking about.
12          There were also times when the input of
13  water and electricity would be turned off to a big
14  Frankie in order to make repairs, correct?
15          A.  Yes.
16          Q.  Okay.  So sometimes yes, sometimes no, in
17  the sense of whether you had to turn off the water or
18  the electricity to make repairs to a big Frankie?
19          A.  You are correct.
20          Q.  And other than looking at your logbook,
21  do you recall -- do you recall any of the dates of
22  these repairs?
23          A.  No, impossible.
24          Q.  Yeah, I'm not going to get into --
25          A.  You know for me that year is as if has
```

Page 84

```
1  been one day.
2          Q.  It all ran together for you.  Let me --
3  so let's talk about an instance where a repair had to
4  be done to a big Frankie unit and you would turn off
5  the electrical and the water.
6          A.  Okay.
7          Q.  Question -- my first question is what was
8  the process for redirecting the water to the
9  remaining big Frankies or redirecting the electrical
10  to the remaining big Frankies?
11          MR. ANNESSER:  Object to form.
12          THE WITNESS:  Every big Frankie had
13  independent valves -- valves.  The correct
14  pronunciation, valve.
15  BY MR. PACE:
16          Q.  Valves.
17          A.  Valves for the water that could
18  partialize the flow.
19          Q.  I'm sorry, that could what the flow?
20          A.  Partialize, parzializze.
21          Q.  Partialize the flow.
22          A.  Partialize the flow and also had
23  independent electric connections through -- no,
24  independent electric connections that ended with --
25  in a panel we can see -- the panels are very well
```

21 (Pages 81 to 84)

Page 85

1  shown in one of the exhibits that you gave me the
2  last -- during my first deposition.
3        And in those panels there were the
4  commands to give back or cut off the electric energy
5  to any single BF separately, big Frankie.
6        Q.  There are days when according to the
7  record logs that there is maintenance being done on
8  one of the big Frankies and yet the output of the
9  plant stayed the same.
10        So if I can understand this correctly,
11  for that to happen, if you take one of the four big
12  Frankies offline, the other three have to be getting
13  more water and more electricity per big Frankie,
14  right, to keep the same level of output; is that
15  correct?
16        MR. ANNESSER:  Object to form.
17        THE WITNESS:  What you say is logic in a
18     normal plant but not here because for the water
19     you are correct, because -- because if the
20     temperature remains the same, the power of the
21     system is regulated by the amount -- by the mass
22     of water that is steam.
23  BY MR. PACE:
24        Q.  Water.
25        A.  In the case of the E-Cats it is not so

Page 86

1  far what concerns the electric energy because there
2  is a status that we call SSM, self-sustaining mode,
3  that can allow the energy be produced even if you are
4  not introducing electricity.
5        This is -- this a particularity of this
6  technology that Industrial Heat knows very well.  So
7  this is the -- we call it SSM, self-sustaining mode.
8        Q.  But when we're talking about -- the
9  instance we're talking about now though, let's just
10  focus on the water.
11        In order for the power level -- the power
12  output of the plant to stay constant even when one of
13  the big Frankies is taken offline and the water is no
14  longer flowing through that one big Frankie, what has
15  to happen is more water has to flow through the other
16  big Frankies, correct?
17        MR. ANNESSER:  Object to form.
18        THE WITNESS:  The -- in that case there
19     are -- there is possible to regulate the valves
20     of the inlet of the -- there are many, many ways
21     to regulate that.  One --
22  BY MR. PACE:
23        Q.  Right now I'm just asking -- I want to
24  talk to you about it, don't get me wrong.  I want to
25  make sure that I understand.

Page 87

1        A.  It's complex.
2        Q.  I want to make sure I understand the
3  basic concept.
4        It is right that if you are going to
5  maintain the same power level from the plant when you
6  take off one of the big Frankie units, you had to
7  send more water through the remaining big Frankie
8  units, correct?
9        MR. ANNESSER:  Object to form.
10        THE WITNESS:  This is correct.
11  BY MR. PACE:
12        Q.  And I want to come back to that in a
13  second, how that happened, but that's the general
14  principle.
15        Also, if you are sending more water
16  through the remaining big Frankies, you are actually
17  increase -- you also have to not just sustain a level
18  of electrical input, you actually have to increase
19  it, don't you?
20        A.  No.
21        Q.  Okay.  So now let's -- I will ask you to
22  explain both of them but let me go one at a time.  If
23  you can explain on the water.
24        A.  The correct answer is not no.  It's not
25  necessary.

Page 88

1        Q.  Not necessarily.  So let me break each of
2  those down.
3        So for the water, that seems the easier
4  one, one big Frankie unit is taken offline, the water
5  is stopped, the power is stopped to that big Frankie
6  unit.
7        The power level for the plant remains the
8  same or close to the same.  That means more water was
9  redirected through the remaining big Frankies,
10  correct?
11        A.  Correct.
12        MR. ANNESSER:  Object to form.
13  BY MR. PACE:
14        Q.  Now, how did you -- how would you execute
15  on that?  How would you make that happen?
16        A.  There are two ways to regulate that.  One
17  is the intake of the water, that the intakes of the
18  water that can be regulated and the other is the
19  recirculator of the water that has to give more
20  energy because in that case you have a pressure drop
21  in the system, a hydraulic pressure drop.
22        Q.  I'm a little bit confused in your first
23  example there.  We're talking about more water going
24  to three of the big Frankies while water is not going
25  to one of the big Frankies.

22  (Pages 85 to 88)

Page 89

1    That has to come into play somewhere
2  between the water tank and the actual big Frankies,
3  correct?  There has to be some adjustment to the way
4  the water is flowing?
5    A.  Yes, sure.
6    Q.  So are there -- can you set -- would you
7  have -- let me start with the easy question.
8    Can you set the water level in each E-Cat
9  unit separately?
10   A.  Yes.
11   Q.  When you took one of the big -- if we
12 look at Exhibit 4.
13   A.  I'm sorry.
14   Q.  No problem.  When we look at Exhibit 4 --
15   A.  Yes.
16   Q.  -- what are those red boxes we're seeing
17 there at the very beginning of Exhibit 4?  The
18 closest thing to the camera.  Are those --
19   A.  Pumps.
20   Q.  Those are the pumps.  These are the
21 individual pumps per E-Cat unit?
22   A.  Yes, sir.
23   Q.  So someone could individually change the
24 level of each pipe -- each pump, correct?
25   MR. ANNESSER:  Object to form.

Page 90

1    THE WITNESS:  Yes, it's correct.
2  BY MR. PACE:
3    Q.  So when a big Frankie was taken offline
4  and the water and the electrical was shut off to that
5  big Frankie, did somebody have to manually change the
6  pumps for the E-Cat units in the remaining three big
7  Frankies?
8    A.  Yes.
9    Q.  All right.  Who would do that?
10   A.  I.
11   MR. ANNESSER:  Object to form.
12   THE WITNESS:  I did.
13 BY MR. PACE:
14   Q.  You would.  Would anyone -- would it
15 always be you?
16   A.  Always.
17   Q.  All right.
18   A.  Because it's a too delicate situation.
19   Q.  And how would you know -- when this
20 happened -- let me start over again.
21   When you would do this would each pump in
22 the remaining three big Frankies be set to the exact
23 same number or would it vary by E-Cat?
24   A.  Vary.
25   Q.  All right.  So you had to make an

Page 91

1  individual judgement with each E-Cat unit how you
2  would adjust it in order to account for the increased
3  water flow?
4    A.  Yes, and it is a very delicate and
5  sensible operation.
6    Q.  And how would you -- in terms of knowing
7  how much water is in each E-Cat, either when you are
8  turning up the water flow or turning down the water
9  flow, what device would you use to determine how much
10 water?
11   A.  Look at exhibit --
12   MR. ANNESSER:  Object to form.
13   THE WITNESS:  Look at Exhibit 4.  Go from
14 the top to the second from the top, BF.  Now go
15 to the left.  You see that water column?
16 BY MR. PACE:
17   Q.  Yes.
18   A.  That is a level.
19   Q.  I understand.  But you don't have -- but
20 each -- because each E-Cat is set separately don't
21 you need a sight gauge or some kind of gauge for each
22 E-Cat unit or could you just tell it from that one
23 gauge?
24   A.  I just know -- sorry, can you repeat the
25 question?

Page 92

1    Q.  Sure.  I believe what you just testified
2  to is each E-Cat unit might get a different setting
3  in terms of adjustments to the water level.
4    So I understand you have a valve over
5  here on the left-hand side of Exhibit 4, but that is
6  not specific to each E-Cat unit.  It tells me only
7  the amount -- it's only a level for that entire big
8  Frankie.
9    MR. ANNESSER:  Object to form.
10   THE WITNESS:  Sorry, but the big Frankie
11 is considered a single unit.
12 BY MR. PACE:
13   Q.  Oh, so I may have misunderstood.  When
14 you say you had to adjust each unit, you mean --
15   A.  Big Frankie.
16   Q.  So each big Frankie has -- let me look at
17 this, if I can.  Look at the top big Frankie.
18   A.  Yes.
19   Q.  There are six different pumps on the top
20 big Frankie; is that correct?
21   A.  It is correct.  It is correct.
22   Q.  And we can see them in this exhibit
23 because they are the red boxes, each has its own
24 digital readout in front of it?
25   A.  You are correct.

Page 93

```
 1        Q.   You can adjust each of those pumps
 2   differently, correct?
 3        A.   Correct.
 4        Q.   Are you telling me that you would adjust
 5   those pumps so that they would all read the exact
 6   same for at least any individual big Frankie or would
 7   you sometimes adjust them by pump?
 8           MR. ANNESSER:  Object to form.
 9           THE WITNESS:  No, because as you can see,
10      all of them send the water to the same
11      collector.  You see?
12   BY MR. PACE:
13        Q.   Uh-huh.
14        A.   So basically adjust the pump -- the pumps
15   does not mean that each pump must have that specific
16   value.
17           But adjust the pump means to make the
18   amount of water go at the level that you want in the
19   big Frankie.  So basically it is not -- each pump
20   connected with some specific resistance, it's not so.
21        Q.   Understood.  But each pump -- am I
22   just -- am I just reversing this?  Each pump is
23   sending water into a big Frankie or pulling water out
24   of a big Frankie?
25        A.   No, it's sending water to the big
```

Page 94

```
 1   Frankie.
 2        Q.   To the big Frankie?
 3        A.   Pulls the water from the internal tank.
 4        Q.   So each -- each pump can send a different
 5   amount of water into the one big -- the one E-Cat
 6   unit to which it's attached, correct?
 7        A.   Correct.
 8           MR. ANNESSER:  Object to form.
 9   BY MR. PACE:
10        Q.   So the fact they may draw from a common
11   waterline doesn't mean that the first pump I see here
12   on the top left-hand corner of Exhibit 4, it can be
13   set differently than the second pump I see right next
14   to it on Exhibit 4, correct?
15           MR. LEON DE LA BARRA:  Object to form.
16           THE WITNESS:  Yes, it is correct.
17   BY MR. PACE:
18        Q.   So my question to you though is simply
19   when you would set -- we're talking about a situation
20   here where one of the big Frankies has gone down, you
21   have to make adjustments to the water level going
22   into the remaining big three Frankies.
23           Would you set the pumps for a particular
24   big Frankie, would those pumps all be set the exact
25   same or could they be set differently per each E-Cat
```

Page 95

```
 1   unit?
 2           MR. ANNESSER:  Object to form.
 3           THE WITNESS:  They can be set
 4      differently.
 5   BY MR. PACE:
 6        Q.   I understand they can be.  I am asking
 7   you would you?
 8        A.   Depends on the situation.
 9        Q.   So there is times when you would have to
10   adjust it by E-Cat unit, you would have to say, just
11   using my Exhibit 4, top row big Frankie, the very
12   first pump we see there in the left --
13        A.   Okay.
14        Q.   -- it may be that that pump feeding
15   into -- which feeds into its own individual E-Cat
16   unit, that might have been set differently than the
17   pump right next to it that's fed into a different
18   E-Cat unit, correct?
19           MR. ANNESSER:  Object to form.
20           THE WITNESS:  Yes, it is correct.
21   BY MR. PACE:
22        Q.   And those -- that difference is something
23   that you would -- that would be up to you to make
24   that judgement of how much goes into the first E-Cat
25   unit, how much goes into the second E-Cat unit as
```

Page 96

```
 1   part of that big Frankie, correct?
 2        A.   It is correct.
 3        Q.   All right.  I understand what you've
 4   referenced to me here on the left-hand side of
 5   Exhibit 4 but I am still trying to understand.
 6           Maybe it's just a feel for the units but
 7   how would you know or how would you decide I'm going
 8   to pump X amount of water into the first E-Cat in a
 9   big Frankie and some different amount of water, maybe
10   even slightly, but some different amount of water
11   into the second E-Cat in a big Frankie?
12        A.   From the level.
13        Q.   From the level.  This level doesn't
14   distinguish between from one pump to the next, does
15   it?
16        A.   No, the levels are one for every -- for
17   every BF, big Frankie.
18        Q.   I understand.
19        A.   But it does not matter.  No, the other
20   pumps do not matter if you activate the pump.
21           If we number the pumps from one to six,
22   one, two, three, four, six.  One, two, three --
23        Q.   Four, five, six.
24        A.   Four, five.
25        Q.   Six.
```

24  (Pages 93 to 96)

Page 97

1    A.   Sorry.  One, two, three, four, six is a
2  very big mistake.
3    Q.   Just so the record is very clear, we're
4  talking Exhibit 4, there is a big Frankie at the top
5  of that picture.  It's got -- we can count six red
6  pumps?
7    A.   Yes, exactly.  It doesn't matter if --
8  you know, the regulation between one pump and the
9  other is just to have a total that must fit with the
10  quantity that you want.
11    Q.   Okay.
12    A.   These pumps have a capacity.  Each of
13  these pumps, we have calibrated them.  I have
14  calibrated them together with -- with Barry and with
15  Fabiani when we started, just to be sure.
16       They have a capacity, if I remember well,
17  starts from zero to 100 liters per hour each.  So
18  basically we had a capacity of 600 liters per hour
19  with all the six pumps in full -- in full power for
20  each BF.
21       So then you had to regulate to maintain
22  the level constant.  The regulation had to be made
23  many times.
24    Q.   And one of the reasons, if I understand
25  this correctly that it's important, is that if there

Page 98

1  is too much water flowing into an E-Cat unit, that
2  would -- would -- if the water is flowing through an
3  E-Cat unit too fast, the E-Cat unit would not have
4  time to adequately heat that water; is that correct?
5       If there is too much water flowing
6  through an E-Cat, one danger, one risk that could
7  occur is that the water would be going out too fast
8  before it had a chance to be adequately heated by the
9  E-Cat?
10       MR. ANNESSER:  Object to form.
11       THE WITNESS:  Well, let me put it in a
12  rigorous form.  The power of a reactor at a
13  specific situation is constant.  The temperature
14  is an integral that is function of the amount of
15  water in time.
16       So if in one hour I have a flow of 250
17  liters, just to say a number and at 250 liters I
18  get steam, so I am above 100 Celsius, okay.  If
19  I pass through 500 liters, I will not have
20  steam, I will have hot water.
21  BY MR. PACE:
22    Q.   That was the only point I was making.
23    A.   Yes.
24    Q.   Is you have to be careful in this
25  regulation because if you are sending too much water,

Page 99

1  if you are pumping too much water through an E-Cat
2  unit it doesn't have adequate time to heat up the
3  water and turn it into steam, correct?
4    A.   Exactly.  And turn it into steam,
5  exactly.
6    Q.   And conversely if there is not enough
7  water going into an E-Cat unit it can -- the E-Cat
8  unit itself can burn out, right?  Because doesn't --
9  the water actually kind of cools the E-Cat unit,
10  correct?
11       MR. ANNESSER:  Object to form.
12       THE WITNESS:  It is correct.  If there is
13  no -- because the water for the reactor is a
14  coolant.
15  BY MR. PACE:
16    Q.   Right.
17    A.   It's a coolant.
18    Q.   If you ran -- go ahead.
19    A.   Basic on the first principle of
20  thermodynamic we have -- the first principle of
21  thermodynamic is based on the phenomenon that when
22  you put in contact -- in contact two bodies of which
23  one is warmer and one is colder, after due time the
24  temperature will be equal for both bodies.
25       This is the core -- the core of the first

Page 100

1  principle.  So along the first principle it is clear
2  I send cold water inside a very hot reactor and I
3  send cold water into a hot reactor and I will -- the
4  first principle of thermodynamic will bring us to an
5  equilibrium, which means the reactor will become
6  colder and the water will become warmer.
7       If the water that in this case acts as a
8  coolant lacks the -- is less than the due amount, the
9  reactor continues to heat up, heat up, heat up, until
10  it can burn.
11    Q.   Okay.  So that's what I was getting at.
12  Like, for example, if you turned off a valve on an
13  E-Cat unit so no water was going in there and let the
14  E-Cat run, it would burn out?
15    A.   Absolutely.
16    Q.   So --
17       MR. ANNESSER:  Object to form.
18       THE WITNESS:  Not necessarily burn out.
19  BY MR. PACE:
20    Q.   Shut down eventually?
21    A.   Yes, it will shut down because in that
22  case there is a safety system that if the temperature
23  goes above a secure limit.
24    Q.   So when a big Frankie is taken offline,
25  if I understand it correctly, you and only you would

25 (Pages 97 to 100)

Page 101

1   make adjustments to the amount of water that was
2   going into the remaining big Frankies?
3           MR. ANNESSER: Object to form.
4           THE WITNESS: Can you repeat?
5   BY MR. PACE:
6       Q.   Yes.  In the example when one of the big
7   Frankies was taken offline and the power and water
8   was turned off --
9       A.   Yes.
10      Q.   -- you and only you would make adjustments
11  to the pumps for the remaining big Frankies to
12  increase -- to increase by some amount the water
13  going through the remaining big Frankies, correct?
14          MR. ANNESSER: Object to form.
15          THE WITNESS: It is correct.
16  BY MR. PACE:
17      Q.   And then I believe you testified that the
18  electrical -- the amount -- whether or not there had
19  to be changes to the electrical input varied?
20      A.   I don't understand the question.
21      Q.   I think you testified before -- my
22  example of one big Frankie being taken offline, the
23  remaining three big Frankies doing more of the work,
24  we were -- you explained that always means that there
25  is going to be more water going into those remaining

Page 102

1   big Frankies.  It may not mean there is more
2   electrical power going into the big Frankies.
3           So how would you know whether the
4   remaining big Frankies needed more electrical power
5   or not?
6           MR. ANNESSER: Object to form.
7           THE WITNESS: From reading the
8       temperatures, reading the temperatures,
9       maintaining under control the temperatures and
10      the pressure and -- and the -- the temperature,
11      the pressure and -- can you repeat the
12      question?
13  BY MR. PACE:
14      Q.   You know what, I might not be able to do
15  it any better than I did last time, so if you could
16  reread it for me, that would help.
17      A.   I lost the other piece of the question.
18      Q.   I'll redo it.  Don't worry.  I got it.
19  The way I asked before had a little bit -- it was a
20  little drawn out.
21          You testified that when one big Frankie
22  was taken offline and the power was turned off to it
23  and the remaining big Frankies were still operating,
24  you testified that you might have to change the
25  electrical input into the remaining big Frankies but

Page 103

1   you might not.
2           So my question was well, how did you know
3   whether you had to change the amount of electrical
4   power going into the remaining big Frankies?
5       A.   Three parameters, yes.  Go ahead.  Now I
6   got it.
7       Q.   Okay.
8       A.   Three parameters that I had at my
9   disposal there, temperatures, pressure and level of
10  water.
11      Q.   Okay.  And temperature, you mean the
12  temperature on the output pipe?
13      A.   Temperature in the steam, yes.
14      Q.   So --
15      A.   But also in the water.  Also the
16  temperature of the water.  Because -- yes.
17      Q.   And so if I understand this correctly,
18  when one big Frankie was taken offline and the power
19  and water was turned off to that big Frankie, some
20  adjustments to the water pipes would be made and
21  those would be made by you, correct?
22      A.   Yes.
23      Q.   And then you would go to the -- then you
24  would monitor the temperature readings and the
25  pressure readings and decide whether an adjustment

Page 104

1   needed to be made to the amount of electricity that
2   was being sent to the remaining big Frankies,
3   correct?
4           MR. ANNESSER: Object to form.
5           THE WITNESS: I lost the second part of
6       your question.  I'm sorry, please can you speak
7       a little bit slower?
8   BY MR. PACE:
9       Q.   I can.
10      A.   Thank you.
11      Q.   I am just -- our example is one of the
12  four big Frankies is turned off for maintenance and
13  the water and the power is turned off to that big
14  Frankie, okay.
15          We have three big Frankies left.  One
16  thing that occurs when this happens is that you make
17  adjustments to the amount of water that is flowing
18  into the remaining three big Frankies, correct?
19      A.   Yes.
20      Q.   And that's a process you do individually,
21  possibly changing each pipe for the remaining big
22  Frankies?
23      A.   Correct.
24      Q.   I'm sorry, for the remaining E-Cat
25  units.

26 (Pages 101 to 104)

Page 105

1    A.  Correct.
2    Q.  You also might have to make an adjustment
3  to the electrical power going into the remaining big
4  Frankie units, correct?
5    A.  Correct.
6    MR. ANNESSER:  Object to form.
7  BY MR. PACE:
8    Q.  And you would determine whether that was
9  so by looking at the temperature readings --
10    A.  Yeah.
11    Q.  -- that you had available?
12    A.  Yes, sir.
13    Q.  The pressure reading you had available?
14    A.  Yes, sir.
15    Q.  And the water level in the input tank for
16  the E-Cat plant?
17    MR. ANNESSER:  Object to form.
18    THE WITNESS:  Correct.
19  BY MR. PACE:
20    Q.  What would be the temperature gauge
21  indicator that would tell you you had to increase the
22  electrical power?
23    A.  The temperature gauge is the -- the
24  temperature gauge is the one --
25    Q.  Let me take the word gauge out.  I'm

Page 106

1  sorry.  I'm sorry.  Let me do it again.  That was a
2  bad question by me.
3    When you looked at the temperature
4  readings, we have got one of the E-Cat -- one of the
5  big Frankies is taken offline, the remaining three
6  are there, you've got to decide whether you have to
7  change the electrical input.
8    What are you looking for when you go read
9  the temperature readings?  Are you looking for them
10  to increase, decrease?
11    A.  The level of water.  Because if a reactor
12  is -- has too much energy inside, the level of water
13  goes down and vice versa.
14    Q.  Right.
15    A.  So a very crucial instrument here is this
16  very, very simple and humble glass column that is
17  there that gives us the level of water inside.
18    Because that combined with the lecture of
19  the temperatures and also I had -- that was off the
20  record of the test, I had my personal infrared
21  thermometer and with that I did not have a precise
22  temperature but pointing the laser of the infrared to
23  same spot -- to some spots that I knew, I had not
24  exactly at the decimal, but I had with a margin of
25  error of say one percent, I had the temperature --

Page 107

1  the temperatures.
2    But at a glance what immediately gave the
3  information necessary to react along the issues that
4  you are raising were the water columns because they
5  immediately tell you which is going too fast and
6  which is going too slow.  And this is an indication,
7  now you know that something is wrong, then you have
8  to detect.
9    Q.  Then you have to make adjustments -- then
10  you make some kind of adjustment to the amount of
11  electrical power but --
12    A.  Yes, but that is -- sorry.  I'm sorry.
13    Q.  How much of -- how do you decide -- how
14  do you decide how much of a change to make to the
15  electrical power?
16    A.  Empirically.  Empirically.  Only you had
17  to modulate until the situation reentered in a
18  normal.
19    It is -- you know, attorney, this was
20  like -- in many cases this was a prototype.  This was
21  like to play a violin.  It's like to ask how do you
22  know when the sound of the violin is very good.  You
23  have to play it and hear it.
24    Q.  Right.
25    A.  There is not a rule.

Page 108

1    Q.  So it was a trial and error method, you
2  would make a little adjustment to the electrical, if
3  that wasn't the right number you would change it a
4  little more?
5    A.  It was something in between trial and
6  error method, the Galilean method that you describe
7  it now and the tuning of a violin.
8    When a violinist has to tune the violin
9  there is not a rule three turns right clockwise and
10  half turn.  No, he has to modulate it until his ear
11  says that's right.
12    Q.  The right pitch?
13    A.  Yeah.
14    Q.  When the -- when an E-Cat unit was shut
15  down -- I'm sorry, a big Frankie unit was shut down
16  and the electrical and the water was stopped what
17  would happen with the water that was already inside
18  the E-Cats?
19    A.  It usually evaporated during the cooling
20  down of the plant.  Because it's like to leave --
21  also because situation here is very complex because
22  we have here a factor that is not in normal plants
23  that is the SSM.  Here is not that simple.
24    Because, you know, in a normal heater you
25  turn off the electricity, it cools down.

27  (Pages 105 to 108)

Page 109

```
 1        Q.   Right.
 2        A.   Here it's not so because if you are in an
 3   SSM mode to turn down takes time because the SSM mode
 4   can go after -- after you take off the contribution
 5   of the electrical resistances can go on also for
 6   hours and you have just to wait.
 7        Q.   And so --
 8        A.   During that time -- during that time you
 9   must also let the water flow because if not you risk
10   to destroy the reactor.  So also in that case this is
11   a matter of experience.
12        Q.   Where would the water -- you have decided
13   to take -- my hypothetical is you decided, whether
14   it's you or Fulvio or anyone else, but a decision has
15   been made to take one of these big Frankies offline.
16        As you said, there is time when a big
17   Frankie was taken offline, water and electrical were
18   turned off to it.  I understand what you're saying
19   about electrical.  When you turn off the electrical,
20   the electrical is when you turn off a switch,
21   right, and it's electrical, it stops.
22        MR. ANNESSER:  Object to form.
23   BY MR. PACE:
24        Q.   That's correct, isn't it?  Like the
25   electrical -- turning off the amount of electricity
```

Page 110

```
 1   going into the big Frankie wasn't very difficult,
 2   correct?
 3        MR. ANNESSER:  Object to form.
 4        THE WITNESS:  As a matter of fact, if I
 5        have understood properly your question, I did
 6        not say exactly this.
 7        I say that the situation on the electric
 8        side was much complicated from the particular
 9        factor that we have of the self-sustaining mode
10        that is --
11   BY MR. PACE:
12        Q.   I think you might have misunderstood my
13   question.  I am only asking now let's take the
14   example of turning off a big Frankie, not rerouting
15   the electrical anywhere now.
16        A.   You mean not in SSM mode?
17        Q.   Well, actually, if I can, just -- you
18   have a big Frankie unit that you want to turn off and
19   stop the electrical and the water flowing into it.
20        I understand it's going -- it's not so
21   easy to understand, there is going to be some issues
22   you and I are about to talk about in terms of the
23   water -- because you can't just turn the water off.
24   You can't just come in and turn all the water off.
25        Can't you just turn off the electrical
```

Page 111

```
 1   that is flowing to one of the big Frankie units if
 2   you wanted to shut it down?  I am not saying that
 3   would shut it down.  I am just saying but you can
 4   turn off the electrical, kind of like flicking a
 5   switch, correct?
 6        MR. ANNESSER:  Object to form.
 7        THE WITNESS:  Depends.  Depends on the
 8        situation, because the electromagnetic fields
 9        have a function inside that is also connected
10        with the safety.
11        So there are situations in which you can
12        just shut off.  There are situations in which
13        you must do it gradually.
14   BY MR. PACE:
15        Q.   Okay.  And what distinguishes one
16   situation from the other?
17        A.   Again, temperatures, pressure and level
18   of water.
19        Q.   Let's take an example or let's talk a
20   little bit more, if we can, about the water issue.
21        So you want to turn off a big Frankie.
22   You can't just turn the water flow off into that big
23   Frankie, right?
24        A.   No.
25        Q.   You have to let the water keep flowing?
```

Page 112

```
 1        A.   Yes.
 2        Q.   Because that's one of the things --
 3        A.   Until the temperature has reached a level
 4   that -- so that you can also stop the flow of the
 5   water.
 6        Q.   And that would be a level of closer to
 7   room temperature or maybe --
 8        A.   No, no, no.
 9        MR. ANNESSER:  Object to form.  Go ahead,
10        you can answer.
11        THE WITNESS:  When you are well below the
12        boiling point.
13   BY MR. PACE:
14        Q.   What is well below the boiling point?
15        A.   80.
16        Q.   80 degrees Celsius?
17        A.   Yes.  Not eight, 80, 8-0.
18        Q.   8-0.  But you are giving me a reading in
19   Celsius?
20        A.   Yes, sir.
21        Q.   Okay.  I mean that's still pretty
22   dangerously hot water, right?
23        A.   Yes, but too distant from -- when the
24   temperature goes down to that level but, you know,
25   you must associate this reading with the momentum.
```

28  (Pages 109 to 112)

Page 113

1   You understand me if I say momentum?
2       Q.   It's going downward instead of upward.
3       A.   Yeah, it's going down.  It's not making a
4   roller coaster.  It's going down.  Once you reach the
5   80 it will never recover the energy because consider
6   that 4/5th of the energy is the vaporization
7   (phonetic).
8           So when you are in the 80s, you are not
9   only 20 degrees distant from 100, you are an ocean
10  distant from 100.
11      Q.   I understand what you are saying.  I just
12  want to -- so you have to keep flowing some water
13  through this big Frankie that you have otherwise
14  turned off.  You are still flowing some water through
15  there to cool it down, to something around --
16      A.   Yes.
17      Q.   -- 80 degree Celsius area?
18      A.   Yes.
19      Q.   Then you can stop flowing water through
20  it?
21      A.   Yes.
22      Q.   All right.  Two questions.  One is, that
23  water that is flowing through the big Frankie when it
24  drops below 100 and before it gets below 100 Celsius
25  and before it gets to 80 Celsius, where is that water

Page 114

1   being discharged to?
2       A.   Depends on the system.  In this system we
3   did not discharge water.  The water was always in
4   circulation.
5           When the -- the water was always in
6   circulation until the plant was in operation.  When
7   the plant is not in operation the water is still.
8       Q.   So while the plant is in operation --
9       A.   Once the water is liquid it just -- if
10  nothing moves it, again, first principle of
11  thermodynamics, it is still.
12      Q.   So the water -- we're looking at Exhibit
13  4.  We've got this big Frankie on top.
14      A.   Yes.
15      Q.   The decision has been made to turn that
16  one off to make some repairs.
17          What happens is water is continued to be
18  pumped into those -- into each E-Cat unit while it
19  cools down, correct, and then that water passes --
20  whatever water goes into that E-Cat unit is passed
21  out, new water comes in, more cooling effect by the
22  new water; is that correct?
23      MR. ANNESSER:  Object to form,
24  mischaracterization.
25      THE WITNESS:  No, either I did not

Page 115

1   understand you or it is incorrect.  Can you
2   kindly repeat slowly?
3   BY MR. PACE:
4       Q.   I can.
5       A.   Yes.
6       Q.   Our hypothetical here -- I don't want to
7   say hypothetical because this actually occurred.
8           When you would turn off a big Frankie
9   unit and want to turn off the flow of water to it,
10  you didn't just turn it off entirely, you turned
11  it -- you turned it off over time, you let some water
12  continue to flow through that big Frankie while it
13  cooled down, correct?
14      A.   Yes.
15      Q.   That water that would go into the big
16  Frankie during that time period, would it stay in the
17  big Frankie or would it pass through the big Frankie?
18      A.   No, it will pass through the other big
19  Frankies.
20      Q.   Okay.  And then does -- in what order
21  does the water flow through the big Frankies?
22      MR. ANNESSER:  Object to form.
23      THE WITNESS:  I did not understand the
24  question.
25  BY MR. PACE:

Page 116

1       Q.   In what order does the water flow through
2   the big Frankies?  In other words, does it start --
3       A.   It can be regulated because they are
4   interconnected through valves.
5       Q.   So there is --
6       A.   I can decide, for example, if to send the
7   water partially -- partially to one and another, all
8   the other how.  It depends on the situation.
9   Depends on the situation on the columns in that
10  moment.  There is not a rule.
11      Q.   So you can take water -- you can take the
12  output from big Frankie number 4 and route it through
13  big Frankie number 1?
14      A.   Yes.
15      Q.   Okay.  And vice versa, you can take the
16  output of big Frankie number 1 and route it through
17  big Frankie number 4?
18      A.   Yeah.
19      Q.   Now, when you shut off one of these big
20  Frankies, the -- once it reached the point of let's
21  say 80 degrees Celsius, you would turn off the water
22  that was flowing into the big Frankie, correct?
23      MR. ANNESSER:  Object to form.
24      THE WITNESS:  Can you repeat?
25  BY MR. PACE:

29 (Pages 113 to 116)

Page 117

1    Q.  I can.  We're talking about times when
2  you would turn off a big Frankie.
3    A.  Okay.
4    Q.  As you have testified, you don't just
5  turn off the water, you have to let water keep
6  running until it reduces to a certain temperature
7  that's a little safer, correct?
8    A.  Yes.
9    Q.  So let's take one of these examples.  The
10  water level -- the temperature within the E-Cat unit
11  and the water in there is no longer 100 degrees
12  Celsius, now it's 80 degrees Celsius.
13    A.  You know, it is not a black and white
14  situation, turn on, turn off.
15    Here are 24 pumps, so we can regulate.
16  When I need that one reactor cools down, I can reduce
17  the water to that reactor to give just the water
18  necessary to cool down the reactor until it is
19  possible to operate on it because it is cold.
20    In the meantime gradually the amount of
21  water that decreases from it increases to the other.
22  It's like a violin, as I told you.
23    Q.  No, I understand.  My question was going
24  to be once you have cooled down that big Frankie unit
25  what do you do with that water?

Page 118

1    Is that water rerouted through one of the
2  other big Frankies?
3    MR. ANNESSER:  Object to form.
4    THE WITNESS:  You know, it is not -- if I
5  regulate the pumps of the other three to pump
6  more and I regulate the pump of the one that I
7  want to turn off, to pump less, just to give --
8  just to give the cooling -- the cooling water,
9  but at the same time the water that exits from
10  here goes to the tank and not to the others, I
11  can cool down a reactor while the other can
12  supply to his energy increasing the flow through
13  the other three.
14  BY MR. PACE:
15    Q.  So you can --
16    A.  Basically now I understand what you
17  are -- what you are saying.
18    Q.  So you could route the water for the big
19  Frankie you want to turn down -- turn off, you can
20  route the water back into the tank?
21    A.  Yes.
22    Q.  And that's how you would --
23    A.  So, you know, the water is always the
24  same but it's always different, like the river of
25  Heraclitus.

**IMP**

Page 119

1    Basically the water is always the same
2  but I just give less, less, less here, more, more,
3  more here, so that at the end the output does not
4  change within certain limits.  Within certain
5  limits.
6    And this is a tuning that has no rules.
7  This is just experience in this prototype.
8  Obviously -- obviously one mandatory thing to do for
9  this technology is a much more sophisticated control
10  system to make all this tuning, something that does
11  not need a slave like that stays there tuning, et
12  cetera, you know, like a guard.  I can drive a car
13  without being --
14    Q.  It doesn't need a personal touch, so to
15  speak?
16    A.  Exactly.
17    Q.  It doesn't need Andrea Rossi in every
18  plant?
19    A.  But to arrive to that level we need a
20  control system much more sophisticated.  Much, much
21  more sophisticated.  This is a very simple control
22  system.
23    Q.  And when the work is done on the big
24  Frankie -- on the big Frankie that has been turned
25  off -- well, let me ask you.

Page 120

1    For example, some of the records indicate
2  a big Frankie was turned off because of leaks.
3    A.  Yes.
4    Q.  When that would happen would you have to
5  speed up the shutdown?
6    MR. ANNESSER:  Object to form.
7    THE WITNESS:  I am sorry, I did not
8  understand the question.
9  BY MR. PACE:
10    Q.  Sure.  If a big Frankie has to be turned
11  off because it's leaking, what is it leaking?
12    MR. ANNESSER:  Object to form.
13    THE WITNESS:  If leaks, it leaks water.
14  It's just water that is leaking because -- maybe
15  also steam.  Also steam can leak.
16    And, you know, if it leaks steam is
17  easier because it's just a matter to put a patch
18  if it is not a dramatic.  But usually when --
19  you just put a rubber patch with clamps.
20    If it leaks water it depends.  It has to
21  be analyzed, the situation, because usually the
22  leaks that we had have been small leaks, small
23  respect the mass in circulation.
24    But sometimes they can be worrying if
25  they are in critical points and, you know, a

Page 121

1    leak can become something much worse than that
2    if it is not treated immediately.
3    BY MR. PACE:
4        Q.  And that's why I was kind of wondering
5    whether in connection with leaks there is a process
6    for shutting down a big Frankie faster because it's
7    either leaking steam, which is dangerous, right?
8    Because you're now saying this is coming out at 100
9    degrees Celsius, which can hurt someone.
10       MR. ANNESSER:  Object to form.
11   BY MR. PACE:
12       Q.  Or it's leaking water, which if it
13   continues might do more damage to the big Frankie and
14   also I would assume -- if it's like 80 degrees
15   Celsius water that's also pretty hot, right?
16       A.  Yeah.
17       Q.  I think -- I'm looking at John here out
18   of the corner of my eye.  I think it's almost time
19   for us to take a break.  Let me just wrap up this one
20   question.
21       Would it vary based on the type of
22   maintenance that needed to be done how fast you would
23   shut down a big Frankie, how fast you would turn it
24   off?
25       MR. ANNESSER:  Object to form.

Page 122

1        THE WITNESS:  Can you repeat me the
2    question in few words?
3    BY MR. PACE:
4        Q.  Would the type of maintenance you had to
5    do on a big Frankie impact how fast or how slow you
6    turned off that big Frankie?
7        A.  Yes.
8        Q.  All right.  So, for example, if there was
9    a water or steam leak, you would shut down the big
10   Frankie faster than if it was a normal maintenance
11   schedule?
12       MR. ANNESSER:  Object to form.
13       THE WITNESS:  Depends on the situation.
14   Depends on the situation always.  Depends on the
15   situation.
16       MR. PACE:  This is probably actually a
17   pretty decent breaking point if we want.
18       MR. ANNESSER:  Yes.
19       MR. PACE:  Do you want to plan on 2
20   o'clock?
21       MR. ANNESSER:  I think that's
22   reasonable.
23       MR. PACE:  Can people do it in 45
24   minutes?  I'm not so sure.  That's my only
25   concern.  Do you want to say an hour?

Page 123

1        MR. ANNESSER:  Let's say 2.
2        MR. LEON DE LA BARRA:  Get here as quick
3    as possible.
4        MR. ANNESSER:  If we can't, we can't but
5    let's say 2.
6        THE VIDEOGRAPHER:  13:11, off the
7    record.
8        (Thereupon a lunch recess was taken,
9    after which the following proceedings were had.)
10       THE VIDEOGRAPHER:  Time is 14:19.  We're
11   back on the record.
12   BY MR. PACE:
13       Q.  Dr. Rossi, you understand that you are
14   still under oath?
15       A.  Yes.
16       Q.  Okay.  I am going to ask you some
17   questions.  I want you to answer yes, no and then
18   when I ask you a question that asks for a more
19   open-ended answer, I want you to give your lawyer a
20   chance to say object and perhaps instruct you not to
21   answer.  We did this last time.  I am going to do it
22   very briefly here.
23       During your break did you have a chance
24   to speak with your lawyer?
25       A.  Yes.

Page 124

1        Q.  During your break did you speak with any
2    of the other lawyers in the room?
3        A.  Yes.
4        Q.  When you spoke with your lawyer did you
5    speak about your testimony this morning?  Just yes or
6    no.
7        MR. ANNESSER:  Object to form.  I am
8    going to instruct you not to answer, privilege.
9        THE WITNESS:  Yes.
10       MR. ANNESSER:  Dr. Rossi.
11       THE WITNESS:  No, no, sorry.  You were
12   not finished.  Sorry.  I thought you were
13   finished.
14   BY MR. PACE:
15       Q.  I understand.
16       MR. ANNESSER:  I am trying --
17   BY MR. PACE:
18       Q.  Let me ask this question.  Let your
19   lawyer respond before you say anything.
20       MR. ANNESSER:  You need to listen to my
21   response, please.
22   BY MR. PACE:
23       Q.  What did you discuss with your lawyer
24   this morning when we took our break, our lunchtime
25   break?

31  (Pages 121 to 124)

Page 125

1    MR. ANNESSER: Objection, privilege. I
2 am instructing the witness not to answer.
3 BY MR. PACE:
4    Q. Again, give your lawyer a chance to
5 object and this question is just a yes or no
6 question.
7    In speaking with the other lawyers in
8 this room, one or more of them, did you discuss your
9 testimony from this morning?
10    A. No.
11    Q. All right. Let me mark as -- 4 and 5
12 were the pictures. That's why.
13    Let me mark as Exhibit 6.
14    (The document referred to was thereupon
15 marked Deposition Exhibit 6 for Identification, a
16 copy of which is attached hereto.)
17 BY MR. PACE:
18    Q. This is a document that I believe you saw
19 at your last deposition.
20    We discussed this previously and I don't
21 want to go back through a lot of this but one thing I
22 wanted to ask you about, if you can do me a favor and
23 turn to the entry for June 11, 2015. Actually, I'm
24 sorry. Let me start, before I say that, do you
25 recognize this document?

Page 126

1    A. No.
2    MR. ANNESSER: I am going to object to
3 the form on that.
4 BY MR. PACE:
5    Q. Other than at your deposition last week
6 do you recall ever seeing this document?
7    A. No. As a matter of fact, I don't even
8 remember to have seen -- maybe if you have shown me
9 in the last deposition. Surely you have shown me in
10 the last deposition, if you say so, but I don't
11 remember it.
12    Q. Okay. This is a document that at least
13 appears to reflect different events relating to the
14 E-Cat plant.
15    And if you look for me on June 11th of
16 2015.
17    A. Yes.
18    Q. It looks like the statement there says
19 that there is a -- does this say that there was a
20 reboot of the system?
21    MR. ANNESSER: Object to form.
22    THE WITNESS: Sorry, where?
23 BY MR. PACE:
24    Q. For June 11.
25    A. June 11.

Page 127

1    Q. After 7.92, the statement there.
2    A. The statement, "riavviato completamente
3 con angolo di fase." I don't understand what is
4 written here. Because it's electric jargon that I
5 don't know.
6    Q. Okay. Is there -- is there such a thing
7 as a system reboot or a reboot of all of the big
8 Frankies?
9    A. Yes, it seem.
10    MR. ANNESSER: Object to form.
11    THE WITNESS: Where, you are still or on
12 June 11?
13 BY MR. PACE:
14    Q. Actually, let me take a step back away
15 from that document even and just ask you more
16 generally.
17    A. Okay.
18    Q. Is there such -- was it ever the case
19 when all of the big Frankies were restarted at the
20 same time?
21    A. I don't recall. I have to go through my
22 logbook.
23    MR. ANNESSER: I'm sorry, I am going to
24 go back and object to the form on that.
25 BY MR. PACE:

Page 128

1    Q. Are you familiar with the phrase a
2 reboot?
3    A. No.
4    Q. Okay. If you -- was there a process for
5 turning off and then turning back on either shortly
6 thereafter or even much later, the big Frankies?
7    MR. ANNESSER: Object to form.
8    THE WITNESS: It depends on the
9 situations. It depends on the situation.
10 BY MR. PACE:
11    Q. But you could turn off all the big
12 Frankies at the same time and then turn them back on
13 at the same time?
14    A. Yes, but there is an integral of start-up
15 and an integral of stop-down.
16    Q. Well, if you can go back to Exhibit 3,
17 maybe there is a terminology issue.
18    A. Which page?
19    Q. Page 1388.
20    A. Sorry?
21    Q. 1388.
22    A. Exhibit 3.
23    Q. We're on Exhibit 3. We're going back.
24    A. All right.
25    Q. Exhibit 3 reflects your language,

32  (Pages 125 to 128)

Page 129

1 correct?
2 MR. ANNESSER: Object to form.
3 THE WITNESS: Yes, Exhibit 3 is my
4 language. Page?
5 BY MR. PACE:
6 Q. 1388.
7 A. Yes. Okay.
8 Q. If you can look at the entry from March
9 9th, you see at the top of the page?
10 A. March 9, yes. Yes.
11 Q. The note says: "From 2 p.m. through 6
12 p.m. the plant has been shut down to repair the water
13 pipes of the 4 E-Cat 100 or 1000", correct?
14 A. Yes.
15 Q. And the E-Cat 1000 is a name for a big
16 Frankie?
17 A. Yes, it is correct.
18 Q. So this says that the plant was shut down
19 to repair the water pipes?
20 A. Yes.
21 Q. So I have two questions about that. One
22 is, is the process for shutting down the big
23 Frankies -- all four big Frankies similar to the
24 process for shutting down just one big Frankie?
25 MR. ANNESSER: Object to the form.

Page 130

1 THE WITNESS: Yes.
2 BY MR. PACE:
3 Q. And then what has to be done to restart
4 the big Frankies, following a shutdown such as this?
5 A. The procedure to shut up and shutdown, if
6 everything was all right, it's just to be turned it
7 on from the control panel, there are the switches to
8 restart the plant.
9 Q. Do you have to kind of reset or
10 recalibrate the water pumps for each of the E-Cat
11 units?
12 A. It depends. It depends. It depends.
13 For sure during -- during a start-up there is work to
14 do. You cannot just start up, and it's not like a
15 car. For sure a control must be made during the
16 start-up.
17 Q. Now, do you remember this event on March
18 9th?
19 A. No.
20 Q. Am I safe to conclude that if the -- if
21 the plant was shut down for four hours some part of
22 that four hours is the plant -- are the E-Cats
23 cooling down and part of that is the repair work
24 being done?
25 MR. ANNESSER: Object to form.

Page 131

1 THE WITNESS: It depends on the
2 situation. It depends on the situation.
3 BY MR. PACE:
4 Q. Well, this situation was to repair the
5 water pipes.
6 A. Yes, but I don't remember which water
7 pipes are we talking about, attorney. It depends
8 because there were a lot of water pipes.
9 Here, you know, this is a communication
10 that I gave to Penon, so Penon had nothing to do with
11 the maintenance. I just was communicating to him
12 this anomaly that we had, but without entering in
13 particulars because they were not his turf.
14 Q. Well, certainly on other occasions that
15 we looked at earlier today there were times when you
16 would say that three quarters of the plant was down?
17 A. Yes.
18 Q. I'm sorry, one quarter of the plant was
19 down --
20 A. Yes.
21 Q. -- you were working with three quarters?
22 MR. ANNESSER: Object to form.
23 Dr. Rossi, please allow him to finish his
24 question before answering.
25 THE WITNESS: Yes.

Page 132

1 BY MR. PACE:
2 Q. So this at least shows that the entire
3 plant was shut down for four hours?
4 MR. ANNESSER: Object to form.
5 THE WITNESS: Can you repeat the
6 question, please?
7 BY MR. PACE:
8 Q. Yes. It says -- what you wrote here was
9 from 2 p.m. through 6 p.m. the plant has been shut
10 down to repair the water pipes to the four E-Cat
11 1000s.
12 So that doesn't mean that a -- an
13 individual E-Cat or just an individual big Frankie
14 was shut down, but all of the big Frankies were shut
15 down to do the water pipe repair, correct?
16 A. Well, actually in -- while when I
17 communicated to Penon the water flow, the water
18 temperature, the steam temperature, the bars, et
19 cetera, I was rigorous.
20 When I gave him communication of
21 shutdown, et cetera, I was very synthetic because,
22 again, it was not his turf. I cannot answer to your
23 question not knowing precisely what happened that
24 day.
25 Q. Well, what you wrote though at least was,

33 (Pages 129 to 132)

Page 133

1    you know, from 2 p.m. through 6 p.m., so you gave
2    kind of a specific time period, correct?
3        A.   Yes, it is correct.
4        Q.   Okay.  Then you say the plant has been
5    shut down to repair the water pipes, correct?
6        A.   Correct.
7        Q.   And then you identify the water pipes of
8    the four E-Cat 1000s, not one or another, but all
9    four?
10       MR. ANNESSER:  Object to form.
11       THE WITNESS:  You know, again, I am not
12   sure about that because this writing is pretty
13   much -- pretty much imprecise.
14       I just was communicating to Penon that I
15   had problems to the plant and that for this
16   reason he could have -- you know, from these
17   three lines I am not able to reconstruct the
18   situation, to synthetic and I did not conserve
19   any.  I don't remember.
20   BY MR. PACE:
21       Q.   All right.  You don't remember that --
22   just to be clear though, you don't remember that the
23   plant wasn't shut down, you don't remember that it
24   was, you just don't remember?  You have something
25   written here.

Page 134

1        MR. ANNESSER:  Object to form.
2        THE WITNESS:  I remember that if I have
3    written these two lines here some problem has
4    happened there, but I am not able to give a
5    precise description of which kind of pipes we
6    had to repair and which exactly, which
7    phenomenon happened.
8        MR. PACE:  I am going to hand you what's
9    marked -- I apologize, I probably should have
10   stapled this.  We will staple it at a break.
11   It's going to be Composite Exhibit 7.
12       (The document referred to was thereupon
13   marked Deposition Exhibit 7 for Identification, a
14   copy of which is attached hereto.)
15   BY MR. PACE:
16       Q.   Can you take a moment to look through
17   Exhibit 7 for me.
18       MR. ANNESSER:  The first page or all of
19   it?
20       MR. PACE:  Through all the pages.
21       MR. ANNESSER:  All right.
22       THE WITNESS:  Okay.
23   BY MR. PACE:
24       Q.   These are -- these are invoices that you
25   provided to -- that Leonardo Corporation provided to

Page 135

1    Industrial Heat or IPH International for
2    reimbursement for expenses, correct?
3        A.   Yes.  I am reading those.  If you have
4    them, absolutely.
5        Q.   Okay.  And I apologize because I did give
6    them to you in a little bit out of order sequence.
7        A.   The graphic is a little bit different but
8    I think that is a matter of photocopying.  Because I
9    don't remember the graphic but the graphic can have
10   been changed by the photocopies.
11       Q.   You mean the graphic, the Leonardo
12   Corporation --
13       A.   Yes, exactly.
14       Q.   -- you have a more interesting graphic?
15       A.   Yes, yes, exactly.
16       Q.   Let me -- I have not given them to you in
17   date order.  I apologize.
18       A.   No problem.  No problem.
19       Q.   Let me take them in date order.
20       A.   Okay.
21       Q.   If you can look at a document marked --
22   having the number 19062.
23       A.   19062.
24       Q.   Should be at the back of that package.
25       A.   Here it is.

Page 136

1        Q.   Okay.
2        A.   Yes.
3        Q.   This says -- the description of the work
4    is:  "Work to modify and upgrade the pumping system
5    and substitution of nozzles and Teflon pipes, plus
6    materials.  Period February 23 through February 27."
7    And the total amount of that was $2,750.
8        Do you recall what that work was -- what
9    work was done?
10       MR. ANNESSER:  Object to form.
11       THE WITNESS:  I do not recall but I can
12   read it what it was and make sense.  It is what
13   is written.
14   BY MR. PACE:
15       Q.   Do you recall anything beyond what was
16   written?
17       A.   No, honestly.  But probably we had
18   problems with the distribution system of the pumps
19   that had been made in Industrial Heat and the
20   connections had been made with very low quality
21   material and we had problems, leakages caused by that
22   so they had been substituted with higher quality
23   material.
24       Q.   Who did that work?
25       A.   Industrial Heat in their factory.  This

34  (Pages 133 to 136)

Page 137

```
1   work?
2       Q.  The work reflected in Exhibit 20 --
3       A.  The substitution --
4           MR. ANNESSER:  Object to form.
5           THE WITNESS:  I don't remember.
6   BY MR. PACE:
7       Q.  Let me finish the question.
8       A.  Sure.
9       Q.  I think I asked it in a poor way.
10      A.  Sorry.
11      Q.  Who performed the work that is described
12  here on page 19062?
13          MR. ANNESSER:  Object to form.
14          THE WITNESS:  I don't remember.
15  BY MR. PACE:
16      Q.  Do you remember whether it was someone
17  who -- was it someone other than you, Fabiani or
18  Barry West?
19          MR. ANNESSER:  Object to form.
20          THE WITNESS:  I do not remember because
21  this is a work that could have been done by us
22  as well as by some contractor that always was
23  around there.
24  BY MR. PACE:
25      Q.  And then if it was done by some
```

Page 138

```
1   contractor who was in the area, would you have been
2   the person on behalf of Leonardo Corporation who paid
3   for the work?
4       A.  Can you kindly repeat the question?
5       Q.  Yes.  If it was done --
6       A.  Few words.
7       Q.  If this work was done by some independent
8   contractor --
9       A.  Yes.
10      Q.  -- who would have paid that independent
11  contractor?
12          MR. ANNESSER:  Object to form.
13          THE WITNESS:  Leonardo Corporation.
14  BY MR. PACE:
15      Q.  And who at Leonardo Corporation would
16  have actually made the payment?  Would that have been
17  you?
18      A.  Yes.
19      Q.  The next page in this, if we're going
20  sequentially -- or, I'm sorry, if we're going by date
21  is 18819.  It's an invoice from March 11 of 2015.
22      A.  Okay.
23      Q.  This description says:  "N.55
24  thermocouples not grounded.  To be put in place of
25  the grounded thermocouples precedently installed to
```

Page 139

```
1   avoid short circuits, $33.50 each, total for
2   thermocouples 1,842."
3           Then we have:  "Work hours to complete
4   the substitution of all the pipes, pipes connectors,
5   thermocouples, plumbing."
6           My first question is do you recall
7   anything about the work that I just described or the
8   thermocouples that I just described beyond what is
9   here on page 18819?
10      A.  No, I don't remember the particulars but
11  I have an idea of what happened.
12      Q.  Is N.55, does that mean 55 thermocouples
13  were replaced or is that a type of thermocouple?
14      A.  No, they had to be replaced because
15  also -- you know, sometime we had the suspect that
16  there had been some --
17          MR. ANNESSER:  Dr. Rossi, I'm going to
18  help.
19          THE WITNESS:  Okay.
20          MR. ANNESSER:  You've got to listen to
21  his question and answer them and then you can
22  explain, if you need to, but this will go a lot
23  smoother if you listen to what he's asking you.
24          THE WITNESS:  Can you kindly repeat?
25  BY MR. PACE:
```

Page 140

```
1       Q.  I can.  I am going to take it in pieces
2   here.  The N.55, does that mean that --
3   thermocouples?
4       A.  Yes.
5       Q.  Is that a type of thermocouple or is that
6   a number?  Does that mean 55 thermocouples were
7   replaced or that's a type of thermocouple?
8       A.  No, it's 55 thermal, N is for number.
9       Q.  Got it.
10      A.  This number is the quantity.
11      Q.  Okay.
12      A.  It says that 55 thermocouples had to be
13  substituted.
14      Q.  And the 55 thermocouples, those -- those
15  were not just in the piping leading into the E-Cat
16  plant, were some of those thermocouples in connection
17  with the actual E-Cat units?
18      A.  I don't remember.
19      Q.  And did this include the thermocouples
20  for Dr. Penon as well as thermocouples that Leonardo
21  or Fabiani installed or were they just for ones that
22  were installed by Leonardo?
23          MR. ANNESSER:  Object to form.
24          THE WITNESS:  I don't remember.
25  BY MR. PACE:
```

35 (Pages 137 to 140)

Page 141

1    Q.  All right.  The problem with the earlier
2   thermocouples, the ones that needed to be replaced,
3   is that they were grounded thermocouples, the result
4   of which they were causing short circuits, correct?
5        MR. ANNESSER:  Object to form.
6        THE WITNESS:  I am not able to answer
7    because this is -- it appears that it is an
8    electric problem and I remember that the two --
9    the two contractors of Industrial Heat, Fabiani
10   and Barry West, sometime came up to me saying
11   that there was material that was creating
12   problems, we had to substitute, et cetera, but I
13   don't remember the issues exactly, when here we
14   entered in a matter that is not my turf.
15  BY MR. PACE:
16   Q.  There is $3,250 paying for work hours.
17  Is that money that was paid to Fabiani or West or
18  would that be money paid to one of these independent
19  contractors you hired for a day or so?
20       MR. ANNESSER:  Object to form.
21       THE WITNESS:  I am very sorry, I don't
22   remember.
23  BY MR. PACE:
24   Q.  If that amount of money was paid out to
25  workers, though, that would have been paid out by

Page 142

1   you?
2    A.  No, by Leonardo Corporation.
3    Q.  I'm sorry, by Leonardo Corporation.  But
4   who at Leonardo Corporation would actually make the
5   money -- would actually make the payment?
6    A.  Can you kindly repeat?  I did not --
7    Q.  Yes.  So Leonardo Corporation --
8    A.  Yes.
9    Q.  -- it may come from their bank account,
10  its bank account, but some human being has to
11  actually deliver --
12   A.  That's me.
13   Q.  That's what I meant.  So you would
14  actually deliver the money to the workers?
15   A.  Yes, but not me as Andrea Rossi.
16   Q.  Understood.
17   A.  Me as the CEO of Leonardo Corporation.
18   Q.  Understood.  And do you recall anything
19  more about these workers other than -- do you recall
20  anything about the workers that did the work hours
21  reflected on page 18819?
22   A.  No.
23       MR. ANNESSER:  Object to form.
24       THE WITNESS:  No.
25  BY MR. PACE:

Page 143

1    Q.  Do you recall that the short circuits
2   were -- I guess my understanding is thermocouples
3   don't really short circuit.
4        Is the short circuit at the control panel
5   or, again, is that something you don't know?
6        MR. ANNESSER:  Object to form.
7        THE WITNESS:  I don't remember.
8   BY MR. PACE:
9    Q.  Moving to the next in time, I believe the
10  document ends in 17341.
11   A.  Got it.
12   Q.  Okay.  This is an August 24 invoice --
13   A.  Yes.
14   Q.  -- that Leonardo submitted to IPH
15  International.  It says: "N.16 spare resistances to
16  be substituted in the reactor number 4, each $450."
17  Let me see if I have this correct, which is N.16
18  means there were 16 units that were replaced,
19  correct?
20       MR. ANNESSER:  Object to form.
21       THE WITNESS:  No, attorney, spare.  Spare
22   means spare parts.
23       This I remember because was a particular
24   thing.  One day I reflecting I said since the
25   delivery term of this resistance is a little bit

Page 144

1   longer, I say if we lose resistances we have
2   problems because then it takes time to have
3   them.
4        So just as your car has a spare wheel, I
5   wanted to have 16 spare resistances, just to put
6   them there in case of necessity.  Spare.
7   BY MR. PACE:
8    Q.  I understand.  After saying spare
9   resistances it says "to be substituted in the reactor
10  number 4", so it identifies a specific reactor,
11  correct?
12   A.  Yes, it is correct because the reactor
13  number 4 was the one that inspired me to do so
14  because it had resistances that did not work properly
15  and did not -- did not have the necessity to be
16  substituted but I prefer to have a full change ready.
17   Q.  And what were the issues that were
18  arising with the resistances for reactor number 4?
19   A.  Can you repeat?
20       MR. ANNESSER:  Object to form.
21  BY MR. PACE:
22   Q.  You said that there was an issue with the
23  resistances for reactor number 4.  I just wanted to
24  understand, what was that issue?
25   A.  They had -- they sometime tended to not to

36 (Pages 141 to 144)

Page 145

1  have regular absorption of current and not so much to
2  need a substitution but enough to induce me to
3  prepare spare parts.
4       Q.  Would that -- would that problem result
5  in lesser output by the reactor number 4, or no?
6       A.  No.  No, because in that case that would
7  have been necessity of substitution and not those
8  spare parts.
9       Q.  Turning to page 16777.
10      A.  Got it.
11      Q.  That's November 14.  I'm sorry, November
12  17, 2015, invoice from Leonardo to IPH.
13      A.  Okay.
14      Q.  It says:  "Electricians work to repair
15  the reactor number 2."
16      Do you recall what the work was done to
17  repair reactor number 2?
18      A.  Absolutely not.
19      Q.  Do you -- I am assuming, and correct me
20  if I am wrong, that these electricians are not --
21  this is not a reference to either Fulvio Fabiani or
22  Barry West, correct?
23      A.  Correct.
24      MR. ANNESSER:  Object to form.
25  BY MR. PACE:

Page 146

1       Q.  Do you recall who these electricians
2  were?
3       A.  No, I do not recall.  I do not recall.
4       Q.  These electricians would have been paid
5  by Leonardo Corporation, correct?
6       A.  Yes.
7       Q.  And you would have been the person on
8  behalf of Leonardo Corporation to make the payment?
9       A.  Yes.
10      Q.  One more in this exhibit string, the one
11  we haven't touched on yet, the first page.  September
12  16, 2015 invoice.
13      A.  Number 6937.
14      Q.  Yes, 16937, correct.
15      A.  Yeah.
16      Q.  This says -- the description of the work
17  here is:  "Reparation of the reactor E-Cat 250 kW
18  number 4 from September 7 through September 15.  Four
19  workers, 8 hours per day, TOT 32 HPD for a total of
20  224 hours at $60 an hour."
21      A.  Uh-huh.
22      Q.  Do you recall what work was being done by
23  these workers from September 7 through September 15
24  of 2015?
25      A.  I think, yes.  I suppose this has been

Page 147

1  when we have changed the resistances to the number
2  4.
3       Q.  And is that something that would take
4  eight hours a day for seven or eight days?
5       MR. ANNESSER:  Objection to form.
6       THE WITNESS:  If it is written so.  If it
7  is written so, yes, because it was a very
8  delicate work.
9       Also because we had to operate without
10  disassembling, so it has been -- yes.  If it is
11  written so it has been, yes.
12  BY MR. PACE:
13      Q.  Well, let me ask you, independent of what
14  is written, just from your own knowledge of this
15  plant --
16      A.  Yes.
17      MR. ANNESSER:  Just for clarification are
18  you asking him as the rep of Leonardo --
19      MR. PACE:  Yes.
20      MR. ANNESSER:  -- or from his own personal
21  knowledge?
22      MR. PACE:  Since this is work for
23  Leonardo, I think both are covered.
24  BY MR. PACE:
25      Q.  So as a representative of Leonardo, I am

Page 148

1  asking independent of this document what do you know
2  about the -- this work that was done?  Do you recall
3  this work being done at all?
4       A.  Yes, I recall that we had substituted the
5  resistances of the number 4, yes.
6       Q.  And your recollection that it was -- do
7  you recall that it would take four workers working
8  eight hours a day for several days to do that?
9       A.  I don't recall this particular but if it
10  is written so here, I suppose it was so.
11      Q.  And the amount paid was $13,440?
12      A.  This is the amount that we have invoiced
13  to IPH.
14      Q.  So that's the amount that was paid to the
15  four workers?
16      A.  I suppose so, yes.
17      Q.  And that's an amount that you would have
18  paid on behalf of Leonardo Corporation?
19      A.  That -- yes, that Leonardo Corporation
20  has paid, yes.
21      Q.  And you have no additional information on
22  what this work was that was done during that time
23  period?
24      A.  No.
25      MR. ANNESSER:  Object to form.

37  (Pages 145 to 148)

Page 149

1    THE WITNESS:  No.
2  BY MR. PACE:
3    Q.   And during the time period of this work
4  do you recall that the -- the big Frankie unit number
5  4 was not operating during that time?
6    A.   During the time was not operating, yes.
7    Q.   But it was still in the same -- it was
8  still in the container that housed big Frankie
9  units --
10    A.   Yes.
11    Q.   -- 1, 2 and 3?
12    A.   Yes.
13    Q.   I want to discuss a little bit in
14  connection with the operation of the plant in Doral,
15  Florida, the measuring equipment and the data that
16  was collected from the measuring equipment.
17    Some of the measuring equipment that was
18  used in connection with the plant was provided by
19  Engineer Penon, correct?
20    A.   Yes.
21    Q.   And then there was some measuring
22  equipment that was placed in there by -- that was --
23  either belonged to Fulvio Fabiani or Leonardo for
24  separate measurements; is that correct?
25    A.   No, we must make a clear distinction here

Page 150

1  between Fulvio Fabiani and Leonardo Corporation.
2    Fulvio Fabiani was the consultant of
3  Industrial Heat, he was paid by Industrial Heat and
4  he operated also to help me by precise orders that
5  Industrial Heat gave to him, but he was dependent
6  from Industrial Heat.
7    Fulvio Fabiani I know that has installed
8  some instrumentation of his to take measurements, I
9  suppose under direction of Industrial Heat.  Surely
10  not of me.
11    Q.   You never told him to take any
12  measurements?
13    A.   I never told him to make any measurements
14  but -- but of course I recommended to him -- I did
15  not order to him to take measurements but he told me
16  that he was installing his thermocouples, if I
17  remember, and I underline if I were remember because
18  I never have put -- I never have made any
19  intervention in the work of Fabiani for what concerns
20  of the measurements, let alone in everything that was
21  made from or on behalf of Dr. Penon.
22    Q.   Just so I am clear, just to make sure I
23  am clear, and I think you testified to this already
24  this morning, so I don't think there is any conflict
25  here.

Page 151

1    In Exhibit 2 and Exhibit 3, which are
2  measurements that you took and provided -- either
3  took for yourself or provided to --
4    A.   Dr. Penon.
5    Q.   -- Dr. Penon, those were always from the
6  equipment that was installed by Dr. Penon?
7    A.   It is correct.
8    MR. ANNESSER:  Object.  Object to form.
9    THE WITNESS:  Sorry, sorry.  It is
10  correct.
11  BY MR. PACE:
12    Q.   And just so I am clear the -- so let's
13  call this the -- we will call it the Penon measuring
14  equipment for the equipment that Dr. Penon installed
15  and we'll call it the Fabiani measuring equipment for
16  the equipment that Fulvio Fabiani installed.
17    A.   Correct.
18    Q.   All right.  So let me see.  I might even
19  have this wrong in the second part.
20    As to the measuring -- what I am calling
21  the Fabiani -- yeah, the Fabiani measuring equipment,
22  he installed that, Fabiani?
23    A.   Yes.
24    Q.   And --
25    A.   Maybe in collaboration with Barry West.

Page 152

1  I do not know because I am not aware of all that
2  stuff.
3    I do not know how that stuff worked.  I
4  always told so to everybody that came there to begin
5  with to Mr. Tom Darden, to Mr. J.T. Vaughn, to Mr. T.
6  Barker and to all the persons and to all the visitors
7  that they brought there to promote their license with
8  their investors, I always said during these visits,
9  of all these people, for what concerns the control
10  system, the measurements, et cetera, et cetera, speak
11  with Engineer Fabiani because he is the man that
12  knows this stuff.  I understand nothing of all this
13  stuff.
14    Q.   Or speak with -- would you instruct them
15  to speak with Dr. Penon as to the equipment -- as to
16  the measuring equipment that Dr. Penon installed?
17    MR. ANNESSER:  Object to form.
18    THE WITNESS:  Can you kindly repeat the
19  question a little bit slower?
20  BY MR. PACE:
21    Q.   Would you tell -- would you tell others
22  to speak with Dr. Penon as to the measuring equipment
23  that Dr. Penon installed?
24    A.   To Tom Darden.
25    Q.   I'm just asking.  It's a yes or no

38  (Pages 149 to 152)

## Page 153

1    question.
2        A.  Yes or no question.
3            MR. ANNESSER:  Object to form again.
4            THE WITNESS:  Yes.
5    BY MR. PACE:
6        Q.  Again, I am drawing my distinction
7    between the Penon measuring equipment and the Fabiani
8    measuring equipment.
9        A.  Sure.
10       Q.  You only took data either for your own
11   notes or for what you sent to Dr. Penon from the
12   Penon measuring equipment?
13       A.  Absolutely.
14       Q.  Did you ever look at or discuss the data
15   being -- did you ever look at the data that was being
16   collected by Fulvio Fabiani to check -- check it
17   against the data you were collecting from the Penon
18   measuring equipment?
19           MR. ANNESSER:  Object to form.
20           THE WITNESS:  So you asked me if I ever
21       told to Fulvio Fabiani to check if his data were
22       coherent with the numbers that I read?  Is this
23       your question?  Because this is what --
24   BY MR. PACE:
25       Q.  It's a little different but I will get to

## Page 154

1    that question next.  So you're one step ahead of me.
2        My question right now was did you ever
3    actually look at the data that Fulvio Fabiani
4    collected to see whether it was consistent with the
5    data that you were collecting from the Penon
6    measuring equipment?
7        A.  No, because -- no, because Fabiani
8    collected those data in a language that for me -- in
9    a particular language, so -- and I was not interested
10   honestly because for me what counted was what I read
11   in the instruments of Penon and that was all.
12       But, honestly, I told to Fabiani many
13   times, I told -- I am -- I am finding this
14   temperature between 103 and 104, blah, blah, does
15   this make sense with what you are measuring with your
16   instrument, and he always said yes, we are in the
17   same -- we are in the same range.  At this level,
18   yes.
19       Q.  So you would -- you would discuss with
20   Fabiani the data he was collecting but you didn't
21   actually look at his underlying data?
22       A.  Yes, I did not discuss those data.  I
23   just now and again randomly for curiosity and also
24   for -- you know, for serious curiosity, not curiosity
25   just joking.

## Page 155

1    For curiosity I asked him does this data
2    that does this -- because the only thing that we
3    could confront about was the temperature, because
4    he -- because I was just measuring -- I was reading
5    the flow meter and there was nothing to discuss.
6        That was a seal at the thing with numbers
7    around and you have to read it, so there is nothing
8    to discuss.  For the temperature there is the
9    situation is not just reading a running wheel, but
10   there are probes and so it is interesting to see if
11   the probes are coherent or not.
12       And I asked now and again and always --
13   it never happened that I said, are you between 103
14   and 104?  It never happened that he said no, I am in
15   completely different on mine.
16       Q.  The data that was collected from the
17   Penon measuring equipment, at least it was collected
18   electronically.  Do you recall where that was stored?
19           MR. ANNESSER:  Object to form.
20           THE WITNESS:  Excuse me, I did not
21       understand the question.
22   BY MR. PACE:
23       Q.  So thermocouples will generate data,       IMP
24   correct, that is stored electronically on a computer
25   somewhere or in a data log?  Do you recall how that

## Page 156

1    data was being stored in connection with the Penon
2    measuring equipment?
3            MR. ANNESSER:  Object to form.
4            THE WITNESS:  I never knew a bit about
5        that stuff and I was absolutely not interested
6        to that.  It was not my turf.
7    BY MR. PACE:
8        Q.  And so Leonardo Corporation has no
9    information on how or where that data was stored for
10   Penon?
11       A.  Absolutely not.
12       Q.  If Dr. Penon testified that Fulvio
13   Fabiani would send him -- would access that data and
14   send it to him every couple of months, Leonardo
15   Corporation doesn't have any information that is
16   contrary to that?
17           MR. ANNESSER:  Object to form.
18           THE WITNESS:  Absolutely.  Sorry.  I have
19       no information about that.
20   BY MR. PACE:
21       Q.  Okay.
22       A.  The only thing I knew was there was a
23   computer of Penon that was storing that.  That's all
24   I know.
25       Q.  Did you ever see Fulvio Fabiani accessing

39 (Pages 153 to 156)

Page 157

1  that computer?
2      A.  Can you repeat?
3      Q.  Did you ever see Fulvio Fabiani using
4  that computer?
5      A.  Not that I can recall.
6      Q.  I think you testified to this earlier but
7  I want to make sure I've covered it, which is do you
8  recall any of the Penon measuring equipment ever
9  being replaced?
10     A.  Not that I can recall.  But I remember
11  now this morning we have read somewhere in an exhibit
12  of yours that the PCE 830 had stopped.
13        I don't remember if that was for some --
14  maybe was a blackout, no.  I don't remember.  But
15  this morning during the deposition we have read
16  something about the PCE 830.  I don't remember what
17  was that.
18     Q.  Okay.  And Leonardo Corporation doesn't
19  have any information on that?
20     A.  It was a blackout.  It was a blackout.
21  Now I remember.  It was a blackout and it was written
22  during the blackout out the PCE 830 is going out of
23  service.  That was it, yeah.
24     Q.  So Leonardo Corporation doesn't have any
25  information on any of the measuring equipment ever

Page 158

1  being replaced during the testing in Doral,
2  Florida --
3        MR. ANNESSER:  Object to form.
4  BY MR. PACE:
5      Q.  -- of the E-Cat plant?
6      A.  Not that I can recall.
7      Q.  How about on a more mundane level?  If in
8  connection with a measuring device it had to be oiled
9  or a battery had to be changed, was that -- was that
10  the responsibility of Dr. Penon when he would come
11  into town?
12        MR. ANNESSER:  Object to form.
13        THE WITNESS:  Nobody could touch his
14  instrumentation.  The flow meter was sealed and
15  the Omega I used to read the temperature, yes,
16  it had batteries and I had to change batteries
17  once.  It is true, I had to change but it was --
18  but it was not -- not recording.
19  BY MR. PACE:
20     Q.  Right.  That wasn't a recording device,
21  that was just a hand-held device?
22     A.  Yes, I had to change the battery after
23  ten months or something like that because you
24  understand when it is time to change.  I read the
25  instructions when you see the numbers --

Page 159

1      Q.  Flash?
2      A.  -- flash, you have to change the battery.
3      Q.  But if there was a change to -- again, I
4  am trying to cover things that are, you know, not
5  dramatic.
6        If there was a need to replace batteries
7  in any of the measuring equipment, if there was a
8  need to check the seal on any of the measuring
9  equipment, that would only be done by -- I'm sorry,
10  let me start that over because I wasn't being clear.
11        If there was a need to do some work on
12  any of the Penon measuring equipment, such as
13  changing batteries, checking and cleaning --
14  maintaining a seal --
15     A.  Yes.
16     Q.  -- on any of the Penon measuring
17  equipment, that would only be done by Dr. Penon?
18        MR. ANNESSER:  Object to form.
19        THE WITNESS:  Yes, with the exception of
20  the battery of the manual thermometer.
21  BY MR. PACE:
22     Q.  And the manual -- when you say manual
23  thermometer but really it's the manual reading
24  device --
25     A.  Exactly.

Page 160

1      Q.  -- that you would connect to the
2  thermometer?
3      A.  That you have to plug every day.
4      Q.  I wasn't counting that -- I should have
5  been more clear.  I wasn't really counting that as a
6  Penon measuring device.
7        That is just able to read information
8  from the measuring device?
9      A.  Sure.
10        MR. ANNESSER:  Object to form.
11        THE WITNESS:  The only thing that needed
12  battery was the instrument that I had because
13  all the rest, the flow meter was just a mechanic
14  thing and all the rest was via computer.
15  Computer was plugged.
16  BY MR. PACE:
17     Q.  Right.  I am not just limiting it to
18  changing batteries though.  I am saying if a seal got
19  loose on a device --
20     A.  Yes, sure, sure.
21     Q.  -- all that was left -- that was the
22  responsibility of Penon to handle?
23     A.  Absolutely.
24     Q.  When Dr. Penon installed the Penon
25  measuring equipment, who assisted him?

40  (Pages 157 to 160)

Page 161

1    A.  Fabiani, Barry West, and I observed -- I
2  recall that Tom Darden also came to check the work of
3  the ERV and also gave suggestions.  And -- stop.
4    Q.  Just to make sure I'm getting it right,
5  my time period too, we're talking about this is work
6  being done in either late --
7    A.  February.
8    Q.  In February of 2015?
9    A.  Before -- before the start of the plant.
10  The plant, if I will recall well, started on maybe,
11  if I say 16, does make sense to you?  Either 16, 20,
12  something like that.
13    Q.  I think it may have been the 23rd.
14    A.  23rd, okay.  All this has been made one
15  day or two days before the start.
16    Q.  And this was physically on site, your
17  recollection is is Dr. Penon?
18    A.  Yes.
19    Q.  Fulvio Fabiani?
20    A.  Yes.
21    Q.  Barry West?
22    A.  Yes.
23    Q.  And Tom Darden?
24    A.  And me.
25    Q.  And you?

Page 162

1    A.  Yes.
2    Q.  And Tom Darden.  So there is five of you
3  there when the measuring equipment was being
4  installed by Dr. Penon?
5    A.  You are correct.
6    Q.  But if I also --
7    A.  At least.  I do not remember if also J.T.
8  Vaughn was there.  I do not remember J.T. Vaughn.  I
9  do not recall if he was there.
10      And maybe -- and most likely was there
11  T. Barker, because T. Barker came to see the plant
12  immediately before it started, to check everything,
13  et cetera and he said that for him it was all right
14  and then he came several days after the start-up of
15  the plant and again, he said yes, he was satisfied of
16  what he said -- of what he saw.
17    Q.  So T. Barker was there twice in February
18  of 2015?
19    A.  Yes, attorney.  Has been there few days
20  before -- at the end of the assembling of all the
21  stuff and I had a vision that also T. Barker was
22  there when was there Tom Darden and the ERV before
23  the start of the plant.  Maybe I am wrong.
24    Q.  Okay.
25    A.  And I don't remember about J.T. Vaughn.

Page 163

1    Q.  And in terms of the physical installation
2  of the Penon equipment --
3    A.  Physical?
4    Q.  The actual installing.
5    A.  Installation.
6    Q.  Installing of the Penon measuring
7  equipment --
8    A.  Yes.
9    Q.  -- that would have been done by Dr. Penon,
10  Fulvio Fabiani, Barry West and Tom Darden, but not by
11  you?
12    A.  No, I assisted.  I wanted not to have a
13  voice in that issue.  I just said, do what you want.
14    Q.  All right.  Do you recall after the
15  measuring equipment was installed by Dr. Penon and
16  others, do you recall Dr. Penon doing a trial run?
17    A.  Sir, can you repeat?  Dr. Penon?
18    Q.  Yes.  Do you recall Dr. Penon doing a
19  trial run of the plant?
20    A.  I don't understand the word trial.  What
21  is trial?
22    Q.  Well, there is a -- maybe --
23    A.  It's one word I don't understand, trial.
24  I understood everything you said.  Only one word I
25  miss.

Page 164

1    Q.  I want to make sure that we're on the
2  same page.  Just give me one second.  I think I
3  can --
4    A.  Of course.
5      (The document referred to was thereupon
6  marked Deposition Exhibit 8 for Identification, a
7  copy of which is attached hereto.)
8  BY MR. PACE:
9    Q.  I have got marked for you here a
10  document.  This is Leonardo Exhibit 8.
11      So do you recognize the attachment to
12  this e-mail as the test plan for the testing that was
13  going on in Doral?
14    A.  Yes, it's -- yes.  Yes.
15      MR. ANNESSER:  Wait.  Object to form.
16  BY MR. PACE:
17    Q.  If you can turn to page -- there is a
18  page, the bottom number is 7023.
19    A.  7023, okay.
20    Q.  It's the last page.
21    A.  I am on it.
22    Q.  At the very top of the page it says --
23    A.  Before the plant.
24    Q.  "Before the plant start up the ERV will
25  verify the compliance of the plant configuration and

41  (Pages 161 to 164)

Page 165

1  of the measuring chains with reference
2  documentation.  He will carry out a trial run."
3       Did you understand what was meant?
4       A.  Trial.  Now I have understood the word.
5  You said trial.  Sorry.  I know the word but I did
6  not understand the pronunciation.
7       Q.  I'm sorry, it was my pronunciation of
8  it.
9       A.  A trial run.  Yes, I do not remember
10  exactly the particular.
11       But as far as I can recall, yes, he
12  made -- we made a couple of days because Penon came
13  on the 16th and the plant has been started up.  That
14  was the trial.  And after that -- and that has been
15  when also I remember there T. Barker and Darden.
16       Q.  And during this time --
17       A.  Then -- sorry.
18       Q.  I am just trying to figure out.  If Penon
19  comes on the 16th, then the measuring equipment --
20       A.  I recall.
21       Q.  On or about the 16th.  Then the measuring
22  equipment has to be installed, correct?
23       A.  Yes.
24       Q.  So the plant has to be stopped for that
25  to occur?

Page 166

1       A.  No, the plant had not yet been put in
2  operation.  The plant has been put in operation, as
3  you correctly said before, on the 22nd, 23rd,
4  something like that.
5       But the week before has been -- has
6  been -- has been a week of trial because Penon came,
7  installed his instrumentation.  We run the plant.
8  Then we had to stop it.  We had to make some start
9  and stop because -- because -- and that has been the
10  trial period.
11       Q.  That's what I was trying to understand.
12       So what your testimony is is that after
13  the measuring equipment was installed, to do a trial
14  run you actually -- not you, but the group of people
15  who were there in Doral, Florida, had to turn on the
16  plant and run it for a little while with Dr. Penon
17  still being there --
18       A.  Yes.
19       Q.  -- so that he could see how the measuring
20  equipment was working, that it was doing what he
21  expected it to be doing?
22       MR. ANNESSER:  Object to form.
23       THE WITNESS:  This is what I recall.  But
24  again, I cannot tell you that I am 100 percent
25  sure of this because too much time has passed,

Page 167

1  too many events have passed through my brain
2  since then about this argument and maybe I am
3  wrong.
4       This is what I recall.  Because I recall
5  this trial also because during this trial I
6  found a lot of problems.  So I remember the
7  problems.  Because, for example, there were
8  heavy leaks of steam inside the container that
9  we had to fix.
10       So I remember that I had to struggle very
11  much because I had to work inside the container
12  where there was the steam that was pretty hot
13  and I had to stay there because I had to
14  understand things, see things.
15       Then turn it down, call Barry, Fabiani,
16  et cetera, fix this, do that, do that, et
17  cetera, et cetera.  So has been pretty much
18  tough.
19  BY MR. PACE:
20       Q.  And the idea of a trial run is that the
21  plant is somehow operated, right, and Penon --
22       A.  Yes.
23       Q.  -- and Dr. Penon gets to see the
24  operation?
25       A.  Trial means that the official start of

Page 168

1  the plant had not been already made.  So I had all --
2  he had all the chance to control his
3  instrumentation.  Don't ask me what he did because I
4  don't know.
5       Q.  I understand.
6       A.  And I had my -- the possibility for
7  myself once the plant was down before communicating
8  to Industrial Heat, the test is started, I wanted to
9  check because -- and we had to make a lot of
10  reparations.
11       Q.  So that's part of what Dr. Penon will
12  carry on a trial run, is the plant was actually run
13  and he got to see how his measuring equipment worked,
14  correct?
15       MR. ANNESSER:  Object to the form.
16       THE WITNESS:  It's what I said now.
17  BY MR. PACE:
18       Q.  You just mentioned something to me.  I
19  don't think we have talked about this before.
20       If steam is ever coming out of the -- you
21  said the container.  I think I understand that means
22  like the E-Cat plant is -- or the E-Cat units are
23  inside a big container, correct, big steel container?
24       A.  It is correct.
25       Q.  And if steam would be -- would -- other

42  (Pages 165 to 168)

Page 169

1 than through the piping if steam would come out from
2 the E-Cat unit somehow from a leak in an E-Cat unit
3 or a pipe, you would -- the steam would actually kind
4 of come out through the container, correct?
5        MR. ANNESSER: Object to form.
6        THE WITNESS: Yes.
7 BY MR. PACE:
8        Q.   All right. So when that -- if that
9 happened or whenever that happened --
10       A.   Yes.
11       Q.   -- that signifies a leak -- a leak
12 somewhere between the E-Cat -- either in an E-Cat
13 unit or units or the piping after the E-Cat units,
14 correct?
15       A.   Yes.
16       Q.   Okay. And would that require immediate
17 repair?
18       MR. ANNESSER: Object to form.
19       THE WITNESS: It depends on -- it depends
20 on the amount of the leak. Because if it is
21 just a dripping does not need immediate repair
22 but, you know, the sooner the better. If it is
23 a substantial leak it needs immediate
24 intervention.
25 BY MR. PACE:

Page 170

1        Q.   I believe you testified to this a little
2 bit ago. I think you testified there were changes
3 that were made to the E-Cat plant by Industrial Heat
4 that you or that -- that either Leonardo Corporation
5 or somebody working with Leonardo Corporation had to
6 change -- had to change again or change back. I
7 don't know what the right phrase is. Am I correct
8 about that?
9        MR. ANNESSER: Object to form.
10       THE WITNESS: Can you kindly split --
11 BY MR. PACE:
12       Q.   Yes.
13       A.   -- in short pieces?
14       Q.   Yes. There was -- the E-Cat plant was
15 sent by you in Italy, by Leonardo Corporation in
16 Italy to Industrial Heat in North Carolina, correct?
17       A.   Correct.
18       Q.   Later it was sent by Industrial Heat in
19 North Carolina down to Doral, Florida, correct?
20       MR. ANNESSER: Object to form.
21       THE WITNESS: Much later.
22 BY MR. PACE:
23       Q.   In that interim period there were changes
24 that were made to the E-Cat plant, correct?
25       A.   Correct.

Page 171

1        MR. ANNESSER: Object to form.
2 BY MR. PACE:
3        Q.   After the E-Cat plant got down to Doral,
4 Florida some of those changes that were made in North
5 Carolina, Leonardo Corporation or someone working
6 with Leonardo Corporation either changed back to the
7 old version or at least made changes to; is that
8 correct?
9        MR. ANNESSER: Object to the form.
10       THE WITNESS: Yes and no, because it's a
11 little bit complex.
12       The complexity comes from the complexity
13 of the plant. Yes, repercurring (phonetic) what
14 you said from Italy, the original plant arrives
15 to North Carolina in the factory of Raleigh.
16       In the factory of Raleigh it has been
17 all -- it has been basically remade. Has been
18 remade along my direction. I suggested a lot of
19 things to improve it.
20       And also I wanted to -- you know, in the
21 original one the big Frankies were on the roof.
22 I wanted to put the four big Frankies in the
23 position that you can see here. If you look at
24 the old photographs of the plant that we
25 originally gave to Industrial Heat, you can see

Page 172

1 these four --
2 BY MR. PACE:
3        Q.   Just so the record is clear, you are
4 pointing to Exhibit 4?
5        A.   Yes, Exhibit 4. These four BF, big
6 Frankies that we jokingly call it, were above the
7 roof of the original container. In Industrial
8 Heat -- with Industrial Heat we have changed the
9 container, put in much longer container so that the
10 big Frankies from the roof have been put in this
11 position that is clearly here because now there was
12 the space.
13       So basically at that point we had two
14 plants instead of one, luckily, so this is the
15 modification that has been made.
16       Q.   So I am actually now asking for, I think
17 a different time period.
18       I am asking after the plant and the water
19 tanks and the piping, after that was sent from North
20 Carolina to Doral, Florida, were there changes made
21 to that setup in Doral, Florida?
22       A.   Initially, no.
23       Q.   And when you say initially, let me -- the
24 plant was delivered in late 2014?
25       A.   In late 2014, yes. But it was not

43 (Pages 169 to 172)

Page 173

1 complete.
2     Q.  From North Carolina -- the plant goes
3 from North Carolina to Doral in late 2014?
4     A.  Yes.  In October, November maybe,
5 something like that.
6     Q.  And --
7     A.  Sorry.
8     Q.  When you said initially changes were
9 made, do you mean up through the start of the testing
10 that you were doing in Doral, Florida or do you mean
11 before then?
12     MR. ANNESSER:  Object to form.
13     THE WITNESS:  When the plant arrived was
14 not ready to go, was not complete, so Industrial
15 Heat sent also their workers, you know, four,
16 six good workers, I must say, very good blue
17 collars and they completed the constructions.
18     And when the constructions has been
19 completed, at that point the plant has been
20 delivered to me for my direction.  At that point
21 I -- at that point we were ready for the ERV to
22 come and put on -- of course everything had been
23 scheduled.
24     So when Barry West -- that Barry West --
25 mainly Barry West directed the completion of the

Page 174

1 plant, of course under my control.
2 BY MR. PACE:
3     Q.  Can you tell me about when that is?  Are
4 we still in 2014 or are we beginning 2015?
5     A.  This is difficult to say.  You must
6 consider that if the plant has been, let me say just
7 one number that could be wrong.  Assume the plant
8 arrived the 1st of November.
9     Now we have from the 1st of November to
10 the 23rd of February, you know, inside the period
11 there was also Christmas, the Christmas holidays,
12 blah, blah, blah, so one month is gone in various
13 kinds of holidays.
14     So basically we had all November, half
15 December and half January to complete the -- because
16 much work had to be done yet.
17     At that point when we scheduled or when
18 we understood that more or less within ten days we
19 would have been completed, I phoned to the ERV and
20 said from the 15th of February we are ready, you can
21 come when you want.
22     Q.  And did you -- well, let me -- let me see
23 if I can -- I believe this is an exhibit we used in
24 your last deposition but let me mark as Exhibit
25 Number 9.

Page 175

1     (The document referred to was thereupon
2 marked Deposition Exhibit 9 for Identification, a
3 copy of which is attached hereto.)
4     THE WITNESS:  Thank you.  Okay.
5 BY MR. PACE:
6     Q.  Do you recall this -- there being an
7 e-mail exchange between you, Dr. Penon and Tom Darden
8 about how the test was going to operate in Doral?
9     A.  No, I don't remember but I take advice of
10 this now from you.  For sure it's genuine.
11     Q.  You're actually I think going to answer
12 my question then because my question was really going
13 to be do you know anything about what is being
14 discussed in this e-mail --
15     A.  I don't remember.
16     Q.  -- beyond what is written in the e-mail?
17     A.  Let me read the e-mail.  If I read the
18 e-mails maybe something comes up.  So they are in
19 reverse order of date.  The last is the first, is
20 that correct?
21     Q.  Yes, sir.
22     A.  Okay.  (Witness reading to himself.)
23     MR. ANNESSER:  If you read allowed he has
24 to take it down.
25     THE WITNESS:  I am sorry.

Page 176

1     MR. PACE:  He has to write mumble,
2 mumble, mumble.
3     THE WITNESS:  All right.  Well, now your
4 question is if -- your question was?
5 BY MR. PACE:
6     Q.  Do you recall this e-mail exchange about
7 questions about the test plan?
8     A.  Now that I have read it, I recall it.
9 And I -- it seems to me it confirms what I said
10 before basically.
11     Q.  If you look at page 19106.
12     A.  Yes, got it.
13     Q.  This actually is an e-mail from
14 Dr. Penon.
15     A.  Dear Mr. Darden, yeah.  From Fabio Penon,
16 yes.
17     Q.  And if you look at the last full
18 paragraph there it starts with:  "Following my
19 request."
20     A.  Following.
21     Q.  It says:  "Following my request a few
22 weeks ago --
23     A.  Yes.
24     Q.  -- before the plant start up Dr. Rossi has
25 to apply a condensed steam collector at the bottom of

Page 177

1  the steam pipe before the plant start up."
2      A.   Perfect.
3      Q.   Do you recall having that conversation
4  with Dr. Penon?
5      A.   I recall this perfectly.
6      Q.   And he is accurately summarizing the
7  conversation that he had with you, that you were
8  agreeing to apply a condensed steam collector?
9      A.   I recall perfectly.
10     Q.   All right.  I'm sorry, I understand you
11  recall the conversation perfectly.  I guess my next
12  question is is his summary of that conversation
13  accurate?
14     A.   No, this conversation is accurate.
15     Q.   So you had -- at the request of
16  Dr. Penon --
17     A.   Yes.
18     Q.   -- you had agreed to install a condensed
19  steam collector at the bottom of the steam plant?
20     A.   Sure.
21     Q.   I'm sorry, steam pipe.
22     A.   See here -- yes.  Condensed steam, yes,
23  exactly.
24     Q.   And then -- most of these e-mails are not
25  then -- that is the one e-mail where he was

Page 178

1  describing a conversation with you, so I wanted to
2  ask about that.  There is also an e-mail in here from
3  you and it's on page 19104.
4      A.   Sorry, 19104?
5      Q.   Uh-huh.
6      A.   19104.  Here we go.  Yes.
7      Q.   So the paragraph I'm interested in, do
8  you see a sentence about halfway down it starts
9  with:  All those instruments for the measurement of
10  temperature -- I'm sorry.
11     A.   And of the steam, of the pressure of the
12  steam and of the temperature of the water and the
13  water tank inside the container connected with a
14  computer of Engineer Penon, that he brought here and
15  registers the data 24 hours per day, as well as with
16  the control system -- am I mumbling enough clearly
17  for you?  Obviously Penon will consider for his
18  calculations, blah, blah, blah.  I think now he is
19  embarking, et cetera.
20     Q.   Let me just -- I want to read one small
21  part of this and see if I can understand this
22  better.  It talks about data going to the computer of
23  Engineer Penon.
24     A.   Yes.
25     Q.   But then says, "as well as with the

Page 179

1  control system of ours."
2      A.   Sorry.
3      Q.   Then a little bit later or then right
4  after that you say:  "Obviously Penon will consider
5  for his calculations only the data registered by his
6  computer."
7      A.   Yes.
8      Q.   "But we can compare data that he will
9  find with the data that we will find."
10          So my question is, what is the data --
11  what are you referring to as the data we will find?
12     A.   With this we was the team.  In particular
13  these were the parallel measurements that Fabiani had
14  told me that had prepared under the direction of
15  Darden.
16     Q.   And you are saying here that you -- you
17  and someone else, you and Fabiani, because it says
18  we, we can compare the data that he will find with
19  the data that we will find?
20     A.   Yes.
21          MR. ANNESSER:  Object to form.
22  BY MR. PACE:
23     Q.   Do you recall ever comparing that data
24  with Fabiani, other than what you described earlier
25  today?

Page 180

1          MR. ANNESSER:  Object to the form.
2          THE WITNESS:  Other than what I described
3      before, no.
4  BY MR. PACE:
5      Q.   All right.  It says, data is collected
6  with -- data is collected in a computer of Engineer
7  Penon, as well as with the control system of ours.
8          Is that the control system that was
9  operated by Fulvio Fabiani?
10     A.   Yes, sir.
11     Q.   Where was the condensed steam collector
12  placed?
13     A.   It was placed -- I set it up, I remember,
14  together with Tom Darden and it was basically a
15  rubber pipe with a cup at the bottom that had to
16  collect -- there is -- okay.
17          Along the pipe, the steam pipe that
18  exited from the one megawatt plant to go to the J.M.
19  plant, we have put this cup, this plastic cup sealed
20  with the bottom of the steam pipe so that any
21  dripping of water was visible at any time and it was
22  put inside the insulation, but the insulation was
23  made in a way that it could be easy displaced to pull
24  down the rubber pipe, open the valve that was at its
25  end and see if water was going down.

45  (Pages 177 to 180)

Page 181

1          And I remember perfectly that Darden
2    together with me and Fabiani all -- quite all the
3    times that Darden came down, he wanted to see the
4    dripping of the water from, and we never have seen
5    any dripping of water.  And also the ERV.  Also the
6    ERV during his -- during his -- during the days in
7    which he came controlled the dripping.
8          Q.  So let me hand you what I will mark --
9          A.  Yes, exactly.
10         Q.  -- as Exhibit 10.
11         A.  Yes, very good.  Not that I can indicate
12    to you.  Not there.  You can see the dripping in --
13         MR. ANNESSER:  Dr. Rossi, let him hand
14    you the exhibit and let me get a copy too.
15         THE WITNESS:  Okay.  Okay.  Sorry, sorry,
16    sorry.  You have a photo that is precise,
17    because you already gave it to me the last
18    time.
19         MR. PACE:  That would be 10 and 11.
20         (The document referred to was thereupon
21    marked Deposition Exhibit 10 for Identification, a
22    copy of which is attached hereto.)
23         (The document referred to was thereupon
24    marked Deposition Exhibit 11 for Identification, a
25    copy of which is attached hereto.)

Page 182

1          THE WITNESS:  No, this is not good.
2    BY MR. PACE:
3          Q.  The first one is 10, the second one is
4    11.  Dr. Rossi --
5          A.  Yes.
6          Q.  -- on Exhibits 10 and 11, can you --
7          A.  No.
8          Q.  -- can we this --
9          A.  No.
10         Q.  -- the condensed --
11         A.  No.
12         Q.  Let me finish my question.
13         A.  You have the photo.
14         Q.  Hold on a second.  In pictures -- in
15    Exhibits 10 and 11 --
16         A.  Yes.
17         Q.  -- can you see the condensed steam
18    collector?
19         A.  No.
20         Q.  All right.  Now, this is the steam --
21    this shows the pipe that is coming out of the --
22         A.  Correct.
23         Q.  -- E-Cat plant --
24         A.  Correct.  But -- sorry, sorry.
25         MR. ANNESSER:  Dr. Rossi, let him finish

Page 183

1    please and then answer his question.
2    BY MR. PACE:
3          Q.  Let's just do it in pieces.
4          A.  I'm sorry.
5          Q.  We will get to where you want to be.
6    Just give me a second here to make sure I get a clean
7    record.
8          A.  Sure.
9          Q.  Exhibit 10 and 11 show the pipe that
10    comes out of the E-Cat plant and carries over --
11    carries the output of the E-Cat plant over to the
12    J.M. Products side of the warehouse, correct?
13         A.  Correct.
14         Q.  All right.  The condensed steam collector
15    was not connected to that pipe?
16         MR. ANNESSER:  Object to form.
17         THE WITNESS:  Yes, but you cannot see it
18    in this position because this pipe is longer
19    than this.
20         And to be more conservative, I have put
21    the cup to see if there was the dripping, if the
22    more distant point possible because, you know,
23    it was -- it was to advantage -- to the
24    advantage of Industrial Heat.
25         Because the closer you go to the heat

Page 184

1    source, the less likely is that you find
2    condensation.  The more you go away from the
3    heat source the more is likely that you find
4    condensation.  So this cup has been put in just
5    a few inches before the wall.
6    BY MR. PACE:
7          Q.  The wall -- do we see the wall there in
8    Exhibit 10?
9          A.  Well, maybe -- no, no, it is -- yes, but
10    it's too -- it is not in high -- no, you have a photo
11    that is perfect, but it is not this and it is not
12    this.  It's a photo that you have shown me in the
13    last depo that we made.
14         Q.  All right.
15         A.  There is one that indicates exactly that.
16         MR. ANNESSER:  Dr. Rossi, there is no
17    pending question.
18         THE WITNESS:  I am sorry.
19    BY MR. PACE:
20         Q.  When we take a break I have a bunch of
21    pictures here.  So when we take a break I will find
22    it.
23         A.  Yes.
24         Q.  Let me put this here then.
25         A.  May I help you off the record?

Page 185

1          MR. ANNESSER:  Dr. Rossi, let him ask his
2    questions, please.
3          THE WITNESS:  Okay.
4    BY MR. PACE:
5      Q.  Before I forget, I meant to ask you this
6    this morning.
7          When did you first start working with
8    Dr. Penon?
9      A.  Can you repeat the question?
10     Q.  Yes.  When did -- this is a question for
11   you as Dr. Andrea Rossi as opposed to Leonardo
12   Corporation.
13     A.  Okay.
14     Q.  When did you first start working with
15   Dr. Penon?
16         MR. ANNESSER:  Object to form.
17         THE WITNESS:  You mean when first I gave
18   consulting task to Dr. Penon?
19   BY MR. PACE:
20     Q.  Yes.
21     A.  Because he never worked with me.
22     Q.  I see.  Let me make it even easier.
23     A.  He worked for me.
24     Q.  When did you first meet Dr. Penon?
25     A.  Okay.  In 2008, I think.  2008, 2009,

Page 186

1    2008.  More likely 2008.  Because I had to certify a
2    plant that made electricity, electric power using
3    waste oil treated with a particular process that I
4    had patented and that plant that has nothing to do
5    with Leonardo or this stuff absolutely.
6          In that plant I had coupled my plant with
7    an alternator.  If I say alternator you can
8    understand me?
9      Q.  Uh-huh.
10     A.  Very good.  An alternator of about one
11   megawatt that had been produced by a big company of
12   Italy whose name Mecc Alte, M-E-C-C, A-L-T-E.
13         It a big company with about 1,000
14   employees.  It's in Vicenza and they had Penon as the
15   certificator of that industrial alternator and --
16     Q.  I'm sorry, I was just going to ask.  What
17   company was this for?
18     A.  Mecc Alte.
19     Q.  I'm sorry, I meant for you.  What
20   company -- which of your companies was this?
21     A.  My company?
22     Q.  Yes.
23     A.  EON.
24     Q.  EON?
25     A.  EON.  EON made plant to make energy with

Page 187

1    fuels derived from waste materials.  I used to buy
2    the alternator from Mecc Alte.
3          Mecc Alte was directed by a very high
4    level engineer and they needed certification because
5    an alternator is very dangerous, of course.  And they
6    -- I asked them I need a certificator to certify my
7    plant and they suggested to me Penon because he was
8    there, the certificator that made the safety
9    certifications for their alternators.  This is how I
10   knew him.
11     Q.  All right.
12     A.  And I asked him to certify my plants.
13     Q.  Again, I am letting this go for a little
14   bit but sometimes I'm asking pretty narrow questions
15   and I don't mind that you want to say something else
16   but kind of not on my time, so to speak, because
17   we're limited and we don't want to run out today.  So
18   this is going to be just a narrow question.
19         Is the next time you worked with -- not
20   necessarily for, whatever.  Is the next time you
21   worked with Dr. Penon in connection with your -- in
22   connection with the E-Cat?
23         MR. ANNESSER:  Object to form.
24         THE WITNESS:  Can you kindly repeat the
25   question?

Page 188

1    BY MR. PACE:
2      Q.  Yes.  You just told us about working with
3    Dr. Penon back in 2008, 2009.
4      A.  Yes, because you asked me when I knew
5    him.
6      Q.  Yes.  So I am asking you after that
7    period is the next time you worked with Dr. Penon in
8    connection with the E-Cat?
9      A.  Yes.
10         MR. ANNESSER:  I object to the form on
11   the last one.  Chris, if we can get a rest room
12   break sometime in the near future.
13         MR. PACE:  Let's take it now.  I am about
14   to change subjects so now is a good time.
15         THE VIDEOGRAPHER:  Time is 15:52.  Off
16   the record.
17         (Thereupon a brief recess was taken,
18   after which the following proceedings were had.)
19         THE VIDEOGRAPHER:  Time is 16:07.  We're
20   back on the record.
21         (The document referred to was thereupon
22   marked Deposition Exhibit 12 for Identification, a
23   copy of which is attached hereto.)
24   BY MR. PACE:
25     Q.  Dr. Rossi, I put in front of you an

Page 189

```
1   Exhibit 12.
2         Right before the break there was -- you
3   were telling me there was a different picture angle
4   that showed the steam condenser line.  Do you see it
5   here in Exhibit 12?
6     A.  Yes.
7     Q.  Have you --
8     A.  This is -- sorry.
9     Q.  Have you circled it on the Exhibit 12
10  that's in front of you?
11    A.  Yes, I have put a circle.
12    Q.  Can you do me a favor and just put an AR
13  next to that circle, just so that for future purposes
14  we know that that's not somebody else's handwriting,
15  but it's yours.  All right.
16        And what you have circled on Exhibit 12,
17  that's the -- that's the water collector, the water
18  line collector?
19    A.  That's the shape of the water collector
20  that when was not used, it was just incorporated
21  inside the insulation of the pipe.
22        As a matter of fact, you can see the
23  shape -- in the circle that I have made, you can see
24  the shape of a pipe, of a rubber pipe.  When we had
25  to control if there was dripping, this part of the
```

Page 191

```
1     Q.  I'm sorry.  And what we're seeing here,
2   the bulge in Exhibit 12 --
3     A.  Bulge, that's the --
4     Q.  -- on the top pipe, it's like a cord or a
5   tube?
6     A.  It's a tube of rubber.
7     Q.  Okay.
8     A.  It's a flexible tube that was connected
9   through a cup of plastic that was sealed to the pipe
10  of the steam and of course when you open the
11  insulation and let the rubber pipe fall down, you
12  know, just to hang -- just to hang, as I am showing
13  for -- with this pen, hanging from the pipe, if there
14  was any dripping you could see it.
15        And I remember perfectly that I had shown
16  it to Mr. Tom Darden and I remember perfectly that
17  also ERV Penon when he came there checked the
18  dripping of water.  As a matter of fact, no water
19  ever dripped from there.
20    MR. PACE:  All right.  I should cover
21  this before we go -- move to the next topic.
22    John, there was an order on discovery
23  that required Leonardo to identify certain
24  documents before the 30(b)(6) and no such
25  documents were identified.
```

Page 190

```
1   insulation was easy to remove because it was made in
2   a way that it was easy to remove to allow this pipe
3   that now you can see the shape, but it is hidden
4   under the insulation.
5         This pipe goes down and then with this --
6   this ladder -- this ladder that I have seen in
7   another -- here.  With this ladder it was possible to
8   open a valve that was at the end of this pipe and it
9   was easy to see dripping, if there was dripping.
10    Q.  So the pipe was contained within the
11  insulation?
12    A.  Sorry?
13    Q.  The pipe was contained within the
14  insulation on Exhibit 12?
15    A.  If you observe this photo it is very
16  clear.
17    Q.  And this insulation that covered the
18  pipe, it was pretty easy to open up that
19  insulation --
20    A.  Correct.
21    Q.  -- and access the pipe?
22    A.  Correct.
23    Q.  Then you could cover up the pipe with the
24  insulation again?
25    A.  Correct.
```

Page 192

```
1         This was a conversation that was had
2   with -- I think it was with Chris and with
3   Porpoise the other day.  So I want that just to
4   be on the record that we never got the
5   identification of any documents.
6     MR. ANNESSER:  Is this the order that you
7   are saying specifically?
8     MR. PACE:  Yes.
9     MR. ANNESSER:  Give me a second to review
10  this order.
11    MR. PACE:  I'm going to mark this because
12  I'm referencing it now and then I will move on.
13  You don't need this, Mr. Penon.  I am marking it
14  as Exhibit 13.
15        We can address it later off the record
16  but we were never provided the information.
17  Again, it was discussed with Porpoise Evans and
18  Chris, not with you.
19    MR. ANNESSER:  I am not up to speed on
20  where that discussion was, so I am not familiar
21  with what discussions have been had.
22        (The document referred to was thereupon
23  marked Deposition Exhibit 13 for Identification, a
24  copy of which is attached hereto.)
25  BY MR. PACE:
```

48  (Pages 189 to 192)

Page 193

1      Q.  I am going to mark now as Exhibit 14.
2         (The document referred to was thereupon
3    marked Deposition Exhibit 14 for Identification, a
4    copy of which is attached hereto.)
5         THE WITNESS:  Thank you.
6    BY MR. PACE:
7      Q.  No problem.  The second exhibit number on
8    there is from an earlier deposition but this is now,
9    for our purposes, Exhibit 14.
10        Dr. Rossi, you are familiar with this
11   from seeing it I believe at your earlier deposition
12   but also for purposes of litigation, this was a
13   second amendment to the license agreement?
14     A.  (Nods head.)
15     Q.  Do you remember communicating with --
16   discussing this second amendment after you had signed
17   the second amendment on behalf of Leonardo
18   Corporation?
19     A.  Can you kindly repeat the question?
20     Q.  I certainly can.  Let me start this over
21   again.  Exhibit 14 is a second amendment for the
22   license agreement, correct?
23     A.  Yes.
24     Q.  All right.  And on page 480, that
25   reflects your signature?

Page 194

1      A.  480.  Yes, it is my signature.
2      Q.  And there is no signature on this
3    document from Ampenergo, correct?
4      A.  Yes, it is correct.
5      Q.  Do you recall any discussions with
6    Ampenergo after you signed this second amendment
7    about their refusal or failure to sign the second
8    amendment?
9      A.  Yes, I recall.
10     Q.  I am going to hand you what's marked as
11   Exhibit 15.
12        (The document referred to was thereupon
13   marked Deposition Exhibit 15 for Identification, a
14   copy of which is attached hereto.)
15        THE WITNESS:  Thank you.  Sorry, I got
16   two.  Maybe one copy is not mine.
17   BY MR. PACE:
18     Q.  Yes, sorry about that.
19     A.  It's okay.
20     Q.  This is -- this contains on the first
21   page here -- that's what I want to ask you about.
22   This is an e-mail from you to a Craig Cassarino,
23   correct?
24     A.  Attorney, I was reading.  I did not get
25   your --

Page 195

1      Q.  No problem.
2      A.  Can you kindly repeat?
3      Q.  I can.  On the first page here there is
4    an e-mail from you to Craig Cassarino on April 30,
5    2014, correct?
6      A.  Yes, it is correct.
7      Q.  And Craig Cassarino is somebody who is
8    one of the managers or members of AEG?
9      A.  It's the vice president of AEG.
10     Q.  The vice president of AEG?
11     A.  Yes.
12     Q.  He also holds or at the time held some
13   position in LTI Global?
14     A.  Yes.  I suppose yes.
15        MR. ANNESSER:  Object to form.
16        THE WITNESS:  Yes, he was the vice
17   president of LTI.
18   BY MR. PACE:
19     Q.  The last sentence of your e-mail reads:
20   "We had offered to make the test with the Hot Cat,
21   and we had sent to you an amendment, already signed
22   by me and by Tom Darden, but for reasons remained
23   mysterious to me Ampenergo did not sign and the
24   amendment has been cancelled."
25        Do you recall writing that to Craig

Page 196

1    Cassarino?
2      A.  Yes.
3      Q.  And that accurately reflects your -- your
4    recollection of the situation, your view of the
5    situation?
6         MR. ANNESSER:  Object to form.
7         THE WITNESS:  Well, I don't understand
8    exactly what your question implies, so what I
9    want --
10   BY MR. PACE:
11     Q.  How about I will ask it again?
12     A.  Yes.
13     Q.  You wrote that because Ampenergo did not
14   sign the amendment the amendment had been cancelled,
15   correct?
16     A.  Yes.
17     Q.  That's what you wrote?
18     A.  Yes.
19     Q.  Okay.
20     A.  I wrote -- I wrote this, yes.
21     Q.  And that's a reference to what's been
22   marked as Exhibit 14, the second amendment to license
23   agreement, correct?
24     A.  Correct.
25     Q.  All right.  And the second amendment to

49  (Pages 193 to 196)

Page 197

1   license agreement in fact contemplated that testing
2   would be done using a six cylinder unit, that is a
3   six cylinder unit containing Hot Cats, correct?
4           MR. ANNESSER: Object to form.
5           THE WITNESS: Yes, and this is because,
6   as I -- in this same e-mail, I explain we have
7   to put in operation the one megawatt plant that
8   we are ready to put in operation since when we
9   deliver it in August of 2013.
10          It has been delivered perfectly ready to
11  go, as it has been turned off after the May
12  test, the test made in 30 April, 1st of May
13  2013.
14  BY MR. PACE:
15      Q.  Did you say after this you made
16  improvements to the -- Industrial Heat made changes
17  to the plant that you -- under your direction?
18          MR. ANNESSER: Object to form.
19          THE WITNESS: Later.
20  BY MR. PACE:
21      Q.  Right.  Okay.
22      A.  Much later.
23      Q.  Later than April 30 of 2014?
24      A.  Yes, later has been taken a bigger
25  container, et cetera.

Page 198

1           But the issue is that the plant was ready
2   to go independently from those improvements.  And I
3   write, it has not been possible to put in operation
4   the one megawatt plant as we delivered it, I
5   intended, for reasons independent from us,
6   location -- for example, location where to put it in
7   operation, authorization.
8       Q.  I'm sorry, you just said for example.  Am
9   I missing that word?
10      A.  No, no, no, that was a comment of mine.
11  The exact text is:  To put it in operation for
12  reasons -- it has not been possible to put it in
13  operation for reasons independent from us, location
14  where to put it in operation, authorizations, et
15  cetera.  I inspected it a few days ago --
16      Q.  Dr. Rossi, the e-mail is written as it's
17  written.
18      A.  Sorry.
19      Q.  You can read it.  I am not really here to
20  have you read it all, okay?
21          MR. ANNESSER: Dr. Rossi.
22  BY MR. PACE:
23      Q.  Let's just go.  I understand the e-mail
24  says what it says.  I am just trying to understand
25  the one sentence here that you are explaining to

Page 199

1   Craig Cassarino of AEG that because the second
2   amendment wasn't signed by AEG it had been
3   cancelled.
4       A.  This is what Tom Darden told me.
5       Q.  So that information that you have here,
6   you are saying that Tom Darden told you that the
7   amendment had been cancelled because it wasn't signed
8   by Ampenergo?
9       A.  Yes, it is exactly what I am saying.
10      Q.  And did Tom Darden also tell you to
11  communicate that to Craig Cassarino?
12      A.  Sorry, can you repeat the question?
13      Q.  Did Tom Darden -- is it your testimony
14  that Tom Darden told you to communicate that to Craig
15  Cassarino or no?
16          MR. ANNESSER: Object to form.
17          THE WITNESS: No.
18  BY MR. PACE:
19      Q.  That was your -- you separately decided
20  to do that?
21      A.  Yes.
22      Q.  Do you recall what the AEG objection was
23  to signing the second amendment?
24          MR. ANNESSER: Object to form.
25          THE WITNESS: Yes, I remember.

Page 200

1   BY MR. PACE:
2       Q.  It was going to change the unit -- it
3   changed the device that was going to be tested,
4   correct?
5           MR. ANNESSER: Object to form.
6           THE WITNESS: Both things, because the --
7   the -- this second amendment contains two
8   sections, two issues.
9           One issue is the one that you just said
10  correctly.  The other issue is the delay of the
11  term to perform -- to begin the performance
12  test, due to the fact that we simply could not
13  put it in operation before for reasons not
14  dependent from us, because they have not been
15  able to get the necessary authorizations.
16  BY MR. PACE:
17      Q.  So AEG had two objections to the second
18  amendment.  One is that it was changing -- it would
19  have changed the license agreement to have the
20  testing being done of the six cylinder unit as
21  opposed to the 1MW plant, correct?
22          MR. ANNESSER: Object to the form.
23          THE WITNESS: No, AEG -- Mr. Craig
24  Cassarino simply he did not make any kind of
25  distinction.

Page 201

1    When I asked him why the heck did you not
2 sign this amendment, he just answered me because
3 our attorney told us not to sign it and the
4 issue was over.
5 BY MR. PACE:
6    Q.  But you just gave me two examples here.
7 I want to go back to them because I assume -- there
8 is a basis for them, right?
9    So one is -- I will use the second one.
10 I thought you were just testifying that the second
11 objection that AEG had to the second amendment to the
12 license agreement was that it delayed -- it left
13 open-ended when the guaranteed performance test would
14 begin.
15    Was that an objection that AEG ever
16 voiced to you?
17    A.  No.
18    Q.  You were just testifying that that was an
19 objection that AEG had to the second amendment.
20    MR. ANNESSER:  Object to form.
21    THE WITNESS:  Maybe I have not been able
22 to explain myself well, so I will do it.
23 BY MR. PACE:
24    Q.  No, I don't need any more explanation.
25 We got your testimony.  It will be whatever it is.

**IMP**

Page 202

1    A.  Okay.
2    Q.  I wanted to cover for a little bit the
3 validation test in Italy.  I want to provide you --
4 well, I don't know if we need to look at the
5 exhibit.
6    Do you recall the validation testing in
7 Italy occurring in -- this was late April, beginning
8 of May of 2013, correct?
9    A.  Yes.
10    Q.  There were -- there were changes to the
11 protocol or there were changes to the way that the
12 validation test was being done before it actually was
13 performed, correct?
14    The plan for the validation test got
15 changed in the days preceding the test?
16    MR. ANNESSER:  Object to form.
17    THE WITNESS:  Can you exactly explain
18 what --
19 BY MR. PACE:
20    Q.  I can.  It's probably easier just to show
21 you.
22    A.  Thank you.
23    (The document referred to was thereupon
24 marked Deposition Exhibit 16 for Identification, a
25 copy of which is attached hereto.)

Page 203

1 BY MR. PACE:
2    Q.  Here is an exhibit, what we have marked
3 as 16.  This e-mail reflects questions about --
4 questions directed to Dr. Penon about how the
5 validation test was going to occur in Italy, correct?
6    MR. ANNESSER:  Object to form.
7    THE WITNESS:  I am -- I would like to
8 finish.
9 BY MR. PACE:
10    Q.  Please, finish reading.  Let me know when
11 you are done.
12    A.  Thank you.  But I don't find a part where
13 here he says the only phrase is, for example, if we
14 did, you would measure water flow instead of steam
15 pressure -- pressure, so I assume you will need -- so
16 I assume you would need different equipment.  You
17 know, it is very obscure to me, this.
18    Q.  Let's go through some of this because I
19 am just trying to understand this in context which
20 is --
21    A.  I don't understand what is written here.
22    Q.  -- Tom Darden is asking, the fourth
23 paragraph down, for example, what specific
24 instruments will you use for the test?
25    A.  Yeah.  Okay.

Page 204

1    Q.  I am not saying that you have to disagree
2 with any of these questions, Dr. Rossi.
3    A.  But I don't --
4    MR. ANNESSER:  Dr. Rossi, wait for his
5 questions.
6 BY MR. PACE:
7    Q.  Wait for my question.  We're looking at
8 an e-mail here.  Do you recall this e-mail?
9    A.  No.
10    Q.  Okay.  Do you have any reason to doubt
11 that this e-mail was sent to Dr. Penon?
12    A.  No, absolutely not.  No, no.
13    Q.  There are questions being asked about the
14 validation process.  This e-mail does relate to the
15 validation test, correct?
16    A.  Absolutely, yes.  Sure.
17    Q.  Okay.  And, you know, I guess one of my
18 questions about this is do you know whether these
19 issues were addressed by Dr. Penon or not?
20    A.  I do not know.
21    Q.  You have no information?
22    A.  Also because, you know, I received it,
23 just a copy, but I was not involved in the
24 discussion.
25    Q.  Okay.

Veritext Florida Reporting Co.

800-726-7007                                        305-376-8800

Page 205

1      A.  This was between Industrial Heat and
2   Penon.
3      Q.  And so some of the issues here, there is
4   a middle paragraph that starts with where will the
5   instruments be installed.
6      A.  Okay.
7      Q.  First, that's definitely a question
8   directed from Tom Darden to Fabio Penon, correct?
9      A.  Yes.
10      Q.  Do you recall whether he addressed that
11   issue or not?
12      MR. ANNESSER:  Object to form.
13      THE WITNESS:  Okay.  Can you kindly
14   repeat the question?
15   BY MR. PACE:
16      Q.  Yes.  Do you recall whether Dr. Penon
17   addressed that question or issue?
18      A.  I do not remember absolutely to be
19   involved in this -- in this exchange of e-mails.
20   Yes, I received them in copy but I ignored them
21   because it was Industrial Heat that with good reason
22   asked to Engineer Penon to give some clarifications.
23   It was between them.  I was not involved because they
24   did not ask anything to me.
25      Q.  Okay.  You somewhat answered my question

Page 206

1   there.  To the best of your recollection you never
2   discussed these questions with doctor -- how do
3   resolve these questions with Dr. Penon?
4      MR. ANNESSER:  Object to form.
5      THE WITNESS:  The only thing that I can
6   say is that I did not receive from Industrial
7   Heat any -- any complaint or observation
8   regarding any shortcoming in the proceeding of
9   these discussions, so I have to assume that
10   Penon has satisfactory answered because should
11   it not be the case, for sure Mr. Tom Darden
12   would have contacted me to say hey, Mr. Rossi, I
13   am not -- not glad about what is going on with
14   the ERV.  He did not.
15   BY MR. PACE:
16      Q.  Okay.  And then from a timing standpoint
17   you had testified previously about reaching a
18   resolution with the neighbors over the sound issue
19   that may be connected to running the test in Italy.
20      That resolution with the neighbors, was
21   that reached, if you recall, one day before the test,
22   two days before the test, a week before the test?  Do
23   you recall?
24      A.  I don't recall exactly, but few -- I
25   don't know if it was a week or ten days or five

Page 207

1   days.
2      It was -- it was before the test because
3   I had put the plant in operation and it made a lot of
4   noise and I assumed that problems were brewing up.
5      Q.  Problems were brewing.  Do you recall
6   whether Tom Darden or J.T. Vaughn or anyone else
7   was -- I am trying to use this as a touchstone for
8   figuring out when you spoke with the neighbors.
9      Do you recall whether they were in town
10   yet or not?
11      A.  No, no they were not in town yet.
12      Q.  So they came into town -- someone from
13   Industrial Heat or IPH came into town probably a day
14   or two before the test?
15      A.  Absolutely, yes.
16      Q.  Okay.
17      A.  Absolutely, yes.
18      Q.  So the resolution was reached at least a
19   couple of days prior to that?
20      A.  At least.
21      Q.  I want to talk a little bit about
22   Leonardo Corporation and its dealings with J.M.
23   Products.
24      First, what agreements existed between
25   Leonardo Corporation and J.M. Products?

Page 208

1      MR. ANNESSER:  Object to form.
2      MR. LEON DE LA BARRA:  Join.
3      THE WITNESS:  The main agreement between
4   Leonardo Corporation and J.M. Products was an
5   agreement based on which Leonardo Corporation
6   was going to buy from J.M. Products the
7   catalysts they were producing, in change of the
8   fact that Leonardo was going to pay all the
9   accessory expenses that J.M. was going to have
10   to pay for, besides to pay the well known $1,000
11   per day to Industrial Heat and this is the only
12   written agreement that exists between -- that
13   has been made between Leonardo Corporation and
14   J.M.
15   BY MR. PACE:
16      Q.  I want to talk about that agreement a
17   little bit more in a second but there is also a
18   license agreement or a sublicense agreement between
19   Leonardo Corporation and J.M. Products?
20      A.  No, no, not that I can recall.
21      Q.  There is also a loan of an employee from
22   Leonardo Corporation to J.M. Products, correct?
23      MR. ANNESSER:  Wait.  I'm sorry, state
24   that again.
25   BY MR. PACE:

52  (Pages 205 to 208)

Page 209

```
 1        Q.   There is a loan of an employee from
 2   Leonardo Corporation to J.M. Products?
 3        MR. ANNESSER:  Object to form.
 4        MR. LEON DE LA BARRA:  Join.
 5        THE WITNESS:  Attorney, I would prefer to
 6   rephrase in the answer because I don't know what
 7   does mean exactly by the loan of an employee.
 8   BY MR. PACE:
 9        Q.   Fair enough.
10        A.   I can say that Leonardo Corporation paid
11   expenses, paid the employee of J.M. Products in
12   the compensation agreement I had spoken just before
13   this question.
14        Q.   Are you referring to James Bass?
15        A.   Can you repeat?
16        Q.   Are you referring to James Bass?
17        A.   No -- yes.  Well, if James Bass was a
18   consultant of J.M., was not an employee.  While I was
19   talking of the employee of J.M., that was
20   Mr. Reinaldo Breto and was basically was a person
21   that has functions as janitor and guardian.
22        Q.   And he -- your understanding of that
23   written document is that he -- he was an employee of
24   J.M. --
25        A.   Yes.
```

Page 211

```
 1   involving platinum sponge, correct?
 2        A.   Correct.
 3        MR. ANNESSER:  Object to form.
 4   BY MR. PACE:
 5        Q.   And that was your idea to create this
 6   product for J.M. Products?
 7        MR. LEON DE LA BARRA:  Object to form.
 8        THE WITNESS:  Yes.
 9   BY MR. PACE:
10        Q.   All right.  And your idea was on behalf
11   of J.M. Products, you were going to -- you were going
12   to alter or treat platinum sponge that you were going
13   to buy from Johnson Matthey?
14        A.   Correct.
15        Q.   And then sell that platinum sponge, that
16   modified platinum sponge to Leonardo?
17        A.   Correct.
18        Q.   All right.  And this, if I recall from
19   the testimony --
20        A.   Also, may I?  I have not finished the
21   answer.
22        Q.   Okay.
23        A.   I'm sorry.  You know, the market of the
24   advanced platinum sponge was much wider than
25   Leonardo, but the buying of the platinum -- the
```

**R, IMP**

Page 210

```
 1        Q.   -- for whom Leonardo paid, not an employee
 2   of Leonardo for whom J.M. Products paid?
 3        MR. ANNESSER:  Objection to the form.
 4        MR. LEON DE LA BARRA:  Object to the
 5   form.
 6        THE WITNESS:  I recall, but I could be
 7   wrong because, again, this is matter of papers
 8   and accounting and it is not my strong side.
 9        But what I recall is that the employee,
10   Mr. Reinaldo Breto, was an employee of J.M. and
11   Jim Bass was a consultant of J.M., and Leonardo
12   Corporation has paid for both of them, as well
13   as has paid all the bills, all the electricity,
14   as well as it has paid for many other things
15   that I don't remember, to compensate.
16   BY MR. PACE:
17        Q.   And this was pursuant to the sales
18   agreement between Leonardo and J.M. Products, whereby
19   Leonardo was going to buy products from J.M.
20   Products?
21        A.   It is correct.
22        Q.   All right.  Let's talk about those
23   products for a second.
24        The original product that was going to be
25   produced by J.M. Products was going to be something
```

Page 212

```
 1   advanced platinum sponges made by J.M. was also part
 2   of the agreement.
 3        So between -- between the products that
 4   Leonardo intended to buy from J.M. were also, but
 5   Leonardo was -- did not intend to buy all the
 6   production of J.M., if any.
 7        Q.   If any.  So the agreement was Leonardo
 8   would buy whatever -- if J.M. Products produced any
 9   platinum sponge, modified platinum sponge, Leonardo
10   would buy it, unless J.M. Products was able to sell
11   it to someone else?
12        MR. ANNESSER:  Object to form.
13        THE WITNESS:  No.
14        MR. LEON DE LA BARRA:  Form.
15        THE WITNESS:  It was not the agreement.
16   The agreement was Leonardo would buy it, at
17   least in an amount enough to allow J.M. to pay
18   for all its expenses, with exception of the
19   expenses to pay Industrial Heat.
20   BY MR. PACE:
21        Q.   And Leonardo, if they had bought -- if
22   this modified platinum sponge had ever been created
23   and actually a transaction occurred where Leonardo
24   actually bought it, what was Leonardo going to do
25   with this modified platinum sponge?
```

**R, IMP**

Page 213

```
1        A.  I'm sorry, can you --
2        Q.  I'll start it over again.
3        A.  Just divide this question in shorter
4    ones.
5        Q.  I will.  That's fair enough.  Leonardo --
6    no modified platinum sponge was ever delivered by
7    J.M. Products to Leonardo, correct?
8            MR. ANNESSER:  Object to the form.
9            MR. LEON DE LA BARRA:  Object to the
10   form.
11           THE WITNESS:  No, it is not correct.
12   BY MR. PACE:
13       Q.  What modified platinum sponge was
14   delivered by J.M. Products to Leonardo?
15           MR. ANNESSER:  Object to form.
16           THE WITNESS:  A small amount.
17           MR. LEON DE LA BARRA:  Join.
18           THE WITNESS:  Sorry.  A small amount.
19   BY MR. PACE:
20       Q.  How much?
21       A.  I don't remember exactly.  I don't
22   remember exactly.  I don't remember exactly.
23       Q.  Are we talking grams?
24       A.  We're talking of grams.
25       Q.  Grams?
```

Page 214

```
1        A.  And we're talking of grams that have been
2    worked upon.  Because -- if you want, I repeat to you
3    all that I already told you.
4        Q.  I am not asking you to repeat.  You asked
5    me to break it down, so I am trying to break it
6    down.
7        A.  Perfect.
8        Q.  Does that platinum sponge -- modified
9    platinum sponge that you are testifying J.M. Products
10   sold to Leonardo, does Leonardo still have that
11   modified platinum sponge or has it sold it?
12           MR. ANNESSER:  Object to form.
13           MR. LEON DE LA BARRA:  Join.
14           THE WITNESS:  Has used it.
15   BY MR. PACE:
16       Q.  Leonardo has used it?
17       A.  Has utilized it, yes.
18       Q.  In what process would it utilize that
19   modified platinum sponge?
20       A.  We have utilized it in -- we utilized it
21   in experiments that we made with a new product, not
22   connected with this situation.
23       Q.  Okay.  So at some point J.M. Products --
24   I believe your prior testimony was at some point J.M.
25   Products stopped working on trying to create some
```

Page 215

```
1    kind of modified platinum sponge and moved over to
2    creating a graphene product; is that correct?
3        A.  It is correct.
4            MR. ANNESSER:  Object to form.
5            MR. LEON DE LA BARRA:  Join.
6    BY MR. PACE:
7        Q.  I am trying to understand from a time
8    period here.  I think I have -- right in front of
9    me.  I going to mark as Exhibit 17.
10           (The document referred to was thereupon
11   marked Deposition Exhibit 17 for Identification, a
12   copy of which is attached hereto.)
13   BY MR. PACE:
14       Q.  This is an e-mail from you to somebody
15   at --
16       A.  Thank you.
17       Q.  -- Johnson Matthey about buying --
18       A.  Yes.
19       Q.  -- some platinum sponge.
20       A.  Yes.
21       Q.  Okay.  And this is for, I believe it's 10
22   kilograms of platinum sponge, correct?
23       A.  Can you repeat the question to me?
24       Q.  Yes.  What we have here is Exhibit 17,
25   this is an e-mail from you?
```

Page 216

```
1        A.  Yes.  And the top, top manager of Johnson
2    Matthey.
3        Q.  The top manager of Johnson Matthey.  This
4    is for the -- a purchase of platinum sponge from
5    Johnson Matthey, correct?
6        A.  That is correct.
7        Q.  And you are telling him that you are
8    apologizing for a delay because you had -- they had
9    sent you an invoice or a proposal for buying some
10   platinum sponge a while ago?
11       A.  That is correct.
12       Q.  And is this the first purchase of
13   platinum sponge that you are making for or on behalf
14   of J.M. Products or Leonardo Corporation?
15           MR. LEON DE LA BARRA:  Object to form.
16           THE WITNESS:  As far as I remember I was
17   going to buy this platinum sponge.  I don't
18   remember if my program at the moment was to make
19   J.M. directly buy from -- from Johnson Matthey
20   or -- or -- but since I signed here please have
21   the invoice and send the material to J.M.
22   Products Corporation, warms regards, Andrea
23   Rossi.  In this moment I was talking as the
24   director of J.M. Products.
25   BY MR. PACE:
```

Page 217

1    Q.   And as the director of J.M. Products at
2 this time, in March 22nd of 2015 --
3    A.   Yes.
4    Q.   -- the product that J.M. Products was
5 working on, according to your testimony, is going to
6 be some type of modified platinum sponge; is that
7 correct?
8         MR. LEON DE LA BARRA:  Object to form.
9         THE WITNESS:  The program was to buy the
10 basic platinum sponge from Johnson Matthey and
11 then upgrade them through a new process that I
12 wanted to experiment.
13 BY MR. PACE:
14    Q.   I guess I'm really kind of asking about
15 the time period though.  I am trying to figure this
16 out through looking at e-mails.
17    A.   Yeah.
18    Q.   This is March 22nd.
19    A.   This is March 22nd, yeah.
20    Q.   So sometime after March 22nd is when this
21 platinum sponge was delivered to J.M. Products to the
22 best of your knowledge?
23         MR. ANNESSER:  Object to form.
24         MR. LEON DE LA BARRA:  Join.
25         THE WITNESS:  No, sir.  The platinum

Page 218

1 sponge we worked with at the plant of Doral was
2 a residual of -- reserve of platinum sponge that
3 I had made in Italy when I worked for completely
4 different things.
5 BY MR. PACE:
6    Q.   Okay.
7    A.   Not -- so I brought with me that material
8 when I came in the United States and basically I gave
9 it to -- gave it in conto fornitura.  I don't
10 remember the English name.
11         When you are -- have a material, give it
12 to somebody that treat it, then you get back the
13 treated material and pay only the work made upon it.
14 What is the English?
15    Q.   Consignment?  No.
16    A.   In Italian it's conto fornitura.
17    Q.   It's a contribution of it.  I think I
18 understand what you're saying.
19    A.   If you understood, I am fine.
20    Q.   So J.M. products has platinum sponge from
21 prior to this date that was provided by you?
22    A.   Exactly.
23    Q.   And it was going to be provided later to
24 Leonardo Corporation?
25         MR. ANNESSER:  Object to form.

Page 219

1         THE WITNESS:  Yes.
2 BY MR. PACE:
3    Q.   And it was going to be altered by being
4 placed in the cylinders and put into the -- what on
5 the J.M. Products side is in the input tube coming
6 into the -- coming over to the J.M. Products side; is
7 that correct?
8    A.   Can you kindly repeat?
9    Q.   Sure.  I don't know if we need a picture
10 of it.  We looked last time.  There is a container on
11 the J.M. Products side, right?
12    A.   Okay, sure.  Now we're talking of J.M.
13 Products side?
14    Q.   We're talking about J.M. Products side.
15    A.   Okay.
16    Q.   We're talking about this product that
17 eventually is going to be purchased by Leonardo
18 Corporation.
19    A.   Yes.  It's okay.
20    Q.   This is the -- what you testified
21 earlier, this is the platinum sponge that you put
22 into cylinders --
23    A.   Yes.
24    Q.   -- correct?
25    A.   Correct.

Page 220

1    Q.   Then you insert it into the tubing on the
2 J.M. Products side of the Doral warehouse?
3    A.   You are correct.
4    Q.   Okay.  And what was supposed to be -- and
5 the combination of the heat from the steam and the
6 pressure in the tubes was going to alter the platinum
7 sponge?
8    A.   It's a pretty complex thing but in -- if
9 you want to say it in a very restricted nutshell,
10 yes.
11    Q.   I'm not claiming I'm not using a
12 simplified approach.
13    A.   It's okay.
14    Q.   I'm just trying to understand.
15    A.   It's okay.
16    Q.   At some point J.M. Products changes over
17 to trying to create or work with a product that is
18 graphene, correct?
19    A.   Correct.
20    Q.   That change occurs because of the price
21 of -- well, why does that change occur?  Why does
22 J.M. Products go from -- as a director of J.M.
23 Products why does it go from doing a platinum sponge
24 product to a graphene product?
25         MR. ANNESSER:  Object to form.  Are you

IMP

Page 221

```
 1    now asking -- I just want to be clear for the
 2    record you're no longer asking him as the
 3    30(b)(6) of Leonardo.
 4    BY MR. PACE:
 5         Q.   Yes, this is a question to you,
 6    Dr. Rossi, in terms of what you know as opposed to
 7    Leonardo, what Leonardo Corporation knows.
 8         Just for the question, for that question,
 9    why did J.M. Products switch from creating a product
10    that involved platinum sponge to a product that
11    involved graphene?
12         A.   Practically your question, for economic
13    reasons.  Because as you can see from this e-mail, I
14    was dealing with these guys cited here are not just
15    two salesmen of Johnson Matthey, they are top
16    level -- top level guys of Johnson Matthey.
17         So I was pretty much enthusiastic to work
18    with them.  But when I asked to send me the pro forma
19    invoice I received a price that was basically not
20    acceptable and since --
21         Q.   Not acceptable because it's too high or
22    too low?  It could be both, right?
23         A.   Sure, sure.
24         Q.   Not acceptable --
25         A.   My point of view not acceptable means too
```

Page 222

```
 1    high.
 2         Q.   If you were going to resell it prices
 3    being too low can be bad too.
 4         A.   Sure, sure.
 5         Q.   I'm sorry, I stopped.  So you said they
 6    quoted you too high?
 7         A.   It's welcome your --
 8         MR. ANNESSER:  Objection.
 9    BY MR. PACE:
10         Q.   Please resume.  Sorry.
11         A.   No problem.  They made an offer that was
12    too expensive and the risk for us was very high
13    because that activity of J.M. was an experiment.
14         It was an invention of mine and the risk
15    that it could also not work was there and J.M. did
16    not accept my proposal of a friendly agreement
17    considering all the future possible developments and
18    at that point I broken with them.
19         And since that physical principle that
20    could have worked on the platinum sponges was
21    applicable I was studying on the issue, was
22    applicable also to graphite, to get graphene, a mix
23    powder of graphene and diamond powders, I wanted to
24    try that experiment that allowed us to work with a
25    raw material, very poor (phonetic), so the risk was
```

Page 223

```
 1    very limited.
 2         Q.   And that was determined sometime after
 3    this e-mail that we're looking at here in March 22nd?
 4         A.   I tried -- I tried -- as I can recall, I
 5    tried for months to save the relationship with
 6    Johnson Matthey because I liked very much their
 7    products and I had strong ideas about that, but -- so
 8    I asked to them okay, give me a small amount.
 9         Because, you know, they have some kind of
10    a monopoly of that raw material.  If you don't get
11    them from them you can't find it.  And I tried.
12    Anyway, but I don't remember when at a certain point
13    I said all right, good bye.
14         Q.   Then you switched over to the graphene
15    product?
16         A.   Yes.
17         (The document referred to was thereupon
18    marked Deposition Exhibit 18 for Identification, a
19    copy of which is attached hereto.)
20         Q.   Okay.  So handing you what's been marked
21    as Exhibit 18.  This is the written contract you were
22    just referring to between J.M. Products and Leonardo;
23    is that correct?
24         A.   That is correct.
25         Q.   And this calls for Leonardo to pay $300 a
```

Page 224

```
 1    gram --
 2         A.   Yes.
 3         Q.   -- for any graphene catalyzer that was
 4    provided?
 5         A.   Yes, it is correct.
 6         Q.   Well, in fact, if you look at Exhibit 3
 7    or Exhibit 18, I guess the third and fourth page --
 8    this was produced in order -- is the gross sublease
 9    between J.M. Products and Leonardo?
10         A.   Yes.
11         Q.   That's another written agreement,
12    correct?
13         A.   Correct.
14         Q.   And did you testify earlier that -- was
15    any graphene catalyzer ever provided by J.M. Products
16    to Leonardo?
17         A.   Can you -- I was reading.  Can you kindly
18    repeat your question?
19         Q.   I think you testified -- I might be wrong
20    here.  I thought you testified that some platinum
21    sponge -- some modified platinum sponge was delivered
22    to J.M. -- was delivered -- I'm sorry, I believe you
23    testified earlier --
24         A.   Yes.
25         Q.   -- that J.M. Products sold some modified
```

Page 225

1     platinum sponge to Leonardo?
2          A.   Yes.
3          Q.   Some grams of it?
4          A.   Yes.
5          Q.   Did J.M. Products ever sell any graphene
6     catalyzer to Leonardo?
7          A.   Yes.
8          Q.   And sold them pursuant to the terms of
9     this agreement?
10         A.   Yes.
11         Q.   And sold them for -- for the price of
12    $300 per gram?
13         A.   Yes.
14         Q.   So net -- in light of all that Leonardo
15    has paid for J.M. Products am I correct that Leonardo
16    has lost money compared to how much -- compared to
17    the amount of graphene catalyzer it received,
18    Leonardo Corporation has paid much more than $300 a
19    gram in terms of the cost for -- for Jim Bass and the
20    cost for the space that J.M. Products uses and
21    everything else?
22         A.   Good question.  Not -- I don't remember.
23    I don't recall.  But if a difference there is, it is
24    not a big difference.
25              Because I think that the amount of

Page 226

1     graphene that Leonardo got from J.M. is not distant
2     from that sum, but --
3          Q.   How much?  How much have they gotten from
4     J.M. Products?
5          A.   That I recall, ballpark, ballpark
6     numbers, something around 150 grams, something around
7     that.
8          Q.   Okay.  So you think they have gotten 150
9     grams.
10              Is there documentation reflecting the
11    delivery of that 150 grams from J.M. Products to
12    Leonardo?
13         A.   There are the invoices.
14         Q.   There are invoices.  When was that
15    delivered?
16         A.   I don't remember exactly, but I should
17    have to go to check.  But, you know, we have -- the
18    first -- I am trying to answer to your question
19    reconstructing.
20              First we worked with a few grams of
21    platinum sponge that I had and then finished the work
22    with those, I had no more raw material, so in March I
23    had to change the issue and in March I switched to
24    graphene that was already an idea that I had in
25    mind.  So it was not something that I already had my

Page 227

1     safety boat.
2          Q.   And the idea for these products, even
3     though you're the CEO of Leonardo, it does come from
4     you, the idea for whatever product was created by
5     J.M. Products?
6              MR. ANNESSER:  Object to form.
7              MR. LEON DE LA BARRA:  Form.
8              THE WITNESS:  I pray you to repeat the
9     question because I did not understand.
10    BY MR. PACE:
11         Q.   Sure.  Whatever this product was that
12    J.M. Products was creating, it was based on a process
13    or a method that you came up with?
14              MR. ANNESSER:  Object to form.
15              THE WITNESS:  Yes.
16    BY MR. PACE:
17         Q.   All right.  Not a process or method that
18    you ever put into place at Leonardo?
19         A.   No.
20         Q.   All right.  So let me mark this as
21    Exhibit 25.  Or Exhibit 19, I'm sorry.  This is
22    actually an exhibit from our answer and counterclaims
23    which is why it's got the number 25 on it.
24         A.   Thank you.
25         Q.   For our purposes today we're going to

Page 228

1     refer to it as Exhibit 19.
2              (The document referred to was thereupon
3     marked Deposition Exhibit 19 for Identification, a
4     copy of which is attached hereto.)
5     BY MR. PACE:
6          Q.   If you look at -- these are excerpts from
7     your blog, correct?
8          A.   Yes.
9              MR. ANNESSER:  Object to form.
10             THE WITNESS:  Sorry.
11    BY MR. PACE:
12         Q.   If you look down here on the last one,
13    April 14, 2016, this is actually kind of a generic
14    question as opposed to really driven by this posting
15    but you make a reference here:  "Our customer spoke
16    his satisfaction with facts, not words.  He bought
17    three units like the one he tested during this year
18    with the company set up specifically for this
19    purpose."
20             Is the customer you are referring to
21    there J.M. Products?
22         A.   I want to underline that the answer to
23    this question is related to the activity of Leonardo
24    Corporation out of the territory of Industrial Heat,
25    for which Industrial Heat had been licensed.

57  (Pages 225 to 228)

Page 229

1    So my comment about this issue must be, I
2  think, I'm asking to my attorney, here is present
3  Mr. J.T. Vaughn of Industrial Heat, and I would like
4  not -- I think I have the right not to give him this
5  information.
6    Q.  I think he's covered by the protective
7  order, so he has limitations based on the protective
8  order.
9    A.  Yes, but if he listens what I'm saying he
10  gets information.
11    Q.  How about this.  Same thing would apply
12  to you whenever you look at any information that is
13  marked as confidential, but let me ask you this way.
14    MR. ANNESSER:  Object to form, move to
15  strike.
16  BY MR. PACE:
17    Q.  I asked a different question here.  Maybe
18  you weren't focusing on my question.
19    A.  Yeah.
20    Q.  My question was is the customer of J.M.
21  Products?
22    A.  To answer this question --
23    Q.  You can't answer yes or no to that
24  question?
25    A.  Sorry?

Page 230

1    Q.  You can't answer yes or no to that
2  question without revealing confidential information?
3    A.  I am under oath so basically I insist --
4  if possible I want to respect the law, I want to
5  respect the judge, I want to respect everybody.
6    I am -- I am asking if the law allows me
7  in this case to ask Mr. J.T. Vaughn to exit from
8  here.
9    MR. ANNESSER:  Chris, may I?  I don't
10  know the answer to this question.  May I talk
11  with the client and find out what his concern
12  is?
13    MR. PACE:  Go off the record.  Why don't
14  we go off the record.
15    THE VIDEOGRAPHER:  Time is 17:06.  Off
16  the record.
17    (Thereupon a brief recess was taken,
18  after which the following proceedings were had.)
19    THE VIDEOGRAPHER:  Time is 17:17.  We're
20  back on the record.
21  BY MR. PACE:
22    Q.  Dr. Rossi, I believe we left off, we were
23  looking at Exhibit 19.  On the second page there is a
24  passage written by you that says: "Our customer
25  spoke his satisfaction with facts not words.  He

Page 231

1  bought three units, like the one he tested during
2  this year with a company set up specifically for this
3  purpose."
4    So my first question is, this is kind of
5  the narrow one, which is the customer that you are
6  referencing here, is that J.M. Products?
7    A.  Yes, but I am not sure that they will use
8  the same entity.
9    Q.  So J.M. Products, the company --
10    A.  Sorry.
11    Q.  -- for whom the president is Henry
12  Johnson, that company has -- has agreed to buy three
13  E-Cat plants from Leonardo Corporation?
14    MR. ANNESSER:  Object to form.
15    THE WITNESS:  Yes.
16    MR. LEON DE LA BARRA:  Object to form.    IMP
17  BY MR. PACE:
18    Q.  I'm sorry, I am not sure I heard your
19  answer, Dr. Rossi.
20    A.  Yes.
21    Q.  Is that documented anywhere?
22    A.  Not yet.
23    Q.  At what price?
24    A.  That has been -- it's a complex contract
25  so it's not easy to answer this question.

Page 232                                R

1    Q.  Well, it's not written so it can't be
2  that complex, if everyone can remember it.
3    A.  Yes, but it's an agreement.  It's an
4  agreement.
5    Q.  Is it an agreement between you and -- you
6  as the CEO of Leonardo and Henry Johnson as the
7  president of J.M. Products?
8    MR. ANNESSER:  Object to form.
9    THE WITNESS:  No.
10  BY MR. PACE:
11    Q.  Who is the agreement with or between?
12    A.  With -- with Mr. Di Giovanni, that he is
13  the man of reference of the entity that will use
14  these three plants.
15    Q.  So this is Francesco Di Giovanni -- you
16  are referring to Francesco Di Giovanni?
17    MR. ANNESSER:  Object to form.
18    MR. LEON DE LA BARRA:  Object to form.
19    THE WITNESS:  Yes.
20  BY MR. PACE:
21    Q.  And Francesco Di Giovanni is the
22  beneficiary of the Platinum American Trust?
23    A.  Yes.
24    MR. ANNESSER:  Object to form.
25  BY MR. PACE:

58  (Pages 229 to 232)

Page 233

```
 1        Q.  And the Platinum American Trust owns J.M.
 2   Products?
 3            MR. ANNESSER:  Object to form.
 4            MR. LEON DE LA BARRA:  Object to form.
 5            THE WITNESS:  As far as I know and as far
 6   as I recall, yes.
 7   BY MR. PACE:
 8        Q.  And these three plants that you have
 9   written are being bought, where will these plants be
10   built?
11        A.  This has still to be decided.
12        Q.  You blogged recently about a
13   manufacturing plant in the US as well as in Sweden.
14        A.  This is our strategy.
15            MR. ANNESSER:  Object to form.  Are we
16   wearing the Leonardo hat or --
17   BY MR. PACE:
18        Q.  Wearing the Leonardo hat.  You as the CEO
19   of Leonardo has blogged that Leonardo is going to
20   have or has an agreement with someone to build two
21   manufacturing plants, one in the US and one in
22   Sweden, correct?
23            MR. ANNESSER:  Object to form.
24            THE WITNESS:  It is correct.
25   BY MR. PACE:
```

Page 234

```
 1        Q.  With whom is that agreement to build the
 2   plants?
 3        A.  With nobody.  This is a decision of
 4   Leonardo Corporation.
 5        Q.  Okay.  Some of the blog posts make it
 6   sound like you are working with somebody else in
 7   building the plants.
 8        A.  No.
 9        Q.  So where will the plant be in the United
10   States?
11        A.  The factory will be here in --
12            MR. ANNESSER:  I am going to object to
13   form.  Go ahead.
14            THE WITNESS:  Is in Miami.
15   BY MR. PACE:
16        Q.  And where would the factory be in Sweden?
17            MR. ANNESSER:  Object to form.
18            THE WITNESS:  That has -- we have chosen
19   a locality, but has not yet been defined.
20   BY MR. PACE:
21        Q.  And you just said we.  Is that just
22   because you are referring to Leonardo or is there
23   somebody other than you?
24        A.  In Sweden we are in a collaboration with
25   HydroFusion.
```

Page 235

```
 1        Q.  Again, in that context we meaning
 2   Leonardo Corporation?
 3        A.  Yes, sir.
 4        Q.  Has the factory in Sweden -- has work on
 5   the factory in Sweden begun?
 6        A.  No.
 7        Q.  Has work on the factory in the United
 8   States begun?
 9        A.  No.
10        Q.  You have blogged fairly recently that --
11   I'm sorry, I forgot to finish on an earlier issue.
12        The three plants that you have said the
13   customer has bought, which you have identified as
14   J.M. Products, where are they going to be operated?
15            MR. LEON DE LA BARRA:  Object to form.
16            MR. ANNESSER:  Object to form.  You can
17   answer if you know.
18            THE WITNESS:  This has to be defined.
19   BY MR. PACE:
20        Q.  To where is Leonardo planning to deliver
21   the three plants?
22            MR. ANNESSER:  Object to form.
23            MR. LEON DE LA BARRA:  Object to form.
24            THE WITNESS:  Depends on the will of the
25   customer.
```

R

Page 236

```
 1   BY MR. PACE:
 2        Q.  The will of the customer being J.M.
 3   Products?
 4            MR. ANNESSER:  Object to form.
 5            MR. LEON DE LA BARRA:  Object to form.
 6            THE WITNESS:  J.M. Products or another
 7   entity.
 8   BY MR. PACE:
 9        Q.  All right.  So these are plants that
10   could be delivered in the United States?
11        A.  Can you kindly repeat?
12        Q.  These are plants that could be delivered
13   in the United states?
14            MR. ANNESSER:  Object to form.
15            MR. LEON DE LA BARRA:  Object to form.
16            THE WITNESS:  No, because in the United
17   States the situation has to be defined.
18   BY MR. PACE:
19        Q.  Are they plants that could be delivered
20   in Europe?
21        A.  Could be.
22        Q.  Does Leonardo still have some existing
23   licenses that its granted that apply to certain parts
24   of Europe?
25        A.  Can you kindly repeat the question?
```

59  (Pages 233 to 236)

Page 237

```
1        Q.  Sure.  Are there licenses that
2   Leonardo -- are there territories in Europe that
3   Leonardo has licensed already to other companies?
4        A.  We --
5        MR. LEON DE LA BARRA:  Object to form.
6        THE WITNESS:  Yes.
7   BY MR. PACE:
8        Q.  You have testified that there is a
9   number -- I'm sorry, you have blogged -- sorry about
10  that.
11       You have blogged that there are -- that
12  you have received a number of pre-orders and that
13  Leonardo Corporation before accepting an order does a
14  due diligence into the customer and then afterwards
15  decides whether to accept the pre-order and has
16  accepted a number of pre-orders.
17       First of all, is that an accurate
18  process, that someone can make an order for an E-Cat
19  plant and Leonardo will conduct due diligence on that
20  customer?
21       MR. ANNESSER:  Object to the form.
22       THE WITNESS:  I did not understand the
23  question.  I heard the question but I do not
24  understand the meaning.
25  BY MR. PACE:
```

Page 238

**R**

```
1        Q.  Sure.  I am just going to read you -- I'm
2   not going to give you these blog posts because there
3   is so many pages of them but you were asked a
4   question, you write about pre-orders.
5        "We send a precise offer to them who
6   make the pre-orders, with the price and the sale
7   terms along with an order form.  If the potential
8   customer decides to buy, they send the order signed.
9   Leonardo Corporation before accepting the order makes
10  a due diligence about the customer to verify his
11  industrial and financial consistency.  If the due
12  diligence is positive, we accept the order, otherwise
13  the order is not accepted."
14       Is that the accurate process, the way
15  that Leonardo Corporation has been handling
16  pre-orders for E-Cat plants?
17       MR. ANNESSER:  Object to form.
18       MR. LEON DE LA BARRA:  Join.
19       MR. ANNESSER:  Are you referring to a
20  specific document?
21       MR. PACE:  I am referring to a blog post.
22       MR. ANNESSER:  Is that something that we
23  have got in discovery?
24       MR. PACE:  Yes.
25       MR. ANNESSER:  Can you tell me the Bates
```

**R, IMP**

Page 239

```
1   number?
2        MR. PACE:  I cannot but it's June 28,
3   2016 blog post.
4        THE WITNESS:  That is a procedure, if I
5   recall, because it's -- it's not a new thing but
6   that is the procedure that we intend to follow.
7   BY MR. PACE:
8        Q.  Is it the procedure that Leonardo
9   Corporation has followed?
10       A.  No, because -- well, so far we got many
11  pre-orders that are just in suspension because we are
12  not in a condition that we can deliver, so basically
13  nothing has been done yet.
14       Q.  So no one has ever -- no potential
15  customer has ever, quote, sent the order signed?
16       A.  No.
17       Q.  And Leonardo has never conducted due
18  diligence on a customer yet?
19       A.  Not yet.
20       MR. ANNESSER:  Object to the form.
21  BY MR. PACE:
22       Q.  And Leonardo has not -- if the due
23  diligence is positive, Leonardo has not accepted any
24  orders yet?
25       MR. ANNESSER:  Object to form.
```

**R**

**R, IMP**

**R**

Page 240

```
1        THE WITNESS:  No.
2   BY MR. PACE:
3        Q.  You have also identified a blog post that
4   you have a new customer.  At least different -- well,
5   compared to previous partners and licensees, how
6   important is the development of E-Cat to a new
7   partner?
8        Is there a new partner in developing
9   E-Cats with which Leonardo is working?
10       MR. ANNESSER:  Object to form.  If you
11  are going to refer to a specific document you
12  may want to show it to him.
13  BY MR. PACE:
14       Q.  Let me just ask the question.  Does
15  Leonardo Corporation have a new partner in the
16  development of E-Cat units?
17       MR. ANNESSER:  Object to form.
18       THE WITNESS:  No.
19       (The document referred to was thereupon
20  marked Deposition Exhibit 20 for Identification, a
21  copy of which is attached hereto.)
22  BY MR. PACE:
23       Q.  I am going to hand you what has now been
24  marked as Leonardo Exhibit 20.
25       This is an e-mail you wrote to Tom Darden
```

60  (Pages 237 to 240)

Page 241

```
 1   with a copy to J.T. Vaughn, T. Barker Dameron and
 2   several others, correct?
 3       A.   You mean the first e-mail in the first
 4   page?
 5       Q.   Yes.
 6       A.   Because here are several e-mails.
 7       Q.   You know what, in fact I am only going to
 8   ask you about that first e-mail.
 9       A.   Okay.  "Dear Tom", you mean?
10       Q.   Yes.
11       A.   Okay.
12       Q.   Yes, sir.  Actually, you know what,
13   contextually you should look at the whole document
14   that way we can talk about any parts of it.
15       A.   May I read it?
16       Q.   Please.  That's what I meant, please do.
17       A.   Thank you.  Thank you, I have read it.
18       Q.   So let's start with the e-mail there that
19   is earliest in time.
20       A.   Earliest in time?
21       Q.   Yeah.
22       A.   So from Andrea Rossi to Tom Darden of
23   February 27, 7:12 p.m.?
24       Q.   Correct.
25       A.   Okay.
```

Page 242

```
 1       Q.   First of all, there is a -- we're on page
 2   19056.
 3       A.   Okay.
 4       Q.   There is a sentence there:  "Today the
 5   director of J.M. phoned me and said that they are
 6   satisfied."
 7       A.   Okay.
 8       Q.   Who are you referring to as the director
 9   of J.M. who phoned you?
10       A.   Jim Bass.
11       Q.   Jim Bass.  And Jim Bass was not -- did
12   this phone call actually take place between you and
13   Jim Bass?
14       MR. ANNESSER:  Object to form.
15       THE WITNESS:  Sorry?
16       MR. LEON DE LA BARRA:  Join.
17   BY MR. PACE:
18       Q.   You're saying today the director of J.M.
19   phoned me and said they are satisfied.
20       A.   I cannot remember.
21       Q.   Later you talk about how the -- there
22   will be confirmation.  Will be able to find
23   confirmation of the COP by what is invoiced to J.M.
24   Products versus what -- by Leonardo, versus what is
25   invoiced to J.M. Products for the electrical bill
```

Page 243

```
 1   from FPL, correct?
 2       A.   Yes.
 3       Q.   It says, but the -- but J.M. Products
 4   actually had no means of measuring the amount of
 5   steam or power that they were receiving from
 6   Leonardo, correct?
 7       MR. LEON DE LA BARRA:  Object to form.
 8       THE WITNESS:  No, it is not correct.
 9   BY MR. PACE:
10       Q.   How did J.M. Products measure the steam
11   or power they were receiving from Leonardo?
12       A.   They had a flow meter and thermometers.
13       Q.   They had a flow meter on the steam?
14       A.   No, on the returning water.
15       Q.   So they could measure --
16       A.   The water -- the condensed water that run
17   back to the Leonardo plant and then they had a
18   thermometer that measured the temperature of the
19   steam at the inlet of their plant.
20       Q.   Do you know who maintained that
21   information for the thermometer for the temperature
22   of the steam?
23       MR. ANNESSER:  Object to form.
24       THE WITNESS:  In collaboration, I and Jim
25   Bass.
```

Page 244

```
 1   BY MR. PACE:
 2       Q.   Well, most days Jim Bass wasn't at J.M.
 3   Products, correct?
 4       MR. ANNESSER:  Object to form.
 5       MR. LEON DE LA BARRA:  Object to form.
 6       THE WITNESS:  I did not understand the
 7   question.
 8   BY MR. PACE:
 9       Q.   Most days Jim Bass was not at the Doral
10   warehouse, correct?
11       A.   I don't know if it is correct or not.  He
12   was there two, three days a week, as I can recall,
13   something like that.
14       Q.   So four to five days a week it was your
15   responsibility to check the temperature of whatever
16   was coming over to J.M. Products from Leonardo?
17       MR. ANNESSER:  Object to form.
18       THE WITNESS:  I did not -- yes.  As a
19   matter of fact, I was able to have those data
20   also independent of Leonardo.  But yes, I would
21   say that that task was both on Jim Bass and me.
22   BY MR. PACE:
23       Q.   I understand, but on days when Jim Bass
24   wasn't there, you just said it's four or five days a
25   week --
```

**Veritext Florida Reporting Co.**

Page 245

1          MR. ANNESSER: Object to form.
2   BY MR. PACE:
3          Q. -- Jim Bass was not there?
4          MR. LEON DE LA BARRA: Object to form.
5          THE WITNESS: I did not say that.
6   BY MR. PACE:
7          Q.  You said he was there two or three days a
8   week, didn't you?
9          A.  Yes.
10         Q.  How many days in a week?
11         A.  Seven, less three.
12         Q.  Would be --
13         A.  Is four.
14         Q.  Less two would be five?
15         A.  Yes.
16         Q.  I mean, Dr. Rossi, I am not going to
17  claim your --
18         A.  No, it's okay.
19         Q.  You're great with math.  I know you are.
20  I am not trying to make this a math game.  I know
21  it's getting long today.
22         A.  Okay, okay.
23         Q.  It's fair.  It's fair.  I'm being cute
24  and I shouldn't be, so I apologize.  Let me do this
25  again.

Page 246

1          Four or five days a week Jim Bass was not
2   the present at J.M. Products but you were, correct?
3          MR. ANNESSER: Object to form.
4          MR. LEON DE LA BARRA: Object to form.
5          THE WITNESS: Not always, because in some
6   periods his days per week was more than that, as
7   I recall.
8   BY MR. PACE:
9          Q.  And for some periods he wasn't there
10  weeks at a time, correct?
11         A.  I did not understand the question.
12         Q.  There are e-mails between he and you
13  where he reflects that he is not going to be there
14  for a given week, Jim Bass.  I won't be there for a
15  week.  I won't be there for two weeks.  You remember
16  that, correct?
17         A.  No, I don't remember those e-mails.
18         Q.  Okay.  When Jim Bass wasn't there -- that
19  can be sorted out through e-mails.
20         When Jim Bass wasn't there would you
21  check the temperature on the J.M. Products side or
22  would you just rely on the temperature on the
23  Leonardo side?
24         A.  No, I check it in both sides.
25         Q.  Okay.  So you would essentially go to a

Page 247

1   thermocouple on the Leonardo side, get down off a
2   ladder, walk over to the door between Leonardo and
3   J.M. Products --
4          A.  Yes.
5          Q. -- and open the door --
6          A.  Yes.
7          Q. -- walk back alongside the wall --
8          MR. ANNESSER: Object to form.
9          THE WITNESS: Yes.
10  BY MR. PACE:
11         Q.  And get up and check a thermometer or a
12  thermocouple a few feet away from the one you just
13  checked?
14         MR. ANNESSER: Object to form.
15         MR. LEON DE LA BARRA:  Object to form.
16  BY MR. PACE:
17         Q.  Is that correct?
18         A.  Yes.
19         Q.  Did you consider that an independent
20  check on the measurements of Leonardo?
21         A.  Yes, because -- yes, because I was as --
22  it was well known that I was also the director of
23  J.M. and when I was in the side of J.M. I was looking
24  at instruments that are not subjective object, are an
25  objective object and so I was -- when I looked at the

Page 248

1   instrumentation of J.M., obviously I was independent
2   from Leonardo because the plant of Leonardo was on
3   the other side and I was just reading gauges.  I was
4   not -- I was not writing opinions.
5          Q.  Right.
6          A.  So that -- the reading of an instrument
7   is what it is, independently from who is looking the
8   instrument.
9          Q.  Did you write down the numbers that you
10  saw on the flow meter on the J.M. Products side?
11         A.  No, it was just -- since the number
12  correspond to the numbers that I had in Leonardo, I
13  did not have the necessity.
14         Q.  So you wrote down pretty methodical every
15  number you read on the Leonardo side?
16         A.  Yeah.
17         Q.  And then when you would walk through the
18  door at the Doral warehouse on the J.M. Products side
19  you didn't write down the numbers that you read on
20  the thermometer in the J.M. Products side or the flow
21  meter on the J.M. Products side?
22         A.  Not methodically.
23         MR. ANNESSER: Object to form.
24         MR. LEON DE LA BARRA:  Object to form.
25  BY MR. PACE:

62  (Pages 245 to 248)

Page 249

1    Q.  Is that correct?
2    A.  Can you repeat the question?
3    Q.  Sure.  You systematically wrote down the
4  numbers for the thermometer readings on the Leonardo
5  side, correct?
6    A.  Correct.
7    Q.  You systematically wrote down some
8  assessment of the water level on the Leonardo side,
9  correct?
10    A.  Correct.
11    MR. ANNESSER:  Object to form.  Dr. Rossi
12    please allow me to object before you answer.
13  BY MR. PACE:
14    Q.  Once you went over -- through the door
15  over to the J.M. Products side of the Doral
16  warehouse, you would not write down the numbers that
17  you saw on the thermometer on the J.M. Products side,
18  correct?
19    MR. ANNESSER:  Object to form.
20    MR. LEON DE LA BARRA:  Object to form.
21    THE WITNESS:  Not methodically because I
22    did not need it.
23  BY MR. PACE:
24    Q.  Did you maintain -- any ones that you
25  wrote down not methodically, did you maintain any of

Page 250

1  those records?
2    A.  Can you repeat the question?
3    Q.  Sure.  I just asked if you wrote down the
4  information when you were on the J.M. Products side
5  for the thermometer, you said not methodically --
6    A.  Right.
7    Q.  -- which suggests sometimes you wrote it
8  down.
9    A.  Sometimes probably -- I don't recall
10  precisely this, but it is not impossible that I have
11  taken some note.
12    Q.  Did you maintain any of it?
13    A.  No.
14    Q.  Okay.  So the notes you took from the
15  Leonardo side you kept, the notes you took on the
16  J.M. Products side you discarded somehow?
17    MR. ANNESSER:  Object to the form.
18    MR. LEON DE LA BARRA:  Object to the
19    form.
20    MR. ANNESSER:  Mischaracterization.
21    THE WITNESS:  I would have taken note
22    should I have found differences, relevant
23    differences, because in that case that would
24    have been an event.  But since --
25  BY MR. PACE:

Page 251

1    Q.  That you would have reported to Penon?
2    A.  No.  To Penon, no, because Penon had
3  nothing to do with -- that would have been an event
4  for me.
5    Q.  Understood.
6    A.  For my study.
7    Q.  Understood.
8    A.  Because I was also the technical director
9  of the plant of J.M. and for me it would have been an
10  event should I have found relevant differences.
11    Until when there were -- and I never
12  found relevant differences.  There is nothing --
13  there was no events to remark.
14    Q.  And the same thing with the flow meter
15  that was on the J.M. Products side, your testimony is
16  that you didn't -- you didn't methodically write down
17  the readings on those flow meter -- that flow meter,
18  correct?
19    A.  Correct.
20    Q.  And this is a flow meter that you have
21  testified existed in the area between J.M. Products,
22  the container, and the wall that divided J.M.
23  Products and Leonardo?
24    A.  Correct.
25    Q.  All right.  And to the extent that you

Page 252

1  did write down any of those flow meter readings for
2  whatever reason, you haven't maintained them?
3    A.  Can you repeat?
4    MR. ANNESSER:  Object to form.
5    THE WITNESS:  I lost the question.
6  BY MR. PACE:
7    Q.  Sure.  To the extent that you did keep
8  any records of the meter readings on the J.M.
9  Products side, is it correct that you haven't kept
10  them?
11    A.  Yes.
12    Q.  All right.  I want to go back to this
13  e-mail for a little bit here.
14    There is a part of Tom Darden's response
15  makes a reference to the smaller devices.  That's the
16  E-Cat units that are not part of the big Frankies,
17  correct?
18    A.  Correct.
19    MR. ANNESSER:  Object to form.
20  BY MR. PACE:
21    Q.  Is it correct that you -- you
22  individually or you -- let me rephrase that.
23    Is it correct that you fueled the big
24  Frankie E-Cats without Industrial Heat and that
25  Industrial Heat fueled the other E-Cats, some with

63  (Pages 249 to 252)

Page 253

1  your involvement, some without?
2       MR. ANNESSER:  Object to form.
3       THE WITNESS:  I am not able to answer
4  this question because the plant remained for
5  almost -- for a very long time in the -- the big
6  Cats remained for many months in full hands of
7  Industrial Heat.
8       So I do not know if they have
9  disassemble, recharge, because they had -- for
10 sure all the Cats, the big Frankies and the
11 small Cats had been charged from us in Italy
12 before being delivered to the United States.
13 BY MR. PACE:
14      Q.  By us in that context you mean Leonardo
15 Corporation?
16      A.  Can you repeat?
17      Q.  When you said were charged by us in
18 Italy, you mean us, Leonardo Corporation?
19      A.  Well, I mean Andrea Rossi.
20      Q.  Okay.
21      A.  Okay.  Because I made the charges.
22      Q.  Okay.
23      A.  Personally with my hands.  And -- because
24 I couldn't trust anybody to do that kind of work.
25      And what -- I cannot know what happened

Page 254

1  to all the E-Cats, big and small, during the many
2  month during which the plant has not been under my
3  control while I was in Miami or in Doral and they
4  were working there.
5       So I cannot know this because they could
6  have disassembled also the big and recharged them or
7  not.  I do not know.
8       Q.  Did you ever have any discussions with
9  Tom Darden about whether Industrial Heat cared about
10 whether the big Frankies were being operated or the
11 smaller units were being operated in Florida?
12      Did they ever draw a distinction between
13 the two, in other words saying we want to see the big
14 Frankies operate or we want to see the smaller units
15 operate, or did it make no difference to them?
16      MR. ANNESSER:  Object to form.
17      MR. VAUGHN:  Sorry, sorry.
18      MR. ANNESSER:  He's got a foot out the
19 door already.
20      THE WITNESS:  Sorry.  I'm sorry.
21 BY MR. PACE:
22      Q.  Let me ask the question again.
23      A.  Yes, thank you.
24      Q.  When you -- there is both big Frankie
25 units and smaller E-Cat units in the E-Cat plant in

**R**

Page 255

1  Doral, correct?
2       A.  Correct.
3       Q.  Did Industrial Heat ever tell you that it
4  was important to it that the smaller E-Cat units be
5  functioning, operating correctly or did they not care
6  which units were operating?
7       A.  I don't recall.  I don't recall.  I do
8  not recall if yes or not but the issue is this, that
9  the small did not work because they have been charged
10 improperly, because the imbalance between them.
11      Because when I started, the initial
12 strategy was to use the small ones.
13      Q.  Dr. Rossi, it's fair.  I understand you
14 want -- that's actually independent of my question.
15 I was just asking the question.
16      A.  You're right and I'm sorry.
17      Q.  I am right on that one.  John was looking
18 down so he wasn't focused on it.
19      A.  My answer is I do not recall.
20      Q.  Fair enough.  I may even ask you about
21 what you were about to get into, but let me keep this
22 thing moving here a little bit.
23      I have kind of a list of things to get
24 through, if I can.
25      A.  I'm sorry.

Page 256

1       Q.  The platinum sponge cylinders that were
2  put into the tubes on the J.M. Products side, was
3  there a specific time period that they were supposed
4  to be in those tubes?
5       MR. ANNESSER:  Object to form.  Are we
6  wearing our Leonardo hat now or --
7  BY MR. PACE:
8       Q.  I think he's been wearing his Leonardo
9  hat for quite a while now.  So this
10 one is -- I will ask if Leonardo knows and then I
11 will ask if you know as a 30(b)(1) witness.  But this
12 is the product that Leonardo was going to buy.
13      How long was -- are you familiar with the
14 phrase in terms of talking about meat -- you hear
15 about curing meat?  Have you heard of that before?
16      A.  No.
17      Q.  So I won't use that phrase.  I assume
18 there is some period of time that the platinum sponge
19 in these cylinders were supposed to be in the tube
20 that's to be carrying the steam over from the
21 Leonardo Corporation to the J.M. Products side.  Is
22 there a period of time that they were supposed to be
23 in that tube?
24      MR. ANNESSER:  Object to form.
25      THE WITNESS:  I try to rephrase your

**Veritext Florida Reporting Co.**

800-726-7007                                                    305-376-8800

Page 257

1    question to be sure that I have understood it.
2    Because did you ask -- sorry, if I put it.
3        So I have understood your question this
4    way.  You are asking me that -- you are asking
5    me if I had an idea how much time the reactors
6    with the platinum sponge inside had to remain
7    under treatment.  Is this your question?
8    BY MR. PACE:
9        Q.  It's close.  I am asking you how much
10   time they remained, not just did you have an idea.
11       A.  Same thing.
12       Q.  How much time did you, in fact, have them
13   in there?
14       MR. ANNESSER:  Object to form.
15       THE WITNESS:  So my supposition -- it was
16   an experiment.
17   BY MR. PACE:
18       Q.  I understand.
19       A.  There was not a scheduling.  There was an
20   experiment.
21       My supposition was that for the platinum
22   sponge the period of treatment should have been at
23   least six months before -- before, but I did not know
24   so it has -- had to be experienced.
25       Q.  So when did you first take the -- so when

Page 258

1    you would first take out the reactors or the
2    cylinders, would you take them out of the tube, take
3    them out of the pipe and run like a test on them and
4    decide whether you had to put them back or not?
5        A.  Yes.
6        Q.  When did that occur?
7        MR. ANNESSER:  Object to form.
8        THE WITNESS:  I don't recall now.  I
9    don't recall now.  But if I recall well, I --
10   because in a certain -- so the question -- can
11   you repeat the question, please?
12   BY MR. PACE:
13       Q.  Let me break it down.  I will talk about
14   the graphene -- the cylinders with the graphene in it
15   next.  I am just asking right now about the platinum
16   sponge cylinders that were in the piping.
17       You would have to remove the platinum
18   sponge cylinders or cylinders, run some tests and
19   decide do I need to put it back in there or not.  I
20   am asking -- first question is whether -- do you
21   recall when those -- when you removed the platinum
22   sponge cylinders from the piping?
23       MR. ANNESSER:  Object to form.
24       THE WITNESS:  The first check, if I
25   recall correctly, has been after two, three

Page 259

1    months.
2    BY MR. PACE:
3        Q.  So are we talking about --
4        A.  May.
5        Q.  May of 2015?
6        A.  May, June.
7        Q.  May, June.  Was the platinum sponge
8    adequately treated by then or did you have to put it
9    back in?
10       MR. ANNESSER:  Object to form.
11       THE WITNESS:  I had to put it back in.
12   BY MR. PACE:
13       Q.  When did you remove it again?
14       MR. ANNESSER:  Object to form.
15       THE WITNESS:  Again, maybe -- maybe after
16   another three months.
17   BY MR. PACE:
18       Q.  Okay.
19       MR. ANNESSER:  Chris, just for the record
20   for this entire line of questioning regarding
21   the J.M. side, I am going to object on the basis
22   that he's here as Leonardo's 30(b)(6) not
23   J.M.'s.
24   BY MR. PACE:
25       Q.  After the few more months did you then

Page 260

1    keep the platinum cylinders out?
2        A.  Yes.
3        Q.  In other words, were they done?
4        A.  Sorry?
5        Q.  Were the platinum sponge cylinders
6    completed at that point, the second time you checked?
7        A.  Honestly, the quality of the product that
8    we obtained was not good.  Again, that was an
9    experiment that needed time.  As a matter of fact,
10   the program, as I also say to Di Giovanni, was
11   consider the first year just experimental and I
12   expected in the second year to have good results.
13       Q.  How about the graphene cylinders, those
14   would have been put in later in time, right, sometime
15   in mid or late 2015?
16       A.  I don't remember exactly, no, but also
17   before, because they -- for a certain period they
18   coexisted.  They were not an alternative.
19       Q.  So in the pipeline coming over from
20   Leonardo, and if we're looking at -- if I ask you to
21   look at -- -- if we're looking at Exhibit 12.
22       A.  Yes.
23       Q.  In this -- in the top -- that's the steam
24   pipe in which the cylinders were placed --
25       A.  No, no, no.

65  (Pages 257 to 260)

Page 261

1    Q. -- not on this side, but on the other
2  side, over on the J.M. Products side?
3    A. Well, it is not that -- the -- this is
4  the pipe of the steam, end of the story.
5    Then the steam entered -- made a course
6  through a series of bypass and is going where it had
7  to interact with the reactors.
8    Q. So let me -- this is the picture we were
9  using before --
10    A. Yes.
11    Q. -- so I think this might help.
12    A. Yes.
13    (The document referred to was thereupon
14  marked Deposition Exhibit 21 for Identification, a
15  copy of which is attached hereto.)
16  BY MR. PACE:
17    Q. Dr. Rossi, that's an exhibit marked as
18  Number 21. I think it was an exhibit we may have
19  used during your last deposition as well.
20    Can we see from this picture the steam --
21  this is from inside the container on the J.M.
22  Products side, correct?
23    A. Yes.
24    Q. The steam from Leonardo Corporation is
25  coming directly into this container?

Page 262

1    A. No, through a bypass. Yes, through a
2  bypass that -- yes, in any case, yes, the steam
3  arrived -- this is the steam that run inside these
4  pipes arrived from the Leonardo -- Leonardo's plant,
5  yes, sir.
6    Q. So the cylinders you were just referring
7  to or the reactors, can we see where in the piping --
8  just where in the piping they would be here? Can you
9  tell me which pipe they would be in?
10    A. All the insulated pipes that you can see.
11    Q. Okay. So there is reactors on four
12  levels of pipes that show up --
13    MR. ANNESSER: Object to form.
14    MR. LEON DE LA BARRA: Join.
15    THE WITNESS: When this photos has been
16  taken, yes.
17  BY MR. PACE:
18    Q. Okay. In those reactors were containers,
19  they might have graphene in them or they might have
20  platinum sponge in them?
21    MR. ANNESSER: Object to form.
22    THE WITNESS: There was only -- there was
23  only a couple of them with the platinum sponge
24  and --
25  BY MR. PACE:

Page 263

1    Q. How many of them with graphene?
2    MR. ANNESSER: Object to form.
3    MR. LEON DE LA BARRA: Join in that
4  objection.
5    THE WITNESS: Around 30.
6  BY MR. PACE:
7    Q. And you removed -- you removed and
8  checked at least the platinum sponge containers but
9  for the cylinders that had the graphene in them, is
10  it the same situation, which is every so often you
11  had to pull them out of this tubing and check them?
12    A. Yes.
13    Q. All right. And to do that did anyone
14  ever assist you in checking the cylinders?
15    A. No.
16    Q. Was anyone ever in the container with you
17  when you checked the cylinders?
18    MR. ANNESSER: Object to form.
19    MR. LEON DE LA BARRA: Object to form.
20    THE WITNESS: No.
21  BY MR. PACE:
22    Q. How did you turn off the steam coming
23  over to J.M. Products so you could check the
24  cylinders?
25    MR. ANNESSER: Object to form.

**R**

Page 264

1    MR. LEON DE LA BARRA: Object to form.
2    THE WITNESS: Can you repeat the
3  question?
4  BY MR. PACE:
5    Q. Sure. You couldn't physically go in
6  there and remove the cylinders while what you have --
7  you are saying is 103 or 100 degree Celsius steam
8  coming through those pipes, you can't reach in there
9  and take a cylinder out of it and then put it back
10  in, can you?
11    A. Yes.
12    Q. The steam -- so --
13    A. No, the steam was bypassed.
14    Q. Bypassed how?
15    A. It was bypassed. We had a bypass.
16    Q. There was a bypass located up where the
17  steam was coming into the container?
18    A. Yes. The bypass was located in -- just
19  behind the wall there was a bypass.
20    Q. Behind -- if we look at Exhibit 12 --
21    A. Yes.
22    Q. -- behind the gray wall?
23    A. Yes, behind this we had a bypass and the
24  bypass allowed the steam in part or in total to the
25  plant or all the steam out from the plant.

**Veritext Florida Reporting Co.**

800-726-7007                                             305-376-8800

Page 265

1    Q.   So the steam would be bypassed, it would
2    either just be released into the warehouse or it
3    would be circled back into the --
4         MR. LEON DE LA BARRA:  Object to form.
5         MR. ANNESSER:  Object to form.
6         THE WITNESS:  No, it could not be
7    released in the warehouse.  The steam was sent
8    to the heat exchanger that we had, that I
9    explained to you the last time when I -- in my
10   former deposition.
11        So we had a bypass there that could
12   either allow part or total -- on total the steam
13   because I did not know how much -- how much
14   steam it could be necessary in the various
15   phases so we had a bypass that --
16   BY MR. PACE:
17   Q.   Who?
18   A.   Sorry.
19   Q.   Who built the bypass?
20   A.   We did it, because the bypass is made by
21   pipes with a butterfly.
22   Q.   But who is we?
23   A.   I, with the help of contractors.
24   Q.   And are they the same contractors who
25   built the heat exchanger?

Page 266

1    A.   You know, there was not the same
2    contractors because sometime we had some contractor
3    that -- that we call it from outside, but in that
4    industrial area mainly in that period every day
5    arrived guys with trucks that were ambulant --
6    ambulant workshops, you know, with welders, et
7    cetera.
8         And they knocked at the door saying you
9    need help, et cetera, et cetera and I use it many,
10   many times those guys because they are very well
11   skilled, very good and I -- and also the advantage is
12   they were not curious.  They just wanted to work.  So
13   under -- I myself, I work with them and we made this
14   piping system.  I bought pipes and we made all the
15   connections.
16   Q.   And pipes as well as fans, correct?  You
17   had fans for your heat exchanger?
18   A.   Yes.
19   Q.   You had to have the heat exchangers
20   themselves, correct?
21   A.   Yes.
22   Q.   Who paid for that?
23   A.   Leonardo Corporation.
24   Q.   Leonardo Corporation?
25   A.   Yes.

Page 267

1    Q.   Are there records reflecting those
2    purchases by Leonardo Corporation?
3         MR. ANNESSER:  Object to the form.
4         THE WITNESS:  I suppose so, yes.
5    BY MR. PACE:
6    Q.   So there is records you assume that
7    reflect purchasing heat exchangers?
8    A.   No, the heat exchangers are pipes.  I
9    bought pipes.
10   Q.   How about the fans, are there records
11   reflecting the fans?
12   A.   Yes.
13   Q.   Because those would have to be pretty big
14   fans that were done, correct?
15   A.   I had two fans with a total capacity
16   of -- within the fan of the heat exchanger.
17   Q.   The fans for the heat exchanger, those
18   would be pretty bag fans?
19   A.   They had the capacity necessary to move
20   the air that had to be moved.
21   Q.   And did you testify before that the way
22   of getting the heat out was through the second story
23   office?
24   A.   No, it was not an office.
25        MR. ANNESSER:  Object to form.

Page 268

1    BY MR. PACE:
2    Q.   Office.  Second story space?
3    A.   Now it's becoming an office.  Then was
4    a -- basically was a pretty big -- pretty big, I
5    would say workshop that we had in the second level.
6    Q.   You said we had.  We had being that
7    second level?
8    A.   We is --
9    Q.   Is there no distinction really in this
10   context between Leonardo and J.M. Products --
11        MR. LEON DE LA BARRA:  Object to form.
12   BY MR. PACE:
13   Q.   -- just space you worked?
14        MR. ANNESSER:  Object to form.
15        THE WITNESS:  No, no.  When I say we is
16   because I worked with the contractors with, you
17   know, when I -- I was not alone there.  So when
18   I say we, it's because it was -- there was not
19   only me.  I was with contractors, et cetera.
20        And Jim Bass also sometimes for other
21   things, et cetera, et cetera.  So I say we for
22   my -- it is my custom to say we and not I.
23   BY MR. PACE:
24   Q.   And up in this second story your
25   testimony I think was that to get the heat out you --

67  (Pages 265 to 268)

Page 269

1  you or somebody knocked out the window on the second
2  story?
3      A.  Yes, the second floor we had big windows
4  and we had to remove it completely one.  Now we have
5  reset everything because we're making offices there.
6      Q.  So Leonardo paid for the piping --
7      A.  Yes.
8      Q.  -- that was used for the heat exchanger?
9  Leonardo paid for the workers that did the work?
10     A.  Yes.
11         MR. ANNESSER:  Object to the form.
12  BY MR. PACE:
13     Q.  Leonardo paid for the fans that were used
14  for the heat exchanger system?
15         MR. ANNESSER:  Object to form.
16         THE WITNESS:  Yes.
17  BY MR. PACE:
18     Q.  And this heat exchanger, the bypass, I am
19  just trying to understand.  We have both a bypass --
20  I'm sorry.
21         Is it your testimony -- is the testimony
22  that the piping for this heat exchanger ran along the
23  side of the wall where the -- essentially this wall
24  here that we see in Exhibit 12, but just on the J.M.
25  Products side?

Page 270

1      A.  Yes.
2      Q.  Did it go straight up and then straight
3  over to the --
4      A.  It's impossible --
5      Q.  -- loft?
6      A.  -- to answer this way because there was a
7  design and the bypass was run along the -- if we look
8  at this wall from the side of Leonardo, if we look
9  from here on, this run through the right -- yeah.
10     Q.  So if we're looking at Exhibit 10 now?
11     A.  Yeah, this run along the -- this run down
12  and then along the right side of the plant of J.M.,
13  with the transmissions to the bypass.  To the bypass
14  that was on the flank and also -- and also there was
15  the frontal connection for the inlet of the steam.
16     Q.  So by this picture that you have there
17  that is Exhibit 10, is this after the heat exchanger
18  was removed from the warehouse or before?
19     A.  I cannot -- I cannot say from this
20  photos.  It could be -- no, this photo has been made
21  before.
22     Q.  Before the heat exchanger was put into
23  place?
24     A.  No.
25         MR. ANNESSER:  Object to the form.

Page 271

1         THE WITNESS:  No, this photo has been
2  made before it has been dismantled.  This photo
3  has been made -- this photo has been made when
4  the heat exchanger was in operation.
5  BY MR. PACE:
6      Q.  So the heat exchanger was in operation
7  when that photo was made.  You recognize that photo
8  having been made when?
9         MR. ANNESSER:  Object to form.
10         THE WITNESS:  I don't know, you did it.
11  BY MR. PACE:
12     Q.  How do you know the heat exchanger was in
13  place then?  That's what I don't understand.
14     A.  Because we had the plant in operation
15  because when the plant stopped to be in operation all
16  this piping has been removed.
17     Q.  I understand.  I will actually come to
18  that in just a second.  Simply because the pipe is
19  there --
20     A.  I suspect that this photos have been made
21  the last day of the test.  I suspect.
22     Q.  You understand the last day of the test
23  the heat exchanger was still there?
24     A.  Of course.
25     Q.  Who removed that piping?

Page 272

1      A.  I did.
2      Q.  When did you remove that piping?
3      A.  After the end of the test.
4      Q.  Where is that piping now?
5      A.  We use it to make other things.  I
6  recovered all the pieces that were not -- no more
7  necessary to make other things and the heat
8  exchanger -- all the pipes of the heat exchanger have
9  been recovered to make other things and that space
10  now is becoming offices.
11     Q.  Let's see if I understand.  You are
12  looking there at Exhibit 10, there is a pipe there in
13  Exhibit 10 that we see that is the pipe you are
14  saying was carrying the output of the E-Cats over to
15  the J.M. Products side of the Doral warehouse,
16  correct?
17         MR. ANNESSER:  Object to the form.
18  BY MR. PACE:
19     Q.  That's what we see there?
20     A.  You should repeat speaking if possible a
21  little bit slower.
22     Q.  Sure, certainly will.  There in Exhibit
23  10 we see insulated pipe --
24     A.  Yeah.
25     Q.  -- that is carrying the output of the

68 (Pages 269 to 272)

Page 273

1   E-Cat plant over to the J.M. Products side of the
2   Doral warehouse, correct?
3        A.   Yes.
4        Q.   That has now been -- you removed that
5   pipe after -- sometime after February 16 of 2016,
6   correct?
7             MR. ANNESSER:  Object to form.
8             THE WITNESS:  Correct.
9   BY MR. PACE:
10       Q.   And you have repurposed that piping or
11  you now are using that piping for another purpose?
12            MR. ANNESSER:  Object to the form.
13            THE WITNESS:  It's correct.
14  BY MR. PACE:
15       Q.   And you didn't maintain the pipe, you
16  didn't maintain the insulation, it's been put to
17  another use?
18            MR. ANNESSER:  Object to form.
19            THE WITNESS:  (Nods head.)
20  BY MR. PACE:
21       Q.   The heat exchanger no longer exists at
22  the Doral location, correct?
23       A.   Correct.
24       Q.   The piping that was used for the heat
25  exchanger you have now put to another use, you didn't

**[AA, R]**

Page 274

1   maintain any of the piping for the heat exchanger?
2            MR. ANNESSER:  Object to form.
3   BY MR. PACE:
4        Q.   Is that correct?
5        Q.   The -- I assume you replaced the window
6   on the J.M. Products side, Leonardo paid for that?
7            MR. ANNESSER:  Object to form.
8            THE WITNESS:  We have represented as it
9   was before we have installed the --
10  BY MR. PACE:
11       Q.   What's your testimony as to when that
12  window was put back in?  Was it February 16th or 17th
13  of 2016?
14       A.   Sorry, can you repeat the question?
15       Q.   Sure.  Your testimony is that the heat
16  exchanger was in place and functioning all the way
17  through at least February 16 of 2016, correct?
18       A.   Correct.
19       Q.   So up until February 16 of 2016 that
20  window in the second story was removed, correct?
21            MR. ANNESSER:  Object to the form.
22            MR. LEON DE LA BARRA:  Object to the
23  form.
24            THE WITNESS:  Can you repeat the

**[AA, R]**

Page 275

1   question?
2   BY MR. PACE:
3        Q.   I will.
4        A.   A little bit slower.
5        Q.   Sure.  You said that the heat exchanger
6   was pushing the heat out the window on the second
7   story --
8        A.   Yes.
9        Q.   -- on the J.M. Products side, correct?
10       A.   Yes, correct.
11       Q.   Once -- as long as the heat exchanger was
12  in place --
13       A.   Yes.
14       Q.   -- that window had to be removed, correct?
15       A.   Correct.
16       Q.   Otherwise that room would have turned
17  into an absolute furnace?
18            MR. LEON DE LA BARRA:  Object to form.
19            THE WITNESS:  Of course.

**[R]**

20  BY MR. PACE:
21       Q.   Of course, notwithstanding the form.  So
22  after you took -- after the plant was turned off and
23  you took the heat exchanger down, you could replace
24  the window on that second story, in that second story
25  room, correct?

**[R]**

Page 276

1            MR. ANNESSER:  Object to form.
2            THE WITNESS:  Correct.
3   BY MR. PACE:
4        Q.   So sometime after February 16 of 2016 is
5   when you replaced the window on the second story?
6        A.   No, the window as it was before has been
7   replaced not much time ago.  Not much time ago when I
8   decided to make offices.  Because --
9        Q.   And do you recall who you paid to put the
10  window back in?
11       A.   Yes.
12       Q.   Who was that?
13       A.   Was a contractor.
14       Q.   Do you recall --
15       A.   Together with -- together with me, yes.
16       Q.   When we talk about contractor, is this
17  again somebody who -- like a day laborer?
18       A.   Yes.
19       Q.   Somebody who you -- there is no records
20  of who this person is that Leonardo Corporation
21  maintains?
22       A.   Yes.
23       Q.   You are not aware of any records that
24  anyone maintains as to who this person is?
25       A.   No.

**[R]**

**Veritext Florida Reporting Co.**

800-726-7007                                                    305-376-8800

Page 277

**R**

1      MR. ANNESSER:  Object to form.
2  BY MR. PACE:
3      Q.   And that person worked with you to
4  replace the window, correct?
5      A.   Yeah, yeah.
6      Q.   No one else was present at the time?
7      MR. ANNESSER:  Object to form.
8      THE WITNESS:  No.
9  BY MR. PACE:
10     Q.   And what happened to the fans?
11     A.   The fans are still there.
12     Q.   The fans are still in the warehouse?
13     A.   Yeah.
14     Q.   And what happened to the cylinders?
15     A.   The cylinders have been -- I have used
16  them for other things.  I have recovered them for
17  other things.  Can we cut five minutes?
18     Q.   Certainly.
19     A.   Only call my wife.
20     Q.   Please.  We will go off the record.
21     A.   Five minutes.
22     THE VIDEOGRAPHER:  The time is 18:16.
23  Off the record.
24     (Thereupon a brief recess was taken,
25  after which the following proceedings were had.)

Page 278

1      THE VIDEOGRAPHER:  Time is 18:58.  We're
2  back on the record.
3      MR. PACE:  Should we put our agreement on
4  the record to start?
5      MR. ANNESSER:  Sure.
6      MR. PACE:  Okay.  What we have agreed
7  to -- I'm sorry, what time is it right now?
8  18:58.
9      What we have agreed then in lieu of me
10  asking Dr. Rossi on the record for the energy
11  catalyst formula, that it will be provided in a
12  sworn declaration by Dr. Rossi to a limited
13  group of people, limited at least to either Tom
14  Darden and myself or Tom Darden, myself and a
15  third person and that those -- either Tom Darden
16  or myself, if limited to that or Tom Darden
17  myself and the third person, if limited to that,
18  may not disclose it further.  Is that accurate?
19     MR. ANNESSER:  Well, I want to just --
20     MR. PACE:  What did I miss?
21     MR. ANNESSER:  -- clarify with respect to
22  the third person.
23     We are agreeing today that it will be
24  disclosed to yourself and Mr. Darden, with a
25  narrowing or a specification under the

Page 279

1  protective order that it remain with the two of
2  you, unless we can agree upon otherwise, either
3  party can take it before the court if we cannot
4  agree to the disclosure to a third person for
5  the right to do so.
6      MR. PACE:  Fair enough.  So that if we
7  can't agree on a third person, my remedy is to
8  go to the court and say I'm entitled to have a
9  third person or your remedy is -- and your
10  remedy is to oppose it.
11     MR. PACE:  Correct.
12     MR. PACE:  Just so it's also clear, the
13  issue relating to the third person is somebody
14  who would have to be either with the law firm or
15  one of the parties, as opposed to -- we're not
16  contemplating it being an outsider.
17     MR. ANNESSER:  No.  And just for further
18  clarification, we will work towards getting a
19  drafted narrowing of that protective order for
20  this purpose solely, correct?
21     MR. PACE:  Perfect.
22     MR. ANNESSER:  Very good.
23  BY MR. PACE:
24     Q.   Dr. Rossi, I have a few categories that I
25  want to ask you about covered within, I think what is

Page 280

**IMP**

1  Exhibit 1, is the deposition topics for today.
2      Actually, let me ask.  When I refer to
3  the energy catalyst formula or the E-Cat formula,
4  without telling me any of the components, just I want
5  to see if we're on the same page, which is that is
6  the fuel that goes into E-Cat reactors?  Period.
7      A.   Yes.
8      Q.   Okay.  The E-Cat formula, with whom have
9  you -- to whom have you provided that, other than --
10  let me say it that way.  To whom have you provided
11  that?
12     A.   To nobody but Tom Darden.
13     Q.   When you provided it to Tom Darden was
14  there anyone else present?
15     A.   I don't think so.  I don't remember
16  but -- I remember only Tom Darden.
17     Q.   Was it an in person meeting?
18     A.   Sorry?
19     Q.   Was it at a face-to-face meeting with Tom
20  Darden?
21     A.   Yes.
22     Q.   Have you ever provided it to, for
23  example, anyone at HydroFusion?
24     A.   No.  HydroFusion is a commercial licensee
25  of us.  It's not a full licensee like Industrial

Page 281

1    Heat.
2        Q.  Okay.  Is there anyone else you have
3    provided it to for security purposes, in other words,
4    like, you know, your wife if you were to pass away or
5    your brother-in-law or something like that?
6        A.  In case -- in case of my unforeseeable
7    death there is a notary in Italy that will pass it to
8    my wife.
9        Q.  Okay.
10       A.  But in Italy notary is not a light thing
11   as in the United States.
12       Q.  Right.
13       A.  It's something much more heavy.  A notary
14   has the same range of an attorney but maybe more
15   because it depend from the minister -- well, a notary
16   basically in Italy is a very top figure, just to give
17   an idea.
18           In the United States to notarize a
19   signature, you pay $10, $20.  In Italy you pay
20   $2,000.
21       Q.  No, I understand the process in Italy.
22   The merger of Leonardo Corporation of New
23   Hampshire and Leonardo Corporation of Florida, first
24   question is why was that done?
25       A.  I don't remember.  Because was something

Page 282

1    that my accountant said to do and I did.
2        Q.  And to prepare for this deposition you
3    didn't consult with your accountants or review any of
4    the documents relating to the Leonardo -- the merger
5    of the two companies with Leonardo?
6        A.  Honestly, no.
7            MR. ANNESSER:  Object to form.
8    BY MR. PACE:
9        Q.  Why was the Leonardo of Florida formed in
10   the first place?
11       A.  I -- it was formed because my former
12   accountant told me that since I was in Florida it was
13   opportune to make also the official address in
14   Florida.
15           Here I misunderstood because in Italy --
16   I did not understand that in the United States when
17   you open -- close one and open another company
18   because in Italy, you are in Milan.  If you open also
19   an address in Rome, the companies are always the same
20   company.
21       Q.  Okay.
22       A.  So when I made under suggestion of my
23   accountant that at those time was Jim Travis of New
24   Hampshire, somewhere New Boston, New Hampshire.
25           When he told me it is better to do this I

Page 283

1    said all right.  For me it was something
2    absolutely -- I did not understand that I was closing
3    one company and opening another.  I did not
4    understand that.
5            As soon as I knew that this was what
6    happened, immediately we made the melding to resolve
7    the problem.
8        Q.  Because you --
9        A.  Sorry.
10       Q.  Because you controlled both Leonardos,
11   right?
12       A.  Yes.
13       Q.  Both Leonardo of New Hampshire --
14       A.  Yes, of course.
15       Q.  -- and Leonardo of Florida?
16       A.  Of course, 100 percent.  I was the CEO of
17   both.
18           MR. ANNESSER:  There is no question
19   pending.
20           THE WITNESS:  Sorry.
21   BY MR. PACE:
22       Q.  Were you the shareholder of -- you were
23   shareholder of either of those companies?
24       A.  Of course.
25       Q.  You were the sole shareholder of both

Page 284

1    companies?
2            MR. ANNESSER:  Object to form.
3            THE WITNESS:  Yeah.  As a matter of fact,
4        I did not understand that I had two companies.
5        For me I had still one company with two
6        addresses.
7    BY MR. PACE:
8        Q.  I understand.  Well, they were both --
9    actually they both used the same business address,
10   right?
11       A.  Yes.
12       Q.  In Miami?
13       A.  Yes.
14       Q.  I think you testified earlier that
15   Leonardo of Florida is actually owned by a trust; is
16   that correct?
17           MR. ANNESSER:  Object to form.
18           THE WITNESS:  It is correct.
19   BY MR. PACE:
20       Q.  Then you are the beneficiary of that
21   trust?
22       A.  Yes.
23       Q.  Leonardo of New Hampshire was actually
24   owned by you?
25       A.  Yes.

71 (Pages 281 to 284)

Page 285

```
 1        Q.  Okay.  Do you have any agreements with --
 2   does Leonardo have any agreements with Di Giovanni?
 3        A.  No.
 4        Q.  I'm sorry, I should say Francesco
 5   Di Giovanni.
 6        A.  I had understood.
 7        Q.  And does Leonardo have any agreements
 8   with Platinum American Trust?
 9        A.  No.
10        Q.  Has Leonardo ever made payments to the
11   trust that owns Leonardo?  Does it pay any money to
12   that trust?
13        A.  No.
14        MR. ANNESSER:  Object to form.
15   BY MR. PACE:
16        Q.  Is any money paid to that trust on behalf
17   of Leonardo?
18        A.  No.
19        Q.  All right.  So the trust doesn't have any
20   income?
21        MR. ANNESSER:  Object to form.
22        THE WITNESS:  No.
23   BY MR. PACE:
24        Q.  And the same question in terms of the
25   Platinum American Trust.  Does the Platinum American
```

Page 286

```
 1   Trust -- I'm actually going to say -- I'm not asking
 2   into.  I'm asking does the Platinum American Trust
 3   make any payments to Leonardo?
 4        A.  No.
 5        MR. ANNESSER:  Object to form.
 6   BY MR. PACE:
 7        Q.  And Leonardo doesn't make any payments to
 8   Platinum American Trust?
 9        A.  No.
10        Q.  Are you aware that at some point in 2016
11   Leonardo was asked to transfer or assign the license
12   patents under the licensing agreement to Industrial
13   Heat or IPH?
14        A.  Can you kindly repeat --
15        MR. ANNESSER:  Object to form.
16        THE WITNESS:  -- the question because it's
17   heavy.
18   BY MR. PACE:
19        Q.  I can.  It is.  I'll rephrase it.  I will
20   see if I can break it down a little bit.  That might
21   make it easier.
22        A.  Thank you.
23        Q.  Are you aware that under the license
24   agreement there is a provision that says upon the
25   request of either Industrial Heat or IPH, that
```

**R**

Page 287

```
 1   Leonardo and Rossi shall assign to Industrial Heat or
 2   IPH what are called the licensed patents; are you
 3   familiar with that?
 4        MR. ANNESSER:  Object to form.
 5        THE WITNESS:  Yes.  Yes.
 6   BY MR. PACE:
 7        Q.  Are you aware that in 2016 IPH and
 8   Industrial Heat requested that such an assignment
 9   occur?
10        MR. ANNESSER:  Object to form.
11        THE WITNESS:  I don't recall exactly but
12   if you have any document about that.  I don't
13   recall exactly what happened in 2016 on this
14   matter.
15   BY MR. PACE:
16        Q.  Okay.
17        A.  So if -- if you have some document to
18   show me, I will be glad to take a look at it.
19        Q.  I think it's actually an attachment to
20   the complaint, but I don't have it here but I am
21   going to make the easier part to it which is whether
22   or not that was sent, Leonardo has -- Leonardo
23   Corporation or yourself individually have not
24   assigned any of your patents -- let me start that
25   over again.
```

Page 288

```
 1        Leonardo Corporation has not assigned any
 2   patents it owns to anyone else in the year 2016; is
 3   that correct?
 4        A.  Absolutely.
 5        Q.  Dr. Andrea Rossi has not assigned any
 6   patents he owns to anyone else in the year 2016?
 7        MR. ANNESSER:  Object to form.
 8        THE WITNESS:  Correct.
 9   BY MR. PACE:
10        Q.  And would the answers be the same also
11   for the year of 2017?  In other words, Leonardo has
12   not made any such assignment in 2017, correct?
13        A.  Correct.
14        MR. ANNESSER:  Object to form.
15   BY MR. PACE:
16        Q.  And Dr. Rossi has not made any such
17   assignment in 2017?
18        A.  Correct.
19        MR. ANNESSER:  Same objection.          R, IMP
20   BY MR. PACE:
21        Q.  For the temporary workers that you would
22   hire on different occasions at -- for work at the
23   Doral location, is there any identifying information
24   that you have as to any of those individuals?
25        MR. ANNESSER:  Object to form.
```

**Veritext Florida Reporting Co.**

800-726-7007                                                    305-376-8800

```
                                              Page 289
1          THE WITNESS: Can you repeat?
2     BY MR. PACE:
3          Q.  Yes.  There were a number of temporary
4     workers --
5          A.  Yes.
6          Q.  -- that were hired for work to be done at
7     the Doral warehouse, correct?
8          A.  Correct.
9          Q.  Do you have any identifying information
10    as to any of those individuals?
11         MR. ANNESSER: Object to form.
12         THE WITNESS: The information that I had,
13    for the ones of which I had information, I
14    already provided you with the discovery because
15    you asked -- you asked in some phase of this
16    litigation to be informed about all the supply,
17    blah, blah, et cetera, and I supplied.
18         So the ones of which I have the
19    possibility to have a track, I already have
20    informed you.
21    BY MR. PACE:
22         Q.  That's the information that you're aware
23    that your attorney put into a interrogatory response
24    and then you signed?
25         A.  Can you please speak slower?
```

```
                                              Page 290
1          Q.  I can.
2          A.  Thank you.
3          Q.  That's information that your attorney put
4     into -- put in writing and then you signed and swore
5     that that was accurate?
6          A.  Correct.
7          MR. ANNESSER: Object to form.
8          THE WITNESS: Correct.
9     BY MR. PACE:
10         Q.  We talked about this earlier today but I
11    don't think -- I am not quite sure if I really closed
12    the loop on this.
13         What alterations were made to the E-Cat
14    plant in Doral as compared to how it existed when it
15    was shipped from Raleigh to Doral?
16         MR. ANNESSER: Object to form.
17    BY MR. PACE:
18         Q.  Do you want me to do that again?
19         A.  Yes.
20         Q.  At some point in November, December -- at
21    some point between October and December of 2014 the
22    E-Cat plant was shipped from Raleigh to Doral.
23         My question is after that occurred what
24    changes were made to the plant in Doral?
25         A.  Now I have understood perfectly.  Well,
```

```
                                              Page 291
1     let me think.
2          As I said before, when the plant -- of
3     course we're talking of the one megawatt plant has
4     been delivered from Raleigh to Doral it was
5     incomplete.  It was not ready to go.
6          It was still incomplete and so Industrial
7     Heat sent to Doral not only the plant but also, if I
8     were recall, six workers, very good ones I must say,
9     very well skilled and they worked for two months to
10    complete everything, because it was very incomplete,
11    the plant.
12         And there was to make pipings,
13    connections, et cetera, et cetera.  So I would not
14    say -- if I remember well in your question was
15    contained the word altered, but nothing has been
16    altered.  It has been completed.
17         Q.  Okay.
18         A.  Like you receive a kit and you have to
19    complete it.  So which works did they do?  A lot
20    because they mounted the tank.  They mounted a lot of
21    pipings.  They made a lot of connections.
22         Q.  Can I ask it slightly differently?
23    Because this will help, just a word, which is what
24    you are saying is that these workers, they
25    reassembled the plant along with the piping that was
```

```
                                              Page 292
1     shipped down from North Carolina?
2          A.  Yes, sir.
3          Q.  Because in North Carolina, for example,
4     the pipe that went from the plant over to the J.M.
5     Products side was put together in North Carolina, it
6     just had to be reconnected to the plant down in
7     Florida?
8          A.  No.
9          MR. ANNESSER: Object to form.
10         THE WITNESS: The plant that connected
11    the J.M. plant to the Leonardo plant was not of
12    our property.  Was of J.M.
13    BY MR. PACE:
14         Q.  Okay.
15         A.  But -- but many pipings have been
16    delivered from -- from Industrial Heat from Doral --
17    from Raleigh to Doral in Florida that have been
18    assembled because there are -- there is a kilometer
19    of pipings inside the plant.
20         Q.  That's what I meant.  So when you were
21    talking about these six workers though, what they
22    were doing is essentially reassembling the plant and
23    the related equipment, like the water tanks and the
24    tubing or the piping that was initially put together
25    in Raleigh?
```

73 (Pages 289 to 292)

Page 293

1        MR. ANNESSER:  Object to the form.
2        THE WITNESS:  Reassembling is the wrong
3    word.  To reassemble means first disassemble,
4    then reassemble.
5  BY MR. PACE:
6        Q.  Right.
7        A.  It is not so.  The plant has been
8    delivered at the state -- in the state it had arrived
9    to be in Raleigh.
10        Together with this there was another
11    truck full of a lot of components that -- parts that
12    had to be still connected, installed.
13        Q.  I think I may know where we're differing
14    here a little bit which is when you say the plant,
15    are you referring only to the container and not to,
16    for example, the -- there was another container right
17    next to it, right, that had all the electrical
18    equipment?
19        A.  Correct, the computer.
20        Q.  The computer and everything.  Those are
21    the things that had to be assembled when everybody
22    got down to Doral?
23        MR. ANNESSER:  Object to form.
24        THE WITNESS:  Same thing.  You are right,
25    the containers were two.  One, the bigger one

Page 294

1    contained the reactors, the E-Cats.  The other,
2    shorter, contained the control systems, also the
3    one that we call the computer container.  Also
4    it was not -- sorry.  Sorry.
5        Also it had to be completed and so arrive
6    in parts to be still connected, et cetera.  In
7    the computer container mainly the electricians
8    worked, like Barry West, Fabiani.  In the other
9    worked mainly the workers, I would say all of
10    them under my direction.
11  BY MR. PACE:
12        Q.  Okay.  What payments has Leonardo
13    Corporation made to Fabio Penon?
14        A.  The same that Industrial Heat made.  We
15    received invoices from the ERV and we paid the
16    invoices.
17        Q.  Well, Penon -- Dr. Penon also -- he did
18    do a test for Leonardo Corporation back in 2012,
19    didn't he, before the license agreement?
20        A.  Yes.  No test.  He made the
21    certifications.
22        Q.  Made the certification?
23        A.  The safety certification because he
24    worked with Bureau Veritas and with SGS also.  And he
25    is the certificator.  As I said before, we knew him

Page 295

1    to certificate my power plants in Italy in 2008, et
2    cetera.
3        At that point I knew him as a
4    certificator and I trusted him.  So when I had the
5    necessity to make the safety certification for the
6    one megawatt plant of Leonardo, I called him again to
7    make the safety certification, so yes.
8        Q.  So Leonardo paid him for those, whatever
9    work was done for the safety certification?
10        A.  Yes, it is correct.
11        Q.  And then other than that the only money
12    that Leonardo has paid Penon is for -- is pursuant to
13    the invoices that Penon has sent to both Industrial
14    Heat and Leonardo; would that be correct?
15        A.  Correct, as the ERV.  He sent the
16    invoices, same sum, it was 50/50, as per agreement,
17    and he invoiced to Industrial Heat and to Leonardo
18    Corporation.  I don't remember exactly.
19        If I don't remember in total it was
20    something more than $100,000 divided in two, 50
21    percent paid by Leonardo Corporation, 50 percent paid
22    by Industrial.  I don't remember if Industrial Heat
23    has paid or not the last.  I don't think Industrial
24    Heat paid the last invoice and I had to pay on behalf
25    because in Italy there is a law that we say in

Page 296

1    Italian is a Latin allocation is in solido, means if
2    Mr. A and Mr. B make an agreement with Mr. C and
3    Mr. C is paid from Mr. A, but is not paid from Mr. B,
4    Mr. A has to pay also for Mr. B.
5        So at that point since Industrial Heat
6    did not pay the last invoice of the ERV, I had to pay
7    for it.
8        Q.  What payments has Leonardo Corporation
9    made to Fulvio Fabiani?
10        A.  To Fulvio Fabiani, I -- he was a
11    consultant of mine.  He was a consultant of mine.  I
12    knew him in 2012.  It's completely false that he was
13    adopted by the mother of my wife, as J.T. said.  This
14    is completely invented.
15        He was a client of the brother of my wife
16    who is an attorney like you and we knew Fabiani
17    through the brother of my wife because he was a
18    client.
19        Q.  I'm only asking you just again --
20        A.  No, no.  Sorry, sorry.
21        Q.  We're getting near the end of the day.
22  It's hard, I know.
23        A.  You are right.
24        Q.  What money has Leonardo Corporation paid
25  Fulvio Fabiani?

74  (Pages 293 to 296)

Page 297

1    A.   Correct.  I have retained him as a
2 consultant in 2012.  I don't remember exactly how
3 much I paid him in the period.
4        I think I paid him something around 40,
5 $50,000.  After that when I -- sorry, I end up the
6 answer.
7    Q.   Since that time in 2012 has Leonardo
8 Corporation paid anything to Fulvio Fabiani?
9    A.   No.
10    Q.   Has Leonardo Corporation -- has Leonardo
11 Corporation paid anything to United States Quantum
12 Leap?
13    A.   No, same thing.
14    Q.   Am I correct that Fulvio Fabiani lived
15 when he was in Miami in a unit that you or a company
16 of yours owned?
17    A.   No, he rented -- no, when he was in Miami
18 he rented an apartment that belongs to a company of
19 which I am the CEO.
20    Q.   That's what I meant.
21    A.   But he rented.
22    Q.   He rented?
23    A.   Yes.
24    Q.   I think that's what I said too though,
25 maybe poorly.

Page 298

1    A.   Maybe I poorly understood.
2    Q.   Where he lived -- where Fulvio Fabiani
3 lived in Miami Beach --
4    A.   Yes.
5    Q.   -- he was in the same building that you
6 lived in?
7    A.   Yes, it is correct.
8    Q.   And his condo unit was owned by a company
9 that you own?
10    A.   Not a company that I own but a company of
11 which I am a CEO, the CEO.
12    Q.   Sorry.  Who owns that company?
13    A.   A trust.
14    Q.   A trust.  And who are the beneficiaries
15 of that trust?
16    A.   It's not me.
17    Q.   Is it somebody -- is it a relative of
18 yours?
19        MR. ANNESSER:  Object to form.
20 BY MR. PACE:
21    Q.   I won't get beyond the relative.
22    A.   I don't remember exactly who is the
23 beneficiary.
24    Q.   Okay.  Did Mr. Fabiani pay rent?
25    A.   Yes.

Page 299

1    Q.   To whom?
2    A.   To Refc, to the company that rented the
3 apartment.
4    Q.   I was just thinking more logistically.
5 Was there an agent who controls that company?
6    A.   We have a property manager, yes.
7    Q.   Who is the property manager?
8    A.   Sorry?
9    Q.   Who is the property manager?
10    A.   Mr. --
11        MR. ANNESSER:  Object to form.
12        THE WITNESS:  Mr. Michael Dubas.
13 BY MR. PACE:
14    Q.   What work did Fulvio Fabiani perform for
15 you or at your direction -- actually, let me rephrase
16 it.
17        What work did Fulvio Fabiani perform at
18 the Doral location to your knowledge, whether it was
19 for you or otherwise?
20        MR. ANNESSER:  Object to form.
21        THE WITNESS:  Fulvio Fabiani has been
22    hired for --
23 BY MR. PACE:
24    Q.   I am asking for the work he did.  I am
25 not asking who hired him.  I am not asking --

Page 300

1        MR. ANNESSER:  He can answer in any way
2    he wants to.
3        MR. PACE:  I'm just asking what was the
4    tasks he was doing.  I know where this is
5    going.
6        MR. ANNESSER:  He can answer any way he
7    wants to.
8        MR. PACE:  I'm just asking for the actual
9    work he was doing.
10        MR. ANNESSER:  Dr. Rossi, you can answer
11    however you deem appropriate.
12        THE WITNESS:  Sorry, I did not
13    understand.
14 BY MR. PACE:
15    Q.   The question is -- here is my question.
16 We can get into for who he was doing it.  I am asking
17 the physical work, what was the work he was doing
18 while he was at the Doral location?
19        MR. ANNESSER:  Object to form.
20        THE WITNESS:  Control the plant during
21    the performance test.
22 BY MR. PACE:
23    Q.   Was there any other work that he was
24 doing during that time period?
25    A.   In the same period he also helped, under

**Veritext Florida Reporting Co.**

800-726-7007                                                             305-376-8800

Page 301

1  my request, helped Jim Bass because I had asked Jim
2  Bass to study robotization to make a better control
3  of the plant in the side J.M. and for this
4  robotization --
5      Q.  I missed what you said.  I apologize, I
6  just missed.  Did you say on the side of J.M.?
7      A.  Yes, sir.
8      Q.  Okay.  That was my fault.  Please, I
9  apologize.
10      A.  I say that.  And so now and again Fabiani
11  making the tour because I wanted not that Fabiani
12  cross the area of J.M., because I wanted not that
13  he -- I wanted that nobody had to enter in the area
14  of J.M. from the side of Leonardo, as prepared term
15  sheet and Fabiani worked with -- helped Jim Bass to
16  study a robotized control system.
17      Q.  Is this the thing we have seen about in
18  referencing the BeagleBone?
19      A.  Sorry?
20      Q.  The BeagleBone?
21      A.  Yes, I -- I heard that definition for the
22  first time together with you when Jim Bass described
23  in detail because, you know, I am not an electronic
24  man.
25          So I just say, you know, my -- with them

Page 302

1  I just say I need this.
2      Q.  Right.
3      A.  Do it.
4      Q.  So you -- you directed or requested for
5  Jim Bass to work on a new control system that would
6  be used by J.M. Products?
7      A.  Correct.
8      Q.  And then you requested or directed that
9  Fulvio Fabiani assist Jim Bass in that project?
10      A.  Yes, because they are complimentary,
11  because where ends Fabiani begins Bass and vice
12  versa.  They together make a good couple, electronic.
13      Q.  I will let that side.
14      A.  Electronically speaking.
15      Q.  A good electronic couple.  And the work
16  that they did together was sometimes done -- was
17  sometimes done over at J.M. Products, correct?
18      A.  Can you explain the question?  I don't
19  get the English.
20      Q.  Sure.  They would meet together?
21      A.  Yes.
22      Q.  Jim Bass and Fulvio Fabiani --
23      A.  Yes.
24      Q.  -- on this product -- on this project?
25      A.  Yes.

Page 303

1      Q.  When they would do so would they meet
2  over at the offices that are on the J.M. Products
3  side of the warehouse?
4          MR. ANNESSER:  Object to form.
5          THE WITNESS:  Yes.
6  BY MR. PACE:
7      Q.  What you would have is you would have
8  Fulvio instead of going through that door that
9  directly connects Leonardo to J.M. Products, you
10  would have him walk around the building and walk in
11  the front door of J.M. Products, correct?
12      A.  Yes, it is correct.
13      Q.  There he would meet with Jim Bass?
14      A.  Yes.
15      Q.  And so that was so anyone else in the
16  warehouse, such as a Barry West, would not see Fulvio
17  crossing over from the Leonardo side of the warehouse
18  to the J.M. Products side of the warehouse?
19          MR. ANNESSER:  Object to form.
20          MR. LEON DE LA BARRA:  Object to form.
21          THE WITNESS:  Correct.  But attention, I
22  say correct and I hope so, but consider that I
23  was in the factory from 5, 6 in the afternoon to
24  10, 11 of the day after.  During the day I was
25  not there.  I assume that they respected the

Page 304

1  rule.
2  BY MR. PACE:
3      Q.  So the rule that you gave to Fulvio
4  Fabiani was don't walk right through the door --
5      A.  Exactly.
6      Q.  -- that goes from Leonardo to J.M.
7  Products, always walk around the building when you
8  are going to go to the J.M. Products?
9          MR. ANNESSER:  Object to form.
10          THE WITNESS:  Correct, and the same
11  symmetrical rule I gave to Jim Bass.  Jim Bass
12  was absolutely forbidden to enter in the area of
13  Leonardo, for any reason.
14  BY MR. PACE:
15      Q.  Right.  He would -- he was to stay on the
16  J.M. Products side?
17      A.  Yes.
18      Q.  Okay.
19      A.  Yes.  So the area that they had in common
20  was the office of Jim Bass that was separated because
21  when you -- as you will see when you will come there,
22  you will see that you enter in the office and there
23  are the offices.
24      Q.  Understood.
25      A.  Then there is a door, you enter through

76  (Pages 301 to 304)

Page 305

1  the door and you are in the J.M. area.
2      Q.   Did J.M. Products pay Fulvio Fabiani for
3  that work or was that -- was that pursuant to what he
4  was already being paid under his USQL contract?
5          MR. LEON DE LA BARRA:  Object to the
6      form.
7  BY MR. PACE:
8      Q.   Let me start that over again.  We have
9  gotten a little away from it.
10     This project you are talking about that
11  Fabiani worked on with Jim Bass, did J.M. Products
12  pay him for working on that project?
13     A.   No.
14     Q.   Is the only compensation he got for
15  working on that project the money he was making under
16  his USQL agreement with Industrial Heat?
17         MR. ANNESSER:  Object to form.
18         MR. LEON DE LA BARRA:  Object to the
19     form.
20         THE WITNESS:  Can you repeat the
21     question?
22  BY MR. PACE:
23     Q.   Yes.  Is the only money that Fabiani was
24  making for working on this project with Jim Bass the
25  payments he was getting from Industrial Heat under

Page 306

1  his USQL agreement?
2      A.   Understood the question.  No, there are
3  two completely separated thing.
4      Q.   What money was Mr. Fabiani being paid for
5  working on that project?
6      A.   He was hoping that once J.M. had
7  consolidated a production they could make a good
8  consulting agreement with Fabiani.  Because
9  Fabiani -- as the professional Fabiani is to make the
10  consultant and he was working exclusive for nobody.
11     So he was working for Industrial Heat,
12  was paid for Industrial Heat to make what he had to
13  make for Industrial Heat.
14     Q.   Okay.
15     A.   But then he was helping Jim Bass, hoping
16  because -- because -- hoping that he could get a good
17  consulting contract with Industrial Heat because
18  Industrial Heat -- the program was from Industrial
19  Heat before the litigation loomed, the prospective
20  was that Industrial Heat had to go ahead with that.
21     Q.   I'm sorry, I missed the very end of that,
22  the prospective --
23     A.   The prospective was that Industrial Heat
24  had not to close on February 2016.  The prospective
25  was to go ahead.

Page 307

1      Q.   Understood.  I have a couple of questions
2  here.  What income tax did Leonardo Corporation
3  either of New Hampshire or of Florida pay in the year
4  2012?
5          MR. ANNESSER:  Object to form.  Hold on
6      one second.  If you know the amount, you can
7      answer.
8          THE WITNESS:  I don't know because all I
9      know of taxes is that my accountants give me the
10     tax report and I don't remember how much I
11     paid.
12         The only thing that I can assure you is
13     that whomever had to pay taxes paid the taxes.
14     So either Andrea Rossi or Leonardo Corporation
15     paid all the taxes that the accountant told them
16     to pay.
17  BY MR. PACE:
18     Q.   Who is the accountant for Leonardo
19  Corporation of New Hampshire taxes in 2012?
20     A.   It was Jim Travis.
21     Q.   Did you talk to Jim Travis to prepare for
22  today's deposition?
23     A.   Can you repeat?
24     Q.   Did you speak with Jim Travis to prepare
25  for today's deposition?

Page 308

1      A.   I don't hear Jim Travis since years.
2      Q.   Same question for Leonardo Corporation of
3  New Hampshire for 2013.
4      A.   Yes.
5      Q.   The person who would have that
6  information is Jim Travis?
7      A.   Yes.
8          MR. ANNESSER:  Object to form.
9  BY MR. PACE:
10     Q.   Does Leonardo Corporation maintain -- let
11  me close out the loop here.  Leonardo Corporation of
12  Florida, the accountant for that company in 2012
13  would have been Jim Travis?
14     A.   I need you repeat the question, sorry.
15     Q.   Was the accountant who prepared any tax
16  returns filed by either Leonardo Corporation of New
17  Hampshire or Leonardo Corporation of Florida --
18     A.   Yes.
19     Q.   -- for the years 2012 or 2013 --
20         MR. ANNESSER:  Object to form.
21  BY MR. PACE:
22     Q.   Who was that -- is there just one
23  accountant who would have filed all those tax returns
24  or multiple accountants?
25     A.   For 2012 was Jim Travis.  2013, I don't

77  (Pages 305 to 308)

Page 309

1  remember if it has been Jim Travis or Jim Travis and
2  the accountant that I had eventually or something
3  like that.  I don't remember.
4        I don't remember exactly if the -- about
5  the 2013 I don't remember.  About 2012 I am sure it
6  was Jim Travis, no question about that.
7        Q.  Who is the current accountant for
8  Leonardo Corporation?  Who handles the tax returns?
9        A.  Ms. Diane Annesser.
10       Q.  Does Leonardo Corporation maintain copies
11 of its tax returns?
12       A.  Can you repeat the question?
13       Q.  Sure.  Does Leonardo Corporation maintain
14 copies of its tax returns?
15       A.  Yes.
16       Q.  Does Leonardo Corporation have the copies
17 or does -- are they in the hands of its accountant or
18 accountants?
19       MR. ANNESSER: Object to form.
20       THE WITNESS: I am not able to answer
21 because something is in the office of Leonardo
22 Corporation, something is in the office of the
23 accountant.
24       Because, you know, in accounting I just
25 do whatever the accountants tell me to do and I

Page 310

1  do it.
2  BY MR. PACE:
3        Q.  Okay.
4        A.  Never happened that they told me to pay a
5  tax and I did not pay for it.  Never happened.
6        You know, I can understand him because
7  when it comes to accounting to get bored is normal.
8        Q.  Ten minutes left.  I have a variety of
9  wrap-up questions.  I may have asked you this before
10 but I am not sure I did, so I want to make sure I got
11 it clear.
12       I know you testified that the E-Cat 1000
13 were the big Frankies?
14       A.  Yes.
15       Q.  The E-Cat 100s are the smaller E-Cat
16 units?
17       MR. ANNESSER: Object to form.
18       THE WITNESS: You know, all this, there
19 is not a precise definition.  Usually, yes, yes,
20 we say the 1000 was the big ones.  I don't
21 remember to have defined 100 maybe.
22       Usually I defined E-Cats by the photo or
23 the smaller units, while the big ones were
24 either big Frankies.  The correct denomination
25 should be 250 E-Cats, because it's the rating.

Page 311

1  BY MR. PACE:
2        Q.  That's how many kilowatts the big Frankie
3  can put out?
4        A.  It's the rating.
5        MR. ANNESSER: Object to form,
6  mischaracterization.
7  BY MR. PACE:
8        Q.  You testified earlier today that there is
9  an ability to regulate the power output of the big
10 Frankie by regulating the amount of electricity or
11 the amount of water that goes into the big Frankie.
12       But am I correct that there is no way --
13 that you didn't have a way of -- let me rephrase
14 this.  That you never attempted to regulate or modify
15 the COP of one of the big Frankies?
16       A.  Can you just either split the question?
17       Q.  Break apart?
18       A.  Yes.
19       Q.  I am trying to separate between power and
20 COP.  You testified earlier today that the amount of
21 power that a big Frankie puts out or an E-Cat unit
22 puts out can be regulated by controlling the amount
23 of water that would go in there or the amount of
24 electricity, correct?
25       A.  Yes.

R

Page 312

1        Q.  Okay.  And then at times at least in
2  connection with some of the big Frankies you would do
3  that, you would regulate the amount of water or
4  electricity going into them.
5        But do I understand correctly that in
6  terms of the COP being created by one of the E-Cat
7  units, you never took any methods to regulate that,
8  to lower that or to increase it above, like you kind
9  of tried to get the best you could, the best COP you
10 could out of each unit all the time; is that
11 correct?
12       MR. ANNESSER: Object to form.
13       THE WITNESS: Yes.
14 BY MR. PACE:
15       Q.  Okay.  I am talking about the difference
16 between the power output.  So you can regulate the
17 power output but you didn't regulate the COP?
18       A.  COP is -- it's still a known harnessed
19 horse.  A known harnessed horse.  To harness.
20       MR. LEON DE LA BARRA:  Harness.
21 BY MR. PACE:
22       Q.  A hard to harness horse?
23       A.  Yes.
24       Q.  Wow.  At the end of a deposition you
25 should try for much easier phrases like hello kitty.

78  (Pages 309 to 312)

Page 313

R

1  It's hard to regulate the COP of an E-Cat?
2      A.  If not impossible.
3      Q.  If not impossible?
4      A.  In good and in bad.
5      Q.  I think my only other questions are
6  during the course of the testing that was being done
7  in Doral, Florida, did you ever change the fuel or
8  charge in any of the E-Cat reactors?
9      A.  I made tests.  I did.
10     Q.  You changed the fuel in some of the
11 reactors?
12     A.  Not changed but made some test, some
13 injections.
14     Q.  I'm not quite sure what that means.  Does
15 that mean you took samples of it or did you make --
16     A.  No, the contrary.  The contrary.  I have
17 injected some materials to make tests, to make
18 experiments.
19     Q.  You have extracted some of the fuel from
20 the E-Cat reactors to run other experiments?
21     MR. ANNESSER:  Object to form.
22     THE WITNESS:  No.
23 BY MR. PACE:
24     Q.  I'm missing it.  I'm sorry.
25     A.  The contrary.  I have injected.  To

Page 314

1  inject, English.
2      MR. LEON DE LA BARRA:  Injected.
3  BY MR. PACE:
4      Q.  Oh, I'm sorry.  I'm sorry.
5      A.  No, I am sorry.
6      Q.  I thought you said enacted.  I'm thinking
7  of the Constitution.
8      MR. ANNESSER:  You don't know what
9  injecting is?
10     THE WITNESS:  Sorry.  My fault.
11 BY MR. PACE:
12     Q.  No, we're two minutes away from being
13 done or one minute away from being done so don't
14 worry about it.  Let's start again.
15     A.  No, injected.  Because in Italian it's
16 iniettare.

R

17     Q.  So iniettare.  You iniettare, you added
18 something into the fuel of some of the E-Cat
19 reactors?
20     A.  To make experiment.
21     MR. ANNESSER:  Object to form.
22     THE WITNESS:  I did to make an
23 experiment, yes.
24 BY MR. PACE:
25     Q.  Were those big Frankie reactors, were

Page 315

1  those the smaller E-Cats?
2      A.  The big Frankies.
3      MR. ANNESSER:  Objection.
4  BY MR. PACE:
5      Q.  When did you do that?
6      A.  Toward -- when -- when I -- when we
7  repaired the fourth reactor, I made this experiment
8  to see if -- just to test the new materials.
9      Q.  I'm trying to figure out how to deal with
10 the new material.
11     Will you either tell me what the new
12 material is or include the new material as an
13 additional disclosure pursuant to the agreement that
14 we've already made on the record?  You can do either
15 one.
16     A.  The second is better.
17     Q.  All right.  So you want to include it in
18 the disclosure.
19     That new material, did it improve the
20 performance of the big Frankie, the fourth big
21 Frankie?
22     A.  I have not the time to see this
23 because -- I had not the time because to know that I
24 would have needed more time.
25     Do not forget that before we decided to

Page 316

1  litigate this -- this plant had to work there at
2  least two years.
3      Q.  Understood.
4      A.  The performance test was 350 days, but --
5  but -- but the -- the term sheet between Industrial
6  Heat and J.M. was of two years.
7      Q.  Understood.
8      A.  Without impossibility to renew it because
9  the program was to go ahead.
10     Q.  And my final question is you testified
11 that the -- that you had the piping removed at the
12 Doral warehouse, the pipe that went from the E-Cat
13 plant over to the J.M. Products side.
14     You testified that -- you had the
15 heat exchanger removed from the J.M. Products side.
16 What other -- what other things have been removed
17 from the warehouse at the Doral location?  I am not
18 talking about adding to.  I am talking about removed
19 from.
20     MR. ANNESSER:  Object to form.
21     THE WITNESS:  What do you mean for Doral
22 location?
23 BY MR. PACE:

AA, R

24     Q.  That you are aware of.  At the warehouse
25 you have already testified that there was piping that

Page 317

1  came from the E-Cat plant over to the J.M. Products
2  plant.  That's been removed, that's been taken
3  down --
4      A.  Correct.
5      Q.  -- and pipes used for another purpose.
6  There are heat exchangers you testified that all
7  that, the heat exchangers, all that piping have been
8  taken down and use for other purposes?
9      A.  Right.
10     Q.  So I am asking what other changes have
11 been made at the Doral warehouse location?
12     MR. ANNESSER:  Object to form and --
13 well --
14     THE WITNESS:  The plant of J.M. has been
15 completely redesigned because now it's destined
16 to do another work.
17     So basically all the material around has
18 been represented, reassembled, cut, welded, et
19 cetera.
20 BY MR. PACE:
21     Q.  How about what you see there in Exhibit
22 21, does that still exist?
23     A.  No.
24     Q.  No.  Do you remember looking before the
25 filter that's in that same container, has that been

Page 318

1  removed?
2      MR. ANNESSER:  Object to form.
3      MR. LEON DE LA BARRA:  Join.
4      THE WITNESS:  No, has been removed.
5  BY MR. PACE:
6      Q.  Any other changes that have been made at
7  the warehouse?
8      MR. ANNESSER:  Object to form.
9      THE WITNESS:  For example, now we are
10 making offices where there was the heat
11 exchanger and we are -- I am -- I think that we
12 will prepare it to become a factory.  Once
13 freed, et cetera, that will be a factory at that
14 the Doral location.
15 BY MR. PACE:
16     Q.  How about any other changes on the
17 Leonardo side of the warehouse?
18     A.  The Leonardo side has not been touched.
19     Q.  Other than the piping being removed?
20     MR. ANNESSER:  Hey, Chris, we're out of
21 time.
22 BY MR. PACE:
23     Q.  Other than the piping being removed?
24     A.  Other than the piping that has been
25 removed because it was property of J.M.

Page 319

1      MR. PACE:  Understood.  No further
2  questions.  I think my time is up.  I appreciate
3  it.
4      THE WITNESS:  Thank you.
5             CROSS EXAMINATION
6  BY MR. ANNESSER:
7      Q.  Okay.  Just on the record I've got two
8  quick questions for you, just to clarify two things.
9      One is you were talking about the big
10 Frankies and I believe you said that they're properly
11 called the 250 unit and Mr. Pace asked is that
12 because they put out 250 kilowatts?
13     Are the big Frankie units capable of
14 putting out more than 250 kilowatts each?
15     A.  Yes.
16     Q.  And then the other thing I wanted to
17 clarify was Mr. Pace was asking you about Mr. Fabiani
18 having to walk out of the Leonardo side and around
19 the building to the J.M. side.  I want to make sure I
20 understand correctly.
21     He asked you whether the purpose of
22 making him walk around was so Barry West would not
23 see you -- or, I'm sorry, would not see Mr. Fabiani
24 go through that door.
25     A.  No, no was not this.  Because I -- no, I

IMP

Page 320

1  did not understand this this way.  I understood that
2  the question was that Fabiani had not to see the area
3  of J.M.
4      Q.  Okay.
5      A.  So I prohibited to Fabiani to go through
6  the door that separated J.M. from Leonardo because I
7  wanted not that Fabiani crossed the space of J.M.
8  This is why.  So I forced -- I demanded
9  him to make the tour there because I wanted not that
10 Fabiani could see inside the area of J.M., as well as
11 I wanted that Jim Bass did not -- could not enter in
12 there in the area of Leonardo.
13     MR. ANNESSER:  Okay.  That's all the
14 questions I have.  I think we're good.
15     MR. PACE:  Could have been a one sentence
16 response if you put him together with your
17 translator.
18     MR. ANNESSER:  We will read.
19     THE VIDEOGRAPHER:  Time is 19:56.
20 Deposition adjourned.  Off the record.
21     (Thereupon the taking of the deposition
22 was concluded.)
23
24
25

80  (Pages 317 to 320)

Page 321

```
 1
 2                    Deponent
 3
 4
 5        Sworn to and subscribed before me this
 6
 7    day of        2017.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 322

```
 1            CERTIFICATE OF OATH
 2
 3    STATE OF FLORIDA:
 4              SS:
 5    COUNTY OF  DADE:
 6
 7
 8        I, the undersigned authority, certify that
 9    ANDREA ROSSI personally appeared before me and was
10    duly sworn.
11        WITNESS my hand and official seal this 6th
12    day of March 2017.
13
14
15            <%signature%>
16         _____
17            Notary Public, State of Florida at
18            Large; my commission expires
19            February 26, 2019. Bonded through
20            Troy Fain Insurance, Inc.
21
22
23
24
25
```

Page 323

```
 1    CERTIFICATE OF REGISTERED PROFESSIONAL REPORTER
 2
 3        I, EDWARD VARKONYI, and Registered
      Professional Reporter and a Notary Public for the
 4    State of Florida at Large, do hereby certify that I
      reported the deposition of ANDREA ROSSI; that the
 5    foregoing pages, numbered from 1 to 320, inclusive,
      constitute a true and correct transcription of my
 6    shorthand report of the deposition by said witness on
      this date.
 7        I further certify that I am not an
      attorney or counsel of any of the parties, nor a
 8    relative or employee of any attorney or counsel
      connected with the action, nor financially interested
 9    in the action.
          WITNESS my hand and official seal in the
10    City of Miami, County of Dade, State of Florida, this
      6th day of March 2017.
11
12
13
14
15            <%signature%>
16         _____
17            Notary Public, State of Florida at
18            Large; my commission expires
19            February 26, 2019.  Bonded through
20            Troy Fain Insurance, Inc.
21
22
23
24
25
```

Page 324

```
 1    _____, 2017
 2
 3
 4
      JOHN W. ANNESSER, ESQ.,
 5    Perlman Bajandas Yevoli & Albright, P.L.
      283 Catalonia Avenue, Suite 200
 6    Coral Gables, Florida 33134
 7
      RE: Rossi v. Darden
 8
      Dear Mr. Annesser,
 9
      With reference to the deposition of Andrea Rossi
10    taken on February 24, 2017 in connection with the
      above-captioned case, please be advised that the
11    transcript of the deposition has been completed
      and is awaiting signature.
12
      Please arrange to have the deponent stop by our
13    office at Two South Biscayne Boulevard, Suite
      2250, Miami, Florida, for the purpose of reading
14    and signing the transcript.
15    If this is not taken care of, however, within the
      next 30 days, we shall conclude that the reading
16    and signing of the deposition has been waived and
      shall then process the original of the transcript
17    for filing with the Clerk of the Court by counsel
      without further notice.
18
      Sincerely,
19
20
      Edward Varkonyi,
21    Registered Merit Reporter
22
23
24
25
```

81  (Pages 321 to 324)

```
                                          Page 325
  1              ERRATA SHEET
  2    RE   : Rossi v. Darden
       DEPO OF: Leonardo Corporation/Andrea Rossi
  3    TAKEN : 2/24/16
       ASSG# : 2534814
  4      DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
  5    Page #   Line #  Change              Reason
  6    _____  _____  _____  _____
  7    _____  _____  _____  _____
  8    _____  _____  _____  _____
  9    _____  _____  _____  _____
 10    _____  _____  _____  _____
 11    _____  _____  _____  _____
 12    _____  _____  _____  _____
 13    _____  _____  _____  _____
 14    _____  _____  _____  _____
 15    _____  _____  _____  _____
 16    _____  _____  _____  _____
 17    _____  _____  _____  _____
 18    _____  _____  _____  _____
 19    _____  _____  _____  _____
 20    _____  _____  _____  _____
 21    State of Florida)
       County of    )
 22
       Under penalties of perjury, I declare that I have
 23    read my deposition transcript, and it is true and
       correct subject to any changes in form or substance
 24    entered here.
       _____  _____
 25    Date      Signature
```

**Veritext Florida Reporting Co.**

800-726-7007                                                    305-376-8800